IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| -vs- | : | CASE NO. 2:11-CR-010 (1) |
| SEAN MURPHY, | : | JUDGE SMITH |
| Defendant. | : | |

## MOTION TO SUPPRESS EVIDENCE

Now comes Defendant, Sean Murphy, by and through his attorney, David J. Graeff, and respectfully moves to suppress from the use in evidence anything recovered as a result of a search and seizure at 407 Walnut Street, Lynn, Massachusetts on January 23, 2009. A copy of the Search Warrant and Affidavit are attached hereto. [Attachment].

As reasons therefore, the application for the Search Warrant (1) contains material misstatements of fact; (2) the Affiant omitted material information from the Affidavit; (3) there was a lack of corroboration on information received; (4) the Affidavit contained excessively stale information; (5) there was no nexus between the items sought and criminal activity associated to those items; (6) the officer used the search for business-related records as a pretext to search for other evidence; and (7) the officers searched beyond the scope of the Search Warrant.

WHEREFORE, the Defendant moves the items seized, to-wit:

1. Any and all evidence listed on the Search Warrant return.

2. All observations made and information obtained by the officers and agents as a result of the search.

Be suppressed from entry into evidence and use of any kind in this or any other proceedings.

Respectfully submitted,

  s/David J. Graeff
David J. Graeff  #0020647
P.O. Box 1948
Westerville, Ohio  43086
Phone:  (614) 226-5991
Trial Counsel for Defendant
Sean Murphy

MEMORANDUM OF LAW
MOTION TO SUPPRESS

OVERVIEW

On January 23, 2009, Federal, State, and local authorities executed a series of Search Warrants at Defendant Sean Murphy's home at 407 Walnut Street, Lynn, MA; at his moving storage warehouse; and on his vehicle. For the purposes of this Motion, Murphy will only focus on the search of his home.

The Massachusetts State Police and Boston FBI had been investigating Murphy for several months prior to the January 23, 2009 search. In December 2008 and January 2009, at least four (4) local criminals were interviewed by authorities. All of the individuals interviewed gave false information implicating Murphy in crimes which could not be corroborated. Other information received by authorities which could be corroborated was excessively stale or was double hearsay at best.

On January 15, 2009, the Affiant, Lt. Alan Zani, interviewed a Jordayne Hartman at Woburn District Court where she was appearing on a felony Burglary charge unrelated to Murphy. Hartman made several incriminating statements against Murphy which formed the bases of issuing the Search Warrant.

Unfortunately, Jordayne Hartman lied a minimum of seventeen (17) times in her statement regarding Murphy. The information police tried to corroborate from Hartman did not conform to information received from the victim, E.A. Dion Company and the Affiant failed to include that information in the Affidavit.

The Search Warrant authorized the search for business-related records only. Murphy was granted a "Home Office" permit from the City of Lynn to conduct business from one room in his home. On January 23, 2009, nineteen (19) law enforcement personnel entered Murphy's small one-family home to search for these business-related records. Police and agents searched every room, closet, bureau, drawer and piece of clothing on the first floor, second floor, basement, and detached shed, including seizing two home computers. The officers were clearly searching for evidence other than business-related records the Search Warrant authorized. The totality of the circumstances support the basis for a pretextual search. There was no nexus between the business-related records sought and any criminal activity associated with those records in the Affidavit.

<u>MATERIAL MISSTATEMENTS</u>

When the Defendant makes a substantial showing that a false statement knowingly and intentionally or with reckless disregard for the truth, was included by the

Affiant in the Warrant Affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires a hearing will be held at the Defendant's request.  Franks v. Delaware, 438 U.S. 154, 155-156 (178).

"Reckless disregard" can be established by evidence that the officer acted "with a high degree of awareness of [a statement's] probably falsity," that is, "when viewing all the evidence, the Affiant must have entertained serious doubts as to the truth of the statement or had obvious reasons to doubt the accuracy of the information reported." Wilson v. Russo, 212 F.3d 781, 788 (3rd Cir. 2000); see also, Forest v. Pawtucket Police Dept., 377 F.3d 52, 58 (1st Cir. 2004).  Here, the Affiant either knew or should have known several informants provided false information that he included in the Affidavit in support of the Search Warrant.

Jordayne Hartman Statement

On January 15, 2009, Jordayne Hartman met with State and Federal authorities at Woburn District Court where she was appearing for a Felony Burglary charge unrelated to Defendant Sean Murphy.  Ms. Hartman was seeking favor from the State Police and FBI in return for the information she was providing against Murphy.  Hartman's Co-Defendant, Brian Stevens, pled guilty to the Woburn charges and was sentenced to jail. However, Hartman's charges, along with another case in Malden District Court, were dismissed by request of the District Attorney.

