# SEARCH WARRANT

G.L. c. 276, § § 1-7

| TRIAL COURT OF MASSACHUSETTS | |
|---|---|
| Salem Superior | **COURT DEPARTMENT DIVSION** |
| SEARCH WARRANT DOCKET NUMBER | |

**TO THE SHERIFFS OF OUR SEVERAL COUNTIES OR THEIR DEPUTIES, ANY STATE POLICE OFFICER, OR ANY CONSTABLE OR POLICE OFFICER OF ANY CITY OR TOWN, WITHIN OUR COMMONWEALTH:**

Proof by affidavit, which is hereby incorporated by reference, has been made this day and I find that there is **PROBABLE CAUSE** to believe that the property described below:

| | |
|---|---|
| | *has been stolen, embezzled, or obtained by false pretenses.* |
| X | *is intended for use or has been used as the means of committing a crime.* |
| X | *has been concealed to prevent a crime from being discovered.* |
| | *is unlawfully possessed or concealed for an unlawful purpose.* |
| X | *is evidence of a crime or is evidence of criminal activity.* |
| | *other (specify):* |

**YOU ARE THEREFORE COMMANDED,** within a reasonable time and in no event later than seven days from the issuance of this search warrant to search for the following property:
Employee personel records and business records of North Shore Movers and Angel One Security. In addition the records are to include but not limited to financial records, contracts, advertisements, payroll, and tax documents. The records will include both computer generated and encased records and non-computer generated and encased records.

| X | *at (Identify the exact location or description of the place(s) to be searched):* |
|---|---|

407 Walnut Street, Lynn MA a two story single family white colored dwelling with green shutters. The number 407 is affixed over the front door.

*which is occupied by and/or in the possession of:*
Sean Murphy dob:7/19/64

| X | *on the person or in the possession of (identify any specific person(s) to be searched):* |
|---|---|

Sean Murphy dob 7/19/64

| You | ☐ are | ☒ are not | also authorized to conduct the search at any time during the night. |
|---|---|---|---|
| You | ☐ are | ☒ are not | also authorized to enter the premises without announcement. |
| You | ☒ are | ☐ are not | also commanded to search any person present who may be found to have such property in his or her possession or under his or her control or to whom such property may have been delivered. |

**YOUR ARE FURTHER COMMANDED** if you find such property or any part thereof, to bring it, and when appropriate, the persons in whose possession it is found before the

_Lynn_ Division of the _District_ Court Department.

| DATE ISSUED | SIGNATURE OF JUSTICE, ~~CLERK-MAGISTRATE OR ASSISTANT CLERK~~ |
|---|---|
| 1/22/09 | x _John T Ly_ |
| FIRST OR ADMINISTRATIVE JUSTICE | PRINTED NAME OF JUSTICE, ~~CLERK-MAGISTRATE OR ASSISTANT CLERK~~ |
| WITNESS: _Barbara J. Rouse_ | _John T. Ly_ |

407 #1

# ...VING SEARCH WARRANT

...ibly possible after its issuance, and in any case may not be validly
...xecuting officer must file his or her return with the court named in the
...lled. G.L. c. 276, §3A.

...his search warrant was issued on ___January 23, 2009___, and I have executed it as follows:

The following is an inventory of the property taken pursuant to this search warrant:

| | |
|---|---|
| 1. | (1) 3.5" computer disk |
| 2. | (1) Lawyers diary |
| 3. | Financial documents North Shore Movers |
| 4. | Financial documents Angel One |
| 5. | Financial documents Sean Murphy |
| 6. | US Postal money order receipts |
| 7. | (1) Hewlett Packard desktop computer tower model M7000 (serial #: MXX6480VRH) |
| 8. | (1) Hewlett Packard desktop computer tower model M7470n (serial #: CNN6120HND) |
| 9. | |
| 10. | |
| 11. | |
| 12 | |
| 13. | |
| 14. | |
| 15. | |
| 16. | |
| 17. | |
| 18. | |
| 19. | |
| 20. | |

(attach additional pages as necessary)

This inventory was made in the presence of:
Trooper Steven R. Wohlgemuth #2942

I swear that this inventory is a true and detailed account of all the property taken by me on this search warrant.

| SIGNATURE OF PERSON MAKING SEARCH | DATE AND TIME OF SEARCH | SWORN AND SUBSCRIBED TO BEFORE |
|---|---|---|
| X _____ | 12/23/2009 at 6:15 AM | X _____ |
| | | Signature Of Justice, Clerk-Magistrate Or Assitant Clerk |
| PRINTED NAME OF PERSON MAKING SEARCH | TITLE OF PERSON MAKING SEARCH | DATE SWORN AND SUBSCRIBED TO |
| Lt. Alan C. Zani | Lieutenant, MA State Police | 1·29·09 |

| APPLICATION FOR SEARCH WARRANT<br>G.L. c. 276, § § 1-7 | TRIAL COURT OF MASSACHUSETTS |
|---|---|
| NAME OF APPLICANT<br>Alan C. Zani | Salem Superior     COURT DEPARTMENT<br>                   DIVISION |
| POSITION OF APPLICANT<br>MA State Police Lieutenant | SEARCH WARRANT DOCKET NUMBER |

I, the undersigned APPLICANT, being duly sworn, depose and say that:

1. I have the following information based upon the attached affidavit(s), consisting of a total of 10 pages, which is (are) incorporated herein by reference. *and Attachments A Through X.*

2. Based upon this information, there is PROBABLE CAUSE to believe that the property decribed below:

       has been stolen, embezzled, or obtained by false pretenses.

   [X] is intended for use or has been used as the means of committing a crime.

   [X] has been concealed to prevent a crime from being discovered.

       is unlawfully possessed or concealed for an unlawful purpose.

   [X] is evidence of a crime or is evidence of criminal activity.

       other (specify):

3. I am seeking the issuance of a warrant to search for the following property (*describe the property to be searched for as particularly as possible*):
   Employee personel records and business records of North Shore Movers and Angel One Security. In addition the records are to include but not limited to financial records, contracts, advertisements, payroll, and tax documents. The records will include both computer generated and encased records and non-computer gemerated and encased records.

4. Based upon this information, there is also probable cause to believe that the property may be found (*check as many as apply*):

   [X] at (identify the exact location or description of the place(s) to be searched):
   407 Walnut Street, Lynn MA a two story single family white colored dwelling with green shutters. The number 407 is affixed over the front door.

   which is occupied by and/or in the possession of:
   Sean Murphy dob:7/19/64

   [X] on the person or in the possession of (identify any specific person(s) to be searched):
   Sean Murphy dob 7/19/64

   [X] on any person present who may be found to have such property in his or her possession or under his or her control or to whom such property may have been delivered.

THEREFORE, I respectfully request that the court issue a Warrant and order of seizure, authorizing the search of the above described place(s) and person(s), if any, to be searched, and directing that such property or evidence or any part thereof, if found, be seized and brought before the court, together with such other and further relief that the court may deem proper.

I   [ ] have previously submitted the same application.

I   [X] have **not** previously submitted the same application.

| PRINTED NAME OF APPLICANT<br>LT. ALAN C. ZANI | SIGNED UNDER THE PENALTIES OF PERJURY<br>X _____<br>                 Signature of Applicant |
| SWORN AND SUBSCRIBED TO BEFORE ME<br>John Tlu<br>    Signature of Justice, Clerk-Magistrate or Assistant Clerk<br>       (John T. Lu) | 1/22/09<br>            Date |

### COMMONWEALTH OF MASSACHUSETTS

### AFFIDAVIT IN SUPPORT OF APPLICATION FOR A SEARCH WARRANT

1. I, Alan C. Zani, being duly sworn, depose and say:

2. I have been a Massachusetts State Police (MSP) Officer since 12/06/85. In August of 1989, I was reassigned from the MSP Field Division to the Essex County District Attorney's Drug Task Force (ECDTF) (based in Lynn and Lawrence). In June of 1997, I was promoted to the rank of Sergeant and remained in the ECDTF. In January of 2004, I was promoted to the rank of Lieutenant and was assigned as a Shift Commander in the MSP Field Division. In July and October of 2004, I commanded a Public Order Platoon during the Democratic National Convention and Red Sox Playoff Series in Boston. In November of 2004, I was assigned to the MSP Special Services Unit/FBI Bank Robbery/Violent Crimes Task Force (BRVCTF). In March of 2007, I was placed in charge of the Suffolk County District Attorney's Narcotics Unit. In June 0f 2008, I returned to supervise the state police assigned to the Bank Robbery Task Force. During my MSP career, I have participated in numerous investigations involving use and distribution of Controlled Substances, assaults, larcenies, kidnapping, extortion, firearms violations, armed and unarmed robberies, prostitution and crimes against persons. I have received the following specialized training: Investigation of Controlled Substance Use and Distribution (40 hour course, while attending the MSP Academy), Highway Drug Interdiction (03/88, 24 hour course), Basic Narcotics Investigation (10/89, 40 hour course), Advanced Narcotics Investigation (04/90, 32 hour course), DEA Sponsored Domestic Cannabis Eradication (at Westover and Otis A.F.B., 08/90 and 08/91, both 40 hours courses), Concealed Compartments training (03/00, 8 hour course), NENEOA sponsored Multi-jurisdictional Narcotics Task Force Management and Operations (09/98, 32 hour course), Hidden Compartment training (05/01, 16 hour course), Undercover Tactical Pistol training (MSP Academy, 09/02, 16 hour course), NENEOA sponsored Drug Investigation training (11/02 8 hour course), FBI

Street Survival Awareness (FBI Academy, 02/06, 32 hour course), and Street Crimes Investigations (09/07, 24 hour course, sponsored by John E. Reid and Associates), FBI Sponsored Undercover Training (as an observer, one week course, 10/07). I have attended various seminars/workshops concerning narcotics enforcement and have been recognized in the U.S. Federal District, Essex and Middlesex Superior and District Courts repeatedly as an expert witness in the area involving Controlled Substance use and distribution. While assigned to the ECDTF and BRVCTF, I have participated in all types of electronic audio and video surveillances used in apprehending felons and drug traffickers and am familiar with the laws regulating these methods.

