IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| -vs- | : | CASE NO. 2:11-CR-010 (1) |
| SEAN MURPHY, | : | JUDGE SMITH |
| Defendant. | : | |

## SENTENCING MEMORANDUM - II

PSI Factual Report Objection: ¶¶ 11, 27, 34

There is one unresolved Factual Objection.

In the Addendum to the Presentence Report, it is stated there is an objection to the inclusion of the words "he conduced research on the internet for this burglary" in paragraphs 11, 27, and 34."

The Probation Officer's response to this is that "Robert Doucette and David Nassor testified during the defendant's trial that Sean Murphy conducted research on the internet to obtain specific information regarding this Brinks facility. * * * The Court had the opportunity to preside over Sean Murphy's trial and hear all of the evidence that was presented. The Court would be in the best position to make a determination on this matter." (PSR at Addendum to the Presentence Report, Objection No. 1).

As a result of the above, counsel ordered the trial transcript of David Nassor and Robert Doucette. Attached to this document are what this counsel believes to be the pertinent question dealing with this issue (Exhibit 13). In both of their testimony, Messrs. Nassor and Doucette are quite vague and do not use the word "research."

This counsel remembers the only time "research" was used was in the Opening Statements of the Government's attorney. At the onset of the Opening Statement, he states that Mr. Murphy used "research" on the internet.

As a result of the above, it is respectfully asserted that the Factual Objection to this issue be sustained.

Objection No. 2: Intended Loss

In the Presentence Report, again, at the Addendum, it states:

"Objection No. 2

The defendant and defense counsel object to the government's assertion that 'intended loss" should be $92,000.00. There was no information that the perpetrators intended or attempted to steal 'all the money' in the building. Additionally, Murphy argues both Joseph Morgan and Robert Doucette were held responsible for the $92,000,000 'intended loss' by the probation department in their presentence investigation report. However, the Court sustained their objection and sentenced them under §2B1.2(b)(1)(J), which only adds 18 points to the base offense level. Here, the government is applying § 2B1.1(b)(1)(M), more than $50,000,000, which adds 24 points to the base offense level. This enhancement is inherently unfair and punished Murphy significantly more than Morgan and Doucette for the same offense behavior. The

defendant requests the Court to depart downward and 'adjust' to a lower range in the Loss Table commensurate with the loss amount attributed to Morgan and Doucette, resulting in a 6 level reduction."

Probation Officer's response is: "At the time plea agreements were being finalized for Joseph Morgan and Robert Doucette, the government did not have the final loss figures from Brinks and, therefore, there was a discrepancy in the loss figure for which these two defendants were held accountable. Therefore, the loss figure was lower than the true figure. Regardless, the government agreed the defendants had the ability to steal in excess of $92,000,000. * * * The defendant further contends he should only be accountable to the loss amount reflected in his co-defendants' plea agreements, to which the government agreed to be bound. When the government negotiated its plea agreements with Morgan and Doucette, the government had yet to receive a full accounting relative to the money contained in the vault at the time of the burglary." (PSR; Addendum at Objection No. 2).

There are numerous reasons why Mr. Murphy should receive a level beginning at 18, instead of the 24 that is noted in this Final Presentence Report.

The first is that Special Agent Harry Trombitas of the FBI knew on January 18, 2009, the day the Burglary was discovered that $100,000,000 was inside the BRINKS facility on Essex. Discovery provided verifies this.

James Daniels, the Vault Supervisor, employed by BRINKS for 19 years, and in his capacity as Vault Supervisor for 15 years, testified on October 18, 2011, in the jury trial.

He arrived on Sunday, January 18th, at around 10-10:30 a.m.

When he looked into the vault, he noticed that they had taken a "small amount of money. The rest of the vault was "full."

This was after the Christmas Season and Mr. Daniels testified that from November to February there is a lot of "money floating around." In other words, there is considerably more money during this time period in the vault, than a "normal day."

He testified that other than the Christmas Season, normally there is about $50,000,000 in the vault.

He, obviously, was interviewed by the FBI, Columbus Police, and, again, it was evident that according to Agent Trombitas and, minimally, Mr. Daniels, there was a significant amount of money left, and law enforcement had specific knowledge of the amount of money.

Thus, when it is stated that at the time of the plea negotiations of Messrs. Morgan and Doucette, the U.S. Attorneys is claiming they did not know the amount of money in the vault, by the testimony of Mr. Daniels, and by discovery, on the very morning the Burglary was discovered, they knew approximately $100,000,000 was stored inside the facility.

