1    UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF OHIO
2            EASTERN DIVISION

3
UNITED STATES OF AMERICA,      )
4                              )    CASE NUMBER
               PLAINTIFF,      )    2:11-CR-10(1)
5         VS.                  )
                               )    COLUMBUS, OHIO
6    SEAN D. MURPHY,           )    OCTOBER 17, 2011
                               )
7              DEFENDANT.      )
    _____

8

9                    **VOLUME 1**
        **TRANSCRIPT OF THE JURY TRIAL PROCEEDINGS**
10       BEFORE THE HONORABLE GEORGE C. SMITH
        UNITED STATES DISTRICT JUDGE AND A JURY

11

12

13

14   APPEARANCES OF COUNSEL:

15   FOR THE PLAINTIFF:          SALVADOR DOMINGUEZ, AUSA
                                 HEATHER HILL, AUSA
16
     FOR THE DEFENDANT:          SEAN MURPHY, PRO SE
17                               DAVID GRAEFF, STAND-BY COUNSEL

18

19

20

21

22

23       GEORGINA L. WELLS & DENISE N. ERRETT
           OFFICIAL FEDERAL COURT REPORTERS
24                (614) 719-3225

25

I-N-D-E-X

VOLUME 1 – OCTOBER 17, 2011

GOVERNMENT'S WITNESSES:                                    PAGE NO.

CHRIS McINTOSH    –    DIRECT EX. BY MR. DOMINGUEZ....     71
                  –    CROSS-EX. BY MR. MURPHY........    104

DAVID NASSOR      –    DIRECT EX. BY MR. DOMINGUEZ....    122
                  –    CROSS-EX. BY MR. MURPHY........    156
                  –    REDIRECT EX. BY MR. DOMINGUEZ..    211
                  –    RECROSS-EX. BY MR. MURPHY......    219

– – –

1                    Monday Morning Session

2                      October 17, 2011

3                          – – –

4    IN OPEN COURT:

5         THE COURT:  Good morning.  The defendant is seeking

6    to represent himself and has filed a motion to that effect.

7    So, the first order of business this morning will be to inquire

8    of the defendant on his reasons and what problems that he is

9    having, if any, with Mr. Graeff.

10        And I'll ask Mr. Murphy, why are you raising this at

11   this point?

12        MR. MURPHY:  Well, Your Honor, as the Court knows,

13   the Court granted me $5,000 for investigative funds, and I got

14   Mr. Gary Phillips as an investigator.  And he came up, and I

15   gave him a bunch of items that I would like him to investigate,

16   and he took it, and he was on his way.  And when I got back

17   from picking the jury on Thursday, I received a letter in the

18   mail from Mr. Graeff.  And in that letter, Mr. Graeff had told

19   me that he had told Mr. Phillips to stop his investigation

20   without discussing it with me.  And I also had a bunch of

21   witnesses that I gave Mr. Graeff to put on the list in my

22   defense –– my witnesses –– and also, in that letter, Mr. Graeff

23   said he will not call my witnesses, and I believe for

24   unacceptable reasons.

25        And considering that I have seen Mr. Graeff on

1    Wednesday and Thursday in court, and he never mentioned any of

2    this to me and I didn't find out, I thought this was of grave

3    importance.  And Mr. Graeff came up and seen me on Sunday, he

4    told me that he had reviewed Jencks material, and he told me

5    that there is nothing he could do for me, and he tried to get

6    me to plead guilty.

7           And, Your Honor, this is unacceptable.  And at this

8    point, I must proceed pro so with the assistance of Mr. Graeff

9    because we have actually reconciled certain differences that we

10   have had, and he has agreed to stay on as stand-by counsel in

11   my assistance.

12          THE COURT:  Thank you, Mr. Murphy.

13          Mr. Graeff?

14          MR. GRAEFF:  The last part first, Your Honor.

15   Mr. Murphy and I do not have any communication barriers.  He

16   and I have discussed at length all of the things that

17   Mr. Murphy just mentioned, and essentially, they are correct.

18   He has asked me to, I guess, work as stand-by counsel, and I

19   have absolutely no problem with that.  I know the case.  I

20   probably do not know the case as well as Mr. Murphy, but I do

21   know the case.

22          But Mr. Murphy yesterday has insisted that he wants

23   to work and represent himself, and I agree with his decision,

24   sir.

25          THE COURT:  Thank you, Mr. Graeff.

1    Mr. Dominguez, your response?

2    MR. DOMINGUEZ:  Obviously, Mr. Murphy has that right,

3    Your Honor.  Mr. Graeff, in good faith, telephoned me yesterday

4    and said that this might be a development, and we are ready to

5    go forward.

6    THE COURT:  Thank you.  Mr. Murphy, Mr. Graeff

7    appears in my courtroom and other courtrooms similar to this

8    over many years.  I think you mentioned 38, Mr. Graeff --

9    MR. GRAEFF:  That's correct.

10   THE COURT:  -- years in practice here and as a

11   specialist on criminal cases in both the Common Pleas and the

12   federal courts.  And a specialist actually, too, on

13   representing clients who have been convicted and taking their

14   cases to the higher courts and with some degree of success on

15   that, which is very difficult to do, as you know.  With some

16   degree of success with that.  So, in deciding who to appoint to

17   your case, Mr. Murphy, the vast experience, and frankly, the

18   personality of Mr. Graeff in getting along with clients was the

19   basis for that.

20   Now, you are in federal court, and you know the

21   difference between the two systems.  This is a lot more -- or

22   is more -- I have been in both systems, too -- and this is much

23   more specific, and there are many more appellate cases from the

24   various circuits that are to be followed, and the system is

25   nationwide -- not county-wide and not state-wide -- it is

1  nationwide.  So, there are some very, very specific cases of

2  law, and most cases, by far, are well-settled that you have to

3  be right on -- to use the vernacular -- right on the money to

4  be able to win a point.

5          And you are sure, really sure, that you want to

6  represent yourself, Mr. Murphy?

7          MR. MURPHY:  Yes, Your Honor.  I have been through

8  the federal system before as well as the state, and I am

9  well-prepared and qualified -- I think I am qualified to do

10  what I want to do.

11          THE COURT:  All right.  And the United States Supreme

12  Court has held that an accused has a Sixth Amendment right to

13  conduct his own defense in a criminal case.  Before proceeding,

14  I must advise you that -- that you must knowingly and

15  intelligently waive your right to counsel to insure a valid

16  waiver of counsel.  You should be made aware of the dangers and

17  disadvantage of self-representation so that the record will

18  establish that you know what you are doing and that your choice

19  is made with eyes wide open, and that's what the courts have

20  said.  And you may, of course, be familiar with that.

21          So, I must make a further inquiry as to your

22  understanding of what's going on here and what's about to

23  happen here.  To meet the burden, the Court must first consider

24  whether the defendant is competent to waive his right to

25  assistance of counsel.  The competency standard for waiving the

1    right is the same as the competency standard for pleading

2    guilty or standing trial; it is not a higher standard.  If you

3    are competent to waive counsel, if you have a sufficient

4    ability to consult with your lawyer and have a reasonable

5    degree of rational and factual understanding of the proceeding

6    against you.

7            The Court must also ascertain whether you, as the

8    defendant, that your waiver is made knowingly and voluntarily.

9    Is it?

10            MR. MURPHY:  Yes, sir.

11            THE COURT:  The Court of Appeals for the Sixth

12   Circuit has recommended that district courts ask a series of

13   specific questions to a defendant who wishes to represent

14   himself without the assistance of counsel in a criminal

15   proceeding.  And the following is a modified list of the

16   questions which consider whether the defendant is competent to

17   waive his right to counsel and whether the defendant has

18   knowingly and voluntarily waived his right to counsel.

19            Mr. Murphy, how old are you?

20            MR. MURPHY:  Forty-seven years old.

21            THE COURT:  What is it?

22            MR. MURPHY:  Forty-seven.

23            THE COURT:  Forty-seven?  Have you taken any narcotic

24   drugs, medicine or pills or drunk any alcoholic beverages

25   within the past 24 hours?

1    MR. MURPHY:  No, sir.

2    THE COURT:  Have you read a copy of the Indictment

3  against you?

4    MR. MURPHY:  Yes, sir.

5    THE COURT:  And do you understand the Indictment and

6  factual allegations made against you?

7    MR. MURPHY:  Yes, Your Honor.

8    THE COURT:  Do you consent to Mr. Graeff serving as

9  stand-by counsel throughout the trial and allow him to sit at

10  counsel table to assist you with evidentiary and procedural

11  matters?

12    MR. MURPHY:  Yes, Your Honor.

13    THE COURT:  Now, if I grant this, Mr. Murphy, and you

14  don't want Mr. Graeff involved at all, he is still going to be

15  there, and he is going to be involved and available to you,

16  whether you like that or not.

17    MR. MURPHY:  Yes, sir.

18    THE COURT:  You understand that?

19    MR. MURPHY:  Yes, Your Honor.

20    THE COURT:  So, there is no -- the firing here, the

21  separation of you two is only because you have a right to

22  represent yourself, and the Court is obligated to have legal

23  counsel available to you, and I have done that in the past.

24    And Mr. Graeff, do you doubt as to your client's

25  understanding of the nature of this proceeding?

1          MR. GRAEFF:  Your Honor, I have no doubt -- I believe

2     I entered this case in June of this year, and I have seen him

3     upwards of 15 or 20 times.  He is one of the more intelligent

4     young men I have ever met.  He understands perfectly the rules

5     of evidence and case law.  He is even aware of the last case

6     that you and I had together where I was stand-by counsel -- I

7     believe it was U.S. v. McBride.  And he knew about the case

8     before I even mentioned it.  So, he is extremely aware of case

9     law, the Rules of Evidence and, obviously, the facts of this

10    case.

11         THE COURT:  Mr. Murphy, again, have you ever studied

12    law?

13         MR. MURPHY:  I am a certified paralegal, Your Honor.

14         THE COURT:  In order to prepare for that, did you

15    take any courses?

16         MR. MURPHY:  Yes, I did.

17         THE COURT:  And where were those courses taken?

18         MR. MURPHY:  Boston University, Your Honor.

19         THE COURT:  And what was the length of time you spent

20    doing that?

21         MR. MURPHY:  Eighteen months.

22         THE COURT:  And did you ever work for a law firm?

23         MR. MURPHY:  Yes, I did, Your Honor.

24         THE COURT:  What was the law firm?

25         MR. MURPHY:  I worked for two law firms, but I worked

1  with the same attorney, it was attorney Albert S. Conlon.  He

2  worked -- we worked for Ware(phonetic), Samson, Conlon &

3  Conlon, and then it turned over to Conlon & Conlon until Albert

4  Conlon became a judge, and then I went into business for

5  myself.

6  　　　　THE COURT:  Well, after -- before he became a judge,

7  what kind of cases did you handle?

8  　　　　MR. MURPHY:  Again, I sat in on many criminal trials

9  as the paralegal on the case, and I have also handled several

10 civil trials on my own, pro so.

11 　　　　THE COURT:  So, you have done this before?

12 　　　　MR. MURPHY:  Yes, sir.

13 　　　　THE COURT:  Now, to what degree of success?  Well,

14 have you ever been successful?

15 　　　　MR. MURPHY:  Well, Your Honor, in regards to my civil

16 trials, I think I have won four out of five.  In the

17 Massachusetts Appeals Court, I have had 16 cases up there, and

18 I have won nine out of those 16 in the appeals court.  And

19 criminally, I have been successful on my last five criminal

20 cases in a row.

21 　　　　THE COURT:  And you have represented yourself?

22 　　　　MR. MURPHY:  On one of them.  Usually, I have had an

23 attorney that did what I asked him to do and worked with me

24 closely, and I didn't have a problem with him, and we were

25 successful in working together.  And that's what I am hoping

1   that me and Mr. Graeff can do now, is to work together to be

2   successful.

3          THE COURT:  Okay.  Let's go over the Indictment here.

4          Count 1, the conspiracy to transport stolen goods, in

5   violation of 18 United States Code, Section 371;

6          Counts 2 and 3, traveling in interstate commerce with

7   the intention to further promote an unlawful act, in violation

8   of 18 U.S.C., Section 1952 and Section 2;

9          And in Count 4, interstate transportation of stolen

10  property, in violation of 18 U.S.C., Sections 2314 and 2.

11         And the penalties for these:  On Count 1, up to 5

12  years imprisonment, $250,000 fine, $100 special assessment and

13  three years of supervised release;

14         On Counts 2 and 3, up to 5 years imprisonment,

15  $250,000 fine, a $100 special assessment and three years

16  supervised release on each count;

17         And on Count 4, up to 10 years imprisonment, a

18  $250,000 fine, $100 special assessment and three years

19  supervised release.

20         Do you realize that if you are found guilty of more

21  than one of those crimes, the Court can order the sentences to

22  be served consecutively, that is one after the other?  They

23  could be stacked.  Do you understand what that means?

24         MR. MURPHY:  Yes, Your Honor.

25         THE COURT:  So, you could serve five years, and then

1  five years on 2, five years on 3 and another or up to ten years

2  on Count 4, which adds up to 25 years?

3       MR. MURPHY:  Yes, Your Honor.

4       THE COURT:  And so forth.  The Court understands that

5  you have been offered an opportunity to plead guilty and to, I

6  believe, one count and with a limited sentence even on that

7  basis.  Do you still want to turn that down?

8       MR. MURPHY:  Yes, Your Honor.  The offer that the

9  government gave me was just too much time.

10      THE COURT:  All right.  Basically, if you represent

11  yourself, you are basically on your own, and even though

12  Mr. Graeff will be there to advise you, you are the one that is

13  going to be having the discussions with the jury?

14      MR. MURPHY:  Yes, Your Honor.

15      THE COURT:  And they are going to judge you, just as

16  they do Mr. Dominguez, and they are going to judge you as well

17  as they judge your witnesses as to the facts and whether to

18  believe you or not or whether you are convincing or not, and

19  that's an important part of this case.

20      You say that you are familiar with the Federal Rules

21  of Evidence?

22      MR. MURPHY:  Yes, Your Honor.

23      THE COURT:  Do you realize the Federal Rules of

24  Evidence govern what may or may not be introduced at the trial?

25  In representing yourself, you must abide by those rules.  And

1  one of them is -- I am anticipating what may be happening

2  here -- but one of those is relevance.  If you try to introduce

3  something that's not relevant or doesn't have anything to do

4  with this specific case, the Court will not let you do that.

5  Do you understand?

6          MR. MURPHY:  Yes, Your Honor, I understand.

7          THE COURT:  Anymore than Mr. Dominguez, if he puts up

8  someone that isn't relevant.  But I am just conjecturing here a

9  little bit, but you know, Mr. Graeff may be advising you -- as

10  any lawyer would advise you -- that you can't run in a bunch of

11  witnesses that don't have relevant information or for other

12  reasons would not be -- it would not be acceptable in court.

13  And I can't tell you, I can't advise you how to do this or how

14  to do that; do you understand that?

15          MR. MURPHY:  Yes, Your Honor.

16          THE COURT:  In a civil case, I might be able to say,

17  well, you have got to do this or that, I can try to guide the

18  case as to whether they stick to what's going on, but I can't

19  do that with you or anyone similarly-situated; do you

20  understand that?

21          MR. MURPHY:  Yes, Your Honor.

22          THE COURT:  Also, if you decide to take the witness

23  stand, which, as you know, you don't have to do, you must

24  present your testimony by asking questions of yourself and

25  giving counsel, opposing counsel, an opportunity to enter

1  objections and not just spiel on as a narrative.  Do you

2  understand that?

3        MR. MURPHY:  Yes, Your Honor.  I won't be taking the

4  stand in this trial.

5        THE COURT:  All right.  And finally, I must advise

6  you that, in my opinion, that you would receive a better

7  defense if you proceeded with a lawyer, full-time working for

8  you and presenting your case before the jury than you would on

9  your own.  I think it is unwise to try and represent yourself,

10 even though you feel that you have had probably more experience

11 than most of the defendants who come in here and try to do

12 that.

13        But you may think that you are familiar with the law,

14 but you are not familiar with actually these courtroom

15 procedures here in Columbus, Ohio, and I would strongly urge

16 you not to represent yourself -- and I assume the answer is

17 still no?  Or still, yes, that you want to represent yourself?

18        MR. MURPHY:  Yes.

19        THE COURT:  I ask you to consider, again, the

20 penalties that you could suffer in light of all of the

21 difficulties of representing yourself and what effect that

22 might have on the thinking of the jury, and that's my last --

23 that, and is your decision entirely voluntary to represent

24 yourself?

25        MR. MURPHY:  Yes, Your Honor.

THE COURT: Now, the Court finds that the defendant,

Sean Murphy, has knowingly and voluntarily waived his right to

counsel -- you may be seated -- and the Court also finds that

the defendant is competent to waive this right as he has

demonstrated an understanding of the proceeding and the factual

allegations against him.  I will, therefore, permit him to

represent himself.

Your right to represent yourself, however, is not

absolute; therefore, I am going to ask Mr. Graeff to continue

in his role of stand-by counsel to both assist you, and if

necessary, to replace you if the Court determines during the

trial that you can no longer represent yourself.

Are there any other preliminary questions that we

must discuss before we bring in the jury?

MR. DOMINGUEZ:  Just very preliminary, Your Honor.

It is something that we need not resolve at this point in time.

I discussed with Mr. Graeff yesterday, Government's Exhibit

15-1.

If I may approach, Your Honor?

THE COURT:  Yes.

MR. DOMINGUEZ:  This is an item of evidence that has

been provided months ago to Mr. Graeff in discovery.  And it is

a manifesto, if you will, reportedly written by Sean Murphy and

recovered by a Corrections Officer at the Essex County Prison

Facility in Massachusetts in July of 2010.  It is signed by

1    Sean Murphy, and we are going to want to introduce that item

2    into evidence sometime during the government's case-in-chief.

3           THE COURT:  Have you seen this?

4           MR. MURPHY:  I just seen it this morning, Your Honor.

5    Mr. Graeff just gave it to me.

6           THE COURT:  Does he have a copy of this?

7           MR. DOMINGUEZ:  Yes, Your Honor.

8           THE COURT:  Okay.

9           MR. GRAEFF:  That was provided during the course --

10   Mr. Graeff will verify that -- that was given well over a month

11   ago during the course of discovery in this case.

12          The government's theory on its foundation would be,

13   of course, to call up to the witness stand the sergeant,

14   Sgt. Roach, Michael Roach, who actually obtained that booklet

15   in the Essex County Jail.  Factually, Mr. Murphy was

16   transferred from that jail on April 28th of 2010.  And in July

17   of 2010, as a result of a search of a cell that was across from

18   the cell that Mr. Murphy resided in, the booklet itself was

19   taken out from underneath the bunk.

20          THE COURT:  Not his cell?

21          MR. DOMINGUEZ:  Not his cell, it was Prisoner

22   McDonald's cell.  We would be seeking to introduce that item of

23   evidence under Rules of Evidence 901, and we believe that the

24   Court can conduct a preliminary fact-finding mission with

25   respect to --

1  THE COURT:  I will need to do that outside of the

2  hearing of the jury.

3  MR. DOMINGUEZ:  That is exactly right, Your Honor.

4  And the cases that I'll provide the Court with are Maldonado

5  and Rivera out of the Second Circuit and Dumeisi out of the

6  Seventh Circuit, similar fact patterns.

7  We believe -- the way we want to approach this, which

8  is why the Court does not have to address this issue at this

9  point, we believe that the evidence that will be adduced during

10  the course of this trial will dictate that the contents of that

11  manifesto, if you will, is a mirror image of Mr. Murphy's

12  participation in the Brink's burglary during the course of the

13  evening hours and the morning hours of January 17 and

14  January 18 of 2009.

15  THE COURT:  Bring in the jury.

16  – – –

17  THEREUPON, the Jury entered the courtroom.

18  – – –

19  THEREUPON, the Court and the U.S. Deputy Marshall

20  conferred at the bench, and as a result, the following

21  proceedings were held at the bench out of the hearing of the

22  jury:

23  THE COURT:  It has come to my attention that the

24  United States Deputy Marshal who is assigned to the security in

25  this courtroom, that he has a request, and I will let him make

1   it for the record.

2           DEPUTY MARSHAL:  If the defendant is going to proceed

3   pro se, we have additional logistical concerns and security

4   concerns as movement comes with that.  I want to make it clear

5   that he is to use the podium, and it will only be in that area,

6   no movements to either side.  And at sidebars, I request that,

7   clearly, he have a Deputy Marshal beside him at all times.  And

8   that the defendant wear a restraining device, which will

9   clearly not be visible to the jury, but it will prevent any

10  sudden --

11          THE COURT:  I want to make sure that it is not

12  visible to the jury.  Mr. Murphy?

13          MR. MURPHY:  Your Honor, I object to having a sidebar

14  with the Marshal next to me.  It is will be obvious that I am

15  in custody, in jail, and I assure the Court that I will adhere

16  to security procedures and not try anything whatsoever to upset

17  the normal course of this trial.  And I would suggest that I,

18  based upon my experience in the legal system and in courtroom

19  protocol, that I am not going to violate any of the rules that

20  the Marshal gives me.

21          But putting on a restraining device and having the

22  Marshal next to me -- there will be some sidebar discussions in

23  this trial, Your Honor, and it will create a prejudicial effect

24  on my defense.

25          THE COURT:  Well, as long as the device is not seen,

1  it may actually make it possible for you not being as close --

2  I would not want you standing next to him or behind him if he

3  is addressing the jury, you know, but you must do what you have

4  to do, but I don't want you to be so close that it is obvious.

5       DEPUTY MARSHAL:  Absolutely, if it is the podium.

6       MR. MURPHY:  Your Honor, in closing, are we going to

7  be addressing the jury from the jury box or the podium?

8       THE COURT:  Opening and closing, we don't go to the

9  jury box here in federal court.  In Common Pleas Court, we do.

10      So, it is really pretty strict rules about where you

11 are to stand.

12      MR. MURPHY:  In the First Circuit, they allow counsel

13 to do it, but I will abide by the Sixth Circuit rules.

14      THE COURT:  I don't like it.  I have tried it, and we

15 have jurors crawling in the jury box, in the Common Pleas

16 boxes.

17      DEPUTY MARSHAL:  Your Honor, at sidebar, could I

18 suggest I stand beside you?  That way, counsel, I am not right

19 beside him.

20      THE COURT:  You understand what we are trying to

21 avoid?

22      DEPUTY MARSHAL:  Yes, sir.

23      THE COURT:  What Mr. Murphy's concern is, that while

24 up here, is that he is being restrained while he is working in

25 here.  You do have a history, as I understand it, you have been

1  incarcerated before?

2      MR. MURPHY:  Yes, Your Honor.  I have been

3  incarcerated before, and you know, I understand the Court's

4  ruling.  My concern is if the U.S. Marshal is at my guard at

5  all times -- if they put a restraint on me, it is basically a

6  taser?  So, if I do anything -- he wouldn't have to be up here,

7  he could tase me and I would hit the floor.

8      THE COURT:  That would be absolutely the last resort,

9  and I assume you would have to make a definite movement.

10      DEPUTY MARSHAL:  Yes, Your Honor.  There is criteria.

11  Mr. Murphy would be advised of this prior to it being applied

12  or attached to him.

13      THE COURT:  Okay.  Well, let's lay off that now until

14  we break --

15      DEPUTY MARSHAL:  Yes, Your Honor.

16      THE COURT:  -- after the preliminary instructions.

17      MR. MURPHY:  I have one more request.  I have an

18  investigator, and I will need to resurrect my defense.  And I

19  will need 30 minutes, if we can get him here during the break

20  or whatever, to actually tell him what I need him to do.  I

21  need him to subpoena my witnesses and finish the investigation

22  work that he had started.  I assume my defense will start

23  sometime next week -- Mr. Dominguez will probably take this

24  whole week up -- and if you remember, on the pretrial, we

25  discussed the matter of an easel?

1          THE COURT:  Yeah, we have an easel around here

2    somewhere.

3          MR. MURPHY:  I will need an easel and two pads of

4    paper.

5          THE COURT:  For the easel?

6          MR. MURPHY:  I will need like 40 pages.  And if

7    possible, Your Honor, two Sharpies.

8          THE COURT:  I will tell Lisa what you need.

9          MR. MURPHY:  In my breaks -- I was expecting these to

10   be done before trial, but due to the difficulties we have had,

11   I am forced to do it on my own.  I have to prepare the easels

12   according to my witnesses.  I haven't received a copy of the

13   witness list, so I don't know what the order is, but if I can

14   prepare the easels on my breaks at lunch or anytime that's

15   available, I can write them up to get them ready for trial.

16         MR. DOMINGUEZ:  If I may respond, Your Honor?

17   Mr. Murphy is aware -- the Court read the list of witnesses

18   before the jury when we voir dired them last Thursday, and I

19   will provide a copy of the final witness list to the defense,

20   but Mr. Murphy has received the Jencks material -- most of the

21   material for Mr. Nassor and I gave Mr. Morgan's over on

22   Thursday and Mr. Doucette's over on Friday.  Mr. McIntosh was

23   to be delivered to Mr. Graeff on behalf of Mr. Murphy on

24   Saturday.  So, he has received Jencks material for the

25   witnesses that will testify today and most of tomorrow.  I will

1  continue to provide that Jencks material before the witness

2  testifies in the case.

3          MR. MURPHY:  Your Honor, I have not received Jencks

4  material.  Mr. Graeff may have received it, but I have not

5  reviewed it or seen it in any form at all.  I would ask,

6  depending upon when he calls his first witness, that I would

7  come over to sidebar and make a specific request that I have a

8  reasonable amount of time, based upon my experience, to review

9  the Jencks material.  I hear it is voluminous, hundreds and

10 hundreds of pages.

11         MR. GRAEFF:  As Mr. Dominguez said, I received all of

12 the Jencks material about an hour ago.  I provided it to

13 Mr. Murphy.  He is correct that this is the first time that he

14 has actually received it in his own personal possession, about

15 an hour ago, and it is extensive.

16         THE COURT:  You are going to have to do all of your

17 work, you know, on your own time, unless there is some kind of

18 surprise or something, some witness that you are not aware of.

19         MR. MURPHY:  No.

20         THE COURT:  You will be able to do that.

21         MR. MURPHY:  But what I would suggest, Your Honor --

22 are you going to be calling any witnesses, Jenck's witnesses

23 today?

24         MR. DOMINGUEZ:  Yes.

25         MR. MURPHY:  I would suggest, Your Honor, that I

1  would be able to go back to my cell tonight and review the

2  Jenck's material and cross-examine tomorrow.

3  　　　　MR. DOMINGUEZ:  Your Honor, Mr. Murphy had a portion

4  of the Jenck's material that was provided to Mr. Graeff as a

5  part of his case in Massachusetts, the statement of Mr. Nassor,

6  when he was interviewed, essentially.  So, he has had that for

7  some time, Mr. Nassor's Grand Jury transcript, which is the

8  only information that I am going into.  I am not touching upon

9  E.A. Dion, which he talked about extensively in his videotaped

10  statement, but I am only focusing on what Mr. Nassor delved

11  into in the Grand Jury transcript, which apparently, Mr. Murphy

12  has now and which clearly can be read over the bunch break.

13  　　　　THE COURT:  Well, you asked for this.  I didn't know

14  about it until this morning.  So, you are going to have to live

15  within your means here by going over it before, you know, the

16  witness takes the stand.

17  　　　　Mr. Graeff has the material.  You are available,

18  aren't you, Mr. Graeff?  Okay.  That's it.

19  　　　　MR. MURPHY:  Yes, sir.

20  　　　　(Back in open court.)

21  　　　　　　　　　　　- - -

22  　　　　THE COURT:  Would the Deputy Clerk please swear the

23  jury panel?

24  　　　　　　　　　　　- - -

25  　　　　　　　THEREUPON, the Jury was sworn.

1                           - - -

2           THE COURT:  Good morning.

3           THE JURY:  Good morning.

4           THE COURT:  One of the things that I think I alluded

5    to during the selection process is that you have to have

6    patience, and I hope you brought your patience with you during

7    the week because there are important legal matters that come up

8    that aren't really the presentation of evidence to you, and I

9    have to do those things and don't blame those on any party --

10   you can all blame it on me, that's okay.  And we will now begin

11   to hear the opening statements of counsel and then take the

12   evidence.  But before that, we want to give you some

13   preliminary instructions which are to give you some guidelines,

14   guidelines to follow as you listen to the case, so you don't

15   listen to all of the evidence and then get instructions later

16   on.

17           In other words, this is what you ought to be looking

18   for and what the charges are and so forth.  And we are going to

19   go into great detail on the charges, because they are fairly

20   complex with the materials, so try to be patient with me as we

21   do this.

22           It is the duty of the Court to instruct you on the

23   law, and it is your duty to follow the law as I will state it

24   to you both now and at the conclusion of the evidence.  You

25   will be given written instructions to hold in your hand and

1    follow as I give the instructions at the end of the case.

2         A criminal case begins with the filing of an

3    Indictment.  The Indictment informs the defendant that he has

4    been charged with an offense.  The fact that it was filed may

5    not be considered by you for any other purpose.  The plea of

6    not guilty is a denial of the charge and puts in issue all of

7    the essential elements of each offense.

8         The Indictment reads as follows:  This is United

9    States of America v. Sean D. Murphy, M-U-R-P-H-Y aka -- it

10   means "also known as" -- Brian Heatherman, H-E-A-T-H-E-R-M-A-N,

11   and two other individuals, Joseph M. Morgan and Robert

12   Doucette, that's spelled D-O-U-C-E-T-T-E.

13        The Grand Jury charges that beginning on or about

14   December of 2008 and continuing through, on or about May of

15   2009, the exact dates being unknown, the Southern District of

16   Ohio and elsewhere, the defendant, Sean D. Murphy, aka Brian

17   Heatherman, hereinafter Sean D. Murphy, Joseph M. Morgan,

18   Robert Doucette, and at least one other person whose identity

19   is known to the Grand Jury, did knowingly, willfully, and

20   unlawfully combine, conspire, confederate and agree -- can

21   everyone hear me all right?  Okay.

22        With each other to transport, transmit, and transfer

23   in interstate commerce any merchandise of money of a value of

24   $5,000 or more, knowing that said merchandise and money had

25   been stolen, in violation of 18 U.S.C. Section 2314 and Section

2.

It was part of this conspiracy that on or about December 2nd, 2008, Sean D. Murphy caused a radio frequency jamming device to be shipped in foreign and interstate commerce from the United Kingdom to the state of Tennessee in order to achieve the objectives of this conspiracy.

It is further a part of this conspiracy that a person known to the Grand Jury traveled from the state of Massachusetts to the state of Tennessee in order to obtain the aforementioned radio frequency jamming device for use during the course of this conspiracy.

It was further a part of this conspiracy that Sean D. Murphy realized -- utilized an alias or one or more false identification documents in order to rent trucks and storage facilities to assist in carrying out the objectives of this conspiracy to avoid detection.

It was further a part of this conspiracy that sometime in early January of 2009, the exact date being unknown to the Grand Jury, a person known to the Grand Jury traveled from the state of Massachusetts to Columbus, Ohio in order to survey and case the Brink's warehouse facility located at 1362 Essex Avenue, Columbus, Ohio.

