1      UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF OHIO
2              EASTERN DIVISION

3

4

UNITED STATES OF AMERICA,        )
5                                )      CASE NUMBER
                   PLAINTIFF,    )      2:11-CR-10(1)
6            VS.                  )
                                 )      COLUMBUS, OHIO
7    SEAN D. MURPHY,             )      OCTOBER 18, 2011
                                 )
8                  DEFENDANT.    )
   _____

9

10                       **VOLUME 2**
        **TRANSCRIPT OF THE JURY TRIAL PROCEEDINGS**
11        BEFORE THE HONORABLE GEORGE C. SMITH
          UNITED STATES DISTRICT JUDGE AND A JURY

12

13

14

15   APPEARANCES OF COUNSEL:

16   FOR THE PLAINTIFF:          SALVADOR DOMINGUEZ, AUSA
                                 HEATHER HILL, AUSA
17
     FOR THE DEFENDANT:          SEAN MURPHY, PRO SE
18                               DAVID GRAEFF, STAND-BY COUNSEL

19

20

21

22

23

24        GEORGINA L. WELLS & DENISE N. ERRETT
            OFFICIAL FEDERAL COURT REPORTERS
25                  (614) 719-3225

1                          I-N-D-E-X

2                  VOLUME 2 – OCTOBER 18, 2011

3      WITNESSES:                                      PAGE NO.

4      JANET HONEY        –  Direct Ex. by Mr. Dominguez....     4
                          –  Cross-Ex. by Mr. Murphy........    10
5                         –  Redirect Ex. by Mr. Dominguez..    10

6      KENNETH HOPKINS    –  Direct Ex. by Ms. Hill.........    11
                          –  Cross-Ex. by Mr. Murphy........    26
7
       JAMES DANIELS      –  Direct Ex. by Mr. Dominguez....    31
8                         –  Cross-Ex. by Mr. Murphy........    46

9      GLEN BLANKENSHIP    – Direct Ex. by Mr. Dominguez....    54
                          –  Cross-Ex. by Mr. Murphy........    84
10
       PETER MALIONEK     –  Direct Ex. by Mr. Dominguez....    91
11                        –  Cross-Ex. by Mr. Murphy........    98

12     SUSAN ROBSHAW      –  Direct Ex. by Mr. Dominguez....   100
                          –  Cross-Ex. by Mr. Murphy........   117
13                        –  Redirect Ex. by Mr. Dominguez..   131

14     ANGELA LOWE        –  Direct Ex. by Ms. Hill.........   133
                          –  Cross-Ex. by Mr. Murphy........   140
15
       HELMUT HAGAN       –  Direct Ex. by Mr. Dominguez....   148
16                        –  Cross-Ex. by Mr. Murphy........   157
                          –  Redirect Ex. by Mr. Dominguez..   158
17
       KRISTIN KOCH       –  Direct Ex. by Mr. Dominguez....   159
18                        –  Cross-Ex. by Mr. Murphy........   166

19     STEVEN WOHLGEMUTH  –  Direct Ex. by Mr. Dominguez....   167
                          –  Cross-Ex. by Mr. Murphy........   176
20
       MICHAEL McCALL     –  Direct Ex. by Mr. Dominguez....   177
21                        –  Cross-Ex. by Mr. Murphy........   182

22     JASON COSTELLO     –  Direct Ex. by Mr. Dominguez....   190
                          –  Cross-Ex. by Mr. Murphy........   197
23                        –  Redirect Ex. by Mr. Dominguez..   201
                          –  Recross-Ex. by Mr. Murphy......   206
24
       SEAN MURPHY        –  Direct Ex. by Mr. Dominguez....   209
25                        –  Cross-Ex. by Mr. Murphy........   212

1          Tuesday Morning Session

2          October 18, 2011

3          9:30 a.m.

4          – – –

5    IN OPEN COURT:

6          (Whereupon, the Jury was seated in the courtroom at

7    9:37 a.m.)

8          THE COURT:  Good morning.

9          JURORS:  Good morning.

10         THE COURT:  Mr. Dominguez, you may call your next

11   witness.

12         MR. DOMINGUEZ:  We do indeed, Your Honor.

13         Janet Honey, Your Honor.

14         (Whereupon, the witness was sworn in by the Courtroom

15   Deputy Clerk.)

16         THE COURT:  You may proceed.

17         MR. DOMINGUEZ:  Thank you, Your Honor.

18         – – –

19                    JANET HONEY,

20   AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

21         – – –

22                DIRECT EXAMINATION

23   BY MR. DOMINGUEZ:

24   Q.   Ma'am, would you please state your name?

25   A.   Janet Honey.

1  Q.   And, ma'am, Ms. Honey, is your name spelled as in honey,

2  the --

3  A.   Yes, H-O-N-E-Y.

4  Q.   Okay.  Where are you presently employed, ma'am?

5  A.   Residence Inn, Memphis Downtown.

6  Q.   And what are your duties there?

7  A.   I'm the controller.  I'm the administrative assistant, the

8  property accountant, HR manager.  Mostly, I take care of all

9  the records.

10  Q.   And how long have you been employed there, ma'am?

11  A.   Seven, almost eight, years.

12  Q.   And as Residence Inn, you, in particular, and your staff,

13  are you trained to enter information into a computer system

14  with accuracy as to guests who reside there overnight or reside

15  there over a period of time?

16  A.   Yes.

17          MR. DOMINGUEZ:  May I approach, Your Honor?

18          THE COURT:  You may.

19  BY MR. DOMINGUEZ:

20  Q.   Ma'am, I've just handed you what has been marked for

21  identification purposes and labeled Government's Exhibits 2-1

22  and 2-2.  I ask you to take a moment, please, and look those

23  over.

24  A.   (Witness complies.)

25  Q.   Do you recognize, those, ma'am?

1   A.   I do.

2   Q.   And what is Government Exhibit 2-1?

3   A.   It is called a folio, which is created at the time the

4   guest checks into the hotel.

5   Q.   And that is -- is that a record that is entered into your

6   computer system at the time that the person actually checks in

7   and checks out?

8   A.   Yes.

9   Q.   And is that document maintained in your system of records

10  in the normal course of business?

11  A.   Yes, it is.

12  Q.   And Government Exhibit 2-2, ma'am, particularly the first

13  page thereof, do you recognize anything on that document?

14  A.   I do.  The front desk associate's signature where she

15  accepted a package that was delivered from FedEx.

16  Q.   You recognize that signature?

17  A.   I do.

18  Q.   And you recognize that signature as whose signature?

19  A.   Olga -- I'm sorry.  I cannot pronounce her last name.

20         THE COURT:  Spell it.

21         THE WITNESS:  S-A-P-A-G-E-A.

22  BY MR. DOMINGUEZ:

23  Q.   And do you know who Olga, with that spelling of the last

24  name, is?

25  A.   Yes.  She's our front desk associate.

1  Q.   And you've seen her signature before, ma'am?

2  A.   Many times.

3       MR. DOMINGUEZ:  May I approach, Your Honor?

4       THE COURT:  Yes.  You may continue to approach.

5       MR. DOMINGUEZ:  Thank you, Your Honor.

6  BY MR. DOMINGUEZ:

7  Q.   For the record, ma'am, I'm now displaying Government

8  Exhibit 2-1 that you just identified.  Now, in your system of

9  records, are you required to place the name and the address of

10 your guest residents?

11 A.   Yes.

12 Q.   And who was a guest resident on this document?

13 A.   David -- Mr. David Nassor.

14 Q.   And based on this record, ma'am, does it have a date of

15 arrival?

16 A.   The date of arrival is December the 1st, 2008.

17 Q.   And does it have a date of departure?

18 A.   Yes, December the 3rd, 2008.

19 Q.   And I see that there is a total bill associated with this

20 transaction, ma'am.  And what is that?

21 A.   $440.73.

22 Q.   For a two-night stay?

23 A.   Two-nights stay, plus incidentals.

24 Q.   When you say "incidentals," are you referring to the

25 itemized input there on that page?

1   A.   Yes, package food and movies.

2   Q.   I'm entering the second page of Government Exhibit 2-1

3   there, ma'am.  And what does this reflect?

4   A.   This reflects the name, the initials, of the clerk that

5   checked him in, and it also reflects the check-out time.

6   Q.   Okay.  And the -- would that be the check-in time, or the

7   book date, is December 1st of 2008?

8   A.   Yes.

9   Q.   And do you recognize -- when you say the initials of the

10   check-in clerk, who is that, ma'am?

11   A.   That's Jessie Broom (phonetic).

12   Q.   And the last page of Government Exhibit 2-1, ma'am?

13   A.   It shows Carl Washington as the associate who checked Mr.

14   Nassor out at 13:02.

15   Q.   Now, you stated for this record that you've been employed

16   there in your present capacity at Residence Inn for a number of

17   years.  At that hotel, ma'am, on occasion, do customers or

18   guests actually receive packages shipped to them from entities

19   like UPS, Federal Express, Express Mail?

20   A.   Yes.

21   Q.   And do you have a procedure for your receipt of those

22   items?

23   A.   Actually, the only procedure that we have is that, when

24   the delivery person arrives, we check the name on the package

25   going into the system and make sure that the guest is in the

1  hotel and sign for the packages.  We also at that time either

2  call the room and let the guest know that we have a package for

3  them.

4  Q.   Showing you, ma'am, what you've already identified as

5  Government Exhibit 2-2, Federal Express package receipt, you

6  see the square box with Olga's signature in it?

7  A.   I do.

8  Q.   And based on that, what does that tell you?

9  A.   That Olga did sign for the delivery of the package on

10  December the 3rd at 8:58.

11  Q.   And does it designate the recipient of that package,

12  ma'am?

13  A.   It does.  The recipient is Mr. David Nassor.

14  Q.   And is that the same -- well, is that the name that was on

15  the folio that you've testified about, 2-1?

16  A.   Yes, it is.

17  Q.   Ma'am, are you at all familiar with Federal Express?

18  A.   Yes, I'm very familiar with Federal Express.  My husband

19  works for Federal Express.

20  Q.   Does he work for Federal Express in Memphis?

21  A.   He does.

22  Q.   And is there any special characteristics with respect to

23  Federal Express in Memphis, Tennessee?

24  A.   Yes.  Federal Express in Memphis, Tennessee, is the main

25  hub for Federal Express, also called the World Headquarters.

1          THE COURT:  You say it's the world headquarters?

2          THE WITNESS:  Yes, sir.

3          THE COURT:  Thank you.

4          MR. DOMINGUEZ:  May I have a moment, Your Honor?

5          THE COURT:  Yes.

6          (Whereupon, there was a brief interruption.)

7          MR. DOMINGUEZ:  Your Honor, that would conclude my

8     direct examination of this witness.

9          THE COURT:  Mr. Murphy?

10                              - - -

11                         CROSS-EXAMINATION

12     BY MR. MURPHY:

13     Q.    Good morning.

14     A.    Good morning.

15     Q.    You just looked at what the government put down as

16     Government's Exhibit 2-1.  How many number of guests checked

17     into that room that day?

18     A.    Just one.

19     Q.    It was just one?

20     A.    Yes.

21     Q.    And on that exhibit, there was a list of things that the

22     person in that room purchased while he was there?

23     A.    That's correct.

24     Q.    And just one note that I'd like to make, on December 8th,

25     right here, he, Mr. Nassor, ordered a beer?

1  A.   That's correct.

2  Q.   Okay.  And the total bill was $440?

3  A.   Yes, sir.

4  Q.   Do you know if that bill was paid by cash or a credit

5  card?

6  A.   It was paid by a Discover credit card.

7  Q.   And is it your policy that the credit card be in the name

8  of the guest that checked in?

9  A.   Our policy is that we check the credit card and a photo ID

10 at check-in to match the name on the reservation.

11 Q.   So, it would be your understanding that Mr. David Nassor

12 used his credit card to pay for these services?

13 A.   That's our policy.  Yes, sir.

14 Q.   Okay.

15      MR. MURPHY:  Thank you very much.  I have no further

16 questions.

17      THE COURT:  Thank you.

18      Anything further?

19      MR. DOMINGUEZ:  Sir, just one clarification.

20      THE COURT:  Okay.

21                - - -

22                REDIRECT EXAMINATION

23 BY MR. DOMINGUEZ:

24 Q.   So the record is clear, I believe you were asked about a

25 purchase of the beer, and I believe the question was December

1  8th.  But isn't it a fact that --

2  A.   It's up a little ways.  It's December the 1st, actually,

3  2008.

4          MR. DOMINGUEZ:  Thank you.

5          No further questions, Your Honor.

6          THE COURT:  You may step down.  Thank you very much.

7          THE WITNESS:  Thank you.

8          (Whereupon, the witness was excused.)

9          THE COURT:  Mr. Dominguez?

10         MR. DOMINGUEZ:  Yes, Your Honor.  Ms. Hill will be

11 directing the next witness.

12         THE COURT:  All right.

13         MS. HILL:  Kenneth Hopkins, Your Honor.

14         (Whereupon, the witness was sworn in by the Courtroom

15 Deputy Clerk.)

16         THE COURT:  You may proceed, Ms. Hill.

17         MS. HILL:  Thank you, Your Honor.

18                        - - -

19                    KENNETH HOPKINS,

20 AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

21                        - - -

22                  DIRECT EXAMINATION

23 BY MS. HILL:

24 Q.   Good morning, sir.  Could you please tell us your name and

25 spell your last name for the record?

1   A.   Kenneth Robert Hopkins, H-O-P-K-I-N-S.

2   Q.   Thank you.

3      Now, Mr. Hopkins, do you live here in the general Columbus

4  area?

5   A.   Yes, I do.

6   Q.   And are you currently employed?

7   A.   Yes.

8   Q.   Where do you work?

9   A.   Brink's.

10   Q.   And where is Brink's located?

11   A.   Essex Avenue, Columbus, Ohio.

12   Q.   Okay.  How long have you worked for Brink's?

13   A.   Over eight years.

14   Q.   And what is your official job title?

15   A.   Messenger/courier.

16   Q.   And has that been your title for the whole time that

17  you've worked for Brink's?

18   A.   Mostly.

19   Q.   Can you describe to us what your duties are as a

20  messenger/courier at Brink's?

21   A.   I always tell people I'm the guy in the back of the truck

22  with the bag.  So, I deliver -- I deliver the money, pick up

23  the money; I service ATMs, various jobs like that, for Brink's.

24   Q.   And do you have a set schedule that you work every week,

25  or does it vary?

1  A.    I do.  I work Monday through Friday.

2  Q.    And has that been your schedule the whole time that you've

3  worked at Brink's?

4  A.    No.  For most of the time I've been there, I worked Sunday

5  through Thursday.

6  Q.    And was there a particular time that you generally arrived

7  to start work?

8  A.    On Sunday, at 9:30 usually.

9  Q.    Now, were you working that Sunday-through-Thursday

10  schedule in January of 2009?

11  A.    Yes, I was.

12  Q.    I want to draw your attention, specifically, to the time

13  period of January 17th and January 18th of 2009.  Now, were you

14  scheduled to work either of those days?

15  A.    The Sunday.

16  Q.    January 18th, was that a Sunday?

17  A.    Yes.

18  Q.    And were you scheduled to arrive at 9:30 on that Sunday?

19  A.    Yes.

20  Q.    And about what time did you actually arrive there on

21  January 18th?

22  A.    Right around 9:30.

23  Q.    Were you the only one that arrived there at that time?

24  A.    No.  There were three others.

25  Q.    Did you all arrive at the same time?

1  A.    Roughly within a few minutes of each other.

2  Q.    Did you go immediately into the Brink's, and is this a

3  warehouse?

4  A.    It's a warehouse, combo, office.

5  Q.    Did you immediately go into the warehouse when you first

6  arrived?

7  A.    No.  We wait for everybody to get there.  Once all four of

8  us have arrived, then we all proceed to enter the building

9  together.

10  Q.    So, what happened when everyone arrived and you went to go

11  into the building?

12  A.    We entered through the employee gate with the set of keys,

13  opening keys, that one of us has.  And then we attempted to

14  open the door to get into the building.

15  Q.    Now, how many doors are there, actually, to the Brink's

16  facility?

17  A.    There is two that we could enter and exit, then two garage

18  doors.

19  Q.    And which -- was there a specific door that you tried to

20  enter that morning?

21  A.    The one that we always try to enter is the north door.

22  Q.    Were you able to get into the building through that door

23  that morning?

24  A.    No, we were not.

25  Q.    What happened when you tried to open it?

1  A.   We just weren't able to get it open.  I thought perhaps

2  that the door had frozen.  It was very cold that day.  It had

3  been cold during that time period.  The door had frozen

4  recently.  So we thought maybe that was the issue again.

5  Q.   When you say "recently," a couple of days before?  A week

6  before?

7  A.   Sometime within that, I believe, the previous week or

8  something.  It was recently that I, that we, had attempted to

9  get in, and the door was frozen.  So, we thought maybe, maybe

10 the door had frozen again.  So, but each one of us took turns

11 trying to get in, and there was no success on that.  So we then

12 called the transportation manager.

13 Q.   And who is that?

14 A.   Don Driver.

15 Q.   And what happened after you called him?

16 A.   We waited in the car for him to get there, maybe 20

17 minutes.  I don't know exactly how long it took him to get

18 there.  Then he attempted to enter the north door without

19 success.  And at that time, then we decided to go through the

20 south.  We went over to the south gate, and we'd noticed that

21 the chain was off the gate.

22 Q.   And what did you think -- well, first of all, can you

23 describe -- you said "the chain."  Is that a locking chain or

24 some other sort of a chain?

25 A.   The chain to the motor that opens and closes the gate from

1  the inside.

2  Q.   And what did you think when you saw that chain off the

3  gate?

4  A.   I was in denial.  I thought maybe that the chain had

5  broken, too, because it was cold.  It's a possibility.

6  Q.   So, were you able to open that gate?

7  A.   Yes.  The gate opened right up.  Like I said, then we

8  noticed that the chain was off of it.  So, we all entered

9  through, entered through the south gate, and we attempted to

10  enter what would be the front door, which is the door on the

11  south side.  And we couldn't get in that as well.

12      Then I thought there is no way that both doors were

13  frozen.  So, we kind of -- we wandered around for a little bit.

14  And then Don decided to go ahead and try the south garage door.

15  And it was then I noticed that there was coin laying on the

16  ground, which I thought was extremely unusual.  Then I knew

17  something was, wasn't, quite right.

18  Q.   Why did you think that was so unusual?

19  A.   Well, our coin guy, Bob, is very meticulous.  And I

20  thought, with the amount of coin where it was laying out there,

21  it wasn't right.  Something was wrong with that.  So, I

22  think -- I think then Don said, Well, okay, let's go ahead and

23  open up the door.

24  Q.   Which door was he talking about at that point?

25  A.   The south garage door.

1  Q.   And when he tried that door, did it actually open?

2  A.   Yes.  It opened right up.

3  Q.   And was that normal for it to open right up like that?

4  A.   No.

5  Q.   Okay.  Was there a normal procedure that you have to go

6  through in order to open that door?

7  A.   Normally, it opens from the inside.  The door just -- it

8  opened, manually, right up.  We just lifted it up.  And then,

9  when we did that, a bunch of smoke came billowing out.  It was

10 an incredible amount of black smoke.  So, once that cleared up,

11 we saw the -- we saw the damage.

12 Q.   Okay.  Sir, I'm going to direct your attention to the

13 screen in front of you in what has been previously identified

14 as Government's Exhibit 1A-25.  Do you recognize what's

15 depicted in that photograph?

16 A.   Yes.  That is the south garage door.

17 Q.   And is that the door you were just talking about that you

18 entered from?

19 A.   That is the door we entered from.

20 Q.   And is that the way this area looked when you first

21 arrived?

22 A.   Yes, minus the smoke.

23 Q.   Now, is there anything unusual about the way this area

24 looked?

25 A.   Absolutely.  The doors to the trucks are open.  There is a

1  ladder sitting there.  It's just -- it --

2  Q.    The ladder would not normally be there?

3  A.    No.  No.

4  Q.    Now, you mentioned some coin that you saw earlier?

5  A.    Yes.

6  Q.    Does this photograph depict where you saw that coin?

7  A.    Where I saw the coin was just in front of the garage door.

8  There was --

9  Q.    I'm going to draw a circle.

10  A.    Yeah.  Right around in that area, there was coin laying

11  out there.  And I thought that was -- like I said, I thought

12  that was extremely unusual.  Our coin guy would never allow

13  that.

14  Q.    And did you notice what kind of coin that was?

15  A.    It was larger coin.  It looked to be either half-dollars

16  or dollars.  They weren't -- they weren't quarters or pennies

17  or anything that, I remember.

18  Q.    Now, once you actually walked in through that garage door,

19  did you notice anything else odd in that general area right

20  there when you first walked in?

21  A.    Yes.  It was -- there was a truck that was out of place.

22  All the truck doors were open.  There was -- there was a bin

23  knocked over.  There was coin laying everywhere.  There was --

24  the -- there was smoke.  There was money, money floating around

25  that was still on fire, or smoldering.  There was the -- the

1    security systems on the wall had been broke, broken, torn down.

2    There was electrical burns on the wall.

3         Then we walked into the building, and I think we'd noticed

4    then that there was a hole right in front of the turret.  That

5    was the next thing we noticed.

6              THE COURT:  Right in front of what, sir?

7              THE WITNESS:  The guard shack that lets everybody in

8    and out.

9    BY MS. HILL:

10   Q.   You said that there was money still on fire?  Where was

11   that that you saw?

12   A.   It was in the garage.  It was kind of floating around and

13   burning up.

14   Q.   In the air?

15   A.   Yeah.  It was floating around.  There was some on the

16   ground.  There was money everywhere.  It looked like there had

17   been coins spilled.

18   Q.   Throughout the area?

19   A.   Yes.  Yes, over by the coin area.  The truck -- the truck

20   out of place, too, was very noticeable.

21   Q.   Now, I want to show you what, again, has been previously

22   identified as Government's Exhibit 1A-26.  Do you recognize

23   what's depicted in this photograph?

24   A.   Yes.  That's the -- that's the south garage door area.

25   That's the ladder, and there's the pull cord from the garage

1  door, which shouldn't be laying on the ground.

2  Q.   Where should it be?

3  A.   Attached to the garage door.

4  Q.   And is that where it was when you first walked into that

5  garage door --

6  A.   Yes.

7  Q.   -- the morning of January 18th?

8  A.   Yes.

9  Q.   And what is, generally, the purpose of that little -- that

10  pull?

11  A.   It releases the garage door so that you can manually --

12  manually lift it up and down.

13  Q.   Now, I'm going to show you what has, again, previously

14  been identified as Government's Exhibit 1A-30.  Now, do you

15  recognize what's depicted in that photograph?

16  A.   Yes.  That's -- when you go into the south door, there is

17  an area over to the left.  There is two more -- there is a dock

18  area there.  And there's the truck -- the truck is sitting in

19  an area where it's not supposed to be in.  Normally, there is

20  no truck there.

21  Q.   So, the truck that's depicted in this picture, --

22  A.   Yes.

23  Q.   -- that's not normally where it's parked?

24  A.   No.

25  Q.   Do you guys ever park trucks in that dock area?

1  A.   No, not anymore.

2  Q.   So, that was unusual for it to be there that morning?

3  A.   Oh, absolutely, yes.  It's not supposed to be there.

4        THE COURT:  Is that your truck?

5        THE WITNESS:  The Brink's truck?

6        THE COURT:  Brink's truck.

7        THE WITNESS:  Yes.

8  BY MS. HILL:

9  Q.   All right.  And you had discussed earlier, you said, that

10 the trucks -- you observed a truck that was open?

11 A.   Yes.

12 Q.   I'm going to draw your attention to Government's Exhibit

13 1A-195.  Now, do you recognize what's depicted in this

14 photograph?

15 A.   Yes.  It's a truck with the door open, which is -- which

16 is very out of place.  We don't leave the doors open on the

17 trucks.

18 Q.   And this is one of the Brink's trucks that was in the

19 warehouse that morning?

20 A.   Yes.

21 Q.   And this is how the doors were when you saw that truck?

22 A.   Yes.  The doors were open.

23 Q.   Now, was there anything inside of those trucks?

24 A.   There's box coin in there.

25 Q.   And did you happen to notice what kind of coin it was that

1  was in there?

2  A.   Well, right up front there, there is at least a couple of

3  boxes of quarters.

4  Q.   And did you happen to notice when you were looking at

5  those trucks on the morning of January 18th whether all of the

6  trucks had coin in them?

7  A.   Not for sure.  There were trucks with coin in them,

8  though.  Those would have been closed.

9  Q.   And did you observe whether any of those appeared to have

10 been moved or disturbed at all?

11 A.   It didn't look to me as though they had been, they had

12 been disturbed.

13 Q.   And did you notice was it all the smaller denomination

14 coins, or were there any of the larger denomination coins that

15 you noticed on those trucks?

16 A.   I didn't notice that there were any larger denominations.

17 Q.   And then, sir, if you could look at what's been previously

18 identified as Government's Exhibit 1A-122, do you recognize

19 what's depicted in that photograph?

20 A.   Yes.  It's a truck with the door open and a bin with keys

21 in it, which was not supposed to be there.  We don't keep --

22 those are spare truck keys.  If you see the number on the

23 front, that would match with the corresponding truck.

24 Q.   Where were those keys, the bins of keys, usually kept?

25 A.   Usually in the vault.

1  Q.   So, it was unusual for them to be in a truck?

2  A.   Yeah, absolutely.  They are not supposed to be in the

3  truck.

4  Q.   Did you observe the bins there as they look in this

5  photograph on the morning of January 18th?

6  A.   Yes, we noticed those.

7  Q.   Now, I want to talk a little bit about those keys.  Is

8  there anything specialized or unusual about the method that you

9  use the keys for a Brink's truck to open it, unlock it, or turn

10 it on?

11 A.   To open it originally, you would have to open the hood of

12 the truck and hit a release switch in there while you were

13 turning the key at the same time to get into the front of the

14 truck.  You can't just go up to it and turn the key and get

15 into the truck.

16 Q.   And in order to actually get into the back of the truck

17 and open that up, would you first have to be able to get the

18 front driver's door open?

19 A.   You would either have to do that, or you would have to hit

20 the release that's in the front of the truck.  There is a

21 release for all the doors in the front.

22 Q.   Drawing your attention to Government's Exhibit 1A-71, do

23 you recognize what is depicted in this photograph, sir?

24 A.   Yes.  It's a forklift.  It's sitting in an area it would

25 not normally be sitting, with the lift up, which is highly

1  unusual as well.

2  Q.   Okay.  And was this how it looked when you saw this area

3  on the morning of January 18th?

4  A.   Yes.

5  Q.   Government's Exhibit 1A-72, do you recognize what's

6  depicted in this photograph?

7  A.   Yes.  It's coin sitting on the lift, loose coin.

8  Q.   Now, is that the same forklift that we just saw in

9  Government's Exhibit 71 here?

10  A.   Yes.

11  Q.   And did you see this coin on the forklift on the morning

12  of January 18th?

13  A.   Yes.  There's -- there's coin everywhere.

14  Q.   And did you happen to notice the denomination of the coin

15  that was on that forklift?

16  A.   It looks like halves or, at the very least, quarters.

17          MS. HILL:  Court's indulgence, Your Honor.

18  BY MS. HILL:

19  Q.   All right.  Mr. Hopkins, you said that you tried both the

20  north and south doors, and you were not able to open those

21  doors on the morning of January 18th, right?

22  A.   That is correct.

23  Q.   Did you ever at any time when you were walking through the

24  warehouse determine why you were not able to get those doors

25  opened?

1  A.   We did -- we did look into -- we looked through the one

2  door to see the door that we had attempted to enter and noticed

3  that there was some kind of what looked like sealant on the

4  doors.

5            THE COURT:  Sealant?

6            THE WITNESS:  Some kind of epoxy looking --

7            THE COURT:  Epoxy?

8            THE WITNESS:  Yeah.  It's something that did not look

9  like it belonged there.

10  BY MS. HILL:

11  Q.   I'm going to show you -- and you'll have to excuse the

12  exhibit sticker being upside down -- Government's Exhibit

13  1A-141.  Do you recognize what is depicted in this photograph,

14  sir?

15  A.   Yes.  That is one of the doors, and that's the -- that's

16  the sealant, epoxy, that we saw on there.

17  Q.   I'm going to point out are you talking about this area

18  right here (indicating)?

19  A.   Yes.

20  Q.   Okay.

21  A.   And especially up at the top, that's -- that would be

22  highly unusual.

23  Q.   In this area here (indicating)?

24  A.   Yes.

25  Q.   And this area, here, is the epoxy that you're talking

1   about (indicating)?

2   A.   Yeah, extremely noticeable.

3          MS. HILL:  I have no further questions, Your Honor.

4          THE COURT:  Thank you.

5          Mr. Murphy.

6          MR. MURPHY:  Thank you, Your Honor.

7                       - - -

8                 CROSS-EXAMINATION

9   BY MR. MURPHY:

10  Q.   Good morning, Mr. Hopkins.

11  A.   Good morning.

12  Q.   You testified that you appeared at work that morning about

13  9:30?

14  A.   Roughly in that area.  That's our opening.

15  Q.   And how long did it take you before you actually opened

16  that south door garage and got in?

17  A.   I'm not sure exactly because we -- we kind of lost track

18  of time from the time that we called Don, him getting there.

19  We'd tried several times to get into both sides of the doors.

20  So --

21  Q.   So, I mean, a rough estimate.  If you got there at 9:30,

22  would you say 10:30, 11:00?

23  A.   It could be within that area.  Probably -- probably in --

24  within the hour is my guess.

25  Q.   When you were there, did you see anyone in the area that

1  was out of place?

2  A.   Anyone?

3  Q.   (Nodding affirmatively.)

4  A.   No.

5  Q.   No persons?  You didn't observe any persons in the area?

6  A.   No, not that I was aware of.

7  Q.   Okay.

8  A.   I didn't -- I didn't look, specifically, for anybody to be

9  there, though, that morning.

10  Q.   And you were the first one on site?

11  A.   No, I was not.

12  Q.   Oh, you were not?  Okay.

13  A.   I was -- I was at least second or third.

14  Q.   Okay.  You testified that, when you went in, you saw

15  smoldering money in the garage area?

16  A.   Yes.

17  Q.   So that would indicate that it was still on fire?

18  A.   It was -- it was burning.

19  Q.   Did you guys touch any of that money?

20  A.   No.

21  Q.   Okay.  You also testified that there was a ladder in the

22  front of the garage when you first got there?

23  A.   Yes.

24  Q.   Did that ladder belong to Brink's, or was it just out of

25  place and left there?

1  A.   I don't know if it belongs to Brink's.  There should not

2  have been a ladder in front of the door.  That's highly

3  unusual.

4  Q.   So, it's your testimony that you don't know, or it didn't

5  belong to Brink's, or you don't know?

