1

1          UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF OHIO
2                EASTERN DIVISION

3

4

UNITED STATES OF AMERICA,       )
5                               )      CASE NUMBER
                  PLAINTIFF,    )      2:11-CR-10(1)
6          VS.                  )
                                )      COLUMBUS, OHIO
7    SEAN D. MURPHY,            )      OCTOBER 19, 2011
                                )
8                 DEFENDANT.    )
     _____

9

10                         **VOLUME 3**
          **TRANSCRIPT OF THE JURY TRIAL PROCEEDINGS**
11          BEFORE THE HONORABLE GEORGE C. SMITH
            UNITED STATES DISTRICT JUDGE AND A JURY

12

13

14

15

16   APPEARANCES OF COUNSEL:

17   FOR THE PLAINTIFF:        SALVADOR DOMINGUEZ, AUSA
                               HEATHER HILL, AUSA
18
     FOR THE DEFENDANT:        SEAN MURPHY, PRO SE
19                             DAVID GRAEFF, STAND-BY COUNSEL

20

21

22

23

24          GEORGINA L. WELLS & DENISE N. ERRETT
               OFFICIAL FEDERAL COURT REPORTERS
25                   (614) 719-3225

2

1

2                                I-N-D-E-X

3                      VOLUME 3 – OCTOBER 19, 2011

4

5    WITNESSES:                                          PAGE NO.

6    ROBERT DOUCETTE   –  Direct Ex. by Mr. Dominguez....   25
                       –  Cross-Ex. by Mr. Murphy........  159
7

8

9                                – – –

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
 1                    Wednesday Morning Session

 2                       October 19, 2011

 3                          9:43 a.m.

 4                            - - -

 5   IN OPEN COURT:

 6            (Jury not present.)

 7            THE COURT:  We are here on the matter of -- we're

 8   going to take up the matter of the letters.  And there had been

 9   some prior discussions, or negotiations, whatever you want to

10   call it, between Mr. Graeff, when he was counsel, and Mr.

11   Dominguez, over what should be redacted.  Am I correct in that?

12            MR. GRAEFF:  That's correct, Your Honor.

13            MR. DOMINGUEZ:  Yes, Your Honor.

14            THE COURT:  And Mr. Murphy would like to go over

15   those again.

16            Am I correct in that, Mr. Murphy?

17            MR. MURPHY:  Yes, Your Honor.  I have some additional

18   redactions that I have suggested.

19            THE COURT:  Okay.

20            Do we have numbers on these?

21            LAW CLERK:  In the front corner, Judge.  That's the

22   government exhibit.

