UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

UNITED STATES OF AMERICA,      )
                               )      CASE NUMBER
          PLAINTIFF,      )      2:11-CR-10(1)
     VS.                        )
                               )      COLUMBUS, OHIO
SEAN D. MURPHY,                )      OCTOBER 20, 2011
                               )
          DEFENDANT.      )
_____

**VOLUME 4**
**TRANSCRIPT OF THE JURY TRIAL PROCEEDINGS**
BEFORE THE HONORABLE GEORGE C. SMITH
UNITED STATES DISTRICT JUDGE AND A JURY

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF:          SALVADOR DOMINGUEZ, AUSA
                            HEATHER HILL, AUSA

FOR THE DEFENDANT:          SEAN MURPHY, PRO SE
                            DAVID GRAEFF, STAND-BY COUNSEL

GEORGINA L. WELLS & DENISE N. ERRETT
OFFICIAL FEDERAL COURT REPORTERS
(614) 719-3225

I–N–D–E–X

VOLUME 4 – OCTOBER 20, 2011

WITNESSES:                                                    PAGE NO.

ROBERT DOUCETTE    –  Cont. Cross-Ex. by Mr. Murphy..    10
                   –  Redirect Ex. by Mr. Dominguez..   113
                   –  Recross-Ex. by Mr. Murphy......   116

GREGORY TOMASICH   –  Direct Ex. by Mr. Dominguez....   119
                   –  Cross-Ex. by Mr. Murphy........   127

SUZANNE McALISTER  –  Direct Ex. by Mr. Dominguez....   132
                   –  Cross-Ex. by Mr. Murphy........   142
                   –  Redirect Ex. by Mr. Dominguez..   148

JASON COSTELLO     –  Direct Ex. by Ms. Hill.........   158

– – –

1              Thursday Morning Session

2                  October 20, 2011

3                      9:35 a.m.

4                        - - -

5    IN OPEN COURT:

6              THE COURT:  I understand there is a matter that Mr.

7    Murphy wants to bring up on some -- regarding some testimony

8    yesterday.

9              MR. MURPHY:  Yes, sir, Your Honor.

10             THE COURT:  Okay.  Let me get my book open here.

11             MR. MURPHY:  Yes, Your Honor.

12             Yesterday, Robert Doucette made reference to my

13   arrest on three or four different occasions during his

14   testimony.  All of the reasonings for his mentioning of the

15   arrest were beyond the scope of what the Court specifically

16   authorized in limiting that reference to it.

17             Why Mr. Doucette and Morgan went out to Pennsylvania

18   to pick up the tools, that was what the government requested

19   Mr. Doucette, allow him to say what caused him to do what he

20   did, was that my arrest caused them to go out to Pennsylvania

21   to pick up the tools.  But the three or four instances that Mr.

22   Doucette referenced my arrest were well after that, when he was

23   back to Lynn and when he went up to -- things that he did up in

24   Raymond, New Hampshire.  He kept saying that, because you got

25   arrested, because you got arrested.  And that's beyond the

1   scope, and I would look for the limiting instruction that I

2   suggested to the Court earlier when we argued this, Your Honor,

3   which basically said Mr. Murphy was arrested on January 23rd

4   and for fake I.D. violations; and, one month later, those

5   charges were dropped, dismissed.

6           That's the limiting instruction I would be

7   requesting, Your Honor.

8           THE COURT:  Mr. Dominguez?

9           MR. DOMINGUEZ:  Well, Your Honor, I think the record

10  will reflect, frankly, in my direct examination of Mr.

11  Doucette, I steered completely clear of his arrest, if you'll

12  recall.  It was never mentioned once, at all.  It was in

13  response to Mr. Murphy's constant questions that Mr. Doucette

14  referenced his arrest in response to his question as to why he

15  did what he did.

16          Ever since Day One when I responded to the Defense's

17  motion in this regard, I suggested to the Court that the Court

18  could give a limiting instruction at the close of the evidence

19  or at the end of Mr. Doucette's testimony that there has been

20  mention of an arrest but you are to attach no significance to

21  it whatsoever.

22          I think getting into details about what it was for

23  and that it was dismissed, that's not relevant to this

24  proceeding.  So, while I do not object to a limiting

25  instruction, I believe getting into detail about the background

1    of it is not necessary in this matter.

2         THE COURT:  Well, what you're saying is an

3    instruction telling them not to read anything into an arrest,

4    as an arrest is merely --

5         MR. DOMINGUEZ:  That's absolutely correct.

6         THE COURT:  I shouldn't say "merely," but is a

7    notification to an individual that they have been -- they've

8    been charged with something.

9         MR. MURPHY:  Well, Your Honor, I would suggest to the

10   Court that in the tense that Mr. Doucette said it and in the

11   time frame that he was talking about indicated that I was

12   incarcerated, because we were -- when he was answering, you

13   know, he was quite upset, and he was spitting stuff out because

14   the Court allows him to speak freely and fully.  He was talking

15   about a time which is a month after I was arrested.  And he's

16   saying, I did that because you were arrested, which indicated,

17   in that tense, that I was incarcerated.

18        And, you know, as I said before, the only reason that

19   the Court allowed the arrest in was because of, the day that I

20   got arrested, they went up to Pennsylvania to get the stuff.

21   And you ruled that my arrest caused them to do that.  The

22   subsequent references later on are beyond the scope.

23        THE COURT:  Well, this was as -- this was brought

24   out -- your questioning of the witness --

25        MR. MURPHY:  Yeah.

1          THE COURT:  -- caused these answers to be made.  And

2    I can't control what the answers are to your questions.  And if

3    those are reasons why they did things, I can't change that.  We

4    can't change what the people are testifying to --

5          MR. MURPHY:  No.  I understand that.

6          THE COURT:  -- unless it's, you know, he's made --

7    but I will give a limiting instruction as to references to

8    arrests.

9          MR. MURPHY:  Well, we have --

10          THE COURT:  But I'm not going to get into, you know,

11    going into, you know, statements that were made here or there

12    or what have you.  The testimony is over and -- over and done

13    with, as far as that's concerned.

14          You also have an ability to give final argument --

15          MR. MURPHY:  Yes.

16          THE COURT:  -- and say that yourself.  That can be --

17          MR. MURPHY:  Okay.

18          THE COURT:  That's the part of the thing, the part of

19    what you're allowed to do in final argument.

20          MR. MURPHY:  Thank you, Your Honor.

21          THE COURT:  Okay.

22          MR. MURPHY:  Just note my objection for the record

23    and --

24          THE COURT:  All right.  That's fine.

25          MR. MURPHY:  Yeah.

1          THE COURT:  And I believe I'll give the instruction,

2     limiting instruction, on arrests in my final instructions.

3     That's right before they deliberate, and that will mean more

4     then than it will now.

5          MR. MURPHY:  Thank you, Your Honor.

6          THE COURT:  Okay.  Are we ready?

7          MR. MURPHY:  We have one more issue, Your Honor.  I'm

8     looking to strike some testimony from the record from

9     yesterday.

10         THE COURT:  Well, you should have moved at the time.

11         MR. MURPHY:  I understand that, Your Honor.  I

12     just -- my mind was in a different set of -- I mean, I could

13     get on the record.  And if --

14         THE COURT:  Put it on the record.

15         MR. MURPHY:  Okay.  Yesterday, when I was

16     cross-examining Mr. Doucette, I had made reference to, on

17     January 18th, when he was in Pennsylvania, I made reference

18     that he may have stayed in a hotel overnight on January 17th.

19     And I asked him a couple of questions in regards to that.

20         When I -- when I went and checked my records last

21     night and checked my notes, I realized that they were

22     incomplete, and I wasn't sure of whether it was January 18th or

23     the next weekend when Mr. Doucette and Mr. Morgan went back.

24     And because my notes were incomplete and I want to be clear, I

25     want to withdraw that line of questioning from the record as

1   being, you know, stricken from the record.

2           THE COURT:  Well, that's not the way it works.

3           MR. MURPHY:  Okay.

4           THE COURT:  But you can bring it up again with him --

5   I'll allow you to do that -- and get it straightened out.

6           MR. MURPHY:  Okay.  That's what I plan to do, but --

7           THE COURT:  Because, frankly, my impression of what

8   you're talking about of when you stayed, when you didn't,

9   became very confusing.  So it wouldn't hurt your case to try to

10  straighten that out.

11          MR. MURPHY:  I'll do it.

12          THE COURT:  I will allow you to go into that.

13          MR. MURPHY:  It will be my first line of questioning,

14  Your Honor.

15          THE COURT:  Okay.  Is that it?

16          MR. MURPHY:  Yes.

17          MR. DOMINGUEZ:  I have just one matter, Your Honor,

18  just briefly.

19          THE COURT:  Oh, certainly.

20          MR. DOMINGUEZ:  We have entered into certain

21  stipulations.  I just want to put on the record that the

22  defense has agreed to stipulate to the admissibility of the DNA

23  results and the fingerprint results pertaining to Mr. Murphy.

24  And I'm going to read those stipulations into the record, that

25  stipulation into the record, in addition to the stipulations

1 that were reached yesterday following Mr. Doucette's testimony.

2         THE COURT: Okay.

3         MR. DOMINGUEZ: But I want to make sure for the

4 record that the defense agrees to the stipulation as to the

5 fingerprints and the DNA so we can release our witness in that

6 regard.

7         MR. MURPHY: Yes, Your Honor. So stipulated.

8         THE COURT: You are aware of what he's talking about,

9 Mr. Murphy?

10         MR. MURPHY: Yes, Your Honor.

11         THE COURT: Okay.

12         MR. MURPHY: The analyst that would testify to the

13 authenticity of the DNA and the fingerprints.

14         THE COURT: All right.

15         MR. DOMINGUEZ: Thank you, Your Honor.

16         THE COURT: That's fine.

17         Did you have something else? Was there an after-

18 thought there?

19         MR. MURPHY: I would just ask, in regards to this

20 strickening from the record, I would ask that I be allowed to

21 bring it up in closing arguments, too, Your Honor.

22         THE COURT: Yes.

23         MR. MURPHY: Thank you.

24         THE COURT: But it's got to be about something that's

25 in the record.

1          MR. MURPHY:  Yes.

2          THE COURT:  Call the jury.

3          CSO:  Your Honor, the witness is taking a comfort

4    break first.  Should I wait?

5          THE COURT:  No.  No.  Just bring the jury in.

6          CSO:  Okay.

7          (Whereupon, at 9:50 a.m., the Jury was seated in the

8    courtroom, and Witness Robert Doucette resumed the witness

9    stand.)

10          THE COURT:  Good morning.

11          JURORS:  Good morning.

12          THE COURT:  We're getting closer to 9:30.

13          You may proceed.

14          MR. MURPHY:  Thank you, Your Honor.

15                        - - -

16                    ROBERT DOUCETTE,

17    HAVING BEEN PREVIOUSLY DULY SWORN, FURTHER TESTIFIED AS

18    FOLLOWS:

19                        - - -

20              CONTINUED CROSS-EXAMINATION

21    BY MR. MURPHY:

22    Q.   Good morning, Mr. Doucette.

23    A.   Good morning.

24    Q.   Do you remember, yesterday, I had asked you a few

25    questions in regards to whether you had stayed in a hotel on

1   Sunday, January 18th.  Do you recall that?

2   A.    Yes.

3   Q.    And I asked you a couple of follow-up questions, if you

4   recalled, a couple things.

5   A.    Yes.

6   Q.    Well, last night, when I went home and checked my records

7   and checked my notes, I realized that my notes were incomplete.

8   And I couldn't determine whether it was Sunday, January 18th,

9   or the week following when yourself and Mr. Morgan went back to

10   Pennsylvania to pick up the stuff that you said you picked up.

11   So, because I wasn't complete, I am going to withdraw that line

12   of questioning from the record, so you're clear, and I would

13   ask the Judge to so note it.

14         THE COURT:  Well, that's fine.  You made --

15         MR. MURPHY:  Okay.

16         THE COURT:  You made reference to that.  It's still

17   on the record, of course.

18         MR. MURPHY:  Okay.  Okay.  I just -- I withdraw that

19   line of questioning in regards to you staying in a hotel on

20   January 18th, Sunday night.

21   BY MR. MURPHY:

22   Q.    Mr. Doucette, you testified that when you got back from

23   Ohio with your crew and you dropped off the rental truck over

24   by the moving company and you took the Dodge Journey and you

25   went to your house -- is that true?

1   A.   Yes.

2   Q.   And the Dodge Journey went in your yard?

3   A.   Yes.

4   Q.   And you said that you went in that night, which would be

5   Sunday night, January 18th?

6   A.   Yes.

7   Q.   And you did some counting?

8   A.   That is correct.

9   Q.   And when you were done counting, you made reference and

10   you said that you took the money and you put it inside the

11   Dodge Journey?

12   A.   You took the money and put it in there.

13   Q.   Okay.

14   A.   The money was put in the vehicle, and you left with the

15   keys.

16   Q.   Okay.  So your testimony is that Mr. Murphy left with the

17   keys?

18   A.   That is correct.

19   Q.   Okay.  And, the next day, did somebody come back and count

20   again?

21   A.   Yes.

22   Q.   And what happened that next day?

23   A.   We slept late, because we were up for three days straight,

24   pretty close to it.  And I would say mid-aft- -- probably

25   closer to dinnertime, four or five o'clock at night, we started

1  counting.

2  Q.    Counting again the next day?

3  A.    Yes.

4  Q.    Okay.  And when did that counting end?  Now, we're on

5  Monday.

6  A.    A few hours.  I'm not sure of the exact time.

7  Q.    Okay.  And just a few hours?

8  A.    Yeah.

9  Q.    Okay.  And what happened at the end of that day?

10  A.    The money was taken and put back into the rental car, and

11  everybody left, and it was locked up, and you left with the

12  keys.

13  Q.    And the rental car stayed in your yard again?

14  A.    The rental car stayed in my yard again.

15  Q.    What happened the next day?

16  A.    I believe the same procedure.

17  Q.    Okay.  Somebody showed up at your house, unlocked the

18  Journey, took the money out?

19  A.    Yes.

20  Q.    Went in your house, counted it, separated it to do

21  whatever you did?

22  A.    (Nodding affirmatively.)

23  Q.    And then, when they were done, again it went in the

24  Journey in your yard?

25  A.    Yes.

1   Q.   And locked up for the night?

2   A.   Yes.

3   Q.   Okay.  Now we're coming up to the fourth day.  What

4   occurred on that fourth day?

5   A.   I believe that was the day that the truck showed up to --

6   that you and Damien showed up with the truck to clean it.  And

7   we cleaned up the truck.  And you guys went to return it.  And

8   then we came back -- when you guys came back, we all -- me,

9   you, Joe -- resumed our counting.

10  Q.   Okay.  Now, that would be Thursday.  Now we're coming

11  up -- and it's the same procedure on Thursday night; would you

12  say?

13  A.   I'm going to say I'm not sure which day, now, that -- the

14  truck got returned on that day; but, the car rental, I'm not

15  sure if we returned it on that day or the following day.

16  Q.   Okay.  So the car would be rented then -- the car rental

17  would be going back around that time?

18  A.   Yes, within a day or two.

19  Q.   Okay.  So you just testified that, from the time you got

20  back from Ohio, that Journey stayed in your yard the whole

21  time?

22  A.   That's correct.

23  Q.   Okay.  Thank you, Mr. Doucette.

24       I'm going to show you a document here, Mr. Doucette.  It's

25  kind of small.  But right in this area right here (indicating),

1  can you see how many miles that car was driven?

2  A.   I'm having a hard time making that out.  Can you show it

3  to me, or bring it way in?

4  Q.   Can somebody --

5         MR. GRAEFF:  May I approach?

6         THE COURT:  Yes.

7         (Whereupon, Mr. Graeff hands the document to the

8  witness.)

9  BY MR. MURPHY:

10  A.   According to the calculations on this paper, it says 2,245

11  miles.

12  Q.   Twenty-two hundred and forty-five miles.

13         THE COURT:  Which vehicle is this?

14         MR. MURPHY:  This would be the Journey, Your Honor,

15  the sedan rental car.

16  BY MR. MURPHY:

17  Q.   Now, Mr. Doucette, I'm going to show you the Budget rental

18  truck.  Okay?  Under "Odometer," how many miles does it say

19  that Budget rental truck was driven?

20  A.   Just shy of 1800.

21  Q.   Okay.  We have a difference of like -- let me do my

22  math -- there's a difference of 452 miles.

23  A.   Okay.

24  Q.   Now, that appears, to me, to be approximately seven hours,

25  plus, of driving.  Would you agree?

1   A.    Approximately.

2   Q.    Seven hours.  And would you agree that the distance

3   between the Pennsylvania storage facility and the Brink's in

4   Ohio is three-and-a-half hours?

5   A.    I'd only be guessing.  I mean, once again, I was on a -- I

6   was up for almost a hundred hours straight.  So, I mean, I know

7   it was a few hours.  So I'm not sure on the exact time on that.

8   That's not a trip that I take regularly.

9   Q.    Is that extra mileage consistent with the Dodge Journey

10  going back to Columbus from the storage facility and then

11  driving back?

12  A.    That would only be -- that would only be speculation.  I

13  mean, you had the keys to the vehicle while it was sitting in

14  my driveway every night.  You could have came and took it.

15  Q.    You just testified that it was there all night.

16  A.    I know, but I was up for a hundred hours straight.  When I

17  was sleeping, I was sleeping.  And you had the keys.  So I

18  wasn't out driving it.

19  Q.    Mr. Doucette, we have a discrepancy here of 452 miles,

20  which would probably equal out to the trip from Pennsylvania,

21  back to Ohio, and back to Pennsylvania.  We have an extra seven

22  hours on that car.  So that sets your trip back seven hours,

23  doesn't it?

24  A.    No.

25  Q.    No?

1  A.   You're speculating.  So, I mean, you're throwing -- you're

2  throwing ideas around.

3  Q.   I'm asking you to account for the extra 452 miles.

4  A.   Considering you had possession of the keys, I think you

5  should be asking yourself.

6  Q.   Oh, really?

7  A.   Yes.

8  Q.   Mr. Doucette, you testified that the car stayed in your

9  yard with the money in it in the car.  That's why I asked that

10  line of questioning of you first, made you testify to what

11  actually happened.  Now that I'm asking you for the extra

12  miles, you don't have an answer.  And you're trying to put it

13  on me, like you have this whole crime.  I --

14         THE COURT:  Calm down.

15         THE WITNESS:  I can't account for when I'm sleeping.

16  Like I said, I was up for a hundred hours straight.  And when I

17  got home, the next three or four days, I was sleeping as much

18  as I could.  And I was definitely in a deep, heavy sleep.  I'd

19  done something I'd never done before, and I was totally

20  exhausted, asphyxiated from smoke.

21         And, yes, I was -- when I got out of that building

22  and climbed out, my body wanted to collapse.  And then we had

23  to drive home that whole distance.  And when I got home, I was

24  ready to fall into a coma for a week straight.

25         So, yeah, someone could have came; and, unless there

1   was a fire in my house, I wouldn't have woke up.

2   BY MR. MURPHY:

3   Q.   So, if someone came and -- you're saying that someone came

4   into your yard and drove that Dodge Journey an extra 452 miles?

5   A.   I'm just saying I can't account for the extra miles,

6   considering that you had the keys.  So you have to ask

7   yourself.  I mean, maybe you came and took it.  Maybe you let

8   someone borrow it.  I can't account for that.

9   Q.   With all the money in it in your yard?

10  A.   I mean, if you do wrong, I can't account for your actions.

11  Q.   Okay.  Now, do you recall Special Agent Costello asking

12  you about this extra mileage?

13  A.   I do not recall.

14  Q.   You do not recall?

15  A.   No.

16  Q.   You do not recall telling Special Agent Costello that

17  Murphy drove the car around during the day and put these extra

18  miles on it?

19  A.   I don't recall saying that.

20  Q.   If I showed you his grand jury testimony, would it refresh

21  your memory?

22  A.   Absolutely.

23         MR. DOMINGUEZ:  Objection, Your Honor.  It's not his

24  testimony.

25         THE COURT:  Sustained.

1     MR. MURPHY:  May I have a minute, Your Honor?

2     THE COURT:  Yes.

3     (Whereupon, there was a brief interruption.)

4  BY MR. MURPHY:

5  Q.   So is it your testimony, Mr. Doucette, that you're still

6  saying that you came home on January 18th, on that Sunday?

7  A.   If that was the date.  I just don't have a calendar to

8  confirm that date.  It was Sunday night.

9     THE COURT:  Was it a Sunday?

10     THE WITNESS:  It was Sunday.

11  BY MR. MURPHY:

12  Q.   And, just one more time, do you recall having a

13  conversation with Special Agent Costello?

14  A.   I do, but I don't recall the piece of the conversation

15  that you just mentioned.  No.  That was quite some time ago.

16  Q.   When you were first approached by authorities regarding

17  the Brink's burglary, did you make any type of statement?

18  A.   Yes.

19  Q.   What did you tell them?

20  A.   I told them that I wasn't involved.

21  Q.   And was that a lie?

22  A.   Yes, it was.

23  Q.   Now, did Special Agent Costello ask you why Murphy wrote

24  you a bunch of checks?

25  A.   Yes.

1    Q.    And what did you tell him?

2    A.    That you lent me some money.

3    Q.    That's what you told him:  You told him that he lent you

4    some money?

5    A.    Yes.

6    Q.    Was that the truth?

7    A.    Yes.

8    Q.    That was the truth?

9    A.    Yes.

10   Q.    Did you tell Special Agent Costello that the reason why

11   Murphy wrote you those checks was because you worked for him?

12   A.    No.  I don't recall saying that.

13   Q.    You don't recall saying that?

14   A.    I never worked for you.

15   Q.    Oh, I understand that.  I just asked you what you told

16   Special Agent Costello.

17   A.    I don't recall saying that.  I recall saying that you lent

18   me the money.

19   Q.    On that first interview, did Special Agent Costello tell

20   you who he got the information from about regarding the Brink's

21   burglary?  Did he mention somebody's name?

22            THE COURT:  The what burglary?

23            MR. MURPHY:  The Brink's.

24            THE COURT:  Oh, Brink's.  Okay.

25            THE WITNESS:  If I recall, I believe he said Joe

1   Morgan.

2   BY MR. MURPHY:

3   Q.   He said he got his information from Joe Morgan?

4   A.   That is correct, when he first approached me at my house.

5   Q.   Did he mention Mr. Nassor's name at all?

6   A.   No.

7   Q.   Never mentioned Mr. Nassor's name?

8   A.   No.

9   Q.   Did he mention Mr. Murphy's name?

10  A.   In relation to the crime, yes.

11  Q.   Okay.  Did Special Agent Costello ever tell you that he

12  wanted Murphy, and not you?

13  A.   I don't recall him saying that.

14  Q.   Now, in regards to the items that were up in the Raymond,

15  New Hampshire, storage bin, did you get charged with receiving

16  stolen property for the items in that bin?

17  A.   No, I didn't.

18  Q.   Were you charged with possession of burglarious tools for

19  the items in that bin?

20  A.   No, I wasn't.  I didn't think there would be any charges,

21  considering I turned it all over voluntarily, but --

22  Q.   That makes no difference with the law.

23  A.   Okay.

24  Q.   Did you tell Special Agent Costello, or any of the FBI or

25  law enforcement that questioned you, that James Hennessey

1 (phonetic) helped you move the stuff?

2 A.    No, I didn't.

3 Q.    You didn't tell them?

4 A.    Nope.  I told them that he had rented a bay for me and a

5 truck for me to go get the stuff.

6 Q.    Did Special Agent Costello, or any other law enforcement,

7 ask you how you moved it from one site to the next site?  Did

8 he ask you that?

9 A.    Yes.

10 Q.    And what was your answer?

11 A.    I moved it by myself.

12 Q.    All that equipment?

13 A.    Yes.

14 Q.    The big 400-pound hydraulic pumper and all that stuff?

15 A.    It was on wheels, but, yes.

16 Q.    So you wheeled it across town?

17 A.    No.  I had -- I had Jim Hennessey help me, and I corrected

18 myself yesterday and stated that.  He helped me move it, when

19 Joe got arrested, from his site, because Jim was a life-long

20 friend, and I had asked him for help, that I needed help with

21 my mother's stuff.  And I didn't tell him the truth.

22      And when Joe got arrested, I started panicking that I

23 involved one of my friends in a crime that had nothing to do

24 with it, and I went up and told him what I did.  And I opened

25 the bay, and he seen what was there for the first time.  And I

1 said, Let's get it out of here and get you not involved.

2     And I brought it to a new bay. And then I went and

3 worked out a deal with returning the stuff.

4 Q. And you didn't tell the authorities about James Hennessey?

5 A. I did tell them about him, but I didn't tell them that he

6 knew about it.

7 Q. So you withheld that information?

8 A. Yes, I did. He didn't know about it until the day I

9 dumped it on him and opened the bay door and said, Shazam!

10 Look at what I did to you. And I said: I will get you out of

11 this.

12 Q. No. I'm just --

13 A. Just, I'm making it correct so you understand the --

14 Q. You answered my question. You said you withheld the

15 information from the authorities.

16 A. Yep.

17 Q. And whose idea was it to go back to the Ohio,

18 Pennsylvania, where the coins and tools were stored?

19 A. It was Joe's idea.

20 Q. It was Joe's idea?

21 A. Yes.

22 Q. And who drove out to the facility?

23 A. I did. I had Jimmy rent me the truck. And I went and

24 picked up Joe. And we went and picked it up.

25 Q. Okay.

1    A.    He tried to get a truck and didn't have any luck.  So I

2    said -- I called Jimmy and asked him if he could get me a

3    truck.  After a half a day of Joe trying to get one, he had no

4    luck.

5    Q.    Who drove in the Pennsylvania storage facility?

6    A.    I'm going to say it was me, from what I recall.

7    Q.    Okay.  Did you use the code to get in?

8    A.    I don't recall.

9    Q.    You don't recall.  Well, do you recall whether the

10   punch-in code is on the driver's side or on the passenger's

11   side when you're pulling into a facility?

12   A.    I don't recall.

13   Q.    Mr. Doucette, did you rent a storage bin in Lynn?

14   A.    No, I did not.

15   Q.    You did not rent a storage bin in Lynn?

16   A.    Not that I recall, not that had anything to do with this

17   stuff.

18   Q.    At the U-Haul facility on the Lynnway?

19   A.    Yes.  That was Joe Morgan that rented that.

20   Q.    Joe Morgan rented it?

21   A.    Yes.

22   Q.    Do you know which name Joe Morgan rented it under?

23   A.    Nope.  He went into the office and handled the business

24   and walked out.

25   Q.    Now, what date was that?

1   A.   I don't recall the exact date, but it was shortly after

2   our trip.

3   Q.   You don't remember the date?

4   A.   I don't remember the exact date.  I do not.

5        THE COURT:  Excuse me, Mr. Murphy.  What -- you're

6   referring to a rental facility in Lynn?

7        MR. MURPHY:  Yes, Your Honor.

8        THE COURT:  Is that a different place than we've been

9   talking about?

