1

1                 UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF OHIO
2                     EASTERN DIVISION

3

4

UNITED STATES OF AMERICA,    )
5                    )     CASE NUMBER
           PLAINTIFF,   )     2:11-CR-10(1)
6        VS.          )
                    )     COLUMBUS, OHIO
7  SEAN D. MURPHY,        )     OCTOBER 24, 2011
                    )
8           DEFENDANT.   )
_____

9

10                      **VOLUME 5**
       **TRANSCRIPT OF THE JURY TRIAL PROCEEDINGS**
11      BEFORE THE HONORABLE GEORGE C. SMITH
      UNITED STATES DISTRICT JUDGE AND A JURY

12

13

14

15

16  APPEARANCES OF COUNSEL:

17  FOR THE PLAINTIFF:       SALVADOR DOMINGUEZ, AUSA
                     HEATHER HILL, AUSA
18
  FOR THE DEFENDANT:       SEAN MURPHY, PRO SE
19                     DAVID GRAEFF, STAND-BY COUNSEL

20

21

22

23

24      GEORGINA L. WELLS & DENISE N. ERRETT
        OFFICIAL FEDERAL COURT REPORTERS
25            (614) 719-3225

2

```
1                        I-N-D-E-X

2               VOLUME 5 - OCTOBER 24, 2011

3


4   WITNESSES:                                    PAGE NO.

5   JASON COSTELLO   -  Direct Ex. by Ms. Hill.........   7
                     -  Cross-Ex. by Mr. Murphy........  28
6                    -  Redirect Ex. by Ms. Hill....... 120
                     -  Recross-Ex. by Mr. Murphy...... 120
7
    JANEL MEAD       -  Direct Ex. by Mr. Dominguez.... 124
8                    -  Cross-Ex. by Mr. Murphy........ 138

9   HARRY TROMBITIS  -  Direct Ex. by Mr. Dominguez.... 144
                     -  Cross-Ex. by Mr. Murphy........ 151
10
    DAVID NASSOR     -  Direct Ex. by Mr. Murphy....... 162
11                   -  Cross-Ex. by Mr. Dominguez..... 174
                     -  Redirect Ex. by Mr. Murphy..... 175
12
    HARRY TROMBITIS  -  Direct Ex. by Mr. Murphy....... 177
13                   -  Cross-Ex. by Mr. Dominguez..... 183
                     -  Redirect Ex. by Mr. Murphy..... 185
14

15

16                        - - -

17

18

19

20

21

22

23

24

25
```

3

1          Monday Morning Session

2          October 24, 2011

3          9:53 a.m.

4          - - -

5          (REPORTER'S NOTE:  The jury is not present.)

6    IN OPEN COURT:

7          THE COURT:  We have a request by Mr. Murphy to

8    interview David Nassor, who has already testified and been

9    cross-examined.

10          First of all, what is the Government's position on

11   that?

12          MR. DOMINGUEZ:  Well, Your Honor, the one concern I

13   have -- and it, candidly, it's not a concern I have from a

14   personal perspective; but Mr. Nassor is, in fact, a represented

15   party.  And an attorney and I don't believe a pro se attorney

16   can have contact with a represented party.

17          Obviously, Mr. Murphy has cross-examined Mr. Nassor

18   at length.  The Court held him to be called on direct

19   examination.  So, that would be my only concern:  the ethics

20   involved, Your Honor.

21          THE COURT:  Mr. Murphy, what is your plan here with

22   Mr. Nassor?  Is it -- why do you have to interview him before

23   you put him on the stand?

24          MR. MURPHY:  Well, Your Honor, we have -- first of

25   all, one of the first things that I would ask Mr. Nassor is if

4

1   he waives his attorney/client privilege.  If he doesn't waive

2   it, I will not interview him.

3           There were certain issues that were brought up by Mr.

4   Doucette, and I would like to interview Mr. Nassor as my

5   witness, now, to determine if these are issues that should be

6   brought up on his recalling from the defense, Your Honor.

7           THE COURT:  All right.  Well, I'll question Mr.

8   Nassor to make sure he does not want counsel present, and

9   further advise him that he has agreed to cooperate with the

10  government in exchange for a favorable plea agreement, which

11  could be put in jeopardy if he fails to tell the truth.

12          All right.  Call your next witness.

13          MR. DOMINGUEZ:  Your Honor, if I may, I thought this

14  might be best brought up outside the hearing of the jury in

15  this matter.

16          As the Court is aware, Mr. Murphy, in his opening

17  statement, made some comments about Jason Costello which

18  suggested that Mr. Costello, or Agent Costello, wrongfully

19  targeted Mr. Murphy in terms of this investigation.

20          The government has a concern, candidly, about that

21  depending on the nature of the cross-examination.  I guess I

22  just want to put Mr. Murphy on notice and the Court on notice

23  that Agent Costello was well aware of Mr. Murphy's past.  He's

24  well aware of Mr. Murphy's involvement in the Costco burglary

25  in Pennsylvania, 2004, to which Mr. Murphy entered a guilty

1    plea.  He's aware of the Amerisource burglary, where more than

2    a million dollars worth of pharmaceuticals were taken, in which

3    Mr. Murphy was implicated.  And he is well aware of the E. A.

4    Dion burglary for which Mr. Murphy is now under indictment in

5    the State of Massachusetts.

6            As Mr. Murphy has brought out in a preliminary

7    hearing with respect to the admissibility of the manifesto, if

8    you will, Mr. Murphy has participated in several proffers with

9    Agent Costello.  Therefore, Mister -- Agent Costello has a

10   broad range of knowledge of Mr. Murphy's activities separate

11   and distinct from the charges for which he is litigating here.

12           So, I guess my concern is, based on the nature of the

13   questions that Mr. Murphy may ask, he may very well open the

14   door to a lot of information coming before this Court that the

15   government would not otherwise try to bring out from Agent

16   Costello.

17           THE COURT:  Mr. Murphy, take heed of what was just

18   said.

19           MR. MURPHY:  I did, Your Honor; but, you know, my

20   concern would be that, A, the proffer would not be inadmissible

21   unless I took the stand and testified differently or I

22   introduced a defense that was inconsistent with the proffer.

23   That's in regards to the proffer.

24           And the government just brought up issues where I was

25   not charged with crime.  This Amerisource crime that he's

1    talking about, I was not charged with this crime, Your Honor.

2    The statute of limitations has run on it.  It can no longer be

3    charged.  And in order for allowing the government to introduce

4    evidence of that, Your Honor, it would be highly prejudicial.

5    And I don't --

6              THE COURT:  Well, don't ask about it.

7              MR. MURPHY:  I wasn't going to.

8              THE COURT:  That's what he's advising you.

9              MR. MURPHY:  Right.

10             THE COURT:  Do you get that?

11             MR. MURPHY:  No.  I understand what he's saying, but

12   I -- what I was --

13             THE COURT:  Don't open the door.  Do you know what

14   that means?

15             MR. MURPHY:  I know what opening the door means, Your

16   Honor.

17             THE COURT:  All right.

18             Agent Costello.

19             We're doing the cross on Costello, right?

20             MR. DOMINGUEZ:  Finishing the direct, Your Honor.

21             THE COURT:  Oh, finishing direct.  Oh, I'm sorry.

22   Okay.

23             And bring him in, and you may start as soon as he

24   gets in here.

25             Bring in the jury.  Get this show on the road.

7

1    Why don't you be seated until the jury comes in,

2 Agent Costello.  I'm going to advise you that you're still

3 under the oath.

4    THE WITNESS:  Yes, Your Honor.

5    THE COURT:  Okay.

6    (Whereupon, the Jury was seated in the courtroom at

7 10:00 a.m.)

8    THE COURT:  Good morning.

9    JURORS:  Good morning.

10    THE COURT:  Agent Costello was on the stand when we

11 closed up business last week.

12    And, Mr. Costello, I advise you you're still under

13 the oath previously administered.

14    You may proceed.

15    MS. HILL:  Thank you, Your Honor.

16                    - - -

17                JASON COSTELLO,

18 HAVING PREVIOUSLY BEEN FIRST DULY SWORN, FURTHER TESTIFIED AS

19 FOLLOWS:

20                    - - -

21           CONTINUED DIRECT EXAMINATION

22 BY MS. HILL:

23 Q.   Good morning, Agent Costello.

24 A.   Good morning.

25 Q.   When we left off last week, we were discussing the

1    evidence that you and other agents and officers from the FBI

2    and Columbus Police have recovered from that Raymond, New

3    Hampshire, storage facility.  Do you recall that testimony?

4    A.    Yes.

5    Q.    Now, I just want to talk specifically about one more piece

6    of evidence that you had talked about briefly last week.

7              MS. HILL:  May I approach, Your Honor?

8              THE COURT:  You may.

9    BY MS. HILL:

10   Q.    Now, I have handed you what has been marked as

11   Government's Exhibit 1D-13.  Do you recognize that?

12   A.    Yes, I do.

13   Q.    And what is that?

14   A.    It's a TomTom GPS.

15   Q.    And is that one of the items that you'd previously

16   discussed that you discovered in that Raymond storage facility?

17   A.    Yes.

18   Q.    Now, have you had the opportunity to review the contents

19   and information that was within that TomTom GPS device?

20   A.    Yes, I have.

21   Q.    Can you explain how that was done?

22   A.    It was powered up, turned on, and then the various menus

23   were scrolled through for recent places visited and favorite

24   locations stored in the device.

25   Q.    And was the information stored in those different places?

1  The favorites or the recent locations, was that documented in

2  any way?

3  A.   Yes, it was photographed.

4  Q.   And have you had the opportunity to review the photographs

5  documenting all that information?

6  A.   Yes, I have.

7  Q.   And I've handed you, there, what has been marked for

8  identification as Government's Exhibits 1D-13A through 1D-13L

9  inclusive.  Can you look through those documents and tell me if

10 you recognize those when you're done?

11 A.   Yes.  13A would be the GPS, with the serial number

12 exposed.

13      13B would be the initial screen when the GPS was started

14 up.

15      13C is a menu screen.

16      13D is another menu screen under the "Navigate To"

17 category.

18      13E is a listing of recent destinations.  Of note on the

19 recent destinations shows 922 Brush Creek Road, Warrendale,

20 Pennsylvania; 1362 Essex Avenue, Columbus, Ohio; as well as

21 Walnut Street, Lynn, Massachusetts.

22      13F is an additional listing of recent destinations.

23      Likewise, 13G is a listing of recent destinations.

24      And, finally, 13H is a listing of recent destinations.

25      13I is a listing of favorites.  Under "Favorites," two

10

1    items of interest are stored:  922 Brush Creek Road,

2    Warrendale, Pennsylvania, as well as 1362 Essex Avenue,

3    Columbus, Ohio.

4        And Walnut Street, Lynn, Massachusetts, is shown on 13J,

5    still under "Favorites."

6        And, 13K, it's a search of recent cities that were

7    searched for, or a screen, rather, showing that.  And

8    Warrendale, Pennsylvania, and Tarentum, Pennsylvania, are two

9    cities listed.

10       And one additional screen shot of that on 13L, which would

11   be Warrendale, Pennsylvania; Tarentum, Pennsylvania, and

12   Pittsburgh, Pennsylvania.

13   Q.   Now, do those photos fairly and accurately reflect the

14   information that you observed on that TomTom GPS device?

15   A.   Yes.

16   Q.   Now, Agent Costello, I just want to go over a couple of

17   these photographs that you just discussed.  In Government's

18   Exhibit 1D-13E, you discussed a couple of these addresses.  You

19   said the 922 Brush Creek Road, in Warrendale, Pennsylvania.

20   A.   Yes.

21   Q.   And you indicated that was an address of significance in

22   your investigation?

23   A.   That is the address of the Lock-Up Storage facility in

24   Warrendale, Pennsylvania.

25   Q.   Okay.  And then you also mentioned the 1362 Essex Avenue?

11

1    A.    Yes.   That's the location of the Brink's facility here in

2    Columbus.

3          The final one I referenced was Walnut Street.  Mr. Murphy

4    resides at 407 Walnut Street, in Lynn, Massachusetts.

5    Q.    Okay.  And then turning just briefly to Government's

6    Exhibit 1D-13I, is that where you indicated you observed those

7    two addresses again that you found to be of significance?

8    A.    Yes.   Both of those, the Lock-Up address, as well as the

9    Brink's address, are stored as favorites.

10   Q.    Now, Agent Costello, during the course of your

11   investigation, have you discovered or investigated anything

12   about the distance between, approximately, the Lynn,

13   Massachusetts, area to Warrendale, Pennsylvania, and/or from

14   Warrendale, Pennsylvania, to Columbus, Ohio?

15   A.    Yes.

16   Q.    And what have you learned about that, that distance?

17   A.    A round trip from -- well, I did it from Newmarket

18   Storage, in Newmarket, New Hampshire, to stopping in Lynn,

19   stopping in Warrendale, to Columbus, and then returning by that

20   same route.  It was approximately 1,720 miles, based on just

21   Google maps and using the centers of those towns as reference

22   points.

23   Q.    Okay.  And how does that compare, if you know, to the

24   distance that was -- the mileage driven on the Budget rental

25   truck that was rented by -- I believe it was Brian Hetherman in

12

1  this case?

2  A.   It fits in perfectly with that number.  I don't know the

3  exact number off the top of my head, but I believe it was

4  somewhere in the mid 1700s, was actually the odometer was

5  showing when it was returned.

6  Q.   And have you had a chance to compare the mileage that you

7  have determined to the distance that was driven by the Thrifty

8  rental car that was rented by Sean Murphy in this case?

9  A.   Yes.

10  Q.   And how does that compare?

11  A.   Again, without the invoice, I don't recall the exact

12  mileage on the rental car, but I know that a trip from Lynn,

13  Massachusetts, all the way through to Columbus by way of

14  Warrendale and back again would fit with inside the listed

15  mileage on the odometer upon its return.

16  Q.   All right.  Moving on, during the course of your

17  investigation, did you come into possession of a book entitled,

18  or a booklet, pamphlet thing, entitled "Master Thief, How to Be

19  a Professional Burglar," written by Sean Murphy?

20  A.   Yes, I did.

21       MR. MURPHY:  Objection, Your Honor.  How can the

22  government take my course and then turn around and try to use

23  it against me, Your Honor?

24       THE COURT:  Objection overruled.

25  BY MS. HILL:

13

1   Q.   Have you had an opportunity to review that document?

2   A.   Yes, I have.

3   Q.   Can you explain to the ladies and gentlemen of the jury

4   generally what is that, is contained in that document?

5   A.   Yes.  It's essentially a how-to guide to plan for, equip

6   yourself for, and carry out high-end commercial burglary;

7   discusses tools required, how to use those tools, where they

8   would fit into a burglary, things of that nature.

9   Q.   And is there any sort of set-up to the book, or is it all

10   just one big, long document, or are there sections or anything?

11   How is it broken down, if you recall?

12   A.   It seems very fairly well thought out.  It's divided into

13   chapters that progress in a logical order.

14   Q.   And did you find any particular portions of the document

15   to be significant in regards to this investigation?

16   A.   Yes, I did.

17          MS. HILL:  May I approach, Your Honor?

18          THE COURT:  You may.

19   BY MS. HILL:

20   Q.   Handing you what's been marked Government's Exhibit 15-1,

21   now, do you recognize that document?

22   A.   Yes, I do.

23   Q.   And what is that document?

24   A.   "Master Thief, How to be a Professional Burglar," by Sean

25   Murphy.

14

1    Q.    Now, during your prior review of that document, did you

2    mark, or flag, the portions of it that you found to be

3    significant in regards to your investigation in this case?

4    A.    Yes.

5    Q.    Okay.  And, turning briefly, you indicated there were --

6    it's broken out into sections or chapters.  Can you indicate

7    and let us know what those chapters are?

8    A.    It's broken into ten chapters:  Research, Scope, Tools and

9    Equipment, Set Up, Entry, Safe and Vaults, Smash and Grab,

10   ATMs, Flukes and Storage.

11   Q.    Then, turning to that first chapter, is there a section in

12   that chapter that you flagged during your review that you found

13   to be significant?

14   A.    Yes.  Under the "Research" chapter, there is a line in

15   reference to how to select a potential target to be

16   burglarized.  There is a quote:  Most of the online telephone

17   directories like Superpages and Yellow Book, have a map feature

18   available for very businesses -- very business listing and its

19   database.

20        I am assuming that's a misspelling by the circle.

21        The map feature will allow you to choose a bird's-eye

22   view, which is a picture taken from a satellite in space.  You

23   can zoom in to see the building itself and all the surrounding

24   areas.  This will allow you to assess if the score is even

25   worth looking at in person.  As will be discussed in the next

15

```
 1   chapter, location is the most important fact when picking a
 2   target.
 3   Q.   And why, Agent Costello, did you find that portion of this
 4   document to be significant in regards to this investigation?
 5   A.   Well, during my debrief of Mr. Doucette on June 4th, he
 6   mentioned that Mr. Murphy had shown him photos of the Brink's
 7   location to be burglarized on the Internet and indicated that
 8   that's how he researched this particular facility, was over the
 9   Internet, using some features like Google Earth and the like.
10   Q.   All right.  And then turning to the second chapter, the
11   chapter you'd indicated was entitled "Scope," --
12   A.   Yes.
13   Q.   -- was there any section of that chapter that you had
14   flagged as being particularly relevant to your investigation in
15   this case?
16            THE COURT:  What chapter is this, now?
17            MS. HILL:  Chapter 2, entitled "Scope."
18            THE WITNESS:  Yes.  The third paragraph of note:  One
19   of the first things to assess is location.  Is this a good spot
20   to do a score?  Generally, industrial parks and remote set-ups
21   are best.  The less people have a chance at seeing you, the
22   better your chances are for running into a fluke.  Also, you
23   may be making a lot of noise or moving around on a roof.  Good
24   locations put the advantage on your side.
25   BY MS. HILL:
```

1   Q.   And what was it about that section that you found to be

2   particularly significant?

3   A.   Well, the Brink's facility is situated in an industrial

4   type area.  It's not what I would consider in a traditional

5   industrial park, but it is very industrial in nature, meaning

6   there are very few residential units around.  Likewise -- and,

7   again, from Mr. Doucette's proffer, he had said that, you know,

8   they were making a lot of noise on the roof attempting to gain

9   access.  So both of those notes would fit here within this

10  paragraph.

11  Q.   Turning then to Chapter 3, "Tools and Equipment," were

12  there any sections of this chapter that you found to be

13  significant?

14  A.   Yes.  Well, I found the whole section to be significant,

15  but there are a couple of items of particular note that I

16  thought were interesting and relevant to the current case at

17  hand.  The first one would be on the first page of that section

18  under -- and it's subtitled "Cell Phone Jammer."

19       "A cell phone jammer will jam the signal and alarm

20  system's backup wireless transmitter.  The best jammers are,

21  quote, worldwide jammers that cover all the cellular

22  frequencies all over the world.  The frequency bands are 800

23  megahertz, 900 megahertz, 1800 megahertz, 1900 megahertz, 3G

24  megahertz, and now the 4G megahertz network.  The higher the

25  power, wattage, in parentheses, the more effective your jammer

1   will be.  Ten watts per channel.

2       My copy is a little light.

3       An excellent jammer will be 100 watts per channel.  Most

4   jammers can be powered by AC or DC.  The higher powered jammers

5   use 220 volt AC, but also use 24 volt DC.  Considering that no

6   roof will have 220 volt AC accessible, it is easier to put two

7   12 volt car batteries in series.  Connect the positive terminal

8   of one battery to the negative terminal of the second battery

9   with a wire, which will give you 24 volts DC on the open two

10  terminals remaining on the two car batteries.

11  Q.   Now, why did you find this section on cell phone jammers

12  to be significant in this investigation?

13  A.   Well, I am aware that the Brink's facility, being a

14  somewhat secure facility, does have a robust alarm system, and

15  it does have a cellular backup to its main method of

16  communication over traditional phone lines.

17      Second is the reference to batteries.  We found car

18  batteries in our search of Raymond, New Hampshire.  In addition

19  to cell phone jammers, we found several car batteries, which

20  would seem to coincide with the use spelled out here.

21  Q.   So am I correct in understanding that a cell phone jammer

22  used in the area of Brink's would, in fact, have an impact on

23  the Brink's security system?

24  A.   Right.  A cell phone jammer, for the lay person's

25  description of it, essentially, it's a device that, when

18

1   properly employed and powered up, depending on its power, it

2   will disrupt cellular communications in a given -- a given

3   area.

4        And that area is going to be, I'm sure, a product of the

5   types of antennas that the person's using, the power that's

6   being pumped through them, and just simply the geography and,

7   you know, buildings or other things in the area.  If that is

8   effective, then cellular traffic in that area will be unable to

9   communicate to cellular networks back and forth.  It will just

10  be temporarily disrupted.  It doesn't have a lasting effect.

11  It's only when the unit is in place and operating that cell

12  phones can't work.

13       So, in the case of a building alarm system where building

14  alarms prefer to communicate over telephone lines, when those

15  telephone lines are cut, the alarm still has a means to

16  communicate to the alarm service provider by way of cellular.

17  If that cellular signal cannot get out -- i.e., a cell jammer

18  is up and running and is effective -- then the alarm service

19  provider would have no idea that the alarm system is

20  experiencing some type of fault or fault sequence.

21  Q.   Thank you.  Now, is there anything else of significance in

22  this book about cell phone jammers that you flagged?

23  A.   Yes.  On the second page of that --

24            MR. MURPHY:  Objection, Your Honor.  The witness is

25  not an expert, Your Honor.

19

1        THE COURT:  You may provide some foundation for this.

2        MS. HILL:  Yes, Your Honor.  Thank you.

3    BY MS. HILL:

4    Q.   Now, Agent, --

5        THE COURT:  I'll take it under advisement.

6    BY MS. HILL:

7    Q.   Agent Costello, you've testified about, quite a bit about,

8    your -- about how cell phone jammers work.  Have you seen

9    and/or used or investigated the use of cell phone jammers in

10   your work as an FBI agent?

11   A.   Yes.

12   Q.   And can you explain a little bit about that to the Court,

13   as to what the nature of your understanding is, how you've come

14   to have that knowledge?

15   A.   Sure.  Well, my knowledge is derived from two sources.

16   One is just open source material on the Internet.  You can look

17   it up.

18       The company Global Gadget, where the particular cell phone

19   jammers that we believe we have here in the courtroom were

20   purchased, has information on their websites on what a cell

21   jammer does.  Mr. Menage's statement, from Global Gadget, gave

22   a very good primer on cell phone jammers.

23       In addition, through briefings I've had with FBI bomb

24   technicians and whatnot, cell phone jammers are used by the

25   military -- and our bomb technicians do work in conjunction

20

1    with the military -- to try to disrupt IEDs over in Iraq and

2    Afghanistan since most of them are triggered by cell phones.

3    So a lot of the convoys will drive with cell phone jammers

4    operating to prevent those IEDs from going off.

5         So that's pretty much where my knowledge comes from.

6    Again, I'm not an expert on how it works, but the lay person's

7    version, which is what I just gave, I'm quite comfortable with.

8                THE COURT:  How long have you been an agent?

9                THE WITNESS:  Since July 2004, Your Honor.

10   BY MS. HILL:

11   Q.   And the use of cell phone jammers, has that been an

12   ongoing part of investigations you've been conducting during

13   your time as an FBI agent?

14   A.   Yes.  Since I started working on these types of

15   investigations back in the summer of 2008 is when I started

16   seeing this type of thing and looking into it for my own

17   purposes and learning about it.

18                THE COURT:  Objection's overruled.

19                MS. HILL:  Thank you, Your Honor.

20                THE COURT:  The witness is qualified to testify on

21   these matters.

22   BY MS. HILL:

23   Q.   Going back, Agent Costello, was there anything, further,

24   about cell phone jammers, in this book, that you found to be

25   significant?

21

A.    Yes.   There is a paragraph on the second page of that

section continuing the discussion on jammers where it says:

Several different countries sell jammers, but they are

technically illegal in the United States.  U.S. Customs will

seize jammers if detected.  A company named Global Gadget, in

England will work with you on all the current procedures on how

to import jammers into the United States.  If all else fails,

you can drive up to Canada or down to Mexico and have it

shipped to you at a hotel or motel in that country, then drive

it back across the border in your trunk.  Bring a cheap $100

electric guitar and say the jammer is a preamp for the guitar.

Q.   And why did you find that specific section to be

particularly relevant in this investigation?

A.   Well, I first heard that jammers were getting intercepted

and Mr. Murphy was having difficulty obtaining a replacement

one through David Nassor.

     When I followed up with Global Gadget and read the e-mails

that they provided, that topic was discussed.

     In particular, the Newark port of entry was -- their

customs unit there was actively looking for these types of --

pieces of equipment and intercepting them.  Therefore, that

necessitated a shipping route that would go through Memphis,

instead, where they weren't quite as observant to these types

of things.

     One other thing of note, in the reference to bring a cheap

1    guitar and call the -- any inspecting official, tell them the

2    jammer was a preamp for the guitar, that's also a topic that

3    Mr. Murphy had brought up in those emails with Global Gadget.

4    In fact, at one point, I think he told Mr. Menage that he

5    thought of shipping him some stickers to put on the equipment

6    that would label the device just that:  a guitar preamplifier,

7    amplifier, or whatnot.

8    Q.   And that was an e-mail that you observed in that Global

9    documents -- Global Gadget's document that was entered as

10   Government's Exhibit 4-1?

11   A.   Yes.

12   Q.   Now, you indicated that you found the tools and equipment

13   section to be, all of it, particularly relevant.  Was there any

14   other sections in that chapter that you actually flagged as

15   particularly significant?

16   A.   Yes.

17   Q.   Can you describe that?

18   A.   There is a section where it addresses what to use for

19   communications devices, how they relate to the jammers.  It

20   says:  Try to get two-way radios with the 460 megahertz to 565

21   megahertz frequency range.  Check the frequencies before you

22   buy them.  The jammer only jams the higher frequency range from

23   800 megahertz or higher."

24   Q.   And why was that significant?

25   A.   Well, that's how, you know, if one were to use

23

1  walkie-talkies, that would be the rationale, because cell

2  phones could be -- the same cell phones that the jammer would

3  be trying to suppress on the cellular backup alarm would have

4  the same effect of any part of, you know, the burglary crew

5  trying to use the cell phone to communicate.  So, therefore,

6  that would necessitate some other device:  a walkie-talkie.

7  This explains why the walkie-talkie would not be affected by

8  the cell jammer, because it operates on an entirely different

9  frequency band.

10 Q.   Now, looking at this page here where that flagged section

11 was, was there another section that you flagged or highlighted

12 as being particularly relevant?