The five (5) page statement Hartman provided on January 15, 2009, was riddled with misstatements, falsities and outright lies (Exhibit 1).  Murphy alleges the statement is so infected with inaccurate information, that the entire statement must be disregarded

when determining whether probable cause exists in the Affidavit as a whole.

Murphy will address each of Jordayne Hartman's misstatements as they appear in her statement:

[A = Hartman's misstatement]   [a = Murphy's reply]

A. Hartman described a cellular jammer she allegedly saw in Murphy's warehouse as having a dial on the front along with several gauges or meters and several switches. (Statement, pg. 3).

a. No cellular jammer (in existence) even remotely fits the description Hartman gave to authorities of the cellular jammer she alleged observed. None of the five (5) cellular jammers police seized from this investigation fit that description.

B. Hartman claimed that Murphy had to replace a "switch" on the cellular jammer. (Statement, pg. 3).

b. One month later Hartman appeared before the Grand Jury and testified that a "dial" had to be replaced.

C. Hartman stated the single part (switch/dial) cost Murphy $7,000. (Statement, pg. 3).

c. At the Grand Jury she testified that the dial cost $8,000. It is important to note, that the entire cellular jammer costs $3,130.

D. Hartman stated that a member of the burglary crew was a moving company employee named "Jose" Last Name Unknown. (Statement, pg. 3).

d. Authorities determined this to be a false statement after investigation.

E. Hartman stated Murphy's moving company would provide some limited moving services to make the company look legitimate. (Statement, pg. 3).

e. Moving company General Manager Andrea LeBlanc testified at the Grand Jury that the moving company performed 400-500 moving jobs in the year she ran the company and she believed the moving company to be totally legitimate. (Exhibit 2, pgs. 12 and 25).

F.  Hartman stated that the equipment she was allegedly shown at the moving warehouse was concealed by property being moved or stored. (Statement, pg. 3).

f.  Upon execution of the Search Warrant, police never found any of the items Hartman described or allegedly to be in the moving warehouse.

G.  Hartman stated that the inner door to the moving warehouse was secured with multiple deadbolts. (Statement, pg. 4).

g.  The inner door to the moving warehouse was only secured with a center handle lock.

H.  Hartman stated that the inner door to the moving warehouse had an electronic key card reader. (Statement, pg. 4).

h.  There is no electronic key card device on the inner door or anywhere in the entire building.

I.  Hartman stated that she left for the weekend and when she returned the bed was covered with jewelry and gold bars. (Statement, pg. 4).

i.  At the Grand Jury when asked to describe the gold bars, Hartman admitted to never seeing any gold bars. It is important to note, no gold bars were stolen from E.A. Dion.

J.  Hartman stated Murphy gave her a gold ring with a Red Ruby bearing the Radio Shack logo. (Statement, pg. 4).

j.  No such ring was manufactured by E.A. Dion nor was one stolen from E.A. Dion. There were no Radio Shack items (at all) listed as items stolen that the Affiant attached to the Affidavit. Hartman could not provide authorities with any items Murphy allegedly gave to her.

K.  Hartman stated the burglary occurred in Pennsylvania. (Statement, pg. 4).

k.  E.A. Dion is located in Attleboro, Massachusetts.

L.  Hartman stated the burglary occurred in July 2008. (Statement, pg. 4).

l.  E.A. Dion was broken into on June 8, 2008. After reading about the break in the newspaper after Murphy's arrest, Hartman stated that the

-6-

break in occurred in the first week of June, at the Grand Jury. (Exhibit 2).

M. Hartman stated Murphy gave Rikkile Brown $1,000,000.00 worth of jewelry to hide at Rikkile's grandmother's house. (Statement, pg. 4).

m. At the Grand Jury, Hartman now claims it was @ $40,000.00 worth of jewelry. No jewelry was found at Rikkile's grandmother's house pursuant to a Search Warrant.

N. Hartman said she and Rikkile left Murphy's house with two (2) backpacks full of jewelry. (Statement, pg. 4).

n. At the Grand Jury, Hartman stated it was one (1) background full of jewelry.

O. Hartman claimed to have seen 12 Superbowl rings. She did not describe the rings. (Statement, pg. 4).

o. At the Grand Jury, Hartman now claims up to 16 Superbowl rings and described the rings as not being complete and bearing the name "New York Giants" on <u>all</u> the rings. (Exhibit 3). It is important to note that 95% of the 27 Superbowl rings seized were complete with all diamonds mounted. Also, only one (1) ring said New York Giants on it. It was a prototype manufactured by E.A. Dion, but not selected by the NFL. 99% of the Superbowl Rings only said "World Champions." (Exhibit 6).

P. Hartman stated Murphy identified himself as "Frank" when dealing with the New Hampshire truck rental company. (Statement, pg. 5).

p. Murphy was identified by the New Hampshire truck rental company as Brian Heatherman. (Exhibit 4).