3. I respectfully suggest that the following information contained in paragraphs 7-16 will establish that Sean Murphy is a career criminal, living at 407 Walnut St. in Lynn, owner of North Shore Movers, 725R Summer St., Lynn, MA, and owner of a black, 2007 Jeep Grand Cherokee bearing MA Registration 43VK43. Paragraphs 17-19 will also establish Rikkile Brown, 04/22/87 date of birth, as being Murphy's past and/or present girlfriend, who is a conspirator in Murphy's pill/stolen property distribution, who lives at 1 Silver Leaf Way, Apt. 127, Peabody, MA, and the owner of a 2002 black Mercedes ML320 bearing MA registration NE67DT.

4. Paragraphs 20-22 will summarize two commercial breaks taking place at the Amerisource Bergen Corporation, on 11/05/06, and at the E.A. Dion Company, on 06/08/08.

5. Paragraph 23 will detail Murphy and Brown's involvement in commercial breaks, including, but not necessarily limited to, the 06/08/08 E.A. Dion break, and details locations where the two maintain related paraphernalia. More specifically, paragraph 23 will detail how Murphy was involved, if not being the ringleader of, at the very least, the E.A. Dion burglary and how there is probable cause to believe that Murphy and Brown are in possession of property stolen from this and other breaks, profits derived from this and other breaks, records (some computer generated) related to and identifying conspirators

in these breaks, burglarious equipment used in these and/or other breaks, and illicitly possessed Controlled Substances, including, but not limited to Heroin, a Class "A" Controlled Substance, and Marijuana, a Class "D" Controlled Substance, both earmarked for distribution.

6. Paragraph 36 and 37 will describe the locations and person requested to be searched.

7. Sean D. Murphy (Murphy), 07/19/64 date of birth, of 407 Walnut Street, Lynn, MA, is a career criminal. More specifically, and besides displaying an ongoing pattern of drug distribution throughout his criminal career, Murphy is an accomplished commercial breaker, breaking into high end commercial establishments and burglarizing them of their assets. Offered in support of these assertions are the following; A copy of Murphy's Massachusetts Driver's License information (Attachment A); Murphy's Massachusetts Criminal History (BOP), affixed as Attachment B; Murphy's multi - state criminal history (III), which includes some, but not necessarily all, of Murphy's out of state criminal arraignments and convictions (affixed as Attachment C); an FBI interview report (302), affixed as Attachment D, written by this writer, which reflects a 01/14/09 interview of Thomas Enquist by FBI Special Agent Jason Costello (who is also assigned to the FBI's BRVCTF) and me. Noteworthy in the interview is that Enquist recalled a 1984 Saugus bicycle store robbery Murphy had committed; a 12/18/08 Interview Report (Attachment E) completed by Swampscott Police Detective Sergeant Timothy Cassidy and implicating Murphy in recent ATM breaks; a 09/25/06 letter Murphy sent to Costco Management in the State of Washington (Attachment F). Noteworthy in the letter is Murphy's admission of having committed burglaries on Costco warehouses. Although Costco delivered the letter to the FBI, the company chose not to be involved in any further criminal investigation.

8. This Costco solicitation/letter was later connected to a 10/17/04 Costco Wholesale Warehouse, Montgomery Township, PA, burglary, where a cell phone jammer (a device used to jam/interfere with local cellular transmissions, utilized by high end burglars to

defeat alarm system cellular phone alert backups)
was used and entry was gained through the ceiling.
Murphy was eventually charged with this burglary and
later convicted (on 06/03/08) on charges related to
the burglary.  Noteworthy is that during plea
bargain negotiations, Murphy offered, for a fee, to
train law enforcement regarding his knowledge of
commercial breaks. (Montgomery Township Police
report relating to this investigation is affixed as
Attachment X)

9.  FBI S/A Costello's 01/19/09 computer query of the
Massachusetts Movers Association lists North Shore
Movers of Lynn as having an address of 407 Walnut
St., Lynn, MA.  Sean Murphy is the listed contact,
and the contact number is (781) 599-0036 (Attachment
M).  Noteworthy is that this number is the same as
being the contact number listed on the Costco
solicitation letter.

10.  FBI S/A Costello's further computer inquiry revealed
North Shore Movers website, which lists 407 Walnut
St., Lynn, MA as the business address and 725R
Summer St., Lynn, MA, as the warehouse location
(Attachment N).

11.  On 10/30/06, Sean Murphy successfully petitioned the
City of Lynn Zoning Board of Appeals to list 407
Walnut St. for the "Home Occupation of Office for
Moving Company and Security Consultant Business"
(Attachment O).

12.  On Friday, 01/02/09, FBI Costello and I observed
Sean Murphy being driven away from 407 Walnut St.
S/A Costello later observed Murphy and his companion
at 725R Summer St.  Affixed as Attachment Q is S/A
Costello's report (302) reflecting these and other
observations.

13.  Noteworthy besides Murphy's criminal convictions, is
that Murphy's license data, BOP and III (on page C-
11) all list Murphy's residence as being 407 Walnut
St. in Lynn, MA.  In further support of this
location being Murphy's residence is that, on an
occasion during the week of 01/04/09, FBI Special
Agent Jason Costello and I walked to the rear door
of 407 Walnut St. and knocked on the door.  We

received no response, but I noted a sign, which read "The Murphy's," hung over the outer door. Also noted during this visit and previous recent surveillances was a sign, advertising "North Shore Movers," affixed to a tree in the front yard.

14. Also noteworthy on page C-11 of Murphy's III is "North Shore Movers of Lynn 407 Walnut St., Lynn," as being listed as Murphy's employer.

15. Noteworthy, too, is that, on page B-1 of Murphy's BOP, is an expired Restraining Order, listing a Rikkile Brown as the Plaintiff.

16. On repeated occasions during the months of November and December of 2008 and January 2009, FBI S/A Costello and I have either driven past 407 Walnut St. in Lynn and/or 725R Summer St. in Lynn (the business warehouse for North Shore Movers). On repeated occasions S/A Costello and/or I have noted a black 2007 Jeep Cherokee (bearing MA registration 43VK43) parked at these locations. A check of this Massachusetts registration revealed it to be registered to Sean D. Murphy, 407 Walnut St., Lynn, MA (Attachment G).

17. During a March to August of 2007 Federal Wiretap Investigation (T-3), ATF Special Agent John Kelter identified Rikkile Brown, 04/22/87 date of birth, as being Sean Murphy's then girlfriend. The T-3 also intercepted (audio taped) evidence of Brown involved in selling Vicodins and other prescription pills to the T-3's target, Josh Richard. Also taped is Sean Murphy, implicating Brown, himself and John Fleury (aka: "Johnny Rotten") in the pill distribution. Brown's Massachusetts Drivers License Data and BOP are affixed as Attachment H. S/A Kelter also identified a black 2002 Mercedes ML320 (bearing MA registration NE67DT) Brown owns (Attachment I).

18. Noteworthy is that, although Brown lists her license address as being 48 Cannon Rock Rd., in Lynn, FBI S/A Costello has determined this location to be the address belonging to Brown's aunt. S/A Costello's further investigation (including the months of November and December, 2008 to present) revealed Brown's Mercedes to repeatedly be parked at 1 Silver

Leaf Way in Peabody. S/A Costello's 11/06/08 AT&T cell phone subscriber check revealed Rikkile Brown's billing address to be listed as 1 Silver Leaf Way, Apt. 127, Peabody, MA (Attachment J). On 11/21/08, S/A Costello observed the Mercedes parked by 1 Silver Leaf Way. Speaking to building management and observing its tenant roster on that date, S/A Costello learned that Rikkile Brown was listed as the tenant for Apt. 127 at 1 Silver Leaf Way, Peabody, MA. As late as December of 2008, S/A Costello spotted a female believed to be Brown park the Mercedes by 1 Silver Leaf Way and enter the building.

19. On 10/18/08, a Domestic Dispute between Sean Murphy, Rikkile Brown and Jordayne Hartman at 407 Walnut St., in Lynn, MA, resulted in Murphy's being charged with Domestic Assault and Battery and Cultivating Marijuana. Affixed as Attachment K is responding Lynn Police Officer John Mackin's Investigative Report and the related Lynn District Court Complaint.

20. On 11/05/06, the Amerisource Bergen Corporation, 101 Norfolk St., Mansfield, MA, a pharmaceutical distributor, was broken into. Telephone (T-1) lines were cut and entry was gained through a hole cut in the roof. Estimates indicate that over 1.8 *million* pills, including Hydrocodone, Cialis and other Scheduled Controlled Substances were taken.

21. On 10/13/07, Attleboro, MA, Police discovered a cell phone jammer, a device, which is illegal to use to interrupt radio/wireless transmissions (see 47 USC sec. 333) in the United States and which, when activated, continuously jams/interrupts nearby cell phone transmissions, in the woods near the Jostens Jewelry Company.

22. On 06/08/08, the E.A. Dion Company, which is located near Jostens Jewelry Company and is also in Attleboro, MA, was broken into and burglarized. Telephone lines were cut, the cellular backup alarms were somehow defeated, and access was gained through the roof. Stolen during this break were jewelry, precious metals and gems worth an estimated 2.5 *million* dollars. Noteworthy that also taken in this break were Super Bowl rings for the New York Giants

that E.A. Dion had been contracted to produce. A news story related to the break is affixed as Attachment P.