It should also be noted that in the Sentencing Memorandum filed by Joseph Morgan on August 11, 2011, the document reflects the objection of the identical objection that this Court now has before it. The Probation Report in Joseph Morgan's also initially used the figure of more than $50,000,000 but less than $100,000,000 and thus the level was 24 under §2B1.1(b)(M). This Court sustained the objection at Mr.

Morgan's Sentencing Hearing on August 17, 2011, and reduced it down to §2B1.1(b)(J) "more than $2,500,000.00, i.e., level 18. In addition to (1) the above noted factual data from discovery and the trial, (2) res judicata, and (3) the law of the case being in favor of Mr. Murphy, (4) Sixth Circuit case law with respect to the intended losses also is directly in his favor.

In <u>United States v. McBride</u>, 362 F.3d 360 (6th Cir. 2004), the Court of Appeals analyzed the issue of "intended loss" in detail. <u>McBride</u> is a jury trial that was conducted in front of this Court, Mr. McBride represented himself, and, as in the present case, the "probation officer estimated the total intended loss at $1,139,760.67, which represented the sum of bad checks written by McBride to the IRS ($12,990.67) and to the bankruptcy court ($800), plus the total market value of the residences of Judge Marbley, attorneys Sherman and Axelrod, and agent Nypaver. ($1,125.970). * * * Even though McBride would never have succeeded in obtaining possession of his victims' residences, the district court nonetheless felt obliged to use the residences' value because intended loss is defined as including 'harm that would have been impossible or unlikely to occur.' ", <u>McBride</u> at 373-74.

In response to the above, Judge Gilman stated: "There may be cases in which the offense level determined under this guidelines substantially overstates the seriousness of the offense. * * * "A court should therefore consider 'whether there was any reasonable possibility that the scheme could have caused the loss the defendant intended.' * * * This is so because the Sentencing Commission is using intended loss as a proxy for the defendant's degree of culpability.", <u>McBride</u> at 375.

The <u>McBride</u> decision then summarizes: "We conclude that the impossibility that McBride's scheme would succeed and the gross disparity between the actual loss and the intended loss demonstrate that there is a significant risk that 'the offense level determined under this guideline substantially overstates the seriousness of the offense . . . [and] a downward departure may be warranted.' ", <u>McBride</u> at 376.

Just as in the <u>McBride</u> case, in the present case, Rob Doucette went out of his way to state that it was physically impossible to obtain any more money from the vault then they did, because of the smoke, fire, and the danger.

It was getting close to 9:00 a.m., they knew that BRINKS employees arrived at that time, and so it was mandatory that they vacate the premises. Robert Doucette testified that they did not gain access to the vault until after 6:30 a.m., and thus had little time before the next BRINKS' shift arrived. (Doucette, TR – 71-72).

In conclusion, with respect to this issue, this Court is well aware that the U.S. Attorney has to show by preponderance of the evidence with respect to the $92,000,000 amount.

It should also be noted that the Government argued at Joseph Morgan's initial appearance way back in Boston Federal Court, that the vault held approximately $93,000,000.

Finally, with respect to letters received, attached to this document are letters from Presiding Judge Albert Conlon, who represented Mr. Murphy when he was in private practice, and also a letter from Rikkile Brown, Mr. Murphy's former wife. (Exhibit 14).

*Included in the attachments also is Exhibit 9, which this counsel neglected to add as part of that Exhibit in the initial Sentencing Memorandum filed in this matter. (Doc. 147).

CONCLUSION

As noted, on the day of the Burglary, a Supervisor at BRINKS told S.A. Harry Trombitas that there was approximately $100,000,000 in the vault. When Joe Morgan appeared in Boston Federal Court in January 2011, the Government argued that the vault contained almost $93,000,000. When the Government wants this Court to believe that they did not know the amount of money in the vault until after March 2011, plea agreements were tendered, this is inconsistent with documentation and testimony. Put another way, it is indisputable that the Government knew the vault contained, minimally, over $50,000,000 and because of the holidays, close to $100,000,000.

For the above reasons, it is respectfully asserted that this Court sustain the Intended Loss Objection.

Respectfully submitted,

s/David J. Graeff
David J. Graeff   #0020647
P.O. Box 1948
Westerville, Ohio  43086
Phone:  (614) 226-5991
Trial Counsel for Defendant
Sean Murphy

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was delivered by ECF to Salvador A. Dominguez and Heather Hill, Assistant United States Attorneys, 303 Marconi Boulevard, Suite 200, Columbus, Ohio 43215, this  18th   day of    January   , 2012.

                         s/David J. Graeff
                         David J. Graeff  #0020647
                         Trial Counsel for Defendant
                         Sean Murphy