It was further a part of this conspiracy that on or about January 17th, 2009, Sean D. Murphy, Joseph M. Morgan and Robert Doucette used a variety of tools to gain entry into the

1   Brink's warehouse facility located at 1362 Essex Avenue,

2   Columbus, Ohio.

3           In furtherance of the conspiracy -- this is called or

4   entitled "Overt Acts".  In furtherance of the conspiracy and in

5   order to effect its objectives in the Southern District of Ohio

6   and elsewhere, the defendant Sean D. Murphy, Joseph M. Morgan

7   and Robert Doucette and another person known to the Grand Jury

8   did commit at least one of the following overt acts among

9   others:

10          1.  On or about December 1, 2008, a person known to

11  the Grand Jury drove from the Greater Boston, Massachusetts

12  Metropolitan Area to Memphis, Tennessee.

13          2.  During the month of January of 2009, a person

14  known to the Grand Jury drove from the Greater Boston,

15  Massachusetts Metropolitan Area to Columbus, Ohio.

16          3.  On January 3rd, 2009, Sean D. Murphy, using the

17  alias Brian Heatherman rented a storage facility from the

18  LockUp Storage Centers, 922 Brush Creek Road, Warrendale,

19  Pennsylvania.

20          4.  On or about January 15th of 2009, Sean D. Murphy

21  rented a Dodge sedan from DTG Operations dba Thrifty Car

22  Rental, 40 Lee Burbank Highway, Revere, Massachusetts.

23          5.  On January 16th of 2009, Sean D. Murphy, using

24  the alias Brian Heatherman, rented a truck from Newmarket

25  Storage, 133 Exeter Road, Newmarket, New Hampshire.

1          6.  On or about January 16th, 2009, Sean D. Murphy,

2  Joseph M. Morgan and Robert Doucette drove from the Greater

3  Boston, Massachusetts Metropolitan Area to Warrendale,

4  Pennsylvania.

5          7.  On or about January 17th, 2009, Sean D. Murphy,

6  Joseph M. Morgan and Robert Doucette drove from Warrendale,

7  Pennsylvania to Columbus, Ohio.

8          8.  On or about January 17th, 2009, Sean D. Murphy

9  and Joseph M. Morgan entered the Brink's Warehouse Facility

10  located 1362 Essex Avenue, Columbus, Ohio.

11          9.  On or about January 18th of 2009, Sean D. Murphy,

12  Joseph M. Morgan and Robert Doucette drove from Columbus, Ohio

13  to Warrendale, Pennsylvania.

14          10.  On or about January 18th of 2009, Sean D Murphy,

15  Joseph M. Morgan and Robert Doucette drove from Warrendale,

16  Pennsylvania to the Greater Boston, Massachusetts Metropolitan

17  Area.

18          All in violation of 18 United States Code, Section

19  371.

20          Count 2:  On or about the month of January of 2009,

21  the exact date being unknown to the Grand Jury, Sean D. Murphy

22  did knowingly, willfully, and unlawfully aid, abet and cause an

23  individual known to Grand Jury to travel in interstate commerce

24  from the State of Massachusetts to the Southern District of

25  Ohio, with the intent to further promote, manage, establish,

1  carry on and to facilitate the promotion, management and

2  establishment and carrying on of unlawful activity, that being

3  the theft of merchandise and money, for the purpose of taking

4  the stolen merchandise and money in interstate commerce from

5  the Southern District of Ohio to locations outside the State of

6  Ohio.

7          In violation of the laws of the United States,

8  specifically, 18 United States Code, Section 2314.

9          And thereafter, Sean D. Murphy did cause the

10  performance and attempted performance of acts to further

11  promote, manage, establish and carry on and facilitate the

12  promotion, management, establishment and carrying on of said

13  unlawful activity.

14          In violation of 18 United States Code, Section 1952

15  and Section 2.

16          Count 3:  On or about January 16th of 2009, Sean D.

17  Murphy, Joseph M. Morgan, and Robert Doucette did knowingly,

18  willfully and unlawfully travel in interstate commerce from

19  Columbus, Ohio -- from the State of Massachusetts to the

20  Southern District of Ohio with the intent to further promote,

21  manage, establish, carry on and to facilitate the promotion,

22  management, establishment and carrying on of unlawful activity,

23  that being the theft of merchandise and money for the purpose

24  of taking the stolen merchandise and money in interstate

25  commerce from the Southern District of Ohio to locations

1  outside the State of Ohio.

2          In violation of the laws of the United States,

3  specifically 18 United States Code, Section 2314.

4          And thereafter, Sean D. Murphy, Joseph M. Morgan and

5  Robert Doucette did perform and attempt to perform acts to

6  further promote, manage, establish and carry on and facilitate

7  the promotion, management, establishment and carrying on of

8  said unlawful activity.

9          In violation of 18 United States Code, Section 1952

10 and Section 2.

11         Count 4:  On or about January 18th of 2009, in the

12 Southern District of Ohio, the defendant, Sean D. Murphy,

13 Joseph M. Morgan, and Robert Doucette did unlawfully transport

14 stolen merchandise and money in interstate commerce, that is

15 miscellaneous items of some value and more than $5,000 in U.S.

16 currency from Columbus, Ohio to locations outside of the State

17 of Ohio, knowing that the merchandise and money had been

18 stolen.

19         In violation of Title 18 U.S.C., Section 2314 and

20 Section 2.

21         Signed a True Bill, signed by the foreperson of the

22 Grand Jury and Carter M. Stewart, United States Attorney, and

23 Gary L. Spartis, Columbus Branch Chief, Assistant United States

24 Attorney.

25         Now, here are the jury instructions -- those are the

1  charges that I have just read:  The duty of the jurors is,

2  first of all, your exclusive duty is to decide all questions of

3  fact submitted to you.  In connection with this duty, you must

4  determine the effect and value of the evidence.  You must not

5  be influenced by your decision and by any sympathy or prejudice

6  toward any party, witness or attorney in this case.

7           If, in these instructions or in the instructions

8  which I will give you at a later point in time, any principle

9  or idea is repeated or stated in varying ways, no emphasis

10  thereon is intended and none must be inferred by you.

11  Therefore, you must not single out any particular sentence or

12  individual point or instruction and ignore the others, but

13  rather, you are to consider each instruction in relation to all

14  of the other instructions.

15           The fact that I give you some of the instructions now

16  and some at the conclusion of the evidence has no significance

17  as to their relative importance nor has the order in which I

18  give you the instructions have any significance.

19           The attorneys and the defendant will, of course, have

20  active roles in the trial.  The Court has already conducted the

21  voir dire.  The parties will make opening statements to you,

22  question the witnesses and make objections.  And finally, they

23  will argue the case as their last step before you hear any

24  final -- my final instructions and begin your deliberations.

25           I want you to remember that the attorneys are not

1    witnesses.  And since it is your duty to decide the case solely

2    on the evidence, what you see or hear in this case, you must

3    not consider the evidence any statements of any attorney made

4    during this trial.

5         Now, I'll tell you, so it helps you understand the

6    instructions, Mr. Murphy is going to act as his own attorney.

7    So, you will be hearing from him, and any statements that he

8    makes in his capacity of representing himself is not sworn

9    testimony, unless he wants to put himself on the witness stand.

10   And at that point it would be sworn testimony.  I do not know

11   if that will happen at this point, and that is strictly up to

12   Mr. Murphy.  Mr. Graeff will continue to serve as an attorney

13   provided for Mr. Murphy to assist him during the trial if he

14   determines that he needs help.

15        If a question is asked by one attorney and an

16   objection to the question is made by another attorney, the duty

17   is placed by law upon the Court to decide under the appropriate

18   Rules of Evidence whether the objection should be sustained or

19   overruled.  If the objection is sustained, you will not hear

20   the answer, and you must not speculate as to what the answer

21   might have been or as to the reason for the objection.  If the

22   answer is given to a question before an objection is made and

23   sustained by the Court, the Court will then grant a motion to

24   strike out the answer, and you will be further instructed to

25   completely disregard such question and answer and not consider

them for any purpose. A question in and of itself is not evidence, but it may be considered by you only as it supplies meaning to the answer.

Presumption of innocence, burden of proof and reasonable doubt. As you know, the defendant has pled not guilty to the crimes charged in the Indictment. The Indictment is not any evidence at all of guilt; it is just the formal way that the government tells the defendant what crimes he is accused of committing. It does not even raise any suspicion of guilt. That must be based upon the facts and evidence and documents that you would hear or see coming from the witness stand in this case.

Instead, the defendant starts the trial with a clean slate with no evidence at all against him, and the law presumes that the defendant is innocent. This presumption of innocence stays with the defendant unless the government presents evidence here in court that overcomes the presumption of innocence and convinces you beyond a reasonable doubt that the defendant is guilty. This means that the defendant has no obligation to present any evidence at all or to prove to you in any way that he is innocent. It is up to the government to prove that the defendant is guilty, and this burden stays on the government from start to the finish.

You must find the defendant not guilty unless the government convinces you beyond a reasonable doubt that he is

1    guilty.  The government must prove every element of the crimes

2    charged beyond a reasonable doubt.  Proof beyond a reasonable

3    doubt does not mean proof beyond any possible doubt.  Possible

4    doubt or doubts based purely on speculation are not reasonable

5    doubts.  A reasonable doubt is a doubt based upon reason and

6    common sense.  It may arise from the evidence, the lack of

7    evidence or the nature of the evidence.

8           Proof beyond a reasonable doubt means proof which is

9    so convincing that you would not hesitate to rely and act on it

10   in making the most important decisions of your own lives.  If

11   you are convinced that the government has proved the defendant

12   guilty beyond a reasonable doubt, say so by returning a guilty

13   verdict.  If you are not convinced, say so by returning a not

14   guilty verdict.

15          Now, what is evidence?  With some frequency, you will

16   hear the term evidence.  Evidence in a case consists of only

17   the sworn testimony of the witnesses, the exhibits that are

18   received into evidence, and any stipulation of fact entered

19   into by the parties.  However, exhibits offered as evidence but

20   not admitted by the Court are not to be considered by you at

21   all.  As I have told you, the Indictment is not evidence.  The

22   opening statements of the parties that you hear before any

23   evidence is presented are not to be considered as part of the

24   evidence.  Any questions or statements to which I sustain an

25   objection are not to be considered as evidence.  The closing

1    arguments of the parties are not evidence.  Finally, anything

2    that you may see or hear outside of this courtroom is not

3    evidence and must not be considered by you as evidence.

4          You are to consider only the evidence in this case.

5    You are permitted to draw from the facts that you find have

6    been proved by the evidence such reasonable inference as seem

7    justified in the light of your own experience.  That is to say,

8    from the facts that have been proved, you may draw an inference

9    based upon reason and common sense.  You may not, however, base

10    one inference solely upon another inference.

11          You may draw more than one inference from the same

12    facts or circumstances.  But if the circumstances create

13    inferences that are equally consistent with either innocence or

14    guilt, such inferences must be resolved in favor of the

15    defendant's innocence.  Testimony elicited on cross-examination

16    of witnesses is evidence as is testimony elicited on direct

17    examination of witnesses.

18          Direct and circumstantial evidence.  These are two

19    types of evidence that you, as jurors, may properly consider in

20    reaching the verdict.  They are known as direct evidence and

21    circumstantial evidence.  Direct evidence is where a witness

22    testifies to what he or she heard or observed.  In other words,

23    when a witness testifies about what is known to the witness as

24    personal knowledge, by virtue of his or own senses, what he or

25    she sees or hears, that is called direct evidence.  For

1    example, if a witness testified that she saw it raining outside

2    and you believe her, that would be direct evidence that it was

3    raining.

4            Proof of a chain of circumstances pointing to the

5    commission of the offense is an example of circumstantial

6    evidence.  Circumstantial evidence is evidence which tends to

7    prove a disputed fact by proof of other facts.  You infer on

8    the basis of reason and experience and common sense from the

9    established fact, the existence or non-existence of some fact.

10           For example, if someone walked into the courtroom

11   wearing a raincoat covered with drops of water and carrying a

12   wet umbrella, that would be circumstantial evidence from which

13   you could conclude that it was raining.  Circumstantial

14   evidence is of the same value as direct evidence.

15   Circumstantial evidence is of the same value as direct

16   evidence.

17           As a general rule, the law does not distinguish

18   between direct and circumstantial evidence.  The law does

19   require that before you convict -- before convicting a

20   defendant, the jury must be satisfied from all of the evidence

21   in a case that the government has proved the defendant guilty

22   beyond a reasonable doubt.

23           Witness credibility.  An important part of your job

24   will be making a judgment about the testimony of the witnesses

25   who will testify in this case.  You should decide whether you

1  believe what each person had to say and how important that

2  testimony was.

3        In making that decision, I suggest that you ask

4  yourself a few questions after their testimony:

5        Did the person impress you as honest?

6        Did he or she have any particular reason not to tell

7  the truth?

8        Did he or she have any personal interest in the

9  outcome of the case?

10        Did the witness seem to have a good memory?

11        Did the witness have the opportunity and ability to

12  observe accurately the things that he or she testified about?

13        Did he or she appear to understand the questions

14  clearly and answer them directly?

15        Did the witness's testimony differ from the testimony

16  of other witnesses?

17        These are a few of the considerations that will help

18  you determine the accuracy of what each witness said.  There

19  are some of these things that you may consider in deciding --

20  these are only some of the things that you may consider in

21  deciding to believe a witness.  You may also consider other

22  things that you think shed some light on the witness's

23  believability.

24        Opinion witness credibility.  Are we going to have

25  some opinion witnesses, counsel?

1    MR. DOMINGUEZ:  We will, Your Honor.

2    THE COURT:  Mr. Murphy?

3    MR. MURPHY:  Not at this time, Your Honor.

4    THE COURT:  You may hear testimony from an opinion

5    witness or witnesses.  An opinion witness is one who by

6    knowledge, skill, experience, training or education has

7    specialized knowledge of some art, science, profession or

8    calling.  An opinion witness is allowed to express his or her

9    opinion on those matters about which he or she has special

10   knowledge and training.  Opinion witness testimony is presented

11   to you on the theory that someone is experienced in the field

12   and can assist you in understanding the evidence or in reaching

13   an independent decision on the facts.

14        You may consider the opinions received in evidence in

15   this case and give it such weight as you think it deserves.  If

16   you decide that the opinions are not based upon sufficient

17   knowledge, skill, experience, training or education or that the

18   reasons given in support of the opinions are not sound or that

19   the opinion is outweighed by other evidence, you may disregard

20   the opinion entirely.  Likewise, you may disregard the opinion

21   witness if you decide that any assumptions of fact upon which

22   the opinion is based are not established by the evidence.  You

23   may give the opinion witness testimony whatever weight, if any,

24   that you find it deserves in light of all of the evidence in

25   this case.

1      In your daily lives, you are constantly determining

2  who is worthy of belief and who is not.  Employ the same tests

3  in determining what weight and credibility, if any, you will

4  assign to the testimony of each witness; who do you believe?

5      Collective memory.  During the trial of this case, it

6  will be your duty to pay careful attention to all of the

7  testimony.  Your careful attention is required because you must

8  rely on your combined collective memory or collections of the

9  facts –- recollection of the facts.  In the absence of some

10  extraordinary reason, the Court will not bring you back into

11  the courtroom and order the testimony of a particular witness

12  read to you after you have begun your deliberations.  So, you

13  must rely on your own individual memory and the collective

14  memory of the jury as a whole.  You must pay careful attention

15  to all of the testimony.  If you are unable to hear any

16  witness, I ask that you so indicate –- just raise your hand,

17  and I will ask you why your hand is raised –- and we will have

18  the witness speak up or face you or do whatever is necessary.

19  I ask that you do so.  On occasion, I will instruct the witness

20  to speak up.  As I have said to you before, you must rely upon

21  your collective memories.

22      Notetaking.  Those of you who wish to take notes

23  during the trial will be permitted.  If you choose to take

24  notes, the notes you take are for your only personal use and

25  should not been shared with the other jurors.  It is important

1    that each juror rely solely on his or her recollection and not

2    on another juror's notes.  It is important that you do not

3    attempt to write down every word said.  Instead, those notes

4    should be an outline of the items that you deem important --

5    key words or phrases, however you work that out -- and should

6    serve to aid your recollection during the ultimate

7    deliberation.  If you choose not to take notes, you will be

8    asked to rely upon your own independent recollection or memory

9    of what the testimony was.

10          Another caution.  Consider only the crimes charged.

11    You are here to decide whether the government has proved beyond

12    a reasonable doubt that the defendant is guilty of the crimes

13    charged.  The defendant is only on trial for the particular

14    crimes charged in the Indictment.  Your job is limited to

15    deciding whether the government has proved the crimes charged.

16          Also, remember that whether anyone else should be

17    prosecuted and convicted for this crime is not a proper matter

18    for you to consider.  The possible guilt of others is no

19    defense to a criminal charge.  Do not let the possible guilt of

20    others influence your decision in any way.

21          Now, that completes my preliminary instructions,

22    except for this fact, to remind you, again, that the defendant,

23    Sean Murphy, has decided to represent himself and not use the

24    services of a lawyer.  He has the right to do this.  His

25    decision has no bearing on whether he is guilty or not guilty,

1    and it should have no effect on your consideration of the case.

2         Attorney David Graeff will continue to serve as

3    stand-by counsel with the defendant and may participate

4    periodically.  In other words, the lawyer that will be at that

5    table may assist him, if he wishes.

6         Counsel, is there anything we haven't covered?

7         MR. DOMINGUEZ:  No, Your Honor, thank you.

8         THE COURT:  Mr. Murphy?

9         MR. MURPHY:  Excuse me, Your Honor?

10        THE COURT:  Is there anything that we haven't covered

11   in the instructions?

12        MR. MURPHY:  Not at this point.

13        THE COURT:  All right.  Thank you.

14        Let's take a break here and then come back and hear

15   the opening statements of counsel, and then we will break for

16   lunch.  Ten minutes.

17                           - - -

18             THEREUPON, a recess was taken.

19                           - - -

20   IN OPEN COURT:

21        THE COURT:  Mr. Dominguez, you may proceed.

22        MR. DOMINGUEZ:  Thank you, Your Honor.  May it please

23   this Honorable Court, Special Agent Trombitas, Ms. Hill,

24   Mr. Graeff, ladies and gentlemen, on January 17th of 2009, the

25   climate in Columbus, Ohio was quite cold, but that did not

1  deter three individuals, the evidence will show, from coming

2  into our city in a 24-foot moving van and a Dodge Journey for

3  the sole purpose of entering the Brink's facility located at

4  1362 Essex Avenue here in Columbus to burglarize that Brink's

5  facility.

6          You see, a very, very cold temperature and one

7  person, Robert Doucette, the evidence will show, posed as a

8  lookout in order to detect any law enforcement or otherwise

9  law-abiding citizens from detecting the goings on in and around

10 the Brink's facility.  The Brink's facility is located at 1362

11 Essex here in Columbus.  And for those of you who might be

12 familiar with Columbus, it is just off 1-71 North, where it

13 intersects with 11th Avenue, just west of there, kind of hidden

14 away, tucked away for apparent reasons is that Brink's

15 facility.

16         The evidence will show that Mr. Murphy, Sean Murphy,

17 the defendant in this case, actually did a little research with

18 respect to that Brink's facility -- found it, targeted it and

19 then on that evening of January 17th of 2009 was able to cut

20 several holes into the roof of that facility, found a hole that

21 was over the vault room in that facility, the room that led to

22 the actual vault in that facility, utilized tools in order to

23 blow a hole into a metal door on the vault, and as a result of

24 their activities the late night of January 17th of 2009 and the

25 early morning of hours of January 18th of 2009 was able to

1   obtain well in excess of a million dollars, and the evidence

2   will show they took that money from the Southern District of

3   Ohio outside of the Southern District of Ohio.

4          Good morning, once again, ladies and gentlemen.  I am

5   Sal Dominguez.  We met last week, and I represent the United

6   States.  The Court has informed you in the preliminary

7   instructions that he provided to you this morning that the

8   government has the burden -- and we do -- to prove Mr. Murphy's

9   guilt in this case beyond a reasonable doubt as to every

10   element of the offenses to which he is charged -- the four

11   counts of the Indictment which the Judge has already outlined

12   for you.

13          Ladies and gentlemen, we readily accept that burden

14   in this cause.

15          You see that there was certain activity that led up

16   to the Brink's burglary on January 17th and January 18th of

17   2009 as the evidence will show you during the course of this

18   trial.  I am not going to stand up here and comment upon every

19   piece of evidence because that will come to you by way of that

20   witness stand and by way of the physical evidence that the

21   government intends to present during the course of this trial

22   over the next several days.  So, suffice it to say that what I

23   am telling you now is, basically, a preview of what we believe

24   the evidence will show later today and throughout the several

25   days of this trial.

1    And what that evidence will show you, ladies and

2    gentlemen, is that in early December or late November of 2008,

3    Mr. Murphy, Sean Murphy, hooked up with one of his friends, and

4    you will note that this person has been a friend of

5    Mr. Murphy's for quite some time, and his name is David Nassor.

6    And what happened was that Mr. Murphy asked his old friend,

7    David Nassor, to travel from the state of Massachusetts to the

8    state of Tennessee in order to obtain a radio frequency jammer,

9    which the evidence will show that Mr. Murphy caused to be

10   shipped from the United Kingdom from a company called Global

11   Gadget to Memphis, Tennessee.  And during the course of the

12   trial, you will find out why he went through that evolution as

13   opposed to having it sent directly to the City of Boston in the

14   Greater Metropolitan Area of Boston, Massachusetts.

15   The evidence will show that upon this request,

16   Mr. Nassor did, indeed, travel from Boston, Massachusetts to

17   Memphis, Tennessee and stayed at a Marriot Residence Inn there,

18   checking in on December 1, 2008 and checking out on December

19   3rd of 2008.  And the evidence will show that a Federal Express

20   package from Global Gadget was delivered to Mr. Nassor there

21   and interestingly enough, it was delivered to Mr. Nassor care

22   of Northshore Company -- care of Northshore Company.

23   Mr. Nassor then traveled back to Massachusetts and delivered

24   this radio frequency jamming device to Mr. Murphy.

25   Now, you will hear that device being described as a

1  cell phone jammer during the course of these proceedings, and

2  you might wonder what a cell phone jammer is.  Well, you will

3  be told a little bit about that during the course of these

4  proceedings.  But suffice it to say, that that is a device that

5  is able to disrupt the backup cellular system associated with

6  alarm systems.  It is able to disrupt cellular communications.

7        The evidence will show, ladies and gentlemen, that on

8  January 2nd of 2009, that Mr. Murphy presented himself to

9  Newmarket Storage, a storage facility not in Massachusetts but

10 in Newmarket, New Hampshire.  You see, Mr. Murphy had been

11 doing business with Newmarket Storage over a number of years

12 but didn't do it under the name of "Sean Murphy".  The evidence

13 will show you, we believe, that his name to those who dealt

14 businesswise with him at Newmarket Storage knew him as "Brian

15 Hetherman".  In fact, there was a driver's license that

16 Mr. Murphy used when he did business with Newmarket Storage in

17 New Hampshire, identifying himself as "Brian Hetherman".

18        Anyway, Mr. Murphy -- Mr. Hetherman -- actually

19 rented a 24-foot Budget Rental Truck box truck on that date of

20 January 2nd of 2009 and what he did then was travel from the

21 Greater Boston Metropolitan Area to a town called Warrendale

22 Pennsylvania, just outside of Pittsburgh.  For whatever reason,

23 Mr. Murphy, the evidence will show, selected a storage facility

24 in Warrendale, Pennsylvania called The LockUp in order to get a

25 storage unit there.  And the manager of The LockUp will testify

1   before you, but she will tell you that he used the name "Brian

2   Hetherman", had no questions about particulars with respect to

3   his storage unit, paid cash for the storage unit for six months

4   and went on about his business.  But what the evidence will

5   show is that Mr. Murphy on this occasion, actually unloaded

6   several tools, oxygen tanks, generators, thermal-lance

7   devices -- things with which I am not familiar, I am not an

8   engineer or mechanic -- but numerous tools and left them there.

9   And then traveled back to the Greater Boston, Massachusetts

10  Area and returned that truck to Newmarket on January 7th of

11  2009.

12          Around this same time frame, ladies and gentlemen --

13  don't know the date -- but around this same time frame,

14  Mr. Murphy called upon his old friend yet again, David Nassor.

15  And what he asked Mr. Nassor to do is not to go to Memphis,

16  Tennessee on this occasion but to travel to Columbus, Ohio.

17  You see, Mr. Murphy, the evidence will show, wanted Mr. Nassor

18  to survey or case the Brink's facility at 1362 Essex here in

19  Columbus on a Saturday night and on a Sunday.  What he wanted

20  to know is precisely what time do the employees at the Brink's

21  facility leave the workplace on Saturday nights and the precise

22  time that they return on Sunday mornings.  Mr. Nassor will tell

23  you about that, and he will tell you that he made a report to

24  Mr. Murphy about what he had observed and what he had noted.

25          Thereafter, ladies and gentlemen, the evidence will

1   reveal that on January 15th of 2009, Mr. Murphy rented a

2   vehicle from the Thrifty Car Rental facility at the

3   Boston-Logan Airport in the name of "Sean Murphy".  It was a

4   Dodge Journey type of sedan vehicle.

5        The evidence will further show that on the following

6   day, January 16th of 2009, Mr. Murphy again went back to

7   Newmarket Storage facility in New Hampshire, the one that he

8   went to on January 22nd and ordered up another 24-foot box

9   Budget truck under the name of "Brian Hetherman".

10        The evidence will show that on January 16th, that

11   same day, Mr. Murphy and Joseph Morgan, also known as "JoMo",

12   drove that truck, the 24-foot truck from the Greater Boston,

13   Massachusetts Area back to Warrendale.  The evidence will

14   reveal Mr. Doucette, Robert Doucette followed along in that

15   Dodge Journey.  And once they were in Warrendale, they

16   reentered that storage space that Mr. Murphy had rented earlier

17   in the month, and they put all of those tools that he had

18   stored there into that rental truck, the 24-foot box truck.

19        Ladies and gentlemen, the evidence will reveal that

20   on January 17th of 2009, utilizing that truck and utilizing

21   that Dodge Journey, Sean Murphy, Joe Morgan and Robert Doucette

22   traveled from Warrendale, Pennsylvania to Columbus to do the

23   deal.

24        There is very careful planning involved in this

25   Brink's burglary, which you will see from the evidence that

1  will be received by you during the course of this trial.  You

2  will see that the truck was parked off-site initially at that

3  Brink's facility.  The sedan was parked in a different location

4  at that Brink's facility, and that Robert Doucette was given

5  specific instructions to perform lookout duties on a bridge

6  close to that facility.

7       You will hear testimony that Joe Morgan and Sean

8  Murphy went up to the roof of the Brink's facility and actually

9  utilizing the tools that they had brought with them, cut four

10 to five holes in the roof, making sure that they got the right

11 hole in the right location in order to get into the vault room.

12      The evidence will reveal, ladies and gentlemen, that

13 Joe Morgan and Sean Murphy entered that vault room and that

14 while in there, yes, the intent was to get into the vault, but

15 there was certain planning that had to be done.  The alarm

16 system prior to entering had to be secured; the radio frequency

17 device, the cell phone jammer had to be operational; there had

18 to be testing done to make sure that the alarm didn't go off.

19 The surveillance units that Brink's has stocked within the

20 warehouse facility had to be destroyed, and all of that was

21 done.

22      You will have photographs as to the mess created by

23 the three co-conspirators during the course of this burglary.

24 You will also have photographs, ladies and gentlemen, of how

25 the thermal-lance device and the combustible -- whatever they

1    had to put it to use -- blew a hole into a metal door in the

2    vault.

3           You will hear testimony that the flame was so strong

4    and the heat was so strong, that when Mr. Murphy actually blew

5    through that vault door along with Mr. Morgan, that it actually

6    ignited the contents in the vault, causing a fluke, if you

7    will, with the money being burnt up, smoke created, fire

8    created, and only a minimal amount of money able to --

9    currency -- able to be obtained out of that vault. And when I

10    say minimal amount, that's relatively speaking. And that's

11    just $1 million was able to be brought out of that vault.

12           So, there had to be a change of plans, if you will.

13    And you see, at that Brink's facility, they not only had paper

14    currency, but they also have coins. And you will see

15    photographs of the coins, several denominations, but

16    specifically, for our purposes, ladies and gentlemen, one

17    dollar Susan B. Anthony coins and fifty-cent pieces called

18    halves, and they are on skids. And what these defendants

19    decided to do was when they cannot successfully take all of the

20    currency out of the vault, the second plan or the change-up, if

21    you will, was to put the crates of coins into the truck.

22           So, with the currency that they did take and the

23    coins that they placed in the truck, it was time to leave, but

24    there was more to be done. During the course of this burglary,

25    these defendants actually epoxyed -- using an adhesive

1   material -- the door closed, the normal entrance for the

2   employees, epoxyed those doors closed, so they could not be

3   opened upon the employees entering the next day or upon someone

4   who may have been happening upon the premises while the three

5   of them were inside.

6         Ladies and gentlemen, the evidence will reveal that

7   Joe Morgan, Sean Murphy and Robert Doucette were actually at

8   that facility in an excess of six hours doing their deal.  In

9   the early morning hours of January 18th of 2009, the evidence

10   will show that they loaded the tools back into the 24-foot

11   truck; they loaded the coins into that truck and the currency

12   into the truck or into the sedan and drove off back to

13   Warrendale, Pennsylvania.  Somewhere along the line, the plan

14   was made to store those tools back into that Warrendale storage

15   facility as well as the coins that were taken during the course

16   of the burglary.

17         Thereafter, with the truck and with the car, the

18   sedan containing the currency, the paper money, that was taken

19   during the course of this burglary, the three men returned

20   from -- to Boston, Massachusetts Greater Metropolitan Area

21   after having left the Warrendale storage facility.

22         The evidence will reveal that some five to six months

23   thereafter, following the investigation by the Federal Bureau

24   of Investigation here in Columbus, the Columbus Police

25   Department, the Federal Bureau of Investigation in

1  Massachusetts and State Police officers in the state of

2  Massachusetts, the evidence will reveal that much of the money

3  was recovered in New Hampshire.  Many of the tools utilized

4  were recovered in New Hampshire.  And during the course of this

5  trial, as I have informed you, you will be able to put together

6  every piece of evidence which the government would suggest will

7  make your decision that much easier at the close of our

8  evidence.  Thank you, ladies and gentlemen.

9          Thank you, Your Honor.

10          THE COURT:  Mr. Murphy?

11          MR. MURPHY:  Thank you, Your Honor.  Good morning,

12  ladies and gentlemen.  My name is Sean Murphy.  I am 47 years

13  old.  I was born and bred in Lynn, Massachusetts.  You are

14  going to hear throughout this trial some facts about my family

15  and what happened.  I have endured more tragedy than most

16  people would in their lifetime.  I had a girlfriend in high

17  school --

18          MR. DOMINGUEZ:  Objection, Your Honor.

19          THE COURT:  Well, let's stick to the facts of what

20  your side is in this case, Mr. Murphy.  You can save things

21  like that for your final argument.

22          MR. MURPHY:  That's fine.  Some of you may be

23  wondering why I represent myself.  Well, no attorney is going

24  to come up here and say or do what needs to be said or done in

25  this trial.  On Thursday of last week, you heard Mr. Graeff

1  tell you that he was going to make mistakes in this trial.

2  Well, he has made a few and which prompted me to come up here

3  and represent myself.  I am a certified paralegal, I have

4  extensive training in the law, and I believe I am qualified to

5  do this job.

6        You will see that when I question my witnesses and

7  when I do a lot of stuff, I will have everything written down.

8  That's how I do things.  It's easier for me to remember things.

9  Although I do have a good memory, if I write things down, I

10 won't forget.

11       Sal painted a picture about what happened.  You are

12 going find out that Mr. Dominguez has his facts all wrong.  His

13 witnesses are going to come up here and testify to the fact

14 that he has his facts all wrong.

15       This isn't a case of United States v. Sean Murphy; I

16 believe it's a case of Sal Dominguez v. Sean Murphy.  This case

17 is like Swiss cheese; it has got holes posted all through it.

18 Better yet, you can describe it like a house of cards.  When

19 the house of cards is built up, it looks fine and dandy, but

20 the slightest push and the whole thing falls down.

21       Witnesses are going to testify in this trial.  Sal

22 mentioned two -- David Nassor and Rob Doucette.  Ladies and

23 gentlemen of the jury, these guys are lying.  And they are

24 lying repeatedly; I am going to catch them lying.  Although you

25 can't catch every single lie, I'm going to catch enough of

1 these lies for you people to say:  Hey, when is enough enough?

2 You know, how many lies do these guys have to tell before we

3 don't believe a word they say?