6  A.   I don't know if it was Brink's' property or not.  We have

7  similar ladders.  So --

8  Q.   You have similar ladders?

9  A.   Yes.

10  Q.   That looked like to be a tall -- how tall was that ladder?

11  A.   I'm not sure.  Everything looks tall to me.

12  Q.   Okay.

13  A.   I'm not good at gauging height.

14  Q.   Now, I'm going to show you an exhibit here.  Do you

15  recognize this photo?

16  A.   That looks to be the inside of the vault.

17  Q.   Through --

18  A.   -- the safe door.

19  Q.   Did you get to observe the safe door upon arrival into the

20  building?

21  A.   I peaked in through the window, but did not go into the

22  room.  I saw that the safe door was still -- it was on fire.

23  Q.   Well, did you notice the safe door as it appeared when you

24  entered the building?

25  A.   Safe --

1  Q.   When you peaked through the window, you looked at it.  So

2  as -- as the safe door appeared when you entered the building?

3  A.   Okay.  It was -- if you're asking -- yes, it was on fire,

4  if that's what you mean.  I don't -- I don't understand the

5  question.

6  Q.   This picture right here (indicating), is this how the door

7  appeared?

8  A.   No.

9  Q.   It's not?

10 A.   No.  It was still on fire.

11 Q.   I'm talking about the hole in the door.

12 A.   I'm not sure how large the door was.  Once again, it

13 was -- it was on fire.  So, I couldn't -- I couldn't gauge a

14 size of the hole that was in the door.

15 Q.   Okay.  Thank you.

16      What is this a picture of, Mr. Hopkins?

17 A.   That is one of the safes in the room outside of the vault.

18 Q.   And is this the way the safe normally looks?

19 A.   No.

20 Q.   Has it been altered at all?

21 A.   Yes.  There is some kind of foreign substance on the safe

22 door.  And the lock that was on it is off.

23 Q.   Okay.  Was this safe entered that you know of?

24 A.   Not that I know of.

25 Q.   Okay.  And you noticed that the lock, which a -- right

1    here (indicating), this appears to be something right here.

2    A.    That is the key that we use in combination with the combo

3    side of the lock.

4    Q.    Okay.  And this area right here in the middle

5    (indicating), that would be the lock?

6    A.    That was -- that would be where the lock is supposed to

7    be.

8    Q.    And would that be another key lock, a combination, a

9    digital pad?

10   A.    It would be some type of combination lock.

11   Q.    Like a spin combination lock?

12   A.    Yes.

13   Q.    Okay.  During the time of the morning of January 18th, did

14   anybody come in and work on the main vault?

15   A.    We had called the police and the fire department, and they

16   came in to put out whatever remaining fire was there.

17   Q.    Okay.  And that's all they did, was put out the fire?

18   A.    That's all I'm aware of.  At that time, I was -- I was

19   instructed to guard the door that they were coming in through,

20   which was the south garage door.

21              MR. MURPHY:  Okay, Mr. Hopkins.  Thank you very much.

22              THE WITNESS:  Thank you.

23              THE COURT:  Anything further, Ms. Hill?

24              MS. HILL:  No, Your Honor.

25              THE COURT:  You're excused.  Thank you very much.

1        THE WITNESS:  Thank you.

2        (Whereupon, the witness was excused.)

3        MR. DOMINGUEZ:  James Daniels, Your Honor.

4        THE COURT:  James Daniels.

5        (Whereupon, the witness was sworn in by the Courtroom

6   Deputy Clerk.)

7        THE COURT:  You may examine.

8        MR. DOMINGUEZ:  Thank you, Your Honor.

9                        - - -

10                    JAMES DANIELS,

11   AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

12                        - - -

13                  DIRECT EXAMINATION

14   BY MR. DOMINGUEZ:

15   Q.   Sir, would you state your name for the record?

16   A.   James Daniels.

17   Q.   Mr. Daniels, where are you presently employed?

18   A.   At Brink's, armored guard.

19   Q.   How long have you been employed at Brink's?

20   A.   For 19 years.

21   Q.   And what are your present duties at Brink's?

22   A.   I am the vault supervisor.

23   Q.   And what do you do as a vault supervisor, sir?

24   A.   Make sure all the monies that come into the vault go out

25   to the customers that they're supposed to go to.

1   Q.   And I'm going to try to project my voice, sir, to you.  So

2   perhaps in response, you can project to me so we can all hear

3   you.  Okay?

4   A.   Okay.

5   Q.   Very well.

6        How long have you been the vault supervisor there, sir?

7   A.   For 15 years.

8   Q.   And are you generally familiar with sums of money that are

9   in the vault on a general basis and on a daily basis?

10  A.   Yes.

11  Q.   If I may invite your attention to January 18th, sir, of

12  2009, were you scheduled to work that day?

13  A.   No, I was not.

14  Q.   Did you end up coming to work anyway?

15  A.   Yes, I was.  Yes, I did.

16  Q.   Why did you go to the Brink's facility on June (sic) 18th

17  of 2009, sir?

18  A.   I had had a phone call saying that my vault was on fire

19  and that I needed to come down.

20  Q.   Did you find that call to be unusual?

21  A.   Yes, I did.  I didn't believe it at first.  I made them

22  tell me again.  And I made sure that the -- they had to secure

23  the building first before I went there, because I am the vault

24  manager.

25  Q.   Okay.

1  A.    And --

2  Q.    And let me ask you this:  You said you've been at Brink's

3  how long?

4  A.    Nineteen years.

5  Q.    And you've been the vault manager, or supervisor, for 15

6  years?

7  A.    Yes.

8  Q.    What did you do before that, sir?

9  A.    I was either on the trucks as a messenger or driving the

10  trucks, also.

11  Q.    Are you familiar with Kenneth Hopkins?

12  A.    Yes.

13  Q.    In your first four or so years, did you perform the same

14  job function that he does now?

15  A.    Yes.

16  Q.    Very well.  Had there ever been a fire in the 19 years

17  that you've been there at the Brink's facility?

18  A.    Never.

19  Q.    Had there been any break-ins?

20  A.    Never.

21  Q.    Do you recall about the time that you arrived at the

22  Brink's facility there on January 18th of 2009?

23  A.    I would say around between 10:00 and 10:30.

24  Q.    Would you tell the ladies and gentlemen of this jury what

25  you first observed when you arrived, sir?

1  A.   When I first came, there was obviously a perimeter, the

2  cops.   When I went into the building, it was still dark, smoky,

3  from the fire.

4  Q.   When you say dark and smoky, none of us were there that

5  day, sir.

6  A.   Right.

7  Q.   So, if you could help take us there.   When you say dark

8  and smoky, what do you mean?

9  A.   Like from where -- from where there had been a fire,

10  someone was trying to put a fire out, the smoke from the fire

11  inside the garage and inside of the vault room once I got

12  inside the vault room.

13  Q.   Was there a distinct odor?

14  A.   Yes.   Yes, of burnt paper.

15  Q.   I believe you stated that the Columbus police and the fire

16  department were both there?

17  A.   Yes, they were.

18  Q.   And what was -- what did you observe representative

19  personnel from the fire department doing?

20  A.   Seemed like they were working on the vault door.   They

21  were trying to put the fire out, or put whatever was on fire

22  out.

23  Q.   Did you get a chance to observe -- did you go back to the

24  vault area and observe this, sir?

25  A.   For a second.   I was back there maybe -- maybe ten,

1   fifteen, seconds before I was, you know, ushered out and told

2   to go ahead and go up front while they handled their business

3   there in the vault room.

4           MR. DOMINGUEZ:  One moment, Your Honor.

5           May I approach?

6           THE COURT:  Yes.

7   BY MR. DOMINGUEZ:

8   Q.   Sir, for the record, I've just handed you what's been

9   marked for identification purposes and labeled Government's

10  Exhibit 1A-86, -87, -94, -95, -99, -105, -154, -157, -160,

11  -165, -166, and -167.  I ask if you would please take a moment

12  to review those items.

13  A.   (Witness complies.)

14  Q.   Do you recognize those, sir?

15  A.   Yes, sir.

16  Q.   Are those photographs from the interior of the Brink's

17  facility?

18  A.   Yes, they are.  In fact --

19  Q.   Do they appear to be photographs taken on January 18th of

20  2009 sometime in the morning hours?

21  A.   Yes, they are.

22  Q.   Have you seen those photographs before?

23  A.   We went over, yes, sir.

24  Q.   Do they fairly and accurately depict what you saw, as to

25  each photograph, on the date of January 18th of 2009?

1  A.   Yes, they do.

2        MR. DOMINGUEZ:  May I again approach, Your Honor?

3        THE COURT:  You may.

4  BY MR. DOMINGUEZ:

5  Q.   You are the vault supervisor.  Tell us, on a typical day

6  when someone has not set the facility on fire, what does the

7  vault room look like.  Tell the ladies and gentlemen of the

8  jury what the vault room looks like.

9  A.   Well, it's hard to describe.  I mean, there's a room.  We

10  have monies on the carts that are going to the customers.  We

11  have different carts for different runs that go to different

12  areas of the city.

13  Q.   Now, is that in the vault itself?

14  A.   At that time, yes, they are.  Yes.

15  Q.   Now, what about the vault?  Isn't there -- is there a

16  vault room that -- where the vault is actually contained?

17  A.   Exactly.  There is a vault room, and then there is the

18  vault itself.

19  Q.   And tell us about the setup of the vault room.

20  A.   The vault room is where we have our computers and

21  everything that we do to set up the runs and everything for the

22  monies to go out to the customers.  And we also check in, also,

23  in the vault room, check in the messengers bringing the monies

24  back from the street into the vault.

25  Q.   Showing you, sir, what has been marked for identification

1  purposes and labeled Government Exhibit 1A-86, do you recognize

2  that, sir?

3  A.   Yes, sir.  That's my vault door.

4  Q.   And when you say that's the vault door, is that the actual

5  vault, and behind that door is where the money is contained?

6  A.   That is correct.

7  Q.   Now, is this the appearance of the vault door after the

8  fire department had actually put out the fire?

9  A.   Yes, it is.

10 Q.   Showing you Government Exhibit 1A-87, sir, do you

11 recognize anything there?

12 A.   Yes.  That's the vault door again; also the wall next to

13 the vault door where all the drywall is off; and they were

14 trying to get in that way, also.

15 Q.   When you say that, they were trying to get in that way

16 also, what, what did you observe on January 18th, 2009, that

17 led you to believe they were trying to get in there also?

18 A.   The whole wall was destroyed.  I don't believe they

19 realized that the container of the vault, you can just go

20 through the wall and get there.

21 Q.   And I see equipment.

22 A.   Yes.  That's all our radios that we keep in contact with

23 the messengers.

24 Q.   Okay.  And what about this area here, sir (indicating)?

25 What is that typically?

1    A.    That's the alarm system.  It's right next to the vault

2    door.  We have two of them that we set up every evening.

3    Q.    Under normal circumstances, are those intact?

4    A.    Yes, they are.

5          Those are completely destroyed.

6    Q.    Completely destroyed?

7    A.    Yes.

8    Q.    Displaying Government's Exhibit 1A-94, sir, do you

9    recognize that?

10   A.    That is the actual vault door, itself, with the hole cut

11   into it.

12   Q.    Excuse me?

13   A.    With the hole cut into it.

14   Q.    Very well.  Now, was this taken after the fire department

15   actually put out the fire, sir?

16   A.    Yes.

17   Q.    Now, do you know whether or not the fire department had to

18   expand that hole in order to put the fire out?

19   A.    That, I don't know for sure.

20   Q.    You don't know for sure?

21   A.    No.

22   Q.    But you do know that there was a hole, --

23   A.    Yes.

24   Q.    -- initially, that led to the fire within the vault?

25   A.    Yes, I do.

1  Q.   Displaying for you, sir, 1A-95, that is Government's

2  Exhibit 1A-95.  Do you recognize that, sir?

3  A.   Yes.  That is the ceiling above the vault room itself,

4  where it seems like they came down the wall there on both

5  sides.  That's how they got inside the vault room.

6  Q.   Does there appear to be some --

7  A.   Footprints on the wall.

8  Q.   -- footprints on the wall?

9  A.   Yes, sir.

10  Q.   Now, you're not an expert analysis on crime scenes, but

11  from the naked eye, did there appear to be, on that day,

12  footprints on the wall?

13  A.   Oh, there was footprints.  I was in there.  I seen them.

14  Q.   Let me ask you this:  Were you familiar with any other

15  holes in the Brink's facility on the ceiling that day?

16  A.   Adjacent to this, on the other side of the wall that's on

17  the right, there's a coin room.  And there is also, I believe,

18  two holes over there, also.  And then there was a hole in the

19  garage in the roof.

20  Q.   And you had not seen those holes, any of the holes you've

21  described, prior to January 18th of 2009?

22  A.   No.  There were no holes prior to.

23  Q.   But when you saw this hole, you looked at the wall, and

24  you saw what appeared to be footprints on the walls?

25  A.   Yes.

1    Q.    Showing you Government Exhibit 1A-99, sir, do you

2    recognize that?

3    A.    Yes.  This is the vault room floor, the aftermath of all

4    the destruction.

5    Q.    Now, when you say "the vault room floor," so that the

6    jurors are aware of your testimony, what you are testifying

7    about, is this the room outside of the actual vault where the

8    money is contained --

9    A.    Yes, it is.

10   Q.    -- that you discussed earlier?

11   A.    Yes.  This is where all the computers were and everything

12   that we do before we put everything in the vault.

13   Q.    Do you recognize those -- do you recognize these items

14   (indicating)?

15   A.    The fire extinguishers?  Yes.

16   Q.    Do you know whose fire extinguishers those are?

17   A.    They're from around, around the building.  There was one

18   right by the vault room door as you go in.  I believe that was

19   one of them.  And I don't know where the other one came from.

20   But they were inside the building.

21        Also, the black hose is from a closet in the garage.

22   That's not normally there.  We don't need a black hose in the

23   vault.

24   Q.    Okay.  And when you saw -- when you observed the fire

25   department putting out the fire, sir, were they using fire

1   extinguishers?

2   A.   I believe they were using fire extinguishers.  I'm not

3   sure.  I can't, you know, say for sure.

4   Q.   Did you see them bring in the big hoses from the trucks?

5   A.   No.  They were already inside once I got there.  So --

6   Q.   1A-105, sir, do you recognize it?

7   A.   Yes.  This is my vault door, itself, from the outside

8   looking in.  The blue pouches and that cart right there

9   (indicating) had monies on it to go out Monday.

10   Q.   And that was further into the vault, the actual vault

11   itself?

12   A.   Yes, it is.  That's inside the vault itself.

13   Q.   Is that money back in the back still intact, or did it

14   catch fire?

15   A.   I believe the front of the cart is where most of the

16   damage was.  I don't know how far into that cart it got to.

17   Q.   Your recollection is that you were able to recover some

18   money that was still in the vault?

19   A.   Yes, definitely.

20   Q.   And had this not -- had the contents of the vault not been

21   ignited, there is a significant amount of money in the back of

22   the vault?

23   A.   Yes, definitely.  That's just a very small portion of it.

24   As a matter of fact, if you're looking at that picture, --

25   Q.   By all means.

1  A.   -- you can see how packed the vault was.  That's all the

2  way at the door.

3  Q.   Is that typical, sir?

4  A.   No.  This is, like, after the holidays.  So, no, it's not,

5  not typically right there.

6  Q.   A substantial amount of money was in the vault on that

7  particular occasion?

8  A.   Definitely.

9  Q.   And as a matter of fact, based on the amount of money in

10  there, the casings or the packaging was closer to the vault

11  door?

12  A.   Yes, sir.

13  Q.   And, therefore, it caused the ignition or igniting of the

14  money?

15  A.   Yes.

16  Q.   Government's Exhibit 154, sir, 1A-154, do you recognize

17  it?

18  A.   That's from the inside of the vault door, looking out into

19  the vault room.

20  Q.   Okay.  The vault room that we described earlier --

21  A.   Yes.

22  Q.   -- where the black hose and the fire extinguishers were on

23  the floor?

24  A.   Yes.  Yes.

25  Q.   Government's Exhibit 1A-157, sir?

1   A.   That's inside the vault itself, right inside the door

2   where the monies caught fire.

3   Q.   And on the floor -- we're creating a record here.  So, we,

4   obviously, can see the picture, but the court reporter is

5   taking down everything associated with your testimony.

6   A.   Yes.

7   Q.   On the floor of that vault room or -- strike that; not the

8   vault room -- of the vault, what's there on the floor?

9   A.   A significant amount of money that was burnt from that

10  cart, right there (indicating), that was right by the door.

11  Q.   Government Exhibit 1A-160, sir, --

12  A.   Yes, sir.

13  Q.   -- do you recognize anything there?

14  A.   This is also a picture like you just had, only this is a

15  little bit higher than the floor.  The floor will be right

16  below these containers of money right here (indicating) in

17  satchels.

18  Q.   And that's actually in the vault?

19  A.   Yes, it is.

20  Q.   And within these containers, sir, what is contained

21  therein?

22  A.   This is -- that's where money -- that's where most of the

23  money got burnt, from being in those containers right there.

24  That's what caught fire, along with the bags, the plastic bags.

25  Q.   Drawing a second circle, sir, --

1    A.    Yes, sir.

2    Q.    -- what's on the left there?

3    A.    That's also bags of money.

4    Q.    Now, how do you distinguish within -- unless it's a trade

5    secret -- you don't need to answer.  I'm telling you right now.

6    A.    Okay.

7    Q.    But how do you distinguish the money that's in the blue

8    bins and the money that's in the plastic bags?

9    A.    The blue bins are from compu-safes, they're called, that

10   we pick up from customers.  The money on the left most likely

11   is fed money going out to fed on Monday.

12   Q.    1A-165, sir?

13   A.    Yes, sir.  That's the same thing:  inside the vault

14   itself, the cart that was right by the door.  That's like a

15   middle picture of the series of pictures you just showed me.

16   Q.    Mr. Daniels, you testified, based on your knowledge of the

17   contents of the vault, about the significant amount of money

18   that was in the vault at the time of this event, if you will,

19   on January 18th --

20   A.    Yes.

21   Q.    -- of 2009.

22   A.    (Nodding affirmatively.)

23   Q.    From Brink's perspective, was it somewhat fortuitous for

24   all that money to be up closer to the vault door?

25   A.    Not usually.  Like I was saying, it was pretty crowded in

1  there.  Anytime that the money is right there by the door, it's

2  only because it has to be right by the door.  It was full.

3          THE COURT:  What do you mean, it has to be there?

4          THE WITNESS:  Meaning the rest of the vault is full.

5          THE COURT:  Oh, okay.  You have to speak up complete

6  -- speak up so we can hear that.

7          THE WITNESS:  Yes.

8  BY MR. DOMINGUEZ:

9  Q.   I guess my question is, given the fact that the vault was

10  pretty full that day and the money was closer to the door, did

11  it somewhat benefit Brink's by catching on fire and not -- the

12  entire contents not taken on that date?

13  A.   Can you explain that for me, please?

14  Q.   Okay.  Let me ask you this:  Typically speaking -- you've

15  been the vault supervisor for 16 years?

16  A.   Fifteen years.

17  Q.   Fifteen years.  I'm sorry.  And, again, I'm not trying to

18  get into trade secrets or anything.

19  A.   Yes, sir.

20  Q.   But what is the typical minimal amount of money in that

21  vault on any given day?

22  A.   I'd say that the typical minimal is around 50 million.

23  Q.   Is there any days of the week that are typically --

24  typically larger amounts of money is in the vault?

25  A.   Definitely, on Friday, we get all our -- all our banks

1 ship to the fed for Monday delivery. So, we'll get all that

2 money then on Friday to ship out Monday morning.

3 Q. So, therefore, on a Saturday night --

4 A. Definitely. It could double.

5 Q. And any time of the year, sir, that's particularly more

6 bountiful, if you will, in terms of how much money is in the

7 vault than others?

8 A. Definitely around Christmastime. Any time from November

9 to February.

10 Q. And why is that, sir?

11 A. Because of the time of year. It's Christmas, and everyone

12 is -- money is flowing on the holidays.

13 Q. Very well.

14         MR. DOMINGUEZ: May I have a moment, Your Honor?

15         THE COURT: You may.

16         (Whereupon, there was a brief interruption.)

17         MR. DOMINGUEZ: No further questions, Your Honor.

18         THE COURT: Mr. Murphy?

19         MR. MURPHY: Thank you.

20                         - - -

21                    CROSS-EXAMINATION

22 BY MR. MURPHY:

23 Q. Good morning, Mr. Daniels.

24 A. Good morning.

25 Q. You testified that you observed several holes in the roof

1  of Brink's?

2  A.    Yes.

3  Q.    How many holes were cut in the roof that you know of?

4  A.    I believe four, that I know of.

5  Q.    Do you have any opinion of how those holes might have been

6  cut?

7  A.    No.

8  Q.    Did Brink's have video surveillance at 32 (sic) Essex

9  Ave.?

10  A.    Yes.

11  Q.    Was it internal and external?

12  A.    Internal.

13  Q.    Just internal video?

14  A.    Yeah.  Well, we had external, also, yes.  I'm sorry.

15  Q.    Okay.

16  A.    Parking lot.

17  Q.    How long does Brink's retain their video surveillance

18  before they dispose of the video?

19  A.    That, I don't know.

20  Q.    Would the video surveillance show who was around the

21  outside of the building, as well as who entered the building?

22  A.    Yes, it should.

23  Q.    So, in short, the video would establish who committed this

24  burglary?

25  A.    Yes, it should.

1  Q.  What happened to the video recordings of Brink's?

2  A.  I have no idea.  They were taken.

3  Q.  So, they were taken?

4  A.  Yes.

5  Q.  Were they ever recovered that you know of?

6  A.  I'm pretty sure they were.  I don't know --

7  Q.  You're pretty sure what?

8  A.  I don't know, exactly.

9  Q.  Do you happen to know how many video recording units were

10 taken?

11 A.  No.

12 Q.  Do you know how many cameras Brink's has?

13 A.  Not exactly, but they're all over.  We have quite a few

14 cameras.

15 Q.  General, ten?  Twenty?  Thirty?  Forty?

16       THE COURT:  He said he's not really sure.

17       I don't want you to speculate, Mr. --

18       THE WITNESS:  Okay.  Well, I don't know exactly, no.

19 BY MR. MURPHY:

20 Q.  Now, you described that you keep control of the money in

21 the vault?

22 A.  Yes.

23 Q.  Did you happen to take an accounting of the money in the

24 vault when you actually returned to work or actually got in the

25 vault after the fire department got in?

1  A.   Yes.  Everything was accounted for.  Yes.

2  Q.   Do you know how much money was in that vault?

3  A.   Before the fire?

4  Q.   Yes, before the fire.

5  A.   Yes.

6  Q.   How much is that amount?

7  A.   I don't know exactly.

8  Q.   Okay.

9  A.   You have to see -- I would have to see the balance sheet

10 for that date.  We balance our vault every day, so I'd have to

11 see that to know exactly what was in there.

12 Q.   Okay.  Are you familiar with the losses that Brink's

13 happened upon because of this burglary?

14 A.   I also don't know that exactly.

15 Q.   Okay.  Now, do you know how long Brink's took to actually

16 repair the building?

17 A.   Also, I don't know exactly.  I know it was months.

18 Q.   Months?

19 A.   Yes.

20 Q.   Okay.  And do you know what Brink's did in regards to the

21 time there?  Did they post security guards around the building?

22 Did they move everything out?

23 A.   We had everything -- we couldn't do anything in the vault.

24 We had to do everything from the garage, and we did have to

25 post guards with Brink's, and also with the Columbus Police

1 Department.

2 Q.   Okay.  Now, in regards to the holes in the roof, do you

3 know if they just patched the holes or if they put a whole new

4 roof on the building?  Do you know?

5 A.   I think it was a little bit of both:  patched and repaired

6 the whole roof.

7 Q.   Are you familiar with federal treasury regulations

8 regarding U.S. currency?

9 A.   No.

10 Q.   So you wouldn't know what the policy is in regards to

11 burnt money at the federal treasury?

12 A.   No.

13 Q.   And what time did you say that you responded to 1362 Essex

14 on January 18th?

15 A.   I would say around 10:00, 10:30.

16 Q.   And had they actually entered the building by the time you

17 got there?

18 A.   Yes.

19     By "they," you mean the police and fire department?

20 Q.   Police, fire department, employees from Brink's.

21 A.   Yes.

22 Q.   Is that a residential area?

23 A.   Maybe blocks away, a couple blocks.

24 Q.   So, in and around Brink's, it's a commercial area?

25 A.   Mostly, yes.  There is a fairground right across the

1  street.

2  Q.   Is there a lot of foot traffic in and around that area?

3  A.   Not around Brink's, no.

4  Q.   Not around that area?

5  A.   No.

6  Q.   When you -- when you went to Brink's in the morning, did

7  you see anybody that appeared out of place that you didn't know

8  or recognize?

9  A.   Only the police and the fire department.

10  Q.   No one else?

11  A.   Not that I can -- there is no way for me to tell.

12       MR. MURPHY:  I have no further questions for Mr.

13  Daniels.

14       MR. DOMINGUEZ:  Nothing further, Your Honor.

15       THE COURT:  Nothing further?

16       Thank you very much.  You're excused.

17       (Whereupon, the witness was excused.)

18       THE COURT:  This is a convenient time, I believe, to

19  take a morning break of ten minutes.  Remember the admonition.

20       (Whereupon, a recess was taken at 10:43 a.m., and the

21  proceedings reconvened at 11:00 a.m.)

22                           - - -

23  IN OPEN COURT:

24       (REPORTER'S NOTE:  The jury is not present.)

25       THE COURT:  The government may have issues that may

1   arise -- the subject is the communication between counsel --

2   that may arise and need to provide information to the

3   defendant, and, I suppose, vice versa.

4           And, Mr. Dominguez, when possible, I think probably

5   the best way to do this is to discuss it with both Mr. Graeff

6   and Mr. Murphy.  And if it's after hours or something or early

7   morning or after the trial -- in other words, when we're not in

8   session and we haven't planned for it -- I think probably the

9   best communication of any issues should be directly to Mr.

10  Graeff, and have you then pass it along to Mr. Murphy.  Okay?

11          MR. MURPHY:  As long as I hear about it, Your Honor.

12          THE COURT:  Any problem?

13          MR. MURPHY:  As long as I hear about it.

14          THE COURT:  Right.  Well, that's his obligation, you

15  know, to pass it along to you.  So, it's a little, little

16  strange to have the counsel -- you see the problem -- counsel

17  talking directly to you, because you're not only the lawyer,

18  you're the defendant in the case.

19          Any problem with that?

20          MR. DOMINGUEZ:  That would be my -- thank you, Your

21  Honor.  That would be my preference:  to just communicate

22  directly to Mr. Graeff.

23          THE COURT:  Mr. Graeff?

24          MR. GRAEFF:  None.  No problem, sir.

25          THE COURT:  And Mr. Murphy?

1    MR. MURPHY:  No, Your Honor.  I don't have a problem

2  with that.

3    THE COURT:  Okay.

4    Now, we also have two other issues that we'll have to

5  take up, and probably we'll have to do this at the end of the

6  day.  And that is the master thief manual that the defendant

7  authored, and the Global Gadgets business records.  And we'll

8  take those up at the end of the day.

9    The business records are, obviously, from the United

10  Kingdom.  Are they in London or --

11    MR. DOMINGUEZ:  United Kingdom, Your Honor.  That's

12  part of the London, Scotland, Britain, that area.  It's Global

13  Gadgets, Limited, United Kingdom.

14    THE COURT:  All right.

15    Call in the jury.

16    (Whereupon, the jury was seated in the courtroom at

17  11:02 a.m.)

18    THE COURT:  You may call your next witness.

19    MR. DOMINGUEZ:  Thank you, Your Honor.

20    Glen Blankenship.

21    (Whereupon, the witness was sworn in by the Courtroom

22  Deputy Clerk.)

23    COURTROOM DEPUTY CLERK:  Thank you.  You may have a

24  seat.

25    THE COURT:  You may inquire.

1          MR. DOMINGUEZ:  Thank you, Your Honor.

2                       - - -

3                  GLEN BLANKENSHIP,

4    AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

5                       - - -

6                  DIRECT EXAMINATION

7    BY MR. DOMINGUEZ:

8    Q.   Sir, would you please state your name and spell -- well,

9    spell both your first and last name for the court reporter.

10   A.   Glen Blankenship, G-L-E-N, B-L-A-N-K-E-N-S-H-I-P.

11   Q.   Good morning, sir.

12   A.   Good morning.

13   Q.   Where are you presently employed?

14   A.   Brink's, Incorporated.

15   Q.   And how long have you been with Brink's, sir?

16   A.   Eighteen years.

17   Q.   And what are your duties with Brink's?

18   A.   I am currently an ATM supervisor.

19   Q.   And when you first started out with Brink's, what were

20   your duties then?

21   A.   I started as a driver.

22   Q.   Messenger?

23   A.   Yeah.  I've been in that position, too.

24   Q.   Same position that Kenny Hopkins has now?

25   A.   Yep.

1   Q.   You know Mr. Hopkins?

2   A.   I do.

3   Q.   And you know Mr. Jim Daniels?

4   A.   Yes, sir.

5   Q.   On January 18th of 2009, what were your duties at that

6   time, sir?

7   A.   At that time, I was an operation supervisor.

8   Q.   And as operation supervisor, what does that entail?

9   A.   You know, we would handle, like, routing trucks, training

10   employees, coaching.  I would coordinate, like, our security

11   devices, like get cameras worked on, stuff like that.

12   Q.   So, you, at that time, were familiar with the surveillance

13   equipment and the cameras throughout the Brink's facility at

14   1362 Essex, here in Columbus?

15   A.   Yes, sir.

16   Q.   Very well.  I'd like to invite your attention, sir, if I

17   could, to January 18th of 2009.  Were you scheduled to work

18   that day?

19   A.   No, sir.

20   Q.   Did you end up working that day?

21   A.   Yes.

22   Q.   And why is that, sir?

23   A.   Our facility was invaded.

24   Q.   That's an interesting word.  Is your -- for the record, in

25   your 18 years, had your facility ever been invaded before?

1   A.   Didn't think it was possible.

2   Q.   Were you -- did you receive a phone call?

3   A.   I did.

4   Q.   And in response to that phone call, what did you then do?

5   A.   Well, I got up that morning, got prepared to come in, had

6   some idea what had happened, speaking with the then assistant

7   manager, Don Driver, and I just came into work.

8   Q.   Do you remember what time you got there?

9   A.   I do not.

10  Q.   Was it prior to noon, if you know, or --

11  A.   Yes.

12  Q.   So sometime late morning?

13  A.   Yep.

14  Q.   You have to answer yes or no.

15  A.   Yes.  Yes, sir.

16  Q.   That's all right.  You have to say, sir.

17       What did you immediately notice, Mr. Blankenship, once you

18  arrived at the facility?

19  A.   My first -- the first thing I noticed was, obviously, our

20  first responders, or police, were there, and fire.  And pulling

21  into the facility's south lot, I noticed that our cameras had

22  been redirected and changed, the position of our cameras, how

23  we had them facing, our perimeter.