23            THE COURT:  Oh, 13-1.

24            Where do you want to start, Mr. Murphy?  Do you want

25   to start with 13-1?
```

4

1          MR. MURPHY:  Okay.  I have the letters themselves

2     that I'm thinking, if we could just name the front of them,

3     like from who and to who, and I could -- I could go from there.

4     I don't have the numbers on them.

5          MR. DOMINGUEZ:  Your Honor, the first one would be

6     the one that is postmarked 11 May, 2009, from Rubin Sanchez to

7     Dawn Doucette.  That's 13-1.

8          THE COURT:  Do you have that?

9          MR. MURPHY:  Yes, I do, Your Honor.

10         THE COURT:  Okay.

11         MR. MURPHY:  The first thing, Your Honor, on the

12    front of the page, the front envelope where the postmark is,

13    there's a stamp that says "Essex County Correctional Facility,

14    Middlesex, Massachusetts."

15         MR. DOMINGUEZ:  I've discussed this with Ms.

16    Rawlings, Your Honor, your law clerk.  If any of those -- that

17    was just to make -- as of the complete, we're going to black

18    those out.

19         THE COURT:  Okay.

20         MR. MURPHY:  That's fine.  Your Honor, on the first

21    paragraph, it talks about I got arraigned in New Bedford

22    Superior Court.  They lowered my bail from three million to

23    500,000.  No one could ever post a half a million dollars

24    without being interrogated and proving where the money came

25    from.

5

1           Joe got his bail reduced.  They want a lot of money

2  to let us out, but, in the meantime, I'll keep working on my

3  case.

4           That's prejudicial, Your Honor, Rule 403.  And it

5  actually indicates that I'm in jail.

6           THE COURT:  Mr. Dominguez, what's your position on

7  this?

8           MR. DOMINGUEZ:  Your Honor, with respect to that, I

9  would agree to take out that first paragraph, except for the

10  first sentence.  I mean -- yeah, except for the first sentence

11  with the question mark and the same old bullshit here, period.

12  And then from "I got arraigned" to "I'll keep working on my

13  case," block that information out of there.

14           THE COURT:  The first paragraph?

15           MR. DOMINGUEZ:  After the first two sentences, Your

16  Honor, the one ending in the question mark, and --

17           THE COURT:  So, after the word -- bullshit here,

18  period?

19           MR. DOMINGUEZ:  Right.  Right.

20           THE COURT:  Then take --

21           MR. DOMINGUEZ:  That entire rest of the paragraph

22  out.

23           THE COURT:  -- the rest of the paragraph out?

24           MR. DOMINGUEZ:  Where it ends with "I'll keep working

25  on my case."

6

1       THE COURT:  Okay.  Next paragraph?

2       MR. MURPHY:  Next paragraph is fine, Your Honor.

3       THE COURT:  Okay.

4       Next page.  Anything on the next page?

5       MR. MURPHY:  That's fine.

6       THE COURT:  It says "GTO Judge."

7       MR. MURPHY:  Yes.  That page is fine, Your Honor.

8       THE COURT:  And the page that's marked as 2, or

9    something:  Otherwise, I hope everything is -- anything on that

10   page?

11      MR. MURPHY:  I'm checking right now.

12      THE COURT:  Begins with "Otherwise."

13      MR. MURPHY:  That's fine, that page.

14      THE COURT:  Okay.

15      Next one starts:  I've got room for everyone's stuff

16   upstairs that Joe has quads and tools, so forth.

17      MR. MURPHY:  That page is fine, Your Honor.

18      THE COURT:  Okay.

19      MR. MURPHY:  Excuse me, Your Honor.

20      THE COURT:  So, the reference -- the reference to all

21   correctional and incarcerations are to be removed, that's --

22      MR. DOMINGUEZ:  Well, if we can go over -- Your

23   Honor, if we can go over them letter by letter like the Court

24   just did?

25      THE COURT:  All right.

7

1    MR. DOMINGUEZ:  And so the record is clear, the

2    redactions that are currently in place are the ones that Mr.

3    Graeff and I addressed earlier.

4    THE COURT:  Okay.

5    MR. DOMINGUEZ:  And he was sent redacted copies, but

6    he did say with the caveat that there may be further redactions

7    at a later time.

8    THE COURT:  Okay.

9    MR. MURPHY:  That's correct.

10    THE COURT:  Thirteen dash two, Jason Deprato --

11    MR. MURPHY:  Yes, Your Honor.

12    THE COURT:  -- to Dawn Doucette.

13    MR. DOMINGUEZ:  From the second page, Your Honor, if

14    I may, as the exhibit currently exists, there is that stamp

15    from Essex County Jail.  I'm removing it from the exhibit at

16    this moment.

17    THE COURT:  I don't see any stamp.

18    MR. DOMINGUEZ:  Well, it may not be in yours.  The

19    page was just a page with a stamp saying --

20    LAW CLERK:  It's not in our copy.

21    MR. DOMINGUEZ:  It's not in your copy.

22    THE COURT:  Okay.

23    MR. MURPHY:  Are we on the first page?

24    THE COURT:  The first page, where there is writing.

25    MR. MURPHY:  Yes.

8

1          Your Honor, on the third paragraph, I would ask that

2    the first, the first and second sentences, be redacted:  I

3    should be seeing Joe soon.  Well, that's -- the first three

4    sentences.  He just got indicted in June up in Bristol County.

5    They would put our cases together, because we are

6    co-defendants.

7          THE COURT:  Any problem with that?

8          MR. DOMINGUEZ:  Your Honor, frankly, the first

9    sentence does not pertain to Mr. Murphy.  I'm willing to redact

10   the second sentence.

11         MR. MURPHY:  And the third?

12         MR. DOMINGUEZ:  So far, he has been standing strong?

13         MR. MURPHY:  No.  The second sentence says, He

14   just...  The third sentence is, They will put our cases

15   together.

16         MR. DOMINGUEZ:  Oh, I'm sorry.

17         Yes.  That's what -- I apologize.  That's the

18   sentence I was referring to, the third sentence:  They will put

19   our cases together because we are co-defendants, I'm willing to

20   redact that, Your Honor.

21         THE COURT:  But you want the first sentence in?

22         MR. DOMINGUEZ:  Yes.  The first two sentences have

23   nothing to do with Mr. Murphy.  They have everything to do with

24   Joe Morgan.

25         THE COURT:  And then the sentence:  They put our

9

1   cases together?

2          MR. DOMINGUEZ:  I'll willing to redact that, Your

3   Honor, in its entirety.

4          THE COURT:  Does that go to the end of the paragraph?

5          MR. DOMINGUEZ:  No.  It goes to the end -- the second

6   line, are co-defendants; we are co-defendants, period.  So, for

7   the record, we would be offering to redact, They will put our

8   cases together because we are co-defendants.  The government is

9   willing to redact that in its entirety.

10         THE COURT:  Any problem with that, Mr. Murphy?

11         MR. MURPHY:  No.

12         THE COURT:  Okay.

13         Next page.

14         MR. MURPHY:  Well, on the -- the second-to-the-last

15  sentence, Your Honor, on that page, I would never do it to him,

16  I would like that redacted:  He knows I would never do that to

17  him.

18         THE COURT:  So, it would read:  So far, he has been

19  staying strong.  The feds went to him to cut a deal, and he

20  told them to beat it.  He knows I would never do it to him.

21         MR. MURPHY:  That's the sentence I want out, Your

22  Honor.

23         MR. DOMINGUEZ:  It has nothing to do with his being

24  indicted.  It has nothing to do with, Your Honor, with him

25  being in jail.  It's his letter.  It's his statement.  I don't

10

1    see how that's 403 barred.

2           MR. MURPHY:  Well, Your Honor, I would suggest that

3    since it's talking about cutting a deal with the feds, it

4    suggests that, you know, I had something -- I had a vested

5    interest in not doing it to him.

6           MR. DOMINGUEZ:  Well, Your Honor, Joe Morgan and Sean

7    Murphy are co-defendants in this case.  So --

8           MR. MURPHY:  Point in case.

9           THE COURT:  I don't really see how that statement

10   prejudices you, Mr. Murphy.

11          MR. MURPHY:  Well, I mean, I'll adhere to the Court's

12   ruling.  Just note my objection, Your Honor.

13          THE COURT:  Okay.  So that sentence, They will put

14   our cases together because we are co-defendants, should be

15   redacted.

16          Next page is -- starts with, The word I got was that

17   he was gonna take care of the -- is that "rat"?

18          MR. DOMINGUEZ:  Your Honor, I believe that -- you may

19   not have the redacted version.  On our exhibit, myself and Mr.

20   Murphy's, the first paragraph reads:  I need to know why

21   whoever.

22          LAW CLERK:  That paragraph has been redacted, Judge,

23   under theirs.

24          THE COURT:  I need to know --

25          LAW CLERK:  This whole paragraph (indicating) has

11

1    been redacted.

2          THE COURT:  Oh.  So what's left is:  I need to know

3    why whoever went down to the warehouse went through other

4    people's stuff.

5          MR. DOMINGUEZ:  And then, down to the bottom, Your

6    Honor, is what remains.

7          MR. MURPHY:  That page is fine, Your Honor, --

8          THE COURT:  So, from --

9          MR. MURPHY:  -- from the redacted part, down.

10         THE COURT:  Okay.  I need you to call Kristen.

11         MR. MURPHY:  Yeah.  I'm on that page right now, Your

12   Honor.

13         THE COURT:  Okay.  First of all, what's happened in

14   advance -- has anything happened to this?

15         MR. DOMINGUEZ:  Oh, no.  This reads the whole way

16   down.  I'm sorry, Your Honor.

17         THE COURT:  Okay.

18         Mr. Murphy?

19         MR. MURPHY:  I'm just about done.

20         That page is fine, Your Honor.

21         THE COURT:  Okay.  The next page starts with:  Just

22   didn't move your stuff to another storage place.

23         Anything on that page?

24         MR. MURPHY:  There's some redaction already in there.

25   I'm just going over it right now.

12

1          THE COURT:  Okay.

2          MR. MURPHY:  Right where the sentence that says, I

3  don't feel I'm going to take a big hit on this; I usually have

4  a sixth sense for these things; I think I'm going to be all

5  right.

6          THE COURT:  You want that out?

7          MR. MURPHY:  Yes, sir.

8          MR. DOMINGUEZ:  Well, Your Honor, it doesn't have

9  anything to do with his jail term.  It has nothing to do -- I

10 mean, obviously, it assists the government's case.  He is

11 talking about Rob Doucette here.  He is indicted with Rob

12 Doucette.  He references that Rob Doucette is the last injun

13 standing, and he says, I don't think I'm going to take a big

14 hit for this.

15         MR. MURPHY:  Your Honor, it indicates sentence and

16 punishment, Your Honor.

17         THE COURT:  Well, that's really part -- you know,

18 they know you're, you know, you're obviously indicted with

19 these other people.  And you're just -- it's just conjecture on

20 your part that you're not going to take a big hit on this.  You

21 know.  You may be found not guilty, you know.

22         MR. MURPHY:  Yes, Your Honor.  However, if the jurors

23 go back and look at the date on the envelope, it's back in

24 2009.  This indictment didn't come down until 2011.

25         THE COURT:  So, it's another case, is what you're

13

1   saying?

2           MR. MURPHY:  Yes.

3           MR. DOMINGUEZ:  No.

4           MR. MURPHY:  The Massachusetts case.

5           MR. DOMINGUEZ:  Was Robert Doucette indicted in

6   Massachusetts?  You say he's the last injun standing.  Now,

7   come on.

8           MR. MURPHY:  That's the next paragraph.  I haven't

9   got to that.  I'm talking about -- we're talking about the

10  paragraph before that right now.

11          MR. DOMINGUEZ:  Your Honor, he wrote it.  It has

12  nothing to do with his jail term.  It has nothing to do with

13  being indicted, and nothing about a case in Bristol County,

14  like the other one, which I agreed to redact.

15          He's talking about Rob Doucette.  This is just Rob

16  Doucette.  He calls him the last injun standing, and just

17  before that says he doesn't think he's going to take a big hit

18  on this.

19          MR. MURPHY:  And, Your Honor, that indicates that I'm

20  in jail.  If he is the last injun standing, everybody else is

21  in jail.

22          THE COURT:  I don't know that "last injun standing"

23  means something.

24          MR. MURPHY:  That's what that means, Your Honor.

25          THE COURT:  Well, it may mean something in your

14

1  community, but I don't know that it means that you're in jail.

2        MR. MURPHY:  Well, I was reading through the

3  discovery, and I read an FBI 302 from Special Agent Costello,

4  and he mentioned Rob Doucette as the last injun standing.

5        THE COURT:  Yeah.  Well, that may be the way they

6  talk, but I don't think it's the way people necessarily talk,

7  unless it's 1880 or something like that.

8        I'll allow it.  Your exception is noted.

9        MR. MURPHY:  Thank you, Your Honor.

10        THE COURT:  Anything else on that page?

11        MR. MURPHY:  No.

12        THE COURT:  Okay.

13        Dash three.  It's a letter from Barry Troy.

14        Mr. Murphy?

15        MR. MURPHY:  Yes.

16        THE COURT:  Have you got that?

17        MR. MURPHY:  Yes.

18        THE COURT:  To Doucette?

19        MR. MURPHY:  Yep.  Again, Your Honor, this is just

20  what the government has agreed to.  The second page is the

21  stamp from Essex County Correctional Facility.

22        MR. DOMINGUEZ:  Absolutely.

23        THE COURT:  Okay.

24        MR. MURPHY:  One, two -- the fourth paragraph, Your

25  Honor, it's the second sentence:  When I go to jail, I have

15

1    nothing better to do than chase a buck.  That's got to go.

2            And most of my customers in here are civil clients,

3    rather than criminal.

4            MR. DOMINGUEZ:  Your Honor, I would be willing to

5    accept the redaction of that third sentence, Most of my

6    customers in here are civil clients, rather than criminal, but

7    the reference -- actually, the reference when I go to jail

8    helps Mr. Murphy's cause, because it's a suggestion that he's

9    not in jail at this time.  That's consistent with his previous

10   objection.

11           MR. MURPHY:  I would suggest that any reference to

12   jail has to go, Your Honor.

13           MR. DOMINGUEZ:  For the record, Your Honor, I would

14   suggest this could be brought in as consciousness of guilt.

15   It's his own statement.  It's not stating that he's in jail at

16   the present time.  When I go to jail, that's a consciousness of

17   guilt.  That's a suggestion that I'm guilty.

18           MR. MURPHY:  Your Honor, that's --

19           MR. DOMINGUEZ:  That's allowed under the rules of

20   evidence.

21           MR. MURPHY:  Your Honor, that's not the sense, this

22   present sense that the letter was written.  I'm asking Mr.

23   Doucette to take care of my stuff.  When I go to jail, I have

24   nothing better to do than chase a buck.  That indicates that,

25   while I'm in jail, I'm chasing a buck.

16

1      I mean, you can interpret it a couple different ways,

2 but the sense that it was written is, when I go to jail, I have

3 nothing to do better than to chase a buck.  And it's indicating

4 that I'm in jail.

5           MR. DOMINGUEZ:  Your Honor, my response --

6           THE COURT:  Do you want the whole paragraph out?

7           MR. MURPHY:  No.  I just want the sentence "When I go

8 to jail" and then the next sentence "Most of my customers

9 here," those two sentences are fine to be taken out.

10          THE COURT:  Well, I think -- I don't want to take a

11 chance on that.  I'm going to allow that to -- where will it

12 end?  Where do you want it to end?

13          MR. MURPHY:  It will end at:  "Most of my" -- that

14 "then criminal."  So start "When I go to jail" and end "then

15 criminal."

16          THE COURT:  Most of my customers in here are civil

17 clients, rather than criminal.

18          MR. MURPHY:  Right.  And the sentence just before

19 that:  When I go to jail, I have nothing better to do than

20 chase a buck.

21          THE COURT:  Right.  I've got that.

22          MR. MURPHY:  And then the next sentence:  Most of my

23 customers in here are civil, rather than criminal.  Those two

24 sentences, and I'm content.

25          THE COURT:  I'll allow that.

17

1      MR. MURPHY:  Thank you, Your Honor.

2      THE COURT:  Anything else on that page?

3      MR. MURPHY:  No.  That's fine, Your Honor.

4      THE COURT:  Anything -- oh!  That's it?

5      MR. MURPHY:  No.  There is one more letter.

6      THE COURT:  The letter --

7      LAW CLERK:  13-4.

8      MR. MURPHY:  13-4.

9      THE COURT:  Oh!  All right.  Well, I meant that was

10 it on the rest of the --

11     COURTROOM DEPUTY CLERK:  Yeah.

12     THE COURT:  Okay.

13     Dear Rob.

14     MR. MURPHY:  That again, Your Honor, the cover of the

15 Essex County should be blacked out.

16     THE COURT:  Okay.

17     MR. MURPHY:  Okay.

18     THE COURT:  Anything on the first page of that letter

19 to Doucette?

20     MR. MURPHY:  Well, the first paragraph's already

21 redacted, Your Honor.

22     THE COURT:  And it has a long list of items.  And

23 that's out?

24     MR. MURPHY:  Yes.

25     MR. DOMINGUEZ:  The first paragraph is completely

18

1   redacted, Your Honor.

2          THE COURT: Okay. Anything else?

3          MR. MURPHY: Yes, Your Honor. There's -- there's a

4   bold, in the middle of the -- the original third, the redacted

5   second, there is a bold "I will be back." I would ask that

6   that be removed.

7          THE COURT: All right. That's out. "I will be back"

8   is out.

9          MR. MURPHY: I would ask that "The numbers" -- the

10  next paragraph, "The numbers I am facing only add up to a

11  handful of years," again, that goes to the sentence.

12         THE COURT: Where's that?

13         MR. MURPHY: Right after the "I will be back."

14         THE COURT: Oh! I'll take that out, too.

15         Anything else on that page?

16         MR. MURPHY: I'm in the fourth paragraph right now,

17  Your Honor.

18         MR. DOMINGUEZ: So I'm clear, the sentence "I will be

19  back" and then "The numbers I'm facing only add up to a handful

20  of years," that's been redacted, Your Honor?

21         THE COURT: Right.

22         MR. DOMINGUEZ: Okay.

23         MR. MURPHY: That page is fine, Your Honor.

24         THE COURT: Pardon me?

25         MR. MURPHY: That front page after those redactions,

19

1    that's fine.

2         THE COURT:  All right.  Anything on the last

3    paragraph, next page?

4         MR. MURPHY:  No, Your Honor.  That's fine.

5         THE COURT:  And there is a list of property to be

6    returned from Rob Doucette.  Is that property that he has?

7         MR. DOMINGUEZ:  Your Honor, we've redacted that off

8    of the letter.

9         MR. MURPHY:  I don't have that.

10        MR. DOMINGUEZ:  That's not part of the letter.

11        THE COURT:  Anything else?

12        MR. MURPHY:  Yeah.  I have a general objection, Your

13   Honor.

14        MR. GRAEFF:  He has one more thing, Your Honor.

15        MR. MURPHY:  I have a general objection on two of the

16   letters, Your Honor.

17        THE COURT:  Okay.

18        MR. MURPHY:  That would be the first two, the first

19   two letters that are addressed to Dawn Doucette.

20        THE COURT:  Yes.

21        MR. MURPHY:  My objection would be, Your Honor, that

22   these letters are not addressed to Rob Doucette himself; and if

23   they were -- Dawn Doucette actually lived with him back when I

24   was arrested in January of 2009 and thereafter for at least the

25   next several months.  I would suggest that if Mr. -- if Mr. Rob

20

1   Doucette opened these letters on his own, it would be a

2   violation of the federal mail regulations, Your Honor; that he

3   would be admitting to a federal offense.

4           THE COURT:  Well, these are addressed to Rob

5   Doucette.  Rob Doucette.

6           MR. MURPHY:  The first two are just --

7           THE COURT:  Dawn Doucette.  Is that his wife?

8   Girlfriend?

9           MR. MURPHY:  Girlfriend.  Wife.

10          THE COURT:  And a D.A. Doucette.  Is that Dawn again?

11          MR. MURPHY:  Yes.  The two Dawns -- I'm talking about

12  the two Dawns, Your Honor, two Dawn Doucettes.

13          THE COURT:  And that if he opened them, they should

14  not be admitted because of that he might have violated -- he

15  would be violating the mail fraud laws or --

16          MR. MURPHY:  Yes.  You're not -- if mail is sent to

17  someone and you opened up somebody else's mail, it's a

18  violation of federal law, Your Honor.

19          THE COURT:  Well, that could be.  I don't see that

20  that's any reason to keep these out.  They're your letters.

21          MR. MURPHY:  Well, Your Honor, I would suggest --

22          THE COURT:  They're admissions against interest

23  perhaps.

24          MR. MURPHY:  I would suggest that my return address

25  isn't on either letter either.  One is from a Jason Deprato,

21

1    and one is from a Ruben Sanchez.

2            THE COURT:  Uh-huh.

3            MR. MURPHY:  And I don't know if Mr. Doucette is

4    going to claim that he can recognize Mr. Murphy's handwriting.

5    If he does, I would suggest that there was no prior writings to

6    him there, and he had nothing to base his decision on.

7            THE COURT:  You signed them all with your nickname.

8            MR. MURPHY:  Well, you can just note my objection.

9            THE COURT:  Why would someone else be signing that

10   nickname?

11           MR. MURPHY:  Well, I mean, if you look at one of the

12   letters, Your Honor, it's to Nig from Nig.  Yo Nig.  Signed

13   Nig.

14           THE COURT:  Uh-huh.

15           MR. MURPHY:  Are we both Nig?

16           MR. DOMINGUEZ:  Your Honor, we'll let the jury figure

17   this out.

18           One thing that I would like to express to the Court,

19   and I caution Mr. Murphy on the rules of evidence is the rules

20   of completeness.  If, in fact, Mr. Murphy uses these letters

21   for his purposes, I'm just cautioning I believe he could, in

22   fact, open up the door to the complete letter depending on how

23   the testimony develops based on the rule of completeness.  So,

24   but --

25           THE COURT:  That is correct.

22

1          MR. DOMINGUEZ:  -- if I were to go there, I would do

2     a side bar to make sure that the record is complete so we could

3     proceed on caution.  But the rule of completeness would allow

4     me to use the entire letter, depending on what Mr. Murphy

5     attempts to do with them for his purposes.

6          THE COURT:  The objection is overruled.

7          MR. MURPHY:  Thank you, Your Honor.

8          MR. DOMINGUEZ:  We don't have to stall the

9     proceedings.  I'm not going to have Mr. Doucette look at these

10    until later on in his testimony.

11         LAW CLERK:  Oh, okay.

12         MR. DOMINGUEZ:  Ms. Hill can take them upstairs, and

13    she'll come right back down.

14         MR. MURPHY:  And, also, Your Honor, left over from

15    yesterday, we had two objections that you kicked over to today.

16    The one, the William Palavacini ID that wasn't provided in

17    discovery and wasn't on the government's witness list, we

18    brought that up.  And at the end of the day, you said you were

19    kicking it over to today.

20         And we also have the objection for the quash of Tina

21    Ankrom, Your Honor.

22         THE COURT:  She is available today.

23         MR. MURPHY:  Okay.

24         THE COURT:  And the other one, -- well, the ID

25    problem is still under consideration.  I don't want to take up

23

1   the time to do it now.

2          MR. MURPHY:  Okay.

3          THE COURT:  Or does it relate to Doucette?

4          MR. MURPHY:  Not if the government isn't going to try

5   to have him identify the William Palvacini.  We can do it at a

6   later time.

7          MR. DOMINGUEZ:  Your Honor, we're not going to have

8   him introduce it, but --

9          MR. MURPHY:  Okay.

10         MR. DOMINGUEZ:  I'm sorry, Your Honor.

11         We're not going to have Mr. Doucette look at any of

12   the items that were seized pursuant to the search warrant

13   January 23rd, 2009, of the 407 Walnut where that evidence was

14   seized:  the key, the cash, and the three IDs.  Mr. Doucette is

15   not going to talk about any of that.

16         THE COURT:  Okay.

17         MR. DOMINGUEZ:  Well, with the -- with the caveat,

18   Your Honor, Mr. Doucette will testify that he knew that a

19   search warrant was conducted that day at Mr. Murphy's

20   warehouse, but he's not going to talk about any of the contents

21   or anything.

22         THE COURT:  Okay.

23         Are you ready to call in the jury, gentlemen?

24         MR. DOMINGUEZ:  Your Honor, just one concern that I

25   have.

24

1       Mr. Murphy cross-examined Mr. Nassor at length about

2   Mr. Murphy not doing certain things, going to storage units and

3   other things, after he was arrested and incarcerated.  I think,

4   if he does that with respect to Mr. Doucette, then the

5   government has no other choice than to make mention of the fact

6   that it was an impossibility for Mr. Murphy to have assisted in

7   doing things after January 23rd because he was, in fact,

8   incarcerated.  So, I just want to make that clear now.

9       In other words, in questioning Mr. Nassor, Mr. Murphy

10  alluded to actions that he was trying to suggest that Mr.

11  Nassor took during the course of this conspiracy after January

12  23rd of 2009.  I anticipate that he will attempt to ask those

13  same questions of Mr. Doucette; in other words, Mr. Murphy did

14  not go with you to obtain the items at the warehouse in

15  Pennsylvania; Mr. Murphy did not assist you in transferring

16  those items to New Hampshire.

17      If he goes there, Your Honor, I think Mr. Murphy is

18  opening up the door that it was impossible for him to

19  participate because he was, in fact, in jail.  So, I just

20  wanted to put that on the record.

21      MR. MURPHY:  Your Honor, the defense is absolutely

22  going to go there and ask those questions.  And, in response,

23  we would ask for a limiting instruction stating that I was

24  unavailable.  And if the government wants to try to say that I

25  was in jail, it's highly prejudicial, Your Honor.

25

1    THE COURT:  I'll reserve my ruling until the question

2    is asked.

3    Bring in the jury.

4    (Whereupon, the jury was seated in the courtroom at

5    10:20 a.m.)

6    THE COURT:  Good morning.

7    You may call your first witness.

8    MR. DOMINGUEZ:  Thank you, Your Honor.  We would call

9    Robert Doucette to the stand.

10    THE COURT:  That's spelled D-O-U-C-E-T-T-E?

11    MR. DOMINGUEZ:  That is correct, Your Honor.

12    (Whereupon, the witness was sworn in by the Courtroom

13    Deputy Clerk.)

14    THE COURT:  You may examine.

15    MR. DOMINGUEZ:  Thank you, Your Honor.

16    - - -

17    ROBERT DOUCETTE,

18    AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

19    - - -

20    DIRECT EXAMINATION

21    BY MR. DOMINGUEZ:

22    Q.   Sir, would you please state your name?

23    A.   Robert Doucette.

24    Q.   Mr. Doucette, in what state do you presently reside?

25    A.   Massachusetts.

26

1   Q.   And would that be in the Greater Boston Metropolitan Area?

2   A.   That is correct.

3   Q.   Mr. Doucette, do you know Sean Murphy?

4   A.   Yes, I do.

5   Q.   How do you know Sean Murphy?

6   A.   He's an acquaintance of mine.

7   Q.   And how long have you been acquainted with him?

8   A.   About ten years.

9   Q.   If you were to see him again, for the record, would you

10  recognize him?

11  A.   Yes.

12  Q.   I ask you to look around the courtroom, and let us know

13  whether or not Mr. Murphy is with us today.

14  A.   Yes, he is.

15  Q.   Would you please point to him and tell us what he is

16  wearing?

17  A.   He's sitting over there (indicating), and he is wearing a

18  blue shirt.

19          MR. DOMINGUEZ:  Your Honor, may the record reflect

20  that Mr. Doucette has identified Sean Murphy?

21          THE COURT:  It shall so reflect.

22  BY MR. DOMINGUEZ:

23  Q.   Mr. Doucette, do you know Joe Morgan?

24  A.   Yes, I do.

25  Q.   How long have you known Joe Morgan?

27

1   A.   Probably 20 years.

2   Q.   And do you know David Nassor?

3   A.   Yes, I do.

4   Q.   Do you know him by any nickname?

5   A.   Damien.

6   Q.   And do you know Joe Morgan by any nickname?

7   A.   Joe Schmo.

8   Q.   Joe Schmo, or JoMo?

9   A.   JoMo.  Joe Schmo.

10  Q.   Both?

11  A.   Both.

12  Q.   Very well.

13          MR. DOMINGUEZ:  May I approach, Your Honor?

14          THE COURT:  Yes, sir.

15  BY MR. DOMINGUEZ:

16  Q.   I ask you to take a look at those, sir.

17  A.   Okay.

18  Q.   I've just handed you, for the record, sir, Government's

19  Exhibit 16-1 and 16-3.  Do you recognize those, sir?

20  A.   Yes.

21  Q.   What is in Government's Exhibit 16-1, sir?

22  A.   That is Joseph Morgan.

23  Q.   16-3?

24  A.   David Nassor.

25  Q.   If I may, Mr. Doucette, I am going to invite your

1  attention to the fall of 2008, September-October time frame.

2  Did you, by chance, have any discussion with Mr. Murphy in that

3  time frame regarding something he desired to do relative to a

4  burglary?

5  A.    Yes.

6  Q.    Tell us about that.

7  A.    He approached me with an idea to break into a Brink's

8  company.

9  Q.    And what did he tell you about that, sir?

10 A.    He showed me pictures on the Internet and brief detail of

11 what his plan was.

12 Q.    And would you tell the ladies and gentlemen of the jury

13 what his plan was?

14 A.    His plan was to drive down there during a holiday weekend

15 and break into the place, try to do it in a timely manner over

16 the course of one night, and return the same weekend.

17 Q.    Did he -- without going into detail, because we'll get

18 there, but did he tell you, at all, about how he planned to

19 carry this out?

20 A.    At this point in time, not yet.  He wasn't getting into

21 full details.

22 Q.    Moving along to the time frame of December of 2008, did

23 you have any discussions with Mr. Murphy regarding a telephone

24 cell jammer?

25 A.    Yes.

29

1    Q.    What did he tell you about that?

2    A.    That he needed to acquire one, and that he was going to

3    send David Nassor to go and pick one up that he had ordered.

4    Q.    Did he tell you where he had ordered it from?

5    A.    No, just off the Internet, no specific location.

6    Q.    Did he tell you where he was going to send Mr. Nassor to

7    obtain this item?

8    A.    No, no specific location, just that he couldn't do it on

9    the east coast due to the high security within New Jersey,

10   Boston, and New York.  So he had to go west.

11   Q.    Did he tell you how he was going to have the item

12   delivered wherever it was going to go west?

13   A.    He was very vague.  They were going to go do it at a

14   hotel.

15   Q.    Do you know whether or not that Mr. Nassor had

16   accomplished this function?

17   A.    Yes.

18   Q.    And how do you know that?

19          MR. MURPHY:  Objection.  Hearsay, Your Honor.

20          THE COURT:  Overruled.

21   BY MR. DOMINGUEZ:

22   Q.    Do you know if Mr. Nassor had accomplished this function?

23   A.    Yes.

24   Q.    And how do you know that?

25   A.    I was with Sean when he got the phone call.

30

1   Q.   And when you say when Sean got the phone call, what do you

2   mean by that?

3   A.   He had gotten a phone call that he was -- they had a

4   successful mission picking up the jammer.

5   Q.   And where were the two of you when Mr. Murphy received

6   that phone call?

7   A.   We were at my house.

8   Q.   And since you're mentioning that house and, obviously, Mr.

9   Murphy knows where that is, what city is that in, sir?

10   A.   That is Lynn, Massachusetts.

11   Q.   Very well.  Following the successful mission with the cell

12   phone jammer, do you know whether or not Mr. Murphy traveled

13   anywhere as part of this plan to do a Brink's burglary?

14   A.   Yes.  Prior to the crime, he had drove to deliver his

15   tools.  And he had done a second trip to go down and get some

16   DNA.

17   Q.   Okay.  Let's talk about the first thing you discussed.

18   When you were talking about he drove down to deliver some

19   tools, tell us about that.  What do you know about that?

20   A.   I -- me, Joe and Sean met up at the warehouse where --

21   Q.   You say "Joe."  Who are you referring to?

22   A.   Mr. Morgan.

23   Q.   Okay.

24   A.   And we loaded up one of the trucks.  And Joe and Sean took

25   off to go to the storage facility, in Pennsylvania, to bring

31

1    the tools down there.

2    Q.   And how do you know that Joe and Sean took off to deliver

3    tools?

4    A.   They had it scheduled to take that ride.  And they had me

5    meet them up to load up the truck.

6    Q.   Now, at that time, Mr. Doucette, did you know they were

7    going to Pennsylvania, or did you learn that -- did you learn

8    that sometime later?

9    A.   I learned that later.

10   Q.   Very well.  And what type of tools were loaded onto the

11   truck?

12   A.   There was a bunch of stuff, some stuff I'd never

13   recognized, but there was generators, torches, them thermal

14   lance rods, various bags of smaller tools, drills, smaller

15   saws.

16           THE COURT:  Excuse me.  What kind of rods?

17           THE WITNESS:  It's called a thermal lance rod.

18           THE COURT:  Thermal?

19           THE WITNESS:  Which is a cutting tool.  And, you

20   know, some electronics, walkie-talkies, some suits for us to

21   wear.

22   BY MR. DOMINGUEZ:

23   Q.   When you say "suits for us to wear," what do you mean by

24   that?

25   A.   For the people that were going, which was Joe, Sean and

32

1   myself, he had a bag full of clothes that were miscellaneous

2   items in it just to wear.

3   Q.   How did you know when you helped load that truck for this

4   initial trip that you were going to be part of the mix?

5   A.   We had been talking about it for a few weeks prior.

6   Q.   Do you recall when -- only if you recall, do you recall

7   when you helped load the truck for them to deliver the tools?

8   A.   I don't remember an exact date, but it was -- it was prior

9   to us leaving.

10  Q.   You mean prior to you, your participation, in the

11  burglary?

12  A.   Correct.

13  Q.   Did you see Joe or Sean Murphy or Joe Morgan following

14  their trip with the tools?

15  A.   Yes.  When they returned, I had seen them.

16  Q.   Did you have any discussions with either JoMo or Mr.

17  Murphy regarding that trip?

18  A.   Yes.

19  Q.   What were you told?

20  A.   That everything was delivered and everything was fine with

21  the first phase.

22  Q.   And who told you that?

23  A.   Mr. Murphy.

24  Q.   Very well.  Did he tell you, prior to your assisting him

25  and JoMo with loading that truck, why it was he felt the need

33

1   to make a first trip like that?

2   A.   Yes.  His -- his intention was to drive down, the night

3   that we were going to go do the actual break-in, to go down

4   there empty.  He wanted to do the least amount of traveling

5   with tools as possible.

6   Q.   And why is that?

7   A.   Safety precaution.

8   Q.   Okay.  When you say "safety precaution," what do you mean

9   by that?

10  A.   As far as having any inter- -- any getting pulled over or

11  having any issues, maybe the truck breaking down or anything

12  and having all that equipment.  There is no need to drive with

13  it more necessarily than you need to.

14  Q.   When you answered my question regarding if there were any

15  trips made, you talked about another trip.  You called it a DNA

16  trip.  What -- what were you talking about there?

17  A.   Sean had informed me that he was going to head down there

18  to try to obtain some DNA to try to keep the crime local.

19  Q.   Keep the crime local.  Did he tell you what that meant?

20  A.   Yes.  He wanted to leave, like, cigarette butts and maybe

21  some plastic water bottles that were from people that had lived

22  in that area so that the police would look at that evidence,

23  find fingerprints, and think that it was that area of Ohio.

24  Q.   Did he tell you how he went about doing that?

25  A.   Yes.  He said that he had went down to a homeless shelter,

34

1   him and --

2   Q.   By -- was he by himself?

3   A.   No.  He was with Joe Morgan.  They took a trip down there,

4   and they went to a homeless shelter and supplied a few people

5   that were down on their luck with some cigarettes and a few

6   drinks.

7   Q.   And then what happened?

8   A.   And then, when the people walked away, they picked up the

9   cigarettes and the drinks and brought them back.

10  Q.   And did he tell you how that would assist in any way?

11  A.   Just like I said:  He wanted to keep the crime local.  He

12  wanted to leave some DNA at the crime scene that would be from

13  people that lived in that neighborhood, or that area, so that

14  they weren't looking for people in other areas.

15  Q.   During this trip that you're referring to now for the

16  ladies and gentlemen of the jury, did he say anything else he

17  did relative to the Brink's facility itself?

18  A.   He went to -- they did -- it was his first time down

19  there.  And they -- they went and looked at the building,

20  briefly.  And they found some scaffolding that they could use

21  to help get on top of the roof.  So they brought that stuff

22  over closer towards the building, and they left it in a general

23  area up on the railroad tracks behind the business.

24  Q.   Did he tell you why he chose to find some scaffolding for

25  that purpose?

35

1    A.   It was to get to the building.  It was -- it was, kind of,

2    probably about 25 to 30 feet tall.  So you needed something to

3    climb up the side of the building.