10       MR. MURPHY:  It's a completely different place.

11       THE COURT:  Okay.  What was the name of it?

12       MR. MURPHY:  I believe it's called U-Haul Storage,

13  Your Honor.

14       THE COURT:  U-Haul?

15       MR. MURPHY:  U-Haul Storage.

16       THE COURT:  Okay.

17  BY MR. MURPHY:

18  Q.   What did you put in that Lynn storage bin, Mr. Doucette?

19  A.   Like I described yesterday, the electronics, the racks;

20  and Joe had grabbed a couple of bags out of the storage in

21  Raymond.

22  Q.   And they went in there, too?

23  A.   Everything went in there.  Basically, everything that we

24  put in there was stuff that we were going to get rid of,

25  meaning destroy.

1  Q.   Did you tell the FBI about the Lynn storage bin?

2  A.   I don't recall.

3  Q.   You don't recall?

4  A.   I don't recall.  I believe I did.  I told them we

5  destroyed everything.  So, I'm going to say I don't recall if

6  they even asked that question.

7  Q.   Well, I mean, you were debriefed.  You came, and you're

8  giving up all this information to the FBI.  You're telling them

9  all these stories.  And you're taking items from the Raymond

10 storage bin and moving them down to another storage bin.

11      Don't you think it would be important, from someone

12 cooperating, to tell them, Oh, by the way, we rented this Lynn

13 storage bin, and we put this, this, this in it?  Don't you

14 think that's important?

15 A.   I would think so.

16 Q.   And it's your testimony today that you didn't tell the FBI

17 about this Lynn storage bin?

18 A.   I just said I don't recall.  You're putting words in my

19 mouth.

20 Q.   I'm asking you.

21 A.   And I say I don't recall.  I mean, how much more blunt can

22 I be?

23 Q.   I don't know.  It seems like you're having memory loss

24 today, Mr. Doucette.

25 A.   On some items, I do.  I mean, it was a few years ago, and

1  it was a tragic event in my life.  And when I went through

2  everything -- I mean, these stories that I've told the FBI were

3  a couple of years ago.

4  Q.  Mr. Doucette, let's go back to yesterday's testimony.  You

5  gave a detailed description of this crime:  This guy did this.

6  This guy gave this instruction.  He did this.  He did this.  He

7  did this.

8       You were right on the money, telling these people, you

9  know, this is what you witnessed or what you did.  And, now, a

10 couple weeks later, you don't remember nothin'?

11 A.  It's not that I don't remember nothin'.  It's just, out of

12 the whole details of the crime, every little incident that was

13 involved was not to my recollection.  The big blunt of it and

14 all the information that mattered -- how we got there, how we

15 did it, how you orchestrated it -- that was pretty simple.

16      When you're asking me about a drill, if it was left on the

17 left side or the right side, to me, you're picking me apart on

18 stuff that doesn't really matter.

19 Q.  Doesn't really matter?  I'm asking you about storage

20 facilities where you put things in and what you told the

21 police.  And --

22 A.  I said I don't recall on that, if I told the FBI that.  I

23 told them that I dismantled everything and got rid of it.  I

24 forget if I told them if Joe rented a bay or not.  And I don't

25 want to guess.

1   Q.   Again, what happened -- what was in that bin, again?

2   A.   The electronics, the racks that held the change, and a

3   couple of duffel bags.

4   Q.   When did you take them out of the Lynn storage bin?

5   A.   We took them out in pieces.

6   Q.   So you went in there several times?

7   A.   Yes, because we had to get our torch, and we took the

8   racks back to the house, torched them up.  And then we brought

9   some of the electronics over, dismantled them.  And it was a

10  process, because there was a lot of equipment.

11  Q.   Did Murphy instruct you to do that?

12  A.   Nope.

13  Q.   Okay.  Now, you testified that the video recording units

14  were in that facility?

15  A.   Yes.

16  Q.   Those are a key piece of evidence; wouldn't you think?

17  A.   I would think everything I had was a key piece of

18  evidence.

19  Q.   Okay.  Mr. Doucette, would the video have established who

20  was with you the night that you robbed Brink's?

21  A.   Probably not.

22  Q.   Probably not?

23  A.   Because we hopped up on the trailer.  You smashed the

24  camera down.  They probably had a three-second picture of a guy

25  in a mask.  So I would say probably not.  And we didn't take

1  our masks off until we had all the electronics loaded up into

2  the van.  The truck.  Excuse me.  Once everything was

3  dismantled and we knew all the wiring was down, then we took

4  off our stuff.

5  Q.   Well, if I was all dressed in black and you were all

6  dressed in black and there was a camera recording, would

7  someone be able to make out the difference between you and me?

8  A.   At nighttime?  It would be kind of tough.

9  Q.   What about inside the building?

10  A.   Inside the building?  It's possible.  Depends on lighting

11  and depends on different scenarios.

12  Q.   And you destroyed this evidence?

13  A.   Yes.

14  Q.   Did Murphy tell you to destroy the video units?

15  A.   No, he didn't, not when I dismantled them, but you did --

16  instructed me to take them apart inside of the building.

17  Q.   I'm talking when you got back to Lynn when you took them

18  out of the storage --

19  A.   You gave me two different orders:  one on the crime scene,

20  and one you didn't give me.

21  Q.   Okay.

22  A.   So I'm just clarifying that, --

23  Q.   Okay.

24  A.   -- because you're trying to ask me tricky questions, and I

25  just want to make sure I answer properly.

1  Q.   So, just so we're clear, you rented a moving truck in

2  someone else's name to move stolen goods.  You rented storage

3  bins, to put stuff in, rented under somebody else's name.  You

4  had exclusive access to those bins.  And you destroyed

5  evidence.  You withheld evidence.  Is that all true?

6  A.   I didn't have exclusive.  Joe had keys to the facility,

7  and myself.  So me and Joe had access to -- to -- to

8  everything.

9  Q.   Well, you said that you moved it twice after Joe got

10 arrested.

11 A.   You didn't specify which area.

12      When you got arrested, me and Joe went and picked up the

13 stuff, so that we're clarified on this.

14 Q.   Okay.

15 A.   Then we brought it to New Hampshire.  Me and Joe unloaded

16 everything.  We both left with a key.

17 Q.   Okay.

18 A.   And then, from there, when Joe got arrested, I moved the

19 stuff.

20 Q.   And then you moved it again?

21 A.   And then I moved it again, because it looked like the

22 place was tampered with.

23 Q.   And, the last two storage bins, you had exclusive access

24 to?

25 A.   That is correct.

1     Can I add to that?  There was -- I told you someone went

2  in the other facility.  That's why I removed it into the second

3  bay.  I found a key.  I'd went up to the bay to put the burnt

4  money in so that I could turn it over.  And there was -- I

5  noticed someone had went in the bay.  So, when I wandered up

6  there, there was a key on the ground; and that's when I moved

7  it to the other bay.  And that was within a couple of days of

8  me turning the stuff over to the FBI.

9  Q.   Right.  And that's when you said that that's when somebody

10  probably went in there and stole the --

11  A.   Right.  Exclusive -- I just want to clarify that, that it

12  appeared to me that somebody went in the bay.

13  Q.   Okay.  And you had a key to that bay?

14  A.   Yes.

15  Q.   And there was an extra key?

16  A.   Yes.

17  Q.   And you said you dropped the key on the ground?

18  A.   I assume I did.  I was in a rush, moving that stuff.  And

19  I, most likely, dropped it on the ground.

20  Q.   Okay.  And when you came back, the key was still on the

21  ground?

22  A.   Yes.

23  Q.   It wasn't moved?

24  A.   It was bent, and it was rusty.  So -- that was the

25  condition that I found it in.

1    THE COURT:  And it was what?  Rocky?

2    THE WITNESS:  Excuse me?

3    THE COURT:  Bent and what?  What was -- you said the

4  key was bent?

5    THE WITNESS:  Rusty.

6    THE COURT:  Rusty?

7    THE WITNESS:  Rusty from being weathered.

8    THE COURT:  Oh, okay.

9  BY MR. MURPHY:

10  Q.   And when I was asking you about that, the Milwaukee

11  electromagnetic drill and the unaccounted for $600,000 and the

12  grinder, that's what you said:  You said someone went in the

13  bin, and that's who probably took it, right?

14  A.   I said that we had burnt money at my house, which we had

15  no way of counting how much was burnt, because we burnt the

16  money bands.  And all the receipts that we found and any

17  paperwork that was involved from the Brink's, we burnt that in

18  my fireplace in my kitchen while we were counting, is what I

19  said.  And if someone did go in the bay and take something, I

20  have no clue how much they took.

21       And, on top of that, we washed a lot of the money in my

22  washing machine.  So we don't know how much got destroyed in

23  there, also.  So a combination of all of it, that's where it

24  went.

25  Q.   Money being destroyed in a washing machine?

1  A.   Yes.  Money is not designed to be washed through a washing

2  machine.

3  Q.   Isn't it made of cloth and paper?

4  A.   I'm not a chemist.  I don't know how that's all made.

5  Q.   Well, --

6  A.   I mean, the money was destroyed, and we tried to salvage

7  it.  I'm not a professional.  It's not like I've washed money

8  in the past to say.

9  Q.   Okay.  Now, can you describe to the jury, again, what type

10  of clothing you were wearing the night of the burglary?

11  A.   I was wearing thermals, which was a one-piece suit.  And

12  we had on our regular clothes and white clothes underneath, on

13  top of those, and a jumpsuit, a black jumpsuit with a black

14  hood, a mask covering our face.

15  Q.   Was everybody wearing the same thing?

16  A.   Very similar.  Your instructions were to wear white

17  clothes underneath and to wear the galoshes, which I didn't

18  mention a minute ago, and the masks.  In case we got chased, we

19  could peel off the mask and the black suit, and we would have

20  light-colored clothes underneath to -- if anybody was chasing

21  us, it would be harder for them to say it was us, because they

22  would be looking for people wearing dark clothes, not

23  light-colored clothes.

24  Q.   You seem to be remembering this very well, Mr. Doucette.

25  A.   There is some things that, you know, were very clear.

1  Q.   And some things that are just gone?

2  A.   There was a lot of things that happened.

3  Q.   Okay.  The clothes made it to the Raymond storage

4  facility?

5  A.   Yes.

6  Q.   And you stated that you took the clothes out.  You took

7  the clothes out?

8  A.   I didn't state that.  You just did.

9  Q.   I'm asking you, did you take the clothes out of the

10 facility?

11 A.   They may have went to Lynn with some of the bags that were

12 taken back to the Lynn facility.  Everything that went to Lynn

13 was to be destroyed.

14 Q.   And why would you destroy the clothes, Mr. Doucette?

15 A.   We were to destroy everything.  That was what Joe wanted

16 to do:  get rid of the stuff that wasn't salvageable, that we

17 could use.

18 Q.   Well, the clothes would have DNA on them; wouldn't they?

19 A.   Yep.

20 Q.   And they would establish who wore those clothes?

21 A.   Most likely.  I mean, they were -- we were wearing

22 multiple layers.  So -- I don't know.  I'm not a DNA person to

23 tell you that.  I mean, we wore rubber galoshes and a big black

24 suit over other clothes.  I mean, that's the way that it was.

25 Q.   I'm just trying to get it straight for the jury that, you

1   know, the two things that would establish who committed this

2   crime, the video of the crime that Brink's had with these DVR

3   recorders and the clothes that have the DNA on them that would

4   establish who wore them, you got rid of those?

5   A.   Yes.  Me and Joe got rid of all that stuff.

6   Q.   Mr. Nassor testified before you.  And Mr. Nassor testified

7   that --

8           MR. DOMINGUEZ:  Objection, Your Honor.

9           MR. MURPHY:  May I have a minute, Your Honor?

10          THE COURT:  Yes.

11          (Whereupon, there was a brief interruption.)

12  BY MR. MURPHY:

13  Q.   Mr. Doucette, are you aware that the crime clothes stay

14  with the tools and that they're reused for future crimes?

15  A.   No, I'm not.  That's the first time that I've ever done

16  anything like that.  So I'm not aware of the procedures.

17  Q.   Okay.

18  A.   But thank you for informing me.

19  Q.   Oh, okay.  Are you aware that Joseph Morgan had been

20  involved in many crimes?

21  A.   Not that I'm aware of, not many.  There was only one that

22  I was aware of.

23  Q.   Okay.  Now, in your dealings with the FBI or Mr.

24  Dominguez, did they ever tell you that, if you cooperated, they

25  would keep you out of jail?

1   A.   No, they didn't.

2   Q.   And do you remember the date that the FBI first came and

3   spoke to you?

4   A.   The date?

5   Q.   The date.

6   A.   I don't recall the date.  It was when Joe got arrested.

7   Q.   It would be that day?

8   A.   It was that afternoon.

9   Q.   Okay.  So, if I told you that it was April 8th, would that

10  recollect your memory?

11  A.   If that was the date that that went down.  Do you have any

12  evidence of that, because I'm just going to agree with you?

13  Q.   Okay.  And --

14          THE COURT:  What year are we talking about?

15          MR. MURPHY:  Two Thousand and Nine, Your Honor.

16          THE COURT:  Okay.

17  BY MR. MURPHY:

18  Q.   And when did you decide to cooperate with the FBI?

19  A.   Shortly after that.

20  Q.   A week?

21  A.   No.  It was a little longer.  It was a process.  I had to

22  get a lawyer.  And there was a little bit of deliberating going

23  on.  I'm not sure of the exact time, but it was shortly after.

24  Q.   Now, if you're going to cooperate and the FBI comes and

25  sees you on April 8th and, a short time thereafter, you're

1  saying, I'm going to get ahold of them and cooperate, why are

2  you moving all these tools around and taking stuff out?  Why

3  are you doing it?

4  A.   When Joe got arrested, I moved all the tools.  I was

5  panicking.  You were in jail, Joe was in jail, and I was the

6  last person on the street.  I've never done nothing of this

7  magnitude, and I was scared shit.  So I moved all the stuff to

8  protect myself.  And then I went and got a lawyer and did the

9  right thing, turned it over and owned up to my actions.

10            MR. MURPHY:  Your Honor, may I have a minute, please,

11  one second?

12            THE COURT:  Yeah.

13            (Whereupon, there was a brief interruption.)

14            MR. MURPHY:  Your Honor, may we approach the bench?

15            THE COURT:  Yes.

16            (Whereupon, a discussion was held at the bench

17  between the Court, Counsel, and Mr. Murphy as follows:)

18  AT THE BENCH:

19            THE COURT:  Mr. Murphy?

20            MR. MURPHY:  Your Honor, Mr. Doucette was exclusively

21  instructed not to say anything about Mr. Murphy being in jail.

22  It is highly prejudicial to this jury.  I don't know if a

23  curative instruction is going to correct it.

24            MR. DOMINGUEZ:  Your Honor, Mr. Murphy -- I told him

25  that, based on his questions of this witness -- he's going --

1          MR. MURPHY:  No.

2          MR. DOMINGUEZ:  -- over and over and over the same

3     things.  He's asked this witness why he did what he did, and

4     Mr. Doucette was honest in his response.

5          MR. MURPHY:  No.

6          THE COURT:  He explained why he did it, and that was

7     one of the reasons why he did it.  So your question elicited

8     that response from him.

9          MR. MURPHY:  Please note on the record for my

10    objection that Mr. --

11         THE COURT:  It's on the record.

12         MR. MURPHY:  -- the fact that Mr. Doucette was

13    instructed not to bring it up and that this is a highly

14    prejudicial statement.

15         THE COURT:  And the Court's ruling is that your

16    question elicited the answer.

17         MR. DOMINGUEZ:  And we have no objection, Your Honor,

18    at the appropriate time, when you give the final instructions,

19    to do another limiting instruction.

20         MR. GRAEFF:  You could have a limiting instruction

21    right now.

22         MR. MURPHY:  Yeah.  I could have a limiting

23    instruction right now.

24         MR. GRAEFF:  Testimony revealed that Mr. Murphy was

25    in jail at the time.  Period.

1          MR. MURPHY:  That Mr. Doucette just testified to.

2          MR. GRAEFF:  You are to consider -- you are not to

3    consider this in any fashion.  You are not to consider this in

4    any fashion regarding --

5          THE COURT:  Regarding his guilt?

6          MR. GRAEFF:  No, regarding --

7          MR. DOMINGUEZ:  Any issue pertinent to this case.

8          MR. GRAEFF:  Yeah, there you go:  regarding any issue

9    pertinent to this case.

10          MR. MURPHY:  And, Your Honor, we have another issue

11   coming up right now on my next line of questioning.  I would

12   like to issue Mr. Doucette a warning, because there is --

13          THE COURT:  You would like to --

14          MR. MURPHY:  -- issue him a warning in regards to his

15   testimony coming up now, because the line of questioning that

16   I'm going to ask is after -- after this initial thing happened,

17   Mr. Doucette went into my warehouse and took things out in a

18   larcenous form.  And I want to give -- and I haven't pressed

19   charges against him yet.  I've been holding off.  I've been

20   waiting for this matter to come.  But if Mr. Doucette is

21   willing to tell the truth about what happened, I will give him,

22   actually, an assurance, on the record, that I will not press

23   charges against him if he tells the truth.

24          THE COURT:  Mr. Murphy, if you're talking about

25   pressing charges about him going in there --

1    MR. MURPHY:  And stealing.

2    THE COURT:  -- with burglary tools --

3    MR. MURPHY:  No.  No.  No.  No.  No.  No.  This is my

4  moving warehouse.

5    THE COURT:  -- do you realize you might be admitting

6  your own guilt?

7    MR. MURPHY:  Your Honor, you're missing the point.

8  My moving warehouse, he went in there and stole personal things

9  from me.  This is in Lynn, my business.

10    LAW CLERK:  Is this relevant to these crimes?

11    MR. DOMINGUEZ:  How is that relevant to this

12  proceeding?

13    LAW CLERK:  It's not.

14    MR. MURPHY:  Well, it's going to go to his untruthful

15  character.

16    MR. DOMINGUEZ:  He hasn't been convicted of that.  I

17  would like -- I object, strenuously, on that.

18    LAW CLERK:  It's other bad acts, Judge.  There has

19  been -- no crime's been committed.  He hasn't been formally

20  charged.  It's not relevant.

21    MR. GRAEFF:  Are you going to call him as a witness,

22  Doucette?

23    MR. MURPHY:  Yes.

24    MR. GRAEFF:  Just save it for then.

25    MR. MURPHY:  Okay.

1    MR. GRAEFF:  I mean, we're wasting time.  Just bring

2 it up --

3    MR. MURPHY:  I'll call him as a witness.

4    MR. DOMINGUEZ:  Well, there's another issue.

5    MR. GRAEFF:  That's fine.  We can do it --

6    MR. DOMINGUEZ:  No.  He is here on the government's

7 dime.  And if he doesn't get here 'til Monday, he hasn't been

8 subpoenaed.  There's a problem.  We can talk about it later,

9 but I have a problem with that.

10    MR. GRAEFF:  Okay.  We'll subpoena him.

11    MR. DOMINGUEZ:  On your dime.

12    MR. MURPHY:  Yeah.

13    At the end of his testimony, I'll ask you to hold him

14 for re-call.

15    THE COURT:  Okay.  We can do that.

16    MR. MURPHY:  Okay.

17 IN OPEN COURT:

18    THE COURT:  Ladies and gentlemen of the jury, the

19 testimony that was just given by the witness on the stand

20 revealed that Mr. Murphy was in jail.  And you're not -- there

21 was a reference to that, and you're not to consider this as

22 evidence of guilt or for any other purpose.  The witness was

23 giving an answer that explained why he was doing things, but

24 you're not to consider the fact that Mr. Murphy was in jail for

25 any issue or purpose in this case.

1          Are we in agreement, Counsel?

2          MR. DOMINGUEZ:  Yes, Your Honor.

3          MR. MURPHY:  Thank you, Your Honor.

4          THE COURT:  Okay.

5          We're going to take a ten-minute break.

6          (Whereupon, a recess was taken at 10:40 a.m., and the

7    proceedings reconvened at 10:50 a.m.)

8                         - - -

9    IN OPEN COURT:

10         THE COURT:  Mr. Murphy, you may continue.

11         MR. MURPHY:  Thank you, Your Honor.

12   BY MR. MURPHY:

13   Q.   Mr. Doucette, you testified that you had belongings stored

14   in Murphy's moving warehouse?

15   A.   Could you repeat the question?

16   Q.   You testified earlier that you had some belongings of

17   yours testified -- I mean stored -- in Mr. Murphy's warehouse,

18   the moving warehouse.

19         THE COURT:  I didn't hear what you said.  What you

20   had stored in there?

21         MR. MURPHY:  Yes.  Your Honor, yesterday, he

22   testified that he had personal belongings --

23         THE COURT:  Personal belongings.

24         MR. MURPHY:  Personal belongings.

25         THE COURT:  That's what I didn't hear.

1      THE WITNESS:  Yes.  My mother passed away, and you

2  let me store her stuff in your warehouse.  That is correct.

3  BY MR. MURPHY:

4  Q.   Have you been in that warehouse?

5  A.   Yes.

6  Q.   To the best of your recollection, would you say that

7  Murphy's storing warehouse is pretty much full at the time,

8  full with customers' stuff?

9  A.   I would say you're about sixty percent full.

10  Q.   Okay.  Did you ever work for Murphy's moving company?

11  A.   No.

12  Q.   So you wouldn't be aware from the day-to-day operations?

13  A.   Other than you hanging out with me, running your operation

14  while you were hanging with me.  I've learned from being with

15  you, but I'm not familiar with, you know, all operations.

16  Q.   Do you know if Murphy paid his workers in cash, daily, at

17  the end of the moving day, when they were done working?

18  A.   I'm -- I'm not sure.

19  Q.   Okay.

20      THE COURT:  Where is this leading?

21      MR. MURPHY:  I'm done, Your Honor.

22      THE COURT:  Pardon me?

23      MR. MURPHY:  I'm done with that line of questioning.

24      THE COURT:  All right.

25  BY MR. MURPHY:

1  Q.   You testified that the small Y2000 Quad cell phone jammer

2  was used in the Brink's burglary?

3  A.   Yes.

4  Q.   Was the big hundred-watt cell phone jammer used in the

5  Brink's heist?

6  A.   Its service was not needed.

7  Q.   Was it even brought out to Ohio?

8  A.   I don't recall.

9  Q.   Do you know if it was in the Pennsylvania storage bin?

10 A.   I would say yes.

11 Q.   You would say yes, but you don't recall whether it was out

12 in Ohio?

13 A.   I don't recall.

14 Q.   It's a pretty big unit; don't you say?

15 A.   Yes.

16 Q.   Did you ever have that unit at your residence, at your

17 house, at 34 Witt Street?

18 A.   Yes.  When we, me and Joe, unloaded all the stuff from the

19 storage facility, it was brought to my house.

20 Q.   Which storage facility?

21 A.   The one that was in Lynn.

22         THE COURT:  Your answer, sir?

23         THE WITNESS:  The one that was in Lynn.

24         THE COURT:  The one that was in Lynn.

25 BY MR. MURPHY:

1   Q.   So you brought it from -- you brought it from --

2   A.   -- Raymond.

3   Q.   -- from Raymond to Lynn?

4   A.   Correct.

5   Q.   To your house?

6   A.   Yes.

7   Q.   Okay.  And what did you do with it then?

8   A.   I put it in the blue container that you had at my house,

9   and I let it sit.

10   Q.   Okay.  And how long did it stay for?

11   A.   Until I brought all the stuff back up to New Hampshire and

12   worked out a deal with the FBI.

13   Q.   Oh.  So you put it back in the bin?

14   A.   Yes.

15   Q.   What else did you put in the bin that didn't come directly

16   from Pennsylvania?

17   A.   I only put things that were -- belonged with the crime in

18   there.

19   Q.   But you put -- did you put things in that didn't come

20   directly in there?

21   A.   I don't understand your question.

22   Q.   Okay.  You took the stuff from Pennsylvania and put it in

23   the Raymond storage bin?

24   A.   Yes.

25   Q.   And other items didn't go in the Raymond storage bin?

1  Other items were elsewhere that came from the Brink's crime?

2  A.   I'm not sure I'm following your question.

3  Q.   Okay.  You testified that the money and the burnt money

4  went to your house after the crime --

5  A.   Correct.

6  Q.   -- and you counted it.  At some point, did you take that

7  burnt money and put it into the Raymond storage bin?

8  A.   Yes.

9  Q.   Did you put anything else into the Raymond storage bin

10 before you turned it over to the FBI?

11 A.   The only thing I had was that jammer and the money.

12 Everything else, we had gotten rid of.

13        MR. MURPHY:  Just one second, Your Honor.

14        (Whereupon, there was a brief interruption.)

15 BY MR. MURPHY:

16 Q.   Mr. Doucette, you testified earlier, yesterday, that you

17 had some electrical work done at your house.

18 A.   Yes.

19 Q.   How much did that cost you?

20 A.   The kid did piecework.  He did one room at a time.

21 Guesstimate, about 15,000.

22 Q.   Fifteen thousand.

23 A.   Approximately.

24 Q.   Okay.

25 A.   I mean, you know, whatever I could afford, he did, weekly.

1    Q.    Okay.  And did you have a new roof overhang put on your

2    garage?

3    A.    Yes.  Me and -- me and a friend installed it.

4    Q.    And how much did that cost you?

5    A.    It was only materials.  So it was fairly cheap.  Under a

6    thousand.  I had some skylights laying around, and we shingled

7    the rest of the garage.  So whatever that may have cost in

8    supplies.

9    Q.    Eight hundred?  Nine hundred?

10   A.    Approximately.

11   Q.    You also had some landscaping done at your house?

12   A.    Any work that was done at my house, I did on my own.

13   Q.    How much did it cost you for supplies?

14   A.    I'm not sure.  I don't recall.

15   Q.    You don't recall?

16   A.    It was over a couple year period.  I mean, I did normal

17   maintenance on the yard.  I put some bricks up.  A lot of it

18   was digging, moving the stuff in the front yard to the back

19   yard.  So, it was more labor than it was --

20   Q.    No.  I understand that you did most of the labor.  I'm

21   just asking -- you talked about some bricks, and you talked

22   about some dirt.

23   A.    A couple thousand dollars, maybe.  Three thousand.  I

24   mean, that's me guesstimating.

25   Q.    Okay.  Okay.  Now, at sometime after the Brink's heist and

1   you came back, did you purchase a Chevy Avalanche truck?

2   A.    Yes.

3   Q.    How much did that cost?

4   A.    That cost 13,000.

5   Q.    And sometime after you bought the Chevy Avalanche -- and I

6   believe we're still in the 2009 era, before the summer -- did

7   you purchase a Chevy Camaro SS?

8   A.    Yes.

9   Q.    And what year is that?

10  A.    A 2010.

11  Q.    2010.  How much did that cost?

12  A.    With the trade-in, it was in the high 20s.

13  Q.    Twenty nine?

14  A.    Right around there.

15  Q.    Did you at any time add on any performance parts to that

16  car, like that didn't come stock, add anything onto it?

17  A.    No.

18  Q.    It's completely stock?

19  A.    Yeah, other than a couple of dress-up items.  I mean, a

20  couple of hundred bucks.  Nothing --

21  Q.    A couple hundred bucks?

22  A.    Yeah.

23  Q.    You didn't put a special exhaust on it or any special

24  rims?

25  A.    Not yet.  The car came with -- the way it came, and there

1  was no need to touch it.

2  Q.    Okay.  Did you buy a new Dana -- D-A-N-A -- rear-end for

3  your 1968 GTO?