13 A.   Yes, the clothing section.  Being properly clothed for a

14 score is essential.  Go to any Army-Navy store and purchase

15 black jumpsuits, also called flight suits.  Don't forget to buy

16 black ninja masks there.  Check your local shoe store for black

17 rubber sole -- it's a misspelling -- shoe, galoshes.  These

18 will change your footprint, and they can be removed and

19 discarded easily.  It is good -- it is good to wear bright

20 colors under your black jumpsuit.  If you get chased, then you

21 can discard your outer clothing and be a totally different

22 person when no can -- who no one can identify as being at the

23 score.

24 Q.   And why did you find that section to be significant?

25 A.   We had heard the black suit thing before; but,

24

1   specifically, Mr. Doucette, in his proffer, had said that they

2   wore dark-colored clothing.  And he'd indicated to us that, you

3   know, he was told to wear bright clothing underneath for that

4   very purpose:  If you're being chased, you could strip down and

5   ultimately be wearing totally different colors.

6   Q.   Now, again, you indicated that you found this entire

7   chapter to be particularly significant.  Was -- can you

8   describe, generally, what the rest of that section contained

9   that you found to be significant without reading the entire

10  chapter to the ladies and gentlemen of the jury?

11  A.   Sure.  There are other very specific-use tools that were

12  described which we found in our search of the Raymond storage

13  locker on June 4th:  a very large, very specific hydraulic

14  generator that would turn a special drill; to use a term, it's

15  called a Core Bore.  We had heard that from David Nassor, that

16  particular device, described; and it's used to cut very large

17  holes through, presumably, concrete, asphalt, and the like.  So

18  we found that in the unit.  Something called magnesium thermal

19  rods, which are very long rods that are used in the cutting

20  process to go through plate steel; and various other -- again,

21  not your -- not typical tools that most people would have in

22  their home workshop were discussed.  And they were -- appeared

23  to have either matched Mr. Nassor and Mr. Doucette's

24  descriptions or just what I've learned from the crime scene.

25  Q.   Let's skip ahead a couple of chapters to Chapter 6,

25

1  entitled "Safes and Vaults."

2  A.    Yep.   There is section on the magnesium thermal rods in

3  particular.   It says:   The magnesium thermal rods will burn

4  through any metal or steel and will also burn through

5  reinforced concrete.   To set up an operation of thermal rods is

6  discussed in Chapter 3, Tools and Equipment.   Once lit, you

7  want to cut a three-foot-by-five-foot hole in the vault door or

8  wall.   We will call this an easy access window.

9      Because vault doors are so big, they usually are not made

10  of solid steel.   A lot of vault doors will have a light-weight

11  substance in the middle of the vault door itself.   There will

12  be a steel layer; then a layer of either wood, ceramic or fire

13  chalk; and then another layer of steel.

14      Burning off the outer plate of steel should be fairly

15  easy.   Just put the lit rod to the steel and push it through.

16  Then start sawing away until your square is cut.   The wood, if

17  it is wood, can be drilled for a pilot hole; then Sawzalled out

18  with a little prying from a crowbar.   Use a spade drill to

19  drill your pilot hole.

20      Ceramic cannot be drilled or melted.   A sledge hammer,

21  heavy duty chisel, and Killer crowbar will remove the ceramic

22  if your vault door has ceramic as an inner substance.   Fire

23  chalk can be smashed out with a sledge or Killer.

24      Be extremely careful when piercing the last layer of steel

25  on the vault door.   If your thermal road catches something on

1    fire in the vault, everything could burn up; and the smoke

2    could prevent you from even entering the vault.

3    Q.   Can you explain why you found that section to be

4    significant?

5    A.   Well, the concept of a multi-layer vault door I know is --

6    I don't know the exact layering of the Brink's vault door, but

7    I know that it was comprised of different things inside it.

8    But of particular note would be the very last section that I

9    read in reference to being careful about pushing your thermal

10   rod through the last layer of steel and inadvertently catching

11   something on fire.

12        From my knowledge of the crime scene, and also in

13   conversations with Mr. Doucette, it was apparent that some

14   money was set on fire, and that hampered efforts, because, the

15   vault, it's filled with smoke.

16   Q.   Finally, Agent Costello, turning to the final chapter,

17   Chapter 10, was there a -- that is entitled "Storage" -- is

18   there a section in there that you flagged as significant?

19   A.   Yes.  It's the very first portion of it.

20        Any good thief knows that he needs a place to store his

21   tools and equipment, as well as his booty, after a score.  The

22   first place cops look and search is the suspect's home.

23   Therefore, keeping anything at your residence is a no no.

24   After you become a prime suspect in a score and probable cause

25   has arisen, the cops almost always obtain a search warrant to

27

1   search your home.  That being the case, you need a good storage

2   facility.  Never get a storage facility near where you live.

3   Always go at least four to fifty miles away.

4       I am assuming that may be a 40 to 50 miles away.  I'm not

5   sure.

6       If you can cross state lines, that is even better.  A

7   smart detective may check and/or canvas the local self storage

8   facilities near your residence to investigate whether you rent

9   there or not.  In some rural communities, the people working at

10  self-storage facilities may not even ask you for an ID.  Always

11  open a storage bin in another name.  Never use your own name

12  even if you bring a friend with an ID to open it for you.

13  Q.   And can you explain why you found that section to be

14  particularly significant in this investigation?

15  A.   Sure.  We knew that Mr. Murphy had utilized both storage

16  facilities in Newmarket, New Hampshire, and then down in

17  Warrendale, Pennsylvania.  The Newmarket location was probably

18  about 50 miles, based on my Google research.  From Lynn, Mass,

19  to Newmarket, Mass, is approximately 50 miles.  And it is in an

20  adjacent state.  So it matches his description of going a

21  little ways away and trying to cross state lines if you can.

22      The ID issue, through my investigation at Newmarket, I

23  became aware that Mr. Murphy was renting units in various

24  persons' names, not his own, but also renting trucks under the

25  name of Brian Hetherman.  The people there knew that all those

28

1    things to be linked under Hetherman.

2        And, in Warrendale, at the Lock-Up storage unit, I'm also

3    aware that the unit was rented under the alias of Brian

4    Hetherman.

5            MS. HILL:  Thank you, Agent Costello.

6            Your Honor, I have no further questions.

7            THE COURT:  Pardon me?

8            MS. HILL:  I have no further questions, Your Honor.

9            THE COURT:  You may examine, Mr. Murphy.

10           MR. MURPHY:  Thank you, Your Honor.

11                          - - -

12                       CROSS-EXAMINATION

13   BY MR. MURPHY:

14   Q.   Good afternoon, Special Agent Costello.

15   A.   Good morning.

16   Q.   May I ask you a few questions, Special Agent Costello,

17   about your investigation into this matter?

18       Are you aware of any information that would lead you to

19   believe that David Nassor or Robert Doucette gave false

20   information to law enforcement in this case?

21   A.   No.

22   Q.   Are you aware of any information that would lead you to

23   believe that David Nassor or Robert Doucette withheld evidence

24   in this case?

25   A.   No.

29

1   Q.   Are you aware of any information that would lead you to

2   believe that David Nassor or Robert Doucette destroyed evidence

3   in this case?

4   A.   No.

5   Q.   Are you aware of any information that would lead you to

6   believe that David Nassor or Robert Doucette misled law

7   enforcement in this case?

8   A.   No.

9        MR. MURPHY:  Just one minute, Your Honor.

10       (Whereupon, there was a brief interruption.)

11  BY MR. MURPHY:

12  Q.   Special Agent Costello, with respect to this case, were

13  you investigating Mr. Murphy in December 2008 and 2009?

14  A.   With respect to Brink's, no, because it had not occurred

15  yet.

16  Q.   Okay.  Special Agent Costello, do you know what a junkie

17  is?

18  A.   I know what the term means, yes.

19  Q.   Can you explain to the jury what your definition of a

20  junkie is?

21  A.   Well, generally speaking, that's slang for a drug addict.

22  Q.   And, throughout your career, have you formed an opinion as

23  to whether junkies are honest people or dishonest people?

24  A.   I've formed opinions.

25  Q.   And what have you determined?

30

1   A.   That one label does not fit every particular person.  Some

2   people are drug users, but they're honest on certain things;

3   maybe not honest on their drug use.  Other people are chronic

4   liars.  I mean, you can't -- you can't say that one person is

5   one thing.

6   Q.   For the most part -- for the most part, even though I

7   understand your explanation, do junkies tend to lie, or tell

8   the truth, for the most part?

9   A.   I can't break it down.  I can tell you that a lot of those

10   that I come in contact with subsequent to arrest are maybe

11   inclined to give us misleading statements to avoid being

12   arrested; but, you know, I can't say a blanket statement that

13   junkies lie or tell the truth a certain percentage of the time.

14   I wouldn't have any foundation.

15   Q.   Do you know if David Nassor was a junkie?

16   A.   I know he had a history of some drug use.

17   Q.   And, Rob Doucette, did you know that he had a history of

18   drug use?

19   A.   Yes.

20   Q.   And do junkies possess certain skills that they acquire to

21   get to use their drugs?

22   A.   Can you be more specific?

23   Q.   Do junkies possess certain skills to acquire the drugs

24   they need?

25   A.   Well, if you need something, yeah, you go learn how to buy

31

1    it.

2    Q.    Or get it or acquire it?

3    A.    Sure.

4    Q.    And do junkies steal money to support their habit?

5    A.    Yes, some do.

6    Q.    Okay.  And do junkies tend to manipulate people to get

7    what they want?

8    A.    That would probably fit with some of the behaviors; but,

9    again, I can't make that as a group statement.  I think a lot

10   of people manipulate to get what they want, even if they're not

11   a junkie.

12   Q.    Do you think Rob Doucette and David Nassor were

13   manipulating you to avoid doing time for this crime?

14   A.    Absolutely not.

15   Q.    Do you think Rob Doucette and David Nassor lied to you to

16   get what they want?

17   A.    Nope.

18   Q.    Were you aware that Rob Doucette did drugs on his weekend

19   out at Ohio on January of 2009?

20   A.    I was not aware of that.

21   Q.    You're not aware of that.  So, if he didn't tell you about

22   that, obviously, he withheld that information from you?

23   A.    Or I didn't ask.

24   Q.    And were you aware that Rob Doucette also did drugs when

25   he went back out west to pick up this stuff when he was with

32

1    Joe Morgan?

2    A.    The topic didn't come up.

3          MR. MURPHY:  Just one minute.

4          (Whereupon, there was a brief interruption.)

5    BY MR. MURPHY:

6    Q.    Special Agent Costello, with respect to this case, was I

7    the target of your investigation?

8    A.    You became the prime suspect of this investigation, yes.

9    Q.    Special Agent Costello, isn't it true that the only

10   witness that you have that attempts to place Murphy at the

11   scene of the Brink's burglary is Rob Doucette?

12   A.    Yes.  Rob Doucette put you at the crime.

13   Q.    Besides Rob Doucette, you have no other evidence that

14   places Mr. Murphy at the scene of the crime?

15   A.    We have plenty of evidence that shows going up, coming

16   back, but you're right.  In the building itself, Mr. Doucette

17   is our testifying witness who says that you were there in the

18   building.

19   Q.    Now, do you have any evidence that places Murphy in the

20   State of Ohio besides Rob Doucette?

21   A.    Same answer to that question.

22   Q.    And with respect to the weekend of January 17th and

23   January 18th, do you have any evidence that places Murphy in

24   the State of Pennsylvania on that weekend besides Rob Doucette?

25   A.    I'm not aware of anything besides Rob Doucette.

1  Q.   Now, let's move along to the day that Joseph Morgan got

2  arrested.  Do you remember that day?

3  A.   Yes.

4  Q.   And what day was that, Special Agent Costello?

5  A.   If my memory serves me correct, April 8th.

6  Q.   April 8th?

7  A.   Of 2009.

8  Q.   And did you do something on that day after Joseph Morgan

9  was arrested?

10  A.   Uh-huh.

11  Q.   What did you do?

12  A.   I went and spoke with Rob Doucette.

13  Q.   So that was your first contact with Rob Doucette on April

14  8th?

15  A.   Yes.

16  Q.   And what did you tell Rob Doucette?

17  A.   I told him that I was looking at you, Joe Morgan, and he

18  for the Brink's Columbus job, and that if he wanted to have a

19  talk about it, we wanted to talk to him.

20  Q.   So you mentioned three specific names to Rob Doucette on

21  that day?

22  A.   Yes.

23  Q.   And did you tell Rob Doucette where you got your

24  information?

25  A.   Nope.

34

1  Q.    You didn't mention any names?

2  A.    Nope.

3  Q.    So, if Rob Doucette testified that you told him that Joe

4  Morgan gave you the information, that would be incorrect?

5  A.    I did not give him any information as to how I came to my

6  information.

7  Q.    Okay.  So, to answer the question, if Rob Doucette

8  testified that you told him that Joe Morgan gave you the

9  information, that would be incorrect information from Rob

10  Doucette?

11  A.    Well, if he testified to it, then he was somewhat mistaken

12  on where the information come from.  He may have assumed, if he

13  did testify to it -- but I don't know what he testified to or

14  what he didn't.  If he did, he may have assumed -- since I went

15  from Joe Morgan's arrest, then over, some time later, to talk

16  to Mr. Doucette, he may have assumed that Mr. Morgan had given

17  us some information, but he would be incorrect in assuming

18  that.

19  Q.    Yes.  Well, if he testified that that's what was told to

20  him, not what his opinion was, what was told to him --

21  A.    Well, you would have that in error if he thought that.

22  Q.    Okay.  So that would be a misstatement?

23  A.    Sure.

24  Q.    Okay.  Now, when you spoke to Mr. Doucette, did he admit

25  to doing this crime on April 8th?

35

1   A.   He told me he had nothing to say at that time.

2   Q.   He didn't deny it?

3   A.   He said he had nothing to say at that time.

4   Q.   And did you ask any other questions of Mr. Doucette on

5   that date?

6   A.   We told him that we'd like to talk to him, and I gave him

7   a business card.

8   Q.   Did you ask Mr. Doucette why Murphy had written him any

9   checks?

10  A.   I don't believe so.  I may have, but I don't -- I don't

11  recall.

12  Q.   Did you ever ask Mr. Doucette why Murphy wrote him any

13  checks --

14  A.   I may have.  I may have asked him in the proffer.  I don't

15  know.  I don't recall.

16  Q.   And do you remember what his response was?

17  A.   If the topic came up -- and I don't know if it was in

18  relation to checks or just in general -- I know that you and he

19  had old cars in common, or something to that effect.

20  Q.   Did Mr. Doucette ever tell you that those checks were from

21  work that he did for Murphy?

22  A.   Again, I don't recall, specifically, if that topic went

23  down the line of checks or simply how he knew you, which was, I

24  think, through the old cars, originally.

25  Q.   Now, in respect to Mr. Nassor, he told you he went to

36

1    Memphis, Tennessee?

2    A.    Yes.

3    Q.    And did he tell you why he went to Memphis, Tennessee?

4    A.    Yep, to -- he had lost one of your cell phone jammers, and

5    he went there to -- kind of as penance -- to pick one up on

6    your behalf to bring it back for you.

7    Q.    Did Nassor say that he opened the package that he received

8    in Tennessee?

9    A.    I don't know if he said that or not.

10   Q.    Now, did Nassor tell you that the cell phone jammer he

11   received in Tennessee was the cell phone jammer used at

12   Brink's?

13   A.    At that time, he just said he received a cell phone jammer

14   for you.

15   Q.    Now, did you review Murphy's bank records?

16   A.    Yes.

17   Q.    And did you notice that there were two separate FedEx

18   shipments in early 2008 that went through Memphis?

19   A.    From your bank records, it doesn't -- well, all FedEx --

20   you can't tell where the shipment goes through.  But if you

21   look at your bank records, anytime you ship, you make a

22   purchase at FedEx -- if you go into the local Kinko's FedEx to

23   mail an envelope in Lynn, Massachusetts, and to mail it to

24   California -- the charge is going to show Federal Express,

25   Memphis, Tennessee.  That's where their corporate headquarters

1  is.  So that's where it all gets charged.

2  Q.  And you know this how?

3  A.  Through reviewing a lot of bank records in my performance

4  of my duties as an agent, and also through inquiring with FedEx

5  liaison that we have just to make sure that that was, in fact,

6  the case:  that the charge would show in Memphis.  And they

7  confirmed, that, yes, that was where things are charged

8  through.

9  Q.  Okay.  And in regards to cell phone jammers, which cell

10  phone jammer was used during the Brink's burglary?

11  A.  I don't know which one was used.  I wasn't there.  But we

12  recovered two in Raymond's storage.  And Mr. Doucette said a

13  cell phone jammer was employed.  I'm not sure if he picked the

14  big one or the little one, but we did recover two that seemed

15  to correspond to the Global Gadget's emails.

16  Q.  So it's your testimony that Mr. Doucette didn't tell you

17  which cell phone jammer he used during Brink's?

18  A.  He did not have a detailed knowledge of cell jammers.  So

19  whatever you told him is what he told me.  But he said he -- he

20  used -- called it a jammer.  That's it.

21  Q.  So your testimony is that he didn't have a detailed

22  knowledge of cell phone jammers?

23  A.  He knew, generally, what it was.  But he could not give me

24  a very good explanation of what the model number was, what the

25  power was, exactly why it worked.  He just knew that it was

38

1   supposed to work.

2   Q.   Huh.  Well, if I told you he explained to the jury in

3   detail what cell phone jammers did, how they worked, how they

4   were set up and how everything, would that be inconsistent with

5   what he told you?

6   A.   Well, I'm telling you what he told me.

7   Q.   Okay.  We'll get to that in a little while, too.

8   A.   Uh-huh.

9   Q.   Now, Special Agent Costello, you said you've reviewed the

10  emails from Global Gadget?

11  A.   Yes.

12  Q.   According to those emails, don't they establish that

13  Murphy's company provided cellular jammers to its customers?

14  A.   There is a reference that you have a company that provides

15  jammers, but I don't think it establishes it.

16  Q.   Well, it's on more than one email, you would suggest, that

17  it refers to Murphy and customers buying jammers?

18  A.   Why don't you show me the e-mail?  And we can talk about

19  the specific one, and I'll give you my impression of it.

20  Q.   I have the emails, but I just can't seem to locate the

21  exact ones that I'm looking for.  Just give me a second,

22  please.

23       Here we go.  I have them.

24       Right there, Special Agent Costello.

25  A.   Uh-huh.  Okay.

39

1  Q.   I have people here that want to purchase your products.  I

2  have one customer who wants two Y2000 Quads; then the one

3  customer who wanted an XK-1000, 5 band.

4      Would that indicate that Murphy provides jammers to his

5  customers?

6  A.   Well, Northshore is a moving company.  So I -- I'm not

7  familiar with moving companies that sell cell phone jammers.

8      If you're asking for my impression of this, it would be to

9  sell them, possibly, through other -- to other associates, who

10 may use them for their other-than-intended purpose, but I don't

11 know how that demonstrates a legitimate resale market,

12 especially when your moniker of "Northshore" is for Northshore

13 Movers of Lynn.

14 Q.   Does it say "Northshore Movers of Lynn"?

15 A.   It says "Northshore."

16 Q.   Okay.  It just said "Northshore"?

17 A.   Yeah, because I'm guessing you dropped "the Movers of

18 Lynn" because the cell phone -- this guy selling cell phone

19 jammers would probably be a little suspect knowing that those

20 things are not for the civilian market.

21 Q.   This guy -- you're saying he would think it would be

22 suspect?

23 A.   You're asking for my impression.  Yeah.

24 Q.   Well, you've read all these emails, right?

25 A.   Uh-huh.

40

1   Q.   And wasn't there conversations between the manager of

2   Global Gadget and Mr. Murphy regarding getting these products

3   into the United States?

4   A.   Yeah.

5   Q.   And weren't they devising ways of how that could happen in

6   avoidance of Customs?

7   A.   Yep.

8   Q.   So why would this person even care who he was selling them

9   to if he was just trying to get them in any way he could?

10  A.   Well, maybe he has some standards.

11  Q.   Yeah.  And this document right here (indicating), this is

12  another one that indicates I have a customer?

13  A.   So you say.

14  Q.   Okay.  Now, getting back to Mr. Nassor and his purchasing

15  of this jammer, are you aware of an email that Mr. Nassor sent

16  to Global Gadget in this case?

17  A.   I'm not familiar with one.

18  Q.   You've reviewed discovery in this case, haven't you?

19  A.   I have.  He may have sent one, but I'm not familiar with

20  it.

21  Q.   Okay.

22  A.   If you can show to it me, it may jog my memory.

23  Q.   If I could show it to you, it would refresh your memory?

24  A.   Sure.

25           (REPORTER'S NOTE:  Witness shown document.)

41

1    BY MR. MURPHY:

2    Q.   Does that refresh your memory, Special Agent Costello?

3    A.   I have seen this.  This actually came off of the searches

4    from some of the computers that were seized in another

5    investigation.

6    Q.   Okay.  And what does Mr. Nassor say to Global Gadget?

7        Oh!  By the way, this email is after the Brink's burglary?

8    A.   Uh-huh.

9    Q.   And what does Mr. Nassor tell Global Gadget?

10    A.   I purched a jammer in December 2008 in Tenn.

11        Presumably Tennessee.

12        Could I receive the same one.

13    Q.   He says he purchased one, correct?

14    A.   Uh-huh.

15    Q.   Okay.  And that's not saying that he went and picked them

16    up; he's saying he purchased it?

17    A.   That's what he says.

18    Q.   Okay.  And that would imply that he was the owner of the

19    device, correct?

20    A.   By that email, sure.

21    Q.   Okay.  And do you know what the response to that e-mail

22    was?  Did you ever investigate that?

23    A.   No.

24    Q.   If I told you that Global Gadget told him to go through

25    Northshore to get his device, would you disagree with that?

42

1    A.    I'd have no basis to say yea or nay.

2    Q.    Okay.  And would you agree that other people in the

3    Greater Lynn area had cell phone jammers?

4    A.    I've heard of one that was stolen from you.

5    Q.    Only one?

6    A.    I've only heard that one.

7    Q.    Did you ever hear that a guy named Johnny Rotten had a

8    cell phone jammer?

9    A.    That would be two.  You're right, yeah.  A long time ago,

10   I heard that.

11   Q.    Okay.

12   A.    But I heard that from you.

13   Q.    Yeah.

14         Just one minute.

15         Special Agent Costello, in regards to Brink's and the

16   Brink's building, have you reviewed all the pictures that were

17   taken?

18   A.    Not all of them; some of them.

19   Q.    Did you -- specifically, did you review the pictures of

20   any holes that may have been cut in the roof?

21   A.    Yes.

22   Q.    And how many holes did you determine were cut in the roof?

23   A.    I think there are somewhere in the ballpark of five, but I

24   don't -- I don't particularly know.

25   Q.    And did you examine the pictures of the holes?

43

1    A.    I saw some of the pictures, yes.

2    Q.    And based on your experience as an investigator who has

3    been investigating burglaries on that task force for a long

4    time, did you form an opinion as to what type of device cut

5    those holes in the roof?

6    A.    Well, I wasn't at the crime scene.  That was the work of

7    the local folks here in Columbus.  So I really can't say.  I

8    mean, looking at photos, I don't know if I could give it a good

9    assessment.

10   Q.    Okay.  Well, based on -- based on your observations of the

11   photos.

12   A.    I would think some combination of either a metal grinder,

13   a Sawzall, some other things, you know, some other cutting

14   tools like that, I would think.

15   Q.    Okay.  Thank you.  I mean, that's a legitimate answer.

16         Now, have you reviewed the list of tools that was

17   recovered from the Raymond, New Hampshire, storage bin?

18   A.    Yes.

19   Q.    Did you find a Sawzall or a grinder in those tools capable

20   of cutting the hole that we were just describing?

21   A.    I don't recall if we found one in those tools.  I would

22   have to look at the evidence.  We found a lot of things, a lot

23   of small hand tools that were in bags.  So, off the top of my

24   head, I don't have it committed to memory.

25   Q.    Did you find a plug-in Sawzall in the tools?

44

```
1   A.    I don't know.  I'd have to look at the listing.

2              MR. MURPHY:  Do you have a list of the tools?

3              (Whereupon, Ms. Hill hands a document to Mr. Murphy

4   and Mr. Graeff.)

5              MR. GRAEFF:  May I approach?

6              THE COURT:  Yes.

7              (Whereupon, Mr. Graeff hands a document to the

8   witness.)

9   BY MR. MURPHY:

10  Q.    Would you please review that list, Special Agent Costello?

11  A.    Sure.

12        (Witness complies.)

13        Okay.

14  Q.    Have you reviewed that document, Special Agent Costello?

15  A.    Yes.

16  Q.    Is that an accurate description of all the items that were

17  seized from the Raymond, New Hampshire, storage bin?

18  A.    Appears to be.

19  Q.    And do you see a grinder on that list, Special Agent

20  Costello?

21  A.    No, no grinder.

22  Q.    Do you see a plug-in Sawzall on that list?

23  A.    I see saw blades, but no plug-in Sawzall.

24  Q.    Okay.  Thank you very much.

25        And if a plug-in Sawzall was used, wouldn't the
```

45

1    perpetrators have had to have extension cords to get to -- how

2    were these five holes situated?  Were they right next to each

3    other, or were they spread out on the roof?

4    A.    I think they were spread out.

5    Q.    So wouldn't the perpetrators have needed extension cords,

6    logically?

7    A.    If they were using a plug-in version.  I mean, I know

8    there are cordless versions.  I mean, I don't know what tools

9    were used up on the roof.  You're asking me to speculate.

10   Q.    Okay.  Let's address that briefly.

11   A.    Uh-huh.

12   Q.    Would a cordless drill have the power and the endurance to

13   cut all those holes in the roof, Special Agent Costello?

14   A.    I've never tried to cut a hole in a roof.  So I don't

15   know.

16   Q.    Okay.  Did you find any extension cords in the Raymond,

17   New Hampshire, storage bin?

18   A.    Yes.

19   Q.    You did?

20   A.    Uh-huh.  Item 1B-31, extension cords.

21   Q.    Okay.  Thank you.

22   A.    Sure.

23   Q.    Now, Special Agent Costello, are you familiar with an

24   electromagnetic drill press?

25   A.    I am.

46

1   Q.    And --

2              THE COURT:  That was a drill press, Mr. Murphy?

3              MR. MURPHY:  Yes, a drill press, Your Honor.

4   BY MR. MURPHY:

5   Q.    And what does an electromagnetic drill press do, Special

6   Agent Costello?

7   A.    Well, from my understanding, when you plug it in, the --

8   and I may not be doing it justice, but from what I've been able

9   to learn about it, you plug it in, and it's magnetized, and it

10  will adhere itself to a metal surface.  So you could go,

11  potentially, adhere it to a vertical surface, and then the

12  drill allows you to operate from there as if it were actually

13  bolted into the surface.  It is a very heavy-duty, very

14  specific drill.  And it can cut a hockey puck size hole out of

15  something.