Q. Hartman stated Murphy has a fake Massachusetts license in the name of "Patrick" Last Name Unknown. (Statement, pg. 5).

q. Authorities discovered no evidence that Murphy ever possessed a fake Massachusetts license in the name "Patrick" LNU.

Frank Senibaldi Statement

On December 18, 2008, Sgt. Tim Cassidy met with a person that wished to remain anonymous. This anonymous informant told Sgt. Cassidy that Sean Murphy was active breaking into pharmacies and ATM's in the area. (Exhibit 5).

On the same date, Lt. Alan Zani wrote a report identifying the person Sgt. Cassidy spoke to as Frank Senibaldi.

Senibaldi did not claim to have committed any crimes with Murphy nor did Senibaldi claim to have even spoken to Murphy. No identifiable pharmacies or ATM's were named by Senibaldi. The police did not corroborate any of the information provided by Senibaldi, nor did they claim Senibaldi to be a "reliable informant" who had been used in the past.

Senibaldi also said Murphy purchased a jamming device from Russia. Police knew Murphy purchased his jamming devices from England in the United Kingdom.

Thomas Enquist Statement

On January 14, 2009, the Affiant, Lt. Alan Zani, met with a Thomas Enquist. During the interview, Enquist stated he had not seen Sean Murphy since 1984. Enquist stated that Murphy had broken into a bicycle shop in Saugus, Massachusetts in 1984. (Exhibit 6). Enquist also stated he had only seen John Fleury one time in the past year and a half.

All of the information Enquist provided to the Affiant was false and the Affiant had a high degree of awareness to its falsity. Police did not corroborate whether a bicycle shop in Saugus was ever burglarized in 1984. A fact easily determined.

In short, the Affiant attached Enquist's statement to the Affidavit knowing the information to be untrue.

MATERIAL OMISSIONS

With respect to omissions from the Affidavit, "reckless disregard" can be established by evidence that police "failed to inform the judicial officer of facts [he] knew would negate probable cause." Beauchamp v. City of Noblesville, Inc., 320 F.3d 733, 743 (7th Cir. 2003); Wilson, 212 F.3d at 788.

On January 20, 2009, two days prior to applying for the Search Warrant, the Affiant appeared at a meeting in the Boston FBI office to discuss the Murphy case. At that meeting, SA Cabral of the FBI stated that he spoke to Dennis Dion of the E.A. Dion Company to attempt to verify the information that Jordayne Hartman provided. (Exhibit 11). The Affiant did not include this information in this Affidavit. It is Murphy's contention that this material information was omitted because Hartman claimed to have seen gold bars when none were stolen from E.A. Dion. Hartman also claimed to have received a gold ring with the red ruby bearing the Radio Shack logo, when no such ring existed. Dennis Dion surely would have told this to SA Cabral, which would have dispelled Hartman's statement.

Therefore, this material omission amounts to "reckless disregard."

The Affiant also knew information obtained by Frank Senibaldi and Thomas Enquist to be false and did not inform the judicial officer of those facts.

LACK OF CORROBORATION

Uncorroborated information received by police does not provide probable cause. U.S. v. Monteiro, 447 F.3d 39 (1st Cir. 2006); U.S. v. Hammond, 351 F.3d 765 (6th Cir. 2003); U.S. v. Williams, 224 F.3d 530 (6th Cir. 2000); U.S. v. Leake, 998 F.2d 1359 (6th Cir. 1993).

Here, much of the information Jordayne Hartman provided would have been easily corroborated by police. However, the Affiant failed or neglected to do the necessary police work. Murphy suspects that police were so anxious to obtain their Search Warrant that they rushed to the judicial officer without properly investigating the information received by obvious liars. Since this was a protracted investigation, the additional time needed to corroborate facts would have been negligible and the sought after business-related records would still have been at Murphy's Home Office at a later date.

There was also a lack of corroboration on information received from Frank Senibaldi and Thomas Enquist. This simply amounts to poor police work.

STALENESS

Staleness may negate the finding of probable cause. U.S. v. Thomas, 757 F.2d 1359, 1367-68 (2nd Cir. 1989).

In the case at bar, police attached a statement from an Anthony Cataldo that occurred on February 20, 2007, almost two years prior to the instant Search Warrant. The information received from Cataldo referred to a 2006 burglary. Additionally, the

information received from Cataldo allegedly came from a John Fleury and not from Murphy, which makes it double-hearsay at best. (Exhibit 7).

Taking the extreme staleness of the information into consideration, along with the obvious hearsay implications and the fact that Cataldo was seeking favor from authorities for providing the information, the Cataldo statement should not be considered in the Court's determination of probable cause.