23. On Wednesday, 01/15/09, S/A Costello, MSP Trooper John Strazzullo and I interviewed Jordayne Hartman at the Woburn District Court. Hartman is listed as a witness in Murphy and Brown's 10/18/08 domestic abuse Lynn Police Report. Affixed as Attachment L is S/A Costello's Investigative Report (302) reflecting the interview. Additionally learned during the interview is that Rikkile Brown is five months pregnant with Sean Murphy's child.

24. On the evening of Monday, 01/19/09, S/A Costello observed 1 Silver Leaf Way, Peabody, MA, to be part of the "Highlands at Dearborn" apartment complex. This apartment building, numbered "1" is a beige colored, three story, multiple unit dwelling with white and black shutters. There are two front outer doors, with the one to the left accessing apartment 127. The green colored door to apartment 127 is on the second floor, having "127" affixed to it and a doormat, stating "Come Back with a Warrant," on the floor in front of it.

25. Special Agent Costello's subsequent 01/20/09 observations of 407 Walnut St. and 725R Summer St., Lynn, MA, are the following: 407 Walnut St., Lynn, MA, is located on the corner of Walnut St. and Revere Avenue in Lynn. It is a two story, white colored single family dwelling with green shutters. The front door has the number "407" affixed over it, and the rear door, which can be accessed from Revere Avenue, has a sign, stating, "The Murphy's" over it. 725R Summer St., Lynn, MA, is inside a beige colored, multi use commercial building, which is located at the intersection of Summer and Ashland Streets in Lynn, MA. The door accessing 725R Summer St. is facing Ashland St. and has "North Shore Movers of Lynn" affixed over it.

26. During S/A 01/20/09 observations of 407 Walnut St., S/A Costello noted Murphy's black Jeep Grand Cherokee parked next to the address, on Revere Avenue. Later in the morning, I drove past the

address and noted Murphy's Jeep to still be parked
at the location.

27. Sean Murphy's black colored, 2007 Jeep Grand
Cherokee bears MA registration 43VK43 and VI#
1J8HR78317C508799.

28. Rikkile Brown's 2002 black colored Mercedes ML320
bears MA registration NE67DT and VI#
4JGAB54E02A309316.

29. Later on Tuesday, 01/20/09, S/A Costello and I met
with FBI Special Agents assigned to its satellite
Lakeville Office, Attleboro and Mansfield Police
Detectives.  During this meeting, FBI S/A Brian Zinn
provided me with a working copy of an interview
report (302), completed on 02/20/07 (the report is
affixed as Attachment R).  This report reflected an
interview of Anthony Cataldo, who I have arrested in
the past and who is presently serving a sentence in
New York on pharmacy burglary related charges.
During the interview, Cataldo implicates Murphy,
John Fleury and Thomas Enquist in the 11/05/06
Amerisource pharmaceutical burglary.

30. During this meeting, FBI S/A Charles Cabral also
provided me with the related Attleboro Police
Incident Reports and the E.A. Dion inventory list,
approximating the items stolen during the 06/08/08
burglary.  These reports and inventory are affixed
as Attachment S.

31. Noteworthy on Rikkile Brown's BOP (Attachment H,
page H-3) is the listing of "Dennis Brown" as being
her father.  In January of 1990, as a Trooper
assigned to the Lynn Drug Task Force, I assisted
members of the Bureau of Alcohol and Tobacco and
Firearms in arresting Dennis W. Brown, 10/04/51 date
of birth, and his accomplice, Byron Vorgias, on
Firearms Possession and Morphine Distribution
charges.  Years later, and while still assigned to
the Lynn Drug Task Force, and during a separate drug
investigation, I had contact with Dennis Brown in
the third floor apartment at 36 High Rock Street in
Lynn.  During that interaction, Brown and I spoke of
his previous arrest.  Brown also stated that the
location we were at was his residence.  Dennis Brown

has since died, but a copy of his Massachusetts Driver's History and his BOP are affixed as Attachment T. Noteworthy on the Driver's History and BOP are that both list 36 High Rock St. in Lynn and Dennis Brown's residence. Also noteworthy is that the BOP lists Dennis Brown's mother's maiden name as "Mary Harrigan."

32. A further check with the Registry of Motor Vehicles revealed five (5) people to have active drivers licenses listing 36 High Rock St. in Lynn as their address: (Aforementioned) Dennis W. Brown, 10/04/51, Dennis W. Brown, 05/04/86, Mary E. Brown, 03/29/29, Paul A. Brown, 06/18/55, and Karen Miller, 08/15/67. Affixed as Attachment U is a copy of this listing and Mary Brown's license data.

33. Attachment W represents an online Essex Registry of Deeds query, where, on 04/12/02, a Mary E. Brown, listed a Paul A. Brown and a Dennis W. Brown the inheritors of 36 High Rock St. in Lynn, MA.

34. On the morning of Wednesday, 01/21/09, I observed 36 High Rock St. in Lynn. I found the address to be three stories in height, with the first floor façade brown in color and the second and third floor facades having yellow colored shingles. The number "36" affixed to the front porch/stairway.

35. Also on 01/21/09, FBI S/A Costello spoke with the building management for the apartment complex at 1 Silver Leaf Way in Peabody. S/A Costello learned that Rikkile Brown still rented Apt. 127 and listed her employer as North Shore Movers of Lynn, 407 Walnut St., Lynn, MA. Sean Murphy signed a verification of employment letter. A copy of S/A Costello's report (302) is affixed as Attachment V.

36. Based upon the information listed herein, it is my opinion that evidence related to the E.A. Dion burglary, including, but not limited to jewelry and burglarious equipment; as well as evidence relating to the past and ongoing conspiracy to commit burglary, including but not limited to employee personnel records, which may be computer generated and/or encased, for North Shore Movers and Angel One Security, are at 407 Walnut Street, Lynn, MA, and

725R Summer Street, Lynn, MA. It is also my opinion that Heroin and Marijuana, Class A and D Controlled Substances, both earmarked for distribution, are inside Sean Murphy's 2007 black Jeep Grand Cherokee. It is further my opinion that evidence linking Sean Murphy to these locations and vehicle is on the person of and in the possession of Sean Murphy (including but not limited to access keys and/or electronic access cards).

37. It is further my opinion that evidence related to the E.A. Dion break, including, but not limited to an NFL Giants Superbowl Ring, evidence related to the past and ongoing conspiracy to Receive Stolen Property, including, but not limited to personnel pay stubs and/or tax records reflecting employment at North Shore Movers, is at 1 Silver Leaf Way, apartment 127, Peabody, MA and on the person of Rikkile Brown and in her 2002 black Mercedes ML320. In addition keys and documents relating to dominion and control of apartment and vehicle.

38. Therefore I respectfully request the Court issue Orders of Search and Seizure for these locations, commanding the seizure of the described property.

39. Signed under the pains and penalties of perjury this 22th day of _January_, 20 09 _cr al C8 #2052_

_____
Lieutenant Alan C. Zani, Massachusetts State Police

Then personally appeared before me this date 22nd day of _January_, 20 09.

The above named, Alan C. Zani and made oath that the foregoing subscribed by him is true.

_____
Justice/Clerk Magistrate/Assistant Clerk Magistrate

EXHIBIT 1

FD-302 (Rev. 10-6-95)

- 1 -



**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    01/19/2009

    JORDAYNE HARTMAN was interviewed at the Woburn District Court by the undersigned personnel. Massachusetts State Police Trooper John Strazzullo was also present for a portion of the interview. After advising HARTMAN of the identities of the undersigned personnel and the nature of the interview, HARTMAN provided the following information:

    In approximately August 2007, HARTMAN met JULIE IWANIKE (sp) while the two were being treated for heroin addiction at the Center for Addictive Behaviors (CAB) in Danvers, MA. HARTMAN and IWANIKE became friends, and following their discharge from CAB, HARTMAN went to stay with IWANIKE. It was then that HARTMAN first met SEAN MURPHY, of 407 Walnut Street, Lynn, MA. IWANIKE would have sex with MURPHY in an outright exchange for heroin or a deep discount on the heroin's normal street value. For example, IWANIKE would get $100 worth of heroin for $20. When IWANIKE and HARTMAN needed heroin, IWANIKE would call MURPHY and he would come to her house in his Jeep Cherokee to do the transaction. He would always keep multiple "fingers" (bulk quantity) of heroin in the upper console of the vehicle and marijuana in the center console. HARTMAN parted company with IWANIKE after approximately two weeks.

    Also through IWANIKE, HARTMAN met RIKKILE BROWN. BROWN was MURPHY's girlfriend. BROWN was addicted to prescription narcotics (Oxycontin, etc.) which she obtained from MURPHY. HARTMAN became friends with BROWN.

    Sometime in September 2007, MURPHY called HARTMAN and wanted to get together with her. HARTMAN had a boyfriend, but was secretly trying to maintain a heroin habit. She decided to start seeing MURPHY unbeknownst to her boyfriend and MURPHY began supplying her with heroin in exchange for sex. MURPHY was supplying HARTMAN with at least $300 worth of heroin per day. Anytime she needed money, MURPHY would hand her at least two $100 bills.

    For Christmas, MURPHY gave HARTMAN $2000. As her heroin habit had grown significantly, she spent the money on the course of two days on heroin. At that point, she needed more than what MURPHY was supplying her with.