4          In addition to these guys lying, these witnesses

5 withheld evidence -- evidence in this trial.  They withheld it

6 from the FBI, the State Police and the government.  You sit

7 back and say, why did they withhold evidence?  The cooperating

8 witnesses for the government?  And it just doesn't make sense,

9 but I am going to prove that in addition to all of these lies,

10 that they withheld evidence.

11          And it doesn't end there.  Not only did they withheld

12 evidence, they withheld information -- key information.  These

13 witnesses gave statements, in early to mid-2009, both

14 Mr. Nassor and Mr. Doucette gave statements.  And then about

15 two years later they showed up at the Grand Jury hearing in

16 Columbus, and they gave sworn testimony.  Those are the only

17 two statements and testimony that we have in this case, is what

18 they gave in mid-'09, in January of 2011.  But you will hear

19 that there is a ton of other information that they didn't give

20 the government.  And recently, we received -- last month we

21 received some new information and that's because a month ago I

22 had a conversation with Mr. Dominguez, and I told him, I said I

23 believe what you know about this case hurts your case, but it

24 is what you don't know about this case kills it.  I believe

25 Mr. Dominguez went back to his witnesses, and all of a sudden,

1    they come up with some more information.

2            MR. DOMINGUEZ:  Objection, Your Honor.

3            THE COURT:  Overruled.

4            MR. MURPHY:  I believe this information is key to

5    this case.  If you have witnesses that are lying and you have

6    witnesses that are withholding evidence, and they are

7    withholding information, then it doesn't even end there, ladies

8    and gentlemen of the jury.  These witnesses tampered with

9    evidence, clearly, and it is going to be proven in the case.

10            Mr. Dominguez talked about this storage facility up

11   in New Hampshire that, you know, was rented and that they

12   recovered some money and some tools from this facility.  You

13   are going to hear that these witnesses went into this facility

14   and took tools and evidence out of that facility.  The FBI went

15   and seen these witnesses in April of 2009.  They denied their

16   involvement in this crime, they lied to the FBI about numerous

17   things on this first interview.  Then, they sat back and then

18   they went into this facility up in New Hampshire and took out

19   numerous items, things that they didn't want the FBI to have or

20   the government to have.

21            In addition to taking items out, they went and put

22   items in that didn't go to Ohio, that had nothing to do with

23   this crime, and they put them in this facility, in this storage

24   bin.  And what did they do?  These items that didn't go to Ohio

25   and didn't have anything to do with crime?  They were tying me

1 to this facility. And their witnesses are going to tell you

2 this, that there is no other reason that you would put these

3 items in this facility, short of trying to tie me to this

4 crime.

5     In addition to tampering with this evidence, these

6 witnesses destroyed evidence, okay? They are getting ready to

7 cooperate with the FBI, and they go in, and they take key

8 pieces of evidence.

9     You have heard Mr. Dominguez talk about these videos

10 that allegedly came from Brink's. Well, obviously, Brink's has

11 video surveillance. This is the 21st century, and this is the

12 age of technology. This crime was recorded. Those videos

13 showed who was actually there and who committed this crime.

14 And you are going to hear that one of Mr. Dominguez's witnesses

15 removed these videos and destroyed them on his own. Now, this

16 is after he was approached by the FBI and before he decided to

17 cooperate. This is key evidence, ladies and gentlemen.

18     You are also going to hear that some of the other

19 items that they took out of this facility were the clothing.

20 There is a lot of clothing that these criminals wore, and the

21 clothing would obviously have DNA on it. When you put clothes

22 on, you sweat. If you put a mask on, your hair and all of this

23 stuff gets into it. His witnesses took the clothing out of the

24 facility and destroyed that. So, now, they have no video of

25 who did this, and the people that were actually there that wore

1    the clothing, they don't have that either.  They don't have the

2    DNA, we can't prove who was there by the clothing.  These were

3    their witnesses who did this.

4           I am telling you, by the time this trial is over, you

5    are going to be disgusted with these two witnesses that he puts

6    on the stand.  They are junkies; they are liars; they are

7    admitted participants; they are career criminals that have been

8    doing this their whole life; and it is going to come out in the

9    trial, all of the dirt that comes out and that goes with

10   witnesses who get on the stand and testify.

11          In addition to that, ladies and gentlemen of the

12   jury, you are going to hear that their witnesses kept hundreds

13   of thousands of dollars from this crime.  Yes, they returned

14   the coin that was in the facility -- and not all of it, they

15   did keep some of the coin -- and they returned a very, very

16   small portion of some of the partially burnt money, but all of

17   the clean paper money that was stolen from this facility, his

18   witnesses kept it.  The FBI didn't get it back from them.  We

19   are going to find out if the FBI even asked for it back.  I

20   mean, what kind of case is that if you have got these witnesses

21   that are cooperating, and they have stolen hundreds of

22   thousands of dollars, and they are cooperating with the FBI,

23   and they are not required to give back the stolen money.

24          You are going to hear that their witnesses have been

25   spending all of this money frivolously since they actually

1  stole it.  You are going to find out, through the testimony,

2  that these witnesses can't get their stories straight -- one of

3  them will say one thing, and the other one will say another.

4  That's a clear indication that they are lying, and, you know,

5  you are going to say, hey, who do I believe?  Well, that is

6  going to be up to you to determine their credibility, but I say

7  you can't believe a word either one of them says by the time

8  this trial is over.

9        And you are also going to find out that after both of

10  these witnesses decided to cooperate with the FBI and the

11  government, that they continued to commit felonies.  You know?

12  They are being accused of crimes.  They have got a deal with

13  the government, that one of them didn't even get charged, and

14  another one is not going to do a day in jail.  So, they feel

15  they have the get-out-of-jail free gold card, and they continue

16  to commit felonies.

17        And you know what the irony of this whole thing is,

18  ladies and gentlemen of the jury?  Both of these witnesses

19  continue to commit felonies against me.  After they decide to

20  cooperate for the government, both of them committed felonies

21  against me.  The government knows about that, and they didn't

22  want to do anything about it.  Why?  It would destroy the

23  credibility of their witnesses and the trial that was going to

24  go on here today.  But it will come out, I will be able to

25  prove it.

1    You will hear that the FBI in this case was out to

2 get me.  And I am not talking about Agent Trombitas, I'm

3 talking about the Boston FBI.  You are going to hear that they

4 questioned a bunch of witnesses prior to this crime going down

5 about me, and several witnesses lied to the FBI -- which they

6 will admit to -- about me.  Now, the FBI is on my tail, they

7 want me.  I'm their target.

8    When the FBI questioned these witnesses and started

9 making their deals, they told these witnesses, we don't want

10 you, we want Murphy.  You know?  What does that say about the

11 crime and about what's going on here?

12    You are also going to hear that there were other

13 people involved in this crime, people who assisted Mr. Doucette

14 in renting trucks, in renting storage bins, in moving these

15 tools and stuff.  The FBI knows that these other people were

16 involved, they were co-conspirators but not even charged, which

17 comes into play in this case.  How many people are getting off

18 and not going to do a day for this crime that were so involved,

19 that it is almost mind-blowing.

20    You are going to hear evidence, ladies and gentlemen

21 of the jury, that there is no physical evidence whatsoever that

22 places me in or around Brink's.  They have nothing.  They have

23 no fingerprints that puts me in Brink's.  They have no DNA that

24 puts me in Brink's.  They have no footprints that put me in

25 Brink's.  They have no video that determines who this is

1    because their witnesses destroyed the video.

2           The FBI -- this is 2011.  We have an FBI who has been

3    in business for 80 years.  All of the technological advances in

4    society, the FBI doesn't have any evidence that puts me in the

5    State of Ohio.  You are going to hear this from their own

6    witnesses, from everybody, there is no evidence whatsoever that

7    even puts me in Ohio.

8           The scientific evidence that they do have, because

9    they do have some fingerprints and they do have some DNA, don't

10   get it twisted because it has nothing to do with this case.  It

11   is evidence that they found in this storage facility six months

12   after the crime, after the stuff has been moved two or three

13   times, and certain evidence has been taken out by their

14   witnesses and other evidence has been put in by their

15   witnesses, and they have a couple of pieces of items -- one

16   item -- that has my fingerprints on it.  Out of these hundreds

17   and hundreds of things, they have one piece, an item, that has

18   my fingerprint on it, it is a battery, a little portable

19   battery that you put in a radio.  And they have my DNA on a

20   respirator.  You are going to hear testimony on how this DNA

21   and how this fingerprint got on there -- not possibly -- but

22   how it actually got on there and why the government is showing

23   it.

24          You heard Sal on Thursday, and the Judge today,

25   explain to you about circumstantial evidence, okay?  They

1  explained it.  I believe Sal Dominguez is going to twist the

2  circumstantial evidence to try to make it appear to support his

3  case.  I am going to do the best job that I can to explain any

4  circumstantial evidence that they may have, which is

5  non-criminal in nature.  Okay?  You heard both of them explain

6  that, you know -- an example that Sal gave on Thursday, he said

7  if Harry Trombitas went outside for a minute and came back in

8  and he had water dripping off of him and everything, you could

9  reasonably infer that it was raining out because he came in

10  from outside and he had water dripping all over him and it was

11  raining.

12       Ladies and gentlemen of the jury, if you convicted me

13  on that circumstantial evidence, it would be a wrongful

14  conviction because, in actuality, Mr. Trombitas had to go out

15  to the car to get a file that he forgot, and when he was

16  walking back into the building, he was walking up the walkway,

17  the sprinkling system kicked on, and he got caught in the

18  crossfire in the sprinkling system.  So, when he came in the

19  building, even though it may have appeared that it was raining

20  out because you have water; in actuality, it was the sprinkler

21  system that put the water on him.

22       Do you understand what I am saying about

23  circumstantial evidence?  It can be viewed a bunch of different

24  ways.

25       You will find out that I am well-prepared for this

1  trial.  I have been notified of this crime since 2009.  It took

2  awhile for them to bring it forth, until 2011, and I am

3  well-prepared.  And you are going to find out, generally, in

4  situations like this, in these cases like this, that generally

5  the best prepared wins.  And I'll state it again in my closing

6  at the end, who was the best prepared?  Who presented the

7  better case?  And I believe that I am going to present the

8  better case in this trial.

9      I had an opportunity -- you heard about a

10  co-conspirator in this case, his name is Joseph Morgan.  I have

11  known him since he has been a little kid.  He has worked for me

12  at my moving company.  He has actually pled guilty, and he is

13  in federal prison for this crime.  He is the only person

14  involved in this whole case who is actually doing time for this

15  crime.

16      I had the opportunity, and actually the pleasure, to

17  interview Mr. Morgan for 200 hours regarding this case, 200

18  hours.  Mr. Morgan told me things about this case that I could

19  have never found out, never learned, or ever, you know,

20  determined from the discovery and the statements that

21  Mr. Dominguez's witnesses gave.

22      Based on that, I also got an investigator, Mr. Gary

23  Phillips, he is sitting over there right now.  He has been

24  investigating this case for awhile now, I believe all together

25  it is going to be about 60 hours.  You are going to find out

1  that the information that I found out from Mr. Morgan and

2  Mr. Phillips is going to help my case tremendously.  The

3  evidence and the information that I am going to present is

4  basically, probably going to acquit me of this crime.

5       You are going to hear information about the City of

6  Lynn.  That's where all of these people are from.  I am from

7  the city of Lynn.  Mr. Doucette is from the City of Lynn.

8  Mr. Morgan is from the City of Lynn.

9       Have many of you seen the new movie, The Town?  It

10  came out recently, it is about a bunch of bank robbers and

11  armored car robbers from a small little city in Boston called

12  Charlestown.  In Charlestown, there are more armored car

13  robbers and bank robbers per square mile than anywhere in the

14  whole world.  Can you figure that out?  Small little town in

15  Boston, there are more armored car robbers and bank robbers in

16  that small little city than anywhere in the whole world, and

17  that's what this movie, The Town, was all about.

18       You are going to hear evidence in this trial, ladies

19  and gentlemen, about a city about 15 miles north of Boston and

20  Charlestown, and it is called Lynn, Massachusetts.  I have

21  traveled throughout the world -- not the world, the United

22  States -- I have been all around, and when people hear my

23  accent, yeah, I'm from Boston, we park the car in Harbor Yard,

24  okay?  People know where I'm from.  And when I tell them that

25  I'm from the City of Lynn -- I have met people out in Hawaii,

1   California, Florida, and they say, Lynn, I have heard of Lynn

2   before.  Lynn has a saying and a song, it is called:  "Lynn,

3   Lynn, city of sin, never go out the way you come in."  I was

4   surprised that people across the country knew about that.

5         But what you are going to hear about Lynn -- Lynn,

6   Massachusetts, which is a small city of less than 90,000

7   people -- has more professional burglars per square mile than

8   anywhere in the whole world.  There is hundreds of them.  Kind

9   of like the Charlestown thing with armored car and bank

10  robbers.  The FBI will get up and say that they created the

11  list of these professional burglars and they documented them.

12  And these burglars travel the country to break into commercial

13  establishments and pharmacies throughout, and then come back to

14  Lynn and live their life.  You are going to hear that

15  throughout this trial.

16        You are also going to hear, ladies and gentlemen of

17  the jury, that I am a man of many talents and many skills.  I

18  am a security expert.  Just so you know.  I own a security

19  consulting company.  Just so you know.  My security consulting

20  company, we evaluate buildings.  If somebody wants to come up

21  and get my expertise, I will go and evaluate their building and

22  tell them where their strong points are and where weak points

23  are, how they can advance their security and --

24        THE COURT:  Mr. Murphy, I think you are beginning to

25  get off of the opening statement.

1          MR. MURPHY:  No, Your Honor.  This is what the trial

2   is going to prove, I am informing the jury of what the trial is

3   going to show.

4          THE COURT:  Okay.

5          MR. MURPHY:  And, also, my security company, we

6   provide training, okay?  Companies, law enforcement.  You are

7   going to hear that the FBI took my training course, the same

8   FBI that's accusing me of this crime.

9          You are going to also hear that I own two moving

10  companies, both based out of the Greatest Boston Area, one

11  based in Lynn and one based in Wakefield.  They do two separate

12  things.  You are going to hear how my moving company works and

13  what services we provide.  You will hear it from Sal's

14  witnesses and my witnesses -- I don't need to get into that

15  right now, it will come out in the course of this trial.

16         I should be able to prove everything that I am

17  telling you, I wouldn't sit here and argue it and telling you

18  if I was just blowing it out.  The Judge has been very gracious

19  on all of the preliminary matters about what he is going to let

20  in and not let in this trial, and I believe I will be able to

21  prove everything that I am telling you here today.

22         For those of you who haven't been to a trial, been

23  through this before, this is basically how it works:  Sal is

24  going to call his witnesses, they are going to paint a story,

25  they will tell you their thing.  If that's all that there was

1    to a trial, 100 percent of the people would get convicted if

2    the government just came and presented their witnesses and told

3    their story.  That's why at the beginning of this trial the

4    Judge told you to reserve your judgment until you have heard

5    all of the evidence.

6           Because ladies and gentlemen of the jury, it is the

7    cross-examination that is the meat and potatoes of a case.

8    That's where you get to the true facts, that's where you get

9    what actually really happened, and what these witnesses are all

10   about.

11          As I told you, I am going to catch their witnesses

12   lying.  And honestly, I believe that I will catch the FBI

13   lying -- not Mr. Harry Trombitas, I have no qualms with him --

14   but the Boston FBI, the ones that are out to get me.  When they

15   take the stand, I believe a handful of times, you are going to

16   hear a couple of lies, and then you are going to sit there and

17   say, wow, the FBI.  You are also going to hear a bunch of stuff

18   about the Boston FBI that ain't going to sit in your stomach

19   well.

20          I am going to prove that their witnesses are lying

21   repeatedly.  I am going to prove that they withheld evidence.

22   I am going to prove that they withheld information.  I am going

23   to prove that they tampered with evidence, destroyed evidence,

24   and ladies and gentlemen of the jury, I am going to prove that

25   I did not get a penny from this crime -- not one red cent, and

1   you are going to sit back and say, how did that happen?  Well,

2   that's what you are going to hear.

3        And the sad thing all about this is, Sal knows all of

4   this.  Most of the stuff that I am telling you, he already

5   knows all of this.  Sal's job is to seek the truth, not just to

6   win.  They have gotten it twisted throughout the years.  You

7   know, everybody wants to win a case, and instead of trying to

8   get to the truth of the matter and bring the proper people to

9   justice, they just look for a win at all costs, and I don't

10  think that's right.  I do not think that's right.

11       Sal's playing a game that we all played when were

12  little kids, every single one of you's played it when you were

13  a little kid -- it is called tag.  And, unfortunately, I am it.

14  But, ladies and gentlemen of the jury, by the time this trial

15  is over, you are going to realize that I have tagged two other

16  people, and I am not it.

17       At times I might seem combative in my defense of my

18  case, it is only because I am fighting for my life here, I am

19  trying to get the truth out and prove my innocence.  You know,

20  it may not come out all that much, but there may be times when

21  I may appear a little combative.  I will be as quick as

22  possible.  I know you don't want to be here anymore than I do.

23  I am required to be here and you are required to be here, so I

24  will not try to delay this case but move it along as quick as

25  possible.

1          And I hope, ladies and gentlemen of the jury, that by

2   the time the case is over, that you will agree with me that I

3   am not guilty of the crimes that have been put forth on me from

4   the government.  Thank you, ladies and gentlemen of the jury,

5   and I appreciate your service.

6          THE COURT:  Well, ladies and gentlemen of the jury,

7   it is five after twelve and time to take a lunch break.  And

8   remember, as I mentioned when you were dismissed last Thursday,

9   not to discuss this case with each other or anyone else during

10  the course of the trial.  This includes the attorneys or anyone

11  else involved in the case.  Report any violations to court

12  personnel.  Do not form or express an opinion on the case until

13  you are in deliberation, and do not make any investigation or

14  perform any experiments or do any reading or research on the

15  case and stay off the computer.  Do not discuss the case with

16  your family or friends until you are discharged by the Court.

17  Do not observe any media reports from newspapers, TV or radio.

18  And wear your Juror badges at all times during the trial and

19  around the courthouse.

20         And this admonition is something that I will try to

21  repeat at every break, but it is good during the course of the

22  trial until you are brought in here and dismissed as a jury.

23         Thank you very much.  Enjoy your lunch until one

24  o'clock.

25                          – – –

1    THEREUPON, a lunch break was taken until 1:00 p.m.

2                          – – –

3    THEREUPON, the Jury exited the courtroom, and the

4  following proceedings were held in open court with Court,

5  counsel and Mr. Murphy:

6        THE COURT:  Mr. Graeff or Mr. Murphy, you have the

7  Jencks material for the first witness?

8        Who is your first witness, Mr. Dominguez?

9        MR. DOMINGUEZ:  My first witness will be Chris

10  McIntosh, Your Honor.  He has that material as well as David

11  Nassor's Grand Jury transcript.

12        THE COURT:  All right.  Use your time wisely here,

13  Mr. Murphy.

14        MR. MURPHY:  Yes, Your Honor.  Can I make a request

15  of the Court, Your Honor?

16        THE COURT:  Yes.

17        MR. MURPHY:  Can we have the witnesses separated,

18  Your Honor?

19        MR. DOMINGUEZ:  That's already been done, Your Honor.

20  For the record, the only potential witness here is Harry

21  Trombitas, the case agent and who is here pursuant to the rule.

22        THE COURT:  And, also, we need to introduce –– is

23  this Mr. Phillips?

24        MR. GRAEFF:  Yes, sir.

25        THE COURT:  I don't know who he is.

1        MR. GRAEFF:  For the record, we discussed this a

2  couple of weeks ago, Mr. Gary Phillips will be at counsel

3  table.

4        MR. DOMINGUEZ:  No objection.

5        THE COURT:  For the record, the separation is

6  granted.

7        MR. MURPHY:  Can I get some time with Mr. Phillips to

8  resurrect my defense and get things rolling again?  This is the

9  only time.

10       THE COURT:  We are taking up the first witness at one

11  o'clock, and you have had access to Mr. Phillips for -- how

12  long have you been on this case?

13       MR. PHILLIPS:  Since September.

14       THE COURT:  We are adjourned.

15                - - -

16       THEREUPON, Court and counsel and Mr. Murphy took

17  their lunch recess.

18                - - -

19

20

21

22

23

24

25

1                    Monday Afternoon Session

2                       October 17, 2011

3                          1:00 p.m.

4                            – – –

5    IN OPEN COURT:

6            THE COURT:  You may call your first witness.

7            MR. DOMINGUEZ:  Thank you, Your Honor.

8            Detective Chris McIntosh, Columbus Police Department.

9            (Whereupon, the witness was sworn in by the Courtroom

10   Deputy Clerk.)

11           THE COURT:  You may proceed.

12           MR. DOMINGUEZ:  Thank you.

13                            – – –

14                     CHRIS MCINTOSH,

15   AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

16                            – – –

17                    DIRECT EXAMINATION

18   BY MR. DOMINGUEZ:

19   Q.   Sir, would you please state your name and spell your last

20   name for the benefit of the court reporter?

21   A.   Detective Chris McIntosh.

22        Should I be using this, I guess?

23        Detective Chris McIntosh, Columbus Police Department.

24   Last name is M-c-I-N-T-O-S-H.

25   Q.   How long have you been a Columbus police officer or

1  detective, Detective McIntosh?

2  A.    Twenty-five years.

3  Q.    And is there a particular unit within which you work?

4  A.    The burglary squad.

5  Q.    And how long have you been attached to the burglary squad?

6  A.    Fourteen years.

7  Q.    I invite your attention to January 18th of 2009.  Were you

8  working on that date, sir?

9  A.    Yes, sir.

10  Q.    And were you called to the Brink's facility at 1362 Essex

11  Avenue here in Columbus, Ohio, in the near east side on that

12  date?

13  A.    Yes, I was.

14  Q.    Was that in the early morning hours, sir?

15  A.    It was around 11:00 or so, 11:30'ish.

16  Q.    Did you in fact go to the Brink's facility on that date?

17  A.    Yes, I did.

18  Q.    And, upon your arrival, what did you discover, sir?

19  A.    Well, I was sent up there at the request of patrol

20  officers who had been dispatched on a burglary that had taken

21  place at the Brink's facility.  And, upon arrival, there were

22  numerous police cars there and fire equipment.  And the

23  building had sustained some damage.  And there had been a fire

24  in the building.

25  Q.    And, Detective McIntosh, upon your arrival, did you work

1 hand in hand with representatives from the Federal Bureau of

2 Investigation and other Columbus police officials, crime scene

3 search units personnel, and other detectives in investigating

4 the burglary?

5 A.   Yes, I did.

6 Q.   And, sir, during the course of that investigation, were a

7 series of photographs taken both of the exterior of the

8 premises and the interior of the building to denote how the

9 building looked both on the outside and the inside at the time

10 of the burglary?

11 A.   Yes.  Both Columbus police crime scene investigators and

12 FBI crime scene investigators were on the scene and

13 photographed the area.

14 Q.   Have you had an opportunity, sir, to review those

15 photographs?

16 A.   Yes, I have.

17          MR. DOMINGUEZ:  And may I approach?

18          THE COURT:  You may.  You may continue to approach.

19          MR. DOMINGUEZ:  Thank you, Your Honor.

20          I appreciate that.

21 BY MR. DOMINGUEZ:

22 Q.   For the record, sir, I've just handed you what has been

23 marked for identification purposes and labeled Government's

24 Exhibits 1A-1 through 1A-195 inclusive.  I ask you to take a

25 minute, maybe several minutes, to look through those

1    photographs.  And once you've completed looking at those

2    photographs, would you please look back at me?

3    A.    Okay.

4          (Witness complies.)

5    Q.    Thank you, Detective McIntosh.

6          Now, for the record, you have reviewed Government's

7    Exhibit 1A-1 through 1A-195 inclusive?

8    A.    Yes, sir.

9    Q.    And --

10          THE COURT:  One ninety five or ninety five?

11          THE WITNESS:  One ninety five, Your Honor.

12          MR. DOMINGUEZ:  One-hundred-ninety-five photographs.

13   BY MR. DOMINGUEZ:

14   Q.    And, sir, just for the record, that's not the first time

15   you've had an opportunity to review those photographs?

16   A.    No, sir.

17   Q.    But you have reviewed those here in open court on this

18   record?

19   A.    Yes.

20   Q.    And do each of those photographs depict accurately the

21   exterior of the Brink's facility and the interior of the

22   Brink's facility as they appeared on January 18th of 2009?

23   A.    Yes, they do.

24   Q.    Very well.  Sir, I'm displaying for you what has been

25   marked for identification purposes and labeled Government's

1    Exhibit 1A-2.  Do you recognize that, sir?

2    A.    Yes.

3    Q.    And what is it?

4    A.    That's the Brink's facility at 1362 Essex Avenue.  That's

5    the west side of the building.

6    Q.    Government's Exhibit 1A-3, sir.

7    A.    That is also the Brink's facility, west side of the

8    building, just a little farther south from the other photo.

9    Q.    1A-5, sir?

10   A.    Yeah.  That's the gated entrance to the south lot of the

11   Brink's facility.

12   Q.    And if you enter through that gate there, would that

13   actually take you behind the building, sir?

14   A.    That's correct, south side of the building.

15   Q.    So the record is complete and for the jurors' edification,

16   I'm not going to show our, or publish, each one of these

17   photographs, but I would like to invite your attention, if I

18   could, to Government Exhibit 1A-99.  Do you recognize that,

19   sir?

20   A.    The photograph or the scene?  Yes.

21   Q.    The photograph and the scene, sir.

22   A.    Yes.  Yes.  That's the cash room, or -- I'm not sure of

23   the exact terminology Brink's may use.  That's the vault room

24   just outside the vault door.

25   Q.    And it appears to be -- there appears to be fire

1  extinguishers there in the photograph, sir.

2  A.   That's correct.

3  Q.   Do you know anything about those fire extinguishers?

4  A.   Well, like I said, this is the room directly outside the

5  vault door.  The vault had been caught on fire, and they used

6  fire extinguishers to try and extinguish the flames.

7  Q.   When you say "they," who are you referring to?

8  A.   The burglars.

9  Q.   And, sir, as I look at that photograph, just to -- can you

10  see it on your monitor, sir?

11  A.   Yes.

12  Q.   To the far right, toward the middle there, there appears

13  to be something that is green there, sir.  Do you recognize

14  that?

15  A.   That's correct.  That's a safety cap that goes on the top

16  of an oxygen tank, oxygen bottle, large capacity.  I'm not sure

17  how big, but that's an oxygen cap that was left at the scene.

18  Q.   Government Exhibit 1A-105, sir.  Can you tell the ladies

19  and gentlemen what that is?

20  A.   That's a picture of the vault door at Brink's.  The jagged

21  edges that you see there is the opening that was cut into the

22  vault door with a torch.

23        MR. DOMINGUEZ:  May I have a moment to confer with

24  Mr. Graeff, Your Honor?

25        (Whereupon, there was a brief interruption.)

1  BY MR. DOMINGUEZ:

2  Q.   Displaying for you, Detective, Government's Exhibit

3  1A-193, do you recognize that, sir?

4  A.   That's the same green cap that was photographed in the

5  other picture.  It's a safety cap for the top of an oxygen

6  tank.

7           THE COURT:  Could you move that up a little bit,

8  Detective, a picture?

9           THE WITNESS:  Oh!

10          MR. DOMINGUEZ:  Do you see, Judge?

11          THE COURT:  Do you have it?

12          MR. DOMINGUEZ:  Right here, Judge.

13          THE COURT:  Yeah.  Now I can see it.  Mine is hidden,

14  partially, by the desk.

15          MR. DOMINGUEZ:  I understand.  I'm sorry, Judge.

16  BY MR. DOMINGUEZ:

17  Q.   Just so the record is clear, Detective, you identified

18  Government's Exhibit 1A-99, which was a big picture of the

19  vault room where the cap was in the right-hand side toward the

20  middle.  Is this a closer picture of that?

21  A.   Right.  That's a close-up photo of it.

22  Q.   In its same location?

23  A.   In its same location, yes.

24  Q.   Very well.

25          THE COURT:  Did you say what that was?

1        MR. DOMINGUEZ:  A green cap to what -- it purports to

2   be a green cap to an oxygen container, Judge.

3        THE COURT:  Oh, okay.

4   BY MR. DOMINGUEZ:

5   Q.   Now, Detective, you are aware that several other folks

6   took part in the investigation and collected evidence and so

7   forth at the Brink's facility on January 18th of 2009, correct?

8   A.   Correct.

9   Q.   One person you work with is Special Agent Harry Trombitis

10  of the FBI?

11  A.   That's correct.

12  Q.   And Detective J. J. Meade from the crime scene unit?

13  A.   Columbus police crime scene, yes.

14  Q.   Sir, after January 18th of 2009, were you assigned as a

15  detective with respect to this Brink's case for the Columbus

16  Police Department in order to further your investigation?

17  A.   Yes.  I was on the case the entire time, yeah.

18  Q.   I invite your attention, if I could, sir, to the summer of

19  2009, May, May-June, time frame.  Did you, in fact, have

20  communication with Special Agent Jason Costello, FBI Boston,

21  regarding the Brink's case?

22  A.   Yes, I did.

23  Q.   And subsequent to your discussion with him, did you, in

24  fact, to further your investigation, travel to Boston,

25  Massachusetts, in order to meet with Special Agent Costello and

1  other law enforcement officials from the state of

2  Massachusetts?

3  A.   Yes, I did.

4  Q.   And at that time, sir, or during that time frame, did you

5  participate, along with Special Agent Costello and others, in

6  the interview of a Robert Doucette?

7  A.   That's correct, we did.

8  Q.   And following your interview with Robert Doucette, did

9  you, Special Agent Costello, and others visit a storage

10  facility located in Raymond, New Hampshire?

11  A.   Yes, we did.

12  Q.   And based on information provided to you by Mr. Doucette,

13  did you, in fact, locate a specific storage unit in Raymond,

14  New Hampshire?

15  A.   Yes, we did.

16  Q.   And did you search that unit?

17  A.   Yes, we did.

18  Q.   And was there anything of evidentiary value recovered with

19  respect to your Brink's investigation from that storage

20  facility?

21  A.   Well, we recovered burglary tools and a large amount of

22  coin and burnt cash money and just about everything you'd need

23  to break into Brink's.

24          MR. DOMINGUEZ:  May I approach, Your Honor?

25          THE COURT:  You may.

1    BY MR. DOMINGUEZ:

2    Q.    Detective McIntosh, I've handed you what's been marked for

3    identification purposes and labeled Government's Exhibits 1B-1

4    through 1B-30 inclusive.  I ask you to take a look at those.

5    And let us know when you're finished looking at them, sir.

6    A.    Okay.

7    Q.    Have you had an opportunity to review those photographs,

8    sir?

9    A.    Yes, I have.

10   Q.    And before I ask you the logical question, again, June 4th

11   of 2009, in Raymond, New Hampshire, you've already stated that

12   you entered a storage facility, and there were items of

13   interest there?

14   A.    That's correct.

15   Q.    And during the course of being there, were those items of

16   interest photographed?

17   A.    Yes, they were.

18   Q.    And I ask now what is contained in Government's Exhibit

19   1B-1 through 1B-30 inclusive?

20   A.    That's the contents of the storage unit that we found in

21   Raymond, New Hampshire.

22   Q.    And the items that appear in those photographs, sir, that

23   you've identified, do they fairly and accurately depict the

24   appearance of those items on the date of June 4th of 2009 as

25   you saw them on that date?

1    A.   Yes, they do, both when we first got there and as we

2    started to remove items from the storage facility.

3    Q.   For the record, sir, I'm displaying Government Exhibit

4    1B-14.  Do you recognize that, sir?

5    A.   Yeah.  That's the -- that's the door to the storage unit

6    in Raymond, New Hampshire.

7    Q.   Showing you, sir, what has been identified as 1B-26, sir,

8    what's contained in that photograph, sir?

9    A.   That's the contents of the storage facility just as it was

10   when we opened the door.

11   Q.   And, sir, you've mentioned in your earlier testimony

12   information about oxygen tanks?