24  Q.   Did you find that unusual?

25  A.   Yeah.  I knew right away something was real bad.  So --

1  Q.   I'm going to show you --

2         MR. DOMINGUEZ:  May I approach, Your Honor?

3         THE COURT:  You may.  You may continue to.

4         MR. DOMINGUEZ:  Thank you, Judge.

5  BY MR. DOMINGUEZ:

6  Q.   Sir, for the record, I've just handed you what has been

7  marked for identification purposes and labeled Government's

8  Exhibits –5, –6, –36, –37, –38, –44, –53, –59, –60, –62, –74,

9  –77, –81, –102, –113, –115, –117, –118, and –136.  And that is

10 the 1A series, those particular numerals.

11        If you would take a look at those, sir.  And when you're

12 done, please look up at me.

13 A.   (Witness complies.)

14 Q.   Do you recognize those, sir?

15 A.   Yes, sir.

16 Q.   What are they?

17 A.   Those are photographs of our facility and damage that we

18 found that morning.

19 Q.   And have you seen those photographs before today?

20 A.   Yes, sir.

21 Q.   And do those photos fairly and accurately depict the

22 contents as you saw them at the Brink's facility, both exterior

23 and interior of the facility, on January 18th of 2009?

24 A.   Yes, sir.

25 Q.   Showing you Government's Exhibit –185, sir, do you

1  recognize that?

2  A.    I do.

3  Q.    And what is that, sir?

4  A.    That is a photograph of the south -- the entrance to our

5  south lot of our facility, the entrance I moved into that

6  morning, actually, when I got to work.

7  Q.    Anything of significance with respect to that photograph,

8  sir?

9  A.    The chain is broken on our fence.  You can see the chain

10  is laying down by the yellow pole there.

11  Q.    Is it in that area, sir (indicating)?

12  A.    A little bit to the right.

13  Q.    This area here (indicating)?

14  A.    Yes, sir.  Down at the bottom of that -- see between those

15  two poles, the chain laying there?

16  Q.    I see.

17  A.    That chain has been broken for -- the gate was forced

18  open.

19  Q.    And with respect to that gate, is that a gate that you

20  would pull up to and have to enter a code to enter or someone

21  on the interior would have to hit a button to open?

22  A.    Yes.  That's controlled by our guard.

23  Q.    And that's for security purposes?

24  A.    Yes.

25  Q.    Now, you stated, sir, that you noticed some cameras that

1  were eschew, if you will?

2  A.   Yes.

3  Q.   And where was that?

4  A.   That was in that south lot.

5  Q.   Very well.  And a camera was folded down, I believe you

6  said?

7  A.   Yeah.  I can't remember if it was down or up, but it was

8  misplaced.

9  Q.   It was not in its normal position?

10  A.   Yes, right.

11  Q.   And tell us, sir, once you arrived, did you actually enter

12  the facility?

13  A.   Yes.

14  Q.   And what did you first notice when you entered the

15  facility?

16  A.   I walked in.  I guess the first thing I noticed, you know,

17  at the time I was, you know, leading people, if you will.  And

18  the first thing I noticed was the look on our people's faces.

19  You know.  They were just traumatized, to say the least.  You

20  could almost tell that half the people didn't know if they were

21  going to have jobs going forward.  You know.  It was pretty bad

22  damage.

23  Q.   And you said you arrived there sometime late morning.  Was

24  the fire department still there?

25  A.   Yes.

1   Q.   And what were they doing?

2   A.   They were, for the most part, running around the building

3   and just looking.  And the investigation was pretty much

4   underway.  I was stopped when I tried to enter my own overhead

5   door by the police officers and people I don't even know who

6   they were.

7   Q.   Did you have to identify yourself and let them know that

8   you were --

9   A.   Yeah.  I had to wait until somebody was brought out

10   from -- Bill Vechiarella, at the time, actually, was brought

11   out to identify me.

12   Q.   Didn't he take you in?

13   A.   Yes.

14   Q.   Was there any smoke in the air, at all, at that time?

15   A.   Oh, yeah.  Oh, yeah.  Please.

16   Q.   When you say "Oh, yeah," what do you mean by that?

17   A.   The place was a disaster.  And it's a smell in there, I

18   can still smell it sitting here right now.  It was bad.

19   Q.   Are you a smoker, sir?

20   A.   I am.

21   Q.   Would you have smoked a cigarette while you were in there

22   with that smoke --

23   A.   No.  No.

24   Q.   -- going the way it was?

25   A.   No.

1   Q.   And that was some time after the building was first

2   entered that morning, --

3   A.   Yeah.

4   Q.   -- the time you arrived, I assume?

5   A.   Yeah.

6   Q.   And you smelled smoke?

7   A.   Yes.  Yes.

8   Q.   What is the smoking policy at Brink's?

9   A.   There is no smoking inside the facility at all.  We have

10   to go outside.

11   Q.   Showing you Government's Exhibit 1A-36, do you recognize

12   that, sir?

13   A.   Yes, sir.

14   Q.   And what's in there?

15   A.   That is looking directly inside of that overhead door that

16   I've mentioned that I came in that morning.  It's our trucks

17   that are staged inside of our warehouse, or our garage,

18   whatever you would like to call it.  We would stage trucks in

19   there for early or quick checkout and get, you know, have

20   everybody prepared to go the next morning.

21   Q.   So, when you say staging your trucks, just having them

22   ready to go for the rounds the next day?

23   A.   Yeah.

24   Q.   Anything of significance with respect to that photograph,

25   sir?  I'm not suggesting there is.

1    A.    No.  No, nothing looks out of the ordinary to me.

2    Besides, I was able to see it from outside.

3    Q.    Because of the garage door being open?

4    A.    Yeah.

5    Q.    That's unusual?

6    A.    Oh, yeah.  Yeah.

7    Q.    1A-37, sir.

8    A.    This is again looking inside of that, that door.  You can

9    obviously see the light from outside shining on that truck.

10   And that truck door is open, and it shouldn't be.

11   Q.    Is there a policy within Brink's in terms of how the

12   trucks are to be secured --

13   A.    Yes.

14   Q.    -- the night before?

15   A.    Yes.

16   Q.    And it would be unusual for a door to be open upon the

17   facility being opened in the morning?

18   A.    That's correct.

19   Q.    And where are the keys to those vehicles typically stored?

20   A.    You say where, sir, or when?

21   Q.    I'm sorry.  Where are those?  At the end of the evening,

22   sir, where are the keys to the trucks typically stored?

23   A.    At that time -- our policies and procedures have

24   drastically changed, but, at that time, they were stored inside

25   of what we call the vault room.

1    Q.   Showing you Government's Exhibit 1A-38, what do you

2    recognize there, sir?

3    A.   You can't see it on the screen now, but if you looked a

4    little bit further up towards the top corner, there is a door

5    marking, one sixteen.

6    Q.   Yes, sir.

7    A.   That indicates a door passage from the garage area.  You

8    would have to walk behind that truck we just looked at.

9    Q.   Okay.

10   A.   And that door would be right there.  And that leads into

11   our office area.  And then, below, a little bit further below

12   there, that used to be an alarm panel where we would set and

13   disarm our security system, one of our security systems.

14   Q.   And so that the record is complete, sir, what's the

15   appearance of the alarm system there in that photograph?

16   A.   It's been destroyed.

17   Q.   Now, you've told the ladies and gentlemen of the jury

18   you've been a messenger or driver in the past; and when you

19   were operation supervisor, you supervised drivers, apparently?

20   A.   Yes, sir.

21   Q.   Do Brink's drivers, are they allowed to carry firearms?

22   A.   They are.

23   Q.   Are firearms stored at the facility?

24   A.   They are.

25   Q.   Government's Exhibit 1A-44, sir, do you recognize that?

1    A.    I do.

2    Q.    And what's in that photograph, sir?

3    A.    This is an example of a photograph taken inside of our

4    then HR department's office.  We have multiple Smith & Wesson

5    semiautomatic firearms that we had purchased, because we were

6    in the middle of converting from the firearm we carried at the

7    time to that firearm.

8    Q.    So, are those containers (indicating) that are on top of

9    that crate, or whatever, on the bottom, what are those?

10   A.    Those are -- each one has a firearm inside of it, a brand

11   new firearm.

12   Q.    And does it appear to be -- in terms of how they're

13   stacked, are they stacked just one on top of the other, and

14   that's just solely the number of firearms in a particular row,

15   if you know, if you understand my question?

16   A.    Yeah.  Could you repeat that?

17   Q.    Is it just one row of -- one row of firearms there, or is

18   there another row of firearms behind it?

19   A.    Oh.

20   Q.    Only if you know.

21   A.    Yeah.  I'm not -- I can't remember.  I can't remember how

22   they were staged.

23   Q.    Because if you look at the right there, it appears that

24   there might be two sets.

25   A.    There is many more rows further to the right, not in this

1  photo, but there is another cabinet probably about the same

2  width as the one that the two are sitting on.  I think this had

3  three rows on top of it, maybe.

4  Q.    So, suffice it to say, there is a number of firearms?

5  A.    Yes, enough firearms to equip every one of our employees

6  in Columbus.

7  Q.    Now, I believe I heard you say that you had just acquired

8  those firearms; you were changing over from a different set of

9  firearms?

10  A.    Yeah.  I mean, they're here because we're in the process

11  of checking them and making sure we don't have any missing from

12  our shipment.

13  Q.    Do you know what price, per firearm, is associated with

14  each of those firearms, a rough -- a rough estimate?

15  A.    I would be speculating, but I'm going to say that they're

16  probably in the range of three-hundred-and-fifty to

17  four-hundred-and-some dollars for that particular one.

18  Q.    And looking at this photograph, sir, recollecting being in

19  that room on January 18th, does it appear that those firearms

20  are not even touched?

21  A.    Yeah.  They weren't messed with at all.

22  Q.    Government's Exhibit 1A-53, sir, what's depicted in that

23  photograph?

24  A.    This is a photograph taken inside of our operations

25  office, I think it was, at that time.  That black thing sitting

1  in the middle of the room is a cabinet that we would keep our

2  DVR units in, our recording devices that will record video.

3  Q.  And what would the DVR video equipment operate to do

4  within the facility?

5  A.  It would record and retain video for everything that would

6  happen throughout the building and our perimeter.

7      And this is an example of it shouldn't be there.  It never

8  sat in the middle of that office.  It's been removed from where

9  it belongs, destroyed.  And there's some evidence of DVRs being

10 missing.

11     This is an electronics rack, if you will.  And when all

12 the DVRs were in there, you wouldn't be able to see through

13 there.

14 Q.  And when you saw that, sir -- as operation supervisor

15 there at Brink's, when you saw the condition of this room and

16 the condition of that rack, what went through your mind?

17 A.  I felt like I was defeated.  You know.  That's one of the

18 one things we fell back on in a situation like this, we would

19 fall back on:  that to get evidence and proof and find who did

20 this, who invaded our facility.

21 Q.  And I know it's a significant topic, and I know it's a

22 sensitive topic, and I'm not going to go there, but suffice it

23 to say that you and Brink's management have taken measures to

24 enhance your security since this happened?

25 A.  Yes.  Don't try it again.

1   Q.   Government Exhibit 1A-59.  Is that the same room, sir?

2   A.   It is, sir.

3   Q.   And what's there on the back wall?

4   A.   This is evidence.  If you were to walk through that door,

5   it's on the other side.  You can see the door.  That -- that

6   wall, that cabinet, would normally be closed.  These are power

7   supplies where the DVRs that we would run, that would be closed

8   in this DVR case, or the electronics rack would be up against

9   that.  And it was actually locked.

10  Q.   And does this show that it was tampered with?

11  A.   Yeah.  Yeah.

12  Q.   Government Exhibit 1A-60, sir?

13  A.   This is an example of, if you were to walk out that door

14  and look to your left, that's where our -- that room where you

15  see the canister of --

16  Q.   I think you can circle yours, sir, if I'm not mistaken.

17  A.   I can?  I'm like a football telecaster now.

18  Q.   What is that, sir?

19  A.   That is -- so, can I get rid of that or -- I'll just --

20  okay.

21       So, this right here (indicating), that is another

22  electronics rack where we kept our servers.  That would, you

23  know, run our -- drive our computers and such.  Those were

24  taken.  They're missing.

25  Q.   Government Exhibit 1A-62, sir, can you describe anything

1  in that photograph?

2  A.   Yeah.  This is a desk inside of our office area that has

3  an adhesive, which it shouldn't be there.  It was later found

4  that that adhesive and some other adhesive types were used on

5  our doors.

6  Q.   Did you -- did you hear any reports about some difficulty

7  getting into the facility earlier that morning?

8  A.   Yes.  Yeah.  That was part of the calls I received that

9  morning.  Our crew didn't think they could get into the

10  building, because it was very cold, and they assumed the door

11  was frozen shut.

12  Q.   I know this is a day that sticks out in your mind.  Do you

13  recall the weather that day, January --

14  A.   Actually, I do now.  But Kenny Hopkins, in some discussion

15  with him, reminded me that it was kind of cold.  I hadn't

16  recalled that until I spoke with him a few days ago.

17  Q.   1A-74, sir, do you recognize anything there?

18  A.   Yes.  This is an example of coin that actually I brought

19  for you guys to review that was busted all over our coin room

20  floor.  It doesn't belong there.  It's not how we keep house.

21  It's a mess.

22  Q.   And that's in your coin room?

23  A.   Yes.  Yes.

24  Q.   Government Exhibit 1A-77, sir, do you recognize anything

25  there?

1 A.   That is again another shot just to the right of the shot

2 we just looked at of our coin room.  And coin is all misplaced

3 and everywhere.  There is -- I believe that's a skid tipped

4 over (indicating).  You can see these skids right here and how

5 they're staged with the coin on it.

6 Q.   Yes, sir.

7 A.   There is an example of a skid that's been dropped in some

8 way.  Coin fell off and busted all over our floor.

9 Q.   Now, sir, approximately, do you know -- not approximately,

10 but do you know, on your particular skids, let's say the -- is

11 it Susan B. Anthony one-dollar pieces?

12 A.   Yes, sir.

13 Q.   Do you know how much a skid --

14 A.   Do you mind --

15 Q.   -- of Susan B. Anthony coins would weigh?

16        THE WITNESS:  Your Honor, can I grab my -- I have a

17 folder with this information in it.

18        THE COURT:  Oh, yes, certainly.

19        THE WITNESS:  Thank you, sir.

20        All right.  Just ask me that again.

21 BY MR. DOMINGUEZ:

22 Q.   Do you know what a skid or how many -- how many boxes of

23 Susan B. Anthony one-dollar coins would be on a skid?

24 A.   There are 144 boxes, on each skid, of dollars.

25 Q.   And how much does one box of those Susan B. Anthony coins

1  weigh?

2  A.    Just under 18 pounds, 17.94.

3  Q.    And how many pounds per skid?

4  A.    Two thousand, five hundred, and eighty-three pounds.

5  Q.    Fairly significant?

6  A.    Yeah.  Yeah.

7  Q.    And how many boxes of 50-cent pieces are on a skid in your

8  facility?

9  A.    A hundred boxes per skid.

10  Q.    And how much do those boxes weigh per box?

11  A.    Twenty-five pounds a piece.

12  Q.    And what would be the total weight of a skid, sir?

13  A.    Two thousand, five hundred, and nine pounds.

14  Q.    For illustration purposes, sir, did you, upon our request,

15  bring with you a box of Susan B. Anthony coins and a box of

16  halves?

17  A.    I did.

18  Q.    Could you please retrieve that?

19  A.    (Witness complies.)

20  Q.    For the record, sir, to your -- if you -- have a seat.

21  A.    Okay.

22  Q.    To your right is what appears to be half coins?

23  A.    Yes, sir.

24  Q.    A box load?

25  A.    Yep.

1  Q.   And to your left there, sir, appears to be a box.  Is that

2  correct?

3  A.   Yep.

4  Q.   And what is in there?

5  A.   Susan B. Anthonys, a thousand dollars.

6  Q.   The one-dollar coins?

7  A.   Yes.

8  Q.   You said a thousand dollars, total?

9  A.   Yeah.

10         MR. DOMINGUEZ:  Your Honor, with the Court's

11  permission, may I publish those to the jury?

12         THE COURT:  You may.

13         (Whereupon, Mr. Dominguez hands the boxes to the

14  jurors.)

15         THE WITNESS:  Sal, can I have some water?

16         MR. DOMINGUEZ:  (Nodding affirmatively.)

17         THE WITNESS:  Thank you.

18         It's been a source of many back injuries in our time.

19  And Sal made me carry them all the way from the parking lot.

20         MR. DOMINGUEZ:  With the Court's permission, may

21  Special Agent Trombitis retrieve the coins from the jurors when

22  they're finished?

23         THE COURT:  Agent Trombitis, you may do so.

24  BY MR. DOMINGUEZ:

25  Q.   Suffice it to say, when you talk about skids being removed

1  from your facility, Mr. Blankenship, those are quite heavy

2  skids?

3  A.   Yes.

4  Q.   Government Exhibit 1A-81, sir, do you recognize that?

5  A.   I do.

6  Q.   And what is it, sir?

7  A.   This is a shot, kind of aerial shot, of our coin room

8  above the floor where you saw the busted coin.  And what's

9  significant about this is the holes in our roof here and here

10 (indicating), and this light fixture is busted and hanging

11 down.  Things are not like that in our facility.

12 Q.   Now, you have identified, by circling that photograph,

13 sir, certain holes that are in the roof.  And only if you know,

14 but -- you work there; we don't -- can you gauge, based on your

15 knowledge of the interior of that coin room, the height from

16 the roof to the floor in that room?

17 A.   It would be a guess, but I know we can probably stack four

18 to five skids high.  And if you've seen the skids in examples

19 prior, probably the equivalent of a two-story building,

20 probably.

21 Q.   Two-story building?

22 A.   Yeah.

23 Q.   So, if a person attempted to enter your facility, say from

24 the hole to your -- the circle that you drew to the right there

25 on your screen, that would be a significant drop?

1  A.   Oh, yeah.  Yes, sir.

2  Q.   Government's Exhibit 1A-102, sir.

3  A.   This is an office outside of our vault room.  It's an

4  auxiliary manager's office where we had another set of DVRs,

5  recording devices, staged that would record different areas of

6  our building.  And this is an example of the damage in that

7  office, and the DVRs are missing.  They were, at that time,

8  (indicating) sitting right there.

9  Q.   And like your prior testimony, sir, those would be items

10  that would be utilized in order to detect security breaches in

11  your facility?

12  A.   Yes, sir.  And you can -- there is also evidence of the

13  monitor just being, like, torn off, and in a hurry, I would

14  guess.

15  Q.   And where would that monitor typically be placed, sir?

16  A.   It was sitting on top of the DVRs, right here

17  (indicating).

18  Q.   And it's right there on the floor where you drew the lower

19  circle?

20  A.   Yes, sir.

21  Q.   Government Exhibit 1A-113, sir, do you recognize that?

22  A.   Yes, sir.

23  Q.   And what is it?

24  A.   That is a hole inside of our garage, or warehouse area,

25  just outside of our turret room.

1  Q.   And I'm going to ask you the same question I asked you

2  with respect to the hole over the coin room.  About how much is

3  the length from the floor to the ceiling there?

4  A.   It's the exact same height.

5  Q.   About two stories?

6  A.   Yes.

7  Q.   A significant drop if one wanted to drop through that hole

8  to the floor?

9  A.   Yes.

10  Q.   Government Exhibit 1A-115, sir, do you recognize it?

11  A.   I do.

12  Q.   What is that, sir?

13  A.   This is just below that hole that we just reviewed.  This

14  is our turret door.

15         THE COURT:  A what door?

16         THE WITNESS:  Turret door.  I'm sorry, sir.  It's a

17  guard post.  Just inside of that door is where we post a guard.

18  BY MR. DOMINGUEZ:

19  Q.   Let me ask you this:  You testified earlier -- and if I'm

20  mistaken, correct me, please, but I believe you testified

21  earlier that that south gate where you saw the chain was broken

22  --

23  A.   Yes, sir.

24  Q.   -- that that is operated by a guard who would open the

25  gates for visitors or employees?

1  A.   Yes, sir.

2  Q.   And you just testified about a guard being in this turret.

3  Is that the guard you were referring to earlier?

4  A.   Yes, sir.  This is the room -- this is the door into the

5  room where that, those, doors and gates would be controlled in

6  our perimeter.

7  Q.   Does it appear that that door has been compromised?

8  A.   Yes.  Yes.

9  Q.   And what, if anything, is located within that turret, sir?

10 A.   If you were to step inside of there, there's all the

11 controls for our doors, non-recording devices -- we call them

12 duplexers at the time -- that were used to drive the monitors

13 so we could look around the facility --

14 Q.   Were any of those items compromised?

15 A.   -- and some shotguns.

16      Yes.  Inside, we found those to be taken as well.

17 Q.   All right, sir.  I'm going to show you once again -- hold

18 your thought about the turret, though; we'll get back there --

19 Government Exhibit --

20 A.   Okay.

21 Q.   -- -102, again.  We've talked about the monitor on the

22 floor being compromised.  You talked about the equipment being

23 taken.  What's there on the right, on your right of that

24 photograph?

25 A.   There is a rack that's installed on the wall, with two

1  shotguns.

2  Q.    What type of shotguns are those, sir?

3  A.    Fully loaded, and Winchester 970s, I think.

4  Q.    Did it appear that they were tampered with at all?

5  A.    No.

6  Q.    Do you recall your testimony about the turret door?

7  A.    I do.

8  Q.    Showing you Government Exhibit 117, sir, do you recognize

9  that?

10  A.    I do.

11  Q.    And what is that?

12  A.    This is inside of that door.  If you were to walk inside

13  that door and turn left and look to your left, this is the

14  countertop in there, with some door controls.

15  Q.    And I take it this is -- on a typical workday, this is

16  where the guard would be posted?

17  A.    Yes, sir.

18  Q.    That walkie-talkie would be used --

19  A.    Yes.

20  Q.    -- in conducting his functions?

21  A.    Yes, sir.

22  Q.    The keys.  Is it typical for those keys to be sitting on

23  top of that board there?

24  A.    No.

25  Q.    Is that the way the keys appeared while the crime scene

1    was being investigated?

2    A.    Yes.

3    Q.    Anything else of significance with respect to the turret

4    room?  And I'm going to show you Government's Exhibit 118.  Do

5    you recognize that, sir?

6    A.    Yeah.  This is that same countertop.  And if you're

7    looking to the right, a little bit to the right, all those

8    cables (indicating) plugged into that duplexer, and it was a

9    non-recording device that was simply used to view our cameras

10   and move our cameras' views, look in different areas and stuff.

11   That was missing that morning.

12   Q.    Again, you were the operation supervisor at the time of

13   this event?

14   A.    Yes, sir.

15   Q.    You felt like you'd been invaded?  I believe that was your

16   testimony.

17   A.    Yeah.

18   Q.    And you felt like you had been defeated?  I believe

19   those -- those are your words?

20   A.    Yes.

21   Q.    Was there any surveillance camera video footage, anything

22   at all, that was able to be gathered together from an

23   evidentiary perspective in order to assist in the investigation

24   or finding the identity of those who may have committed this

25   crime?

1  A.   We have obtained other video.  I cannot speculate as to

2  whether there has been -- what was found within that.  I know

3  that my company has obtained video from other sources around

4  our building, our facility.

5  Q.   Were there any identities of individuals found on those

6  surveillance cameras, surveillance videos?

7  A.   It would be speculation if I answered that.

8  Q.   Was any of that turned over to law enforcement?

9  A.   Yes.

10       THE COURT:  I didn't -- excuse me, Mr. Dominguez.  I

11  didn't understand your answer.

12       That would be speculative.  What do you mean by that?

13       THE WITNESS:  I don't know what the findings were.  I

14  didn't get to see those.

15       THE COURT:  Oh, I see.  Okay.  So, you don't know

16  what --

17       THE WITNESS:  No.

18       THE COURT:  So, your testimony is, there is other

19  video sources outside the --

20       THE WITNESS:  Absolutely, sir.

21       THE COURT:   -- outside the Brink's property?

22       THE WITNESS:  Yes, sir.  We lost our DVR, but we have

23  obtained other.

24  BY MR. DOMINGUEZ:

25  Q.   Are you talking about -- sir, are you talking about the

1  surveillance company from the Jegs Company nextdoor?

2  A.   Yes.

3  Q.   Very well.  Government Exhibit 136, sir, 136, do you

4  recognize that?

5  A.   I do.

6  Q.   And what was that, sir?

7  A.   That is scaffolding that we found that morning sitting

8  outside our facility.  And in this container right here

9  (indicating) --

10  Q.   Yes, sir.

11  A.   -- that container is sitting against our building.  At the

12  time, that's where it was, and that scaffolding shouldn't be

13  there.

14  Q.   Do you know to whom that scaffolding belonged?

15  A.   I do not.

16       THE COURT:  It's not Brink's?

17       THE WITNESS:  It is not.  It does not belong to our

18  company.

19       MR. DOMINGUEZ:  Thank you, Judge.  I was just about

20  to go there.  Thanks.

21  BY MR. DOMINGUEZ:

22  Q.   Government Exhibit 1A-37, sir?

23  A.   That is a better example of that, that storage container

24  that has been tagged out.  I didn't remember that, but that's

25  the container that was sitting right outside of our facility.

1  Q.   At the bottom of that photograph, sir, is the scaffolding

2  you described earlier?

3  A.   Yes, sir.

4  Q.   I believe that I may have misspoke.  Just for the record,

5  that's Government Exhibit 1A-137; is that correct?

6  A.   Yes, sir.

7  Q.   For the record, 1A-132, sir, do you recognize anything

8  there?

9  A.   I do.  That is a -- that is a look inside of our

10 perimeter, and the fence has been (indicating) cut open.  And

11 that -- above in that photo was that -- there is that storage

12 container that we just spoke of.

13 Q.   Let me ask you this:  Do you have that same storage

14 container on the side of the building at that point?

15 A.   We have moved that out.  It's bad luck.  We got another

16 one, though.  And it is not there anymore.

17 Q.   Is that the smallest -- in terms of Brink's facilities,

18 sir, and how it's configured physically, is that the smallest

19 space in terms of getting on top of the roof?

20 A.   Yeah, I would say that's the lowest level --

21 Q.   Lowest level.  Thank you.

22 A.   -- at that time, yeah.

23 Q.   And, frankly, that box truck, or whatever, that container,

24 actually would provide someone with assistance?

25 A.   Yeah.  Yeah.

1   Q.   Along with the scaffolding?

2   A.   Right.

3   Q.   Government Exhibit 1A-95, sir, you recall testifying about

4   the ceiling to the garage area, the hole in the roof to the

5   garage area, and the hole in the roof to the coin area.  And I

6   believe I recall your testimony as being it was two stories

7   high?

8   A.   Yes, sir.

9   Q.   Do you recognize anything in this photograph, sir?

10   A.   This is an example of that same height if you were to go

11   from floor to ceiling, but there's a drop-down ceiling that's

12   in place.  Kind of gives you a feel for, in scale, the height

13   that Sal's talking about.  And above that, where you see the

14   light above the -- or the daylight that's above the fluorescent

15   light is -- right up in that area, that light is coming from

16   another hole in our roof.  And that hole is going into our

17   vault room area.

18   Q.   Were you able to see this area on the day -- on January

19   18th when you arrived to the facility, that is, January 18th of

20   2009?

21   A.   Yes.

22   Q.   Did you see anything of significance on the walls there?

23   A.   Yeah.  Those footprints are out of place.  The damage to

24   the drop-down roof is part of the damage that we incurred that

25   we found that morning.

1  Q.  So, sir, in terms of the Brink's security system, in-house

2  and the cameras and everything you had on the interior and the

3  exterior, was your system completely compromised in terms of

4  being able to identify who may have done this?

5  A.  To my knowledge, yes.

6       MR. DOMINGUEZ:  May I have a moment, Your Honor?

7       THE COURT:  Yes.

8       (Whereupon, there was a brief interruption.)

9       MR. DOMINGUEZ:  One more question, Your Honor.  Thank

10 you very much.

11 BY MR. DOMINGUEZ:

12 Q.  Sir, I'm going to show you Exhibit 1A-138.  Do you

13 recognize anything there, sir?

14 A.  Yes.

15 Q.  And what is that?

16 A.  That is an example of what we spoke of earlier, the

17 cameras that I noticed had been misplaced.  This camera

18 (indicating), at the time, was facing in this direction

19 (indicating).  And it was kind of actually facing the direction

20 where we saw the one exhibit of the fence, the shot that we saw

21 into our perimeter where the fence had been cut open.  That

22 camera was facing in that direction.  Yeah.  So, if you look

23 above, the camera is -- there is the container, and the camera

24 would be right up there (indicating).

25 Q.  And so that we're clear, that camera, what you're saying,

1  would have been focused toward the hole in the fence?

2  A.   Yes.

3  Q.   And whoever perpetrated this saw fit to point the camera

4  down and away from projecting towards the fence area?

5  A.   It would appear, yes.

6        MR. DOMINGUEZ:  May I have a moment, Your Honor?

7        (Whereupon, there was a brief interruption.)

8  BY MR. DOMINGUEZ:

9  Q.   Solely with respect to the coins, sir, that were taken

10  from the facility, do you know how much money in coins was

11  taken from this facility?

12  A.   I do, by denomination and total, if you'd like it.

13  Q.   Tell us by denomination.

14  A.   All right.  In dollars, we incurred a loss of $332,350; in

15  halves, $63,940; for a total of $396,290.

16        THE COURT:  What was the halves again, Mr.

17  Blankenship?

18        THE WITNESS:  $63,940.

19        MR. DOMINGUEZ:  And I'm sorry.  I wrote slow.  What's

20  the final figure?  Three ninety-six --

21        THE WITNESS:  $396,290.

22        MR. DOMINGUEZ:  Very well.

23        Your Honor, that would conclude my direct examination

24  of this witness.

25        THE COURT:  This is just the coins?

1    THE WITNESS:  Just coin, sir.  Yes, sir.

2    THE COURT:  Okay.

3    Mr. Murphy?

4    MR. MURPHY:  Thank you, Your Honor.

5                        - - -

6                  CROSS-EXAMINATION

7    BY MR. MURPHY:

8    Q.   Good morning, Mr. Blankenship.

9    A.   Good morning.

10   Q.   You stated -- how long have you been an employee at

11   Brink's?

12   A.   Eighteen years.

13   Q.   Eighteen years.  And you were the operation supervisor at

14   that time?

15   A.   I was.

16   Q.   You spoke about these truck doors being opened.  Did you

17   notice that the armored car truck doors had been opened?

18   A.   Yes.

19   Q.   There's a special procedure to open them doors?

20   A.   Yes.

21   Q.   And you'd have to be trained or know the procedure to open

22   them?

23   A.   Yeah, or have outside knowledge, yeah, or be able to

24   figure it out, I guess.  Yeah.

25   Q.   And you also identified some firearms in the building

1 through the pictures?

2 A.   Yeah.

3 Q.   Do you know if any firearms were missing from the

4 building?

5 A.   They were not.

6 Q.   None missing.  You also spoke significantly about the

7 video at Brink's.  How long does Brink's retain their video?