4    Q.   You identified David Nassor, Government's Exhibit 16-3,

5    the photograph, and you spoke to us about a trip to assist

6    earlier.  Do you know whether or not Mr. Nassor was ever sent

7    to Ohio for any reason?

8    A.   Yes.  During the trip when he went to go get the jammer,

9    he also stopped, on his way home, at the Brink's company to

10   notice their hours of operation.  And he stayed there overnight

11   and then reported back, to Sean Murphy, the hours that they

12   were open.  From nine to nine was the hours that we'd gotten

13   from him.

14   Q.   And how do you know that Mr. Nassor performed this

15   function?

16   A.   Once again, me and Sean were hanging out at that time, and

17   we'd gotten a phone call.

18   Q.   From --

19   A.   Mr. Nassor.

20   Q.   Did Mr. -- following Mr. Murphy's receipt of the phone

21   call, did Mr. Murphy discuss with you that trip and that

22   surveillance?

23   A.   Yes.

24   Q.   Did he tell you, Mr. Doucette, why he wanted someone to go

25   there and stay there and just look at the place?

36

A.    Yes.  Where the business was, so far away from where we
lived, we had no way of knowing their hours of operation.  So
he wanted to have a hands-on to know what time they left on
a -- on a Saturday night and what time they returned on a
Sunday morning.

Q.    Now, you've testified about a trip that Mr. Murphy made to
get the lay of the land and get the DNA.  Do you know why he
would send Mr. Nassor to perform the surveillance function
when, apparently, he'd already been there to get a lay of the
land?

A.    Just to get a feel for himself, and, when he was there,
getting the DNA.  He needed to just surveillance the area.  As
he was in charge, he wanted to make sure that he felt
comfortable with what he was seeing through the Internet.

Q.    But what about why would he send Mr. Nassor to do the
scouting for him?

A.    Mr. Nassor was only there for the hours of operation, not
for an actual layout of the building or escape routes.

Q.    At that time -- do you know whether or not Mr. Nassor had
suffered any physical injury in 2008?

A.    When I first heard of David Nassor, he was in the
hospital.  And, apparently, someone had beaten him up pretty
good and left him in his car, running, at the hospital.  And
when they came out to find him, they brought him in the
hospital, and he was in very bad condition.  He was tied up in

37

1    the hospital for a couple of months due to this injury.

2    Q.    Do you know if Mr. Murphy and Mr. -- well, obviously, you

3    know Mr. Murphy and Mr. Nassor were familiar with each other.

4    Was that Mr. Nassor's role, to do this scouting or -- as

5    opposed to helping you later on?

6    A.    Yes.

7    Q.    Tell us about that.

8    A.    Mr. Murphy didn't want him to go on the crime, but chose

9    to help him out.  So he gave him a small chore to do.

10   Q.    Why wouldn't he want him to help with the crime?

11   A.    He was -- he wasn't physically fit; or, due to his injury,

12   he was a little bit slower than he started out in life.  So he

13   didn't feel as though he was fit or in the proper condition to

14   go down and handle such a chore.

15   Q.    We'll get to it later, but is burglarizing a Brink's

16   facility a chore?

17   A.    No.

18   Q.    Is it -- it's not a chore?

19   A.    Well, yes, it is a chore, but it's a crime, also.

20   Q.    Is it an arduous chore?

21   A.    Yes.

22   Q.    Following the trip that Mr. Morgan and Mr. Murphy took to

23   unload the tools --

24   A.    Yes.

25   Q.    -- and their return to Massachusetts, I believe you said

38

1   something to the effect that Mr. Murphy said everything was in

2   place, everything was all set, or --

3   A.   Yes.

4   Q.   What was it that he said?  I don't want to misquote you.

5   A.   He just said that everything went okay and that he was

6   ready for the next phase.

7   Q.   Ready for the next phase.  Sometime after that trip, did

8   you, by chance, get together with Mr. Murphy and head over to

9   Thrifty Car Rental in Revere, Massachusetts?

10  A.   Yes.

11  Q.   Is that somewhere close to the Boston airport?

12  A.   Yes, it is.

13  Q.   And what did you do there, sir?

14  A.   We rented a car.

15  Q.   What type of car; do you recall?

16  A.   A little four-door sedan.  It was a Journey.

17  Q.   And have you described that as something else previously?

18  A.   Yes.  I called it a Voyager previously.

19  Q.   Okay.  But it was a small sedan?

20  A.   Yes, a little, small four-door hatchback, a little green

21  car.

22  Q.   Do you remember what color?

23  A.   Green.

24  Q.   And who rented that vehicle, sir?

25  A.   Sean Murphy.

39

1    Q.    And how do you know he rented that vehicle?

2    A.    I went there with him, and he went and rented it.

3    Q.    Were you put on the invoice in terms of being a second

4    driver of that vehicle, sir?

5    A.    Not that I'm aware of.  I didn't show any ID.

6    Q.    After you picked up that vehicle, sir, at the Thrifty

7    there in Revere, Massachusetts, did you -- do you know whether

8    or not Mr. Murphy actually rented any other vehicle?

9    A.    Yes.  He went and rented a box truck, a 24-foot truck, for

10   moving.

11   Q.    Do you know how close in time it was to your renting of

12   the car at Thrifty?

13   A.    It was the day following.

14   Q.    And how do you know that?  How do you know that he rented

15   the truck?

16   A.    I gave him a ride.

17   Q.    Do you know where you went?

18   A.    We went to New Hampshire.

19   Q.    Do you know where in New Hampshire?

20   A.    I am not sure.

21   Q.    Had you ever been to the place where Mr. Murphy had rented

22   that vehicle prior to the date you took him to rent this truck?

23   A.    No, not to that business, but I have driven by that

24   location, just because I've traveled to New Hampshire numerous

25   times.

40

1 Q. Can you describe, as best you can, for the ladies and

2 gentlemen of this jury, in terms of directions, what it was

3 close to?

4 A. It was on a major -- major road, and it was next to a

5 bridge.  Like the bridge was going up, and the business was off

6 to the side at the bottom of the bridge.

7 Q. You say you took Mr. Murphy there to get the truck?

8 A. Yes.

9 Q. And did he, in fact, obtain a truck?

10 A. Yes.

11 Q. Do you know how big the truck was?

12 A. It was a 24-foot -- 24-footer.

13 Q. Did he -- did he have any discussions with you, Mr.

14 Doucette, as to why he wanted to rent a truck on this occasion?

15 A. That was to go do the Brink's job.

16 Q. Did you know that for a fact?

17 A. Yes.

18 Q. And did you know that you were going to participate?

19 A. Yes.

20 Q. Did he tell you who else was going to participate?

21 A. Yes.  It was going to be Sean Murphy, Joe Morgan, and

22 myself.

23 Q. Did he tell you anybody else would participate?

24 A. None.

25 Q. Did he tell you whether or not anyone that was in the

1    Columbus, Ohio, area was going to have any role at all?

2    A.    Nobody that I was aware of.

3    Q.    On the date that you picked up that truck that you've

4    mentioned for the ladies and gentlemen of the jury, what

5    happened next?

6    A.    We went home, brought the truck back to Lynn, Mass.  And

7    then we got ready to get ready to go on the road.  So we went

8    home, gathered up whatever we needed, last-minute food,

9    clothes, and then we met up to take the ride.

10   Q.    And how many vehicles did you take, Mr. Doucette?

11   A.    We took two vehicles:  the box truck and the small, little

12   rental car.

13   Q.    And why did you take two vehicles, sir?

14   A.    I'm not sure of his theory on it, but that was what Sean

15   requested.

16   Q.    Did you actually travel outside the State of Massachusetts

17   that date?

18   A.    Yes.  Sean and Joe drove the truck, and I drove the rental

19   car.

20   Q.    Was there anything in the truck when you left

21   Massachusetts?

22   A.    No.  The truck was empty.

23   Q.    Was there anything in the -- what car did you drive?

24   A.    The little rental car.

25   Q.    That Sean Murphy had rented the day before?

42

1   A.   That is correct.

2   Q.   Did you leave together?

3   A.   No.  They left a couple of minutes before me.  I called

4   them up, and they were on the road already.  So I had to catch

5   them.

6   Q.   Did you, in fact, catch up with them?

7   A.   Yes.

8   Q.   At that moment, sir, when you were leaving Massachusetts

9   to catch up with Mr. Morgan and Mr. Murphy, did you know where

10  you were going?

11  A.   No.  They just told me to hop on the Mass Pike, that I

12  would follow, I would catch up to them, because they only had a

13  ten-minute lead on me.  And where they were, in a truck, they

14  can only go so fast.

15  Q.   And for those of us who are not familiar with the

16  Massachusetts Turnpike, is there -- is that an interstate

17  number associated with that?

18  A.   Yes.  That's -- that's a main highway.

19  Q.   And does that travel -- how does that road travel?  Where

20  does it go to?

21  A.   It leads to --

22  Q.   Does it lead to New York or --

23  A.   It leads to New York, that's correct.  From downtown

24  Boston, it goes right -- right through.

25  Q.   Was there any discussion, prior to you leaving, Mr.

43

1   Doucette, as to where your initial destination would be?

2   A.   I knew it was going to be to the storage facility.

3   Q.   At that point in time -- because you told us, earlier, you

4   didn't know where the storage facility was, at that point in

5   time when you left Massachusetts, did you know where the

6   storage facility was located?

7   A.   Not yet.

8   Q.   Where did you go that day when you left the state, sir?

9   A.   We drove -- we drove to the -- to the -- to a hotel.  And

10   we stayed overnight.

11   Q.   Do you know what city you stayed in?

12   A.   I do not.

13   Q.   Do you know what type of hotel?

14   A.   I've -- to the best that I can recall, it was -- I

15   remember -- it's kind of weird to say, but the carpets were

16   green.  So I thought it was a Courtyard.  We had had a long

17   day, and we showed up late at night, and we weren't there very

18   long.  We were up bright and early and left.

19   Q.   Did you stay in one room?

20   A.   I don't recall.

21   Q.   Did you select the hotel?

22   A.   No.

23   Q.   Do you know who did?

24   A.   I believe Sean did.

25   Q.   But you know you all three stayed at that hotel?

44

1    A.    That is correct.

2    Q.    Was there any discussion amongst yourselves, upon your

3    arrival to the hotel, as to your plan?

4    A.    Our plan was to go to the storage facility and load up and

5    then continue on to the Ohio area.

6    Q.    When were you going to go?  The next day?

7    A.    The next morning.

8    Q.    Do you recall when you got up and going the next day?

9    A.    Yes.

10   Q.    Would that have been January 18th of 2009, sir?

11   A.    Yes.  If that was a Saturday, that's when it would have

12   been.

13   Q.    What did you do when you got up and on your way?

14   A.    We got up.  We had some issues with the truck.  It

15   wouldn't start.

16         MR. DOMINGUEZ:  May I have a moment, Your Honor?

17         (Whereupon, there was a brief interruption.)

18   BY MR. DOMINGUEZ:

19   Q.    I may have misspoke.  I think I said the 18th.  The 17th?

20   You know it was a Saturday?

21   A.    Correct.

22   Q.    Okay.  So -- I'm sorry.  I interrupted you.  Please

23   continue with your testimony.

24   A.    We had woken up early in the morning.  And the truck that

25   we had rented was -- it was extremely cold out, and it was a

45

1    diesel, and it wasn't plugged in.  So it was giving us trouble,

2    to start.  So it took us approximately two hours to get the

3    vehicle up and running.

4         And then, once we got it running, we were able to continue

5    to the storage facility to load up the truck.

6    Q.   You said it was very cold?

7    A.   Yes.

8    Q.   Did you eventually arrive at the storage facility?

9    A.   Yes.

10   Q.   Is that the first time you had been to that storage

11   facility?

12   A.   Yes, sir.

13   Q.   Do you remember the name of it?

14   A.   I do not.

15   Q.   Can you describe its location?

16   A.   Yes.  It was up on a hill, approximately a couple hundred

17   feet up a hill.  And the storage -- the driveway went up, and

18   the storage facility was to the right of the driveway.  Like,

19   when you turned in, it was to the right.

20   Q.   Do you know where it was, the storage unit was, physically

21   located within the compound?

22   A.   Yes.  There was -- as soon as we got to the top of the

23   hill, there was a gate to get in the entrance.  And you turned

24   right into the gate.  And we were in that very first row,

25   towards the end.

46

1    Q.   And where was the office located in conjunction with where

2    your ultimate destination was?

3    A.   As soon as you turn in the gate, the office was the very

4    first -- what would be the very first unit right there on the

5    corner.  And you have to drive by it to get in to go to the bay

6    that we had.

7    Q.   And you recall the unit being at the end?

8    A.   Yes.

9    Q.   Did you have to enter some kind of a code, sir, in order

10   to get into the facility?

11   A.   You normally would, but the gate was open when we arrived.

12   Q.   Did you have any idea why it was open?

13   A.   Sean went down to the office.  And when he came back, he

14   said that the gate was -- they left it open.  Due to the cold,

15   they were having trouble opening and closing it.  So, for that

16   particular day, they had left it open.

17   Q.   What did -- did you ultimately arrive at the storage unit?

18   A.   Yes.

19   Q.   And what did you do when you arrived there, sir?

20   A.   We pulled the truck up, nose first, so that the people

21   from the office could only see the front of the truck.

22   Q.   Why did you do it that way?

23   A.   Just, if we had the truck pulled up the other direction,

24   you would be able to see right in the back, with the back open,

25   what we were loading up.

47

1   Q.   And who advised you to pull in in such a manner?

2   A.   That would be Sean Murphy.

3   Q.   Please continue.  What did you do then?

4   A.   We loaded up the truck with all the tools and torches and

5   all the bags that were there and barrels that were filled with

6   stuff.

7   Q.   Did you empty the storage unit at that time?

8   A.   Yes.

9   Q.   What happened next, sir?

10  A.   And then, from there, we continued to Ohio.

11  Q.   Had you ever been to the State of Ohio before that, sir?

12  A.   No, I haven't.

13  Q.   Now, you stated, sir, in your testimony, that you were

14  driving the sedan?

15  A.   That is correct.

16  Q.   And Mr. Morgan and Mr. Murphy were driving the rental

17  truck?

18  A.   Yes.

19  Q.   After you arrived and loaded up the rental truck, were you

20  still driving the sedan afterwards?

21  A.   Yes.

22  Q.   And did they remain driving in the truck?

23  A.   Yes.

24  Q.   Did you communicate with one another as you were driving

25  from Massachusetts to Pennsylvania?

48

1   A.    Yes.

2   Q.    And how did you communicate?

3   A.    With cellular phones.

4   Q.    After you left the storage facility, sir, and traveled to

5   Ohio, did you continue to speak with each other and communicate

6   by way of cellular telephone?

7   A.    Up until that we got close to Ohio.

8   Q.    Why did you -- why do you say that?

9   A.    The cell phones were -- I was instructed by Sean that the

10  cell phones were only meant for emergency use.  When we were

11  traveling on the road, we would use them to communicate, with

12  the two-way radio function of that particular phone, because it

13  has like a walkie-talkie function.

14  Q.    What kind of phone did you have?

15  A.    It was a Motorola.

16  Q.    Nextel?

17  A.    Nextel.

18  Q.    And you know if Mr. Murphy had a Nextel?

19  A.    Yes.

20  Q.    So you could communicate that way?

21  A.    Correct.

22  Q.    Did you -- did you arrive into Ohio?

23  A.    Yes.  When we got there, it was dark out.

24  Q.    Was there a concern about cell phone use once you arrived

25  in Ohio?

49

1   A.    Yes.  Do not use them, at all, unless it's an emergency

2   and we get split up.

3   Q.    Who gave you that instruction?

4   A.    Sean did.

5   Q.    And why did he give you that instruction?

6   A.    We didn't want no trace of the phone being used off of any

7   of the cell phone towers in that area.

8   Q.    Did you know about cell phone towers prior to this

9   evolution?

10  A.    No.

11  Q.    Who gave you that instruction?

12  A.    Sean did.

13  Q.    Once you arrived into the State of Ohio, what did you all

14  then do, sir?

15  A.    We had parked the rental car down the street approximately

16  a half mile from the facility.  Then we all hopped in the truck

17  and drove the truck over towards the Brink's company on the

18  back side of the railroad tracks.

19  Q.    How did you know where the truck would be parked, and how

20  did you know where the Journey, the Dodge Journey, would be

21  parked?

22  A.    I was just following instructions, because I had never

23  been to that area before.

24  Q.    So the truck and the Journey, the sedan, were parked in

25  different locations?

50

1    A.    Yes, sir.

2    Q.    Did you -- do you know why that was?

3    A.    I'm not sure of his reasoning for that.

4    Q.    But that was your directive?

5    A.    That is correct.

6    Q.    From whom?

7    A.    From Sean Murphy.

8              MR. DOMINGUEZ:  May I approach, Your Honor?

9              THE COURT:  You may.

10   BY MR. DOMINGUEZ:

11   Q.    Mr. Doucette, I've just handed you a series of

12   photographs, the first two being 1A-2 and 1A-5, and the second

13   set being 14-1 to 14-4, inclusive.  And, of course, those are

14   all government exhibits.  I ask you to take a moment to look at

15   those, and then look up at me when you're done.

16   A.    Okay.

17   Q.    Have you seen those, sir?

18   A.    Yes, I have.

19   Q.    Do you recognize them?

20   A.    Yes.

21   Q.    What are they?

22   A.    They are pictures of the Brink's company and the railroad

23   tracks behind it.

24   Q.    The first two photographs, sir, do they depict the Brink's

25   facility as you recall it when you arrived there on that

51

1   Saturday, January 17th?

2   A.   Yes.

3   Q.   Of course, you said it was dark, then, when you arrived?

4   A.   Yes.

5   Q.   And then Government's Exhibit 14-1 through 14-4 are

6   taken -- are daylight pictures.  Can those pictures assist you

7   in your testimony regarding the events that happened on January

8   17th of 2009?

9   A.   Yes.

10           MR. DOMINGUEZ:  May I again approach, Your Honor?

11           THE COURT:  You may.

12   BY MR. DOMINGUEZ:

13   Q.   Mr. Doucette, upon you first arriving in Columbus and then

14   traveling to the Brink's facility, to the best of your

15   knowledge, where was your car stationed?  Where did you park

16   your car?

17   A.   Approximately a half mile away.  It was within walking

18   distance.

19   Q.   And then where was the truck parked?

20   A.   The park -- the truck was parked on the -- behind the

21   Brink's company, on the other side of the railroad tracks.

22   There was a business that was over there.  And with the loading

23   docks, we were able to back the truck up to it to look like it

24   belonged there.

25   Q.   I'm showing you what has been marked for identification

52

1   purposes and labeled Government's Exhibit 1A-2.  Do you

2   recognize that, sir?

3   A.   Yes.

4   Q.   And what is that?

5   A.   That is the Brink's building.

6   Q.   1A-5, sir?

7   A.   That is the -- a picture of the back gate, also looking at

8   the Brink's building.

9   Q.   14-1, sir, do you recognize that?

10  A.   Yes.  That's the bridge that is in front of the building,

11  the main street leading to the dead-end where the Brink's

12  facility is.

13  Q.   Now, looking at that photograph, can you tell -- and if

14  you can't, that's okay, but can you tell where the rental truck

15  was parked?

16  A.   From this angle, I cannot.

17  Q.   You cannot?  Fair enough.  And is there any significance

18  to that bridge that we can get to?

19  A.   That's the bridge that I watched out, as a lookout, when

20  they were dis-alarming the building.

21  Q.   And with respect to Government's Exhibit 14-1 to 14-4, you

22  stated that you recognized them as photographs taken around the

23  Brink's facility area.  But, clearly, there is foliage here,

24  and there was probably no foliage on those trees at the time,

25  correct?

53

1   A.   That's correct.  It was wintertime, snow.  Trees were

2   empty.

3   Q.   14-3?

4   A.   That is a picture of the railroad tracks behind the

5   facility.

6   Q.   Does there appear to be a path somewhere there, sir?

7   A.   Yes.

8   Q.   Was that path used at all?

9   A.   That was leading up to the bridge.

10  Q.   Will you draw a line of the path?

11  A.   I can touch --

12  Q.   You can do it on your monitor.

13  A.   (Witness complies.)

14       I mean, it was heavy brush there at this time, but it was

15  opened up.

16  Q.   And you have an arrow pointing, sir.  Where does that path

17  lead to?

18  A.   That leads to the bridge that overlooks the main street.

19  Q.   14-4, sir.

20  A.   Yes.  That's overlooking the bridge, looking down the

21  street.

22  Q.   And where does this street lead to?

23  A.   That leads to the top of the dead-end street that goes to

24  the Brink's facility.

25  Q.   Can you point the direction of the Brink's -- if you

54

1  recall, can you point to the direction of the Brink's facility

2  from this picture?

3  A.   I am not sure, off this picture.

4  Q.   Okay.  Now, once you arrived at the Brink's facility, sir,

5  were there roles to be played in terms of accomplishing the

6  mission by yourself, by Mr. Morgan, and Mr. Murphy?

7  A.   Yes.  When we arrived, Mr. Murphy wanted to have me post

8  lookout while they, Joseph Morgan and Mr. Murphy, disengaged

9  the alarm to the building.

10  Q.   Now, earlier in your testimony, you stated it was quite

11  cold at the storage facility.  And, as a matter of fact, I

12  believe you said that the -- you were informed that the gate to

13  the storage facility was frozen, cold.  What was the

14  temperature in Columbus that evening?

15  A.   I'm not sure of exact, but it had to be the high teens to

16  low 20s.

17  Q.   Cold?

18  A.   Very cold.

19  Q.   Do you recall the time that you arrived, approximately?

20  A.   Between eight and nine o'clock.

21  Q.   And upon your arrival, what did you do?

22  A.   We -- we backed the truck up to the loading dock, and we

23  hopped into the back of the truck and put on the black suits

24  that we had, and then we --

25  Q.   Let me interrupt you there, just so we're clear.  When you

1   talk about a loading dock, are you talking about the loading

2   dock that was off the side of the facility that you had found?

3   A.   Yes, across the tracks.   There was a business that was

4   opposite the tracks, behind the Brink's facility.   And we

5   backed up to the loading dock to make it look like a truck that

6   the business may have parked there.

7        And we hopped into the back of the truck and got dressed

8   in the clothes that we were supplied.

9   Q.   Who supplied the clothing?

10  A.   Sean did.

11  Q.   And what type of clothing -- first of all, you had a long

12  drive, presumably, from the storage facility to Columbus and

13  then, ultimately, to the Brink's vicinity.   What type of

14  clothing did you have on your person once you arrived?

15  A.   I just had regular jeans and a sweatshirt.

16  Q.   And you stated that Mr. Murphy supplied clothing.   What

17  type of clothing did you put on?

18  A.   We put on white clothes first, and a jumpsuit on top of

19  that.   But I --

20  Q.   What kind of jumpsuit?

21  A.   Could I just elaborate?

22  Q.   Sure.

23  A.   I, personally, brought a one-piece long johns suit that I

24  knew that it was going to be cold due to the time of the year.

25  And the jumpsuit that we wore was just a one-piece, zip-up

56

1    black suit.

2    Q.    What about on your feet?

3    A.    Over our feet, we had slid over some, like, a galoshe type

4    of rubber boot that would go over your existing shoe.

5    Q.    Is there any reason -- did you ask Mr. Murphy why you were

6    wearing galoshes?

7    A.    He informed me that that was to -- to change our

8    footprint.

9    Q.    What do you mean by that?

10   A.    In case if things went wrong and we had to run, he had us

11   wear white clothes underneath the black jumpsuit, and he had us

12   wear the rubber galoshes, so if somebody seen us at the scene

13   and we had to run, we could slip off the galoshes and take off

14   the black jumpsuit, and we had white clothes underneath, with

15   regular shoes, and it wouldn't be a match to maybe what they

16   were looking for if that was to happen.

17   Q.    Okay.  Did Mr. Murphy and Mr. Morgan put on similar

18   clothing that you've described, with the exception of the

19   undergarment that you said you had brought on your own?

20   A.    Yes.

21   Q.    And what happened after that, sir?

22   A.    We carried a couple of bags of tools over the railroad

23   tracks, over to the fence, and cut a hole in the fence.

24   Q.    Who cut a hole in the fence?

25   A.    Sean cut a hole in the fence with a pair of wire cutters.

1    And we dragged, out of the bushes, a couple of pieces of metal

2    scaffolding that was in the bushes, over to -- through the

3    fence to lay against the building to climb up.  And when we

4    climbed up on the building --

5    Q.    Let me -- let me stop you there.  Now, you stated that Mr.

6    Murphy cut a hole in the fence?

7    A.    That is correct.

8    Q.    I ask you to take a look at Government's Exhibit 1A-135.

9    Do you recognize that, sir?

10   A.    Yes.

11   Q.    And what is that?

12   A.    That is the fence that was cut.

13   Q.    And to provide a different angle, --

14   A.    Yes.

15   Q.    -- 1A-132, sir.

16   A.    Yes.  That's the same fence.  It's the section on the

17   right-hand side.

18   Q.    Mr. Doucette, why did you -- why did you cut a hole, or do

19   you know why a hole was cut in the fence in order to get into

20   the facility?

21   A.    He wanted to come into the -- Sean wanted to come into the

22   back side of the business so that we couldn't be seen from the

23   street view.

24   Q.    And with respect to all of this detail -- parking the

25   truck at the loading dock at the business behind the railroad

1  track, you parking your car half a mile away and entering the

2  facility through this cutted fence, is this what -- these were

3  Mr. Murphy's directives?

4  A.   Yes, sir.

5  Q.   And what -- were you with Mr. Murphy and Mr. Morgan when

6  you made this initial approach to the vicinity?

7  A.   Yes.

8  Q.   And what did you do at this point?

9  A.   We carried the two bags of tools that we had over to

10  the -- there was, like, a box truck, or a trailer, beside the

11  building.

12  Q.   Showing you again Government's Exhibit 1A-132.

13  A.   Yes.   There is a green --

14       THE COURT:  Excuse me.  Can you see where that hole

15  is, Mr. Doucette?

16       THE WITNESS:  Yes.  The foliage is --

17       THE COURT:  Can you use a marker?

18       THE WITNESS:  Yeah.

19  BY MR. DOMINGUEZ:

20  Q.   You can just mark it with your -- circle it, sir.

21  A.   Yeah.  It's right here (indicating).  It's just hard to

22  see, with the foliage, from that angle (indicating).

23       THE COURT:  Thank you.

24  BY MR. DOMINGUEZ:

25  Q.   And, then, with respect to that same exhibit, sir, you

1    said -- you call it a box truck, but what are you referring to?

2    A.    It's -- either it's a back of a truck or a storage

3    container, right here (indicating).

4    Q.    Just touch it.

5    A.    Very well.

6          The green container.

7    Q.    And what did that do for you?

8    A.    That allowed us access to the roof.

9    Q.    Were you able to get on the roof just by climbing up on

10   that thing?

11   A.    We had --

12   Q.    The storage truck.  I'm sorry.

13   A.    We dragged over the scaffold that was there prior.  And

14   there was two pieces.  And we used them as a ladder to climb

15   up, one section to climb up on the trailer and the second

16   section to climb up on the roof.

17   Q.    Showing you Government's Exhibit 1A-136.

18   A.    Those are the two pieces.

19   Q.    Those were ultimately left behind?

20   A.    Yes.

21   Q.    And from a different angle, Government's 1A-137, sir?

22   A.    Yes.  Those are the two pieces next to the trailer.

23   Q.    Do you recall a camera being up above that storage truck

24   that you've described?

25   A.    Yes.  At the corner of the building, right above that

60

1   trailer, there was a camera mounted on the building.

2   Q.   Was anything done with that?

3   A.   That was smashed with a piece of, like, a long pry bar, to

4   knock it down out of its position.

5   Q.   Was that done in your presence on this occasion or

6   sometime later on?

7   A.   That was done in my presence.

8   Q.   Showing you Government's Exhibit 1A-138, do you recognize

9   that, sir?

10  A.   Yes.  That's a picture of the camera facing downwards.

11  Q.   Do you want to circle it?

12  A.   (Witness complies.)

13  Q.   And that's the camera you stated -- who destroyed that

14  camera, or who --

15  A.   Sean did.

16  Q.   Placed it in that position?  And is this the storage at

17  the bottom, here (indicating)?  Is that the storage container

18  we've discussed?

19  A.   Yes, just the top.  You can only see the top of it, but

20  that is it.

21  Q.   Do you know why -- did Mr. Murphy tell you why he placed

22  the camera in that position?

23  A.   He didn't tell me why.

24  Q.   What did you say he used to do that?

25  A.   Something long, a piece of metal, either one of the pry

61

1    bars or something of that nature.

2    Q.   Did you know, on this first occasion as you're discussing

3    with the ladies and gentlemen of the jury when Mr. Murphy cut

4    the hole in the fence and you first entered, what was your

5    mission at that point in time?

6    A.   Our mission was to -- he wanted to get up on the building

7    and set me up to go do watch down the street.  I can overlook

8    while he tried to gain access to the building, him and Joe

9    Morgan.

10   Q.   Were you concerned about the security system initially.

11   A.   I was, but Sean had me convinced that he would be able to

12   handle whatever they had.

13   Q.   Was there -- did -- were there eventually holes cut into

14   the roof of the building?

15   A.   Yes.

16   Q.   Prior to that, was there anything done in order to assist

17   with the mission?

18   A.   Can you please reframe that?

19   Q.   Was there anything done with respect to the security

20   system?  Did you set up anything in order to assist with the

21   burglary?

22   A.   I did not.  I went to the -- I was instructed to go over

23   to the railroad tracks and keep --

24   Q.   What was your mission?  What were you supposed to do?

25   A.   I was supposed to listen on the two-way radio that we had.

62

1   Q.   What were you listening for, sir?

2   A.   Communication amongst each other and on a police scanner.

3   Q.   And did you, in fact, perform that function?

4   A.   Yes.

5   Q.   Was that on a railroad track?

6   A.   Yes.  That was on that bridge overlooking the main street.

7   Q.   That bridge?

8   A.   That is correct.

9   Q.   For the record, 14-1, Government's Exhibit?

10  A.   Yes.

11  Q.   And when you were first instructed to go look out on that

12  bridge, what was your understanding as to what Mr. Murphy and

13  Mr. Morgan were going to do?

14  A.   They were going to disengage the alarm system.

15  Q.   Do you know how they were going to disengage the alarm

16  system?

17  A.   Not -- not fully.  I mean, I had a brief idea, but I

18  didn't understand all of their tactics.

19  Q.   Did you know what they were going to use?

20  A.   Yes.

21  Q.   Tell us about that.

22  A.   One of the -- one of the items they were going to use was

23  a -- it's a cell phone jammer, it's called.  And it's -- it

24  blocks the frequencies so their phones cannot make any phone

25  calls in an area.  You set it up.  It has four antennas, and it

63

1    makes, like, an invisible bubble around an area that you set it

2    up so that it blocks all frequencies coming in or out.

3    Q.    Who told you about the use of the cell phone jammer?

4    A.    Mr. Murphy.

5    Q.    And you recall, earlier, your testimony you were aware of

6    Mr. Nassor going to get an item, the cell phone jammer?

7    A.    That is correct.

8    Q.    Do you know if that was the cell phone jammer that Mr.

9    Nassor had obtained?

10   A.    Yes.

11   Q.    How do you know that?

12   A.    Because when -- Mr. Murphy had told me that that was the

13   unit that we were going to use.

14   Q.    Now, just so that the ladies and gentlemen of the jury are

15   clear, you were not with Mr. Murphy when he set up the cell

16   phone jammer; is that correct?

17   A.    Yes, that is correct.

18   Q.    You were playing lookout?

19   A.    Yes.  I was up on the bridge, watching, while they did --

20   while they did what they had to do.

21   Q.    Was there anything else, any other equipment, utilized on

22   the roof at that time, sir?

23   A.    None that I'm aware of.  I could hear noise being made.

24   You know, I was probably maybe 70 yards, roughly, from the

25   building, on the bridge.  It was late at night, and you could

64

1   hear noise and banging and some noise going on, but I didn't

2   know what tools they were using.

3   Q.   After the cellular telephone jammer was in place, to your

4   knowledge, at least, did Mr. Murphy and Mr. Morgan remain at

5   the facility, or did you see them again?

6   A.   They came down approximately an hour after going up on the

7   roof and came down to the bridge to watch with me.  And they

8   were waiting -- told me they were going to wait 45 minutes, 35

9   minutes, just to see if anybody had come, if their -- what they

10  had done would work.

11  Q.   Well, explain -- explain that to me.  They left after the

12  cell phone jammer was set up.  They came back to the bridge

13  with you?

14  A.   Yes.

15  Q.   And they were waiting to see what now?

16  A.   To see if any police had gotten any phone calls or if

17  anybody was going to come to aid the alarm system going off.

18  Q.   They were basically seeing if it worked?

19  A.   Correct.

20  Q.   How long were they with you at that time?

21  A.   Thirty-five to forty minutes, maybe forty-five, right --

22  right around that range.

23  Q.   Then what happened?

24  A.   Then they, Joe and Sean, went back to the building for

25  approximately an hour and a half to two hours.  And I kept --

65

1    Q.    Did they tell you what they were going to do when they

2    went back to the building before they left for it?

3    A.    Yes.   They said they had to go into the building and

4    disengage the alarm system.

5    Q.    Did they tell you how they were going to get into the

6    building?

7    A.    No.

8    Q.    They eventually did, in fact, leave?

9    A.    Yes, they left, and they were gone for, like I said, an

10   hour and a half to two hours.

11   Q.    When they left, sir, what was your role?

12   A.    To stay on the bridge and keep an eye out and listen on

13   the scanner.

14   Q.    Did you hear anything, when they were gone, that one and a

15   half hours to two hours?

16   A.    No.

17   Q.    You didn't hear anything going on at the Brink's facility?

18   A.    At the Brink's, I heard, but not on the scanner.

19   Q.    I'm sorry.  I wasn't clear with my question.

20         Did you hear anything going on with respect to the Brink's

21   facility while you were standing?

22   A.    I didn't hear nothing other than some banging and maybe a

23   power tool.  And that was going on, like I said, for

24   approximately and hour and a half to two hours.

25   Q.    Now, you discussed with the ladies and gentlemen of the

1    jury Mr. Morgan and yourself and Mr. Murphy setting up the

2    cellular phone jammer, and then -- well, strike that -- Mr.

3    Murphy and Mr. Morgan setting up the cell phone jammer, coming

4    back to you for about 45 minutes, and then returning to do

5    something for about an hour and a half to two hours, correct?

6    A.    That is correct.

7    Q.    And you heard some banging going on?

8    A.    Yes.

9    Q.    Was there any means of communication between yourself and

10   Mr. Morgan and Mr. Murphy while you were separated?

11   A.    We had little hand-held walkie-talkies that you can buy

12   at, like, a Radio Shack or a, you know, Home Depot store that

13   we used to communicate.

14   Q.    Why didn't you communicate by cell phone?  A note for the

15   record.

16   A.    The cell phones wouldn't work due to the tool that he had

17   set up.

18   Q.    The cell phone jammer?

19   A.    Correct.

20   Q.    Well, let me ask you this:  How would walkie-talkies be

21   able to work if the cell phones wouldn't work?

22   A.    Sean described to me the way that the frequencies work.

23   And a hand-held walkie-talkie does not occupy the same

24   frequency as a cell phone.

25   Q.    So you were able to communicate in that fashion?

67

1    A.    That is correct.

2    Q.    After that one-and-a-half to two-hour period, sir, did you

3    again see Mr. Morgan and Mr. Murphy?

4    A.    Yes.  They came down the tracks to where I was at on the

5    bridge, and they waited approximately 30 minutes.

6    Q.    And did they tell you why they were waiting?

7    A.    Once again, just to see if anybody was going to come.

8    Q.    Did they tell you what they had done during that