4  A.    Yep.

5  Q.    How much did that cost?

6  A.    Two thousand.

7          THE COURT:  How much?

8          THE WITNESS:  Two thousand.

9  BY MR. MURPHY:

10  Q.    And for that same car, that 1968 GTO, did you buy a

11  Willwood brake set for it?

12  A.    Yes.  That was actually probably about 1500.

13  Q.    Fifteen hundred for the Willwood brakes?

14  A.    Approximately.

15  Q.    Now, you have -- you made reference to your Chevelle in

16  around the area, time area, of the burglary.

17  A.    I've owned that car for about four years now,

18  three-and-a-half years.

19  Q.    That would be a 1972 Chevelle?

20  A.    Yes.

21  Q.    And did you put a new engine in that car?

22  A.    No.

23  Q.    You didn't?

24  A.    No.

25  Q.    It's still -- what kind of an engine is in it?

1  A.   Chevy 350.

2  Q.   Okay.  And you have a 1979 Trans-Am?

3  A.   Nope.  The car is sold.

4  Q.   When did you sell it?

5  A.   Two years ago.

6  Q.   Two years ago.

7  A.   The car needed body work, and the motor needed to be

8  refreshened.  So it was time.  I didn't have the money to

9  invest in it.

10  Q.   Do you pay monthly bills at your house?

11  A.   Lately, no.

12  Q.   Huh?

13  A.   No.

14  Q.   You don't?

15  A.   Nope.

16  Q.   Who pays them?

17  A.   Nobody.  My house is getting foreclosed on.

18  Q.   Okay.

19  A.   I haven't paid mortgage in two years.

20  Q.   Haven't paid a mortgage.  What about gas, like natural

21  gas?

22  A.   I owe them $3,000.

23  Q.   You owe them $3,000.

24  A.   Or more.  Between three and four, but definitely over

25  three.

1  Q.    And they haven't shut it off?

2  A.    Not yet, but I'm expecting any day now that the winter is

3  coming.  That's usually when they do it.

4  Q.    And when was the last time you paid electric?

5  A.    Probably six months ago.

6  Q.    How about the home phone?

7  A.    Don't have one.  Excuse me.  I do.  That is included.  I

8  just don't use it.  It's cable, Internet, phone.

9  Q.    And how much -- how much do you pay a month on that?

10 A.    It's $99 a month.

11 Q.    Okay.

12 A.    I usually wait for them to call me up to shut it off to go

13 down and pay a couple hundred.

14 Q.    I'll include that as cable and phone.

15        Do you have a cell phone?

16 A.    Yes.

17 Q.    How much is your bill for the cell phone monthly?

18 A.    Fifty.

19 Q.    Fifty bucks?

20        Have you paid property taxes on your residence?

21 A.    No.

22 Q.    What about food?  How much do you spend a month on food?

23 A.    None, --

24 Q.    None?

25 A.    -- or very little.  My girl takes care of it.

1  Q.    Your girl feeds you?

2  A.    Yeah.

3  Q.    Okay.  So you don't buy food for yourself at all?

4  A.    I might stop for a drive-in, occasionally, but she cooks

5  dinner every night.  So there is no need to waste the money.

6  Q.    How about gasoline for your car?  How much would you

7  estimate that you spend a month on gasoline?

8  A.    Approximately two hundred.

9  Q.    Car insur- -- and how many cars do you have on the road

10  right now?

11  A.    Two.

12  Q.    You have two cars on the road.  How much does it cost for

13  insurance for them cars?

14  A.    Two hundred a month.

15  Q.    Two hundred a month.

16         Do you have a home insurance policy?

17  A.    Yes.

18  Q.    How much does that cost?

19  A.    Nothing.  Mortgage company is taking care of it.

20  Q.    Even though you're in foreclosure?

21  A.    Yes.  That was all included even when I was paying my

22  monthly mortgage.  When I was paying it, it included the

23  property tax and insurance.  That's the way the mortgage was

24  set up.

25  Q.    Okay.  And you've testified that you paid your attorney

1    $150,000?

2    A.   Yes, which part of that money went to the estate for my

3    mother and paying some bills.

4    Q.   Okay.

5    A.   And the stuff on the GTO I got reimbursed for, because

6    that car was sold to Mike Ward (phonetic) like five years ago.

7    That car is his, just for the record.  So, even though I bought

8    the stuff and it was a customer's car that I had been working

9    on --

10            THE COURT:  There is no question pending.

11            THE WITNESS:  I just wanted to make that correct.

12   Excuse me.

13            MR. MURPHY:  We'll get to that.

14   BY MR. MURPHY:

15   Q.   How much money do you have in the bank, Mr. Doucette?

16   A.   Zero.

17   Q.   And the house at 34 Witt Street, is that in your name, or

18   is it in your mom's name?

19   A.   It's in both.  The estate is in her -- it's in her name,

20   but it's part of the estate.  So I would say it's both.

21   Q.   And you're in the process of probating her estate now?

22   A.   No.  That probation part's all done.  What -- they have to

23   do that within the first year.  After someone dies, you have

24   one year -- from what I'm told, you have one year to get all

25   your paperwork done.

1  Q.   In Massachusetts, you have one year to file.  It could

2  take several years.  And sometimes the estate will never close.

3            MR. DOMINGUEZ:  Objection, Your Honor.

4  BY MR. MURPHY:

5  Q.   So let's go back to January of 2009.  At that time, did

6  you own your Pontiac Trans-Am?

7  A.   I'm going to say yes.  I know I sold it in '09.  I'm not

8  sure what month.

9  Q.   Do you know what the book value on that vehicle was?

10  A.   I sold it for $500.

11  Q.   I'm going to show you a document, Mr. Doucette, and see if

12  you're familiar with it.

13            Are you familiar with NADAguides and NADA prices?

14  A.   Yes.

15  Q.   And you testified that it was a Pontiac Firebird Trans-Am,

16  two-door coupe?

17  A.   Correct.

18  Q.   And what are the book values for those vehicles?

19  A.   It says, low, 9,000; average, 15; high, 27.

20  Q.   Well, we're talking -- you had -- what engine was in the

21  vehicle?

22  A.   It wasn't the original engine.  And when I sold the car,

23  there was no engine in it, or transmission; and the car was due

24  for paint.  So I let the car go.

25  Q.   Okay.

1  A.   And that paperwork reflects low mileage, original matching

2  numbers car, which my car was far from.

3          THE COURT:  Mr. Murphy, was that -- what was that

4  receipt?  It said something about a Firebird on there.  Is that

5  just a Blue Book type of --

6          MR. MURPHY:  It's a Blue Book.  NADA is a compliment

7  to Kelley's Blue Book.

8          THE COURT:  It wasn't, necessarily, his car?

9          MR. MURPHY:  No.  It's the vehicle in general.

10          THE COURT:  Okay.

11  BY MR. MURPHY:

12  Q.   And you talked about your 1972 Chevrolet Chevelle?

13  A.   It's a 1972 Malibu.  It's a base coupe model, not even a

14  Chevelle.

15  Q.   Not even a Chevelle?

16  A.   No.

17  Q.   Do you know how much that's worth?

18  A.   Not sure.  And the car got keyed.  I drive it daily.  It's

19  got some rust bubbles.  I paid 5,000 for it, but it needs to be

20  restored.  So what's it worth today?  I'm not sure.

21  Q.   Again, this is a NADAguide.  Is that an average price?

22  A.   That would be for a big block Chevelle, and I have a small

23  block Malibu.  So that wouldn't apply to what I have.

24  Q.   Okay.  And your 2010 Chevy Camaro SS, how much is that

25  worth?

1    A.   I haven't looked it up on the book.

2    Q.   Is that a fair assessment (indicating)?

3    A.   Yeah, 25 grand.  The car has got 25,000 miles on it.  A

4    couple of years old.

5    Q.   Okay.

6    A.   I would say that's average retail.

7    Q.   And what about the 1971 Pontiac LeMans Sport convertible?

8    A.   I no longer own that car.

9    Q.   When did you sell that car?

10    A.   That was actually -- the car was given to me, and I

11    returned it back to the original owner.  So there was no sale.

12    Q.   You don't recall?

13    A.   Oh, I had the car.

14    Q.   You don't recall paying $10,000 for that car?

15    A.   I didn't pay $10,000 for that car.  Joe gave me that car.

16    It was sitting around for a few years.  I drove it around six

17    to eight months, and I worked the bugs out of it, since the car

18    had been sitting for awhile.

19    Q.   So that --

20    A.   The guy told me -- I gave him a bill for what I did the

21    work on.

22    Q.   Joe -- Joe who?

23    A.   Joe Duyon (phonetic).

24    Q.   Joe Duyon?

25       And is it your testimony that that 1971 Pontiac LeMans

1  Sport was never titled to your name?

2  A.   I just said I put it on the road.  The car, he had owned

3  it for 25 years.  It sat, for about eight years, in his garage.

4  And I asked him if I could use it.

5  Q.   And he titled it to you?

6  A.   And he titled it to me.  It's a life-long friend, and I

7  fix up old cars, and it's not a problem.  I have my own cars.

8  It's not like I was taking his car to sell it.  And I did some

9  work to it, and I returned it to him.

10  Q.   Well, if he was -- Mr. Doucette, if he was letting you

11  lend it, why would he have to title it over to you?  Why didn't

12  he just lend it to you?  You don't just transfer titles to help

13  somebody out, and --

14  A.   I put it on the road in my name, because I wanted

15  insurance covering it.  In case there was an accident, then I

16  want to be fully covered and be responsible for the car.

17  Q.   Do you recall telling me that you paid $10,000 for the

18  car?

19  A.   I don't recall that.

20  Q.   Do you know what the car was worth?

21  A.   I have no clue.

22  Q.   Was it in good condition?

23  A.   It was in decent condition.  It was a driver.

24       (Whereupon, Mr. Murphy displayed a document on the

25  ELMO.)

1  BY MR. MURPHY:

2  Q.   Okay.  Is that a fair assessment?

3  A.   Yep.

4  Q.   Now, we're talking about your 1968 Pontiac GTO

5  convertible?

6  A.   Yes.

7  Q.   You said you sold it?

8  A.   Yes.

9  Q.   And when did you claim to sell it?

10  A.   Four or five years ago.

11  Q.   What year?

12  A.   Four or five years ago.  I'm not sure of the exact time,

13  but it's been --

14  Q.   2007?

15  A.   Approximately.

16  Q.   Okay.  And I believe I -- do you know how much car that

17  was worth, the book value on it?

18  A.   No.  I'm sure you have the paperwork.  Show me.  I mean,

19  you've got a non-matching number car that needs to be restored.

20  So, I mean, the paperwork you're showing me is cars that are in

21  good condition.

22          MR. DOMINGUEZ:  Objection, Your Honor.

23          THE COURT:  Sustained.

24  BY MR. MURPHY:

25  Q.   Did your mother -- you got all -- you got her estate,

1  didn't you?

2  A.   That's correct.

3  Q.   When your mother passed, did she leave you a 1969 Pontiac

4  Firebird?

5  A.   It was a 1968 that she bought in 1974 that she took off

6  the road in 1985 or '86, and it sat under a tree for 22 years.

7  And when I dug it out, the car was rotted to death.

8  Q.   Okay.

9  A.   So, yes, she did leave me that car.  The engine seized,

10  and the car is only good for junk value.

11  Q.   Okay.  Well, do you know what the book value on that car

12  would be?

13  A.   Nothing.  Just whatever scrap metal is.  The car, you can

14  push your hand on it and go through the -- go through the

15  rotten.

16  Q.   Okay.

17  A.   And it's a 1968 -- just to correct the --

18  Q.   Yeah.  Okay.

19  A.   You know, you might want to have the right year up there.

20  Q.   Okay.  And is that car -- has that car been estated to you

21  and titled to you now?

22  A.   No.  I mean, her car hasn't been registered in

23  20-something years.  I have the paperwork if I want to transfer

24  it.  But the car is far from roadworthy.  It had rats living in

25  it.  And, all the leaves, when we were doing the yard work,

1  ended up underneath it.  So the car is rotted, top to bottom.

2  It is not worth putting on the road, or very limited parts are

3  good on it.

4  Q.   Okay.

5  A.   I mean, you've seen the condition of it.  Are you going to

6  tell me that's a $30,000 car?  I mean, you could push on it,

7  and you'd go through the quarter panel.

8  Q.   So it's your testimony that you sold your Trans-Am two

9  years ago, and you sold your GTO in 2007?

10  A.   You pick the year.  It was a few years ago, four or five

11  years ago.

12  Q.   Four or five years ago.  Well, if it's 2011 now, at the

13  earliest, it would be 2007?

14  A.   Yes.

15  Q.   Okay.  One minute.

16       (Whereupon, there was a brief interruption.)

17  BY MR. MURPHY:

18  Q.   Mr. Doucette, are you aware that my investigator, Gary

19  Phillips, subpoenaed the titles to all your cars that were

20  titled to you --

21  A.   Okay.

22  Q.   -- in the last five years?

23  A.   Nope.

24  Q.   Okay.  I'm going to ask you some questions about your trip

25  to Ohio.  Did you do any drugs on your way to Ohio?

1  A.   Only the ones that you gave me.

2  Q.   Is that a yes?

3  A.   That's a yes.

4  Q.   And just so the record is straight, what drugs did you do?

5  A.   What do I do?

6  Q.   What did you do on the weekend of the Brink's burglary?

7  A.   You gave me a pill which I wasn't familiar with.  You said

8  it was Adaril, which is, like, a pill to keep me up, like kept

9  me full of adrenaline or speed or something along them natures.

10  I wasn't familiar with it.

11  Q.   Okay.  Is there anything else?

12  A.   That was all I did that weekend.

13  Q.   Did you smoke any marijuana?

14  A.   No.

15  Q.   No?  At the time, were you a daily marijuana smoker?

16  A.   Yes.

17  Q.   And you didn't smoke no marijuana that weekend?

18  A.   No.  I wanted to have a clear mind, and I wasn't driving

19  to do -- drive around with drugs.

20  Q.   Now, you testified, a week later, you went back out to

21  Pennsylvania --

22  A.   Yes.

23  Q.   -- with Joe Morgan?

24  A.   Yes.

25  Q.   Were you snorting Oxycontin 80s with Joe Morgan on your

1  way out there?

2  A.    Definitely not.

3  Q.    Definitely not?

4  A.    Definitely not.

5         THE COURT:  What's that called?  Oxycontin?

6         MR. MURPHY:  Oxycontin, Your Honor.

7         THE COURT:  Contin?

8         MR. MURPHY:  C-o-n-t-i-n.

9  BY MR. MURPHY:

10  Q.    Was Joe Morgan snorting Oxycontins?

11  A.    Not that I'm aware of.

12  Q.    Do you know if Joe Morgan did illegal drugs on a regular

13  basis?

14  A.    I'd only be speculating.  So I'm going to say I don't

15  know.

16  Q.    Mr. Doucette, isn't it true that, for the past ten years,

17  you were a drug dealer?

18  A.    Yes.

19  Q.    And you sell marijuana?

20  A.    Yes.

21  Q.    Didn't you sell prescription pills?

22  A.    The ones I got from you, yes.

23  Q.    You smoked marijuana on a daily basis?

24  A.    Yes.  That was what I liked to do.

25  Q.    And did you take prescription pills to get high?

1  A.   Only when they were prescribed to me.  I took them for

2  pain.

3  Q.   And how much did you sell an ounce of marijuana for

4  generally?

5  A.   A hundred and fifty dollars.

6  Q.   The good stuff?

7  A.   I usually don't carry the good stuff, because there's not

8  a clientele for it, but it varies from three to six hundred

9  dollars.

10  Q.   Do you recall selling marijuana for $400 an ounce at one

11  time?

12  A.   I could have.

13  Q.   Okay.

14  A.   I mean, the price fluctuates on that stuff.  Every batch

15  is different.

16  Q.   Let's go back to December, November/December 2008, January

17  2009.  Do you remember selling Murphy some marijuana?

18  A.   Yes.

19  Q.   And would Murphy buy ounces from you?

20  A.   Yep.  You'd call me up and ask me for ounces.

21  Q.   Okay.  And at that time, you had some fairly decent weed.

22  It was greenish, but it was kind of clumpy, but it was -- it

23  was a high quality weed?

24  A.   It was okay, but the stuff that you requested -- you like

25  high test.  I would have to make phone calls to get it.

1    Q.    Yeah.  But you were selling it to me for $400 an ounce?

2    A.    Average retail I would sell is about 150, because, your

3    average person, that's what they pay.  You were an exception.

4    You preferred the stuff that was a Grade 10.  And I would have

5    to go shopping around for it.  So I never carried it on hand.

6    So the price fluctuated on that.

7    Q.    So I paid $400 an ounce?

8    A.    I don't recall.  It could have been three to six hundred

9    dollars.  That's usually your average price on that type of

10   product.

11   Q.    I'm going to show you some documents, Mr. Doucette.  Okay?

12   Do you recall those?

13   A.    I can't make the dates out, but --

14   Q.    I believe the top one says 11-29-08, and the second one is

15   12-3-08.

16   A.    Okay.

17   Q.    Are those familiar?

18   A.    Yes.

19   Q.    And what were those for?

20   A.    You loaned me money.  I was down on my luck, and I didn't

21   have much money.  So you helped me out.

22   Q.    Is that true, Mr. Doucette?

23   A.    Yes.

24   Q.    You testified yesterday that you had $300,000 a couple

25   months -- a couple months from this, from your mother's estate?

1  A.   My mother died in May of '08.

2  Q.   Okay.  And --

3  A.   And it took time for the money to come in.  And not

4  every -- I mean, the day my mother died, I wasn't at the bank

5  cashing a check.  It was an emotional rollercoaster.  And when

6  her money came in, it was at different stages:  twenty

7  thousand, thirty, or whatever.

8  Q.   Mr. Doucette --

9  A.   I never had $300,000 at once.  And it was closer to, like,

10 280, 270.  I mean, I approximated, because you're trying to get

11 me to corner myself on numbers.

12 Q.   Okay.  I'll stipulate that it was 280.  Okay?  You had

13 $280,000.  You had -- you're testifying that you paid $15,000

14 for an electrical upgrade; 850 for your garage roof; 3,000 for

15 landscaping; all this money that you were spending back at that

16 time.  And you're telling here that these checks for $400 that

17 you were selling marijuana for, that Murphy didn't purchase

18 marijuana with these checks?

19 A.   No.  I was waiting on checks to come in, and you gave me

20 money until I got money back in.

21 Q.   And just for the record, we have one more right here, Mr.

22 Doucette.  This one is on 12-4.

23 A.   Is that '09?  What's the date on that?

24 Q.   That's '08.  Those are all '08s.

25 A.   Okay.

1  Q.   So we have 11-29, 12-3 and 12-4, all for $400?

2  A.   Yes.

3           (Whereupon, there was a brief interruption.)

4           MR. MURPHY:  Thank you, Your Honor.

5  BY MR. MURPHY:

6  Q.   Mr. Doucette, in this case that you're on right now,

7  you've been assigned to pretrial probation?

8  A.   That is correct.

9  Q.   Have you been ordered to remain drug and alcohol free as a

10 condition of your pretrial probation?

11 A.   Absolutely.

12 Q.   Has the probation department given you any drug screens

13 since you've been on pretrial probation?

14 A.   Yes.

15 Q.   Approximately how many?

16 A.   I'd have -- I would be guessing.  You would have to call

17 my probation officer, but he checks me randomly.

18 Q.   Once a month?  Once every two weeks?

19 A.   Every few weeks.

20 Q.   Okay.  Have you gotten any failed drug screens?

21 A.   Not at all.  This has been a traumatic experience, and my

22 life has changed.  And I stopped doing drugs once this all came

23 down.  I was smoking a lot of weed up until that point, trying

24 to forget about the crime.  And once it came to the point where

25 I had to stop, I stopped cold turkey.  And it's actually

1  probably the first time in my life my head has been clean for

2  the amount of time it has.

3  Q.   Okay.  Now we're moving on to another subject, Mr.

4  Doucette.

5  A.   Yep.

6  Q.   You testified you entered into a plea agreement with the

7  government.

8  A.   I -- yes.

9  Q.   What was your understanding of the deal that you cut with

10 the government?

11 A.   That I had to testify.

12 Q.   Okay.

13 A.   And then I'd get sentenced shortly after that.

14 Q.   Okay.  And what was your understanding of the outcome of

15 this deal that you cut?

16 A.   There is no guarantied outcome.

17 Q.   Did you have an understanding of what you may get?

18 A.   We had an idea.

19 Q.   And what would that be?

20 A.   I don't know if I can say that.

21 Q.   You absolutely can.

22 A.   I got -- they said that it could be two years.

23 Q.   Two years?

24 A.   Yes.

25 Q.   That's what you're expecting to get from this crime:  two

1  years?

2  A.   That -- unfortunately, the paper that I signed does not

3  guaranty me nothing.  The judge makes the final decision on the

4  case.  And the paper that me and the prosecutor signed is only

5  an agreement between me and him.  Ultimately, the judge makes

6  the final decision on how the outcome comes.

7  Q.   I understand that.

8  A.   So, right now, that is up in the air.  So, just because I

9  signed a piece of paper, it's far from official.

10  Q.   But I was asking you what your understanding of what the

11  final outcome of this case is after you testify.

12  A.   I can't predict the future.

13  Q.   So you don't --

14        THE COURT:  I believe he's answered the question.

15        MR. MURPHY:  Okay.

16  BY MR. MURPHY:

17  Q.   Didn't you face 20 years in federal prison for the charges

18  you were indicted for?

19  A.   Yes.

20  Q.   And neither you, nor anyone that helped you, got charged

21  with anything from the Raymond storage facility?

22  A.   That is correct.  That was part of my deal.

23  Q.   Did you receive any financial benefits for your

24  cooperation in this case?

25  A.   Other than traveling expenses to get here, no.  They took

1  care of my hotel, which is -- I believe that's what they do,

2  but I didn't receive like a check for being here.

3  Q.   No.  I'm saying any financial benefits for your

4  cooperation in this whole case, not just here for today at the

5  trial.  For the whole case, in regards to your deal, do you

6  have any financial benefits?

7  A.   I'm going to say no.

8  Q.   Didn't you get to keep your share of the unburned money?

9  A.   No.

10 Q.   No?  You testified you blew it.

11 A.   That wasn't part of me getting any --

12 Q.   I asked if you had any financial benefits.  I didn't ask

13 you if the government paid you.

14 A.   I misunderstood your question.

15 Q.   Okay.

16 A.   We already discussed this earlier that the money that I

17 got, I blew, and you're just re-asking me in a different way,

18 trying to trip me up.

19 Q.   Okay.

20 A.   I did not get a check from the government for pleading out

21 or to be testifying.

22 Q.   Okay.

23 A.   That's the way I was taking your question, just for the

24 record.

25 Q.   But you got to keep and spend your share of the Brink's

1  burglary?

2  A.   Yes.   When I went and seen the FBI, the money was already

3  gone.

4  Q.   And if you don't go to jail and you can work and earn

5  money, that's a financial benefit, too, isn't it?

6  A.   I believe I have to pay restitution.   So I'm going to say

7  it's not that cut and dry.

8  Q.   And, finally, we still have the issue of the missing

9  $600,000, don't we?

10 A.   You do.

11 Q.   I have this missing $600,000?

12 A.   I didn't know there was $600,000.   You're -- you're the

13 one that's bringing it up.

14 Q.   I showed you the paperwork from Brink's yesterday, didn't

15 I?

16 A.   Okay.

17 Q.   And your buddy, Jimmy Hennessey, you testified that he

18 wasn't charged in this case?

19 A.   That's correct.

20 Q.   And he doesn't have to pay for lawyers, does he?

21 A.   He wasn't charged.

22 Q.   Correct, he wasn't charged.   So he doesn't have to pay for

23 lawyers, right?

24 A.   That's correct.

25 Q.   And he doesn't have to pay any of the over $2 million

1  restitution?

2  A.   He had nothing to do with the crime.  He helped me move

3  the stuff.  I told you, I took advantage of a friend; called

4  him up and said I needed help with my mother's stuff that was

5  in storage; that you got –– that you –– you lost your storage

6  facility, and I needed somewhere to put it.  He offered to

7  help.

8  Q.   Isn't that a co-conspirator?

9  A.   I'm not sure if that's how you would word it.

10  Q.   If somebody helped you move the crime tools from one place

11  to another, actually rented a truck for you, rented a storage

12  bin for you, and then helped you move the stuff to another

13  storage facility, he's not a co-conspirator?

14  A.   Well, he did it without his knowledge.

15  Q.   He didn't know that it was stolen?

16  A.   When I approached him to ask him to rent the truck and a

17  storage facility, I told him it was for my mother's stuff,

18  because she'd just passed away, and I needed help.  He didn't

19  question me what I was putting in there.

20      And then, when Joe got arrested, I went up to Jimmy and

21  said, I got you in trouble, opened up the bay and said, Shazam!

22  I said, I need to get this stuff out of here so I can go turn

23  it in.

24      And he helped me get the stuff out of the bay so that I

25  could go face the truth.

1   Q.   And wouldn't the right thing to do, if you'd noticed that,

2   any citizen, you know, that lives, wouldn't they just turn

3   around and say, I'm not going to have anything to do with this,

4   because it's illegal?

5   A.   He may have.

6   Q.   But when he actually helped you, he became a

7   co-conspirator, didn't he?

8   A.   If that's the way you want to word it, yeah.

9   Q.   And just to remind you, these are the Brink's losses

10  again.  You testified that the total amount of money that got

11  split up was between 180 and 200 thousand.  And there's

12  $853,441 missing from Brink's from that burglary.  So there is

13  still the question of the six to seven hundred thousand

14  dollars, Mr. Doucette.

15  A.   Okay.  A lot of the money was damaged.  I'm going to say

16  this nice and clear so you understand.

17      A lot of the money was burnt.  We sat at my house,

18  counting it, and we burnt the money that was no good, because,

19  as you can see in the pictures and the evidence that was shown

20  to the jury, the money was damaged extensively.  We used a

21  thermal lance rod to cut through metal.  That was like melting

22  lava.  So there was a lot of money that was damaged.

23      And on top of it -- may I finish? -- we washed and dried

24  it.  So money got damaged there.  And when I went to the

25  storage facility, I noticed there was an issue with one of the

1  bags missing.  So -- and it was all damaged money, which was

2  useless.  That's the reason why we had it in bags, because we

3  only took what was good.

4       And, in the end, we ended up with a bunch of burnt money

5  that was useless.  That's why there was a bag.  So, if someone

6  stole a bag of burnt money, good luck to them, because --

7  Q.   How much money do you think was in those bags that was

8  returned to the FBI?

9  A.   I have no clue.

10 Q.   The burnt money, Mr. Doucette.

11 A.   I have no clue.  I didn't count it.  I'd only be

12 speculating.  So, I can't look at those bags and guesstimate an

13 amount.

14 Q.   If I told you it was only $28,000, would you disagree with

15 me?

16 A.   I'd have to say I'm not sure.  I mean, if there is

17 paperwork stating that's what it is, then that's what it is.

18 Q.   Twenty-eight thousand dollars?

19 A.   Okay.  And all of that money is showed as no good.  I

20 mean, when we were at my house divvying it up, if there was

21 money that was usable, we took it in the first few days.

22      Why would we let anything go that was no good and linger

23 around?  And then, when you were no longer around and it was me

24 and Joe divvying it up, in the end, we ended up with a bunch of

25 money that was no good, and we continued burning it and getting

1  rid of it, because it was no good.