16  Q.    Now, Special -- Special Agent Costello, --

17  A.    Uh-huh.

18  Q.    -- was there any evidence at Brink's that an

19  electromagnetic drill press was used, or may have been used, or

20  attempted to be used?

21  A.    From what I saw in the photos, there was some adhesive

22  dripping down the front of -- there was like a refrigerator

23  size safe in the area.  And I believe that we asked Mr.

24  Doucette to clarify why that adhesive was put there.  And he

25  told us that, because -- whether the skin of the safe, that the

47

1    electromagnetic drill was not -- you know, the magnet was not

2    functioning properly or just because of the surface, it wasn't

3    working.  So there was an effort made to glue it to try to hold

4    it there; but, because of the temperature in the building, that

5    wasn't working.  So -- but that would be my only indication, is

6    from what he told me.

7    Q.    So Robert Doucette acknowledged that they had an

8    electromagnetic drill press?

9    A.    From what he described, yeah.

10   Q.    Okay.  And when you went into the Raymond, New Hampshire,

11   storage bin, did you find an electromagnetic drill press?

12   A.    I don't know if we found one or not, to be honest.  I'd

13   have to look.

14   Q.    Review your records.

15   A.    We found a lot of stuff.  So I believe we did.  We might

16   have found something that looked like it.

17   Q.    Can you look through that list and tell me what exhibit,

18   the electromagnetic drill press?

19   A.    Bear with me.

20         I mean, I can say that there is the hogwash, which is

21   recovered, which is the lubricating oil that you squirt down to

22   get it to lubricate while it's cutting.  So I would assume that

23   one was there by virtue of us finding that, but --

24   Q.    That would indicate that there actually was one there if

25   the hogwash was there?

48

1   A.   Well, just because we didn't find it doesn't mean it

2   wasn't there.

3       Well, there is a bag here, and it's not specific.  One bag

4   containing drill, saw, which could be the saw you were talking

5   about earlier, blades, rope, bungee cord, Stratos batteries.

6       So it's not very specific.  So I don't know.  I'd have to

7   look at the item and see what's actually in it, because the

8   description simply says "drill."

9   Q.   Well, if I told you that, earlier in this trial, the

10   government showed all the exhibits to a couple of the

11   witnesses, and the drill that they're talking about would be a

12   hammer drill, --

13   A.   Okay.

14   Q.   -- that's not an electromagnetic drill, is it?

15   A.   No.

16   Q.   Okay.  You do recall the hammer drill, don't you?

17   A.   Yes.

18   Q.   Okay.

19   A.   I don't see -- I don't see it referenced on here.

20   Q.   Okay.  So it's fair to say that it wasn't in the Raymond

21   storage bin?

22   A.   Fair to say.

23   Q.   Okay.  Now, Special Agent Costello, did Rob Doucette tell

24   you that he purchased an electromagnetic drill press just prior

25   to the Brink's burglary?

49

1    A.   No.

2    Q.   He didn't tell you that?

3    A.   No.

4    Q.   So, if he didn't tell you that, he withheld that

5    information?

6    A.   I wouldn't have asked that type of question, but --

7    Q.   Well, if you've determined that one was used and you

8    didn't find it in the storage bin, wouldn't you start

9    investigating and trying to determine where this item was or

10   where it came from?

11   A.   We didn't follow that up.

12   Q.   Didn't follow that up.  So you laxed off on your

13   investigation in regards to specific leads of this crime?

14   A.   Well, there was -- you recall, when we searched your

15   residence and your warehouse, there were a lot of tools in a

16   lot of places.  To me, it was logical that maybe it got moved,

17   maybe it came out of that stuff when the stuff was moved.

18   Q.   When you searched my house, did you find an

19   electromagnetic drill press?

20   A.   Not to my knowledge, my point being, a lot of tools might

21   have gone other places.  So, you know, I did not think that,

22   based on what he told me and the fact we didn't find one in

23   Raymond, that -- I didn't find that all that troublesome, to be

24   honest.

25   Q.   Well, you did know that he was in total control of the

50

1    tools from the time that he went out west to pick them up,

2    don't you?

3    A.    He and Joe Morgan, yeah.

4    Q.    Okay.  Now, did he tell you that Joe Morgan or him went

5    into the storage facility anytime prior to Joe Morgan getting

6    arrested?

7    A.    I don't think he did.

8    Q.    So, if he didn't go into the storage facility anytime

9    before Joe Morgan got arrested, that only leaves Rob Doucette

10   in charge of the tools, correct?

11   A.    Well, they did discard a lot of metal things, the pallets

12   that the coins went out the door on.  They discarded the

13   surveillance systems, you know, some of that, to scrap.  So

14   it's possible that one of them took that drill because it's a

15   high value item, and it went somewhere else.

16   Q.    It's possible, but you don't have any information about

17   that?

18   A.    Well, I wouldn't have any information.

19   Q.    You're speculating.

20   A.    Well, that's what you've essentially asked me to do.

21   Q.    No.  I asked you specific questions.  I said -- I asked

22   you if Rob Doucette was in total control of the tools after Joe

23   Morgan got arrested.  That's what I asked you.

24   A.    Yes.

25   Q.    Okay.  And I asked you if Rob Doucette told you that he

1    purchased this electromagnetic drill prior to the Brink's

2    burglary.

3    A.    He did not.

4    Q.    Okay.  And if he didn't tell you that he purchased it and

5    it wasn't in the storage bin, it was, obviously, removed,

6    because, probably, he didn't want you to tie him to this

7    burglary; would you say?

8    A.    Well, he brought us to the storage unit.  So that kind

9    of -- and he admitted to it.  So that -- if he moved it

10   earlier, then maybe that was his plan; but, when he had a

11   change of heart and decided to cooperate with us, he tied

12   himself, pretty cleanly, to the burglary.

13   Q.    Okay.  Let's just go over that briefly.

14         You said that you approached him on April 8th.

15   A.    Right.

16   Q.    When did he reach out to you to initially start that he

17   wanted to cooperate?

18   A.    His attorney sent me a letter probably two weeks later and

19   said that, if we wanted to discuss something with him, to run

20   it through his attorney.

21   Q.    So he knew within two weeks of you going to him that he

22   was going to cooperate?

23   A.    Whether he knew or I -- I mean, when he made the decision,

24   I don't know.  When I first contacted his attorney, it wasn't

25   decided that he wanted to cooperate.  We told him we wanted him

52

1    to, and took some time for him to finally come around and come

2    to the table and sit down and at least hear us out.

3    Q.   But the initial contact with you that he was willing to

4    cooperate was within two weeks of you going to see him?

5    A.   Again, the initial contact was with his attorney.  His

6    then attorney asked why we wanted to speak with him.  So when

7    he decided he was willing to cooperate, my guess, happened

8    immediately before we sat down with him.

9    Q.   Now, you testified about these burglary clothes.

10   A.   Uh-huh.

11   Q.   Did you find any burglary clothes in the Raymond storage

12   bin?

13   A.   Not to my recollection.

14   Q.   Now, did the FBI do a shoe print analysis?

15   A.   I do not know.

16   Q.   You do not know.  Now, when you went in the bin, did you

17   notice that these clothes were missing?

18   A.   Yeah.  We would have expected to find those types of items

19   there, but they weren't.

20   Q.   Okay.  And did you ask Nassor or Doucette where these

21   clothes were?

22   A.   No.

23   Q.   You didn't?

24   A.   No.

25   Q.   Now, wouldn't the clothing that the burglars wore on the

1   weekend of the crime, wouldn't they have DNA on them?

2   A.   They might.

3   Q.   More than likely.  Can you explain what clothing these

4   burglars wear, again?

5   A.   Well, by your book, some sort of flight suit over top of

6   other multi-colored clothes and over boots.

7   Q.   Now, would sweat possibly get into these flight suits?

8   A.   It's possible.

9   Q.   And was there any -- was there any mention of any masks?

10  A.   Uh-huh, yes, masks as well.

11  Q.   Masks that go over the head?  Now, wouldn't sweat and hair

12  and other items of DNA be lodged in these masks?

13  A.   Sure.  They would be a great piece of evidence.

14  Q.   Now, so, obviously, my question, my initial question was

15  that the clothing would establish who wore those clothes.

16  A.   It could, yes.

17  Q.   And do you think that's why Rob Doucette got rid of the

18  clothes:  because it would establish who actually wore them?

19  A.   I don't know that he got rid of the clothes.

20  Q.   Well, you stated that they weren't in the Raymond storage

21  facility.

22  A.   Right.  Right.

23  Q.   And you stated that you don't believe that he went in

24  there prior to Joe Morgan getting arrested.

25  A.   Let's back up.  The life cycle of those clothes would have

54

1   been when the three of you wore them in the Brink's facility.

2   They could have been discarded in a trash bin in Warrendale and

3   taken out for the collector.

4        So we don't know of that -- I don't -- I don't know if

5   those clothes were secured in the Warrendale unit and made the

6   trip from Warrendale back up to New Hampshire.  We don't know

7   that.  So they may have dropped out of the bag of goods.  They

8   might have been discarded out a car window driving down a

9   highway.  I don't know.

10  Q.   So Rob Doucette didn't tell you anything about that?

11  A.   No.

12  Q.   So, if I told you he testified that they were in the

13  Pennsylvania storage facility and they did make it to Raymond,

14  would you disagree with me?

15  A.   I can't disagree with you.  I never saw them in Raymond.

16  Q.   Okay.  Special Agent Costello, did Rob Doucette ever tell

17  you about a truck cover?

18  A.   Yeah.  He said something about putting a tarp, or

19  something like that, over the truck.

20  Q.   And did Rob Doucette tell you that he purchased this RV

21  cover tied to the Brink's burglary?

22  A.   No.

23  Q.   So this is other information that he withheld from you?

24  A.   Well, he told me they covered the truck.  That was good

25  enough for my purposes.

55

1   Q.   Okay.  Wouldn't it have been important to say, Oh, by the

2   way, I purchased this item, like I purchased the

3   electromagnetic drill?  You don't think that would have been

4   important for him to tell you that?

5   A.   Him buying a tarp I wouldn't think is the actual relevant

6   portion.  The relevant portion is that he admitted to covering

7   the truck with the tarp.

8   Q.   Okay.  You testified that Brink's had video surveillance

9   units?

10   A.   Yes.

11   Q.   And that the burglars removed these units from Brink's?

12   A.   That's what I was told, yes.

13   Q.   Do you know how many units there were?

14   A.   No, I don't, off the top of my head, no.

15   Q.   Did you find the video recording units in the Raymond

16   storage bin?

17   A.   No.

18   Q.   Did you notice that they were missing?

19   A.   We didn't expect to find them there.

20   Q.   Did you ask Nassor or Doucette what happened to them?

21   A.   Mr. Doucette told us in his proffer that he and Joe Morgan

22   disassembled them, sold some of the casings for them to the

23   scrap dealer that took the pallets for the coins, and that all

24   of the electronics, basically the hard drives, the circuit

25   boards, they threw into the ocean to get rid of.

56

1  Q.   And wouldn't the video footage establish who actually

2  committed this crime?

3  A.   It could.

4  Q.   It would have been the best evidence that would have been

5  available?

6  A.   Yeah.  But when it's on the bottom of the Atlantic, it's

7  not going to help as much.

8  Q.   And your witness put them there?

9  A.   Yep.

10  Q.   So, when I asked you earlier if you had any evidence --

11  one of the first questions I asked you, I said, Do you have any

12  evidence that led you to believe that Rob Doucette or Nassor

13  destroyed any evidence -- you said no.

14  A.   Well, he told us about it.  And it was during the days

15  following the crime.  So, to me, he hasn't withheld any

16  evidence from me.  He was up front with me about that.  So --

17  Q.   That's not what I asked you.  I asked you if you had any

18  evidence that would lead you to believe that Nassor or Doucette

19  destroyed any evidence, and you said no.

20  A.   Okay.  Then I misunderstood the question.

21  Q.   Oh, okay.

22       And by these tools missing from this storage bin, wouldn't

23  that be withholding evidence, too, if they took them out?

24  Knowing that they were part of this crime and they were part of

25  a crime scene and not giving them to the FBI, wouldn't that be

1    withholding evidence?

2    A.   I don't know that they took them out.  So I can't tell you

3    if they're withholding them.  I don't know.

4    Q.   Okay.  They didn't get up and walk out on their own, did

5    they?

6    A.   (No response.)

7    Q.   And it's looking like that all the key evidences that

8    would prove who did this crime were removed by Rob Doucette,

9    doesn't it, the clothing and the video?

10   A.   We already talked about the clothing.

11   Q.   Okay.

12   A.   That wasn't addressed with him.  I don't know what he

13   testified to, but that wasn't addressed between us and him.

14        The hard drives and the video surveillance, he did tell us

15   in his early -- when he first talked to us, or in the proffer,

16   that he and Joe Morgan, together, had done that, yes.

17   Q.   Special Agent Costello, do you think you may have

18   underestimated the manipulative skills of Rob Doucette?

19   A.   No.

20   Q.   Special Agent Costello, did Rob Doucette tell you about a

21   Lynn storage facility on the Lynnway, a U-Haul facility?

22   A.   I don't recall.

23   Q.   You don't recall?

24   A.   Hu-uh.

25   Q.   Did he tell you that he rented this facility after he got

58

1    back from picking up the tools and that's where he put the

2    video units and the coin racks?

3    A.    No.  He talked about a storage unit up in Raymond, New

4    Hampshire.

5    Q.    So he never told you about the Lynn facility?

6    A.    Not that I remember, no.

7    Q.    So, if he testified in this trial that there was a Lynn

8    U-Haul storage facility that he put items from Brink's in there

9    and he didn't tell you about that, is that clearly withholding

10   evidence from the FBI?

11   A.    He didn't tell me about it.

12   Q.    So, to answer your question then, if there was a Lynn

13   facility and he put items in from Brink's, it's withholding

14   evidence?

15   A.    Well, that's something he should have told us.

16   Q.    Okay.  Do you think Rob Doucette will ever be charged with

17   obstruction of justice?

18   A.    That's not my call.

19   Q.    That's not your call?

20   A.    Nope.

21   Q.    Did you find any of Murphy's DNA or fingerprints anywhere

22   inside Brink's building?

23   A.    Not to my knowledge.

24   Q.    Do you have any video that places Murphy in or around

25   Brink's?

59

1   A.   Not to my knowledge.

2   Q.   Did you find Murphy's DNA or fingerprints on anything

3   taken from Brink's?

4   A.   Not to my knowledge.

5   Q.   And you've already testified that you have no evidence and

6   no video that even places Murphy in the State of Ohio?

7   A.   Correct.

8   Q.   Did you collect DNA samples from all the participants in

9   Brink's?

10  A.   Yes.

11  Q.   Did you collect a DNA sample from David Nassor?

12  A.   I don't believe him, because he was not actually out there

13  at the time.  He told us that he went out in advance.

14  Q.   Well, that's what he told you.  I asked you if -- is Mr.

15  Nassor a co-conspirator?

16  A.   Sure.

17  Q.   Was he -- so he was involved in this crime?

18  A.   Right.  We took the samples from the three that we

19  believed to go to Brink's and commit the actual burglary.

20  Q.   Okay.

21  A.   That would be yourself, Joe Morgan, and Rob Doucette.

22  Q.   According to Rob Doucette?

23  A.   Yes.

24  Q.   Okay.  And isn't it true that there were DNA samples found

25  that didn't match Murphy, Doucette, or Morgan?

60

1   A.   I have heard of that, yep.

2   Q.   Okay.  So there are people that are actually involved that

3   you didn't take DNA samples from?

4   A.   I've been told that a cigarette butt was found and it had

5   DNA on it.

6   Q.   And is there anything else, any other samples of DNA that

7   may have been found on the items in the storage bin that didn't

8   match Murphy, Doucette, or Morgan?

9   A.   I haven't seen the DNA report, so I don't know.

10  Q.   You didn't review them?

11  A.   That wasn't my portion of the investigation to run.

12  Q.   Okay.  And you testified that there was DNA samples found

13  inside Brink's that didn't belong to any of the three suspects?

14  A.   I have been made aware of one such instance, yes.

15  Q.   Okay.  And are you aware of the person who helped Rob

16  Doucette move some of these items and rent storage bins and

17  rent trucks?

18  A.   Yes.

19  Q.   Who would that person be?

20  A.   He gave me a name of Jim Hennessey.

21  Q.   Jim Hennessey.  Did you do any investigation on a Jim

22  Hennessey?

23  A.   No.

24  Q.   No?

25  A.   No.

61

1   Q.   Okay.  We have a person who rented storage bins and rented

2   trucks for Rob Doucette to move stolen items, and you didn't do

3   an investigation on this guy?

4   A.   Well, it was after the Brink's burglary.  And our focus

5   was on the Brink's burglary.  So it's not something we deemed

6   important to follow up at that time.

7   Q.   Well, most of the investigation happened months after the

8   Brink's burglary anyway, correct?

9   A.   Yes.

10   Q.   And so that this time frame, which would be four to six

11   months after, is where all the investigation focused anyway.

12   And you have information that a specific person assisted

13   basically a co-conspirator with Rob Doucette, and you didn't

14   investigate him?

15   A.   No.

16   Q.   You didn't take his DNA?

17   A.   No.

18   Q.   You didn't take his fingerprints?

19   A.   No.

20   Q.   You didn't question him?

21   A.   No.

22   Q.   And what did Rob Doucette tell you about this guy, James

23   Hennessey?  What did he tell you?

24   A.   That he was a friend and that, when he needed a truck for

25   he and Joe Morgan to quickly drive down to Warrendale on

1   January 23rd of 2009, that he told him that he needed a truck

2   and a storage locker to move some of his mother's estate, to

3   quickly move it, and that he got him a truck and storage unit

4   as requested.

5   Q.   Okay.

6   A.   He also followed up later and did tell us that when --

7   after Mr. Morgan was arrested, that when he then believed it

8   was in his best interest to move the stuff across town, that

9   Mr. Hennessey did help him move the stuff across town.

10  Q.   So he did tell you that?  So you knew that Mr. Hennessey

11  had direct contact with this -- these items from Brink's?

12  A.   I recently learned that name, yes.

13  Q.   Okay.  So this is information that he didn't give you for

14  the first two --

15  A.   He told us that a friend had helped him.  He was reluctant

16  at the time to name this friend.  And we didn't push too hard,

17  because the proffer -- we did not want to hamper the efforts to

18  complete the proffer, and we never went back and asked him the

19  name of that friend.  I only recently learned that Jim

20  Hennessey, in addition to helping to rent the trucks, the truck

21  and the storage locker, also was the friend that helped move

22  the items later on.

23  Q.   So that would be information, again, that he withheld from

24  you?

25  A.   Well, he said it was a friend.  I didn't push because I --

63

1   based on my take on how the interview was progressing, I did

2   not want that to dampen our efforts to get all the way through

3   to the end and determine the location, which was the most

4   important thing to us at that time:  the location of the tools

5   and the money.

6   Q.   So you're saying that you knew that Jim Hennessey had

7   helped him during these proffer sessions?

8   A.   No.  Well, Jim Hennessey -- yes.  During the initial

9   proffer, he told me that Jim Hennessey rented a truck so that

10  he and Joe Morgan could drive down and back from Warrendale and

11  rented a storage unit in Raymond.

12       When Mr. Morgan was arrested on April 8th, sometime

13  thereafter, Mr. Doucette felt that it was in his best interest

14  to move the stuff once again.  He asked for help.  At the time,

15  he told us it was a friend.  He was initially reluctant to name

16  the friend; did not want the friend to get into trouble.

17       In the interest of allowing the proffer to continue, we

18  didn't push him too hard on that.  We never did go back and ask

19  him the name of that friend.  It's only recently that I asked

20  him, once again, who the name of the friend was.  And he told

21  me that it was, in fact, Jim Hennessey.

22  Q.   So he withheld that evidence from you?

23  A.   I wouldn't call it withholding.  I would say I didn't push

24  and follow up.  He knew who it was.  He told me it was a

25  person.  He didn't tell me no one helped him.  He said someone

1    helped him.  I didn't push because I did not want to shut down

2    the proffer right there.

3        When I asked him the second time, which was recently,

4    recognizing that that was an oversight, not seeing who that

5    friend was, when I asked him, he came clean with me and said it

6    was Jim Hennessey.

7    Q.   Yeah.  That's two-and-a-half years later, right?

8    A.   Well, that's when I asked him the question.

9    Q.   Okay.

10   A.   I haven't seen him.

11   Q.   Okay.  Now, if this guy, Jim Hennessey -- if this guy, Jim

12   Hennessey, actually was involved and helped move stolen items

13   from Brink's and rented trucks and rented bins, is he not a

14   co-conspirator?

15   A.   I'd have to defer to the U.S. Attorney's Office on that.

16   Q.   In your opinion -- you're an FBI agent.  You've been an

17   FBI agent since 2004.

18   A.   Uh-huh.

19   Q.   You've arrested many people?

20   A.   Yes.

21   Q.   You've indicted many people?

22   A.   Yes.

23   Q.   In your opinion, the actions of Jim Hennessey, is he a

24   co-conspirator in this case?

25   A.   If he had knowledge of what he was doing and why he was

65

1    doing it, then yes.

2    Q.   And you just testified that he moved the stuff.  He

3    wouldn't have -- if you go into a facility and you see all

4    these boxes of coin that say "Brink's" on them and you're

5    renting storage bins and you're renting trucks, that's

6    knowledge, isn't it?

7    A.   It's knowledge of something.  It isn't necessarily

8    knowledge of a burglary.

9    Q.   Okay.  Did you even check to see if James Hennessey had a

10   criminal record?

11   A.   No.

12   Q.   You did a real good investigation, Special Agent Costello.

13   A.   Thank you.

14   Q.   Now, in regards to the items in the Raymond storage

15   facility, did you ever find one little battery that was

16   separated from everything else?

17   A.   I don't know.  We found a lot of items.

18   Q.   So, if I had -- if I show you a picture of -- when you

19   took pictures of these items, you laid them out on pieces of

20   paper and took pictures of everything as they came out?

21   A.   We took photos as we went into the storage unit.  Things

22   removed that were in bags, they stayed in those bags, were

23   transported to a more secure facility so we could look at them

24   and package things up.

25   Q.   And when you got to that facility, you laid out all the

1    items as they came out of the bags and took pictures of them?

2    A.    Yeah.   I don't know if they photographed every single

3    item.  They might have done group shots of some things.

4    Q.    No.  That's what I mean:  in group shots.

5    A.    Potentially, yeah.

6    Q.    So, if I showed you a picture which had a picture of one

7    battery, just separate from things, would that recollect your

8    memory that there was a single battery just laying out in the

9    bag somewhere?

10   A.    No.

11   Q.    It wouldn't?

12   A.    Well, like I said, there were a lot of items.  So a single

13   battery in and of itself wouldn't jog my memory.  If you show

14   me the photo, then I'll know that it came from our

15   photographer; so it would have come from one of those bags.

16   Q.    Can you give me a minute so I can get the photo?

17   A.    Sure.

18         (Whereupon, there was a brief interruption.)

19   BY MR. MURPHY:

20   Q.    Does this photo look familiar, Special Agent Costello?

21   A.    Yes.

22   Q.    Right here (indicating), what's that laying next to the

23   flashlight?

24   A.    That looks like a Duracell battery.

25   Q.    And it's separate from everything else.  So that would

67

1  have been just laying around in the bag?

2  A.   Yeah.

3  Q.   Do you have any opinion why one single battery would be

4  laying around in a bag?

5  A.   No.

6  Q.   Okay.

7         THE COURT:  How much longer are you going to be with

8  this witness?

9         MR. MURPHY:  I have awhile to go, Your Honor.

10         THE COURT:  Let's take a break, then.

11         Remember the admonition not to discuss this case with

12  each other.  Don't allow anyone to discuss the case with you.

13  Report any violations, and the rest of the admonition.

14         We'll be back in 15 minutes.

15         (Whereupon, a recess was taken at 11:37 a.m., and the

16  proceedings reconvened at 11:58 a.m., when the jury was seated

17  in the jury box.)

18                          - - -

19  IN OPEN COURT:

20         THE COURT:  You may continue.

21         MR. MURPHY:  Thank you, Your Honor.

22  BY MR. MURPHY:

23  Q.   We were discussing James Hennessey before we had the

24  break, and you didn't feel that it was important to follow up

25  on any of the information regarding James Hennessey?

68

1   A.   I deemed it of low importance at the time because of other

2   things that we were doing.

3   Q.   Has it ever resurfaced?

4   A.   No.

5   Q.   And you testified that you don't have any video that

6   places Murphy at the Pennsylvania storage facility?

7   A.   That hasn't come up yet.

8   Q.   Okay.  Did law enforcement execute a search warrant at

9   that facility?

10   A.   Yes.

11   Q.   Were you present?

12   A.   No.

13   Q.   You weren't present?

14   A.   No.

15   Q.   To your knowledge, was anything found there?

16   A.   No.

17   Q.   So, besides the testimony of Rob Doucette, do you have any

18   evidence that anything was ever in that bin?

19   A.   No.  Just his testimony.

20   Q.   Now, did you ever receive information from Morgan,

21   Doucette, or Nassor that they weren't happy with the Warrendale

22   storage facility?

23   A.   No.

24   Q.   You didn't receive information that, because the gate was

25   open, they didn't like that?

69

1   A.   Nope.

2   Q.   And you didn't receive information that, because there was

3   so many video units, that they didn't like that?

4   A.   No.

5   Q.   You testified about this Core Bore unit.  Do you remember

6   that testimony?

7   A.   Uh-huh.  Yes.

8   Q.   Was the Core Bore unit used in the Brink's facility?

9   A.   It doesn't appear so.

10  Q.   And, Special Agent Costello, are you aware of any crime

11  that this Core Bore unit was ever used?

12  A.   No, I'm not aware of anything.

13  Q.   And do you know where it came from?

14  A.   No.

15       THE COURT:  What are you talking about?  The unit?

16       MR. MURPHY:  The Core Bore unit, the unit that they

17  described that it bores a big hole in cement and goes through.

18  Your Honor, it's been discussed several times in this trial

19  already.

20       THE COURT:  All right.

21       MR. MURPHY:  It's a unique item.  Unless you are

22  paying attention and knew what it was, it could have just got

23  by you.

24  BY MR. MURPHY:

25  Q.   Now, are you aware of any items that Rob Doucette put into

70

1    the Raymond facility that didn't come from -- directly from

2    Pennsylvania and go in there?

3    A.    He may have indicated that one of the jammers might have

4    been stored somewhere else and put up there.