In addition to the Cataldo statement and information being excessive stale in the Affidavit in support of the Search Warrant, the only incriminating information that Thomas Enquist mentioned in his statement to police was an uncorroborated break in into a Saugus, Massachusetts bicycle shop that allegedly occurred 25 years prior in 1984. All the information received from Jordayne Hartman was seven (7) months old or more and the Frank Senibaldi statement contained no dates of crimes because the crimes he mentioned were fictitious.

NEXUS

There must be sufficient nexus between the places and items to be searched and some sort of criminal activity associated to those items. See, U.S. v. Williams, 544 F.3d 683 (6th Cir. 2008).

In this instance, there must be a nexus between the sought after business-related records and some sort of criminal activity associated to those records. Unfortunately, the Affidavit is devoid of any information alleging that Northshore Movers of Lynn or Angel One Corporation was involved in any criminal activity that the business-related records would reveal.

Therefore, a sufficient nexus has not been established to authorize the search of the business records. It is apparent that police were on a "fishing expedition." Police should have employed the preferred method of subpoena for the business records.

PRETEXTUAL SEARCH

Here, it is abundantly clear that the officers and agents were searching for information and evidence not authorized by the Search Warrant. The Affiant used the search for business-related records as a "pretext" to search for evidence of crimes police had Murphy under investigation for. The "totality of the circumstances" support the contention of a pretextual search. First, there was no need to bring 19 searching officers and agents to Murphy's small one-family home to search for business-related records for a small business that was restricted to one or possibly two rooms. Second, based on where the officers searched and what they seized established their intent and objective. Third, the pretextual search is further evidenced by the officers entering the home with pistols drawn and then handcuffing Sean Murphy for the entire search (in his underwear only) claiming he was the target of a major investigation. The other four persons in the house were not detained.

BEYOND THE SCOPE OF THE WARRANT

Searching beyond the scope of the Search Warrant violates the Fourth Amendment; police cannot broaden the scope of a warrant. U.S. v. Hill, 10 F.3d 984 (5th Cir. 1994); U.S. v. Nelson, 36 F.3d 758 (8th Cir. 1994). In some instances, officers

cannot search every part of the building. U.S. v. Whitney, 633 F.2d 902, 907 (9th Cir. 1980); U.S. v. Medlin, 842 F.2d 1194 (10th Cir. 1988).

In the case at bar, a search warrant was issued for business-related records only. The City of Lynn authorized Murphy to use no more than two rooms (one for each business) in his home to conduct business from. (Exhibit 13). Murphy only needed one room and that is where all the business-related records were kept.

Authorities brought 19 officers and/or agents to search a small one-family home. They searched every inch of every room, closet, bureau, drawer, and piece of clothing on the first floor, second floor, basement, detached shed and under the front porch.

Based on the fact that the Affiant attached the restrictions of Murphy's home office to the Affidavit in Support of the Search Warrant, police were aware that the search for business-related records would be located in only one or possibly two rooms. The officers and agents clearly exceeded the scope of the search warrant. Although there are many items subject to suppression from the residence, Murphy is referring to three specific items. First, two Massachusetts licenses bearing Murphy's picture were found in a clothing closet containing no business records, in the dining room, on the back row of a two row hanger bar, in the inside pocket of a dungaree jacket. There can be no legitimate explanation for why the officers searched this area for business-related records. Second, a half-moon series key was found and seized in Murphy's sock drawer in his bedroom. This item was not authorized to be seized and no other subsequent search warrant issued authorized its seizure, nor was documented on any return of the Search Warrant. Third, an agent observed a Carnival Cruise guest folio in the dining room. The folio was not

seized. However, the agent wrote a report relating to information on the folio. This report was provided in discovery. Murphy requests that all four items be suppressed as "beyond the scope" violations.

Furthermore, the search warrant authorized the search of computers for the business-related records. However, the "keyword search terms" that the Attorney General's Office, Cyber Crime Division, Computer Forensics Laboratory used to search the computers were certainly not business-related records terms for Northshore Movers of Lynn or Angel One Corporation. (Exhibit 8).

In conclusion, the Computer Forensics Laboratory searched the computers for information not authorized by the Search Warrant.

## CONCLUSION

For all of the above-stated reasons, the Defendant respectfully requests this Honorable Court to ALLOW the Motion to Suppress Evidence.

    Respectfully submitted,

    _s/David J. Graeff_____
    David J. Graeff  #0020647
    P.O. Box 1948
    Westerville, Ohio  43086
    Phone:  (614) 226-5991
    Trial Counsel for Defendant
    Sean Murphy

CERTIFICATE OF SERVICE

 I hereby certify that a true copy of the foregoing was delivered to Salvador A. Dominguez, Assistant United States Attorney. 303 Marconi Boulevard, Suite 200, Columbus, Ohio 43215, this __6th__ day of ___October___, 2011.

             _s/David J. Graeff_
             David J. Graeff  #0020647
             Trial Counsel for Defendant
             Sean Murphy