Investigation on _____01/15/2009_____ at _Woburn, MA_

File # _92T-BS-100698_  Date dictated ___N/A___

    SA Jason D. Costello/jc
by _LT Alan C. Zani_

D-302a (Rev. 10-6-95)

92T-BS-100698

Continuation of FD-302 of ___JORDAYNE HARTMAN_____ , On 01/15/2009 , Page   2

     In approximately January 2008, HARTMAN moved in with
MURPHY and BROWN at 407 Walnut Street.  BROWN believed that
HARTMAN was moving in with her, apparently unaware of the
existing sexual relationship between HARTMAN and MURPHY.
HARTMAN still maintained her relationship with her existing
boyfriend.

     In approximately February 2008, HARTMAN came home (407
Walnut Street) and found the front door open.  As she approached
the door, a unidentified 25 - 27 year old, white, "Spanish
looking" male, with dark hair and dark eyes, came out of the
house.  He hurriedly told HARTMAN that MURPHY was being
questioned by the police and that he (the unidentified male)
need to find the "jammer" and get it out of the house before the
police came and found it.  HARTMAN did not have any idea what
the male was talking about.  He then fled the area in a gray or
white pickup truck with work racks on the back of it.

     MURPHY came home a little while later.  He was
preparing to go smoke marijuana with a friend of his, a white
male who goes by the nickname of DAMIEN.  HARTMAN described
DAMIEN as approximately 40 years old, tall and thin.  Last year,
DAMIEN was beaten badly because he owed people money for drugs.
His head was crushed and he was left for dead in the trunk of
his car.  Because of this, he appears to have brain damage.

**Administrative note:** DAMIEN is believed to be DAVID NASSOR.
NASSOR matches HARTMAN's physical description.  On August 8,
2008, NASSOR was badly beaten, wrapped in a blanket, and left in
front of a Lynn hospital.  NASSOR suffered brain hemorrhaging as
a result.

     HARTMAN told MURPHY about the incident earlier in the
day with the male in the house and his search for the jammer.
MURPHY went crazy.  He told her that the male must have been
working for JOHN FLEURY, aka ROTTEN.  MURPHY explained that he
and FLEURY had committed a burglary involving a large amount
prescription narcotics (pills).  Sometime in the summer of 2007,
FLEURY subsequently stole approximately $1,000,000 worth of the
pills from MURPHY.  At that time, MURPHY cut FLEURY off from
participating in future burglaries and spread the word on the
street that FLEURY was not to be trusted.  Because of the
burglary, FLEURY knew about the equipment MURPHY had to defeat
alarm systems.  MURPHY believed that the incident stemmed from
FLEURY wanting to get the equipment.  Later that night, MURPHY

D-302a (Rev. 10-6-95)

92T-BS-100698

ontinuation of FD-302 of _____JORDAYNE HARTMAN_____ , On 01/15/2009 , Page 3

had "everyone" come to the house so that HARTMAN could identify
who she had seen. HARTMAN did not recognize any of the people
MURPHY summoned.

Later, HARTMAN asked MURPHY what the male had been
looking for. He advised that it was a good thing that she had
not mentioned the warehouse. When she did not understand, he
explained that the equipment that he used to commit his
burglaries was kept in his moving company's warehouse.

In approximately March 2008, MURPHY took HARTMAN to the
warehouse. He showed her black "ninja suits" worn by MURPHY and
his accomplices during their burglaries. He showed her climbing
ropes used to enter the buildings from holes cut through the
roofs. He then showed her "the jammer". He explained that the
jammer was used to jam cellular phone signals in the area of the
burglary. This was done to prevent the building's backup alarm
system, based on cellular phones, to function following he and
his accomplices cutting the building's phone lines. MURPHY
demonstrated the functioning of the device to HARTMAN. HARTMAN
described the jammer as looking like a cable television box
approximately the size of a small suitcase. The device had a
dial on the front of it along with several gauges or meters and
several switches. Rope like cables protruded from the device.
HARTMAN sketched the device and provided the drawing to the
writer. MURPHY told HARTMAN that the jammer had to be bought
from overseas and that it was incredibly expensive. He once had
to replace a switch on it. The single part cost him $7000.

MURPHY told HARTMAN that a typical burglary would be
done after researching a target and conducting multiple
reconnaissance trips to the area. A burglary crew would consist
of approximately five people. MURPHY and two others would go up
on the roof of the building to disable the alarm systems and
make entry. MURPHY generally uses two individuals that "work"
for him and his moving company. JOSE Last Name Unknown (LNU) is
one the individuals. One or two others would be used as drivers
and lookouts. DAMIEN will fill that role.

HARTMAN advised that the moving company will provide
some limited moving services in order to make the company appear
legitimate. The warehouse does contain what appears to be
property that is being moved and/or stored. The equipment shown
to HARTMAN is somewhat concealed by this property. HARTMAN
described the warehouse by completing a sketch of it which she

D-302a (Rev. 10-6-95)

92T-BS-100698

ontinuation of FD-302 of ____JORDAYNE HARTMAN_____ , On 01/15/2009 , Page __4__

provided to the writer.  She advised that an inner door secured
by multiple deadbolts and an electronic card reading lock
separates the entry hallway from the main warehouse.  In the
main warehouse is a computer that MURPHY uses to identify and
research his potential burglaries.

        HARTMAN frequented the warehouse from March 2008,
through approximately September 2008.

        While HARTMAN lived with MURPHY, he would often leave
for a few days to go check out a potential burglary out of
state.  HARTMAN was aware that Pennsylvania was a favorite
destination of MURPHY's.

        Money had gotten a little tight for a while in the
spring/summer of 2008.  In approximately July 2008, MURPHY said
that was going to do a burglary in Pennsylvania.  He told
HARTMAN that when he got back they shouldn't be poor anymore.
He left on a Thursday night.  She went to stay with BRIAN
STEVENS for the weekend.  STEVENS was HARTMAN's boyfriend at the
time.  When she returned on Sunday, MURPHY was back.  The bed
was covered with jewelry and gold bars.  HARTMAN saw
approximately 12 Super Bowl rings, along with rings with various
company insignia.  MURPHY gave HARTMAN one such ring, a gold
ring with a red ruby, bearing the "Radio Shack" logo.  He also
gave her a gold bracelet and necklace from the take.  He
instructed her never to try to pawn the items as they would be
easily linked to the burglary.  MURPHY described the target of
the burglary as a jewelry manufacturer and/or gold melting
operation.

        MURPHY split the jewelry in half.  He took one half to
give to his accomplices as their share of the take.  The other
half was taken by HARTMAN and BROWN to be hidden at BROWN's
grandmother's house in a safe in the bedroom that BROWN
maintains there.  HARTMAN remembers taking two full backpacks of
jewelry there.  HARTMAN advised that there is approximately
$1,000,000 worth of stolen jewelry at BROWN's grandmother's
house.  MURPHY explained to HARTMAN that the jewelry could not
be fenced for a long time because it could be easily identified.

        BROWN has one of the Super Bowl rings.  She generally
keeps it in her purse as she is afraid to leave it anywhere.
Either MURPHY gave it to her or she stole it from him.

)-302a (Rev. 10-6-95)

92T-BS-100698

ontinuation of FD-302 of ___JORDAYNE HARTMAN_____ , On 01/15/2009 , Page ___5___

      MURPHY used HARTMAN's cellular phone on occasion to make rental truck reservations prior to the burglaries.  Rather than use his company trucks, he would rent them from New Hampshire and use them for the burglaries.  MURPHY may have done this prior to the aforementioned jewelry burglary.  She remembered dialing the number for him and him using the name FRANK when identifying himself to the person he was speaking with.  HARTMAN's phone number at the time was 603-973-6122.

      MURPHY has a fake Massachusetts license in the name of PATRICK LNU.

      MURPHY's phone number is 781-443-3303.  He told HARTMAN never to call him, even if the house were burning down, while he was out scouting or doing a burglary.  She remembers defying him and repeatedly calling him anyway.

      In October 2008, BROWN got into a fight with MURPHY.  BROWN scratched "SLUT" onto the hood of MURPHY's Jeep because she was mad that he was sleeping with women besides her.  MURPHY punched BROWN a few times and then ran away from the house before the police arrived.  When the police came, they confiscated a large marijuana plant that MURPHY had been growing.

TRUE COPY ATTEST

DISTRICT COURT OF ___ ESSEX

EXHIBIT 2

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS.                          SUPERIOR COURT

GRAND JURY

**IN THE MATTER OF: SM INVESTIGATION**

**APPEARANCE: Garrett Fregault,**
            Assistant District Attorney
            Bristol County
            District Attorney's Office
            888 Purchase Street
            New Bedford, Massachusetts 02740
            Representing the Commonwealth.

PLACE:      Fall River Durfee Complex
            Grand Jury Room
            289 Rock Street
            Fall River, Massachusetts 02720

DATE:       Wednesday, June 17, 2009

YVETTE J. PERRY
Certified Court Reporter
Office of the District Attorney
Bristol District
888 Purchase Street
P.O. Box 973
New Bedford, Massachusetts 02741-0973
(508) 997-0711

(REPORTER'S NOTE:  If this transcript contains
certain quoted material, such material is reproduced as
read or quoted by the speaker.)

## I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **Andrea LeBlanc** | | | | |
| By Mr. Fregault | 3 | | | |
| **Jason Costello** | | | | |
| By Mr. Fregault | 33,44 | | | |
| **Detective Richard Campion** | | | | |
| By Mr. Fregault | 46 | | | |

## E X H I B I T S

| NO. | DESCRIPTION | FOR I.D. | IN EVID. |
|---|---|---|---|
| 1 | Disk | | 3 |
| 2 | Photograph | | 9 |
| 3 | Photograph | | 10 |
| 4 | Letter | | 28 |
| 5 | Phone records | | 44 |

YVETTE J. PERRY
COURT REPORTER

I-3

## P R O C E E D I N G S

MR. FREGAULT: Ladies and
Gentlemen, I'm going to have marked before
you a CD Rom that contains digitized copies
of the grand jury minutes from the SM
Investigation which this grand jury heard
earlier in its sitting. It also contains
all of the exhibits that were entered at
that hearing, approximately 31 or 32
exhibits. The exhibits comprise of
photographs, prior testimony before a grand
jury, as well as a lot of different
records, some bank records, phone records,
as well as some business records. So the
digitized copy -- this disk contains a
digitized copy of all that information.