13   A.   Yes.

14   Q.   I ask you to look to the back of that photograph.  Those

15   green items, what do they appear to be?

16   A.   Those are oxygen tanks.  Oxygen tanks are painted green.

17   So, we knew right away they were oxygen.

18   Q.   And does it appear that one of those -- they all, except

19   one, appear to have a cap on them?

20   A.   That's correct.

21   Q.   Showing you again Government's Exhibit 1A-193, is that the

22   cap that was left behind at Brink's facility on January 18th of

23   2009?

24   A.   That is the cap that was left behind, yes.

25   Q.   Any other items of interest in that photograph, sir?

1    A.    Well, if you'd like, I can describe what I can see in

2    there.

3    Q.    That's fine.

4    A.    Off to the left of that photograph are postal boxes full

5    of gold coins.  That would be Susan B. Anthony dollars.

6    There's -- you can see bolt-cutters, the red handles,

7    obviously.  There is a large fan in there.  That would be used

8    to disperse smoke from any kind of fire or welding.

9                MR. MURPHY:  Objection.

10               THE COURT:  Sustained.

11               THE WITNESS:  There's a large hydraulic drill.  That

12   would be the pump for it.  That's the large, white, square

13   object that you can see, and just other items in there.

14   BY MR. DOMINGUEZ:

15   Q.    Displaying for you, sir, Government Exhibit 1B-2, do you

16   recognize anything in that photograph, sir?

17   A.    Yeah.  That's the storage facility after we -- we removed

18   the oxygen tanks out of the way for, obviously, as we're

19   clearing the storage unit and for safety purposes.  And behind

20   there is rolled and boxed coin.  And they were marked "BRINK'S"

21   on the rolls of the coins in there.

22   Q.    And when you testified earlier, sir, you testified about

23   being on call to the Brink's facility on January 18th of 2009?

24   A.    That's correct.

25   Q.    And when you were in the Brink's facility, you testified

1  about, in describing one of the photographs -- I believe it was

2  1A-99 -- that you were in the vault room area at that time?

3  A.   Yes, sir.

4  Q.   And did there come a time where you were in other areas of

5  the Brink's facility where Susan B. Anthony coins and

6  half-dollar coins were kept?

7  A.   Yeah.  That was the coin room.

8  Q.   And do the coins you've described in Government's Exhibit

9  1B-2 look similar to coins that you saw when you were at the

10  Brink's facility conducting your investigation?

11  A.   Yeah.  The boxes are similar to the ones that were at the

12  Brink's facility.

13  Q.   1B-16, sir, can you see that from here?

14  A.   Yeah.

15  Q.   And as you look at it, what is that, sir?

16  A.   Those are the oxygen bottles again.  Clearly, one's

17  missing a cap.

18  Q.   1B-3, sir, do you recognize it?

19  A.   Yes.  A blue nylon bag with a Carnival tag on it.

20  Q.   When you say "Carnival," you're referring to Carnival

21  Cruise Lines?

22  A.   Yes, I'm sorry.  Carnival Cruise.

23  Q.   Displaying, sir, Government's Exhibit 1B-4, do you

24  recognize it, sir?

25  A.   Yea.  It's the same bag, with the top opened on it.

1   Q.   And what is contained in Government's Exhibit 1B-4,

2   contained in the bag, sir?

3   A.   Well, what you can see from there is coaxial cables, and

4   those are antennas.  And through my research, I believe they're

5   -- they may be called omni antennas.  I'm not exactly sure on

6   that, but they are antennas.

7   Q.   Very well.

8      1B-5, sir?

9   A.   That was in the bag, also.  That is a Y2000 cell phone

10   jammer.  The coaxial cables are connected to those antennas.

11   The sole purpose for this piece of equipment is to jam cell

12   phone signals.

13   Q.   1B-9, sir?

14   A.   Black garbage bags.  That's all burnt paper money.  Some

15   of it was in a usable state.  Some of it was burnt up pretty

16   good.  The postal boxes are full of loose coin that spilled out

17   of other boxes; and, of course, you can see the boxed coin in

18   the background.

19   Q.   And, sir, so that the record is clear, through the course

20   of your investigation, was it determined that the burglars

21   actually stole coin, currency, and the postal boxes that

22   contained some of the coin as well?

23   A.   I'm not sure where the postal boxes came from.

24   Q.   Very well.

25         THE COURT:  What did you say about the black bags?

1          THE WITNESS:  The black bags contained the paper

2    money, just cash.

3          THE COURT:  In U.S. currency?

4          THE WITNESS:  U.S. currency, yeah.  Yeah, in all

5    denominations and various stages of burnt.

6          THE COURT:  Some were burnt?

7          THE WITNESS:  Some was burnt.  Some was still

8    spendable, I guess.

9          MR. DOMINGUEZ:  May I proceed, Your Honor?

10         THE COURT:  You may.

11   BY MR. DOMINGUEZ:

12   Q.   1B-24, Detective?

13   A.   That's the storage unit again.  I believe all those items

14   there were photographed in place when we first opened up the

15   door.  You can see some large crowbars.  That's on top of the

16   hydraulic pump there.  Those large rods are --

17   Q.   What I'm circling there, sir?

18   A.   Yes.  Those are rods -- through our course of the

19   investigation, we determined that the method of entry on the

20   vault was a welding term called thermal lance.  And those are

21   basically burning bars that are ignited and used to burn --

22         MR. MURPHY:  Objection.

23         THE COURT:  So, what's the basis of your objection?

24         MR. MURPHY:  He's not an expert in this field, Your

25   Honor.  He's a police officer, and this is a specialized area.

1    And I don't see he's qualified to say what these rods are.

2              MR. DOMINGUEZ:  He said his investigation revealed.

3    That's exactly what he said.

4              THE COURT:  Overruled.

5    BY MR. DOMINGUEZ:

6    Q.   1B-23, Detective?

7    A.   Just additional items in there:  the rods, the

8    bolt-cutters, and miscellaneous equipment.

9              THE COURT:  Did you say "bolt-cutters"?

10             THE WITNESS:  Yeah.  They're red-handled

11   bolt-cutters.  There were two pairs in the storage locker.

12             THE COURT:  Thank you.

13   BY MR. DOMINGUEZ:

14   Q.   And lastly with respect to the photographs, Detective,

15   1B-28?

16   A.   That is also another cell phone jammer.

17   Q.   Separate from the one you described that was in the bag

18   with the Carnival tag?

19   A.   Yes.  It's considerably larger than the other one.  It may

20   be a higher wattage.  I don't know.

21             MR. DOMINGUEZ:  May I approach, Your Honor?

22             THE COURT:  You may.

23   BY MR. DOMINGUEZ:

24   Q.   Detective McIntosh, I've handed you several items that are

25   Government's Exhibits 1D-1 through 1D-8 inclusive.  I ask you

1   to take a look at 1D-1.

2   A.   Okay.

3   Q.   Do you recognize that, sir?

4   A.   Yes, I do.

5   Q.   And what is it?

6   A.   It's a folder and a lease agreement for a storage facility

7   in Pennsylvania.

8   Q.   And have you been able to look at that agreement, lease

9   agreement?

10  A.   Yeah, only briefly.

11  Q.   And did it say who the storage unit was leased to?

12  A.   Without looking at it, I'm not sure.

13  Q.   Open it up.

14  A.   Oh, okay.

15  Q.   Okay.  Do you recognize who the unit was leased to?

16  A.   Yeah.  It's to Brian Heatherman.

17  Q.   Does it have a date?

18  A.   They rented that storage unit January 3, 2009.

19  Q.   And, again, this lease agreement in the name of Brian

20  Heatherman was found, along with the other items you've

21  mentioned, during your search of the storage facility in

22  Raymond, New Hampshire, on June 4th of 2009?

23  A.   That's correct.

24  Q.   Government Exhibit 1D-2, Detective, --

25  A.   Okay.

1   Q.   -- do you recognize it, sir?

2   A.   Yeah.

3   Q.   And what is it?

4   A.   It's a welder's mask.

5   Q.   And was that found during the search of June 4, 2009, in

6   Raymond, New Hampshire?

7   A.   Yes, it was.

8   Q.   And did you cause anything to be done with that mask

9   subsequent to its seizure on June 4th of 2009?

10   A.   Yes.  This was -- okay.  Subsequent?  You mean after --

11   Q.   Yes, after.

12   A.   Yeah.  It was -- once it got back to Columbus, Ohio, it

13   was submitted to our crime lab for latent prints and DNA

14   analysis.

15   Q.   Very well.

16       Government Exhibit 1D-3?

17   A.   Do you want me to take these out?

18   Q.   If it will help you with your testimony, sir.

19   A.   Well, it's okay.  I know what they are.

20   Q.   What are they?

21   A.   It's walkie-talkies that were recovered up in Raymond.

22   Q.   And similar to the item you've just identified, the

23   welder's mask, did you or any other investigators cause those

24   to be tested for prints?

25   A.   Yes.

1    Q.    And were they submitted to the CPD -- were the lifts

2    submitted to the CPD crime lab?

3    A.    Yes, they were.

4    Q.    1D-4, sir?

5    A.    Okay.

6    Q.    What are those?

7    A.    These are what they call head lamps.  That's -- well, I'll

8    take one out.

9         It's like a flashlight you wear on your head.  They look

10   like that (indicating).

11              THE COURT:  Hold that up for everyone.

12              THE WITNESS:  Sure.  You strap that on your head.

13              THE COURT:  That's a strap?

14              THE WITNESS:  Yeah.  They're not working now, but,

15   yeah.  You put that on your head and look around.

16   BY MR. DOMINGUEZ:

17   Q.    1D-5, sir?

18   A.    It's the same thing, another one.  There were, like, four

19   in that bag and one in this one.

20   Q.    Another one what, --

21   A.    A head lamp.

22   Q.    -- for the record?

23         1D-6, sir?

24   A.    Screwdriver.

25   Q.    And that was found at the storage facility as well?

1  A.   Yes, also, yeah.

2  Q.   1D-7, sir?

3  A.   That's a pair of gloves that was also found in Raymond.

4        MR. DOMINGUEZ:  May I have a moment, Your Honor?

5        (Whereupon, there was a brief interruption.)

6  BY MR. DOMINGUEZ:

7  Q.   I've provided you with 1D-8, but I see no reason to

8  mention that one, Detective.

9  A.   Okay.

10        MR. DOMINGUEZ:  May I approach, Your Honor?

11        THE COURT:  You may.

12        MR. DOMINGUEZ:  Your Honor, with the Court's

13  permission, could Agent Trombitis take that up?

14        Your Honor, may --

15        THE COURT:  Yes.

16  BY MR. DOMINGUEZ:

17  Q.   Sir, for efficiency purposes, I have handed you the rest

18  of the D series, and I ask you to take a look at Government's

19  Exhibit 1D-9, or -- strike that.  I believe you've already

20  identified that.  One D -- no.  1D-9, I don't believe you have.

21  A.   Okay.

22  Q.   Do you recognize that item, sir?

23  A.   Yeah.  It's another two-way walkie-talkie radio also found

24  at Raymond.

25  Q.   And 1D-10, sir?

1  A.    That's a cell phone also found at Raymond, New Hampshire.

2  Q.    1D-11?

3  A.    This is a welder's mask also found in Raymond.

4  Q.    Now, was that likewise submitted, sir, for testing,

5  subsequent to June 4th of 2009 --

6  A.    Yes.

7  Q.    -- to the Columbus police lab?

8  A.    That's correct.

9  Q.    1D-12?

10  A.    Okay.  That's, like, a ski mask also found at Raymond.

11  Q.    1D-13?

12  A.    It's a TomTom GPS which was also recovered at Raymond.

13  Q.    Now, with respect to that TomTom GPS, sir, were you able,

14  any time after your recovery of that item, able to display

15  addresses that had been --

16          MR. MURPHY:  Objection, Your Honor.

17          MR. DOMINGUEZ:  -- logged into that TomTom?

18          MR. MURPHY:  Objection.

19          Could we have a side bar, Your Honor?  It's a 103(c)

20  issue.

21          THE COURT:  Well, he hasn't finished the question

22  yet.

23  BY MR. DOMINGUEZ:

24  Q.    Were you able to do that, sir?

25  A.    Yes.  We were able to plug it in and turn it on.

1          MR. MURPHY:  Objection, Your Honor.

2          THE COURT:  All right.

3          (Whereupon, a discussion was held at the bench

4    between the Court and Counsel as follows:)

5    AT THE BENCH:

6          MR. MURPHY:  This is a printout of the information

7    that allegedly came off of this GPS device.  Okay?  And we

8    would just --

9          THE COURT:  Speak up a little bit.

10          MR. MURPHY:  Okay.  We were just provided with this

11    discovery today.  This is information that the government has

12    had for over two-and-a-half to three years.

13          THE COURT:  Uh-huh.

14          MR. MURPHY:  Okay?  And I'm saying that this late

15    introduction of evidence is -- it's -- it's just not called

16    for.  In your preliminary matter, when we asked that all

17    discovery be provided, you told us in your decision that any

18    late discovery given at this late date would not be looked upon

19    favorably.

20          THE COURT:  What is -- is this something I can read

21    here?

22          MR. MURPHY:  Yes.

23          MR. DOMINGUEZ:  Yes, Your Honor.

24          THE COURT:  These are addresses?

25          MR. MURPHY:  Yes.  The government had for --

1     THE COURT:  What is it -- I don't know what the

2  answer to the question is.

3     MR. DOMINGUEZ:  Well, I wasn't going to ask him to

4  identify those at this juncture, sir, Judge.  As we were

5  organizing the evidence, this GPS has been in the evidence log

6  for months, capable of being reviewed by anyone.  Suffice it to

7  say that these are addresses that were stored in the GPS

8  device.

9     When we were gathering our evidence this weekend,

10 Detective McIntosh took the GPS out to his car, plugged it in,

11 and was able to find that information which had been stored

12 since 2009.  It has been available since we've had it.

13    THE COURT:  It shows where the device has been?

14    MR. DOMINGUEZ:  Yes.

15    THE COURT:  Oh, I see.

16    MR. DOMINGUEZ:  It has addresses.  If you plug in an

17 address into your GPS, it will give you directions, but it will

18 also store the address that you've inputted.

19    MR. MURPHY:  It will record it, Your Honor, but my

20 argument is that they've had this information for so long and,

21 this late, you know, the day of trial introducing it is just

22 uncalled for.

23    MR. DOMINGUEZ:  Your Honor, we could --

24    THE COURT:  If you had more time, what would that --

25 what could you do with it?

1            MR. MURPHY:  I could at least investigate it.  I

2    can't do anything with that now.

3            THE COURT:  Well, do you know these addresses?

4            MR. MURPHY:  No.  I know one address.  That's the

5    street that I live on.  It's the main street in Lynn, and it

6    goes through the whole city.

7            THE COURT:  Well, you know the address of 1360, or

8    18 -- 1362.  This is the Brink's.

9            MR. MURPHY:  Right.  I recognize that.

10           THE COURT:  Brush Creek, Warren, Pennsylvania.  These

11   are all being talked about.

12           My question is, what are you going to do with -- what

13   more can you do with the information?

14           MR. MURPHY:  Well, I mean, I --

15           THE COURT:  There are no names connected with it.

16   There is just addresses.

17           MR. MURPHY:  No.  There is going to be a question of

18   whether or not, you know -- there has been testimony, and I've

19   read some, some of the Jencks material, that Mr. Nassor went

20   out with a GPS device to do his scoping and doing what he did.

21   And, you know, I --

22           THE COURT:  It doesn't say who has it.  It doesn't

23   say you had that or who, whoever, had that.  I don't know what

24   you're going to do with it.

25           MR. MURPHY:  Well, you know, my concern is that, you

1  know, Mr. Dominguez is going to try to claim that this is a

2  device that I used.

3            Are you going to try to say that?

4            MR. DOMINGUEZ:  Your Honor, Mr. Murphy has already

5  stood up in opening statements, and he's going to disavow any

6  connection to any of this stuff anyhow.  I frankly don't

7  understand -- it's not consistent with his defense to even have

8  a problem with it.

9            MR. GRAEFF:  Excuse me.  Is there a way we can move

10 the trial along and just reserve this document until after the

11 jury is excused this afternoon?

12           MR. DOMINGUEZ:  I'm fine with that, Your Honor.  I

13 can ask other questions as long as if the Judge rules that it

14 is okay.

15           MR. GRAEFF:  We could hold it in abeyance.

16           MR. DOMINGUEZ:  Right.  I can use it with Jason

17 Costello, who was privy to the same thing.

18           MR. GRAEFF:  We're just wasting the jurors' time

19 here.

20           THE COURT:  Right.

21           MR. DOMINGUEZ:  That's fine.

22 IN OPEN COURT:

23           THE COURT:  You may proceed.

24           MR. DOMINGUEZ:  Thank you.

25 BY MR. DOMINGUEZ:

1   Q.   So, the answer to my previous question is, yes, you did in

2   fact find input, what was contained on the GPS?

3   A.   Yeah, that's correct.

4   Q.   We'll move to the next question.

5        Government's Exhibit 1D-14?

6        You may open it, sir.

7   A.   What's that?

8   Q.   You may open it.

9   A.   Okay.

10       It's binoculars.

11  Q.   1D-15, sir?

12  A.   Looks like a pair of ear buds for, like, listening to

13  radios or walkie-talkies, and paper towels.

14  Q.   1D-16, sir?

15  A.   It's got a police radio scanner and J-B Weld.  It's an

16  epoxy.

17  Q.   Hold that epoxy up, sir.

18  A.   Sure.  And these items also were submitted for prints.

19  Q.   Very well.

20       1D-17, sir?

21  A.   It's a battery-powered saw.

22  Q.   1D-18?

23  A.   It's a drill.  I don't know if everybody needs to see a

24  drill.

25  Q.   Standard drill?

1    A.    Standard, yeah, battery-powered drill, I think.

2    Q.    1D-19, sir?

3    A.    Nineteen?  That's going to be a respirator and goggles.

4    Q.    Would you hold that item up, sir?

5    A.    I'm sorry?

6    Q.    Could you hold that item up?

7    A.    Yes.  Yes.  These are welding goggles, 'cause they're,

8    like, really, really dark.  And that's a respirator.

9    Q.    1D-20, sir?

10         Would it be helpful if I retrieved some of those items

11   you've identified, sir?

12   A.    Yeah.

13              (Whereupon, Mr. Dominguez retrieves some of the

14   exhibits.)

15              THE WITNESS:  This is ready to go back.  This is

16   pretty heavy.

17   BY MR. DOMINGUEZ:

18   Q.    1D-20, sir?

19   A.    1D-20 is a black canvas bag with cell phone jammer

20   antennas.

21   Q.    And 1D-21?

22   A.    Okay.  This is another canvas bag, and it had various

23   types of epoxy in it, and --

24   Q.    Sir, as you're holding those items up, if I could invite

25   your attention back to January 18th of 2009 when you were

1  conducting your investigation at the Brink's facility, was

2  there any -- did you denote, or did the investigators denote,

3  any adhesive or any kind of epoxy that may have been used

4  during the course of that burglary?

5  A.   Yeah, we did.

6  Q.   Explain that for the ladies and gentlemen of the jury.

7  A.   The exterior doors, the pedestrian doors, had been sealed

8  shut, or attempted to be sealed shut, with the epoxy going up

9  around the seams of the doors and in the door locks.  There was

10  also a large amount of J-B Weld was found on the face of one of

11  the smaller safes in the facility.

12  Q.   1D-22, sir?

13          THE COURT:  Just one moment.

14          MR. DOMINGUEZ:  Stand by, Detective.

15          THE COURT:  J-B Weld?

16          THE WITNESS:  Yeah.  It's also a two-part epoxy.

17  It's for adhering to metal.

18          THE COURT:  All right.  Thank you.

19          THE WITNESS:  Yeah.  That's the actual brand name of

20  it.  There's several different companies that make it.

21          THE COURT:  Okay.

22  BY MR. DOMINGUEZ:

23  Q.   1D-22, sir?

24  A.   This is the cell phone jammer that was in one of the

25  photographs there.

1  Q.   Are you able to lift that out of the box fairly easily,

2  sir, so that the jurors can see it?

3  A.   Yeah.  I can lift it out by component.

4  Q.   Please describe what you're lifting out, sir.

5  A.   Sure.  These are the coaxial cables that are connected to

6  the antennas, and then the back of the cell jammer.  Once

7  again, these are what the antennas look like.  I think

8  there's -- there's four.

9  Q.   You don't have to bring them all out, sir.

10     Anything else in there?

11 A.   And that's the Y2000 cell jammer.

12 Q.   And I believe D-23 is the actual bag itself?

13 A.   That's correct.

14 Q.   And there appears to be some type of tag on the bag.

15 A.   That would be the Carnival Cruise Line tag.

16 Q.   Very well.  And just so that the jurors are clear, you're

17 identifying these items, sir, but you don't profess to be an

18 expert on how a cellular jamming device is actually used?

19 A.   No.

20 Q.   And for the record, sir, so that we can move on, I want to

21 make sure we're clear that the items you identified in

22 Government's Exhibits 1D-1 through 1D-23, inclusive, were items

23 that were seized during the search of the Raymond, New

24 Hampshire, storage facility on June 4th of 2009?

25 A.   That's correct.  Everything here was found in Raymond, New

1    Hampshire.

2    Q.    And are each item in substantially the same condition

3    today, as you look at them, as they were when you found them on

4    June 4th, 2009?

5    A.    Yes.

6          MR. DOMINGUEZ:  May Agent Trombitis and I approach,

7    Your Honor?

8          THE COURT:  Yes.

9          MR. DOMINGUEZ:  May I approach, Your Honor?

10         THE COURT:  You may.  You may continue to approach.

11         MR. DOMINGUEZ:  Your Honor, may Ms. Hill assist in

12   delivering and tendering exhibits to the witness?

13         THE COURT:  You may.

14   BY MR. DOMINGUEZ:

15   Q.    I ask you to take a look at, if you would, Detective,

16   Government's Exhibit 1E-1.

17   A.    Okay.

18   Q.    Do you recognize 1E-1, sir?

19   A.    Yes, I do.

20   Q.    And what is it, sir?

21   A.    That's miscellaneous tools, hoses, jumper cables.  There's

22   a grinder in there.

23         I take that back.  It looks like a hammer drill, and

24   welding supplies.

25   Q.    Government Exhibit 1E-2?

1  A.   This is just a welding kit.

2  Q.   1E-2?

3  A.   Yes.

4  Q.   Is that 1E-2?

5  A.   Yes.

6  Q.   1E-3?

7       You can just look at them right there, sir, and pick them

8  up and identify them right where you are.

9  A.   This is a heavy-duty welding suit.

10 Q.   Anything else in that box, sir?  Is that another suit?

11 A.   More of the welding outfit.  And this is a hose that hooks

12 up to an oxygen tank, and there's some gauges --

13 Q.   Very well.

14 A.   -- as well.

15 Q.   1E-4, sir?  1E-4 is not there, sir?

16 A.   I'm not sure.  What is it?  What does it purport to be?

17 Q.   It was an electronic device, but we can move on.  Agent

18 Costello will testify in these proceedings.

19      Are there any other items that you have not yet

20 identified, sir?

21 A.   Yeah.  Items --

22 Q.   Item 6?

23 A.   I have E-7.

24 Q.   E-7?

25 A.   Knee pads.  And 1E-6 looks like a Carnival fanny pack.

1   Q.   What did you call it?

2   A.   A Carnival Cruise Line fanny pack.

3   Q.   Okay.

4   A.   Fanny pack?  Is that --

5   Q.   A hip pack?

6   A.   Yeah, a hip pack.

7   Q.   Is 1E-8 up there with you, sir?

8   A.   Yes, it is.

9   Q.   Could you please take 1E-8 and, if you have it, 1E-9 out?

10  Do you recognize those items, sir?

11  A.   This appears to be some of the burnt money, I would say.

12  It's burnt money.  I know that.  I can't differentiate from all

13  other burnt money, but it's burnt money.

14  Q.   And there was burnt money that was taken during the search

15  of the storage facility on June 4th of 2009?

16  A.   That's correct.

17       MR. DOMINGUEZ:  Your Honor, with the Court's

18  permission, may we allow the jurors to take a look, closer

19  look, at that?

20       THE COURT:  Yes.

21  BY MR. DOMINGUEZ:

22  Q.   Would you please pass that to the first juror, both of

23  those items?  For the record, that's Government's Exhibits 1E-8

24  and 1E-9.

25       THE COURT:  I don't want anyone taking samples.

1  BY MR. DOMINGUEZ:

2  Q.   A couple of questions while the jurors are taking a peek

3  at those exhibits, Detective.

4       When you identified several of the photographs, there were

5  some items -- I believe there was the thermal lances.  Do you

6  recall talking about those rods?

7  A.   Yes.

8  Q.   I believe I made a big circle on a photograph containing

9  those, and there was a big white -- what is that called?

10  A.   It was a hydraulic pump.

11  Q.   Now, you've identified several items that were seized

12  during this search of that Raymond storage facility on June 4th

13  of 2009, but we did not present the physical evidence of the

14  white pump and the thermal rods.  Can you explain to the ladies

15  and gentlemen of the jury the sheer weight of those items?

16  A.   Yeah.  A thermal pump is really large and heavy,

17  cumbersome.  You would need a large -- you can't just pick that

18  up and throw it in a pickup truck.  I mean, it would have to be

19  on a lift gate, a large box truck.

20  Q.   Can I ask Ms. Hill to bring that to you, sir?

21  A.   You could, but she wouldn't have done it.  So --

22  Q.   How about the metal rods?

23  A.   The metal rods that were in the storage unit?

24  Q.   Yes.

25  A.   They're longer.  I think they're eight foot, maybe, or

1   longer.  I don't know.  I didn't measure them, but there were

2   enough of them.  They were substantially heavier.  They're not

3   just copper pipe.

4   Q.   Sir, so the record is complete, the items you've

5   identified in the 1E series -- that is, 1E-1, 1E-2, 1E-3, 1E-6,

6   1E-7, and 1E-8 -- are those in substantially the same

7   conditions and appearance as they were when they were seized on

8   June 4th of 2009 from the storage facility in Raymond, New

9   Hampshire?

10  A.   Yes.

11          MR. DOMINGUEZ:  Your Honor, may I again approach?

12          THE COURT:  You may.

13          MR. DOMINGUEZ:  Your Honor, that would conclude my

14  direct examination of Detective McIntosh.

15          THE COURT:  You may examine.

16          MR. MURPHY:  Thank you, Your Honor.

17                      - - -

18                  CROSS-EXAMINATION

19  BY MR. MURPHY:

20  Q.   Good afternoon, Detective McIntosh.

21  A.   Good afternoon.

22  Q.   You testified that you appeared at Brink's on the day that

23  the burglary was reported?

24  A.   I'm sorry.  What was that?

25  Q.   You testified that you appeared at Brink's at 1362 Essex

1  Avenue, in Columbus, on the day that the burglary was reported?

2  A.    That's correct.

3  Q.    And at what time did you arrive at the facility?

4  A.    Well, I'll check in my notes.  I'm going to say 11:00,

5  maybe earlier.

6  Q.    Okay.  And what was the state of the building and the

7  facility when you got there?

8  A.    As far as --

9  Q.    As far as were people in the building?

10  A.    Yeah.  Yeah.  Like I said, there were police cruisers,

11  police officers, fire personnel, Brink's personnel, and myself,

12  my partner, Detective James; and several other -- eventually

13  several other detectives from both the FBI and our unit.

14  Q.    Now, you had testified that they were actually in the

15  building when you got there.  The building was open?

16  A.    The building was open.

17  Q.    Would you happen to know how they got in the building,

18  because you testified and there was information that the doors

19  were epoxied shut?  Now, I don't have to be a rocket scientist

20  to figure out, if the doors are epoxied shut, how did you get

21  in.

22  A.    That's correct.  I believe they ended up forcing the

23  overhead door.

24  Q.    Forcing the overhead door?

25  A.    That's speculation on my part since it was open at the

1    time when I got there.

2    Q.   Would you know who the officer was or who the person was

3    that actually gained entrance to the building?

4    A.   I'm going to defer that to Brink's personnel.  They were

5    the first ones on the scene.  The police were called later.

6    Q.   Okay.  The government introduced Exhibit 105, which was, I

7    believe, a picture of the vault door with a hole in it or

8    something.

9         Do we have it so we can introduce -- put it on the

10   screen?

11        (Whereupon, Mr. Graeff hands Mr. Murphy a document.)

12   BY MR. MURPHY:

13   Q.   Does that picture look familiar, Detective?

14   A.   Yes.

15   Q.   Now, is that the way the door appeared when the burglary

16   was discovered?

17   A.   I can't speak to that since I did not discover the

18   burglary.  We responded after fire personnel were there.

19   Q.   Okay.  Let me rephrase the question.  Did you enter the

20   building when you went there at eleven o'clock in the morning

21   on January 18th?

22   A.   That's correct.

23   Q.   And did you go to the area that had the vault, in the main

24   area of the vault?

25   A.   That's correct.

1  Q.   Now, when you went there at approximately eleven o'clock,

2  is this the way the door appeared when you first saw it?

3  A.   As best as I recall.

4  Q.   That would be "yes"?

5  A.   I'm not sure.  I didn't -- you've got to remember two

6  things:  One, I didn't photograph the scene.  That would have

7  been crime scene searching.

8  Q.   I didn't ask you that.

9  A.   And, number two, the fire personnel had cut on this door

10  to put the fire out.  So, they may have enlarged the hole.  I

11  don't know.  But that would be somebody else that would be able

12  to elaborate on that.

13  Q.   Well, my question is, is that -- there has been testimony

14  that this burglary had been reported at 9:00 a.m. in the

15  morning.  And you're testifying that you appeared at 11:00 a.m.

16  in the morning, which is a two-hour difference?

17  A.   I wasn't the first on the scene.

18      THE COURT:  I think it's obvious.  Try to get to your

19  point.

20      MR. MURPHY:  Well, my point is if -- I pass on that

21  question.

22  BY MR. MURPHY:

23  Q.   You were present when the Raymond storage facility was

24  entered?

25  A.   That's correct.

1  Q.   Now, you documented all the tools and equipment that were

2  taken out of that facility?

3  A.   No, I did not.

4  Q.   You didn't document it?

5  A.   No.  That would have been the FBI.

6  Q.   Do you have a copy of the list?

7  A.   Should be in our files.

8  Q.   Would you be familiar with all -- it looked like you were

9  familiar with all the items that the government described in

10  their Government's Exhibit 1.  You just described them all.

11  A.   Okay.

12  Q.   Would those be all the items that were in the storage

13  facility?

14  A.   Yes.

15  Q.   Okay.  Did you happen to find a Milwaukee electromagnetic

16  steel drill in the Raymond facility?

17  A.   Yes.

18  Q.   You did?

19  A.   I do -- I do believe.  That may still be down at the

20  storage facility, over at -- the FBI property room.

21  Q.   What exhibit would that be?

22  A.   I'm sorry?

23  Q.   What exhibit would that be?  Do you have a list that

24  shows, that documents, that specific item?

25       You may review the file.

1          THE COURT:  Mr. Dominguez, is this item that Mr.

2    Murphy is describing, is it -- is it amongst the evidence

3    that's going to be introduced or not?

4          MR. DOMINGUEZ:  No, Your Honor.  There's several

5    items that were in FBI storage that we didn't deem necessary to

6    present to this jury.

7          THE COURT:  Okay.

8          MR. DOMINGUEZ:  We're going to have the evidence

9    inventory.

10          THE COURT:  Okay.  Unless there is some other

11    purpose, this is -- you're wasting your time.

12          MR. MURPHY:  I'm not wasting time, Your Honor.

13          MR. DOMINGUEZ:  May I approach Mister, Detective,

14    McIntosh?

15          THE COURT:  Yes.

16          (Whereupon, Mr. Dominguez hands a document to the

17    witness.)

18          THE WITNESS:  Yeah.  I would first have to ask what's

19    an electromagnet drill.  What am I looking for?

20    BY MR. MURPHY:

21    Q.   It's -- first of all, it's made from Milwaukee, and it's a

22    drill that, when you plug in, it locks onto metal.  And then it

23    cuts through metal.