8 A.   Due to security reasons, I cannot answer that question.

9 Q.   Okay.  How many cameras does Brink's have in and around

10 their building?

11 A.   My answer would be speculation.

12 Q.   Okay.  But the video that Brink's has or would have in

13 their units, this would have recorded the external and internal

14 goings-on in and around Brink's?

15 A.   Yes, sir.

16 Q.   So, this video would have been basically a movie of the

17 burglary if you had these videos?

18 A.   It would give us the information we needed, yes.

19 Q.   And you testified that, in addition to DVRs missing, you

20 were missing some servers?

21 A.   That's correct.

22 Q.   Do you know how many servers were missing?

23 A.   More than one.  I'm not sure of exactly how many were in

24 that rack.

25 Q.   Now, you identified some holes in the roof through some

1  pictures.  Do you recognize these?

2  A.    Yes.  One of the many holes that were in our facility, in

3  the roof in our facility.

4  Q.    And how many holes, in total, were cut in the roof?

5  A.    Five.

6  Q.    Do you have an opinion as to how these holes were cut?

7  A.    I do not -- I mean, no.  A Sawzall, I would assume.

8  Q.    Sawzall?

9  A.    Yeah.

10  Q.    It looks like a Sawzall cut?

11  A.    Yeah.

12  Q.    Now, you spoke about DVR units.  I believe your testimony

13  was there were two sets of them?

14  A.    Multiple.  More than two DVR units.

15  Q.    I said "sets."  You described one of the sets of DVR and

16  some type of rack, did you say?

17  A.    Yes.

18  Q.    And you said that there were some other ones on top of

19  something?

20  A.    Yes.

21  Q.    Do you know how many DVR units, total, were in Brink's,

22  approximately?

23  A.    I do not.  I do not recall.

24  Q.    You don't recall.  You also said that there were some

25  duplex units missing?

1   A.   Yes.

2   Q.   And did you know how many duplex units were missing?

3   A.   It would be speculation, but I think four, total.

4   Q.   And on the DVR units, would that be more than two?

5   A.   Yes.

6   Q.   Would it be more than four?

7   A.   Yes.

8   Q.   Would it be more than six?

9   A.   Unknown.  I do not know.

10   Q.   So, it's more than four?

11   A.   Yeah.

12   Q.   You identified some type of, as the government said, some

13   type of truck container that was in the yard.

14   A.   Oh, the storage container?

15   Q.   It's a storage container?

16   A.   Yes.

17   Q.   In the picture, there was some type of spray painting on

18   the side of the container?

19   A.   Yes.

20   Q.   Was that spray paint on there when Brink's got that

21   container?

22   A.   Yes.

23   Q.   It was?  Okay.

24   A.   Oh, no.  No.  Can I retract that?  I do not believe there

25   was.

1      THE COURT:  Yes.

2      THE WITNESS:  I believe that was tagged after we

3  received that container.

4  BY MR. DOMINGUEZ:

5  Q.   Okay.

6  A.   We would not accept a container like that and put it in

7  our environment.

8  Q.   Okay.  You mentioned the word "tagged."  Can you explain

9  to the jury what "tagged" means?

10  A.   It's a terminology that I've heard kids, for gangster

11  graffiti or whatever, you know, if somebody were to apply

12  graffiti to a surface.

13  Q.   And what do taggers usually tag on things?  What do they

14  usually put on there?

15  A.   I do not know.  I don't know what it means, what it stands

16  for.

17  Q.   You wouldn't have any -- well, it seems that you have some

18  knowledge of tagging.  Would it sometimes --

19      THE COURT:  Mr. Murphy, where is this going?

20      MR. MURPHY:  I just wanted to find out --

21      THE COURT:  Does it make any difference what was on

22  the containers?

23      MR. MURPHY:  Well, what I'm trying to do, Your Honor,

24  is, I'm trying to determine when it was -- when that tagging --

25  he said that it wasn't there when he --

1   BY MR. MURPHY:

2   Q.   So, obviously, the tagging occurred on Brinks' property?

3   A.   Yes.

4   Q.   Okay.  And you identified some holes in the fence that

5   were cut.  Do you know when those holes in the fence were cut?

6   A.   Sometime that evening.  Our perimeter is checked on a

7   regular basis, and it wasn't there prior to that evening.

8   Q.   So, Brink's would check the fences all around the building

9   every night?

10  A.   Not every night, but on a regular basis.

11  Q.   Okay.  Mr. Blankenship, are you familiar, at least, with

12  the name of most of the employees of Brink's?

13  A.   At the time, I was.  Today, not so much.

14  Q.   Well, I mean --

15  A.   I'm not as engaged as I was.

16  Q.   At the time of the burglary in January 17th or 18th, 2009,

17  for the most part?

18  A.   Yeah.

19  Q.   Are you familiar with the name Anthony L. Woods?

20  A.   No.

21  Q.   You've never heard of him?

22  A.   No.

23  Q.   If you saw a picture of him, would you be able to identify

24  him if he was an employee?

25  A.   Maybe, if my --

1  Q.   (Showing a photograph to the witness.)

2      Does that person look like an employee of Brink's that you

3  know?

4  A.   No.  I -- I don't remember him at all.

5  Q.   Okay.  Thank you.

6  A.   No.

7          MR. MURPHY:  Thank you, Mr. Blankenship.

8          I have no further questions, Your Honor.

9          THE COURT:  Anything else?

10         MR. DOMINGUEZ:  No, thank you, Your Honor.

11         THE COURT:  Thank you, Mr. Blankenship.

12         THE WITNESS:  Thank you, sir.

13         THE COURT:  You're excused.

14         (Whereupon, the witness was excused.)

15         THE COURT:  Ladies and gentlemen, it's about that

16  time to do lunch.  So we'll be back at one o'clock.

17         And remember the admonition not to discuss this case

18  with each other or anyone during the course of this.  Report

19  any violations to court personnel, and do not make any

20  investigation, and enjoy your lunch.

21         (Whereupon, the lunch recess was taken at 12:00 p.m.)

22                      - - -

23

24

25

1          Tuesday Afternoon Session,

2               October 18, 2011

3                    - - -

4    IN OPEN COURT:

5          THE COURT:  Call your next witness.

6          MR. DOMINGUEZ:  Thank you, Your Honor.  We would call

7    Peter Malionek.

8                    - - -

9                 PETER MALIONEK

10   AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

11                   - - -

12                DIRECT EXAMINATION

13   BY MR. DOMINGUEZ:

14         THE COURT:  You may proceed.

15         MR. DOMINGUEZ:  Thank you.

16   Q.   Sir, would you please state your name and please spell

17   your last name.

18   A.   First name is Peter, last name is Malionek,

19   M-A-L-I-O-N-E-K.

20   Q.   Malionek?

21   A.   Correct.

22   Q.   Mr. Malionek, good afternoon.  Where are you presently

23   employed?

24   A.   Eastern Bank.

25   Q.   And where is that located?

1    A.    Lynn, Massachusetts.

2    Q.    Is Eastern Bank based in Lynn, Massachusetts?

3    A.    We are headquartered in Boston, and we have an Operations

4    Center in Lynn.

5    Q.    And what is your job there, sir?

6    A.    I am a Regional Fraud Investigator.

7    Q.    And as a Regional Fraud Investigator, do you have access

8    to the records with respect to Eastern Bank?

9    A.    I do.

10    Q.    And are transactions with Eastern Bank required to be

11    inputted at or near the time of the transaction is made?

12    A.    Correct.

13    Q.    In your capacity as Regional Fraud Investigator, are you

14    able to download records and also check them for accuracy?

15    A.    I am.

16         MR. DOMINGUEZ:  May I approach the witness, Your

17    Honor?

18         THE COURT:  You may.

19    Q.    (By Mr. Dominguez) If you would, sir, please page through

20    that document that I just handed you.  For the record, it is

21    Government's Exhibit 3-1.

22    A.    Okay.

23    Q.    Do you recognize this, sir?

24    A.    I do.

25    Q.    What is it?

1  A.   It is Eastern Bank documents.  It is specifically Eastern

2  Bank's signature card as well as bank statements and canceled

3  checks.

4  Q.   Does it also identify certain transactions relative to

5  that account?

6  A.   Yes, it does.

7  Q.   And can you identify the account for the record, sir?

8  A.   The account is entitled Angel One Corporation, Sean D.

9  Murphy.

10  Q.   And is there an address associated with that account, sir?

11  A.   There is.

12  Q.   And what is that address?

13  A.   407 Walnut Street, Lynn, Mass.

14  Q.   And those are particular identifiers so someone in your

15  position as a custodian of records can discern the owner of

16  that bank account?

17  A.   Correct.

18  Q.   And does it also designate a social security number?

19  A.   It does.

20  Q.   And we need not read that into the record, but that's

21  standard operating procedure for the bank, correct, to obtain a

22  social security number in connection with a particular account?

23  A.   It is.

24  Q.   I ask you to flip, sir, to the flag at pages -- within

25  that document.  The first flagged page?

1  A.   Okay.

2  Q.   Without discussing it with us, can you please look through

3  it and let us know if it is a record kept in the ordinary

4  course of business along with this stack of documents that you

5  have identified in Exhibit 3-1?

6  A.   Yes, it is.

7  Q.   I ask to you skip to the second flagged page.

8  A.   Yes, mh-hmm.

9  Q.   Does that, likewise, contain entries that are kept in the

10 normal course of business there at the Eastern Bank?

11 A.   Yes, it is.

12      MR. DOMINGUEZ:  May I approach, Your Honor?

13      THE COURT:  You may, and you may continue.

14      MR. DOMINGUEZ:  Thank you.

15 Q.   (By Mr. Dominguez) Sir, you have identified -- well, for

16 the record, you recognize Government's 3-1.  Is that the first

17 page of the set of exhibits that you have identified here for

18 the ladies and gentlemen of the jury?

19 A.   Yes.

20 Q.   The second page of the document, sir, is that the

21 signature card page that you have identified for the ladies and

22 gentlemen of the jury?

23 A.   Yes, it is.

24 Q.   And at the top right side of that document, that's

25 information that's designated as the owner of the account?

1   A.   Correct.

2   Q.   I am showing you the first flagged page with the flag

3   being the blue Post-it there, sir.  And I would like to invite

4   your attention, if I could, to the last three entries there.

5   A.   Yep.

6   Q.   Do you recognize those, sir?

7   A.   I do.

8   Q.   And on the left-hand side, at the very top, where it says

9   "other withdrawals/debits continued", it has postdates.  And

10  simply for the record, sir, what does postdate mean?

11  A.   That's the date that the funds cleared the account, posted

12  to the actual account.

13  Q.   Does that mean that the transaction either occurred on

14  that date or a date prior?

15  A.   Correct.

16  Q.   So, if a transaction were to occur on December 2nd or

17  December 3rd, which would the likely postdate be?

18  A.   Depending on the day of the week, it should be the exact

19  date unless the transaction is a Saturday or Sunday, then the

20  Monday following will be actual postdate.

21  Q.   And if there is a transaction that occurs with a

22  corporation that's out of this country, say, the United Kingdom

23  or some other place in Europe, would that tend to delay it,

24  perhaps, an additional day?

25  A.   It could, yes.

1   Q.   What is the likelihood, sir, of a transaction occurring on

2   December 2nd and December 3rd and it not posting until January

3   2nd of 2009?

4   A.   Say that again?

5   Q.   What is the likelihood of a transaction occurring on

6   December 2nd or December 3rd and posting to an account in

7   January of the next year?

8   A.   Not very likely.

9   Q.   Explain to the ladies and gentlemen what is reflected in

10   the last three entries on the page that you are viewing there?

11   A.   There are three purchases dated December 5th.  Each

12   purchase going to a "Global Gadget, UK, LM, Worthing."  But the

13   "LM", I am not familiar with.

14   Q.   And for the record, sir, the figures that follow the

15   postdate, can you just recite those for the record?

16   A.   The first one December 5th, $1,384.89; the second one on

17   December 5th, $2,182.81; and the third, $2,182.81, all for the

18   same merchant.

19   Q.   And math is not my strong suit, but that's somewhere in

20   the area of $4,000 or so dollars?

21   A.   A little higher, five or six.

22   Q.   Very well.  $5,000, right.

23        THE COURT:  You better stay in the legal profession.

24        MR. DOMINGUEZ:  Thank you, Your Honor.  I think you

25   are right, Judge.

1   Q.  (By Mr. Dominguez) And so the record is clear, that

2   document would indicate, based on your knowledge as the

3   custodian of the records, that those figures that you gave and

4   those three transactions went from Sean Murphy's account to

5   Global Gadget there in the United Kingdom?

6   A.  Correct.

7   Q.  The second flagged page.  I ask you to look at the last

8   entry on that page.  What is reflected there, sir?

9   A.  On January 26th, there is a debit card purchase for

10   $543.19, the merchant being Thrifty Rental Car in Revere,

11   Massachusetts.

12   Q.  And what is the postdate on that, sir?

13   A.  On January 26th.

14   Q.  Of 2009?

15   A.  2009, correct.

16   Q.  And, again, sir, you stated that if the transaction were

17   to occur on a Saturday or Sunday, then the following Monday is

18   when it would post to the account?

19   A.  Correct.

20   Q.  For the record, that would be a transaction coming out of

21   Sean Murphy's account to the attention of the Retail Center at

22   Thrifty Car Rental in Revere, Massachusetts?

23   A.  Correct.

24        MR. DOMINGUEZ:  May I have a moment, Your Honor?

25   Q.  (By Mr. Dominguez) Well, one last question, sir.  So the

1  record is complete with respect to all of the documents

2  contained in 3-1, these are documents that are required to be

3  kept in the normal course of business there at Eastern Bank?

4  A.   Correct.

5  Q.   And they are maintained in that fashion for easy retrieval

6  for you or someone else similarly-situated for records as

7  consistent with bank procedures?

8  A.   They are.

9        MR. DOMINGUEZ:  No further questions, Your Honor.

10       THE COURT:  Mr. Murphy?

11       MR. MURPHY:  Thank you, Your Honor.

12                        - - -

13                   CROSS-EXAMINATION

14  BY MR. MURPHY:

15  Q.   Good afternoon, Mr. Malionek.

16  A.   Good afternoon.

17  Q.   In regards to the first account that you spoke about, the

18  Angel One Corporation, does Eastern Bank keep any type of

19  record of what type of business that is?

20  A.   We would, yes.

21  Q.   Would you have those records with you here today?

22  A.   I do not.

23  Q.   Would you know off the top of your head what type of

24  business it was?

25  A.   I do not.

1    Q.    Have you had any experience with this account?

2    A.    I have not.

3    Q.    Are you familiar with whether or not Sean Murphy had

4    another account at Eastern Bank, another business account?

5    A.    Not off the top of my head.

6    Q.    You wouldn't be familiar with the Northshore Movers of

7    Lynn?

8    A.    Oh, yes.  Actually, yes.

9    Q.    Okay.  So, is it your testimony that in addition to the

10   Angel One Corporation account, Sean Murphy also had another

11   business account of Northshore Movers of Lynn?

12   A.    Correct.

13          MR. MURPHY:  Okay.  Thank you very much,

14   Mr. Malionek.

15          No further questions, Your Honor.

16          MR. DOMINGUEZ:  Nothing further, Your Honor, of this

17   witness.

18          THE COURT:  Thank you very much.

19          THE WITNESS:  Okay.

20          THE COURT:  Call your next witness.

21          MR. DOMINGUEZ:  Sue Robshaw, Your Honor.

22                          - - -

23

24

25

1                          - - -

2                     SUSAN ROBSHAW

3    AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

4                          - - -

5                   DIRECT EXAMINATION

6    BY MR. DOMINGUEZ:

7          THE COURT:  You may examine.

8          MR. DOMINGUEZ:  Thank you, Your Honor.

9    Q.   Ma'am, would you please state your name and spell your

10   last name for the benefit of the court reporter.

11   A.   The first name is Susan, the last name is Robshaw,

12   R-O-B-S-H-A-W.

13   Q.   Ms. Robshaw, where are you presently employed?

14   A.   Newmarket Storage.

15   Q.   Tell us about Newmarket Storage.  First of all, where is

16   it located, ma'am?

17   A.   It is located in Newmarket, New Hampshire.

18   Q.   I take it that you reside in the Greater Newmarket, New

19   Hampshire Metropolitan Area?

20   A.   Yes, I do.  I reside in Newmarket.

21   Q.   And what are your duties at the Newmarket Storage?

22   A.   It is a self-storage facility, which I manage.

23   Q.   How long have you been associated with Newmarket Storage?

24   A.   A little over 13 years.

25   Q.   What are your duties there, ma'am?

1  A.  We manage the facility, we do Budget Truck Rentals.  We

2  rent storage units.

3  Q.  Do you maintain the records associated with that business?

4  A.  Yes, I do.

5  Q.  Do you know an individual by the name of Brian Hetherman?

6  A.  Yes.

7  Q.  And if you would see Brian Hetherman again, would you

8  recognize him?

9  A.  Yes, I would.

10  Q.  Could you please look around the courtroom and let us know

11  if Brian Hetherman is with us here today?

12  A.  He is.

13  Q.  Would you please point to him and tell us what he is

14  wearing?

15  A.  Right there in the tan shirt with a brownish-colored tie.

16       MR. DOMINGUEZ:  Your Honor, let the record reflect

17  that Ms. Robshaw has identified Brian Hetherman or the

18  individual who she knows as Brian Hetherman.

19       THE COURT:  The record should so reflect.

20       MR. DOMINGUEZ:  May I approach the witness, Your

21  Honor?

22       THE COURT:  You may, or you may continue.

23       MR. DOMINGUEZ:  Thank you, Your Honor.

24  Q.  (By Mr. Dominguez) Ma'am, I have just handed you what has

25  been marked for identification purposes and labeled as

1  Government's Exhibits 5-1 through 5-8.  I ask that you please

2  take a moment to look at those, and when you are finished,

3  please look up at me.

4      Ma'am, do you recognize those items?

5  A.    Yes, I do.

6  Q.    And I want you to briefly describe them for me, and then

7  we are going to display them for the ladies and gentlemen of

8  the jury.  Government's Exhibit 5-1?

9  A.    5-1 is a picture of Brian Hetherman.

10 Q.    Was that displayed -- were you shown that photograph by

11 law enforcement officials when you signed off on it?

12 A.    Yes, I did.

13 Q.    Government's Exhibit 5-2, ma'am?

14 A.    Yep.

15 Q.    What is that?

16 A.    That is a ledger or a history on a storage unit, CC-08.

17 Q.    Is that a record that's normally kept in the normal course

18 of business there at Newmarket?

19 A.    Yes, it is.

20 Q.    A record that you have control over?

21 A.    Yes, I do.

22 Q.    5-3, ma'am?

23 A.    This is a move-out ledger.  It is produced when the

24 customer moves out.

25 Q.    And when you say move out, are you speaking about a

1   storage facility?

2   A.   Yes, this is a storage unit.

3   Q.   And so that this might be a good place to entertain this

4   question, ma'am, with respect to Newmarket Storage, if you

5   haven't already answered, is it like a twofold business with

6   storage units and rental trucks?

7   A.   Yes.  Our primary business is storage, but we supplement

8   it with the Budget Truck Rentals.

9   Q.   5-4, ma'am?

10   A.   This goes with that 5-3.  When we move a customer out, it

11   produces these two documents.

12   Q.   Very well.  The next in order, ma'am, what is that?

13   A.   5-5.

14   Q.   Please describe what that is.

15   A.   It is an open agreement on a Budget Truck Rental.

16   Q.   5-6?

17   A.   It is a close -- there is no number on here.  Just go in

18   order?

19   Q.   Just go in order, ma'am.

20   A.   All right.  It is closed agreement.  When the truck is

21   closed out, that's a closed agreement.

22   Q.   Very well.  The next one in order, ma'am?  Which exhibit

23   number?

24   A.   The number?  I don't see that number.  It is another open

25   agreement for a Budget Truck.

1  Q.   Very well.  And the next in order?

2  A.   Okay.  This is the -- when a customer rents a truck, they

3  have the option of taking responsibility for the truck,

4  insurance-wise or signing off.  And this is, basically, signing

5  off the insurance rights.

6  Q.   Very well.

7  A.   They take full responsibility.

8  Q.   The next in order?

9  A.   The next in order is the damage report, showing what

10  damage there is on the truck prior to them taking the vehicle.

11  Q.   Is that like when you rent an automobile sedan as well and

12  you are concerned about being accused of having damaged a car

13  when it was damaged prior to you renting it, so you go around

14  the car and note what might be a scratch or a ding, if you

15  will?

16  A.   Yes, that is correct.

17  Q.   The next one in order, ma'am?

18  A.   The next one is a reservation for a Budget Truck.

19  Q.   And the next one in order?

20  A.   It is a closed agreement for a Budget Truck.

21  Q.   The next page, ma'am?

22  A.   A letter that I received.

23  Q.   Okay.

24  A.   From Northshore Moving.

25  Q.   Is there a signature line on that letter?

1  A.    Yes, it is.  Well, the signature underneath it, it says

2  "Sean Murphy".

3  Q.    "Sean Murphy"?

4  A.    Yes.

5  Q.    And is there a date on that letter, ma'am?

6  A.    The date is April 17th, 2008.

7  Q.    Do you recall receiving that letter personally?

8  A.    I personally received this letter.

9  Q.    Anything that was unusual about the letter in terms of

10  your receipt of it?

11  A.    Not the letter itself.  I mean, it is just a normal letter

12  thanking us for our service, but I did notice that the postdate

13  on the envelope was a year later than the letter was dated.

14        MR. DOMINGUEZ:  May I again approach, Your Honor?

15        THE COURT:  Yes.

16  Q.    (By Mr. Dominguez) With respect to these letters -- with

17  the exception of 5-8, the letter that you have identified that

18  we will discuss and 5-1, the photograph that you identified --

19  the business records that you identified, 5-2 through 5-7, do

20  you recognize those as documents that are kept in the normal

21  course of business there at Newmarket Storage?

22  A.    Yes, they are.

23  Q.    I ask you to take a look at Government's Exhibit 6-1, the

24  first item in that baggie?

25  A.    It is a driver's license.

1  Q.   And do you recognize the name on that driver's license?

2  A.   Not on one of them, I do not, but one of them I do.

3  Q.   Take out the one that you recognize, ma'am.

4  A.   This one here (indicating the exhibit).

5  Q.   And what is the name on that driver's license?

6  A.   Brian Hetherman.

7  Q.   And what state of issue is that driver's license?

8  A.   Massachusetts.

9  Q.   And have you seen that driver's license before?

10  A.   I have.

11  Q.   Is that the driver's license utilized in transactions that

12  you are going to discuss with us?

13  A.   Yes.

14         MR. DOMINGUEZ:  May I approach, Your Honor?

15         THE COURT:  Yes.

16  Q.   (By Mr. Dominguez) You stated that you reviewed a

17  photograph displayed for you by law enforcement officials on

18  March 13th of 2009?

19  A.   Yes.

20  Q.   Is that the photograph that you were shown?

21  A.   Yes, it is.

22  Q.   And what are you saying in response to having seen that

23  photograph, ma'am?

24  A.   "I do recognize the above subject as Brian Hetherman."

25  Q.   Do you have a coworker there at Newmarket?

1    A.    I do.

2    Q.    What is her name?

3    A.    Theresa (phonetic)BadorPeake.

4    Q.    And do you know if she had contact with Brian Hetherman

5    there at the Newmarket store?

6    A.    Yes, she did.

7    Q.    I am going to show you Government's Exhibit 5-2.  What

8    does that document reflect, ma'am?

9    A.    That documents reflects a move-in on 6-12, 2008 and a

10   move-out on 1-9 of 2009 -- or I should say a paid-to date of

11   1-9 of 2009.

12   Q.    Very well.  So the record is clear, 5-2, that's a record

13   as to Mr. Hetherman's -- Mr. Hetherman's rental of a storage

14   unit, correct?

15   A.    That is correct.

16   Q.    Government's Exhibit 5-3, ma'am?

17   A.    That is the move-out ledger.  That shows you all of the

18   information.

19   Q.    Does it have a move-out date?

20   A.    It has a paid-to date of 1-12 of 2009.  I don't know --

21   Q.    Is that still a part of the storage facility, ma'am?

22   A.    That is correct.

23   Q.    Government's Exhibit 5-4, ma'am?

24   A.    That is the actual move-out receipt.

25   Q.    What is that date?

1   A.   1-9 of 2009.

2   Q.   Did you have any conversations with Mr. Hetherman

3   regarding his move-out date?

4   A.   He called me to advise me that he had vacated the unit.

5   Q.   Now, I am going to draw your attention, if I could, ma'am,

6   to Government's Exhibit 5-5, a two-page document, and I will

7   show you the first page of that document, Exhibit 5-5.

8        What is reflected there, ma'am?

9   A.   That is an open agreement on a Budget Truck.

10  Q.   When you say "open agreement", what do you mean by that?

11  A.   That is when the agreement is open, when they come in and

12  actually rent the truck.

13  Q.   Okay.  Is it rented for a particular -- a particular time

14  frame or daily or weekly?  How does that work?

15  A.   It is usually daily.  In this case, it was rented on 1-2,

16  and the anticipated date of return is 1-7.

17  Q.   There is a deposit amount reflected there, ma'am.  How

18  does that work with your company?

19  A.   You are required to leave a deposit, either by cash or by

20  credit card, and this was a cash deposit.

21  Q.   And when you say a cash deposit, is that a percentage of

22  what the use is anticipated, or how does that work?

23  A.   It is a percentage of the anticipated usage.

24  Q.   And you recognized Sean Murphy -- excuse me -- strike

25  that -- Brian Hetherman by way of a photograph and actually

1  here in open court today.  How long have you known

2  Mr. Hetherman?

3  A.    I would say early 2000s.

4  Q.    So, quite a bit of time?

5  A.    Yes.

6  Q.    And how often did he do business at Newmarket Storage?

7  A.    Well, initially, he rented storage units, and he would

8  rent the unit and use the unit, and that was pretty much the

9  extent of our -- originally the extent of our rental agreement.

10  Q.    And then sometime thereafter, later down the line, if you

11  will -- not to put words in your mouth -- did he begin to rent

12  rental trucks?

13  A.    Yes, he did.

14  Q.    Under the name of "Brian Hetherman"?

15  A.    Yes, he did.

16  Q.    And I note -- was there a section of the rental agreement

17  where you would -- or one of your associates would input the

18  driver's license number?

19  A.    That is correct.

20  Q.    And I note -- it appears that you don't place the entire

21  license number on the agreement?

22  A.    No, we do not.  Let me correct that.  We put it into the

23  system, the full number, but --

24  Q.    Okay.

25  A.    But for personal reasons, Budget does not print everything

1   out on the agreement, in case the agreement got lost.

2   Q.   Just the last four?

3   A.   That is correct.

4   Q.   That's for the benefit of the consumer?

5   A.   That is correct.

6   Q.   I will display now Government's Exhibit 6-1.  You recall

7   identifying that from the witness stand?

8   A.   Yes.

9   Q.   Now, clearly, there are two items in there.  I will just

10  pull one from the package.  What is that, ma'am?

11  A.   That is a Massachusetts driver's license.

12  Q.   In the name of?

13  A.   Brian Hetherman.

14  Q.   And it appears to have like it is embossed or certain

15  security features consistent with a valid driver's license?

16  A.   It does.

17  Q.   A dual picture?

18  A.   Um-hmm.

19  Q.   Yes?

20  A.   Yes, yes.  I'm sorry.

21  Q.   That's okay.  And I believe you showed -- or said this

22  reflects the driver's license number that would appear on the

23  rental agreement, the last four digits -- 7055?

24  A.   That is correct.

25  Q.   Showing you the second page, 5-5, ma'am, what is reflected

1    here?

2    A.    That is the close, the end of when the agreement -- when

3    the truck is returned, we close the agreement.

4    Q.    And what is reflected as the date that it was closed?

5    A.    It was closed on 1-5 of 2009 at 14:55.

6    Q.    Do you actually -- I notice some information there at the

7    bottom left.  Do you actually record the amount of mileage

8    that's actually used during the course of the rental?

9    A.    That is correct.  We record the mileage when it leaves and

10   the mileage when it comes back, yes.

11   Q.    And for the record only, what was the total amount of

12   mileage that used on this revolution?

13   A.    1696 miles.

14   Q.    Can you please tell us, ma'am, how a person can go about

15   reserving a rental?

16   A.    Well, they call in and give us the dates and the

17   approximate mileage that they are going to be going, and we

18   make the reservation.

19   Q.    I am showing you, ma'am, what has been marked as

20   Government Exhibit 5-6.  What is that document, ma'am?

21   A.    That is a reservation.

22   Q.    And is it reserving a rental truck for a future date

23   certain?

24   A.    Yes, it is rented for -- it was rented 1-5, 2009 for a

25   pick-up date of 1-16 of 2009.

1  Q.   And as reflected in the previous exhibit, 5-5, the vehicle

2  that was rented was rented on January 2nd of 2009 and actually

3  returned on January 5 of 2009; is that correct?

4  A.   That is correct.

5  Q.   So, based upon these documents, upon Mr. Hetherman's -- or

6  upon this truck being returned on the 5th of January, the

7  person who returned it made a reservation that same day to rent

8  another truck on the 16th?

9  A.   Yes.

10  Q.   To be rented from you?  And is it your recollection,

11  ma'am, that Mr. Hetherman did, indeed, rent that truck that he

12  had reserved on January 16th of 2009?

13  A.   Could you repeat that?

14  Q.   Is it your recollection that Mr. Hetherman did, in fact,

15  pick up a truck on January 16th of 2009 that he had reserved on

16  January 5th of 2009?

17  A.   Yes.

18  Q.   I'm sorry if I jumbled my words, ma'am.

19        MR. DOMINGUEZ:  May I have a moment, Your Honor?

20        THE COURT:  You may.

21  Q.   (By Mr. Dominguez) Showing you Government's Exhibit 5-7,

22  ma'am.  Do you recognize that document?

23  A.   I do.

24  Q.   And what is that?

25  A.   That is the close agreement.

1    Q.    And just so that the record is complete, I think as

2    opposed to the last rental agreement, I think that I got them

3    flip-flopped.

4          So, I will have you for the record identify 5-7, which is

5    the close agreement.  The first page or the actual rental

6    agreement as the car is going out is reflected here, ma'am?

7    A.    That is correct, that is the open agreement.

8    Q.    Was there an anticipated mileage there?

9    A.    I don't think on the open the anticipated mileage is

10   there.  On the reservation, it was.

11   Q.    Does it reflect a time that the vehicle was actually

12   rented to Brian Hetherman?

13   A.    Yes, it was 1-16-09 at 10:30 a.m.

14   Q.    And going back, again, into Government's Exhibit 5-7, what

15   does that reflect, ma'am?

16   A.    That was the close, when the truck was returned.

17   Q.    And does it reflect there how many miles were used during

18   this rental period?

19   A.    Yes, it does, 1,791 miles.

20          THE COURT:  Which truck is this?  The one on the

21   16th?