9    one-and-a-half to two-hour periods they were gone from you?

10   A.    At this point in time, yes.

11   Q.    What did they tell you?

12   A.    That they had cut holes in the roof and that they hopped

13   in the building and went after the alarm system.

14   Q.    Did they tell you how they went about going after the

15   alarm system?

16   A.    They just said they smashed it off the wall.  And he was

17   vague on that, but he just said, I smashed it.  He referred to

18   it as "Murphing" the building.

19   Q.    "Murphing"?

20   A.    Yes.  The building's been "Murphed," that was, like, a

21   term that he had used.

22   Q.    "Murphed"?

23   A.    Meaning that it was shut down and that no one was going

24   to -- the building couldn't call out for help.

25   Q.    Did you take that to mean a catch phrase on his last name:

68

1   It has been "Murphed"?

2   A.   Yes.

3   Q.   To your knowledge, was the building, at least after your

4   waiting period, successfully "Murphed"?

5   A.   Yes.

6   Q.   Once you figured out it was safe, what happened next?

7   A.   We all walked down to the building and climbed up onto the

8   roof, and they had me wait up on the roof while they hopped

9   down into the building.

10  Q.   Why would you have to have waited on the roof?

11  A.   They asked me to keep an eye out up on the roof.

12  Q.   Let me ask you this:  Once they made successful entry into

13  the building, before they exited, why didn't -- why weren't you

14  able to go through one of the doors to get into the building?

15  A.   I didn't ask.  That was -- that was just the route that he

16  had chose.

17  Q.   So you're on the roof, standing post, basically?

18  A.   Correct.

19  Q.   Standing watch.  And they're in the building?

20  A.   Yes.

21  Q.   And how long were they in the building while you were

22  standing watch on the roof?

23  A.   Twenty minutes to thirty minutes.  Not long.

24  Q.   What was your understanding as to what they were doing at

25  this juncture, Mr. Doucette?

69

1    A.    While I was keeping watch, I was poking down my head in

2    the holes to look to see what they had done.  And they were

3    trying to find some keys to move the trucks that were blocking

4    the garage door.

5    Q.    Do you know if they successfully found the keys?

6    A.    Yes.

7    Q.    Did you see either one of them move a truck?

8    A.    Yes.  At this point in time, I had -- Sean requested me to

9    come down, and they found the keys, and they were trying to not

10   only move the trucks, but gain access into the back of the

11   trucks, also, to see if there was anything in them.

12   Q.    Was there a truck moved?

13   A.    Yes.

14   Q.    And how did they go about moving the truck, sir?

15   A.    They hopped in it, started it, and opened up the garage

16   door and pulled it out of the building.

17   Q.    Were they able to hop in it and open it up like you did

18   your Dodge Journey or like anyone else would open up a regular

19   sedan to put it into drive and drive it?

20   A.    I did not see them actually hop in it, do the actual

21   starting of it, but they had found the keys, and the truck was

22   running within a few minutes.

23   Q.    Did Mr. Murphy tell you anything about how to drive an

24   armored car?

25   A.    No.

70

1   Q.   Did he talk to you about any special procedure you have to

2   utilize to enter an armored car?

3   A.   Yes.  He explained to me that they have a high security.

4   So, to enter an armored car, you need to do two things.  Like,

5   someone has to be in the driver's seat, maybe hitting a button,

6   while the guy's at the back of the door with a key, so that

7   someone couldn't just hop up and grab the key from a driver and

8   get in it.  It has to be a two-person process.

9   Q.   After the truck was repositioned and after they went

10  through finding keys and so forth, what happened next?

11  A.   Joe went across the tracks to drive over the box truck

12  that we had drove down.

13  Q.   Now, let me ask you this.  I'll back up a little bit an

14  then come back forward.

15  A.   Okay.

16  Q.   You recall talking about the rental truck being at the

17  loading dock at the business away from Brink's?

18  A.   Correct.

19  Q.   When it was stationed there by itself, did you all do

20  anything with it, change its appearance in any way?

21  A.   Yes.  We had covered it with a car cover that was set up

22  for a motor home, like an RV, and because that would be the

23  only thing big enough size to cover a vehicle of that size.  So

24  we covered the vehicle and cut out a porthole for the driver to

25  see.

1    Q.    Any reason why this was done?

2    A.    The business across from the Brink's had cameras, and it

3    was just a security measure so that his truck couldn't be

4    identified.

5    Q.    And who dictated that this tarp be placed over the truck

6    in the manner that you've described?

7    A.    Mr. Murphy.

8    Q.    Now, you talked about Mr. Morgan going over across the

9    tracks and actually retrieving this truck.  Did he actually

10   drive it anywhere?

11   A.    Yes.  But can I elaborate?  We skipped a step.

12   Q.    Yes.  I'm sorry.

13   A.    We had to break into -- before we pulled the Brink's truck

14   out, we had to break into a secure room to be able to open up

15   the garage door.  So there was -- we had to pry open a door to

16   get into -- it's like a room with bulletproof glass where a

17   guard would stand so that the drivers would be protected and

18   the guy would be protected inside the building.  And that was

19   used to -- so we could open up the gate and open up the garage

20   door, because it's not like a conventional building that has

21   just an open and close button on the doors, or the gates.

22   Q.    When you described breaking into the shack to open it --

23   what was -- to open it, what was that to open?

24   A.    To open -- I referred to it as the Command Center because,

25   like the armored car, the building also shared the same type of

72

1    system where two people had to be in two areas to operate to

2    get into one door.  So a guy had to be in a room and a guy had

3    to be with a key across the room to be able to access another

4    area.  That's just safety precautions for them so no one can

5    run in and get anywhere.

6    Q.    And who knew this information?

7    A.    Mr. Murphy.

8    Q.    Showing you Exhibit 1A-115, sir, do you recognize that?

9    A.    Yes.  That's the door leading into that area.

10   Q.    Is that like a guard area?

11   A.    It's -- it's in the garage area, and it's a booth, like an

12   oversized booth with, like, bulletproof glass.  And there was a

13   bunch of controls in there.  I wasn't familiar with what they

14   were, but I'm sure they access different areas of the building.

15   Q.    Showing you Government's Exhibit 1A-117, do you recognize

16   anything in there, sir?

17   A.    Yes.  That's inside of the -- that particular room.

18   Q.    Once you were -- you all gained access to that room, were

19   you able to open up any doors to the facility?

20   A.    Yes.  We were able to open the back gate, because, when we

21   opened up the garage door for the truck, we weren't able to get

22   out of the parking lot, the back area.

23   Q.    So, getting back to Mr. Morgan and the truck, --

24   A.    Yes.

25   Q.    -- after you accomplished this task and breaking into the

1   guard shack, did you, in fact -- did he, in fact, enter the

2   facility with the truck?

3   A.   Yes.

4   Q.   And you described the tarp on the truck with a hole in the

5   driver's side.  Did he actually drive it with the tarp on?

6   A.   Yes.  It has straps on it so that you can pull it tight to

7   it.  It's -- like I said, it's a car cover for a truck, and it

8   was designed to withstand wind and stuff, not to meant to be

9   driven with.  But, for it to go around the short area that it

10  was driven, it served its purpose.

11  Q.   Did Mr. Morgan eventually bring the truck into the

12  facility?

13  A.   Yes.

14          MR. DOMINGUEZ:  Your Honor, may I have a moment?

15          THE COURT:  Yes.

16          MR. DOMINGUEZ:  May Mr. Graeff and I approach the

17  bench?

18          THE COURT:  Yes.

19          (Whereupon, a discussion was held at the bench

20  between the Court and Counsel off the record.)

21          THE COURT:  Ladies and gentlemen, remember the

22  admonition.  We're going to take a comfort break here, and for

23  ten minutes.  And remember not to discuss this case with each

24  other and the other admonitions that I've given you every time.

25  And they cover you until your jury service on this case is

74

1   complete.

2           (Whereupon, a recess was taken at 11:30 a.m., and the

3   proceedings reconvened at 11:42 a.m.)

4                       – – –

5   IN OPEN COURT:

6           THE COURT:  You may proceed.

7           MR. DOMINGUEZ:  Thank you, Your Honor.

8   BY MR. DOMINGUEZ:

9   Q.   Mr. Doucette, before our break, you were discussing

10  breaking into the guard post and opening the gate and opening a

11  garage door.  What happened after that?

12  A.   Joe went across the tracks to retrieve the 24-foot box

13  truck that we had parked over there.

14  Q.   And then what happened?

15  A.   And then he drove the truck around the building, down the

16  short distance down the street, and down into the facility.

17  Q.   Where were you when this occurred?

18  A.   I was in the building.

19  Q.   In the Brink's facility?

20  A.   Yes.

21  Q.   And who else was there with you?

22  A.   Mr. Murphy.

23  Q.   Where did Mr. -- did Mr. Morgan pull the truck directly

24  into the Brink's facility?

25  A.   He backed it in.

75

1   Q.    Backed it in?

2   A.    Uh-huh.

3   Q.    And did he park it once it was in the garage area?

4   A.    Yes, parked the truck, and then the garage door was shut.

5   Q.    Did the tarp remain on the truck, or did you take it off?

6   A.    Yes.  We left it on.

7          THE COURT:  You left what on?

8          MR. DOMINGUEZ:  He left it on, Your Honor, the tarp

9   that was --

10         THE COURT:  Oh, the tarp.  Okay.

11         MR. DOMINGUEZ:  Sorry, Your Honor.

12  BY MR. DOMINGUEZ:

13  Q.    Once he pulled the truck into the garage area, sir, what

14  happened next?

15  A.    We opened up the back of the truck and started unloading

16  all the tools that were requested, the torches and the -- that

17  thermal lance rod, and set it up towards over by the safe.

18  Q.    Now, let me back up just a bit.  When you came to the

19  Brink's facility the second time to get on the roof when you

20  entered the facility itself, --

21  A.    Yes.

22  Q.    -- do you recall how many holes were in the roof?

23  A.    There was a few.  I'm not sure an exact amount.  Between

24  four and six.

25  Q.    Do you know why there were multiple holes cut in the roof?

1  A.    The -- Sean had told me that he cut so many holes to look

2  for an access point into the building and to look for the alarm

3  system.

4  Q.   Did some of the holes present a degree of difficulty of

5  entering the building?

6  A.    Yes.

7  Q.   And why is that?

8  A.    'Cause it's a very steep drop, maybe 30 feet,

9  approximately, from the roof, straight down.

10  Q.   A couple of stories high?

11  A.    Yeah.

12  Q.   Now, did you enter the vault room after Mr. Morgan pulled

13  the semi into the facility?

14  A.    I got instructed to glue the doors shut and start

15  dismantling the DVRs and the electronics that were in one of

16  the -- one of the rooms.  I referred to it as the computer

17  room.

18  Q.   Was this before anything happened with respect to the

19  vault room?

20  A.    Yes.  We unloaded the tools.  And then that was my next

21  instructions, and that's what I started to do.

22  Q.   Who gave you that instruction?

23  A.    Mr. Murphy.

24  Q.   And when you say "glue the doors shut," what was the

25  purpose behind that?

77

1  A.    It was actually only one, one door.  The --

2  Q.    I'm sorry.

3  A.    I did say "doors," plural, but there was one door.  In

4  case someone had arrived, they couldn't just walk in and

5  surprise us.  So we glued the doors with, like, an epoxy, to

6  make it so that the door couldn't open.

7  Q.    And who performed that function?

8  A.    I did.

9  Q.    And where did you find the epoxy to use to secure the

10  doors in the manner you have described?

11  A.    That was brought with us.  It was in the truck.

12  Q.    Did you complete that task?

13  A.    Yes.

14  Q.    And what happened after that, sir?

15  A.    Then I went into the computer room and started taking,

16  dismantling, the DVRs and the electronics that were in that

17  room.

18  Q.    And who directed you to do that?

19  A.    Mr. Murphy.

20  Q.    And why were you to do that, sir?

21  A.    He said that that was all their -- the surveillance

22  equipment and anything that had to do with the building, it

23  would all be in them racks as far as any information that --

24  basically, like a DVR, they record.  So we weren't sure which

25  units were recording, the cameras or the alarm system.  So you

78

1    just took everything.

2    Q.   Now, did you perform this function before you did anything

3    in terms of -- well, strike that, because I don't think we've

4    covered it.

5        What were you there to obtain?

6    A.   Money.

7    Q.   Before you did anything to attempt to obtain money, you

8    performed all these other functions?

9    A.   That's what -- that was what I was doing, that's correct.

10   Q.   And while you were dismantling the DVRs as you've

11   described, what were Joe Morgan and Sean Murphy doing?

12   A.   At first, we -- while I was gluing the doors, we were kind

13   of doing a quick run-around to see if there was anything else

14   that we could find, like in offices and drawers.  And then

15   once --

16   Q.   You mean -- look for anything else to find.  What are you

17   referring to?

18   A.   Money or where there might be other safes or anything that

19   was of value in any of the offices.  So they would, you know,

20   breaking the desk drawers open and, you know, like a filing

21   cabinet, whatever may have been locked, breaking into those.

22   Q.   You said "anything of value."  Let me stop you right

23   there.  Do you know whether or not there were any guns in the

24   facility?

25   A.   Yes.  There was many guns.

79

1   Q.   Were those valuable?

2   A.   Yes, they were.

3   Q.   Did you touch any of them?

4   A.   No, I did not.

5   Q.   Why is that?

6   A.   Mr. Murphy instructed me that there would be a lot of guns

7   in there, and do not take or touch any of them.

8   Q.   And what happened after you all went through files and

9   offices and things of that nature?

10  A.   I was in the computer room, because that took me quite

11  awhile, because they had a pretty sophisticated system holding

12  them all together.  And Sean and Joe started trying to cut

13  through the safe.

14  Q.   Okay.  Now, describe that room for us.

15          THE COURT:  Excuse me.  Started to cut through what?

16          THE WITNESS:  The safe.  The vault.

17          THE COURT:  The what?

18          THE WITNESS:  The vault.  The safe.

19          THE COURT:  Oh!  The vault.  Okay.

20  BY MR. DOMINGUEZ:

21  Q.   Now, describe that room where the vault was for us, Mr.

22  Doucette.

23  A.   That was the room that we actually gained access to the

24  building.  One of the holes in the roof led to the top of the

25  vault, and we were able to hop down to a shelf, and then a

1   desk, because, like I said, the building was very high.  And

2   that was the only area that we were able to get into the

3   building through the roof.

4   Q.   Is that the same hole that you entered and exited each

5   time?

6   A.   That is correct.

7   Q.   I show you Government's Exhibit 1A-85, sir.  Do you

8   recognize that?

9   A.   Yes.  That's the room with the -- with the vault door.

10  Q.   Is that the room that you entered the building?

11  A.   Yes.  You can -- we stepped on the desk and that shelf

12  above the desk.  You can actually see the sneaker marks on the

13  wall from where we were trying to pull ourselves up.

14  Q.   When you say "sneaker marks," had you taken your galoshes

15  off at that point?  Or --

16  A.   I'll rephrase that.

17       The markings from the shoes we were wearing.

18  Q.   Does this photograph present a better angle of the

19  footprints, Government's Exhibit 1A-95, sir?

20  A.   Yes.

21  Q.   Would you circle the footprints that you're referring to?

22  A.   (Indicating)

23       Two sets.  We had to pull ourselves up to this upper

24  section, right up here (indicating).

25  Q.   But you were able to utilize the desk and the ledges below

81

1   there, --

2   A.    Yes.

3   Q.    -- per your testimony?

4         That was the vault room, sir, that you just looked at?

5   A.    Yes.

6   Q.    And the vault was there?

7   A.    Yes.

8   Q.    How did you go about getting into the vault, sir?

9   A.    They had a special cutting tool called a thermal lance

10  rod, which is used for cutting and melting metal.

11  Q.    When you say "they," who are you referring to?

12  A.    To Mr. Murphy and Mr. Morgan.

13  Q.    I would like for you to describe, precisely, as much as

14  you can, the process of that thermal rod --

15  A.    The thermal lance --

16  Q.    -- utilization in the manner you've described.

17  A.    Yes.  The thermal lance rod is a piece of magnesium that's

18  hollow in the middle, and you have to use a high-powered torch

19  to light the end.  It takes a few minutes to get it to go.

20        Once it starts to light up, you feed it oxygen, which is

21  attached to the end of the rod.  And there's a handle on it

22  that goes to an oxygen tank.  Once it lights up, you turn it

23  on, and it turns into, just to give you an idea, like a

24  sparkler, but ten thousand-fold.  It's a giant, very

25  illuminating tool that sparkles.  And it creates a very bright

82

1   light and a lot -- it's dropping a lot of metal as it's

2   burning.  It's meant to be used to cut, like, under water, cut

3   through concrete or cut through steel.

4   Q.   Had you personally ever used one of those, sir?

5   A.   No.  This was the first time I had ever seen one.

6   Q.   How did you know that it operated in the fashion you just

7   described?

8   A.   As time went on after the Brink's job, I had done a little

9   research on it, just because I'd never heard of it prior, plus

10  I'd seen it in action, and the thing is very -- it's also

11  dangerous, because, like, you couldn't even be next to Mr.

12  Murphy when he was trying to cut through the vault because it

13  was sending sparks upwards of ten feet back.  And it was as

14  bright as the sun in the room when it was going off.  So we had

15  to constantly have hoses and fire extinguishers to help keep an

16  eye on, making sure he wasn't catching on fire or other items

17  around him weren't catching on fire.

18  Q.   What was Mr. Murphy -- because you've described for the

19  record that Mr. Murphy was performing this function, what type

20  of clothing was Mr. Murphy wearing when he performed this

21  function?

22  A.   He had made a makeshift suit out of -- out of leather

23  coats.  A welder, someone that welds metal, wears, like, a

24  suede leather coat.  And he had a couple of them that he

25  strapped around his body to cover.  He had a coat that he wore

83

1    backwards, put his arms in so that the back side would cover

2    his front so that there was no openings, and he had taken out

3    another coat, or another piece that he had and strapped them

4    around his legs to make it so that his body was covered in the

5    front from top to bottom.

6    Q.   Was there anything else that had been set up in order to

7    assist with the thermal lance rod?

8    A.   Yes.  There was a stand set up, because the rod, itself,

9    is pretty long, and it's heavy.  So he had set up -- Mr. Murphy

10   set up a stand that would help aid in holding it up closer to

11   the vault so that he could use it like a -- like a saw.

12   Q.   And did you see him actually engage the vault with the

13   thermal lance rod?

14   A.   Yes.  Even though that I was doing the office stuff, I was

15   going back and forth, loading the stuff up into the truck, but

16   I was peeking in the room to see what was going on in there.

17             MR. DOMINGUEZ:  May I approach the witness, Your

18   Honor?

19             THE COURT:  You may.

20   BY MR. DOMINGUEZ:

21   Q.   Sir, I'm showing you what has been marked for

22   identification purposes and labeled 1E-3; that is, Government's

23   Exhibit 1E-3.  I would like for you to look at that box and

24   tell the ladies and gentlemen of the jury whether or not

25   anything you've just described is in that box.

84

1    A.    Yes.  These were the pieces that he strapped around

2    himself, put his arms through the coat backwards so that he was

3    wearing it like this (indicating), so that there was no

4    opening.  And then we just took these pieces and covered his

5    lower half (indicating).

6    Q.    You may place that back into the box, sir.

7          Mr. Doucette, was a hole eventually created with the

8    assistance of a thermal lance rod?

9    A.    Yes.

10   Q.    You said you were back and forth, seeing some of it and

11   then seeing some of the action, actually, the torch, engaged to

12   the vault and going office to office.  Approximately how long

13   did it take to create the hole?

14   A.    It -- we didn't have a full access hole for a couple of

15   hours due to the fact that the vault door was layered with

16   different types of material to stop such a tool from going

17   through it with ease.  For example, there was steel, and then

18   cement, and then wood.  They do that so that the tools -- they

19   make it a little more challenging to go through the vault door.

20   Q.    Prior to cutting a hole into the bigger vault, -- and

21   we'll have pictures of that in a moment -- was there another

22   vault or safe that you tried to crack as well?

23   A.    Yes.  There was another safe that was approximately five

24   feet tall, and it was standing up by itself in another room.

25   Q.    Government's Exhibit 1A-107, do you recognize that, sir?

85

1   A.   Yes.   That's the safe.

2   Q.   And it appears to have some kind of spotting there.  Can

3   you recognize that?

4   A.   Yes.

5   Q.   What's that all about?

6   A.   We tried to stick a drill to it, which it wouldn't work.

7   And so then we tried to glue it to the door, and that wouldn't

8   work either.

9   Q.   Did you actually participate in that process?

10  A.   Yes.

11  Q.   Is that another picture of the same thing?

12  A.   Yes.

13  Q.   For the record, Government's Exhibit 1A-108.

14       Now, you described the wood and how big the vault door

15  was.  Was there eventually a hole created?

16  A.   Yes.

17  Q.   Tell us what happened, as best you can, when that hole was

18  created.  First of all, obviously, were you there when that

19  occurred?

20  A.   Yes.

21  Q.   Tell us what happened immediately upon the hole being

22  created, sir.

23  A.   We -- well, there was a process of breaking the wood to

24  get to it; but, once the hole was made, we were able to reach

25  in and grab some money.

86

1  Q.   Was there a degree of difficulty associated with that

2  process?

3  A.   Yes.  The smoke was very overwhelming; and, due to

4  fatigue, because I'd been up for a couple of days, it was very,

5  very -- it was hard.

6  Q.   Was the door hot?

7  A.   The door was very hot, but we had a hose nearby.  So we

8  were constantly trying to put out the fire.  So, as soon as the

9  hole was made, we just rinsed everything down.

10  Q.   And when you -- what was the state of the contents of the

11  vault?

12  A.   Couldn't really see in there due to the fact that the

13  smoke was pouring out of the small hole that we had made,

14  because the stuff inside had caught fire.  So that -- what was

15  on the other side of the vault door was, obviously, filled with

16  smoke.

17  Q.   Now, you -- I'm going to back you up a little bit.  You

18  described, Mr. Doucette, the various functions that everyone

19  performed up to that point:  Mr. Morgan, yourself, Mr. Murphy.

20      Let me ask you this:  Did you guys take a smoke break

21  while you were doing this?

22  A.   No.  But there is one thing I just recalled when you

23  brought up the smoke; that one of the things we had to do was

24  carry a fan up to the roof, which was prior to cutting,

25  starting to cut.  We carried a fan that was maybe four or five

87

1    feet around, an industrial size fan, and put it up on the roof

2    over one of -- the hole that was over the vault.

3    Q.    When did that occur?

4    A.    That happened -- that was one of our first functions.

5    Q.    And why did you put a fan on the top of the roof?

6    A.    That was to get the smoke -- we knew there was going to be

7    a lot of smoke in the area.

8    Q.    Is that because of the flames you've described for the

9    jury?  I think you said a sparkle, but ten thousand times that

10   amount?

11   A.    That might even be underestimating of it, yes.  It's like

12   as bright as the sun.  It's very -- something I've never seen

13   before.

14   Q.    So you anticipated, before you even went in and started

15   with the thermal lance, that there was going to be some degree

16   of smoke associated with it; so you had a fan on the roof to

17   help with that?

18   A.    That is correct.  That was part of the -- I had overlooked

19   that, but that was part of the initial setup when we were

20   unloading the tools, that we went up on the roof, dragged the

21   fan up, and set it up.

22   Q.    How did you get the fan to operate on the roof?

23   A.    With an extension cord.

24   Q.    Now, getting back to my earlier question, -- I appreciate

25   you interrupting me there -- you're in the Brink's facility?

1  A.    That's correct.

2  Q.    What was your adrenaline level like?

3  A.    On a scale of one to ten, over ten.  It was very like I've

4  never felt before.

5  Q.    You were with Joe Morgan and Mr. Murphy the whole time,

6  correct?

7  A.    Yes.

8  Q.    Based on your knowledge of being in their presence at the

9  same time, were their adrenaline levels similar to yours?

10  A.    Yes.  They were very focused.  Mr. Murphy was in charge.

11  You know what I mean?  I was kind of walking around not sure

12  what would be my next step.  So, whatever needed to be done, I

13  followed.  And it's --

14  Q.    Do you know -- do you know if Mr. Murphy smokes

15  cigarettes?

16  A.    No, not that I'm aware of.

17  Q.    How about Mr. Morgan?

18  A.    I believe he smoked occasionally.

19  Q.    While you were in this Brink's facility and you're

20  disarming the VCRs and taking alarm systems down, blowing

21  through a safe door, a vault door, conducting yourselves in the

22  manner that you've described up to this point, did any of you

23  say to each other, Hey, let's go take a smoke break?

24  A.    Not at all, but I wasn't with everybody for every minute;

25  so I'm not sure if anybody may have ventured off, but I don't

89

1    think that anybody went for a smoke break.

2    Q.    Who was in the facility, to your knowledge, while all of

3    this is going on?

4    A.    The three of us:  Mr. Murphy, Mr. Morgan and myself.

5    Q.    Was there anybody from Columbus in the building with you

6    at that time?

7    A.    Not at all.

8    Q.    Did you pick up anybody along the way?

9    A.    No.

10   Q.    As a matter of fact, based on your obligation, at least

11   initially, if anyone else had come onto the scene, what were

12   you to do?

13   A.    I was to notify, over -- through the walkie-talkie, that

14   we had company.

15   Q.    Now, let's get back to the initial hole opening in the

16   vault and the safe.

17            MR. DOMINGUEZ:  Your Honor, we have quite a bit.  So

18   whenever you want to -- we have a lot more.  So whenever you

19   want to signal me to be quiet, I'm there.

20            THE COURT:  Let's see if we can go a few -- we've

21   lost some time this morning.

22            MR. DOMINGUEZ:  I just wanted to tell the Court we

23   have --

24            THE COURT:  We can go another 30 minutes.

25            MR. DOMINGUEZ:  That's fine.

90

BY MR. DOMINGUEZ:

Q.   So tell me about the smoke, as you recall it, immediately

upon the hole being created.  Just describe it for the ladies

and gentlemen of the jury.  None of us were there.  Describe it

for us.

A.   It was very thick, hard to breathe.  Actually, I -- I had

threw up probably 20 times in the course of the night.

Q.   Why is that?

A.   Between fatigue and the smoke asphyxiation, it was very --

it was very overwhelming, because the smoke was not just

cutting steel; it was cutting through wood; it was melting the

dry -- the sheet rock on the wall.  The clock above the wall

melted, the plastic.  It was just a combination of things that

were caught fire.  The smoke that was coming from that was very

overwhelming.

Q.   And you said you vomited a few times?

A.   Yes.

Q.   Where did you go to do that?

A.   The first time I felt myself getting sick, there was a

sink in the back of the garage.  I went to that, and I could

tell it was going to continue on.  So I carried a -- I went

into one of the offices and got a small barrel, and that was

something I carried with me, or nearby.

Q.   Why were you concerned about that, as opposed to just

doing that in the open floor?

91

1  A.   Didn't want to leave any evidence that we were there.

2  Q.   DNA?

3  A.   Correct.

4  Q.   Now, speaking of that, we talked about the clothing that

5  you were wearing when you were outside.  You entered.  Did you

6  remove some of your layers of clothing when you entered the

7  facility?

8  A.   Once we had all the electronics taken down, we took off

9  our masks.

10  Q.   What about on your hands?  What did you have on your

11  hands?

12  A.   We all had gloves on.

13  Q.   And why were you wearing gloves?

14  A.   To leave no fingerprints.

15  Q.   Very well.  Now, getting back to the vault and the smoke

16  that you've described, did anyone enter the vault, Mr.

17  Doucette?

18  A.   Mr. Murphy did at one point in time.

19  Q.   And describe that for us.

20  A.   After reaching in the vault -- well, we had to let the

21  smoke clear for a short time, maybe a half hour.  We were

22  trying to reach in and grab what we could, blindly; and Mr.

23  Murphy decided to dive in the vault.  So he jumped in; and due

24  to the jagged edges, his suit had gotten caught.  So me and Mr.

25  Morgan helped assist him with his feet and pushed him through

92

1    the hole.  And --

2    Q.   Did he get all the way in?

3    A.   He got all the way in the room and started throwing money

4    out.  And he was probably in there for no more than, I'd say,

5    90 seconds to two minutes, tops, and he started to come out.

6    And once he started to come out, his suit got caught on the

7    jagged edges, and we pulled him out.  And he said, right to me,

8    that he almost passed out in there.

9    Q.   And --

10              THE COURT:  What did you say?

11              THE WITNESS:  He almost passed out from smoke

12   asphyxiation.

13              THE COURT:  He said that to you?

14              THE WITNESS:  Yes.

15              THE COURT:  Okay.

16   BY MR. DOMINGUEZ:

17   Q.   You pulled Mr. Murphy out, and he made that statement to

18   you?

19   A.   Yes.

20   Q.   Did you look into the vault at that time, at that moment?

21   Did you look inside it?

22   A.   I had peeked in it, but it was very hard to see further

23   than a little bit of distance, a foot or two.

24   Q.   And why is that?

25   A.   The smoke was still pouring out.

93

1   Q.   Any flames that you saw in there?

2   A.   I didn't see no flames in there.

3   Q.   But smoke?

4   A.   Very smoky.

5   Q.   At this moment in time, what did you next do?

6   A.   We continued reaching in the vault and loading up plastic

7   totes that we had found in the area with as much money as we

8   could.

9   Q.   Was Mr. Morgan assisting in this regard?

10  A.   We were all taking turns because, the smoke was so

11  overwhelming, not one person could sit there and keep reaching

12  in the hole to grab any amount of money for any long time.  So

13  we would -- I would go up, do it for five minutes, roughly,

14  four minutes.  I'd walk away gagging.  Mr. Murphy would walk

15  up, do his fair share for a few minutes.  Mr. Morgan would do

16  his fair share for a few minutes, so that we were all, you

17  know, taking turns, because, like I said, the smoke was very

18  nauseating.

19  Q.   Any discussion amongst yourselves in terms of a reaction

20  to the smoke and how that developed?

21  A.   None.

22  Q.   Now, about what time -- and I know you're in there doing

23  your thing, but about -- do you know what time it was?

24  A.   I would say that, when I was on the roof before we went in

25  the building, it was close to 2:00 a.m.  And when I went down

94

1   and started moving the trucks and we got the truck in there, it

2   was 2:30.  So, by the time he cut through the vault and gained

3   access, it had to be about 6:30.  It was pretty late, or early

4   in the morning.

5   Q.   Six thirty when the access was gained?

6   A.   Yes, right around that time.

7   Q.   Roughly?

8   A.   Yes.

9   Q.   So, given the fact that you arrived at the scene around

10  8:30, nine o'clock, you had been in and around the Brink's

11  facility for a long period of time at that point?

12  A.   Yes, sir.

13  Q.   You say you were taking turns trying to get money out of

14  the smoking vault.  Did anyone do anything else after that

15  point?

16  A.   After we were going in and out of the vault for probably

17  about an hour, approximately, it was getting close to daylight.

18  And Joe -- I seen Joe driving a fork truck.  I noticed, behind

19  me, a fork truck moving.

20  Q.   Did that shock you, or did you find it strange?

21  A.   Yes.  At this point in time, it's an hour deep into going

22  into that vault, dealing with the smoke.  And now my intervals

23  of being able to reach in the actual hole is down to 30

24  seconds, because I'm just so asphyxiated with smoke that my

25  time kept growing less and less and less the more that I stayed

95

1    in that area.  So I welcomed the fresh air.

2        So I walked over to see what he was doing.  And there was

3    a room next to the vault room that was just an open room that

4    had -- that had carts with change, box change, in it.

5    Q.   And what was going on with that?

6    A.   Joe took a fork truck and started loading up the carts

7    onto the moving truck.

8    Q.   You say the 24-foot truck that you'd brought in?

9    A.   Yes.

10   Q.   Did you assist him with that?

11   A.   There wasn't much assisting I can do due to the fact that

12   those carts -- I'm not sure what the weight is, but they

13   were -- the boxes are, like, 30, 40, pounds a piece.  And there

14   is hundreds of them on there.  So there's thousands of pounds

15   worth of weight.  And there wasn't much I could do.  So I just

16   had to step out of the way so I didn't get run over by the

17   machine he was operating.

18   Q.   When you say "boxes," you describe boxes that were -- what

19   type of change?  Do you remember?

20   A.   There was Susan B. Anthony dollars, and there was 50-cent

21   pieces, just a combination of both.  We had -- Joe had loaded

22   up five racks.  I'm not sure which, like, if there was -- which

23   the denomination was, but there was a combination of those

24   coins amongst the racks.

25   Q.   And he loaded them as skids, or as carts, as they were

96

1   positioned within the facility?

2   A.   Yes.   These carts are like -- they're open, and they

3   have -- the legs that they stand on are open at the top so that

4   they can be stacked up, like, five or six high.   And they're

5   made out of three-inch-square tubing.   They're designed to hold

6   the weight, and they're all metal.

7   Q.   And you stated that the boxes were pretty heavy,

8   individually?

9   A.   Yes.   They were approximately 30 pounds.

10  Q.   Well, you hadn't weighed them, had you?

11  A.   No, but, just by grabbing it, they were, you know, 25, 30,

12  pounds at least.

13  Q.   And then did he load quite a few -- you said five skids?

14  A.   Yes.

15  Q.   And what happened after that, sir?

16  A.   We -- it was getting close to the time that we had to

17  leave.   We knew that they were going to be opening up around

18  9:00 a.m.   So we had to stop loading up the tools.

19  Q.   Who gave that directive?

20  A.   Mr. Murphy.

21  Q.   So please continue.

22  A.   We hopped up.   You know.   We started bringing the torches

23  to the truck, all of the boxes of money that we'd collected,

24  and started loading up the truck to get ready to get out of

25  there.

97

1    Q.    And what happened next?

2    A.    We finished loading up the truck, and we went to go to

3    leave after obtaining all the tools and stuff up on the roof,

4    the cell phone jammer, the fan, and everything, and, for some

5    reason, the power was lost to that Command Center room that we

6    went in.  They were able to open the gate earlier.  So we had

7    to go outside and smash the gate off, or smash the chain that

8    assists the gate opening up.

9    Q.    So you actually broke the chain to the gate --

10   A.    Yes.

11   Q.    -- to assist you in getting out?

12   A.    Yes.

13   Q.    Okay.

14   A.    It was either the chain or the bracket that holds it.

15   Sorry.

16   Q.    And did you eventually take the truck out of the building?

17   A.    Yes.

18   Q.    Who drove the truck out of the building?

19   A.    Joe drove the truck out.  And then me and Murph went back