2  Q.   You testified earlier -- I believe you've done it several

3  times in this, throughout your examination and

4  cross-examination -- that this was your first burglary.  Is

5  that correct?

6  A.   Yes.

7  Q.   You haven't done any crimes prior?

8  A.   Not -- not of this magnitude.

9  Q.   I'm talking professional level burglary, Mr. Doucette.

10  A.   None.  When I was a kid, I broke into a car and stole a

11  stereo.  And, I mean, I mean, it's far fetched from this to

12  that.

13  Q.   So you expect the jury to believe that you traveled

14  halfway across the country, used cell jammers, deactivated

15  alarm systems, cut open vaults, stole over a million dollars,

16  and this was your first burglary?

17  A.   You are very convincing and good at what you do, and you

18  only needed a follower.  So, yes.

19  Q.   You withheld evidence, you destroyed evidence, you

20  tampered with evidence, all by yourself, like a seasoned pro,

21  but, under oath, you're telling the jury that Brink's was your

22  first burglary?

23  A.   Yes, it was.

24  Q.   During your examination from Mr. Dominguez, you exhibited

25  a high level of sophistication and elite burglary knowledge;

1    would you not?

2    A.    Yes.  I've had a lot of time to think about it.

3    Q.    And why don't you just admit to the jury that you took

4    Murphy's professional burglary course and that you're a

5    professional burglar?  Admit it, Mr. Doucette.

6    A.    I've only hung out with you, and we smoked weed.  And you

7    told me, because you like to run your mouth, about how

8    everything is that you do.  And you told me about your whole

9    history, and you've included details.

10        And, yes, if someone is talking, you listen.  Do I know

11   how to go into a building and disarm it?  Definitely not.  Do I

12   understand how a cell phone jammer is?  I mean, I explained it

13   to the jury.  I'm sure that they could explain to you how it

14   works or how --

15   Q.    So is it your testimony today, Mr. Doucette, that you

16   didn't take Murphy's professional burglary course and learn how

17   to become a professional burglar?

18   A.    No.

19   Q.    Okay.

20   A.    No, I didn't.  I was a follower, and I did what you told

21   me to do.

22   Q.    Okay.

23   A.    I didn't go into there as a leader, telling you what to

24   do.  When I was running around, I was like a chicken with my

25   head cut off.  And you instructed me, Go for this, go for that,

1  do for this, help me here.  Don't you remember?

2      And I didn't know you offered a course, but thanks for

3  enlighting us on that.

4  Q.    You didn't?

5  A.    Okay.  I just thought you said that.

6  Q.    No.  You didn't know?

7  A.    I do now.

8  Q.    How long have you known Mr. Murphy, Mr. Doucette?

9  A.    I've known you for -- I met you ten years ago.  You got

10 out of jail.  You come down to the car dealership.  You were

11 friends with my boss.  And that was the first time I met you.

12 You purchased a car off us.  And then you went --

13 Q.    And you're not aware that Mr. Murphy owns a security

14 consulting business?

15 A.    Not that I'm aware of.

16 Q.    Really?

17 A.    Yes.  I mean, how many businesses have you -- you've never

18 told me that you've done a security consulting job.

19 Q.    Mr. Doucette, are you aware of the Angel One Corporation?

20 A.    I've heard you mention it, but I'm not sure what they do.

21 Q.    Well, didn't those checks that were written to you come

22 from the Angel One Corporation?

23 A.    They did, because, when I sold you drugs, I asked for

24 cash.  I don't accept Master Card, credit card, or checks.  And

25 I asked for checks so that we had a paper trail so that I knew

1   what to repay you.  So, if that's where you wrote them from,

2   that's where you wrote them from.

3   Q.   And you didn't know that Murphy had a security consulting

4   business?

5   A.   I wasn't aware of it.

6   Q.   Okay.

7   A.   How many jobs have you done, consultant security?

8   Q.   What does this look like, right here, to you, Mr.

9   Doucette?

10          MR. DOMINGUEZ:  Objection, Your Honor.  No

11   foundation.

12          THE COURT:  Sustained.

13          MR. MURPHY:  Just a minute, Your Honor.

14   BY MR. MURPHY:

15   Q.   Mr. Doucette, have you ever been to Mr. Murphy's home at

16   407 Walnut Street?

17   A.   A couple of times.

18   Q.   Were you aware that Mr. Murphy had a home office for his

19   business in that residence?

20   A.   No.

21   Q.   Were you aware that Mr. Murphy had a computer in that

22   residence?

23   A.   I'm not aware.  I don't recall.  Your house was a mess,

24   and limited travel was from the front door to your bedroom.

25   There was like a path going through, like a hoarder's house.

1   So, honestly, I didn't galavant through your house and see

2   everything you had.

3   Q.   So -- okay.  So it's your testimony that you didn't know

4   that Mr. Murphy owned a security consulting business?

5   A.   No.  Just because you have a piece of paper doesn't mean

6   you have a business.  I've never heard of you talking of going

7   to upgrade the security at Stop & Shop or upgrade the security

8   anywhere, to be totally honest with you.  So that's the first

9   I've heard of it.

10  Q.   So you didn't -- you weren't aware that I offered certain

11  courses in my business?

12  A.   No, not at all.

13  Q.   Okay.  Mr. Doucette, you testified that Mr. Nassor went

14  over to Ohio to get a cell phone jammer?

15  A.   I didn't say Ohio.

16  Q.   Okay.  Where did he go?

17  A.   I just said that you sent him on an errand to go pick up

18  the cell phone jammer that you ordered.

19  Q.   Okay.

20  A.   And that -- the only thing I recalled was that you

21  couldn't go to New York, New Jersey, or Boston because those

22  were areas that would flag that type of product.  So you sent

23  him to a different area.  And on the way home, he stopped by

24  Ohio to look at the Brink's company, overnight, to give you a

25  time frame on what time they opened and what time they closed.

1  Q.   And you're sure of that?

2  A.   I was sitting with you when you got the phone call when he

3  arrived.

4  Q.   Okay.  So --

5  A.   You got the phone call, and it said, I got the -- I have

6  the item, and I'm sitting here.

7       And you said, Make sure you stay there 'til morning.  I

8  need to know.  Then head home.

9  Q.   Okay.  So you're sure that Mr. Nassor picked up the cell

10  phone jammer on the same trip he went and scoped out Brink's?

11  A.   Yes, --

12  Q.   Okay.

13  A.   -- through the information that you gave me.  So we'll say

14  it's on hearsay.

15  Q.   Okay.

16  A.   You got the phone call.  I was sitting with you.  I was

17  not with David Nassor when he did it, but you got a phone call,

18  and then you said to me, Everything's looking good.  He's

19  staying tonight.

20       So, according to what you've told me, that's what I

21  believe.  I was hoping you were telling me the truth.

22  Q.   Well, do you remember the date?

23  A.   It was prior to the crime.  I don't remember an exact

24  date.

25  Q.   Let's now --

1  A.   I was speculating.

2  Q.   Let's narrow it down to a week.  How does that sound?

3  A.   I can't.  It was prior to the crime.  It was within two

4  months of the crime.  I'll say that safely.

5  Q.   Okay.  Now, what if we were to be able to show you

6  documents that Mr. Nassor went out to Tennessee?  That's where

7  he claims he picked up this package:  in Memphis, Tennessee.

8  If we showed you documents that he went out there in early

9  December 2008, would that recollect your memory?

10  A.   It would fall in the time frame that I just said.  So --

11  Q.   Okay.  And what if we told you that Mr. Nassor scoped out

12  Brink's in January of 2009?  That's a month apart.  You're

13  saying it happened on the same day, Mr. Doucette.

14  A.   I was only going by the phone calls that you told me.

15  Q.   Oh.

16  A.   So it was hearsay.

17  Q.   Okay.  Whether it's hearsay or not, I'm not objecting to

18  any hearsay.  I'm basing on your testimony.  I asked you if you

19  were sure, and you said yes.

20  A.   I'm sure to what you told me.  And you told me that he --

21  that he's at the Brink's location; he's hanging out until

22  morning.  And you told me that he had the jammer.  So that was

23  my testimony.

24  Q.   All your testimony is getting pretty far-fetched, Mr.

25  Doucette.

1  A.   Well, you're kind of beating around the bush, just --

2  Q.   I'm not beating around the brush.  I'm getting to the

3  facts of the case.  I'm on trial here, and I'm questioning you

4  under oath.

5  A.   Well, if you're under oath, just own up to your actions.

6  How does that sound, because I did.

7        MR. MURPHY:  Your Honor, I would like to have that

8  stricken from the record, please.

9        MR. DOMINGUEZ:  Your Honor, Mr. Murphy's testifying,

10  and he's answering.  What's good for the goose is good for the

11  gander.

12        MR. MURPHY:  Was I testifying?

13        THE COURT:  You elicited the answer.

14        MR. MURPHY:  Your Honor, I would like to suggest to

15  the Court that questions are not testifying.

16        THE COURT:  That depends on the wording of the

17  question, doesn't it?

18        MR. MURPHY:  Please note my objection.

19        THE COURT:  Well, believe me, it does.

20  BY MR. MURPHY:

21  Q.   Mr. Doucette, when this case was fresh in your mind back

22  in early 2009, did you tell Special Agent Costello that you

23  picked up the Budget truck the day before you left for Ohio?

24  A.   Yes.

25  Q.   You did?  Is that the truth?

1    A.    I told -- actually, I'm going to retract that, because I

2    told -- I told him that we picked up the truck together.  I

3    don't recall giving him an exact date on that time.

4    Q.    Well, if Special Agent Costello has stated in his

5    report --

6              MR. DOMINGUEZ:  Objection.

7              MR. MURPHY:  Okay.

8              THE COURT:  Sustained.

9    BY MR. MURPHY:

10   Q.    So, is it your testimony did you or did you not tell

11   Special Agent Costello that you picked up the Budget truck the

12   day before you left for Ohio?

13   A.    I don't recall what I told Mr. Costello back then, and it

14   was a couple years ago.

15   Q.    Now, at the beginning of your testimony yesterday when I

16   first came up to cross-examine you, I asked you if I -- if you

17   told authorities everything you testified to on direct

18   examination by Mr. Dominguez, and you responded by saying,

19   Everything I testified to, I told authorities in prior

20   meetings; is that correct?

21   A.    Yes.  And I also said that there were some people that I

22   talked to that didn't record everything; so there was some

23   things that may have been said that may not be on record.

24   Q.    I'm sorry.  Then who did you talk to?

25   A.    When I came out here and we went over the crime scene.

1  Q.   Just recently?

2  A.   No.  It was a couple -- I'm not sure of the exact date,

3  but two years ago.

4  Q.   Two years ago?

5  A.   Approximately.

6  Q.   And who did you speak to?

7  A.   I believe it was -- I'd have to look at the paperwork.

8  Honestly, I forget.  I think Jason Costello, maybe.  I think --

9  I want to say I'm not sure, because there was a bunch of cops

10 there I'd never met before, or FBI agents, and we took a walk

11 up and down the tracks and looked at the area.

12 Q.   I'm talking about back in 2009 when you first met Special

13 Agent Costello --

14 A.   Okay.

15 Q.   -- and I believe it was a detective from Columbus, Chris

16 McIntosh --

17 A.   Okay.

18 Q.   -- and Special Agent Harry Trombitis.

19 A.   I don't believe Harry was there the first meeting.

20 Q.   Okay.  So what I'm saying is, did you tell these

21 authorities everything that you testified to yesterday.

22 A.   I'm going to say I'm not sure.

23 Q.   You first started testifying that, when you were scoping

24 out this crime, you were looking for a holiday weekend; is that

25 correct?

1  A.   I don't recall saying that.

2  Q.   You don't recall telling the jury that, at the beginning,

3  that you were looking for a weekend, a holiday weekend?

4  A.   That's -- I thought you meant like a holiday as a trip.

5  You were looking for a long weekend.  That was the type of

6  things that you like to do.  You liked to look for a weekend

7  that ends --

8  Q.   And was the weekend of January 17th and 18th a holiday

9  weekend?

10  A.   I don't recall.  I'd have to look at a calendar.

11  Q.   And --

12  A.   I thought it was President's Day.  I could be wrong.

13  Q.   And did you tell that information to Special Agent

14  Costello or anybody else?

15  A.   I don't recall.

16  Q.   You don't recall?

17  A.   No.

18  Q.   I had asked you the date that you claim that the

19  Pennsylvania -- the tools went out to Pennsylvania to get put

20  into the storage bin.  And you've testified -- what was the

21  time period before the Brink's burglary?

22  A.   I just said prior to.  I know I didn't commit to a date.

23  Q.   What was -- you did give a number.  What was -- what was

24  that number?

25  A.   I don't recall.  Maybe a month, I said, approximately.

1  Q.  Okay.  And did you tell authorities that in a prior

2  statement?

3  A.  I'm going to say I don't recall.  I mean, my conversation

4  with these people, Sean, were over two years ago.  And I smoked

5  a lot of weed, and I tried to forget about it because it was a

6  huge mistake.  And now I'm owning up to it, and there may be

7  some things I don't remember what I said, exactly, to someone

8  two or three years ago.  I mean, so if you have proof of it,

9  show it to me.  Then I'll tell you if I said it.  If it's on

10 paper, I said it.

11 Q.  No.  That's not what I'm trying to establish right here

12 now, Mr. Doucette.  I'm trying to establish that you testified

13 to things yesterday.  You were very detailed.  You were very

14 specific.  And I'm trying to establish that when this crime was

15 fresh in your mind only months after it happened, there is no

16 evidence in grand jury testimony or any report by any officer

17 that any of these facts ever happened.

18       MR. DOMINGUEZ:  Objection.  Objection.  Any of these

19 facts?

20       MR. MURPHY:  The ones that I'm referring to.

21       MR. DOMINGUEZ:  Objection.

22       THE COURT:  Sustained.

23       MR. MURPHY:  Yes, Your Honor.

24 BY MR. MURPHY:

25 Q.  You testified that somebody wanted to travel with the

1  least amount of tools in the truck.  Do you remember that?

2  A.    Yes.

3  Q.    Do you remember telling that to any law enforcement or

4  grand jury in a prior statement?

5  A.    I don't recall.

6  Q.    And you testified about this DNA trip to, as you say, keep

7  the crime local.  Did you tell law enforcement about that or

8  tell the grand jury about that in any prior statement?

9  A.    Once again, I don't recall.  You're asking me stuff from

10  two years ago, and I know you're trying to trip me up on my

11  questions.  So I know I've said it.

12       Did I say it on the grand jury?  Did I say it when I was

13  walking with the tracks, with the cops, behind the tracks?  Did

14  I say it when I met with the FBI?  Honestly, I did say it.  I'm

15  not sure if it's on documentation being said or during the

16  grand jury or whatever else may have transpired where there was

17  transcripts taken, but they definitely knew about it.  There

18  was definitely nothing that was hidden.

19  Q.    What do they know about?  All these facts, or just the one

20  about the DNA trip?

21  A.    The one we were just -- the question you just asked.

22  Q.    Okay.  Did you tell any law enforcement agent or grand

23  jury about this DNA trip to keep the crime local?

24  A.    Yes.  Those are your exact words.

25  Q.    Okay.  You also spoke about the homeless shelter.

1   A.   Yes.

2   Q.   Did you tell any law enforcement or grand jury about the

3   homeless shelter?

4   A.   Yes, I told them about that.  That's where you told me you

5   went.  And who else is going to be hanging out in wintertime

6   that's going to bum cigarettes off you where you can collect

7   DNA?  So it was a perfect place for you to go to.  You brought

8   water or drinks and some cigarettes, and anybody that's in that

9   situation that's in a homeless shelter is going to be more than

10  welcome to look at you like a god and say "Thank you very much

11  for showing up."  So they were easy targets.

12  Q.   Now, you just testified about the Nassor phone call and

13  him allegedly calling Mr. Murphy in your presence.

14  A.   That's correct.

15  Q.   Did you tell any law enforcement or grand jury about that

16  phone call?

17  A.   I don't recall.  I just told them the generics:  He went

18  down to do this errand.  You guys brought the tools down.  You

19  went and got DNA.  We all left and did the crime.

20       So every detail may have not been covered, that I took ten

21  steps to get to the truck.

22  Q.   And you also testified at the beginning of this case, at

23  the beginning of this crime, that you thought that the sedan

24  was a Voyager.  That's what you told police:  it was a Voyager?

25  A.   I did.  And it was an honest mistake.  A Journey, a

1  Voyager. It's not like I was saying one was a Mercedes and one

2  was a Cadillac or a bus. I mean, they're kind of similar in

3  name. So I did make an error. I mean, a journey, a voyage,

4  they're kind of -- almost the same word.

5        THE COURT: Is this a convenient place for you to

6  break, Mr. Murphy?

7        MR. MURPHY: Yes, Your Honor.

8        THE COURT: Okay.

9        We'll take our lunch break until one o'clock.

10  Remember the admonition not to discuss this case with each

11  other or anyone else. And this includes the attorneys or

12  anyone involved in the case. Report any violations to court

13  personnel.

14        Do not form or express an opinion on the case until

15  deliberations. Do not make any investigation, perform any

16  experiments, do any reading, research, on the case, computers,

17  et cetera. Do not discuss the case with your family or friends

18  until you are discharged by the Court. Do not observe any

19  media reports, newspapers, T.V., or radio reports. And

20  continue to wear your jurors badges.

21        Thank you, and enjoy your lunch.

22        (Whereupon, the lunch recess was taken at 12:00 p.m.)

23                      - - -

24

25

1                    Thursday Afternoon Session

2                       October 20, 2011

3                           - - -

4          THEREUPON, the following proceedings were held in the

5    open courtroom with Court and counsel and Mr. Murphy outside of

6    the hearing and presence of the Jury:

7          MR. MURPHY:  The Court may have to examine

8    Mr. Doucette's Presentence Investigation in camera to determine

9    if the assets he documented on his PSI are consistent with what

10   he testified to, and we would ask that the Court do that.

11         THE COURT:  And you want me to stop the proceedings

12   to do this?

13         MR. MURPHY:  Well, I would think that we would have

14   to do it before his testimony is done, unless we want to do it

15   later because I am going to hold him for recall.  Would you

16   rather do that?

17         THE COURT:  Well, I would rather do that.  I would

18   like to get some other witnesses done today.

19         Mr. Dominguez, what is the relevance of this?  Can we

20   figure this out?

21         MR. DOMINGUEZ:  I have no idea what the relevance is

22   with respect to all of these cars, it has no relevance to the

23   matter of his testimony about the Brink's burglary proceeding.

24   But like with respect to all of his cross-examination now over

25   four-and-a-half hours, I have stood pat and let him go, but

1  this is far afield to anything relevant to the Brink's

2  burglary.

3          THE COURT:  I am going to overrule your request.

4          If you can come up with some specific differences

5  between what he has said on the stand and what he has said

6  elsewhere on relevant points -- not how many cars he has had or

7  what have you -- unless you are trying to get across a point

8  that he has spent thousands of dollars that he didn't have --

9          MR. MURPHY:  No, Your Honor.  My point on this matter

10  would be that if Mr. Doucette did not document these cars on

11  his PSI report as assets --

12          THE COURT:  Yeah.

13          MR. MURPHY:  -- he is going to be subject to a

14  restitution order.  And I would put forth to the Court that

15  this is a material matter, where he has denied certain

16  things --

17          THE COURT:  Well, we are not going to decide

18  restitution.  The Judge decides restitution after it's over.

19          MR. MURPHY:  I understand that, Your Honor.

20          THE COURT:  I fail to see how that is relevant to

21  whether he is telling the truth or not in the material matters

22  in this case having to do with the crime and his activity or

23  your activity or Morgan's or Nassor's or all of that.

24          MR. MURPHY:  I would say that it would go toward his

25  truthfulness, Your Honor.

1    THE COURT:  We have gone through meticulously now

2  what cars might be worth and so forth and so on, some that he

3  purchased before the crime was committed.

4    MR. MURPHY:  I agree, Your Honor.  I think you are

5  missing my point.  I am trying to say if he doesn't have cars

6  listed on his PSI, he has been untruthful to the PSI, and it is

7  actually an obstruction of justice under the section of

8  obstruction of justice, Your Honor.  There is a section under

9  the obstruction of justice where he has to give truthful

10  information.

11    THE COURT:  He may be guilty of other things, but

12  this is about the Brink's robbery.

13    MR. MURPHY:  Yes, and I am just trying to --

14    THE COURT:  This is not about whether he was truthful

15  on that unless it is a material matter as to whether or not he

16  committed the crime and was involved with you or whoever else.

17  That's what this case is about.  And you are getting far

18  afield, Mr. Murphy, that's the problem.

19    MR. MURPHY:  Okay, Your Honor.  If that's your

20  ruling, note my objection for the record and --

21    THE COURT:  All right.

22    MR. MURPHY:  -- for the Sixth Circuit.  Thank you.

23    COURTROOM DEPUTY CLERK:  Is it okay to bring the jury

24  in?

25    THE COURT:  Yes.

1                          - - -

2          THEREUPON, the Jury entered the courtroom.

3                          - - -

4          THE COURT:  Okay.  Thank you.

5          Mr. Murphy?

6          MR. MURPHY:  Thank you, Your Honor.

7                          - - -

8              ROBERT DOUCETTE (CONTINUED)

9    AFTER HAVING BEEN PREVIOUSLY DULY SWORN, TESTIFIED AS FOLLOWS:

10                         - - -

11             CROSS-EXAMINATION (CONTINUED)

12   BY MR. MURPHY:

13   Q.   Mr. Doucette, you testified that on one of the days -- I

14   believe you said that it was Saturday the 17th, that you woke

15   up to get into the truck and you had issues with the truck; is

16   that correct?

17   A.   Yes.

18   Q.   Did you say that or tell that to any prior law enforcement

19   or to the Grand Jury in prior statements?

20   A.   I don't recall.  I didn't think it was a superficial fact

21   stating that we had issues or needed a jump start.

22   Q.   And when you testified that Mr. Murphy went to the office

23   of management at the Pennsylvania storage facility, the same

24   question, did you tell law enforcement that?  Or the Grand Jury

25   that?

1  A.   I don't recall.

2  Q.   And you testified that the burglary crew wears these

3  rubbers over their feet to change their footprint.  The same

4  question, did you tell the FBI or the Grand Jury that in a

5  prior statement?

6  A.   I had told someone, but I am not sure which person that I

7  had told.

8  Q.   You are not sure which person you had told?

9  A.   Like I said, there was a lot of interviews involved.  So,

10  the two that you have mentioned, there could have been

11  interviews afterwards, but it was mentioned.

12  Q.   And I asked you before, do you remember how many

13  interviews that you gave?

14  A.   I don't recall.

15  Q.   You don't recall?

16  A.   No.

17  Q.   Would it be more than two?

18  A.   Yes.

19  Q.   Would it be more than four?

20  A.   I don't recall, somewhere around there.  It could have

21  been a couple of more.

22  Q.   A couple more?

23  A.   I am not sure.

24  Q.   You testified that they didn't tell you how they were

25  going to get in the building; is that correct?

1  A.   I believe so.

2  Q.   Did you know that the burglars went on the roof?

3  A.   Did I know that they went on the roof?

4  Q.   Yeah.

5  A.   I was there, yes.

6  Q.   And what was your understanding of how they were going to

7  get into the building?

8  A.   Well, at that point in time, it was kind of obvious they

9  were going to go out on the roof and try to gain access to a

10  vent or cut a hole or propel down to a window, I wasn't sure.

11  Q.   You testified that when you were over keeping the peek,

12  you heard some type of power tool?

13  A.   I heard noise, yes.

14  Q.   I believe your testimony was that you heard a power tool?

15  A.   I believe I did, yes.

16  Q.   And what type of power tool did you hear?

17  A.   From the distance that I was away, I couldn't identify it

18  by sound.

19  Q.   Now, you testified that Mr. Murphy told you that the

20  two-way radios occupied different frequencies?

21  A.   Yes.

22  Q.   Did you tell that to any law enforcement agency or the

23  Grand Jury in any prior statement?

24  A.   I don't recall.

25  Q.   And then you testified that Mr. Murphy came up to you and

1  said that he "Murphed" the building, correct?

2  A.    I said that yesterday.

3  Q.    Well, you testified to that?

4  A.    Yes.

5  Q.    Did you tell that to any law enforcement agent or any

6  Grand Jury?

7  A.    At one point in time, yes.

8  Q.    Who did you tell it to?

9  A.    I don't recall.  I mean, like I said, there was a lot of

10  interviews and different people that I have told the story to,

11  and I just don't recall.  That was a couple of years ago.

12  Q.    Mr. Doucette, I am going to show you a picture and see if

13  you can identify it.  What is that a picture of?  Oh, I am

14  referring to Government's Exhibit 1A-35.

15  A.    That's a picture of the inside of the building with a

16  couple of trucks.

17  Q.    A couple of trucks?  Where would this picture be taken

18  from?

19  A.    From inside the building.

20  Q.    And this picture is being taken from inside the building?

21  A.    It appears to be.  I mean, I don't have a complete, full

22  angle to give you that answer, but it looks like I can see -- I

23  can't see any outside walls.

24  Q.    Are those two things that I just --

25         THE COURT:  Mr. Murphy, it appears that it is the

1   inside the building.  What is your point of this question?  Is

2   your point that he wasn't there?

3           MR. MURPHY:  No, no, no, Your Honor.

4           THE COURT:  Okay.  Get to your point.

5           MR. MURPHY:  No, I am asking him --

6   Q.   (By Mr. Murphy) See this space (indicating on the screen)

7   right behind this truck, what would that be during the

8   burglary?

9   A.   What space?  I am not sure.

10  Q.   This space (indicating on the screen) behind the armored

11  truck?

12  A.   That would be an open spot.

13  Q.   And did the burglars utilize that spot at all?

14  A.   It looks like the area we were in.  From that angle, it is

15  hard to tell.  I would have to see both angles so that I could

16  give you a better answer.

17          THE COURT:  What would be the purpose of asking that?

18  Your questions that you are asking, I would like to know what

19  the purpose is, whether they walked behind it, or they danced

20  there or what?

21          MR. MURPHY:  I will tell everybody now, Your Honor.

22  I was trying to get the witness to identify it.  Now, I will

23  get specific.

24          THE COURT:  It is a space behind a truck.  What's to

25  identify?

1    MR. MURPHY:  Your Honor, I will get there.

2  Q.   (By Mr. Murphy) Mr. Doucette, you testified that Joseph

3  Morgan pulled a box moving truck into the building.  If this is

4  a picture of the garage, where would that box truck have been?

5  A.   I don't have a complete view of the building to give you

6  an answer, but that was the approximate area that it was.  So,

7  I don't know if that picture is in the building ten feet behind

8  that truck or outside looking in and making that area look

9  smaller.

10    THE COURT:  Now, have we got a lot of other exhibits

11  to go through here?  Because if we do, I want Mr. Graeff to

12  help on this and try to get them lined up, so we don't have to

13  go through these long pauses of searches.

14  A.   Before you move that photo, there appears to be a fifth

15  truck.  You can see the right-hand side blinker.  It looks like

16  the front bumper on the very bottom right-hand side all of the

17  way down.

18  Q.   Okay.  Right here? (Indicating on the screen)

19  A.   So, it appears to be five trucks in that picture.

20  Q.   Okay.  And if I showed you this picture, which is from the

21  other side, the other angle coming from -- would that refresh

22  your memory?

23  A.   It is not a good picture of it, but yeah, looking in

24  between the trucks.