5    Q.    Okay.  That would probably be Sean's big jammer?

6    A.    Could be, yeah.

7    Q.    Yeah.  Well, there's been testimony that supports that

8    contention.

9    A.    I'm not privy to other people's testimony in the

10   courtroom.

11   Q.    Okay.  So, besides Murphy's big hundred watt jammer, are

12   you aware of any other evidence that Rob Doucette put into the

13   storage facility that didn't have anything to do coming back

14   from Ohio?

15   A.    No.

16   Q.    Did Rob Doucette tell you what these thieves did when they

17   got back from the score?

18   A.    Got back to where?

19   Q.    Got back to Lynn.

20   A.    Yes.

21   Q.    And what did they do?

22   A.    He said you, Joe Morgan, and Rob started counting the

23   money, and that -- I don't know if it was every day, or at

24   least on a couple of the days, David Nassor came by to get his

25   cut, as well, for his services beforehand; so started counting

71

1   the money, separating the burnt cash from the non-damaged cash.

2   Q.   Thank you.  That's -- that's the testimony I'm looking

3   for.

4   A.   Okay.

5   Q.   So you are aware from Rob Doucette's testimony that he

6   says that there was -- all the money went back to his house,

7   the burnt cash and the regular cash?

8   A.   I am aware from what he told me, not from his testimony,

9   yes.

10  Q.   Okay.  You are not aware of his grand jury testimony?

11  A.   I've read my grand jury testimony, but I proffered him.

12  Q.   Okay.  Based on this information that you're discussing

13  right now, --

14  A.   Uh-huh.

15  Q.   -- wouldn't that indicate, at least from what you were

16  told, that all the money went to Rob Doucette's house?

17  A.   He said that you guys brought it to his house, counted,

18  and then, at the -- at the end of every day, you would lock it

19  in the rental car.  This way, everybody's -- it would all stay

20  in the rental car.  No one would have access to it until you

21  all collectively resumed counting the following day.

22  Q.   Okay.  We'll get to that point a little bit later.

23       So it's fair to say that, according to Rob Doucette, all

24  the money stayed in Lynn?

25  A.   The cash money stayed in Lynn, yes.

1  Q.   Yes.  Okay.  Did you find any cash money in the Raymond

2  storage bin?

3  A.   Yes.

4  Q.   So wouldn't that indicate that Rob Doucette went up there

5  and put cash money in the bin?

6  A.   Yeah.  It came from Brink's.  It's money -- you asked me

7  if anything not used he added.

8  Q.   Okay.  Well, okay.

9  A.   The money was derived from Brink's.  So he added that, but

10 that was not something that was foreign to the whole crime.

11 Q.   Okay.  So -- I apologize for not being clearer.

12      Besides the big jammer that Rob Doucette put into the

13 storage bin that didn't go to Ohio, he also put in burnt money

14 at a later date?

15 A.   From Brink's, yes.

16 Q.   From Brink's.  Okay.

17 A.   Uh-huh.

18 Q.   How much burnt money did you recover in total?

19 A.   Well, we estimated, just based on a very, very, very rough

20 count of bills that were over fifty percent intact, maybe

21 28,000.  That was just, again, something to put on a piece of

22 paper.  We really wouldn't know what the true value would be

23 until it went to the fed.

24 Q.   And how much -- I'm not going to hold you down to a

25 specific number.  I'm just looking for a generalization here.

73

1      How much burnt money would you say was less than fifty

2  percent intact?

3  A.   I would have no idea.

4  Q.   No idea?

5  A.   Well, no, because we could only really estimate what was a

6  bill that appeared to be half a bill.

7  Q.   Well, if it was less than half a bill, you would at least

8  know what the bill was, wouldn't you?

9  A.   Maybe.  Sometimes you could recognize it, yeah.

10  Q.   And you didn't -- you didn't -- you don't have an opinion

11  as to how much --

12  A.   No.  We weren't interested in counting the little scraps.

13  We just wanted a very rough estimate of about how much currency

14  was in those bags.

15  Q.   And would you say that the bulk of the money that you

16  recovered, the bulk of it -- I'm saying 60, 70, 75 percent --

17  was the bulk of it more than fifty percent intact?

18  A.   I don't know what the breakdown was.  I mean, we took a

19  photo of it.  So, I mean, there is a photo of what it looks

20  like, and it's in evidence.  So --

21  Q.   Okay.  Well, I mean, you were there.  You seized the

22  money.

23  A.   Yes.

24  Q.   And you went through it.

25  A.   Yes.

74

1    Q.    And you don't have a recollection?

2    A.    Because that fact is not important, because I know that

3    the fed does not restore anything under fifty percent.  So we

4    simply focused on the bills that we looked to be fifty percent

5    or larger; counted those so we would have an idea.  The rest,

6    we didn't count.

7              THE COURT:  Excuse me.  That means the bills that are

8    fifty percent or larger are what?  Redeemable?

9              MR. MURPHY:  By the U. S. Treasury, Your Honor, by

10   regulation.

11             THE COURT:  So what was found and counted were these

12   bills that were redeemable?

13             THE WITNESS:  We believe so.

14             THE COURT:  Which means fifty percent of the bill was

15   left?

16             THE WITNESS:  That's our --

17             THE COURT:  And the rest is just odds and ends or

18   pieces of other burned money that were smaller?

19             THE WITNESS:  Yes, Your Honor.  It could be as simple

20   as a little corner of a bill that was separated.

21             THE COURT:  Okay.  So that's what --

22   BY MR. MURPHY:

23   Q.    Now, when you went to that Raymond storage facility, were

24   there burglar's tools in that facility?

25   A.    Yes.

75

1   Q.   And did you charge Rob Doucette with possession of

2   burglar's tools?

3   A.   Well, knowing that this was going to be a federal

4   prosecution, we didn't charge him with that state charge.  He

5   was, obviously, in conversation with the U.S. Attorney's

6   Office.  They're a different set of charges that apply.

7   Q.   Well, the charge that he was charged with the federal

8   government was interstate transportation of stolen goods.

9   A.   Uh-huh.

10  Q.   And that would account for the receiving stolen property

11  that would have been in that bin.

12  A.   Okay.

13  Q.   But in regards to possession of burglarious tools, he

14  wasn't charged?

15  A.   Well, again, I'm not an attorney, but my understanding is

16  that, having those items would be one of the elements to one of

17  the conspiracy charges that he was charged with.

18  Q.   Really?

19  A.   I'm not an attorney.

20  Q.   Okay.

21  A.   So I think you're asking the wrong person that question.

22  Q.   Okay.  Well, you're the only one that I can question on

23  this, Special Agent Costello.

24       And you testified that you haven't charged James Hennessey

25  with anything in regards to the Raymond, New Hampshire, bin?

76

1  A.   Yes.

2  Q.   Have you -- are you aware of the total amount of money

3  that was missing from Brink's?

4  A.   I -- I've heard different numbers thrown around.  I mean,

5  I think the loss was ballpark of 2.3 million, is what I've been

6  told; but, again, that's not really my -- I haven't been

7  focused on that part of the investigation.  So I've not -- I

8  don't want to say I'm completely accurate on that number.

9  Q.   Well, taking into consideration all the recoveries, the

10  recovery of the coin, the recovery of the redeemable burnt

11  money, --

12  A.   Uh-huh.

13  Q.   -- and the other stuff, do you know -- do you -- after

14  taking all that into account, are you aware of how much money

15  is still missing?

16  A.   I'm not, no.

17  Q.   If I showed you a list, are you -- have you been made

18  privy of a list made from Brink's?

19  A.   I'm aware that there is a list from Brink's; but, again, I

20  haven't been focused on that part of the investigation.

21  Q.   If I told you that there was still almost $900,000

22  missing, would that -- would you disagree with that?

23  A.   I would have no basis to agree or disagree.

24  Q.   Okay.  Right here is robbery, paid losses, from Brink's.

25  And down here, we have what they call internal recoveries.

1   Since the total loss was 2.3 million and you have some internal

2   recoveries, those recoveries would indicate that they were

3   probably recovered from within the building?

4   A.   That's what I would understand that to mean.

5   Q.   And the Randolph coin would be right down here

6   (indicating)?

7   A.   Yep.

8   Q.   And the federal reconstruction, that would be the amount

9   of money that was reconstructed?

10  A.   If you say so, yeah.

11  Q.   And the net loss, what's the net loss?

12  A.   Eight hundred, fifty-three thousand and change.

13  Q.   Thank you, Special Agent Costello.

14       Now, did Rob Doucette tell you he got a specific cut from

15  this crime?

16  A.   Yes.

17  Q.   And how much did he tell you he got?

18  A.   He said you guys counted up about 200,000, ballpark, maybe

19  one eighty to two hundred; that Nassor was to receive a

20  straight five percent off the top.  Your cut -- from the

21  remaining, your cut was to be fifty; Joe Morgan's, thirty; his,

22  twenty percent.  So he estimated that he received somewhere in,

23  you know, the 35-to-40-thousand-dollar range, is what he told

24  us.

25  Q.   Did Rob give his money back?

1   A.   No.  He told us he spent it on bills and other things.

2   Q.   And were you aware that Mr. Doucette had other money that

3   he had that he could have replaced that money with?

4   A.   I'm not aware of his financial situation.

5   Q.   You weren't aware that he had 250-to-300-hundred-thousand

6   dollars from a life insurance policy where his mother had just

7   died a few months prior?

8   A.   No.

9   Q.   So you were basically letting Rob keep his stolen money?

10  A.   I talked to him on June 4th.

11  Q.   Okay.

12  A.   He told me that, the money that he had received that was

13  from the cut from your score, that, he had already spent.  So

14  there was no more money to recover from him.

15  Q.   Do you think Rob lied to you about how much money he got?

16  A.   I think he gave me what he remembered.

17  Q.   Now, did Rob ever allegedly say that Murphy got a cut?

18  A.   He said that your cut was fifty percent.  That was the

19  standing order.  He says everybody took cash at the end of

20  every day, whatever had been counted that particular day.

21  Q.   So it's your understanding that Murphy left his house with

22  money?

23  A.   What he told me was that -- and, you know, you would have

24  to refer to his testimony.  But from my recollection of what he

25  told me was that he -- you guys would count every day, that the

1    uncounted money would be locked into the rental car so that way

2    no one could steal from everybody else.  And one or two of the

3    nights, he did say that, for whatever reason, you did not want

4    to take your cut home, because probably you didn't want your

5    girlfriends to get to it, so that you would ask Joe Morgan and

6    Rob to maybe hold, temporarily, your share until you got it

7    back from them later.  So those are the things that he told me.

8    Q.   Okay.  Now we're getting to it.  Now you're getting to

9    testimony where Murphy didn't take any money, allegedly, and

10   that Rob claimed that he held money?

11   A.   On one occasion.

12   Q.   Okay.

13   A.   But he also said you counted for a period of several days.

14   So he wasn't specific on how much money you left with.

15   Q.   Well, so, if Rob Doucette testified that he never had any

16   of Murphy's money and he put it all on Morgan, Morgan may have

17   had it, that would be inconsistent with what he told you?

18   A.   I don't know what he testified to.

19   Q.   I'm just asking you, if he testified that he never had any

20   of Murphy's money, --

21            THE COURT:  You're asking for conjecture now.  I've

22   let you go far afield from --

23            MR. MURPHY:  Just a minute, Your Honor.

24            I apologize, Your Honor.

25   BY MR. MURPHY:

80

1   Q.   So, based on your investigation, Mr. Doucette told you

2   that he held some of Murphy's money?

3   A.   Temporarily, yes.

4   Q.   Okay.  And did he ever tell you what he did with that

5   money?

6   A.   Presumably, you got it back from him.

7   Q.   Presumably?

8   A.   Yeah.  He said he temporarily held onto it for you.  From

9   that, I take it that you came and got it from him after.  I

10  don't know.

11  Q.   Didn't you -- didn't you execute a search warrant for

12  Murphy's house?

13  A.   Yes.

14  Q.   And when was that executed?

15  A.   January 23rd, 2009.

16  Q.   And that was only days after?

17  A.   Six days after Brink's.

18  Q.   But, after they came home from Lynn, how many days was

19  that?

20  A.   Well, you guys returned from Lynn, or -- Sunday would have

21  been -- what? -- the 18th.  So my guess is you probably arrived

22  late on the 18th, or maybe into the early, early morning hours

23  of the 19th.

24  Q.   And, on the 23rd, when you raided, didn't you take Murphy

25  into custody?

81

1   A.   Yes.

2   Q.   Okay.  So it doesn't look like -- I can't understand when

3   Doucette would have allegedly given this money back, if he had

4   it at all.

5   A.   Well, you are counting money from -- on the 19th, 20th,

6   21st, presumably the 22nd.  So that was about a four-day block

7   that's unaccounted for from when you got back to Lynn and, as

8   you said, were taken into custody the morning of the 23rd.

9   Q.   So, if they're counting money and Doucette is saying that

10  Murphy doesn't want to take the money home and they're not done

11  counting, how does Murphy get this money?

12       You can't -- you can't -- you can't figure it out, can

13  you?

14  A.   He said, one night, he kept your money for you.  That's

15  what he told us.

16  Q.   And you testified that Doucette told you that Nassor was

17  present when the money was being split up?

18  A.   He said that he stopped by.  I don't know if he was there

19  for the entire counting procedure, but he did stop by.  Again,

20  I don't know if it was every day, but he did stop by to

21  retrieve a cut when there was a cut for him available.

22  Q.   And did you speak to Mr. Nassor about this crime?

23  A.   Yes.

24  Q.   Did he ever admit to being at Doucette's house or

25  accepting any money?

82

1    A.    He eventually did, yes.

2    Q.    Really?  When was this?

3    A.    Well, he said he helped you return the rental truck and

4    that, at that point, you gave him a cut of money.

5    Q.    That's not what you testified to.  You testified that he

6    was at the house and he was splitting the money and received

7    money.

8    A.    That's what Rob Doucette told me.

9    Q.    Oh.

10   A.    Even Nassor told me that he did get a cut of money.  He

11   was somewhat vague in his detail, but he told me that he helped

12   you return the truck.  So those are the two sources of

13   information that I had.

14   Q.    Okay.  So, if Nassor says that he never received any money

15   or never saw any money, that would be inconsistent?

16   A.    Yes.

17   Q.    Okay.  So it appears that at least one or both of your

18   informants are lying about something?

19   A.    Well, that's how you're characterizing.  I'm not thinking

20   they're lying.

21   Q.    Okay.

22   A.    I'm thinking they're giving me their version of events.

23   Q.    Okay.  Are you aware that Rob Doucette was spending money

24   frivolously from the time that he cooperated with you, and

25   thereafter?

83

1   A.    I have no knowledge of his spending habits.

2   Q.    No knowledge.  Did you do any investigating in regards to

3   any financial background into Rob Doucette?

4   A.    No.  We did not see the need for a financial

5   investigation.

6   Q.    You have a guy that breaks into this facility, steals

7   millions of dollars, and there's almost a million dollars

8   unaccounted for, and you see no reason to do a financial

9   investigation into him?

10  A.    Well, I had the guy who is the lowest-ranking member of

11  the crew, yourself being the top member of the crew.  I know

12  that there was a large fire in Brink's.  And when in

13  discussions with case agents out here in Ohio -- I believe that

14  the unaccounted for money you're talking about, I believe, is

15  believed to have largely been incinerated.  Based on what he

16  told us, we recovered coin.  And he described approximately

17  200,000, or so, usable dollars returning to Lynn.

18        His cut -- he told us that he spent his cut.  He was quite

19  clear about that.  Didn't try to hide it.  He says that he

20  spent it all.

21  Q.    Did you ever look into his work history?

22  A.    No.

23  Q.    So you don't know what his job was, how he earned his

24  money?

25  A.    I didn't find that to be a fact that had any bearing on my

84

1   investigation at the time.

2   Q.   Now, in regards to the Raymond storage facility, did you

3   receive any video surveillance from the Raymond storage

4   facility?

5   A.   They did not have any.

6   Q.   In regards to this investigation in regards to Brink's,

7   did you ever speak with Joe Morgan at all?

8   A.   He was unwilling to speak with us about it.

9   Q.   Did you ever tell Morgan that you would keep him out of

10  jail if he testified against Murphy?

11  A.   He was unwilling to speak with us.  And, no, I wouldn't

12  tell him something like that, because there is no way I could

13  keep him out of jail or would want to.  So, there you go.

14  Q.   I just asked the question, Special Agent.

15       Now, what type of deal did you offer Nassor?

16  A.   I don't offer deals.  That's the U.S. Attorney or District

17  Attorney's function.

18  Q.   Who offered Nassor his deal in regards to this case?

19  A.   In regards to the case that he was charged with in

20  Massachusetts, the Bristol County District Attorney's Office

21  offered him a deal.  Part of that deal was a proffer where he

22  sat down and told the government about anything he could tell

23  the government about, which ultimately was the initial

24  information that we had on this case.

25  Q.   So the deal from this case, which I asked you, Brink's,

85

1    came from Massachusetts?

2    A.    The deal for the case he was charged with came from

3    Massachusetts.  He was not charged in this case, because his

4    information was provided under a proffer, which, under good

5    faith, we cannot use against him.  So, therefore, there was no

6    basis to charge him on that.

7    Q.    Okay.  But if -- and anything that flows from that

8    investigation doesn't -- can't be used against him?

9    A.    We cannot use his words against him, no.

10   Q.    Okay.  But, later on, you went and got information from a

11   Rob Doucette.

12   A.    Uh-huh.

13   Q.    And Rob Doucette implicated Mr. Nassor?

14   A.    Yes, he did.

15   Q.    And that was separate from Mr. Nassor's words?

16   A.    Yes.

17   Q.    And he was still wasn't charged?

18   A.    Well, that's a decision made by the United States

19   Attorney's Office, not Special Agent Jason Costello.

20   Q.    Okay.  Now, Rob Doucette faces 20 years in federal prison

21   for the charge that he was indicted for, doesn't he?

22   A.    I'm not sure what his maximum sentencing exposure would

23   be.

24   Q.    And if Nassor was indicted, he would have faced a

25   substantial prison time, too?

86

1   A.   I don't know his specifics; but I would think, knowing Mr.

2   Nassor, I would say "substantial" is probably an accurate

3   description.

4   Q.   Did Mr. Nassor benefit financially from the deal you cut

5   with him?

6   A.   Not to my knowledge.

7   Q.   He didn't benefit financially?

8   A.   Not to my knowledge.

9         THE COURT:  Benefit financially from what, Mr.

10  Murphy?

11        MR. MURPHY:  From the deal that was cut in this case,

12  Your Honor.

13        THE COURT:  In this case?

14        MR. MURPHY:  In this case.

15  BY MR. MURPHY:

16  Q.   Do you understand?

17        THE COURT:  He got a cut.

18        MR. MURPHY:  Well, we're getting to that.

19        THE COURT:  In this case, the testimony is -- I'm not

20  testifying.

21        MR. MURPHY:  Right.

22        THE COURT:  -- he got a cut in this case.  That's

23  been testified to.

24        MR. MURPHY:  Right.  I asked him.

25        THE COURT:  So --

87

1        MR. MURPHY:  I asked the agent --

2        THE COURT:  Why don't you reask him?

3        MR. MURPHY:  I'll ask him.

4   BY MR. MURPHY:

5   Q.    Did David Nassor benefit financially from the deal you cut

6   with him in this case?

7   A.    I did not cut a deal with David Nassor.

8   Q.    Okay.

9   A.    But the deal that you are referring to, cut by the

10  District Attorney's Office in Massachusetts, that deal was for

11  a number of years to be -- to serve incarcerated.  There is no

12  financial benefit that I'm aware of.

13  Q.    Okay.  Did Mr. Nassor have a private attorney in his

14  Massachusetts case?

15  A.    Yes, he did.

16  Q.    Do you have any idea how much it cost for him to retain

17  that private attorney?

18  A.    I have no idea.

19        MS. HILL:  Objection, Your Honor.

20        MR. MURPHY:  Okay.  Withdrawn.

21        THE COURT:  Sustained.

22  BY MR. MURPHY:

23  Q.    How much do you think it would cost Nassor to retain a

24  federal attorney in this case if he was charged?

25  A.    I have no idea.

88

1   Q.   Would it be substantial?

2   A.   I have no idea.

3   Q.   You have no idea whether a federal attorney in this case

4   would be substantial?

5   A.   I don't know -- I've never had to hire an attorney, Mr.

6   Murphy.  So I don't know what the going rate is for a good

7   attorney.

8   Q.   And, since Mr. Nassor isn't charged, he doesn't have to

9   pay restitution in this case, does he?

10  A.   These are all questions for the Court, not for me.  I

11  don't know what any sentencing arrangement would be, will be,

12  theoretically will be.

13  Q.   But what I'm getting at, Special Agent Costello, is, if

14  Mr. Nassor doesn't have to pay for a federal attorney and he

15  doesn't have to pay restitution, those are financial benefits,

16  aren't they?

17  A.   Indirectly, sure.

18  Q.   Okay.  And since he's not going to go to jail for this

19  crime, he can work on the street and earn money?

20  A.   Mr. Nassor is serving time in the state of Massachusetts.

21  That's all I can tell you.  I don't know what he's going to do

22  upon his release.

23  Q.   But if he's not going to go to jail for this crime, he can

24  earn money?

25  A.   That would be a question for him.  I don't know what he's

89

1    going to do upon his release.

2    Q.   And would you agree that that would be a financial

3    benefit, too:  being able to work and earn money on the

4    streets, without having to go to jail?

5            THE COURT:  This line of questioning is just going on

6    and on.

7            MR. MURPHY:  Okay.

8            THE COURT:  And I don't think it's relevant.

9            MR. MURPHY:  It's not relevant?  That --

10           THE COURT:  No, it's not relevant to the issues in

11   this case.

12           MR. MURPHY:  Well, Your Honor, --

13           THE COURT:  That's my ruling, Mr. Murphy.

14           (Whereupon, Mr. Murphy speaks to Mr. Graeff.)

15   BY MR. MURPHY:

16   Q.   Special Agent Costello, are you aware that Rob Doucette

17   has cooperated on two times in the past with law enforcement?

18   A.   Nope.

19   Q.   You're not aware?  Are you aware that he was investigated

20   by the Secret Service for counterfeiting money obligations?

21   A.   I asked him about that.  He told me that he was

22   interviewed by the Secret Service.

23   Q.   And was he ever charged with that crime that you're aware

24   of?

25   A.   That I'm aware of, no.  There has been no charge.

90

1    THE COURT:  You didn't say which crime.

2    MR. MURPHY:  The counterfeiting crime, Your Honor.

3    THE WITNESS:  As far as I know, he was interviewed as

4  a witness.

5  BY MR. MURPHY:

6  Q.   And are you aware that Rob Doucette was caught with

7  marijuana and pills?

8    MS. HILL:  Objection.

9    THE COURT:  Sustained.

10  BY MR. MURPHY:

11  Q.   Special Agent Costello, were you aware that Rob Doucette

12  stole personal belongings from Murphy's warehouse?

13    MS. HILL:  Objection.

14    THE COURT:  Sustained.

15    MR. MURPHY:  Your Honor, I would proffer that this is

16  information that was in one of the letters.

17    MR. DOMINGUEZ:  A side bar, Your Honor.

18    THE COURT:  Sustained.

19    No.  That's my ruling.

20    I'm not going to take -- you understand it?

21    MR. MURPHY:  Yes.

22    (Whereupon, Mr. Murphy speaks to Mr. Graeff.)

23  BY MR. MURPHY:

24  Q.   Special Agent Costello, in your investigation of this

25  matter, did you ask Rob Doucette about his history in doing

91

1  burglaries?

2  A.    Yes.

3  Q.    And what was his answer?

4  A.    That he had never done something like this before.

5  Q.    And you believed him?

6  A.    Seemed very credible.  And he did not have a criminal

7  history that would make me think otherwise.

8  Q.    Were you aware that David Nassor got hit on the head on

9  August 8, 2008?

10  A.    Yes.

11  Q.    Was Nassor seriously injured?

12  A.    Yes.

13  Q.    Are you aware of any information that law enforcement had

14  that Murphy may have been responsible for that injury?

15  A.    No.

16  Q.    When you were investigating this matter, Brink's, did you

17  ever learn information that Murphy's girlfriend was pregnant?

18  A.    Yes.

19  Q.    Did she have his baby?

20  A.    That's what you told me, yeah.

21  Q.    And --

22          THE COURT:  What is the relevance of this line?

23          MR. MURPHY:  It goes to my closing, Your Honor.  It's

24  going to go into my closing.  I'm just getting facts out into

25  the thing.

92

1    THE COURT:  It goes to your closing about whether

2    your girlfriend was pregnant or not?

3    MR. MURPHY:  Whether I had a baby or two babies.

4    I have one other question from the agent in this

5    line, and then I'm going to move on.

6    THE COURT:  This doesn't have anything to do with the

7    crime that you're charged with, or crimes you're charged with.

8    It's not relevant, Mr. Murphy.  Stick to the relevant parts

9    about the crime.  I'll give you -- I've given you every

10   opportunity you have coming to you on this.

11   Do you have any other questions of this witness?

12   MR. MURPHY:  Absolutely, Your Honor.  I'm going

13   through them.

14   THE COURT:  It's about three hours now.

15   MR. MURPHY:  I don't believe it's been three hours.

16   BY MR. MURPHY:

17   Q.   Special Agent Costello, when you raided Murphy's house on

18   January 23rd, you seized the storage key?

19   A.   Yes.

20   Q.   And you testified that you weren't the agent that was

21   present when the bin was searched?

22   A.   You mean your house?

23   Q.   The bin in Pennsylvania.

24   A.   Right.  I did not -- I was not in Pennsylvania when that

25   unit was accessed and opened up.

93

1   Q.    Okay.

2              THE COURT:  He wasn't there.  So what's the next

3   question?

4              MR. MURPHY:  I'm moving on.  I'm compounding through.

5              THE COURT:  Are you on to another subject?

6              MR. MURPHY:  Yes.

7              THE COURT:  All right.  Is it relevant?

8              MR. MURPHY:  Yes, it is.

9              THE COURT:  Okay.

10  BY MR. MURPHY:

11  Q.    Special Agent Costello, are you aware of that Murphy had a

12  security consulting company?

13  A.    I've heard that mentioned, but we never found any evidence

14  of a legitimate company existing.

15  Q.    Didn't you go to Lynn City Hall and obtain a document for

16  business certificate and zoning that indicated that Murphy had

17  a security consulting company?

18  A.    Uh-huh.  Well, the permit said that you were allowed to

19  operate a said business out of your home.