May I have that marked as Exhibit
1?

**(Exhibit 1, Disk; marked into**
**evidence.)**

Andrea LeBlanc, Sworn

DIRECT EXAMINATION

**BY MR. FREGAULT:**

Q. Would you please state your name, spelling

YVETTE J. PERRY
COURT REPORTER

I-4

```
 1        your first and last name.
 2    A.  Andrea LeBlanc, A-N-D-R-E-A, L-E, capital B,
 3        L-A-N-C.
 4    Q.  How old are you, ma'am?
 5    A.  Twenty-one.
 6    Q.  And what do you do for school?
 7    A.  I am a nursing student at the Chelsea
 8        Nursing School.
 9    Q.  When do you graduate?
10    A.  Hopefully in a month.
11    Q.  What is your degree going to be when you
12        graduate?
13    A.  I will be an LPN.
14    Q.  Then you have to sit for some boards; is
15        that correct?
16    A.  Yes.  I take my boards hopefully in July,
17        August, or September.
18    Q.  And what's your highest level of education
19        other than nursing school?
20    A.  I got my high school diploma, and I did a
21        year and a half at Salem State.
22    Q.  When did you graduate high school?
23    A.  In 2006.
24    Q.  You did a year and a half in Salem State?
```

YVETTE J. PERRY
COURT REPORTER

I-11

1   A.  At the warehouse.

2   Q.  Now, the warehouse, is that separate from

3       the business office?

4   A.  It's the same, it's right in the same place.

5   Q.  So it's your understanding that Joe Moe, the

6       person in Exhibit No. 3 right there, had

7       items stored at North Shore Movers?

8   A.  Yes.

9   Q.  And would it be fair to say that you had

10      seen Joe Morgan go there to access the

11      storage?

12  A.  Yeah.

13  Q.  Okay.  Between February, January and

14      February of 2008 until, say, about May or

15      June of 2008, what was the pace of business

16      like at North Shore Movers?

17  A.  Fairly slow, mostly weekend jobs.

18  Q.  And between that period, that about

19      six-month period, do you know about how much

20      money North Shore Movers generated?

21  A.  I would have to look.  I don't know.

22  Q.  But would you be the person who was in

23      charge of the books at that period of time?

24  A.  I was recording all the jobs, yes.

I-12

1    Q.   Are you able to give the grand jury an

2         estimate of about how many jobs per month

3         North Shore Movers would do on average in a

4         six-month period?

5    A.   Monthly I'd have to say no only because July

6         we do so many more jobs than in April.  Over

7         the year I can tell you we probably did 4 to

8         500 jobs.

9    Q.   Okay.  On an average year?

10   A.   That was the only year I worked there, so I

11        don't know.

12   Q.   But it's your understanding that the

13        business had slow periods and busy periods?

14   A.   Uh-huh, yes.

15   Q.   The busy periods were usually when?

16   A.   Spring, summer.  Fall it began to slow down.

17   Q.   But it would also be true that between

18        January and February to June the business

19        still had jobs?

20   A.   Yeah.

21   Q.   And you were required to pay the employees?

22   A.   Uh-huh.

23   Q.   You have to say yes or no.

24   A.   Yeah, sorry.

YVETTE J. PERRY
COURT REPORTER

```
                                            I-25
 1      Movers?
 2  A.  After I spoke with Agent Costello.
 3  Q.  All right.  So we're talking the end of
 4      March?
 5  A.  March.
 6  Q.  And why was it you stopped working with
 7      North Shore Movers?
 8  A.  I was under the impression that it was not
 9      for my best well-being.
10  Q.  Did you have concerns about the legitimacy
11      of the business?
12  A.  North Shore Movers I still believe was a
13      legitimate business.  I put all the
14      paperwork through, and on all his jobs
15      people called me.  I think the business is
16      legit, but I just don't want to be involved.
17  Q.  Okay.  But it's your understanding that
18      prior to you beginning working there in
19      2008, Millennium Movers was no longer in
20      business?
21  A.  Right.
22  Q.  And that Millennium Movers was the precursor
23      company to North Shore Movers?
24  A.  Right.
```

YVETTE J. PERRY
COURT REPORTER

I-26

1    Q.  And as far as you're aware, North Shore

2         Movers, were they ever in a position to be

3         doing anything with Millennium Movers in

4         2008?

5    A.  No.

6    Q.  Just hang on for one moment, please.

7             (Pause)

8    Q.  I have a couple of more questions.  Are you

9         aware that Murphy had been arrested at one

10       point?

11    A.  Yes.

12    Q.  And did he also contact you concerning his

13       business after he had been arrested?

14    A.  When he was arrested in January.

15    Q.  The end of January of this year?

16    A.  Yes.  He called me from the Lynn Police

17       Station asking me to switch over the phone

18       lines.

19    Q.  What did that mean?

20    A.  That meant go out to his house on Walnut

21       Street with a 599-0036 phone number.

22       Basically you press Star 73 and swap the

23       phones so it rings to my cell phone so I

24       would get all the business calls.

YVETTE J. PERRY
COURT REPORTER

EXHIBIT 3







EXHIBIT 4



I do recognize the above subject as Brian Heatherman.

Susan Roushan

3/13/09

I recognize the above person As Brian Heatherman.

Theresa E. Bader. PEA

3/13/09

EXHIBIT 5

12/18/08

To: Lt Alan Zani Mass State Police

From: Sgt Timothy P Cassidy

RE: Interview

Lt.Zani today 12/18/08 I spoke to a party that wished to remain anonymous, this party told me that Shawn Murphy of Lynn a known pharmacy breaker was very active in breaking into ATM's and pharmacies in the area by using alarm jamming devices he purchased from Russia. This party said that Murphy has been training all of the breakers in Lynn on how to use these jamming devices. This party told me that Ernie Rogers another known pharmacy breaker had called him in the past and asked him if he wanted to help with some pharmacy breaks. This party states, that he was not involved in any recent breaks. This party did appear very nervous while speaking to him about the recent break in at the Walgreens in Swampscott on November 9th 2008

Respectfully

Sgt. Timothy P Cassidy

EXHIBIT 6

FD-302 (Rev. 10-6-95)

-1-

FEDERAL BUREAU OF INVESTIGATION

Date of transcription  01/16/2009

    On Wednesday, 01/14/09, at approximately 3:15 PM, New Hampshire Parole Officer Chris Regan, FBI S/A Jason Costello and this writer met with (parolee) Thomas ENQUIST (04/01/68 date of birth).

    At the interview's onset, we identified ourselves and the nature of our inquiry. We also advised ENQUIST that the interview was to be audio taped. This writer further advised ENQUIST that, although he was not under arrest, this writer would read a Miranda warning and then request ENQUIST do so. ENQUIST confirmed he could read, and this procedure took place, with ENQUIST signing the warning (Included in the 1A portion of this file). ENQUIST expressed a willingness to speak with us.

    When confronted with information relating him to committing commercial breaks with Sean MURPHY and John FLEURY, ENQUIST denied this. When asked, ENQUIST stated that the last time he had observed MURPHY was in 1984, in Curwin Circle in Lynn. At that time, according to ENQUIST, MURPHY had just broken into a bicycle shop in Saugus and was selling the stolen bicycles. ENQUIST stated that he had written (prison to prison) correspondence with MURPHY in 1996, but did not have personal contact with him. When asked if he had contact with MURPHY within the past three years, ENQUIST repeatedly denied he had such contact with MURPHY.

    When asked about contact with FLEURY, ENQUIST stated that FLEURY's girlfriend, Melissa (FALASCA) had at some point come with her child to live at his (ENQUIST's) New Hampshire residence. FLEURY had once called the residence from the Middleton Jail/House of Correction and came up to retrieve FALASCA and their child after he got out. When asked, ENQUIST estimated that this happened in December (of 2007). Referring to FLEURY's visit as being "a year and a half ago," ENQUIST repeatedly stated that this was the last contact he had with FLEURY.

    ENQUIST repeatedly denied having committed commercial breaks with Sean MURPHY and/or John FLEURY. We spoke further and ended the interview.

Investigation on  01/14/09  at  Derry, NH Police Dept.

File # 92T-BS-100698
    MSP Lt. Alan C. Zani, # 2092
by  FBI S/A Jason Costello

Date dictated  01/16/09

EXHIBIT 7

---- Working Copy ----                    Page     1

02/20/2007

     ANTHONY CATALDO (PROTECT SOURCE), date of birth (DOB)
March 4, 1967, social security account number (SSAN) 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,
1842 Voshage Street, Baldwin, New York (NY), was interviewed at his
attorney's office, Attorney Jay C. Sherman, Esq., 70 Spring Street,
Ossining, NY, pursuant to a proffer agreement with the United
States Attorney's Office, District of Massachusetts, Boston,
Massachusetts (MA). Present during the interview was Mansfield
Police Detective Michael Ellsworth, and CATALDO'S attorney Jay C.
Sherman, Esq.:

     CATALDO heard about the break-in at AMERISOURCE, in
Mansfield, MA, either through an on-line resource or another media
outlet. CATALDO was in New York when he heard about the break-in.

     FLEURY spoke to CATALDO in May or June of 2006 about
doing some jobs to make some money. CATALDO declined because he
was recently released from prison and was on probation. CATALDO
has not spoken to FLEURY since the end of November.