24    A.   Okay.  Let me look.

25          There's something called an eco drill on a rolling cart.

1   Q.   That's not --

2   A.   I don't know.  I don't see anything here listed actually

3   as Milwaukee.

4   Q.   All right.  Or an eletromagnetic drill?

5   A.   Not unless somebody else down there knew exactly what it

6   was.

7   Q.   Okay.  How about a Milwaukee plug-in Sawzall?

8              THE COURT:  Mr. Dominguez, is this -- is this what --

9   what Murphy has just described, is this something that's going

10  to be introduced into evidence against him?

11             MR. DOMINGUEZ:  The only things that the government

12  is introducing with respect to New Hampshire are what the

13  detective has identified.

14             THE COURT:  So that's it?

15             MR. DOMINGUEZ:  That's it.  There's other

16  photographs --

17             MR. MURPHY:  Your Honor --

18             MR. DOMINGUEZ:  If I may finish, there's other

19  photographs relating to New Hampshire, probably five, that

20  another witness is going to identify.

21             THE COURT:  Okay.  Unless there is some purpose in

22  this --

23             MR. MURPHY:  There is a purpose, Your Honor.  Would

24  you like me to explain it to you?

25             When you heard -- in my opening, you heard that there

1  was certain items that these witnesses took out of the Raymond

2  storage facility.  And I was talking about tampering with

3  evidence and withholding evidence.  These items that I'm asking

4  for are items that the witness took out of the facility.  And

5  I'm just verifying that they were not in the facility.

6          THE COURT:  How would they be evidence against you?

7          MR. MURPHY:  It's not going to be evidence against

8  me.  It's going to go towards my cross-examination of the two

9  cooperating witnesses.  But, right now, I have to verify that

10  these items were not in that facility when the government

11  seized it and went through it.

12          THE WITNESS:  Yeah.  I don't see that on here either.

13  BY MR. MURPHY:

14  Q.   Okay.  Now, Detective McIntosh, did you find any black

15  rubber shoe galoshes in that facility?

16  A.   No.

17  Q.   Did you find any black flight suit overhauls?

18  A.   No.

19  Q.   And I noticed that you had documented a black ski mask.

20  A.   Yeah.  Some type of mask, yeah.

21  Q.   Were there four or five ninja masks in there, somewhat

22  similar?

23  A.   Not that I know of, no.

24  Q.   Okay.  Did you find any extension cords in that facility?

25  A.   I believe -- no.  Well, --

1    Q.    Okay.

2    A.    -- we may have down at the other facility.  I'm not sure.

3    Q.    And did you find any of the video units that were stolen

4    from Brink's and removed?

5    A.    No.

6    Q.    Did you find a grinder, a plug-in grinder?

7    A.    No.

8    Q.    And I believe there may have been -- were there any wire

9    cutters that you found in there?

10   A.    Yeah, we found wire cutters.

11   Q.    You did find wire cutters?

12   A.    Yeah.

13   Q.    And did you find a big, gray, 28-foot RV cover?

14   A.    I didn't, no.

15   Q.    Did you understand what I'm saying?

16   A.    Yeah, I think so.  I don't -- I don't remember seeing

17   anything like that.

18   Q.    You couldn't miss it if you --

19   A.    Yeah.  Pretty big, I would think, yeah.  No.

20   Q.    And did you find any of the coin racks that were stolen

21   from Brink's?

22   A.    No.

23   Q.    Now, was there also some sort of money-counting machine

24   taken from Brink's?

25   A.    I can't speak to that.  I don't know what their entire

1  loss was.

2  Q.   And you didn't find a money-counter device in the Raymond

3  storage facility?

4  A.   No.

5  Q.   Okay.  When you were at Brink's at eleven o'clock in the

6  morning, did you see me anywhere near the building, anywhere

7  around?

8  A.   See you?

9  Q.   Yes.

10  A.   No.

11  Q.   Okay.  You had described these rods that -- I believe you

12  called them thermal lance rods?

13  A.   Yes.

14  Q.   And your investigation determined how they were used and

15  what they're used for?

16  A.   Yes.

17  Q.   How did you go about that investigation?  How did you

18  determine that that's what they were used for?

19  A.   In what?  I mean, get online, look for welding, look for

20  cutting.

21  Q.   Okay.  And what did you find?

22  A.   Well, I went to -- I went to, actually, a welder supply

23  place, who said, uh, you know, we don't normally use that

24  around here; that's normally for demolition and cutting through

25  large, heavy steel.

1  Q.  Okay.

2  A.  And so he kind of called them carbon arc burning or

3  burning rods.  So, I looked up that.  And then that brought me

4  to "thermal lance."

5  Q.  Okay.  And these rods, it's just used for cutting steel,

6  and steel only?

7  A.  They can actually bore through concrete and melt concrete

8  or cinder block.

9  Q.  Okay.  You showed -- the government showed a picture of a

10  different type of cell phone jammer.  You had the Y2000, which

11  you had here in the facility, and there was another one.  Do

12  you know anything about that device?

13  A.  In what way?

14  Q.  In where it originated from.

15  A.  As far as --

16  Q.  It was located in the Raymond storage facility.

17  A.  That's correct.

18  Q.  Do you have any information of how it got there?

19  A.  No.

20  Q.  Okay.  Okay.

21  Where is that list here?

22  You introduced a bunch of items that were introduced under

23  Government's Exhibit 1A, -B, -C, -D.  How many of those items

24  do you know for sure were actually used in the Brink's

25  burglary?

1  A.    I'm sorry?

2  Q.    In the items that the government introduced as Exhibits

3  1A, 1B, 1C, 1D and 1E, out of those items, which items do you

4  know were actually used during the Brink's burglary?

5  A.    What are those items?

6  Q.    Okay.  We'll go through them one at a time.

7        1C-1 is metal rods.

8  A.    Okay.  I have no firsthand knowledge that that was used.

9  Q.    Okay.  How about the pieces of steel pipe?

10  A.    No firsthand knowledge.

11  Q.    The three dials from the vault door?  Well, that -- that's

12  something else.

13        THE COURT:  How about we do this:  Have you got the

14  list in front of you?

15        THE WITNESS:  No, I don't.

16        MR. DOMINGUEZ:  I can provide it, Judge.

17        THE COURT:  Provide him with the list.  Look over the

18  list.  And you tell us if there is anything on the list that

19  you know, from firsthand knowledge, was used in the robbery.

20  Okay?

21        MR. MURPHY:  I was trying to -- that's what I was

22  trying to get to, Your Honor.

23        MR. DOMINGUEZ:  May I approach, Your Honor?

24        THE COURT:  You may.

25        (Whereupon, Mr. Dominguez hands a document to the

1  witness.)

2         THE COURT:  Now, look it over carefully, Mr.

3  McIntosh.

4         THE WITNESS:  (Witness complies.)

5         Okay.  What numbers, again?  Or did you just want me

6  to look at the whole list?

7         THE COURT:  Look at the whole list.

8         THE WITNESS:  Okay.

9         (Witness complies.)

10        Okay.

11 BY MR. MURPHY:

12 Q.   So, are there any items on that list that you know that

13 were used in the Brink's burglary?

14 A.   There is no tools on here that I know of that were used in

15 the Brink's burglary.

16 Q.   Okay.  You've described an item that was of evidentiary

17 matter, I believe a radio that was submitted for prints.

18 A.   A walkie-talkie?

19 Q.   A walkie-talkie.

20 A.   Yes.

21 Q.   How many items were actually in that storage facility?

22 A.   Without having the list, I'm going to say over a hundred,

23 I mean if you count every little thing, obviously.

24 Q.   Okay.  And out of them hundred, only one item had a print

25 on it that was identifiable?

1  A.   Oh, I can't speak to that.  I know that's -- we printed

2  some items, yeah.

3  Q.   Okay.  I believe it was Item 1D-17 which was a

4  battery-powered Sawzall.  Are you familiar with battery-powered

5  Sawzalls?

6  A.   Yeah.

7  Q.   Are they very powerful?

8  A.   Well, they can be.  I have a Dewalt.  It's fairly

9  powerful.

10  Q.   How long does the battery last in it if it was doing

11  heavy-duty work?

12  A.   I don't know.  I've never had to do really heavy-duty work

13  with it.

14  Q.   Okay.  So, you wouldn't have knowledge of --

15  A.   No.

16  Q.   -- the power of a Sawzall?  Okay.

17        So, the cell phone jammer that you've described as a Y2000

18  quad that was the exhibit from the government, you don't know

19  if that device was used at Brink's?

20  A.   No.

21  Q.   Okay.

22  A.   I have no firsthand knowledge of that.

23  Q.   Okay.  You went up to the Raymond storage facility when

24  they actually entered it and went in?

25  A.   Yes.

1   Q.   Was there a search warrant, or was there just a consent?

2   A.   It was consent.

3   Q.   It was consent?  And do you know whose name the storage

4   facility was in, firsthand knowledge?

5   A.   No.

6   Q.   You don't?  Did you -- did you or any one of your team

7   request or obtain any of the entry/exit logs from the Raymond,

8   New Hampshire, storage facility?  Do you know what I mean?

9   A.   I know what you mean.  I don't -- there is no gate on the

10  facility.  I don't think there was -- you're talking Raymond,

11  New Hampshire?

12  Q.   Yes.

13  A.   Yeah.  There is no entry code, gate, or anything like that

14  to get in or out of the place.

15  Q.   Oh!  So it's just a free, open facility?

16  A.   Pretty much.

17  Q.   Okay.  Those welding suits that you described -- is that

18  what they're called:  welding suits?

19  A.   I don't know the exact terminology.  It's protective gear

20  to keep you from getting burnt up.

21  Q.   Okay.  And the burnt money that got passed around to the

22  jurors, you don't have any direct or firsthand knowledge where

23  that money originated from?

24  A.   Only, based upon the paperwork, that was money that was

25  turned over to Brink's and, apparently, counted at that point

1  to determine how much was in there.

2  Q.   And you described this big hydraulic pump.  To your

3  knowledge, that hydraulic pump wasn't used at Brink's, was it?

4  A.   No.

5  Q.   Okay.  I have a picture here that was provided in

6  discovery, and I want you to try to describe it if you can.  Do

7  you know what that is, Detective?

8  A.   That's a vault door.

9  Q.   And which vault door would that be?

10  A.   That would be the smaller -- I think they call it the

11  petty cash vault.  That's in a secured area between a set of

12  locked doors just outside the cash room.

13  Q.   And what does this picture describe?

14  A.   Well, it shows the vault dial knocked off, and it looks

15  like some type of epoxy or J-B Weld stuff up at the top of it

16  there stuck on the vault door.

17  Q.   Okay.  And it looks like -- it looks like -- if you look

18  in this area right here (indicating), what does that look like?

19  A.   I have no idea.  I'm not an expert in striations or marks

20  or anything.

21  Q.   You don't have an opinion of what it is?

22  A.   A scratch?

23  Q.   A scratch on -- and that would be stainless steel?

24  A.   I have no idea what kind of metal that is.

25  Q.   So you would have no opinion of how that scratch got

1  there?

2  A.    No.

3  Q.    Would you have an opinion of how that dial was removed?

4  A.    Nope.

5  Q.    Okay.  You do notice the size of the circle right there

6  (indicating), right?

7  A.    Yeah.

8  Q.    Was it measured to your knowledge?

9  A.    I don't know.  I'm not a crime scene person.  I don't

10  believe -- I don't believe it was.  I don't know.

11  Q.    You don't believe it was?

12  A.    I don't know what evidentiary value it might have.  I'm

13  not sure.

14  Q.    Well, you did find a dial somewhere in the area, didn't

15  you?

16  A.    I didn't find any dials.

17  Q.    You're not familiar with evidence that was recovered from

18  the scene on the day of the crime?

19  A.    No.  That was our evidence collection people took care of

20  that.

21        MR. MURPHY:  Okay.  I have no further questions from

22  you.

23        Thank you, Detective.

24        THE COURT:  Anything further with Mr. McIntosh?

25        MR. DOMINGUEZ:  If I could have a moment, Your Honor?

1          (Whereupon, there was a brief interruption.)

2          MR. DOMINGUEZ:  No further questions, Your Honor.

3          THE COURT:  You may step down.  Thank you very much.

4          THE WITNESS:  Thank you, sir.

5          (Whereupon, the witness was excused.)

6          THE COURT:  Who is your next witness?

7          MR. DOMINGUEZ:  David Nassor, Your Honor.

8          THE COURT:  Let's take a little break.  That will be

9    awhile.  Ten minutes?  Remember the admonition.

10          (Whereupon, a recess was taken at 2:37 p.m., and the

11   proceedings reconvened at 2:55 p.m.)

12

13                              -  -  -

14   IN OPEN COURT:

15          THE COURT:  Call your next witness.

16          MR. DOMINGUEZ:  Your Honor, David Nassor, please.

17          THE COURT:  That is spelled how?

18          MR. DOMINGUEZ:  N-A-S-S-O-R, Your Honor.

19          COURTROOM DEPUTY CLERK:  Mr. Nassor, will you please

20   raise your right hand?

21          (Whereupon, the witness was sworn in by the Courtroom

22   Deputy Clerk.)

23          COURTROOM DEPUTY CLERK:  Thank you.

24          THE COURT:  You may proceed.

25          MR. DOMINGUEZ:  Thank you, Your Honor.

- - -

DAVID NASSOR,

AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

- - -

DIRECT EXAMINATION

BY MR. DOMINGUEZ:

Q.   Sir, would you please state your name?

A.   David Nassor.

Q.   Good afternoon, Mr. Nassor.  Sir, you have come into the

courtroom, and you have an orange jumpsuit on.  Are you

presently incarcerated?

A.   Yes, I am.

Q.   Sir, I'd like to ask you, initially, where do you live?

A.   Delaware County.

Q.   Presently.  Where are you from?

A.   Massachusetts.

Q.   Is that the Lynn area of Massachusetts, sir?

A.   Correct.

Q.   Do you know a person by the name of Sean Murphy?

A.   Yes, I do.

Q.   How long have you known Sean Murphy?

A.   About 20, 25, years.

Q.   If you were to see him, would you recognize him?

A.   Yes.

Q.   I ask you to look in the courtroom and let us know whether

1   or not Sean Murphy is with us here today.

2   A.   Yes, he is.

3   Q.   And what is he wearing?

4   A.   Blue shirt.

5        MR. DOMINGUEZ:  Your Honor, may the record reflect

6   that the witness has identified Sean Murphy?

7        THE COURT:  It should so reflect.

8   BY MR. DOMINGUEZ:

9   Q.   Sir, if I could invite your attention to August of 2008,

10  did you have a physical issue that occurred during the month of

11  August of 2008?

12  A.   Yes, I did.

13  Q.   And what is that, sir?

14  A.   Got hit in the head with a bat or a pipe or something.

15  Q.   And did it cause some medical issues for you?

16  A.   Yes.

17  Q.   Were you in a coma for awhile?

18  A.   Yes, I was.

19  Q.   For how long?  Do you recall?

20  A.   A little over a month.

21  Q.   Very well.  So from, sometime in August to sometime in

22  September, sir?

23  A.   Correct.

24  Q.   I would like to invite your attention to the end of

25  November, the beginning of December, of 2008.  Did you have any

1  discussions with Sean Murphy during that time frame, sir?

2  A.  Yes.

3  Q.  And did Sean Murphy have a request of you at that time?

4  A.  Yes.

5  Q.  And what did he ask you to do?

6  A.  Go to Memphis and pick up a package.

7  Q.  Very well.  And when he asked you to do this for him, Mr.

8  Nassor, did you fill obliged to do it?

9  A.  Yes.

10  Q.  And why is that?

11  A.  Say that again.

12  Q.  Did you feel like you owed him a favor, if you will, in

13  response to his request that you go to Memphis?

14  A.  Yes.

15  Q.  And why did you feel like you owed him a favor?

16  A.  Because he let me borrow something, and I let someone else

17  use it and never got it back.

18  Q.  And what was that something that he let you borrow?

19  A.  A cellular telephone jammer.

20  Q.  Sir, what is a cellular telephone jammer?

21  A.  It jams the cellular telephone.

22  Q.  And are you familiar with how it operates?

23  A.  Yes.

24  Q.  How does a cellular telephone jammer operate, sir?

25  A.  It's a device that stops a cellular telephone from calling

1  out.

2  Q.   Do you use it in a certain location in order to get

3  maximum effect, to your knowledge?

4  A.   Up higher, the better.

5  Q.   When you say "the higher," you mean the higher in the air

6  from the ground level?

7  A.   Yeah.

8  Q.   And does it have antennas?

9  A.   Yes, it does.

10  Q.   And how do the antennas function on the cellular telephone

11  jammer, sir?

12  A.   I don't know.  I know that you move them as far away from

13  each other as you can.

14  Q.   Now, based on what your response to my answer, does that

15  mean it maximizes the area in which it blocks cellular traffic?

16  A.   Correct.

17  Q.   When Mr. Murphy asked you to do him a favor and go to

18  Memphis, did you, in fact, go to Memphis?

19  A.   Yes, I did.

20  Q.   And it was to obtain -- what was that, sir?

21  A.   A cellular telephone jammer, I believe.  I mean, --

22  Q.   It was a Federal Express package?

23  A.   Yes.  Yes.

24  Q.   Do you recall how far Memphis, Tennessee, was from Lynn,

25  Massachusetts?

1    A.    A good ways.

2    Q.    Did you drive?

3    A.    Yes, I did.

4    Q.    Do you recall about how many hours it took you to get

5    there?

6    A.    Eighteen.

7    Q.    And aren't there Federal Express locations closer to Lynn,

8    Massachusetts, that you could have gone to pick up that same

9    package?

10    A.    Yes.

11    Q.    And why did you have to go to Memphis to pick up the

12    package?

13    A.    Because if it came anywhere closer, it might not have made

14    it to where it was going.

15    Q.    And why is that, sir?

16    A.    Because they check for that stuff, I guess, for that

17    company or --

18    Q.    To your knowledge, are cellular telephone jammers sold in

19    the United States?

20    A.    I don't believe so.

21    Q.    Do you know what company that the package was going to be

22    shipped from?

23    A.    I believe Global Gadget.

24    Q.    Are you familiar with Global Gadget?

25    A.    Yes. I've looked at them on the website.

1    Q.    And can you tell the ladies and gentlemen of the jury what

2    Global Gadget is?

3    A.    It's a company that sells devices to tell you if your car

4    is bugged or they have a tracking device on you or something.

5    Q.    And you say you've looked it up on the Internet, sir?

6    A.    Yes.

7    Q.    And where is Global Gadget located?

8    A.    I'm not sure.

9    Q.    Fair enough. And, to your knowledge, they also sell

10    cellular telephone jammers?

11    A.    Yes.

12    Q.    I invite your attention to December 1st of 2008. Did you,

13    in fact, arrive in Memphis, Tennessee, on or about that date?

14    A.    Correct.

15    Q.    Do you recall where you stayed, sir?

16    A.    Residence Inn.

17    Q.    And is that a Marriott hotel?

18    A.    Yes.

19    Q.    Okay. Did you make the reservation yourself?

20    A.    Yes, I did.

21    Q.    And did you check out of the Residence Inn on December 3rd

22    of 2008?

23    A.    Yes.

24    Q.    While you were there, did you obtain a package?

25    A.    Yes.

1    MR. DOMINGUEZ:  Your Honor, may I approach?

2    THE COURT:  You may.

3    BY MR. DOMINGUEZ:

4    Q.   Mr. Nassor, I've handed you what has been marked for

5    identification purposes and labeled Government Exhibits 2-1 and

6    2-2.  I'd like you to first take a look at Government's Exhibit

7    2-1.  Do you recognize that, sir?

8    A.   Yes.

9    Q.   And what is it?

10   A.   It's a receipt.

11   Q.   The receipt for what, sir?

12   A.   The residence Inn, Marriott.

13   Q.   Is that the receipt from your stay there on December 1st?

14   A.   Yes, it is.

15   Q.   And do you recognize your name on that receipt?

16   A.   Yes, I do.

17   Q.   And did you, in fact, check out from the Residence Inn

18   there in Memphis on December 3rd of 2008?

19   A.   Yes, I did.

20   Q.   I ask you to take a look at Government's Exhibit 2-2, Mr.

21   Nassor.

22   A.   Yep.

23   Q.   Do you recognize that?

24   A.   Yes.

25   Q.   And what is that, sir?

1    A.   It's a delivery receipt, I guess, I believe.

2    Q.   From Federal Express?

3    A.   Correct.

4    Q.   Does it have your name on it?

5    A.   Yes, it does.

6    Q.   And does it say -- does it reflect that you received a

7    package?

8    A.   Yes, it does.

9    Q.   And does it reflect who sent the package?

10    A.   Yes.

11    Q.   And who was the package sent to?

12    A.   David Nassor.

13    Q.   And does it have an address for you, sir?

14    A.   Northshore Company, Monroe Ave., Suite 501, Memphis,

15    Tennessee.

16    Q.   So it was sent to the Residence Inn, but it was sent care

17    of Northshore Company?

18    A.   Correct.

19    Q.   Was that the first time you ever heard of Northshore

20    Company, sir?

21    A.   To that name, yes.

22    Q.   Very well.  Do you know whether or not Northshore Company

23    is associated with anyone you know?

24    A.   Not Northshore Company, but a different company that's

25    close.

1  Q.    What's the company you know as Northshore?

2  A.    Northshore Movers.

3  Q.    And who is associated with Northshore Movers, to your

4  knowledge?

5  A.    Sean Murphy.

6  Q.    Is he the owner of that company?

7  A.    I believe so.

8  Q.    Very well.

9      Was that package received by an employee of the Residence

10  Inn, to your knowledge, and then provided to you there at the

11  Residence Inn?

12  A.    Yes, it was.

13  Q.    Now, once you obtained this package, can you describe for

14  the ladies and gentlemen of the jury, as best you can, how big

15  the package was?

16  A.    It was in a box.  I don't know.  It was (indicating).

17  It's kind of hard --

18  Q.    I understand.  I understand.  Can you describe it feet by

19  feet if you would?

20  A.    I would say 18 inches long, maybe, to -- 18 inches long,

21  by ten inches high.

22  Q.    Very well.

23      And did you leave the Residence Inn, sir, on December 3rd

24  of 2008?

25  A.    Yes.

1  Q.   And did you take that package with you, sir?

2  A.   Yes, I did.

3  Q.   And what did you do when you left the Residence Inn on

4  December 3rd with that package?

5  A.   Drove home.

6  Q.   Did you drive straight?

7  A.   I believe so.  I believe I might have stopped for a rest

8  here and there.  But, yeah, I don't believe I got another hotel

9  room.

10 Q.   Okay.  And so approximately another -- and correct me if

11 I'm wrong.  I believe you said 18 hours; is that correct?

12 A.   Correct.

13 Q.   About 18 hours to get back?

14 A.   Yes.

15 Q.   Okay.  And did you go back to Lynn, Massachusetts, at that

16 time, sir?

17 A.   I don't specifically recall if I went right to Lynn.  I

18 probably went to my house, which is like a hundred miles away.

19 Q.   Oh, I apologize.  And it's no one's business where you

20 live, but you live a hundred miles from Lynn --

21 A.   Correct.

22 Q.   -- or a hundred miles from Boston?

23 A.   It's the same.  Lynn is eight miles north of Boston.

24 Q.   Very well.

25      And did you eventually do something with that package upon

1  your return to the Boston area?

2  A.   Yes.

3  Q.   What did you do with it?

4  A.   I gave it to Sean.

5  Q.   Very well.

6       Did you ever see the contents of that package, sir?

7  A.   No, I didn't.

8  Q.   Very well.  I would like to move forward, if I could, sir,

9  later in the month of December or perhaps earlier in January of

10  2009, did Mr. Murphy approach you again, sir, requesting that

11  you do something for him?

12  A.   Could you repeat that question, please?

13  Q.   Did Mr. Murphy approach you again and request that you do

14  something for him?

15  A.   Yes, he did.

16  Q.   And what did he ask you to do, sir?

17  A.   He asked me to drive to Ohio, and put several addresses in

18  a GPS system.

19  Q.   Who put addresses in a GPS system?

20  A.   I got a GPS system from Sean, who actually put them in

21  there, but they were in there when I received it.

22  Q.   Very well.

23       Do you recall what type of GPS it was?

24  A.   Maybe a TomTom.

25  Q.   Okay.  And what did he want you to do in Ohio, sir?

1   A.   Just surveil a few places.

2   Q.   Did he ask you to come to Columbus to surveil a place in

3   particular?

4   A.   Yes, he did.

5   Q.   And when you say "surveil," sir, what do you mean by that

6   term?

7   A.   See what time people come in and leave.

8   Q.   Was there a particular location?

9   A.   Yes.

10  Q.   And what was that?

11  A.   I'm not sure of the address, specifically.

12  Q.   Do you know what type of facility it was?

13  A.   A Brink's armored car.

14  Q.   Like a building facility, warehouse?

15  A.   Correct.

16  Q.   Did you get a chance to actually see the facility, sir?

17  A.   Yes.

18          MR. DOMINGUEZ:  May I approach, Your Honor?

19          THE COURT:  You may.

20  BY MR. DOMINGUEZ:

21  Q.   Mr. Nassor, I've just handed you what's marked for

22  identification purposes and labeled Government's Exhibit 1A-2

23  and 1A-3 for identification again.  Do you recognize anything

24  in those photographs, sir?

25  A.   Yes.

1   Q.   And what is it, sir?

2   A.   It's a building that I was looking at.

3   Q.   You may set those to the side.

4   A.   (Witness complies.)

5   Q.   You've identified the building there at 1362 -- well, it

6   just says "1362," and you don't remember the street address or

7   what the street name was, correct?

8   A.   No.  I actually remembered what it was.

9   Q.   Why is that?

10  A.   Because there's an Essex Street in Lynn.

11  Q.   Okay.  So it was Essex?

12  A.   Correct.

13  Q.   And there's an Essex Street in Lynn?

14  A.   Yes.  It's where the courthouse is.

15  Q.   Is there an Essex County, I believe, in Massachusetts, as

16  well, correct?

17  A.   Yes.

18  Q.   Now, had you ever been to that facility, or that street,

19  or that area in Columbus, Ohio, prior to January of 2009?

20  A.   No.

21  Q.   And what specific instructions were given to you by Mr.

22  Murphy?

23  A.   See what time people leave and what time they come in in

24  the morning.

25  Q.   And was there a particular day of the week that you were

1  to provide this service?

2  A.   Saturday night.

3  Q.   Did he tell you why he wanted you to do that on a Saturday

4  night?

5  A.   Not outright, no.

6  Q.   Did you have a feeling as to why he wanted you to do the

7  surveillance?

8           MR. MURPHY:  Objection.

9           MR. DOMINGUEZ:  I'll pass.

10  BY MR. DOMINGUEZ:

11  Q.   But you knew he wanted you to watch what time people left

12  on Saturday night, what time people arrived on a Sunday

13  morning, correct?

14  A.   Correct.

15  Q.   Are you familiar, Mr. Nassor, with an individual by the

16  name of Joe Morgan?

17  A.   Yes.

18  Q.   Does he have a nickname?

19  A.   JoMo.

20  Q.   And how long have you known Joe Morgan, or JoMo?

21  A.   Maybe ten years.

22  Q.   And do you know a person by the name of Robert Doucette?

23  A.   Yes.

24  Q.   And how long have you known him?

25  A.   A few years.

1   Q.   Do you know whether or not they're associated or friends

2   with Mr. Murphy?

3   A.   Yes, they are.

4          MR. DOMINGUEZ:  May I approach, Your Honor?

5          THE COURT:  You may.

6   BY MR. DOMINGUEZ:

7   Q.   Mr. Nassor, I just handed you what's been marked for

8   identification purposes and labeled Government's Exhibit 16-1

9   and 16-2.  I ask you to first look at Government's Exhibit

10  16-1.  Do you recognize it?

11  A.   Yes.

12  Q.   And what is that?

13  A.   A picture of JoMo.

14  Q.   Or Joe Morgan?

15  A.   Correct.

16  Q.   And Government's Exhibit 16-2?

17  A.   Yes.

18  Q.   What's in that picture, sir?

19  A.   A picture of Rob Doucette.

20  Q.   Displaying 16-1, Mr. Nassor, that's who?

21  A.   Joe Morgan.

22  Q.   And 16-2?

23  A.   Rob Doucette.

24  Q.   And based on your testimony, is it safe for me to

25  understand that you've known Mr. Morgan quite a bit longer than

1  Mr. Doucette?

2  A.   Yes.

3  Q.   Now, tell us about your time in Columbus when you were

4  surveying the Brink's facility on Saturday evening.  What was

5  the weather like on that occasion?

6  A.   Unseasonably warm.

7  Q.   For January?

8  A.   Correct.

9  Q.   And were you given any instructions as to how you were to

10  station yourself when you conducted this service?

11  A.   Yeah, pretty much.  Yeah, I was.

12  Q.   And where were you told to position yourself?

13  A.   Behind the, umm, auto parts store.

14  Q.   Do you remember the Brink's facility being behind an auto

15  parts store?

16  A.   Yes, I do.

17  Q.   Do you remember the name of it?

18  A.   Jegs.

19  Q.   And once you arrived and began your service and --

20  surveillance service, did you actually go and sit there?

21  A.   No.

22  Q.   And why is that, sir?

23  A.   Because I didn't like it.  There was no cars there, and I

24  would have been the only one.

25  Q.   So where did you decide to set up?

1  A.    Across the street.

2  Q.    From the facility itself?

3  A.    Correct.

4  Q.    And do you recall any of the surrounding buildings in the

5  vicinity of that Brink's facility?

6  A.    Yes.

7  Q.    And what do you recall seeing?

8  A.    VFW Post, some houses, little -- little bar --

9  Q.    A bar?

10  A.    -- across the street.  Yes.

11  Q.    Do you remember the name of the bar?

12  A.    No.

13  Q.    Did you go over to the bar while you were conducting your

14  service?

15  A.    No, not that bar.

16  Q.    Okay.  Do you recall how long you were in that vicinity

17  surveilling the Brink's facility?

18  A.    Roughly 14 hours.

19  Q.    And did you discover what time the employees left for the

20  evening on Saturday night?

21  A.    Yes.

22  Q.    What time was that?

23  A.    Approximately 8:30.

24  Q.    And did you happen to ascertain what time the employees

25  arrived for work on the following morning?

1 A. Nine a.m. Eight thirty. Nine.

2 Q. On a Sunday morning?

3 A. Correct.

4 Q. Very well.

5      MR. DOMINGUEZ: May we have a moment, Your Honor?

6      THE COURT: Yes.

7      (Whereupon, there was a brief interruption.)

8      MR. DOMINGUEZ: May I approach, Your Honor?

9      THE COURT: Yes.

10 BY MR. DOMINGUEZ:

11 Q. I've handed you, at this time, Mr. Nassor, several

12 photographs, the first photograph being Government's Exhibit

13 14-1. Do you recognize anything in that photograph, sir?

14 A. Yes.

15 Q. And what is that photograph, or what's in that photograph?

16 A. It's the street I was parked on.

17 Q. When you were surveilling the Brink's facility?

18 A. Correct.

19 Q. And with exception to the foliage that appears in that

20 picture, given the fact that you were there in January of 2009,

21 does it fairly and accurately depict the street that you were

22 on when you conducted your surveillance activities?

23 A. Yes.

24 Q. Now, you can set the other exhibits aside just for a

25 moment.

1   A.   (Witness complies.)

2   Q.   Do you recall approximately when you left your post, sir,

3   after you had finished your duties in January of 2009, that

4   Sunday?

5   A.   The minute the first car pulled in.

6   Q.   Okay.  So it would have been around 8:30, nine o'clock, in

7   the morning?

8   A.   Yes.

9   Q.   And do you recall what you did after that?

10  A.   Drove to McDonald's to get something to eat.

11  Q.   Now, was it McDonald's, or Kentucky Fried Chicken?

12  A.   McDonald's.

13  Q.   Okay.  And, sometime thereafter, did you go back to

14  Massachusetts?

15  A.   Yes.

16  Q.   Okay.  And once you arrived in Massachusetts, did you have

17  any contact with Mr. Murphy following your trip to Columbus and

18  the Brink's service?