22          MR. DOMINGUEZ:  This is the one rented on the 16th of

23   January 16th, the one reserved on January 5th to be picked up

24   on January 16th.

25   Q.    (By Mr. Dominguez) Is that correct, ma'am?

1  A.   That is correct.

2  Q.   Does it reflect when it was returned?

3  A.   1-21 of 2008 at 8:30 in the morning.

4  Q.   Now, the rental documents that you have identified, ma'am,

5  for the record, those are maintained in the normal course of

6  business there?

7  A.   Yes, they are.

8  Q.   You are the custodian of the records?

9  A.   Yes, I am.

10  Q.   And you have identified, for the record, a letter that you

11  had received from Sean Murphy, dated April 17th of 2008; do you

12  recall that?

13  A.   Yes, I do.

14  Q.   When you received this letter, did you know who Sean

15  Murphy was?

16  A.   No.  No, I did not.

17  Q.   But you recognized the letter as having received it?

18  A.   That is correct.

19  Q.   Who is reflected as the Truck Manager?

20  A.   Brian Hetherman.

21  Q.   And who was reflected as the vice president?

22  A.   Sean Murphy.

23  Q.   And the letter is dated what date?

24  A.   April 17th of 2008.

25  Q.   With a postmark of?

1  A.   May 11th of 2009.

2  Q.   Did you find that a little bit strange or unusual?

3  A.   Yeah, I did.

4  Q.   And just so the record is clear, I see a reference to FBI

5  Jason Costello.  Did you turn this letter over to the FBI in

6  Boston?

7  A.   Yes, I did.

8  Q.   Ma'am, you talked about Mr. Hetherman utilizing cash for

9  his transactions with your company?

10  A.   Yes.

11  Q.   Was that consistent?

12  A.   Yes.

13  Q.   Over all of the years that you were familiar with him?

14  A.   Yes.

15  Q.   About how many -- what is the percentage of customers, if

16  you know, at your company who paid by cash for their storage

17  units and/or their rental units?

18  A.   I would say the truck rentals probably about 25 percent

19  pay cash and storage units, at least 50 percent pay cash.

20  Q.   Now, you talk in terms of customers who purchase on a

21  regular basis from you by way of business entities over a

22  period of time, does your percentage change?

23  A.   Yeah.  Most of my commercial customers or my repeat Budget

24  Truck customers pay with a credit card.

25       MR. DOMINGUEZ:  May I have a moment, Your Honor?

1          THE COURT:  You may.

2     Q.   (By Mr. Dominguez) Ma'am, you said that you had reviewed

3     those documents before you came to Court today?

4     A.   Mh-hmm, yes.

5     Q.   I just want to clarify one item.  This rental agreement

6     for January 16th of '09, appears to be the signature and

7     initials of "BH", and the customer signature there at the

8     bottom?

9     A.   Yes.

10    Q.   Upon my review, I do not see a similar initial and a

11    similar signature there on Government's Exhibit Number 5-5.

12    Can you explain that for us?

13    A.   The reason for that would be with our regular good

14    customers, if for some reason they are running late and can't

15    get to us during regular business hours, we will deal with the

16    agreement ahead of time and put it into the truck, and then

17    they pick up the truck after business hours.

18    Q.   However, this record does reflect that that rental

19    agreement was utilized and that there was a return and the

20    amount was 1,696?

21    A.   That is correct.

22         MR. DOMINGUEZ:  Your Honor, that would conclude my

23    direct examination of this witness.

24         THE COURT:  Thank you.  Mr. Murphy?

25

                            - - -

                      CROSS-EXAMINATION

BY MR. MURPHY:

Q.    How are you, Ms. Robshaw?

A.    Good.  How are you?

Q.    In regard to your dealings with Millennium Movers and

myself, did a private investigator contact you at Newmarket

Storage regarding your dealings with Millennium Movers?

A.    I received a call at home from a private investigator.

Q.    And did you tell the private investigator to contact your

lawyer?

A.    No, I did not.

Q.    Did you refuse to speak to the private investigator?

A.    I called Mr. Costello and asked him what my options were

and whether or not I was required to speak with him, and he

told me that it was my option whether or not to speak with him,

and I chose not to.

Q.    You chose not to speak to the investigator?

A.    I did.

        THE COURT:  What investigator are you talking about,

Mr. Murphy?

        MR. MURPHY:  We got a private investigator from

Massachusetts to call and see Ms. Robshaw.

        THE COURT:  On your behalf?

        MR. MURPHY:  Yes.

1    A.   May I correct that?  He did not come and see me, he called

2    me on the telephone.

3              MR. MURPHY:  May I continue, Your Honor?

4              THE COURT:  You may.

5    Q.   (By Mr. Murphy) Ms. Robshaw, were all business dealings

6    with Millennium Movers done in accordance with company policy

7    and procedure?

8    A.   As far as I know, yes.

9    Q.   How long has Newmarket Storage done business with

10   Millennium Movers?

11   A.   I am saying the early 2000s.  Well, can I correct that?

12   Q.   Yes.

13   A.   I am not sure when it became Millennium Movers.  Prior to

14   that, it was just Brian Hetherman when it came to storage

15   units.

16   Q.   Okay.  Well, that's not my question.

17   A.   Okay.

18   Q.   I asked you how long Newmarket Storage has done business

19   with Millennium?

20   A.   I am not sure.

21   Q.   Would that be longer than you have been the Facility

22   Manager?

23   A.   I wouldn't know that.

24   Q.   Who was the Facility Manager when Millennium Movers began

25   doing business with Newmarket Storage?

1  A.  Prior to me it was John Mitchell.

2  Q.  Right.  When did John Mitchell's employment terminate with

3  Newmarket Storage?

4  A.  Goodness.  I am going to guess around September of 2000,

5  maybe, or 2001.

6  Q.  What happened to him?

7  A.  He was let go for reasons -- one of the reasons he was let

8  go, he was closing our office in the middle of the day and

9  going off and doing things, poor job performance.

10  Q.  But he was the manager back then?

11  A.  He was.

12  Q.  And after he left in 2000, you took over as manager?

13  A.  I did.

14  Q.  And is it your understanding that prior to you taking over

15  as manager, Millennium actually did business with this guy

16  John?

17  A.  I don't know, I don't remember.

18  Q.  Is it your testimony that since you have been manager,

19  Millennium or Brian Hetherman has been doing business with

20  Newmarket Storage?

21  A.  Could you repeat that?

22  Q.  Since you took over as manager, is it your testimony that

23  Newmarket Storage and/or Brian Hetherman have been doing

24  business with Newmarket Storage since that time?

25       THE COURT:  Just a minute, Mr. Murphy.  Someone take

1  care of that and tell those people to quiet down in the

2  hallway.

3  Q.   (By Mr. Murphy) And throughout the ten-year business

4  relationship, has Millennium Movers rented many trucks and

5  storage bins?

6  A.   Yes.

7  Q.   Did Millennium always pay their bills to Newmarket?

8  A.   Yes.

9  Q.   Did Newmarket Storage know how to get in touch with

10  Millennium Movers?

11  A.   Yes.

12  Q.   Did Newmarket Storage know Millennium moved its office to

13  an address in Wakefield?

14  A.   I believe so, yes.

15  Q.   And this is -- I am just going to ask your opinion, now.

16  If Millennium Movers were using Newmarket Storage for illegal

17  purposes, wouldn't they have concealed their phone number and

18  their business address?

19          MR. DOMINGUEZ:  Objection, Your Honor.

20          THE COURT:  Sustained.

21  Q.   (By Mr. Murphy) In the normal course of business, does

22  Newmarket Storage require a picture I.D. to rent a moving

23  truck?

24  A.   Yes.

25  Q.   Is it the policy that Newmarket Storage retains a copy of

1  the truck renter's driver's license?

2  A.    No.

3  Q.    Does Newmarket Storage require a picture I.D. to rent a

4  storage unit?

5  A.    No.  Can I correct that?  At that time, we did not.  We do

6  now require a picture I.D.

7  Q.    What date did you change policy?

8  A.    I don't know.  I mean, let's say two years ago.

9  Q.    Two years ago?  Okay.

10  A.    That's a guess.  I just know we started accepting --

11        THE COURT:  If you are not sure, that's your answer.

12  A.    Okay.  I am not sure.

13  Q.    (By Mr. Murphy) So, does Newmarket Storage have a copy of

14  the picture I.D. for any of the trucks or storage bins rented

15  over the years?

16  A.    No, I do not.

17  Q.    So, you don't have a copy of the Brian Hetherman driver's

18  license?

19  A.    I do not.

20  Q.    And you testified from a document that you just showed

21  what Brian Hetherman's position was at Millennium Movers?

22  A.    Yes.

23  Q.    What was that, again, please?

24  A.    Can you --

25  Q.    Brian Hetherman's position at Millennium Movers?

1  A.   Truck Manager.

2  Q.   And I noticed in a lot of the documents that the

3  government showed, that you spelled Brian Hetherman's name as

4  H-E-A-T-H-E-R-M-A-N; is that correct?

5  A.   I would have to see the document again.  I didn't look at

6  that.

7       MR. MURPHY:  May I see the government's stack?  The

8  whole stack?

9  Q.   Here is where you wrote in your own writing?

10 A.   Yep.

11 Q.   And that's H-E-A, "Heatherman"?

12 A.   That is correct.

13 Q.   And so did Theresa (phonetic) BadorPeake spelled it the

14 same way?

15 A.   I see that, yes.

16 Q.   And here is a storage contract, and it is spelled the same

17 way, H-E-A, "Heatherman"?

18 A.   I see that, yes.

19 Q.   On this (indicating) document the same way?

20 A.   That is correct.

21 Q.   Okay.  And this one right here?

22 A.   I see that, yes.

23 Q.   So, we are being consistent with H-E-A, "Heatherman"?

24 A.   I see that.

25 Q.   So, would it be fair to say that all the documents from

1  Newmarket Storage had "Heatherman" as H-E-A?

2  A.   Yes.

3  Q.   On the letter that you described, how is "Hetherman"

4  spelled there?

5  A.   "H-E-T-H-E-R-M-A-N", no "A".

6        MR. MURPHY:  May I see the license, please?

7  Q.   (By Mr. Murphy) How is it spelled on the license?

8  A.   H-E-T-H-E-R-M-A-N.

9  Q.   So, are you claiming that you saw this license at some

10 time?

11 A.   Yes.

12 Q.   And you just made a mistake on all of the documents?

13 A.   Yes.

14 Q.   Now, when you first started as manager, wasn't there

15 another person at Millennium Movers who did business with

16 Newmarket Storage, also?

17 A.   I don't remember it going that far back as Millennium

18 Movers; I do remember a partner.

19 Q.   You remember the partner?

20 A.   But I don't remember his name.

21 Q.   But you do remember him coming up and renting trucks and

22 storage bins?

23 A.   You see, I don't remember going that far back with the

24 trucks, but I do remember the storage units.

25 Q.   Well, let's get clear for the record, since Millennium has

1   done business probably longer than you were the manager, wasn't

2   there a time, a long period of time when Newmarket Storage

3   didn't rent trucks?

4   A.   Yes, you are correct, we did not.

5   Q.   So, there was a matter of years -- well, let's go back

6   before you were manager, they did rent trucks?

7   A.   Yes.

8   Q.   Then, they stopped for a long period of time?

9   A.   Yes, there was a -- I want to say, approximately, three

10   years.

11   Q.   Possibly four?

12   A.   Possibly four.

13   Q.   Then, Newmarket started renting trucks again?

14   A.   That is correct.

15   Q.   So, your recollection of them just renting storage bins,

16   that's possibly because Newmarket Storage wasn't renting trucks

17   at the time?

18   A.   That is correct.

19   Q.   Thank you.  And you do remember this other person that

20   went up and did business?

21   A.   I remember two people.

22   Q.   Okay.  Did you keep Brian Hetherman's record on file, like

23   on back of a folder or somewhere in the computer?

24   A.   I believe that I had a file folder for my regular

25   customers who do, you know, more than one or two truck rentals.

1  I do keep a file folder and put their agreements as they close

2  into the file folder.

3  Q.   Wouldn't it be your testimony and recollection that you

4  did so with Brian Hetherman?

5  A.   I believe I did.

6  Q.   So, when Brian Hetherman or Millennium Movers went up to

7  do business, you would already have all of this information on

8  the folder, you wouldn't need to see an I.D. or anything like

9  that, correct?

10  A.   In some instances, that's correct.  Once I have seen the

11  I.D., then -- and I do this with my regular customers -- once I

12  have seen the I.D., then we just automatically do the --

13  Q.   Well, couldn't this have been a situation because

14  Millennium Movers had done business with Newmarket for so long,

15  couldn't that information been have been in the file folder

16  when you took over as manager?

17  A.   No, no, that's something I did.

18  Q.   Would the computer have held that information?

19  A.   No, absolutely not.

20  Q.   The computer doesn't hold the rental information?

21  A.   For the trucks?

22  Q.   Yes?

23  A.   No, it does not.

24  Q.   Now, you said that you have held -- I believe earlier,

25  that all of your business deals with Millennium were done

1    according to company policy and procedure?

2    A.    To the best of my knowledge, yes.

3    Q.    Does Newmarket Storage require you to get the driver's

4    information for every person driving a Budget Truck?

5    A.    If you rent it commercially?

6    Q.    Anybody?  Does Budget require the driver information for

7    everybody who rents a truck?

8    A.    On commercial rentals, no.  Commercial rentals, one

9    driver's information goes in and then anybody can drive it

10   under that person.  On a personal rental, then we have to get

11   everybody's driver's license information.

12   Q.    Did Millennium Movers ever rent two trucks at one time

13   from Newmarket Storage?

14   A.    I can't remember.

15   Q.    Would your records reflect that?

16   A.    It would, depending upon how far back I had to go.

17   Q.    You don't recall on at least three or four or five

18   occasions Millennium reserving two trucks?

19   A.    I don't remember.

20   Q.    You have the file with you here today?

21   A.    I do not, I have turned everything over.

22   Q.    So, the government has the whole file?

23   A.    I believe so.

24        MR. MURPHY:  Does the government have all of the

25   rental agreements from Newmarket Storage?

1          MR. DOMINGUEZ:  No.

2  Q.   (By Mr. Murphy) You don't have the records?  You gave them

3  to the government?

4  A.   I gave everything that was required of me to the

5  government.

6  Q.   Which would be the whole file, all of the rentals that

7  Millennium Movers had done since you have been at this?

8  A.   During a certain time frame.

9  Q.   Which time frame would that be?

10 A.   I don't remember.

11 Q.   You don't remember the time frame?

12 A.   Not for what they requested.

13 Q.   So, you wouldn't be able to tell us what your recollection

14 is on the instances when Millennium may have rented two trucks?

15 A.   No, I can't remember.

16 Q.   Were there times when someone other than Brian Hetherman

17 would go and pick up a Budget Truck because Brian physically

18 couldn't make it?

19 A.   Not when I was there, I don't believe.  When it was picked

20 up afterhours, I wouldn't know, but I don't remember anybody

21 picking it up when I was actually there.

22 Q.   Were you present every time when Millennium picked up a

23 truck?

24 A.   I would probably say no.  My employee may have been there.

25 Q.   So, it is possible that the other employee had actually

1  turned over the keys and rental contract to someone other than

2  Brian Hetherman?

3  A.   It is possible.

4  Q.   Were there times when other people dropped off the Budget

5  Trucks other than Brian Hetherman, and you resolved the bill at

6  a later date when he was available?

7  A.   There were times when the trucks were dropped off

8  afterhours, and it was settled on later.

9  Q.   Were there times when Newmarket Storage owed Millennium

10  money and other times when Millennium owed Newmarket Storage

11  money?

12  A.   Yes.

13  Q.   And was Newmarket Storage aware that Millennium rented out

14  fully-equipped moving trucks to its customers for $300 a day?

15  A.   I believe that was stated in the letter that I received, I

16  didn't know it prior to that.

17  Q.   Your recollection is fine.

18  A.   Okay.

19  Q.   Besides Millennium, are you aware of any other company

20  that rents out fully-equipped moving trucks that contain 60

21  full-sized moving pads, six loading straps, four four-wheeled

22  dollies, two two-wheeled box carts and a full set of tools?

23  A.   No, I do not.

24  Q.   So, Millennium provided a unique service to the industry?

25          MR. DOMINGUEZ:  Objection, Your Honor.

1          THE COURT:  Sustained.

2          MR. MURPHY:  I would like the record to reflect that

3   this was a company that rents trucks, too, Your Honor, so she

4   should be a semi-expert in the field.

5          MR. DOMINGUEZ:  Your Honor, she cannot respond to

6   what he is testifying about that he supplied to other people.

7          THE COURT:  You made a statement.  You testified as

8   to a statement.

9          MR. MURPHY:  No, I believe what I said --

10         THE COURT:  Do you know anything about that?

11         THE WITNESS:  About?

12         THE COURT:  About whether they are a special company,

13  or anything like that?

14         THE WITNESS:  I don't know what regular moving

15  companies do, but I just know when we rent the trucks --

16         THE COURT:  All right.

17         THE WITNESS:  We do offer at a price, we will supply

18  those things.

19         THE COURT:  But you don't know what the industry

20  does?

21         THE WITNESS:  No.

22         THE COURT:  Okay.

23  Q.   (By Mr. Murphy) Now, has Millennium Storage rented storage

24  bins for other customers at Newmarket Storage?

25  A.   Yes.

1   Q.   Have they done so on more than one occasion?

2   A.   Yes.

3   Q.   And on certain occasions, has Millennium brought up and

4   referred other companies that needed storage, that you can

5   recall from the years doing business?

6   A.   Can you repeat that?

7   Q.   Has Millennium brought up other customers, other moving

8   companies and referred them to Newmarket Storage to rent

9   storage facilities there?

10  A.   I am not sure.

11  Q.   Okay.  I will show you a document, Ms. Robshaw.  It is

12  dated 11-17-09.

13  A.   Yes.  Thomas Mullen, Mary McDonald.

14  Q.   Do you see the Taylor Movers there?

15  A.   Yes, I do.

16  Q.   And you see the address of Taylor Movers?

17  A.   Yes, I do.

18  Q.   That address -- are you familiar with that address?

19  A.   I am not sure.  I mean, there has been so many addresses.

20  Q.   Okay.  Now, would you remember the day that Brian

21  Hetherman went up there with two other persons.  One of the

22  other persons was Thomas Mullen, and the other was a

23  representative of Taylor Movers; do you remember that day?

24  A.   No, I do not remember the day.

25  Q.   Well, the record will reflect that you actually rented to

1   Thomas Mullen.

2   A.   I do remember the unit being rented.

3   Q.   Okay.  And it was through Taylor Movers?

4   A.   Okay.

5        MR. MURPHY:  Thank you very much.

6   Q.   (By Mr. Murphy) And would you know anything about a moving

7   company and how they pay their employees?

8   A.   How a moving company?

9   Q.   A general moving company pay their employees, movers, they

10  go out and work every day for the moving company; do you have

11  any idea?

12  A.   I have no idea.

13  Q.   So, you don't know whether they get paid by check or cash?

14  A.   I have no idea.

15       MR. MURPHY:  Thank you for being honest, Ms. Robshaw.

16  Have a nice day.

17       THE COURT:  Any questions?

18       MR. DOMINGUEZ:  Yes, Your Honor.

19                        – – –

20                   REDIRECT EXAMINATION

21  BY MR. DOMINGUEZ:

22  Q.   Ma'am, Mr. Murphy was asking you questions about

23  Mr. Hetherman.  And I believe the name "Hetherman" is spelled

24  H-E-A-T-H-E-R-M-A-N on the form?  You knew this person

25  (indicating Mr. Murphy) as Brian Hetherman?

1    A.    Yes.

2    Q.    And do you remember the photograph that you identified in

3    Exhibit 5-1?

4    A.    Yes.

5    Q.    Is that the photograph that you recognize as being Brian

6    Hetherman?

7    A.    Yes, it is.

8    Q.    The name on that driver's license is?

9    A.    Sean Murphy.

10   Q.    Now, Mr. Murphy asked you questions whether or not you

11   conducted your transactions with Millennium Movers in

12   accordance with company policy and community standards,

13   whatever language that he used.  If Sean Murphy was to come

14   into your facility and said, I want to rent a vehicle under the

15   name of Brian Hetherman, would you have allowed that

16   transaction?

17   A.    Absolutely not.

18   Q.    That wouldn't have been in accordance with law, would it?

19   A.    No.

20   Q.    Ma'am, do you see the signature on that driver's license?

21   A.    I do.

22   Q.    Can you spell that last name for us?

23   A.    On the signature?

24   Q.    On the signature.

25   A.    It looks like H-E-A-T-H-E-R-M-A-N.

1      MR. DOMINGUEZ:  No further questions, Your Honor.

2      THE COURT:  Anything on that?

3      MR. MURPHY:  No questions, Your Honor.

4      THE COURT:  All right.  Thank you very much.

5      Your next witness.

6      MS. HILL:  Angela Lowe.

7                        - - -

8                   ANGELA LOWE

9   AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

10                       - - -

11                 DIRECT EXAMINATION

12  BY MS. HILL:

13      THE COURT:  You may proceed.

14      MS. HILL:  Thank you, Your Honor.

15  Q.   Good afternoon, ma'am.

16  A.   Good afternoon.

17  Q.   Can you please introduce yourself to the ladies and

18  gentlemen of the jury and go ahead and spell your last name for

19  the record.

20  A.   My name is Angela Lowe, L-O-W-E.

21  Q.   Thank you.  Ms. Lowe, where do you work?

22  A.   Dollar/Thrifty Automotive Group.

23  Q.   And where is that located?

24  A.   The corporate office is in Tulsa, Oklahoma, but I work out

25  of Columbus, Ohio.

1  Q.   So, you work around the general Columbus area?

2  A.   Yes.

3  Q.   How long have you worked for -- is it Dollar/Thrifty?

4  A.   Mh-hmm.

5  Q.   How long have you worked there?

6  A.   Seven years.

7  Q.   What is your position?

8  A.   I am a Staff Assistant.

9  Q.   Have you been a Staff Assistant the whole seven years?

10 A.   I have been a Staff Assistant for five years.

11 Q.   And what was your position before being a Staff Assistant?

12 A.   A Reservation Assistant.

13 Q.   As a Staff Assistant, what are your general duties?

14 A.   I take care all of our dealer business reports, keeping

15 rental agreements in their own daily -- in with the report

16 tickets it is, and our fleet, as well as making sure that all

17 of the vehicles are accounted for.

18 Q.   And when you say your fleet, what do you mean by that?

19 A.   Making sure each of the cars that we own are actually

20 where they are supposed to be.  Our fleet is the cars that we

21 rent.

22 Q.   And you said running daily reports, what sorts of reports

23 are you responsible for?

24 A.   To make sure what vehicles were actually rented the day

25 before, the rental agreements are accounted for, that they are

1  signed, and that the vehicles are attached to them.

2  Q.   Now, as a part of your duties as Staff Assistant at

3  Budget(sic)/Thrifty, do you have access to all of the records

4  kept by Thrifty in the normal course of business?

5  A.   Yes.

6  Q.   Do you assist in the maintenance of those records that are

7  kept by Thrifty?

8  A.   Yes, here in Columbus.

9  Q.   And do you have access to all of the records for Thrifty

10  locations all across the nation?

11  A.   Yes.

12  Q.   Do you have any idea, if you know, approximately, how many

13  Thrifty rental agencies that there are?

14  A.   I believe there is, approximately, 300 to 500.

15  Q.   And just for the record, I think it is pretty obvious from

16  what you said so far, but the general business of Thrifty is

17  just renting vehicles?

18  A.   Yes.

19  Q.   Is that more to private customers or commercial customers

20  or a mix?

21  A.   We have a mix.  We have fly-ins that fly into the airport

22  as well as local customers.

23  Q.   Now, are you familiar with the training that employees at

24  Thrifty receive as far as the making and keeping of records?

25  A.   Yes.

1    Q.   And you have undergone that training?

2    A.   Yes.

3    Q.   And are you familiar with the content of records -- those

4    records that are kept in the normal course of business by

5    Thrifty?

6    A.   Yes.

7    Q.   And when records are -- does Thrifty create records

8    related to the actual rental of vehicles?

9    A.   Yes.

10   Q.   And are those records created at the time that the rental

11   transaction actually occurs?

12   A.   Yes.

13        MS. HILL:  Permission to approach, Your Honor?

14        THE COURT:  Yes.

15   Q.   (By Ms. Hill) Ms. Lowe, I have handed you what has been

16   identified as Government's Exhibit 7-1.  Do you recognize that

17   document?

18   A.   Yes.

19   Q.   What do you recognize that to be?

20   A.   The first document is the opening rental agreement, and

21   the second document is the closing rental agreement.

22   Q.   Is that a record that is kept in the normal course of

23   business by Thrifty?

24   A.   Yes.

25   Q.   Now, if you could, ma'am, I am going to ask you to look

1 through that document.  Does that document indicate who that --

2 who a vehicle was rented to?

3 A.   Yes.

4 Q.   What is the name on that?

5 A.   Sean Murphy.

6 Q.   Does it indicate when that vehicle was rented to Sean

7 Murphy?

8 A.   Yes.  The date out was January 15th of 2009, and the

9 rental expired on January 22 of 2009.

10 Q.   And all of the information obtained in this record, is

11 this information that would be put into Thrifty records at the

12 time that the actual car was rented?

13 A.   Absolutely.

14 Q.   I will take that back from you.  I will display here,

15 Ms. Lowe, again, this is Government's Exhibit 7-1, the page,

16 first page that you were just looking at.  You indicated that

17 there is a customer name on this document?

18 A.   Right.

19 Q.   Can you touch on the screen there and circle and point

20 that out to the ladies and gentlemen of the jury what that is?

21 A.   Yes.

22 Q.   That is the name of Sean Murphy, correct?

23 A.   Correct.

24 Q.   Again, discussing when this agreement was actually for,

25 when the car was rented, can you point out the information,

1  please, to the time frame.  And, again, what was that date out?

2  A.   The date out was January 15th of 2009 at 5:30 p.m -- I'm

3  sorry, 5:29 p.m.

4  Q.   Is there any indication of what kind of vehicle was

5  rented?

6  A.   It was a Dodge Journey.

7  Q.   And can you point out where the actual -- where this

8  vehicle was actually rented from, what location?

9  A.   Yes, Massachusetts.

10  Q.   So, this was not something that was rented from your

11  office here in Columbus?

12  A.   Correct.

13  Q.   This is a business record that you would have access to as

14  a Staff Assistant?

15  A.   Yes.

16  Q.   Now, drawing your attention to the second page of this

17  document, 7-1.  What, specifically, is displayed on this page?

18  A.   The closing.  It actually looks like it closed on

19  January 22nd.

20  Q.   What was the date?

21  A.   1-15-09.

22  Q.   You say it closed.  What does that mean?

23  A.   It means the vehicle was returned.

24  Q.   So, it was actually returned earlier than scheduled?

25  A.   Yes.

1  Q.   And can you just point out on this document, again, that

2  information as to where it was returned?

3  A.   (Witness did so).

4  Q.   Ms. Lowe, was their an indication of how many miles was

5  driven on this vehicle while it was being rented?

6  A.   Yes, 2,245 miles.

7  Q.   Okay.  Very good.

8          MS. HILL:  Thank you.

9          THE COURT:  What was that?  Two thousand what?

10         THE WITNESS:  2245.

11         THE COURT:  Was that when the car left?

12         THE WITNESS:  That would be the mileage when it was

13  returned, that's how many miles were driven.

14  Q.   (By Ms. Hill) Now, Ms. Lowe --

15         THE COURT:  That's the miles driven between

16  January 15th and the 22nd?

17         THE WITNESS:  Correct.

18         THE COURT:  Thank you.  Excuse me, Ms. Hill.

19         MS. HILL:  I apologize, Your Honor.

20  Q.   (By Ms. Hill) I want to go back to the first page of this

21  document, again.  Again, referring to Government Exhibit 7-1,

22  can you tell by looking at this document whether there were any

23  other drivers authorized besides Sean Murphy?

24  A.   There were none.

25  Q.   Can you point to any area of this document that tells you

1    that?

2    A.    Under "Additional Drivers", it states "none".

3    Q.    So, if somebody wanted to have more than one driver

4    authorized to drive the rental vehicle, would they have to give

5    information?

6    A.    Yes.  That person has to be at the time of the rental with

7    the other driver with a valid driver's license.

8    Q.    And in order to actually rent a vehicle from Thrifty, is

9    it standard operating procedure for someone to obtain the

10   renter's driver's license?

11   A.    The driver's license and a major credit card.

12   Q.    Does Thrifty keep a copy of that in any manner?

13   A.    We keep a copy, and it actually goes into a

14   computerized -- we take a picture, and that's what we kept for

15   a year.

16   Q.    And would it be a standing operating procedure of the

17   Thrifty worker to check the photograph on the identification

18   against the actual person before that camera?

19   A.    Absolutely.

20            MS. HILL:  I have no further questions, Your Honor.

21            THE COURT:  Mr. Murphy?

22                                - - -

23                          CROSS-EXAMINATION

24   BY MR. MURPHY:

25   Q.    Good afternoon.  You testified that Thrifty has to have a

1   valid driver's license in order to rent the vehicle?

2   A.   Correct.

3   Q.   Does Thrifty check to see if those licenses are active at

4   the time?

5   A.   No.

6   Q.   So, then they wouldn't know if they are valid or not?

7   A.   We are given the picture I.D. of the driver's license.

8   Q.   Well, if someone had a picture I.D. that looked like a

9   Massachusetts driver's license and had someone's picture and

10  information on it, and it was just totally made up or someone

11  else's information on it, Thrifty would have no knowledge of

12  that?

13  A.   We have a driver's license book that we go by, and if it

14  looks suspicious, we do check into it.

15  Q.   If it was a really good fake I.D.?

16  A.   There are specific indications that we are given --

17  Q.   Really?

18  A.   -- to look for.

19  Q.   If we were to show you one, would you be able to I.D. it?

20  A.   Most certainly.

21  Q.   Okay.

22       MR. MURPHY:  Let the record reflect that the

23  government would not show the I.D.

24       MR. DOMINGUEZ:  Your Honor, so the record is clear,

25  Mr. Murphy wants to show her the driver's license of Brian

1  Hetherman, and Brian Hetherman is not relevant to this

2  transaction.  So, the record is complete.  That's the issue.

3          Now, if the Court wants Mr. Murphy to show her Brian

4  Hetherman's driver's license, I have no objection.

5          MR. MURPHY:  Your Honor, the witness testified that

6  she could recognize fake I.D.s and describe them.

7          THE COURT:  Well, she didn't do the rental.

8          MR. MURPHY:  I think she was talking in general.

9  Q.   (By Mr. Murphy) In general, you could identify them?

10 A.   No.

11 Q.   Okay.  Would the records of Thrifty know who returned this

12 Dodge Journey?

13 A.   Whoever brings the vehicle back.

14 Q.   Do they I.D. the people who return the vehicle?

15 A.   Yes.  We make sure that whoever was driving the vehicle is

16 the one who returns the vehicle.