20   in the building, closed it up, and took one last look around,

21   made sure that we were content that we'd gotten everything, and

22   then climbed back out the hole that we had entered the building

23   in.

24   Q.    Remember, you discussed earlier in your testimony

25   something about Mr. Murphy having DNA?

98

1    A.    Yes.

2    Q.    Was it -- do you know what it was located in, or packaged

3    in or anything?

4    A.    He had -- the DNA he had obtained he had into a Ziploc bag

5    that was approximately this big (indicating), and he had some

6    cigarette butts and a couple of bottles in there.

7    Q.    And do you know what he did with those?

8    A.    He laid them out amongst the fence area, and some up on

9    the roof.

10   Q.    Did you see him deal with the DNA, completely, or did he

11   do that?

12   A.    I seen those two areas that he did.  I don't know if --

13   like I said, throughout the course of the night, there was

14   various times where we were not all together.  So those are two

15   areas that I seen.

16   Q.    Is that what he meant by keeping it local?

17   A.    Yes.  His phrase for getting the DNA was to keep the crime

18   local.

19   Q.    How did you exit the building after Mr. Morgan left with

20   the truck?  You said you and Mr. Murphy looked around to make

21   sure that you -- everything was good, cleaned?

22   A.    Yes.  And then we climbed --

23   Q.    What was that process about?  What did you do in that

24   regard?

25   A.    Just to make sure there was no tools left or there was

99

1    nothing that we overlooked.

2    Q.    What about the bucket of --

3    A.    That was already loaded up in the truck, my bucket of

4    vomit.  I threw that in when we were loading the tools up.

5    Q.    And why was that, for the record?

6    A.    I didn't want to leave any DNA, myself.

7    Q.    How did you exit the building?

8    A.    Through the roof that we entered on.

9    Q.    Now, let me ask you this:  You'd already secured the

10   alarms, secured the DVRs, the alarm system, smashed things.

11   Why didn't you leave out of a door, as opposed to going back

12   through the roof?

13   A.    Because it was quarter of 9:00, and we were expecting a

14   guy to come open up the place, and we didn't want to meet him

15   out front, with his cup of coffee, trying to open up the place.

16   So we exited through the roof and went out through the back.

17   Q.    Okay.  And that's the back hole?

18   A.    The back hole.

19   Q.    In the --

20   A.    In the fence up on the railroad tracks.  And then we

21   walked down to the little car that we had rented.  And, from

22   there, we were using the two-way walkie-talkies.  And Joe drove

23   the truck down the street to come meet us.

24   Q.    Did he still have the tarp on the truck?

25   A.    He did; but, like I said, it's meant for storage; but, as

100

1    he was driving and turning and we moved the tarp to unload the

2    tools and covered it back up, we were kind of sloppy.  So,

3    while he was driving, it ended up getting ripped off, probably

4    eighty percent.

5    Q.    Okay.  Did you eventually remove the tarp, in its

6    entirety, from the truck?

7    A.    Yes.  We took -- when he met up to us, met up with me and

8    Murphy, we removed the tarp, and then removed the clothes that

9    we had on, and just put on regular clothes.

10   Q.    And did you drive away?

11   A.    Then we drove away.

12   Q.    You talked about Mr. Morgan putting coins into the truck.

13   And you recall your testimony about you all taking turns

14   grabbing money out of the vault while it was smoking.  Do you

15   recall that?

16   A.    Yes.

17   Q.    What did you do with the money, the currency, that you had

18   taken out of the vault?

19   A.    We had put it into plastic totes like the local post

20   office uses.  The white plastic totes that they carry your mail

21   in, there happened to be a bunch of those laying around.  So we

22   just put it right in front of us.  We were reaching in and

23   dropping the money into those, and then loading them up into

24   the truck.

25   Q.    So you put the currency in the truck as well?

1  A.   That is correct.

2  Q.   Did anything, at least while you were in Columbus, Ohio,

3  make its way into the Dodge Journey?

4  A.   Nothing.

5  Q.   What happened after that, sir?

6  A.   We drove straight to Pennsylvania, to the storage

7  facility.

8  Q.   And before we go there, I'm going to show you a series of

9  photographs.

10      Government's Exhibit 1A-10, do you recognize that, sir?

11  A.   That is one of the holes that were cut in the roof.

12  Q.   1A-12, sir?

13  A.   That is also another hole.

14  Q.   1A-11, sir, do you recognize it?

15  A.   Yes.  That's a hole that was in the roof.

16  Q.   And do you recognize what's underneath the hole, sir?

17  A.   I can see the light and a top of a truck, one of the

18  Brink's trucks.

19  Q.   1A-23, sir, do you recognize that?

20  A.   Yes.  That's the extension cord that he used to obtain

21  power up on the roof.

22  Q.   And let me ask you this:  Who had obtained that extension

23  cord?

24  A.   Mr. Murphy.

25  Q.   Did he tell you anything about that extension cord, at

1   all, prior to him obtaining it?

2   A.   Yes, that the -- the Brink's company, from us looking on

3   the Internet and looking at the building numerous times on

4   Google Earth, you could see the trucks, and some of the trucks

5   were plugged in.  So he wanted to get the same color extension

6   cord that that company had used.

7   Q.   1A-24, sir, do you recognize that?

8   A.   Yes.

9   Q.   And what is it?

10  A.   That's a three-way -- it's kind of blurry, that picture,

11  but -- can I circle it?

12  Q.   Yes, please.

13  A.   Right here (indicating), it's a three-way plug to convert

14  a single plug to multiple outlets.

15  Q.   Do you want to redraw the circle?

16  A.   There we go (indicating).

17  Q.   Now, you say it had multiple circuits.  Did you use the

18  multiple functions on the circuit?

19  A.   Yes.

20  Q.   What were they used for, sir?

21  A.   The fan and the jammer.

22  Q.   1A-37, sir, do you recognize it?

23  A.   Yes.  That's the back of one of the trucks that are open.

24  And, actually, in the right-hand corner, those are the carts

25  that the coin was in, even though those look empty.

1   Q.    Okay.  Do you see any -- remember, you talked about totes

2   that you used to carry money?

3   A.    Yes.

4   Q.    Do you see any similar totes in that photograph, sir?

5   A.    Yes, I do.

6   Q.    Do you want to circle them for us?

7   A.    Yes.  Right up on top of this (indicating).

8   Q.    Do you know whether or not -- and only if you know, sir.

9   This is Government's Exhibit, for the record, 1A-37.  Is this

10  one of the trucks that was opened by one of you?

11  A.    I'm not sure.

12  Q.    Very well.

13        Government's Exhibit 1A-50, sir, do you recognize it?

14  A.    It looks like the computer room, with the rack with the

15  electronics that I disassembled.

16  Q.    Is that the room -- you had said that you were directed to

17  clear out some DVRs and so forth.  Is that the room you were

18  talking about?

19  A.    Yes.

20  Q.    1A-62, sir, do you recognize anything there?

21  A.    Looks like the epoxy that was used.

22  Q.    The epoxy you used?

23  A.    Yes.

24  Q.    How did it get on that desk?

25  A.    I was carrying the gun, and I laid it down on the desk.

104

1   And that's what just dribbled out of it.

2   Q.   1A-70, sir, do you recognize it?

3   A.   Yes.   That's another rack that -- there was multiple racks

4   holding all their equipment.   That was one of the racks that

5   they had.

6   Q.   Is that one that you had destroyed equipment on?

7   A.   Yes.

8   Q.   1A-71, sir, for the record, do you recognize anything

9   there?

10  A.   That's the fork truck that was used to load up the coin.

11  Q.   The fork truck you identified with respect to Mr. Morgan?

12  A.   Yes.

13  Q.   1A-74, sir.

14  A.   That is the coin room and some of the coins that had

15  gotten knocked around on the floor and some of the various

16  carts that they used.

17  Q.   And who was responsible for knocking those coins around?

18  A.   Mr. Morgan.

19  Q.   1A-75?

20  A.   It's the same room, just a different angle.   And as you

21  can -- you can see the coins, how they stack them, how many

22  deep are on each rack.

23  Q.   Do you recall your testimony, sir, when you discussed some

24  of the holes being too tall in terms of trying to enter the

25  building?   Do you recall your testimony there?

1    A.    Yes.

2    Q.    I wonder if you can see what is in Government's Exhibit

3    1A-80.

4    A.    That is one of the holes that was overlooking the coin

5    room.

6    Q.    1A-81?

7    A.    Same room.  It's two holes.  Different angle.

8    Q.    Couldn't enter through those?

9    A.    Could we enter through those?

10   Q.    You said couldn't enter --

11   A.    Couldn't enter.  Just a visual.

12              MR. DOMINGUEZ:  A moment, Your Honor?

13              THE COURT:  You may.

14              (Whereupon, there was a brief interruption.)

15              THE COURT:  Is this a good place to stop?

16              MR. DOMINGUEZ:  Anyplace, Your Honor.  I have a lot

17   more.

18              THE COURT:  Okay.  Ask your next question, and then

19   we'll --

20              MR. DOMINGUEZ:  I will, Your Honor.

21   BY MR. DOMINGUEZ:

22   Q.    Government's Exhibit 1A-84, do you recognize that picture,

23   sir?

24   A.    Yes.  That's a picture of the room in front of the vault.

25   The vault would be to our left, which we can't see.

106

1  Q.   And let me ask you this:  You talk about oxygen tanks

2  being used.

3  A.   Yes.

4  Q.   Do oxygen tanks contain caps?

5  A.   Yes.  The -- on the top of the tank where you connect the

6  hose is a valve to actually turn it on so the gas can be

7  released, or oxygen.

8  Q.   Do you think one of them might have been left behind?

9  A.   Yes.

10  Q.   Do you see it there (indicating)?

11  A.   It's right there, on the floor.

12          MR. DOMINGUEZ:  Thank you, Your Honor.

13          THE COURT:  Ladies and gentlemen of the jury,

14  remember the admonition not to discuss this case with each

15  other or anyone else during the course of the trial.  This

16  includes the attorneys and anyone else involved in the case.

17  Report any violations to the court personnel.

18          Do not form or express an opinion until the case is

19  given to you for deliberation.  Do not make any investigation

20  or perform any experiments or do any reading or research on

21  this case, and stay off the computer.  Do not discuss the case

22  with your family or friends until you are discharged by this

23  Court.

24          Please do not observe media reports, newspapers,

25  T.V., radio reports, and wear your badges at all times during

1    trial.

2            We'll take a one-hour break for lunch.

3            (Whereupon, a recess was taken at 12:25 p.m.)

4                        – – –

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

108

1                   Wednesday Afternoon Session

2                      October 19, 2011

3                         - - -

4         THE COURT:  Mr. Dominguez, you may continue with the

5  witness.

6         MR. DOMINGUEZ:  Thank you, Your Honor.

7  BY MR. DOMINGUEZ:

8  Q.  Mr. Doucette, prior to the lunch recess, we had discussed

9  your participation in the actual Brink's burglary, your actions

10  and the actions of Mr. Morgan and Mr. Murphy while you were all

11  three in the Brink's facility and outside of the Brink's

12  facility, and you had discussed with us that you had proceeded

13  to the truck, to the sedan, and that you had left the state,

14  and I was showing you a series of photographs.  Do you recall

15  that?

16  A.  Yes, sir.

17  Q.  I am now showing you Government Exhibit 1A-86.  Do you

18  recognize that, sir?

19  A.  Yes, that's the safe door inside the Brink's facility.

20  Q.  And does that show -- now, it may have been affected by

21  the Fire Department and what they did, but does that show the

22  damage that was done to the door by the thermal lance rod?

23  A.  Yes, that is correct.

24  Q.  Showing you 1A-88, sir, do you recognize that?

25  A.  Yes, that is one of the offices, the desk that we had gone

109

1   through.

2   Q.    And Government Exhibit Number 1A-99, sir.  I believe that

3   you identified that briefly before we left when you discussed

4   the cap to the oxygen tank, but anything else that you

5   recognize on the floor there, sir?

6   A.    Just the fire extinguishers and the hose that we used to

7   have control of the fire that we were causing.

8   Q.    Now, when you talk about the fire extinguishers and the

9   hose used with respect to the fire -- pardon me -- were you

10  actually spraying that into the vault after it had been entered

11  or after a hole had been created?

12  A.    Yes.  The hole wasn't fully through when we had used up

13  all of the fire extinguishers that were in the building.  And

14  when we went to the hose, as we progressively kept cutting

15  through further and further, we had to keep control of the fire

16  that was going on.  It took awhile to get through it.

17  Q.    Did you actually ever spray water into the vault?

18  A.    Yes.

19  Q.    And did that have any effect on the currency that you had

20  subsequently taken out as you have described for the ladies and

21  gentlemen of the jury?

22  A.    Yes, it was wet.

23  Q.    Government Exhibit 1A-105, sir, do you recognize that?

24  A.    Yes, that's the safe door.

25  Q.    Now, do you recall in your testimony, Mr. Doucette, that

110

1    when the hole was created, that you could not see into it, that

2    it was smoky -- I don't want to put words in your mouth -- is

3    that what your testimony was?

4    A.    Yes, sir.

5    Q.    If you look at the back of this photograph now as it

6    appears, were you ever able to see the blue bins?

7    A.    No, I was not.

8    Q.    How about the items that are on that rack?

9    A.    Yes.

10   Q.    So, the items on the rack were actually closer to the hole

11   that opened as a result of the hole to the vault?

12   A.    Yes.

13   Q.    Government's Exhibit 1A-39, sir, do you recognize this

14   door?

15   A.    Yes.

16   Q.    And what is that door, sir?

17   A.    That was one of the internal doors.

18   Q.    That's to the Brink's facility?

19   A.    Yes.

20   Q.    And 1A-141, sir, do you recognize that?

21   A.    Yes.

22   Q.    What is that, sir?

23   A.    That was the adhesive that I had put on the door.

24   Q.    Show us the adhesive that you put on the door.

25   A.    It was two different types.  It was black and tan.

111

1    Q.    If you just put your finger right on it (indicating on the

2    screen).  Circle it.  There you go.

3          And Government Exhibit 1A-142.  Right there (indicating on

4    the screen)?

5    A.    Yes.

6    Q.    Do you know if you were successful in epoxying those doors

7    closed?

8    A.    I was able to apply the epoxy, but I don't believe it

9    cured properly due to the cold.

10   Q.    You are not sure whether or not it had the desired effect?

11   A.    Correct.

12   Q.    Government's Exhibit 1A-150, sir, do you recognize

13   anything there?

14   A.    That's one of the rooms that had the electronic equipment

15   in it.

16   Q.    Was it destroyed?

17   A.    Yes.

18   Q.    And to your right there, sir, what appears to be on the

19   wall there?  Is that to your right or to your left?

20   A.    That would be to my right.  It looks like two shotguns,

21   the racks, the racks that I had seen in there that would hold

22   two guns at once.

23   Q.    Did you ever touch those items?

24   A.    No.

25   Q.    And why is that?

112

1    A.    I was instructed not to.

2    Q.    Who gave you that instruction?

3    A.    Mr. Murphy.

4    Q.    Government's Exhibit 1A-153, do you recognize that, sir?

5    A.    Yes, that's a picture of the vault with the door open.

6    Q.    1A-167?

7    A.    Picture of the vault looking at some burnt money.

8    Q.    Now, when you were taking money out of the vault that you

9    ultimately said went into some postal bins, was some of the

10   money in the same condition as that burnt money that was

11   displayed in Government's Exhibit 1A-167?

12   A.    Yes.

13   Q.    1A-193, sir, do you recognize that?

14   A.    That's a cap to one of the tanks.

15   Q.    Is that the one that you described in a previous

16   photograph?

17   A.    Yes.

18   Q.    Now, sir, what happened when you left Columbus?  Who was

19   in which vehicle?

20   A.    I was driving the rental car, and Joe Morgan and Sean

21   Murphy were driving the box truck.

22   Q.    Where did you go?

23   A.    We went to Pennsylvania to the storage facility.

24   Q.    Now, are we on Sunday, January 18th at this point?

25   A.    Yeah, if that is the date.

1    Q.    On January 18th?

2    A.    Yes, if that is a Sunday?

3    Q.    Yes.

4    A.    Yes, it was a Sunday, a.m., and we started heading right

5    from Ohio right to Pennsylvania.

6    Q.    Did you make any stops along the way?

7    A.    None.

8    Q.    Did you know where you were going when you left Columbus

9    and the state of Ohio?

10   A.    Yes.

11   Q.    And how did you know?

12   A.    Mr. Murphy told me our first stop would be to the storage

13   facility to empty the truck.

14   Q.    Was this a plan that was made even prior to entering the

15   Brink's facility?

16   A.    Yes.

17   Q.    And what was the purpose of going to the storage facility?

18   A.    We wanted to unload all of the tools and wanted to drive

19   back with as little as possible.

20   Q.    Did you, in fact, go back to the storage facility?

21   A.    Yes.

22   Q.    Is it the same one you testified about having taken the

23   tools out of the day before?

24   A.    Yes.

25   Q.    Did you unload the truck?

114

1    A.    Yes.

2    Q.    What actually did you put back into the storage facility?

3    A.    All of the tools, the racks, the change, the bags of

4    tools, everything that was involved that we had brought with

5    us.  The only thing that we took with us was the actual

6    currency which we took and put into trash bags and took those

7    with us.

8    Q.    You said "change".  Do you mean the five big racks of

9    Susan B. Anthonys and halves?

10   A.    Yes.

11   Q.    Once the truck was unloaded into the storage facility and

12   the currency placed into the sedan, what happened next?

13   A.    We drove to Boston, Massachusetts.

14   Q.    Who drove which car?

15   A.    I drove the truck, and Sean and Joe Morgan drove the

16   rent-a-car.

17   Q.    Why is that?

18   A.    Just to switch it up.  I really wasn't too comfortable

19   driving the truck.  And on the way home, they wanted to change

20   it up, and I was driving an empty truck.

21   Q.    And where was the currency at this point in time?

22   A.    It was in the rent-a-car.

23   Q.    The sedan?

24   A.    The sedan.

25   Q.    Very well.  Did you stop anywhere after you left -- I

115

1   believe you stated that you went straight to the storage

2   facility?

3   A.   Yes, and we got fuel and hopped on the road to Boston.

4   Q.   Did you drive straight through to Boston?

5   A.   Yes.

6   Q.   Where did you go?

7   A.   We went to -- dropped off the truck to an area where he

8   parks his trucks.

9   Q.   So, he -- who are you referring to?

10  A.   To Mr. Murphy.

11  Q.   Okay.

12  A.   Then, we hopped into the sedan and went to my house.

13  Q.   Why did you go to your house?

14  A.   To start divvying up the money that we had with us.

15  Q.   I asked a poor question, Mr. Doucette.  Why did you all

16  select your house to go to?

17  A.   I am not sure why my house was chosen.

18  Q.   What did you do when you arrived at your house?

19  A.   We took the currency out of the car and started to hand it

20  out and split it up.

21  Q.   Do you know how or do you how recall how it was split?

22  A.   It was split that David Nassor was to get 5 percent off

23  the top.

24  Q.   And why was that?

25  A.   That was the deal that Mr. Murphy had made with David.

1   Q.   Did he make that deal with David in your presence?

2   A.   Not in my presence, but he made me aware of how that would

3   be split up.

4   Q.   And continue, please.

5   A.   And after that 5 percent was taken off the top, they split

6   it up 50 percent to Sean Murphy, 30 percent to Joe Morgan and

7   20 percent to me.  Even though that equals 105 percent, we took

8   the 5 percent off and then started off fresh with the

9   100 percent, just so you guys are aware.

10   Q.   Now, why was it that Morgan was to receive 30 percent and

11   you were to receive 20 percent, if you know?

12   A.   I am not sure.

13   Q.   Okay.  And why was Mr. Murphy was going to get a larger

14   share?

15   A.   He was in charge of the whole thing, so he gets a larger

16   share.

17   Q.   Did you divide it all up at that time?

18   A.   Not all of it.  We were very tired from the transition

19   that led up to that, so we put in two hours tops and called it

20   a night.

21   Q.   And what happened after that?

22   A.   We took the money, put it into the rent-a-car and

23   everybody went home.  I was at my house, I just stayed there.

24   And the money was in the Journey little rent-a-car.

25   Q.   What part of the Journey?

117

1    A.    Into the back hatch area and Sean took the keys with him.

2    Q.    Okay.  When you took the money, the currency, into your

3    residence, Mr. Doucette, and attempted to divvy it up, at least

4    initially, what state was the currency in?

5    A.    It was wet, smelly, and lot of it was burnt.

6    Q.    Was there anything that you did, you, Mr. Murphy or

7    Mr. Morgan did to try eliminate some of that odor?

8    A.    Yes, we put some Febreze into the trash bags that the

9    money was in to try to help start eliminating the odor.

10   Q.    Is that before you had arrived at your home there on the

11   trip?

12   A.    Yes, because the car was smelling.  The smell was

13   permeating through the plastic.  So, we just took a bottle and

14   poured it into each bag.  And when we showed up to my house, we

15   started divvying it up, and we were able to -- we started

16   divvying up what was manageable because a lot of the money was

17   wet or destroyed.

18   Q.    After everyone left your home because you were tired, did

19   you reconvene the following day?

20   A.    Yes.

21   Q.    Tell us about that.

22   A.    They showed up at my house midday because we all slept in

23   a good day, and then we started doing the same thing again,

24   starting to divide the money up.  But we were realizing that it

25   was really unworkable, so we started washing and drying the

118

1    money physically in our washer and dryer.

2    Q.    You literally put money into a washer and dryer?

3    A.    I put money into a washing machine with soap, washed it,

4    and then threw it into the dryer.

5    Q.    Did that work?

6    A.    Yes.

7    Q.    Now, was some of the money actually burnt and unusable?

8    A.    Yes.  And when we would bring it upstairs to separate it,

9    we would separate the money that was good for us to use now and

10   took the burnt money and put it off to the side and just tried

11   to continue the process to get through it all.

12   Q.    Did you get through some money that following day?

13   A.    Yes.

14   Q.    Did you have some left over?

15   A.    Yes.

16   Q.    And what happened after that, sir?

17   A.    We put a few hours in, and once again, we were still tired

18   from our -- from our trip, and we called it an early night and

19   the next day we reconvened again, doing the same thing.

20   Q.    Did you eventually get all of the money divided up?

21   A.    No.  Well, eventually, but it took some time.  Let me

22   rephrase that.

23   Q.    Okay.  Do you know whether or not Mr. Murphy ever returned

24   the rental truck to the storage facility?

25   A.    Yes.

119

1   Q.   And do you know how he got there?

2   A.   Him and David Nassor showed up with the truck at my house,

3   and we washed the truck down inside and out, to try to clean it

4   from any of the stuff that we may have dropped in the vehicle,

5   and then they hopped in it and returned it to the storage

6   facility.

7   Q.   You say "they", who are you referring to?

8   A.   David and Sean Murphy.

9   Q.   I will invite your attention, if I could, Mr. Doucette, to

10  January 23rd of 2009.  Do you recall that date?

11  A.   Yes.

12  Q.   Did you happen to get alarmed personally on that date?

13  A.   Yes.

14  Q.   And why is that?

15  A.   I got a phone call from one of my friends that the

16  warehouse that Mr. Murphy used was -- was being raided.  There

17  was State police, a crime scene van and quite an array of

18  police officers there.

19  Q.   And once you obtained this information, what did you do?

20  A.   I had phoned Joe Morgan.

21  Q.   What did you tell Joe Morgan?

22  A.   That the place -- that I had got a phone call, that the

23  place was being raided, so he came over and we took a natural

24  drive-by to visually see what was going on.

25  Q.   And when you say you saw his warehouse being raided, tell

120

1    the ladies and gentlemen of the jury what you did saw?

2    A.   I saw a -- I am not sure how many officers, but there had

3    to be -- it looked like about 20, and they had like a mobile

4    office set up outside so that they could bring the stuff in and

5    out that they needed to.  There was quite a few people there.

6    It wasn't just like one cruiser or two cruisers, it was quite a

7    few people there, a couple of trucks, a bunch of cars and a lot

8    of officers.

9         I only did a drive-by, so it wasn't like I sat there and

10   took notes, but I could tell there was a lot of activity going

11   on.

12              THE COURT:  Did you say that there was a mobile unit?

13              THE WITNESS:  Yes.

14              THE COURT:  Like a trailer or van?

15              THE WITNESS:  Yes, like a big van, like a small box

16   truck.

17              THE COURT:  What did it say on it?

18              THE WITNESS:  I believe it said State Police.

19              THE COURT:  Some police agency of some kind?

20              THE WITNESS:  Yes.

21   Q.   (By Mr. Dominguez) Had you been in that warehouse before?

22   A.   Yes.

23   Q.   You were certain that it was Mr. Murphy's warehouse?

24   A.   Yes.

25   Q.   What discussions did you and Joe Morgan have after you

121

1   made this observation?

2   A.    What we should do.

3   Q.    And what did you decide to do?

4   A.    To go to Pennsylvania and get the stuff that was in

5   storage.

6   Q.    Why did you make that decision?

7   A.    We were concerned about the stuff being there and what was

8   happening with "Murph".  We had no way of really knowing what

9   was going on.

10  Q.    You were worried that you might get caught?

11  A.    Correct.

12  Q.    Was Morgan worried that he would get caught?

13  A.    Yes.

14  Q.    How long before you left to go back to that storage

15  facility in Pennsylvania?

16  A.    The next day.

17  Q.    Who rented the truck?

18  A.    A friend of mine I called up and asked to rent the truck

19  for me.

20  Q.    You didn't want to rent it in your own name?

21  A.    No.

22  Q.    Why is that?

23  A.    I didn't -- from what I have learned from Sean, he said

24  try not to have any kind of paper trail or anything when you

25  are going to do anything of that nature.

122

1   Q.   Who went to the storage facility in Pennsylvania?

2   A.   Joe Morgan and myself.

3   Q.   Now, did you make it there?

4   A.   Yes.

5   Q.   Did you recognize it?

6   A.   Yes.

7   Q.   Did you recognize it as the same storage facility that you

8   had been to twice in the last several days?

9   A.   Yes.

10  Q.   Did you actually enter that storage facility?

11  A.   Yes.

12  Q.   How did you do that?

13  A.   We took the truck, we taped up the numbers that were on it

14  so that it couldn't be -- we took the DOT numbers and covered

15  them and covered the license plate and went up to the gate and

16  went in.

17  Q.   You entered the storage facility?

18  A.   Yes.

19  Q.   The storage unit?

20  A.   That is correct.

21  Q.   How did you actually enter the unit?

22  A.   There was a key that Mr. Murphy had left hidden a couple

23  of units down and --

24  Q.   How did you know that?

25  A.   Joe knew that.

123

1    Q.    Did you know that personally?

2    A.    No.

3    Q.    When you entered the -- you remember your testimony

4    regarding going to that storage facility on Saturday,

5    January 17th and Sunday, January 18th and your testimony

6    that the gate to that facility was frozen?

7    A.    Yes.

8    Q.    Was it frozen on this occasion when you went back?

9    A.    I do not recall.

10    Q.    But you were able to enter it?

11    A.    Yes.

12    Q.    Did you load the tools and so forth into the truck?

13    A.    We emptied everything that was in that bay into the truck.

14    Q.    Including the coins?

15    A.    Including the coins.

16    Q.    How long did it take you?

17    A.    Approximately an hour, an hour-and-a-half maybe.  I wasn't

18    timing it, but we moved pretty steadily.  And the racks with

19    the coins were moved with a fork truck, so we had to physically

20    carry one box or two boxes at a time, so it was a little bit

21    longer of a process.

22    Q.    What did you then do?

23    A.    Hopped in the truck and drove back to Lynn, Massachusetts.

24    Q.    Did you stay overnight anywhere?

25    A.    Nope.

124

1  Q.   Why did you drive straight to Pennsylvania and drive

2  straight back?

3  A.   I wanted to be as quick as possible.

4  Q.   Once you got back to the Greater Boston Metropolitan Area

5  with this truck full of the goods now with Joe Morgan, what did

6  you then do?

7  A.   We called it a night because we had just pulled off a

8  20-hour trip.

9  Q.   And where did you park the truck?

10 A.   Just on a common street, and we both went home for the

11 night, and the next morning we were going to bring it to a

12 storage facility.

13 Q.   Did you do that?

14 A.   Yes.

15 Q.   Who picked the storage facility?

16 A.   I did.

17 Q.   And where was that?

18 A.   That was in New Hampshire.

19 Q.   Now, you stated that you lived in Lynn, Massachusetts?

20 A.   Yes.

21 Q.   Why did you choose a storage facility in New Hampshire?

22 A.   I was trying to be low key, and I had called a friend up

23 and asked if they could rent me a truck and a storage facility,

24 and he lived up in that area.  So, that's where we -- that's

25 where we did it.

125

1   Q.   How far from Lynn was this storage facility?

2   A.   Forty-five to 50 miles, approximately.

3   Q.   Did you and Mr. Morgan actually unload the truck into a

4   storage unit?

5   A.   Yes.

6   Q.   You both knew its location?

7   A.   Yes.

8           MR. DOMINGUEZ:  May I have a moment, Your Honor?

9           THE COURT:  Yes.

10  Q.   (By Mr. Dominguez) During this time frame where you are

11  talking about driving to Pennsylvania with Joe Morgan and then

12  placing items into a New Hampshire storage unit, what was going

13  on with the currency that you had been dividing up some days

14  prior?

15  A.   That was at my house and that was put on hold while we

16  went and picked up the stuff from Pennsylvania.

17  Q.   And what happened with the currency after you picked up

18  the stuff from Pennsylvania?

19  A.   Me and Joe Morgan started continuing divvying it up.

20  Q.   Between the two of you?

21  A.   Yeah.

22  Q.   What about Mr. Murphy's share?

23  A.   Joe was taking that.  Can I also add something?

24  Q.   Yes.

25  A.   The first couple of days we got back, David Nassor did

126

1   help us divvy up the money, also -- not the very first night we

2   got back and put two hours in, but the second and third day he

3   showed up for a couple of hours each day.

4   Q.   Is that right around the same time that Mr. Nassor

5   actually assisted Mr. Murphy in taking the rental truck back to

6   New Hampshire?

7   A.   That is correct.

8   Q.   Back up to the Brink's, just for a moment, you talked

9   about when you left Brink's, before you left you loaded the

10  truck with everything, the tools, the coins, all of those

11  items.  What about all of that electric -- the electric

12  equipment, the DVRs and the things that you have destroyed, did

13  you also put those into the truck before you went back to

14  Warrendale?

15  A.   Yes, I put those in.  As soon as I was pulling those out

16  of those racks, I was bringing them and putting them into the

17  truck one at a time because it wasn't destroying the actual

18  equipment, it was destroying the racks to try to get them out

19  because they were secured very securely.

20  Q.   And you put the equipment into the truck as well?

21  A.   Yes.  As I was going along, I would get a couple out and

22  I'd walk them over to the truck.

23  Q.   And when you -- following the Brink's burglary, when you

24  took those items to the storage, did you unload those items as

25  well?

127

1   A.    Yes.

2   Q.    When you and Joe Morgan went back after January 23rd of

3   2009 to retrieve those items, did you put the racks and the

4   electronic equipment into the truck as well?

5   A.    Yes.  The racks were from the coin, and the electronics

6   were all separate.  They were actual individual units.  We

7   didn't take the racks that actually held all of the

8   electronics, we just broke them out of it.

9   Q.    When you took the items, you and Joe Morgan after

10  January 23rd, when you took the items back to the Greater

11  Boston Metropolitan Area and then to New Hampshire, as you have

12  described it to the storage facility, what did you do with the

13  electronic equipment and those kinds of things?

14  A.    We left everything sitting in that storage facility in

15  New Hampshire for a couple of weeks, and we worked on figuring

16  out a plan with the money that was at my house.  And every day

17  we put in a couple of hours washing, folding and divvying up

18  that money.  And then a couple of weeks later, we collected the

19  electronics and a few of the items out of the New Hampshire bay

20  and brought them down into Lynn.

21  Q.    And where did you place the electronic equipment?

22  A.    Joe Morgan rented a bay at a UHaul facility.

23  Q.    What eventually happened to that electronic equipment?

24  A.    The electronic equipment and the racks that held the

25  coins, we ended up taking those and using a torch to cut up the

128

1   racks.  And the electronic equipment I disassembled and

2   separated them from the outer cases to their circuit boards

3   through wires into the hard drives.  I broke them down until

4   they were all in individual pieces.

5   Q.   Did you eventually destroy those items?

6   A.   Joe arranged for a local metal collector to come and get

7   all of the metal.  And I had took all of the hard drives myself

8   and threw them out into the ocean.

9   Q.   Why did you do that, sir?

10  A.   Just to get rid of the information that was on them.

11  Q.   You didn't want to get caught?

12  A.   That's correct.

13  Q.   And I am going to invite your attention to April 8th of

14  2009.  Do you recall anything happening with Joe Morgan on that

15  date?

16  A.   Yes.

17  Q.   What happened to Joe Morgan on that date?

18  A.   He got arrested.

19  Q.   Were you alarmed by that?

20  A.   Yes.

21  Q.   And why is that?

22  A.   For the fear of being caught.

23  Q.   Did you take any actions after you found out that

24  Mr. Morgan had been arrested?

25  A.   Yes.

129

1   Q.   What did you do then?

2   A.   I took the stuff out of the bay that it was in and moved

3   it to another storage facility.

4   Q.   So, you did that on your own?

5   A.   I did that on my own.

6   Q.   Did you have any help the first -- when you initially went

7   and moved it from one bay to another?

8   A.   Yes.

9   Q.   And then, did the items remain in that unit?

10   A.   Yes.

11   Q.   And where was that unit?

12   A.   That was in Raymond, New Hampshire.

13   Q.   How far from the previous unit in New Hampshire was this

14   new unit?

15   A.   A few miles.

16   Q.   And why did you -- what happened -- why did you pick this

17   unit in Raymond, New Hampshire to move the equipment or the

18   tools and so forth yet again?

19   A.   That particular unit, that storage facility had no locking

20   gate or anything.  It was pretty much you could drive in 24

21   hours a day, and it was very much older, we will say.

22   Q.   Okay.  Did there ever come a time when you moved the

23   equipment yet again?

24   A.   Yes.

25   Q.   Why is that?

130

1   A.   I had went to the facility, and it looked like someone had

2   went in there and some of the stuff was moved around, and while

3   I was there, I found a key on the ground, so I took and moved

4   the stuff from that bay to another bay a couple of bays down.

5   Q.   Now, while you are going through all of these movements,

6   Mr. Doucette, what is going through your mind?

7   A.   Panic.

8   Q.   Why is that?

9   A.   Fear of being caught.

10  Q.   Did there come a time where you were, in fact, caught?

11  A.   Yes.

12  Q.   Did you speak to Special Agent Jason Costello?

13  A.   Yes.

14  Q.   Did you speak with Detective Chris McIntosh of the

15  Columbus Police Department?

16  A.   Yes.

17  Q.   Was your attorney present?

18  A.   Yes.

19  Q.   Was this participation in what is called a "debriefing"?

20  A.   Yes.

21        MR. DOMINGUEZ:  May I have a moment, Your Honor?

22  Q.   (By Mr. Dominguez) What did you the tell them?

23  A.   I told them the whole story and what had happened.

24  Q.   Did you tell them about the money?