25  Q.   Okay.  So, you would understand that this picture I just

1 showed you here (indicating on the screen) would be coming from

2 this area back here (indicating on the screen)?

3 A.   Okay.  And it would be showing the corner of this truck

4 right there (indicating on the screen).

5 Q.   Yes.  Now, is that -- you testified earlier -- is that the

6 area that you testified to that Joe Morgan pulled a truck out

7 of the building?

8 A.   It appears to be.  I wish I had more pictures to have

9 better angles of it, but if that's where the racks were to the

10 coins to our right --

11       THE COURT:  If you can answer the question, you can.

12 But if you can't, that's the answer.

13 A.   I am not sure.

14 Q.   (By Mr. Murphy) Would that be consistent with the area

15 that Joe Morgan parked the truck?  That area? (indicating on

16 the screen)

17 A.   It was in that area.

18 Q.   Maybe this -- this is the picture that I was actually

19 looking for.  And this is from an up-above view.  Does that

20 refresh your memory, Mr. Doucette?

21 A.   Okay.  That was the area.

22 Q.   Okay.  So, this area right here (indicating on the screen)

23 is where Joe Morgan pulled the truck in?

24 A.   Yeah, through that doorway that you have in your markings.

25 Q.   And that area is where you observed him pull a truck out

1  of the building and into the backyard, you said?

2  A.    Yes.  That appears to be it.  The picture is a little

3  grainy, but it looks like it.

4  Q.    What is that a picture of, Mr. Doucette?

5  A.    It looks like a truck.

6  Q.    And do you know what area of the building that was in?

7  A.    I am not familiar with that area.  I can't tell from that,

8  it is a small picture.

9  Q.    Okay.  Maybe we have another angle.

10        Did you notice that there was a garage door right here

11  (indicating on the screen)?

12  A.    There appears to be.

13  Q.    How many garage doors did you observe when you were in the

14  Brink's building?

15  A.    Two that I recall.

16  Q.    And those would be a straight-through shot of this?

17  A.    Actually, there was another one, but it was unaccessible,

18  there was a truck backed up to it.  So I am sure that was some

19  sort of bay or door on the side of the building because there

20  was a trailer, but we never went to that area.

21  Q.    Okay.  Was that truck there when you entered the building?

22  A.    I don't recall.

23  Q.    Could that truck have been the truck that Joe Morgan

24  moved?

25  A.    I don't recall.

1  Q.  Do you have a picture of the backyard?  Okay.  I am going

2  to show you a picture, Mr. Doucette, of that backyard.  Do you

3  see an armored car in that backyard?

4  A.  Not from that angle.

5  Q.  Okay.  Do we have the angle that shows the other back of

6  the building?

7     I have identified this picture as 1A-6, and you don't see

8  an armored car in that picture, right?

9  A.  Not from that angle.

10    THE COURT:  Well, while they are looking there, I

11 would like to know why we are going through these car-by-car

12 and truck-by-truck and so forth, what is the point that you are

13 trying to make to these good folks over here (indicating the

14 Jury in the jury box)?

15    MR. MURPHY:  The witness testified that he observed

16 one of the co-conspirators or participants in this burglary,

17 Your Honor, drive one of Brink's trucks out of the building and

18 into the yard.  He was specific when he testified to that.  And

19 I am trying to establish that there was no armored car in the

20 yard according to the pictures.

21    MR. DOMINGUEZ:  Your Honor, there has been no

22 testimony to that effect.

23    MR. MURPHY:  Yes, he did.

24 Q.  (By Mr. Murphy) Mr. Doucette, did you testify that Joe

25 Morgan pulled a truck out of the building?

1   A.   I testified that he moved the truck.

2   Q.   Yeah, an armored car?

3   A.   I testified that he moved a truck.

4   Q.   What kind of a truck?

5   A.   He moved a moving truck, and one of the trucks was moved

6   inside of the building to gain access to the door.

7   Q.   Okay.

8        THE COURT:  Okay.  Now, can we stop going through the

9   pictures?  I think if we get right directly to the questions,

10  Mr. Murphy, it will help your continuity.

11       MR. MURPHY:  Okay.

12  Q.   (By Mr. Murphy) Okay.  Now, Mr. Doucette, you testified

13  yesterday that the burglars broke into the guard shack.  Is

14  that what you called it?

15  A.   Yes.  I referred to it as a guard shack.  It may have a

16  different name, but it was a room inside of the building.

17  Q.   What was the purpose of them getting into that building,

18  that room?

19  A.   From you what you told me, they needed to access that room

20  to get into anywhere else.

21       THE COURT:  Right.  That was asked and answered

22  yesterday.

23  Q.   (By Mr. Murphy) You testified to that.  That's the way

24  they opened and closed the back garage?

25  A.   From what I recall.  There was a lot of -- you explained

1    to me that you needed to be in that office to operate anything

2    else, that it was equivalent to a high security place.

3           THE COURT:  You went into that yesterday, and it was

4    answered yesterday.

5    Q.   (By Mr. Murphy) Do you recall using a ladder at all?

6    A.   I don't recall.

7    Q.   Do you recall if a ladder was used by anybody else in your

8    presence during this burglary?

9    A.   I don't recall.

10   Q.   If you were shown a picture of the area, would it refresh

11   your memory?

12          THE COURT:  He was shown a picture of the ladder

13   yesterday; isn't that correct, Mr. Murphy?

14          MR. MURPHY:  I don't believe that it was this

15   witness, Your Honor.

16          THE COURT:  Or on direct?

17   Q.   (By Mr. Murphy) Does that picture look familiar to you,

18   Mr. Doucette?

19   A.   I don't recall it, the ladder.

20   Q.   It is 1A-25.  That ladder doesn't look familiar?

21   A.   I don't recall the ladder.

22          MR. DOMINGUEZ:  For the record, he did not identify

23   that photograph yesterday, Your Honor.

24          THE COURT:  There was another ladder.  Is there

25   another picture with a ladder in it?  I saw one yesterday.

1    MR. DOMINGUEZ:  That was a different ladder, Your

2    Honor.  We will find it.

3    THE COURT:  Okay.  He said he is not aware of the

4    ladder.

5    Q.   (By Mr. Murphy) Mr. Doucette, you testified about some

6    guns that you saw in the building?

7    A.   Yes.

8    Q.   You also said that you were instructed not to touch the

9    guns?

10   A.   Yes.

11   Q.   Did you tell that to any law enforcement agent or to the

12   Grand Jury prior?

13   A.   I recall saying that.

14   Q.   You do recall saying it?

15   A.   Yes.

16   Q.   Who did you say that to?

17   A.   I don't recall who I said it to, but I do recall saying

18   that because that was one of the criterias that you specified

19   not to touch.

20   Q.   And you also testified about these makeshift suits, the

21   leather coats, how they were used somehow with the rod that you

22   described?

23   A.   Okay.

24   Q.   Did you tell any law enforcement agent or FBI agents or

25   Grand Jury about these makeshift leather suits that you used?

1  A.   It was only a couple of pieces, enough to cover one person

2  so it would be a suit.

3  Q.   Your testimony is that you didn't tell anybody about it

4  prior?

5  A.   I don't recall.

6  Q.   And you testified something about a fan.  Did you -- can

7  you explain yourself about the fan?

8  A.   The fan was carried up to the roof, and when we got there,

9  you and me carried it up to the roof and set it up.

10  Q.   Now, did you tell the FBI or somebody about this fan?

11  A.   I told somebody.

12  Q.   Do you know who that was?

13  A.   I do not recall.  I spoke with numerous people.  To recall

14  back on interviews of who I said what to, I am not sure.

15  Q.   And on the night of the burglary, you testified that you

16  did some type of drug; is that correct?

17  A.   Yes.

18  Q.   Okay.

19       THE COURT:  You have asked this question before, and

20  he answered it.

21  Q.   (By Mr. Murphy) Okay.  Mr. Doucette, just briefly.  Your

22  departure.  What time did you leave the Brink's burglary?

23  A.   In the a.m.

24  Q.   Approximately what time?

25  A.   After the score, you are talking about?

1   Q.   Yes.

2   A.   In the a.m. prior to them opening at nine.

3   Q.   And would it be ten minutes, 15 minutes before nine?

4   A.   Within the hour of nine o'clock, like 8:30, 8:15 or a

5   quarter of nine, somewhere between eight and nine.

6   Q.   And you testified that you went -- walked a half a mile to

7   somewhere?

8   A.   Yes, we climbed up the roof.  We jumped down onto the

9   trailer and then went down the tracks to the first neighborhood

10   to where the rent-a-car was parked, however far that distance

11   was.  It could have been a quarter mile, a half mile, but it

12   was a distance down the track.

13   Q.   And then when you got there, what did you do?

14   A.   You communicated with JoMo, Joe Morgan on the two-way, and

15   he was bringing the truck around to meet us.

16   Q.   And what did you do when you met up with this truck?

17   A.   We took the rest of the cover that was on the truck off,

18   and we disrobed to regular clothes.

19   Q.   Okay.  Now, the time that it took you to walk this half

20   mile, to go meet up with Joe Morgan, to take the cover off the

21   truck, to take the clothes off and to get on the road, about

22   what time would you say that was at that time?

23   A.   I would be speculating, I am not sure.

24   Q.   Well, if you said that you left at 8:30, about how long

25   would it have taken to do that?

1    A.    Twenty minutes, half-hour.

2    Q.    So, nine o'clock would be an --

3    A.    Approximate.

4    Q.    Okay.  And this is our starting point at nine o'clock.  At

5    that point, you testified that you left Columbus and went to

6    the PA storage facility?

7    A.    Yes.

8    Q.    And unloaded?

9    A.    Yes.

10   Q.    And how long did you testify that it took you to unload?

11   A.    An hour, maybe an hour-and-a-half tops, I wasn't clocking

12   it, but we were moving pretty quick because we were looking to

13   do it fast.

14   Q.    Okay.  So, that's an hour or an hour-and-a-half?  And when

15   you were driving home --

16        THE COURT:  That's an hour or hour-and-a-half to do

17   what?

18        MR. MURPHY:  To unload the tools and the coin into

19   the storage --

20        THE COURT:  Once they were there?

21        MR. MURPHY:  Once they were there.  Coming from the

22   burglary, Your Honor, going into the Pennsylvania storage

23   facility.

24        THE COURT:  But not an hour-and-a-half to get there?

25        MR. MURPHY:  No, not an hour-and-a-half to get there.

1    An hour or hour-and-a-half to unload the truck.

2            THE COURT:  And where is this Pennsylvania facility,

3    Mr. Doucette?

4            THE WITNESS:  Where is it?

5            THE COURT:  Yeah, where in Pennsylvania is it?

6            THE WITNESS:  I am not sure which town, it was my

7    first time ever being there.

8            THE COURT:  Is it in the western part or the eastern?

9            THE WITNESS:  I was up for 100 hours straight.  I was

10   driving the rent-a-car just following the box truck, Your

11   Honor.  I am not familiar with the area.

12           THE COURT:  Okay.

13   Q.   (By Mr. Murphy) And you testified when you were driving

14   home, you stopped at some truck stop to get food and eat, you

15   and the crew?

16   A.   We stopped for fuel at one point in time.  I don't know if

17   it was a truck stop or a gas station, but fuel was needed.

18   Q.   Did you go into the truck stop and get some food at that

19   place?

20   A.   I probably grabbed a drink.

21   Q.   Okay.  How long would you think that it took while you

22   were at that truck stop?

23   A.   Ten or 15 minutes.

24   Q.   Fifteen minutes?  So, that would be added onto the

25   hour-and-a-half?

1  A.   Okay.  Hour.  It could have been an hour.

2  Q.   It could have been an hour?

3  A.   No, no.  I said an hour or an hour-and-a-half.  Now, you

4  are saying it is an hour-and-a-half.

5  Q.   No, the hour-and-a-half from unloading the truck at the

6  storage facility.  I am adding on now.

7  A.   Oh.  I said that could have been an hour or an

8  hour-and-a-half.  But continue.

9  Q.   Okay.  And then you drove home to Lynn?

10  A.   Correct.

11  Q.   And what time did you get home in Lynn?

12  A.   I'm not sure of the exact time, but it was nighttime.  And

13  at that time of year, it gets dark around six-ish, so it had to

14  be later than that.

15  Q.   About how much later?

16  A.   I am not sure.

17  Q.   An hour, two hours, three hours?

18  A.   I am not sure.  You are trying to pin me down on times.

19  It was dark out.

20  Q.   Okay.  How long had it been dark out?

21  A.   I am not sure.

22  Q.   Well, okay.  You testified that after you got home, you

23  counted the money for a little bit.  This is that Sunday that's

24  in question here.

25  A.   Yes.

1   Q.   Okay?  You got home and went to bed.  What time do you

2   think that you stopped counting and went to bed?

3   A.   I am not sure.  We put in an hour or maybe two, tops, and

4   I wasn't keeping track of time, but I went upstairs and fell

5   down and fell asleep.

6   Q.   I mean, you had been driving for awhile, I understand,

7   Mr. Doucette, and you were tired.

8   A.   I was up for 100-hours straight almost, kid.

9   Q.   Would it have been before midnight?

10  A.   It could have been close to midnight.

11  Q.   That you stopped counting?

12  A.   Approximately.

13  Q.   Okay.

14  A.   I don't think that we had the energy to go much longer

15  than that, but we were excited when we got home.  We went at it

16  for a little bit and called it a night.

17  Q.   Okay, Mr. Doucette.  So, if I show you a map quest on how

18  long it takes to get from Columbus, Ohio to Lynn, Massachusetts

19  and then we add that onto the time that you said that you left

20  and add all of the other times up, it should be a fairly

21  accurate description?

22  A.   Well, what does it come up with?

23  Q.   It is two.  It is actually three.  If you were way up

24  north in Pennsylvania, up by Youngstown, way up high, you would

25  have took 13 hours, 12 hours and 59 minutes.  If you went

1  across I-West-80, which is in the middle of the state, which

2  would have went somewhere near -- I think it cuts across, it is

3  lower the way they go across -- you have got 90 higher and 80

4  lower -- that would be 13 hours and 24 minutes. And if you

5  went down a little further, it would be even more -- 13 hours

6  and 32.

7  So, even assuming that you went I-90, it would be 13

8  hours, okay? And if you had left Brink's at 8:30 and you went

9  13 hours from there, that would be how much?

10  A.  From 8:30? 13 hours?

11  Q.  Yes.

12  A.  That would be 9:30.

13  Q.  And if you added the hour, hour-and-a-half unloading, how

14  much would that be?

15  A.  If you add an hour to that, 10:30.

16  Q.  And then you had to stop for gas?

17  A.  Mh-hmm.

18  Q.  And you said that you counted for two hours?

19  A.  Approximately. It could have been an hour, but we had a

20  long weekend, we were excited, we counted for a little bit

21  until we felt suffice. And once the adrenaline kicked down, we

22  decided to call it a night. As I said, I wasn't sitting there

23  with a stopwatch.

24  Q.  Okay. Now, when the police raided Mr. Murphy's house and

25  arrested him on the 23rd of January, you and JoMo got together

1  and decided that you are going to go back up.  Did you leave

2  the same day that Mr. Murphy got arrested, or was it the next

3  day?

4  A.    I don't recall, but it was either that day or the

5  following day.

6  Q.    Okay.

7  A.    I know that we did it pretty quick.

8  Q.    And you testified that Nassor was there when you were

9  splitting up the money?

10  A.    At different times, yes.

11  Q.    Okay.  And described to the Jury your knowledge of what

12  the hydraulic cobalt unit was and what it did?

13  A.    Yes.

14  Q.    Now, you testified that you actually went and purchased

15  this RV cover for the truck.  Did you tell Special Agent

16  Costello or the Grand Jury that you purchased this item?

17  A.    I don't recall that I did, but I did mention that it was

18  used.

19  Q.    Okay. but you don't recall telling them that you purchased

20  it?

21  A.    I guess that we -- they were more concerned about the

22  specifics of what was done, than how many steps it took to walk

23  into the store.

24  Q.    Okay.  Mr. Doucette, you were talking about the "Brian

25  Hetherman" I.D. information?

1  A.   Yes.

2  Q.   And you had testified that, according to your story, that

3  you gave Mr. Murphy the information for the Brian Hetherman

4  I.D.?

5  A.   I gave you an envelope, but the I.D., a lot of it was put

6  together from -- for you.

7  Q.   And do you remember -- I am going to be very wide on

8  this -- do you remember what year that was?

9  A.   I do not recall.

10  Q.   You don't remember the year?

11  A.   No, I don't.

12  Q.   Would it have been around the 2006 time?

13  A.   It could have been.

14  Q.   Or would it have been 2004?

15  A.   I don't recall.

16  Q.   2002?

17  A.   If I had to speculate, I.D.s are good for five years.  So,

18  if we backtracked five years from whenever that I.D. expires,

19  that was roughly around the time, approximately, but I am only

20  guessing.  I don't recall.  As I say, I don't recall.

21  Q.   Now, Mr. Doucette, we are nearing the end.  You began your

22  testimony here yesterday.  When I began the cross-examination,

23  I asked you a bunch of questions that if you were going to tell

24  the truth, the whole truth and nothing but the truth, and your

25  response was?

1    A.    Yes.

2    Q.    And do you believe that over these five-and-a-quarter

3    hours of cross-examination, that's what you did, is tell the

4    truth on cross-examination?

5    A.    I have been truthful as I can be.  You are asking me

6    questions in very tricky formats, and I am trying to be as

7    honest as I can, trying to remember an incident from over three

8    years ago, but yes.

9              MR. MURPHY:  Thank you, Mr. Doucette.  I have no

10   further questions at this time.

11             Your Honor, I would ask that you hold the witness for

12   recall.  Thank you, Your Honor.

13             THE COURT:  I will take that under advisement.

14             MR. DOMINGUEZ:  May I, Your Honor?

15             THE COURT:  You may.

16                          - - -

17                    REDIRECT EXAMINATION

18   BY MR. DOMINGUEZ:

19   Q.    I hadn't kept track of the time, Mr. Doucette, but after

20   five hours of cross-examination, I only have one area of

21   inquiry.

22             MR. DOMINGUEZ:  May I approach, Your Honor?

23             THE COURT:  You may, and you may continue to do so.

24   Forever and ever.

25   Q.    (By Mr. Dominguez) Mr. Doucette, that only area of inquiry

1  relates to your plea agreement with the United States that

2  Mr. Murphy touched upon.

3      First of all, I have handed you Government's Exhibit 20,

4  and I ask you to take a look at that.  First of all, the back

5  page.  Does your signature appear on that page?

6  A.    Yes, it does.

7  Q.    And Mr. Michael Natola signed it on your behalf?

8  A.    Yes.

9  Q.    And he is your licensed attorney in the Commonwealth of

10 Massachusetts?

11 A.    Yes.

12 Q.    Please read over the plea agreement, Mr. Doucette.

13 A.    From Page 1?

14 Q.    Please scan it and familiarize yourself with it.

15 A.    I am done, Mr. Dominguez.

16 Q.    Have you re-familiarized yourself with that plea

17 agreement, Mr. Doucette?

18 A.    Yes.

19 Q.    Is that the plea agreement that was filed with this Court

20 in your case on March 25th of 2011 -- the file stamp-date is

21 on the top of the page?

22 A.    Yes.

23 Q.    So that we are all clear, I am showing you Government's

24 Exhibit Number 20, displaying it for the ladies and gentlemen

25 of the jury, Mr. Doucette.

1      Is it true that you entered guilty pleas to Counts 1 and 4

2 of the Indictment?

3 A.    Yes.

4 Q.    You were charged in three counts, correct?

5 A.    That is correct.

6 Q.    Count 1, you pled guilty to conspiring to transport

7 merchandise and money in interstate commerce?

8 A.    That is correct.

9 Q.    And who did you plead guilty to conspiring with?

10 A.    Conspiring with Sean Murphy, Joseph Morgan and David

11 Nassor and myself.

12 Q.    Very well.  And you pled guilty to Count 4 with

13 transporting merchandise and money in interstate commerce; is

14 that correct?

15 A.    Yes.

16 Q.    Now, you remember Mr. Murphy asked you whether or not you

17 were charged with receiving stolen property relative to

18 everything that was in your storage unit that the FBI seized on

19 June 4th of 2009?

20 A.    Yes.

21 Q.    Weren't you, in fact, charged with transporting that

22 merchandise and money in interstate commerce in this court?

23 A.    Yes.

24 Q.    Isn't that what you are here for; isn't that right?

25 A.    That is correct.

1  Q.   In Paragraph 8, you are required to testify truthfully and

2  completely concerning all matters pertaining to the Indictment;

3  is that your understanding?

4  A.   Yes, sir.

5  Q.   Submit yourself to supplemental debriefings when required?

6  A.   Yes.

7  Q.   What do you understand Paragraph 10 to mean, sir?

8  A.   Can I read it?

9  Q.   Well, you can read it to yourself, but I just want to know

10  what you understand it to mean.

11  A.   It says that it does not protect me from prosecution from

12  perjury if I testify untruthful, and it would affect my deal as

13  if it had never been made.

14  Q.   Now, the very next page, a carry-over from Paragraph 11,

15  Mr. Murphy asked you if you had a thought or if anybody had

16  told you what type of sentence that you will receive.  And you

17  did respond that the Judge makes that determination, correct?

18  A.   That is correct.

19  Q.   What does the last sentence of Paragraph 11 say, sir?

20  A.   To read it?

21  Q.   Yeah, read it.

22  A.   The United States makes no promise or representation

23  concerning what sentence the defendant will receive, and the

24  defendant cannot withdraw his guilty plea based upon the actual

25  sentence imposed.

1   Q.   Now, have I made you any promise about what your sentence

2 is going to be, sir?

3   A.   No.

4   Q.   Now, you told this jury when I had the opportunity to talk

5 to you yesterday that you were, in fact, hoping to get some

6 leniency.  That's clear to everybody here; that is true,

7 correct?

8   A.   That is true.

9   Q.   Read the last part of your actual plea agreement, the last

10 sentence there, what does that say?

11   A.   The defendant understands that such motions may not be

12 filed until the State Attorney (sic) is satisfied --

13   Q.   United States Attorney.

14   A.   Thank you.  The United States Attorney is satisfied that

15 the defendant has substantially cooperated.  Defendant

16 understands that whether such motion should be made lies within

17 the discretion of the United States Attorney and that whether

18 and to what extent such motion should be granted are solely

19 matters for determination by the Court.

20   Q.   So you understand, my office doesn't sentence you?

21   A.   That is correct.

22   Q.   Who is going to sentence you in this case, sir?

23   A.   The Judge will?

24   Q.   What Judge?

25   A.   Your Honor.

1    Q.    Judge Smith?

2    A.    Your Honor Judge George Smith, that is correct.

3    Q.    And he is the one that you stood before in this court,

4    prior to testifying yesterday and today, and pled guilty to a

5    conspiracy charge and pled guilty to the interstate

6    transportation of stolen money charge, correct?

7    A.    That is correct.

8    Q.    While Mr. Murphy asked you questions about your plea

9    disposition, do you have any problem whatsoever with this Jury

10   seeing your entire plea agreement?

11   A.    Not at all.

12         MR. DOMINGUEZ:  No further questions, Your Honor.

13   Thank you.

14         THE COURT:  Anything on that?

15         MR. MURPHY:  Just one point, Your Honor.

16                      - - -

17                RECROSS-EXAMINATION

18   BY MR. MURPHY:

19   Q.    Mr. Doucette, Mr. Dominguez asked you about being charged

20   with receiving stolen property, and he said that you are being

21   charged here with interstate transportation of stolen property,

22   and it is the same thing.  Weren't their burglarious tools

23   inside of those bins, too?

24         THE COURT:  There were what?

25         MR. MURPHY:  Burglarious tools.

1        THE COURT:  Burglarious?

2        MR. MURPHY:  Yes.

3        THE COURT:  You mean burglary tools?

4        MR. MURPHY:  Burglary tools, it is another term for

5    it.

6    Q.   (By Mr. Murphy) Were there not?

7    A.   Yes.

8    Q.   Were you charged with burglarious tools in Massachusetts

9    and New Hampshire?

10    A.   I was not.

11    Q.   Are you charged with possession of burglarious tools here

12    in the Southern District of Ohio?

13    A.   No, I am not.

14        MR. MURPHY:  Thank you very much.

15        MR. DOMINGUEZ:  Nothing further, Your Honor.  Thank

16    you.

17        THE COURT:  You may step down.

18                        - - -

19        MR. DOMINGUEZ:  We call Greg Tomasich, Your Honor.

20                        - - -

21                   GREGORY TOMASICH

22    AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

23                        - - -

24                   DIRECT EXAMINATION

25    BY MR. DOMINGUEZ:

1          THE COURT:  You may proceed.

2    Q.   Mr. Tomasich, would you please state your name and please

3    spell your last name for the court reporter.

4    A.   Yes, Gregory Tomasich, T-O-M-A-S-I-C-H.

5    Q.   Good afternoon, sir.  I am going to try to be quick, I

6    know you have a flight to catch.

7         Where are you presently employed, sir?

8    A.   I am employed by Carnival Cruise Lines.

9    Q.   And where are your base operations?

10   A.   Miami, Florida.

11   Q.   And what is your title there, sir?

12   A.   I work for Security Services as an investigator.

13   Q.   And I am assuming that you have several -- or a few people

14   in your division who perform the same function?

15   A.   That's correct.

16   Q.   And does your unit within Carnival Cruise Lines actually

17   have access and have maintenance authority, as a part of your

18   position, over the records with Carnival Cruise Lines?

19   A.   Yes, under bookings.

20   Q.   And do you have the ability to access records based upon

21   certain information, whether it be someone providing you with

22   an address or a guest number or, perhaps, even a name?

23   A.   Yes, I do.

24          MR. DOMINGUEZ:  May I approach, Your Honor?

25          THE COURT:  You may.

1  Q.  (By Mr. Dominguez) I have marked -- I have handed you what

2  has been marked for identification and labeled as Government's

3  Exhibit 9-1.  Please, sir, take a look at that and let me know

4  if you recognize it.

5  A.  Sir, yes, I do.

6          MR. DOMINGUEZ:  May I approach, Your Honor?

7          THE COURT:  You may.

8  Q.  (By Mr. Dominguez) Sir, what is the document you just

9  reviewed?

10 A.  It is an access data base called Past Guest Portals.

11 Q.  And to talk about a past guest profile, what information

12 is contained in such a record?

13 A.  In that record, it is from a past guest who has cruised on

14 Carnival Cruise Lines, it contains his name, date of birth, a

15 telephone number that he used to book with and a home address.

16 Q.  And with respect to a home address, if a home address is

17 plugged in, will your system of records at Carnival Cruise

18 Lines actually pull up the residents at that particular address

19 and whether or not those residents have taken a cruise with

20 Carnival?

21 A.  It's actually -- the cross reference is the phone number.

22 When you book with Carnival Cruise Lines, two or one or two or

23 three people in a residence, you use the residential phone

24 number and that commingles the entire residence, and they are

25 all put in one data base.

1  Q.   And when you search that phone number and the commingling,

2  it will print out the number of cruises taken by members of the

3  household?

4  A.   Members of the household, people who live at that

5  residence and have used that phone number.

6  Q.   I am showing you now what you have identified, the guest

7  record, as 9-1, and can you explain to the ladies and gentlemen

8  of the jury what is actually contained on that page?