20  Q.    Now, did the FBI obtain a copy of Murphy's training course

21  from you, from him, for what you described earlier in regards

22  to this --

23             THE COURT:  What do you mean by "Murphy's training

24  course"?  The book?

25             MR. MURPHY:  Your Honor, the book, the information in

94

1    the book.

2          THE COURT:  All right.  I'll allow you to ask

3    questions about that.

4          THE WITNESS:  I wouldn't call that a training course.

5    In November of 2010, I was made aware of that existence.  And

6    then I received a copy of it, yes.

7    BY MR. MURPHY:

8    Q.   Had you been made aware of any information prior to that

9    that Murphy had been teaching criminals around Lynn how to use

10   cell phone jammers?

11   A.   Anything I know would have been just street hearsay.  So

12   nothing tangible to support a formal training process.

13   Q.   Okay.  Are you familiar with a list that a Lt. Alan Zani

14   -- is he your partner?

15   A.   He and I worked together for a number of years.

16   Q.   Are you familiar with a list that he compiled that he

17   believed to be professional burglars in the City of Lynn?

18   A.   I think I saw a list a long time ago that was circulating

19   of known commercial B & E, or breaking and entering, types in

20   and around Lynn.

21   Q.   And what did Lt. Zani call this group of people?

22   A.   Well, it wasn't just him.  All law enforcement called them

23   the Lynn Breakers.

24   Q.   The Lynn Breakers.  And --

25          THE COURT:  Lynn Breakers?

95

1          THE WITNESS:  Yes, Your Honor.  It's a reference --

2    everyone -- everyone was either from Lynn or had some sort of

3    tie to Lynn and had a demonstrated history of committing

4    various burglaries.

5          So law enforcement, over a couple of decades, a lot

6    of burglaries, pharmacies, other types of institutions, a lot

7    of those things were attributed back to this group of people in

8    Lynn, and they were dubbed, just as a collective nickname, the

9    Lynn Breakers.

10          THE COURT:  I see.

11   BY MR. MURPHY:

12   Q.   And I'm not going to hold you to any specific number, but

13   is it fair to say that there's probably about 150 people on

14   this list?

15   A.   Could be.  I don't know.  I haven't seen that list in a

16   number of years.  And that -- I think the list that you're

17   referring to, I'm pretty sure I've seen the same one.  It's

18   old.  So, you know, but there are -- suffice it to say, there

19   are a lot of names on it, yeah.

20   Q.   Okay.  And would it be fair to represent that there are a

21   lot of people that fit that criteria that aren't listed on that

22   list?

23   A.   Well, it's an old list.  So, whoever wrote it, which I

24   don't even know who prepared it, at the time they were writing

25   it, that's who they thought was -- a name should be on a

96

1    particular list.

2    Q.    Okay.  Now, Special Agent Costello, I'm going to ask you a

3    bunch of questions in regards to what Rob Doucette told you

4    back in June of 2009.  Did you testify that you testified

5    before the grand jury in July of '09?

6    A.    Yes, I did.

7    Q.    And you wrote at least two FBI 302 reports regarding the

8    information received from Rob Doucette?

9    A.    Sounds about right.

10   Q.    You also testified before the grand jury in this matter in

11   January of 2011?

12   A.    Yes.

13   Q.    And Rob Doucette testified before the grand jury in June

14   and July 2009?

15   A.    Sounds about right.

16   Q.    Would you have documented and testified to all the matters

17   of importance that Rob Doucette told you according to the

18   Brink's burglary?

19   A.    I don't understand your question.

20   Q.    Would you have documented -- I'll separate it into two

21   separate questions.

22        Would you have documented all matters of importance that

23   Rob Doucette told you regarding the Brink's burglary?

24   A.    Well, my 302 on my interview with Rob was a very general

25   302 because the interview was recorded.  So I didn't document

97

1   in detail the topics that he covered, because it was a recorded

2   interview.

3   Q.   Would you agree that, if it was a matter of importance, it

4   would have been documented?

5   A.   No.

6   Q.   You don't?

7   A.   Because it was a recorded interview.  There was no need

8   for me to write a summary of it.  So, if anything, I'm sure --

9   I would have to look at my 302, but when we have conducted

10  recorded interviews, I generally just write a summary to say

11  this is the topic that was discussed.  The recording is the

12  recording.

13  Q.   And would you have testified -- since -- you've testified

14  twice in this matter at the grand jury?

15  A.   Right.

16  Q.   Would you have testified to all the matters of importance?

17  A.   Well, when we put in -- before the grand jury, not every

18  single fact known to us is put in.  It's -- there are certain

19  topics that get put in.  There are certain that don't need to

20  go in at that time.

21       He discussed a lot of important things on that recording

22  which I'm sure didn't come in the grand jury because there

23  wasn't a pressing need to get them in at the time.  It's still

24  documented in the form of a recorded interview.  Okay.

25  Q.   Did Rob Doucette tell you that he saved the burnt

98

1    currency?

2              MS. HILL:  Objection.

3              THE COURT:  Sustained.

4              MR. MURPHY:  Excuse me.

5              (Whereupon, Mr. Murphy speaks to Mr. Graeff.)

6    BY MR. MURPHY:

7    Q.   Special Agent Costello, during the course of your

8    investigation, did you ever learn or hear from any witness that

9    any money was burned in Rob Doucette's kitchen from Brink's?

10   A.   I believe, lately, you know, when he was getting prepped,

11   and I remember -- I think that topic might have come up that

12   the little cinders, whatever, were just burned to be gotten rid

13   of.

14   Q.   But this isn't information that he gave you in the first

15   two-and-a-half, three years?

16   A.   Hu-uh.

17   Q.   Did you ever receive information that the person who gave

18   Murphy his Brian Hetherman ID information was Rob Doucette?

19   A.   No, I didn't receive any of that information.

20   Q.   You wouldn't have thought that that was important?

21   A.   You had the ID.  I really didn't -- the source of a fake

22   ID would have been a state crime, and we really didn't see the

23   need, based on the actual crime that we were looking to prove,

24   to go down that road after the fact.

25   Q.   Did you ever receive information that Murphy went into the

1    Brink's vault from Rob Doucette?

2              THE COURT:  Went into the Brink's vault?

3              MR. MURPHY:  Vault.  Inside the vault.

4              THE WITNESS:  I don't know if the -- I can't remember

5    if he said you went in or stood outside and pulled money out.

6    I don't recall.

7    BY MR. MURPHY:

8    Q.   So you don't -- you don't recall?

9    A.   (Shakes head.)

10   Q.   Did you ever receive information from Rob Doucette that he

11   stole a digital money counter from Brink's?

12             MS. HILL:  Objection.

13             THE COURT:  Overruled.

14             THE WITNESS:  No.

15   BY MR. MURPHY:

16   Q.   You never received that?

17   A.   No.

18   Q.   So that would have been information that he withheld from

19   you?

20   A.   If in fact he did steal one.  I don't know how I would

21   know that he stole one.

22   Q.   Well, I asked you if you'd have received information.

23   A.   I've never received that information.  I don't know of its

24   validity.  So, therefore, when you've asked me if he withheld

25   information, that wouldn't count, because I have no idea of

100

1   that piece of information as to where it came from.

2   Q.   Now, did Rob Doucette tell you -- well, did you receive

3   information from Rob Doucette of why he didn't rent the storage

4   bin, himself, up in Raymond, New Hampshire?

5   A.   Because he didn't want it in his own name.

6   Q.   Did he say anything about a fake ID that he did or didn't

7   have?

8   A.   He said he didn't have a fake ID and that's why he needed

9   help.

10  Q.   So that if -- then, if he testified that he did have a

11  fake ID, that would be inconsistent with what he told you?

12  A.   If that's the case, and that would be an inconsistency.

13  Q.   Okay.

14           THE COURT:  Can you estimate how long you'll be with

15  this witness?

16           MR. MURPHY:  I have probably another fifteen, fifteen

17  minutes, to a half an hour, Your Honor.

18           THE COURT:  All right.  We'll have to break, then,

19  for lunch.

20           Remember the admonition.  One hour.

21                          - - -

22

23

24

25

101

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19          (Whereupon, the jury exited the courtroom, and

20   Witness David Nassor was seated in the witness chair.)

21          MR. DOMINGUEZ:  Your Honor, for the record, so that

22   the record is complete, the last line the nature of objection

23   is hearsay.  It is absolutely improper for Mr. Murphy to ask to

24   impeach Rob Doucette by asking Agent Costello questions of what

25   Mr. Doucette told him.  It's hearsay, clearly.

1          THE COURT:  Mr. Nassor, you're still under oath,

2    previously administered.  That's good for the whole trial.  Do

3    you understand that?

4             ** NOTE: Nassor on the witness stand.  Yes, I do

5          THE COURT:  Okay.

6          THE COURT:  Mr. Murphy wants to -- has held you over

7    to testify, as you know.  That's why you're here.  That's why

8    you're back.

9          THE WITNESS:  Okay.

10            ** NOTE: David Nassor on the witness stand.

11         THE COURT:  And I will ask you, first, do you give

12    your permission to have Mr. Murphy interview you, -- this is

13    not the testimony -- to have him interview you before your

14    testimony?  And we will not be present if I allow that to

15    happen.

16         THE WITNESS:  Yeah.  I'm fine with that as long as

17    this gets over.  I just want this to end.

18         THE COURT:  Okay.  Do you wish to have your attorney

19    present?

20         THE WITNESS:  I'm all set.  No.  I'm good.  I don't

21    have an attorney here.  So I don't think it's going to be a

22    problem.  I mean --

23         THE COURT:  Well, we talked to your attorney and

24    asked him of his availability.  He is available by phone if you

25    want to talk to him and talk to him out of the hearing of

```
1   anyone else.  In other words, you may talk to him and consult

2   with him before your interview with Mr. Murphy, not your

3   testimony, but before your interview with Mr. Murphy.  And, of

4   course, before your testimony.  And I strongly suggest, Mr.

5   Nassor, that you talk to your attorney, because you have agreed

6   to tell the truth in this case in exchange for a favorable plea

7   agreement, right?

8             THE WITNESS:  Correct.

9             THE COURT:  And if you fail to tell the truth, you

10  could jeopardize your plea agreement and potentially face

11  additional charges.  Now, I am advising you to tell the truth.

12  I'm not advising --

13            THE WITNESS:  Of course --

14            THE COURT:  -- you to talk to Murphy or take the

15  stand or not take the stand, but I am advising you that you

16  tell the truth and that you -- I am advising you that it would

17  probably be a good idea to talk to your attorney, if only for a

18  few minutes, and we have made contact with him, without going

19  into any of this, and asked if he would be available to talk to

20  you.

21            THE WITNESS:  I will say ^ if he finds the time, Your

22  Honor.  I have the worst attorney in the world.  Really, his

23  advice is -- I mean --

24            THE COURT:  Your answer to that?

25            THE WITNESS:  What are you asking?  Are you asking me
```

104

1    if I want to speak to Mr. Murphy?  Correct?  Is that what this

2    is all about?

3              THE COURT:  Yes.  You can speak to him in an

4    interview, --

5              THE WITNESS:  Okay.

6              THE COURT:  -- a closed interview with just the two

7    of you present.  And, of course, the security would have to be

8    present.

9              THE WITNESS:  His attorney, too, right?

10             THE COURT:  Pardon me?

11             THE WITNESS:  His attorney is in there, also?

12             THE COURT:  No.  Mr. Murphy -- well, Mr. Murphy can

13   have his consulting attorney with him on this interview.  I'm

14   saying, I have to have marshals, because we've got this unusual

15   situation where Mr. Murphy is the attorney and the defendant.

16   So I'm sure that doesn't bother you, Mr. Murphy.

17             MR. MURPHY:  I believe Mr. Graeff is going to go to

18   lunch, and I don't need him for any consulting.

19             THE COURT:  Okay.  Well, that's up to you.

20             MR. MURPHY:  I would just interview Mr. Nassor.

21             THE COURT:  That's fine.  That's up to you.

22             THE WITNESS:  How long is this going to take?  This

23   is quite -- this isn't an all-day thing, right?

24             MR. MURPHY:  Your Honor, all I need is probably about

25   45, 40, 45 minutes.  That's it.

105

```
1              THE COURT:  To interview him?

2              MR. MURPHY:  Yes, sir.

3              THE COURT:  40 or 45 minutes to have him testify, or

4    interview him?

5              MR. MURPHY:  No, Your Honor.  For the interview, Your

6    Honor.  Maybe 30.

7              THE COURT:  I'll give you 30 minutes.  And do you

8    waive your right to have your attorney present or consult with

9    your attorney before this interview?

10             THE WITNESS:  Yeah.  I'm fine.

11             THE COURT:  You waive your right?

12             THE WITNESS:  Yeah, I waive my right.

13             THE COURT:  I want to hear it.

14             THE WITNESS:  I just want this to go away.  I just

15   want it to end.  I don't want to go through this no more.

16             THE COURT:  All right.  As soon as we exit the room

17   back here.

18             MR. DOMINGUEZ:  Just so long, Your Honor, just so

19   long Mr. Nassor knows it's his choice whether or not to go

20   through with this interview.

21             THE WITNESS:  I know that, and I understand I'm under

22   the proffer and anything.

23             MR. DOMINGUEZ:  I just want to make sure.

24             THE WITNESS:  I just want to make sure that you know

25   that, also.  This is my farewell, I guess you could call it.
```

1          THE COURT:  Okay.  Arrangements have been made so you

2     could be in separate cells, with the marshals, and they can

3     interview.  So that it's set up out here.  I thought we were

4     going to use right here.  That's all right.

5          MR. MURPHY:  Thank you, Your Honor.

6          THE COURT:  Thirty minutes.  Thirty minutes for this,

7     Mr. Murphy.  So, get organized.

8          (Whereupon, the lunch recess was taken at 12:52 p.m.)

9                              - - -

107

1              Monday Afternoon Session

2                 October 24, 2011

3                     – – –

4    IN OPEN COURT:

5              THE COURT:  You may continue.

6              MR. MURPHY:  Thank you, Your Honor.

7                     – – –

8              JASON COSTELLO (CONTINUED)

9                     – – –

10             CROSS-EXAMINATION (CONTINUED)

11   BY MR. MURPHY:

12   Q.   Do you remember, Mr. Costello, that we were talking about

13   prior statements that may or may not have been told to you from

14   Mr. Rob Doucette?

15             THE COURT:  Now, as far as prior statements made by

16   other people --

17             MR. MURPHY:  Yes, I understand.

18             THE COURT:  -- I understand that there will be an

19   objection to hearsay.

20             MR. MURPHY:  Okay.

21             THE COURT:  You understand that?  You can't be saying

22   what someone else said.

23             MR. MURPHY:  Yes.

24   Q.   (By Mr. Murphy) Special Agent Costello, do you remember

25   testifying at the Grand Jury that Nassor had to replace certain

108

1  tools that were lost?

2  A.  Yes.

3  Q.  Was that told to you by any witness at any time?

4  A.  He told me that.

5  Q.  Rob Doucette did?

6  A.  I believe Rob Doucette -- Mr. Nassor did, and I believe

7  Mr. Doucette told me that as well.

8  Q.  And would that have been included in your reports?

9  A.  Well, again, it was a recorded interview.  So, the report

10  may or may not reflect that level of detail.  Most likely it

11  does not.

12  Q.  Okay.  Did you ever receive any information about an Ohio

13  storage bin that was rented?

14  A.  No.

15  Q.  Did you receive any information about another

16  theft-related offense that may have occurred in the greater

17  Columbus area on the night of January 18th?

18  A.  No.

19  Q.  Now, getting to the rental truck and the rental car.

20  A.  Okay.

21  Q.  Did you notice that there was an extra 452 miles on the

22  rental car?

23  A.  Yes.

24  Q.  And how did -- did you ever try to account for that

25  mileage?

1  A.    No.  I believe Doucette had told me that the car was used

2  in and around Lynn by you -- or I am not sure by who -- so, it

3  was kept for a couple of days after coming back from Ohio.  So,

4  that would seem logical that if there was extra mileage on the

5  odometer, that would account for it.

6  Q.    So, you testified that Doucette told you that someone

7  drove the car around?

8  A.    I think he said you did.

9  Q.    He said I did?

10 A.    I believe so.

11 Q.    Oh, really.  Okay.  Now, wouldn't that extra mileage also

12 account for someone, let's say, going back from the

13 Ohio-Pennsylvania border back to the greater Columbus area and

14 then driving back?  Would that account for that extra 452

15 miles?

16       THE COURT:  That calls for speculation.

17 Q.    (By Mr. Murphy) Did you ever receive any information that

18 Murphy preferred to do his scores on holiday weekends?

19 A.    I don't think so.

20 Q.    You never heard that?  You don't recall?

21 A.    It doesn't ring any bells.

22 Q.    Did you ever receive any information that Murphy allegedly

23 wanted to have the least amount of traveling done with the

24 tools?

25 A.    Doucette told us that you wanted to go out to Ohio to do

1   the actual burglary of Brink's and wanted to travel with an

2   empty truck on the way to it.  That's why he told us that you

3   and Joe Morgan had moved the tools in advance on a separate

4   date out to Warrendale or to a storage unit -- which he didn't

5   know it was Warrendale -- but into a storage unit.

6   Q.   But did you ever receive information, specifically, that

7   Murphy would rather travel with the least amount of tools?

8   A.   No.

9   Q.   Okay.  Excellent.  Now, did you ever receive any

10  information about an alleged DNA trip to go collect DNA?

11  A.   I was told about that last week.  Yeah, that was the first

12  I had heard of it.

13  Q.   Wouldn't that be a very important matter in this case?

14  A.   Sure.

15  Q.   Of extreme importance, correct?

16  A.   It could be.

17  Q.   And you didn't testify to it in the two prior testimonies

18  that you had with the Grand Jury, the one in July of 2011 -- or

19  I mean, January of 2011 and July of 2009; you didn't mention

20  anything about that, did you?

21  A.   Well, I couldn't have because I just told you that I first

22  heard about it last week.

23  Q.   So, that means that information would have been withheld

24  for almost three years?

25  A.   I don't think that's an accurate statement.  I think it

111

1   was told to someone, but not me.

2   Q.   Well, would you agree that that information was withheld

3   from law enforcement for three-and-a-half years or almost three

4   years?

5   A.   Again, I don't think that's an accurate statement.  I

6   can't speak to it because I was not the one who that

7   information was relayed to, but I don't think it was, as you

8   say, withheld for quite that long.  I think it was sometime

9   sooner than that.

10  Q.   And you testified that authorities found someone else's

11  DNA in Brink's?

12  A.   I have been made aware of that fact, yes.

13  Q.   And doesn't it appear almost that this testimony was

14  prompted from Mr. Doucette?

15  A.   What are you insinuating?

16  Q.   Well, I am trying to infer that if the government found

17  DNA that didn't belong to any of the participants, and it

18  belonged to someone else that they determined to be from the

19  Columbus area, and Mr. Doucette didn't say anything about any

20  DNA trip or anything, and then all of a sudden just before

21  trial, he comes up with this DNA trip?

22  A.   Well, I don't think that he came up with it before trial.

23  It is my understanding that when he visited out here to testify

24  before the Grand Jury, whenever that was, that's when he

25  recollected that event, and it was relayed to the agents or

1  officers that he spoke with at the time.  So, I don't know of

2  it.  I can't speak -- you are asking the wrong person, in other

3  words.

4  Q.  Okay.  Do you know who the right person to ask would be?

5  A.  No.

6  Q.  Because if Doucette didn't come up with the DNA story, you

7  would have been left with an unaccounted-for party in the mix,

8  right?

9  A.  Well, we would have to address that finding.

10        THE COURT:  That calls for speculation.  You don't

11  need to answer.

12  Q.  (By Mr. Murphy) Do you know if this other party who had

13  the DNA, do you know if he was questioned?

14  A.  I don't know.

15  Q.  Now, did you ever receive any information that Nassor went

16  from picking up the cell phone jammer in Tennessee straight to

17  Ohio to scope out Brink's?

18  A.  I was under the impression that those were two separate

19  trips.

20  Q.  Do you know what the interval in between of them was?

21  A.  Yeah.  What he told me was that the first -- he said early

22  December he went to Memphis to pick up the jammer for you, and

23  then that you directed him to go back out and watch Brink's

24  overnight to see what time the last shift left and what time

25  the first shift came in, in the morning, and he believed that

113

1   was sometime early January.

2   Q.   Okay.

3   A.   That was the timeline that he relayed to me.

4   Q.   Did anybody give you any information that that trip

5   happened one day at the same time?

6   A.   No.  I think -- well -- let me back up.  I can't remember.

7   I'd have to listen to Doucette's statement.  Doucette may have

8   speculated that it was one and the same, but I don't know he

9   knew that for certain.  Again, from what he told me, he was

10  going off by what he had been told by you.

11  Q.   But that would have been incorrect, though?

12  A.   I don't know.  I'd have to listen to what he told me, I

13  don't recall how he related it.

14  Q.   Did you ever receive any information that the burglars had

15  problems with the truck on the morning of the burglary?

16  A.   I think Doucette said something about having a hard time

17  starting it.

18  Q.   And when did he say that?

19  A.   I don't recall when that came up.

20  Q.   And would you have testified to that in the Grand Jury?

21  A.   I don't recall.

22  Q.   Now, did anybody ever tell you in the course of your

23  investigation that Murphy said he "Murphed" Brink's?

24  A.   I had never heard that expression before.

25  Q.   You have never heard that?

114

1    A.    No.

2    Q.    So, it wouldn't be in any prior statement or any prior

3    testimony?

4    A.    I have never heard that expression before.

5    Q.    Okay.  Did anybody give you any information on the

6    procedure of how to open an armored car door or an armored car

7    truck?

8    A.    I know that there is a procedure, but I don't know what

9    the procedure is.

10    Q.    Did anybody in this case ever give you information on how

11    to do it?

12    A.    No.  I think Rob Doucette, when he described the problems

13    that you and Joe Morgan were having inside, part of the

14    slow-down was figuring out the procedure to open up the trucks

15    so they could be moved, but he didn't claim to know that

16    procedure.

17    Q.    And he didn't describe the procedure to you?

18    A.    I don't know that he knew the procedure, or if he did, he

19    didn't describe it.  Suffice it to say, there was some sort of

20    sequence of actions to open the door.

21    Q.    Okay.  Were you ever given any information that these

22    burglars were instructed not to touch any of the guns or

23    firearms?

24    A.    Yes.

25    Q.    Did you include that information in your Grand Jury

115

1    testimony or your --

2    A.   I don't know if it was asked of me in Grand Jury, but I

3    can say that Rob Doucette did tell us that you instructed both

4    he and Joe Morgan not to touch a gun or look at a gun, that it

5    would only make matters worse if caught.

6    Q.   Now, did you ever receive any information that Rob

7    Doucette was up for 100 hours on the weekend of the burglary?

8    A.   He told me that they were awake for a long time, driving

9    out, resting for a little bit, doing the score and then driving

10   back.  I don't know that he gave me a precise hour count, but I

11   got the impression that you guys were all awake for an awful

12   long time as did you this.

13   Q.   Okay.  So, if the burglars went out -- and I believe the

14   testimony was -- is that they slept in a hotel on the night of

15   the 16th, somewhere one hours or two hours before they got to

16   wherever they were going?

17   A.   He said you guys stopped to rest at a hotel.

18   Q.   Okay.  That was on the night of the 16th?

19   A.   Yeah.

20   Q.   What night did he tell you that he got back on?

21   A.   I believe it was right after you guys -- right after you

22   loaded all of the materials into the Warrendale unit and then

23   headed home to Lynn or for Lynn, that would have put you back

24   in Lynn sometime late on the 18th or early on the 19th.

25   Q.   So, they slept in a hotel on the 16th, and they got back

116

1    on the 18th.  What's the interval in between?

2    A.    We are talking about 72 hours or thereabouts.

3    Q.    Seventy-two hours?

4    A.    Sure, something like that.

5    Q.    The 16th was a Friday.

6    A.    Mh-hmm.

7    Q.    Okay.  So, they would have woke up Saturday morning.  So,

8    all day Saturday to Sunday would have been how many hours?

9    A.    Okay.  So, we are talking about 24, 36, 48 hours.

10   Q.    Okay.

11   A.    I have never heard 100 hours.

12   Q.    You have never heard 100 hours?

13   A.    No.

14   Q.    But the timeline you are aware of only accounts for 36 or

15   maybe 40 hours?

16   A.    Okay, okay.

17   Q.    Now, are you aware of any alias that Joe Morgan may have

18   used?

19   A.    He used an alias in relation to a Massachusetts crime, and

20   I don't know what it is off the top of my head, but I do know

21   that he did use an alias.

22   Q.    If I mentioned the name "John", would that sound familiar?

23   A.    It might, yeah, but give me a last name, though.

24   Q.    Possibly beginning with a "C"?  "John Cummings"?

25   A.    No, it doesn't ring a bell.  I know he did business with a

117

1   fence in downtown Boston with some precious metals, and he used

2   an alias, but it was unrelated.  So, I don't know it off the

3   top of my head.

4   Q.   Now, are you aware --

5   A.   Oh, "John Lynch", it might have been.

6   Q.   "John Lynch"?

7   A.   There you go.

8           MR. MURPHY:  Just a minute, Your Honor.  I am going

9   to be finishing up.

10          THE COURT:  Okay.

11  Q.   (By Mr. Murphy) Now, are you aware that Mr. Murphy paid

12  his moving company employees in cash?

13  A.   I think I heard that, yeah.

14  Q.   Okay.  Now, I believe there was earlier testimony in this

15  trial that somewhere in the Raymond storage facility that you

16  found a rental contract for the Pennsylvania bin?

17  A.   Yes.

18  Q.   Now, isn't it customary that the customer would receive

19  the contract?

20  A.   I don't know what is customary, but presumably, you would

21  have a copy of it, sure.

22  Q.   Okay.  Now, you testified in regards to the GPS, that

23  there were a bunch of inputs on the GPS that you testified to?

24  A.   Yes.

25  Q.   Most of the inputs had numbers with addresses?

118

1   A.   Yes.

2   Q.   And you testified that there was one address that said

3   "Walnut Street"?

4   A.   Yes.

5   Q.   Is "Walnut Street" one of the main streets in Lynn?

6   A.   No, I wouldn't say it is one of the main streets, but it

7   is a long street.

8   Q.   Okay.  And isn't it true that Walnut Street is a direct

9   exit off of Route 1?  You have a Walnut Street exit?

10  A.   Yes.

11  Q.   And isn't it also true that you have a Walnut Street exit

12  off of Route 95?