     CATALDO had spoken to JOHN FLEURY approximately six
months ago when FLEURY told CATALDO that SEAN MURPHY had "beat" a
case in Pennsylvania regarding a break-in at COSTCO. MURPHY was
apprehended while leaving the scene of the break-in. CATALDO did
not know how MURPHY beat the case. FLEURY stated that once MURPHY
was out from Pennsylvania, they were going to make a big score.
FLEURY stated that "The Fugitive", who CATALDO later learned to be
TOM ENQUIST of Manchester, NH, would also be involved in the break-
in. CATALDO has heard that FLEURY and ENQUIST "hang out" together.

     FLEURY told CATALDO that they (FLEURY and MURPHY) were
planning one big score a year instead of a score once a month.

     After the break-in at AMERISOURCE, in approximately the
end of November, CATALDO contacted FLEURY. CATALDO was upset that
FLEURY had not included CATALDO in the job at AMERISOURCE. CATALDO
left messages on FLEURY'S telephone. When CATALDO finally spoke
with FLEURY in person, FLEURY was upset at CATALDO for leaving
messages on his phone. FLEURY was afraid that law enforcement was
watching him. FLEURY told CATALDO that he had enough pills to last
him until Christmas. FLEURY asked CATALDO if he had any "fences"
in New York to move the pills. CATALDO told FLEURY that he was
recently settled in New York and he did not have anybody.

     CATALDO thought that FLEURY was keeping the pills from
the AMERISOURCE theft at his (FLEURY'S) apartment. FLEURY told a
friend of CATALDO'S, KELLY REYNOLDS, that he (FLEURY) was not
staying at his apartment because his apartment was being used as a
"warehouse". FLEURY was staying with his wife and child at a Hotel
on North Route 1 in Saugus, Massachusetts (MA). FLEURY also told
REYNOLDS that he was driving a new Cadillac Escalade.

---------------------------------------------------------------

---- Working Copy ----                                    Page    2

FLEURY has a garage in East Lynn, MA, but CATALDO felt
that he would not keep the pills there because they would be safer
at his apartment.  FLEURY'S apartment is located at 387 Broadway
Apt. 406, Lynn, MA.

CATALDO has been to FLEURY'S apartment on several
occasions and has seen pills and a "cell phone jammer" in the
apartment.  FLEURY purchased a cell phone jammer from Afghanistan
for $10,000 (ten thousand dollars) over the internet.  CATALDO saw
the cell phone jammer in June or July of 2006 when CATALDO was at
FLEURY'S apartment.  CATALDO described the cell phone jammer as a
medium size black suitcase.  FLEURY demonstrated the operation of
the cell phone jammer when he told CATALDO to make a call on his
cellular telephone.  FLEURY then activated the cell phone jammer
and CATALDO immediately lost the connection on his call.

CATALDO drew a sketch of the inside of FLEURY'S home
(sketch enclosed in the 1A section of this file).  CATALDO stated
that upon entering the front door you are standing in the family
room and the kitchen in on the right.    The family room has a
balcony which overlooks the parking lot.  The hallway is also
located to the right.  As you walk down the hallway, there are two
bedrooms on the left and a bathroom on the right.  The first
bedroom has a computer with an internet connection.  The cell phone
jammer is kept in this room.  CATALDO thought that this is also
where FLEURY would keep the pills.  The second bedroom is the
master bedroom, which also includes a bathroom.  The master bedroom
overlooks the lake.

CATALDO stated that in order to gain entry into
AMERISOURCE, they would have first cut the pone lines, since they
are the brain to the alarm system, unless there was something
directly connected to the alarm system, outside of the phone line.
They would have used a cordless saws all or hack saw to cut the
cord.  MURPHY studied alarms while in prison.  MURPHY'S knowledge
about alarms would have made him responsible for disabling the
alarm system.  They would have ripped the back door open, or cut
through the roof, and lower the cell phone jammer to block the
alarm's cellular back up.  CATALDO felt that they would not have
done the break-in without the cell phone jammer.  After entering,
they would have "killed the brain" of the alarm system.  The alarm
system would be located close to where the phone line, or direct
line, entered the building.  The fire alarm would also have to be
disabled because the communication is more difficult to disconnect
if the fire alarm was activated.

Construction bags, or a heavy duty bag that can be
purchased at home depot, would be used to carry the pills.  They
would be in the building as long as necessary to clean it out.
They owned the building after shutting down the security so they
could take as long as they wanted.  The tools would have been
dumped after the score somewhere they could not be found.  A box
van, or UHAUL would be used for transportation.  CATALDO thought
that MURPHY may have used a UHAUL on the break-in at the COSTCO in
Pennsylvania.

In the past, FLEURY has discussed using a type of saw

---- Working Copy ----                              Page        3

blade to cut through the roof during a break-in. FLEURY has told
CATALDO that in using the cell phone jammer he would cut a hole
through the roof and lower the cell phone jammer to bypass the
alarm's cellular back up. CATALDO stated that MURPHY likes doing
jobs through the roof. MURPHY and ENQUIST are in good enough shape
to manage a break in through the roof. FLEURY is in poor shape and
would be the "peek man". FLEURY would have been sitting in the
truck during the break-in keeping watch.

        CATALDO was not aware of any other people involved in the
theft, except for FLEURY, MURPHY, and ENQUIST.

        CATALDO thought that FLEURY would be "bulking" the pills
and selling them on the street through four or five people. FLEURY
could be using JOHN DONOVAN to move some of the pills. CATALDO met
DONOVAN through BRODIE SULLIVAN of Peabody, MA. SULLIVAN recently
died from a drug overdose. DONOVAN was arrested in North Carolina
in 2006.

        CATALDO did not think that FLEURY would feel any pressure
from the HELLS ANGELS to give them a piece of the score. FLEURY'S
deceased father was a HELLS ANGELS and CATALDO stated that they
take care of their own. However, FLEURY might still use HELLS
ANGELS because FLEURY wanted to maintain a good reputation.

        In October 2006, when CATALDO was arrested by Attleboro
Police, he was working at Empire Architectural in Freeport, New
York (NY). CATALDO did not recall having burglarious tools with
him at the time of the arrest. CATALDO was with JOHN CRESPO,
a.k.a. FLACKO, when he was arrested. CATALDO stated that CRESPO
was currently living at his sisters house on St John Street, Bronx,
NY, near the Hunts Point area.

        CATALDO met CRESPO at ANTHONY HOUSE, Roosevelt, NY,
through the purchase of heroin. CATALDO stated that CRESPO will
typically rob someone at gun point instead of making a pharmacy
break. CATALDO stated that himself/herself, FLEURY, MURPHY, and
others involved in pharmacy breaks do not carry weapons during a
score. If caught they do not want to be charged with armed
robbery, which carries a stiffer penalty.

        CATALDO was told that an Attleboro Police Report stated
that CATALDO had a Police Radio, bolt cutters, and other
burglarious tools, with him at the time of his arrest, CATALDO
stated that he now recalled having the items with him. CATALDO
stated that he was living in a small apartment and kept most of his
stuff in the car. CATALDO traveled to Attleboro with CRESPO but
did not have any intention of committing a break-in on the way
there, while they were there, or on the way back. CATALDO did have
heroin with him during the trip. CATALDO took the trip to
Attleboro to take REYNOLDS to a court hearing.

        CATALDO stated that he was going to use either his sister
in Lynn, MA, or FLEURY, to move pills taken from the break-in
attempted at HEALTHSMART PHARMACY in Ossining, NY. CATALDO did not
know that AMERISOURCE provided the supply of drugs for HEALTHSMART
PHARMACY. CATALDO stated that it was a coincidence. However,

---- Working Copy ----                    Page      4

CATALDO felt the score in Mansfield was bigger than he had
originally thought after learning that AMERISOURCE provided drugs
for HEALTHSMART PHARMACY.

Typically, CATALDO does not break into a Pharmacy like
HEALTHSMART because of the location. However, CATALDO was high on
heroin at the time. CATALDO stated that he found HEALTHSMART
PHARMACY through pure luck while traveling through Ossining.
CATALDO did not attempt the theft near his home because he was on
probation.

REYNOLDS contacted FLEURY to see if he would help pay to
have CATALDO bailed out of jail. FLEURY stated that he might be
able to help out but he never followed through on the request.
FLEURY called REYNOLDS a few weeks ago, but CATALDO was not sure
why. REYNOLDS has not spoken to FLEURY since.

CATALDO was with CRESPO during the break-in at
HEALTHSMART. They used an Enterprise Rental car from TF Green
Airport with Rhode Island plates. CRESPO later told REYNOLDS that
he (CRESPO) was pulled over by Ossining Police, and released, after
the attempted theft at HEALTHSMART. CATALDO was not sure if CRESPO
was in a vehicle or not.

CRESPO sent an Unidentified Male (UM1) to CATALDO to find
out if CATALDO told police that CRESPO was involved in the
HEALTHSMART break-in. CATALDO told UM1 that he has not said
anything to police. CATALDO later received a call from another
Unidentified Male (UM2). UM2 told CATALDO that CRESPO thought that
CATALDO was "telling on him." CATALDO told UM2 that he was not
telling and UM2 responded "I didn't think you were going to tell."
UM2 was further identified as someone that CRESPO purchased heroin
from.

CATALDO stated that he has not heard from DAVID NASSOR
but believes he is living somewhere in Massachusetts.