19  A.   Yeah.  Not right away, though, I don't believe.  I

20  probably went to my house again, my home again.

21  Q.   Sometime in the next few days, did you have occasion to

22  chat with him?

23  A.   Yes.

24  Q.   And what did you tell him?

25  A.   Exactly what I told you.

1  Q.   Which was?

2  A.   That they came in at 8:30, 9:00, in the morning, and left

3  at 8:30 at night.

4  Q.   And what was his response to you when you told him that

5  information?

6  A.   Something like "good job" or something.  I'm not sure

7  exactly what he said.

8  Q.   Now, you told the ladies and gentlemen of the jury, when

9  you made your Memphis trip in December of 2008, December 1st

10  through December 3rd, to receive the Federal Express package,

11  that you went there and did that because you believed you owed

12  Mr. Murphy a favor.  Do you recall that?

13  A.   Correct.

14  Q.   Now, with respect to this service you performed in early

15  January, 2009, when you conducted your surveillance activities,

16  did you receive payment for that?

17  A.   I don't believe so, no.

18  Q.   So why did you -- why did you participate, if you recall?

19  A.   I believe I borrowed something from Sean, borrowed some

20  tools or something, and didn't return it.

21  Q.   Okay.

22  A.   Taken -- whoever -- the person I gave it to didn't return

23  it to me.

24  Q.   Did you and Sean share tools from time to time?

25  A.   Say that again.

1  Q.   Did you and Sean share tools from time to time?

2  A.   Yeah, sometimes.

3  Q.   Were you familiar with some of Sean's tools, sir?

4  A.   Yes.

5  Q.   I'd like to invite your attention, if I could, sir, to

6  January 21st of 2009.  Around that time frame -- you may not

7  recall the date, but around that time frame, did you take Sean

8  to Newmarket Storage in New Hampshire in order to return a

9  Budget rental truck?

10  A.   Yes, I did.

11  Q.   Tell us about that.

12  A.   He called and asked me if I could give him a ride, and I

13  said I would.

14  Q.   And I assume -- I am assuming you mean give him a ride

15  back?

16  A.   Correct.

17  Q.   And did you see Mr. Murphy return the truck?

18  A.   Yes.

19  Q.   And you drove him back home, or someplace, after Mr.

20  Murphy turned in the truck?

21  A.   Yes.

22  Q.   Did you have any discussions with him?

23  A.   Yes.

24  Q.   And what did you discuss?

25  A.   I can't recall exactly what we discussed, like word for

1 word.  I know I asked him if they made money.

2 Q.   When you say "they," who are you referring to?

3 A.   JoMo and Rob and Sean.

4 Q.   And why did you ask that question?

5 A.   Say it again.

6 Q.   Why did you ask that question?

7 A.   Because I was curious.  I just wanted to know.  I mean, I

8 was supposed to get some, anyway, supposed to get some of the

9 money.

10 Q.   You were supposed to get some of the money?

11 A.   I believe so, yeah.

12 Q.   And why were you supposed to get some of the money?

13 A.   Excuse me?

14 Q.   Why were you supposed to get some of the money?

15 A.   Well, I figured that they did something that I went and

16 looked at.

17 Q.   Okay.  And you mentioned Sean, JoMo, and Rob.  Why did you

18 mention JoMo and Rob in addition to Sean?

19 A.   I'm not sure.  I'm --

20 Q.   But you recall asking him about those two individuals?

21 A.   Oh, yeah, yeah, just because where I was meeting him.

22 Q.   And where were you meeting him?

23 A.   At Rob's house.

24 Q.   Very well.

25     After January 23rd of 2009, Mr. Nassor, did you have any

1   conversations with Joe Morgan regarding money?

2   A.   Yes.

3   Q.   And tell us about your discussions with Joe Morgan

4   regarding money.

5        MR. MURPHY:  Objection, Your Honor.

6        THE COURT:  What was the question?

7        MR. DOMINGUEZ:  What discussions did he have with Joe

8   Morgan regarding money.

9        THE COURT:  Overruled.

10       MR. MURPHY:  Overruled?

11       THE COURT:  Overruled.

12       MR. MURPHY:  It's hearsay, Your Honor.

13       MR. DOMINGUEZ:  The testimony of a co-conspirator in

14   furtherance of a conspiracy, Your Honor.  The conspiracy lasted

15   to May of 2009.

16       THE COURT:  Overruled.

17   BY MR. DOMINGUEZ:

18   Q.   What discussions did you have with Joe Morgan?

19   A.   I asked to borrow some money.

20   Q.   And why did you believe Joe Morgan had money?

21   A.   I just assumed he did.

22   Q.   Did you obtain some money from him?  Did he give you some

23   money?

24   A.   Yes.  I believe he gave me maybe a thousand or fifteen

25   hundred.

1  Q.   Did you have some understanding, Mr. Nassor, following

2  your surveillance of that Brink's facility in January of 2009

3  as to a certain percentage or sum of money you were supposed to

4  receive?

5  A.   I don't recall that.  No, I don't recall a specific sum.

6  Q.   You believe you were supposed to get some money?

7  A.   Correct.

8  Q.   You stated earlier, Mr. Nassor, that you were familiar

9  with some of Mr. Murphy's tools.  I ask you to take a look at

10 Government's Exhibits 1B-16, 1B-24, 1B-31, 1B-32, 1B-33 and

11 1B-36 that are right there with you at the witness stand.

12      Do you recognize those photographs, sir?

13 A.   Yes.

14 Q.   And what's contained in those photographs?

15 A.   Various different tools.

16 Q.   And you're familiar with those tools?

17 A.   Yes.

18      MR. DOMINGUEZ:  May I approach, Your Honor?

19      THE COURT:  Yes.

20 BY MR. DOMINGUEZ:

21 Q.   Sir, I'm displaying 1B-16.  Do you recognize anything in

22 that picture?

23 A.   Yes.

24 Q.   What are those, sir?

25 A.   Oxygen tanks that me and Joe stole.

1   Q.   That who stole?

2   A.   Me and Joe Morgan.

3   Q.   Okay.  And do you recall when you stole those?

4   A.   Summer of 2007.

5   Q.   And, in January of 2009, if you know, who had possession

6   of those oxygen tanks?

7   A.   I believe they were in storage.

8   Q.   Did you ever see them in storage?

9   A.   Yes.

10   Q.   And in what storage facility did you see them at?

11   A.   Newmarket.

12   Q.   Newmarket Storage in New Hampshire?

13   A.   Correct.

14   Q.   Who had a storage unit there, sir?

15   A.   Sean Murphy.

16   Q.   And I ask you to look at the middle -- actually, in terms

17   of the tall oxygen tanks, the exact middle one.  Does that

18   appear to be missing something?

19   A.   The cap on the top, maybe.

20   Q.   Showing you what has been identified earlier as

21   Government's Exhibit 1A-193, do you recognize that, sir?

22   A.   Could you say that again, please?

23   Q.   I'm sorry.  1A-193, do you recognize anything in that

24   photograph, sir?

25   A.   Appears to be the top of an oxygen tank.

1  Q.    Would that top fit on the middle oxygen tank on 1B-16?

2  A.    I believe so.  I mean, --

3  Q.    You're familiar with oxygen tanks?

4  A.    Yeah, but there's different -- there's different sizes for

5  different tanks.  That's an oxygen tank, and they're supposed

6  to be the same size, but different kind of gases have different

7  kind of tops so they don't get mixed up.  So I'm just not sure

8  if that's specifically the one for that tank.  That's all.

9  Q.    Let me ask you this -- and I'm just talking about you, and

10  nobody else, Mr. Nassor --

11  A.    Okay.

12  Q.    -- have you ever used an oxygen tank in committing a

13  burglary?

14  A.    I don't believe so.

15  Q.    Okay.  Are oxygen tanks used, to your knowledge, to commit

16  burglaries, along with other tools?

17  A.    Yeah.  I'd prefer different means than oxygen.

18  Q.    Okay.  Showing you Government's Exhibit 1B-24, sir, do you

19  recognize anything there?

20  A.    Yes.

21  Q.    What do you recognize there, sir?

22  A.    I mean, there's a whole bunch of stuff there.  I mean --

23  Q.    Okay.  How about the big white thing?

24  A.    The big white thing, I believe, is a generator of some

25  sort.

1   Q.   Have you seen that before?

2   A.   Yes.

3   Q.   And where did you see that item, sir?

4   A.   In storage, Sean's.

5   Q.   Is that the Newmarket Storage facility?

6   A.   Correct.

7   Q.   And whose storage facility was that, sir?

8   A.   Sean's.

9   Q.   And do you know what that white piece of equipment would

10  be used for?

11  A.   Not specifically.

12  Q.   Okay.

13          THE COURT:  What are you referring to, Mr. --

14          MR. DOMINGUEZ:  The big white, with rust on it, Your

15  Honor.

16          THE COURT:  Oh!  That's a machine, not a table top?

17          MR. DOMINGUEZ:  Yes, that's a machine.

18  BY MR. DOMINGUEZ:

19  Q.   Do you know what type of machine that is, Mr. Nassor?

20  A.   I believe it's a generator of some sort.

21          THE COURT:  Okay.

22  BY MR. DOMINGUEZ:

23  Q.   And then do you recognize the rods on top of that

24  generator, sir?

25  A.   Yes.

1  Q.   And have you seen those before?

2  A.   Yes.

3  Q.   And where did you see those?

4  A.   I've used them before.

5  Q.   And what did you use those for, sir?

6  A.   To cut the Central Artery in Boston.  They built a new

7  highway, and that was the old highway.  And we used those to

8  cut them down.

9  Q.   And could you explain for the ladies and gentlemen of the

10 jury how you would use that rod in order to perform that

11 function?

12 A.   You would attach it to a handle and feed oxygen through it

13 and light it at the end, with a torch.  And it burns like 5,000

14 degrees and just melts anything that it touches.

15 Q.   Can it burn through concrete?

16 A.   I believe so, yes.

17 Q.   How about metal?

18 A.   Yes.

19 Q.   To the right of that item, sir -- well, the rods and the

20 generator that you've described -- what is that item?

21 A.   Looks to be a fan.

22 Q.   Is there any reason why a fan that size would be used when

23 you're using the lance rods?

24 A.   Yes, for fresh air.

25 Q.   Is that, if something were to burn, it would provide fresh

1   air to those around the item?

2   A.   Just fresh air in general.  When those rods burn, they

3   burn real smoky.

4   Q.   Showing you Government Exhibit 1B-33, Mr. Nassor, do you

5   recognize anything there?

6   A.   Yes.

7   Q.   And what is that?

8   A.   Looks to be oxygen.

9   Q.   And what is that used for?

10  A.   Along with another gas, it's used for a torch.

11  Q.   Is that to assist in the torch that you've described for

12  the ladies and gentlemen of the jury with the lance rod?

13  A.   It's not what I would have used, but yeah.  I mean --

14  Q.   Please explain.

15  A.   I wouldn't use a little one like that.  I would have used

16  a regular cutting torch, the tank and -- big tank, not little

17  tanks.

18  Q.   So, for someone like me that knows absolutely nothing

19  about this, would this solution go into the oxygen tanks that

20  we saw earlier?

21  A.   No.

22  Q.   Okay.  Where would they go?

23  A.   Right there where they're at.  You would add another tank

24  to it.

25  Q.   And then use it?

1  A.   Together, to mix and burn, correct.

2  Q.   I see.

3       Government's Exhibit 1B-34, do you recognize anything

4  there, sir?

5  A.   Yes.

6  Q.   And what is that?

7  A.   It's gas.

8  Q.   And what is that used for, sir?

9  A.   Along with oxygen, to --

10 Q.   Assists in igniting the torch?

11 A.   Correct.

12 Q.   1B-35, sir, recognize anything there?

13 A.   Yes.

14 Q.   And what is it, sir?

15 A.   It's lubrication for a drill, electromagnetic drill.

16 Q.   And what is an electromagnetic drill, sir?

17 A.   It's a drill that attaches to a safe and cuts it so you

18 can gain entry.

19 Q.   And that's one of the components to work with the

20 electromagnetic drill?

21 A.   Correct.

22 Q.   And with respect to those items, sir, have you seen those

23 items anyplace before?

24 A.   Yes.

25 Q.   The oxygen, the MAPP gas and the hogwash?

1   A.   I don't recall the MAPP gas and the oxygen, but everything

2   else I have actually seen, yes.

3   Q.   And where did you see that?

4   A.   In storage.

5   Q.   At the Newmarket Storage?

6   A.   Yes.

7   Q.   Government's Exhibit 1B-36, do you recognize anything

8   there, sir?

9   A.   Yes.

10   Q.   And what is that?

11   A.   The batteries.

12   Q.   And what is that battery used for, sir, --

13   A.   Specifically?  I mean --

14   Q.   If you know.

15   A.   I've never used it; but, from what I understand, it's for

16   the other jammer.

17   Q.   For a cellular phone jammer?

18   A.   Yeah.  Yeah, one that doesn't run on electricity.

19   Q.   And how did you come to that understanding, if you will?

20   Only if you recall.

21   A.   I actually really don't -- actual -- I'm not sure.

22   Q.   Okay.

23   A.   But I believe I heard someone say something about it, talk

24   about it or something, because I've never witnessed it actually

25   used.

1    Q.   Fair enough.

2         MR. DOMINGUEZ:  Your Honor, with Agent Trombitis'

3    assistance, we would ask him to approach with Government's

4    Exhibit 20, 22, and 23.

5         THE COURT:  He may approach.

6         MR. DOMINGUEZ:  And may he provide some assistance

7    based on the -- may Agent Trombitis actually pull it out and

8    assist Mr. Nassor, given the fact that Mr. Nassor has handcuffs

9    on?

10        THE COURT:  That's fine.  Whatever you have to do

11   there.

12        MR. DOMINGUEZ:  Thank you.

13   BY MR. DOMINGUEZ:

14   Q.   And for the record, Mr. Nassor, Agent Trombitis is showing

15   you Government's Exhibit 1B-20.  I'll ask if you recognize

16   that, sir.

17   A.   Yes.

18   Q.   And what is it?

19   A.   Antennas to the cellular telephone jammer.

20   Q.   And have you seen that jammer before?

21   A.   Say that again.

22   Q.   Have you seen that jammer before, sir, or those antennas?

23   I'm sorry.

24   A.   Yes.

25   Q.   And where did you see those?

1    A.    I believe at Sean's warehouse.

2    Q.    Okay.  And Government's Exhibit 1D-22 and -23.

3          (Whereupon, Agent Trombitis displays the exhibits to

4    the jury.)

5    BY MR. DOMINGUEZ:

6    Q.    Do you recognize anything there, sir?

7    A.    Yes.

8    Q.    And what is it?

9    A.    Cellular telephone jammer.

10   Q.    And what type is it, sir?

11   A.    S2000.

12   Q.    A Y --

13   A.    Y2000.  Excuse me.

14   Q.    Are you familiar with Y2000 cellular telephone jammers,

15   Mr. Nassor?

16   A.    Yes.

17   Q.    As a matter of fact, do you recall, earlier in your

18   testimony, telling the ladies and gentlemen of the jury that

19   you had let someone borrow one of Sean's jammers --

20   A.    Yes.

21   Q.    -- and that you did not get it back?

22   A.    Correct.

23   Q.    And that's why you owed him a favor?

24   A.    Yes.

25   Q.    What type of cellular telephone jammer did you let someone

1   borrow that belonged to Mr. Murphy?

2   A.    That same model.

3   Q.    Y2000?

4   A.    Correct.

5         MR. DOMINGUEZ:  May I have a moment, Your Honor?

6         THE COURT:  You may.

7         (Whereupon, there was a brief interruption.)

8   BY MR. DOMINGUEZ:

9   Q.   Mr. Nassor, you, obviously, advised the ladies and

10  gentlemen of the jury that you're currently incarcerated.  Did

11  you enter into a plea agreement with the Commonwealth of

12  Massachusetts, the Bristol District Attorney's Office?

13  A.    Yes.

14  Q.    And in exchange for your guilty plea to your involvement

15  in a theft of the E. A. Dion Company in Attleboro,

16  Massachusetts, you agreed to cooperate with the authorities?

17  A.    Yes.

18  Q.    And did that agreement include your agreement to testify

19  on behalf of the Commonwealth of Massachusetts?

20  A.    Yes.

21  Q.    And did that agreement further state, by you, that you

22  were willing to also cooperate in the case that you're

23  testifying about now?

24  A.    Yes.

25  Q.    And did you, in fact, enter into a proffer agreement, Mr.

1  Nassor, prior to being interviewed by the authorities there in

2  the District of Massachusetts?

3  A.   Yes.  It's the Commonwealth of Massachusetts.

4  Q.   Very well.

5         MR. DOMINGUEZ:  Your Honor, may I have a moment?

6         THE COURT:  You may.

7         (Whereupon, there was a brief interruption.)

8         MR. DOMINGUEZ:  Your Honor, we have no further

9  questions of this witness.

10         THE COURT:  Okay.

11         Ladies and gentlemen of the jury, would you like to

12  stand and stress -- stretch a little bit?  Not stress.

13  Stretch.  Anyone that wishes to do that, they may.  You don't

14  have to do that, but --

15         MR. DOMINGUEZ:  May Agent Trombitis approach, Your

16  Honor, and retrieve exhibits?

17         THE COURT:  Yes.

18         (Whereupon, there was a brief interruption.)

19         THE COURT:  Mr. Murphy, --

20         MR. MURPHY:  Thank you, Your Honor.

21         THE COURT:  -- you may proceed.

22                              - - -

23                      CROSS-EXAMINATION

24  BY MR. MURPHY:

25  Q.   Good afternoon, Mr. Nassor.

1  A.   How are you doing?

2  Q.   When you came to testify in Ohio at the grand jury, did

3  you speak with Mr. Dominguez?

4  A.   Yes.

5  Q.   Was Sal also the person that questioned you at the grand

6  jury?

7  A.   Yes.

8  Q.   During those proceedings, did you ever notice that Mr.

9  Dominguez had his facts wrong when talking about the Brink's

10  burglary?

11  A.   Meaning -- I don't understand what you're saying.

12       THE COURT:  I didn't quite hear the question, Mr.

13  Murphy.

14       MR. MURPHY:  Okay.

15  BY MR. MURPHY:

16  Q.   When Mr. Dominguez was talking about the Brink's burglary

17  to you when you were testifying at the grand jury, did you ever

18  notice that he had his facts wrong?

19  A.   I remember a time or two he made a different reference to

20  a name or someone -- he was calling me something different or

21  something.  I don't know -- nothing --

22  Q.   Was there anything else that you can recall?

23  A.   Not that I recall, no.

24  Q.   Okay.  When you testified at grand jury, the FBI had about

25  two years to investigate this case?

1   A.   Say that again.

2   Q.   When you testified at the grand jury, this case was two

3   years old?

4   A.   I believe so, yes.

5   Q.   Do you have a Massachusetts state lawyer?

6   A.   Yes, I do.

7   Q.   And what's his name?

8   A.   Brian Roman.

9   Q.   Has Brian Roman ever told you that he spoke to Sal

10  Dominguez about this case?

11  A.   Could you rephrase that again?

12  Q.   Has Brian Roman ever told you that he spoke to Sal

13  Dominguez about this case, facts about this case?

14  A.   I believe Brian Roman has spoken to Sal.  I'm not sure

15  regarding this case or not, but I know that they've spoken.

16  Q.   Did Brian Roman ever tell you about any of the information

17  he received from Sal Dominguez about this case?

18  A.   Could you say that again, Sean?

19  Q.   Did Brian Roman ever tell you about any of the information

20  he received from Sal Dominguez about -- from -- about this

21  case?

22  A.   Just said they were going to smoke you if they find you

23  guilty.

24  Q.   So, basically, Brian Roman told you that Sal told him that

25  if I didn't take a certain amount of years they were going to

1  smoke me at trial?

2  A.  Correct.

3  Q.  And what did you understand "smoke him" to be?  The full

4  25 years?

5  A.  No.  I didn't believe it would be that much, no.

6  Q.  Prior to your testimony today, did you review your prior

7  statements or testimony?

8  A.  Yes.

9  Q.  And when was that?

10  A.  Friday.

11  Q.  And did you speak with Sal Dominguez or Harry Trombitis on

12  Friday?

13  A.  Yes, I did.

14  Q.  Did Sal or Harry remind you of anything that you couldn't

15  remember?

16  A.  No, not really.  I mean, I just went over what I said.

17  Q.  So they didn't remind you of anything that you couldn't

18  remember?

19  A.  Not specifically, no.

20  Q.  Okay.  Now, do you recall getting arrested for a burglary

21  into a drugstore in the State of Ohio?

22  A.  Yes.

23  Q.  Where was that pharmacy you broke into?

24  A.  Cuyahoga Falls, that area.

25  Q.  When did that occur?

1  A.   I believe in 2005, maybe, 2004.  Two Thousand Five, I

2  believe.

3  Q.   Did you get away with the drugs from that drugstore?

4  A.   Yes.

5  Q.   Was anybody with you on that break?  Yes or no?

6  A.   Yes.

7  Q.   Did you tell the police who was with you?

8  A.   No.

9  Q.   Was Murphy with you on that Ohio pharmacy?

10  A.   No.

11  Q.   Did you get convicted for that Ohio pharmacy burglary?

12  A.   Yes.

13  Q.   What did you get for a sentence?

14  A.   Six months probation.

15  Q.   Six months probation.  You're kidding me.

16       MR. DOMINGUEZ:  Objection, Your Honor.

17       THE COURT:  Sustained.

18       The jury will disregard the comments of Mr. Murphy,

19  acting as his own counsel.

20  BY MR. MURPHY:

21  Q.   Mr. Nassor, did you also get arrested in Champlain, New

22  York?

23  A.   Yes.

24  Q.   When did you get arrested out there?

25  A.   Winter of 2007, or beginning of 2008.

1   Q.    What were your charges in Champlain?

2   A.    Burglaries, tools.

3   Q.    And weren't you up in Champlain scoping out a big gold

4   score?

5   A.    Yes.

6   Q.    Was Joe Morgan with you out in Champlain?

7   A.    Yes.

8   Q.    Did Morgan get grabbed, too?

9   A.    Yes.

10   Q.    Did you get convicted for the New York charges?

11   A.    Yes.

12   Q.    What did you get for a sentence out in New York?

13   A.    A $500 fine.

14        MR. MURPHY:  Your Honor, I would like to object.

15  This information wasn't given to the defense in discovery under

16  Brady material and Jencks material.

17        THE COURT:  This is not the time to do that, but you

18  can save that --

19        MR. MURPHY:  Okay.

20        THE COURT:  -- for the admissibility of the

21  testimony.

22        MR. MURPHY:  Okay.

23        MR. DOMINGUEZ:  For the record, Your Honor,

24  obviously, Mr. Murphy has this information.  He was given Mr.

25  Nassor's full NCIC criminal history report by way of his

1    previous counsel, Mr. Graeff.

2              MR. MURPHY:  May I have a minute, Your Honor?

3              THE COURT:  Yes.

4              (Whereupon, there was a brief interruption.)

5    BY MR. MURPHY:

6    Q.   Mr. Nassor, prior to the Brink's burglary, were you the

7    only member of the crew who did crime in Ohio?

8    A.   Could you repeat that again?

9    Q.   Prior to the Brink's burglary, were you the only member of

10   your crew who did crime in Ohio?

11   A.   Yes.

12   Q.   You testified that you didn't tell on your partner for the

13   Ohio pharmacy.  Did you tell the Champlain authorities what you

14   were doing out there the night you got arrested?

15   A.   No.

16   Q.   Did you tell police what Joe Morgan was doing out there

17   the night he got grabbed?

18   A.   No.

19   Q.   Going back to January of 2009, did Rob Doucette have an

20   operational vehicle on the road in 2009 that you knew about?

21             THE COURT:  Did who do what?

22             MR. MURPHY:  Did Rob Doucette have an operational

23   vehicle on the road that he was driving on a daily basis that

24   you know about?

25             THE COURT:  Did who have?

1    MR. MURPHY:  Excuse me, Your Honor?

2    THE COURT:  Did who have the automobile?

3    MR. MURPHY:  Rob Doucette.

4    THE COURT:  Oh!

5    THE WITNESS:  I don't believe so.

6  BY MR. MURPHY:

7  Q.   Okay.  But in January, 2009, Murphy had two vehicles on

8  the road, didn't he, his jeep and his Z28?

9  A.   Yes.

10 Q.   So, in January of 2009, Murphy didn't need a rental car,

11 did he?

12 A.   I don't think so, no.

13 Q.   And, from your knowledge of the moving company, Murphy had

14 three moving trucks, didn't he?

15 A.   Two or three, yes; two, anyway, that I recall.

16 Q.   So Murphy didn't need a moving truck in January of 2009 if

17 he owned two, or possibly three, moving trucks of his own?

18 A.   Yes, you're correct.

19 Q.   Do you know if Rob asked Murphy to rent a car or a moving

20 truck for him in January, 2009?

21 A.   I don't recall.

22 Q.   Now, this group of criminals you're involved in down in

23 Lynn, Massachusetts, do they use fake IDs?

24 A.   Yes.

25 Q.   Do they have the ability to create fake IDs with any name

1  and any picture on it?

2  A.   Yes.

3  Q.   Did Joe Morgan have a fake ID?

4  A.   Yes.

5  Q.   Did Rob Doucette have a fake ID to the best of your

6  knowledge?

7  A.   I believe so, yes.

8  Q.   Do you know Mike Murphy?

9  A.   Yes, I do.

10  Q.   Does he look like Sean Murphy?

11  A.   A little bit.

12  Q.   Fair enough.

13      If someone didn't know Sean and Mike Murphy personally,

14  could they mistake one for the other?

15  A.   No.

16  Q.   And on these fake IDs, on some of these fake IDs, did some

17  of the crews use the same name on different IDs, meaning like

18  two people would have the same IDs with different pictures on

19  them?

20  A.   Yes.  I've seen that, yes.

21  Q.   Now, you testified that you know Sean pretty good.

22  A.   Yes.

23  Q.   You spent a lot of time with him?

24  A.   Yes.

25  Q.   Now, from what you know about Sean, if Sean knew that a

1  specific rental vehicle was going to be used to commit a crime,

2  would he put that vehicle in his name?

3  A.   No.

4  Q.   So, if Murphy knew that a specific rental vehicle was

5  going to be used on a crime, he would have probably used access

6  to a fake ID and rented a car in that name, rather than putting

7  it in his own name?

8  A.   Actually, he's done it in the past.  Correct.

9  Q.   So, now, when you lived on Webb Street in Salem, what year

10 was that?

11 A.   Two Thousand Five and Two Thousand Six.

12 Q.   And you eventually moved from Webb Street to a different

13 location, didn't you?

14 A.   Correct.

15 Q.   And when you moved from Webb Street to Petersham, do you

16 rent a moving truck from Murphy to move your belongings?

17 A.   Yes.

18 Q.   You also had a few of your friends help move you when you

19 rented the truck?

20 A.   Correct.

21 Q.   You paid Murphy his rate for renting the moving truck?

22 A.   Correct.

23 Q.   As a matter of fact, Mr. Nassor, doesn't one of Murphy's

24 moving companies -- specifically, Millennium Moving -- provide

25 fully equipped moving trucks to rent for $300 a day?

1  A.    Correct.

2  Q.    When you got arrested and charged for the pharmacy in

3  Ohio, did you learn, from your lawyer out there, what the

4  maximum penalty for a commercial burglary was under Ohio state

5  law?

6  A.    Yes.

7  Q.    And were you the person that told the burglary crew that

8  the state penalties for a commercial burglary were fairly

9  lenient in Ohio?

10  A.    Yes.

11  Q.    So Murphy didn't provide that information, did he?

12  A.    No.

13  Q.    Mr. Nassor, do you have a nickname?

14  A.    Yes.

15  Q.    What's your nickname?

16  A.    Damien.

17  Q.    Who gave you that name?

18  A.    My brothers.

19  Q.    Why did they do that?

20  A.    Because, when the movie came out, I was crazy, like, young

21  and did some stupid things.

22  Q.    So we're talking like the devil Damien?

23  A.    Correct.

24  Q.    Based on your actions when you were younger and growing

25  up, your brothers felt that name fit your personality?

1   A.   Correct.

2   Q.   Just -- you testified you went out to Memphis, Tennessee?

3   A.   Correct.

4   Q.   Who went with you?

5   A.   Went myself.

6   Q.   Was Murphy with you?

7   A.   No.

8   Q.   You stayed at a hotel?

9   A.   Yes.

10  Q.   Did Murphy pay for the hotel?

11  A.   No.

12  Q.   Did Murphy pay for your gas going out there?

13  A.   No.

14  Q.   Why did you go out to Memphis, Tennessee?

15  A.   Excuse me?

16  Q.   Why did you go out to Memphis, Tennessee?

17  A.   To pick up a package.

18  Q.   And whose name was the package addressed to?

19  A.   Me.

20  Q.   Now, are you claiming that Global Gadget sent you a cell

21  phone jammer?

22       Let me ask you this question:  Did you open the package?

23  A.   No, I didn't.

24  Q.   So you really don't know for sure what was in the package,

25  do you?

1   A.   No.

2   Q.   You testified that you thought it was a Y2000 Quad?

3   A.   Yes.

4   Q.   Do you know how much a Y2000 Quad costs?

5   A.   Approximately 5,000, maybe.

6         MR. MURPHY:  Just a minute, Your Honor.

7   BY MR. MURPHY:

8   Q.   I'd like to show you this document, Mr. Nassor.  What does

9   this say a Y2000 Quad goes for?

10   A.   Three thousand, one hundred, thirty-one dollars, twelve

11   cents, U.S.

12   Q.   That's not $5,000, is it?

13   A.   No.

14   Q.   Okay.  Now, you've reviewed the invoice that Mr. Dominguez

15   gave you in regards to the FedEx package that was sent to you?

16   A.   Correct.

17   Q.   And what does Global Gadget say that they sent you in

18   Memphis, Tennessee?

19   A.   Never contacted them.

20   Q.   So you didn't read the invoice?

21   A.   No.  The invoice says "Commercial Amplifier."

22   Q.   A commercial amplifier isn't a Y2000 Quad jammer, is it?

23   A.   Not that I know of.

24   Q.   Doesn't the invoice say that the amplifier only cost $50?

25   A.   Yes.

1  Q.   Mr. Nassor, are you aware that there were two packages

2  sent to Memphis, Tennessee?

3  A.   Excuse me?

4  Q.   Are you aware that there were two packages sent to

5  Memphis, Tennessee?

6  A.   No.

7  Q.   Could you please read the top debit card purchase on 1-2?

8         MR. DOMINGUEZ:  Your Honor, may I discover what he's

9  referring to on the screen?

10         MR. MURPHY:  Your Honor, this is a printout of one of

11  my companies' accounts from a bank.

12         MR. MURPHY:  Would you please --

13         MR. DOMINGUEZ:  For what?

14         THE COURT:  What is it a purchase of?

15         MR. DOMINGUEZ:  I don't believe this witness can tie

16  in this document, Your Honor.  So I would object on that basis.

17         MR. MURPHY:  I would believe that he can, Your Honor.

18         THE COURT:  What is the document?

19         MR. MURPHY:  The document is, actually, the charges

20  that FedEx charged for certain packages going to Memphis,

21  Tennessee.  And that's what we're discussing right now, Your

22  Honor.

23         THE COURT:  This is $5.88?

24         MR. MURPHY:  No.  No.  No.  No.  No.  We're talking

25  the top one, the very first purchase:  Merchant Purchase --

1    Merchant Purchase Terminal, FedEx, Memphis, Tennessee.

2              THE COURT:  Oh, I see.

3              Well, do you realize the pointer is on --

4              MR. MURPHY:  Oh.  I can't control the pointer.  I'm

5    trying to -- here we go.