17         MR. MURPHY:  I have no further questions of this

18 witness.

19         THE COURT:  Anything further, Ms. Hill?

20         MS. HILL:  Nothing further, Your Honor.

21         THE COURT:  Thank you.  You may step down.

22         Call your next witness.

23         THE JURY:  Could we take a break?

24         THE COURT:  Absolutely.  We will take ten minutes.

25                   - - -

1    THEREUPON, the Jury exited the courtroom and the

2    following proceedings were held in the open courtroom with

3    Court and counsel and Mr. Murphy:

4    THE COURT:  Well, what apparently has happened here

5    is that there is some request by Mr. Murphy for some witnesses,

6    many of them from Massachusetts for Monday, and this is Tuesday

7    of a week before, and the Marshals, typically, require 90 days

8    for service of subpoenas.

9    And I have to ask you, Mr. Murphy, why these are

10   brought before me now?

11   MR. MURPHY:  Well, Your Honor, when Mr. Graeff took

12   over this case, I had actually given him the list of my

13   witnesses and everything that needed to be done with them.  And

14   like I told the Court at the beginning of this trial, when I

15   got back to jail on the Thursday after picking the jury, I

16   received a letter from Mr. Graeff telling me that he wasn't

17   going to subpoena my witnesses, and he wasn't going to use them

18   for unacceptable reasons.

19   THE COURT:  What were the unacceptable reasons?

20   MR. MURPHY:  He thought that my defense was going to

21   be an alibi defense, and clearly, I told him that it wasn't an

22   alibi defense.  And, you know, even Mr. Dominguez agrees that

23   the scope that my witnesses are going to testify are outside

24   the alibi time frame, and, you know, I just didn't understand.

25   THE COURT:  Well, did he give you any other reason?

1          MR. MURPHY:  No, he didn't.  He just said that and

2     said if we would do it --

3          THE COURT:  Tina Ankrom, of course, works for us, and

4     she is here in the building.

5          MR. MURPHY:  Right.

6          THE COURT:  Without going into detail, what is the

7     purpose of that witness?

8          MR. MURPHY:  Statements that were made to her from

9     one of the codefendants, Your Honor.

10         THE COURT:  Pardon me?

11         MR. MURPHY:  Statements that were made to her from

12    one of the codefendants.

13         THE COURT:  Oh.  A codefendant that has testified or

14    is going to testify?

15         MR. MURPHY:  Possibly, Your Honor.  One of them has

16    testified already.

17         THE COURT:  Well, you have the witness list.

18         MR. MURPHY:  Mr. Doucette's information is on the

19    list.

20         MR. DOMINGUEZ:  Your Honor, any statement made by

21    Mr. Doucette to Tina Ankrom would be hearsay and inconsistent

22    with the Rules of Evidence.

23         THE COURT:  Right.  Well, that's squashed.  David

24    Nassor is here.

25         Henry Wojewodzic from Lynn.  Who is that?

1          MR. MURPHY:  He is a police officer from the Lynn

2  Police Department.

3          THE COURT:  And what would that person, generally

4  speaking, would that person testify to?

5          MR. MURPHY:  His observations during the course of

6  his patrols on the morning of January 16th of 2009.

7          THE COURT:  What does that have to do with the 17th?

8          MR. MURPHY:  Your Honor, he is one of my witnesses

9  that will state where he observed me on the 16th, which is part

10  of my defense.

11          MR. DOMINGUEZ:  Your Honor, I am willing to stipulate

12  that Mr. Murphy was in Massachusetts, at least until the time

13  that the rental truck was rented on the 16th of January.

14          THE COURT:  There you go.

15          MR. MURPHY:  The Grand Jury testimony of --

16          THE COURT:  And that stipulation will be read to the

17  jury.

18          MR. MURPHY:  Okay.  That's fine.  That takes care of

19  Mr. Wojewodzic.

20          THE COURT:  Shannon Murphy.  Who is Shannon Murphy?

21          MR. MURPHY:  That's my daughter, Your Honor.  She

22  would testify to the same thing, and if the stipulation goes

23  through, that's fine.

24          MR. DOMINGUEZ:  Your Honor, so the record is clear,

25  we are willing to stipulate that Mr. Murphy was in Lynn,

1  Massachusetts at the time that the rental truck was rented from

2  Newmarket in New Hampshire.

3          MR. MURPHY:  Well, Newmarket, New Hampshire is a long

4  way from Lynn, it is north.

5          So, if you are saying that Mr. Murphy was in

6  Newmarket, New Hampshire at 10:38, that's an hour north of

7  Lynn.

8          MR. DOMINGUEZ:  That's fine.

9          THE COURT:  Dylan Holmes (phonetic)?

10         MR. MURPHY:  Same issue, Your Honor.

11         THE COURT:  Same issue?

12         MR. DOMINGUEZ:  He was in Newmarket, New Hampshire at

13  the time the rental truck was rented.

14         THE COURT:  Who is Dylan Holmes?  The same deal?

15         MR. MURPHY:  That would be my daughter's boyfriend,

16  Your Honor.

17         THE COURT:  Okay.  Well, he will testify to the same

18  thing, that you were --

19         MR. MURPHY:  In the Greater Boston Area on the

20  morning of January 16th.

21         THE COURT:  On the morning of January 16th, right,

22  okay.

23         Is that acceptable to you, or do you want a specific

24  location?  Tell me how you want it to read.

25         MR. DOMINGUEZ:  The record reflects that this vehicle

1    was rented at 10:30 in the morning at Newmarket, New Hampshire

2    under the name of Brian Hetherman with his signature, frankly.

3             I mean, if you would just stipulate that you rented

4    the vehicle, that would solve everything.

5             MR. MURPHY:  Well, me and my company did rent that

6    vehicle.

7             MR. DOMINGUEZ:  There we go.

8             THE COURT:  All right.  And then the last one is John

9    Fleury, F-L-E-U-R-Y of 406 Broadway Street, Lynn,

10   Massachusetts.  And is that the same?

11            MR. MURPHY:  No, Your Honor.  This witness would

12   testify as to conversations that he had with Mr. Nassor.

13            MR. DOMINGUEZ:  Hearsay, Your Honor.

14            THE COURT:  Sustained.

15            MR. MURPHY:  I believe we forgot my investigator.

16            THE COURT:  I don't have him on here.  Well, isn't he

17   here?

18            MR. GRAEFF:  Your Honor, he subpoenaed himself.  He

19   is available.  He has been in and out, but he is here.

20            THE COURT:  So, to get this down straight, I am going

21   to leave the courtroom for a few minutes here.

22            MR. DOMINGUEZ:  Your Honor, so we can move things

23   along, I don't believe that we will get to his witness until

24   much later.

25            Can we provide the Court with a stipulation tomorrow

1   morning?

2           THE COURT:  I would like to really get it done now, I

3   think, while it is still fresh in everyone's mind.

4           MR. DOMINGUEZ:  Oh, okay.

5                       - - -

6               THEREUPON, a recess was taken.

7                       - - -

8   IN OPEN COURT:

9           THEREUPON, the Jury entered the courtroom.

10                      - - -

11          THE COURT:  Mr. Dominguez, do you have another

12  witness?

13          MR. DOMINGUEZ:  Yes, Helmut Hagan.

14                      - - -

15                  HELMUT HAGAN

16  AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

17                      - - -

18                  DIRECT EXAMINATION

19  BY MR. DOMINGUEZ:

20          THE COURT:  You may proceed.

21          MR. DOMINGUEZ:  Thank you, Your Honor.

22  Q.   Sir, would you please state your name and spell your last

23  name for the court reporter?

24  A.   Helmut Hagan, H-A-G-A-N.

25  Q.   Good afternoon, sir.  Where are you presently employed?

1    A.    FedEx.

2    Q.    Federal Express?

3    A.    Yes, sir.

4    Q.    Is that the modern name now, FedEx?

5    A.    FedEx, yeah.  Well, FedEx Express, which is -- we are

6    actually the original FedEx, but we cover all of the operating

7    companies, pretty much.

8    Q.    Okay.  But what are your duties there, since you brought

9    that up?

10   A.    I am a Senior Security Specialist.

11   Q.    For Federal Express.  And where are you based out of?

12   A.    I am based out of Columbus.

13   Q.    And in your capacity as a -- what did you say again?  I'm

14   sorry.  Federal Security Specialist?

15   A.    Senior Security Specialist.

16   Q.    Senior Security Specialist.  In that role, sir, do you

17   have access to all of the company records?

18   A.    I wouldn't say all of the records, but anything that

19   pertains to packages, yes.

20   Q.    I should have clarified my question in asking it a little

21   bit better.

22   A.    Yes.

23   Q.    With respect to tracking numbers and addresses, are you

24   able to access records worldwide, frankly, with respect to

25   packages being sent by Federal Express?

1  A.  Yes, sir.

2  Q.  And do Federal Express employees have an obligation to be

3  trained as to how to input information with respect to shipping

4  packages?

5  A.  You mean, if a customer comes in?

6  Q.  Yes.

7  A.  Do they need to know how to help them?

8  Q.  Yes.

9  A.  Normally, the customer would fill out their own airbill.

10  Q.  Yes.

11  A.  But Customer Service agents would be trained on all

12  aspects of Customer Service.

13  Q.  When customers actually do the airbills and fill them out

14  themselves -- we have all done that manually and input the

15  package into the system -- but once it is received within that

16  system, someone from Federal Express actually programs the

17  information into a system?

18  A.  Yes, somehow it makes it in there.  I believe that's at

19  the home office level, but somehow, it does get generated in

20  there.

21  Q.  Does Federal Express, is there a business requirement that

22  they maintain the records of packages shipped in the normal

23  course of business?

24  A.  Yes, sir.

25  Q.  If you were to be shown a document pertaining to a

1  particular transaction, would you be able to review it and

2  recognize it as a business record?

3  A.   Yes, sir.

4         MR. DOMINGUEZ:  May I approach, Your Honor?

5         THE COURT:  You may.

6  Q.   (By Mr. Dominguez) Mr. Hagan, I am handing you what has

7  been marked for identification purposes and labeled

8  Government's Exhibit 2-2, and I ask you to take a look at that.

9  A.   Okay.

10  Q.   Now, first of all, have you seen that document before?

11  A.   Yes, sir.

12  Q.   And having looked at that, do you recognize that as a

13  Federal Express business record?

14  A.   Yes, it is.

15  Q.   And what are the particular features on that document to

16  suggest to you that it is a business record for FedEx?

17  A.   Well, it is our EDR system, and that stands for Electronic

18  Delivery Record, and it is generated by the delivery address.

19  And I can go in there, I can go into the system and put that --

20  I can punch in the tracking number, and I can get this

21  information from that system, the exact same thing that you

22  have here.  It looks exactly like this, and it also has the --

23  the signature is pulled from the employees, the couriers, they

24  have the Power Pen Unit, so the signature is pulled from that

25  information and put into the system.  So, that's the actual

1  signature of that person.

2          MR. DOMINGUEZ:  May I approach, Your Honor?

3          THE COURT:  You may.

4  Q.   (By Mr. Dominguez) Sir, I am displaying for you what has

5  been marked, again, as Exhibit 2-2?

6  A.   Okay.

7  Q.   That, again, is the FedEx record that you have identified?

8  A.   Yes, sir.

9  Q.   And does it designate a shipper?

10  A.   Yes, Global Gadget.

11  Q.   And does that represent where Global Gadget is located?

12  A.   Yes.

13  Q.   And where is that?

14  A.   Goring-By-Sea, PO Box 2081.  That's with respect to our

15  system.

16  Q.   Within the United Kingdom?

17  A.   Yes, sir.

18  Q.   And who is the recipient?

19  A.   David Nassor, care of Northshore Company.

20  Q.   And it is shipped to an actual address in Memphis,

21  Tennessee; is that correct?

22  A.   Yes, sir.

23  Q.   And then there is a box for the person who actually

24  received the package.  Now, that could be the customer or

25  someone receiving it on behalf of the customer?

1  A.  Yes, sir.

2  Q.  For instance, if a package was sent to a customer at a

3  hotel, say, for instance, that would be received by someone at

4  the front desk, typically?

5  A.  Yes.

6  Q.  And then delivered to the customer?

7  A.  Yes, sir, by them.

8  Q.  Okay.  And what type of information is on Page 2 of the

9  document, sir?

10  A.  This, basically, it is like an overview of what the

11  transaction will tell you, you know, the station, the TSOA,

12  that is the station overseas in Great Britain.  And the "A" at

13  end of it is what signifies that it is a "station".  If it was

14  a rail, it would have an "R".  And so those are legitimate

15  stations with FedEx.

16      The other information tells like the shipper information,

17  the account number for the company.  It will show the pick-up

18  courier number, show the delivery courier number.  It is just,

19  basically, a crude overview of the transaction.

20  Q.  Very well.  Now, on Page 4 of the document you have

21  identified, sir, what is that?

22  A.  That would be the on-line system where you generate an

23  airbill.

24  Q.  Very well.  And that record will be kept with the records

25  that you have previously identified?

1  A.    I'm sorry?

2  Q.    Yes?  This record here would be kept with the transaction

3  records that you have identified?

4  A.    This system, I am not sure where that would be kept.  It

5  would be in the FedEx system, but it is not specific to that

6  system there, the Electronic Delivery Record system, that I

7  know of.

8  Q.    But it does have the same recipient on there?

9  A.    Yes, sir.

10  Q.    And the same recipient address?

11  A.    Yeah, yes, sir.  I mean, this would have been generated at

12  the whole beginning of the process.

13  Q.    Got it.  Got it.  Now, let's speak in general about FedEx.

14  You and I met for the first time -- what?  About two hours ago?

15  A.    Yes, sir.

16  Q.    And I believe that you said something about "hub"?

17  A.    It is a hub and spoke system.

18  Q.    Now, when you talk about a hub and spoke system with

19  FedEx, what does that mean?

20  A.    It means that we have centralized areas in different parts

21  of the United States where it covers that certain area, and all

22  of the -- everything comes off of there like spokes, and then

23  it has ramps at each of those locations that actually filter

24  the packages into those locations.  So, it is like a smaller

25  hub and spoke on that end, but initially there is the hubs that

1  everything goes through to get inside of the United States.

2  Q.   And I believe you told me earlier today that, ironically,

3  if I FedEx a package in Columbus to Special Agent Trombitas in

4  Columbus, it would likely go to one of your hubs before it gets

5  to Agent Trombitas?

6  A.   Yes.

7  Q.   Where would that hub be?

8  A.   It depends on where it's going.  If it is coming here, it

9  would mostly likely, it would going to go through Indy.

10  Q.   Indianapolis?

11  A.   Yeah, Indianapolis, because of the location.

12  Q.   And there is a hub in Indianapolis?

13  A.   Yes, sir.

14  Q.   Let me ask you this.  To your knowledge, is there any

15  restriction on companies doing business in the United Kingdom

16  from shipping products to Boston, Massachusetts?

17  A.   Not that I am aware of.

18  Q.   If a package is Federal Express'd from Global Gadget or a

19  company in the United Kingdom to Boston, Massachusetts or to

20  the Greater Boston, Massachusetts Metropolitan Area, where

21  would that package typically -- which hub would it go to?

22  A.   I would imagine -- I'm just assuming that it would go

23  through the Newark hub.  We have a hub there as well.

24      Wait a minute.  Are you talking about -- I'm sorry.  I

25  think I misunderstood what you said.

1    Q.    If United Kingdom is shipping a package to Boston,

2    Massachusetts?

3    A.    Then, I was right, Newark.

4    Q.    Newark, New Jersey?

5    A.    Yes, sir.

6    Q.    And if a person in the United kingdom or a business in the

7    United Kingdom was shipping a package to someone in Memphis,

8    Tennessee, what hub would that typically go to?

9    A.    The Memphis, Memphis hub.

10   Q.    You stated that you are affiliated with security

11   procedures at Federal Express?

12   A.    Yes, sir.

13   Q.    Do you ever have hubs that are on the lookout for products

14   that might be illegal to sell or purchase in the United States

15   and take precautions with respect to the said items?

16   A.    We, typically, will work with Customs, if they want to

17   come in and they think that there are knock-off products or

18   something like that, something illegal, they may come in and do

19   random checks of packages.

20   Q.    That would not be something unusual?

21   A.    No, it does happen.

22          MR. DOMINGUEZ:  May I have a moment, Your Honor?

23          THE COURT:  You may.

24          MR. DOMINGUEZ:  Thank you, sir.  I have no further

25   questions.

1        THE COURT:  Mr. Murphy?

2                            - - -

3                     CROSS-EXAMINATION

4    BY MR. MURPHY:

5    Q.   Good afternoon, Mr. Hagan.

6    A.   Good afternoon.

7    Q.   You just testified that if a shipment was going to New

8    England or Boston, it would go through the Newark hub?

9    A.   Yes, sir.

10   Q.   You also testified that if it was going to the Memphis

11   area, it would go through the Memphis hub?

12   A.   Yes.

13   Q.   And your records would show that?

14   A.   I believe that's where it would go.  It should go through

15   there.

16   Q.   Okay.  And these documents that the government showed you,

17   are these documents that you generated and pulled off from your

18   company?

19   A.   No.  Not that I pulled off, no, sir.

20   Q.   You just identified them?

21   A.   Yes, sir.

22   Q.   Were there any other documents that you identified for the

23   government with regard to FedEx?

24   A.   No, just those documents.

25            MR. MURPHY:  Thank you very much.

1        THE WITNESS:  Okay.  No problem.

2        THE COURT:  Anything else?

3                        - - -

4                REDIRECT EXAMINATION

5   BY MR. DOMINGUEZ:

6   Q.   While you did not pull these off, you recognize these as

7   documents in the normal course of business?

8   A.   Oh, absolutely.  Absolutely.

9   Q.   All I have to give you is the tracking number and the

10  shipper name, and you could likewise go and review the

11  document?

12  A.   I am very familiar with that.  I use that almost on a

13  daily basis.

14       MR. DOMINGUEZ:  Thank you, Your Honor.  Nothing

15  further.

16       THE COURT:  Thank you.  You may step down.

17       THE WITNESS:  Thank you.

18       MR. DOMINGUEZ:  May I have a moment, Your Honor?

19       THE COURT:  Yes.

20       MR. DOMINGUEZ:  May I check with Court Security

21  personnel?

22       THE COURT:  Yes, certainly.

23       MR. DOMINGUEZ:  I would like to call Kristin Koch.

24       THE COURT:  You may.

25                        - - -

1                             KRISTIN KOCH

2   AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

3                            - - -

4                   DIRECT EXAMINATION

5        THE COURT:  You may proceed.

6        MR. DOMINGUEZ:  Thank you, Your Honor.

7   Q.   Ma'am, would you please state your name?

8   A.   Kristin Koch.

9   Q.   And where are you employed, ma'am?

10  A.   I am with the Federal Bureau of Investigation in Boston.

11  Q.   Are you a Special Agent with the FBI?

12  A.   Yes.

13  Q.   Well, Agent Koch -- is it (phonetic) Coke or Cook?

14  A.   Coke like soda.

15  Q.   How long have you been employed with the Boston FBI?

16  A.   A little over eight years.

17  Q.   And is that your first stint with law enforcement?

18  A.   Yes.

19  Q.   And were you so employed in the September, October time

20  frame of 2009?

21  A.   Yes.

22  Q.   Are you familiar with Jason Costello?

23  A.   Yes.

24  Q.   And who is Jason Costello?

25  A.   He is a Special Agent with the FBI, also, in Boston.

1  Q.   Were you familiar with an investigation that he was

2  conducting -- just by name of the investigation -- of Sean

3  Murphy, Joseph Morgan and Robert Doucette?

4  A.   Yes.

5  Q.   And did you happen to assist him in part of his

6  investigation?

7  A.   Yes.

8       MR. DOMINGUEZ:  May I approach, Your Honor?

9       THE COURT:  You may.

10 Q.   (By Mr. Dominguez) Ma'am, I just handed you, Agent Koch --

11 I just handed you what has been marked as Government's Exhibit

12 10-1 through 10-6 inclusive.

13      If you would, Agent Koch, please take a look at those

14 items and when you are done with those, please look up at me.

15      Do you recognize those ma'am?

16 A.   Yes, I do.

17 Q.   Agent, turning your attention, first, to Government's

18 Exhibit 10-1.  Would you please take a look at that, what is

19 it?

20 A.   This is a ten-print card, and behind the ten-print card

21 are a number of other cards with major case fingerprints of

22 Sean Murphy.

23 Q.   If you were to see Sean Murphy, again, would you recognize

24 him?

25 A.   Yes.

1  Q.   And could you look around the courtroom and tell us if he

2  is present today?

3  A.   Yes, sir, he is.

4  Q.   Could you please tell us what he has on for the record?

5  A.   He has got on a white button-down shirt and a multi-color

6  tie.

7       MR. DOMINGUEZ:  Your Honor, would the record reflect

8  that the witness has identified Sean Murphy?

9       THE COURT:  It should so reflect.

10  Q.   (By Mr. Dominguez) Explain to the ladies and gentlemen of

11  the jury, when you talk about major case prints, what are you

12  referring to?  And if it will explain your testimony, you may

13  take the items back.

14  A.   Okay, major case prints -- ten-print cards are your

15  standard fingerprints of the first part of the digit on each

16  hand.  Typically taken when an individual is arrested or at

17  other times.  The major case print cards record, basically, all

18  of the ridge detail of the remainder of the surfaces of the

19  hand to include the palm, the sides and the fronts of all of

20  the rest of your fingers.

21       So, for instance, this (demonstrating) would be the right

22  thumb where you would take a side, a side, and you roll it.

23  You take the tip portion here, you roll the thumb all of the

24  way up, and then, again, the tip portion.  Then, you do that

25  for each of the fingers.

1   This (indicating) one is a partial of the palm, both the

2   side of the palm here and the side of the palm here.  This

3   would be a roll of the full palm.  This (indicating) would be

4   the remainder of the fingerprints, and you do that for both

5   hands.

6   Q.   And you recognize that fingerprint card, and how is it

7   that you recognize it?

8   A.   Each of the cards, I not only labeled which fingers that

9   are being fingerprinted, but I also record the fact that I was

10  the one that took the fingerprints.  And I also wrote down on

11  there fingerprints of Sean Murphy, and Mr. Murphy signed and

12  dated the cards.

13  Q.   Very well.  Did you take those fingerprints on October 1

14  of 2009?

15  A.   Yes, I did.

16  Q.   If I could invite your attention to Government's Exhibit

17  10-2?

18  A.   Okay.

19  Q.   Do you recognize anything there, ma'am?

20  A.   Yes.  This is a ten-print card and the major ten-print

21  cards to confirm Joseph Morgan.

22  Q.   And who took those fingerprints, ma'am?

23  A.   I did.

24  Q.   And do you recall a date that you took those?

25  A.   If you can hang on a second, I will take a look.

1    The date recorded that these prints were recorded was

2  September 16th of 2009.

3  Q.    Was that, likewise, signed by Joseph Morgan?

4  A.    Yes, it was.

5  Q.    And you have already explained the major case prints, I

6  won't have you go through detail with respect to that set of

7  fingerprints.  But if I could invite your attention, then, to

8  Government's Exhibit 10-5.  Do you recognize those, ma'am?

9  A.    Yes, I do.

10  Q.    What are those?

11  A.    This is a ten-print card and major case prints taken from

12  Robert Doucette.

13  Q.    Does it have a date on there?

14  A.    The date is October 16th of 2009.

15  Q.    And did you actually take those major case prints?

16  A.    Yes, I did.

17  Q.    And do you recognize the signature of Mr. Doucette that

18  signed in your presence?

19  A.    Yes.

20  Q.    Now, with respect to those fingerprint cards that you have

21  identified, Agent Koch, that is Exhibit 10-1, 10-2 and 10-5,

22  did you cause those fingerprint cards to, eventually, be placed

23  into evidence?

24  A.    Yes.

25  Q.    Were those fingerprints cards eventually transmitted to

1  Columbus for use in the investigation here?

2  A.   Yes, they were.

3  Q.   And I invite your attention, if I could, ma'am, or Agent,

4  to Government's Exhibit 10-3.  Do you recognize that?

5  A.   Yes.

6  Q.   What is that?

7  A.   This is an envelope.  It is labeled as two swabs from Sean

8  Murphy.

9  Q.   And do you know who took those swabs?

10 A.   I did.

11 Q.   And were those swabs taken on the same date as the time

12 that you rolled the fingerprints for the major case prints with

13 respect to Mr. Murphy?

14 A.   Yes, they were.

15 Q.   Inviting your attention, if I could, to Government's

16 Exhibit 10-4.  Do you recognize those?

17 A.   Yes, it is labeled two oral swabs from Joseph Morgan.

18 Q.   And do you know who took those oral swabs?

19 A.   I did.

20 Q.   And were those swabs taken on the same date as you took

21 the major case prints of Mr. Morgan on September 16th of 2009?

22 A.   Yes.

23 Q.   And, lastly, ma'am, Government's Exhibit 10-6.  Do you

24 recognize that?

25 A.   Yes.

1  Q.   What is that, ma'am?

2  A.   Two oral swabs from Robert Doucette.

3  Q.   And would the record reflect that you took those oral

4  swabs from Mr. Doucette on the same day that you took his major

5  case prints?

6  A.   That's correct.

7  Q.   Now, you stated that you have been in law enforcement with

8  the FBI for eight years?

9  A.   That's correct.

10 Q.   What was your previous employment prior to becoming a

11 special agent, Agent Koch?

12 A.   Prior to that, I was employed by Cellmark Diagnostics, now

13 known as Orchid Cellmark.  It is a DNA laboratory.  At the time

14 I was employed, it was located in Germantown, Maryland.  And I

15 was a DNA Analyst with that laboratory.

16 Q.   And how long were you a DNA Analyst with that laboratory?

17 A.   I was employed five years, and I was a DNA Analyst four

18 years.

19 Q.   In your training, did you learn how to, obviously, analyze

20 DNA, but certainly, how to take DNA without contamination?

21 A.   Yes.

22 Q.   And you are trained in that?

23 A.   Yes, I am.

24 Q.   Did you receive any additional training after you became a

25 Special Agent in that regard?

1  A.   Yes, we have had some training related to our Evidence

2  Response Team in how to properly obtain oral swabs as to DNA

3  known standards.

4  Q.   Now, I asked you about the fingerprint cards, that being

5  10-1, 10-2 and 10-5.  Likewise, with the DNA swabs, 10-3, 10-4

6  and 10-6, did you cause those items to be placed into evidence

7  there in Boston, Massachusetts?

8  A.   Yes, I did.

9  Q.   And were those items eventually transmitted to Special

10  Agent Trombitas in Columbus for further testing?

11  A.   Yes, they were.

12       MR. DOMINGUEZ:  May I have a moment, Your Honor?

13       THE COURT:  You may.

14       MR. DOMINGUEZ:  That would conclude my direct

15  examination of Agent Koch.

16       THE COURT:  Thank you.  Mr. Murphy, any questions?

17                    - - -

18                CROSS-EXAMINATION

19  BY MR. MURPHY:

20  Q.   Good afternoon, Ms. Koch.

21  A.   Good afternoon.

22  Q.   You testified that you took major case prints and DNA from

23  Sean Murphy, Robert Doucette and Joseph Morgan?

24  A.   Yes.

25  Q.   Did you also take major case prints and DNA swabs from

1   David Nassor?

2   A.    Not to my recollection.

3   Q.    Now, do you remember the date when you and Special Agent

4   Costello served the subpoena for the major case prints and the

5   DNA?

6   A.    I don't remember the specific date, but it was prior to

7   the date that I actually took them.

8   Q.    Sometime in late August?

9   A.    Possibly, yes.

10  Q.    Without telling me the nature of the conversation, were

11  you present when Sean Murphy and Jason Costello had a

12  conversation at that time?

13  A.    Yes, I was.

14        MR. MURPHY:  Thank you very much.  I have no further

15  questions.

16        MR. DOMINGUEZ:  No further questions of this witness.

17        THE COURT:  Thank you very much, Agent Koch.

18        MR. DOMINGUEZ:  Your Honor, Special Agent Steve

19  Wohlgemuth.

20                          – – –

21                    STEVEN WOHLGEMUTH

22  AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

23                          – – –

24                    DIRECT EXAMINATION

25  BY MR. DOMINGUEZ:

1          THE WITNESS:  Good afternoon, Your Honor.

2          THE COURT:  You may proceed.

3          MR. DOMINGUEZ:  Thank you, Your Honor.

4    Q.   Sir, would you state your name and spell your last name,

5    please, for the court reporter?

6    A.   Yes, sir.  My name is Trooper Steven Wohlgemuth,

7    W-O-H-L-G-E-M-U-T-H.

8    Q.   Sir, where are you presently employed?

9    A.   With the Massachusetts State Police.

10   Q.   And I would like to -- how long have you been a

11   Massachusetts State Trooper?

12   A.   Approximately 11 years.

13   Q.   So, you were a trooper on January 23rd of 2009?

14   A.   Yes.

15   Q.   At that time, sir, were you working on any type of Task

16   Force?

17   A.   Yes.  I am currently assigned to the FBI Violent Crimes

18   Task Force.

19   Q.   In that capacity, are you familiar with Jason Costello?

20   A.   I am.

21   Q.   Are you familiar with Lt. Al Zani?

22   A.   I am.

23   Q.   And are you aware of Special Agent Michael McCall?

24   A.   I am.

25   Q.   On January 23rd of 2009, sir, did you and fellow officers

1  and agents execute a search warrant at 407 Walnut Street, Lynn,

2  Massachusetts?

3  A.   Yes, we did.

4  Q.   And are you familiar with who owns that property?

5  A.   I am.

6  Q.   Who is that?

7  A.   Mr. Sean Murphy.

8  Q.   If you were to see Mr. Sean Murphy, again, would you

9  recognize him?

10  A.   Yes.

11  Q.   I ask you to look around the courtroom and tell us whether

12  or not Mr. Murphy is present with us today?

13  A.   Yes, he is, sir.  He is sitting right over there at the

14  table.

15  Q.   Thank you.  Would you describe what he is wearing for the

16  record?

17  A.   He has a circle tie with blue circles on it, and he has a

18  slight mustache.

19       MR. DOMINGUEZ:  Let the record reflect that the

20  witness has identified correctly Sean Murphy.

21       THE COURT:  It should so reflect.

22  Q.   (By Mr. Dominguez) Sir, what role, if any, did you take

23  with respect to the execution of the search warrant on

24  January 23rd of 2009?

25  A.   In serving the warrants -- excuse me -- or executing the

1    warrant, I was the On-scene Supervisor for 407 Walnut Street.

2    Q.    And what is your role as On-scene Supervisor?

3    A.    My role is to facilitate all law enforcement resources and

4    assets in the execution of the warrant.

5    Q.    And would you provide direction to certain officers and

6    agents?

7    A.    Yes, sir.

8    Q.    Ultimately, did you have responsibility with respect to

9    the evidence seized or in the execution of the search warrants?