25  A.   Yes.

131

1   Q.   Did you tell them about the location of the money?

2   A.   Yes.

3   Q.   And at that moment of your debriefing, are you aware that

4   the law enforcement authorities actually acted on your

5   information?

6   A.   Yes, sir.

7   Q.   They didn't waste any time, did they?

8   A.   No.  As soon as we got to that part of the story, they

9   took a five-minute break and went outside and made some phone

10  calls.

11  Q.   They didn't tell you what they were doing?

12  A.   I knew what they were doing.

13  Q.   Oh, you did.

14  A.   Yeah.

15  Q.   Initially?

16  A.   Yes.

17  Q.   What did you know that they were doing?

18  A.   Going to retrieve the goods that I told them where they

19  were at.

20  Q.   Did you give them a location?

21  A.   Yes.

22  Q.   Did you tell them that it was in Raymond, New Hampshire?

23  A.   Yes.

24  Q.   And what happened next?

25  A.   They couldn't locate it.  So, I hopped in the -- we

132

1    stopped what we were doing because they were looking for about

2    a half-hour. And we hopped in the truck and drove right up

3    there, and I showed them where it was.

4    Q.   Did they open it up?

5    A.   Yes.

6    Q.   And did they find the tools and find the coins and the

7    other items that you have discussed with the ladies and

8    gentlemen of this jury?

9    A.   Yes, they did.

10            MR. DOMINGUEZ:  May I have a moment, Your Honor?

11            May I approach?

12            THE COURT:  You may.

13   Q.   (By Mr. Dominguez) Mr. Doucette, I have handed you what

14   has been marked for identification and labeled as Government's

15   Exhibits as 1B-1 through 1B-36 inclusive.  Take a look at those

16   and look up at me when you are finished.

17            Have you looked at those items, sir?

18   A.   Yes.

19   Q.   Do you recognize them?

20   A.   Yes.  Those are the items that were in the storage

21   facility.

22   Q.   The storage facility that you led law enforcement

23   authorities to?

24   A.   Yes, that is correct.

25   Q.   Do they look like fair and accurate depictions of the

133

1 contents of that storage facility as it appeared on June 4th of

2 2009?

3 A.    Yes.

4            MR. DOMINGUEZ:  May I approach, Your Honor?

5            THE COURT:  You may.

6 Q.    (By Mr. Dominguez) I am showing you, Mr. Doucette,

7 Government's Exhibit 1B-1.  Do you recognize that, sir?

8 A.    Yes.

9 Q.    What is that?

10 A.    Those are the boxes of coins that we can see.

11 Q.    What else of significance is in that photograph, sir?

12 A.    A couple of duffel bags and a pair of bolt cutters.

13 Q.    Did the bolt cutters go with you all to Ohio?

14 A.    Yes.

15 Q.    And do you know what those were used for?

16 A.    I do not.

17 Q.    Fair enough.  1B-2, sir.  Do you recognize anything there?

18 A.    Yes.

19 Q.    What do you recognize?

20 A.    The fan that we put up on the roof, all of the way over to

21 the right.

22 Q.    Is that the one that you described for the ladies and

23 gentlemen of the jury when you initially went on the roof, and

24 it was used to help with the smoke in the facility?

25 A.    Yes, it was.

134

1   Q.   Anything else that you recognize there, sir?

2   A.   The boxes of coins and a couple of bags, and some of them

3   cut in rugs.  And I am not sure of the name of the tool, but it

4   is a giant -- that big white box in the middle.

5   Q.   Tell us about that.  What do you know about that?

6   A.   That's a drill.  It attaches to a -- it is like a

7   generator with two PTO hoses that come off, and it goes to a

8   drill bit that's the size of -- like a good-sized barrel, like

9   a 36-inch or a 40-inch drill bit, probably about yea tall

10  (indicating with hands).  You run the generator, the hydraulic

11  fluid goes through, and it spins the drill bit.

12  Q.   Did you all take that item with you to Ohio?

13  A.   Yes.

14  Q.   Did you use it?

15  A.   No, we did not.

16  Q.   Why didn't you use it?

17  A.   Mr. Murphy thought that cutting through it was going to be

18  suffice enough.

19  Q.   Using the thermal lance rods along with the oxygen tanks?

20  A.   Yes.

21  Q.   1B-3, do you recognize that, sir?

22  A.   Yes, that's one of the bags that we took with us.

23  Q.   Whose bag is that?

24  A.   That's Sean's.

25  Q.   How do you know it is Sean's bag?

1    A.    He had all types of bags to carry different tools and that

2    was just one of the many bags that he had his stuff in.

3    Q.    Do you recognize the tag on that bag?

4    A.    "15"?

5    Q.    Yes?

6    A.    Yes.

7    Q.    Do you recognize that?

8    A.    Yes, I do.

9    Q.    Government's Exhibit 1B-4.  Do you recognize that, sir?

10   A.    Yes.

11   Q.    What is that?

12   A.    Those four disks that are in the bag, those are the

13   antennas that are used to operate the jammer.

14   Q.    Is that the same jammer that you saw utilized on

15   January 18th and 17th?

16   A.    Yes.

17   Q.    Government's Exhibit 1B-5.  Do you recognize that, sir?

18   A.    Yes.

19   Q.    What is it?

20   A.    That's the actual jammer itself.

21   Q.    Is that the jammer that was used?

22   A.    Yes.

23   Q.    For the Brink's burglary?  Can you make out that card

24   there, sir, on the bag?

25   A.    The "15"?

136

1   Q.   Yes.

2   A.   Yes.

3   Q.   Any words that appear on that?

4   A.   "Carnival".

5   Q.   1B-6, sir.

6   A.   Those are the wires that the antennas are hooked up with,

7   coaxial cable -- I believe that's what you call it -- and those

8   are the antennas that go with it.

9   Q.   1B-7?

10  A.   It is another picture of the same items.

11  Q.   1B-8, sir?

12  A.   A bag or a box of trash bags we had purchased.

13  Q.   Are those the trash bags you utilized to put the money in?

14  A.   Yes.

15  Q.   Or they came from that box, I should say?

16  A.   Yes.

17  Q.   Is this one of the Post Office containers that that stuff

18  was in?

19  A.   That is correct.

20  Q.   1B-9?  Do you recognize that, sir?

21  A.   Yes.

22  Q.   What is that?

23  A.   Those are the Post Office boxes that we used to carry the

24  currency.

25  Q.   Those boxes, so we are clear, were in Brink's and you

137

1   actually took those along with everything else that you took

2   from within that facility?

3   A.   Yes.  They are now filled with change.

4   Q.   The two bags, do you know what is in those?

5   A.   I do not.

6   Q.   1B-10, sir?

7   A.   Pictures of the coin, the boxes with the coin, and two

8   black bags.

9   Q.   1B-14, sir?

10  A.   It is a picture of the door to the storage facility.

11  Q.   1B-15?

12  A.   Yep.  A picture looking in between some boxes and looking

13  at a towel bin.  One of them Post Office boxes filled with

14  change, it looks like.

15  Q.   The Post Office boxes, again, that was merchandise that

16  was in the possession of Brink's that you carried with you?

17  A.   Yes.

18  Q.   1B-16, sir?

19  A.   It is picture of the tanks that we took.

20  Q.   Excuse me, sir?

21  A.   That is a picture of the tanks that we took.

22  Q.   Now, were those the tanks that were used to assist with

23  the thermal rod?

24  A.   Yes.

25  Q.   The thermal lance rod, I should say.

138

1     And with respect to these, the oxygen tanks, Mr. Doucette,

2  it appears that one of them is missing something?

3  A.    Yes.  It is missing the top transport cap.

4  Q.    Showing you, again, 1A-193 from the Brink's facility?

5  A.    Yes, that is a cap.

6  Q.    I mean, does it appear to be one that would fit that unit?

7  A.    Yes.

8  Q.    1B-20, sir.  Do you recognize anything there?

9  A.    There is some wire, wire racks that he had used to hold up

10  the antennas.  And it is really hard to make out, it looks like

11  a four-wheel dolly.

12  Q.    1B-23?

13  A.    It is picture of the -- a couple of trash barrels that we

14  took with items in it, the wire racks that are on top of the

15  barrels.  Those are like the things that you would use to

16  protect a plant like in your garden, you use that to set that

17  up.  The antennas are up.  And to the right, the rusty-looking

18  rods, those are those thermal lance rods.

19  Q.    Now, explain something to the ladies and gentlemen of the

20  jury.  The lance rods, how long are those?  I mean, you can't

21  really tell by the photograph, but how long are those?

22  A.    They are real long.  I didn't physically measure one, but

23  eight to ten feet.

24  Q.    And when a person is actually using that at the heat level

25  that you described, do they remain that length?

139

1   A.   They do not.  They melt as they are being used.

2   Q.   1B-31, does that kind of give an impression of how long

3   they are?

4   A.   Yes.

5   Q.   Can you describe for the record, since I can't talk about

6   it, what is contained there, sir?

7   A.   There is a bunch of those rods and a ladder in the

8   picture.

9   Q.   1B-33, sir?

10  A.   Those are oxygen tanks.

11  Q.   What are those used for?

12  A.   You would use that with a gas to create fire through a

13  torch head.

14  Q.   1B-34?

15  A.   And that would be the other half that we would use.

16  Q.   Along with the items that you have identified in 1B-33?

17  A.   Yes.

18  Q.   1B-35, sir?

19  A.   That was cutting oil.  If we were going to do any drilling

20  or cutting, that would have been what we used.

21  Q.   1B-36?

22  A.   A couple of batteries.

23  Q.   And do you know what these batteries are used for?

24  A.   I do not.

25  Q.   Very well.  Now, you saw -- obviously, you have identified

140

1 coins that were in the storage unit, and you identified coins

2 in the Brink's facility. Did you, yourself, sir, obtain some

3 of those coins for your personal use?

4 A. Yes.

5 Q. And did you obtain currency from this Brink's burglary for

6 your personal use?

7 A. Yes.

8           MR. DOMINGUEZ: May I have a moment, Your Honor?

9           THE COURT: While they are getting that ready, why

10 don't we take about a ten-minute recess?

11                  - - -

12             [THEREUPON, a recess was taken.]

13                  - - -

14           MR. DOMINGUEZ: May I proceed, Your Honor?

15           THE COURT: You may.

16           MR. DOMINGUEZ: Thank you for your indulgence.

17           May I approach the witness?

18           THE COURT: Yes.

19           MR. DOMINGUEZ: Your Honor, for efficiency, may

20 Agent Trombitas assist me throughout by handing items to the

21 witness?

22           THE COURT: Yes, you may, and you may continue to

23 approach the witness with those items.

24           MR. DOMINGUEZ: Thank you.

25 Q. (By Mr. Dominguez) Set those aside. Mr. Doucette, I have

141

1    just handed you several exhibits. And Agent Trombitas is going

2    to assist in handing you certain items.

3         I ask that you take a look at Government's Exhibit 1D-3.

4    Do you see that, sir?

5    A.   Yes, I do.  1D?

6    Q.   1D-3.

7    A.   Yes, that is correct.

8    Q.   Would you please look in that bag, sir?  Do you recognize

9    that?

10   A.   Yes.

11   Q.   What is contained within that bag, sir?

12   A.   A flashlight and a couple of walkie-talkies.

13   Q.   Do those walkie-talkies look familiar to you?

14   A.   Yes.

15   Q.   Were those walkie-talkies used in any fashion on

16   January 17th and January 18th?

17   A.   Yes, this is how we would communicate, if need to be.

18   Q.   Is this the manner to defeat -- not to be detected by the

19   cell phone jammer?

20   A.   That is correct.

21   Q.   1D-4, sir?  Do you recognize those items, sir?

22   A.   Yes.  They are flashlights that you would wear around your

23   head.

24   Q.   Please hold it up and explain it for the ladies and

25   gentlemen of the jury.

142

1   A.   Yep.   These are (indicating) flashlights that you just

2   wear over the top of your head.

3   Q.   Did you have those that evening, sir?

4   A.   Yes.

5   Q.   And what function did they perform?

6   A.   Just to be able to see so your hands would be free.  And

7   these are the headsets that we used with the walkie-talkies.

8   They plug them into the walkie-talkie.  This would be while you

9   are working, you would be wearing this (indicating) in your

10  ear, and you would have the walkie-talkie in your pockets.  You

11  wouldn't have to listen or key up, and then you could be quiet.

12  Q.   That was 1D-4, sir?

13  A.   That is correct, 1D-4.

14  Q.   1D-9?

15  A.   This is also another walkie-talkie.

16  Q.   Similar to one that you used that evening, sir?

17  A.   Yes.

18  Q.   1D-10?

19  A.   This is a cellular phone from Nextel.  And this also has

20  -- it is a phone to call out in, but it has a walkie-talkie

21  function, also, but it is a regular phone.

22  Q.   1D-12, sir?

23  A.   It is one of the masks that we wore.

24  Q.   Is that what you wore over your head?

25  A.   Yes.

143

1    Q.    Do you know which person wore that particular mask?

2    A.    I do not.

3    Q.    Very well.  1D-15?

4    A.    It is another earpiece and some paper towels.

5    Q.    And what would those be used for, sir?

6    A.    I don't know.

7    Q.    I'm sorry, the earpieces?

8    A.    The earpiece was also used with the walkie-talkie or the

9    scanner.  They were earpieces that we used for both.

10   Q.    1D-17?

11   A.    I am out of bags.

12         MR. DOMINGUEZ:  Agent Trombitas will assist you.

13   A.    This is a Sawzall.

14   Q.    What would that be used for?

15   A.    You would put a saw blade in here, and it is cordless.

16   You just run a battery, and you can use it for cutting items.

17   Q.    Do you know if that was used on the evening of

18   January 17th?

19   A.    I didn't see it being used.

20   Q.    Were you told anything about it being used?

21   A.    No.

22   Q.    Okay.  1D-18?  What is that, sir?

23   A.    It is a cordless drill.

24   Q.    Was that used at all on the evening of the 17th and the

25   morning of the 18th?

144

1   A.   I did not see it being used.

2   Q.   Very well.  1D-19.  Strike that.

3        With respect to the two items that you just -- you don't

4   have to give it back to him -- 1D-17 and 1D-18, you stated that

5   you didn't see them being used on the 17th and 18th of

6   January of 2009, but do you know if it was in the truck?

7   A.   Yes, they were with us.  But at different times we were at

8   different locations, so I didn't observe them with my own eyes

9   being used.

10  Q.   Very well.  1D-19, sir?

11  A.   A pair of goggles for either welding or cutting so to

12  avoid the flash and a breathing mask.

13  Q.   And what is that mask used for, sir?

14  A.   This was used for the air that's dirty, you would put it

15  over your mouth to help you breathe, whether it is dust or

16  painting or something of those natures.

17  Q.   Do you know if that was used on January 17th and January

18  18th?

19  A.   I didn't see it being used.

20  Q.   Very well.  1D-20, sir?  The cell signal jammer.  Do you

21  recognize that, sir?

22  A.   Yes.

23  Q.   What is that?

24  A.   That's one of the cell phone jammers.

25  Q.   Do you know whether or not that was one used on the

1    evening of January 17th?

2    A.    That one was not used.

3    Q.    Whose cell phone jammer is that?

4    A.    That is Sean Murphy's.

5    Q.    1D-21?

6    A.    This is the jammer that was used that night with the wires

7    and the antennas.

8    Q.    What is the exhibit sticker on that one, sir, so the

9    record is clear?  On the box?

10   A.    It says "Item 22".  Is that the right number you are

11   looking for?

12        MR. DOMINGUEZ:  The exhibit sticker, Agent Trombitas?

13        AGENT TROMBITAS:  1D-22 and 23.

14   Q.    (By Mr. Dominguez) Very well.  And is the bag there, the

15   box, is that the same bag you identified in the photograph, a

16   blue bag with a Carnival tag?

17   A.    Yes, on the bottom.

18   Q.    You can replace that, sir.  You say that's the bag that

19   belonged to Sean Murphy?

20   A.    Correct.

21   Q.    Place it back in the bag, sir.

22        1E-1.  What is in there, sir?

23   A.    A set of jumper cables, another drill, and a couple of

24   wrenches.

25   Q.    And were those items with you on January 17th and

146

1   January 18th in the Brink's facility?

2   A.   Yes.

3   Q.   1E-3 has already been identified, that's the gold suit; do

4   you recall that, sir?  The gold leather suit?

5   A.   Yes.

6   Q.   1E-4?

7   A.   I didn't see that suit, though.

8   Q.   Excuse me?

9   A.   I didn't see -- you didn't show me that suit yet.

10          MR. DOMINGUEZ:  I'm sorry?

11          THE WITNESS:  Oh, yes.  Yes, yeah from earlier.

12   Q.   (By Mr. Dominguez) Okay.  1E-4?

13          THE COURT:  That might get wrinkled.

14          MR. DOMINGUEZ:  1E-4?  By mistake I showed you the

15   wrong item before.

16   Q.   (By Mr. Dominguez) So the record is complete, I believe

17   you may have misidentified what is now 1E-4 as 1D-20.  So that

18   the record is clear, we are now showing you 1E-4?

19   A.   Yes, that is a cell phone jammer, also.

20   Q.   That belongs to Mr. Murphy?

21   A.   Yes.

22          MR. DOMINGUEZ:  Thank you, Agent Trombitas, for

23   clarifying that.

24   Q.   (By Mr. Dominguez) 1E-5?

25   A.   That is a portable generator.

147

1    Q.    And was that with you on that trip?

2    A.    Yes.

3    Q.    Did you use it at all?

4    A.    I would say that I don't recall.

5    Q.    Very well.  And lastly, 1E-8 and 1E-9.

6    A.    That's some of the money that was -- that we obtained.

7    Q.    And it appears that some of it does have burnt edges on

8    it.  Is that the condition that it was in when it was seized

9    from the Raymond, New Hampshire facility, sir?

10   A.    Yes, sir.

11   Q.    Mr. Doucette, in May, July, November and December, did you

12   receive certain letters in the mail?

13   A.    Yes.

14   Q.    And we'll clarify who the addressee was and where the

15   return address was, but do you recall receiving certain

16   letters?

17   A.    Yes, I do.

18        MR. DOMINGUEZ:  May I approach, Your Honor?

19        THE COURT:  You may.

20   Q.    (By Mr. Dominguez) Sir, I have handed you what has been

21   marked for identification purposes and labeled Government's

22   Exhibits Number 13-1 through 13-4 inclusive.  I ask you to take

23   a moment to look at those carefully one-by-one.

24        MR. MURPHY:  Your Honor, can we approach?

25        THE COURT:  Yes.

148

1                           - - -

2          THEREUPON, the following proceedings were held at

3   sidebar out of the hearing of the jury:

4          MR. MURPHY:  Your Honor, I think we have a problem

5   with redaction.  I just opened them up and looked at them, and

6   there are sentences that were supposed to be redacted.

7          You were to keep the first sentence, and I believe we

8   agreed on everything except "the same old bullshit" here.  That

9   whole paragraph was supposed to be redacted.

10         MR. DOMINGUEZ:  I think that's true.  Okay.  I am not

11  going to identify it at this time, but what I will do is -- I

12  recognize that is an error, and I will not publish it, but we

13  will redact it further.

14         THE COURT:  Okay.  Which exhibit is it?

15         MR. DOMINGUEZ:  13-1, sorry.

16                          - - -

17         (They are redacting it with a black Sharpie pen at

18  the bench.)

19                          - - -

20         MR. DOMINGUEZ:  Is it the only one?  Do you want to

21  retrieve the others?

22         MR. MURPHY:  Yes.

23         MR. DOMINGUEZ:  Ask Mr. Graeff to go and get it.

24         MR. GRAEFF:  What do you need?

25         MR. DOMINGUEZ:  The rest of the letters.

149

1      MR. MURPHY:  I found something else.

2      I would just renew my general objection overall to

3  the letters.

4      THE COURT:  Okay.  Overruled.

5      (Back in open court.)

6      THE COURT:  You may proceed.

7      MR. DOMINGUEZ:  Thank you, Your Honor.

8  Q.   (By Mr. Dominguez) While we were at sidebar, did you

9  review 13-3 and 13-4?

10 A.   Is that the first one that I had?

11 Q.   Yes.  Did you review those?

12 A.   Yes.

13 Q.   Did you read 13-1?

14 A.   Yes.

15 Q.   Now that you have reviewed them all, Mr. Doucette, do you

16 recognize those?

17 A.   Yes.

18 Q.   Do you recognize those as letters that were caused to be

19 sent to you?

20 A.   Yes.

21 Q.   And if I could draw your attention to Government's

22 Exhibit 13-1, sir; do you recognize that?

23 A.   Yes, that's the first letter you showed me.

24 Q.   Who does purport to be from?

25 A.   From?

150

1   Q.   Yes.

2   A.   "Ruben Sanchez".

3   Q.   And who is it addressed to?

4   A.   Dawn Doucette.

5   Q.   Who is "Dawn Doucette"?

6   A.   That is nobody.  My girl's name is Dawn Kendrick, and I am

7   Robert Doucette.  So, it is a combination of both of our names

8   mailed to my address.

9   Q.   When you say "your girl", who are you referring to?

10  A.   Dawn.

11  Q.   I'm sorry.  Is that like a girlfriend or daughter?

12  A.   Girlfriend.

13  Q.   Okay.  And did you recognize when you received that, that

14  would have been some kind of code for you?

15  A.   Yes.

16  Q.   Did you open that letter?

17  A.   Yes.

18  Q.   When you saw the first two words of that letter, did you

19  have a feel for who it was from?

20  A.   Yes.

21  Q.   Does anyone call you by the word N-I-G?

22  A.   Yes.

23  Q.   And who would that be?

24  A.   Sean Murphy.

25  Q.   Did you read the letter in its entirety?

151

1  A.   Yes.

2  Q.   I invite your attention, if I could, sir, to the third

3  page of that letter.  Do you recognize any references there

4  that mean anything in particular to you?

5  A.   Yes.

6  Q.   What do you recognize?

7  A.   It says, "Try to get my China to the kid whenever you get

8  a chance.  You might as well go to KFC and throw in the super

9  crispy chicken, I like their combination meals."

10  Q.   I like their combination meals?

11  A.   Yes.

12  Q.   What did you understand the reference is "to get my China

13  to the kid?"

14  A.   When we -- he only has one kid of age, it is an older

15  girl, his daughter.  And China, when we stacked up the change

16  off the racks, the stack of boxes was so tall and wide, we

17  called that the "Wall of China".  And the super crispy chicken

18  was referring to the money that was burnt.

19  Q.   You weren't familiar with any fine China that you had

20  possession of belonging to Mr. Murphy?

21  A.   That is correct.

22  Q.   The closing salutation, if you will, of that letter, is

23  from -- the letter is "N-I-G" there?

24  A.   Yes.

25  Q.   And what did you take that to mean as the author of that

152

1    letter?

2    A.    Mr. Murphy.

3    Q.    Did you know Mr. Murphy to use that term to identify

4    himself?

5    A.    Yes.

6    Q.    Did you ever know why?

7    A.    No.

8    Q.    Showing you the front of Government's Exhibit 13-2, sir,

9    do you recognize it?

10   A.    Yes.

11   Q.    And what is that?

12   A.    That's another letter that showed up at my house from a

13   "Jason Deprato".

14   Q.    Who is "Jason Deprato"?

15   A.    I have no idea.

16   Q.    When you received that letter and you saw the return

17   address as "Jason Deprato" and you saw it being addressed to

18   "Dawn Doucette", did that give you any sense as to who it might

19   be from?

20   A.    Yes.

21   Q.    And who did you think it was from?

22   A.    Mr. Murphy.

23   Q.    And why is that?

24   A.    This would be the second letter that showed up with her

25   and my name on it.

153

1  Q.   Turning to the first page of that letter, Mr. Doucette, I

2  noticed that the initial address of you is "Rob"; is that

3  correct?

4  A.   Yes.

5  Q.   But then the next line refers to the name he referred to

6  you as in the previous letter?

7  A.   Correct.

8  Q.   Who is "Kristen"?

9  A.   That was a girlfriend that Mr. Murphy had.

10  Q.   Very well.  And then that final paragraph, there is a

11  reference to a person by the name of "Joe".  Do you know who he

12  meant by him?

13  A.   Yes, Mr. Morgan.

14  Q.   And what does he say about Mr. Morgan?

15  A.   "I should be seeing Joe soon.  He just got indicted in

16  June up in Bristol Superior Court.  So far he has been staying

17  strong.  The feds went to him to cut a deal, and he told them

18  to beat it.  He knows I would never do it to him.  There has to

19  be some loyalty."

20  Q.   Acknowledging his relationship with Joe Morgan?

21  A.   Yes.

22  Q.   Read the last paragraph, the last two paragraphs in that

23  letter, Mr. Doucette.

24  A.   From "hold down the fort"?  Is that what you are referring

25  to?

154

1    Q.    Yes.

2    A.    "Hold down the fort.  You are still the last injun

3    standing.  Whatever you are doing, keep it up.  Keep in mind

4    that I am going to need my shit soon.  I'll be sending you know

5    who.  You can put aside a day for me.  I'll do it for you.  As

6    usual stash or trash the letter.  No evidence is the best

7    evidence."

8    Q.    What did you take that last paragraph to mean -- "as usual

9    stash or trash the letter.  No evidence is the best evidence"?

10   A.    To burn it or throw it away.

11   Q.    Throw what away?

12   A.    The letter.

13   Q.    Showing you what has been marked as Government's Exhibit

14   Number 13-3.  Do you recognize that letter?

15   A.    Yes.  That's a letter from Sean Murphy addressed to

16   myself, Robert Doucette.

17   Q.    And this time it is addressed, the postmark or the return

18   address is actually in Sean Murphy's name; is that correct?

19   A.    That is correct.

20   Q.    And this time he also addresses you as Rob Doucette and

21   not Dawn Doucette?

22   A.    That is correct.

23   Q.    Did you receive that letter and open it up?

24   A.    Yes.

25   Q.    And is this the letter that you actually received?

155

1   A.   Yes.

2   Q.   It is signed by?

3   A.   N-I-G.

4   Q.   And with the other two letters that you have just

5   previously identified, you knew that letter was from whom?

6   A.   Mr. Murphy.

7   Q.   Showing you Government's Exhibit 13-4, sir.  Do you

8   recognize that?

9   A.   Yes.

10  Q.   It is addressed to whom?

11  A.   To Robert Doucette -- or Rob Doucette.

12  Q.   And that's your residence?

13  A.   Yes.

14  Q.   This time it is not from Sean, who is it from?  Or who

15  does it purport to be from?

16  A.   Barry "T", or that's all I can see on it.

17  Q.   Did you open this letter?

18  A.   Yes.

19  Q.   Did you read it?

20  A.   Yes.

21  Q.   I want you to look at the first full paragraph there.

22  Would you read that, please?

23  A.   "I am very smart and resourceful.  Not many people escape

24  my grasp once I focus on a particular target.  Therefore,

25  anything wrong you do with any of the items on the attached

156

1    list may come back to bite you in the ass."

2    Q.    How about the last paragraph?

3    A.    "Joe is a bit more madder at you than I am.  He worked

4    very hard for his money, and you took it away from him."

5    Q.    What does he mean by that?

6    A.    The money that I had turned over to the police.

7    Q.    And the next sentence?

8    A.    "Plus, you are reserving him a stay at club fed.  A lot of

9    people will treat you differently now that you have decided to

10   cooperate with the authorities.  It's a label that will stick

11   with you with forever.  It will affect your drug dealing

12   ventures and all other illegal activities you dibbled and

13   dabbled in."

14   Q.    And the second page, the next paragraph, please read that.

15   A.    "I am not 100 percent sure, but the pictures the feds

16   showed me looked like the Great Wall was a little light of some

17   coin, unless you had permission from the FBI to take a specific

18   amount of money out, you are playing with fire.  Good luck on

19   that one, you may need it.  Otherwise, I hope all is well with

20   you.  You will be hearing from me soon.  Yours truly, N-I-G."

21   Q.    And you took that to mean based upon the contents of the

22   letter and the signatory at the end, who was it from?

23   A.    Mr. Murphy.

24   Q.    The "Great Wall", what was the reference there?

25   A.    That was talking about the stack of money.

157

1  Q.   The Great Wall of?

2  A.   The Great Wall of China.  And like I said, when we stacked

3  that money up in the storage facility, we had one single row,

4  so it was very tall and long.

5  Q.   Who would be in a position to know whether or not the

6  Great Wall was a little light of some coin?

7  A.   Someone who had seen it prior.

8  Q.   And with certain edits that appear in the letters that you

9  need not concern yourself with, do those letters appear to be

10  in the same condition and fashion as you received them when you

11  received them in the mail, sir?

12  A.   Yes.

13  Q.   Now, backing up again to January 17th and January 18th

14  of 2009, who was involved in the Brink's burglary?

15  A.   Sean Murphy, Joe Morgan and myself and Damien Nassor,

16  which is David Nassor.

17  Q.   Now, David Nassor, you mean being that he actually scouted

18  the place out?

19  A.   Correct.  He didn't go with us, but he had a job to do

20  prior which involved him, so it was just us four.

21  Q.   And obtaining the cell phone jammer, Mr. Nassor?

22  A.   That is correct.  Mr. Nassor got the jammer.

23  Q.   Mr. Murphy had several discussions with you regarding who

24  was to be involved in this job, correct?

25  A.   Yes.

158

1  Q.   Do you recall any mention of anybody from Columbus?

2  A.   None at all.

3  Q.   Any Columbus connection whatsoever?

4  A.   Not at all.

5       MR. DOMINGUEZ:  May I approach, Your Honor?

6       THE COURT:  You may.

7       MR. DOMINGUEZ:  Please take a look at that,

8  Mr. Doucette.

9  Q.   (By Mr. Dominguez) Displaying for you Government's Exhibit

10  19-1, do you recognize that person?

11  A.   No, I do not.

12  Q.   Have you ever seen that person any time in your life?

13  A.   No.

14  Q.   Now, Mr. Doucette, you have talked extensively about what

15  occurred on January 17th and January 18th of 2009, what led

16  up to that event and what you did subsequent to that event, you

17  spent a lot of time talking to the ladies and gentlemen of this

18  jury.  You were actually indicted, were you not, for conspiracy

19  to transport illegal merchandise and money that had been stolen

20  in interstate commerce?

21  A.   Yes, sir.

22  Q.   And you also pled guilty to the substantive offense of the

23  interstate transportation of stolen money and merchandise?

24  A.   That is correct.

25  Q.   And that merchandise being those postal boxes and other

1   physical items that you took with you during the early morning

2   hours of January 18th of 2009 and the currency and coins that

3   you took with you on January 18th of 2009.  You pled guilty to

4   that, didn't you?

5   A.    Yes, I did.

6   Q.    And you pled guilty pursuant to a plea agreement?

7   A.    Yes, I did.

8   Q.    And with respect to the conspiracy count that is Count 1

9   of the Indictment, who did you plead guilty to conspiring with?

10  A.    Joe Morgan, Sean Murphy and Damien Nassor and myself.

11  There was four people.

12  Q.    And Damien Nassor, your understanding, was an unindicted

13  co-conspirator; is that correct?

14  A.    Yes.

15  Q.    Only if you know.  If you don't know, that's fine.

16  A.    Yes.

17  Q.    And you entered these pleas pursuant to a plea agreement

18  with the government?

19  A.    Yes.

20  Q.    And that plea agreement required you to testify before

21  these ladies and gentlemen of the jury?

22  A.    Yes.

23  Q.    And you actually testified before the Grand Jury here in

24  this Southern District of Ohio as well?

25  A.    Yes, that is correct.

1   Q.   Have you been made any promises as to what your sentence

2   is going to be?

3   A.   Yes.

4   Q.   You have been made promises as to what your sentence is

5   going to be?

6   A.   No, sorry.

7   Q.   That's all right.  But you do -- I mean, let's face it,

8   you have testified here, you do want some favorable

9   consideration for your testimony?

10   A.   Yes.

11   Q.   And who is going to decide what your ultimate sentence

12   will be?

13   A.   The Judge.

14   Q.   Judge Smith?

15   A.   Yes.

16         MR. DOMINGUEZ:  May I have a moment, Your Honor?

17         Your Honor, that would conclude my direct examination

18   of this witness.

19         THE COURT:  Thank you.  Mr. Murphy?

20         MR. MURPHY:  Thank you, Your Honor.

21                   - - -

22              CROSS-EXAMINATION

23   BY MR. MURPHY:

24   Q.   Mr. Doucette.  Mr. Doucette, are you an honest person?

25   A.   Yes.

1    Q.    Yes?

2    A.    Yes.

3    Q.    And when you took the oath to swear to tell the truth, the

4    whole truth and nothing but the truth today, is that what you

5    plan on doing?

6    A.    Yes.

7    Q.    So, everything that you testified to today is going to be

8    the truth?

9    A.    That is correct.

10   Q.    Did you speak with Sal Dominguez or Harry Trombitas prior

11   to your testimony today?

12   A.    Yes.

13   Q.    Did you go over your testimony with them?

14   A.    Yes.

15   Q.    Did Sal or Harry bring up any issues that you didn't tell

16   them or the FBI about in the past interviews or testimony?

17   A.    I was able to look at all of the paperwork, and we were

18   able to -- there wasn't any issues that were not covered.

19   Q.    In the prior statements or testimony?

20   A.    Yes.

21   Q.    So, just to cover, everything that you talked about today,

22   you talked about before?

23   A.    Yes, at one point.  Can I elaborate?

24   Q.    Yeah, if you have got any information.

25   A.    At one point or another, I had talked with people that

162

1   recorded stuff and people who didn't record stuff, so I guess

2   everything was discussed at one point in time or another.

3   Q.    Okay.  Have you read the plea agreement that you have

4   signed in this case?

5   A.    Yes.

6   Q.    You testified that you already pled guilty?

7   A.    That is correct.

8   Q.    How many paragraphs are contained in your plea agreement?

9   A.    I do not recall.

10  Q.    Are you familiar with the conditions of your plea

11  agreement?

12  A.    Not off the top of my head.  There was a lot of paperwork

13  that I have read in the past few days, and there has been a lot

14  of recall coming up to this point in time, remembering

15  everything that happened from a couple of years ago, so I don't

16  remember everything word-for-word.

17  Q.    You don't remember the conditions?

18  A.    Off the top of my head, I do not.

19  Q.    Are you familiar with the only provision in your plea

20  agreement that would void it?

21  A.    Me not to tell the truth.

22  Q.    So, if you didn't tell the truth, what is your

23  understanding of the plea agreement?

24  A.    That is correct.

25  Q.    No, I am asking you.  What is your understanding if you do

1    not tell the truth, according to your plea agreement?

2    A.    That I could be additionally charged.

3    Q.    With what?

4    A.    For perjury.

5    Q.    Do you also understand that if you lie about anything and

6    it is proven that you lie, Mr. Dominguez doesn't have to honor

7    the plea agreement?

8    A.    Yes.

9    Q.    And then I would suggest that you think long and hard when

10   you testify under oath here today about the questions that I am

11   going to ask you; do you understand that?

12   A.    Yes.

13   Q.    Even if the truth makes you look bad or hurts the

14   government's case, as long as you tell the truth, you know that

15   your deal is protected, don't you?

16   A.    That is correct.

17   Q.    Did you speak with Mr. Dominguez or Mr. Harry Trombitas

18   about Murphy digging up dirt on you?

19   A.    I had gotten a letter from you stating that you were going

20   to do that, and I didn't physically talk with them, but I

21   turned it over to my attorney.

22   Q.    So, you had no conversations?

23   A.    No, not a physical conversation between me and them.

24   Q.    Okay.  Mr. Doucette, when you left the Brink's burglary,

25   what was in the moving truck?

164

1   A.   The tools, the money, the electronics, the cutting

2   torches.

3   Q.   Now, you testified when you left there, that you went to

4   the Pennsylvania storage bin?

5   A.   Yes.

6   Q.   Did all of those items go into the Pennsylvania storage

7   bin?

8   A.   Yes, everything except for the currency.

9   Q.   So, it is your testimony that everything went in there

10   except the currency?

11   A.   Yes.

12   Q.   There was nothing else?

13   A.   There was nothing else.

14   Q.   When you went to go pick up the stuff from the

15   Pennsylvania storage bin, you put it where?

16   A.   In a bay in New Hampshire.

17   Q.   And I believe you said what?  Raymond, New Hampshire?

18   A.   I believe so.

19   Q.   Did everything that came out of the storage bin from

20   Pennsylvania go into the Raymond storage bin?

21   A.   Yes.

22   Q.   When you were putting the items in that Raymond,

23   New Hampshire storage bin, did you take anything out at that

24   time?

25   A.   On that trip, no.

1   Q.   You testified that Joe Morgan got arrested the beginning

2   of April?

3   A.   Excuse me.  That's correct.

4   Q.   Did you ever go into that Raymond storage bin before Joe

5   Morgan got arrested?

6   A.   Yes.

7   Q.   When was that?

8   A.   I'm not sure of the date, it was prior to him being

9   arrested, and me and him went up there and took out the items

10  that we wanted to dismantle.

11  Q.   And which items were those?

12  A.   That was the electronics, the racks that held the coins,

13  the clothes that we wore.  And off the top of my head, that's

14  all I recall.  There may have been another bag or two, but

15  those were the major items that we were there for, but no

16  currency was taken.  It was just all stuff that we needed to

17  get rid of.

18  Q.   And sometime after Joe Morgan got arrested, you moved the

19  items?