9  A.   In the upper left is the past guest number, and then it

10 has the guest's name, their address, the city and state that

11 they are in, a zip code.  It also contains an e-mail address, a

12 phone number.  Below that it contains household members, people

13 who have booked from that phone number and that residence.

14 Q.   And I see the last two names being Rikkile Brown and

15 Mr. Sean Murphy?

16 A.   That's correct.

17 Q.   And does your system of records -- since that designates

18 that those individuals have actually booked cruises with

19 Carnival Cruise Lines, further into the document does it

20 explain which dates those individuals may have taken the

21 cruise?

22 A.   Yes.

23 Q.   Inviting your attention to Page 2 of that document, and

24 focusing specifically on the last two entries, Rikkile Brown

25 and Sean Murphy, what does that designate, sir?

1 A.   Going from left to right, we'll get Rikkile Brown first.

2 It is the booking number.  Next to that shows that they cruised

3 on the Carnival ship, Glory.  They departed on 11-25-2006.  The

4 cabin that they stayed in was 7307.  The duration of the cruise

5 was seven days.  It was our Eastern Caribbean cruise, and they

6 booked through a travel agency.

7      Looking below that shows Sean Murphy with his booking

8 number, also on the same cruise ship, which is Carnival Glory,

9 which departed on 11-25 of 2006.  And he was in cabin 7307 with

10 a duration of seven days.  Eastern Caribbean.  It was also

11 booked through a travel agency.

12 Q.   Now, several pages into the document that I showed you,

13 you recall the first page of the document containing the

14 Government's Exhibit 9-1 with the past guest number, and I

15 notice several pages into the document, sir, that there is

16 separate page that lists Sean Murphy solely with a past guest

17 number.  Does that designate the specific cruise that he was

18 on?

19 A.   No, that's a designated number for him.

20 Q.   Once a person actually becomes a party to one of your

21 cruises, and they have traveled in the past, they have a guest

22 number?

23 A.   That's correct.

24 Q.   And does that guest number assist with future cruise

25 information as well?

1   A.   Yes.

2   Q.   So, this particular document and the documents that you

3   have identified, sir, would designate that Mr. Sean Murphy of

4   407 Walnut Street actually took a seven-day cruise to the

5   Eastern Caribbean beginning on November 25th of 2006?

6   A.   That's correct.

7   Q.   Sir, with respect to the Carnival Cruise Lines, do you

8   assist your customers in terms of helping them with airport

9   destinations and numbers and so forth with tags, if you can

10  explain that for me?

11  A.   Tags as far as?

12  Q.   I'm sorry.

13          MR. DOMINGUEZ:  May I approach, Your Honor?

14          THE COURT:  You may.

15  Q.   (Mr. Dominguez) I may have gotten the information wrong,

16  sir.  But I am showing you what has been marked for

17  identification purposes and labeled Government's Exhibit 1D-23.

18  And I know you are not familiar with the contents of the box,

19  but we have gone into that fairly extensively, but there

20  appears to be a tag on the bag containing a cell phone jammer.

21  Do you recognize that tag?

22  A.   Yes.

23  Q.   And what is that?

24  A.   That's a tag that's given to guests when they depart the

25  ship, which is also known as leaving their ship.  Their bags

1    are placed outside, and these tags are put on them.  Currently,

2    we have a newer tag where they write their name on the back of

3    it, so there is no commingling.  But this appears to be an

4    older tag, but it is a Carnival tag.  The Number 15 designates

5    when they get off the ship, Terminal 15 is where the conveyer

6    belt -- that's where they are going to be able to locate their

7    bag at.

8    Q.    Oh, I'm sorry.  That's where I got it messed up, it wasn't

9    an airport terminal, it's a terminal for the cruise ship?

10   A.    No, no.  When your bags come off the ship, that way, you

11   know where exactly, what terminal, your bag is going to appear.

12   Q.    Okay.  My mistake.  You did tell the ladies and gentlemen

13   of the jury that that's an older tag and that you have newer

14   tags, actually, with passenger information that's written on

15   them?

16   A.    Yes, they can write it on the tag, and also, on the

17   portion that they tear off.

18   Q.    Do you know for how long you have had the new tags

19   instituted, sir?

20   A.    I can't recall when they instituted the new tags.

21   Q.    But that's an older tag?

22   A.    That's an older tag.

23   Q.    Let me ask you this.  I have not had the opportunity to go

24   on a cruise before, but when folks go on cruises and stop at

25   port of calls and certain islands, are their certain items that

1  you sell on the ship that might assist them in their tours or

2  going to the beach and so forth?

3  A.   Yes, we sell Carnival products on the ship.

4  Q.   Do you sell Carnival -- I don't know what they call

5  them -- waistbands or waist buckle/pocket things?

6  A.   Yes, we sell those.  When guests get off the ship, they

7  have to carry their identification with them and their sailing

8  signed cards when they get off.  A lot of times guests will get

9  off in just their swimwear where they are going to beaches.

10  This is just where they can put it in their -- kind of like a

11  fanny pack?  A little --

12  Q.   But, again, you do sell those?

13  A.   Yeah.

14  Q.   At Carnival on a regular basis?

15  A.   Yes, they are sold in the gift shop.

16        MR. DOMINGUEZ:  May I have a moment, Your Honor?

17        THE COURT:  You may.

18  Q.   (By Mr. Dominguez) My last question, sir.  Just so we are

19  clear, this record that you have identified for us and

20  explained to the ladies and gentlemen of the jury, this record

21  is kept and maintained in the normal course of business at

22  Carnival Cruise Lines?

23  A.   Yes, that's correct.

24        MR. DOMINGUEZ:  That would conclude my direct

25  examination of this witness, Your Honor.

1    THE COURT:  Mr. Murphy?

2    MR. MURPHY:  Thank you, Your Honor.

3                    - - -

4                CROSS-EXAMINATION

5    BY MR. MURPHY:

6    Q.    Good afternoon, Mr. Tomasich, is it?

7    A.    Yeah, Tomasich.

8    Q.    Mr. Tomasich, can you determine which cruise ship a

9    Carnival bag tag comes from?

10   A.    The debarking tags?

11   Q.    Yes.

12   A.    No.

13   Q.    You can't determine which?

14   A.    Because there is no skew numbers on there, but they are

15   all blue in color.

16   Q.    So, you wouldn't know which ship that tag came from?

17   A.    No.

18   Q.    And you testified earlier that, you know, it doesn't have

19   any information on it.  Can you determine which passenger's

20   baggage that tag belonged to?

21   A.    If I could flip it over?  I don't think anything is

22   written on there.  If something is written on there, then it

23   would have a person's name.  But this is an older tag.  Yes, on

24   both sides it shows the Number 15.

25   Q.    Okay.

1  A.   On our newer tags, it shows the terminal number.  On the

2  backside, it is white, and it has got a listing where you put

3  your name, your address, your phone number, and the same thing

4  with the tear-off tag.  That's an older tag, it doesn't have

5  that.

6  Q.   Now, from that tag, can you determine the date that it was

7  used?

8  A.   No.

9  Q.   And Mr. Tomasich, how many baggage tags does Carnival

10 attach to luggage in about one year's time?

11 A.   Well, I could tell you that we have 123 ships, and the

12 passenger range on different-sized ships is anywhere from 2700

13 to 3200.  So, it a large amount of bags.

14 Q.   A very significant number?

15 A.   Yes.

16 Q.   Okay.  And Mr. Tomasich, did you run any guest profiles

17 for a Robert Doucette, a Joseph Morgan or a David Nassor?

18 A.   They doesn't ring a bell.

19 Q.   They don't ring a bell?  So, you have only viewed

20 passenger information from a Sean Murphy?

21 A.   Yes.

22 Q.   And Sean Murphy's family that are associated with that

23 address?

24 A.   Yes.

25 Q.   Okay.  So, if a Robert Doucette or a Joseph Morgan or a

1   David Nassar had taken a Carnival ship, you didn't run that

2   information?

3   A.   No.

4           MR. MURPHY:  I have no more questions.  Thank you

5   very much.  Have a nice day, Mr. Tomasich.  I liked your

6   cruise.

7           THE WITNESS:  Thank you.

8           THE COURT:  Anything further?

9           MR. DOMINGUEZ:  No, thank you, Your Honor.

10          THE COURT:  Thank you very much.  You are excused.

11          THE WITNESS:  Thank you, Your Honor.

12          MR. DOMINGUEZ:  We call Suzanne McAlister.

13          MR. MURPHY:  Your Honor, may we approach before she

14  comes in?

15          THE COURT:  Yes.

16                          - - -

17          THEREUPON, the following proceedings were held at

18  sidebar out of the hearing of the jury:

19          MR. MURPHY:  Your Honor, I understand that this

20  witness is from the Pennsylvania storage facility.  In

21  discovery of this matter, as you required, the defendant

22  requested supplemental discovery from the government.  And one

23  of them would be the entry/exit records of this storage

24  facility.  And in response, the government stated that they did

25  not have them.

1          THE COURT:  Okay.

2          MR. MURPHY:  But one of the issues that make up now,

3    is that I am trying to prevent if this witness comes on and

4    tries to enter these entry/exit records that we weren't

5    provided in discovery from requests and that at this late hour

6    that they wouldn't be allowed.

7          And the second question is, there was an I.D. in

8    regards to this facility, and it is an incomplete document.

9    And if the witness -- since it is inadmissible in this court, I

10   would ask that if the witness is going to try to identify

11   anybody, that they not be basing their decision on this

12   inadmissible document, that they base their decision on

13   personal knowledge.

14         THE COURT:  Well, if the person qualifies as a keeper

15   of the record and has that information in the course of their

16   business and this is a business record, and the Court is

17   convinced that it is legitimate, they can tell the Court

18   whatever the records show.  Your objection is overruled.

19         MR. MURPHY:  Well, the reason I am saying, Your

20   Honor, is what we received in discovery is that -- is that this

21   identification does not have several pieces of key information

22   on it, it does not have Mr. Hetherman's --

23         THE COURT:  Okay.  You can inquire as to that of the

24   witness on the stand.  And when they -- at the time they move

25   -- at the time they try to put this into evidence, then you may

1    argue that at that time.

2         MR. MURPHY:  Okay.

3         THE COURT:  I am going to hear from the witness.  You

4    are going to have a full chance at cross-examination.  And the

5    fact that they did not have the information at the time when

6    you were exchanging the records and so forth on everything,

7    they have them now.  So, they will be presented in court,

8    unless there is something --

9         MR. MURPHY:  We have evidence that the government

10   knew about it prior, Your Honor.

11        MR. DOMINGUEZ:  What are you talking about?

12        MR. MURPHY:  You are going to try to enter the

13   entry/exit logs.

14        MR. DOMINGUEZ:  It is my understanding that she

15   doesn't have any logs.  She knows when Mr. Morgan and

16   Mr. Doucette actually went there -- I mean, she has a record of

17   them having punched in the computer thing, but --

18        MR. MURPHY:  That's the information that we requested

19   in discovery.

20        MR. DOMINGUEZ:  I don't have a log.

21        MR. MURPHY:  That's the entry/exit log.

22        THE COURT:  Well, you are going to hear it now.  You

23   will have full opportunity to cross-examine and to keep it from

24   being admitted into evidence, if you can convince me of that.

25        MR. MURPHY:  The same thing with the I.D.

1    THE COURT:  That's it.  Let's go.

2    MR. DOMINGUEZ:  He has got that.

3    (Back in open court.)

4                    - - -

5              SUZANNE MCALISTER

6    AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

7                    - - -

8              DIRECT EXAMINATION

9    BY MR. DOMINGUEZ:

10   THE COURT:  You may proceed.

11   MR. DOMINGUEZ:  Thank you.

12   Q.   Ma'am, would you please state your name and spell both

13   your first and last name for the benefit of the court reporter.

14   A.   Suzanne McAlister, S-U-Z-A-N-N-E, M-C-A-L-I-S-T-E-R.

15   Q.   Ma'am, where are you presently employed?

16   A.   The LockUp Storage Center in Pennsylvania.

17   Q.   And whereabouts in Pennsylvania?

18   A.   That's just northwest of Pittsburgh, Greater Pittsburgh

19   and a little bit south of Cranberry Township.

20   Q.   Cranberry Township?

21   A.   Yes.

22   Q.   What's the name of the city?

23   A.   It's Warrendale, Pennsylvania is where it's located.

24   Q.   What do you do at the LockUp?

25   A.   I manage the facility.

1   Q.   And how long have you been the manager there?

2   A.   I have been manager there for 13 years at that site.

3   Q.   What are your duties there?

4   A.   I make sure everything runs smoothly.  I rent units to,

5   you know, people who come, tenants.  Call the late list, make

6   sure that's up-to-date, do the vacates, maintenance, small

7   maintenance things, you know.

8   Q.   And how many units are there, do you know?

9   A.   There is 521 units.

10   Q.   In varying sizes?

11   A.   Yes, from 5-by-5s up to 10-by-30s.  It is actually two

12   stories, but all roadway accessible, so...

13   Q.   Can you please describe like the road leading up to the

14   LockUp Storage Facility, just the terrain for the ladies and

15   gentlemen of the jury?

16   A.   It is like a grassy area, a wooded area, like a hillside

17   on one side of the roadway.  That's about the length of a

18   football field to get up to the actual facility.

19   Q.   And as you go up, you say you can see a hillside?

20   A.   Yes.

21   Q.   You go up on a hill?

22   A.   Yes.

23   Q.   Ma'am, I am going to approach you with a document and ask

24   that you to take a look at it.

25         MR. DOMINGUEZ:  May I?

1           THE COURT:  Yes.

2   Q.    (By Mr. Dominguez) Ma'am, I have just handed you what has

3   been marked for identification purposes and labeled as

4   Government's Exhibit 9-1.  Do you recognize it?

5   A.    Yes, I do.

6   Q.    Ma'am, what is that?

7   A.    It is a lease to our facility.  It is a lease that anyone

8   that wants to rent a unit would fill out and sign.

9   Q.    Did you actually assist in completing that lease

10  agreement?

11  A.    Yes, I did.

12  Q.    Is that a lease agreement that's kept in the normal course

13  of business?

14  A.    Yes.

15  Q.    Without saying, do you recognize the name of the person

16  that you leased a unit to?

17  A.    Yes.

18          MR. DOMINGUEZ:  May I approach again, Your Honor?

19          THE COURT:  You may.

20  Q.    (By Mr. Dominguez) Now, ma'am, if I or Agent Trombitas or

21  anyone else were to come to you in your facility and request to

22  rent a storage unit, what type of information do you require in

23  order to lease one of your units?

24  A.    We require a form of I.D., usually a driver's license and

25  a photo I.D.  And that's what we actually require, and then a

1  deposit, we require one, but it depends upon the circumstances

2  and the rent for the facility.

3  Q.   Do you actually make a copy of the driver's license?

4  A.   Yes, it is required.

5  Q.   Is that a part of your policy?

6  A.   Mh-hmm.

7  Q.   I am going to show you Page 1 -- and I apologize, this is

8  8-1, ma'am.  Showing you what has been marked for

9  identification purposes and labeled as Government's Exhibit

10  8-1, ma'am, do you recognize that?

11  A.   Yes.

12  Q.   What does that represent, ma'am?

13  A.   It is a lease, that's a lease agreement.

14  Q.   Do you recall specifically your involvement with this

15  lease agreement?

16  A.   Yes.

17  Q.   Do you recall who the lease agreement was for?

18  A.   Brian Hetherman.

19  Q.   And this lease agreement was entered into on January 23rd

20  of 2009?

21  A.   Yes.

22  Q.   And that was awhile ago, ma'am.  If you were to see

23  Mr. Hetherman, again, would you recognize him?

24  A.   I feel I could.  I would hope so.

25  Q.   Well, take a look around the courtroom, take your time.

1   If you recognize the person who identified himself as Brian

2   Hetherman, let us know.

3   A.    That looks like Mr. Hetherman.

4   Q.    Would you please tell us what he is wearing.

5   A.    He is wearing a beige shirt and printed tie.  That's him.

6        MR. DOMINGUEZ:  Your Honor, may the record reflect

7   that the witness has identified the person she knew then as

8   Brian Hetherman, who is defendant Sean Murphy.

9        THE COURT:  Well, the person that you are looking at,

10  do they have a jacket on?

11       THE WITNESS:  No.

12       THE COURT:  Let the record so reflect.

13  Q.    (By Mr. Dominguez) Tell us about this transaction, ma'am.

14  Did you engage the person that you knew as Mr. Hetherman in

15  conversation regarding what he wanted?

16  A.    I tried to.  He seemed to know what he wanted.  I usually

17  try to figure out what size they may need, or what their

18  circumstances are as far as size or what they might be storing

19  to figure out what type of unit that they would need.

20  Q.    How was this a little bit different?

21  A.    He seemed to know exactly what size he wanted, which was a

22  little bit odd in our area.  But then I just figured he must

23  have known storage or had stored before, that he didn't want to

24  see anything as far as size.

25  Q.    Now, when you say he didn't want to see anything, do the

1  typical customers who come to you to lease a unit actually take

2  a tour with you?

3  A.   I just show them a unit, every unit, to make sure they

4  know where it is or what size.  Sometimes, they need a larger

5  size, or they may need something larger.  So, we always show

6  them the units.

7  Q.   Now, what is your requirement, ma'am, at your facility

8  there regarding payment.  Do you have like a payment plan?

9  A.   It is a month-to-month lease.  We have different specials

10  running monthly.  You know, prepays to get some free time, but

11  it is a month-to-month lease.  The date you move in is always

12  the date the payment would be made.

13  Q.   Do you recall by looking at Government's Exhibit 8-1

14  whether or not the person you knew as Mr. Hetherman actually

15  signed a month-to-month, or did he pay in advance?

16  A.   He paid in advance six months.

17  Q.   Did he pay by a credit card?

18  A.   He paid cash.

19  Q.   Is that typical in your business?

20  A.   No.  That's another reason that I kind of -- yeah, he paid

21  a large amount of cash.

22  Q.   Is that $1,105.58?

23  A.   Mh-hmm.

24  Q.   Yes?

25  A.   Yes, I'm sorry.

1    THE COURT:  How much?

2    MR. DOMINGUEZ:  $1,105.58, Your Honor.

3    THE COURT:  Was that for several months?

4    THE WITNESS:  That's six months prepay.

5    THE COURT:  Oh, six months.

6    THE WITNESS:  Yes.

7  Q.  (By Mr. Dominguez) Showing you the second page of

8  Government's Exhibit 8-1, ma'am, you stated that you make a

9  copy of the driver's license?

10 A.    Mh-hmm.

11 Q.    Is that the driver's license that you made a copy of?

12 A.    Yes.

13 Q.    And so that the record is complete, this is the third page

14 of the document?

15 A.    Mh-hmm.  That's the application that he filled out

16 himself.

17 Q.    And it appears -- do you typically ask for employer

18 information?

19 A.    Yes.  If they are employed, yes, they write that down.

20 Q.    What employee information did Mr. Hetherman provide to

21 you?

22 A.    He provided GS Contracting in Pittsburgh, Pennsylvania.

23 Q.    Are you familiar with such an entity?

24 A.    No.

25 Q.    And did he complete this document himself in terms of

1  filling out this information?

2  A.  Yes, he did.

3  Q.  And that's what customers typically do?

4  A.  They fill out their own application.

5  Q.  Did he tell you what kind of business he was involved in?

6  A.  No, he didn't.

7  Q.  Now, ma'am, in order to get into your facility, does one

8  have to enter a code?

9  A.  Yes.  Usually, I ask them what code they would chose

10  themselves, and they enter the unit number and a four-digit

11  code to enter the facility and exit.

12  Q.  Why do you ask them that information?

13  A.  It keeps track of how long tenants are on-site.  Usually,

14  if it is a long time, or if you know, some employers want to

15  know how long their tenants are on-site, or if they visited

16  that day, it is just something we do for security purposes.

17  Q.  Are there ever occasions, ma'am, in the winter months that

18  the code is not necessarily to be used because the gate is

19  frozen shut?

20  A.  There are times, yes, that that has happened.

21  Q.  Does it happen on numerous occasions?

22  A.  It depends upon the weather, if it is bad weather or

23  extremely cold, yes, the gate will stay open because there is

24  an electric eye and the gate will stay open.

25  Q.  Now, typically, though, when it is not very cold, you

1 enter a code in order to access the gate?

2 A.   Yes, yes.

3 Q.   Now, with respect to this unit, ma'am, after January 3rd

4 of 2009 when this lease was paid, do you know whether or not a

5 code was entered to enter the facility again?

6 A.   On the 24th, I know that there was a code entered in

7 January.  There was another time, yes.

8 Q.   You were able to look that up through the information with

9 respect to this system?

10 A.   The gate system.

11 Q.   With respect to this particular unit?

12 A.   Yes, yes.

13 Q.   That was on January 24th of 2009?

14 A.   I believe so, yes.

15 Q.   Subsequent to the 23rd of January of 2009, I invite your

16 attention to January 29th of 2009.  Were you approached by

17 anybody in law enforcement with respect to the execution of a

18 search warrant for that particular unit?

19 A.   Yes, I was.

20 Q.   Did you, in fact -- I don't want to say participate in the

21 execution of the search warrant -- but did you go along with

22 the agent when --

23 A.   Yes, that's part of being a manager.  You make sure

24 everything is done correctly, and I did accompany the officer

25 to the unit.

1   Q.   And were you there when the officer -- it was Detective

2   Timothy Skoorig?

3   A.   Yes.  Yes, it was.

4   Q.   And were you there when the detective actually opened the

5   unit?

6   A.   Yes.

7   Q.   And what did you see when the detective opened the unit on

8   January 29 of 2009?

9   A.   It was empty.  There was two air fresheners in it,

10  actually, but it was empty.

11  Q.   Do you recall what type of air freshener?

12  A.   They were the little can type.

13       MR. DOMINGUEZ:  Okay.  May I have a moment, Your

14  Honor?

15       THE COURT:  Yes.

16  Q.   Sorry, ma'am.  I failed to ask one question.  You stated

17  you remembered the actual transaction with the person you knew

18  only as Brian Hetherman?

19  A.   Brian Hetherman, yes.

20  Q.   And was he by himself?

21  A.   No, there was someone with him.  That was another thing

22  that kind of made me remember more because the other gentleman

23  just stood in the background, didn't say anything, just stood

24  there, kind of like -- he didn't talk or anything, but he was

25  with Mr. Hetherman, I call him, or Mr. Hetherman.

1  Q.   Do you recall the size or anything?

2  A.   Stocky, kind of like -- I thought at first it might be a

3  mover, but usually, movers do not come in with someone that

4  rents a unit.  So, I just figured it was someone helping him or

5  someone just watching him.  He just stood in the background,

6  still.  He didn't participate in any of the conversation at

7  all.

8  Q.   He didn't say a word?

9  A.   No.

10  Q.   The only person who spoke was Mr. Hetherman?

11  A.   Yes.

12        MR. DOMINGUEZ:  Your Honor, no further questions.

13        THE COURT:  Mr. Murphy?

14        MR. MURPHY:  Thank you, Your Honor.

15                        - - -

16                   CROSS-EXAMINATION

17  BY MR. MURPHY:

18  Q.   Good afternoon, how are you doing?

19  A.   I am fine, thank you.

20  Q.   You testified that you were the person who rented the bin

21  on that day, you say it was January 3rd?

22  A.   Yes.

23  Q.   And do you remember that day?

24  A.   I do.  Parts of it, not the whole day, but I do remember

25  it.

1  Q.   You testified that there was somebody with the renter, who

2  you identified as myself?

3  A.   Mh-hmm.

4  Q.   Do you remember anything else about these people?  Do you

5  remember what they were wearing?

6  A.   I remember the other, the man in the background was kind

7  of wearing like a bandanna, but I call it like thug-type

8  clothes.  That's just how I --

9  Q.   Which type?

10 A.   Like -- not a body builder -- but the low-riding pants and

11 that type of --

12 Q.   Okay.  And do you remember anything else?

13 A.   I remember Mr. Hetherman -- I'll call you that because

14 that's how you rented the unit --

15 Q.   That's fine.

16 A.   Just very quiet.  Like, kind of in a hurry.  I won't not

17 say very nervous, but you didn't really want to know much

18 information.  Like you knew what size of unit you wanted.

19 Q.   Did you have any conversations with him?

20 A.   Not really, because you didn't really want to talk too

21 much, I don't think.

22 Q.   Now, you identified me as Brian Hetherman.  Did anybody

23 show you any pictures prior to your testimony, or are you

24 basing your identification solely on personal knowledge?

25 A.   No one showed me any pictures.

1  Q.   Okay.  Now, does LockUp Storage have video surveillance in

2  their place?

3  A.   Yes.

4  Q.   And how long do they keep the video for?

5  A.   About 30 days.

6  Q.   That's 30 days?

7  A.   We have video -- that is when we had the VHS tapes, yes,

8  30 days.

9  Q.   You testified that the police came in there on

10  January 29th?

11  A.   Yes.

12  Q.   Did they request any video from you?

13  A.   I don't recall whether they requested it.

14  Q.   Did your give them any video?

15  A.   I had video that I saved only because this is another part

16  of my job to save some type of -- when there is a search

17  warrant, I did go back to the last date when I saw unit 124.

18  Q.   Okay.  Did you personally ever see anyone accessing that

19  bin, 124?

20  A.   I personally did not, no.

21  Q.   Did you ever personally ever see anything inside bin 124?

22  A.   No, I did not.

23  Q.   Was there ever any reports of suspicious activity at bin

24  124 in January of '09?

25  A.   No.

1  Q.   Now, where is bin 124 located within the facility?

2  A.   The office is at one end of the building, and it is at the

3  very other end of the building.

4  Q.   Isn't there more than one building?

5  A.   There is three buildings.

6  Q.   So, this building would be where in location to the

7  facility?

8  A.   It's right at the other end of the office.  As you come up

9  the driveway, it is at the other end of the facility.

10 Q.   Okay.  So, would that be near -- you have two gates at

11 this facility?

12 A.   An entrance gate and an exit gate.

13 Q.   Now, would it be -- which one would this be near?  The

14 entrance gate or the exit gate?

15 A.   The exit gate.  On that side of the building is the exit

16 gate.

17 Q.   The exit gate?  So, everyone who leaves LockUp Storage

18 would have to drive by this bin when exiting the facility?

19 A.   Yes.  Usually, yes.

20 Q.   Now, if someone were unloading 500 boxes of rolled coin on

21 or off a truck, would that be considered suspicious?

22 A.   I would think so.  I don't know.  We don't go into the

23 units.

24 Q.   No, I'm saying loading and unloading off the truck into

25 the bin?

1    A.    Would that be suspicious to me?

2    Q.    Yeah, to anyone?

3    A.    It depends on what kind type of tenant that I have, you

4    know, a coin collector.

5    Q.    But if you had another renter that was at the facility,

6    and you testified that they had to leave the facility, they

7    would have to drive by this bin?

8    A.    Yes, I would say 95 percent of the time.

9    Q.    My question was, if someone was loading or unloading 500

10    boxes of rolled coin on or off the truck, would that be

11    considered suspicious?

12    A.    That's like a hypothetical question.  I don't know.  I

13    would think so.  I would think it would be suspicious if you

14    could see the actual coins.