13          THE COURT:  Now, where is this going?

14          MR. MURPHY:  Your Honor, this has to do with the GPS.

15  This is absolutely relevant.

16          THE COURT:  All right.

17  Q.   (By Mr. Murphy) Isn't that true, Mr. Costello?

18  A.   Yeah, I think it does hit 95.  I don't know if it is still

19  called "Walnut", but the street does continue.

20  Q.   So, if someone was coming from out-of-town and didn't

21  know, you know, which way they were going or what they were

22  going to do or how to get there, Walnut Street would be one of

23  the main ways of getting back into Lynn off of 95 or Route 1?

24  A.   Yes.

25  Q.   Now, Murphy wouldn't need to know where he lived, right?

119

1   A.   No, you know where you lived.

2   Q.   Okay.  And when that entry said on "Walnut Street", it

3   didn't say any specific number like "407 Walnut Street", did

4   it?

5   A.   No, but when I am on a long trip and I am trying to get

6   home or out of a place that I am not all that familiar with, I

7   don't type in my exact street address to find home, I just type

8   in my town, and my GPS gets me pointed in a direction of the

9   highway.  And then I can shut it off once I am driving because

10   I know where I am, so...

11   Q.   Do you know Murphy to be a mover?

12   A.   Yes.

13   Q.   Do you know Murphy to do a lot of moving jobs in and

14   around the New England area?

15   A.   I don't know how many you do.  I know some moving jobs you

16   performed, but I can't quantify it.  We really never got to the

17   bottom of truly how busy your business was.

18   Q.   Okay.  But is it fair to say that as a mover, Murphy would

19   know his way around the general Massachusetts area and

20   New England area?

21   A.   Right, but Columbus is outside of that area.

22         MR. MURPHY:  I have no further questions at this

23   time, Your Honor.

24         THE COURT:  Thank you, Mr. Murphy.

25         MS. HILL:  The Court's brief indulgence, Your Honor.

120

1    　　　　Thank you, Your Honor.

2    　　　　　　　　　　　– – –

3    　　　　　　REDIRECT EXAMINATION

4    BY MS. HILL:

5    Q.   Just a couple of quick questions, Agent Costello.

6    Mr. Murphy asked you a bunch of questions about other

7    individuals that you, perhaps, could have investigated.  During

8    the course of your investigation, did you ever receive any

9    credible evidence that anyone other than Robert Doucette,

10   Joseph Morgan and Sean Murphy participated in the burglary of

11   Brink's on January 17th and 18th of 2009?

12   A.   No.

13   Q.   And what would you have done if you had received such

14   evidence?

15   A.   We would have followed that up; we would have wanted to

16   identify the entire burglary crew.

17   　　　　MS. HILL:  No further questions, Your Honor.

18   　　　　　　　　　　　– – –

19   　　　　　　RECROSS-EXAMINATION

20   BY MR. MURPHY:

21   Q.   Special Agent Costello, you do admit that you didn't

22   follow up anything to do with James Hennessey?

23   A.   Because we had no credible information that he was part of

24   the burglary crew on –- the question was January 17th into the

25   18th of 2009.

121

1   Q.   But you do admit that he was a part of this conspiracy?

2   A.   From what Rob Doucette told me, he assisted him in moving

3   items from across town.  Whether or not he truly was part of

4   the conspiracy depends on what he knew of the items that he was

5   moving.  I don't know what his mindset was at the time, I don't

6   know what Mr. Doucette told him those items were.

7   Q.   If you were moving them -- if Mr. Doucette came to you and

8   you opened up the storage bin, and you seen what was in that

9   storage bin, would you have known what was going on?

10   A.   Well, Mr. Murphy, I am a FBI agent.  I am probably a bit

11   more cynical than most people.  I don't know Mr. Hennessey.  He

12   may not ask a lot of questions.

13           MR. MURPHY:  Thank you.  No further questions.

14           THE COURT:  Ms. Hill?

15           MS. HILL:  No further questions, Your Honor.

16           THE COURT:  Thank you, Agent Costello.

17           May I see counsel up here at the bench?

18                     - - -

19           THEREUPON, there was a discussion at sidebar off the

20   record.

21                     - - -

22           THE COURT:  You may call your next witness.

23           MR. DOMINGUEZ:  Your Honor, with the Court's

24   indulgence, we would like to read some stipulations into the

25   record as agreed to by the parties.

122

1       THE COURT:  Okay.  Let me explain that to the jury,

2  if you would, please.  Stipulations are agreements between both

3  sides of a lawsuit or a case, both the defendant and the

4  government, as to certain facts.  That means that those facts

5  are not disputed; however, you, as jurors, still get to weigh

6  them and determine how important those are, if important at

7  all.  You still get to weigh them as to whether you believe

8  them or not believe them or what have you, but there is no

9  dispute that that is what these parties agree has happened.

10  And how they fit into the big picture or not is up to you.

11       Go ahead.

12       MR. DOMINGUEZ:  Thank you, Your Honor.  May it please

13  the Court, the following paragraphs, ladies and gentlemen, have

14  been stipulated to by the parties in this case.  In other

15  words, the government and the defense have agreed that the

16  following facts are true and can be relied upon by you in

17  reaching a verdict in this case:

18       Forensic scientist, Mark L. Bryant, examined latent

19  lifts from the front of battery and Motorola walkie-talkie,

20  Government's Exhibit 1D-9.  The subject latent lifts were

21  analyzed, according to appropriate latent impression

22  procedures, and compared to the inked fingers and palm prints

23  of Sean D. Murphy.  The lifts from the battery and

24  walkie-talkie were identified as an impression of the left

25  thumb of Sean D.  Murphy.

1          The Crime Lab report that reflected these results is

2     marked as Government's Exhibit 11-1.

3          Forensic scientist, Jamie F. Armstrong, examined DNA

4     swabs collected from the welder's mask, Government's Exhibit

5     1D-11, and the respirator, Government's Exhibit 1D-19.

6          THE COURT:  Excuse me, Mr. Dominguez.

7          The batteries and the walkie-talkies?

8          MR. DOMINGUEZ:  Those were Exhibit 1D-9.

9          THE COURT:  1D-9.  And the next item?

10          MR. MURPHY:  Excuse me, Your Honor.  I think we have

11     a discrepancy here.  May we speak with Mr. Dominguez?

12          THE COURT:  Yes.

13          MR. DOMINGUEZ:  There is no discrepancy, Your Honor.

14          May I pick up with the forensic scientist, Jamie F.

15     Armstrong?

16          THE COURT:  Yes.

17          MR. DOMINGUEZ:  Thank you.  Forensic scientist Jamie

18     F. Armstrong examined DNA swabs collected from the welder's

19     mask, Government Exhibit 1D-11 and the respirator, Government's

20     Exhibit 1D-19.

21          The swabs were compared to an oral swab standard from

22     Sean D. Murphy.  The comparisons were completed according to

23     appropriate DNA analysis procedures.  The DNA types obtained

24     from the mask contained a mixture of at least two different

25     contributors, and Sean D. Murphy cannot be excluded as one of

124

1    those contributors.

2         The DNA from the respirator matched the DNA from Sean

3    D. Murphy.  The Crime Lab Report reflecting these results is

4    marked as Government's Exhibit 12-1.

5         Further, the parties expressly stipulate to the

6    following facts in evidence:

7         1, the defendant, Sean Murphy, is the author of the

8    book entitled, "Master Thief, How to be a Professional Burglar"

9    that was found during the course of this investigation.

10        Also, on January 16, 2009, the defendant, Sean

11   Murphy, was present at Newmarket Storage in Newmarket, New

12   Hampshire at or about 10:30 a.m.

13        Those are the stipulations, Your Honor.  Thank you.

14        THE COURT:  Thank you.

15        MR. DOMINGUEZ:  And we would call Janel Mead to the

16   stand, Your Honor.

17        THE COURT:  Janel Mead.

18                        - - -

19                     JANEL MEAD

20   AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

21                        - - -

22                  DIRECT EXAMINATION

23   BY MR. DOMINGUEZ:

24        THE COURT:  You may proceed.

25        MR. DOMINGUEZ:  Thank you, Your Honor.

1  Q.   Ma'am, would you please state your name and spell your

2  first and last name for the benefit of the jury and court

3  reporter?

4  A.   My name is Janel, J-A-N-E-L, Mead, M-E-A-D.

5  Q.   Ms. Mead, where are you presently employed?

6  A.   Police officer with the Columbus Police Department.

7  Q.   How long have you been a Columbus Police Department

8  Officer?

9  A.   Twenty-six years.

10  Q.   And what have been your duties over the last 26 years?

11  A.   I worked ten years as a patrol officer, and then I worked

12  a year-and-a-half as a Burglary Detective and then 16 years in

13  the Crime Scene Search Unit.

14  Q.   And are you currently working in the Crime Scene Search

15  Unit?

16  A.   Yes, sir.

17  Q.   And what are your duties as a Crime Scene Search Unit

18  Detective?

19  A.   My unit works for the rest of the Detective Bureau.  So,

20  anytime there is any type of crime scene that needs documented,

21  they call us.  So, we work for Homicide, Assault Squad, Sexual

22  Special Victims Unit which is Sexual Crimes, Burglary, Robbery

23  Squad.

24       Basically, my duties involve documenting a crime scene,

25  collecting evidence and processing evidence.

126

1   Q.   I am going to invite your attention, if I could, to

2   January 18 of 2009.  Were you working that day?

3   A.   Yes, sir.

4   Q.   And were you called out to the Brink's warehouse facility

5   located at 1362 Essex?

6   A.   Yes, sir.

7   Q.   Were you familiar with that location?

8   A.   I wasn't familiar -- I didn't know that Brink's was there

9   at that particular building.  I had worked cruiser in that area

10  years before.

11  Q.   Were you in the Patrol Unit?

12  A.   Yes.

13  Q.   Very well.  Did you ever go over to the Brink's facility

14  on that date, ma'am?

15  A.   Yes, I did.

16  Q.   What was the purpose of you visiting that facility on that

17  date?

18  A.   Lt. Woods, one of the burglary detectives or lieutenants,

19  had called and requested Crime Scene to come out and process a

20  burglary scene at that location.

21  Q.   Did you, in fact, arrive there?

22  A.   Yes, sir.

23  Q.   And do you recall an approximate time you arrived there,

24  ma'am?

25  A.   It was in the morning because it was an all-day scene.

127

1   So, I want to say 7:30ish, 7:45.  It was early.

2   Q.   So, to familiarize myself and the ladies and gentlemen of

3   the jury, when you say an "all-day scene", what do you mean by

4   that?

5   A.   It was very detailed.  There was a lot of work to do, an

6   extensive crime scene.

7   Q.   Very well.  And what did you notice when you first arrived

8   there, ma'am?

9   A.   Well, there was a whole lot of police officers there.  The

10  scene had suffered severe fire damage and smoke damage and

11  water damage.  So, there was, also, a lot of -- it was a fairly

12  good-sized building.  So, the entire scene encompassed,

13  obviously, the entire buildings and all of the grounds around

14  it.  And as I said, there was fire damage, so that just makes

15  it worse.

16  Q.   This jury, just so you know -- I am not trying to talk to

17  you about prior testimony in this trial -- but I believe it is

18  safe to say they have been fairly inundated with photographs of

19  the exterior and interior of that facility, ma'am.  And I am

20  not going to show you all of those.  But suffice it to say,

21  have you seen a series of photographs depicting both the

22  exterior and interior of the Brink's facility on that date?

23  A.   Yes, sir.

24  Q.   Very well.  And what did you initially notice about the

25  facility -- and when I ask you this, in your role as a Crime

128

1   Scene Investigator/Processor, what did you notice about it?

2   A.   Just how -- just how -- how messed up it was.  Like I

3   said, there was an extensive scene.  There was what, I believe,

4   was going to be evidence strewn throughout the building.  There

5   was a lot of damage done on the interior of the building.

6   There were holes in the roof.  There was fire damage, as I say.

7   So, it was just -- if you will pardon my French -- I called it

8   the crime scene from hell because it was going to be a very

9   extensive scene.

10                   MR. DOMINGUEZ:  May I approach the witness, Your

11   Honor?

12                   THE COURT:  You may.

13   Q.   (By Mr. Dominguez) I have already told you, basically,

14   that I am not going to show you all of the photographs from

15   that facility, but I did just want to point out a few.  I have

16   handed you Government's Exhibits 1A-95, 1A-98, 1A-99 and 1A-196

17   and I ask you to take a look at those, please.

18   A.   Yes, sir.

19   Q.   Do you recognize those?

20   A.   Yes, sir.

21   Q.   What are those, ma'am?

22   A.   1A-95 depicts one of the corners of the vault room,

23   looking up toward the ceiling, and it is showing footprints on

24   the wall.

25   Q.   And I am going to ask you, do you recognize all four of

129

1   them?

2   A.   Yes, I do.

3   Q.   And are those photographs that were taken during the

4   course of the investigation of the crime scene of the Brink's

5   facility?

6   A.   Yes, sir.

7   Q.   And do they fairly and accurately depict what you saw on

8   that date?

9   A.   Yes, sir.

10           MR. DOMINGUEZ:  May I approach, Your Honor?

11           THE COURT:  You may.

12  Q.   (By Mr. Dominguez) I have just handed you, ma'am, what is

13  marked for identification purposes as Government's Exhibit 1C.

14  Do you recognize it?

15  A.   Yes, sir.

16  Q.   And what is that, ma'am?

17  A.   This is our Evidence Collection List from that day.

18  Q.   And what is an Evidence Collection List?

19  A.   An Evidence Collection List is a list that we compile of

20  any evidence that we collect from a crime scene.  So that if

21  the case is ever adjudicated, I have the specifics as to what

22  was collected, what time it was collected, what the item is and

23  where it was collected.

24  Q.   Ma'am, with respect to showing the items of evidence that

25  were seized during the course of that investigation, would that

1    Evidence Log assist you as to the inventory that was compiled

2    by yourself and your fellow crime scene investigators on that

3    date?

4    A.   Yes, sir.

5    Q.   First of all, I am going to show you what you have

6    identified as Government Exhibit 1A-95, and I believe you

7    talked about some footprints?

8    A.   Yes, sir.  There is some footprints on the wall that

9    were -- there is a hole in the roof above this.  You can't

10   quite see it in this photograph because it is kind of like a

11   drop ceiling, but the dark marks on the wall are -- were like

12   muddy shoe prints coming down.

13   Q.   And I am going to take the liberty of quoting you, but I

14   believe you said something to the effect of the crime scene

15   from hell?

16   A.   Yes, sir.

17            THE COURT:  I didn't know that word was French.

18            MR. DOMINGUEZ:  Thank you for your indulgence, Your

19   Honor.

20   Q.   (By Mr. Dominguez) Government's Exhibit 1A-98?

21   A.   Yes, sir.  That photo was taken in the vault room.

22   Q.   I will show you another one, 1A-99?

23   A.   Same area.

24   Q.   Now, ma'am, when you see those photographs and you talk

25   about processing a crime scene for evidence, and I believe you

131

1   said an all-day scene?

2   A.   Uh-huh.

3   Q.   What type of difficulties do you face when you process a

4   scene in that type of status?

5   A.   As you can tell from the photograph, there was a lot of

6   debris laying around.  There is also smoke damage and water

7   damage.  So, when it comes to evidence processing, the

8   processing I do is strictly for latent fingerprints only.  So,

9   anytime you have items left in a fire scene, due to heat and

10  smoke and water damage, that can very easily destroy latent

11  print evidence.

12  Q.   Did you process the Brink's scene, if you will, for

13  prints?

14  A.   Yes, sir, several of us did.

15  Q.   Were you successful?

16  A.   We obtained 16 lifts from the scene, the entire building.

17  Q.   Now, when you talk about lifts, you know, we all see CSI

18  and shows like that.  But, for instance, I have touched this

19  podium several times -- take my word for it -- throughout the

20  course of this trial, and I am going to assume that when you

21  sat at the witness stand, you have placed your hands about the

22  witness stand here just briefly.  When we conduct ourselves in

23  that manner, touching tangible objects, will they necessarily

24  always leave latent prints of value?

25  A.   No, sir, not always.  There is several things that can

1    determine whether there is a latent fingerprint left.  Number 1

2    is if you are wearing gloves.  Number two, some people secrete

3    more -- have more secretions from their fingerprints than

4    others.  We don't normally, as a race, secret as much during

5    the wintertime than the summer.  We just perspire more during

6    the summer.

7         Fingerprints are primarily made up of water with other

8    salts, proteins and acids, things like that, depending on -- so

9    having gone through a fire scene with heat, it can very easily

10   evaporate off.  Also, the other thing is like this wood right

11   here (indicating) is fairly porous, meaning that even though it

12   has got a finish -- the finish on it would help a little bit,

13   but a non-porous surface, which is more like this plastic --

14   you can't pour water through it -- is a better surface than

15   woods, cloths and things like that.  A lot of it will depend

16   upon the surface, also.

17   Q.   You mentioned something about gloves?

18   A.   You are not going to leave any prints if you are wearing

19   them.

20   Q.   You answered my question.

21   A.   Okay.

22   Q.   Ma'am, do you recall seeing a half of a cigarette during

23   the course of your crime scene investigation?

24   A.   Yes, sir, I do.

25   Q.   And I am showing you Government's Exhibit 1A-96.  Do you

133

1  recognize that, ma'am?

2  A.   Yes, I do.

3  Q.   And what does that purport to be?

4  A.   That's a partially smoked cigarette.  That was on -- the

5  item was sitting on like a gray utility push cart, that type of

6  thing.

7  Q.   I am not going to suggest that what I have back here --

8  for the record, I am pointing to our evidence cart?

9  A.   It is similar to that.

10 Q.   This was apparently left on the top of a cart similar to

11 the (indicating) one here?

12 A.   Yeah, it had couple of little trays there where you could

13 put a beverage.

14 Q.   Not on the floor where someone might --

15 A.   No.

16 Q.   You know, tap it out with their foot?  Did you do anything

17 with this cigarette, ma'am?

18 A.   We collected it.

19 Q.   Do you know whether or not it was submitted for DNA

20 analysis?

21 A.   I don't.

22 Q.   You would not have done that?

23 A.   No, sir.

24      MR. DOMINGUEZ:  Your Honor, with Agent Trombitas's

25 assistance, may he present some of the items to the witness?

134

1          THE COURT:  He may.

2    Q.   (By Mr. Dominguez) Detective Mead, Agent Trombitas -- and

3    he is standing there to assist -- he has placed some items of

4    evidence there to your right that I am going to have you take a

5    look at.  I first ask you to take a look at Government's

6    Exhibit 1C-1.

7          MR. TROMBITAS:  Can you describe the items, please?

8          MR. DOMINGUEZ:  It is metal rods.

9    Q.   (By Mr. Dominguez) Do you recognize that, ma'am?

10   A.   Yes, sir.

11   Q.   And what are they?

12   A.   Metal rods.  Actually, I saw these in the vault room.  And

13   because there were some other tanks and associated items, I am

14   assuming that they were used in welding, but I don't know how

15   to weld, but we collected them due to because that's what we

16   thought they were, used in welding.

17   Q.   Government's Exhibit 1C-2?  It is a piece of pipe, Agent

18   Trombitas.

19        Do you recognize that, ma'am?

20   A.   Well, I can't really tell what is in it.

21   Q.   You can open it up, if you like.

22   A.   Okay.  All right.  This is a piece of metal pipe that we

23   located outside what we call the turret room, which this was

24   actually in the loading bay area of the building, outside the

25   turret room, laying on the ground.

135

1   Q.   Very well.  Government's Exhibit 1C-3.

2          MR. TROMBITAS:  Can you describe it?

3          MR. DOMINGUEZ:  It would be in a bag, Agent

4   Trombitas, some dials from the vault door.

5   A.   Yes, sir.  These are three metal dials that appeared to

6   come off of the vault door.  They were on the floor.

7   Q.   (By Mr. Dominguez) Hold those up so the jury can see.  And

8   those were in the area of the vault room, ma'am?

9   A.   Yes, sir, on the floor.

10  Q.   1C-4.  That would be the roof flashing, Agent.

11  A.   Did you say the roof flashing?  Okay.  All right.

12  Q.   Is there an exhibit sticker on there?

13  A.   Yes, sir, 1C-4.

14  Q.   Yes, that's it.

15  A.   Yes.  This is a piece of roofing material that was located

16  on the roof of the building.  It has been cut.

17  Q.   1C-5?

18  A.   This is what appeared to be -- this is an ADT alarm panel.

19  Q.   1C-6?

20  A.   This is a Honeywell alarm panel, wall panel.

21          MR. DOMINGUEZ:  Would you pick that up for the ladies

22  and gentlemen of the jury, Detective?

23  Q.   (By Mr. Dominguez) And that was found within the facility

24  itself?

25  A.   Yes, sir.

136

1    Q.   And lastly, 1C-7?

2    A.   This is a green steel cap off of some type of a large

3    tank.  I guess an acetylene tank.  That was laying in the vault

4    room on the floor.

5    Q.   I show you, again, ma'am, 1A-99.  Is that the same green

6    oxygen tank cap that you just identified?

7    A.   Yes, sir.

8    Q.   Now, ma'am, for the record, the items that you have

9    identified, Government's Exhibit 1C-1 through 1C-7 -- I didn't

10   ask you this with respect to each individual piece -- but

11   collectively, those that you have identified for these ladies

12   and gentlemen of the jury, are those substantially in the same

13   condition today as they were when they were seized by you and

14   your colleagues with the Crime Scene Unit on January 18th of

15   2009?

16   A.   Yes, sir, they are.

17           MR. DOMINGUEZ:  May I have a moment, Your Honor?

18           THE COURT:  You may.

19   Q.   (By Mr. Dominguez) I will take you back to the beginning

20   of your testimony.  Upon your arrival, Detective Mead, at the

21   Brink's facility on January 18th of 2009 in the morning hours,

22   physically when you arrived there and you entered the building,

23   what was in the air?  Was there anything in the air at all?

24   A.   There was still some smoke in there.

25   Q.   At the time you arrived there, were there still anything

137

1  burning at all?

2  A.    No.  It had -- pretty much everything had been

3  extinguished, but it was a fresh fire smell.

4  Q.    Fresh smoke?

5  A.    Oh, yeah.

6  Q.    How strong was the smoke, do you recall?

7  A.    I would say it was a heavy scent.

8  Q.    A heavy scent?

9  A.    As if a fire had recently been put out, and you were right

10 there.

11 Q.    As you went into that facility and you have the fresh

12 scent of smoke -- I am not trying to get personal with you,

13 Detective -- but do you on occasion have a smoke?

14 A.    Yeah, I smoke cigarettes.

15 Q.    Would you have smoked a cigarette while you are in that

16 environment?

17 A.    No, you don't smoke in crime scenes.

18 Q.    Well, I understand that.  But with the heavy smoke that

19 was in there -- and if that was not a crime scene -- is that a

20 place where you would have taken a smoke in that environment?

21 A.    I am not following the question, sorry.

22 Q.    Okay.  There was heavy smoke?

23 A.    There was still smoke from the fire that had been put out,

24 yes.  Heavy smell of smoke from a fire, yes.

25 Q.    Was it hard to breathe?

138

1    A.    I didn't have any problem breathing.

2          MR. DOMINGUEZ:  No further questions, Your Honor.

3          THE COURT:  Mr. Murphy?

4          MR. MURPHY:  Thank you, Your Honor.

5                       - - -

6                    CROSS-EXAMINATION

7    BY MR. MURPHY:

8    Q.    Good afternoon, Ms. Mead.

9    A.    Good afternoon, sir.

10   Q.    You testified earlier that you collected this cigarette

11   and sent it in for DNA?

12   A.    I collected and turned it into the property room.  The

13   primary investigator is the one responsible to submit the lab

14   request.

15   Q.    Are you privy -- or do you have any knowledge of what the

16   results of that test was?

17   A.    No, sir, I don't.

18   Q.    Now, you testified that you arrived on the scene on

19   January 18th at what time?

20   A.    I don't know the exact time, I'd have to look at my

21   summary.  I don't recall.  It was in the morning sometime.

22   Q.    I believe you said 7:45?

23   A.    As I recall, it was early in the shift -- or I'm sorry --

24   not long after we got there that we were called.  Let me

25   clarify, I come to work at seven, and we were called shortly

1   thereafter.

2   Q.   So, it would be within an hour?

3   A.   I'd have to look at the summary, sir.

4   Q.   Would it have been within two hours?

5   A.   If it was around 7:45, as I recall, it would have been

6   within an hour.

7         MR. MURPHY:  May I have just one moment, Your Honor?

8   Q.   (By Mr. Murphy) Ms. Mead, if the investigation had showed

9   that the employees of Brink's didn't even show up at Brink's

10  until 9 a.m. and then it took them a number of -- maybe almost

11  an hour to determine what happened, which would bring it around

12  at least almost ten o'clock, how could you have reported at

13  7:45?

14  A.   Then, I am wrong on my time.  It was later.  The cops

15  arrived there, and then we were called.  So, I'm sorry, sir, I

16  don't remember the exact time.  I'd have to read my summary, I

17  know that it was in the morning.

18  Q.   Did you see the building as it appeared?  Was any of the

19  evidence disturbed by -- when you got there?

20  A.   Well, let me put it this way.  The scene had been

21  disturbed due to the fire and fire response.  So, when I get

22  there, you know, I know a burglary occurred, but at that point

23  I can't really say what is going to be evidence or what is not

24  going to be evidence, okay?  Until we go through the scene,

25  witnesses are talked to, the investigators get an idea of what

140

1    happened, then we start identifying pieces of evidence.  But

2    the scene had initially been just damaged by the fire and fire

3    response.

4    Q.   Well, the evidence that was actually at the scene upon

5    discovery of this crime?

6    A.   Okay.

7    Q.   It wouldn't have been disturbed -- or nothing would have

8    been moved until you actually viewed it?

9    A.   Correct.  What we do, once we first arrive, we meet with

10   the primary investigators, and they give us what we call a

11   walk-through, which is a physical walk-through the structure or

12   the building of the scene to indicate items that they know have

13   been moved or damaged or part of the scene or that need to be

14   collected.  So, we do a walk-through, and they are passing on

15   information as to what they know happened.

16   Q.   Okay.  I will show you a picture.

17   A.   Okay.

18   Q.   And does that picture look familiar to you from the

19   morning of January 18th?

20   A.   Yes, sir, it does.

21   Q.   And when you got there, is that ladder in the same

22   position that it was when you appeared there?

23   A.   That looks about right, as I recall.  It was near that

24   door.

25   Q.   Okay.  So, to the best of your knowledge, when Brink's

141

1   and/or the police first observed this crime, that ladder was

2   there?

3   A.   I don't know about that.  It was right near there when I

4   got there.

5   Q.   Okay.

6   A.   I don't know what time it had been put there.

7   Q.   Well, you testified that nobody would have disrupted any

8   of the evidence prior to your documenting the evidence?