EXHIBIT 8



# CYBER CRIME DIVISION
# COMPUTER FORENSICS LABORATORY

OFFICE OF THE ATTORNEY GENERAL
ONE ASHBURTON PLACE, 19TH FLOOR
BOSTON, MASSACHUSETTS 02108
TEL 617-963-2860 ~ FAX 617-727-5755

## REPORT OF DIGITAL MEDIA FORENSIC EXAMINATION
## ATTLEBORO POLICE DEPARTMENT ASSIST
## COMPUTER FORENSICS LAB # 09-016

This forensic report in the above-entitled matter is a brief summary of the evidence found, as of this date, durir the forensic examination of the seized media.

Richard P Campion, a police officer assigned to the Attleboro Police Department Detective Division along with Detective Cote, began investigating E.A. Dion Inc., a jewelry fabrication company, on Sunday June 08, 2008. Approximately 2.5 million dollars of various metals, gems, and custom rings had been stolen from E.A. Dion Inc. During their investigation, two individuals by the name of Sean David Murphy and David Nassor were identified as suspects. Several documents of interest, appearing to be computer generated, were located during the search of Muphy's business, The North Shore Movers. One document in particular, a purchase order for a Y200 cell phone jammer car antenna kit from a company called Global Gadget UK Ltd United Kingdom, was located at the business. Other possible computer generated documents were located throughout the business for the websites www.globalgadget.com, www.thingswebuy.com, and www.infousa.com.

The following hard drives, cell phone, and floppy diskette were seized from Sean Murphy on January 23, 2009 and delivered to the Massachusetts Attorney General's Office's computer forensic lab on April 01, 2009:

One (1) 40GB Samsung HDD, Model # SP0401N, S/N: S004J10Y652579
from a Dell Dimension 3000 desktop S/N: CN-0WC292-42940-54R-018F "Computer-1"

One (1) 320GB Seagate Barracuda 7200.10 HDD S/N: 5QF23DAM
from a HP media center M7000 S/N: MXX6480VRH "Computer-2"

One (1) 120GB Seagate Barracuda 7200.9 HDD S/N: 9LS1Y803
from an eMachine S/N: XRF6B10009328 "Computer-3"

One (1) 300GB Seagate Barracuda 7200.8 HDD S/N: 4NF16K3S
from a HP media center M7000 S/N: CNN6120HND "Computer-4"

One (1) 20GB IBM Travelstar HDD Model # DJSA-220
from a Compaq Presario laptop S/N: 1V09FP6617R1 "Laptop-3"

One (1) Blue and Black Sanyo Sprint cellular telephone
Model: SCP-8400, DEC:00805667597, HEX:08567B0D 75

One (1) Floppy Diskette with a Radio Shack label on the disk

The following hard drives were seized from 60 Monson Turnpike Road, Petersham, Massachusetts and delivered to the Massachusetts Attorney General's Office's computer forensic lab on April 01, 2009:

**One (1) 160GB Seagate Momentus 5400.4 HDD S/N: 5RF23A3K
from a HP Presario CQ50-215NR laptop S/N: 2CE8468PP5 "Laptop-1"**

**One (1) 120GB Fujitsu HDD Model # MHW2120BH, S/N: NZ0XT6C27LJF
from a Dell Inspiron laptop Model # E1505, S/N: CN-0XD720-48643-6CI-0197 "Laptop-2"**

The seven (7) hard drives, one (1) cell phone, and one (1) floppy diskette previously listed above, were imaged by the Director of the Computer Forensics Lab, David Papargiris on April 09, 2009.

On Wednesday, April 22, 2009, I used a forensic software program called "EnCase version 6.12.1" to run scripts against each of the hard drives. On each hard drive, I conducted a keyword search consisting of the following terms: *Sean Murphy, David Nassor, Cellular Telephone, Jamming equipment, Global Gadget UK, Global Gadget UK Ltd United Kingdom, www.globalgadget.com, Lippincott LLC, www.thingswebuy.com, www.infousa.com, E.A. Dion Company, 33 Franklin McKay Drive, North Shore Movers, 725 R Summers Street, Summers street Lynn, Angel One, jewelry manufacturing, Lippincott Customer ID, ID# 1111532, 60 Monson Turnpike Road, 407 Walnut Street.*

During the analysis of the electronic media, potential evidence was located on Computer-1, Computer-2, Computer-3, Computer-4, and Laptop-2.

**I recovered the following potential evidence from the hard drive labeled as "computer 1":**
- The internet history search revealed the website www.globalgadgetuk.com, with a specific URL link indicating a page for a "Y300 triple system jammer " was visited found in unallocated clusters, jewelry references for the website ebay.com's store, and a search was run for the names "dave nassor" and "david nassor". One (1) image of a ring was also located during my internet history review.
- The keyword search revealed what appears to remnants of an e-mail message mentioning a payment confirmation for a jetblue flight for Dave Nassor along with contents referencing a "Y200 High Power cell phone jammer" were found in unallocated clusters. The website address "www.thingswebuy.com" was found located in pagefile.sys.

The Norton Antivirus Scan conducted on 08/12/2009 at 11:30 revealed the following 57 risks: Adware.Begin2search, Adware.Gen, Adware.ISMonitor, Adware.Look2Me, Adware.MaxSearch, Backdoor.Tidserv, Backdoor.Tidserv!inf, Backdoor.Trojan, Downloader, Packed.Generic.200, Spyware.ISearch, Trojan Horse, Trojan.Adclicker, Trojan.Dropper, Trojan.Fakeavalert, Trojan.Vundo. These following risks are known for potentially displaying pop-up advertisements, redirecting search queries, tracking user activity, displaying false antivirus alerts, and potentially leaving a backdoor to the system which may or may not leave the computer compromised.

A Gargoyle Investigator scan for malware was conducted on 7/29/2009 at 12:06 and revealed one (1) Anti Forensic Program (DrvCareVista), one (1) P2P Tools (Mytella), and one (1) Scareware (Spyware Striker).

**I recovered the following potential evidence from the hard drive labeled as "computer 2":**
- Ninety-two (92) thumbnail images of what appears to be cellular jamming equipment was discovered in Temporary Internet Files.
- In the HP_Administrator's user account, a link was found to an image, appearing to be of a resume, titled "scan001001.bmp" referencing "407 Walnut Street Lynn, MA" and "Northshore Movers".
- Multiple eBay ".htm" documents appearing to reference the purchase of unidentified equipment for "Northshor Correctional Facility", the purchase of an "All in One Counter Surveillance Device RF", Plasma Cutters, and multiple e-mails which appear to be written by Sean Murphy, were located while reviewing the results from th keyword search I ran. One specific message is from "s.murphy22@verizon.net" to "Phantom Technologies – Sales Department"discussing "Northshore Correctional Facility… operated by the Angel One Corporation" an

a second e-mail message appears to be a receipt of the purchase of an "All in One Counter Surveillance Device RF".

Below are two (2) recovered sample messages that were located under the user "HP_Administrator":
**1) C\Documents and Settings\HP_Administrator\Local Settings\Application Data\Identities\{D190EE07-1887-4595-8F62-6253114299D2}\Microsoft\Outlook Express\Deleted Items.dbx\DBX Volume\(No Subject)**

```
From: "Sean Murphy" <s.murphy22@verizon.net>
To: <info@sesp.co.il>
Subject:
Date: Tue, 27 Feb 2007 12:42:47 -0500
MIME-Version: 1.0
Content-Type: multipart/alternative;
 boundary="----=_NextPart_000_0003_01C75A6C.C8C06BD0"
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 6.00.2900.3028
X-MimeOLE: Produced By Microsoft MimeOLE V6.00.2900.3028

This is a multi-part message in MIME format.

------=_NextPart_000_0003_01C75A6C.C8C06BD0
Content-Type: text/plain;
 charset="iso-8859-1"
Content-Transfer-Encoding: quoted-printable

I am interested in knowing if you can manufacture a 107B (100W per band) =
in a triple band configuration that would give the full 1000 meter =
jamming range. The 250 meter (70W per band) unit you advertise will not =
cover the area we require. Please let me know. I am also assessing =
cellular jammers at Phantom Technologies LTD in Israel.=20

If you can manufacture a 100W per band, 1000 meter (Triple band) 107B, =
please inform me of the purchase price. I purchased a Triple Band =
SILENTEC from SESP 4 years ago. It just does not cover the desired =
jamming range. Hopefully, the new units work better and cover a greater =
distance.

Thank you.

Millenium Adventure Park
```

**2) C\ Documents and Settings\HP_Administrator\Local Settings\Temp\Temporary Internet Files\Content.IE5\9JJ3P5CE\HttpNimletDriver[5].htm**

From: Phantom Technologies - Sales Department <sales@phantom.co.il>
Date: 2007/02/26 Mon AM 09:15:34 CST
To: s.murphy22@verizon.net
Cc: roei@phantom.co.il
Subject: Phantom

Dear Sean Murphy,

Please let me know if you need any Import license to get
the device into USA.

Best Regards,

Khmelnitsky Michael

Sales Department
Phantom Technologies LTD
Tel +972-3-9215720
Fax+972-3-9215434

-----Original Message-----
From: s.murphy22@verizon.net [mailto:s.murphy22@verizon.net]
Sent: Monday, February 26, 2007 4:57 PM
To: Phantom Technologies - Sales Department
Subject: Re: Phantom

Dear Phantom:

Northshore Correctional Facility is a private prison owned and operated by
the Angel One Corporation leased to Essex County in Lynn, Massachusetts. Let
me know once again if we can now forward the certified bank check.

I hope this addresses your concerns.

Sean Murphy.

From: Phantom Technologies - Sales Department <sales@phantom.co.il>
Date: 2007/02/26 Mon AM 08:20:08 CST
To: s.murphy22@verizon.net
Cc: roei@phantom.co.il .
Subject: Phantom


DearSean Murphy,

Pleaselet me know if your facility is in governmental or in private
responsibility.
Ineed these details to fulfill M.D. permission form.