6              THE COURT:  You were pointing to something else.

7    Yeah.

8              MR. MURPHY:  Yeah.

9              THE COURT:  So it's the first one?

10             MR. MURPHY:  First one.

11             THE COURT:  It's 19 -- 18, 19, dollars?

12             MR. MURPHY:  Yes.

13   BY MR. MURPHY:

14   Q.    Do you see that, Mr. Nassor?

15   A.    For $19.70?

16   Q.    Yes.

17   A.    FedEx, Memphis, Tennessee, correct.

18   Q.    And what's the date on that one?

19   A.    One-two.

20   Q.    Is that date consistent with you receiving a package in

21   Memphis, Tennessee, on December 3rd?

22   A.    Correct.

23   Q.    Now, you also see another charge of FedEx for a package

24   going to Memphis, Tennessee, on December 8th, don't you?

25   A.    Yes.

1  Q.   What do you think was in that package a week later after

2  you left Tennessee?

3       MR. DOMINGUEZ:  Your Honor, I object to this line of

4  questioning.  He has not established that this witness is

5  familiar with this document.  It is, apparently, his account.

6  This witness is not qualified to testify as to what's there.

7  If he wants to subpoena whoever can testify as to what's on

8  that document, he's certainly welcome to.

9       MR. MURPHY:  Your Honor, I say the document speaks

10 for itself.

11      THE COURT:  Is that his account?  It doesn't speak

12 for itself if we don't know where it's from.

13      MR. MURPHY:  I explained this is a document from one

14 of my companies' banks and for the charges that went through

15 from Memphis, Tennessee.

16      THE COURT:  So this is your document?

17      MR. MURPHY:  Yes.

18      THE COURT:  Well, he can't testify to your document

19 unless he had something to do with it.

20      MR. MURPHY:  Well, he allegedly went out to pick up

21 the package, Your Honor.

22      THE COURT:  Well, have you ever seen this -- been

23 paid for anything to this company, or seen any bills from this

24 company?

25      THE WITNESS:  No.

1    THE COURT:  Okay.

2         Move on.

3         MR. MURPHY:  Yes, sir, Your Honor.

4  BY MR. MURPHY:

5  Q.   Do you know who went to Memphis, Tennessee, the next week,

6  to get the second package?

7  A.   No.

8  Q.   And you certainly can't testify to what was in that

9  package, can you?

10 A.   No.

11 Q.   In regards to the Brink's burglary, do you know which

12 jammer was used in the Brink's burglary?

13 A.   No.

14 Q.   Do you think it was Murphy's big hundred-watt jammer?

15 A.   I would believe so, yes.  I mean -- I don't know.  I don't

16 know.

17 Q.   And didn't Angelo Ortiz have a jammer that he got off of

18 you?

19 A.   Yes.

20 Q.   Didn't Johnny Rotten have a jammer?

21 A.   Yes.

22 Q.   And Frank Senibaldi also had a jammer, too, didn't he?

23 A.   Correct.

24 Q.   Plus, you can't forget Tom Enquist.  He had a Y2000 Quad

25 jammer, too, didn't he?

1  A.  Yes.

2  Q.  Now, all these people who you just named that have

3  jammers, are they all professional burglars?

4  A.  Yes.

5  Q.  You testified that you went out to scope Ohio alone?

6  A.  Yes.

7  Q.  How long did you stay at Brink's and scope it?

8  A.  Approximately 12, 14, hours.

9  Q.  Was Murphy with you?

10  A.  No.

11  Q.  You were out there alone?

12  A.  Yes.

13  Q.  Have you ever seen Sean Murphy in the State of Ohio, ever,

14  besides today?

15  A.  Yes, I actually have.

16  Q.  When was that?

17  A.  When we drove to Kansas City.

18  Q.  What did we do in Kansas City?

19  A.  Delivered furniture.

20  Q.  For the moving company?

21  A.  Correct.

22  Q.  Okay.  Do you remember what date you went to Columbus,

23  Ohio, to scope out Brink's?

24  A.  Beginning of January, I believe.

25  Q.  And what day of the week did you go?

1  A.    Saturday night.

2  Q.    So, the beginning of January, on a Saturday night.    That

3  would be January 3rd?

4  A.    That could be right.  I'm not sure.  I'm not sure of the

5  date.

6  Q.    Well, we could figure it out.  If this crime happened on

7  January 17th, which was a Saturday, there's only two prior

8  Saturdays before that.  There's January 10th, and then there's

9  January 3rd.  You said the beginning of it.  So would that be

10 January 3rd?

11 A.    Either/or.

12 Q.    And what were you supposedly supposed to get for going out

13 to Columbus to scope?

14 A.    Just some money.

15 Q.    Mr. Nassor, you testified that you've been convicted of

16 burglaries before.  You testified that you were part of this

17 burglary group.  Isn't the general rule on going out to do

18 scores that, if you go to scope a score, that you're going to

19 do it?

20 A.    Yes.

21 Q.    And you are claiming you didn't get anything for going to

22 Tennessee or Columbus?

23 A.    Correct.

24 Q.    You paid all the expenses out of your own pocket?

25 A.    Yes.

1  Q.   You testified that you know what a magnesium rod thermal

2  torch lance is?

3  A.   Yes.

4  Q.   You testified that you have experience using them?

5  A.   Yes.

6  Q.   Now, Mr. Nassor, do you remember cutting up a train wheel

7  at Tom Enquist's house using a magnesium rod thermal torch?

8  A.   Yes, I do.

9  Q.   Was Murphy there when you used the torch to cut up the

10  train wheel?

11  A.   Yes.

12  Q.   Were you and Murphy both wearing welding masks that day up

13  at Tom Enquist's when you cut up the train wheel?

14  A.   Yes.

15        THE COURT:  Excuse me, Mr. Murphy.  A train wheel?

16  What are you talking about?

17        MR. MURPHY:  Yes, Your Honor.  It's a big steel --

18  you know how like a train rolls on a track?

19        THE COURT:  Yeah.

20        MR. MURPHY:  They have big, solid steel wheels.

21        THE COURT:  It's actually a wheel from a train?

22        MR. MURPHY:  It's actually wheels from a train.

23        THE COURT:  That's all I wanted to know.

24        MR. MURPHY:  Mr. Nassor cut up a wheel.

25        THE COURT:  Okay.

1  BY MR. MURPHY:

2  Q.   Now, is it possible that the welding masks that you and

3  Murphy wore at Tom Enquist's were the same welding masks found

4  in the storage bin that Rob gave to the FBI?

5  A.   Yes, it's possible.

6  Q.   So, if Murphy's DNA was on a mask found in that storage

7  bin, it probably got on there the day that you cut up the wheel

8  at Tom Enquist's house?

9  A.   Could have, yes.

10 Q.   Now, aren't you also an experienced welder?

11 A.   Yes.

12 Q.   And haven't you cut open safes in the past using welding

13 equipment?

14 A.   Not that I specifically recall.  I might have.  I'm -- I

15 mean, I -- I don't know.

16 Q.   Tell the truth, Mr. Nassor.  Have you cut up safes using

17 welding equipment in the past?

18 A.   Oh, yeah, yeah.  I have, yeah, most definitely.

19        MR. MURPHY:  Just a minute, Your Honor.

20 BY MR. MURPHY:

21 Q.   What's this a picture of, Mr. Nassor, specifically?

22 A.   Welding torch, regulators and hoses.

23 Q.   Mr. Nassor, doesn't that welding equipment belong to you?

24 A.   Yes.

25 Q.   Mr. Nassor, see this picture right here (indicating)?

1  A.   Yes.

2  Q.   What's this item right here (indicating)?

3  A.   Welding mask.

4  Q.   Doesn't that welding mask belong to you, too, Mr. Nassor?

5  A.   Yes.

6  Q.   Earlier, Mr. Dominguez showed you a bunch of welding

7  torches, welding tanks.  I don't believe this picture shows it,

8  but do those welding tanks look familiar?

9  A.   Yes.

10 Q.   You testified that those are the tanks that you and Joe

11 Morgan stole?

12 A.   Yes, and Tom Enquist.

13 Q.   Okay.  Now, in the picture that Mr. Dominguez showed you,

14 which I don't have, there was a smaller tank, not as big as

15 these ones.  Do you remember seeing that in the picture?

16 A.   Yes.

17 Q.   Now, did that belong to you?

18 A.   I believe so.

19 Q.   You had a small tank, a small cart, with an oxygen

20 acetylene tank on it?

21 A.   Yes, I did.

22 Q.   And they were on a small welding cart?

23 A.   Correct.

24 Q.   What I'm trying to do now, Mr. Nassor, is, I'm trying to

25 find pictures of some evidence that Mr. Dominguez entered in on

1  the witness prior to you.

2      In addition to this welding equipment that you had, didn't

3  you own some welding coats, some welding gloves, and some

4  welding smocks, too?

5  A.    Yes.  Everything welding, I pretty much have owned, yes.

6  Q.    Now, Mr. Nassor, you said that you know Mr. Morgan pretty

7  good?

8  A.    Yes.

9  Q.    You spent a lot of time with him?

10  A.    Yes.

11  Q.    Are you aware who bought the thermal torches that you

12  viewed in that picture?

13  A.    I believe Joe Morgan.

14  Q.    And do you know where he bought those, to the best of your

15  recollection?

16  A.    I believe somewhere in Chelsea, Massachusetts.

17  Q.    Is Everett next to Chelsea?

18  A.    Yes, next town.

19  Q.    Would you happen to know what name Joe Morgan may have

20  used when he ordered those thermal torches?  If you can't

21  recall, you can't recall.

22  A.    I can't recall.  I've heard it, but I just can't recall.

23  Q.    You don't think he used his name, do you?

24  A.    No.

25  Q.    And you testified that all this welding equipment was

1  yours.  Do you believe your DNA is on this welding equipment?

2  A.    Probably not, because I would have heard if it was.

3  Q.    You testified that you are familiar with cell phone

4  jammers?

5  A.    Yes.

6  Q.    Is it fair to say that you've used cell phone jammers on a

7  number of different scores?

8  A.    Yes.

9  Q.    And you used cell phone jammers to shut down alarms in the

10 past on scores that you've done or attempted to do?

11 A.    Yes.

12 Q.    Do you know what -- you kind of explained what a Milwaukee

13 electromagnetic drill is.

14 A.    Yes.  Yes.

15 Q.    Correct?

16       I'm going to show you something.  What's that, Mr. Nassor?

17 A.    A steel hog.

18 Q.    That's only half of it, though, right?

19 A.    Yes.

20 Q.    What's that?

21 A.    That's the drill.

22 Q.    Is that the drill that hooks onto the steel hog to make it

23 one tool?

24 A.    Correct.

25 Q.    Did the crew have a Milwaukee steel hog when they went to

1  Ohio to do the Brink's burglary, to the best of your knowledge?

2  A.    I would believe so.

3  Q.    And, prior to the Brink's burglary, Mr. Nassor, do you

4  know -- do you have personal knowledge and know who bought a

5  steel hog prior to the Brink's burglary?

6  A.    I believe Rob Doucette.

7  Q.    Thank you, Mr. Nassor.

8       How many times have you been inside Murphy's warehouse?

9  A.    Probably a hundred.

10 Q.    Is it an old place?

11 A.    Very old.

12 Q.    Are there any windows that open or close, or is the place

13 completed closed in?

14 A.    Completely closed in.

15 Q.    There is no ventilation system in the building?

16 A.    No.

17 Q.    Who is, or was, the professional painter in the burglary

18 crew?

19 A.    Tom Enquist.

20 Q.    Thank you.

21      Tom Enquist was a union painter, full time?

22 A.    Correct.

23 Q.    When Murphy needed to paint his moving warehouse, didn't

24 Tom Enquist lend Murphy a spray gun, a compressor, and other

25 equipment to paint his warehouse inside there?

1   A.   Yes.  Yes.

2   Q.   Didn't Tom Enquist also give Murphy a face respirator to

3   protect him from the fumes, because there was no ventilation?

4   A.   Yes.

5   Q.   Mr. Nassor, would this be the face respirator that Mr.

6   Enquist let Murphy borrow?

7   A.   Yes.

8         MR. MURPHY:  Thank you.

9   BY MR. MURPHY:

10  Q.   Now, on one of the days that Murphy was painting the

11  moving warehouse, weren't you there?

12  A.   Yes, I was.

13  Q.   Did you see Murphy wearing that respirator while painting

14  his moving warehouse and the walls when he was painting it

15  purple?

16  A.   Yes, I did.

17  Q.   So, if Mr. Murphy's DNA was on that respirator, it got

18  there when he painted the warehouse.

19        MR. DOMINGUEZ:  Objection, Your Honor.

20        MR. MURPHY:  Could it have gotten there?

21        THE COURT:  Sustained.

22        THE WITNESS:  Can I answer the question, or how does

23  that work?

24        MR. MURPHY:  No.  I have to rephrase the question.

25        THE COURT:  No.

1      How can you rephrase the question?  I sustained the

2  objection if it's anything like the main question.  But if you

3  want to try and ask him something else, you may.

4      MR. MURPHY:  No.  I'll move on, Your Honor.

5      THE COURT:  Well, you can ask something else about

6  that, if you want, but he doesn't --

7      MR. MURPHY:  I was asking, Your Honor, if it was

8  possible that Mr. Murphy's DNA was on the respirator from the

9  day that he seen him painting his warehouse.  And I asked him

10  is it possible.

11      THE COURT:  Would it be possible?

12      THE WITNESS:  Yes.

13      MR. MURPHY:  Thank you.

14      THE COURT:  Okay.

15  BY MR. MURPHY:

16  Q.   Now, you stated that you've been to Murphy's warehouse a

17  number of times.  You say over a hundred?

18  A.   Correct.

19  Q.   Would it be an accurate statement to say that Murphy's

20  storage warehouse is full?

21  A.   Yes.

22  Q.   So pretty much all the available space at the warehouse is

23  full except for an aisle going from the front of the warehouse

24  to the back of the warehouse?

25  A.   Correct.

1  Q.   Now, if Murphy were to get additional storage customers,

2  wouldn't he have to store their stuff at another location?

3  A.   Yes.

4  Q.   When this type of a situation occurred, didn't Murphy rent

5  bins at storage facilities to put customers' belongings in?

6  A.   Yes.  I've seen that.

7  Q.   And you testified that you went on a long-haul moving trip

8  with Murphy to Kansas City?

9  A.   Correct.

10  Q.   Were there other long-haul moving trips that you went on

11  with Mr. Murphy?

12  A.   Yes.

13  Q.   More than two?  Possibly three?

14  A.   Possibly, yes.

15          THE COURT:  Mr. Murphy, where is this leading?

16          MR. MURPHY:  Your Honor, it's --

17          THE COURT:  You've got him traveling around the

18  country with you.

19          MR. MURPHY:  I'm getting there right now, Your Honor.

20          THE COURT:  All right.

21  BY MR. MURPHY:

22  Q.   And on these long-haul moving trips, didn't Murphy rent

23  Budget trucks to do the long hauls in?

24  A.   Yes.

25  Q.   So, in addition to renting fully equipped moving trucks

1  out on a per daily basis, which is, you recall, $300 a day,

2  Murphy also used Budget rental trucks to do his long hauls in?

3  A.   Correct.

4  Q.   You're somewhat familiar with Murphy's moving company?

5  A.   Yes.

6  Q.   Does Murphy pay his workers in cash daily?

7  A.   Yes.

8  Q.   So, at the end of every moving job, the workers would come

9  and get paid in cash?

10  A.   Correct.

11  Q.   And at the end of the month, when most people move,

12  because they usually have to be out by the end of the month,

13  Murphy would have up to 12 to 15 workers, a day, out on the

14  job?

15  A.   Yes.

16       MR. DOMINGUEZ:  Objection, Your Honor.  Beyond the

17  scope of direct.

18       THE COURT:  Sustained.

19  BY MR. MURPHY:

20  Q.   So was it normal for Murphy to have 10,000, 12,000,

21  dollars in cash to pay his workers and to pay for diesel fuel

22  for the moving trucks?

23  A.   Yes.

24  Q.   Now, Mr. Nassor, based on your experience doing burglaries

25  and being a criminal, is it your opinion that the two-way

1  radios and cell phone jammers are useless on a burglary because

2  of the cell phone jammer?

3  A.   Yes, useless.

4  Q.   So, if police found two-way radios inside the storage bin

5  where the crime tools were, they probably weren't used during

6  the burglary?

7  A.   Correct.

8  Q.   Now, as part of your preparation when you go out and do

9  these crimes, Mr. Nassor, do you and your crew wipe down the

10  tools when you go out and do these crimes?

11  A.   Usually twice.

12  Q.   So you'd wipe them down and wipe them down again?

13  A.   Correct.

14  Q.   So, on a big score such as Brink's, everything would be

15  wiped down twice?

16  A.   Correct.

17  Q.   That would include all the batteries inside devices?

18  A.   Correct.

19  Q.   And isn't it true, Mr. Nassor, that you use new batteries

20  every time you go out and do a burglary?

21  A.   Yes.

22  Q.   Would there be any reason to have one loose battery

23  floating around in a bag?

24  A.   No.

25  Q.   And it certainly wouldn't make any sense if someone's

1  fingerprint was found on a battery that all this stuff was

2  prepped and wiped down on, correct?

3  A.   Correct.

4  Q.   Mr. Nassor, were you present when the crew got back from

5  Lynn from doing this Brink's burglary?

6  A.   No.

7  Q.   Do you know where the crew went when they returned from

8  Ohio?

9  A.   No.

10  Q.   Did you help the crew do anything when they came back from

11  Lynn?

12  A.   No.

13  Q.   Were you there when the crew was splitting up and

14  separating money?

15  A.   No.

16  Q.   Did you get a share of the stolen money from Brink's?

17  A.   Not that I know of, no.

18  Q.   Now, there's been testimony in this matter, Mr. Nassor,

19  that one of the other co-conspirators, Rob Doucette, he said

20  that you were at his house, with him and other people,

21  splitting up --

22         MR. DOMINGUEZ:  Objection.  There's been no testimony

23  as to what Robert Doucette has said in this court hearing.

24         MR. MURPHY:  Grand jury testimony, Your Honor.

25         MR. DOMINGUEZ:  Your Honor, then, objection.

1      MR. MURPHY:  Okay.

2   BY MR. MURPHY:

3   Q.   So it's your testimony that you weren't there, you didn't

4   see any money, you didn't split up any money, you just weren't

5   there?

6   A.   Correct.

7   Q.   And that would include the second day of counting money,

8   too?

9   A.   I would think so.  I don't recall the first day.

10  Q.   You testified that you returned the Budget truck, with

11  Murphy, up to Newmarket Storage.

12  A.   Yes.

13  Q.   Have you returned other Budget trucks to Newmarket Storage

14  that were rented through Murphy's company on other occasions?

15  A.   Yes.

16  Q.   Now, Mr. Nassor, did Mr. Murphy ever tell you he did the

17  Brink's burglary?

18  A.   No.

19  Q.   Did you see Mr. Murphy after the Brink's burglary at any

20  time?

21  A.   Can you rephrase that again?  I mean, I've seen you after

22  that.  I mean --

23  Q.   Okay.  That's all I've asked.  Have you been with Mr.

24  Murphy, in person, face to face, after the Brink's burglary?

25  A.   Yes.

1  Q.   And you had a good enough relation with Mr. Murphy that,

2  if he actually did this Brink's burglary, he would have told

3  you?

4  A.   Yes.

5  Q.   But he didn't say he did it?

6  A.   Correct.

7  Q.   What type of clothing does the burglary crew wear when

8  they go out to do a burglary?

9  A.   Black flight jackets.  Black flight suits, I mean.  And

10 black masks.

11 Q.   Anything else?

12 A.   Rubber -- rubber, things that fill -- what are they

13 called?  Rubber for the water on your feet.  You know, like

14 rubber boots, booties, or something.  Yeah.

15 Q.   Now, does the burglary crew reuse the same clothing on

16 future burglaries?

17 A.   Yes.

18 Q.   So they don't throw out the jumpsuits, the masks, or the

19 rubbers; they save them to use them again?

20 A.   Correct.

21 Q.   Does the clothing normally stay with the crime tools?

22 A.   Yes.

23 Q.   So, if the clothes were removed from the storage bin, then

24 they were removed for a reason?

25 A.   Yes.

1   Q.   Did you take the clothes out of the storage bin?

2   A.   Could you rephrase that?

3   Q.   Did you take the clothes out of the Raymond, New

4   Hampshire, storage bin?

5   A.   Oh, yeah.  I have in the past, yes.

6   Q.   The Raymond, New Hampshire?

7   A.   Oh, no, not Raymond.  No.  Newmarket, New Hampshire.

8   Q.   Clean it up.

9   A.   Yes.

10  Q.   Have you ever worn the crime clothes?

11  A.   Yes.

12  Q.   Do you think your DNA would be found on the crime clothes?

13  A.   It could.

14  Q.   You testified that you're testifying under a plea

15  agreement?

16  A.   Correct.

17  Q.   That would be from the State of Massachusetts,

18  Commonwealth of Massachusetts?

19  A.   Correct.

20  Q.   And did the FBI agree not to charge you at all in this

21  case?

22  A.   Correct.

23  Q.   So you got a pretty good deal?

24  A.   It could have been better.

25  Q.   For this case?

1   A.   It's a good deal.

2   Q.   You got a complete free ride?

3   A.   Correct.

4   Q.   How much did the federal government pay you for your

5   cooperation?

6   A.   Nothing.

7   Q.   How much did you benefit, monetarily, for your

8   cooperation?

9   A.   I don't think I did.

10  Q.   Did you hire your own attorney for your criminal case in

11  Massachusetts?

12  A.   Yes.

13  Q.   How much did you pay him?

14       MR. DOMINGUEZ:  Objection.

15       THE COURT:  Overruled.

16  BY MR. MURPHY:

17  Q.   How much did you pay him?

18  A.   Nine thousand, two hundred dollars.

19  Q.   If you got indicted for this crime, how much do you think

20  an attorney out here for a federal case would have cost you?

21  A.   Probably 50,000 or so.

22  Q.   So you did benefit monetarily, because you didn't have to

23  pay for a federal attorney.

24  A.   I guess so, yeah.

25  Q.   Do you know that federal law mandates that everybody found

1  guilty in a federal criminal case has to pay mandatory

2  restitution?

3  A.    No, I didn't know that.

4  Q.    Do you know what the government has determined restitution

5  to be in this case?

6  A.    No -- yeah, yeah, yeah.  I read that, yeah.  A couple

7  million dollars.

8  Q.    So you also benefited monetarily because you don't have to

9  pay the couple million dollars restitution because you're not

10 going to get found guilty for this crime, are you?

11 A.    No.

12 Q.    So it's looking like the government did, essentially, pay

13 you a lot of money for your cooperation, because you benefited

14 monetarily; didn't you, Mr. Nassor?

15 A.    I guess so.

16 Q.    And that's a pretty big incentive to tell Sal Dominguez

17 what he wants to hear, isn't it?

18 A.    I guess so.  I mean, it's the truth.

19 Q.    If you got indicted for this crime, you would have faced

20 20 years in federal prison; wouldn't you have?

21 A.    Yeah.

22 Q.    You testified you spent a lot of time with Murphy around

23 December 2008, January 2009?

24 A.    Yes.

25 Q.    Was Murphy aware that the FBI and the state police were

1  investigating him?

2  A.    No.

3  Q.    Didn't Murphy tell you the FBI and state --

4          MR. DOMINGUEZ:  Objection.

5          THE COURT:  Mr. Murphy, how would he know that?

6          MR. MURPHY:  I'm going to get to that.

7          THE COURT:  You're the Murphy you're talking about,

8  aren't you?

9          MR. MURPHY:  Yes.

10         THE COURT:  How would he know?

11         MR. MURPHY:  Well, Your Honor --

12         THE COURT:  That's the objectionable part.

13         So the jury will disregard the answer.

14  BY MR. MURPHY:

15  Q.    Mr. Nassor, did Murphy tell you that --

16         MR. DOMINGUEZ:  Objection, Your Honor.

17         MR. MURPHY:  Your Honor, I'm asking him if Murphy

18  told him something.

19         MR. DOMINGUEZ:  Hearsay offered by the party -- the

20  party opponent -- the party.

21         THE COURT:  Sustained.

22  BY MR. MURPHY:

23  Q.    Do you see this document, Mr. Nassor?

24  A.    Yes.

25  Q.    Can you read it, please?

1  A.   City of Lynn Zoning Board of Appeals, Notice of Decision.

2  Q.   And specifically this paragraph right here (indicating).

3  A.   Permit the use of a room or rooms in a dwelling in an R-2

4  general residence district by a person, tenant, resident of the

5  premises for a home occupation of office for moving company and

6  security consultant business in accordance with provisions of a

7  Section 13.5.2 of the zone ordinance --

8  Q.   Isn't it true?

9  A.   -- for 409 Walnut Street.

10 Q.   Isn't it true that Mr. Murphy owned a security consulting

11 business?

12 A.   Yes, he did.

13 Q.   And isn't it also true that Murphy is an expert in the

14 field of security?

15 A.   Yes.

16 Q.   Customers would consult Murphy for his knowledge in the

17 field of security?

18 A.   Yes, I've seen it.

19 Q.   And these customers would pay for his expert advice?

20 A.   Yes.

21 Q.   And, according to this document, this has been authorized

22 since when?

23 A.   October 30th, 2006.

24 Q.   You were talking to the FBI about this case, Mr. Nassor.

25 Did they tell you that they wanted Murphy and not you?

1   A.   Say that again.

2   Q.   When you spoke to the FBI and you were giving your

3   statement and you were cooperating with the FBI back in

4   Massachusetts, when you were cooperating, did the FBI tell you

5   that they wanted Murphy and not you?

6   A.   Basically, yeah.

7   Q.   Did they tell you they were going to give Murphy as much

8   time as they could?

9   A.   Told my attorney that.

10  Q.   So, basically, it's:  Give us Murphy, and we'll let you

11  go?

12  A.   Pretty much, yeah.

13  Q.   And that's what you did?

14  A.   Yeah.

15  Q.   Now, Mr. Nassor, you also cooperated on a couple cases

16  back in Massachusetts, didn't you?

17  A.   Say that again.

18  Q.   You also cooperated on a couple cases back in

19  Massachusetts?

20  A.   Correct.

21  Q.   Was Murphy aware that you had cooperated on these cases?

22  A.   Yes.

23       MR. MURPHY:  Can I have a minute, Your Honor?

24       (Whereupon, there was a brief interruption.)

25       MR. MURPHY:  Thank you, Your Honor.

1  BY MR. MURPHY:

2  Q.   Mr. Nassor, who went out to Pennsylvania to pick up the

3  stolen coin and the crime tools?

4  A.   I mean, I believe it was Joe and Rob.

5  Q.   Did you go out to pick them up with them?

6  A.   No.

7  Q.   Did Murphy go that you know of?

8  A.   No.

9  Q.   Who put the stolen coin and the crime tools in the

10  Raymond, New Hampshire, storage bin?

11  A.   I have no clue.

12  Q.   Did you help?

13  A.   No.

14  Q.   To the best of your knowledge, was Murphy there?  Did he

15  help?

16  A.   No.

17  Q.   And Joe Morgan got arrested on April 4th, 2009?

18  A.   Sounds about right.

19  Q.   Did you help get rid of the video recording units from

20  Brink's?

21  A.   No.

22  Q.   Did you tell Rob to get rid of the video recording units

23  from Brink's?

24  A.   No.

25  Q.   Do you know if Murphy got rid of them, to your knowledge?

1   A.   No.

2   Q.   And you testified that you didn't take the crime clothes

3   out of the Raymond, New Hampshire, storage bin?

4   A.   Correct.

5   Q.   Were you there when the Milwaukee electromagnetic drill

6   was taken out of the Raymond storage bin?

7   A.   No.

8   Q.   Now, how about the grinder, the generator with the

9   extension cords, were you there when they were taken out of

10  storage?

11  A.   No.

12  Q.   Did you instruct anybody to take any of these items out of

13  storage?

14  A.   Not that I recall.

15  Q.   Did you take your small welding cart out of the storage

16  bin?

17  A.   No.

18  Q.   Did you give Rob, or anybody else, permission to take it

19  out of the storage bin?

20  A.   No.

21  Q.   Where was the last place you've seen Murphy's big jammer?

22          THE COURT:  Murphy's big what?

23          MR. MURPHY:  Jammer.  Cellular jammer, Your Honor.

24  There's two jammers in this thing.  There's the --

25          THE COURT:  Oh, jammer.

1   MR. MURPHY:  Yeah.

2   THE COURT:  Okay.

3   MR. MURPHY:  There's the Y2000 Quad, and there was

4   the bigger one that they showed a picture of.

5   THE COURT:  Okay.

6   MR. MURPHY:  The bigger one is what is referred as

7   "the big jammer."

8   THE COURT:  I understand.  I just --

9   THE WITNESS:  At Rob Doucette's house.

10  BY MR. MURPHY:

11  Q.   So the last time you saw the jammer was at Rob Doucette's

12  house?

13  A.   Correct.

14  Q.   And you don't know if they were part of the tools that

15  went out to Ohio to do the score?

16  A.   No.

17  Q.   Were you there when the big jammer was put in the Raymond,

18  New Hampshire, storage bin?

19  A.   No.

20  Q.   You testified that you've known Rob Doucette for a couple

21  years now?

22  A.   Yes.

23  Q.   You know him fairly well?

24  A.   Yes.

25  Q.   Have you been to his house?

1   A.   Yes.

2   Q.   Have you seen all his old cars in his yard?

3   A.   Yes.

4   Q.   Does Rob Doucette own a 1968 Pontiac GTO convertible?

5        MR. DOMINGUEZ:  Objection, Your Honor.

6        THE COURT:  Where is this going?

7        MR. MURPHY:  It's going towards -- I understand why

8   Mr. Dominguez is saying.  It's going towards the assets of Mr.

9   Doucette.  We discussed them in a prior -- prior hearing.  I'm

10   asking Mr. Nassor if he's aware of these vehicles that Mr.

11   Doucette owns.

12        THE COURT:  Are you aware of them?

13        THE WITNESS:  Yes, I am.

14   BY MR. MURPHY:

15   Q.   Does Rob Doucette own a 1968 Pontiac GTO convertible?

16   A.   Yes.

17   Q.   Does Rob Doucette own a 1979 Pontiac Trans-Am?

18   A.   Yes.

19   Q.   Does Rob Doucette own a 1972 Chevy Chevelle?

20   A.   Yes.

21   Q.   Does Rob Doucette own a 1971 Pontiac LeMans Sport

22   convertible?

23   A.   Yes.

24   Q.   And did his mother, when she passed away, did she leave

25   him a 19 --

1    MR. DOMINGUEZ:  Objection, Your Honor.  Relevance.

2    THE COURT:  I hope you're going somewhere with this.

3    MR. MURPHY:  Yes, Your Honor.  I'm -- we're

4  establishing Rob Doucette's assets.

5    I have one more question.

6    THE COURT:  For what purpose?

7    MR. DOMINGUEZ:  That's not a matter in issue at this

8  point in time, Your Honor.

9    THE COURT:  Sustained.

10    MR. MURPHY:  Okay.  I got most of it in.

11  BY MR. MURPHY:

12  Q.   Do you remember testifying at the grand jury, Mr. Nassor?

13  A.   Yes.

14  Q.   Do you remember testifying that Rob Doucette sells

15  marijuana?

16  A.   Yes.

17  Q.   Have you ever purchased from Rob Doucette?

18  A.   Several times.

19  Q.   Doesn't he sell ounces for $400?

20  A.   Yes.

21  Q.   Didn't Rob also sell Oxycontin pills, Vicodin pills, and

22  Percocet pills?

23  A.   Yes, he did.

24  Q.   Mr. Nassor, did you ever light a house on fire?

25  A.   What do you mean?  What --

1    Q.   Were you ever charged with arson?

2              MR. DOMINGUEZ:  Objection, Your Honor.

3              THE WITNESS:  I was never charged with arson.

4              THE COURT:  Overruled.

5    BY MR. MURPHY:

6    Q.   Did you ever escape from jail?

7              THE COURT:  Did you say you were?

8              THE WITNESS:  No.  No, I was never charged.

9              MR. MURPHY:  But --

10             THE COURT:  You'd better have a basis for your

11   question.