10   A.    I did.

11             MR. DOMINGUEZ:  May I approach, Your Honor?

12             THE COURT:  Yes, you may.

13   Q.    (By Mr. Dominguez) Sir, I have handed you what has been

14   marked for identification purposes and labeled as Government's

15   Exhibit 6-3 through 6-5 would be the physical evidence, and I

16   believe that you have 6-6 and 6-7 that are two photographs.  I

17   ask you to take a look at those two items.  And when you are

18   finished looking at those, please look up at me.

19             MR. MURPHY:  Objection.  Your Honor, may we have a

20   sidebar, please?

21             THE COURT:  Yes.

22                           -  -  -

23        THEREUPON, the following proceedings were held at

24   sidebar out of the hearing of the jury:

25             THE COURT:  Your objection?

1          MR. MURPHY:  Yes, Your Honor.  I object to the

2   admissibility of the evidence that the government is trying to

3   introduce right now.

4          THE COURT:  Okay.  Your basis?

5          MR. MURPHY:  In regards that he mentioned evidence

6   6-3, which is the key to the storage facility, and my argument

7   would be that the key was not authorized by any search warrant.

8   There were two search warrants, and the first one did not

9   authorize that key.  And the second one only authorized two

10  safety deposit keys.

11         MR. DOMINGUEZ:  We have litigated this matter on the

12  Motion to Suppress.  You will recall on the return of the

13  second search warrant, it said, "three security/safety

14  deposit/lock keys."  There were two security safety box keys

15  identified in the body of Paragraph 43, I believe, of the

16  second search warrant, and like I said, this has already been

17  litigated and ruled upon.

18         MR. MURPHY:  My argument, Your Honor, is that in the

19  second search warrant, it authorizes which areas to search, and

20  it says only two; it does not mention a third key.  He has

21  multiple paragraphs throughout that thing, like 45 or 46.

22         THE COURT:  Where was the key in relationship to the

23  two keys that you are talking about?  Where was this other key,

24  the storage key?  Was it in the house?

25         MR. MURPHY:  It was in the business area of the

1    house.  It was not in the same area that the safety deposit

2    keys were, they were in personal areas.  The storage key was in

3    the area where the business was, the moving company office was.

4         And I would say that the third storage key was not

5    mentioned in any of the 46 paragraphs of this.  It is a

6    voluminous affidavit, and it is not authorized by the search

7    warrant.  It doesn't make a difference whether it is in the

8    return.

9         THE COURT:  Well, I will overrule the objection.  It

10   will be admissible.

11        MR. DOMINGUEZ:  Thank you.

12        (Back in open court.)

13

14        THE COURT:  The objection is overruled.

15   Q.   (By Mr. Dominguez) Sir, if I could please direct your

16   attention to -- strike that.  Do you recognize, first, the

17   physical items, Government's Exhibits 6-3, 6-4 and 6-5?

18   A.   I do.

19   Q.   And if I could invite your attention to Government's

20   Exhibit 6-3, sir, what is that?

21   A.   6-3 is a key located during the execution of the search

22   warrant at 407 Walnut Street.

23   Q.   And during the course of the execution, that search

24   warrant, were you provided that key as the ultimate Evidence

25   Custodian?

1  A.   I was.

2  Q.   Government's Exhibit 6-4?  Will you hold that up, sir, and

3  explain to the ladies and gentlemen what that is?

4  A.   This is $9,410 in U.S. currency that was located on the

5  second floor of 407 Walnut Street underneath a radiator in one

6  of the bedrooms.

7  Q.   And Government's Exhibit 6-6, sir?

8  A.   Here we go.  Sorry about that.

9  Q.   That's okay.  What is that, sir?

10  A.   This is a photograph of that U.S. currency in the black

11  bag contained in that room below the radiator.

12  Q.   So, you testified earlier, as the supervisor of the

13  execution of the search warrant, officers were in the residence

14  and when something was pointed out of interest, were you called

15  to take a look at it?

16  A.   Yes.

17  Q.   And was a photograph taken of it?

18  A.   Yes, it was.

19       MR. DOMINGUEZ:  May I approach, Your Honor?

20       THE COURT:  You may.

21  Q.   (By Mr. Dominguez) I am now displaying Government's

22  Exhibit 6-6, Trooper.  Is that the bag as it appeared on

23  January 23rd of 2009 as the search warrant was being executed?

24  A.   Yes, it is, sir.

25  Q.   And it appears to be underneath a radiator in the bedroom?

1  A.   Yes, sir.

2  Q.   And it was ultimately counted as $9,410?

3  A.   That is correct.

4  Q.   I take it that subsequent to taking the picture and

5  identifying 6-6, the radiator, the money was fanned out in

6  another photograph taken of it?

7  A.   That is correct.

8  Q.   That is reflected in Government's Exhibit 6-7, sir?

9  A.   Yes, sir.

10 Q.   And I invite your attention to Government's Exhibit 6-5,

11 sir.  Could you take a look at that?  What is that, sir?

12 A.   It is $2,530 in U.S. currency.

13 Q.   And where was that located?

14 A.   It was located -- discovered in the pants pocket of a pair

15 of blue jeans that were in one of the bedrooms.

16 Q.   Now, with respect to Government's Exhibit 6-3, the key,

17 and Government's Exhibit 6-4, the $9,410 and 6-5, the $2,530 --

18 strike that.  Did you identify that as being $2,530 on the

19 record?

20 A.   $2,530.

21 Q.   Are those substantially in the same condition as they were

22 when they were placed in the evidence bags when they were

23 seized on January 23rd of 2009?

24 A.   Yes, sir, they are.

25 Q.   And with respect to the photographs that you have

1    identified, 6-6 and 6-7, do those appear to be accurate

2    depictions of the photographs taken of those items on

3    January 23rd of 2009?

4    A.    Yes, sir.

5            MR. DOMINGUEZ:  May I have a moment, Your Honor?

6            THE COURT:  Yes.

7            MR. DOMINGUEZ:  May I approach and obtain the key

8    from the witness?

9            THE COURT:  Yes.

10           MR. DOMINGUEZ:  One more question, Your Honor, if I

11   may?

12   Q.    (By Mr. Dominguez) With respect to the key that you have

13   identified as Government's Exhibit 6-3, does it appear to have

14   some letters on one side of it there, Trooper?

15   A.    Yes, it does.

16   Q.    And with respect to the other side of the key, does it

17   appear to have a special coding of letters and numbers on the

18   other side of that key?

19   A.    Yes, it does.

20   Q.    Did one of your fellow troopers conduct further

21   investigation relative to that information on the key?

22   A.    Yes, he did.

23           MR. DOMINGUEZ:  May I have a moment, Your Honor?

24           THE COURT:  You may.

25           MR. DOMINGUEZ:  Your Honor, that would conclude my

1   direct examination of this witness.

2           THE COURT:  You may examine.

3                    - - -

4                CROSS-EXAMINATION

5   BY MR. MURPHY:

6   Q.   Good afternoon, Mr. Wohlgemuth.

7   A.   Good afternoon, sir.

8   Q.   I only have one or two questions for you.

9   A.   No problem, sir.

10  Q.   The morning of the search, do you remember the weather

11  that day?

12  A.   It was very cold.

13  Q.   Very cold?

14  A.   Very cold.

15  Q.   And in the house, was it also very cold in the house?

16  A.   Yes, it was.

17  Q.   And you testified at the beginning of your testimony who

18  the owner of 407 Walnut Street was?

19  A.   Yes.

20  Q.   Do you actually know who the owner is?

21  A.   I was advised that it was Sean Murphy.

22  Q.   Has anybody seen any documents from the City of Lynn or

23  from the registration of deeds that would identify the owner of

24  that house?

25  A.   I did not.

1  Q.  So, you really don't know who the owner is?

2  A.  I do not.

3          MR. MURPHY:  Thank you very much.  Thank you for

4  being honest.

5          No further questions, Your Honor.

6          MR. DOMINGUEZ:  No further questions, Your Honor, of

7  this witness.

8          THE COURT:  Thank you, Trooper.

9          MR. DOMINGUEZ:  Special Agent Michael McCall, Your

10  Honor.

11          May Agent Trombitas to be excused momentarily?

12          THE COURT:  Yes.

13                          - - -

14                    MICHAEL MCCALL

15  AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

16                          - - -

17                    DIRECT EXAMINATION

18  BY MR. DOMINGUEZ:

19          THE COURT:  You may proceed.

20          MR. DOMINGUEZ:  Thank you, Your Honor.

21  Q.  Please state your name, sir.

22  A.  Michael McCall.

23  Q.  And would you please spell your last name.

24  A.  M-C-C-A-L-L.

25  Q.  Sir, where are you presently employed?

1  A.    I work for the Federal Bureau of Investigation, the FBI.

2  Q.    And how long have you been an FBI Agent, sir?

3  A.    Fifteen years.

4  Q.    Where are you based out of?

5  A.    Boston, Massachusetts.

6  Q.    Were you employed and working there on January 23rd of

7  2009?

8  A.    Yes, I was.

9  Q.    Are you familiar with Special Agent Jason Costello?

10 A.    I am.

11 Q.    Do you work with him?

12 A.    I do.

13 Q.    On January 23rd of 2009, did you assist members of the

14 Violent Crimes Task Force there in Massachusetts in the

15 execution of a search warrant?

16 A.    I did.

17 Q.    And was that search warrant executed at 407 Walnut Street,

18 Lynn, Massachusetts?

19 A.    I believe that's the address, yes.

20 Q.    And were you aware -- or who do you believe resided there

21 at the time of the execution of the search warrant?

22        If you don't know, you don't know.

23 A.    Yeah, I don't know.  I know that there was an

24 investigation relating to a theft going on, but who lived

25 there, I wasn't really sure at that time.

1   Q.   That's fine.  But you knew that there was a target of an

2   investigation going on at the time?

3   A.   Yes.

4   Q.   Very well.  And what was your role with respect to that

5   investigation -- or strike that -- your role with respect to

6   the search warrant?

7   A.   I am on the Evidence Response Team for the FBI.  We are in

8   charge of doing search warrants, gathering evidence, collecting

9   evidence and receiving evidence, basically, CSI type of stuff.

10  But in this case, it was a search that we were doing of that

11  premises.

12  Q.   Did you take on a role with respect to that search

13  warrant, sir?

14  A.   Yeah.  Generally, at that point in my career, I was the

15  ERT, Evidence Response Team, Senior Team Leader.  I sat at the

16  kitchen table, and I was, in essence, the evidence custodian.

17  Everybody brought the evidence that was found that day of

18  relevance, and I was, basically, the person they brought it to.

19  I packaged it up, documented, and insured the delivery back to

20  the office.

21  Q.   And then what was Trooper Wohlgemuth's role with respect

22  to -- vis-a-vis your role?

23  A.   I would have been working for him that day.  He was in

24  charge of the whole search, which would have included entry

25  into the premises, separating people that were in the

1  residence.  Also, in charge of all evidence, and I was

2  basically just in charge of evidence.  He was in charge of

3  interviews, preserving the safety of all officers in the place,

4  all people who were in the house.  I believe that there were

5  some animals in the house that morning, and basically, making

6  sure the dogs were put aside, so we could conduct our business.

7  Q.   Very well.  And in your role as the evidence custodian,

8  you said that you obtained items of relevant evidence by fellow

9  officers and agents?

10 A.   Yeah.  We would have kept a log of that, and the answer is

11 yes.

12         MR. DOMINGUEZ:  May I approach?

13         THE COURT:  You may.

14 Q.   (By Mr. Dominguez) Sir, I handed you what has been marked

15 for identification purposes and labeled 6-1, 6-2, and I ask you

16 to take a minute to look at those items.

17 A.   Yes.

18 Q.   Do you recognize those items, sir?

19 A.   Yes, I remember these items.

20 Q.   I invite your attention to Exhibit 6-1, sir.  What is

21 contained in 6-1?

22 A.   There is two separate Massachusetts driver's licenses

23 here.

24 Q.   Were those items delivered to you as the evidence

25 custodian on January 23rd of 2009?

1   A.   Yes.

2   Q.   As a matter of fact, with respect to those two items, were

3   they seized in your presence, if you will?

4   A.   Yes.

5   Q.   And Government's Exhibit 6-2?

6   A.   Yes.  Yes, I see that here, too.

7   Q.   Did you receive that item as evidence custodian on

8   January 23rd of 2009?

9   A.   Yes.

10        MR. DOMINGUEZ:  May I again approach, Your Honor?

11        THE COURT:  You may.

12   Q.   (By Mr. Dominguez) Referring first to the items

13   contained -- the two I.D.s contained in Government's Exhibit

14   6-1.  Is that a driver's license, sir?

15   A.   It is a Massachusetts driver's license.

16   Q.   In the name of?

17   A.   Brian Hetherman.

18   Q.   With respect to the second driver's license contained in

19   Government's Exhibit 6-1, do you recognize that, sir?

20   A.   Yes, I do.

21   Q.   And what is it?

22   A.   It is a Massachusetts driver's license with what appears

23   to be the same picture of the same person.

24   Q.   In the name of?

25   A.   William Palavacini.

1    THE COURT:  William what?  Can you spell that?

2    MR. DOMINGUEZ:  May I?  P-A-L-A-V-A-C-I-N-I.

3 Q.  (By Mr. Dominguez) Now, I am inviting your attention to

4 the item contained in Government's Exhibit 6-2.  Do you

5 recognize anything there, sir?

6 A.  Yes, I do.

7 Q.  And what is that?

8 A.  Sean Murphy, Massachusetts driver's license.

9 Q.  And was that the item that you previously identified as

10 having received as the evidence custodian in the execution of

11 the search warrant at 407 Walnut Street, Lynn, Massachusetts,

12 on January 23rd of 2009?

13 A.  It would be one of the pieces of evidence, yes.

14    MR. DOMINGUEZ:  May I have a moment, Your Honor?

15    THE COURT:  You may.

16    MR. DOMINGUEZ:  No further questions, Your Honor.

17    THE COURT:  Mr. Murphy, do you have any questions?

18    MR. MURPHY:  Yes.  I didn't know it was my time.

19 Sorry, Your Honor.

20                    - - -

21                CROSS-EXAMINATION

22 BY MR. MURPHY:

23 Q.  Good afternoon, Mr. McCall.

24 A.  Hello.

25 Q.  Before your testimony here, did you go over the exhibit

1  list with Mr. Dominguez?

2  A.    The exhibit list for the trial -- or I'm not sure of the

3  question.

4  Q.    The exhibit list of what you would be testifying to here

5  today?

6  A.    Yeah.  What I went over was the evidence log of items that

7  we seized.

8  Q.    Have you seen the exhibit list?

9  A.    No, I don't think that I have seen an exhibit list for the

10  trial, no.

11        MR. MURPHY:  Can I have a minute, Your Honor?

12  Q.    (By Mr. Murphy) I am showing you, now, Mr. McCall,

13  government's exhibit list with regards to 407 Walnut Street.

14  Do you see items 6-1, 6-2 and 6-3?

15  A.    On the screen, I do.

16  Q.    Do you see anything to do with the William Palavacini

17  I.D.?

18  A.    No.

19        THE COURT:  Is this a return from the warrant?

20        MR. DOMINGUEZ:  Your Honor, Mr. Murphy is merely

21  using the exhibit list that we have been updating and amending

22  throughout this trial.

23        THE COURT:  For this trial?

24        MR. DOMINGUEZ:  Yes.  I mean, but this is the exhibit

25  list for court.

1          THE COURT:  And not for the investigation?

2          MR. DOMINGUEZ:  No.

3   Q.   (By Mr. Murphy) Mr. McCall, do you remember the morning of

4   January 23rd?

5   A.   Yes, I do.

6   Q.   Were you present when the warrant was executed?

7   A.   Yes, I was.

8   Q.   What time was it executed?

9   A.   I would have to look at my paperwork, but roughly, right

10  around dawn.

11  Q.   Right around dawn?

12  A.   Yeah.

13  Q.   You don't recall the exact time?

14  A.   It would be in my paperwork.

15  Q.   How many officers were present with you on that day?

16  A.   Approximately -- that would be in my paperwork, too.

17  Q.   You don't recall?

18  A.   I do.  It was roughly around 12, there were 12 agents and

19  officers that day.

20  Q.   Only 12?

21  A.   I would have to look at my paperwork.

22  Q.   Could it have been as much as 19 or 20?

23  A.   Yes, it could have.  Yeah.

24  Q.   Do you remember the weather that day?

25  A.   It was cold, and there was snow on the ground.  It was

1   very cold.

2   Q.   And during the search, do you recall if any of the

3   witnesses were -- any of the occupants of the house were

4   separated?

5   A.   Yes, I believe they were.

6   Q.   And do you remember how many occupants of the house there

7   were?

8   A.   I believe there were -- in reviewing my paperwork last

9   night, there were about five people in the house -- four adults

10  and an infant.

11  Q.   Four adults and an infant?

12  A.   Yes, I believe so.

13  Q.   And during the search, were any of the occupants detained?

14  A.   Well, I don't know if detained is the right word.  What we

15  try to do when we execute a search warrant is make sure that

16  all officers and all occupants of the house are safe.  That

17  would be -- we may isolate each of them and then try to make

18  sure that there is no weapons, and if there are weapons, they

19  are made safe, taken into the officers' possession.

20  Q.   During the course of your search -- how long did it take

21  to search that day?

22  A.   It was a long time that day.

23  Q.   Were any of the occupants of the house allowed to leave

24  during the search, to your recollection?

25  A.   Generally, if no one is under arrest, they are allowed to

1    leave.

2           MR. MURPHY:  Okay.  Thank you very much, Mr. McCall.

3           MR. DOMINGUEZ:  No further questions of this witness,

4    Your Honor.

5           THE COURT:  Thank you very much, Agent.  You are

6    excused.

7           MR. DOMINGUEZ:  Your Honor, may we approach?

8           THE COURT:  Yes.

9                               – – –

10          THEREUPON, the following proceedings were held at

11   sidebar out of the hearing of the jury:

12          MR. DOMINGUEZ:  Your Honor, our next witness, who was

13   a fairly lengthy witness, was called out to a homicide scene,

14   Detective J.J. Mead.

15          THE COURT:  Earlier today?

16          MR. DOMINGUEZ:  She is a local witness, and she is in

17   New Albany.  I didn't know if the Court wanted me to take a

18   break and get her here.

19          THE COURT:  Do you know where she is?

20          MR. DOMINGUEZ:  Nobody is sure, Judge.  I would think

21   that I could get her here in 20 minutes.

22          THE COURT:  Okay.

23          MR. DOMINGUEZ:  Can I make arrangements and maybe we

24   take a ten-minute break and then I can report back to the

25   Court?

1    THE COURT:  Yes.

2    MR. DOMINGUEZ:  Thank you.

3    (Back in open court.)

4    MR. DOMINGUEZ:  May I be excused, Your Honor?

5    THE COURT:  We are checking on a -- we have to get a

6 witness here who is in the county, but actually has some duties

7 elsewhere and has not come back down.  So, we will take a

8 ten-minute break.

9    You may leave the courtroom, if you wish, or go to

10 the jury room, however you wish.  Remember the admonition not

11 to discuss this case and the rest of the admonition.

12                    - - -

13        THEREUPON, a recess was taken.

14                    - - -

15    THEREUPON, the Jury was excused for their evening

16 recess and the following proceedings were held in open court

17 with the Court, counsel and Mr. Murphy:

18    THE COURT:  Is everyone here?  The government has

19 provided notice to this Court of its intent to introduce

20 Exhibit 15-1, entitled "Master Thief; How to be a Professional

21 Burglar" by Sean Murphy.  The government also intends to

22 introduce international business records from Global Gadget

23 pursuant to 18 United States Code, Section 3505.

24        The Court understands that the defendant may have an

25 objection to one or both of these pieces of evidence.  And

1  then, pursuant to Rule 104 of the Federal Rules of Evidence,

2  the Court will consider the admissibility of this evidence

3  outside the presence of the jury.

4       The first thing is the Master Thief manual, we will

5  call it.  And first of all, Mr. Murphy, do you object to the

6  government's introduction of this evidence?

7       MR. MURPHY:  Yes, I do, Your Honor.

8       THE COURT:  All right.  What is your specific

9  objection?

10      MR. MURPHY:  Your Honor, this document was created

11 and manufactured specifically for the proffer.  During the

12 proffer, there was a video training unit, a video training

13 video that I provided to the government through the proffer and

14 information contained in the video is word-for-word from that

15 book, and that book was on the record, on the proffer, supposed

16 to be included in the proffer, but there was a snafu that came

17 up.  I was being held in the Essex County Correctional

18 Facility, and we had two out of the five proffers.  And there

19 became a problem transporting me from Essex facility to the

20 police station where they were handling these proffers.

21      So, the government went out of their way -- without

22 even telling me what was going on -- they moved me to another

23 facility where they could continue these proffers, where they

24 could take me out of the jail to continue these proffers.

25      THE COURT:  You mean more convenient?

1        MR. MURPHY: Which was more convenient for them,

2 which took me away from the book because I couldn't travel with

3 the book. So, I tried to make arrangements to have the book

4 sent out. And then I had Special Agent Costello call my

5 girlfriend/wife to get this book, and we realized that we

6 couldn't get it because it wasn't sent home. So, this book was

7 specifically created for the proffer, and it is word-for-word

8 the information contained in the proffer.

9        THE COURT: All right. Thank you. Mr. Dominguez?

10        MR. DOMINGUEZ: Your Honor, Mr. Murphy's proffer

11 occurred in May of 2010. This document was seized following

12 Mr. Murphy's transfer from Essex County Jail Facility on

13 April 28th of 2010. It was found in a fellow inmate's room

14 underneath his bunker, underneath his bunk, the mattress in his

15 bunk. So, if Mr. Murphy is suggesting it is for law

16 enforcement, it is in Inmate McDonald's bunk, and it was seized

17 as contraband.

18        Now, I didn't know that we were going to have the 104

19 hearing at this time, and I would appreciate the opportunity,

20 Your Honor, with respect to Mr. Murphy's case in Massachusetts,

21 which I am not prosecuting, I believe he is talking about the

22 E.A. Dion case. The person in the best position to testify

23 regarding the timing of any proffers or anything like that

24 would be Special Agent Jason Costello, who is in the building,

25 and he can speak to these matters better than I. I can have

1   him down here in two minutes.

2           THE COURT:  All right.

3                   - - -

4               THEREUPON, a recess was taken.

5                   - - -

6   IN OPEN COURT:

7           MR. DOMINGUEZ:  Your Honor, Special Agent Costello.

8           THE COURT:  All right.  Swear the witness.

9                   - - -

10                  JASON COSTELLO

11  AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

12                  - - -

13

14                  DIRECT EXAMINATION

15  BY MR. DOMINGUEZ:

16  Q.   Agent Costello, please state your name for the record.

17  A.   Jason Costello.

18  Q.   Agent Costello, where are you presently employed?

19  A.   For the FBI in Boston, Massachusetts.

20  Q.   And directing your attention, if I could, please, Agent

21  Costello to the January time frame of 2009, were you with the

22  FBI at that time?

23  A.   Yes.

24  Q.   Were you with something called the Violent Crimes Task

25  Force?

A.   I was.

Q.   And during that time frame, sir, were you investigating a

person that you know as Sean Murphy?

A.   Yes, sir.

Q.   And for the record, he is present here in the courthouse

with us?

A.   Yes, he is.

Q.   And what was the nature of your investigation -- very,

very briefly, just for the record.

A.   It was a commercial theft, burglary type of investigation.

Q.   Was it specifically focusing on E.A. Dion at the time?

A.   Yes.

Q.   Did Mr. Murphy get arrested on February -- strike that --

January 23rd of 2009?

A.   Yes.

Q.   Was he incarcerated at that time?

A.   Yes.  He was held in lieu of bail.

Q.   Do you know if he has been incarcerated since that time?

A.   Yes.

Q.   I am going to invite your attention, if I could, to April

of 2010.  Agent Costello, are you aware that Mr. Murphy was

housed at the Essex County Jail Facility?

A.   Yes, I believe it was up until approximately April of

2010.

Q.   And if I were to tell you that he was discharged from that

1  facility on April 28th of 2010, you would have no reason to

2  disagree with that?

3  A.   No, it is just that I don't recall.

4  Q.   And you put me in touch, actually, with Sgt. Michael

5  Roach, who was a Sergeant/Corrections Officer of the Essex

6  County Jail facility, correct?

7  A.   Yes.

8  Q.   And are you aware that subsequent to his discharge from

9  that facility, that Sgt. Michael Roach caused the shakedown,

10 for lack of a better word, of a cell in July of 2010 of an

11 inmate by the name of Inmate McDonald?

12 A.   I don't recall the name, but I do know that there was a

13 cell shakedown.

14         THE COURT:  Is that a search?

15         MR. DOMINGUEZ:  A shakedown, Your Honor, in jail

16 facilities, there is no expectation of privacy, it was a

17 shakedown for contraband.

18         THE COURT:  All right.

19 Q.   (By Mr. Dominguez) Were you made aware sometime thereafter

20 that Sgt. Roach actually obtained a document entitled "How to

21 be a Master Thief" by Sean Murphy?

22 A.   Yes.

23 Q.   Did you or any agents with the Violent Crimes Task Force,

24 who were investigating Mr. Murphy, direct him or ask him to

25 write such a document?

1  A.   Not to write a document, no.

2  Q.   Tell us any discussions that you might have had with him.

3  A.   We engaged Mr. Murphy in a proffer.  We broached the idea

4  at the end of the proffer that we would be interested in a

5  sitdown with him on camera to learn some things from him about

6  burglary in general, some tricks of the trade, if you will.

7  Q.   Very well.  And did he make a statement to you that he

8  was, in fact, going to himself to create this document for your

9  use?

10  A.   No.

11  Q.   As a matter of fact, on June 7th of 2010, did Mr. Murphy

12  sign a document, a release document with Detective Richard --

13  help me with the last name --

14  A.   Cambium.

15  Q.   With the Attleboro Police Department?

16  A.   With myself and Detective Cambium, yes.

17  Q.   What is that document, sir?

18  A.   This is a release form that we drafted prior to sitting

19  down with Mr. Murphy to do a video of "How To", you know, to

20  pick his brain, again, for tricks of the trade in terms of

21  commercial burglary.

22  Q.   And that's dated June 10 of 2010?

23  A.   June 7th of 2010.

24  Q.   More than a month after his transfer from Essex County?

25  A.   Yes.

1   Q.   Did Mr. Murphy indicate to you that he was going to write

2   a document entitled, "Master Thief", a how-to booklet and pass

3   it onto a fellow inmate?

4   A.   No.   The expectation was that he was going to create a

5   video for law enforcement use, again, to help educate

6   investigators on some of the techniques that burglars employ.

7   Q.   And that was sometime after June 7th of 2010, and that's

8   what the release was for?   The release was for him going

9   forward?

10   A.   The release was in order for us to thwart off any claim

11   after-the-fact that he would have any sort of intellectual

12   property claim if we were to use this, again, as a training

13   tool for law enforcement.   That's why he did it before.   We did

14   the video after he signed this.

15   Q.   So, was there a video actually done?

16   A.   We had made the tape.   It has remained in our file.   We

17   haven't done anything with it pending the outcome of his

18   matters before the Court.

19         MR. DOMINGUEZ:   Very well.   May I have a moment, Your

20   Honor?

21         No further questions at this time, Your Honor.

22         THE COURT:   Agent Costello, I want to try to get the

23   sequence of events here.   When you talked to Mr. Murphy about a

24   proffer, when was that exactly?

25         THE WITNESS:   We served a Grand Jury subpoena on

1  Mr. Murphy in approximately September of 2008. At that time, I

2  knew he was represented by counsel, and I asked him if he would

3  be interested in a proffer and through his attorney to reach

4  out to the Bristol County District Attorney's Office.

5           MR. DOMINGUEZ: So, was that 2009?

6           THE WITNESS: I'm sorry, 2009. And that process took

7  some time due to some delays with his attorney, and ultimately,

8  we sat down to proffer Mr. Murphy on February 23rd of 2010. We

9  did several sessions with him from that date through the final

10 session, which was June 7th of 2010.

11          THE COURT: Well, February 23rd to June 7th of 2010,

12 you had discussions with him in the nature of a proffer?

13          THE WITNESS: Yes, Your Honor.

14          THE COURT: And that included putting together a

15 videotape?

16          THE WITNESS: Yes, Your Honor. The first three

17 sessions were regarding past crimes. The last session was for

18 the sole purpose of recording this educational session.

19          THE COURT: And what were the types of things that he

20 mentioned in the videotape, the so-called educational tape?

21          THE WITNESS: Different techniques, different tools

22 that he would employ, different tactics, what he would do to

23 plan a burglary, how to select an institution, how to train his

24 crew, how to actually carry it out, and things of that nature.

25          THE COURT: Okay. Now, as to this manual, you are

1 familiar with this manual?

2         THE WITNESS:  I have read through it, yes, Your

3 Honor.

4         THE COURT:  Would you like to look at it again?  It

5 is Government's Exhibit 15-1.

6         THE WITNESS:  I don't think I need to, but I can.

7         THE COURT:  Okay.  Well, that's what we are talking

8 about here.

9         THE WITNESS:  Yes, Your Honor.

10         THE COURT:  This session.  This manual was found in

11 April of 2010 -- or April 28th, specifically, at a shakedown

12 right?

13         MR. DOMINGUEZ:  Your Honor, it was found in July of

14 2010, but following Mr. Murphy's discharge from that facility

15 on April 28th of 2010.

16         THE COURT:  Had Mr. Murphy ever mentioned his -- ever

17 mentioned this, that he had -- that he had gone to this effort

18 to put this together and have it typed up and so forth?

19         THE WITNESS:  No, Your Honor.  On the June 7th date,

20 he had indicated that he had prepared some notes, of which to

21 speak of, but that he had given them to his girlfriend, Kristin

22 Sullivan, and he hoped that she would get them to us at the

23 time of the proffer, but that we couldn't arrange, but no

24 mention of an actual, formal document.

25         THE COURT:  Did you ever see the notes?

1        THE WITNESS:  No, Your Honor, because we could not

2   reach her on that day, so, he proceeded from memory.

3        THE COURT:  Okay.  Since this is a hearing of

4   significant importance, I'll allow Mr. Murphy to testify about

5   this, but he will have to be sworn, but he cannot be asked any

6   questions other than about this.

7        MR. MURPHY:  Yes, sir.

8        MR. DOMINGUEZ:  That's fair, Your Honor.

9        THE COURT:  Is that everyone's understanding of the

10  way to do this?

11       MR. DOMINGUEZ:  That's fair, Your Honor.

12       THE COURT:  This is not an everyday occurrence here.

13       MR. DOMINGUEZ:  Your Honor, I'll accept whatever

14  terms or guidance from the Court.

15       THE COURT:  And, of course, you can question

16  Mr. Costello before that.

17       MR. MURPHY:  Yes.

18       THE COURT:  Or you can testify.

19       MR. MURPHY:  I will question Mr. Costello first.

20       THE COURT:  All right.

21                       - - -

22                  CROSS-EXAMINATION

23  BY MR. MURPHY:

24  Q.   Mr. Costello, you testified that the initial beginning of

25  the proffer began in -- when you served the subpoena in August

1  of 2009 and not in 2008?