20  A.   After Joe got arrested, that is correct.  The items that

21  were in New Hampshire, yes.

22  Q.   Do you know how long after Joe got arrested that you moved

23  those items?

24  A.   Shortly afterwards.

25  Q.   One day, two days?

1  A.   I am not sure of an exact time, but it was shortly after.

2  I would say within a week, to be fair, because it was awhile

3  ago.

4  Q.   Within a week?

5  A.   Yeah.

6  Q.   When you moved the items because Joe got arrested, did you

7  take anything out at that point?

8  A.   Yes.

9  Q.   What did you take out?

10 A.   I took out a couple of boxes of coins.

11 Q.   And that's it?

12 A.   That was it.

13 Q.   Okay.  And then you testified that you moved it again?

14 A.   Yes.

15 Q.   Did you take anything out when you moved it again?

16 A.   No.

17 Q.   Do you remember the date that you moved it the second

18 time?

19 A.   I do not.

20 Q.   You don't?

21 A.   I do not.

22 Q.   Well, you testified that the first time you moved the

23 stuff was about a week after Joe Morgan got arrested?

24 A.   It was within a week.

25 Q.   Okay.  And then you moved it again.  How long after that

167

1  was it moved?

2  A.   I am not sure of the exact date.

3  Q.   Well, if Joe Morgan got arrested on April 8th, as it was

4  testified to, and if we went the full week, which would be

5  April 15th, what date did you tell the FBI about the second

6  -- the last storage bin?

7  A.   I am not sure of the date off the top of my head, but I

8  did move the stuff within a week of that particular date.

9  Q.   A week prior to giving it up to the FBI?

10 A.   Yes.

11 Q.   Okay.

12 A.   I just don't recall the date because there has been a lot

13 of numbers.

14 Q.   No, that's fine.  A week before you gave it to the FBI.

15       Now, my records indicate that you gave this stuff to the

16 FBI on June 4th or June 5th?

17 A.   If that's what they say, yes.

18 Q.   Okay.  And a week before that, you had moved it?

19 A.   Yes, within the week.

20 Q.   Okay.  And your testimony is that you took nothing out at

21 that time?

22 A.   That's correct.

23 Q.   Okay.  So, it is looking like from the time that you went

24 out to Pennsylvania to pick up the stuff until the time you

25 gave it to the FBI, you are saying that you took out the DVRs,

1    the clothes, the coin racks and a couple of boxes of coins?

2    A.   Correct.  And there was one or two duffel bags, also,

3    whatever might have been in those because Joe grabbed some

4    stuff, too.  So, I don't recall all of the items, but those

5    were the big items that I recall.

6    Q.   Well, you said that Joe was with you the first time?

7    A.   Right.  And we had to move the DVRs, the racks, and a

8    couple of other items.

9    Q.   Any large items, big items?  What did you go up there in?

10   A.   His Tahoe.  So, there was no big items.

11   Q.   No, big items, no heavy items?

12   A.   The racks were the heaviest.

13   Q.   Really?  Okay.  You testified to direct examination that

14   there were some sort of fences cut around Brink's?

15   A.   Yes.

16   Q.   Do you know what the fences were cut with?

17   A.   With a small pair of cutters.

18   Q.   What kind of cutters would those be?

19   A.   A hand-held item.

20   Q.   Wire cutters?

21   A.   I am not sure of the name of them, but they were the

22   hand-held size of pliers, they were cutters to cut the chain

23   length.

24   Q.   Do you remember what color they were?

25   A.   I do not recall; it was nighttime and dark out.

1   Q.   Now, in regards to the holes in the roof, you identified

2   some holes in the roof up in Brink's?

3   A.   Yes.

4   Q.   Do you have any idea what type of a tool cut those holes?

5   A.   No, I do not.

6        MR. DOMINGUEZ:  One minute, Your Honor.

7   Q.   (By Mr. Murphy) I believe you identified this item earlier

8   in your testimony? (indicating on the screen)

9   A.   Yes.

10  Q.   Do you see the cut around the roof?

11  A.   Yes.

12  Q.   What type of tool do you think that is that cut that roof?

13  A.   I'd only be guessing.

14  Q.   Okay.

15  A.   Do you want me to guess?

16  Q.   Yes.  What's your opinion?

17  A.   I would say that a drill was used to start a hole to drop

18  a saw blade in there, a Sawzall.

19  Q.   A Sawzall?

20  A.   That's just my guess.

21  Q.   Okay.  And you testified that there were several holes in

22  the roof?

23  A.   Yes.

24  Q.   Now, the government showed you some tools that you

25  identified as being a part of the cache of tools.  And I

170

1    believe they showed you a Sawzall, a battery-powered Sawzall?

2    A.    That's correct.

3    Q.    Are you familiar with that type of a tool?

4    A.    Yes.

5    Q.    Have you used them before?

6    A.    Yes.

7    Q.    Would a battery-powered Sawzall be capable of cutting four

8    holes in that type of a roof?

9    A.    I have no idea.

10   Q.    You have no idea?

11   A.    I have no idea.

12   Q.    Okay.  Now, you also testified that you observed the safe

13   door of the vault door getting burned?

14   A.    Yes.

15   Q.    And then you identified some inner substances of the door?

16   A.    Yes.

17   Q.    And what were those substances again?

18   A.    I would have to see the picture to identify them.

19   Q.    You identified them prior through direct examination from

20   the government?

21   A.    They were racks full of money.  I mean, I am not sure what

22   item you want me to identify.

23   Q.    The substance in between the vault door?

24   A.    There was wood, metal and some sort of concrete or brick.

25   Q.    And how were those items removed?

171

1   A.   With pry bars and torch.

2   Q.   Just the pry bars and torch?

3   A.   Yeah.  Can I elaborate on that?

4   Q.   Sure.

5   A.   For that time that I was there because I was doing other

6   items.  When I came over to help, that's what we were using at

7   that point in time, but I wasn't there for the whole cutting of

8   that being cut open.

9   Q.   How did you remove the wood?

10  A.   The wood was damaged from being torched, but it was

11  charred.  And we stuck a long pry bar, six feet long, and tried

12  to pry it open, or five feet, it was a long pry bar.  And we

13  were taking turns trying to chip away at it.

14  Q.   There were no other tools used that you are aware of?

15  A.   Not that I recall.

16  Q.   Do you recall seeing a plug in the Sawzall?

17  A.   I do not.

18          THE COURT:  What, Mr. Murphy?

19          MR. MURPHY:  A Sawzall, Your Honor.

20  Q.   (By Mr. Murphy) Did you have any extension cords?

21  A.   You are asking me if I had any?

22  Q.   Did you have any extension cords in the cache of tools?

23  A.   I didn't see any.

24  Q.   When you were at Brink's out in Ohio?

25  A.   Yes.

172

1   Q.   You didn't see any extension cords?

2   A.   That wasn't your question.  Yes, there was one.

3   Q.   There was?

4   A.   Yes.

5           THE COURT:  I thought you said in the car,

6   Mr. Murphy.

7           MR. MURPHY:  No.  Let me rephrase the question, Your

8   Honor.

9   Q.   (By Mr. Murphy) In the cache of tools that you brought out

10  to Pennsylvania and Brink's, did you have any extension cords

11  in that cache of tools?

12  A.   When we first originally went out there?

13  Q.   Yes.

14  A.   I do not recall.  There was a lot of tools in there.  The

15  truck was halfway filled, and there was a lot of duffel bags

16  that had different stuff in them and trash barrels that were

17  filled with different stuff.  So, I don't recall seeing one.

18  Q.   But you testified that you moved the stuff at least six

19  times?

20  A.   Yeah.

21  Q.   So, if you moved the stuff six times, you moved everything

22  individually six times?

23  A.   That's correct.  But I also didn't investigate every

24  single bag and check through it.  Every time I moved it, I was

25  moving it under rush conditions, and there was always somebody

173

1   helping me.  So, maybe I didn't grab the bag with the extension

2   cord to see it.

3   Q.   Okay.  You testified that there was a smaller safe in

4   Brink's.  I think your testimony was that there was a five-foot

5   safe?

6   A.   Yes.

7   Q.   Is that the safe (indicating on the screen) you testified

8   to?

9   A.   Yes.

10  Q.   Do you notice that the dial is cut off?

11  A.   Yes.

12  Q.   How was that dial cut off?

13  A.   I do not recall.  In one of the previous pictures it was

14  there, and in this picture it is not.

15  Q.   You saw a picture with that dial on it?

16  A.   There was a lot of pictures that I looked at.  If I could

17  review the pictures, I could rephrase that because there was

18  another picture of a safe.  If you have that, I would like to

19  see it.

20       (The witness was shown another picture) Oh, I was

21  mistaken, it was not on there.

22  Q.   You testified that you were going to use some sort of a

23  drill to get into it?

24  A.   Yes.

25  Q.   What type of drill was that, Mr. Doucette?

174

1    A.    That was a -- the magnetic drill press.

2    Q.    Can you explain to the jury what it is and what it does?

3    A.    It is portable drill press with a magnetic bottom that can

4    be used to stick to a metal, so that you can use it -- it is a

5    drill press with a wheel on it, so that you can attach a drill

6    bit to an end and drill.

7    Q.    Now, do you recall seeing a tool bag with any tools in it,

8    hand tools, a Husky tool set or anything like that?

9    A.    When is this?

10   Q.    We are talking in the cache of tools in the truck,

11   Mr. Doucette.

12   A.    Do I recall seeing?

13   Q.    Yes.

14   A.    That drill or other Husky tools?  Because I am not sure

15   that I understand your question.

16   Q.    Okay.  We'll stick with the drill, I haven't gotten to

17   that point yet.  Do you recall seeing the drill?

18   A.    Yes.

19   Q.    Okay.  Now, did you recall seeing a tool bag with a

20   general tool set in it?

21   A.    There was numerous bags with tools in them.  That name

22   doesn't ring a bell, "General".  If you are referring to that,

23   or are you referring to just tools in general?

24   Q.    No, I am referring to a tool kit.  Usually, when you get a

25   tool kit, you open it up and there is wrenches, there is

175

1    screwdrivers, there is little bits?

2    A.    I don't recall that.

3    Q.    Now, you testified that you -- you were present when the

4    tools were put in the truck to go out to Ohio?

5    A.    Yes.

6    Q.    Do you remember the date that that was?

7    A.    It was prior to us leaving, I don't know an exact date.

8    Q.    You have no idea?

9    A.    I can speculate.

10   Q.    Okay.

11   A.    But I don't want to get pinned down to a date.  So, I am

12   going to say I don't know an official date.  But if you want an

13   approximation, it was about a month.

14   Q.    A month?

15   A.    Approximately.  Maybe five weeks.

16   Q.    Five weeks?

17   A.    I mean, you are trying to narrow me down.

18   Q.    No, no, no.  I mean, listen, I am not trying to narrow you

19   down to a date.  I mean, five weeks is different from three

20   weeks which is different from two weeks which is different from

21   two months.

22   A.    It was approximately a month, give or take a week.  I

23   wasn't paying attention and writing down dates, but I know it

24   was prior to us leaving.

25              MR. MURPHY:  Your Honor, may we approach?

176

1       THE COURT:  Yes.

2                   -  -  -

3       THEREUPON, the following proceedings were held at

4   sidebar out of the hearing of the jury:

5           MR. MURPHY:  Your Honor, I would like Mr. Doucette to

6   write down a name and just brief, brief, brief information on a

7   piece -- on a little post-it card.  I mean, I am going

8   somewhere with this, I have got a good faith basis for it, but

9   I would just ask the Court for a little post-it card.

10          THE COURT:  Let him write down his name?  You mean,

11  his hand writing?

12          MR. DOMINGUEZ:  I have no objection.

13          MR. GRAEFF:  I have seen this many times before.

14          (Back in open court.)

15  Q.   (By Mr. Murphy) Mr. Doucette, were you present when the

16  Pennsylvania storage bin was rented?

17  A.   I was not.

18  Q.   So, you don't have any eyewitness testimony who was there

19  when the bin was rented?

20  A.   That is correct.  Pennsylvania, correct?

21  Q.   Yes.

22  A.   Yes.

23  Q.   Do you know when it was rented?

24  A.   I do not.

25  Q.   And do you know how long it was rented for?

1    A.    I do not.

2    Q.    And I believe your testimony was that you put this stolen

3    money and crime tools in the Pennsylvania storage bin on

4    January 18th, which would be a Sunday?

5    A.    Repeat that question one more time.

6    Q.    On what date did you put the stolen money and crime tools

7    in the Pennsylvania storage bin?

8    A.    After the building was broken into, it was on Sunday.  If

9    that's -- I am not sure of what the date is, I don't have a

10   calendar.

11   Q.    Now, on what date did you supposedly go back out west to

12   pick up the coins and tools?

13   A.    It was the following weekend.

14   Q.    The following weekend?  Would that be a Saturday or

15   Sunday?

16   A.    Yes.

17   Q.    Do you remember which day?

18   A.    I do not.  You were arrested, and me and Joe made

19   arrangements.  And I just remember it was that weekend because

20   we had left the weekend before and the following weekend in a

21   row we were on a second road trip.

22          MR. MURPHY:  May I have a moment, Your Honor?

23          THE COURT:  Yes.

24   Q.    (By Mr. Murphy) Now, did Murphy tell you to go pick up the

25   stuff out in Pennsylvania, yes or no?

178

1   A.   No.

2   Q.   Was the Pennsylvania storage bin empty when you left it?

3   A.   Yes.

4   Q.   Mr. Doucette, besides your testimony here today, do you

5   have any physical evidence that places Murphy in the state of

6   Ohio at any time?

7   A.   Physical evidence?

8   Q.   Physical evidence besides your testimony?

9   A.   I would say no.

10  Q.   You testified that you never went out to Brink's before to

11  scope the heist before you did it?

12  A.   That is correct.

13  Q.   You ever see Murphy or anyone else scoping out the Brink's

14  building in Ohio?

15  A.   Nope.

16  Q.   You testified that you did check it out on the computer,

17  though?

18  A.   Yes.

19  Q.   And whose computer did you check it out on?

20  A.   Mine.

21  Q.   Where was that?

22  A.   At my house.

23  Q.   Where is that computer now, Mr. Doucette?

24  A.   It broke and we got rid of it, and I got a new one since.

25  Q.   It broke, or you broke it?

179

1    A.    It broke.

2    Q.    Mr. Doucette, I am going to ask the Deputy Clerk to hand

3    you a pen and piece of paper.

4    A.    Okay.

5          MR. MURPHY:  You have done that?  Okay.

6    Q.    (By Mr. Murphy) I will ask you to write down something to

7    see if you recognize this information.

8    A.    Can I just request another pen?  This one is not working.

9    Q.    Okay.  Because you may or may not know this person, I

10   don't know.  Will you write down the name "Brian Hetherman"?

11   A.    Can you spell that?

12   Q.    H-E-T-H-E-R-M-A-N.  70 Leonard Street.

13   A.    Lennox?

14   Q.    Leonard.  L-E-O-N-A-R-D.

15   A.    L-E-O-N-A -- Street?

16   Q.    Yep.

17   A.    Mh-hmm.

18   Q.    Walden, Mass, 02148.  And then write zero, zero, three

19   dash --

20   A.    Just give me one second.  Go ahead.

21   Q.    Zero, zero, three, dash, six, six, dash, seven, two, five,

22   one.  Phone.  The word phone.

23   A.    That's the phone number?

24   Q.    Yeah, but the word "phone" -- 781-321-0233.

25   A.    "0233".

180

1    Q.   And then just "cell".

2    A.   Cell?

3    Q.   Yep.

4    A.   So, it is a cell phone?

5    Q.   Okay.  Lic -- L-I-C, pound sign?

6    A.   One second.  L-I-C-E, pound sign?

7    Q.   No, L-I-C, pound sign.

8    A.   Okay.

9    Q.   S-7-0-7 --

10   A.   S-7-0-7.

11   Q.   7-7?

12   A.   7-7.

13   Q.   0-5-5?

14   A.   0-5-5.  Can I repeat that?

15   Q.   S-7-0-7-7-7-0-5-5.

16   A.   Okay.

17   Q.   Mr. Doucette, are you familiar with that information?

18   A.   Yes.

19   Q.   Okay.  What information would that be?

20   A.   That would be a customer that came to the car lot.

21   Q.   A customer that came to the car lot?

22   A.   Yep.

23   Q.   You know him?

24   A.   I do not know him, but he purchased a vehicle.

25   Q.   Okay.  And do you have a fake I.D. with your picture on it

1   and someone else's information on it?

2   A.   I do not.

3   Q.   Did you ever?

4   A.   Yes, you supplied me with one.

5   Q.   Okay.  Is that the information that you had on the fake

6   I.D. that you had?

7   A.   This information?

8   Q.   Yes.

9   A.   Honestly, the I.D. has come and gone, I don't recall, but

10  I do recall "Brian Hetherman" as being you.

11  Q.   Oh, as being me?

12  A.   Yes.

13  Q.   I am asking you if you had an I.D. that said "Brian

14  Hetherman", Mr. Doucette.  It is not a hard question.  You said

15  you had one.  Tell the truth.

16          MR. DOMINGUEZ:  Excuse me.  He didn't ask him if he

17  had an I.D. in the name of Brian Hetherman, Your Honor.

18          MR. MURPHY:  Yes, I did.

19          THE COURT:  Well, let's start over.  Ask the

20  question, Mr. Murphy.

21  Q.   (By Mr. Murphy) Mr. Doucette, did you have an I.D. with

22  the name "Brian Hetherman" on it, a fake I.D.?

23  A.   I do not recall.

24  Q.   Okay.

25          MR. MURPHY:  Can someone please pass me that

182

1  information?

2  Q.   (By Mr. Murphy) I am going to show you a document.  Does

3  that look familiar?  Does that look familiar, Mr. Doucette?

4  A.   That's the information that I wrote down, but it is not my

5  handwriting.

6  Q.   It is not your handwriting?

7  A.   Nope.

8  Q.   You don't recall supplying that piece of paper for your

9  Brian Hetherman I.D.?

10 A.   No, I do not.

11 Q.   You are sure about that?

12 A.   You supplied me with an I.D. that was never used, and I

13 have no clue what information was on it.  So, honestly --

14 Q.   I'll ask the questions.

15      THE COURT:  Mr. Murphy, that was his answer.  It was

16 an unnecessary response.

17      MR. MURPHY:  What I will ask, Your Honor, if I ask a

18 question that requires a "yes" or "no" answer, I would like the

19 witness to answer "yes" or "no".

20      THE COURT:  A witness can always explain their answer

21 in this courtroom.

22      MR. MURPHY:  Okay.  Thank you.

23 Q.   (By Mr. Murphy) Mr. Doucette, did your mom pass away?

24 A.   Yes, she did.

25 Q.   When she passed away, did she have a lot of belongings?

183

1   A.   Yes.

2   Q.   Did you eventually clear out most of her belongings?

3   A.   Yes.

4   Q.   Did you need a moving truck to move her stuff?

5   A.   Yes.

6   Q.   Who did you go to for the moving truck to move your mom's

7   belongings?

8   A.   You offered me a truck and told me to pay your guys that

9   day their pay, whatever they require, and we moved.

10  Q.   And you paid me for the use of my truck, too, right?

11  A.   I don't believe so.  I think you just let me use it.

12  Q.   Where did you move them to?

13  A.   I took my mother's belongings and brought it to your

14  storage facility.

15          THE COURT:  Mr. Murphy, what does this have to do

16  with this case?

17          MR. MURPHY:  It has everything to do with this case

18  Your Honor.  If I wasn't leading somewhere, I just wouldn't ask

19  blind questions.

20          THE COURT:  All right.  Connect it up.

21          MR. MURPHY:  Yep.

22  Q.   (By Mr. Murphy) Were there other occasions when you asked

23  Murphy for the use of a moving truck?

24  A.   Yes, you always gave me a truck if I needed to.  I moved

25  my girl and when I moved from my house to my mother's house

184

1   after she passed with drivers and a truck.  I never took it on

2   my own.

3   Q.   So, when your girl moved, when your mom had to move.  Were

4   there any other times?

5   A.   My girl moved twice, to Peabede (phonetic) and then to

6   Lynn.  And then I moved from Pree (phonetic) Street to my

7   mother's, and then we moved my mother's stuff to your storage.

8   Q.   Okay.  So, you have requested the use of my truck at least

9   five times?

10  A.   Something like that.

11  Q.   How many moving trucks does Murphy own?

12  A.   I am not familiar with who is the actual owners of the

13  trucks because I have heard conflicting stories.

14  Q.   Okay.  How many trucks were at the moving company?

15  A.   The moving company?  I believe there was three.

16  Q.   Now, Mr. Doucette, just prior to the Brink's heist, did

17  you have an operational vehicle that was on the road that you

18  were driving on a daily basis?

19  A.   Yes.

20  Q.   And which vehicle would that be?

21  A.   I believe that was my Chevelle.

22  Q.   Chevelle?  Do you recall having to use Murphy's Z28

23  because you couldn't get around for a period?

24  A.   No, your car got out of the body shop from being there for

25  over a year, and you were driving other vehicles and wanted me

1   to drive it.  You put it on the road, and I drove it for a

2   couple of weeks.

3   Q.   That's what I said.  You did drive the Z28?

4   A.   Yes, it wasn't because I was vehicleless.  It was just you

5   wanted me to work the bugs out of it and drive it and see where

6   it was at.

7   Q.   This would be December and January?

8   A.   I am not sure of the time frame.

9   Q.   And it is your testimony -- so, at that time are you

10  familiar with how many vehicles Murphy had on the road in the

11  December-January time period?

12  A.   I know you had a couple of cars.  I don't know if they

13  were all on the road.  I know you were driving your Jeep at

14  that time.

15  Q.   And what other vehicle was registered and insured on the

16  road?

17  A.   The "Z" must have been if it was in that time frame.  And

18  like I said, you had a couple of other cars, so I don't know

19  what they were, their status was on registrations.  And that's

20  all based on you telling me the time frame.  I am not sure

21  because the Z28 was the furthest thing on my mind.  If you tell

22  me it was January, then I have to agree with that.  It is kind

23  of weird for me to be driving a sports car in the winter.

24  Q.   Do you remember what day that Dodge Journey was rented?

25  A.   Yes.

186

1    Q.    What day was that?

2    A.    That was the 15th.

3    Q.    And in your prior testimony, Mr. Doucette, you referred to

4    it as another vehicle?

5    A.    Yes.

6    Q.    I believe.  What did you say it was?

7    A.    I called it a Voyager because a Voyager and a Journey,

8    they are both kind of similar words, and I did get confused on

9    that.

10   Q.    And what caused you to change your mind from a Voyager to

11   a Journey?

12   A.    After I had seen one, I realized that they are two

13   different vehicles.

14   Q.    Were you present when the Dodge Journey was rented?

15   A.    Yes.

16   Q.    What vehicle did you go there in?

17   A.    I don't recall.  But it was either my car or your car

18   because I took you there.

19   Q.    Well, if I told you that it was a blue Dodge Durango,

20   would you say that I was incorrect?

21   A.    I would say that could be because you did own one of those

22   at some point in time.

23   Q.    Okay.  And you were there with who?

24   A.    With you.

25   Q.    Okay.  When we left the car lot, didn't I toss you the

187

1    keys and you drove the Dodge Journey home and I drove my

2    Durango home?

3    A.    Yes.

4    Q.    And you brought the Dodge Journey back to your house?

5    A.    That's correct.

6    Q.    And I believe your testimony was that you drove the Dodge

7    Journey out to Ohio?

8    A.    Yes.

9    Q.    You were in that vehicle alone?

10   A.    Yes.

11   Q.    And when -- do you remember the date that the Dodge

12   Journey was returned?

13   A.    I don't remember the exact date, but it was within a

14   couple of days of us returning.

15   Q.    Okay.  And who was with you when you returned it?

16   A.    You.

17   Q.    And you drove the Dodge Journey to Thrifty?

18   A.    I don't recall which vehicle that I drove, but we both

19   went there to return it.

20   Q.    Okay.  Now, on your Grand Jury testimony, you testified

21   that Murphy picked up the truck on the same week of the score?

22   A.    Yes.

23   Q.    Was it the same day you left for Ohio or was it the day

24   before?

25   A.    It was the 16th.

188

1    Q.   And what makes you not know the relationship and what

2    makes you think the number, the 16th, because you weren't

3    familiar with dates on, you know, what day you came back or

4    what day you did it, but now you are saying the 16th.  Why

5    are you saying the 16th?

6    A.   It was the day we left.

7    Q.   You are saying that was the day that you left?

8    A.   Yes.

9    Q.   Okay.  Now, you testified that you got out to the

10   Pennsylvania storage facility there, and they were having

11   problems with their gates and so they left it open?

12   A.   Yes.

13   Q.   And you said someone spoke to the Pennsylvania storage

14   facility people?

15   A.   Yes.

16   Q.   And who would that be?

17   A.   You.

18   Q.   So, they would remember that?

19   A.   What's that?

20   Q.   Then, the Pennsylvania storage people would remember that?

21   If there was face-to-face contact, then they would remember

22   that?

23   A.   It is very possible.

24   Q.   There was video recordings at the Pennsylvania storage

25   facility?

189

1   A.    Yep.

2   Q.    Okay.  So, everything that happened there would be on

3   video?

4   A.    It would be.  You relayed the message to me that the gate

5   was down.

6   Q.    But you are specifically testifying that me, Mr. Murphy,

7   spoke to people in the Pennsylvania storage facility?

8   A.    I was loading up the truck, and I believe that it was you

9   that went down there.

10  Q.    To the office?

11  A.    Yes.

12  Q.    Okay.  Now, you testified that when you were up in the

13  Raymond, New Hampshire facility and Joe Morgan had gotten

14  arrested, you decided that you would move the stuff to another

15  facility?

16  A.    That's correct.

17  Q.    What did you use to move the stuff to another facility?

18  A.    A truck.

19  Q.    What type of truck?

20  A.    A UHaul.

21  Q.    Now, this would be a second UHaul?

22  A.    Yes.  It may have been a Ryder, but it was a rented truck.

23  Q.    You don't know the difference?

24  A.    Nope, I had a friend rent it.  So, I honestly don't recall

25  what brand it was, but I had somebody get me the truck.

190

1   Q.   And which friend rented it?

2   A.   James Hennessey.

3   Q.   Okay.  And Mr. Hennessey rented the first truck for you,

4   too?

5   A.   Yes.

6   Q.   And Mr. Hennessey rented the first storage bin?

7   A.   That's correct.

8   Q.   Okay.  Now, let's get back to you moving the stuff from

9   one storage bin to another.  Who helped you move the stuff?

10  A.   Which time?  Because there was a few moves, just so I am

11  clear.

12  Q.   Well, let's start at the beginning.  From the time that

13  Joe Morgan got arrested, you moved it from one storage bin to

14  another, you just said that you rented a second truck?

15  A.   Yes.

16  Q.   Who helped you move it from the first storage bin to the

17  second storage bin?

18  A.   James Hennessey.

19  Q.   James Hennessey.  So, he helped carry the money and the

20  tools and everything else?

21  A.   Yes.

22  Q.   You do remember your testimony at the Grand Jury, don't

23  you?

24  A.   Yes.

25  Q.   Do you remember testifying that James Hennessey knew

1    nothing about the storage money, or the person who helped you

2    knew nothing about the money or nothing about the tools and you

3    just kept him in the dark?

4    A.    I did up to that point.

5    Q.    Excuse me?

6    A.    He knew nothing about the crime.  I had called him up and

7    asked for help with my mother's death to rent me a storage

8    facility.  And then when I needed help, I had asked him to help

9    me move the stuff.

10   Q.    First of all, I would like to show you this document.  Is

11   this your Grand Jury testimony?  You testified before the Grand

12   Jury on July 23rd of 2009?

13   A.    Yes.

14           MR. MURPHY:  Led the record reflect that this is his

15   Grand Jury testimony.

16           MR. DOMINGUEZ:  I gave it to you.

17   Q.    (By Mr. Murphy) Now, on Page 58 of that document,

18   Mr. Doucette, can you read starting from here (indicating on

19   the screen) coming down to here, and I will move it up a little

20   bit for you (Line 16 to 25).  Can you read that, please?

21   A.    Yep, I understand.  Did you move it into a different

22   storage facility within the storage facility or a total

23   different storage facility?  A different location was my

24   answer, a different business.

25   Q.    Keep going.

192

1    A.    And it says, and did you utilize your friend to get this?

2    And my answer was no.

3    Q.    No.  But today your testimony is different, isn't it?

4    A.    Yes, it is.

5    Q.    So that -- and that Grand Jury testimony was sworn

6    testimony?

7    A.    Yes.

8    Q.    And what else does it say?

9    A.    At this point in time, I was realized I was getting in

10   deep and was trying to get him out of trouble and myself and

11   tried to move everything out.  And I was referring to Jimmy

12   when I was talking about...

13   Q.    Okay.  Now, Mr. Doucette, since we are on this subject, I

14   was going to come back to it a little later, but now we are

15   going to go to Page 77 of your Grand Jury testimony.  Right

16   here, starting here (indicating on the screen).

17   A.    Yes.

18   Q.    What does that say, Mr. Doucette?

19   A.    Well, let me ask you a question.  Did your friend know

20   that you were taking the truck to Pennsylvania in order to pick

21   up the tools from the Brink's?  No.

22         Did your friend know that you were storing ill-gotten

23   goods in the storage facility when he rented it for you in

24   Raymond?  No -- which he didn't at that point in time.

25         When Joe got arrested and I needed to move it, I confided

1    in him and told him that I had stuff in that facility that

2    needed to be moved, and I got him into trouble.

3    Q.   This is at the end of your testimony, Mr. Doucette, where

4    you have already explained all the moves and everything else.

5    Did your friend know that you were storing ill-gotten goods, if

6    you will, in the storage facility he rented for you in Raymond,

7    New Hampshire?

8    A.   No, he didn't.

9    Q.   He helped you move the stuff out?

10   A.   The day -- I told him that day that he asked -- that I

11   asked for help.  I explained to him, opened the door and went,

12   Surprise!  I need help.  I got you in trouble by renting the

13   bay, and I need help moving the stuff to the next location, can

14   you help me?  And I didn't want to get my buddy in trouble who

15   I called up out of the blue to help me with my dead mother's

16   stuff, so I turned around and came clean with him and told him

17   that I needed to move it from "A" to "B" to get him out of

18   trouble, and that's what I did.

19       If you need it explained to you.  He didn't know.  When I

20   called up and asked for a bay and a truck from him, I asked him

21   to move the stuff from your storage facility to up there

22   because we were going to try to sell my mother's stuff at a

23   flea market.  So, I called him up -- he is a lifelong friend --

24   and asked him to rent me a truck and a facility and gave him a

25   story that we were going to use it for my mother's items.

194

1       And then the day that I decided to move it out of there, I

2   was by myself, and I asked him to get me a truck and said,

3   listen, I am in trouble, I need to move the stuff out of here

4   so that I don't get you in trouble.

5   Q.   Well, if he is helping you move the stuff, doesn't he

6   become a co-conspirator?

7   A.   I guess you could say that.

8   Q.   And he did?  He helped you move the stuff?

9   A.   Yeah.

10  Q.   Did you give him anything for it, Mr. Doucette?

11  A.   I gave him a couple of hundred dollars for helping me and

12  paying for the truck.

13  Q.   And did you take that money out of the stuff that was in

14  the storage facility?

15  A.   Nope.  I just gave him cash.  I didn't want him to have

16  any -- the only dollar that was in there that was left was coin

17  and burnt money.

18  Q.   Now, did you ever determine that that Pennsylvania storage

19  facility was unacceptable because of the video cameras on the

20  property?

21  A.   I didn't take any evaluation on the place.

22  Q.   You didn't -- did you tell Joe Morgan that finding a

23  better facility would be a better decision?

24  A.   From Pennsylvania?

25  Q.   Yeah, from Pennsylvania.

195

1   A.    After you got arrested, yes.  We went to, me and Joe went

2   to --

3   Q.    No, before that, when you went out there originally?

4   A.    My first trip?

5   Q.    Yeah.

6   A.    I didn't make any input on that at all.  We parked the car

7   down the street.  You taped up the plates and the numbers on

8   the truck, covered the license plate, and we drove up there,

9   and the gate happened to be open.

10  Q.    Did you ever go into western Ohio -- actually, no, scratch

11  that.  Did you ever go into eastern Ohio and look at any other

12  storage bin on your trip out to Pennsylvania and Ohio?

13  A.    Not that I recall.

14  Q.    Now, all the tools that went out to Pennsylvania and Ohio

15  for this burglary, who did the tools belong to?

16  A.    To you.

17  Q.    So, it is your testimony that all of the crime tools from

18  the Brink's burglary belonged to Murphy?

19  A.    That is correct.

20  Q.    Now, what proof do you have that all of the tools belonged

21  to Murphy?

22  A.    They were at your storage facility, and you were

23  orchestrating the crime, so you had control of them all.  So,

24  that puts ownership to you.  I didn't physically see receipts,

25  you buying everything, but --

196

1  Q.   Okay.  Mr. Doucette, didn't you purchase a Milwaukee

2  electro-magnetic drill with a four-and-a-half inch hog bit just

3  prior to the burglary?

4  A.   Yep.

5  Q.   You did?

6  A.   You gave me money and sent me on an errand.

7  Q.   Oh, but you --

8  A.   Continue.

9  Q.   No.  But you admit that you bought it?

10  A.   For you, yes.

11  Q.   Okay.

12  A.   You gave me the cash, we looked it up on the internet at

13  my house, and you said, go pick it up and handed me the money

14  for it.

15            THE COURT:  Excuse me.  What was the item?

16            MR. MURPHY:  It is a Milwaukee electro-magnetic

17  drill, Your Honor.

18            THE COURT:  A drill?

19            MR. MURPHY:  It is a drill.  You remember he was

20  talking about a drill that locked onto the safe and cut through

21  it?

22            THE COURT:  Got you.

23            MR. MURPHY:  Okay.

24  Q.   (By Mr. Murphy) You bring that drill to the Ohio burglary?

25  A.   Yes.

197

1   Q.   What is that (looking on the screen), Mr. Doucette?

2   A.   That looks like the style of drill that was used.

3   Q.   And those would be the two components that go with it?

4   A.   I believe so.  I don't recognize the one on the left, but

5   the one on the right.

6   Q.   That's similar to the device that you purchased just prior

7   to the burglary?

8   A.   Yeah.

9   Q.   And you testified that the safe is what it was going to be

10  used on?

11  A.   Yes.

12  Q.   Now, after the burglary, did it go into the Pennsylvania

13  storage bin?

14  A.   Yes.

15  Q.   Did it go into the Raymond storage bin?

16  A.   Yes.

17  Q.   Did you take it out of the Raymond storage bin?

18  A.   I did not.

19  Q.   Did you turn that drill over to the FBI?

20  A.   I did not.

21  Q.   So, what's your testimony of where that drill ended up?

22  A.   When I first moved the items out of the facility was from

23  where Joe Morgan and me put everything, I moved it to a place

24  in Raymond, and -- which happened to be the same town.  And

25  after me going up there a couple of weeks later when I was

198

1    working on a deal to return the stuff, I had noticed someone

2    went in the bay and there was a few items that looked like they

3    were out of place, so I turned around and moved the items down

4    a few bays, so that they were safe until I turned them into the

5    FBI.

6    Q.   So, what are you trying to say in regards to the Milwaukee

7    drill?

8    A.   If it wasn't accounted for, then somebody must have taken

9    it.

10   Q.   Somebody must have taken it?

11   A.   Yes.

12   Q.   So, you are thinking that somebody went in the bin and

13   took the drill and left?

14   A.   They took -- there was -- yes.

15   Q.   That's what you are saying?

16   A.   I'm saying that the drill and a few other items looked

17   rummaged through.  I mean, I don't know specifically if the

18   drill was taken --

19   Q.   Mr. Doucette --

20          MR. DOMINGUEZ:  Your Honor, objection.  The witness

21   can answer the question.

22          MR. MURPHY:  Okay.  Finish your answer to the

23   question.

24   A.   The bin looked like it was ruffled through.  I didn't do

25   an inventory to check to see exactly what was taken.  These

199

1   were all your items.  So, I don't know for sure exactly what

2   was what.  I noticed that it was dim -- that it was messed

3   with, so -- and I was in the process of working on a deal with

4   the FBI, so I took and moved the stuff down a few more bays so

5   that I knew it wasn't messed with.  And when I went there,

6   there was a key on the ground and -- that is what I found.

7   Q.   So, it is your testimony that since it was in Ohio, and it

8   went to Pennsylvania, and then it went to Raymond and into the

9   bins and because it wasn't there when the FBI got it, you are

10  claiming that somebody went in there and took it out?