15    Q.    Now, if I showed you a box, would it help?

16          MR. MURPHY:  Do you have a picture?

17          THE COURT:  Excuse me.

18          MR. MURPHY:  Pictures?

19          THE COURT:  Mr. Murphy, I think you should ask the

20    witness as a matter of foundation here, whether or not she or

21    anyone else out there saw anyone unloading those coins.

22          MR. MURPHY:  That was my next question.

23          THE COURT:  Showing her what they look like won't

24    make any difference if she didn't see them.

25          MR. MURPHY:  Well, she asked the question.

1  Q.   (By Mr. Murphy) Did anyone ever report something like

2  that?

3  A.   No.

4  Q.   And you testified that the access code for this facility

5  was entered into the facility on January 24th?

6  A.   Yes.

7  Q.   And that would mean that the person who actually went

8  there would have to know a code?

9  A.   Mh-hmm.

10 Q.   Not just the bin, but they would have to know the code?

11 A.   Yes.

12 Q.   Okay.  And according to your recollection of the business

13 records, that was the only day?

14 A.   That I know of.  I don't know if I went back any farther,

15 I can't remember.

16 Q.   Okay.  Now, at your facility, do moving companies rent

17 moving bins at LockUp Storage at all?

18 A.   No, it is always the tenant, usually.  I have referrals

19 from moving companies.

20 Q.   That's -- I mean something like that.  If a moving company

21 had a customer to do it, do you have situations where moving

22 companies come in and move stuff in for the customer?

23 A.   Yes, of course.

24 Q.   Okay.  Now, would it be out of the ordinary for a moving

25 company to rent a storage bin for their customer upon request?

1   A.    I have not had that happen.

2   Q.    Is there a rule preventing that?

3   A.    No, but the tenant would have to give permission for the

4   moving company to load or unload.

5   Q.    Okay.  Do you recall any vehicles in regards to this

6   specific bin?

7   A.    A U-Haul truck on the 24th.

8   Q.    That's it?

9   A.    I don't recall anything else.  I can't remember.

10           MR. MURPHY:  Thank you very much.  I have no further

11   questions.

12           MR. DOMINGUEZ:  Just one question.

13                            - - -

14                   REDIRECT EXAMINATION

15   BY MR. DOMINGUEZ:

16   Q.    I want to make sure everyone heard the answer to that very

17   last question.

18   A.    Mh-hmm.

19   Q.    You stated that in your research that you determined that

20   the bin that Mr. Hetherman had leased had been accessed on

21   January 24th of 2009?

22   A.    Yes.

23   Q.    And you reviewed videotape of it?

24   A.    Yes.

25   Q.    And you saw that a U-Haul truck was associated with that

1   bin?

2   A.   Yes.

3   Q.   On January 24th of 2009?

4   A.   Yes, the same time as our gate system, entry and exit, a

5   large U-Haul.

6            THE COURT:  How did you know it was a U-Haul truck?

7            THE WITNESS:  From our camera, I can see it.

8            THE COURT:  And what did it say on the truck?

9            THE WITNESS:  I am pretty sure it was a U-Haul truck.

10           THE COURT:  Okay.

11           MR. DOMINGUEZ:  Thank you very much.

12           THE WITNESS:  You are welcome.

13           THE COURT:  You are excused.

14           Ladies and gentlemen, it is time for a break here,

15   about 15 minutes.  Remember the admonition.

16                          - - -

17               THEREUPON, a recess was taken.

18                          - - -

19           THEREUPON, the following proceedings were held out of

20   the hearing and presence of the jury but in the presence of the

21   Court, counsel and Mr. Murphy as follows:

22           THE COURT:  Okay.  Mr. Murphy previously requested an

23   in camera review of Mr. Doucette's Presentence Report to

24   determine if he has testified regarding his assets in

25   contradiction to what he provided to the Probation Department.

1  And he also mentioned how that would figure into the

2  restitution, his ability, I guess, of his ability to pay

3  restitution.  And the government has argued that this material

4  is not relevant, and the Court has agreed with that.

5          If there is anything specific in that report, that

6  report is confidential to the client and who makes the report,

7  the Probation Department, which is an arm of the Court, and

8  also to the attorney for the person making the report.

9          The Court feels that none of the questions that

10 Mr. Murphy asked Mr. Doucette about the cars that he owns or

11 has previously owned or how much money he has spent on his

12 garage, etc., landscaping and so forth are relevant to the

13 Brink's burglary.  Further, any material contained in the

14 Presentence Report, as I say, is confidential.

15         Mr. Murphy has argued that this information is

16 relevant to restitution, and of course, as I said at sidebar,

17 that the Court will determine the restitution during the time

18 of sentencing if Mr. Murphy is found guilty, and that will be

19 addressed at that time.  I just wanted to make a full

20 discussion of what my ruling is on that.

21         Now, the other matter is on the request to have

22 Mr. Doucette available for recall.  Let the record show that

23 this is Thursday afternoon, and the case will not begin again

24 until next Tuesday.  And there are still witnesses in the

25 government case, and I would like to know on what basis --

1   after having five hours of cross-examination of Mr. Doucette --

2   on what basis you would have to recall him?

3        MR. MURPHY:  Your Honor, I would like to call

4   Mr. Doucette after Mr. Nassor testifies for the defense, Your

5   Honor.

6        THE COURT:  Why do you think you would have to do

7   that?

8        MR. MURPHY:  I believe it is going to be

9   contradicting testimony, Your Honor.  These guys are testifying

10  to facts that are 180 degrees apart in regards to this

11  burglary.

12       THE COURT:  Say that again.

13       MR. MURPHY:  These witnesses are testifying to

14  completely different stories as to what happened in regards to

15  this burglary.

16       THE COURT:  Mr. Nassor was not at the actual

17  burglary.

18       MR. MURPHY:  Right, but after.  When they both

19  returned to Lynn, Your Honor.

20       THE COURT:  Well, that was after the event?

21       MR. MURPHY:  It was still part of the conspiracy,

22  Your Honor.  That's what I meant.  Maybe I --

23       THE COURT:  Well, securing the property and so forth?

24       MR. MURPHY:  Yes, splitting up the money.

25       THE COURT:  Right.

1           MR. MURPHY:  Right.  Mr. Nassor testified to one

2   thing --

3           THE COURT:  The conspiracy was still going on.

4           MR. MURPHY:  Yes, at least until May.

5           THE COURT:  The aftermath.

6           MR. MURPHY:  I don't foresee anything lengthy on

7   either one of them, Your Honor.

8           MR. DOMINGUEZ:  Your Honor, Mr. Murphy -- that's the

9   purpose of cross-examination.  I mean, if he believes that they

10  testified differently, their testimony is on the record, he can

11  argue it.  But to bring these witnesses back to ask them the

12  same series of questions that he has already asked of these

13  witnesses, it is a waste of this Court's time, the jury's time

14  and our time.  That's what cross-examination is all about.  I

15  am adamantly against that.

16          MR. MURPHY:  And, Your Honor, I would add to the

17  Court that there was certain lines of questioning for

18  Mr. Doucette that Mr. Graeff had advised me to save until we

19  called him on the defense.

20          MR. GRAEFF:  That is correct.

21          THE COURT:  Well, what are those items?  The subject

22  matter?

23          MR. MURPHY:  It had to do with -- let me get the list

24  out, Your Honor.

25          THE COURT:  Generally speaking.

1          MR. MURPHY:  Off the top of my head -- I would have

2    to look at the list, Your Honor.  I have so many lines of

3    questioning --

4          THE COURT:  You held these?

5          MR. MURPHY:  I put them aside.

6          THE COURT:  Well, give me an example.

7          MR. MURPHY:  I believe that I had told you about

8    questioning Mr. Doucette about him going in my warehouse and

9    taking out certain items, and you had said that it was --

10   something about bad acts.  And I spoke to Mr. Graeff, and he

11   says that I could ask that when I called him for the defense.

12   That's just one of the lines.

13         THE COURT:  This is stealing from you?

14         MR. MURPHY:  Stealing from my warehouse after he

15   cooperated with the government.  My argument is that after he

16   cooperates with the government and cuts their deal, he is still

17   committing felonies against me.

18         THE COURT:  Okay.  That's an entirely different

19   matter.  You could charge him with a crime.

20         MR. MURPHY:  No, I am not asking to charge him with a

21   crime, but I believe it is information that affects his

22   untruthfulness and his character and that the jury should hear

23   this information.

24         THE COURT:  Well, that's not the way you go about

25   that.

1    MR. DOMINGUEZ:  Your Honor, two things.  One, it is

2  not a conviction.  It is not a conviction for a felony,

3  punishable by imprisonment exceeding one year.  Mr. Murphy and

4  Mr. Doucette had a dialogue on cross-examination about how they

5  commingled things, how he let him use things, how there is a

6  warehouse.  I believe it is confusing to this jury.  It is not

7  a conviction.  It is only tangentially probative of

8  truthfulness.

9    Mr. Murphy literally had Mr. Doucette up here for

10  five-and-a-half hours.  And may I add that he went way beyond

11  the scope of direct examination, and I sat on my hands and let

12  him do it.  To prolong this matter and for him to call him as a

13  witness is obstructing the course of this trial.

14    I believe the same is true for Mr. Nassor, for that

15  matter.  He had him up here for cross-examination and

16  cross-examined him on everything under the sun.

17    THE COURT:  Well, the Court is going to deny

18  Mr. Murphy's request for an in camera review, and Mr. Doucette

19  will not be held for any further questioning.

20    Now, it is the objection to the identification

21  obtained during the search warrant.

22    MR. DOMINGUEZ:  Your Honor, can we have Mr. Graeff to

23  approach us on a very collateral matter?

24    - - -

25    THEREUPON, there was a sidebar out of the hearing of

1    open court and the court reporter.

2                              – – –

3         THE COURT:  Now, Mr. Murphy previously requested an

4    in camera review of Mr. Doucette's Presentence Report to

5    determine if he has testified regarding his assets in

6    contradiction to what he provided to Probation, and we have

7    covered that.

8         And the other in camera, the objection to the I.D.,

9    the I.D. obtained during the –– I think that's the third name

10   that started with a "P"?

11        MR. MURPHY:  Palavacini.

12        THE COURT:  And during the search warrant executed at

13   407 Walnut.  And I want to make it clear that the Court has

14   previously denied the defendant's Motion to Suppress the search

15   warrant issued at 407 Walnut, which applies to any and all

16   items seized as a result of that warrant.

17        The Court found that there was sufficient probable

18   cause for issuance of both the search warrants and the agents

19   searching the home that reasonably relied on the search

20   warrants.

21        Now, Mr. Murphy has also mentioned the zoning or

22   zoning adjustment that was granted to him to run his businesses

23   out of his home and that does not make those areas off limits

24   because they are all at 407 Walnut.  And the I.D. was not

25   anything unusual because they had already found two other

1  I.D.s, and it was not placed in any unusual -- there was no

2  unusual situation surrounding the recovery of the I.D.

3        MR. MURPHY:  Okay.  What I would add to that, Your

4  Honor, in regards to Palavacini, that I.D. was not provided to

5  us in discovery.  Mr. Dominguez had taken pictures that he was

6  going to introduce into evidence of the two I.D.s together.  We

7  did not get that.  So, we did not have pictures of this I.D.,

8  and it is not on their witness list, Your Honor.

9        THE COURT:  How does that disadvantage you now?  You

10  have got it now, and your picture is on all three.  Is there

11  some kind of chemical test that you want to make on the I.D.?

12        MR. MURPHY:  Well, he introduced it at trial.  Your

13  Honor, we are entitled to it through discovery, and it wasn't

14  on his exhibit list.  For 407 Walnut Street, he specifically

15  put the Brian Hetherman I.D., which he obviously knew these

16  I.D.s were there and the key and the cash.  And he didn't put

17  the Palavacini --

18        THE COURT:  And how does that disadvantage you?

19        MR. MURPHY:  I didn't know he was going to enter it

20  until the last minute.

21        THE COURT:  And you would have done what?

22        MR. MURPHY:  I would have prepared.

23        THE COURT:  To do what?  You are not a magician,

24  Mr. Murphy.  Neither are any of these people.  You can't make

25  things disappear just because someone didn't give you the

1    information strictly within the time limits.  Those are

2    guidelines to make these trials move along and to be fair to

3    everyone.

4          MR. MURPHY:  Thank you, Your Honor.

5          MR. DOMINGUEZ:  So the record is complete, Your

6    Honor, because I don't want it to be incomplete, Mr. Murphy has

7    known about this search warrant on his case, on the E.A. Dion

8    case for more than a year.  He has known about the search

9    warrant.  He has known about the return.  He even made

10   objections based upon the return before this Court.  For him to

11   say that he didn't know those I.D.s existed in discovery in

12   this case, frankly, Your Honor, is ludicrous.

13         THE COURT:  I appreciate the additional information,

14   and I am glad that you put it in the record to further support

15   the ruling of the Court.

16         Now, I want to close today around four o'clock.

17   Bring in the jury.

18                         – – –

19         THEREUPON, the Jury entered the courtroom.

20                         – – –

21         THE COURT:  Your next witness.

22         MR. DOMINGUEZ:  Your Honor, Ms. Hill will be calling

23   the next witness.

24         THE COURT:  All right.

25         MS. HILL:  Jason Costello, Your Honor.

1     THE COURT:  Jason Costello?

2     MS. HILL:  Yes, Your Honor.

3                    - - -

4                JASON COSTELLO

5  AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

6                    - - -

7              DIRECT EXAMINATION

8  BY MS. HILL:

9     THE COURT:  You may proceed.

10     MS. HILL:  Thank you, Your Honor.

11  Q.   Good afternoon, sir.

12  A.   Good afternoon.

13  Q.   Could you please introduce yourself for the ladies and

14  gentlemen of the jury and spell your name for the record.

15  A.   Jason Costello.  It is C-O-S-T-E-L-L-O.

16  Q.   Thank you, sir.  Where do you work?

17  A.   I am a Special Agent with the FBI, and I am assigned in

18  Boston, Massachusetts.

19  Q.   How long have you worked for the FBI?

20  A.   Since July of 2004.

21  Q.   And have you worked out of the Boston, Massachusetts

22  office that entire time?

23  A.   Yes.

24  Q.   During your time with the FBI in Boston, were you involved

25  with a task force known as the Violent Crimes Task Force?

1   A.   Yes, I was.

2   Q.   And about how long did you participate in that group?

3   A.   From my arrival in Boston, after academy training,

4   December of 2004 through approximately July of 2010.

5   Q.   Can you tell the ladies and gentlemen of the jury a little

6   bit about what the Violent Crimes Task Force does?

7   A.   Sure.  It was a Task Force comprised of the FBI, the State

8   Police and various city and local police in the Greater Boston

9   Area.  We investigated everything from bank robberies and

10  burglaries to armored car robberies and burglaries and other

11  federal violations that were somewhat reactive in nature,

12  kidnappings, extortions and those type of matters.  One of the

13  other matters that was also assigned to me were major theft or

14  commercial breaking and entering crimes and investigations.

15  Q.   Agent Costello, what did you do prior to working with the

16  FBI?

17  A.   I was an Army officer, four years active duty and four

18  years in the Reserves.

19  Q.   In connection with your duties as an FBI agent, did there

20  come a time that you participated in the investigation of Sean

21  Murphy and his involvement in a burglary at the Brink's

22  facility in Columbus, Ohio?

23  A.   Yes.

24  Q.   How did you come to participate in that investigation?

25  A.   On March 31st of 2009, I had the opportunity to

1    interview Mr. David Nassor, and he indicated that Mr. Murphy

2    may have been involved in a burglary at Brink's in Columbus,

3    and that was my first indication of a possible link with both

4    Brink's and the Columbus office of the FBI.

5        I learned, in fact, that there was a Brink's break-in, and

6    I began my involvement there.

7    Q.   Now, that interview that you conducted with David Nassor,

8    how did you come to interview him, what were the terms of that

9    interview?

10   A.   He had been arrested on an unrelated matter, and he was

11   interviewed under the terms of a proffer agreement between the

12   United States Attorney's Office for the District of

13   Massachusetts and the Bristol County District Attorney's

14   Office.

15   Q.   Prior to this proffer interview with David Nassor, had you

16   ever participated in a proffer type of interview previously in

17   your duties as an FBI agent?

18   A.   Yes.

19   Q.   Approximately, how many times had you done that?

20   A.   One to two dozen times in proffer settings.

21   Q.   So, were you familiar at that point in time with the terms

22   of a proffer agreement?

23   A.   Yes.

24   Q.   What was your understanding regarding evidence that was

25   obtained during a proffer agreement?

1  A.   So long as the person being interviewed abided by the

2  terms of the proffer, that information that they offer cannot

3  be used against them.

4  Q.   So, was it your understanding that any information that

5  David Nassor gave during that proffer couldn't be used against

6  him?

7  A.   Yes, it was.

8  Q.   Now, did there come a time during your investigation in

9  this case that you actually traveled from Boston here to

10  Columbus, Ohio?

11  A.   Yes.

12  Q.   And when was that?

13  A.   July of 2009.

14  Q.   When you came here to Columbus, did you have an

15  opportunity to go and actually look around the Brink's

16  facility?

17  A.   Yes.

18  Q.   Can you describe the general area where that Brink's

19  facility is located?

20  A.   Somewhat of an industrial nature.  The Brink's facility

21  abuts some railroad tracks, you know, a pretty non-descriptive

22  area.

23  Q.   Were there any other buildings or businesses or anything

24  in the area that you found to be of significance in your

25  investigation?

1    A.    Yes.    There is a Jegs Auto Supply across the street, and I

2    believe about a block down the road is a VFW Hall or Post.

3    Q.    Why were those locations or businesses of significance to

4    you?

5    A.    Well, Mr. Nassor had described coming and casing a Brink's

6    facility in Youngstown, Ohio.    He said that there was a Jegs

7    Auto Supply right next door.    He spent the night watching the

8    facility from the VFW Post parking lot.    I googled Jegs Auto

9    Supply and found they only exist in Columbus and not in

10   Youngstown.    So, from what he saw on the ground, he was in

11   error initially by telling me he was in Youngstown, but he was,

12   in fact, in Columbus.

13   Q.    Now, during the course of your investigation, did you come

14   to learn whether or not there was ever any surveillance video

15   recording from any of those businesses in the area of Brink's?

16   A.    Yes.    Agent Trombitas from our office advised me there was

17   a video and shared the still frames of the video with me.

18   Q.    Did you have an opportunity to review those still photos?

19   A.    Yes.    Their image was very poor quality.    It was nighttime

20   photos.    I am not sure if it was snowing at that point, but

21   they are very blurry, nondescript to the point where it was

22   very difficult to ascertain a make and model of a vehicle.

23   Q.    Were you actually able to learn anything of any importance

24   or significance from those stills?

25   A.    No.

1  Q.   Now, Agent Costello, I want to turn your attention to the

2  time period of January of 2009.  And during that time period,

3  were you involved in the execution of a search warrant at 407

4  Walnut Street in Lynn, Massachusetts?

5  A.   Yes.  I was not directly involved in the search, but I was

6  involved in the larger operation going on that day.  So, I did

7  visit the search site once or twice.  I am aware of what was

8  happening.  They were case agents in Boston on an unrelated

9  matter.

10  Q.   Who did you know to reside at that location at that time?

11  A.   Sean Murphy.

12  Q.   And in connection with your involvement in the execution

13  of a search warrant, are you familiar with the items that were

14  recovered during it?

15  A.   Yes.

16        MS. HILL:  May I approach, Your Honor?

17        THE COURT:  You may, and you may continue to,

18  Ms. Hill.

19        MS. HILL:  Thank you.

20  Q.   (By Ms. Hill) I am showing you what has been marked for

21  identification as Government's Exhibit 6-3.  Can you take a

22  look at that?

23  A.   Yes.

24  Q.   Do you recognize that object, Agent Costello?

25  A.   Yes.  It is a key seized during the search.

1  Q.   And did you participate in any investigation regarding

2  that key, what it belonged to?

3  A.   It was recovered in the search.  It is from a company that

4  bears the initials "LA", which we determined to be a key

5  manufacturer.  We determined that the serial number on the key

6  was contained within a lot of keys that were manufactured and

7  sold to the LockUp Corporation.  In conversation with the

8  LockUp Corporation, we learned that that particular key was

9  issued to their Warrendale facility.

10 Q.   And did you do anything further with that information once

11 you learned that it belonged to the Warrendale LockUp?

12 A.   We contacted the Warrendale facility and confirmed that

13 the key was, in fact -- it corresponded to a storage facility.

14 That caused me to contact our Pittsburgh Division for

15 assistance in conducting local follow-up with the LockUp.

16 Q.   And to your knowledge, was there someone from that area

17 that actually went out to that facility?

18 A.   Yes.

19 Q.   Now, I wanted to turn your attention, Agent Costello, to a

20 time in your investigation of Sean Murphy that you reached out

21 and made contact with a company called Global Gadget?

22 A.   Yes.

23 Q.   How did you come in contact with that company?

24 A.   Again, Mr. Nassor identified or informed me that

25 Mr. Murphy had obtained a cell jammer from a company called

1  Global Gadget.  In addition, as a part of my investigation, I

2  subpoenaed Mr. Murphy's bank records from Eastern Bank.  On

3  those bank records in December of 2008, I noticed that there

4  were transactions for purchases from Global Gadget.  That

5  caused me to reach out to the London Legal Attache for

6  assistance and the local police.  The local police official

7  reached out to Global Gadget and asked them for assistance.

8  Q.  Were you able to obtain that information about Sean Murphy

9  from Global Gadget?

10  A.  Yes.

11  Q.  Can you describe generally the nature of the information

12  that you received from them?

13  A.  Largely, it was e-mail correspondence between Sean Murphy

14  and Mr. Michael Menage, who was the Director/Operator of

15  Global Gadget.  There were a few invoices and Fedex

16  Airwaybills.

17        MS. HILL:  May I approach the witness, Your Honor?

18        THE COURT:  You may continue to.

19  Q.  (By Ms. Hill) Agent Costello, I have handed you what has

20  been marked for identification as Government's Exhibit 4-1, and

21  that's including 4-1A and 4-1B.  Do you recognize that exhibit?

22  A.  Yes, I do.

23  Q.  What do you recognize it to be?

24  A.  Exhibit Number 4-1 is the signed sworn witness statement

25  of Mr. Michael Menage from Global Gadget.

1      Exhibit Number 4-1A is a Certificate of Authenticity of

2  Business Records executed by Mr. Menage.  It corresponds to

3  four Airwaybills relating to Fedex shipments from Global Gadget

4  to Sean Murphy.

5      Exhibit 4-1B, likewise, is an Authentication of Business

6  Records to the paginated bundle of correspondence between

7  Mr. Menage and Mr. Murphy.

8  Q.   Is that paginated group of e-mails contained in Exhibit

9  4-1B?

10 A.   Yes, the thick stack here of e-mails.

11 Q.   Are those documents that you received, then, from Global

12 Gadget in regards to Sean Murphy?

13 A.   Yes.

14 Q.   Have you had an opportunity to review all of those

15 documents?

16 A.   Yes, I have.

17 Q.   Now, directing your attention to a portion of the

18 documents labeled as Government's Exhibits 4-1B, at the time

19 that you reviewed that large bundle of e-mails, did you observe

20 portions of it that you found to be significant to your

21 investigation in this case?

22 A.   Yes.

23 Q.   And did you, in fact, then flag some of those portions

24 that you found to be significant?

25 A.   Yes.

1   Q.   Okay.  Do you observe those flags there in the document in

2   front of you?

3   A.   Yes, I do.

4   Q.   Those are areas of that document that you flagged as

5   significant?

6   A.   Yes.

7   Q.   Now, sir, I will draw your attention, first, to three

8   flags in the documents.  Can you describe for us, briefly, what

9   is referenced in those flagged portions of those e-mails?

10  A.   Well, there is a number of a string of e-mails concerning

11  the acquisition of a cellular phone jammer, a 300, 100-watt per

12  band jammer, to be more specific.

13       On page -- there had been a number of -- there is dialogue

14  back and forth.  The first e-mail of interest was dated Friday,

15  March 23 of 2007 in which Sean Murphy writes to Mr. Menage:

16       "Dear Mike:  Thanks for the Y2000 Quad.  Does your company

17  have access to a 100W (per band) Triple Band (300W total) or

18  Quad Band (400W total) cellular jammer?

19       Please let me know if any of your manufacturers can make

20  this type of cellular jammer, or if you can purchase it from

21  another company and sell it to our company.

22       Thank you.  Sean Murphy, Northshore, Lynn, Massachusetts."

23       So, there are a number of e-mails going back and forth

24  between them concerning spec'ing out a cellular jammer.

25       Ultimately, there are issues regarding import-export

1   regulations in the United States, and ultimately, there is some

2   dialogue about the manufacturer, which is in Israel, having

3   some qualms about shipping this directly to Mr. Murphy.

4       So, he poses a potential solution to Mr. Menage in an

5   e-mail dated Tuesday, March 27th of 2007 in which he writes:

6       "Dear Global Gadget:

7       We can handle the Israeli companies in two ways:

8       1.  You declare that Global Gadget is the end-user and

9   that the unit is being used for comparison to the units you

10  sell and its effectiveness in a given range.  The only problem

11  here is that Israel requires an End-User Certificate, and it

12  states that you will not export the unit a third country.

13      2.  We have been dealing with Phantom Technologies in

14  Israel regarding their CCJ1890/3.  However, they were unwilling

15  to describe the unit as an Amplifier and reduce the Invoice

16  amount.  Maybe I can have them send the unit to you as our

17  Import/Export broker and installation specialist.  They may be

18  willing to do this.  Their problem is that "their" Ministry of

19  Defense exportation papers must state that the unit is a

20  cellular jammer.  They already have an End-User Certificate

21  from us.  I will contact them again, and see if they are

22  willing to send it to you as our broker.

23      3.  Unless you have any other ideas that would accomplish

24  our goal.  It's the end result that matters.

25      4.  Lastly, check with the companies from India and China.

1  Maybe they will just send you a 100W per band unit without all

2  of the red tape.

3      Thank you.  Sean Murphy, Northshore."

4  Q.    Then, skipping ahead to the second flagged section.

5  A.    So, the dialogue continued over a series of e-mails, and

6  it was agreed on the pricing from this unit from Israel.

7      So, it picks up on Tuesday, April 10th of 2008:

8      Sean Murphy writes to Global Gadget:

9      "Dear Global Gadget:

10     We wire transferred you $37,969.62 on Friday, April 6,

11 2007.  Did you receive the money yet?  I have confirmed that

12 the money has been taken out of our account."

13     Global Gadget responds, it looks like, on April 16 of

14 2007:

15     "Dear Sir,

16     Just to let you know that Phantom has received our

17 payment, they have started the build process of this unit for

18 you.

19     Best regards, Mike Menage."

20     Then, on April 16, 2007, Mr. Murphy responds to Global

21 Gadget:

22     "Dear Global Gadget:

23     Please let me know when you have possession of the

24 CCJ1890/3.  I want to make sure that all of the documentation

25 is in order before you ship it here to us.

1    Thank you.  Sean Murphy, Northshore."

2  Q.   Did the conversation between Sean Murphy and Global Gadget

3  continue?

4  A.   There were a few issues with the Israel company.

5  Ultimately, the unit shipped out to Mr. Murphy in Lynn,

6  Massachusetts.

7  Q.   There was documentation of that within the e-mails?

8  A.   Yes.

9  Q.   Is that the next flagged section?

10  A.   The next flagged section is once the item has shipped,

11  Global Gadget e-mails Mr. Murphy and inquires as to the unit,

12  and it reads --

13  Q.   If you could hold on just a minute.  I will grab my copy

14  of the document for the ladies and gentlemen of the jury to

15  read.