9   A.   Yeah, we try not to.

10  Q.   Okay.  So this wouldn't be something that somebody would

11  just put there, an officer?

12  A.   Oh, yeah.  I don't know.  If an officer or somebody had

13  to -- for some whatever reason needed to get high up before I

14  got there, then that could have occurred.  I don't know when

15  that was put there or who put it there.  So, I can't really

16  answer your question.

17  Q.   But that's your recollection of what you saw when you got

18  to the scene?

19  A.   Yes, sir.

20  Q.   Did you ever receive any information on how Brink's

21  actually was able to enter their building upon arrival on the

22  morning of January 18th?

23  A.   I can't recall how they got in.  I remember that one or

24  two of the exterior doors had been damaged, but I don't recall

25  how they got in.

142

1   Q.   Okay.  Did you ever receive -- did you ever observe any

2   evidence that anyone was actually inside the cash money vault

3   of Brink's?  Did you ever find any evidence of that?

4   A.   Well, the vault room had been disturbed as had the -- do

5   you mean the currency room?

6   Q.   Well, the vault room, from what I understand, is the

7   office outside of the vault.  And the vault itself is what

8   holds the money, the cash vault?

9   A.   Okay, correct.  So, in the vault room?

10   Q.   No.  Did you ever discover any evidence that anybody was

11   inside the vault itself?

12   A.   Oh, yes.

13   Q.   What evidence would that be?

14   A.   Well, the vault door was burned.  There was a huge hole in

15   it, and there was money missing from inside of the vault.

16   Q.   Okay.  And would this picture depict the vault as you

17   observed it on the morning of January 18th?

18   A.   There is a little bit better photo than that, but, yeah,

19   there is damage to the door.

20   Q.   But that's the size of the hole and the hole in the vault

21   that you observed when you got there?

22   A.   Yeah, it was fairly large.

23   Q.   Did you find any of Mr. Murphy's fingerprints inside of

24   Brink's building?

25   A.   No, I didn't.  Actually, I am not the one to make the

143

1    determination.  I just collect them and turn them in.

2    Q.    Oh, so you don't do the results?

3    A.    I don't do the comparison, no, sir.

4    Q.    Okay.  And the roof panels, I believe they are

5    Government's Exhibit 1C-4?  They are right there.

6         How do you believe they were removed?  What tool, do you

7    think, cut that out?

8    A.    I would think it would have to be something a little

9    heavier than tin snips because that's heavier than tin, but

10   some type of cutting instrument.  I am not a great tool person,

11   sir.

12   Q.    Oh, you are not?

13   A.    No.

14          MR. MURPHY:  Okay.  Well, thank you very much,

15   Ms. Mead.  I have no further questions.

16          THE WITNESS:  Okay, sir. Thank you.

17          MR. DOMINGUEZ:  No further questions, Your Honor.

18          THE COURT:  Thank you very much.  You are excused.

19          THE WITNESS:  Thank you, sir.

20          MR. DOMINGUEZ:  Your Honor, may we retrieve the

21   evidence?

22          THE COURT:  Yes.

23          MR. DOMINGUEZ:  Special Agent Harry Trombitas, Your

24   Honor.

25          THE COURT:  Agent Trombitas.

144

1                          – – –

2                   HARRY TROMBITAS

3    AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

4                          – – –

5                   DIRECT EXAMINATION

6    BY MR. DOMINGUEZ:

7    Q.    Good afternoon.

8    A.    Good afternoon.

9    Q.    Sir, please state your name and spell your last name for

10   the record, please.

11   A.    My name is Harry W. Trombitas.  That's spelled

12   T-R-O-M-B-I-T-A-S.

13   Q.    You are familiar, Agent Trombitas, with the Brink's

14   facility, burglary and investigation associated with it?

15   A.    Yes, I am.

16         MR. DOMINGUEZ:  May I approach, Your Honor?

17         THE COURT:  You may.

18   Q.    (By Mr. Dominguez) Agent Trombitas, I have handed you what

19   has been marked for identification purposes and labeled as

20   Government's Exhibits 1A-196 and 19-1.  And I ask you if you

21   recognize those?

22   A.    Yes, I do.

23   Q.    First, I am going to show you Government's Exhibit 1A-196.

24   Do you recognize that, sir?

25   A.    Yes, sir.

145

1  Q.   And what is that?

2  A.   It appears to be a partially smoked cigarette that was

3  laying on a tray.

4  Q.   And is it your understanding that that cigarette was

5  collected per Detective Mead's testimony and placed into

6  evidence?

7  A.   That's correct.

8  Q.   And subsequent to it being placed into evidence, did an

9  investigator cause that cigarette to be examined for DNA?

10  A.   Yes, sir.  My partner, Detective Chris McIntosh with

11  Columbus PD, who has already testified, filled out a lab

12  request submitting that to the Columbus Crime Lab for DNA

13  analysis, and I believe that was on April 6th of 2009.

14  Q.   And did -- was there a result associated with the DNA

15  analysis with respect to any of the targets of the

16  investigation -- that is Sean Murphy, Joe Morgan and Robert

17  Doucette?

18  A.   Negative.

19  Q.   So, there was no match?

20  A.   No match.  We actually received -- or Chris actually

21  received an e-mail back from an examiner, I believe, on

22  April 22nd, indicating that there was no -- simply put -- no

23  match.

24  Q.   And as a part of your duties as an FBI agent, Agent

25  Trombitas, do you investigate most bank robbery offenses that

146

1   occur in the Greater Columbus Metropolitan Area?

2   A.   Yes.  I am a Violent Crimes Agent, so I investigate bank

3   robberies, kidnappings, serial murders, major break-ins like

4   this.

5   Q.   I only ask that question for some background information

6   for the ladies and gentlemen of the jury.  When a person has

7   been arrested and/or convicted, on occasion, is there DNA

8   collected for law enforcement purposes?

9   A.   Yes, depending on the crime, but there is typically in

10  most states laws that are passed that indicate that if a person

11  is convicted of a felony, their DNA is taken and submitted to

12  -- we call CODIS, which is the Combined DNA Identification

13  System.  And that information is entered into the system, and

14  at the time compared with all other DNA that's in the system to

15  see if there are any matches.

16  Q.   Is it your understanding with respect to the cigarette

17  that you received the report on, that it had negative results,

18  Government's Exhibit 1A-196.  Do you know whether or not the

19  DNA from that item was placed in CODIS as well?

20  A.   Yes, it was.  It was again at the time, and there was no

21  match.

22  Q.   I am going to invite your attention to later in the

23  year -- well, strike that.  In April of 2010, was a report

24  generated that there was, in fact, a match for the cigarette

25  DNA depicted in Government's Exhibit 1A-196?

147

1  A.    That's correct.  Almost a whole year later, Detective

2  McIntosh received notification that there was a preliminary

3  match to an individual that was identified -- and I can give

4  the name, if you like.

5  Q.    Go ahead.

6  A.    An individual by the name of Anthony L. Woods.

7  Q.    And this information was made available to you just a few

8  weeks ago, correct?

9  A.    That's correct.  Now, Detective McIntosh had that

10  information and looked into it initially, but I didn't become

11  aware of it until a couple of weeks ago.

12  Q.    And once you became aware of it, of course, the defense

13  was given all of that information by way of discovery?

14  A.    That's correct.

15  Q.    And you identified a person by the name of Anthony Woods,

16  and I ask you if you recognize anything contained in

17  Government's Exhibit 19-1?

18  A.    That's the individual's picture, Anthony L. Woods.

19  Q.    Did you look into, from an investigator's perspective, as

20  to this Anthony Woods?

21  A.    Yes, absolutely.  Again, Detective McIntosh, it had come

22  to his attention prior, and he did some initial checking, and

23  again, ruled the individual out.  When I became aware of it, I

24  immediately started looking into it as well, just to make sure

25  that I was comfortable that we hadn't missed anything and was

```
 1   actually was able to query the Columbus Police Department's
 2   records and come up with a number of reports involving
 3   Mr. Woods.  And I can go on?
 4   Q.   Anything about where Mr. Woods may have been residing?
 5   A.   Okay.  There were several reports in there.  One of the
 6   things that I first noticed was that he had, in his own words,
 7   a history of mental illness.  He had actually bounced around
 8   from homeless shelter to homeless shelter, and in fact, one of
 9   the reports indicated that he was actually staying at a
10   homeless shelter .2 miles from the Brink's facility on and off
11   at one point and had called the police department and
12   complained about the food selection at the homeless shelter,
13   and they responded and were able to transport him to another
14   homeless shelter, and that was pretty much the entire incident.
15   Q.   And did you do any investigation as to where this Anthony
16   Woods may have been mid-January of 2009?
17   A.   Yeah, I tried to find a location that would pinpoint where
18   exactly he was.  I know he was from Georgia and queried all
19   kinds of Georgia records and the records up here, but I really
20   wasn't able to pinpoint him at that particular time.  But,
21   again, I was comfortable, based on the information that I had
22   come up with that, again, he was most likely, just as he had
23   indicated, bouncing from homeless shelter to homeless shelter.
24   Q.   Anything about a mental issue or a mental placement in
25   January?
```

1  A.   I don't remember in January of that year, but there was a

2  report -- and I can't remember what the date was -- but where

3  he actually requested -- he had made contact with the police

4  and requested transportation to a facility that we call

5  Netcare, which is sort of a mental health facility, a

6  short-term mental health facility.  I guess he wasn't taking

7  his medication or something, and he asked to be transported

8  there.

9  Q.   Anything in his record that revealed that Anthony Woods

10 was in any way involved in any type of sophisticated, high-end

11 burglaries?

12 A.   No.  He does have a criminal record, and I can share that

13 based upon what I know.

14 Q.   Please do.

15 A.   He has a record from Georgia involving rape and sodomy.

16 He does have one arrest here in Columbus for burglary, and that

17 was -- I looked into the incident.  And, apparently, he was

18 upset with his girlfriend and kicked in her door, and he was

19 charged by the Columbus Police Department for burglary.  And

20 certainly nothing of this caliber or anything like that, no

21 commercial establishment burglary.

22         MR. DOMINGUEZ:  May I have a moment, Your Honor?

23         THE COURT:  Yes.

24 Q.   (By Mr. Dominguez) In July of 2009, Mr. Doucette testified

25 before the Grand Jury; do you recall that?

150

1   A.   Yes, I do.

2   Q.   I hope I don't have the month wrong, but do you recall his

3   testimony before the Grand Jury?

4   A.   Well, obviously, I wasn't inside.

5   Q.   But you recall the time frame that he testified?

6   A.   Yes, right.

7   Q.   Around that time frame, did you, in fact, take

8   Mr. Doucette to the Brink's facility to assist you in your

9   investigation as to where individuals were stationed and how

10  things actually went down on January 17th and January 18th of

11  2009?

12  A.   Yes, I did.

13  Q.   Did you have any discussions with Mr. Doucette regarding

14  anything involving any prior trips that Mr. Murphy may have

15  made to the Columbus, Ohio area?

16  A.   Yes.  And, again, I don't know the exact date, but it was

17  around this time frame.  And I do remember him talking about

18  supposedly Mr. Murphy making a trip to the Columbus area and

19  went to a homeless shelter to collect items that possibly

20  contained DNA that would be spread over the scene and possibly

21  make investigators think, you know, that it was committed by a

22  local individual.

23  Q.   At that time -- so this jury is clear -- at that time,

24  Agent Trombitas, had anything come to light about any item that

25  was taken from the Brink's facility in an investigative

151

1   capacity on January 18th that presented DNA for comparison

2   purposes?

3   A.   Yes.  As far as I knew, we didn't have anything, and I,

4   again, had no knowledge that that had occurred at that point.

5   Q.   And it wasn't until 2010, April of 2010, that this match

6   with this Anthony Woods was brought to light?

7   A.   That's correct.

8          MR. DOMINGUEZ:  I have no further questions, Your

9   Honor.

10          THE COURT:  Mr. Murphy?

11          MR. MURPHY:  Thank you, Your Honor.

12                     - - -

13               CROSS-EXAMINATION

14   BY MR. MURPHY:

15   Q.   Good afternoon, Agent Trombitas.

16   A.   Good afternoon, Mr. Murphy.

17   Q.   You testified that Anthony L. Woods had a conviction for

18   burglary?

19   A.   Yes, sir.

20   Q.   Now, you also went and testified about Mr. Doucette coming

21   out and going over the crime scene, and that's when he

22   mentioned to you something about this DNA trip?

23   A.   Yes, sir.

24   Q.   Did you testify before the Grand Jury in this matter?

25   A.   Yes.

152

1   Q.   Did you mention that in the Grand Jury?

2   A.   I don't think that came up.

3   Q.   Did you write a report in regards to your conversations

4   with Mr. Doucette?

5   A.   No.  If my recollection is correct, it occurred when we

6   were out walking around, and it may have been up on the tracks.

7   And, again, there was a lot of conversation going on that

8   wasn't recorded.

9   Q.   I am not asking if it was recorded, but wouldn't it be

10  important if someone told you a detail of that importance, that

11  you would write it down in a report?

12  A.   No.  Again, that's something that you just file away as

13  something that you remember.  It wasn't anything that I went

14  back and wrote a report about.  There were a lot of things that

15  he told us on that walk around.  And, again, at the time it

16  didn't appear to be that significant.

17  Q.   Wouldn't that be considered a statement from Mr. Doucette,

18  that type of information that he gave you?

19  A.   Again, there was a free flow of conversation as we are

20  walking all around the tracks and the area, the general area at

21  the Brink's facility.  And, again, you know, information that,

22  you know, that you listen to, and again, there was no -- I

23  didn't see any need to write a report about that.

24  Q.   I just -- I just don't understand it, something of that

25  importance, that you don't write it down.  I just don't

153

1   understand it.

2   A.   I guarantee, Mr. Murphy, if I had known I would be asked

3   today about it and that it would be an issue, I would have

4   written a report on it.  But, again, based upon what I knew at

5   the time, it was not that significant of a matter that I needed

6   to run back and write a report on it.

7   Q.   Okay.

8           MR. MURPHY:  Thank you very much, Mr. Trombitas.

9           No further questions at this time, Your Honor.

10          MR. DOMINGUEZ:  No redirect examination, Your Honor.

11          THE COURT:  You are excused from the witness stand

12  but not from the building.

13          MR. DOMINGUEZ:  Your Honor, we would like to move

14  certain items of evidence into evidence.

15          THE COURT:  All right.  Ladies and gentlemen of the

16  jury, this will be the time for a break.  There are some legal

17  discussions that have to go on here.  Remember not to discuss

18  this case with each other and not to make a decision, the case

19  has not been given to you.  And the other items of the

20  admonition.  Thank you.  We will come and get you when this

21  discussion is over.

22                          - - -

23          THEREUPON, the Jury exited the courtroom, and the

24  following proceedings were held in open court with the Court,

25  counsel and Mr. Murphy:

1    THE COURT:  You may be seated.

2    MR. DOMINGUEZ:  At this time, we would move for

3  admission of the government's exhibits, and we are working off

4  of the exhibit list.

5    We would move to admit Government's Exhibits 1A-1

6  through 1A-196.

7    THE COURT:  Any objection?

8    MR. MURPHY:  No, Your Honor.

9    MR. DOMINGUEZ:  And we would move for admission of

10  Government's Exhibits 1B-1 through 1B-36, inclusive.

11    THE COURT:  Any objection?

12    MR. MURPHY:  None, Your Honor.

13    MR. DOMINGUEZ:  1C-1 through 1C-7?

14    THE COURT:  Any objection?

15    MR. MURPHY:  No, Your Honor.

16    MR. DOMINGUEZ:  1D-1 through 1D-7?

17    MR. MURPHY:  No objection.

18    THE COURT:  No objection.

19    MR. DOMINGUEZ:  We did not -- just so the record is

20  clear, we did not identify, nor do we move to admit 1D-8.

21    So, we would go with 1D-9 through 1D-23, inclusive.

22    THE COURT:  Objection?

23    MR. MURPHY:  None, Your Honor.

24    MR. DOMINGUEZ:  1E-1 through 1E-10, inclusive?

25    MR. MURPHY:  No objection, Your Honor.

155

1          MR. DOMINGUEZ:  2-1 and 2-2?

2          MR. MURPHY:  No objection.

3          MR. DOMINGUEZ:  3-1?

4          MR. MURPHY:  No objection, Your Honor.

5          MR. DOMINGUEZ:  4-1?

6          MR. MURPHY:  No objection.

7          MR. DOMINGUEZ:  5-1 through 5-8, inclusive?

8          MR. MURPHY:  The defense would object, Your Honor,

9   with regards to the Brian Hetherman identification.

10          MR. DOMINGUEZ:  It was part of her records kept in

11   the normal course of business, Your Honor.

12          THE COURT:  The objection is overruled.  It will be

13   admitted.

14          MR. DOMINGUEZ:  6-1 through 6-7?

15          MR. MURPHY:  The defense would object, Your Honor.

16          To renew the objection that we had before, I would

17   say on 6-2, that the key was seized not pursuant to any search

18   warrant, it was never authorized by any search warrant.

19          MR. DOMINGUEZ:  6-3.

20          MR. MURPHY:  That's not what I have, I have 6-2.

21          MR. DOMINGUEZ:  The key is 6-3.

22          MR. MURPHY:  And I would renew my general objection

23   over the Brian Hetherman I.D. as there being insufficient

24   probable cause to search the residence.

25          THE COURT:  It will be admitted over the objection as

1   well as those other exhibits are admitted without objection.

2   It would be a matter for the jury to weigh.

3          MR. DOMINGUEZ:  I'm sorry, Your Honor.  I didn't mean

4   to interrupt.

5          THE COURT:  It will be a matter for the jury to weigh

6   all of these exhibits.

7          MR. DOMINGUEZ:  7-1, Your Honor.

8          MR. MURPHY:  No objection, Your Honor.

9          MR. DOMINGUEZ:  8-1?

10         MR. MURPHY:  No objection.

11         THE COURT:  Admitted.

12         MR. DOMINGUEZ:  9-1 and 9-2?

13         MR. MURPHY:  No objection, Your Honor.

14         THE COURT:  Admitted.

15         MR. DOMINGUEZ:  May I have a moment, Your Honor?

16         10-1 through 10-6?

17         MR. GRAEFF:  What did you say?  10-1 through what?

18         MR. DOMINGUEZ:  10-6.

19         MR. MURPHY:  No objection, Your Honor.

20         MR. DOMINGUEZ:  11-1?

21         MR. MURPHY:  No objection, Your Honor.

22         MR. DOMINGUEZ:  12-1?

23         MR. MURPHY:  No objection, Your Honor.

24         MR. DOMINGUEZ:  13-1 through 13-4?

25         MR. MURPHY:  I would just renew my prior objection,

157

1    Your Honor, in regards to these letters.

2            THE COURT:  Overruled.  Those exhibits will be

3    admitted.

4            MR. DOMINGUEZ:  14-1 through 14-4?

5            MR. MURPHY:  No objection, Your Honor.

6            THE COURT:  Admitted.

7            MR. DOMINGUEZ:  15-1?

8            MR. MURPHY:  Your Honor, I would object to this

9    document being introduced.  As I said before, it is a violation

10   of the proffer, in violation of Kastigar.

11           THE COURT:  In violation of what, sir?

12           MR. MURPHY:  The proffer, Your Honor.

13           THE COURT:  Oh.  My ruling still stands, it will be

14   admitted.

15           MR. DOMINGUEZ:  16-1 through 16-3?

16           MR. MURPHY:  No objection, Your Honor.

17           THE COURT:  Admitted.

18           MR. DOMINGUEZ:  19-1?

19           MR. MURPHY:  I don't have that.

20           MR. DOMINGUEZ:  That's the photograph.

21           MR. MURPHY:  No objection, Your Honor.

22           THE COURT:  Will be admitted.

23           MR. DOMINGUEZ:  Those would be the only documents

24   that we would be offering at this time, Your Honor.

25           THE COURT:  Thank you.  Is there a motion for

1    acquittal?

2              MR. MURPHY:  Yes, Your Honor.

3              MR. DOMINGUEZ:  And before we formally rest, Your

4    Honor, we would request that the Court at the appropriate time

5    take judicial notice that 1362 Essex Avenue, Columbus, Ohio, is

6    within the Southern Judicial District of Ohio.

7              THE COURT:  The Court accepts that motion.

8              The defendant has moved for a Rule 29 motion for

9    acquittal.  The Court has received a motion filed today,

10   Document 133.  And specifically, the defendant moves for a not

11   guilty verdict on Counts 2, 3 and 4.

12             MR. MURPHY:  Yes, Your Honor.

13             THE COURT:  You are not on 1?

14             MR. MURPHY:  Not on 1, Your Honor.

15             THE COURT:  You may proceed.

16             MR. DOMINGUEZ:  Thank you, Your Honor.  With respect

17   to the standard for the Court's consideration of a motion for

18   judgment of acquittal, clearly, the case law is that the Court

19   looks in the light most favorable to the government as to the

20   evidence considered at trial.

21             We, of course, will argue before this jury sometime

22   tomorrow or Wednesday that we have met all of the elements of

23   each offense beyond a reasonable doubt.  Counts 2 and 3, the

24   evidence has shown that Mr. Murphy did, indeed, request that

25   David Nassor travel in interstate commerce from the District of

159

1    Massachusetts to the Southern District of Ohio for the express

2    purpose of scoping out and scouting and surveying the Brink's

3    facility at 1362 Essex sometime during January of 2009.

4            It was for the express purpose of furthering the

5    unlawful activities, that being the interstate transportation

6    of stolen property.  It was carefully planned and thought out.

7    And we believe that the government has met its burden with

8    respect to that count.

9            On Count 3, Your Honor, clearly, the evidence has

10   shown that Mr. Murphy and Mr. Doucette and Mr. Morgan traveled

11   in interstate commerce -- not only from the District of

12   Massachusetts to the Southern District of Ohio but also stopped

13   in Warrendale, Pennsylvania on January 17th of 2009 in order to

14   obtain carefully placed tools that had been placed there on or

15   about January 4th of 2009 by Mr. Murphy, who, again, traveled

16   in interstate commerce in order to participate in specific

17   unlawful activity, that would be the interstate transportation

18   of stolen property.  We believe that Counts 2 and 3 are,

19   therefore, well-founded.

20           With respect to Count 4, we would rest on the record

21   established during these proceedings.  Thank you, Your Honor.

22           THE COURT:  The evidence that has been presented is

23   more than sufficient to go forward and ultimately send the case

24   to the jury for a decision.  In addition to the government's

25   statements summarizing the highlights of their case, the

160

1    evidence includes testimony from law enforcement Officer

2    Christopher McIntosh; J.J. Mead with the Columbus Police

3    Department, and McIntosh is with the Columbus Police

4    Department; Steven Wohlgemuth; Michael McCall; Jason Costello;

5    Kristin Koch; and Harry Trombitas with the FBI and testimony

6    from co-conspirators Robert Doucette and David Nassor about the

7    defendant's involvement in the Brink's burglary as well as

8    administrators with companies such as storage facilities, a

9    bank, a hotel, Federal Express establishing the defendant

10   and/or his co-conspirators' connection to the tools and

11   preparation of the Brink's burglary.  The information that has

12   been presented here in court through the testimony and exhibits

13   is substantial enough so that the jury could make a finding on

14   each of the three counts that the defendant Murphy is charged

15   with.

16           Accordingly, the defendant's motion for acquittal,

17   pursuant to Rule 29 of the Federal Rules of Criminal Procedure,

18   is denied.

19           MR. MURPHY:  Your Honor?  May I have a moment with

20   counsel?

21           THE COURT:  Yes.

22                        - - -

23           THEREUPON, an off-the-record discussion was held with

24   Court and counsel at sidebar.

25                        - - -

1          THE COURT:  A recent filing, however, was prior to

2    this motion regarding Mr. Murphy's position on the Motion for

3    Acquittal in addition to that and that will be included on the

4    record with the other reasons.

5          And the Court will correct its statement, too, that

6    even though the Motion for Acquittal was only on Counts 2, 3

7    and 4, the Court also rules that there is more than sufficient

8    evidence to go forward, also, on Count 1.  For the record and

9    argument and a higher court, if that's the case, it will be

10   included.  Is that sufficient, Mr. Murphy?

11         MR. MURPHY:  Yes, Your Honor.

12         THE COURT:  Is that sufficient, Mr. Graeff?

13         MR. GRAEFF:  Yes, sir.

14         THE COURT:  Let's take about a five-minute break here

15   for ourselves and then get back to work.

16                          – – –

17            THEREUPON, a recess was taken.

18                          – – –

19         THE COURT:  Mr. Dominguez, have you rested?

20         MR. DOMINGUEZ:  Your Honor, the government rests.

21         THE COURT:  All right.  The government rests.

22         Now, the defendant may go forward, if they wish, and

23   present a case or not, as the case may be.  Mr. Murphy?

24         MR. MURPHY:  The defense calls David Nassor, Your

25   Honor.

162

1          THE COURT:  David Nassor has been called as a defense

2     witness.

3          Mr. Nassor, you are still under the oath as

4     previously administered.

5                         - - -

6                      DAVID NASSOR

7     AFTER HAVING BEEN PREVIOUSLY DULY SWORN, TESTIFIED AS FOLLOWS:

8                         - - -

9                   DIRECT EXAMINATION

10    BY MR. MURPHY:

11    Q.   Good afternoon, Mr. Nassor.  Mr. Nassor, did Mr. Murphy

12    sue you?

13    A.   Yes.

14    Q.   And did Mr. Murphy sue you for damage that was inflicted

15    upon his vehicle?

16    A.   Yes.

17    Q.   And was there a judgment in that case?

18    A.   Yes.

19    Q.   And was there any number amount that Mr. Murphy won for

20    the suit against you?

21    A.   $5,000.

22    Q.   And, also, in regards to that incident, couldn't that

23    incident have been a criminal case, too?

24    A.   I suppose, yes.

25    Q.   Could you have been charged for larceny over 250 and

163

1  malicious damage over 250?

2  A.   I guess so, yeah.

3  Q.   Okay.  Now, Mr. Nassor, you testified that you had a head

4  injury?

5  A.   Yes.

6  Q.   And how long were you in a coma for?

7  A.   Thirty-something days.

8  Q.   And when you woke up, could you talk?

9  A.   A little bit.

10 Q.   Could you walk?

11 A.   A little bit.

12 Q.   Did the doctors tell you that your injuries would affect

13 your ability to remember and/or to perceive events correctly?

14 A.   Say that again.

15 Q.   Did the doctors tell you that your head injury would

16 affect your ability to remember and/or to perceive incidents

17 correctly?