Best Regards,

Khmelnitsky Michael
Sales Department
Phantom Technologies LTD
Tel +972-3-9215720
Fax+972-3-9215434


_____ NOD32 2081 (20070226) Information _____

The Norton Antivirus Scan conducted on 07/02/2009 at 09:32 did not reveal any risks.

A Gargoyle Investigator scan for malware was conducted on 7/07/2009 at 13:32 and revealed two (2) Gaming
Programs (Superslots Casino, G2GPoker) and one (1) Spyware Program (Spy Mail). A diagnosis scan could not be
obtained for Drive C due to constant computer crashes while running the scan.

**I recovered the following potential evidence from the hard drive labeled as "computer 3":**

- The user name "Sean Murphy" was located in the registry, indicating possible ownership of the computer system.
- Images appearing to be that of "North Shore Movers" were found located under "Documents and Settings\Owner\My Documents\My Pictures\Sean\".
- From running HTML carver, one (1) .htm document referring to "Free Gold Packs from GoldKit -- sell gold jewelry online" and one (1) .htm document showing Sean Murphy sending a package to Columbia, South Carolina.
- Internet History search revealed "http://www.northshore-movers.net" being visited multiple times and www.globalgadgetuk.com/y200-quad.htm visited once.
- During keyword search I located remnants of messages referencing "Global Gadget", "North Shore Movers", a "Y200 Quad" which appears to be a type of jammer in multiple locations on the drive.

The Norton Antivirus scan did not reveal any risks.

A Gargoyle Investigator scan for malware revealed one (1) gaming program (Superslots Casino) Drive D -- eleven (11) antiforensics programs (CCleaner, Internet Soap, ZeroNetHistory 2005), two (2) file splitting programs (Fast File Splitter, Zipper), six (6) P2P Tools (Manolito, Imesh Mp3, LimeWireTurbo, Morpheus Music, Morpheus PRO, LimeWireTurbo), four (4) remote access (DameWare Mini Remote Control) and one (1) scareware (Spyware Striker).

**I recovered the following potential evidence from the hard drive labeled as "computer 4":**

- Internet History revealed a sample of the following URL's of interest "cellphonejamming.info/" and "www.pricelessjewlryinc.com/".
- A message appearing to show correspondence between "Global Gadget UK Ltd" and "Sean Murphy" regardin the purchase of a "Y2000 Quad" was found in unallocated clusters. Multiple blank forms appearing to be from the company North Shore Movers of Lynn were located under the HP_Administrator's "My Documents" folde Multiple contract agreement forms appear to be created for "BJ's Wholesale Club", "Connor Real Estate", "COSTCO" and a letter to Michael T. Wedge the President/CEO of BJ's Wholesale Club and James D. Sinega the President/CEO of COSTCO Wholesale Warehouse.

Below is a sample form which appears to be a document written to Michael T. Wedge, the President/CEO of BJ's Wholesale Club by Sean Murphy:

**BJ's President letter 1.rtf**
**19) C\Documents and Settings\HP_Administrator\My Documents\BJ's President letter 1.rtf**
**Page 1**

*Warning !!! Security Alert !!! You can prevent major burglaries of BJ's Wholesale Clubs while upgrading BJ's security as a whole.*

Michael T. Wedge
President/CEO
BJ's Wholesale Club
1 Mercer Road
Natick, MA 01760

RE:     <u>Security Consulting & Contracting</u>

Dear President Wedge:

      Our elite team of experts have been the only group of professionals who have successfully burglarized a number of BJ's Wholesale Clubs and taken multiple high ticket items during the high-tech heists. You can now hire my Security Consulting firm to utilize our expertise in analyzing BJ's security as a whole. We will recommend simple cost effective upgrades to BJ's security alarm system and building(s) that would prevent even someone of my caliber from successfully burglarizing [any] BJ's Wholesale Warehouses.

\*      **The total cost savings to BJ's** in averting just one major burglary substantially outweighs the capital applied to our consulting fee and implementing the recommended changes.

\*      **We will personally travel to each and every** Bj's Wholesale Warehouse to take the required precision measurements necessary for implementing our recommended security upgrades. We will assess each site according to its individual security needs. We will document on custom forms the specific upgrades and corresponding measurements.

\*      **My private security contracting company** is also readily available to implement and install any or all security upgrade recommendations, if BJ's so chooses. In addition to myself, we have licensed electricians, master carpenters and an ex-HONEYWELL supervisor on staff.

      BJ's current security alarm system (as presently installed) is simply insufficient to prevent a high-tech burglary team from defeating the system.

      We would like to enter into a mutually beneficial business relationship with BJ's to upgrade BJ's security alarm system and building(s) to prevent expert criminals from successfully burglarizing any BJ's Wholesale Club nationwide.

      I would first like to touch bases with you via telephone. Then I would request a follow up face-to-face meeting where I could further expand on the cost effective unique services we are willing to provide to BJ's.

**20) C\Documents and Settings\HP_Administrator\My Documents\BJ's President letter 1.rtf
Page 2**

Very truly yours,

_____
Sean D. Murphy
Angel One Security Consulting
407 Walnut Street
Lynn, MA 01905
(781)599-0036

P.S.

I will call your office at 8:30am EST on Monday July 10, 2006. If you will not be in,or if I have chosen an inconvenient time, please have [    ] tell me when I should return the call.

Norton Scan 7/02/2009 11:38 did not reveal any risks.

A Gargoyle Investigator scan for malware run at 10:50 on 7/02/2009 revealed ten (10) antiforensics programs (DryCareVista, CCleaner), one (1) file splitting program (DVDCutter Stream MP3CDWay Converter), one (1) gaming program (Superslots Casino), one (1) P2P Tool (Mytella), four (4) remote access (DameWare Mini Remote Control), one (1) packet sniffing program (Network Probe Lite). The Gargoyle Scan on Drive D revealed one (1) gaming program (Superslots Casino) and one (1) Spyware program (Spy Mail).

**I did not recover any potential evidence from the hard drive labeled as "laptop 1".**

**I recovered the following potential evidence from the hard drive labeled as "laptop 2":**

- Four hundred and fourteen (414) images of jewelry and phone jammers.
- Multiple phone jammer HTML documents.
- Two (2) e-mails referencing purchasing a jammer.

Below is the recovered Outlook e-mail located in the following path "Attleboro 09-016\Outbox.dbx":
Name                    jammer

**Attachments**

**Attleboro 09-016\Outbox.dbx\(No Subject)\(Alternate Body)**

```
Records
    Attleboro 09-016
        Outbox.dbx
            THE REAL DEAL
            the real deal
            jammer
            (No Subject)
```

Norton Antivirus scan 14:28 7-01-09 revealed a total of five (5) risks with the following risk names; "W32.Virut!html", "JS.Downloader", "Trojan.Giframe". These risks may redirect users to a malicious Web site that may exploit the browser and download malicious files from Web sites and executes them.

A Gargoyle Investigator scan for malware was conducted on 13:47 July 01 2009 and revealed one (1) Gaming program (Alpine Cold Casino), one (1) piracy tool (007 DVD Copy), and two (2) Steganography programs (Data Stash – Installer).

**I did not recover any potential evidence from the hard drive labeled as "laptop 3".**

## Floppy Diskette
I reviewed the floppy diskette July 08, 2009 at 10:25. One text file, not of evidentiary value, was located on the disk.

## Cell Phone
I reviewed the cell phone at 10:32 on July 08, 2009 which had been previously acquired by the Director of the Computer Forensics Lab, David Papargiris using Cellebrite. No evidence was recovered.

Based upon my findings during the forensic examination, I can conclude that I located the following items of interest:

- The website www.globalgadgetuk.com, with a specific URL link indicating a page for a "Y300 triple system jammer, was visited on computer 1.
- The website address "www.thingswebuy.com" was found located in pagefile.sys on computer 1.
- Multiple e-mail messages showing correspondence between "Sean Murphy" and "Khmelnitsky Michael from the Sales Department of Phantom Technologies LTD" on computer 2.
- Through independent research, Phantom Technologies LTD's website address is "http://www.phantom.co.il/". On Phantom's website, they claim to be the "World's Leading Developer and Manufacturer of Jammers". The e-mail address "sales@phantom.co.il" listed on their "Contact Us" page appears to match the e-mail address corresponding with "Sean Murphy" found on computer 2.
- Remnants of messages referencing "Global Gadget", "North Shore Movers", a "Y200 Quad" which appears to be a type of jammer in multiple locations on the drive on computer 3.
- Images appearing to be that of "North Shore Movers" were found located under "Documents and Settings\Owner\My Documents\My Pictures\Sean\" on computer 3.
- A message appearing to show correspondence between "Global Gadget UK Ltd" and "Sean Murphy" regarding the purchase of a "Y2000 Quad" was found in unallocated clusters on computer 4.
- Multiple blank forms appearing to be from the company North Shore Movers of Lynn were located under the HP_Administrator's "My Documents" folder on computer 4.
- Multiple contract agreement forms appear to be created for "BJ's Wholesale Club", "Connor Real Estate", "COSTCO" and a letter to Michael T. Wedge the President/CEO of BJ's Wholesale Club and James D. Sinegal the President/CEO of COSTCO Wholesale Warehouse on computer 4.
- Four hundred and fourteen (414) images of jewelry and phone jammers, multiple phone jammer HTML documents, and two (2) e-mails referencing purchasing a jammer were found on laptop 2.

Respectfully submitted,

Caitlin Sweeney
Computer Forensic Examiner
Massachusetts Attorney General's Office
Computer Crime Division


Approved,

David Papargiris
Director Computer Forensics Lab
Massachusetts Attorney General's Office
Computer Crime Division