12             MR. MURPHY:  Okay.  I do have a basis, Your Honor.

13             MR. DOMINGUEZ:  Your Honor, may we approach?

14             THE COURT:  A good faith basis.

15             MR. DOMINGUEZ:  Your Honor, may we approach at side

16   bar?

17             THE COURT:  Yes.

18             (Whereupon, a discussion was held at the bench,

19   between the Court and Counsel, as follows:)

20   AT THE BENCH:

21             MR. DOMINGUEZ:  Your Honor, I sat on my hands for a

22   great deal of this cross-examination.  It's not appropriate for

23   Mr. Murphy to try to establish, for extrinsic evidence

24   purposes, information from this defendant about other

25   defendants.  It's just not proper.  It's not proper.

1          Mr. Murphy desires to represent himself.  If he's

2    going to do so, I would appreciate it if he did so within the

3    bounds of the rules of evidence.

4          Now, he can impeach a witness based on the conviction

5    of one year -- a conviction of one year or more.

6          MR. MURPHY:  I can't use bad acts?

7          MR. DOMINGUEZ:  A bad act of another person -- if a

8    bad act -- if this defendant -- if it involves truthfulness, it

9    can be inquired into, with the discretion of the Court.

10          MR. MURPHY:  Mr. Dominguez, I had --

11          MR. DOMINGUEZ:  And, frankly, Your Honor, Mr. Murphy

12    has stood up here throughout this trial and referred to me as

13    Sal.  I think it's disrespectful.  I refer to him as Mr.

14    Murphy.

15          MR. MURPHY:  You called me "Sean" a couple of times.

16          MR. DOMINGUEZ:  I did not do that.  So I would

17    appreciate it if you refer to me as Mr. Dominguez, and not Sal.

18    We're not familiar with each other.

19          THE COURT:  Let's get with the program on the

20    formality of the courtroom.

21          MR. MURPHY:  Okay.

22          THE COURT:  But I've given you a lot of leeway.

23          MR. MURPHY:  I appreciate that, Your Honor.

24          THE COURT:  But you're not allowed to testify through

25    these other witnesses.  And I said do you have a good faith

1    basis.  You know what that means.

2         MR. MURPHY:  I do, Your Honor, and I have.

3         THE COURT:  And the good faith basis is, you have a

4    pretty good idea that the person has been convicted.  And if

5    you -- and if -- if they say that they haven't been, you're

6    stuck with that.

7         MR. MURPHY:  I just --

8         THE COURT:  Don't -- don't make this a fishing

9    expedition.  We're getting way off field.

10        MR. MURPHY:  No.

11        THE COURT:  And that doesn't help anyone, --

12        MR. MURPHY:  I understand, Your Honor.

13        THE COURT:  -- including you.

14        MR. MURPHY:  I have information that he did light a

15   house on fire.  He didn't admit it.  I can move on.

16        THE COURT:  All right.

17        MR. DOMINGUEZ:  But that does not involve dishonesty,

18   Your Honor.  It doesn't involve falsities or dishonesty.

19   That's what the bad act has to focus on.  You can't just ask

20   somebody if they committed an act if it doesn't focus on

21   dishonesty.  You can impeach on a conviction -- a felony

22   punishable by a term of imprisonment exceeding one year.

23   That's within ten years of today's date.

24        MR. MURPHY:  Okay.

25        MR. DOMINGUEZ:  Those are the rules.

1      THE COURT:  Stick to things that they're important to

2  the case.

3      MR. MURPHY:  Yes.  I think -- I think I'm doing a

4  pretty good job.

5  IN OPEN COURT:

6  BY MR. MURPHY:

7  Q.   Mr. Nassor, have you ever been convicted from escaping

8  from jail?

9  A.   Yes.

10 Q.   Did you get sentenced for that?

11 A.   Yes.

12 Q.   What was your sentence for escaping from jail?

13 A.   Three to five, the first time.

14 Q.   So there's a subsequent one, too?

15 A.   Yes.

16 Q.   Have you ever been convicted of assaulting the police?

17 A.   Yes.

18 Q.   Did you get sentenced for that?

19 A.   Yes.

20 Q.   What was your sentence?

21 A.   Four to five years.

22 Q.   Have you ever been convicted for smuggling drugs into

23 prison?

24 A.   Yes.

25 Q.   What was your sentence for that?

1  A.   One year.

2  Q.   Mr. Nassor, do you have some sort of time-release chip

3  surgically implanted in you?

4  A.   Yes.

5  Q.   What substance was in the time-release chip?

6  A.   Naltrexone.

7  Q.   And what was that --  what was that used for?

8  A.   Opiate blocker.

9  Q.   And the reason you got it implanted in you?

10  A.   Because I used to do heroin.

11  Q.   Did you shoot it in your veins?

12  A.   Yes.

13  Q.   How about cocaine?

14  A.   Yes.

15  Q.   Did you shoot that in your veins?

16  A.   Yes.

17  Q.   Now, did you eventually remove this implanted chip,

18  prematurely, so you could continue to get high?

19  A.   Yes.

20  Q.   Mr. Nassor, when you went out to Memphis, Tennessee, did

21  you use any illegal substances during that trip?

22  A.   Yes.

23  Q.   What did you use?

24  A.   I'm not sure.

25  Q.   Was it an illegal substance?

1   A.   Yes.

2   Q.   And when you went out to Ohio to scope out the Brink's

3   score, did you use any illegal substances during that trip,

4   too?

5   A.   Yes.

6   Q.   Do you recall what those might be?

7   A.   Suboxone.

8   Q.   Anything else?

9   A.   Marijuana, probably.

10   Q.   To the best of your knowledge, does Murphy do drugs?

11   A.   Smokes marijuana.

12   Q.   Besides marijuana?

13   A.   I've never seen him do anything, no.

14   Q.   You've testified that you've shot heroin and you've shot

15   cocaine. So you're basically a junkie?

16   A.   Pretty much.

17   Q.   Are junkies normally honest people?

18   A.   I -- I mean -- no.

19   Q.   A junkie will do just about anything to get the drugs they

20   need?

21   A.   Pretty much.

22   Q.   And is manipulation a skill that junkies master?

23   A.   Yes.

24   Q.   So, if you wanted to manipulate someone, you already have

25   the skills to do so, don't you?

1  A.   Yes.

2  Q.   Now, Mr. Nassor, didn't you ask Murphy to write checks

3  from his company account to your D. N. Construction account,

4  and you'd give him cash for the checks?

5  A.   Yes.

6  Q.   Where were you getting all your cash?

7  A.   Selling marijuana.

8  Q.   Didn't you smuggle large amounts of marijuana across the

9  country?

10  A.   Yeah.

11  Q.   How many times have you filed taxes in the past ten years?

12  A.   Maybe five.

13  Q.   Did you own a house and several cars?

14  A.   Yes.

15  Q.   Was it all purchased with ill-gotten gains?

16  A.   Most of it.

17  Q.   Now, you testified in front of the grand jury in this

18  matter?

19  A.   Yes.

20  Q.   Were you held in custody when you were brought out here?

21  A.   Yes.

22  Q.   Which jail were you held at?

23  A.   Delaware County.

24  Q.   Do you remember who your cellmate was out in Delaware

25  County Jail?

1   A.   I've had several.

2   Q.   Do you remember a person named Kevin Burton (phonetic)?

3   A.   Yes.

4   Q.   Do you also remember a person named Scott Lape (phonetic)?

5   A.   Yes.

6   Q.   Did you ever talk to your cellmates about the Brink's

7   heist?

8   A.   Yes.

9   Q.   In fact, Mr. Nassor, isn't it true that you told Kevin

10  Burton that you did the Brink's heist?

11  A.   I told him I had something to do with it.

12  Q.   You didn't tell -- did you tell him that you cut a hole in

13  the vault and smoke prevented you from getting all the money?

14  A.   I might have.

15  Q.   Did you also tell him that you cashed in stolen coin from

16  Brink's at a casino?

17  A.   I don't recall that, no.

18  Q.   Did you tell Kevin Burton that you were the boss of your

19  crew?

20  A.   Might have.

21  Q.   And you said you remember Scott Lape?

22  A.   Yes.

23  Q.   Didn't you tell him similar facts:  that you did this

24  Brink's burglary?

25  A.   I think I told them both at the same time.

1  Q.   Mr. Nassor, would you consider yourself an honest person?

2  A.   Yeah.

3  Q.   Now, when you took the oath to tell the truth today, the

4  whole truth, and nothing but the truth, do you really expect

5  the jury to believe everything you say?

6  A.   Yes.

7  Q.   You testified that on August 8th, in 2008, you got hit on

8  the head.

9  A.   Yes.

10  Q.   You were in the hospital?

11  A.   Yes.

12  Q.   You were in a coma for over a month?

13  A.   Yes.

14  Q.   When you came out of the coma, did you have difficulty

15  talking?

16  A.   Yes.

17  Q.   When you left the hospital, did you leave early, against

18  the doctors' recommendation?

19  A.   Yes.

20  Q.   Doctors wanted you to stay in the hospital longer?

21  A.   Yes.

22  Q.   But you left early anyways?

23  A.   Yes.

24  Q.   Did the doctors tell you that your brain injury would

25  affect your ability to perceive and remember events accurately?

1   A.   Yes.

2   Q.   Do you remember the day you got hit on the head?

3   A.   Some of it.

4   Q.   Do you remember who hit you?

5   A.   No.

6   Q.   Did anyone ever tell the state police that they believed

7   Murphy was --

8           MR. DOMINGUEZ:  Objection, Your Honor.

9           THE COURT:  Sustained.

10          MR. MURPHY:  May I have a minute, Your Honor?

11          THE COURT:  That would be hearsay.

12   BY MR. MURPHY:

13   Q.   Did you ever receive any information about who may have

14   been responsible for hitting you in the head?

15   A.   Yes.

16   Q.   And who -- who -- what information did you receive of who

17   could have possibly hit you on the head?

18   A.   Kate Glenn (phonetic).

19          THE COURT:  I'm sorry.  Where is this going?

20          MR. MURPHY:  I'm getting ready to finish up, Your

21   Honor.

22          THE COURT:  I mean, the hitting on the head.  No one

23   is charging you with that.

24          MR. MURPHY:  No.  I was just -- I'll ask him the

25   question.

1          THE COURT:  I don't know what it has to do --

2    BY MR. MURPHY:

3    Q.   Did anyone ever tell you that Murphy may have hit you on

4    the head?

5    A.   Yes.

6          MR. MURPHY:  Thank you, Your Honor.

7    BY MR. MURPHY:

8    Q.   Have you recently learned new information on who actually

9    hit you on the head?

10   A.   Yes.

11   Q.   Now, don't you want to get revenge on the person who hit

12   you on the head?

13          THE COURT:  I don't see the point --

14          THE WITNESS:  Yeah.

15          THE COURT:  -- of that question.

16          THE WITNESS:  I don't see it either.

17          THE COURT:  You're straying.

18   BY MR. MURPHY:

19   Q.   So, in fact, was Murphy involved with hitting you on the

20   head?

21   A.   No.

22   Q.   Knowing what you know now about who actually did hit you

23   on the head, do you feel differently about Mr. Murphy?

24   A.   Yes.

25   Q.   Now, Mr. Nassor, if you could take back certain parts of

1  your testimony without facing any consequences, would you?

2  A.   No.

3           MR. MURPHY:  That's all I have, Your Honor.

4           MR. DOMINGUEZ:  Very briefly, Your Honor.

5           THE COURT:  You can go ahead and start from there.

6                          - - -

7                    REDIRECT EXAMINATION

8  BY MR. DOMINGUEZ:

9  Q.   Mr. Nassor, Mr. Murphy asked you several questions.  I'm

10 not going to touch on all of them, but you recall his questions

11 about cleaning off tools twice after you do a job and wearing

12 the same clothes but washing them down, that kind of thing?  Do

13 you recall that line of questioning?

14 A.   Yes.

15 Q.   Who would know that that was what a burglar is supposed to

16 do to be successful and to use those tools again and to not be

17 detected?

18 A.   I don't get where you're going.

19 Q.   Who would know that you're supposed to clean the tools off

20 twice after a burglary?

21 A.   A criminal.

22 Q.   Who would know the manner in which you're to clean your

23 clothes that you use in a burglary in order to use them again?

24 A.   Someone who's been caught because of it.

25 Q.   Several times during Mr. Murphy's questioning of you, he

1    asked you who was part of your burglary crew.  Do you remember

2    those questions?

3    A.    Yes.

4    Q.    Who was -- who was -- who was in your burglary crew?

5    A.    Tommy Enquist, Joe Morgan, Sean.

6    Q.    Who else?

7    A.    A few other people here and there.  I mean, over the

8    years, there's been so many.

9    Q.    And Mr. Murphy and Mr. Enquist and Mr. Morgan and you, you

10   would all know the tools of the trade and how to be successful

11   burglars; is that correct?

12   A.    Yes.

13   Q.    Would you consider yourself high-end burglars?

14   A.    Yeah.

15   Q.    I believe the question was asked of you, isn't it true, as

16   a general rule -- I believe that was the terminology -- as a

17   general rule, the person who scopes out the scene actually

18   participates in the score.  I may have misphrased that a little

19   bit, but do you recall that statement, or that question?

20   A.    Bring my share.

21   Q.    Who would know that that's the general rule?

22   A.    When you do it your whole life, it becomes a general rule.

23   Q.    You were asked if you had a nickname.

24   A.    Yes.

25   Q.    Does Sean have any nickname, or Mr. Murphy?  I'm sorry.

Does Mr. Murphy have any nicknames?

A.    Yes.

Q.    What are his nicknames?

A.    Nigga (phonetic).

Q.    Excuse me?

A.    You heard me.  Nigga.

Q.    Who gave him that nickname; do you know?

A.    I'm not sure.

Q.    Do you know if Mr. Murphy has an alias?  Only if you know.

A.    No, not offhand.

Q.    Do you know -- if you know, do you know what name he used

with Newmarket Storage facility?

A.    No, not offhand.

Q.    Very well.  And he, I think, asked you questions about

fake ID.

A.    Correct.

Q.    And whether or not members of your crew used fake ID?

A.    Yes.

Q.    And you said Mr. Murphy was part of your burglary crew,

correct?

A.    Correct.

Q.    Does Mr. Murphy use fake ID?

A.    I believe so.

Q.    Now, Mr. Murphy asked you questions about the Federal

Express receipt and suggested that $50 dollars was paid for the

1  Federal Express item that was sent to Memphis that you picked

2  up.  Were you familiar with how Mr. Murphy communicated with

3  Global Gadget?

4  A.    No.

5  Q.    So you're not familiar with an e-mail from Mr. Murphy, to

6  Global Gadget, on December 2nd of 2008?

7          MR. MURPHY:  Objection, Your Honor.

8          THE COURT:  What's the objection, sir?

9          MR. MURPHY:  He said he's not familiar with how Mr.

10  Murphy communicated with Global Gadget.  Now Mr. Dominguez is

11  trying to lead him into what he may do.

12          MR. DOMINGUEZ:  I'm just following up, Your Honor,

13  because Mr. Murphy inquired about figures, specifically

14  inquired about figures.

15          THE COURT:  Overruled.  I will allow you to continue.

16  BY MR. DOMINGUEZ:

17  Q.    So are you aware that Mr. Murphy -- and I believe you have

18  Government's Exhibit --

19          MR. DOMINGUEZ:  Is that 4-1, Ms. Hill?

20          MS. HILL:  I believe so.

21          MR. DOMINGUEZ:  Government's Exhibit 4-1.  Is that

22  correct, Mr. Graeff?

23          MR. GRAEFF:  Yes, that's correct.

24          MR. DOMINGUEZ:  So I'm referring to page 206.  I'm

25  referring to page 206 of the Global Gadget document.

1   Actually, page 205.

2   BY MR. DOMINGUEZ:

3   Q.   So you're not familiar with the communication between Mr.

4   Murphy about how much money he actually paid Global Gadget for

5   that --

6   A.   No.  No, I'm not.

7   Q.   -- Y2000 Quad jammer?

8   A.   No.

9   Q.   Now, Mr. Murphy asked you a question regarding privileged

10  information between yourself and your attorney.  But so that

11  the jury is clear, you were never -- I was never with Mr.

12  Roman, your attorney, and you in any room where you overheard

13  any conversations between myself and your attorney, Mr. Roman;

14  is that correct?

15  A.   Correct.

16  Q.   And Mr. Roman, in fact, is based out of Massachusetts; is

17  that correct?

18  A.   Correct.

19  Q.   Now, I'm not in charge of your prosecution in

20  Massachusetts in any way, am I?

21  A.   Nope.

22  Q.   Mr. Murphy asked you a number of questions about your

23  exposure to prosecution in federal court in Ohio.  Do you

24  recall that line of questioning?

25  A.   Yes.

1  Q.   To your knowledge, Mr. Nassor, before you spoke with the

2  agents in Massachusetts, were the investigators even aware of

3  Mr. Murphy's or Mr. Morgan's or Mr. Doucette's involvement in

4  the Brink's facility burglary here in Columbus, Ohio?

5  A.   I don't believe so.

6  Q.   And you knew your information was protected by a proffer

7  agreement; is that correct?

8  A.   Yes.

9  Q.   And defendants generally know, when they proffer, that

10 they need not worry about what is said to them to be used

11 against them in a criminal proceeding, unless, in fact, they

12 take the stand or present a defense that's contrary to what

13 they state in the proffer; is that your understanding?

14 A.   Correct.

15            THE COURT:  So we all know what we mean, what proffer

16 is, --

17            MR. DOMINGUEZ:  Thank you, Your Honor.

18            THE COURT:  -- that's a term that goes with the --

19 goes with the territory, so to speak.  And it's a term I don't

20 think is generally known to the public.

21            And I'm not going to testify.  I'm going to ask them

22 to explain it.

23            MR. DOMINGUEZ:  Thank you, Your Honor.

24            THE COURT:  If you would explain the term "proffer."

25            MR. DOMINGUEZ:  Proffer agreement, Your Honor?

1      THE COURT:  Yes, so the witness' testimony and the --

2      MR. DOMINGUEZ:  Makes sense?

3      THE COURT:  Yes.

4      MR. DOMINGUEZ:  May I make a proffer as to a proffer?

5      THE COURT:  Yes.

6      MR. DOMINGUEZ:  And with Mr. Graeff's assistance,

7  just in case he believes I misstate anything, is an officer of

8  the Court as well.

9      Ladies and gentlemen of the jury, an individual who

10  is suspected of committing a criminal offense or, in fact, is

11  indicted for a criminal offense may engage with government

12  agents in what is called a proffer agreement.  And what that is

13  is, they sit down, typically, with their attorney, the

14  prosecutor, the case agent.  And there is an agreement -- there

15  is an agreement that the information that they provide during

16  that proffer cannot be used against them in any criminal

17  proceeding, cannot be used against them in any sentencing

18  proceeding in order to enhance their sentence in any way.

19      It requires truthfulness, of course.  And the only

20  way that that proffer can ever be used against them is if they

21  go to trial and they present a defense or they testify contrary

22  to what they said in the proffer.  If they do that, then the

23  government is allowed to use that proffer as a confession

24  against them just like a normal confession.

25      And, typically, candidly, those proffer agreements

1   and those proffer sessions are used to further the

2   investigation by law enforcement authorities.

3          THE COURT:  And I'll ask the defense if they have any

4   disagreement with that?

5          MR. GRAEFF:  No disagreement, sir.

6          THE COURT:  All right.  Thank you.

7   BY MR. DOMINGUEZ:

8   Q.   Now, Mr. Murphy, you did, in fact, enter into a plea

9   agreement?

10         MR. MURPHY:  Mr. --

11         MR. DOMINGUEZ:  I apologize.

12  BY MR. DOMINGUEZ:

13  Q.   Mr. Nassor, you did enter into a plea agreement with the

14  authorities of Bristol County?

15  A.   Yes, I did.

16         MR. DOMINGUEZ:  May I approach, Your Honor?

17         THE COURT:  You may.

18  BY MR. DOMINGUEZ:

19  Q.   Mr. Nassor, I just handed you what has been marked for

20  identification purposes and labeled Government's Exhibit 17.  I

21  ask if you recognize that, sir.

22  A.   Yes, I do.

23  Q.   And what is that, sir?

24  A.   It's my plea agreement for three years for the burglary of

25  E. A. Dion.

1  Q.  And does that plea agreement actually require your

2  truthful testimony in proceedings actually in Massachusetts?

3  A.  Correct.

4  Q.  Does your signature appear on the back of that document,

5  sir?

6  A.  Yes, it does.

7  Q.  And, Mr. Nassor, do you in any way have any objection to

8  the jury seeing that plea agreement and what you're required to

9  do in its entirety?

10  A.  No.

11          MR. DOMINGUEZ:  May we have a moment, Your Honor?

12          (Whereupon, there was a brief interruption.)

13  BY MR. DOMINGUEZ:

14  Q.  Mr. Nassor, in the cross-examination of you by Mr. Murphy,

15  he put some kind of bank statement on this ELMO and published

16  it?

17  A.  Yeah.

18  Q.  And it had dates and post dates of January of '09.  Had

19  you ever seen that before, his bank statement, before today?

20  A.  I mean, I have seen bank statements, yes, in his office,

21  in his -- not --

22  Q.  Were you familiar with those entries that he was showing

23  you?

24  A.  No.

25  Q.  Do they even relate, at all, to what happened in Memphis

1  when you received that Federal Express package that he sent you

2  out to receive?

3  A.   I don't believe so.

4          MR. DOMINGUEZ:  May I have a moment, Your Honor?

5          (Whereupon, there was a brief interruption.)

6          MR. DOMINGUEZ:  I have no further redirect, Your

7  Honor.

8          MR. MURPHY:  Two questions, Your Honor.

9          THE COURT:  Okay.  You know, --

10         MR. MURPHY:  I'm limited.

11         THE COURT:  -- restricted to the part that Mr.

12  Dominguez just --

13         MR. MURPHY:  Yes, Your Honor.

14         THE COURT:  -- asked, those subjects.

15         MR. MURPHY:  I'm familiar.

16                            - - -

17                    RECROSS-EXAMINATION

18  BY MR. MURPHY:

19  Q.   Mr. Dominguez asked you about your burglary crew, Mr.

20  Nassor.

21  A.   Yes.

22  Q.   Isn't it true that, in Lynn, Massachusetts, there are

23  hundreds of professional burglars?

24  A.   I would say there's probably a hundred.  I wouldn't go as

25  far as to say several hundred, but it's probably a hundred,

1  maybe a hundred and fifty people.  There's a lot of people that

2  do burglaries in Lynn, yes.

3  Q.   And that's unusually high for a small city like Lynn?

4  A.   Yes, especially for drug stores.

5  Q.   And you also testified that -- Mr. Dominguez asked you

6  about you giving up the information on the Brink's burglary.

7  Do you remember that?

8  A.   Yes.

9  Q.   But you also testified that the FBI told you that they

10  wanted me, correct, and not you?

11  A.   Could you say that again?

12  Q.   You testified that the FBI told you that they wanted

13  Murphy, and not you?

14  A.   I believe they told my lawyer that, yes.

15  Q.   And that was before you gave up the information on the

16  Brink's burglary?

17  A.   Yes.

18        MR. MURPHY:  Thank you, Mr. Nassor.

19        I have no further questions of this witness, Your

20  Honor, but what I'd like to do is, I'd like you to hold him for

21  a defense witness, possibly, when the defense comes up, Your

22  Honor.

23        THE COURT:  All right.

24        Anything on that?

25        MR. DOMINGUEZ:  No.  Thank you, Your Honor.

1      THE COURT:  Ladies and gentlemen, this has been a

2  long day.  And thanks for your patience and your close

3  attention.  I can tell you've been listening very carefully.

4      Do not discuss the case with each other or anyone

5  else during the course of the trial.  This includes the

6  attorneys or anyone else involved in the case.  Report any

7  violations to the court personnel.  Do not form or express an

8  opinion until you're actually in deliberations.

9      Do not make any investigations, perform any

10 experiments, or do any reading or research or get into the

11 computer on any of this business until you can do whatever you

12 want when the case is over and you're discharged.  And do not

13 discuss the case, the case, with your family or friends until

14 you are discharged.

15     Do not absorb -- observe any media reports,

16 newspapers, T.V., or radio reports.  If you have something that

17 comes on the air, please change the channel or go elsewhere in

18 the room.  And on the newspapers, you can have your -- the

19 person you live with, if that's the case, cut out any newspaper

20 reference to this.  That often happens in cases.

21     Wear your juror badges while you're here.  And thank

22 you for your kind attention, and we'll see you tomorrow

23 morning.

24     (Whereupon, the jury exited the courtroom at 5:35

25 p.m., and a recess was taken until 5:47 p.m.)

1                              - - -

2    IN OPEN COURT:

3            THE COURT:  The first matter that I want to take up

4    is the defendant's objection to the government's introduction

5    of a GPS device, and, specifically, that certain addresses

6    recovered from that GPS device -- defendant's basis for the

7    objection is that it was just produced, when the government had

8    the device for years.

9            The government's response is, I believe, that you

10   just took it up and picked that information up.  Is that

11   correct?

12

13           MR. DOMINGUEZ:  Your Honor, as we were going through

14   the evidence on Saturday, Mr. Chris McIntosh, the detective

15   that testified today, said -- looked at it and said, I don't

16   think this has been downloaded, or even tested, to see if any

17   information was still on it, because he didn't know if it would

18   be, still, or erased after a period of time.  He went to his

19   car, looked at it, downloaded it; and that information that is

20   on the sheet was --

21           THE COURT:  So, you've just come by this on Saturday,

22   and this is now Monday following?

23           MR. DOMINGUEZ:  Actually, Judge, as soon as I got the

24   information, I called Mr. Graeff, over the weekend, and told

25   him about it.

1          THE COURT:  Okay.

2          MR. MURPHY:  And I would add, Your Honor --

3          THE COURT:  Mr. Murphy, go ahead.

4          MR. MURPHY:  I would add that it's also hearsay, Your

5     Honor.

6          THE COURT:  Pardon me?

7          MR. MURPHY:  I would add that it's also hearsay.

8          THE COURT:  Okay.  Well, it's not a declaration in

9     court.  It's a device that has information on it.  It's like a

10    piece of evidence.  So, it's not hearsay.  And, so, I am going

11    to -- the government was aware of its continuing duty to

12    disclose discovery to the defendant pursuant to Rule 16 of the

13    Federal Rules of Criminal Procedure and this Court's order.

14    However, Assistant United States Attorney Dominguez has stated

15    that these addresses in the GPS were not discovered until this

16    past weekend, which he has just confirmed here today, in

17    preparing for trial.

18          Further, there is no -- and the counsel at that time,

19    and still is elbow counsel, advisory counsel now, was advised

20    of it.  And this has been part of the evidence available to the

21    defendant since probably 2009.

22          And pursuant to Rule 16(a)(1)(E), the defendant could

23    have requested permission to inspect the GPS.  The defendant

24    had the ability to conduct his own investigation; was given the

25    evidence before court.

1       Today, further, the defendant will have additional

2  time to review the evidence prior to the government's plan to

3  introduce the evidence during the testimony of Agent Costello.

4  Therefore, the Court overrules the defendant's objection.

5       The other matter is regarding the alibi witness.  And

6  you intend to subpoena witnesses from Massachusetts who will

7  provide you an alibi during the time of the burglary; is that

8  correct?

9       MR. MURPHY:  No, Your Honor, absolutely not.

10      THE COURT:  You're not -- you don't have alibi

11  witnesses?

12      MR. MURPHY:  I don't have alibi witnesses.  Mr.

13  Dominguez has served me with an alibi notice that, if I had an

14  alibi between 5:00 p.m. on Saturday evening, July -- January

15  17th, to Sunday morning, at eight o'clock, on the 18th, and my

16  witnesses will not be testifying to either one of those days,

17  the 17th or the 18th.  My witnesses will be testifying to the

18  morning of the 16th, which is a day before, more than 24 hours

19  out.

20      MR. DOMINGUEZ:  Yeah.  That's consistent with our

21  evidence, because our evidence shows that Mr. Murphy actually

22  rented the Budget rental truck in New Hampshire on the 16th.

23      THE COURT:  Is there anything else?  If not, we're in

24  recess until tomorrow morning.

25      MR. DOMINGUEZ:  Your Honor, one thing to ponder.  We

1    have the business records and the certificates of authenticity

2    from Global Gadgets.  Mr. Graeff and I had discussed those some

3    time ago when he was actually representing Mr. Murphy.  He had

4    suggested that there was some concern as to some of the

5    correspondence between Mr. Murphy and Global Gadgets back as

6    long as 2004.  And I told him we would discuss that in terms of

7    whether or not the government needed to put this entire

8    document in or just more recent correspondence between Mr.

9    Murphy and Global Gadgets.

10         And now that Mr. Graeff is no longer lead counsel,

11   I'm just trying to figure out how to go about addressing that.

12         THE COURT:  Do we have a problem here or not?

13         MR. DOMINGUEZ:  I don't know.  We intend to introduce

14   this document pursuant to 18 United States Code Section 3505,

15   certified records.  As a matter of fact, the director of Global

16   Gadgets had certified each entry and invoice in this document

17   is authentic per the rules contained in 18 United States Code

18   Section 3505.

19         So, I just wanted to bring it to the Court's

20   attention.  What we were going to attempt to do is, at an

21   appropriate time, perhaps tomorrow or Wednesday morning,

22   proffer it into the record of this Court, ask for its

23   admissibility, and then go over certain entries in the document

24   with Agent Jason Costello.

25         THE COURT:  Well, look those over, then, when you

1  you've got -- you'll have an opportunity, and then determine

2  whether you want to object to them or not.

3          MR. MURPHY:  Yes, Your Honor.

4          THE COURT:  Okay.

5          MR. MURPHY:  Thank you.

6          THE COURT:  Good evening.

7          MR. MURPHY:  Your Honor, will some of my documents be

8  safe here overnight on the desk?

9          THE COURT:  In the courtroom?

10          MR. MURPHY:  Yes.

11          COURTROOM DEPUTY CLERK:  We'll lock the courtroom,

12  Your Honor.

13          THE COURT:  Well, is that what you have?

14          MR. MURPHY:  I have all this.

15          THE COURT:  What's on the surface?

16          MR. MURPHY:  I'm taking this back to jail with me.

17  All this stuff, right here, is going to stay in the court for

18  tomorrow.

19          COURTROOM DEPUTY CLERK:  I'll stick them in the back

20  room, Your Honor.  I can take them back in the robing room.

21          MARSHAL:  You can lock them in the cell block as

22  well.

23          THE COURT:  I'm concerned that some people --

24          MARSHAL:  I'm the only one with the keys to that,

25  Your Honor.

1          THE COURT:  I'm concerned if it would be open -- do

2     we have a big box to put that in?  Probably not.

3          COURTROOM DEPUTY CLERK:  We could lock it in the cell

4     block.

5          MARSHAL:  Yes.

6          COURTROOM DEPUTY CLERK:  Okay.

7          LAW CLERK:  You'll take care of it?

8          MARSHAL:  Yes.

9          THE COURT:  Okay.

10          (Whereupon, the proceedings were adjourned for the

11     day at 5:55 p.m.)

12                              - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

United States of America

Southern District of Ohio

          We, Georgina L. Wells and Denise N. Errett, Official

Court Reporters of the United States District Court for the

Southern District of Ohio, do hereby certify that the foregoing

227 pages constitute a true and correct transcription of our

stenographic notes taken of the proceedings held in the City of

Columbus, Ohio, in the matter therein stated, on the 17th day

of October, 2011.

          In testimony whereof, we hereunto set our hands on

the 23rd day of March, 2012.




                                   /s/ Georgina L. Wells

                                   _____
                                   Georgina L. Wells, RMR
                                   Official Court Reporter
                                   Southern District of Ohio


                                   /s/ Denise N. Errett, FCRR

                                   _____
                                   Denise N. Errett, FCRR
                                   Official Court Reporter
                                   Southern District of Ohio