2  A.   No, the subpoena was served in, approximately, September

3  of 2009 -- I misspoke when I said 2008.  I believe it was

4  September, I'd have to actually look at the subpoena returns to

5  see the precise date, but my recollection it was toward the

6  middle part of September.

7  Q.   Okay.  Well, we can agree to that.  And at that session,

8  it was agreed upon that Mr. Murphy wanted to proffer?

9  A.   No.

10  Q.   You don't think that he didn't make that offer?

11  A.   You were under -- well, you had counsel, and I am not

12  authorized to engage in a proffer.  I told you that if you

13  would be interested in a proffer, to have your attorney contact

14  the Bristol County District Attorney's Office, and it could be

15  arranged, that we would be interested in hearing a proffer.

16  Q.   Okay.  And sometime later than that, we began proffer

17  sessions?

18  A.   February 23rd was the first session.

19  Q.   And I was at the Essex County Correctional Facility?

20  A.   That was at the Saugus Police Department, which is within

21  Essex County.  We offered to do it there because we did not

22  feel that it would be appropriate to come and talk to you at

23  length in the Correctional Facility for your own safety.

24  Q.   What I meant is I was housed at the Essex Correctional

25  Facility?

1    A.    At that time, yes.

2    Q.    And while I was housed at the Essex County Correctional

3    Facility, how many proffer sessions did we have while I was at

4    that facility?

5    A.    Two.

6    Q.    And then at some point the proffers didn't go off, and

7    they got delayed?

8    A.    Yes.

9    Q.    And why were they delayed?

10   A.    I know Essex County was having difficulty bringing you to

11   the Saugus Police Department.  And at some point, the District

12   Attorney's Office worked out, I believe, your case -- I don't

13   know, I would have to look at your case file -- but I believe

14   that you had some pending matters in the Lynn District Court

15   that were ultimately dismissed, and that caused you to stop

16   being lodged at the Essex County House of Corrections and be

17   transferred to the Bristol County House of Corrections.  Once

18   that happened, then we were able to resume proffers at the

19   Attleboro Police Department sometime in May.

20   Q.    Now, this resolution of the Essex County case, this was

21   done, specifically, outside of my knowledge?

22   A.    I can't speak to that.  That's not something that I have

23   any knowledge of.

24   Q.    Okay.  And when I got to this new Bristol County Facility,

25   it was easier for you to continue these proffers?

1  A.   Well, you were now in a new facility, we were able to do

2  that, yes.

3  Q.   And we had more proffer sessions?

4  A.   We had two more.  We had one on May 27th, if I am not

5  mistaken, and then on June 7th.

6  Q.   Now, do you recall on the proffer session, before the

7  video, when we spoke about the book?

8  A.   You had told me that you had some notes that you had

9  collected to talk off of as a script that you had given to

10 Kristin Sullivan.

11 Q.   And did you actually make a phone call to get ahold of her

12 to get this?

13 A.   Yes.

14 Q.   And when we approached or got to the video -- the proffer

15 session, did I ask you if you actually got the book?

16 A.   She never returned my calls.

17 Q.   But did I ask you if you had actually gotten it?

18 A.   Yes.

19 Q.   Okay.

20       THE COURT:  The book or the notes?

21       MR. MURPHY:  The book.  I am referring to a book, and

22 he is saying notes.

23 A.   You described them to me as notes that you had prepared

24 that you could talk off of as a de facto script for the video.

25 Q.   And when I was at the proffer session, was I referring to

1    certain notes and documents that I had brought with me?

2    A.    Yes.  You had several drawings that you had sketched out

3    that you brought to that proffer.

4    Q.    And an itinerary to cover for what I was going to cover

5    for the proffer of my notes.

6    A.    I don't remember notes, but I do remember -- because they

7    are attached to this -- I have just some drawings that you did.

8    Q.    Well, the drawings is what I released to you as part of

9    the proffer?

10   A.    Yes.

11   Q.    But when I was doing it, I had my notes in front of me

12   that I was reading from?

13   A.    Okay.  I don't have copies of your notes, I wasn't -- you

14   didn't give me those.  I think you had some written out,

15   handwritten out notes.

16   Q.    Thank you.  Mr. Costello, have you read the "Master Thief"

17   manual?

18   A.    I glanced through it, yes.

19   Q.    Is the information contained in the "Master Thief" manual

20   consistent with the information that's proffered in the video?

21   A.    Yes.

22              MR. MURPHY:  Thank you very much.

23                         - - -

24                   REDIRECT EXAMINATION

25   BY MR. DOMINGUEZ:

1  Q.   So the record is clear, that video was made -- was

2  authorized for release purposes per your documentation of the

3  drawings that Mr. Murphy referred to -- on June 7th of 2010?

4  A.   Yes.

5  Q.   And he referred to having some notes on June 7th of 2010?

6  A.   Yes, I believe he is correct when he said that he may have

7  had notes on the 27th of May.  I tried to reach his girlfriend,

8  and again, the notes were in her custody somewhere in Lynn, but

9  I couldn't get ahold of her, she wouldn't return calls.

10  Q.   And who told you that those notes were in the possession

11  of his girlfriend in Lynn?

12  A.   He did.

13  Q.   And as a matter of fact, in the questions of you,

14  Mr. Murphy inquired of you whether or not you were sure that

15  you contacted her in order to obtain these notes?

16  A.   Yes.  I made calls, and I believe I made a call in his

17  presence as well, and it went to voicemail.

18  Q.   Now, he did not describe these notes as a booklet

19  entitled, "How to be a Master Thief" by Sean Murphy?

20  A.   No, and he did not say anything about a copy of anything

21  he did prepare being released to the inmate population in Essex

22  County.

23  Q.   You debriefed him on May 27th of 2010, and again, on June

24  7th of 2010; am I correct?

25  A.   Yes.

1  Q.   Did he ever tell you that a book that he had was left

2  behind at Essex County in any fashion?

3  A.   No.

4  Q.   Did he ever tell you that he left a book regarding "How to

5  be a Master Thief" with an Inmate McDonald?

6  A.   No.

7  Q.   And for all of you know, Inmate McDonald or other inmates

8  may have been privy to the contents of that book?

9  A.   That's reasonable, yes.

10 Q.   Did Sgt. Michael Roach, who discovered that document, do

11 you recall when he gave it to you?

12 A.   I was made aware of that sometime, I believe, in November

13 of 2010.  Yeah, in November of 2010, I was made aware of that.

14 Q.   Now, on June 7th of 2010, when Mr. Murphy had his last

15 proffer with you in November of 2010, when Sgt. Roach or some

16 other representative from the Essex County Jail Facility called

17 you about that document, did he ever tell you that he had left

18 behind -- that he had lost a booklet entitled, "How to be

19 Master Thief"?

20 A.   No.

21 Q.   Now, it is not like Sean Murphy doesn't know how to reach

22 you, is it?

23 A.   Sean has written me several letters, yes.

24 Q.   In any of those letters, did he ask you, do you know

25 anything about the whereabouts of my book, "How to be a Master

1  Thief" by Sean Murphy?

2  A.   No.

3  Q.   Did he ever ask you to inquire of Essex County officials

4  that they may have in their possession a book that he left

5  behind there?

6  A.   No.

7  Q.   Did he tell you that he was concerned about that because

8  it might fall into the wrong hands?

9  A.   No mention.

10 Q.   As a matter of fact, has Sean Murphy ever advised you of

11 concerns he might have of others realizing he might be

12 cooperating with federal authorities?

13 A.   No.

14 Q.   So, to your knowledge, he had no fear of that document

15 being found by fellow inmates?

16 A.   It was never discussed.

17 Q.   Was it a surprise to you when you obtained it, Agent

18 Costello, in November of 2010 from the Essex County officials?

19 A.   It was a complete surprise, yes.

20 Q.   Did you intend to use it as evidence during the course of

21 the trial?

22 A.   When I saw it, I immediately recognized its evidentiary

23 value, and I made you aware of it, yes.

24 Q.   As a matter of fact, on May 27th of 2010, we all now know

25 that Mr. Murphy provided a complete proffer to you and to

1  others about his involvement in this Brink's bank robbery or

2  Brink's burglary?

3  A.    Yes.

4  Q.    Based on your knowledge of the rules in terms of proffers,

5  that's not something that you have offered to be admitted into

6  evidence in his case at trial, correct?

7  A.    No.

8  Q.    Why is that?

9  A.    Because a proffer is considered to be off the record.  In

10  good faith, we engage someone like Mr. Murphy to sit down to

11  see what they have to offer the government, and we can evaluate

12  its usefulness, and we are interested in hearing what he has to

13  say.  And the agreement is that we can't use that against him

14  unless certain things are violated, and it is spelled out in

15  the proffer letter.

16  Q.    When is the first time you received a letter from Sean

17  Murphy?

18  A.    I would have to look at the dates.  It was either the end

19  of September or the beginning of October 2009.  It was probably

20  within two weeks of me serving the subpoena on him and

21  mentioning the idea of a proffer.

22  Q.    And again, I just want the record to be clear.  He never

23  sent you a letter, as he had done many times -- I mean, he did

24  enclose items in letters that he sent to you, didn't he?

25  A.    He enclosed a copy of the Federal Sentencing Guidelines on

1   one occasion, and I am not remembering any other enclosures off

2   the top of my head, but that one sticks out.

3   Q.   So, it wouldn't have been inconceivable for him to enclose

4   "How to be a Master Thief" in a letter to you and to tell you,

5   Agent Costello, this is a manifesto I will offer you in order

6   to supplement the proffer that either I have given or I intend

7   to give in the future?

8   A.   He did not.  That would have been a reasonable thing, but

9   he did not, no.

10          MR. DOMINGUEZ:  May I have a moment, Your Honor?

11          No further questions.

12          THE COURT:  Mr. Murphy?

13                          - - -

14                 RECROSS-EXAMINATION

15   BY MR. MURPHY:

16   Q.   Agent Costello, Mr. Dominguez has asked you if I attached

17   this manual to a letter, sending it to you, okay?

18          If I was transferred out of a facility where the manual

19   was, and we hadn't scheduled the video until I was in the new

20   facility, I wouldn't have access to that manual in the new

21   facility, would I?

22   A.   If you had accidentally left it behind, no, you wouldn't.

23   Q.   Okay.  And this is of such a nature that it is nothing

24   that you can transfer from one facility to another because as

25   you are aware of, when you transfer from one facility to

1 another, the new facility goes through all of your documents to

2 determine whether there is any contraband?

3 A.   I am not an expert on prison protocol, that is not within

4 my area of expertise.

5 Q.   Does that sound reasonable?

6 A.   It sounds reasonable, but I couldn't say one way or the

7 other how thorough the search is on an inmate transfer because

8 I have never been involved in that process.

9 Q.   Okay.  Mr. Costello, Mr. Dominguez asked you if there was

10 ever a situation where information got out where I had possibly

11 proffered?

12 A.   Yes.

13 Q.   Do you remember me being able to call Kristin on the phone

14 at one of the proffers, and she told us that someone had told

15 Johnny Rotten (phonetic) that I was getting ready to testify?

16 A.   I don't recall.

17 Q.   You don't recall me speaking directly to you about that?

18 A.   No, I don't.  I am not saying that it didn't happen, but I

19 don't remember that happening.

20 Q.   Okay.  And all of these proffers are recorded?

21 A.   The proffers are recorded, yes.

22 Q.   Now, when the video-proffer was recorded --

23 A.   Hhm-hmn.

24 Q.   In addition to the video that you made, was the internal

25 camera recorded, too?

1  A.    No.  The facilities camera was used on the first three

2  sessions, the actual video was actually a video camera.

3  Q.    Okay.  And at the proffer just prior to that, it would

4  have been made May 27th you said?

5  A.    Yes, sir.

6  Q.    That was at the Attleboro Police Station?

7  A.    Yes, sir.

8  Q.    And that was completely recorded, the whole proffer?

9  A.    Yes, sir.

10  Q.    And if we had time to review to that video, do you think

11  that I would refer to this document as a book or as notes in

12  the video as recorded?

13  A.    You would have to look at the video, I remember discussing

14  notes.

15        MR. MURPHY:  Okay.  I remember -- well, I will

16  testify in a minute.  Thank you very much.

17        MR. DOMINGUEZ:  No further questions, Your Honor.

18        MR. MURPHY:  No further questions.

19        THE COURT:  Okay.  You may step down.

20        MR. MURPHY:  Your Honor, is Mr. Graeff going to

21  question me?

22        MR. GRAEFF:  Your Honor, I don't think I am allowed.

23  I think the way to proceed on this is he has to be sworn in,

24  and he just has to narrate.

25        THE COURT:  Tell your side of the story.

1          MR. MURPHY:  Okay.

2                       –  –  –

3                    SEAN MURPHY

4  AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

5                       –  –  –

6                 DIRECT EXAMINATION

7  BY MR. MURPHY:

8          THE COURT:  You may proceed.

9          MR. MURPHY:  Yes, Your Honor.  In regards to this

10  matter –– in regards to this matter of the video that was for

11  training purposes, this was originally brought up on the very

12  first day that I met with Agent Costello.  It was in the Essex

13  County Correctional Facility.  He knew that my company had

14  actually offered videos like this in regards to security

15  consulting, and they were very interested in obtaining it.

16          And we had a few conversations about what it was, and

17  Mr. Costello had told me what he thought it might be worth, and

18  you know, he said that it wouldn't be worth much, maybe a one

19  or two-year reduction in sentence, and I said that I thought it

20  would be worth more.  And probably a month or two later, I sent

21  him a letter in regards to proffer part one.  And in that

22  letter, I offered him the video for having my sentence cut in

23  half.  And at that point, the proffer sessions started going.

24          And as I told you, we had two proffer sessions while

25  I was in the Essex County Correctional Facility, I was being

1  held there on a case from Lynn District Court on a $500 bail.

2  I purposely wanted this case there to hold me, and I kept

3  continuing it so I would remain at the Essex County Jail.  The

4  Essex County Jail had an excellent law library, I was a pro se

5  inmate, and I had access to this law library all day long.  In

6  addition, it is my home jail.  And I was staying there as long

7  as I can on this $500 bail; they were transferring me down to

8  Bristol County to a case down there, where transportation would

9  take me whenever I had court.

10         And then one day in April, out of the blue, they took

11  me to Lynn District Court.  My attorney was there, my attorney

12  was Albert Conlon -- I mean, David Conlon, and he didn't know

13  why I was there, it wasn't scheduled.  He said, they put a new

14  DA on the case.  And we went upstairs to the Commonwealth,

15  which was also the government in Massachusetts.  They were now

16  prosequi-ing the case, and we were objecting.  And the judge

17  says that --

18         THE COURT:  You mean your local case?

19         MR. MURPHY:  My local case.  And the judge said that

20  we can't stop the Commonwealth from dropping charges.  We were

21  demanding a trial because I was trying to stay at the Essex

22  County Facility.  He allowed the Commonwealth to drop the

23  charges.  I went back to jail that day, and I was given,

24  literally -- the officer down in booking gave me a break, it is

25  a reception area, and he wasn't supposed to release me back

1  into the population because I was no longer an inmate in that

2  facility.  I was being transferred because I was being held on

3  bail in another county, and they were going to bring me to this

4  other county.  He allowed me to go up in my cell with an escort

5  of an officer, pack my belongings and go directly back down to

6  booking to be transferred out to this Bristol County facility.

7  This book was not kept in my cell, for obvious

8  reasons.  I wasn't going to get caught with this book.  But

9  what I tried to do, when I got to the new facility, I wrote a

10  couple of letters and I tried to have this book sent out to my

11  girlfriend at the time, Kristin Sullivan, so that she would

12  have it, and I could actually have it for the proffer, which it

13  was actually designed for.

14  The proffer sessions started moving fast in the new

15  facility, and before you know it, it was June 7th.  Actually,

16  at the May 27th proffer, I had told Jason that I had a book,

17  and that's why I had mentioned to him that this proffer was

18  recorded, and if we get that whole proffer session from May

19  27th, I will refer to this document as my book and not as

20  notes.  And he took Kristin's phone number, and I said, let me

21  call her now, and I left her a message, saying Jason Costello

22  will be calling you, and if you have the book, give it to him,

23  meet up with him and give it to him.

24  And when I actually went to do the video, I asked,

25  did you get the book from Kristin?  And he said, no, I left a

1   message, and she didn't call me back.  We tried calling her

2   again, and it went to voicemail and it was nothing.  I did the

3   video based on just the basic notes that I had.  And like I

4   say -- as Jason Costello said, the information contained in

5   that book is the same thing as the video.  Okay.

6          MR. DOMINGUEZ:  May I approach, Your Honor?

7          THE COURT:  You may.

8          MR. DOMINGUEZ:  May I approach the Court, and may I

9   have that "How to be a Master Thief"?

10                          - - -

11

12                     CROSS-EXAMINATION

13  BY MR. DOMINGUEZ:

14  Q.   Sir, I have just handed you -- and we will mark it at a

15  later time -- that's designated as Government Exhibit 18-1 for

16  the record.  And I will place a sticker on it in a little bit,

17  but is that the release that you provided?

18  A.   This is the release that was handed to me prior to doing

19  the video, and at the time --

20  Q.   No, just wait, just let me ask the questions.  Did you

21  sign that document, sir?

22  A.   Yes, I did.

23  Q.   What's the date on it?

24  A.   June 7th of 2010.

25  Q.   Read it.

1    A.    The whole document?

2    Q.    Yes.

3    A.    "I, Sean Murphy, DOB, 7-19-64, formerly of 407 Walnut

4    Street, Lynn, Massachusetts, hereby authorize FBI Special Agent

5    Jason Costello and Attleboro Police Detective Richard Cambium

6    to videotape me for the purposes of creating a law enforcement

7    training video utilizing my knowledge in commercial burglary.

8    I understand that any such training video may be distributed

9    amongst the law enforcement community for training purposes.  I

10   have given this written permission to the above named law

11   enforcement officers voluntarily and willingly without any

12   threats or promises of any kind.  I understand that by signing

13   this consent form, I hereby waive any and all intellectual

14   property rights, including but not limited to financial

15   compensation to the information that I provide."

16   Q.    I'm sorry.

17   A.    "I further agree to waive any future claims against the

18   FBI or the Attleboro Police Department and any law enforcement

19   agencies.  Signed by Sean Murphy."

20   Q.    And what is that date, sir?

21   A.    June 7th of 2010.

22   Q.    And you agree that you were discharged from the Essex

23   County Facility on April 28th of 2010?

24   A.    Yes.

25   Q.    Now, on that release, do you mention anything about a book

1  entitled, "Master Thief, How to be a Professional Burglar?"  By

2  Sean Murphy?

3  A.   I didn't create this document.

4  Q.   Did you edit that document to reflect a release with

5  respect to this book?

6  A.   No, sir.

7  Q.   Now, you said that you were a certified paralegal; am I

8  right?

9  A.   Yes, sir.

10  Q.   You worked for two law firms?

11  A.   Yes, sir.

12  Q.   Won several cases?

13  A.   Yes.

14  Q.   So, if you wanted to release -- release them from

15  liability with respect to intellectual property, why didn't you

16  edit that document to reflect this book?

17  A.   We didn't have the book at the time.  We were trying to

18  obtain it.  Yes, we didn't have the book.

19  Q.   From Kristin Cook?

20  A.   Not from Kristin Cook.

21  Q.   I'm sorry.  What was her name?

22  A.   Kristin Sullivan.  I wasn't sure if it had actually been

23  mailed out of Essex County yet.

24  Q.   Mailed out of Essex County?

25  A.   Yes.

1   Q.   Wait a minute.  Now -- I'm sorry.  Didn't you just say

2   that you didn't want to be caught with it?

3   A.   In Essex County.

4   Q.   Well, how in the world would it be mailed from Essex

5   County?

6   A.   That's where it was, that's where I left it, and I told

7   you that I wrote some letters to have it mailed out to Kristin.

8   Q.   Well, how would you write letters to have it mailed out if

9   you were concerned about being caught with it?  That's what you

10  said on this record to the Judge.

11  A.   Yeah.  I am not going to have officers mail it out.

12  Obviously, I am going to have personal friends in the jail of

13  mine mail it out.

14  Q.   Oh.  So, you did leave it behind with other some other

15  inmates?

16  A.   I explained that I did not keep it in my cell.

17  Q.   Because you didn't want to be caught with it?

18  A.   That's right.

19  Q.   Now, will you at least admit --

20  A.   It would have been protected under the proffer.

21  Q.   Would you at least admit, Mr. Murphy, that you never said

22  anything to Jason Costello about leaving that book behind at

23  the Essex County Jail, did you?

24  A.   I thought it had been mailed out to Kristin.

25  Q.   Would you please just answer my question?  You met with

1  him on May 27th, correct?

2  A.   Yes.

3  Q.   You met with him on June 7th, correct?

4  A.   Yes.

5  Q.   Did you tell Agent Costello that I left behind "Master

6  Thief, How to be Professional Burglar" at the Essex County

7  Jail?

8  A.   No, I didn't.

9  Q.   But you knew it existed there, didn't you?

10  A.   I didn't believe it would still be there at the time.

11  Q.   Who would be the best person to obtain this as part of a

12  proffer for your use and for the FBI's use?  Wouldn't the FBI

13  be in a good position?  Law enforcement to law enforcement?

14  A.   Well, it has to be under the proffer.  I just can't mail

15  them the document.

16  Q.   You couldn't tell Jason Costello that you left this

17  document behind; is that what you are telling this Court?

18  A.   No, I told Jason Costello that I believed he could get it

19  from Kristin.

20  Q.   You talked to Jason Costello about notes.  I am talking

21  about this precise book?

22  A.   No, let's it get it straight.

23  Q.   No, you answer my question.  Did you ask Jason Costello to

24  obtain this book from the Essex County Jail?  Did you or didn't

25  you?

1    A.   Not from the Essex County Jail, no.

2    Q.   And when you were at the jail, you were scared about being

3    caught with it, weren't you?

4    A.   From the Correctional Facility, yes.

5    Q.   How would it be a problem if you were writing it as a

6    proffer for a proffer agreement?

7    A.   Because if the Essex County Correctional officers found

8    it, it is not part of the proffer.  If I bring it to a proffer

9    session and include it with a video to Jason, it is covered by

10   Kastigar.

11   Q.   This is so much a part of the proffer, Mr. Murphy, that

12   Agent Costello had to find out about it, independent of you, in

13   November of 2010; is that correct?  Isn't that right?

14   A.   I had no idea how he found out about it.

15             MR. DOMINGUEZ:  May I have a moment, Your Honor?

16             No further questions.

17             THE COURT:  Now, have you looked at Government's

18   Exhibit 15-1, "Master Thief", etc.?

19             MR. MURPHY:  Yes, sir.

20             THE COURT:  "How to be Professional Thief" by Sean

21   Murphy?

22             MR. MURPHY:  Yes, sir.

23             THE COURT:  Have you leafed through it?  Are you

24   familiar with it?

25             MR. MURPHY:  Yes, I am.

1       THE COURT:  Okay.  Is that what you wrote?

2       MR. MURPHY:  Yes, Your Honor.

3       THE COURT:  Okay.  I have no further questions.

4       MR. DOMINGUEZ:  No further questions.

5       THE COURT:  The Court will take this under advisement

6  and issue a ruling tomorrow morning.

7       MR. DOMINGUEZ:  Thank you, Your Honor.

8       THE COURT:  If the Court decides to admit that --

9  this is your work.  Do we need to bring in the person from the

10  jail who found it, Mr. Murphy?

11      MR. MURPHY:  Yes, Your Honor, just to verify that it

12  wasn't in my possession or in the cell that I was in.

13      THE COURT:  Can that be stipulated?  Well, wasn't

14  that the jail that Mr. Murphy was in?

15      MR. DOMINGUEZ:  It was my understanding, Your Honor,

16  that Inmate McDonald was right across the hall on the floor

17  from Mr. Murphy; is that correct?

18      MR. MURPHY:  Your Honor, these blocks carry 120

19  inmates.

20      MR. DOMINGUEZ:  Well, for purposes of this hearing,

21  was he right across the hall from you?

22      MR. MURPHY:  Well, I don't even know who Inmate

23  McDonald is.

24      MR. DOMINGUEZ:  I am willing to stipulate it, Judge,

25  however you want to do it.

1       THE COURT:  We will stipulate that it was not in your

2   cell but in another inmate's cell?

3       MR. MURPHY:  Well, no, no.  That's telling the jury

4   that I am in jail, I definitely don't want that to happen.

5       MR. DOMINGUEZ:  Well, one way we could do it, Judge,

6   and of course, it would have to be with the express agreement

7   of Mr. Murphy, Agent Costello can testify about the book and

8   its contents and he can say it was found at a place where

9   Mr. Murphy previously resided.

10      Otherwise, we are going to have to lay a foundation

11  and call into question that he is in jail.  I don't have any

12  choice.

13      MR. MURPHY:  Can I speak to Mr. Graeff?

14      THE COURT:  Sure.  That's what you are supposed to

15  do.

16      MR. MURPHY:  Your Honor, I would ask if we could wait

17  until tomorrow morning after this Court's ruling?  Because we

18  strenuously object to this ruling.  You know, it is a Kastigar

19  issue.

20      MR. DOMINGUEZ:  That's just the case associated with

21  proffer agreements, Your Honor.

22      THE COURT:  Well, in the interests of time, the Court

23  will announce its decision to admit 15-1 into evidence.  The

24  testimony supports that it was not a part of the proffer, and

25  you have had a couple of years to bring it up as a part of

1   that.

2        And so, we will face the authentication matter, if

3   you don't want to stipulate.

4        MR. MURPHY:  Your Honor, what I would ask the Court,

5   since the government has these -- the May 27th proffer video in

6   their possession, they gave it to us in discovery -- I would

7   ask the Court to briefly look at it and see if I refer to this

8   book as a book in the proffer.

9        THE COURT:  Since you are the author of both, as far

10  as I am concerned, it can basically be the same, and I would

11  still rule the same, that this book, in and of itself, is not

12  part of the proffer.  If you are the author of both things,

13  there is only so much information or intelligence that you

14  would have on how, you know, to go through the course of the

15  things or --

16       MR. MURPHY:  As long as my objection is noted, we can

17  stipulate that I am the author of the book, and it was obtained

18  in the course of the investigation.

19       MR. DOMINGUEZ:  If he is willing to stipulate that,

20  we so stipulate that.

21       THE COURT:  All right.  It is so stipulated.

22       Now, the other matter -- we will keep moving along

23  here -- is the Global Gadget records, and I understand that

24  they are foreign records, and you are seeking to have them

25  admitted pursuant to 18 U.S.C., Section 3505, which provides:

1  (a) in a criminal proceeding in a court of the United States, a

2  foreign record of a regularly conducted activity or a copy of

3  such records shall not be excluded as evidence by the hearsay

4  rule if the foreign certification attests that such record was

5  made at or near the time of the occurrence of the matters set

6  forth by or from information transmitted by a person with

7  knowledge of those matters, or (b) such record was kept in the

8  course of regularly conducted business activity, and the

9  business activity made such a record as a regular practice, and

10  if such record is not the original, such record is a duplicate

11  of the original, unless the source of the information or the

12  method or circumstances of the preparation indicate lack of

13  trustworthiness, and (2) the foreign certification under this

14  section shall authenticate such record of duplicate.

15          Do we have any objection to these records?

16          MR. MURPHY:  They are self-authenticating, Your

17  Honor, we have no objection.  We will probably use part of the

18  records in our defense, too.

19          THE COURT:  All right.  The records will be admitted.

20          The other matter is your subpoena of Tina Ankrom and

21  is a matter that we will take up tomorrow, she was not

22  available today.  There is a serious question in my mind as to

23  whether the information that a person being investigated by our

24  Probation Department, whether their information can be made for

25  use other than the Court's assessment of that person, being

1  what the report is about, the subject of the report.

2          So, we will take that up tomorrow.

3          MR. MURPHY:  Yes, Your Honor.  We would just like the

4  Court to know that this information, Mr. Morgan personally let

5  me read his PSI when we were both at the Delaware County Jail.

6  Before Mr. Dominguez had him moved out, he was in the same

7  block with me.  He was a codefendant, and he told me about his

8  conversation with Ms. Ankrom, what went on, and then he showed

9  me his PSI.

10          THE COURT:  All right.

11          MR. MURPHY:  We have one William Palavacini I.D. that

12  was entered but not on the government's exhibit list, that's an

13  objection.

14          THE COURT:  I don't know, I am not familiar with

15  that.  Explain that, Mr. Dominguez.

16          MR. DOMINGUEZ:  Your Honor, there were three photo

17  I.D.s that were found, the three licenses -- William

18  Palavacini, Brian Hetherman and then Sean Murphy's I.D.  During

19  the course of this trial, Mr. Murphy has brought out that

20  burglars -- I believe this was his term in questioning

21  Mr. Nassor -- use fake I.D.s, and I mean, he was making that

22  pronouncement almost as an expert.  We have delivered these

23  I.D.s in discovery.

24          MR. MURPHY:  Absolutely not, Your Honor.

25          MR. DOMINGUEZ:  Well, in advance of trial.  It was

1  listed on the search warrant return, which we litigated in the

2  Motion to Suppress.  So, we will be moving -- we haven't been

3  moving for their admission yet, but we will be moving for their

4  admission at the close of all of the evidence.

5           THE COURT:  All right.  Anything else?

6           MR. DOMINGUEZ:  One matter, Your Honor, just from the

7  government's perspective on the PSR, we have two concerns.  One

8  being that Mr. Morgan may have shared the contents of his PSR

9  with Mr. Murphy, but those matters contained in the PSR are

10  confidential to the public at large.  If Mr. Murphy wants to

11  display that or display statements to the jury, we find that

12  problematic.  But most importantly, Mr. Morgan's statements to

13  Ms. Ankrom are hearsay, and therefore, we do not see how under

14  any rule of evidence that they would be allowed to be

15  considered by the jury under that rule.

16           THE COURT:  Thank you.  We will be adjourned until

17  tomorrow morning.

18                          - - -

19           THEREUPON, the evening recess was taken to be resumed

20  Wednesday morning, October 19, 2011, at 9:30 a.m.

21                          - - -

22

23

24

25

1

2                    C E R T I F I C A T E

3    United States of America

4    Southern District of Ohio

5            We, Georgina L. Wells and Denise N. Errett, Official

6    Court Reporters of the United States District Court for the

7    Southern District of Ohio, do hereby certify that the foregoing

8    223 pages constitute a true and correct transcription of our

9    stenographic notes taken of the proceedings held in the City of

10   Columbus, Ohio, in the matter therein stated, on the 18th day

11   of October, 2011.

12           In testimony whereof, we hereunto set our hands on

13   the 23rd day of March, 2012.

14

15

16                        /s/ Georgina L. Wells

17                        _____

18                        Georgina L. Wells, RMR
                          Official Court Reporter
                          Southern District of Ohio

19

20                        /s/ Denise N. Errett, FCRR

21                        _____

22                        Denise N. Errett, FCRR
                          Official Court Reporter
                          Southern District of Ohio

23

24

25