11  A.   If that's what you are saying that it was there, yeah.

12  Q.   Mr. Doucette, what else was in that bin?

13  A.   What do you mean?

14  Q.   Was there a lot of money in that bin, Mr. Doucette?

15  A.   Yes.

16  Q.   So, if somebody was going to go in there to check out what

17  was in there, gee, I want to go in this bin, and they open it

18  up, are they going to go in and take a drill that weighs 75 or

19  80 pounds, that's, you know, nothing, or are they going to take

20  the thousands -- the hundreds of thousands of dollars that are

21  in there, Mr. Doucette?

22  A.   I can't account for other people's actions.  I did notice

23  there was some stuff missing.  I didn't count the money, but

24  there was a bag of money missing, and there was a tote missing

25  because there was a few totes, and I recall it being one shy.

200

1   So, whether they were planning to come back and get a truck --

2   you don't know if it was a couple of kids walking by -- I

3   wasn't there to see it.  Maybe they needed to go arrange for a

4   truck, and I foiled their plan.

5   Q.   So, if somebody was going to go in there and they only had

6   a car and it was a couple of kids, and they were going to take

7   something -- they are going to take a drill instead of as much

8   money as they can take at that point?

9   A.   I can't account for their actions.  I mean, it could have

10  been in the woods right next to me.  I mean, you are asking me

11  to answer questions on actions that I didn't do.  So, I can't

12  really pinpoint an answer on it.  So, I am just trying to --

13  Q.   Okay.  Let me just go here.  I know what you are trying to

14  do.  Isn't it convenient that you removed an item from storage

15  or an item from storage is missing that tied you to the Brink's

16  heist rob?  You purchased this item, didn't you?

17  A.   Yes.

18  Q.   It has a serial number on it, doesn't it?

19  A.   Yep.

20  Q.   Okay.  It could be traced back to you?

21  A.   It should be able to.

22  Q.   And now it is missing from storage before you turn it into

23  the FBI?

24  A.   Considering that I was turning all of the items over to

25  the FBI agents, I don't think that one item was going to make a

201

1   difference with the case from what you are referring to.  I

2   really don't understand your logic.

3   Q.   My logic?  My logic is that you have no explanation of

4   where it went.

5   A.   Okay.

6   Q.   You are telling us that you put it in there, and you don't

7   know where it went.  You are saying maybe somebody went in

8   there and took it, which in my view makes no sense.

9        Now, Mr. Doucette, prior to the Brink's burglary, didn't

10  you also purchase a gray RV cover?

11  A.   Yes, me and you took a ride to go get it.  I myself didn't

12  purchase it.

13  Q.   You didn't go in the building and purchase it?

14  A.   I don't recall.

15  Q.   You don't recall?  Okay.  And where did that RV cover end

16  up?

17  A.   Shredded up.  When we drove away from the building, it got

18  ran over and ripped into a bunch of pieces, so it was just

19  trash.

20  Q.   Did it go into the Pennsylvania storage bin?

21  A.   I don't recall.

22  Q.   Do you know if it went to the Raymond storage bin, do you

23  remember seeing it in the Raymond storage bin?

24  A.   I don't recall.  I am not sure if we left it right there

25  in Ohio, it was totally useless.

202

1    Q.    But you would leave evidence in Ohio, in Columbus?

2    A.    I am not sure.  There was a lot going on.  It was late at

3    night, we were up for three days straight, and it could have

4    been left there.

5    Q.    But you do admit that you purchased it, and you do admit

6    that it got thrown out or destroyed?

7    A.    I admit that me and you went to go get it, and yes, it was

8    destroyed because the truck wheels dragged it off the truck,

9    and it was shredded.  When Joe tried to drive the truck down

10   the street, it got caught up in the tires and just ripped off

11   the top of the truck, even though it was strapped on.  And a

12   24-foot box truck versus a little piece of material to cover a

13   truck, it is not going to last.

14   Q.    Now, you testified about an epoxy gun?

15   A.    Yes.

16   Q.    Did you purchase the epoxy gun?

17   A.    No, I did not.

18   Q.    You did not?

19   A.    No.

20   Q.    Do you recall seeing a grinder in the tools?

21   A.    I am going to say yes.

22   Q.    Okay.  And did the grinder go into the Pennsylvania

23   storage bin?

24   A.    I am not sure.  And once again, you are trying to pinpoint

25   me on items where there was three people moving them and

203

1   multiple bags and barrels filled with stuff.  It wasn't

2   organized, bagged and tagged where I could have seen it.  So, I

3   am going to say I don't recall seeing it.  I remember seeing a

4   grinder at one point in time.  Where did it end up?  I am not

5   sure.

6   Q.   Obviously, if the grinder was left at Brink's, it would

7   have been part of the evidence.  Do you agree?

8   A.   It could have been.  I mean, you could have carried it

9   with you on the tracks and dropped it.  I mean, I am not sure

10  what you did with it.

11  Q.   Well, where I am going with this, Mr. Doucette, is the

12  grinder that you are saying was a part of the thing, do you

13  believe that was found in the Raymond storage bin?

14  A.   I am not sure.  I didn't see an inventory of all of the

15  items that were found.

16  Q.   If I told you it wasn't there, would you disagree with me?

17  A.   I would have to say I am not sure.  If you are saying it

18  wasn't there, then we will say it is not there.

19  Q.   Now, Mr. Doucette, before you went out to do the Ohio

20  score, did you wipe down any of the tools and equipment?

21  A.   Yep.

22  Q.   Were you very thorough?

23  A.   Me, you and Joe cleaned everything up prior to loading it

24  up.  That was the night that you guys took off to bring it to

25  Pennsylvania.  And I serviced the drill -- whatever they call

204

1    that type of drill -- excuse me -- with that big drill bit,

2    36-inch around.  It has like a generator attached to it.

3    Q.    And as a part -- and as a part of the cleaning process and

4    wiping everything down, did that include cleaning all of the

5    batteries on all of the different devices?

6    A.    I personally didn't clean those items.

7    Q.    Do you remember replacing any of the batteries?

8    A.    I do not.

9    Q.    Were you wearing gloves when you wiped down all of the

10   tools and equipment?

11   A.    Yes.

12   Q.    Now, you testified that you left Lynn on what date again?

13   To go to Ohio?

14   A.    The 16th.

15   Q.    What time did you leave Lynn?

16   A.    Between 12 and two o'clock, it was early afternoon.

17   Q.    Twelve and two?

18   A.    It was early afternoon.

19   Q.    And how long did it take you to get where you were going?

20   A.    It was nightfall when we arrived at the hotel.

21   Q.    Okay.  And you don't know what time it was?

22   A.    No, I just know it was late.

23   Q.    You don't recall where this hotel was?

24   A.    I do not.  I had never been to that area.  It was

25   nighttime.  I was following a big box truck.  So, I really

205

1    wasn't paying attention.

2    Q.   Okay.  And you slept in the hotel overnight?

3    A.   Yes.

4    Q.   Now, what do you do the next morning?

5    A.   We got up and come outside to a truck that wouldn't start.

6    Q.   Okay.  Now, getting back to that hotel, who checked in the

7    hotel?

8    A.   Who checked in?

9    Q.   Yeah.

10    A.   You did.

11    Q.   And you testified earlier, was there one room or two

12    rooms?

13    A.   I said that I didn't recall.

14    Q.   You don't recall whether you slept in the room with other

15    people or --

16    A.   I do not recall.

17    Q.   Okay.  Fair enough.  Now, you testified the next morning

18    that you got up, and what did you do?

19    A.   We had to get the vehicle started.  The diesel truck would

20    not start due to the cold.

21    Q.   Okay.  What time do you get up and decide to start rolling

22    around?

23    A.   It was early morning, we wanted to get a good start,

24    before ten o'clock.

25    Q.   So, it was before ten o'clock?  And you said that you were

206

1   having problems with the truck?

2   A.   Yes.

3   Q.   And how long -- did you eventually resolve the problems

4   with the truck?

5   A.   Yes, it set us off track for an hour-and-a-half to two

6   hours, roughly.  Between running around buying a battery,

7   getting diesel additive, jumper cables, back and forth to see

8   if we could get it to work.

9   Q.   And then what do you do after you got the truck running?

10  A.   We -- me and Joe jumped in the vehicle and headed out.

11  Q.   As soon as you got the truck running, you headed out to

12  Ohio?

13  A.   That's -- no, we headed out to Pennsylvania.

14  Q.   Okay.  You headed out to Pennsylvania.

15  A.   To the storage facility first.

16  Q.   Okay.  And how far away were you from the storage

17  facility?

18  A.   I'd only be speculating, but it was a couple of hours

19  drive.

20  Q.   Two hours?

21  A.   I don't know, a couple of hours.

22  Q.   And what do you do when you got to the Pennsylvania

23  storage facility?

24  A.   We loaded the truck up.

25  Q.   And how long did it take you to do that?

207

1  A.   Maybe about an hour, but we also, prior to doing that, we

2  parked the car drown the street and then taped up the numbers

3  and the plates on the truck.  We all hopped in the truck and

4  drove up to the storage facility.

5  Q.   So, how long would it have taken you to do what you just

6  described?

7  A.   I don't know, an hour-and-a-half, maybe, an hour.  Say an

8  hour to two hours to be safe.  I wasn't clocking it, but --

9  Q.   To prep the truck?

10 A.   To prep the truck and park the car, all of us hop in the

11 truck, drive up the hill, go to the storage facility and load

12 up the truck, then drive back down, pull all of the tape off

13 the vehicle, hop in the car and continue on our road trip.

14 Q.   And do you recall how long it took you to get from the

15 storage facility to Ohio?

16 A.   It was nightfall when we showed up.  So, I am not sure of

17 the time frame.

18 Q.   Now, when you left Massachusetts to go to head out west,

19 where do you leave from?

20 A.   Where did I leave from?

21 Q.   Yeah.

22 A.   I went -- I was supposed to meet you at John's Oil.  And

23 you guys left before -- excuse me -- I was supposed to meet up

24 with you and Mr. Morgan, and you guys headed on the road before

25 me, and I was leaving my house, and I met up with you guys on

208

1    the Mass Pike.

2    Q.   You are claiming that you left from Lynn?

3    A.   I left from Lynn.

4    Q.   Okay.  What do you do prior to that day?

5    A.   What did I do prior to that day?

6    Q.   That day, prior to that day, what did you do earlier in

7    that day?  Leading up to leaving Lynn, you said between 12 and

8    one?

9    A.   Me and you went and got the truck earlier that morning.

10   Then, I went home and got ready, grabbed a couple of days

11   clothes, some food.

12   Q.   Now, are you aware that I had the opportunity to interview

13   Joseph Morgan for 200 hours in regard to this case?

14   A.   No, I am not.

15   Q.   You are not aware of that?

16   A.   200 hours?

17   Q.   200 hours.

18   A.   That's longer than it took to do the crime.

19   Q.   Now, when you left Brink's and headed back east, you

20   testified at the Grand Jury that you went to the Warrendale

21   facility and got there around one to two p.m.; is that correct?

22   A.   If that's what I testified, yes.

23   Q.   Would you like to read your Grand Jury testimony to

24   refresh your memory?

25   A.   You can put it up on the screen.

209

1          MR. MURPHY:  Just a minute, Your Honor.

2   Q.   (By Mr. Murphy) Start at the bottom of the page, right

3   here, the last question.

4          MR. DOMINGUEZ:  Reference a page.

5          MR. MURPHY:  This is Page 48 on his Grand Jury

6   testimony.

7   Q.   (By Mr. Murphy) At the bottom, the question.

8   A.   The very bottom question?

9   Q.   Yes.

10  A.   Okay.  Approximately, what time of day, if you recall,

11  Mr. Doucette, did you arrive back at the --

12  Q.   Page 49.

13  A.   -- Pennsylvania storage facility?

14      It had to be mid-afternoon.  I would say approximately one

15  to two o'clock.

16  Q.   Keep going.

17  A.   Very well.  How long did you stay at the facility loading

18  the material?

19      An hour-and-a-half, an hour.  It wasn't very long at all.

20  Q.   Well, an hour or an hour-and-a-half, that's a fairly

21  significant amount of time, wouldn't you say, right?

22  A.   Yeah.

23  Q.   So, if it was approximately between one and two o'clock,

24  if you add an hour, an hour-and-a-half to that, how much is

25  that?

210

1    A.    It would be an hour or an hour-and-a-half later.

2    Q.    Okay.  And so could we say that an average time would be

3    three o'clock?

4    A.    Okay.

5    Q.    Okay.  Then, he goes on and asks you a few other things

6    that you are doing, and then, okay, what happened after you

7    left the storage facility?  Your answer was?

8    A.    We drove back to Massachusetts.

9    Q.    Excuse me.  Page 50.  Straight through?

10   A.    Straight through.

11   Q.    Did you not spend the night out?  What was your answer?

12   A.    No night out, just stopped for fuel.

13   Q.    And now, my questioning now is going to be twofold.  We

14   are going to just finish off -- finish off this trip, and then

15   I am going to double back a little bit.

16        And he asked you what time you arrived back in

17   Massachusetts, and what did you tell him?

18   A.    It was late at night.

19   Q.    You are guessing.  Around what?

20   A.    Then, I said it was dark.  I believe with the time it gets

21   darker earlier, around six.  I would be guessing, maybe around

22   eight or nine o'clock.

23   Q.    And that's your testimony?

24   A.    That's my testimony.

25   Q.    How long does it take to get from Pennsylvania to Lynn,

211

1    Massachusetts?

2    A.    I am not sure.

3    Q.    Well --

4    A.    You know, all of these times that are on here were me

5    guestimating a time.  So, if you are trying to go by this, I am

6    not sure.  I have never physically taken that trip to give you

7    an exact time.

8    Q.    You have never physically taken that trip?

9    A.    Other than when I was following you guys and with Joe.

10   But, I mean, it is not a trip that I take regularly that I can

11   say that it is ten hours, eight hours, five hours.  So, I will

12   rephrase that.

13   Q.    Okay.  You are testifying that you got to Lynn around

14   eight or nine o'clock?

15   A.    It says I would be guessing about eight or nine.

16   Q.    Would it be earlier than that or later than that if you

17   were --

18   A.    I don't recall.

19   Q.    You don't recall?  Now, we will double back, Mr. Doucette,

20   getting back to you going back to the Pennsylvania storage

21   facility, unloading the tools.

22        Now, I want you to be honest, and I want you to tell the

23   truth because I received different information.  And since I

24   received different information, there is a discrepancy here,

25   and we need to resolve this discrepancy.

1    You are stating that you didn't spend the night out; is

2   that your testimony?

3   A.   When I did the trip with Joe, we didn't.

4   Q.   No --

5        THE COURT:  Just a minute.  Let him explain it.

6   A.   When I spent -- when me and Joe went down there, it was we

7   drove there and drove straight back.

8   Q.   No, when you were coming back from the Ohio Brink's

9   burglary, and you went and you said you dropped off the tools

10  in the Pennsylvania storage facility?

11  A.   Yes.

12  Q.   You are claiming that you came straight back to Lynn, but

13  you didn't spend the night there?

14  A.   We didn't spend the night.  The only time we stayed any

15  night out was on the way down.  On the way back, we --

16  Q.   Do you recall being in the hotel and washing the crime

17  clothes while two members of your crew went back to the Brink's

18  burglary to check things out.  Do you remember that?  Does that

19  refresh your memory a little bit now?

20  A.   Not at all.  So, you are saying we drove, stayed at a

21  hotel and then you guys drove back with no clothes on?

22  Q.   I am not saying "we guys".  I am saying two members of the

23  crew went back to Brink's and then came back and you guys

24  stayed in a hotel that next night.  You don't recall that?

25  A.   No, I do not.  That makes no sense at all.  Why would

213

1    somebody head back there after the job was done?

2           THE COURT:  Are we done with the Grand Jury

3    testimony?

4           MR. MURPHY:  Yes.  I'm sorry, Your Honor.

5    Q.   (By Mr. Murphy) I will be getting back to it later, but I

6    am just moving on.

7        Now, you testified, Mr. Doucette, when you were counting

8    the money and splitting up the money, you were at your house?

9    A.   Yes.

10   Q.   You testified that -- well, you came back later and said

11   that Mr. Nassor was there?

12   A.   On the second night.  The first night that we arrived back

13   it was late.  And me, you and Joe sat at my table for no more

14   than two hours, and we were beat from being up for the

15   longevity that we were up, so we called it quits.  The second

16   day Mr. Nassor showed up.

17   Q.   And was Mr. Nassor there while any of the money was being

18   split up or divvied up?

19   A.   Yes.

20   Q.   And did Mr. Nassor receive a portion of the money that

21   day?

22   A.   I am going to say yes.

23   Q.   And did Mr. Nassor do anything else?

24   A.   I don't recall.  We sat at my kitchen table.  I was

25   running up and down stairs washing, and everybody was

214

1    straightening out the money and counting it.

2    Q.    How were you counting the money?

3    A.    How were we counting it?

4    Q.    Yeah.

5    A.    We had to unravel it because when it gets dried up, it was

6    all rolled and crunched up, and we held it flat, and we counted

7    money.

8    Q.    Using what?

9    A.    Using our hands.

10   Q.    Anything else?

11   A.    At one point -- the first night, we used our hands.  At

12   one point in time we used a counting machine.

13   Q.    A what?

14   A.    A counting machine.

15   Q.    What was that?

16   A.    That's a money counter.

17   Q.    And where did you get that?

18   A.    That was from inside the Brink's building.

19   Q.    Really?  Well, in your earlier testimony, you said that

20   the only thing that you took back was the -- I believe it was

21   the U.S. currency?  Where did the money counter come from?

22   A.    That's a good question.

23   Q.    You don't have an answer for it, do you, Mr. Doucette?

24   A.    Well, let me try to give you an answer for it.

25   Q.    The jury wants to hear it, too.

1   A.    I know at one point in time we had a money counter, so it

2   must have been brought back with the money.

3   Q.    It must have?

4   A.    Yes.

5   Q.    Oh.

6   A.    I didn't drive the car that the money was in, so -- now

7   that I recall, I do remember having a money machine at the

8   house, and I know it came from that facility, so --

9   Q.    And what happened to that money machine?

10  A.    That got destroyed with the DVRs.

11  Q.    And who destroyed it?

12  A.    Me.

13  Q.    Did Murphy tell you to destroy it?

14  A.    You weren't around, no.

15  Q.    Now, on this first day of counting money, you guys were

16  splitting up the money?

17  A.    Yes.

18  Q.    And did you get a share?

19  A.    Yes.

20  Q.    Did Morgan get a share?

21  A.    Yes.

22  Q.    Who else got a share?

23  A.    You got a share, and you put a share aside for David

24  Nassor.

25  Q.    And are you claiming now that on that day of counting

216

1 money, that Murphy left your house with money?

2 A.   Well, I am not sure what you did with it, whether you gave

3 it to Joe or left with it.  We had just been up for a couple of

4 hours -- or days straight, so I really wasn't paying attention

5 to what you did with your money.

6 Q.   But you mentioned something about, you don't know if I

7 gave it to Joe?

8 A.   Correct.

9 Q.   Why would you say that?

10 A.   Because I don't know.  I can't say for sure if you took it

11 or you gave it to him, or did you give it to somebody else.

12 Q.   Now, was there another day that you are counting money?

13 A.   We counted money every day up until the police raided your

14 house, all four of us.

15 Q.   And on the second day of counting money, did you get a

16 share?

17 A.   Yes.

18 Q.   Did Morgan get a share?

19 A.   Yes.

20 Q.   And did anyone else get a share?

21 A.   Yes.

22 Q.   Who would that be?

23 A.   David Nassor and yourself.

24 Q.   And are you claiming on the second day of money that I

25 left your house with a share of the money?

217

1   A.   I don't know what you did with it.  I do know you did give

2   Joe some money, but whether you gave it to him every day or all

3   of it, I wasn't paying attention to what you were doing.

4   Q.   Oh, now, you are saying what?  That I gave money to Joe?

5   A.   At one point in time, yes.

6   Q.   Oh.  How much money did you get from the Brink's burglary?

7   A.   I don't recall.  I believe it was about 40,000 roughly.

8   Q.   40,000?  Now, do you remember your conversations with

9   Special Agent Costello?

10  A.   Vaguely.

11  Q.   Do you remember talking about the splitting up of the

12  money and what you thought was here and there?  What your

13  version of who got what and where the money went?

14  A.   As far as our percentage?

15  Q.   Yeah.

16  A.   Yes.

17  Q.   Do you remember your conversations with Mr. Costello

18  regarding an alleged share for Mr. Murphy.  Do you remember

19  talking to him about that?

20  A.   I don't recall.

21  Q.   You don't recall?  Do you recall telling Special Agent

22  Costello that you gave some money to go to Murphy's daughter?

23  Do you remember that conversation?

24  A.   I don't recall.  I mean, that was a couple of years ago,

25  Sean.

218

1   Q.   Well, you are remembering everything pretty good?

2   A.   Well, there is a lot that has transpired in between that,

3   so some of the details...

4   Q.   Did you, in fact, tell Special Agent Costello that you had

5   some of Murphy's money and that you ended up giving it to

6   Murphy's daughter or somehow getting it to Murphy's daughter?

7   Did you tell that to Agent Costello?

8   A.   I don't recall.

9   Q.   So, that didn't happen?  What's your testimony?

10  A.   I don't recall.  I would have to see it.

11  Q.   No, I am asking you what actually happened now.  I am not

12  asking you what you told Agent Costello, I am asking you, did

13  that happen?  Did you have some of Murphy's money that you

14  allegedly gave to Murphy's daughter, yes or no?

15  A.   I don't recall.  You just asked me the same question

16  twice.

17  Q.   I understand that.

18  A.   I don't recall.

19          THE COURT:  Well, look, that's the answer,

20  Mr. Murphy.

21          MR. MURPHY:  I understand, Your Honor.  Can I have a

22  minute, please?

23  Q.   (By Mr. Murphy) Now, you testified that you got $40,000

24  from the Brink's burglary.  Did you give that money back to the

25  FBI?

219

1   A.   No, I didn't.

2   Q.   Why not?

3   A.   Because it was spent at that point in time.

4   Q.   What did you spend it on?

5   A.   I blew it.

6   Q.   What did you buy?

7   A.   Various things.  I gave money to my girl.  I helped her

8   set up her house, paid a bunch of bills.

9   Q.   Anything else?

10  A.   That's all I recall spending it on.

11  Q.   Now, wasn't there a bunch of paper money that was burned?

12  A.   Yes.

13  Q.   Now, did you -- you testified that you separated the money

14  from the burnt money?

15  A.   Yes.

16  Q.   How much burnt money would you say that there was?

17  A.   I have no clue because we actually burnt a lot of it in my

18  fireplace with all of the bands and any paperwork that came

19  from that place.  So, there was some money that we just totally

20  disregarded that was burnt more than "X" amount of percentage,

21  so for anything that was definitely unsalvageable.  So, the

22  stuff that we thought we could use, we kept aside.

23  Q.   Now, do you recall telling Joe Morgan that there must have

24  been 100 grand in burned fifties alone and gave him something

25  like -- a sign like this (indicating with his hands)?  Do you

220

1   remember that statement?

2   A.   No.

3   Q.   Do you remember Joe Morgan saying that there was --

4        MR. DOMINGUEZ:  Objection.

5        THE COURT:  That would be hearsay.

6        MR. MURPHY:  Okay.

7   Q.   (By Mr. Murphy) How much coin was stolen from Brink's?

8   A.   It was -- we guesstimated 370, $370,000.

9   Q.   Three-seventy?

10        THE COURT:  What did you say?

11        THE WITNESS:  Right around $370,000.

12        THE COURT:  Three-seventy.

13   Q.   (By Mr. Murphy) Did you count the money?  Did you count

14   the boxes of coin?

15   A.   You counted them.

16   Q.   Okay, and if you say so.  Did you come up with a number?

17   A.   I know it was shy of 400, it was right around that area,

18   370, 360 or 380.  I didn't physically count them.  A bunch of

19   boxes broke open, so it was hard to get a physical exact

20   amount, but we speculated what the amount was in the boxes

21   versus the amounts that was in the totes.

22   Q.   And did you take any of the coin for yourself?

23   A.   Yes.

24   Q.   Did anybody else that was involved in this burglary take

25   any of the coin?

221

1    A.   No.

2    Q.   And how much coin did you take for yourself?

3    A.   I took a couple of boxes of fifty cent pieces, whatever

4    that equaled out to.  I think I took five boxes.

5    Q.   So, how much money would you say, total, was stolen from

6    Brink's?

7    A.   I wouldn't be able to speculate because a lot of it was

8    damaged.

9    Q.   Well, including the damage and everything.  What would you

10    say -- let me ask this question.  How much usable money was

11    taken from Brink's, excluding the coin, how much money?

12    A.   I am not sure.

13    Q.   You testified that you counted it?

14    A.   I counted up the amounts that we split up.

15    Q.   Right.  So, how much are you saying?

16    A.   I am not sure, I got 40 grand, give or take a couple of

17    thousand.

18    Q.   So, what would you say the total amount was?

19    A.   I don't know.  You want me to do the math in my head?  You

20    took 5 percent for Damien.  You took your 50 percent.  I am not

21    sure.  What does that add up to?

22    Q.   Well, you said your cut was 40,000 and that was 20

23    percent.  So, there would be four other $40,000s, right?

24    A.   And 5 percent for Damien.

25    Q.   Okay.  If that added up to 200,000, 5 percent of that

1    would be 10,000?

2    A.    Something like that.

3    Q.    So, you are saying that there was $210,000 taken from

4    Brink's?

5    A.    You are --

6    Q.    Besides the coin?

7    A.    You are saying that, but...

8    Q.    No, I am asking you.

9    A.    I am not sure because I wasn't exactly $40,000.  And the

10   money came in different denominations every couple of days.

11   Q.    So, was it a lot more than that?

12   A.    It was right in that ballpark.

13         MR. MURPHY:  May I have a minute, Your Honor?

14   Q.    (By Mr. Murphy) I will show you a document that was

15   prepared by Brink's in regards to this case, okay?

16   A.    Mh-hmm.

17   Q.    At the top, it is "Columbus BO6 Robbery, 1-17-09, the Paid

18   Losses."  Right here, that's what Brink's had to pay out for

19   their losses.

20   A.    Okay.

21   Q.    And see where it says, "Randolph" coin down below?

22   A.    Okay.

23   Q.    Even -- I am assuming that that's the coin that came from

24   the New Hampshire storage facility, that's the amount?

25   A.    Okay.

223

1   Q.   So, that's done.  And right below that, see where it says

2   "Fed Reconstruction"?

3   A.   Okay.

4   Q.   I would believe that would be the burnt money that was

5   counted that was partially burned that they credited, okay?

6   A.   Okay.

7   Q.   And down below it says net loss.  So, taking into

8   consideration all of the recoveries that they had, Brink's is

9   saying that there is $853,441.40 missing.  How do you account

10   for that, Mr. Doucette?

11   A.   Like I said, we burnt a lot of the money that was damaged,

12   and I have no -- and when that bay got broken into, I don't

13   know what was taken.  I know for a fact that there was a bag of

14   money taken, that was the first thing I noticed.  There was

15   only two bags of burnt cash.  When I opened the bay, that's the

16   first thing that I noticed.

17   Q.   Okay.  So, you are saying that one of the bags had -- you

18   are claiming that initially there was $200,000 that was usable.

19   So, if we take $200,000 off of that, that leaves $653,000.  You

20   are saying, give or take $50,000, there was $600,000 that was

21   taken out of that bin, Mr. Doucette?

22   A.   No, I am saying that we burnt a lot of it that was

23   unusable, and there was money that was burnt inside the safe

24   that could have been not accounted for.

25   Q.   You are speculating, aren't you?

224

1    A.    Well, you are speculating, too.

2    Q.    No, I am talking facts here, Mr. Doucette.  I am talking

3    that Brink's says that there is $853,000 left, and you have

4    accounted for 200,000.  And you are missing all kinds of money.

5    And now you are saying that there was a bag of money missing

6    out of the storage bin and a drill that you bought that they,

7    that the thieves must have took, too.  I mean, where is all of

8    this money, Mr. Doucette?

9    A.    We burnt a lot of it at my house, don't you remember?  We

10   burnt all of the money bands, all of the paperwork, and there

11   was a lot of money that was damaged.  We just grabbed what we

12   could and ran.  We didn't try to sit there and separate.  And

13   when we got to my house, there was a lot of damaged money.

14   Q.    But at your house, you are claiming that they were

15   counting all of the time, that they weren't burning money.  You

16   said that you were washing money and that you were counting

17   money?

18   A.    And I had the fireplace going three feet behind us in the

19   kitchen.  You were sitting there.  You don't remember sweating?

20   I mean, it is a small room, and we had a fire roaring in there.

21   Q.    So, it is your testimony that you don't know where the

22   missing $600,000-plus dollars is?  Is that your testimony?

23   A.    If you want to put words in my mouth.

24   Q.    I am asking you.  I am not putting words in your mouth, I

25   am asking you, you don't know where it is?

225

1   A.   I don't know where it is.

2   Q.   Okay.  Now, you said that your $40,000, that you blew it.

3   Did the FBI ask you to give that money back?

4   A.   Nope.

5   Q.   They never did?

6   A.   It was gone.  When I approached them, it was already gone.

7   Q.   And they never questioned you about it or asked you

8   anything about it?

9   A.   I told them that it was gone, that I blew it.

10  Q.   Okay.  Oh, they just asked you where it was?

11  A.   Yes.

12  Q.   And once you told them that you blew it, that was the end

13  of the questioning?

14  A.   Correct.

15  Q.   Okay.  When your mom died, did she have a life insurance

16  policy?

17  A.   Yes.

18  Q.   And how much was that policy for?

19  A.   She had numerous policies for just under $300,000.

20  Q.   $300,000.  Did you receive the money?

21  A.   Yes, in different -- one check for $50,000 and another one

22  for 30 and one for 80 and whatever the denominations were, I

23  don't recall them off the top of my head, but the total was

24  just shy of 300.

25  Q.   And when you did that, did you pay off your mom's debts?

226

1   A.    We paid off what we could.

2   Q.    Which ones would those be?

3   A.    I don't recall.  I had an estate lawyer handle that.

4   Q.    Did you pay off her credit cards?

5   A.    Honestly, I had the estate lawyer handle it.  He paid off

6   some debts, but I don't recall which ones or if all or if any.

7   Q.    Now, you testified that you didn't give back your cut of

8   the paper stolen money, correct?

9   A.    Yep.

10  Q.    But you had the ability to pay it back, though, didn't

11  you?  Correct?

12  A.    It is possible.

13  Q.    You just testified that you had $300,000 from your

14  mother's policy?

15  A.    Yeah, it came in, in the course of over a year, and she

16  died eight months earlier, and I had had the money prior.

17  Q.    And from the time that she died until the time that you

18  actually stole the money, you spent that $300,000?

19  A.    I don't know.  I mean, I don't know the time frame from

20  when my mother died.  I don't see the relevance of this.

21  Q.    Well, I am asking you a question, Mr. Doucette.  You are

22  on the witness stand, and you are being examined under oath.  I

23  am asking you that at the time that the FBI asked you about

24  your money?

25  A.    Yep.

227

1    Q.   Did you have a substantial amount of money from your

2  mother's estate still?

3   A.   No.  And I gave a retainer to my lawyer, and I gave him

4  every penny that I had, so I had no money.

5    Q.   How much did it cost you for your lawyer?

6   A.   The bill is still going, so there is no set amount.

7    Q.   How much have you paid him so far?

8   A.   I give them 100 -- I believe it was just shy of 150 and

9  that included my -- the estate with my mother because when we

10 did this crime, it was my mother's death was coming up on a

11 year, and you only have a certain amount of time in dealing

12 with closing out all of those issues. So, by the time that I

13 approached and got all of these things together, the lawyer

14 only had a month to get those items together. And I had this

15 case going on, so there was a lot going on.

16    Q.   So, between your mother's estate and your criminal case,

17 it cost you $150,000?

18   A.   Right around there.

19    Q.   And this was a plea? And you pled guilty?

20   A.   I am not as smart as you, so, yes.

21    Q.   And so out of that 150, you are still talking that there

22 is still another 150,000 from your mother's estate, and you

23 blew all of that, too?

24   A.   Yep. I was supporting a house, and yes, I did. I put a

25 new electrical system in the house.

228

1    Q.   We will get to that.

2          THE COURT:  We are going to break in about five or

3    ten minutes.

4          MR. MURPHY:  Whenever you are ready, Your Honor.

5          THE COURT:  Pardon me?

6          MR. MURPHY:  Whenever you are ready.  I still have

7    got a ways to go.

8          THE COURT:  What I want you to do is, tomorrow, try

9    to get some paperclips and pinpoint any Grand Jury testimony

10   and so forth, so you can get to it.

11         MR. MURPHY:  What I plan on doing, Your Honor, is I

12   have a whole list here of the pages that I am referencing.  I

13   have made the list from going through the Jencks material, and

14   at the end of the Grand Jury -- I mean, at the end of the

15   testimony, I will move to enter the Grand Jury minutes as an

16   exhibit.  At the end of the testimony.

17         THE COURT:  Okay.  How much more time are you going

18   to need to cross-examine Mr. Doucette?

19         MR. MURPHY:  I would say an hour-and-a-half or two

20   hours.

21         THE COURT:  Okay.  Well, let's finish right now.  Are

22   you in the middle of a thought or anything?

23         MR. MURPHY:  No.

24         THE COURT:  Will that mess you up any?

25         MR. MURPHY:  Nope, I have changed topics.

229

1          THE COURT:  Okay.  Ladies and gentlemen, do not

2     discuss this case with each other or anyone else during the

3     course of the trial.  This includes the attorneys or anyone

4     involved in the case.  Report any violation to Court personnel.

5          Do not form or express an opinion on the case until

6     deliberations.  Do not make any investigations or perform any

7     experiments or do any reading or research on the case.  And

8     that is stay off of the computers.

9          Do not discuss the case with your family or friends

10    until you are discharged by the Court.  Do not observe any

11    media reports, newspapers, TV or radio reports.  And when you

12    come back tomorrow, wear your Juror badges at all times.  And

13    thank you very much for your kind attention.

14                              –  –  –

15        THEREUPON, the trial was adjourned for the evening recess.

16                              –  –  –

17

18

19

20

21

22

23

24

25

230

1

2                         C E R T I F I C A T E

3    United States of America

4    Southern District of Ohio

5            We, Georgina L. Wells and Denise N. Errett, Official

6    Court Reporters of the United States District Court for the

7    Southern District of Ohio, do hereby certify that the foregoing

8    229 pages constitute a true and correct transcription of our

9    stenographic notes taken of the proceedings held in the City of

10   Columbus, Ohio, in the matter therein stated, on the 19th day

11   of October, 2011.

12           In testimony whereof, we hereunto set our hands on

13   the 23rd day of March, 2011.

14

15

16                              /s/ Georgina L. Wells

17                              _____

18                              Georgina L. Wells, RMR
                                Official Court Reporter
                                Southern District of Ohio
19

20                              /s/ Denise N. Errett, FCRR

21                              _____

22                              Denise N. Errett, FCRR
                                Official Court Reporter
                                Southern District of Ohio
23

24

25