16    Go ahead.

17  A.   The e-mail is dated June 18th of 2007:

18    "Dear Sir,

19    Please can you let us know how you get on with the Phantom

20  jammer, is it any good, what is build quality like, etc.

21    Best regards, Mike Menage."

22    On June 18th, Mr. Murphy responds:

23    "Dear Global Gadget:

24    The range on the CCJ1890/3 is incredible.  On a direct,

25  flat surface it jams for almost 1.5 miles.  The build quality

1  is good.  I would definitely purchase another unit.

2       Sean Murphy, Northshore."

3       Then Global Gadget responds:

4       "Just a couple more things.

5       Does the unit get very hot, is it fan cooled?

6       Any idea on range on the omnis?

7       Best regards, Mike Menage."

8       Then Mr. Murphy responds:

9       "Dear Global Gadget:

10       The unit has ten (10) fans all around.  Three on each

11  side, two on the front and two on the back.  It does get warm,

12  but not hot.  Not bad for a 100W per band unit.  We have not

13  tested the omnis yet.

14       Sean Murphy, Northshore."

15  Q.   Agent Costello, in your investigation of this case, have

16  you ever observed a cell jammer that matches the description

17  contained in that e-mail?

18  A.   Yes, I have.

19  Q.   Could you tell us how you observed that?

20  A.   Yes.  I was involved in a search on June 4th of 2009 of a

21  storage unit in Raymond, a self-storage unit in Raymond,

22  New Hampshire.

23  Q.   Is that where you observed that cell phone jammer?

24  A.   Yes.

25            MS. HILL:  Your Honor, may I have Agent Trombitas to

1  assist me?

2      THE COURT:  Yes, you may.

3  Q.  (By Ms. Hill) 1E-4.  Do you recognize that item?

4  A.  Yes, I do.

5  Q.  What is it?

6  A.  That was the unit that we recovered from the storage unit.

7  Q.  How would you note that was the unit?

8  A.  By the markings on it, by the evidence labels, and I also

9  recognize it from the description because I just read the ten

10 fans, two in front and two in back, three on each side.

11 Q.  Is that item in substantially the same condition as when

12 you observed it and collected it at the Raymond storage

13 facility on June 4th?

14 A.  Yes, it is.

15 Q.  Turning back, then, to the Global Gadget documents, moving

16 onto the next series of flags in Government's Exhibit Number

17 4-1B.

18      Can you tell us what is referenced, that flagged portion

19 of the exhibit?

20 A.  Sure.  This is yet another string of e-mails.  This one is

21 from -- it looks like the July of 2008 time period.  There had

22 been some interim between the two regarding additional

23 purchases, replacement parts, things like that.

24      This particular string picks up after Mr. Murphy appears

25 to have ordered some replacement cables or things of that

1 nature.  So, the e-mail I was most interested in starts on

2 July 13th 2008.

3 Q.    Is there a page reference on that?

4 A.    I'm sorry, Page 189.

5 Q.    All right.

6 A.    Mr. Murphy writes:

7      "Dear Mike:

8      Thank you for resolving the Omni Antenna issue.  You do

9 good business.

10      I have people here that want to purchase your products.  I

11 have one customer who wants two (2) Y2000 Quads.  Then, the one

12 customer who wanted a XK 1000 (5 band) 100W.  However, this

13 FEDEX Customs problem is a serious issue.  I was wondering how

14 long it would take for the US to catch up with you.  Based upon

15 my experience here in the US, you are going to have to change

16 the name of the company that ships to the US.  Customs has been

17 alerted and is looking for packages from GG.  If you change the

18 "shipping" name to something like "British Novelties, LLC", it

19 would take the US another 2-3 years to catch up with you again.

20      I guess it all comes down to how much business you do in

21 the US.  If Customs is starting to grab your shipments, it will

22 only get worse.  They are alerted by your company name ONLY.

23 Think about it and let me know.  It would make me more

24 comfortable putting $70,000 on the line for a new product,

25 knowing it won't get snatched up.

1     Thanks.

2     Sean Murphy, Northshore."

3     On July 13, 2008, Global Gadget responds:

4     "Dear Sir,

5     Unfortunately, the situation is not that straightforward.

6 We only have the Fedex problem at Newark, so this only affects

7 shipments to the eastern states.  We already tried

8 experimenting with different company names & item descriptions,

9 and it had no positive effect at Newark.  We have spoken to

10 Fedex some months ago about setting up a different account

11 completely, however, they will do that as we already have 1

12 established and proper full business account with them.  We

13 still ship by Fedex totally successfully to the western states.

14     Other delivery options include the following which you may

15 also like to consider:

16     1.  We use a different courier completely for your

17 shipments.

18     2.  We ship direct to you from the factory.

19     3.  You collect in UK and arrange your own transportation.

20     4.  We ship to western states for you to then arrange

21 ground transportation to your location.

22     With all of these options I'm afraid you would still be

23 liable for any losses.  The problem with the jammers nowadays

24 is that the FCC/customs are much more geared up to stopping

25 them, things are very different to 8 years ago when things just

1 went into the US easily.  The USA remains our main source for

2 customers, so to bypass Fedex into the eastern states we use

3 the Post office system which goes a different route, this has

4 been very successful so far with no losses, however for

5 shipment weights and values of your magnitude I would still be

6 wary.

7      Perhaps, we could both give further thought to this issue

8 and discuss by phone this week.

9      Best regards, Mike Menage."

10 Q.   Agent Costello, was there any reason why that particular

11 series of e-mails that you found to be significant?

12 A.   Yes.  We had learned through Mr. Nassor that cell phone

13 jammer shipments had been intercepted to Newark, New Jersey,

14 which necessitated him, when he went to pick up the cell phone

15 jammer, asked by Mr. Murphy to go to Memphis, Tennessee to

16 bypass the Newark port of entry for shipments in the US.  The

17 problem is that these -- outside of military and law

18 enforcement -- for use in the US are generally considered

19 illegal contraband, and the average user cannot obtain them.

20 Q.   Now, did those e-mails between Sean Murphy and Global

21 Gadget regarding any particular cell phone jammer continue?

22 A.   Yes.  That was back in 2008.  So, there was a drop-off, I

23 believe, for a little bit in the communications.  And then on

24 Friday, November 7th of 2008, so, a few months later, Sean

25 Murphy writes Global Gadget:

1    "Dear Mike:

2    Now that a few months have gone bye, what is the best way

3    to get your products into the US presently?  Have any Y2000

4    Quads made it into the US successfully within the past few

5    months?  I am looking to purchase, but I do not want to lose

6    the unit.  Please get back to me.  Thanks."

7    To this Global Gadget responds to on November 7th of 2008:

8    "Dear Sir,

9    Thanks for your e-mail.

10   We can ship by Fedex to you but it must go south west,

11   west or north west of TN so that the shipment goes thru Memphis

12   and not Newark (which is where the problem is).  We guarantee

13   Fedex next working day delivery to CA, NV, TX, WA, etc.

14   If you want us to ship to you in Massachusetts then we can

15   still not use Fedex, it would have to be some other carrier of

16   your choice at your own risk.

17   Best regards, Mike Menage."

18   And Mr. Murphy responds:

19   "Dear Mike:

20   I am sending one of my employees to a Residence Inn in

21   Denver, CO for the specific purpose of receiving an overnight

22   package from you.  As soon as he is there, I will give you my

23   credit card number for a 5 band (worldwide) Y2000 Quad.  I also

24   want 4 of the Phantom antenna cables and 4 Phantom Omni

25   antennas.  I found this combination to be the most efficient

1    for the Y2000 Quad.  The antennas and cables can be sent to me

2    here in Lynn, MA as they are not regulated.

3        I will be in touch.

4        Thanks, Sean Murphy, Northshore."

5    Q.   Agent Costello, did there come a point in this e-mail

6    correspondence where Mr. Murphy set up and arranged to purchase

7    this Y2000 Quad from Global Gadget?

8    A.   Yes.  In the next e-mail string, there is an e-payment

9    dated Tuesday, December 2 of 2008.

10            MS. HILL:  Give me one second to pull out a copy

11    here.

12            THE WITNESS:  Sure.  It is Page 205 breaking over to

13    206.

14    Q.   (By Ms. Hill) Starting on Page 205?

15    A.   Yes.  The header information is on 205, the body is on

16    206.  So, it reads -- I'm sorry.  It starts:

17        "Dear Mike:

18        Go forward with the order.

19        Ship to:  David Nassor, C/O Northshore Company, 110 Monroe

20    Avenue, Suite 501, Memphis, Tennessee 38103

21        The items from Phantom can be shipped directly to me here

22    in Lynn, MA to my company at 407 Walnut Street, Lynn, MA 01905.

23        Mastercard 5146940000192352 Exp. 09/10.

24        Thanks.  Send me the tracking info coming into the US.

25        Sean Murphy"

1    Global Gadget responds:

2    "Dear Sir,

3    Ok, we will go ahead and place the order on Phantom, I

4    will come back to you as soon we get an expected

5    production/supply date from them.

6    Regarding the Y2000 Quad, please note that we had to put

7    the prices of the jammers up in November due to the severe

8    weakening British pound against the strengthening USD, so the

9    current price of the Quad is L1950.00 GBP plus L74.00 GBP

10   Fedex.

11   The total cost of your order is therefore as follows:

12   Antenna/Cables from Phantom with Fedex to MA =

13   L1927.68F GBP.

14   Y2000 Quad with Fedex to TN = L2024.00 GBP.

15   Total = L3951.68 GBP.

16   We will need your approval of the total cost above before

17   taking this payment, so we await your response.

18   Best regards, Mike Menage."

19   And finally, on December 2nd, 2008:

20   "Dear Mike:

21   The amount is OK.  Just remember that there may be a

22   $2,500(USD) or a $5,000(USD) limit "per day" on my card.  I

23   have more than enough in the account.  So take whatever you can

24   "per day" until your total is withdrawn.  Please send the Unit

25   itself to Memphis, TN, as soon as possible.  My employee is

1  there waiting.

2      Thanks.  Sean Murphy, Northshore."

3  Q.    Agent Costello, can you explain briefly why this is

4  significant?

5  A.    Mr. Nassor, in order to take custody of the cell jammer,

6  he traveled to Memphis, Tennessee in the early part of December

7  of 2008 and stayed, I believe, at a Residence Inn there for a

8  couple days and took receipt of the Y2000 jammer from Global

9  Gadget.  Likewise, that date range covers in December two or

10 three transactions that I noted on Mr. Murphy's Eastern Bank

11 records made payable to Global Gadget.

12 Q.    And that Y2000 Quad cell phone jammer, is that the

13 device -- have you ever seen that after this?

14 A.    Yes, I have.

15 Q.    When did you come to see or observe that device?

16 A.    Again, on June 4th of 2009 at the search of the Raymond

17 self-storage, we recovered such a device.

18 Q.    Okay.  I will call on Agent Trombitas to assist.

19     Agent Costello, Agent Trombitas is going to be showing you

20 what has been marked for identification as Government's

21 Exhibits 1D-20, 1D-22 and 1D-23.

22     And when you have had a chance to look at those items, can

23 you tell us if you recognize those?

24 A.    Yes.  The item he is currently holding up is a Y2000 cell

25 phone jammer that was contained in this (indicating) blue

1  duffel bag bearing the name Carnival Cruise Line luggage

2  ticket.  The other items in the bag consisted of what appear to

3  be antenna cables and antennas.

4  Q.   And you observed all these items in the storage facility

5  in Raymond, New Hampshire?

6  A.   Yes.

7  Q.   And are they all in substantially the same condition as

8  when you observed and collected those items?

9  A.   Yes, they are.

10 Q.   Now, is that item, then, the same Y2000 Quad that is

11 referenced in those e-mails that we just discussed?

12 A.   Yes, it is the same model referenced.

13 Q.   And finally, I want to turn your attention back then to

14 that Global Gadget document?

15 A.   Yes.

16 Q.   Government's Exhibit 4-1, and specifically turning to

17 Government's Exhibit 4-1A.  Can you explain to the ladies and

18 gentlemen what that document actually is?

19 A.   Well, it is the Certificate of Authenticity, and it is a

20 page bearing copies of four Federal Express Airwaybills.

21 Q.   Let me get that document for you.  Taking a look at this

22 document, then, Agent Costello, 4-1A is.  Is this the second

23 page that you were just looking at?

24 A.   Yes.

25 Q.   Now, was there anything that you found to be significant

1 in looking at this document with regards to this case?

2 A.   Yes, the Airwaybill ending in "44208" with a shipment date

3 of June 6th of 2007.  That would seem to correspond with the

4 e-mail correspondence to the large cell jammer purchase.  And

5 then down at the -- and then of note, it does go to Sean Murphy

6 at his home address of 407 Walnut Street.

7     The bottom Airwaybill bill, ending in, I believe that's

8 "6095", for Global Gadget shipment to the Northshore Company,

9 care of David Nassor.  It says:  C/O Northshore Company, David

10 Nassor, 110 Monroe Avenue, Suite 501, Memphis, Tennessee.  That

11 one, it does specifically say:  "Model Y2000 Quad and extra

12 antennas."

13 Q.   Are those two areas that I just circled, are those the two

14 areas that you were just referencing?

15 A.   Yes, they are handwritten notes.

16 Q.   Going a little bit backwards here, Agent Costello,

17 Government's Exhibit 4-1, you previously indicated that was a

18 witness statement by Mr. Mike Menage?

19 A.   Yes.

20 Q.   Did you read through that witness statement?

21 A.   I did.

22 Q.   And what does that, basically, what information does that

23 provide to you?

24 A.   He indicates that he is the sole director of the company.

25 He describes the company as a broker or importer/exporter of

1  various electronics to include cellular jammers.  He gives a

2  brief description of what cellular jammers do, and he

3  summarizes his business dealings with Mr. Murphy.

4  Q.   And just so the record is clear -- I don't remember if you

5  referenced this or not -- where is Global Gadget located?

6  A.   It is in the United Kingdom.

7  Q.   So, Agent Costello, you earlier, just a few moments ago,

8  testified that you went to a storage facility in Raymond,

9  New Hampshire and that you observed a couple of items of

10 evidence there?

11 A.   Yes.

12 Q.   Can you explain to us the circumstances that led you to

13 that storage facility?

14 A.   Yes.  During the afternoon of June 4th, myself and

15 Detective Christopher McIntosh from the Columbus Police

16 interviewed Robert Doucette under the terms of a proffer

17 agreement about his involvement with the Brink's burglary.  He

18 subsequently led us to that storage unit.

19 Q.   The storage unit in Raymond, New Hampshire?

20 A.   Yes.

21 Q.   Do you recall the address of that storage facility?

22 A.   Well, the business address for Raymond Self Storage, I

23 believe, is 19 Dudley Road in Raymond, New Hampshire, but they

24 have two sites.  And this particular site is their second

25 remote location of storage bins, and it is located off of

1    Route 27 in Raymond, New Hampshire.  There was no street

2    address posted, but it is clearly marked by signage on the

3    roads.

4    Q.   And what did you observe when you went to that storage

5    facility?

6    A.   Well, it is a storage complex containing many buildings

7    with storage.  It is self-serve.  There is no gated access.

8    You can come and go 24 hours a day, seven days a week.

9    Mr. Doucette described to us and led us to a storage unit on

10   the very back corner of the property.  And if my memory serves

11   me correctly, the unit we ended up searching was Unit Number

12   26.

13   Q.   Now, in addition to those couple of items that you have

14   already described and identified here today, were there

15   additional items of evidence that you observed in that Raymond

16   storage facility and collected as evidence?

17   A.   Yes.

18   Q.   While you were there and collecting evidence, were there

19   photographs of the evidence as it was in the Raymond storage

20   facility?

21   A.   Yes, we photographed the entire search.

22   Q.   Now, were those all taken -- were all photographs taken

23   that night of the search or were some additional photographs

24   taken later?

25   A.   There were some taken later because we were doing the

1   search close to midnight or maybe breaking over onto the 5th.

2   We were in a remote location, no lighting.  We were doing it by

3   the headlights of vehicles.

4       So, what we did was we took the evidence out in its "as

5   is" or "as found" condition, and we loaded it onto an FBI box

6   truck.  And we transported it and locked it in our evidence

7   processing facility, so that the next day, under more

8   controlled conditions, we could example some of the items

9   contained within the items and photograph them and package them

10  properly for entrance into evidence.

11  Q.   Agent Costello, I have just handed you what has been

12  marked as Government's Exhibits 1B-1 to 1B-36, inclusive.  Can

13  you take a look through that stack of documents and tell me, if

14  you know, what that is?

15  A.   Yes.  These are photographs of our search in Raymond,

16  New Hampshire of evidence as we -- the way we had to do it

17  because the storage unit is, you know, it's a -- I think it was

18  a square unit or a rectangular unit, and there is a lot of

19  things piled in.  We took photos as we went in, and as we

20  proceeded to take items out, we would take more photographs, so

21  we could see the items that were obscured.

22      They show the money as we sealed it up, the loose money

23  that was not already in sealed boxes.

24      There is an entrance photograph of Unit 26 before we

25  opened it, and the empty unit once we cleared it of all

1    evidence.

2        It appears that 1B-1 through 30 were photographs taken at

3    Raymond storage.

4        1B-31 is a photograph of what I now know to be called, I

5    think, magnesium thermal rods on the floor, laid out for

6    photographic purposes of our processing facility.

7    Q.   Let me stop you, Agent Costello.  If I could just ask you,

8    1B-31 through 1B-36, are those the photographs that were taken

9    the following day after the search?

10   A.   No. 1B-31 and 32 were taken the following day, 32 being

11   what I know now is a hydraulic generator.

12       1B-33 through 1B-36 are certain items that we classified

13   as hazardous materials.  And just based on our evidence storage

14   rules, we could not put them in storage.  So, there came a

15   time, with the concurrence of the U.S. Attorneys Office, we

16   photographed and subsequently destroyed those items because we

17   couldn't maintain them any longer.

18   Q.   In regards, specifically, to 1B-1 to 1B-30, do those

19   photographs fairly and accurately depict the scene there at the

20   Raymond storage facility as you observed it on the night of

21   June 4th?

22   A.   Yes, they do.

23   Q.   And in regards to 1B-31 through 1B-36, do they accurately

24   represent the way the evidence was collected and maintained

25   after it was collected from Raymond?

1    A.    Yes.

2    Q.    Briefly, Agent Costello, showing you what has been marked

3    as Government's 1B-31, what's depicted in that photograph?

4    A.    Those are what I believe to be the magnesium thermal rods,

5    they are a cutting instrument.

6    Q.    And that picture was taken at the FBI facility?

7    A.    Yes.

8    Q.    And those rods came out of the Raymond storage facility?

9    A.    Yes.

10   Q.    1B-32?

11   A.    That is what we were describing as a hydraulic generator.

12   Q.    And that came out of the Raymond storage facility?

13   A.    Yes, it did.

14   Q.    1B-33?

15   A.    Yep.  Those are, you know, bottled gas that we ultimately

16   destroyed in lieu of retaining.

17   Q.    And that was taken out of the Raymond storage facility?

18   A.    Yes.

19   Q.    And 1B-34?

20   A.    Likewise, bottled gas that we destroyed.

21   Q.    From the Raymond storage facility?

22   A.    Yes.

23   Q.    1B-35?

24   A.    These are some lubricants that we also recovered from

25   Raymond, and we destroyed in lieu of storing.

1   Q.   And 1B-36?

2   A.   Those are two car batteries that we recovered in Raymond,

3   and we likewise destroyed.

4   Q.   Agent Costello, how long have you been involved in the

5   investigation of this case?

6   A.   Well, I became involved in an investigation back in August

7   or September of 2009.  Specifically, the Brink's case, I became

8   involved -- once I learned of it -- at the tail end of March or

9   the beginning of April of 2009.

10   Q.   And have you been present during the course of this trial

11   here in Columbus, Ohio?

12   A.   Yes.

13   Q.   About how long have you been here this week?

14   A.   Since Monday night.

15   Q.   Pursuant to the rule of separation, you haven't actually

16   been in the courtroom during the testimony in this trial; is

17   that correct?

18   A.   That's correct.

19   Q.   So, you are not personally aware of the testimony that has

20   been provided during this case?

21   A.   No.

22   Q.   Are you aware that certain items of evidence have been

23   introduced and identified during the course of the trial?

24   A.   Yes, you have advised me of such.

25   Q.   And have you had an opportunity to observe and review some

1  of the evidence that you know has been identified and shown

2  here in the trial?

3  A.   Yes.

4  Q.   And have you had an opportunity to review the Government's

5  Exhibit list in this trial?

6  A.   Yes.

7  Q.   Okay.  And have you seen the correlation of the evidence

8  that you reviewed to the Government's Exhibit list?

9  A.   Yes.

10  Q.   Specifically, drawing your attention to items that you

11  have seen labeled and referenced in the Government's Exhibit

12  list as items 1D-1 through 1D-7, 1D-9 through 1D-19 and 1D-21.

13  Do you recall reviewing those items?

14  A.   Yes.

15  Q.   And when you observed them, what did you observe them to

16  be, generally speaking?

17  A.   Items that we recovered from the Raymond storage facility

18  on June 4th.

19  Q.   And did you observe those items to be in the same or

20  substantially same condition as at the time that you recovered

21  them?

22  A.   Yes.

23  Q.   And turning your attention to items that were labeled as

24  Government's Exhibits 1E-1 through 1E-3 and 1E-5 through 1E-9.

25  Do you recall observing those documents -- those items and

1  observing them in their condition?

2  A.   I believe so.  I actually would have to see the list up on

3  the screen, but I know I have reviewed the entire list.

4       MS. HILL:  If I may approach Your Honor, to give him

5  the list?

6       THE COURT:  Yes.  Are we about through the evidence?

7       MS. HILL:  What?

8       THE COURT:  Are we about through this?

9       MS. HILL:  Yes, Your Honor.

10 A.   Yes, I have observed all of these items.

11 Q.   (By Ms. Hill) And again, what, generally, did you observe

12 those items to be?

13 A.   Again, items that we recovered from the Raymond

14 self-storage facility.

15 Q.   Were those in the same or substantially the same condition

16 as they were at the time that you had collected them from

17 Raymond?

18 A.   Yes, with the exception of forensic processing that had

19 taken place on them.

20      MS. HILL:  I apologize, Your Honor.  Just a couple of

21 more things before we are at a good breaking point.

22      THE COURT:  Yes.

23 Q.   (By Ms. Hill) Now, I want to talk about just a few

24 specific items of evidence in addition to those that you have

25 already identified regarding the Raymond storage.

1    MS. HILL:  May I approach, Your Honor?

2    THE COURT:  You may continue.

3 Q.  (By Ms. Hill) I am showing you what has been marked as

4 Government's Exhibit 1E-10.  And for the sake of efficiency, if

5 Agent Trombitas could approach with one additional item of

6 evidence?

7    Starting with the piece of evidence that I have just

8 handed you, 1E-10, do you recognize that, Agent Costello?

9 A.  Yes, this is a Brink's Inventory Control Sheet.

10 Q.  And where did you recover that, if you did?

11 A.  From our search at Raymond Self Storage.

12 Q.  And is that in the same or substantially the same

13 condition as at the time that you obtained it and collected it?

14 A.  Yes.

15 Q.  And then turning your attention to that large object

16 identified as Government's Exhibit 1E-10 (sic).  Do you

17 recognize that object?

18 A.  Yes, that's a small gasoline-powered generator.

19 Q.  And how are you able to recognize that?

20 A.  By its evidence labeling.

21 Q.  And where did you identify that object?

22 A.  At Raymond Self Storage during our search.

23 Q.  Is that in the same or substantially the same condition as

24 at the time when you discovered it at Raymond Self Storage?

25 A.  Yes, it is.

1          COURTROOM DEPUTY CLERK:  I'm sorry.  What was that

2    exhibit number?

3          MS. HILL:  It would be 1E-4.

4          And Your Honor, that concludes the physical evidence.

5          THE COURT:  Thank you.  Due to the lateness of the

6    hour, I am going recess until Monday morning at 9:30.

7          Remember the admonition not to discuss this case with

8    each other or allow anyone to discuss the case with you, which

9    includes the attorneys or anyone involved in the case and

10   report any violations to Court personnel.

11         Do not form or express an opinion on the case until

12   deliberations.  And do not make any investigations of the case,

13   and do not discuss it with your family or friends or observe

14   media reports.

15         When you come back in on Monday, wear your badges,

16   and thank you very much for your kind attention.

17                         - - -

18         THEREUPON, the Jury was excused for the evening

19   recess, and the following proceedings were had in open court

20   with Court and counsel and the defendant:

21         THE COURT:  We are getting toward the end of the

22   case, I assume?

23         MR. DOMINGUEZ:  Well, it depends upon

24   cross-examination.

25         THE COURT:  Yeah, I understand.

1       MR. DOMINGUEZ:  I believe we only have one other

2  witness besides Agent Costello, Your Honor.

3       THE COURT:  Okay.  I would assume that you would like

4  -- you are going to make a motion for acquittal, Mr. Murphy?

5  Is Mr. Graeff in here?

6       MR. GRAEFF:  Yes.

7       THE COURT:  Oh, I didn't see you.  Mr. Murphy, I want

8  you to work closely with Mr. Graeff and have that typed up.

9       MR. MURPHY:  Okay.

10      THE COURT:  Okay?  Not to be turned into me, but at

11  the right time, I want to be able to, you know, have that

12  typed-up with plenty of copies, so we can have that and be very

13  thorough.  So we can have that or anything else that deserves

14  attention, I would appreciate it in writing, if that's at all

15  possible.  Now, that's not always possible because they come up

16  as we go along, but if it is, I would appreciate it.  And you

17  have got an extra few days here to work on that.

18      MR. GRAEFF:  Yes, sir.

19      THE COURT:  Thank you and good evening.

20      MR. GRAEFF:  Good evening.

21      MR. DOMINGUEZ:  Good evening, Judge.

22      MR. MURPHY:  Have a good weekend, Your Honor.

23      THE COURT:  You, too.

24                     - - -

25      THEREUPON, Page 194 through Page 198 are a sealed

1    hearing that took place Thursday afternoon, October 20, 2011.

2                        - - -

3            THEREUPON, the trial was adjourned for the weekend

4    recess to be resumed on Monday, October 24, 2011 at 9:30 a.m.

5                        - - -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                       C E R T I F I C A T E

3    United States of America

4    Southern District of Ohio

5            We, Georgina L. Wells and Denise N. Errett, Official

6    Court Reporters of the United States District Court for the

7    Southern District of Ohio, do hereby certify that the foregoing

8    193 pages constitute a true and correct transcription of our

9    stenographic notes taken of the proceedings held in the City of

10   Columbus, Ohio, in the matter therein stated, on the 20th day

11   of October, 2011.

12           In testimony whereof, we hereunto set our hands on

13   the 23rd day of March, 2012.

14

15

16                           /s/ Georgina L. Wells

17                           _____
                             Georgina L. Wells, RMR
18                           Official Court Reporter
                             Southern District of Ohio
19

20                           /s/ Denise N. Errett, FCRR

21                           _____
                             Denise N. Errett, FCRR
22                           Official Court Reporter
                             Southern District of Ohio
23

24

25