18 A.   Yeah, a little bit.

19 Q.   I have a document here which is from the Keeper of Records

20 from Massachusetts General Hospital ordering them to produce

21 your medical records.  Do you have any objection to me entering

22 your medical records into evidence?

23 A.   Not really, no.

24 Q.   I would like to show you part of those medical records,

25 Mr. Nassor, and specifically up top here.  It says that you

164

1    don't follow commands, do not open eyes, pupils are reactive to

2    light, and it refers to propofol.  Are you familiar with that

3    drug, propofol?

4    A.    Yeah.

5    Q.    Where have you heard that before?

6    A.    Michael Jackson.

7    Q.    Okay.  Now, you testified that after these burglars came

8    back from Lynn, that you never saw any money?

9    A.    Say that again.

10   Q.    You ever see any money from the Brink's burglary after the

11   burglars came back from Lynn?  Did you physically ever see any

12   money?

13   A.    No.

14   Q.    Now, would you consider Mr. Murphy a security expert?

15   A.    Somewhat, yeah.

16   Q.    And are you familiar with any training that Mr. Murphy

17   might provide in regards to burglary or the security field?

18   A.    Yeah, you wrote books on it or something.  I mean, you

19   showed people how to do burglaries.

20   Q.    Now, bringing your attention back to December of 2008, did

21   you spend a lot of time with Mr. Murphy?

22   A.    Yes.

23   Q.    Now, do you remember any specific items or specific

24   instances where Mr. Murphy lent Rob Doucette anything?

25   A.    Just at Christmas.

165

1 Q. Okay.  And what happened around Christmas?

2 A. You lent him your dad's stuff for Thanksgiving dinner or

3 at Christmastime -- it was either Christmas or Thanksgiving, I

4 am not sure which day.

5 Q. And what would that be?

6 A. Plates, stuff like that that affect dinner, dinnerware.

7 Q. Could it, you know, have been described as China?

8 A. Yeah, yeah, that's what it was.

9 Q. And you recall this because you observed this?

10 A. Yeah, we did it in my truck.

11 Q. Okay.  Now, do you recall an e-mail that you sent to

12 Global Gadget?

13 A. Yes, I actually do, but I forgot about it until you

14 brought it up to me.  I do remember that, though.

15 Q. And in that e-mail, did you tell Global Gadget that you

16 purchased a jammer in Tennessee?

17 A. Yes.

18 Q. And you were trying to purchase another one?

19 A. Yes.

20 Q. And what was Global Gadget's response when you finally got

21 a response from them?

22 A. I am not sure of the actual response.

23 Q. Did they tell you to go through the Northshore Company to

24 get it?

25 A. Yeah, yeah.

166

1   Q.   Now, you have spent a lot of time with Mr. Murphy, you

2   have hung around him, you have known him for how long?

3   A.   Since 1980, the early 80s.

4   Q.   Okay.  From what you know about Mr. Murphy -- I am just

5   going to ask you a question, what is Mr. Murphy's favorite

6   fast-food restaurant?

7   A.   KFC.

8   Q.   He practically lives off the stuff?

9   A.   Pretty much.

10            THE COURT:  I didn't hear the answer.

11            MR. MURPHY:  He said "KFC", Your Honor, the Colonel.

12  A.   Extra crispy.

13  Q.   (By Mr. Murphy) I like that.  Now, I will ask you a

14  question, based upon your knowledge of this group and your

15  knowledge of Joseph Morgan, Robert Doucette and Thomas Enquist

16  and all of this, do you know Robert Doucette to be an

17  experienced burglar?

18  A.   I know he has done burglaries in the past, yes.

19  Q.   Now, you discussed the lawsuit that Murphy filed against

20  you.  Were there several court hearings in that lawsuit?

21  A.   Yes.

22  Q.   At those court hearings, did you actually get a chance to

23  speak with Mr. Murphy?

24  A.   Yes.

25  Q.   And when you spoke to Mr. Murphy in those lawsuits, did

1  you eventually, as they progressed, tell him the information

2  that you forwarded to authorities in regards to this Brink's

3  burglary?

4  A.   Could you repeat that again?

5  Q.   As the lawsuit progressed, in later hearings in the

6  lawsuit, did you tell Mr. Murphy at these court hearings what

7  you told law enforcement in regards to the Ohio burglary?

8  A.   Yes.

9  Q.   Now, you also testified earlier that you had delivered

10 certain items to the Newmarket Storage bin up in New Hampshire?

11 A.   Correct.

12 Q.   And I believe that you were talking about when you, Tom

13 Enquist and Joe Morgan stole all of the oxygen tanks?

14 A.   Correct.

15 Q.   And you were delivering them into storage?

16 A.   Yes.

17 Q.   Mr. Nassor, I am going to ask you, what is one of Tom

18 Enquist's aliases, if you know?

19 A.   Something Mullen, Tom Mullen, maybe.

20 Q.   If I show you this document from Newmarket Storage, would

21 this recollect your memory?  Does that name sound familiar?

22 A.   Yes.

23 Q.   So, in fact, when you were delivering these oxygen tanks

24 that you, Tom Enquist and Joe Morgan stole and you were putting

25 them into Newmarket Storage, you were actually putting them

168

1   into Tom Enquist's bin?

2   A.   I am not sure, I mean --

3   Q.   Fair enough.  Now, you also did some testimony about

4   two-way radios, Mr. Nassor.  Do you remember that testimony?

5   A.   Yes.

6   Q.   Have you ever seen these two-way radios used in

7   Mr. Murphy's legitimate moving business?

8   A.   Yes.

9   Q.   How would they be used?

10  A.   Just to coordinate what is going on as far as moving

11  furniture and stuff like that.

12  Q.   If somebody was doing a commercial move for moving a

13  company, and they were moving up in a high-rise building on

14  different floors, and the truck was down below, and they were

15  determining what was going to go up and what was going to come

16  down, would they be using the two-way radios for that?

17  A.   Yeah.  I guess so, yeah.

18            THE COURT:  What do you mean you "guess so"?

19            THE WITNESS:  I mean, that's what they would be used

20  for, yeah.  I have been on jobs but never on a high-rise like

21  that, but I just seen them used doing moves.

22            THE COURT:  You have seen that done?

23            THE WITNESS:  Yeah, I have seen them used.  Not like

24  he was saying, a high-rise.

25            THE COURT:  But you have seen him use them?

169

1           THE WITNESS:  I have seen his workers use them, yes.

2           THE COURT:  Okay.

3  Q.  Now, Mr. Nassor, did Mr. Murphy ever tell you that he was

4  going to --

5           MR. DOMINGUEZ:  Objection.

6           THE COURT:  Sustained, hearsay.

7  Q.  (By Mr. Murphy) Do you recall testifying at the Grand

8  Jury?

9  A.  Yes.

10  Q.  Do you recall stating in the Grand Jury that Murphy did

11  not tell you why he wanted you to go scope Ohio?

12  A.  Not really.  I mean, I am sure if I said it, it is written

13  down.

14  Q.  Okay.

15           MR. MURPHY:  Just one second, Your Honor.

16  Q.  (By Mr. Murphy) And, also, Mr. Nassor, when you testified

17  at this trial -- you testified that Murphy never told you that

18  he did the Brink's burglary?

19  A.  That's correct.

20  Q.  Now, you also testified in regards to observations that

21  you made in regards to items -- things that happened at Tom

22  Enquist's house and at the moving warehouse.  Specifically, at

23  Tom Enquist's house, you testified that you observed Mr. Murphy

24  wearing one of the welding masks while you were cutting up the

25  train wheel?

170

1   A.   Correct.

2   Q.   And you testified that while Mr. Murphy was painting his

3   warehouse in Lynn, Massachusetts, you observed him wearing the

4   respirator when he was painting his warehouse?

5   A.   Correct.

6   Q.   Mr. Nassor, you testified about these Lynn Breakers.  You

7   testified that there was probably about 150 of them?

8   A.   Probably well over 100.

9   Q.   And are you aware of any information that any of these

10  Lynn Breakers had tried to steal Murphy's 100 watt jammer?

11  A.   Yes.

12  Q.   You are aware of that?

13  A.   Yes, firsthand.

14  Q.   Does the name "James Hennessey" ring a bell to you?

15  A.   Yes.

16  Q.   Do you know James Hennessey?

17  A.   I know of him, I know who he is, yeah.  I have met him

18  several times.

19  Q.   And based upon your knowledge of this group and

20  Mr. Hennessey, is he a part of this criminal group?

21  A.   I believe so, yes.

22  Q.   Now, Mr. Nassor, I want to show you a couple of pieces of

23  evidence.  I believe it is Government's Exhibit 1-4-C (sic)?

24  Do you have that?

25          MR. MURPHY:  Can you show them to the witness,

171

1   please, Mr. Trombitas?

2          THE COURT:  It is all right, in the interests of

3   time.

4   Q.   (By Mr. Murphy) Can you see those, Mr. Nassor?

5   A.   Yes.

6   Q.   What do those appear to be?

7   A.   A roof deck.

8   Q.   And from your experience, what type of tool would cut that

9   roof deck out?

10          THE COURT:  What experience would that be?

11          MR. MURPHY:  His experience in cutting roof, Your

12   Honor?

13          THE COURT:  Well, do you know anything about that?

14          THE WITNESS:  Yes, I do.

15          THE COURT:  Oh.

16   A.   Say that again.

17   Q.   (By Mr. Murphy) What tool do you believe would cut those

18   roof decks out?

19   A.   Either a deck saw or a skill saw.  A skill saw, probably.

20   Q.   A skill saw?

21   A.   Correct.  And from the jagged cuts, I would say a skill

22   saw.

23   Q.   Now, you also testified that in regards to the thermal

24   rods that -- who do you believe purchased those thermal rods?

25   A.   JoMo, Joe Morgan.

1  Q.   Okay.  And do you know through firsthand experience

2  whether Murphy trained Joe Morgan in his art that he performs?

3  A.   Yes.

4  Q.   And do you know if Murphy trained Robert Doucette in the

5  art?

6  A.   Yes.

7  Q.   And how about yourself?

8  A.   Yes.

9         THE COURT:  Trained in the what?

10         MR. MURPHY:  The art, Your Honor.

11         THE COURT:  The art?

12         MR. MURPHY:  Yes.

13         THE COURT:  The art of what?

14         MR. MURPHY:  The art of burglary, Your Honor.  It is

15  a term.

16  Q.   (By Mr. Murphy) Now, Mr. Nassor, throughout all of the

17  information that you have heard and personal knowledge in this

18  case, from back in December of 2008 all of the way up until the

19  present, have you ever heard any information about a storage

20  bin in Ohio?

21         MR. DOMINGUEZ:  Objection.

22         THE COURT:  Well, overruled.  I will hear the answer.

23  A.   Say it again.

24  Q.   (By Mr. Murphy) Have you ever heard any information from

25  anybody, that anybody had ever mentioned a storage bin in Ohio?

173

1          THE COURT:  In connection with what?  That's a pretty

2    board question.

3          MR. MURPHY:  In connection with this crime.

4          THE COURT:  All right.

5    Q.   (By Mr. Murphy) If you can't recall, you can't recall.

6    A.   I don't know if it was specifically for this crime or not.

7    I don't know.

8    Q.   But have you heard someone along the line mention a

9    storage bin in Ohio?

10          MR. DOMINGUEZ:  Objection, Your Honor.

11          THE COURT:  Sustained.

12          MR. MURPHY:  I have no further questions, Your Honor.

13          THE COURT:  All right.

14                          - - -

15                    CROSS-EXAMINATION

16    BY MR. DOMINGUEZ:

17    Q.   Mr. Nassor, Mr. Murphy asked you about what it would take

18    to cut roofing such as that (indicating exhibit)?

19    A.   Yes.

20    Q.   You responded?

21    A.   Correct.

22    Q.   Who else in this room would know what it would take to cut

23    a roof like that?

24    A.   Someone who has cut one before.

25    Q.   Anyone that you are familiar with, in this room, that

174

1  would know how to cut a roof like that?

2  A.   Sean.

3  Q.   And Sean did send you out to scout out the Brink's

4  facility in early January of 2009, that was your testimony,

5  correct?

6  A.   Correct.

7  Q.   He specifically asked you to do that?  Yes?

8  A.   Yes.

9  Q.   Now, there was a question asked, I believe, something to

10  the effect of, did you know why you were scouting out the

11  Brink's facility.  Do you know why you were scouting out the

12  Brink's facility?

13  A.   Yes.

14  Q.   And what was that for?

15  A.   Someone was going to break into it.

16  Q.   And this man, Sean Murphy, specifically sent you to

17  perform that task; is that correct?

18  A.   Correct.

19  Q.   Now, let's talk about the Memphis, Tennessee trip, sir.

20  Stay with me for -- just for a minute.  I am only going to be

21  with you for about three minutes.

22  A.   All right.

23  Q.   Who sent you to Memphis to pick up the cell phone jammer?

24  A.   Sean.

25  Q.   Okay.  Now, he talked about this e-mail that you sent to

175

1   Global Gadget.  Did you purchase the Global Gadget cell phone

2   jammer, sir, that you picked up on December 3rd of 2008?  Did

3   you purchase it?

4   A.   No.

5   Q.   You would have participated in that Brink's burglary if

6   Sean Murphy had asked you to, wouldn't you have?

7   A.   Yes.

8   Q.   Why didn't he ask you to?

9   A.   Because of my head injury.

10  Q.   As a matter of fact, Sean Murphy was aware of all of these

11  medical records and the damage to your head, and you, frankly,

12  couldn't stand up to the job, could you?

13  A.   No.

14  Q.   But you would have.  Back it up to 2009, if Sean Murphy

15  had asked you to participate, like he asked Joseph Morgan and

16  Robert Doucette, you would have jumped at the chance, wouldn't

17  you?

18  A.   Probably, yeah.

19  Q.   No question about it, correct?

20  A.   Correct.

21          MR. DOMINGUEZ:  No further questions, Your Honor.

22                         - - -

23                 REDIRECT EXAMINATION

24  BY MR. MURPHY:

25  Q.   Mr. Nassor, in your e-mail you told Global Gadget that you

176

1   did purchase the jammer, didn't you?  And you were looking to

2   purchase another one?

3   A.   Do you have the letter?  I haven't seen it.

4        THE COURT:  In the interests of time --

5        MR. MURPHY:  A couple of minutes, Your Honor.

6        THE COURT:  -- Mr. Nassor, do you remember sending

7   the e-mail?

8        THE WITNESS:  I just remembered about it today,

9   believe it or not.  I forgot completely about it until earlier

10  today.  I do remember now that, yes, that I did.

11       THE COURT:  Did you get a response to your e-mail?

12       THE WITNESS:  I got a response, but it wasn't one

13  that I wanted to hear.

14  Q.   (By Mr. Nassor) Does that recollect your memory,

15  Mr. Nassor?

16  A.   Yes.

17  Q.   And you are stating here that you wanted to purchase

18  another one?

19  A.   Correct.

20  Q.   Why is that?

21  A.   Because I didn't have the one that I purchased.

22  Q.   What were you going to do with one if you actually got

23  another one?

24  A.   Do another crime.

25  Q.   So, you were ready, willing and able to go out and do

177

1   another crime as of February 22, correct?

2   A.   Correct.

3          MR. MURPHY:  Thank you.  No further questions.

4          MR. DOMINGUEZ:  Nothing further, Your Honor.

5          THE COURT:  You may step down.

6          We are going to quit at 4:30.

7          MR. MURPHY:  Your Honor, the defense calls Agent

8   Harry Trombitas.

9          THE COURT:  All right.  Mr. Trombitas, you are under

10  the oath previously administered.

11         THE WITNESS:  Yes, sir.

12                          - - -

13                     HARRY TROMBITAS

14  AFTER HAVING BEEN PREVIOUSLY DULY SWORN, TESTIFIED AS FOLLOWS:

15                          - - -

16                   DIRECT EXAMINATION

17  BY MR. MURPHY:

18  Q.   Good afternoon again, Mr. Trombitas.

19  A.   Good afternoon.

20  Q.   Mr. Trombitas, were you one of the agents that responded

21  to the Brink's burglary on January 18th of 2009?

22  A.   Yes, I am.

23  Q.   About what time did you get there?

24  A.   I remember getting the phone call, I was coming out of

25  church that morning, it was probably around 11:30.  And it was

1   a Brink's employee who said that they had had a burglary and

2   wanted me to respond.

3   Q.    Now, did you see the picture of the ladder as it appeared

4   in that picture that I showed earlier today?

5   A.    Yes, I saw the picture.

6   Q.    And was that ladder -- based upon the information that you

7   have -- was that ladder in that position when the burglary was

8   discovered?

9   A.    When the burglary was discovered by the Brink's employee?

10          THE COURT:  He wasn't there when the burglary was

11  discovered.

12  A.    Again, I wasn't there until later.

13  Q.    (By Mr. Murphy) When you got there, that's where the

14  ladder was?

15  A.    I don't recall if the ladder was there or not.

16  Q.    Okay.  And throughout this trial, I have showed several

17  times a picture of the vault with the hole in it.  Is that the

18  way the vault appeared when you got there?

19  A.    To my knowledge, yes, that's the way it appeared when I

20  got there.

21  Q.    And did you have any information that it had been altered

22  at all?

23  A.    No, I know that there had been some activity by the Fire

24  Department, but I have no idea what they did.  They were there

25  well before I got there.

179

1   Q.   Okay.  Now, the hole in the vault that is shown in that

2   picture, that's pretty big, don't you think?

3   A.   Yeah, it appears to be pretty big-sized.

4   Q.   It looks like someone even the size of yourself could go

5   in and out of it very easily, does it not?

6   A.   That's possible.  Again, I didn't see a scale or anything

7   by the cut, so I can't tell you, you know, how big it really

8   was based on that picture.  But from my memory, it was a larger

9   hole.

10   Q.   And you heard the testimony of Robert Doucette in this

11   trial?

12   A.   Yes, sir.

13   Q.   And you heard the testimony that the hole wasn't big

14   enough for him to get in?

15   A.   That the hole wasn't big enough for him to get into?

16   Q.   For him to get in?

17   A.   I don't recall whether the discussion was about him

18   getting in the hole or not.

19   Q.   Okay.

20   A.   I remember he talked about you.

21   Q.   No, I understand that, but his testimony was that he was

22   too big to fit through the hole?

23   A.   No, I don't really remember that for sure.

24   Q.   Okay.  Fair enough.  And do you recall how Brink's

25   actually got in their building?

180

1    A.   I remember what I was told.

2    Q.   Okay.

3    A.   Again, the employees that showed up couldn't get in

4    through their regular doors, and they ended up calling one of

5    the other supervisors who came to the scene.  I think together

6    they determined that the only way they could get in was to

7    force the garage door open.  And so several employees actually

8    lifted up the garage door, and it came right up.

9    Q.   And so they got in through the garage?

10    A.   That's my understanding.

11    Q.   Okay.  And in with regards to the doors, how many doors

12    were glued at Brink's?

13    A.   Based upon my recollection, I believe that there were two,

14    but one for sure.

15    Q.   Two, but one for sure.  And besides the testimony of Rob

16    Doucette, do you as the FBI have any other evidence that places

17    me in or around Brink's?

18    A.   No.

19    Q.   And Special Agent Trombitas, do you have any opinion on

20    how those roof panels were cut out?

21    A.   Do I have an opinion?

22    Q.   Yes.

23    A.   Some type of cutting instrument.

24    Q.   Like in regards?  What would you say what kind of cutting

25    instrument?

181

1    A.   That's pure speculation.  That's so foreign to me, I

2    wouldn't know what to say.

3    Q.   And there was some testimony here that there were some

4    inner layers of the vault door.  Does the government have any

5    pictures of those inner layers of the vault door that you are

6    aware of?

7    A.   Just the crime scene photos that were taken.  I think, if

8    I recall correctly, appeared to show a multi-layer door, but as

9    far as the individual, you know, makeup of the door, no.

10    Q.   Okay.  I am moving through this fast so we can get through

11    this.  Did you canvass the area in and around Brink's to see if

12    you could find any eyewitnesses?

13    A.   Yes, we did.  We did an extensive neighborhood canvass.

14    Q.   And did you find any witnesses who had eyewitness

15    testimony with regards to this crime?

16    A.   No.

17    Q.   And you testified that there was a homeless shelter how

18    far away from Brink's?

19    A.   According to Google maps, when I learned the address, I

20    plugged it in and compared the distance between Brink's and the

21    homeless shelter, which I believe is on Eighth Avenue, and it

22    said .2 miles.

23    Q.   Point two, that's not very far?

24    A.   Not very far at all.

25    Q.   And do most people at the homeless shelter have vehicles

182

1    that they travel in, to your knowledge?

2    A.    That would be pure speculation on who was there.

3    Q.    Okay.  Is it accurate to say that most homeless people

4    would be walking on foot?

5    A.    That's a fair assessment.

6    Q.    Okay.  And do you know how many people reside at that

7    homeless shelter, if you know?

8    A.    No, I don't.

9    Q.    Did you actually go to the homeless shelter and interview

10   anybody there for the burglary?

11   A.    No, sir.

12   Q.    And would you know what the average stay in that homeless

13   shelter would be?

14   A.    I would not.

15   Q.    And for the most part, this case was basically solved from

16   the Boston office with Special Agent Jason Costello?

17   A.    He certainly played a major part of it.

18   Q.    Okay.  Did you debrief Mr. Nassor or Mr. Doucette at all

19   in this case?

20   A.    I mean, I have had conversations with them, but no, those

21   were done in Boston.

22   Q.    Okay.  And were you present when the Pennsylvania storage

23   bin was searched?

24   A.    No, sir.

25   Q.    And were you present when the Raymond, New Hampshire

183

1   storage bin was searched?

2   A.   No, sir.

3        MR. MURPHY:  Thank you, Agent Trombitas.

4        THE WITNESS:  Thank you.

5        MR. DOMINGUEZ:  Briefly, Your Honor.

6        THE COURT:  Yes.

7                    - - -

8                CROSS-EXAMINATION

9   BY MR. DOMINGUEZ:

10  Q.   Agent Trombitas, so the ladies and gentlemen of the jury

11  can be aware, this Brink's burglary that you have discussed

12  here this afternoon, it was a fairly significant event on

13  January 17th and January 18th of 2009?

14  A.   Yes, it was.

15  Q.   For about a minute or so, could you tell the ladies and

16  gentlemen of the jury how you went about conducting your

17  investigation when you believed that it may have been someone

18  local who committed the crime?

19  A.   Sure.  Again, we responded to the scene, the FBI along

20  with the Columbus Police Department, we worked together.  I

21  know, again, that the scene was processed.  We got together

22  with the investigators.  I know Detective McIntosh was there,

23  and I knew that he was going to be the lead and assign the

24  case.  We came up with a game plan.  We, basically, took a

25  three-pronged approach.

184

1    The first consideration that we had was there was a

2  possibility that Brink's employees could be involved.  So, we

3  wanted to interview them and maybe select the ones that we felt

4  were significant or would have the ability to be involved, and

5  we further investigated those individuals.

6    At the same time, we took a look at the possibility that

7  there were local burglars involved.  So, we worked with the

8  media in getting that information out, advertising the fact

9  that the Brink's had been broken into.  I think at one point

10  Brink's fairly early on came up with a reward, a substantial

11  reward for information leading to the identification and arrest

12  of the individuals involved.

13  Q.   So, you spent a lot of man-hours investigating?

14  A.   Oh, absolutely.

15  Q.   And there was a reward put out?

16  A.   Yes, sir.

17  Q.   And you wouldn't have guessed that it might have emanated

18  from Boston, Massachusetts at that time?

19  A.   No, but the third prong of that, though, is I did send out

20  the information nationwide, indicating that we had this

21  significant burglary of a commercial establishment and then

22  made contact with fellow agents around the country to see if

23  they had experienced anything similar.

24  Q.   And it wasn't until you received a phone call from Special

25  Agent Costello, who had debriefed David Nassor, that you were

185

1   able to put together the Boston connection?

2   A.   That's correct.

3   Q.   Which has led us here for the last several days?

4   A.   That is correct.

5        MR. DOMINGUEZ:  No further questions, Your Honor.

6        THE COURT:  Anything in that area?

7        MR. MURPHY:  Just one question, Your Honor.  Thank

8   you.

9                          - - -

10                    REDIRECT EXAMINATION

11  BY MR. MURPHY:

12  Q.   Special Agent Trombitas, did you ever find out who the

13  inside guy was at Brink's?

14  A.   There was no inside guy.

15       MR. MURPHY:  All right.  Thank you very much.

16       THE WITNESS:  Okay.

17       THE COURT:  Thank you.  You may return to your seat.

18       THE WITNESS:  Thank you.

19       THE COURT:  May I see counsel?

20                          - - -

21       THEREUPON, an off-the-record discussion was held at

22  sidebar.

23                          - - -

24       THE COURT:  Ladies and gentlemen of the jury, that

25  concludes your work for today.  I would anticipate that there

186

1    will be another witness, one witness tomorrow, but not of the

2    length that some of these witnesses have been, and then the

3    attorneys will be making their final argument to you tomorrow,

4    at some point tomorrow, and the case will be given to you.

5            Let me remind you, again, not to discuss the case

6    with each other or anyone else during the course of the trial.

7    This includes the attorneys or anyone else involved in the

8    case, reporting any violations to court personnel.  Do not form

9    or express an opinion until you are in deliberation.  Do not

10   make any investigation at home or run any experiments or look

11   up anything or anywhere on the computer, and do not discuss

12   this case with your family and friends until you are discharged

13   by the Court.  Do not observe any media reports on TV,

14   newspaper or radio reports.  Of course, you are to keep wearing

15   your juror badges, keep doing that.  And tomorrow, we will see

16   you in the morning.  Thank you very much.

17                            – – –

18           THEREUPON, the evening recess was taken to be resumed

19   on Tuesday, October 25, 2011 at 9:30 a.m.

20                            – – –

21

22

23

24

25

187

1

2                        C E R T I F I C A T E

3    United States of America

4    Southern District of Ohio

5            We, Georgina L. Wells and Denise N. Errett, Official

6    Court Reporters of the United States District Court for the

7    Southern District of Ohio, do hereby certify that the foregoing

8    186 pages constitute a true and correct transcription of our

9    stenographic notes taken of the proceedings held in the City of

10   Columbus, Ohio, in the matter therein stated, on the 24th day

11   of October, 2011.

12           In testimony whereof, we hereunto set our hands on

13   the 23rd day of March, 2012.

14

15

16                        /s/ Georgina L. Wells

17                        _____

                          Georgina L. Wells, RMR
18                        Official Court Reporter
                          Southern District of Ohio
19

20                        /s/ Denise N. Errett, FCRR

21                        _____

                          Denise N. Errett, FCRR
22                        Official Court Reporter
                          Southern District of Ohio
23

24

25