<pre>
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF OHIO
 2                        EASTERN DIVISION

 3

 4
   UNITED STATES OF AMERICA,      )
 5                                )      CASE NUMBER
                    PLAINTIFF,    )      2:11-CR-10(1)
 6           VS.                  )
                                  )      COLUMBUS, OHIO
 7   SEAN D. MURPHY,              )      OCTOBER 25, 2011
                                  )
 8                  DEFENDANT.    )
   _____

 9

10                          **VOLUME 6**
         **TRANSCRIPT OF THE JURY TRIAL PROCEEDINGS**
11          BEFORE THE HONORABLE GEORGE C. SMITH
          UNITED STATES DISTRICT JUDGE AND A JURY
12

13

14

15

16   APPEARANCES OF COUNSEL:

17   FOR THE PLAINTIFF:          SALVADOR DOMINGUEZ, AUSA
                                 HEATHER HILL, AUSA
18
     FOR THE DEFENDANT:          SEAN MURPHY, PRO SE
19                               DAVID GRAEFF, STAND-BY COUNSEL

20

21

22

23

24         GEORGINA L. WELLS & DENISE N. ERRETT
             OFFICIAL FEDERAL COURT REPORTERS
25                    (614) 719-3225
</pre>

1                        I-N-D-E-X

2              VOLUME 6 – OCTOBER 25, 2011

3

4    WITNESSES:                                    PAGE NO.

5    GARY PHILLIPS    –  Direct Ex. by Mr. Murphy.......   3
                      –  Cross-Ex. by Mr. Murphy........  13
6

7

8    GOVERNMENT'S CLOSING ARGUMENT ......................  20

9    DEFENDANT'S CLOSING ARGUMENT .......................  54

10   GOVERNMENT'S REBUTTAL ARGUMENT ..................... 105

11   CHARGE OF THE COURT ................................ 122

12

13                        –  –  –

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    Tuesday Morning Session

 2                       October 25, 2011

 3                            - - -

 4   IN OPEN COURT:

 5            THE COURT:  Good morning.

 6            THE JURY:  Good morning.

 7            THE COURT:  You may call your next witness.

 8            MR. MURPHY:  Thank you, Your Honor.  The defense

 9   calls Gary Phillips.

10                            - - -

11                       GARY PHILLIPS

12   AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

13                            - - -

14                     DIRECT EXAMINATION

15   BY MR. MURPHY:

16   Q.   Good morning, Mr. Phillips.

17   A.   Good morning, sir.

18   Q.   Can you please state your name for the record and what

19   your occupation is?

20   A.   All right.  It is Gary L. Phillips.  I am a licensed

21   private investigator.

22   Q.   Mr. Phillips, were you hired by the defendant Sean Murphy

23   to do some investigating?

24   A.   Yes, I was.

25   Q.   And in the course of that investigation, did you interview
```

1    any people?

2    A.    Yes, I did.

3    Q.    And was one of the persons that you interviewed a

4    participant in the Brink's burglary?

5    A.    Yes, I did.

6    Q.    And who was that person?

7    A.    That would be Joseph Morgan.

8    Q.    And did you speak to Mr. Morgan about a bunch of the

9    details surrounding the Brink's burglary and the weekend of

10   January 17th and 18th?

11   A.    Yes, I did.

12   Q.    And independent of that, did you also conduct an

13   independent investigation to try to corroborate some of the

14   information that Mr. Morgan told you?

15   A.    I did, yes.

16   Q.    And part of that investigation would have been trying to

17   track down various receipts for items that were allegedly used

18   in this crime?

19   A.    That is correct, yes.

20   Q.    Now, did you speak to Mr. Morgan about how much coin was

21   stolen from Brink's?

22   A.    I did.

23   Q.    And did you review the discovery to determine how much

24   coin was recovered from the Raymond storage bin?

25   A.    Yes, I did.

1  Q.   And how much coin was recovered from the Raymond storage

2  bin?

3  A.   I believe just a little over $389,000 in coins.

4  Q.   And what was the difference from the amount of money that

5  was recovered from what you have investigated and determined to

6  be stolen?

7      MR. DOMINGUEZ:  Objection.  It calls for him -- as to

8  hearsay, Your Honor.  I believe the difference he is trying to

9  establish here is what Joe Morgan told him was found in the

10  storage facility, and that's hearsay.

11      THE COURT:  Before I rule on that, you will have to

12  lay some background about how he found out.  It cannot be based

13  on a statement to him by an individual.

14      MR. MURPHY:  Okay.

15  Q.   (By Mr. Murphy) Mr. Phillips, how did you determine how

16  much money was actually taken from Brink's?

17  A.   The only knowledge that I had of the actual cash loss was

18  predicated on the information provided by Mr. Morgan.

19  Q.   Okay.  Thank you.  Would it be fair to say that there was

20  a difference?

21  A.   Yes.

22      MR. DOMINGUEZ:  Objection, Your Honor.

23      THE COURT:  Sustained.  The jury will disregard the

24  answer.

25  Q.   (By Mr. Murphy) Now, were you asked to investigate the

1  purchase of a Milwaukee electromagnetic drill?

2  A.    I was.

3  Q.    And did you attempt to locate the business that the drill

4  was purchased from?

5  A.    I had some information on that.  However, I was told to

6  cease some additional investigation at that point before I was

7  able to make contact to verify the purchase of that.

8  Q.    And who told to you cease that investigation?

9  A.    Mr. Graeff, who was your attorney at the time, and he had

10  asked me to withhold any additional investigation on some of

11  the requests that you had provided, and that was one of them.

12  Q.    So, Mr. Murphy asked you to do certain investigation work?

13  A.    That's correct.

14  Q.    And Mr. Graeff told you to stop doing it?

15  A.    That is correct.

16  Q.    At some point further on, were you asked to continue your

17  investigation, to pick up and go again?

18  A.    Right.  Just recently, you took over the control of your

19  own case, and you asked me to begin to follow-up on some of the

20  initial requests.

21  Q.    Now, were you instructed to investigate the purchase of a

22  thermal rod hose, handle and thermal rods?

23  A.    Yes, I was.

24  Q.    Did you locate the business that the thermal rod

25  accessories were purchased from?

1    A.   Yes, I did.

2    Q.   And did you obtain a copy of the receipt?

3    A.   I was able to obtain a copy, yes.

4    Q.   And if I was to show you this, would this be the receipt

5    that you retrieved in your investigation?

6    A.   That is correct.  That is the receipt.

7          MR. DOMINGUEZ:  Your Honor, if I may?  Can we get

8    reciprocal discovery --

9          MR. MURPHY:  I just got it.

10         MR. DOMINGUEZ:  -- as to matters that are going to be

11    presented so we can review them as well?  We have requested

12    that throughout this investigation.

13         MR. MURPHY:  Your Honor, as Mr. Phillips discussed,

14    he just got this, and I was just given this receipt.

15         THE COURT:  When did you get this?

16         MR. MURPHY:  I received it last week actually, Your

17    Honor.

18         THE COURT:  Last week?

19         MR. MURPHY:  Yes, sir.

20         MR. DOMINGUEZ:  Your Honor, as a courtesy, if we

21    could take a look at it before Mr. Murphy displays it?

22         THE COURT:  Do you have any others?

23         MR. MURPHY:  I believe that's the only one.

24         THE COURT:  Is that the only one?

25         MR. MURPHY:  I believe that's the only one.

1    THE COURT:  Give Mr. Dominguez a chance to look that

2  over, and you can go on to another question.

3  Q.   (By Mr. Murphy) Now, in your investigation, did you speak

4  to someone that gave you information about this, that led you

5  to get this receipt?

6  A.   Yes, based upon the information that you had provided

7  about the material that had been purchased, I contacted the

8  company and asked if there was any way to research this

9  transaction.  They indicated that they would look back to the

10  dates that you had outlined in your request and the type of

11  equipment that was purchased.  They called me back subsequently

12  to their investigation, and they said that they had identified

13  this particular receipt.  Although the name of the customer

14  does not apply to you, the timeline and the equipment purchased

15  was specific to the information that you had provided.

16  Q.   Yes.  And was there a name on that receipt that referred

17  to a specific customer?

18  A.   I believe that there was, yes.

19  Q.   And what was that name?

20  A.   Without seeing it here in front of me, I think it was

21  Ameri-something, possibly.

22  Q.   Not the company, the name.

23  A.   Oh, the name of the selling company?

24  Q.   No, the name of the purchaser?  Did the receipt refer to a

25  specific name?

1  A.   It referred to a company, I believe.

2  Q.   Okay.  Well, we will wait until we get the receipt back so

3  you can refresh your memory.

4       Now, Mr. Phillips, were you also instructed to investigate

5  the purchase of 28-foot RV cover?

6  A.   I was.

7  Q.   And did you locate the business where that cover was

8  purchased from?

9  A.   No, I did not.

10       THE COURT:  Oh, the RV cover.

11       MR. MURPHY:  Yes.

12       THE COURT:  Okay.

13  Q.   (By Mr. Murphy) And why weren't you able to locate that

14  receipt?

15  A.   Once again, that was one of the requests that you had

16  initially had outlined, and Mr. Graeff asked me to withhold any

17  additional efforts at this point.  So, I was not able to follow

18  up on that request.

19  Q.   Now, we are going to go back to this receipt from

20  Middlesex Technology?

21       Now, in looking at the customer, is your memory

22  recollected of any specific person that it may have referred to

23  to?

24  A.   Right.  This says:  Shipped to:  Americanized Welding to

25  John at area code 781-913-5441 with a P.O. Box 234 in Raynham,

1 Massachusetts.

2 Q.   Okay.  Now, did you ever receive information that Joseph

3 Morgan had used the alias John Lynch?

4 A.   I don't recall that I did.

5 Q.   You don't recall?

6 A.   No.

7 Q.   Okay.  Based on your investigation into this matter, have

8 you determined who actually purchased these items?

9 A.   The information that you provided with the types of

10 materials that were purchased are consistent with what you had

11 indicated had been purchased in this matter.

12 Q.   Right.

13 A.   As far as identifying Americanized Welding and this John

14 as directly related to you, no, I was not able to make that

15 link.

16 Q.   Did anybody give you any information that led you to

17 believe who purchased these items?

18 A.   I believe when I spoke to Mr. Morgan --

19       MR. DOMINGUEZ:  Objection, Your Honor.

20       THE COURT:  Sustained.

21 Q.   (By Mr. Murphy) Now, were you also asked to try to locate

22 a U-Haul truck that was used to transport stolen money in the

23 Brink's burglary?

24 A.   I was.

25 Q.   And did you try to do any investigating with that?

1    A.   Once again, that was a request that I was told to withhold

2    any additional investigation on until you took over the case.

3    Q.   Okay.  And were you also asked to try to locate a storage

4    bin rented in the City of Lynn at a U-Haul storage facility

5    sometime in the week following January 23rd?

6    A.   I was.

7    Q.   And did you, in fact, locate a bin rented at the U-Haul

8    storage facility?

9    A.   No, I did not do that investigation either.

10   Q.   Because Mr. Graeff had stopped your investigation?

11   A.   He asked me to withhold any further activity, yes.

12   Q.   Now, were you also asked to do an investigation revolving

13   around a Columbus shelter somewhere in the north end of

14   Columbus?

15   A.   That's correct.

16   Q.   And did you obtain any information about the homeless

17   shelter?

18   A.   I did not.

19   Q.   Now, Mr. Phillips, were you asked to try to locate a

20   storage facility in Eastern Ohio?

21   A.   Yes, I was.

22   Q.   And you were looking for a bin in Eastern Ohio that would

23   have been rented on January 17th?

24   A.   I believe you asked me to try to locate a storage facility

25   within one hour of Columbus -- or not Columbus, rather, but the

1   Ohio-Pennsylvania border, the parameters were one hour from

2   that border, a bin that's yellow -- I'm sorry -- orange in

3   color and without surveillance.

4   Q.   And did you conduct an investigation into that?

5   A.   Due to that being such an overbroad request, there are

6   hundreds of places that meet some or all of those requirements.

7   So, it would have been very difficult to actually pin down

8   without making numerous phone calls as to each facility that

9   would have been identified in that area that's outlined there.

10  Q.   And if you had more time, would you have been able to get

11  further on in your investigation?

12  A.   I would have identified more possibilities, yes.

13  Q.   Now, did you also do an investigation on how long it takes

14  and the distance between the Ohio-Pennsylvania border to

15  Columbus?

16  A.   I did.

17  Q.   And what did you determine?

18  A.   Well, depending on where you are on the Ohio-Pennsylvania

19  border to Columbus, it varies.  Anywhere from 120 miles to, you

20  know, probably 100 to 200 miles.

21  Q.   Now, in this matter there were two vehicles used, as you

22  know, the rental truck and the rental car?

23  A.   Right.

24  Q.   The rental car had 452 miles on it more than the rental

25  truck.  In your opinion, based upon your investigation, would

1  these additional 452 miles be consistent with the rental car

2  going from the Ohio-Pennsylvania border and then back to the

3  Greater Columbus Area and then back?

4  A.   It is possible, yes.

5        MR. MURPHY:  Thank you, Mr. Phillips.  I have no

6  further questions.

7        THE COURT:  Mr. Dominguez?

8                    - - -

9                  CROSS-EXAMINATION

10 BY MR. DOMINGUEZ:

11 Q.   I want to understand something, Mr. Phillips.  In your

12 opinion, were you basically called as a witness to say what you

13 couldn't do?

14 A.   I am not sure.

15       MR. DOMINGUEZ:  Thank you.

16       No further questions, Your Honor.

17       THE COURT:  You may step down.

18       THE WITNESS:  Thank you, sir.

19       MR. MURPHY:  The defense rests, Your Honor.

20       THE COURT:  The defense rests?  All right.

21       Ladies and gentlemen, we have got to do a little bit

22 of legal work here, and then you will have closing arguments

23 here shortly.  So, why don't you take a break right now, and

24 remember the admonition not to discuss this case -- we are very

25 close to the end of it -- not to make any comments or do any

1   research, and we will come and get you when we are ready for

2   final arguments, which should be shortly.  It should not be too

3   long.  Famous last words.

4                                  - - -

5            THEREUPON, the jury exited the courtroom, and the

6   following proceedings were held with Court, counsel and

7   Mr. Murphy:

8            THE COURT:  I understand that the defense has some

9   items of evidence that they wish to have admitted?

10           MR. MURPHY:  Yes, Your Honor.

11           THE COURT:  First of all, are there any stipulations?

12           MR. DOMINGUEZ:  None.  Only the ones that we went

13   over yesterday, Your Honor.

14           THE COURT:  No new ones?

15           MR. MURPHY:  Not that I am aware of.

16           THE COURT:  I'm jumping the gun here.  Is there any

17   other evidence from the government?

18           MR. DOMINGUEZ:  No rebuttal, Your Honor.

19           THE COURT:  No rebuttal?  Okay.

20           MR. GRAEFF:  Did you use letters or numbers?

21           MR. MURPHY:  I will use numbers.

22           MR. GRAEFF:  Put Exhibit 1 down there and go

23   sequentially.

24           MR. DOMINGUEZ:  Your Honor, may I reposition the

25   podium while they are chatting?

1          THE COURT:  Yes.  Mr. Murphy, do you need any help

2    from Mr. Phillips on this?

3          MR. MURPHY:  Mr. Phillips?  No.

4          THE COURT:  Will that speed it up any?

5          MR. MURPHY:  No.  I will be done in a minute, Your

6    Honor.

7          We are all set, Your Honor.  I'm all set.

8          THE COURT:  You may proceed.

9          MR. MURPHY:  Defendant's Exhibit 1 would be the paid

10   losses from Brink's.

11         THE COURT:  It is what, sir?

12         MR. MURPHY:  The paid losses from Brink's.

13         THE COURT:  Objection?

14         MR. DOMINGUEZ:  Your Honor, I don't believe that

15   there has been a foundation laid for its admission into

16   evidence.

17         THE COURT:  Let me see it.

18         MR. MURPHY:  Several witnesses testified to it, Your

19   Honor.

20         THE COURT:  Well, the objection is overruled.  It

21   will be admitted.

22         MR. MURPHY:  Exhibit 2 would be a picture of the big

23   100-watt jammer, Your Honor.

24         MR. DOMINGUEZ:  No objection, Your Honor.  May I take

25   a look at that?

1          THE COURT:  Okay.  Is that one of the regular

2     pictures of it?

3          MR. MURPHY:  That came out of -- that picture came

4     from the initial discovery that you gave in the case.

5          MR. DOMINGUEZ:  Okay.

6          THE COURT:  I guess we didn't see it on the rollers.

7          MR. DOMINGUEZ:  That's fine, Your Honor.

8          THE COURT:  Admitted.

9          MR. MURPHY:  Defendant's Exhibit 3 would be the

10     Zoning Board decision from Lynn with regards to the security

11     consulting business and moving company, which several witnesses

12     identified.

13          THE COURT:  Any objection?

14          MR. DOMINGUEZ:  Your Honor, lack of foundation.  He

15     showed it to witnesses, but no witness to establish the

16     authenticity of that document.

17          MR. MURPHY:  It is self-authenticating, Your Honor.

18          THE COURT:  Right, I agree.  It will be admitted.

19          MR. MURPHY:  Exhibit 4 is a picture of the

20     electromagnetic drill press that was testified to, Your Honor.

21          MR. DOMINGUEZ:  No objection.

22          THE COURT:  Admitted.

23          MR. MURPHY:  Exhibit 5 would be the letter from

24     Millennium Movers to Newmarket Storage which Sue Robshaw

25     testified to.

1          MR. DOMINGUEZ:  No objection, Your Honor.  It is

2     already in evidence.

3          THE COURT:  Admitted.

4          MR. MURPHY:  Defendant's 6 would be the Newmarket

5     Storage rental bin for Thomas Mullen.

6          MR. DOMINGUEZ:  No objection, Your Honor.

7          THE COURT:  Admitted.

8          MR. MURPHY:  Exhibit 7 will be two e-mails from

9     Global Gadget regarding information from the United Kingdom.

10          THE COURT:  Any objection?

11          MR. DOMINGUEZ:  It is already in evidence, Your

12     Honor, so we don't object.

13          THE COURT:  Admitted.

14          MR. MURPHY:  And my final exhibit will be the e-mail

15     that Mr. Nassor testified to that he did to Global Gadget.

16          MR. DOMINGUEZ:  No objection, Your Honor.

17          THE COURT:  Admitted.

18          MR. MURPHY:  Do I give them to you, Lisa?

19          MR. GRAEFF:  You hold onto them.

20          MR. MURPHY:  Okay.

21          THE COURT:  And I asked Mr. Dominguez if there is any

22     rebuttal, and his answer to that is no?

23          MR. DOMINGUEZ:  That's correct, Your Honor.

24          THE COURT:  Is that still your answer?

25          MR. DOMINGUEZ:  Yes.

1          THE COURT:  Are we ready for final argument?

2          MR. DOMINGUEZ:  We are, indeed, Your Honor.

3          MR. MURPHY:  Yes, Your Honor.  I would like to renew

4     my Rule 29 motion.

5          THE COURT:  The evidence that has been presented by

6     both the government and the defense has been more than

7     sufficient to go forth -- or at least to send this case to the

8     jury for a decision.  The evidence includes testimony from law

9     enforcement officers, as pointed out before.  And the Court

10    also considers the arguments which were sent as Document 133 of

11    the defendant, and the testimony of co-conspirators, Robert

12    Doucette and David Nassor, about the defendant's involvement in

13    Brink's burglary as well as the administrators of companies

14    such as storage facilities, a bank, a hotel and Federal Express

15    establishing the defendant and/or his co-conspirators'

16    connection to the tools and preparation of the Brink's

17    burglary.

18          The information has been presented here in court

19    through testimony and exhibits and is substantial enough so

20    that the jury could make a finding on each of these four

21    counts, including defendant Murphy's defense.

22          Accordingly, the defendant's renewal of his motion

23    for acquittal pursuant to Rule 29 of the Federal Rules of

24    Criminal Procedure is, again, denied.

25          MR. MURPHY:  Thank you, Your Honor.

1    MR. DOMINGUEZ:  Your Honor, may I have 30 seconds?

2    THE COURT:  Yes.

3    Bring in the jury.

4    MR. DOMINGUEZ:  Ready to go, Your Honor.

5                        -  -  -

6    THEREUPON, the Jury entered the courtroom.

7                        -  -  -

8    THE COURT:  Ladies and gentlemen of the jury, what is

9  happening now, the parties have an opportunity to discuss this

10  case with you and make arguments to you about their positions

11  on the case.

12    What the people say -- Mr. Murphy acting as his own

13  counsel and Mr. Dominguez and Ms. Hill, when they speak before

14  you -- this is not evidence.  This is not to be considered as

15  evidence, but they may argue what the evidence is and what the

16  evidence means.  And it is just what it says it is, it is final

17  argument.

18    Now, the burden of the case is on the government to

19  prove the issues in the case beyond a reasonable doubt.  And as

20  such, the government will go first, and then they may reserve

21  some time for rebuttal, the burden being on them to prove the

22  case to you, they get a chance, a final chance after the

23  defendant speaks.  And then I will give you -- we will break

24  for lunch, then, and I will give you jury instructions either

25  before or after lunch, and those instructions will be -- I will

1 have copies of those, and you can follow along with me, and I

2 suggest that you do, if you want, and those instructions are to

3 guide you on what the law is and how to proceed throughout the

4 time that you deliberate.

5          And so, now, we will begin with Mr. Dominguez.

6          MR. DOMINGUEZ:  Thank you, Your Honor.

7          May it please this Honorable Court, Ms. Hill, Special

8 Agent Trombitas, Mr. Graeff, ladies and gentlemen of this jury,

9 on Thursday, October 13th, I stood before several of you in

10 this courtroom and we spoke about the government's burden of

11 proof in this case.  And at that time we talked about justice

12 and what justice is all about and how, from the government's

13 perspective, serving justice in a criminal case is very

14 important to us.

15          As a matter of fact, you might recall that during

16 that time, I advised you, as the Court did back on

17 October 13th, that Mr. Murphy at that time was entitled to a

18 presumption of innocence, a very important aspect in our

19 criminal justice system.  Well, ladies and gentlemen,

20 five-and-a-half days have lapsed since I made that statement to

21 you, and I am here to tell you that based upon the evidence

22 that has been presented during the course of this trial that

23 Mr. Murphy is no longer entitled to such a presumption.

24          On January 18th of 2009, you will recall that Ken

25 Hopkins, an employee at Brink's, around 9:30 when he went to

1  enter the Brink's facility at 1362 Essex with three of his

2  colleagues, per standard operating procedure, you see, for

3  security procedures, they had to go in all at the same time.

4  You will recall his testimony that something was wrong,

5  something was different, that he couldn't typically enter the

6  doors that he typically enters.  He thought, well, it is very

7  cold and perhaps the door is frozen.  So, I will try the other

8  entrance.  And when he and his colleagues tried to open that

9  door, the other entrance, it was, likewise, sealed shut.

10      Now that you have been through this trial, you know

11  why it was sealed shut because Robert Doucette told you why it

12  was sealed shut, because of the epoxy that had been placed on

13  those doors.  And then you heard the testimony that they called

14  their supervisor, Don Driver, who came out and assisted.  And

15  upon his arrival there that morning on January 18th of 2009,

16  they were able to open the garage door.

17      And you will recall the testimony of Ken Hopkins as

18  to what was revealed when that door was open.  You heard him

19  testify that there was nothing but smoke in the air, that he

20  was alarmed about what he had learned.  There was currency in

21  the air still smoldering, things within the warehouse were

22  still on fire.  As a matter of fact, certain trucks were out of

23  place, and he didn't recognize that.  Doors for trucks were

24  open when they should not have been.

25      You heard the testimony Jim Daniels.  You know, Jim

1  Daniels for the last couple of years has been the vault room

2  supervisor.  So, he is in charge of the money that's in the

3  vault within the vault room, and you heard him testify about

4  what he observed when he was called into the office on January

5  18th of 2009.  And he identified photographs of money, burnt

6  money on the floor, the hole in the vault door and what

7  appeared to him as he entered that premises on January 18th of

8  2009.  You will recall he testified about the vault room,

9  again, and the hole that was in the ceiling and the footprints

10  that were left on either side of the wall.

11          You will further recall that he testified as to his

12  knowledge of the amount of money that's in the vault.  You see,

13  the folks who targeted this facility wanted the big score.

14  Mr. Daniels advised you that a minimal amount of money in that

15  vault was $50 million, and you will recall his testimony on the

16  weekends, it is many times substantially higher, as it was the

17  holiday weekend of January 17 and 18 of 2009.

18          You will recall the testimony of Glen Blankenship.

19  You will recall that he was the Operations Supervisor, and he

20  was called in later in the day because something that he

21  couldn't believe had happened.  He had been with Brink's for 19

22  years and couldn't believe that his facility could be

23  penetrated in such a way.  You will recall that he identified

24  photographs from both the interior and the exterior of the

25  Brink's facility.  You will recall his testimony as he went

1  through the photographs of the Brink's facility, taking you

2  there as to how he saw the interior of the Brink's facility on

3  January 18th of 2009.  And you will recall that he testified at

4  length about the security system essentially being destroyed in

5  the interior of the Brink's facility.  You will recall that he

6  testified about the camera, that someone knew to point downward

7  on the exterior of the facility right where they had,

8  apparently, come in off of the roof from a storage container

9  that you all saw in the photographs of the exterior of the

10  facility.  Someone knew to point that camera down.

11      You will recall the testimony of Mr. Blankenship when

12  asked how did he feel when he was experiencing and visualizing

13  everything that went on in that Brink's facility.  You recall

14  the words that he used, I felt invaded, I felt defeated.  He

15  talked about money being about the floor, burnt money on the

16  ground, coins from the coin boxes -- and you held those

17  boxes -- coins from those boxes about the floor.  The place was

18  a literal mess.

19      I am not going to bore you with displaying all of

20  those photographs here again today.  You listened intently and

21  looked intently as we showed them to you through the witnesses

22  during the course of this trial, and you will have each and

23  every one of those photos with you when you go about your

24  business of deliberating.

25      You will recall the testimony of Mr. Blankenship in

1   this regard because you will recall that he pointed to this

2   gate, and you will recall his testimony that he informed you

3   that a chain had been broken clearly on that gate. And you

4   know what? Robert Doucette told you that they needed to cut

5   that chain in order to leave the premises.

6          So, while this is happening, as Mr. Hopkins is in the

7   facility, as Mr. Daniels is in the facility, and as

8   Mr. Blankenship is in the facility telling what they observed

9   based on their personal knowledge of how things typically go at

10  1362 Essex, you also heard from law enforcement personnel as to

11  what had to happen because they had to call the Fire Department

12  out. The smoke was billowing. Detective McIntosh was there.

13  Detective Janel Mead was there. And yes, indeed, Special Agent

14  Harry Trombitas from the FBI was there as well. They saw the

15  mess. They saw the invasion. Yes, they saw, as

16  Mr. Blankenship said, at that point in time, they had been

17  defeated.

18          But ladies and gentlemen, during the course of this

19  trial, you know now that that defeat is not ultimate because we

20  know the answers to what happened on January 18 and

21  January 17th and what led up to those dates and what happened

22  thereafter. Agent Trombitas testified that he took a lot of

23  investigative leads. The way it went down, the way everything

24  looked, the holes in the roof, the security being cut, of

25  course, he thought it may have been an inside job. And of

1  course, they interviewed employees in that regard.  And of

2  course, he sought eyewitnesses around the vicinity of the

3  Brink's location there at 1362 Essex.  He sent out national

4  leads in order to resolve this caper.  Brink's actually put up

5  a reward for anyone who could call with information in an

6  attempt to resolve this crime.  Nothing.

7         And you know what, ladies and gentlemen?  It wasn't

8  until March of 2009 from, of all places, the Greater Boston

9  Metropolitan Area, Boston, Massachusetts that David Nassor,

10 David Nassor came forward with information about what he knew

11 about what happened in January of 2009 in this City of

12 Columbus, Ohio.  David Nassor did not mention Tom Enquist or

13 other names.  He didn't mention some list of the Lynn Breakers.

14 What did he tell Agent Jason Costello and others in the Greater

15 Boston Metropolitan Area?  He told Special Agent Costello what

16 he did -- and we will get to that -- and that Joseph Morgan,

17 Robert Doucette and this man (indicating) Sean Murphy committed

18 the crime.

19        Ladies and gentlemen, that's where the investigation

20 from the law enforcement began, when David Nassor in March of

21 2009 identified those three defendants.  And that's when

22 everything gathered at that point.

23        You see, Mr. Nassor told Mr. Murphy, when he called

24 him as a witness, that he had been his friend for 19 years.  He

25 told us 20 to 25 years -- quite a long time that Mr. Nassor and

1   Mr. Murphy had been friends.  And when he talked to the

2   authorities, he told them about certain events that transpired

3   in December of 2008.  He told you about those events on this

4   witness stand.

5           Robert Doucette told you about events that occurred

6   prior to December of 2008.  And what did Mr. Doucette tell you

7   here in open court?  He had known -- Robert Doucette had known

8   Sean Murphy for some time as well.  And sometime prior to

9   December of 2008, Mr. Murphy approached Mr. Doucette and asked

10  him if he wanted to join him in committing a Brink's burglary

11  in Columbus, Ohio.  And what did Mr. Doucette say on this

12  witness stand?  He talked about how Mr. Murphy explained to him

13  how he had found this Brink's facility, 1362 Essex, over the

14  internet and how he had Googled it and how he had used the

15  internet in order to target that specific location.

16          Ladies and gentlemen, I present to you "Master Thief,

17  How to be a Professional Burglar" by -- lo and behold -- Sean

18  Murphy.

19          Now, I am not going to show you every passage out of

20  this booklet, but I do want to reference some of them to put

21  that testimony and the evidence that you have seen and heard

22  into context.  And you will have this exhibit -- Government's

23  Exhibit 15-1 -- back with you when you are deliberating in this

24  case.

25          But what does Mr. Murphy tell us all in this booklet?

1    "The first place to begin your search is the internet.  The

2    amount of information available online is mind-boggling.  All

3    of the different telephone directories online provide a good

4    starting point.  You can search by company type or SEC.  Both

5    will limit your research to the exact type of business that you

6    want to hit."

7            "One of the first things to assess is location, is

8    this a good spot to do a score?  Generally, industrial parks

9    and remote set-ups are best.  The less people have a chance of

10   seeing you, the better your chances are for money and to a

11   fluke.  Also, you may be making a lot of noise or moving around

12   on a roof.  Good locations put the advantage on your side."

13           Robert Doucette advised you about the internet and

14   Mr. Murphy's use of the internet, and Mr. Murphy himself is

15   telling you about it in his book.

16           There was a lot of discussion during the course of

17   this trial about cellular telephone jammers.  And you will see,

18   you will have back with you, Government's Exhibit 4-1, which is

19   the Global Gadget information.  And what that is a document,

20   ladies and gentlemen, from the United Kingdom.  You see, Mike

21   Menage, who is the Director/Operator of Global Gadget, dealt

22   with Mr. Murphy on a regular basis.

23           Now, Mr. Costello, Agent Costello, in response to

24   Ms. Hill's question, gave you basically a layman's version of

25   what a telephone jammer does, but Mr. Menage on Page 2 of his

1    statement provides great detail about how the cellular jammer

2    works and what it works on.

3            Additionally, ladies and gentlemen, in Mr. Murphy's

4    manifesto, on Page 8 he spends a great deal of time talking

5    about a cell phone jammer and how it is used to commit

6    burglaries.

7            So what did Mr. Nassor tell us?  Mr. Nassor said that

8    he owed Mr. Murphy a favor, and he was approached by Mr. Murphy

9    to run an errand, to travel to Memphis, Tennessee in order to

10   pick up a package.  Now, Mr. Nassor didn't testify as to what

11   was in it -- he had some idea, but he didn't know for sure --

12   but he knew he owed Mr. Murphy a favor.

13           Now, ladies and gentlemen, how many of us travel 18

14   hours to pick up a Federal Express package?  David Nassor did,

15   he told you about it.  You see, Mr. Nassor said that he had

16   control of one of Mr. Murphy's cell phone jammers -- it got

17   away from him, it got loss or stolen, what have you.

18           Again, you will have the correspondence between

19   Mr. Murphy and Global Gadget.  And lo and behold, what does

20   Mr. Murphy himself advise Global Gadget?  Name:  Sean Murphy.

21   Company:  Northshore.  I need to purchase another Y2000 quad.

22   Somebody actually stole mine.  How about that?  I will protect

23   it better next time.

24           Mr. Nassor's testimony was that he lost Mr. Murphy's

25   cell phone jammer, and Mr. Murphy's statement, someone actually

1  stole mine.  So, yes, Mr. Nassor did, indeed, owe Mr. Murphy a

2  favor, and so he did travel to Memphis, Tennessee.  And he did,

3  in fact.  You saw Janet Honey, she was the Records Custodian

4  from Residence Inn there in Memphis, and she testified about

5  the stay of Mr. Nassor from December 1 through December 3rd of

6  2009.  I need not display that, you will have it with you in

7  your deliberations.  But she also verified that Federal Express

8  Corporate Headquarters Worldwide are located in Memphis.  And

9  how does she know that?  Well, she lived in Memphis, and

10 secondly, her husband happened to work there.

11         Why Memphis?  Now, Robert Doucette, you will recall

12 his testimony, you see he knew, based upon conversations with

13 Mr. Murphy, that Customs were getting in the way of packages

14 from Global Gadget in Newark.  But what didn't he tell you?  He

15 didn't know where Nassor went to pick up the cell phone jammer,

16 he just knew for a fact that Murphy had sent him there -- sent

17 him somewhere.

18         Again, the Global Gadget correspondence, Global

19 Gadget is corresponding with Mr. Murphy, in the last paragraph

20 there, "As a heads-up for you, we have a potential issue

21 regarding the shipping method of the new CCJ1890 order.  We

22 have had problems with Fedex customers in Newark, New Jersey,

23 which concerns your location" -- speaking about Mr. Murphy --

24 "and there is an extremely high risk of the jammer being seized

25 at Newark.  However, if you are legitimately importing it for

1  export or for use by the government, then it is okay as we can

2  indicate this on the waiver form.  Shipping further west is

3  easier with Fedex as the shipments will go through Fedex in

4  Memphis, which seems more relaxed and less likely to be a

5  problem."

6          What did Mr. Murphy say in response?  His

7  acknowledgment -- this is July of 2008 -- "Thanks for the

8  heads-up.  As you know, all jammers are contraband in the U.S.

9  unless used and possessed by military only.  Police are not

10  even allowed to possess or use the jammers."  And he talks

11  about other ways you might be able to circumvent the system.

12          Ladies and gentlemen, you'll have this document back

13  with you, with all of the rest of the documents from Global

14  Gadget.

15          So, we know about the problem in Newark, Mr. Doucette

16  told you about that, and Mr. Murphy is discussing that directly

17  with Global Gadget and contriving ways in order to beat the

18  system, if you will, to get that cell phone jammer that he

19  badly needs.

20          You heard from Mr. Helmut Hagan who actually

21  authenticated this document from Federal Express, but the most

22  important thing about this document is the fact that the

23  package from Global Gadget did, indeed, go to David Nassor in

24  care of Northshore in Memphis, Tennessee.  And you will recall

25  that Ms. Honey recognized the signature of her employee there,

1    Olga Sapagea, who signed for it.

2         Now, we all know that Mr. Nassor stayed in a hotel.

3    And if you look at Page 9 of Mr. Murphy's manifesto, what does

4    he say about Global Gadget shipments in his little book?

5    "Several different countries sell jammers, but they are

6    technically illegal in the United States.  U.S. Customs will

7    seize jammers if detected.  A company called Global Gadget in

8    England will work with you on all current procedures on how to

9    import jammers into the United States.  If all else fails, you

10   can drive up to Canada or down to Mexico to have it shipped to

11   you at a hotel or a motel in that country.  Ship the package to

12   an individual at a hotel."  Mr. Murphy's own statement.

13        Now, you will recall when Mr. Murphy had Mr. Nassor

14   on cross-examination, do you recall him asking Mr. Nassor

15   questions about this Federal Express receipt?  You will recall

16   that he said, well, wait a minute, Mr. Nassor, that was an

17   amplifier, it was not a cellular phone jammer.  And then he

18   tried to discuss with you through Mr. Nassor that -- that

19   Mr. Nassor had said it was worth $5,000, but it was only worth

20   $50.  I am sure that you recall that cross-examination by

21   Mr. Murphy and by Mr. Nassor.

22        On Page 188 of the Global Gadget communication, what

23   does Mr. Murphy tell Mike Menage, the Director, again, of

24   Global Gadget.  "I was even thinking about sending you stickers

25   to put on the units themselves indicating that the units are

1   guitar amplifiers and preamps."  Mr. Murphy's own words -- own

2   words about what Global Gadget should put on the packaging in

3   order to continue down this path.

4        Mr. Murphy also cross-examined Mr. Doucette about,

5   again, the price of the cellular phone jammer, suggesting that

6   it was only $50.  And you will recall, I believe he had some

7   statement that he showed Mr. Nassor on the overhead, and it was

8   like from January of 2009?  You may recall that.  Where he was

9   trying to suggest that he paid the minimal amount for this

10  package from Fed X.

11       Well, ladies and gentlemen, we all heard from the

12  records custodian from Eastern Bank, and you will have these

13  records with you, Mr. Nassor received the package that

14  Mr. Murphy had him go get on December 3rd of 2009, and the

15  posting from the United Kingdom for the Global Gadget cellular

16  phone jammer -- three separate amounts -- $1,384, $2,182 and

17  $2,182 -- and yes, we shared a laugh about my math skills, but

18  it is over $5,000.  It is not $50; it is $5,000.

19       What did Mr. Murphy say in response to Mr. Nassor

20  when he returned from Memphis?  Good job.

21       But Mr. Murphy wasn't finished with Mr. Nassor at

22  that point, because in January of 2009, he also requested that

23  Mr. Nassor come back to -- or to go to Columbus in order to

24  survey the Brink's facility at 1362 Essex and to keep note as

25  to when employees depart on Saturday nights and when they

1    arrive on Sunday mornings -- that was his sole job.  See when

2    they report and see when they depart.  Does that sound like

3    something plausible for someone to send a person to do?  Well,

4    when you are Master Thief, it is.

5          On Page 7 of his manifesto -- I have marked it, there

6    is no page numbers, but for my ease in talking to you about it,

7    I have put numbers at the bottom -- "Once you decide that a

8    potential target is going to be your score, you need to know at

9    what time the last person leaves the building on the night that

10   you plan to hit the place, also what time the first person

11   comes in to open the next day.  This will give you your window

12   of opportunity."

13         Ladies and gentlemen, there is no question that

14   Mr. Murphy sent Mr. Nassor to scout out his window of

15   opportunity.

16         And you will recall, what did Mr. Nassor say about

17   his instruction?  You heard him say that Mr. Murphy advised him

18   to go somewhere behind the Jegs.  And Mr. Nassor specifically

19   said Jegs, and you know from the witnesses who have testified

20   in this trial that there is a Jegs right behind the Brink's

21   facility which is identified in Government's Exhibit 1A-9.

22         Now, how would Mr. Murphy know about sending

23   Mr. Nassor and telling him a specific spot to place himself to

24   scout out the facility if he, himself, had not already been

25   there?  Now, you will recall that Mr. Nassor said when he got

1   there, he wasn't too comfortable with that location, so he

2   moved elsewhere.  But the bottom line is that Murphy

3   specifically advised Mr. Nassor as to where to go.

4          And who else told you that Mr. Murphy had been back

5   to Columbus prior to the Brink's burglary?  That was Robert

6   Doucette.  He said he came for two purposes.  One -- remember

7   his term -- to keep the crime local.  So, he said that

8   Mr. Murphy had advised him that he had picked up some bottles

9   and cigarettes and so forth at a homeless shelter to put -- you

10  know, that's a pretty good scheme when you think about it --

11  but he told Mr. Doucette about that.

12         But he further -- you recall his testimony -- he

13  further testified that Murphy had told him that he had found

14  some scaffolding and that he had strategically placed that

15  scaffolding around the railroad tracks so no one could discover

16  it.  And you will recall there was scaffolding found right by

17  the security box, the storage box, the green thing, where it

18  was used in order -- per Doucette -- to get up on the roof.

19  And you will remember the testimony of Mr. Blankenship, that's

20  not Brink's scaffolding.

21         So, Mr. Nassor does his thing.  He does survey the

22  premises, and what is important about his testimony that he

23  testified to regarding this survey that he did, the scoping of

24  the Brink's facility, he said the employees typically leave

25  about nine o'clock at night, and they return the next day or

1    they report for business the next day on Sunday at around nine

2    o'clock, and that's exactly what Mr. Doucette said.  And

3    Mr. Hopkins testified, again, that they arrived at 9:30,

4    consistent with the testimony of Mr. Nassor and consistent with

5    the testimony of Mr. Doucette.

6         So, we go then to January 2nd of 2009, and you will

7    recall that Mr. Murphy actually had done business with

8    Newmarket Storage for an extended period of time.  And what

9    Mr. Murphy did, though, with Newmarket Storage in terms of

10   renting storage facilities, storage bins, as they call them,

11   and road trucks, you know, he didn't use his own name.  Brian

12   Hetherman is the name he identified himself as.  And that was

13   testified to by Ms. Robshaw, and that's the name she had known

14   him as for years.

15        Now, you will recall that Mr. Murphy actually rented

16   a Budget -- a 24-foot U-Haul truck on January 2nd of 2009.  And

17   per the testimony of Robert Doucette, what was that for?  That

18   was to load tools into that truck and then to take those tools

19   in interstate commerce from Massachusetts, ultimately, to

20   Warrendale, Pennsylvania.  Now, Mr. Doucette did not say

21   Warrendale, Pennsylvania, but we all know it was Warrendale,

22   Pennsylvania because, ladies and gentlemen, once Mr. Murphy

23   arrived in Warrendale, he met up with Ms. McAlister.

24        You will recall Suzanne McAlister, who was the

25   manager of The LockUp there in Warrendale, and she testified.

1   And what she told us was that Mr. Murphy came in with another

2   individual who didn't say anything but just kind of stood back

3   by the wall as Mr. Murphy, in her words, seemed to be in

4   charge.  And do you remember what she told you?  She told you

5   that most customers that come in and they want to buy or rent a

6   storage facility, they engage in small talk.  They actually go

7   with Ms. McAlister to the unit to see if it's suitable for

8   their purpose, but he didn't have to -- Mr. Murphy didn't have

9   to do that, you know, he knew exactly what he wanted.  And

10   Government's Exhibit 8-1, Ms. McAlister rented him the

11   facility, and he paid for six months in cash.

12          Now, when Mr. Murphy rented that facility, what did

13   he fill out on the application form?  What did he tell

14   Ms. McAlister, where did he work?  GS Contracting, Pittsburgh,

15   Pennsylvania?  How much sense does that make?  Oh, by the way,

16   he rented it under the name of Brian Hetherman.

17          Now, in his manifesto, ladies and gentlemen, what

18   does Mr. Murphy tell us?  "Truck.  It is essential that you get

19   all of your tools and equipment to the site of the score.

20   Rental trucks -- Ryder, Budget, U-Haul and Penske come in very

21   handy, plus you need to get your loot home, too.  A 14 to

22   24-foot rental truck will serve that purpose.  It is always

23   good to cover the truck numbers with light and/or gray duct

24   tape, so the truck cannot be identified by video surveillance.

25   It is good to change the license plates, also."  That's what he

1   tells us about hauling tools, about hauling loot, always use

2   your trucks.

3          What else does he tell us in his manifesto?  On

4   Page 35, "In some rural communities the people working

5   self-storage facilities might not even ask you for an I.D.

6   Always open a storage bin in another name.  "Never" -- in

7   quotes -- use your own name, even if you bring a friend with an

8   I.D. to open it for you."

9          You see, that's the way Mr. Murphy operated.  This is

10  part of his manifesto, this is how he did business in terms of

11  being a burglar.

12         Now, upon his return to Massachusetts, after he had

13  stored his tools in the Warrendale facility, Mr. Murphy told

14  Mr. Doucette, we are ready to go.  Successfully loaded those

15  tools in that storage facility in Warrendale, and you don't

16  have to take Mr. Doucette's word for that, ladies and

17  gentlemen.

18         Government's Exhibit 5-6.  You see this date here?

19  You see, that's the date that Mr. Murphy actually returned his

20  rental truck after being in Warrendale, and he told Newmarket,

21  in essence, that he was ready to go because he rented -- he

22  reserved this truck for rental on January 16th of 2009, the day

23  before they left to pull off the caper here in Columbus, Ohio.

24         Then, we go to January 15th of 2009 and January 16th

25  of 2009, and you know from the testimony of Robert Doucette

1   that they went to the Thrifty Rental Car there in Revere,

2   Massachusetts, and Mr. Murphy, in his name, rented the Dodge

3   Journey.  He paid for it in full, and that's reflected in the

4   Eastern Bank records that you will have with you, and he

5   verified that there were no other drivers of that vehicle.

6           Robert Doucette also told you that on January 16th of

7   2009 that he and Mr. Murphy went to the storage facility in New

8   Hampshire.  And you will recall that Mr. Doucette didn't

9   remember the name of the storage facility, he just remembered

10  the approximate location, that there was a bridge nearby.  He

11  didn't remember the name of it, but he remembered going there.

12  And he remembered that Mr. Murphy picked up the rental truck on

13  January 16th of 2009.  As a matter of fact, as you know from

14  the stipulation, that Mr. Murphy himself admits to being in

15  Newmarket, New Hampshire on January 16th of 2009.

16          And you will recall the testimony of Mr. Doucette,

17  they traveled on the 17th of January, stopped at a hotel --

18  they traveled on the 16th -- excuse me -- of January, stopped

19  at a hotel, and then on the morning of January 17th, they

20  started -- took their truck to Warrendale to pick up the tools

21  that Mr. Murphy and Mr. Morgan had left there on January 3rd of

22  2009.  And you will recall the testimony of Mr. Doucette

23  describing the storage facility, you will recall that he said

24  it was up a hill, and it was down at the end from the office

25  space, from the office at The LockUp facility, which mirrored

1   the testimony of Suzanne McAlister, who said the same thing.

2           The bottom line is they traveled from Warrendale

3   after they received the tools, to Columbus, Ohio, and we all

4   know all know what happened thereafter.  Mr. Doucette was very

5   explicit in his detail about how he, Mr. Murphy and Mr. Morgan

6   went about their business on January 18th of 2009 when they

7   arrived in Columbus, Ohio.  You will recall that he testified

8   that they staged the truck in a loading dock at a business

9   separate from the Brink's facility.

10          And what does Mr. Murphy say about that?  He talks

11  about in his manifesto the fact that you need to park your

12  vehicle away from the target location.

13          And Mr. Doucette also talked about the clothing that

14  they used.  He described in detail, he had some undergarments,

15  it was cold.  He had bright clothing underneath, and it was a

16  black jumpsuit that he was instructed to wear over the inner

17  layer of clothes.

18          What does Mr. Murphy tell us about that?  "Clothing.

19  Be properly clothed for scores.  Essential.  Go to any

20  Army/Navy Store and purchase black jumpsuits, also called

21  flight suits.  Don't forget to buy black ninja mask there.  It

22  is good to wear bright colors under your black jumpsuit.  If

23  you get chased, you can discard your outer clothing and be a

24  totally different person who no one can identify being at the

25  score."

1          You recall that's exactly the testimony that

2    Mr. Doucette gave you while he testified about what happened on

3    January 17th of 2009.  And it is right in Mr. Murphy's

4    manifesto.

5          Mr. Doucette talked to you about the alarm system and

6    what he was told in terms of what they were going to do.  If

7    you recall, Mr. Doucette's initial role was to -- and I believe

8    I heard this quote during this trial -- keep the peek.  You

9    will recall that Mr. Doucette's job was to make sure that he

10   stood on that bridge on the railroad tracks to see the comings

11   and goings of individuals, perhaps, police officers while

12   Mr. Morgan and Mr. Murphy entered the Brink's facility -- but

13   didn't enter it initially -- when they went up to cut the alarm

14   system, to cut the line to the alarm.

15         And you know what, ladies and gentlemen?  You saw the

16   holes in the fence and how that went about, how they went about

17   doing that.  Ladies and gentlemen, you had to have been at that

18   Brink's facility to know exactly what fence to go through,

19   exactly how to cut the fence and where to go to get up on that

20   roof.

21         What did Mr. Doucette tell us?  He said that

22   Mr. Morgan and Mr. Murphy left to go cut the alarm system.  And

23   what did he say?  They returned back for a period of time.  And

24   why did he say they did that?  So, they could wait and see if

25   what they did had worked.

1    What did Mr. Murphy say in his manifesto?  "Also,

2  after you cut the phone lines, you want to sit back for about

3  30 to 40 minutes to see if anyone responds.  Even though you

4  are well prepared and everything is working properly, you never

5  know when some type of signal is going to get out."

6  Mr. Murphy's words.  Consistent with what Mr. Doucette told you

7  about what happened when they cut the phone lines that night.

8    And Mr. Doucette continued in his testimony to talk

9  about the return to the Brink's facility, to talk about cutting

10  the holes -- how the holes were cut in the roof.  He did not

11  see that happen, but he told you about it when he was told to

12  come and join them, go into the facility to do what they did.

13    And how did they communicate?  They communicated by

14  walkie-talkie.  And the walkie-talkie use is discussed in this

15  manifesto as well.

16    When they were in the facility, Mr. Doucette was sent

17  to further take out some of the surveillance equipment, to take

18  out the DVRs while they got ready to do their business.  And

19  what business was that?  Ladies and gentlemen, that business

20  was to get into that vault in an attempt to get all of that

21  money.

22    Were they successful?  No, they were not.  They got

23  some of it, but it caught on fire.  And Mr. Doucette testified

24  at length about how the thermal lance rods were used and how

25  there was a fire and how there were fire extinguishers used by

1 them, how the money was wet, how the mess was created.  And you

2 saw all of those pictures describing what Mr. Doucette told

3 you.

4 And what does Mr. Murphy tell us all in his

5 manifesto, his "Master Thief" manifesto?  On Page 27, "Be

6 extremely careful when piercing the last layer of steel in the

7 vault door.  If your thermal catches fire in the vault,

8 everything could burn up and the smoke could prevent you from

9 even entering the vault."

10 All in his manifesto, ladies and gentlemen.  The

11 mirror image of what Mr. Doucette told you what occurred on

12 January 17th and January 18th of 2009.

13 Now, I am going to jump forward a little bit to the

14 search of the June 4th of 2009 Raymond storage facility because

15 you will recall that there was a GPS discovered there.  And

16 that GPS had certain addresses listed in the device itself.

17 One of which being 922 Brush Creek, Warrendale, Pennsylvania.

18 We all know that is the address of The LockUp storage facility

19 in Warrendale Pennsylvania.  1362 Essex Avenue, Columbus, Ohio,

20 we all know that's the location of the Brink's facility.  And

21 Walnut Street, Lynn, Massachusetts.  No, it doesn't say 407

22 Walnut Street, we all know that's where Mr. Murphy resided, but

23 it does say Walnut Street, and we'll get to the letters that

24 Mr. Murphy sent to Mr. Doucette.  It does not say Wipp Street.

25 Now, Mr. Doucette talked to you at length about the

1  split of the money.  They did, in fact, return from the Brink's

2  facility, and you will recall the testimony that they stopped

3  in Warrendale, Pennsylvania in order to unload the tools and

4  unload the coin, and they took the currency and the truck back

5  to the Boston, Massachusetts Greater Metropolitan Area.

6          And they split the money, they did, at Mr. Doucette's

7  house -- 50 percent for Mr. Murphy; 30 percent for Mr. Morgan;

8  20 percent for Mr. Doucette.  It all makes sense based upon

9  their prospective roles.  And 5 percent for Mr. Nassor as he

10 contributed as well when he came out to scout out the facility.

11         But something happened, ladies and gentlemen, that

12 changed things up a little bit.  No one was aware that

13 Mr. Murphy was going to be arrested on January 23rd of 2009,

14 and Mr. Morgan and Mr. Doucette, they are criminals.  So that

15 we are clear, Mr. Nassor, Mr. Doucette, Mr. Morgan and

16 candidly, Mr. Murphy, are criminals.  And when Mr. Murphy got

17 arrested, Mr. Morgan and Mr. Doucette were concerned about

18 getting caught themselves.  So they went back to the Warrendale

19 facility and then carried the loot and the tools back up to

20 New Hampshire and stored them at a place, yes, that was rented

21 for or on Mr. Doucette's behalf by Mr. Hennessey.

22         But what else happened on January 23rd of 2009?  What

23 else does the evidence reveal?  Well, the evidence revealed

24 that a search warrant was executed at Mr. Murphy's residence,

25 Government's Exhibit 6-1, ladies and gentlemen.

1        Fake I.D.s, ladies and gentlemen, were found within

2   Mr. Murphy's residence at 407 Walnut Street on January 23rd of

3   2009.  And do you remember when Mr. Murphy was beating up on

4   Ms. Robshaw?  Ms. Robshaw could care less about what's going on

5   in this proceeding.  All she does is manage a Newmarket

6   Facility and knew this man as Brian Hetherman.  And he had the

7   audacity to chastise her because his name is Brian Hetherman,

8   H-E-T-H-E-R-M-A-N on his driver's license when he, himself,

9   signed it with an "A".  And, of course, below that is the same

10  photograph, William Palavacini.

11       What else was found during the execution of that

12  search warrant, ladies and gentlemen?  The key.  The key that

13  ties -- in addition to Ms. McAlister identifying Mr. Murphy

14  here in open court -- the key tying Mr. Murphy to the LockUp

15  Storage in Warrendale, Pennsylvania.  And you will recall the

16  investigation of the unique codes on the key as testified to by

17  two of the witnesses here before you and how that led to the

18  officers to the LockUp Storage facility there in Warrendale,

19  Pennsylvania.

20       Also found, ladies and gentlemen, during the

21  execution of the search warrant was cash.  Most importantly,

22  $9,400 and change was found in Mr. Murphy's bedroom,

23  Government's Exhibit 6-6 and 6-7 respectfully, that's being

24  fanned out after being taken out of the bag.

25       Now, getting back, briefly, to the Brink's burglary

1  and all that happened inside of there, and you will recall the

2  testimony of Mr. Doucette and how smoky it was and how he got

3  sick, actually threw-up several times with the smoke emanating.

4  You don't have to take his word for it, Ken Hopkins could

5  hardly breathe, if you will recall, when he went in there

6  because of smoke and seeing the currency.

7  Government's Exhibit 1A-196. You see that's a

8  cigarette that was found by Detective Mead, and it was caused

9  to be analyzed and some DNA was found on that cigarette. And

10  when it was first analyzed, there was no matches at all with

11  anyone involved in these proceedings, but over a year later, it

12  came back to Anthony Woods who guess what? Had been residing

13  at a homeless shelter about .2 miles from the Brink's facility.

14  Isn't that consistent with certain testimony that was adduced

15  in this trial?

16  And look at the placement of that. You see, Janet

17  Mead -- or Janel Mead, J.J. Mead, Detective Mead testified that

18  it was found on a cart, similar to the one in this courtroom

19  here where we have got the evidence and files and so forth on.

20  And look how strategically placed? Right there on top of the

21  cart. It wasn't like somebody grabbed a quick smoke and

22  stomped it out on the floor and threw it away. Strategically

23  placed? Very wise. Consistent with the testimony, if you

24  will, of Robert Doucette.

25  Well, Robert Doucette also testified that he was

1   spooked, again, ladies and gentlemen, because Joe Morgan got

2   arrested on April 8th of 2009.  And now he is scared.  And now

3   he has to tell his buddy, Jim Hennessey, the trouble that he

4   may have gotten him into.  You will recall, initially, when he

5   asked for help with the storage bin, his mother had passed and

6   he was trying to move some of his mom's things, and that's what

7   he told Mr. Hennessey.  But at that point in time, after

8   April 8th of 2009, he was worried, scared and actually confided

9   to Mr. Hennesssey, do you recall, he opened up the storage bin

10  and said, Shazam!  I may have gotten you into some trouble.

11  And, Mr. Hennessey, yes, indeed, did help Mr. Doucette move the

12  tools and the coins to another location.  And then Mr. Doucette

13  got spooked again, he told you about it, he thought someone

14  might have entered the storage facility and had tampered with

15  the items therein.  And so he was concerned again and moved the

16  items again.

17        But, ladies and gentlemen, what also did Mr. Doucette

18  tell you?  He told you that he debriefed with Special Agent

19  Costello, with local law enforcement and that he told them

20  where the location of those goods were.  He took them there

21  with his attorney, he opened up the storage unit there in

22  Raymond, New Hampshire on June 4th of 2009.  And what did

23  Detective McIntosh tell you about that?  I think he used the

24  word, Jackpot!

25        And you saw all of the pictures of everything that

1   was taken out of there.  You saw the oxygen tanks -- pictures

2   of them -- they didn't retain those.  You saw the hazardous

3   material, the hogwash, as Mr. Doucette and Mr. Nassor, frankly,

4   testified about.  You saw walkie-talkies.  You saw a respirator

5   mask, welder's masks, a respirator's mask.  And lo and

6   behold -- he is going to explain it away -- you know, I painted

7   in that stuff, I used those walkie-talkies in my business, but

8   ladies and gentlemen, his DNA and his fingerprints are on this

9   stuff, along with the Brink's coins, along with the tools and

10  everything else that was in the containers.

11          Ladies and gentlemen, you saw the cell phone jammer

12  that was taken from the Raymond storage unit, the Carnival

13  Cruise Line tag, the Carnival fanny pack.  And you have the

14  evidence that Mr. Murphy and Rikkile Brown actually traveled on

15  a Carnival Cruise on November 25 of 2006, you know, the

16  Thanksgiving time frame.  So, they are tied to Carnival.

17          And ladies and gentlemen, you take this back with

18  you, Government's Exhibit 1E-8 and 1E-9, the cash that was in

19  that Raymond Storage facility.  And you will be able to see the

20  condition of that cash, and how much of it was usable and how

21  much of it isn't.

22          Now, Mr. Murphy spent a great deal of time with

23  Mr. Doucette on cross-examination, discussing with him all of

24  his goings on and everything that he was doing subsequent to

25  January 23rd, April 8th and so forth of 2009.  He

1   cross-examined him for five-and-a-half hours.  Well, what we do

2   know is what Mr. Murphy was communicating to Mr. Doucette

3   during that time frame, Government's Exhibit 13-1.  Now, he

4   sent it to Dawn Doucette -- and Mr. Doucette said Dawn was his

5   girlfriend.  Ruben Sanchez.  Not Sean Murphy.  Not Brian

6   Hetherman nor William Palavacini or whatever it is called, but

7   Mr. Sanchez.

8           Of significance, ladies and gentlemen, is what he

9   says on the last page -- the second-to-the-last page of the

10  document.  "Try to get my china to the kid whenever you get a

11  chance."  You will recall Mr. Doucette's testimony, that he

12  said that "China" was referring to the Great Wall of China

13  because of how the coins looked on those pallets.  You will

14  have pictures of how the coins looked both within that storage

15  facility and within the Brink's facility.  And you could see

16  how someone could call that a Great Wall of China.  "Try to get

17  my china to the kid whenever you get a chance.  You might as

18  well go to KFC and throw in super crispy chicken."

19          And you will recall what Mr. Doucette said about

20  that, that "super crispy chicken" was talking about the burnt

21  money.  Get his share, get Murphy's share to someone close to

22  him.

23          "As always trash or stash my letters.  They'll be

24  coming.  It is just a matter of when.  As soon as probable

25  cause is there, so will they.  Be prepared.  I wasn't totally

1    prepared and they got shit they shouldn't have.  Take care,

2    pal" -- and I won't even state what is on the bottom line

3    there.

4            This time it is Jason Departo sending a letter to

5    Dawn Doucette.  You will again have this back there with you.

6            The last page, last paragraph, "Hold down the fort.

7    You are still the last injun standing.  Whatever you are doing,

8    keep it up.  You are the last injun standing."

9            So, with respect to the letters, ladies and

10   gentlemen, lastly, Government's Exhibit 13-4, you remember in

11   the first letter he said "china".  And of course, he brought

12   Mr. Nassor on to say, didn't I give Mr. Doucette some plates or

13   something around Christmas?  You recall Mr. Nassor's testimony

14   yesterday.

15           "I'm not 100 percent sure, but the pictures the Feds

16   showed me looked like the Great Wall was a little light of some

17   coin."  The Great Wall was a little light of some coin.

18           Now, was that china dishes, ladies and gentlemen?  Or

19   was it the Brink's coins that you all know about from that

20   storage facility and from the Brink's facility?  And who would

21   be in a position to know or to even think that the coins were

22   light except for somebody who had actually been there during

23   the burglary.

24           I have talked enough, ladies and gentlemen.  The

25   charges before you are conspiracy.  The Judge will read you the

1   instructions.  The first count is conspiracy, which means that

2   we have to prove that Mr. Murphy conspired with one or more

3   persons to commit a criminal act.  And you have heard all of

4   the evidence.  You know about the agreements.  You know about

5   him sending Mr. Nassor to get the cell phone jammer.  You know

6   about him sending Mr. Nassor to scout out Brink's.  You know

7   about him and Joe Morgan traveling to Warrendale to load up the

8   tools and to take the tools there and then to retrieve them and

9   go back to Brink's.  And you know about the fact that they

10   committed the crime here.  The conspiracy is there.  It is

11   Count 1.

12         Count 2 and Count 3 alleges -- first, in Count 2,

13   that Mr. Murphy caused an individual to travel in interstate

14   commerce for the purpose of promoting and managing and carrying

15   on an unlawful activity, to promote the unlawful activity.  And

16   the Judge will instruct you as to all of the elements of that

17   offense.  But just so we are clear, that charge relates to

18   sending Mr. Nassor in interstate commerce in order to scout the

19   Brink's facility in January of 2009 to promote and facilitate

20   the offense of interstate transportation of stolen property,

21   which we all know occurred on January 17th and January 18th of

22   2009.

23         And Count 3 alleges that they traveled in interstate

24   commerce, Mr. Morgan, Mr. Doucette and, yes, Mr. Murphy to

25   commit that unlawful activity.  Well, to promote and facilitate

1   that unlawful activity, being interstate transportation of

2   stolen property.  How did they do it?  They traveled from

3   Massachusetts to Warrendale to get those tools that they had

4   dropped off two weeks prior and then go from Pennsylvania to

5   Ohio in order to commit the crime, to commit the score.

6           And then lastly, ladies and gentlemen, Count 4, is

7   the actual interstate transportation of stolen property from

8   Columbus, Ohio to locations outside of the State of Ohio, and

9   we all know that these men got money in excess of $5,000.  And

10  they took merchandise -- the postal bins, the equipment, the

11  electricals and all of that, that they put in their truck and

12  took first to Warrendale, Pennsylvania, which ultimately ended

13  up in the Greater Boston Metropolitan Area.  I appreciate your

14  time.

15          Thank you, Your Honor.

16          THE COURT:  Thank you.  Ladies and gentlemen, this

17  would be a good time for a break.  It will be ten minutes, and

18  then we will hear from Mr. Murphy.

19                          - - -

20          THEREUPON, a recess was taken.

21                          - - -

22          THEREUPON, the following proceedings were held in the

23  open courtroom out of the hearing and presence of the jury with

24  Court, counsel and Mr. Murphy:

25          THE COURT:  It's my understanding that we have an

1    issue.  Mr. Dominguez, couldn't you have mentioned this

2    earlier?

3          MR. DOMINGUEZ:  I certainly could have, and I

4    apologize for doing this now, but I just want to move in

5    limine, Your Honor.  Mr. Murphy, in his opening statement and

6    in the questioning of one of the witnesses, talked about

7    speaking with Mr. Morgan for 200 hours.  There is no evidence

8    of that, so I am moving in limine to keep him from saying that

9    to the jury and also to suggest to the jury that Mr. Morgan may

10   have made any statement to him or to anyone else about the

11   issues involved in this case.

12         MR. MURPHY:  Your Honor, and I would add that it is

13   clear that Mr. Morgan was in custody with me at Delaware County

14   for a period of five months in the same block and at the same

15   time throughout this whole case, so I mean --

16         THE COURT:  Well, we can't have you coming up with

17   your conversations, and that's why I am granting the motion in

18   limine.  And you can't go into anything that he -- you can't

19   testify for him, simply, and you also can't testify for

20   yourself because you are not going to be under oath.

21         MR. MURPHY:  And I agree.  But I would argue that

22   closing argument is not evidence, Your Honor.  They are just

23   arguments.  You have instructed the jury that none of this is

24   evidence, it is just arguments.

25         THE COURT:  That's right.  But, also, the Rules of

1  Evidence apply to what you could refer to.  In other words, if

2  it hearsay, you can't -- because it is closing argument -- you

3  can't use it because you are getting it before the jury, and I

4  can tell you that if you, Mr. Murphy, or these folks over here

5  on the other side do that, you are not going to like what I

6  have to say in front of the jury.

7          MR. MURPHY:  May I confer with counsel, please?

8          THE COURT:  Certainly.

9          MR. MURPHY:  Your Honor, there was a question that I

10  asked Mr. Doucette, I asked Mr. Doucette, was he aware that I

11  spoke to Mr. Morgan for more than 200 hours, and Mr. Doucette's

12  answer was that's more time than it took to do this crime.  So,

13  it is in evidence, Your Honor.

14          THE COURT:  That's not a basis.

15          MR. DOMINGUEZ:  No.  Mr. Murphy said, I want you to

16  be aware of the fact that I spoke with Mr. Morgan for 200

17  hours, and then that's when it elicited the response from

18  Mr. Doucette.

19          THE COURT:  You were trying to testify through the

20  witness, and it didn't work.

21          Are you ready to begin?

22          MR. MURPHY:  Yes, Your Honor.

23          THE COURT:  All right.  Call in the jury.

24          MR. GRAEFF:  Mr. Dominguez used all of his time.  Is

25  he going to get time for rebuttal?  Because he used all of his

1  time, Mr. Murphy just asked me that.

2      THE COURT:  You will both get enough time to do your

3  argument.  You will get your time you requested, and I will add

4  that onto his time.

5              – – –

6      THEREUPON, the Jury entered the courtroom.

7              – – –

8      THE COURT:  Mr. Murphy, you may proceed.

9      MR. MURPHY:  Good morning, ladies and gentlemen of

10  the jury.  I told you at the beginning of this trial that I

11  would be as quick at possible.  I apologize for the time that I

12  took with Robert Doucette, but as you know, Robert Doucette is

13  the only person that's accusing me of a crime here.

14      I shortened the trial by over a week by making

15  certain stipulations that the government has brought to you.

16  We reduced the witnesses by nine witnesses.  That's why this

17  two-week trial is ending in one week because I wanted to try to

18  get you back to your regular lives as soon as possible.  And I

19  appreciate the time that you have dedicated to this case.

20      Ladies and gentlemen of the jury, you have heard

21  about these Lynn Breakers and my business.  I tried to make

22  legitimate business when dealing with these guys.  You heard a

23  lot about the Lynn Breakers who were trained by my security

24  consulting company.  Well, ladies and gentlemen of the jury, so

25  was the FBI.  And I am kind of appalled that I was

1  double-crossed, that they would use my information against me

2  here at trial, but I have to live with it.

3       I don't discriminate who I do business with.  I ran a

4  successful business financially.  You can check my business

5  records.  The government has them in Government's Exhibit 3.  I

6  ask you to look at the beginning of that, all the deposits and

7  the checks that were put in there.  I had plenty of money.

8  When I am talking plenty of money, look, ladies and gentlemen

9  of the jury, I had in a three or four-month period, a

10  five-month period of time, I had a couple of hundred, two or

11  $300,000 in my account, okay?  That's letting you know that I

12  don't need to go out and make money.  I am making money on my

13  own through my businesses.

14       And there is two other business accounts that you

15  don't have.  You heard that I owned two moving companies, the

16  Northshore Movers of Lynn and the Millennium Movers.  You don't

17  have those two bank accounts.  Those are two successful

18  businesses.  I had money.  I am not a greedy person.

19       You heard testimony and seen exhibits that my company

20  provided jammers.  That's what we do.  My security consulting

21  company would provide jammers.  You heard testimony that

22  Mr. Nassor after he said he purchased a jammer, which is

23  Defense Exhibit 8, that he purchased a jammer, the response

24  from them was that, go through the Northshore Company.  Well, I

25  was technically an authorized distributor from them because

1    they were dealing with me, and they wouldn't deal with the

2    general public.

3            Were we getting them illegally?  Yes, we were.  What

4    is the punishment for getting caught with a jammer in the

5    United States?  Under FCC law, it is a $500 fine.  There is not

6    even any jail involved with it.  It is just contraband, and

7    they don't want them in.

8            Did we make a profit for selling these devices?

9    Absolutely.  If somebody wanted to buy a jammer, if it cost us

10   $3500, we would make $500, $600 off of it because we are taking

11   the chance, we are going to the problem of getting them into

12   the United States so they could have them and use them.

13           You heard that I had the big 100-watt jammer.  Here

14   it is right here (indicating the exhibit), the one that the

15   government entered into evidence.  I also entered it into

16   evidence.  That is my jammer.  I use that as a part of my

17   training course.  I would train the guys and tell them how it

18   worked, explain how it is hooked up --

19           MR. DOMINGUEZ:  Objection, Your Honor.

20           THE COURT:  Sustained.

21           MR. MURPHY:  Several of these Lynn Breakers have

22   asked me to use my jammer.  I never lent it out to anyone,

23   ever.

24           And you also heard from Mr. Doucette that my jammer

25   didn't go to Ohio, you heard that, and that's key.  Why would I

1   go do this and not bring my own jammer?  Why would I need to go

2   buy another jammer?  I don't need to, and I had the best one.

3   That's a 100-watt jammer.  The other ones that they are talking

4   about are only 10-watts.  Mine was the biggest one.  It didn't

5   go to Ohio and neither did me.

6           And, also, you heard from Mr. Doucette that he put

7   this jammer in the Raymond storage facility.  That was dirty.

8   It didn't go to Ohio, it wasn't part of the booty, yet before

9   he was going to turn this stuff into the FBI and do it, he puts

10  that jammer into the storage facility.  That's the only piece

11  of evidence, out of all of their equipment that was in there,

12  that was actually tied to me.  He puts it in there.  That's

13  tampering with evidence, ladies and gentlemen of the jury, and

14  that's what I told you at the beginning of this trial about

15  tampering with evidence.

16          And you have heard testimony that other people owned

17  these tools.  Mr. Doucette told you, clearly, all of the tools

18  are Murphy's, they are all Murphy's -- Murphy's, Murphy's,

19  Murphy's.  Well, ladies and gentlemen of the jury, you heard

20  from Mr. Nassor that all of the welding equipment was his and

21  all of the welding clothes were his.  And you also heard that

22  Mr. Nassor, Mr. Enquist and Mr. Morgan stole all of the oxygen

23  tanks that they used for the thermal rods.  And then you heard

24  that Mr. Doucette actually admitted to buying this

25  electromagnetic drill press, the one that he took out of

1  storage so that the FBI couldn't find it because it had serial

2  numbers on it, and he didn't want them to find out that he

3  purchased this.  He also purchased -- but, oh, then when I

4  questioned him on it, he said, well, you paid for it.  And then

5  we asked him about the RV cover to cover the truck.  He

6  admitted to buying the RV cover.

7         Ladies and gentlemen, it is clear that these guys

8  were gearing up to do this and not all of the equipment was

9  mine.  They bought all of these items, and it has been

10 established.

11        You heard about the thermal rods that Mr. Morgan

12 purchased at this place where we showed you the receipt.  I

13 believe it is Defendant's Exhibit -- I believe that I have it

14 here -- I may not have it here.  But you have seen the receipt,

15 where it said "John".  And you heard Special Agent Costello

16 state that, oh, yes, I remember Joe Morgan's alias, John Lynch.

17 Mr. Morgan bought the thermal rods.

18        Now, these are all of the tools that we used at the

19 Brink's facility, and they are all purchased and bought by

20 somebody else.  Yet, Mr. Doucette says, they were all Murphy's.

21        As for that Carnival tag that was on that bag, was it

22 mine?  I don't know.  Could it have been?  Possibly.

23        When the Y2000 Quad came in from Memphis, when it

24 came in, we had to test it to make sure that it worked properly

25 so we didn't have to send it back.  We set it up and tested it.

1          MR. DOMINGUEZ:  Objection, Your Honor.

2          THE COURT:  You are testifying.

3          MR. DOMINGUEZ:  Thank you, Your Honor.

4          MR. MURPHY:  And when it was time to go out --

5          THE COURT:  No.  You don't testify as to something.

6          MR. MURPHY:  Okay.

7          THE COURT:  You can comment on the evidence.

8          MR. MURPHY:  Okay.

9          THE COURT:  And argue what that means.

10          MR. MURPHY:  Okay.

11          THE COURT:  The objection is sustained.  The jury

12    should not hear the answer nor attach any meaning to the

13    question, either.

14          MR. MURPHY:  Thank you, Your Honor.

15          The crime clothes.  You heard about the black

16    jumpsuits, the ninja masks, the rubber galoshes.  You heard

17    Mr. Nassor say that these crime clothes are reused, and they

18    stay with the tools.  You heard his testimony on that.

19          However, you also realize that the FBI didn't find

20    them in that bin.  So, if they are reused and they are kept

21    with the crime tools and they are gone -- you heard

22    Mr. Doucette said he took them out of there.  Why would he do

23    that?  Because you also heard that the crime clothes have DNA

24    on them.  The DNA would establish who actually wore those

25    clothes.  Well, Mr. Doucette took them out and destroyed that

1  evidence.

2          You also heard testimony that Mr. Doucette and

3  Mr. Nassor have rented trucks off of me several times in the

4  past.  Mr. Nassor did it when he moved from Salem to Petersham,

5  and Mr. Doucette has done it several times through all of the

6  moves he had.  They rent trucks from me.  That's what my

7  company does, we rent trucks for $300 a day.  We can move you,

8  but we also rent the trucks.  You have heard that testimony.

9          You heard testimony from Newmarket Storage that my

10 company actually rented fully-equipped moving trucks to

11 customers.  We have it as an exhibit from the letter that was

12 written to Newmarket Storage, which you will have it.  It is in

13 the government's, but I only have a few exhibits.  But this is

14 the letter that explains the services that our company

15 provided.

16         You heard testimony that my DNA was on the painting

17 respirator.  You also heard Mr. Nassor say that he seen me

18 painting my warehouse with that painting respirator.  And then

19 the government asked Mr. Doucette, did you see this painting --

20 did you see this respirator used?  And Mr. Doucette said, I did

21 not.  So, it is not -- it wasn't used in the crime and my DNA

22 was on it, but it is because I had painted my warehouse, and my

23 warehouse was closed in and there was no ventilation, so I

24 needed the respirator so that I wouldn't inhale the fumes.

25         You heard testimony where Mr. Doucette said that, oh,

1    Morgan took Murphy's share.  You remember when I was

2    questioning him on that?  I said, you know, did you ever have

3    any of Murphy's money?  No, Morgan might have had.  But then

4    you heard the testimony of Special Agent Costello that he said

5    Doucette told him that he had it, that actually Doucette had

6    the money.  That's contradicting testimony.  I never got any

7    money.

8         You heard testimony that Doucette and Nassor and

9    Morgan are all experienced, professional burglars.  You heard

10   testimony that they have all taken my course.  But then you

11   hear Mr. Doucette say, oh, this is my first burglary, and I

12   don't know anything about it.  But didn't he explain things to

13   you in detail with sophistication of knowing how to commit all

14   of these crimes and how this was used and how that was used?

15   But this was his first burglary, and he has never done it

16   before.  Please.

17        You heard testimony from Mr. Nassor that said that I

18   never told him that I was going to do this crime.  Then, you

19   heard the testimony that I told him that I never did it.  He

20   spent time with me after, and I never admitted to him that I

21   did this crime.

22        I was arrested on January 23rd in my house.  I got

23   arrested for the fake I.D.s, that's what I was arrested for.

24   You heard testimony that we use fake I.D.s when renting trucks

25   and storage bins.  In the past we have had problems doing that,

1  renting bins and people going and doing --

2         MR. DOMINGUEZ:  Objection.

3         THE COURT:  Sustained.

4         MR. MURPHY:  In any event, we needed to use the fake

5  I.D.s to distance ourselves.

6         THE COURT:  To do what, sir?

7         MR. MURPHY:  To distance ourselves, Your Honor.

8         THE COURT:  Distance ourselves, okay.

9         MR. MURPHY:  You heard testimony that I rented the

10 Pennsylvania storage bin, yes, I did.  That's what we do, we

11 rent bins.  If you, yourself, were going to move and you were

12 going to move somewhere and your house wasn't ready or you

13 weren't ready to do something and you needed to put your stuff

14 in there, we would rent a bin, and you could do it and hold

15 your stuff over until your house was ready.  And then you could

16 move your stuff from the storage into the residence that you

17 were in.

18        Or in another situation, if you actually had lived

19 your life and you had a big family, and you were downsizing --

20        MR. DOMINGUEZ:  Objection, Your Honor.

21        THE COURT:  Okay.  You are starting to go on.

22        MR. MURPHY:  You heard testimony from Special Agent

23 Costello, I knew Doucette had cooperated in the past.  I was

24 not really allowed to introduce fully into that evidence, but

25 the evidence did reflect that.  Nassor admitted to cooperating

1   in the past.  Why would I get involved with these guys if I

2   knew they had cooperated in the past?  Why would I go out and

3   do a crime with them and do it if I know that in the past they

4   have cooperated with the police and they have told?  That makes

5   no sense.  It doesn't matter what they do on their own or what

6   I teach them to do what they wanted to do.  But if I knew they

7   cooperated, it doesn't make sense that I would actually go and

8   get involved with them in a crime.

9           And didn't you notice that Doucette put everything on

10  me?  Anytime something happened, he said:  Murphy, Murphy,

11  Murphy.  And then up until the time I got arrested, then he

12  started saying:  Morgan, Morgan, Morgan.  Morgan rented the

13  Lynn storage bin.  Morgan did this, Morgan took that.  And then

14  when Morgan got arrested, he was kind of stuck on his own.

15          When I was asking him about the electromagnetic drill

16  press that's missing from the storage bin and all of these

17  other things, now he knows that he is on his own, he has nobody

18  else to blame it on, and he comes up with the lame excuse,

19  well, maybe somebody went in there and took it, I don't know.

20  And I asked him, well, gee, you know, why wouldn't they take

21  the hundreds of thousands of dollars in there instead of going

22  through the bags and taking tools that you bought that you

23  thought would tie you to the crime.  He didn't have an answer

24  for that, he couldn't blame that on me at the time.

25          You heard testimony that both Nassor and Doucette are

1     drug users.  You also heard a partial testimony of how I was

2     trying to introduce evidence of how Mr. Doucette went into my

3     warehouse and took certain items.  If you remember right in my

4     opening, I told you that I was going to prove that these guys

5     committed felonies against me.  Well, we do have evidence of

6     that, ladies and gentlemen of the jury.

7         If you look at Government's Exhibit 13, these are the

8     letters from me to Doucette.  Either the first or the second

9     letter, these specifically explain how Doucette went into my

10    warehouse and took items he wasn't supposed to.  Where did they

11    go?  What's going on?  It is all explained in there, okay?  I

12    wasn't allowed to introduce it, but the government did it for

13    me through the letters.  So, read the letters from me to

14    Doucette, and you will see how Mr. Doucette committed a felony

15    against me by going in and rifling through all of my customers'

16    boxes and taking whatever he wanted.  When did he do this?  He

17    did this after he cooperated with the government.

18         MR. DOMINGUEZ:  Objection.

19         MR. MURPHY:  The letters are self-dated.

20         MR. DOMINGUEZ:  Objection, Your Honor.

21         MR. MURPHY:  The letters are self-dated.

22         MR. DOMINGUEZ:  There is nothing in that letter when

23    Mr. Doucette supposedly invaded Mr. Murphy's space.

24         MR. MURPHY:  The letters are dated and postmarked,

25    Your Honor.

1          THE COURT:  What letter?

2          MR. MURPHY:  The letter from Mr. Doucette.

3          MR. DOMINGUEZ:  From Mr. Doucette?

4          MR. MURPHY:  No, from me to Mr. Doucette.  They are

5    postmarked.

6          MR. DOMINGUEZ:  Show them.

7          MR. MURPHY:  Can I stop my time to do it?  I am

8    arguing.

9          THE COURT:  Well, I will give you the time to do

10   that.

11         MR. MURPHY:  Okay.  This is Government's Exhibit

12   13-2.  See where it is postmarked July 31st of 2009.

13   Mr.Doucette cooperated in April, and he gave his statement in

14   June.  So, this is after the government -- after he had

15   cooperated with the government.  If you want to get to it, it

16   says it right here:  "I need to know whoever went down to the

17   warehouse and went through my people's stuff.  We are missing

18   some of the plastic bins with the name Tyler on them.  Some of

19   the bins were emptied.  Someone took down the orange fencing

20   around Diaz's stuff.  Kristin acknowledges that there was a

21   mess before, but I gave you the keys to the warehouse so you

22   could clean it up.  I asked you to handle this for me.  I never

23   got it done.  I had a problem.  But the place is a mess.  I am

24   missing stuff.  Chuck said you took and now other customers'

25   stuff is missing, I didn't foresee that happening."

1    And it goes on afterwards, I don't want to waste my

2   time.  But that is the evidence, ladies and gentlemen of the

3   jury.  This theft happened after he started cooperating.  And

4   he must have thought that he had the golden

5   get-out-of-jail-free card because he can go commit felonies and

6   not have to worry about going to jail.

7    You also heard from Mr. Nassor saying I sued him for

8   damage that he committed to my property, that I got a judgment

9   against him.  You also heard that I could have filed criminal

10  charges against him, which were felonies, but I didn't.  I told

11  you that two witnesses would come in in the beginning of this

12  trial who had committed felonies against me after this crime.

13   You heard testimony that the government introduced

14  money that was found at my house.  There were two actual places

15  where money was.  I had $2500 in my pocket and some change, and

16  there was approximately $10,000 in my bedroom.  You heard

17  testimony from Mr. Nassor that I pay my movers in cash, that's

18  how the moving business works.  At the end of the day, they get

19  paid in cash.  You heard that testimony.  Then, I asked Special

20  Agent Costello on the stand, did you receive any information

21  that Mr. Murphy pays his workers in cash?  And he said, yes, I

22  have.  Okay?

23   You have got 15 guys out there during the day, each

24  making $15 an hour, at the end of the month, everybody moves at

25  the end of the month.  You got to have -- if they work all

1   week, $10,000 wouldn't even cover all of the payroll to do it.

2   Then, you have to pay for diesel and everything else.  This

3   money was legitimate money that we had.  I didn't have $150,000

4   or $100,000 in cash, no.

5          And further, ladies and gentlemen, as you may or may

6   not know, when money gets spent, it goes to the treasury.  The

7   treasury records all of this money as it goes through, the

8   serial numbers.  So, the treasury knows where each money has

9   been spent the last time it was spent.  The government knows

10  this, okay?  They haven't allege that any of the money that was

11  found in my house came from the Columbus area because it

12  wasn't, okay?  They had the ability to determine where this

13  money was last spent and where it came from, and they didn't

14  introduce any evidence of that because it wouldn't have

15  supported their theory that this was Brink's money because it

16  was not.

17         At the beginning of this trial, I told you that I was

18  going to catch two witnesses lying repeatedly.  I told you I

19  wasn't going to be able to catch all of the lies because that's

20  tough to do.  But I was going to catch enough of them to where

21  I believe I told you that you are not going to be able to

22  believe a word that they say.  Well, we are going to review

23  those lies now.  Some of you may not have caught them all, but

24  I certainly did.

25         Mr. Doucette said he didn't recall when he gave me

1  the Brian Hetherman I.D., it was probably within five years.

2  He said that he gave me the Brian Hetherman I.D. information.

3  But aside from that, Mr. Doucette also said that he has only

4  known me for seven or eight years, okay?  It is 2011.  If we go

5  back seven or eight years, we are talking 2003, maybe 2002.

6         But then you also heard the testimony from Sue

7  Robshaw up in Newmarket Storage in New Hampshire, and she said

8  that me and my company had did business with them prior to when

9  she was manager.  She took over around 2001.  She says, yes, we

10  did business as Millennium, which was one of my companies, but

11  she says before that, it was just straight Brian Hetherman.

12         So, if Rob Doucette is claiming that he gave me this

13  Brian Hetherman information somewhere between 2003 and up,

14  whatever, you know, we can use from the five years or the eight

15  years that I knew him, how could Sue Robshaw have known or done

16  business with Brian Hetherman prior to that?  He lied.

17         Again, Doucette said that all of the tools belonged

18  to me when we have established through the testimony and the

19  evidence of this trial that all of the tools didn't belong to

20  me.  That was another lie by Mr. Doucette, trying to pawn it

21  all off on me:  Murphy, Murphy, Murphy.  He is the one that's

22  accusing me, and that's what he did.

23         Doucette initially indicated that had he took my

24  professional burglar's course --

25         MR. DOMINGUEZ:  Objection.  That's not what he

1   testified.  As a matter of fact, he said, I am surprised you

2   knew about one or had one, he didn't know about the course.

3   Don't misstate the evidence.

4          THE COURT:  Sustained.

5          MR. MURPHY:  He described extensive knowledge in

6   elite burglary to you.  Nassor said that Doucette was an

7   experienced burglar.  Doucette said that this was his first

8   burglary.  Lie.

9          Doucette said that through the government's

10  questioning when he first did it, that Murphy didn't lend him

11  any fine china, but Mr. Nassor says he was there and he

12  witnessed when it happened.  Mr. Nassor was a witness that the

13  government provided.

14         Mr. Doucette said that the three $400 checks from me

15  were loans.  And he denied that they were for weed, marijuana.

16  Yet, Mr. Doucette sold weed or marijuana at $400 an ounce,

17  ladies and gentlemen of the jury.  Another lie by Mr. Doucette.

18         Doucette said that the tools were at my warehouse in

19  Lynn.  Nassor said that they were up in Newmarket Storage.

20  They can't be at both, they had to be at one or the other.

21         Doucette said that the tools were dropped off one

22  month to five weeks before the January 17th burglary.  You

23  heard that.  He said maybe a month, up to five weeks.  The

24  Pennsylvania storage bin was rented on January 3rd, only two

25  weeks prior.  Somebody has got their stuff wrong.  And Doucette

1  seemed to think that he knew what he was talking about.

2  Another lie.

3  Doucette first called the rent-a-car a Voyager. In

4  all of his prior statements he called it a Voyager. But by the

5  time he got here to trial, it is now a Journey. Okay? He

6  freely talked to the government and reviewed his testimony and

7  got ready for trial, and yet prior he says it is a Voyager, but

8  now when he comes to testify at trial, now, it is a Journey.

9  Doucette testified that I went to the Pennsylvania

10  storage facility when the tools were actually being loaded or

11  unloaded. I am not sure what he said. Because the gate was

12  open, Murphy went in to speak to the manager. That makes no

13  sense whatsoever. And did you hear Ms. McAlister testify to

14  anything about that? She was clear -- and I was very

15  surprised -- she remembered me from two-and-a-half years ago

16  from a ten-minute encounter. I mean, I thought that was -- I

17  think with a memory like that, she should work for NASA. And I

18  am not denying that I didn't do this, that I wasn't there,

19  because I did rent the bin. However, I was very surprised she

20  remembered that because that's like saying to you, do you

21  remember the waitress at Applebee's two-and-a-half years ago

22  when you had dinner? I was like, wow. Therefore, would she

23  have remembered if Mr. Murphy went in there and questioned her

24  about why the gate was open? That never happened, ladies and

25  gentlemen of the jury. That's another lie by Mr. Doucette.

1          Doucette in his initial testimony, he said that

2    Morgan pulled the armored car out of the Brink's building, he

3    said that.  And then when he was confronted with it and showed

4    the picture, he said, no, no, no, I meant that he pulled the

5    moving truck out and the armored car was moved within it.

6    That's another lie, ladies and gentlemen of the jury.

7          Doucette said the crew came back to Lynn on

8    January 18th.  First, he said that they got back at eight

9    o'clock.  And then when he was confronted with his timeline, he

10   said, oh, maybe it was about midnight.

11         Doucette said that Morgan rented the Lynn U-Haul

12   storage bin.  Again, putting it on someone also.

13         And getting to that, the government, when they were

14   closing, they said -- they said Murphy opened bins and rented

15   trucks in other people's names.  Did Mr. Doucette do the exact

16   same thing with Mr. Hennessey?  He did it twice.  Mr. Hennessey

17   rented two trucks for him and rented a bin.  The government

18   says, oh, yeah, look at Mr. Murphy for that.

19         Doucette said on the stand that the FBI told him that

20   Joe Morgan gave him the information.  That's what he said.

21   When I asked him, I said, who told you -- when the FBI

22   questioned you, did they tell you where they got their

23   information from?  Yes, Joe Morgan.  Agent Costello denied that

24   vehemently.  That was another lie.

25         Doucette said that he was up for 100 hours.  How

1   could he think straight?  I was up for over 100 hours.  But yet

2   the testimony in this case, ladies and gentlemen of the jury,

3   came back and said that he slept in a motel or a hotel on

4   January 16th on Friday, okay?  That means he would have woken

5   up Saturday morning.  He was saying he was back Sunday night.

6   That's like 24, 36 hours at the most before he was back home,

7   according to his testimony.  His own testimony is inconsistent.

8        We have heard a lot of implications of trying to

9   determine that this trip actually kicked over until Sunday and

10  Monday based on the mileage and other stories, and I will get

11  to that in a little bit.  But right now, Mr. Doucette saying

12  that he was up for over 100 hours just couldn't possibly be

13  based on what he testified to and what the evidence was.

14        Oh, so -- just so Doucette admitted that my big

15  cellular jammer didn't go to Ohio, and then he came up with a

16  cock and bull story about how it actually got into the bin.  It

17  went from here to there to here -- another lie.  He put it in

18  there directly.

19        Doucette said that he only got $40,000 for this

20  crime.  But, ladies and gentlemen of the jury, you seen his

21  demeanor and his answers when I questioned him about the

22  missing $600,000.  Do you remember when I was going over that

23  with him?  Saying, gee, Mr. Doucette, where is the extra

24  $600,000 that is missing?  He starts coming up with, oh, oh,

25  you seen us burning money in your kitchen.  Well, none of his

1    prior statements say anything about burning money.  Agent

2    Costello never acknowledged that Doucette ever said anything

3    like that to him.

4         Then, you heard him say, oh, there was a missing bag

5    of money from the storage bin.  When I went up there, the key

6    was missing.  There was a bag missing.  He is trying to give

7    you an excuse of where this money went.  Doucette was the money

8    man.

9         There is a lot, a lot of money missing from this

10   crime -- $853,000 total unaccounted for in this crime.  You

11   have seen the bottom number right there -- net loss -- 850.

12   Did some it possibly get burned that was less than 50 percent?

13   Yes, some of it.  But Brink's had internal recoveries.  They

14   recovered a lot of their money from certain things that were in

15   that vault.  Mr. Doucette got a lot more money than he

16   testified to here in this case.  Again, which would have been a

17   lie to you, the Court and the jury.

18        Doucette says that Nassor was at his house counting

19   the money, you heard that testimony.  First, he told a story

20   and then at the very end, oh, I forgot something, he said

21   Nassor was there for two of the days counting money, and that

22   he got money.  And then you heard Mr. Nassor's testimony, that

23   he never even saw any money, never mind that he was there

24   counting money or whatever.  And why would Mr. Nassor have to

25   lie?  He had the best deal going, he didn't even get charged.

He got the free ride.  Doucette got charged, but Nassor didn't.

So, Nassor could have come in and told you guys anything he

wanted and admitted to anything he wanted, and he wouldn't have

been held accountable for it.  But Nassor says he never even

saw any money, but Doucette is saying that he was there

counting money and got money.  And we have testimony, we have

two of the government's witnesses saying something different.

Lies, lies, lies.

And, again, just to review over the lies, Doucette

said that -- Doucette told the FBI that he had my money and

then denied it and said that Morgan had my money.  Again, just

another lie.

Doucette said that James Hennessey had no idea about

the Brink's crime until he opened that storage bin.  You heard

that testimony.  I went over it and made sure that it was

clear.  That he is saying that -- you heard from Mr. Nassor

that Mr. Hennessey is a part of this criminal organization, the

Lynn Breakers, that he is part of the criminal activities.

Well, Mr. Hennessey rented two trucks from Mr. Doucette, and he

rented the storage bin and he helped him move it.  If you

believe Mr. Doucette when he said Hennessey had no idea what

was going on, I have a bridge in Brooklyn, and I am selling it

real cheap.  Come on.

Now, ladies and gentlemen of the jury, you are going

to hear part of this argument and part of this testimony which

1   is logical, and you have to take it for the facts as they are.

2   Doucette said that he went to the Pennsylvania storage facility

3   to pick up the coins and the tools either on January 24th or

4   25th.  That was his testimony.  I got arrested on the 23rd.  He

5   said they went out to the Pennsylvania storage facility to pick

6   up the coins and tools.

7         Ladies and gentleman of the jury, that was absolutely

8   impossible.  There is no way, physically, that they could have

9   went to that Pennsylvania storage facility and got in that bin

10  to get their stuff that Doucette said was in there.  Why

11  couldn't Doucette and Morgan -- or whoever went in there -- I

12  wasn't there, I was in jail on the 23rd.  They went after that.

13  Why couldn't they get in that bin at all?

14        I am going to tell you why.  Because on January 23rd,

15  the FBI had the key.  It's a specialized key.  The government

16  showed you, it is in their evidence.  It is one of those Abloy

17  keys, it cannot be duplicated.  You cannot take it to a

18  locksmith and duplicate it.  On the 23rd, the FBI had the key.

19  They could not get in.

20        You have heard testimony about this case, about an

21  Ohio storage bin in Eastern Ohio that was just over the border.

22  Ladies and gentlemen of the jury, I suggest to you that there

23  was an Ohio storage bin, okay?  We are going to get into that a

24  little bit further, and I will tell you what happened on that

25  second night of that crime that Mr. Doucette wanted to avoid

1  like the plague, okay?  But be clear, they could not get in

2  that storage bin after January 23rd.  The FBI had the key.  So,

3  Mr. Doucette's story about they went up and picked it up from

4  the Pennsylvania storage bin is a lie.

5          You heard Mr. Doucette say that I didn't have a

6  security consulting company.  Well, we have evidence of that,

7  ladies and gentlemen of the jury, and I have showed it to you

8  before.  I am going to show it to you again (indicating).  This

9  is from the City Zoning of Lynn, a Board of Appeals decision.

10  This says for security consulting business.  You have the bank

11  records of Angel One Corporation.  That's the security

12  consulting company.  In order to open up a bank account, you

13  need a bunch of different legal documents to do so.  You need a

14  tax ID number from the federal government.  The bank will not

15  let you open a business account without a tax I.D. number.  You

16  need a --

17          MR. DOMINGUEZ:  Objection, Your Honor.

18          THE COURT:  Sustained.

19          MR. DOMINGUEZ:  You are testifying.  If you want to

20  take the stand, you can testify all you want.

21          MR. MURPHY:  You heard testimony that we were trying

22  to determine what type of tool cut out those panels in the

23  roof.  Well, you heard Mr. Nassor say it was either a skill saw

24  or a Sawzall.  Neither one of those tools were found in the

25  Raymond storage facility, but yet another tool that was removed

1   by Mr. Doucette.  Okay?

2          I think it is pretty clear, ladies and gentlemen of

3   the jury, that Mr. Doucette has manipulated this case.  He has

4   lied repeatedly, repeatedly in front of you.  He got caught.

5   Could he get caught for all of them?  No, I told you, he

6   couldn't get caught for all of his lies.  But I believe he got

7   caught on enough of them to where you can say, do I have to

8   believe everything Mr. Doucette said?  Absolutely not.

9          Now, you also heard testimony that Mr. Doucette

10  withheld information.  I told you that at the beginning of this

11  trial, and we tried to determine whether or not Mr. Doucette

12  had told the government in prior statements or testimony about

13  certain things.  We are just going -- I am just going to run

14  over them briefly, I am not going to go -- he was asked about

15  the Ohio storage bin, he didn't recall.

16         He was asked about the money counter, the thing.  Did

17  you talk about the money counter in prior statements?  I don't

18  recall.

19         The holiday weekend preference.  He testified that

20  Murphy had a holiday weekend preference.  We asked if he

21  testified, again, in prior statements or anything, he said, I

22  can't recall.

23         He talked about Murphy wanting to do the least amount

24  of traveling with the tools.  Again, he couldn't recall if he

25  put it in prior statements.

1    This was the big one -- the DNA trip.  They asked if

2  Mr. Doucette had told him about this DNA trip prior.  This was

3  big.  You know, if something -- oh, they did a DNA trip, and

4  they went and did this.  He never said anything about it to the

5  police when he was interviewed.  He never said anything about

6  it in his Grand Jury testimony.  As a matter of fact, it didn't

7  even come up until the government had actually found out that

8  new DNA was in there, in the building, and that they had

9  identified this person, Mr. Woods, and they ran a check.  You

10 heard Mr. Trombitas say that they had ran a check and found out

11 that he stayed in these homeless shelters and this and that.

12 And now, all of sudden just before trial, Mr. Doucette is

13 testifying about this DNA trip, okay?

14    The government has my course, my professional

15 burglars' course, that the government took and that the Lynn

16 Breakers and these other people took.  Does it say anything in

17 there about a DNA trip, or that you should do this or should do

18 that.  If I actually thought it was a viable thing and that it

19 was something, it would be in there to teach people how to do

20 it, but it is not in there.  The first time you hear anything

21 about this is at trial when Mr. Doucette brings it up after

22 they have already found someone else's DNA in there.  Do I know

23 how this guy's DNA got in there?  No, I don't.  Do I know if he

24 was involved in that?  No, I don't.  And I am not trying to

25 claim that there is someone else involved or that there was a

1    Columbus connection or there wasn't, I am not saying that. I

2    am just very suspicious of the story of this DNA trip.

3         Mr. Doucette was asked about, did he tell them that

4    the Brink's camera was smashed down? He couldn't recall.

5         And here is another one, ladies and gentlemen of the

6    jury. You remember Mr. Doucette claiming that I said, we

7    "Murphed" the building? That would be big. If that had

8    actually happened or that had actually been said, this would

9    have been something he would have told in a prior statement or

10   a prior Grand Jury or Mr. Costello, the FBI. And when I asked

11   him, Mr. Costello, what about this statement? He said, I have

12   never heard that before. That's Mr. Doucette throwing me right

13   into the picture again with a statement that never occurred.

14        Mr. Doucette is talking about the procedure about how

15   opening the guard doors and the armored car doors, and again,

16   not any prior statement, any Grand Jury and Mr. Costello

17   testified that, no, he didn't tell me that, he just told me

18   that, you know, you knew how to get in the trucks. But

19   Mr. Doucette was quite clear in his testimony to saying, oh,

20   Murphy said this and Murphy said that. He didn't say it

21   before.

22        Mr. Doucette talked about these makeshift leather

23   coats that he had. The government brought them out, the

24   clothing that Mr. Nassor stated was his. Mr. Doucette never

25   testified about any makeshift leather coats at his prior

1  statements or the Grand Jury.  Again, new information coming up

2  only at trial.

3          And you know, ladies and gentlemen of the jury, from

4  your own experience, you would generally remember something

5  more when it is closer to the incident.  In this incident,

6  closer to the crime.  So, if Mr. Doucette gave statements

7  within six months of this crime happening, four and six months,

8  and he testified in that area, he remembered more clearly what

9  happened at that time period than three years later when he was

10 getting ready to go to trial.  You know, you will hear my

11 theory on that soon, too.

12         Mr. Doucette testified that they carried the fan to

13 the roof -- not in a prior statement, not in prior Grand Jury.

14 I asked him about it.  "I can't recall" was his answer.

15         He claimed that Mr. Murphy went in this vault.  Can

16 you believe that?  He didn't state it in any prior statement.

17 That would have been big, too -- gee, Murphy went in this

18 vault.  No prior statements.  No Grand Jury.  No anything about

19 Murphy going in this vault.  You heard testimony that they

20 couldn't even see in the vault.  The smoke was so thick and so

21 inundated in there, that you couldn't even see in there.  How

22 could somebody live for more than one breath in that vault?

23 That was a lie, having him trying to put me directly there and

24 in that vault.  Didn't happen.

25         The Lynn U-Haul storage bin.  The FBI didn't hear

1  about that until a couple of months before trial.  They didn't

2  know anything about it.  All of a sudden, just before trial,

3  here it comes.  It came into being, another fact that

4  Mr. Doucette withheld from the FBI.  Didn't tell them about it,

5  okay?  They are getting ready to go to trial, and all of a

6  sudden, we have got this U-Haul storage facility in the

7  picture.

8       Mr. Doucette did not tell the FBI that he bought this

9  electromagnetic drill and he did not tell the FBI that he

10  bought the RV cover, he didn't say anything to them.

11       Now, when I tried to tie -- as I say, when I tried to

12  tie Rob Doucette down as to whether he mentioned these details

13  in prior statements, he answered them all with, "I can't

14  recall".  Do you remember that?  That was his answer.

15       Ladies and gentlemen of the jury, that is what a

16  professional witness would say on the stand.  Like a police

17  officer, when you are trying to tie a police officer down to a

18  question, he says, I can't recall.  Doucette is not a

19  professional witness.  He is an idiot, okay?  And I would

20  suggest that his answers in that were coached, okay?  Because

21  he doesn't -- he is not a professional witness, and he doesn't

22  know how to answer things on the stand, him answering in that

23  fashion, that means he was told to do so.

24       MR. DOMINGUEZ:  Objection, objection.

25       THE COURT:  Sustained.

1    MR. MURPHY:  And as I told you, ladies and gentlemen

2    of the jury, that DNA trip story causes me great concern.

3         Now, we have evidence -- I told you that we were

4    going to prove that Mr. Doucette withheld evidence.  I told you

5    that was -- that was the withholding the information.  Now, we

6    are going to talk about the evidence that he withheld.  He

7    withheld the electromagnetic drill that was taken out of the

8    storage bin, he did not give that to them, that he bought.  He

9    withheld the Sawzall that cut the roof.  He did not give that

10   to them.  He withheld the grinder that he admitted was there

11   and used but was not in the storage facility.  He withheld

12   that.  He withheld the crime clothes.  He withheld the DVRs,

13   the video of this crime.  He withheld this information.  And,

14   of course, he withheld the missing $600,000 from this crime.

15        And in conjunction with withholding them, he

16   destroyed the Brink's videos.  You heard him testify that I

17   didn't tell them to do it.  He withheld the Digital money

18   counter and destroyed that.  He destroyed the crime clothes,

19   and he destroyed the coin racks that these coins were on.

20        Now, if Mr. Doucette is so ready to manipulate all of

21   this evidence, why wouldn't he manipulate his testimony, too?

22   Of course he would.

23        He was setting up what he was going to do.  The FBI

24   go and see him on April 8th.  Within a couple of weeks, he has

25   his lawyer contacting the FBI.  So, from April 8th to a couple

1   of weeks after, he is ready to cooperate.  Yet, now he is

2   moving the evidence from bin to bin to bin.  Why does he need

3   to move any of the evidence and to do anything, if he is ready

4   to cooperate and give it up?  He was determining what evidence

5   he was going to give the FBI that would support his story.

6   There is no other excuse for it, there is no other reason for

7   it.

8           He first gets approached on April 8th.  He is going

9   to cooperate within a couple of weeks, but yet he is moving

10  everything around and taking stuff out and doing everything he

11  wants with it because he wants to set everything up perfect, so

12  that the story he is going to give the FBI coordinates with

13  what he is going to tell them.

14          How many lies does someone have to tell before you

15  don't believe a word that he has to say?  And I suggest to you,

16  ladies and gentlemen of the jury, from the evidence that you

17  saw, that the government knows Mr. Doucette lied.  They know,

18  but they really don't care.  Why?  Because he lied for them.

19  He didn't lie for anything that hurts their case.  He lied to

20  to help their case to put things on me.  All of those lies that

21  we described helped the government's case and hurt me.  And

22  they know that.  As I said at the opening statement, the

23  government's job is to seek the truth, not to let their

24  witnesses lie.

25          You heard Mr. Dominguez get up and say you can

1 believe Rob Doucette.  I can't believe he told you that with a

2 straight face.  Honestly.  It is pathetic.

3       Now, the Judge is going to instruct you at the end of

4 this trial.  He will instruct you that to be very cautious when

5 assessing the testimony of a testifying accomplice, which

6 Mr. Doucette is and Mr. Nassor is.  The Judge is going to

7 specifically tell you to be very cautious when assessing the

8 testimony of these people.  And then after that, the Judge is

9 going to instruct you, also, to be very cautious when assessing

10 the testimony of a drug user.  He is going to do that.

11       In addition to that, the Judge is going to instruct

12 you to be very, very cautious when assessing the testimony of

13 someone under a plea agreement, which Mr. Doucette is under.

14 You have to read it.  It is into evidence, his plea agreement.

15 The Judge will tell you that he has a good reason to lie, to

16 get a good deal from the government.  Now, listen to the Judge

17 very closely when he tells you about that because he is telling

18 you that for a reason.  Three specific and distinct reasons

19 that apply to Mr. Doucette why you should be very cautious in

20 assessing his testimony.

21       Now, there is one witness you haven't heard from in

22 this case that was involved.  You haven't heard from Joseph

23 Morgan.  Joseph Morgan wanted to testify.

24       MR. DOMINGUEZ:  Objection.

25       THE COURT:  Sustained.  We have gone over this

1  before.

2          MR. MURPHY:  I want to tell you what happened on the

3  night of January 18th.  You have heard testimony that Rob

4  Doucette avoided this day like the plague -- his timeline did

5  not match up.  I am going to tell you what happened on that

6  night, okay?  They were afraid for this to come out.  They

7  didn't want this to come out.  So much so that he looked like

8  an idiot when he was confronted with it.

9          You heard about the 452 extra miles, okay?  That the

10 rent-a-car had above and beyond the truck.  You heard

11 Mr. Phillips testify that it was consistent with someone

12 leaving the Ohio/Pennsylvania border, heading back to the

13 Greater Columbus Area, and then coming back.  There is still a

14 few extra miles, but it is consistent with that.

15         But just to break off briefly, we locked Mr. Doucette

16 down into what that car did when it got back to Lynn.  He said

17 that it went into his yard, stayed there all night.  During the

18 day, it stayed there while he counted, stayed there all night.

19 You know, back and forth until it was returned.  And then when

20 I hit him with the testimony about how this extra mileage came

21 in, he says, I think you have got to look at yourself.  He

22 tried to imply that I may have taken the car when he was

23 sleeping.  But you heard Agent Costello state -- he told Agent

24 Costello two years ago that I was driving the car around, okay?

25 You heard testimony that I had three vehicles on the road -- a

1  Durango, a Jeep and the Z-28, okay?  Murphy wasn't the one that

2  needed to drive a rent-a-car around.  Doucette said it stayed

3  in the yard.  And he told the agent something different, you

4  know, back two years ago when he gave a statement.  When you

5  tell so many lies, you can't keep control of them all, you

6  can't remember them all.  Especially when a couple of years go

7  by, you can't remember all of your lies.

8          Now, I am going to tell you what happened on that

9  second night that Mr. Doucette avoided like the plague.  On

10  January 16th, the crew went out west to try to do this Brink's

11  burglary.  When they got out west and got to the Pennsylvania

12  storage facility, two things happened.  First of all, they

13  noticed that the gate was open, okay?  Which is the testimony

14  that came in.  And because the gate was open, it gave them

15  great concern, okay?  And they wanted a facility that the gate

16  would close.

17          MR. DOMINGUEZ:  Objection.

18          THE COURT:  Overruled.

19          MR. MURPHY:  And because they were going to Brink's

20  to steal money, you know from banks and stuff that they have

21  these dye packs that blow up when bank robbers go and do them.

22  But they also have these little GPS packs that go with them,

23  too --

24          MR. DOMINGUEZ:  Objection, Your Honor.

25          THE COURT:  Sustained.  That's not in evidence.

1          MR. MURPHY:  Okay.  Ladies and gentlemen of the jury,

2   they were concerned about two things.  They were concerned that

3   the gate wouldn't close, and they were concerned with the video

4   at the Pennsylvania storage facility.  So, they decided it

5   wasn't a viable place that they wanted to be at.  So, they went

6   to Eastern Ohio.

7          MR. DOMINGUEZ:  Objection, Your Honor.  Mr. Murphy is

8   testifying.

9          THE COURT:  Is that matter in evidence?  What you are

10  saying, has someone testified to that?

11         MR. MURPHY:  I believe there was testimony about an

12  Eastern Ohio storage facility, Your Honor.

13         THE COURT:  Right.

14         MR. DOMINGUEZ:  No, there was not, Your Honor.

15         THE COURT:  There was not?

16         MR. MURPHY:  How do I do this, Mr. Graeff?

17         THE COURT:  You mean in Eastern Ohio?

18         MR. DOMINGUEZ:  Yeah, Eastern Ohio.

19         THE COURT:  No.  No, there wasn't.  Mr. Phillips said

20  that you could get to Columbus and back from -- just a

21  minute -- from what might have been a storage facility because

22  there are storage facilities all around the Ohio state line and

23  the Pennsylvania state line, and 452 miles would be

24  approximately what that trip would be.

25         MR. MURPHY:  And each witness, I believe -- there

1 were three or four witnesses that were asked, Your Honor, if

2 they were aware of the Eastern Ohio storage facility.

3          THE COURT:  And none of them said, yes.

4          MR. MURPHY:  Am I allowed to give my version of what

5 I believe happened that second night?

6          THE COURT:  No, not unless you want to be sworn and

7 testify and subject yourself to cross-examination.  You know,

8 you don't have to testify.  You know that.  You have that right

9 as the accused in this case.

10         MR. MURPHY:  I guess I am not going to be able to

11 tell you what happened that second night.  But it is clear from

12 the mileage and the story that this trip kicked over to Sunday

13 night into Monday.  It is fair to say that I cannot tell you

14 what happened.  I thought I was going to be able to, but I am

15 not going to be able to tell you.

16         MR. DOMINGUEZ:  Your Honor, Mr. Murphy can take this

17 stand and testify in this proceeding, if he would like.

18         MR. MURPHY:  Sidebar, Your Honor.  Could we stop the

19 time?

20         THE COURT:  You can stand and stretch.

21                         – – –

22     THEREUPON, the following proceedings were held at

23 sidebar out of the hearing of the jury:

24         MR. GRAEFF:  This thing about him testifying is

25 creating some concern.  We had a discussion yesterday when

1    Stephanie presided, that there will be an instruction dealing

2    with him not testifying.  So, my concern is that I think we

3    better make it clear that he either has the right to testify or

4    not to testify.

5              THE COURT:  I thought I just said that.

6              MR. GRAEFF:  You did.

7              MR. DOMINGUEZ:  Your Honor, when Mr. Murphy stands in

8    front of this jury and tells them that he is not allowed to

9    tell them what actually happened, then I am duty bound, I have

10   a client here, too.  And Mr. Murphy knows why he won't testify.

11             MR. GRAEFF:  Just a minute.  Would you explain the

12   reasons why to the Judge, why you believe that you can state

13   what you were trying to get in to.

14             MR. MURPHY:  I believed after speaking with

15   Mr. Graeff that I would be allowed to tell the jury what I

16   believe happened on that night, the second night -- not the

17   night of the burglary -- the second night, the night that

18   Mr. Doucette avoided talking about, that he changed his

19   timeline on.  And after speaking with Mr. Graeff, he told me

20   that I would be able to tell the jury that, my version of the

21   events.

22             MR. GRAEFF:  Using the evidence that was presented.

23             THE COURT:  There is a big difference what your

24   lawyer just said, that's a big difference, using the evidence

25   that has been presented.

1    MR. GRAEFF:  You are allowed to draw conclusions from

2    the evidence that was presented.

3         Now, I can't remember the evidence dealing with

4    Eastern Ohio.

5         MR. DOMINGUEZ:  There was no evidence presented.  He

6    asked questions to a witness to try to elicit some testimony

7    about some goings on at a storage bin in Eastern Ohio, and no

8    one knew what the heck he was talking about.  And now, he is

9    trying to stand up and give his version of the events.  And all

10   I am saying is that I cannot let this jury be misled into

11   thinking that the Court or the government is keeping him from

12   doing something that he is otherwise entitled to do if he takes

13   the stand, and Mr. Murphy, I invite you to do so.

14        MR. GRAEFF:  Okay.  That's bull.  Don't say that in

15   front of the jury.

16        MR. DOMINGUEZ:  We are sidebar.

17        THE COURT:  I tell you what.  Here is what I suggest.

18   I am going to read the jury instruction now about that.

19        MR. GRAEFF:  Okay.

20        MR. MURPHY:  Okay.

21        THE COURT:  To protect him that he doesn't have to

22   take the stand, I will read the whole thing.

23        MR. MURPHY:  That's great.

24        MR. GRAEFF:  Because he has said repeatedly that he

25   is not going to take the stand.  No offense, but he is implying

1  that he should take the stand.

2      THE COURT:  If he starts to testify, Dave, which he

3  is doing, you can't speculate.  That is testimony.

4      It is a difficult thing because he is acting as both,

5  a lawyer and a defendant.  I understand.  But everyone is

6  confused.

7      MR. DOMINGUEZ:  So that the record is clear, Your

8  Honor, I don't want this jury to get the impression that the

9  government is keeping Mr. Murphy from doing anything.  And

10  Mr. Murphy puts me at a disadvantage.

11      MR. MURPHY:  I don't think I put it that way.

12      MR. DOMINGUEZ:  You said, I am not allowed to say

13  what I want to say.  That's what you said.

14      THE COURT:  Here is the instruction.  My team has got

15  together and went through -- let the record show that we went

16  through -- and I don't know how much time you spent on this --

17  but with preparation and all, hours probably.

18      "The defendant has an absolute right not to testify.

19  The fact that a defendant does not testify cannot be considered

20  by you in any way.  Do not even discuss it in your

21  deliberations.  Remember that it is up to the government to

22  prove the defendant guilty beyond a reasonable doubt.  It is

23  not up to the defendant to prove his innocence."

24      And then I am going to say:  "However, the

25  defendant -- some of the questions indicate that the defendant

1   is about to testify.  If the defendant wishes to testify, he

2   may take the stand, be sworn, and testify and also be subject

3   to cross-examination."

4         MR. GRAEFF:  That's fine.

5         MR. DOMINGUEZ:  That's acceptable.

6         MR. MURPHY:  That's fine.

7         MR. GRAEFF:  You will use that instruction again at

8   the end?

9         THE COURT:  Yes.

10        MR. DOMINGUEZ:  We have no objection to that.

11        MR. GRAEFF:  Thank you.

12        (Back in open court.)

13        THE COURT:  Ladies and gentlemen of the jury, this is

14  an unusual situation that the Court finds itself in, when the

15  attorney is also the -- the self-attorney is also the defendant

16  in the case.  And the final jury instructions, which I referred

17  to, you will have a copy of, and I am going to give them to you

18  this afternoon.

19        And on the issue of the defendant testifying,

20  Mr. Murphy, as both the defendant and his own counsel, which

21  the law allows him to represent himself, is -- it is sometimes

22  difficult to separate out argument by the defendant and

23  testimony by the defendant.

24        When a person testifies, as you well know, they are

25  sworn in to tell the truth.  And if they testify, then they are

1 also subject to cross-examination and a defendant does have a

2 right to testify.

3 But the most important part of what I am going to say

4 is that -- and that is the instruction here -- is that the

5 defendant's election not to testify. He has elected not to

6 testify. Therefore, the defendant has an absolute right not to

7 testify. That's the law of this land. The fact that a

8 defendant does not testify cannot be considered by you in any

9 way. Do not even discuss it in your deliberations. Remember

10 that it is up to the government to prove the defendant guilty

11 beyond a reasonable doubt. It is not up to the defendant to

12 prove his innocence.

13 However, some of the questions or some of the

14 comments that have been made by Mr. Murphy in his right to have

15 final argument as his own attorney representing himself, if

16 they tend to sound like testifying by him, I cannot allow that,

17 unless he wants to drop his election not to testify and to take

18 the stand to explain what he is trying to explain in some

19 comments.

20 If there is evidence in the case, any attorney can

21 comment on that and should comment on that and comment on what

22 that should mean to you. And that's what we are trying to get

23 at here.

24 But I don't want you to hold that against Mr. Murphy,

25 that I have stopped this to do this because he has a right not

1  to testify, but Mr. Murphy has to realize that he can't

2  comment.  That might be a hard thing for him to do, but it is

3  his election to do it this way.

4          MR. MURPHY:  Thank you, Your Honor.

5          THE COURT:  And we have all agreed on that?

6          MR. DOMINGUEZ:  Yes, Your Honor.

7          THE COURT:  Does everyone agree that that's an

8  accurate way to describe this to the jury?

9          MR. MURPHY:  Yes, Your Honor.

10          THE COURT:  Okay.

11          MR. MURPHY:  May I proceed, Your Honor?

12          THE COURT:  You may proceed.

13          MR. MURPHY:  Thank you, Your Honor.  Ladies and

14  gentlemen of the jury, there are standards of proof that the

15  courts use when determining certain things.  I am going to run

16  them down to you and give you my opinion, and the Judge will

17  give you his opinion in regards to the instruction of standard

18  of proof.

19          The first standard of proof that the courts use is

20  what they call reasonable suspicion.  On a reasonable

21  suspicion, you have to be 40 percent sure that somebody did

22  something and that gives an officer the right to continue an

23  investigation.

24          And the next higher standard of proof, which the

25  government told you on their opening, was the preponderance of

1  evidence.  The preponderance of evidence means that you are

2  51 percent sure, you are more than -- you are just over the

3  half, and that's what they use in civil trials for the standard

4  of proof, which is the preponderance of evidence.

5        The next level up for the standard of proof is

6  something that you may all be familiar with, it is called

7  probable cause.  You have all heard of probable cause.  On

8  probable cause, you have to be 60 percent sure that somebody is

9  guilty of a crime, and that gives the police the ability to

10  arrest someone or search their home, probable cause to arrest,

11  probable cause to search.

12        Then, we have the highest standard that's held, and

13  it is held in criminal trials.  It is the standard that you are

14  held to.  You basically have to be 85 percent sure that

15  somebody is guilty of a crime before you can convict them.

16        THE COURT:  Now, Mr. Murphy, the Court is going to

17  instruct the jury on this.

18        MR. MURPHY:  Yes.

19        THE COURT:  We don't deal in percentages.

20        MR. MURPHY:  Okay.

21        THE COURT:  So, get back to the evidence.

22        MR. MURPHY:  Okay.  I am charged with four counts,

23  and the most important count here is Count 4, it is interstate

24  transportation of stolen goods.  The only evidence that the

25  government has presented that establishes an interstate

1   transportation of stolen goods, that means stuff from Brink's

2   that was transported across state lines is from the testimony

3   of Rob Doucette.  They introduced a whole bunch of other

4   evidence, which was circumstantial, which tried to tie together

5   everything, but don't get it twisted.  The only evidence that

6   was presented at this trial for interstate transportation is

7   the testimony of Rob Doucette.

8         There was no physical evidence that placed me in the

9   State of Ohio.  There is no physical evidence that placed me in

10  the State of Pennsylvania on the weekend of the burglary, on

11  the weekend that they are saying this interstate transportation

12  occurred.  There is no video.  There is no nothing.  There is

13  no phone records.  There is no hotel records.  There is nothing

14  that has been introduced at this trial except for the testimony

15  of Rob Doucette for interstate transportation.

16        You heard the testimony from Mr. Nassor that he went

17  out to scope Brink's.  You also heard the rule, you don't go to

18  scope if you are not going on the score.  Nassor told cell

19  mates when he came out for the Grand Jury -- he is out in

20  Delaware County -- he told cell mates that he did this crime.

21  He didn't think that anybody from Lynn or from anywhere were

22  going to hear about this, but he told people in his block and

23  his cell mates that he committed this crime, you heard his

24  testimony.  He told them that smoke prevented them from getting

25  the money, that's what he told them.  That's what he testified

1    to.  He testified that he was the boss of his crew, he

2    testified to that.

3          And just so we are clear, so everybody understands

4    this, aside from the fact that there is no credible evidence

5    that I committed this crime besides the testimony of Rob

6    Doucette, there is no evidence that anything from Brink's ever

7    crossed state lines before I was in jail -- unless you believe

8    Rob Doucette's story.

9          I put forward to you that he lied.  And I put forward

10    to you that there is no possible way that he could have went

11    back out to the storage facility after January 23rd and got in

12    that storage facility, the Pennsylvania facility.  He couldn't

13    have got in because he didn't have the key.  The only other way

14    to do it would probably be to ask the manager for the master.

15    We heard no testimony from Susan McAlister that anybody went in

16    there and asked for a master key to open up that bin.

17          So that's evidence and that's a fact.  And just so

18    you know, this isn't -- I mean, the government has presented a

19    case which, basically, tried to prove burglary.  I am not on

20    trial for burglary.  I am not being charged with burglary.  I

21    am being charged with interstate transportation of stolen goods

22    in regards to Count 4, and I suggest to you, ladies and

23    gentlemen of the jury, that there is insufficient evidence

24    based solely on the testimony of Rob Doucette.  And I would put

25    forth for that specific charge, that the government has not met

1    their burden in regards to that charge.  There is so much doubt

2    in regards to Rob Doucette, that it is obvious, and that charge

3    carries ten years.

4          MR. DOMINGUEZ:  Objection, Your Honor.

5          THE COURT:  Sustained.  It is not the jury's province

6    to be concerned with what the penalties are.  That lies upon

7    the Court, if there is a guilty verdict.

8          MR. MURPHY:  Count 3.  Count 3, basically, says that

9    the three people that the government are claiming went out to

10   Ohio to commit the crime, saying just by them going out to do

11   this is a violation of Count 3.  And, again, Count 3 is only

12   based on the testimony of Rob Doucette.

13         In Count 2, the government is saying that the

14   defendant sent Mr. Nassor out to case Brink's.  Yet, it was put

15   into evidence that Mr. Nassor agreed that I did not tell him

16   that I was going to do Brink's and that I did not tell him that

17   I did Brink's.  Nassor told cell mates that he did it.

18   Remember the rule.  You don't go case a joint if you are not

19   going to go do the score.  Somebody is lying between

20   Mr. Doucette and Mr. Nassor, when one is saying that he was

21   there for counting the money, and the other guy said he never

22   saw the money.  Their testimony is contradicting each other.

23         Now, ladies and gentlemen of the jury, we get to the

24   final count, conspiracy.  I am going to admit to you that this

25   charge has always concerned me, conspiracy.  It is so easy to

1  prove.  The Judge is going to instruct you on it, and you are

2  going to hear that it is so easy to actually commit conspiracy,

3  and I have acknowledged this for ten years.

4       And I am going to give you a bunch of reasons why I

5  feel I am not guilty of conspiracy, but that will be up to you

6  to determine.  First of all, my company rented trucks and

7  storage bins in the normal course of business.  Two moving

8  companies, you heard it from the lady at Newmarket Storage.

9  You heard it from a bunch of witnesses, that's what my company

10  did, we rented trucks and we rented storage bins.  There is

11  nothing illegal from that.

12       Both Nassor and Doucette have rented trucks from me

13  on several occasions.  I have no control of what other people

14  do when they take items out of my control.  If they go take a

15  truck and do something with it, that's on them.  I can't be

16  held responsible for other people's actions.

17       Two, this is logical and this really makes a lot of

18  sense, and I want you, the jury, to take this into

19  consideration.  You have heard testimony that I rented a

20  rent-a-car at the Thrifty Rental Agency in Revere.  Why would I

21  put a rental car in my own name, knowing it was going to commit

22  a crime?  I am far from stupid, okay?  I wasn't the one that

23  needed a rent-a-car.  Rob Doucette was the one who didn't have

24  a vehicle back then.  You heard David Nassor testify that Rob

25  Doucette didn't have an operational vehicle in December or

1   January -- December 2008, January of 2009, okay?

2       If I knew a vehicle was going to be -- I would not

3   put it in my name.  You heard testimony that I had access to

4   two fake I.D.s.  It would have been so easy for me to just take

5   one of those fake I.D.s and to go rent a car, but that's not

6   what happened.  This car was rented in my name.  I had no idea

7   that that car was going out to Ohio to commit a crime.  If I

8   did, it would not have been in my name.

9       The third reason why, you heard testimony that Rob

10   Doucette and David Nassor have cooperated in the past with

11   police.  Why would I get involved with people that I know have

12   ratted before?  I don't care what they do on their own, if they

13   want to go do it.  If I train them and they go do a score,

14   fine.  Fine and dandy, they can go do what they want to do.

15   But why am I going to get involved with somebody that I know in

16   the past both of them have cooperated?  It makes no sense.  I

17   am far from stupid.  Gee, I am going to go do this crime with

18   these guys and I know they have both ratted in the past, it

19   doesn't make any sense, ladies and gentlemen of the jury.

20       You heard testimony that my house was raided.  You

21   heard testimony that there was an investigation prior to that.

22   If I am being investigated, am I going to jump out and go do

23   this big huge score and get involved with this thing, or am I

24   going to lay low?  Gee, the FBI is investigating me, they are

25   watching me, they are doing whatever they are doing, am I going

1  to go out and do this?  That's ludicrous.

2          Think about it.  If the FBI was on your tail, would

3  you do that?  Absolutely not.

4          You heard testimony from Special Agent Costello that

5  I had recently had a baby, and my girlfriend was pregnant at

6  the time of the raid of January 23rd, at the time of the thing.

7  So, I have one toddler baby, a boy, who is autistic.

8          MR. DOMINGUEZ:  Objection, Your Honor.

9          MR. MURPHY:  I was told that I could do this in my

10 closing, when I started it in the opening, Your Honor, you told

11 me that I could address this at closing.

12         THE COURT:  I will allow it.

13         MR. MURPHY:  So, I have a boy who is autistic.  He

14 has special needs.  He has to go to classes six days a week,

15 okay?  He can only say a few words.  He can change pages.  He

16 is ahead of the people in his class, but he is autistic.

17         I have another baby, a baby girl.  She was born after

18 him.  I have to provide for my family.  And am I going to go

19 and commit this crime and be involved with these people knowing

20 that I could be taken away from my family who needs me at that

21 time?

22         I had successful businesses going on at the time.  I

23 admit -- you heard testimony, that's why I told you that this

24 group of criminals is so vast around Lynn, these Lynn Breakers.

25 I was involved with them because I was teaching them.  They

1    were paying me for my services, okay?

2         Is it anymore -- is it any different that the FBI

3    takes my course than private citizens who want to learn the

4    same thing?  Of course not.

5         I am giving you logical reasons, ladies and gentlemen

6    of the jury.  You heard testimony which was convoluted about

7    money.  There was no direct evidence that I received any money

8    from this crime.  How is somebody going to get involved and be

9    the big man and have all of this money when he gets caught with

10   virtually no money that could be traced back or has anything to

11   do with Columbus?  Where is all of this money?  I didn't get

12   any money, I went to jail.

13        And in regards to my classes and my manual, you will

14   see that there are no -- it doesn't refer to any specific

15   building, entity or anything.  It is just general information

16   that can be applied to anything.  Nothing more.  I mean, some

17   people may not be happy with the information that's involved,

18   but, you know, if you can make money providing information --

19   which maybe now I am realizing that's something I shouldn't

20   have done -- I thought, you know, if the government was cool

21   with it and if they wanted the information, I didn't know they

22   would turn around and use it against me, honestly.

23        There are plenty of reasons to find me not guilty of

24   conspiracy, if you so choose, but I want to acknowledge to you

25   that it is very easy to prove.  And as you have seen in this

1  trial, the rules favor the prosecution.  It is very hard to get

2  a fair trial, even though my fair trial is you people.  I don't

3  have to deal -- I have to deal with the Court's rulings and the

4  government presenting their case as they did, but my future

5  lies with you, you are my fair trial.  You are not part of the

6  court system.  You are jurors, peer jurors from the community,

7  and you decide what happens in this case.

8        For those of you who believe in my innocence or

9  believe that the government hasn't proven their case beyond a

10  reasonable doubt because of all of the lies of Rob Doucette, I

11  would ask you that you hold strong.  You are entitled to your

12  own opinion.  Don't be bullied by other jurors who may think,

13  oh, he is guilty or they have this against him or they have

14  that against him, use your own mind and make your own decision

15  up when you do this.

16        And if you are hung, you can't come to a verdict on

17  certain charges, the Judge will tell you to try again.  You go

18  back.  If you come back again, and your deliberations are

19  fruitless, that's just the way it comes out in court.  You have

20  heard of it all of the time, a hung jury or a mistrial.  It is

21  the same thing.

22        Now, before I end off in this case, as the Judge

23  allowed in my opening, I was going to tell you about my family

24  history.

25        MR. DOMINGUEZ:  Your Honor, objection.

1    THE COURT:  Your family history, what does that have

2   to do with the case?

3    MR. MURPHY:  As I was telling the jury on opening,

4   Your Honor, you stopped me and said that I could do that at

5   closing, and it will not take me long, okay?

6    THE COURT:  Well, this is the end.

7    MR. MURPHY:  Okay.  If I could have like ten minutes.

8    MR. DOMINGUEZ:  Your Honor, there is no evidence as

9   to family history on this record.

10    THE COURT:  Well, I will give you five minutes.

11    MR. MURPHY:  Okay.

12    THE COURT:  Go through it quickly.

13    MR. MURPHY:  Okay.  My mother died at age 59 of anal

14   cancer, okay?  My fair died a couple of years later, 65,

15   because of a heart attack.  A couple of months later, they

16   found my brother -- no, a couple of months ago, four months

17   ago, they found my brother dead in bed -- he is 48 years old,

18   he is a year older than me.  They did an autopsy, and they

19   couldn't determine how he died.  The coroner said that

20   sometimes you just can't determine.  My brother died at 48.  My

21   mother died at 59.  My father died at 65 -- my genes aren't

22   good.

23    My daughter's mother, she died of liver failure.  I

24   raised my daughter since she was three years old.  I sent her

25   through private school, I sent her to college, she graduated a

business major.

I remarried again to a younger woman. She died of a rare medical disease two years after we were married.

You heard about my son who is autistic. His mother has HPV. She is in her second round of chemo and radiation. She is 85 pounds, and she has got no hair. If this doesn't work, she doesn't have long to go, and my autistic son isn't going to have a mother or possibly a father.

You have heard through the testimony of this trial what this time carries. My genes aren't good. I am 47 years old right now. Nobody in my family has lived more than 63 years old. If convicted of these crimes, I'll die in prison, that's the fact. Please, please, please do not let my two toddler children to grow up and never know their father based on the testimony of Robert Doucette. My life is in your hands. Please do the right thing. And at the very, very, very, very, very least, find me not guilty of Count 4, that's what I ask. Thank you, ladies and gentlemen of the jury.

MR. DOMINGUEZ: I am ready, Your Honor. Ladies and gentlemen of the jury, this case is not about sympathy. It is not about Mr. Murphy's family history. We are all considerate human beings. This case is about what Mr. Murphy and Mr. Morgan and Mr. Doucette did on January 17th and January 18th of 2009. And don't let that escape your cognizance and what you are here to do with respect to these proceedings.

1          I am not going to be long because it is time for you

2   all to get to work, but let me tell you one thing about what

3   the government has to do.  You know, Brink's is a victim,

4   ladies and gentlemen.  You saw the destruction of the Brink's

5   facility on January 17th and January 18th of 2009.

6          You know, Mr. Murphy did not care about what was

7   going on with his family when he was involved in that activity.

8   It's clear from his manifesto, if you will.  There comes a

9   point in time, ladies and gentlemen, where you just stop

10  objecting, okay?  Did you hear anything from this witness

11  stand, any witness tell you that law enforcement was taking

12  some training class as offered by Mr. Murphy as outlined in

13  this manual?  Did you hear any testimony about that?  Did you

14  hear any testimony about Mr. Murphy offering some training

15  course to Lynn Breakers and him getting compensated for it?

16  You heard nothing.

17         And as a matter of fact, Mr. Murphy stood up here and

18  said that Mr. Doucette acknowledged that he took a training

19  course, he didn't acknowledge that.  If you want to talk about

20  this -- you will have this (indicating an exhibit) in your

21  deliberations.  If Mr. Doucette took this training course, how

22  could he have?  Because it talks about burning up money in

23  vaults.

24         This manifesto was written by Mr. Murphy after he

25  participated in this criminal conduct.  Mr. Murphy stood up

1  here and talked about Mr. Doucette being involved in a felony

2  at his warehouse and how the government brought that to your

3  attention.  Well, frankly, it is Mr. Murphy's letter -- where

4  he calls himself Jason Departo, and he showed it to you -- I

5  need to know why whoever went down to the warehouse, went

6  through other people's stuff, we are missing -- is this saying

7  Doucette did this?  You will have that letter for yourselves.

8          But what is he trying to do?  Who is manipulating the

9  system here?  Page 2 of that same letter, don't get me wrong, I

10  love you like a brother.  But yet, he is going to stand here

11  and talk about his family and suggest to you that he was upset

12  about him committing felonies against him when he tells him in

13  the same letter he loves him like a brother?

14          Mr. Murphy talked about Mr. Doucette's testimony, and

15  you heard Mr. Doucette's testimony, and you judge

16  Mr. Doucette's testimony.  You will recall in voir dire, and

17  even in my opening statement, I suggested to you -- I will not

18  tell you to do anything, it is your purview -- but I suggested

19  that you view accomplice testimony with caution because we

20  don't pick our witnesses.  We take them as we find them.  You

21  know who picked Mr. Nassor?  This man (indicating Mr. Murphy).

22  Who picked Mr. Doucette?  This man (indicating Mr. Murphy)

23  picked Mr. Doucette.

24          It is clear from the testimony, ladies and

25  gentlemen -- and you know, one thing Mr. Murphy keeps saying

1   about placing him in the State of Ohio on January 17th and

2   January 18th of 2009?  Well, of course, no one places him here.

3   They were good.  They were very good.  And you know what else

4   didn't come out in this trial?  Who placed Mr. Doucette in the

5   State of Ohio with the exception of Mr. Doucette?  There was no

6   testimony from any law enforcement official whatsoever that

7   identified Mr. Doucette as having committed this crime other

8   than Mr. Doucette.

9          And you know what?  He keeps talking about

10  Mr. Doucette manipulating evidence and trying to implicate

11  Mr. Murphy and those kind of things, how does that make sense

12  if Mr. Doucette took law enforcement to the storage unit and

13  turned over the evidence?

14         You know what else?  Mr. Murphy asked several

15  questions about an electromagnetic drill press, a Sawzall and a

16  grinder and accusing Mr. Doucette of having thrown those away.

17  It doesn't make sense in terms of Mr. Doucette because he has

18  given himself up anyway.

19         But ladies and gentlemen, who in this courtroom would

20  know that an electromagnetic drill was used in the Brink's

21  burglary?  Who would know?  Agent Trombitas didn't talk about

22  an electromagnetic drill.  Agent Costello didn't talk about it.

23  Who would know about some drill that was used in the burglary?

24  Who would know?  There is no one else in this courtroom who

25  would know that that drill was used in that burglary but this

1  (indicating Mr. Murphy) man right here.

2          Similar to the letter that he wrote —— that he wrote,

3  Mr. Murphy —— who would know that the money and the coins were

4  short?  I am not 100 percent sure, but the pictures the feds

5  showed me looked like the Great Wall was a little light of some

6  coin.  Who else would know that?  Mr. Murphy himself.

7          Mr. Murphy referred to Mr. Doucette as a manipulator.

8  But you know what?  You have the Global Gadget documents where

9  he is discussing shipping matters with Mr. Menage.  There is

10 nothing but manipulation there, ladies and gentlemen.  There is

11 nothing but information of how to avoid Customs —— how can I

12 have this in my possession because only the military can have

13 it?  The police can't even have it.

14         Government's Exhibit 15-1, his manifesto, has nothing

15 but manipulation carved all of the way through it.  And when

16 you read that, you will read about the thermal rods igniting

17 the money on fire —— at the Brink's facility.

18         Now, Mr. Murphy would like for you to think that

19 those fingerprints and the DNA on the masks and the

20 fingerprints on the walkie-talkie, which he discusses in his

21 manifesto, obviously, had to come from someplace else, but you

22 know what he didn't discuss?  This (indicating an exhibit),

23 ladies and gentleman.  This is the original LockUp receipt and

24 lease agreement with the card from Suzanne McAlister, and guess

25 what?  It was found in the storage facility, too, along with

1  the Brink's coins, along with the tools —— his lease

2  agreement —— not Doucette's —— not Morgan's.  Well, his name

3  doesn't appear there, but it says "Brian Hetherman" and we all

4  know what that is about.

5        You heard the testimony from Mr. Doucette about the

6  state of the money.  You remember that he talked about it being

7  wet, and it had to be washed several times because of the smell

8  and the burn and all of that.  Do you recall that testimony?

9        Ladies and gentlemen, look where close to $10,000 was

10  found in Mr. Murphy's residence, right underneath the radiator.

11  How many people, ladies and gentlemen, that you know of keeps

12  $10,000 in cash right underneath the radiator in their bedroom?

13        You have worked hard.  You have been attentive.  I

14  have talked enough.  We only ask one thing of you on behalf of

15  Ms. Hill, on behalf of Agent Trombitas, we ask you now to go to

16  work.  And that through your deliberations and your review of

17  the evidence, that you tell Sean Murphy that you know that he

18  conspired with Joe Morgan, with Robert Doucette and, yes, David

19  Nassor to commit the crimes alleged in Count 1 —— to enter the

20  Brink's facility, to take money from the Brink's facility and

21  then to travel in the truck he rented, Brian Hetherman rented

22  in interstate commerce from the Southern District of Ohio to

23  locations outside the State of Ohio.

24        We ask you that you tell him that based upon the

25  testimony of Mr. Nassor —— and you know what is interesting

1    about that?  The testimony of Mr. Nassor and Mr. Doucette.  He

2    wants you to believe Mr. Nassor when he talks about the cash

3    that he pays his employees or when he talks about the fact that

4    Mr. Nassor said he purchased from Global Gadget -- he wants you

5    to believe those portions, but when it is portions that help

6    the government or help prove the case, that he traveled in

7    interstate commerce and that he, in fact, went to Memphis,

8    Tennessee per his direction to pick up the cell phone jammer,

9    he don't want you to believe that.  But he wants you to believe

10    that, you know, his favorite food is extra crispy Kentucky

11    Fried Chicken and that around Christmastime of 2008, that he

12    loaned Doucette some china.

13          And as a matter of fact, he had Mr. Doucette on the

14    stand for five-and-a-half hours, and do you remember him saying

15    anything or ask him about china?  He asked him about everything

16    else.  Did he ever so much as ask him about china?  No.

17          Tell him that you know he sent Mr. Nassor out here to

18    scope the facility based upon the evidence that has been

19    presented.  Tell him that you know that on January 17th of 2009

20    that he and Robert Doucette and Joe Morgan traveled in

21    interstate commerce went to Warrendale where he and Joe Morgan

22    had stowed those tools and came to Ohio with the express intent

23    to transfer money and merchandise in interstate commerce and,

24    ladies and gentlemen, tell him that you know he did what he did

25    on January 17th and 18th of 2009 when they all entered the

1    Brink's facility, basically destroyed it, and then took the

2    money and left.

3            Ladies and gentlemen, just tell him.

4            Thank you, Your Honor.

5            THE COURT:  Thank you.  Ladies and gentlemen, we

6    have -- they have ordered lunch for you, and we need to go over

7    the jury instructions, I believe, one more time.  And that will

8    not take long.  So, we will contact you -- you are not going to

9    have to leave to get lunch or anything like -- but we will

10   contact you somewhere around two or 2:15 when we come back in,

11   and I will give you the final instructions, and then the case

12   will be yours.

13           Again, do not discuss this case or make any decisions

14   until the Court says:  Go back and decide the case.  And I

15   haven't said that yet.  So, go and enjoy your lunch.

16                             - - -

17           THEREUPON, the lunch recess was taken.

18                             - - -

19

20

21

22

23

24

25

1              Tuesday Afternoon Session

2                 October 25, 2011

3                    2:15 p.m.

4                     - - -

5     IN OPEN COURT:

6              (REPORTER'S NOTE:  The jury is not present.)

7              MR. MURPHY:  Your Honor, I have a matter that I would

8     like to bring up before the Court.

9              THE COURT:  Yes.  What?

10             MR. MURPHY:  At this point, right now, the closing

11    arguments are done.  I would like to reinstitute Mr. Graeff as

12    my full-time representative attorney.

13             THE COURT:  All right.

14             Mr. Graeff, is that your --

15             MR. GRAEFF:  I accept, Your Honor.

16             THE COURT:  I won't ask if that's your desire.  I'll

17    just ask if you're willing to do it.

18             Now, you have had the opportunity to review the draft

19    of the final jury instructions, and you have conferred with our

20    law clerks here.  Are there further additions or corrections to

21    the final instructions?

22             MR. DOMINGUEZ:  No additions -- I'm sorry.

23             THE COURT:  And are there any objections to the final

24    instructions?

25             MR. DOMINGUEZ:  Not from the government, Your Honor.

1    THE COURT:  And then I understand Mr. Murphy will

2  object to not including a supplemental jury instruction in the

3  final instructions.

4    MR. GRAEFF:  And with respect to that, Your Honor, I

5  think we've provided the Court with a copy of that jury

6  instruction.

7    THE COURT:  Right.  The majority of the acts alleged

8  to be part of the conspiracy?  Is that the one?

9    MR. GRAEFF:  Right.

10    THE COURT:  Okay.

11    MR. GRAEFF:  So that will be part of the record, sir?

12    THE COURT:  Okay.

13    MR. GRAEFF:  And other than that, I've reread the

14  jury instructions.  We went over them.  Mr. Murphy and I went

15  over them yesterday afternoon with Ms. Rawlings presiding.  And

16  we have no objections, Your Honor.

17    THE COURT:  Thank you.

18    I'll read this in.  The proposed instruction by the

19  defendant is:  The majority of the acts alleged to be part of

20  the conspiracy were services that defendant provided in the

21  normal course of business.  The government must prove beyond a

22  reasonable doubt that the defendant knowingly provided services

23  with the intent to commit criminal acts.  Without the required

24  intent, the services the defendant provides in the normal

25  course of business cannot be part of a conspiracy.

1     And I guess now, instead of Mr. Murphy stating your

2 basis for the instruction, do you want Mr. Graeff to do that?

3     MR. MURPHY:  Yes, Your Honor.

4     THE COURT:  Okay.

5     Mr. Graeff, you may proceed.

6     MR. GRAEFF:  With the instruction you just read, sir?

7     THE COURT:  Yes.

8     MR. GRAEFF:  We believe there was sufficient evidence

9 through the testimony of two of the government witnesses in

10 answer to Mr. Murphy's questions that, minimally, he conducted

11 a business, at least two businesses, and that they're part of

12 the record.  And we believe that the instruction should be

13 supplemented to the ones that we have agreed upon.

14     THE COURT:  Thank you.

15     Your response?

16     MR. DOMINGUEZ:  Your Honor, we believe the evidence

17 did not establish that any services that Mr. Murphy may have

18 performed -- I mean he tried to elicit that testimony from

19 witnesses, but there is no proof of the businesses, the

20 services.  And they certainly weren't done in furtherance of

21 the conspiracy or in furtherance of any other count alleged in

22 the indictment.

23     THE COURT:  Thank you.

24     The proposed instruction is not an accurate statement

25 of the relevant law in this case.  There is nothing alleged in

1  the indictment that pertains to services rendered by the

2  defendant.  However, it appears that the defendant's concern is

3  that the government must prove that the acts taken in

4  furtherance of the conspiracy were for an unlawful purpose, and

5  that is explained in the conspiracy definitions.

6          Additional objections?

7          MR. GRAEFF:  There are no objections to the jury

8  instructions, Your Honor, but we do have -- if we're done with

9  the jury instructions, --

10         THE COURT:  One, one, one -- just one minute, Mr.

11  Graeff.  We plan to publish the jury instructions to the jury

12  electronically on their individual screens to follow along as I

13  read them.  The jury will receive two hard copies to take into

14  the jury room with them.  And is there any objection to that?

15         MR. GRAEFF:  No, sir.

16         MR. DOMINGUEZ:  No objection.

17         THE COURT:  Okay.

18         MR. GRAEFF:  During the course of the closing

19  arguments that Mr. Murphy made, there were a couple times when,

20  with all due respect to the Court, you sustained at least two

21  of his objections.  And I've discussed those with Mr. Murphy.

22  And we would just like to, for the record, state that he

23  believes that he was restricted in his closing argument with

24  respect to those two objections.  I can't remember the first

25  one, but the second one deals with where we approached the

1    bench and where Mr. Murphy was attempting to draw conclusions

2    from the evidence dealing with the eastern Ohio storage

3    facility.  And of the two of them, that is the one that sticks

4    out in my mind the most, Your Honor.

5        So, we would respectfully object to the Court

6    sustaining Mr. Dominguez's objection on that.  And, the first

7    one, I simply can't remember which one it was, but --

8        THE COURT:  Well, when you do, you may put it on the

9    record --

10       MR. GRAEFF:  All right.

11       THE COURT:  -- so the record is complete.

12       And the jury instructions, or I mean the discussion

13   was that there was no indication that there was a bin or

14   storage place in eastern Ohio.  The discussion, I believe, was

15   Mr. Phillips stated that there were so many storage bin places

16   along the Ohio border, on the eastern border, that had orange

17   or orange -- of an orange color, if I recall correctly, that it

18   was too many for him to decipher.

19       Now, if there is some other evidence of that, I don't

20   recall what it was, and I don't think Mr. Dominguez's position

21   is similar.

22       MR. DOMINGUEZ:  Your Honor, the basis for the

23   government's position, so the record is clear, is Mr. Murphy

24   stood up and stated, I will tell you what happened after

25   January 18th of 2009.

1          THE COURT:  Right.

2          MR. DOMINGUEZ:  And that's when I objected.  And my

3    understanding was he was going to tell the jury that someone

4    traveled to a bin in Ohio and did some things there, or

5    whatever.  And the basis for my objection was that was not

6    something that was in evidence.  So, --

7          THE COURT:  Right.

8          MR. DOMINGUEZ:  -- in essence, Mr. Murphy would have

9    been testifying.

10         THE COURT:  Is that the other item that you're

11   talking about?

12         MR. DOMINGUEZ:  That's --

13         MR. GRAEFF:  I remember -- I agree with that's the

14   issue that we objected to.

15         I remember the other objection that I thought was

16   significant.  And that is, Mr. Murphy was discussing the nature

17   of the burdens of proof, beginning with the civil burden of

18   proof, and he used percentages.  And he went up to the

19   reasonable doubt percentage where he surmised that the

20   reasonable doubt percentage was eighty-five percent.  And there

21   was no formal objection, but you interrupted him and said, We

22   don't deal with percentages here.  And we'd respectfully object

23   to that.

24         THE COURT:  Well, I also went on to explain that

25   there will be a jury instruction, and it is the Court's duty to

1    make the jury instructions, and, while you can refer to a jury

2    instruction, as my recollection, that's going to be given or

3    very likely going to be given, that is not what he was doing.

4    He was putting percentages where -- I've never heard of that,

5    period, in my 150 years as a lawyer.

6             MR. GRAEFF:  Now, I can't remember, but did we -- did

7    the defense introduce the exhibits?

8             MR. DOMINGUEZ:  Yes, you did.

9             MR. GRAEFF:  All right.

10             I have nothing further, Your Honor.

11             THE COURT:  Okay.  Thank you.

12             MR. DOMINGUEZ:  That was not one of them.  That was

13    not one of them.  The top one, that was not offered.  That was

14    not offered.

15             MR. GRAEFF:  Okay.

16             Your Honor, I apologize.  There is one more thing.

17    Mr. Murphy identified Defense Exhibit 7-3, 7 dash 3.  And --

18             COURTROOM DEPUTY CLERK:  What is that?  I'm sorry.

19             MR. GRAEFF:  This is the thermal rod invoice.

20             COURTROOM DEPUTY CLERK:  Thank you.

21             MR. GRAEFF:  Do you have any objection for us?

22             MR. DOMINGUEZ:  We do.

23             MR. GRAEFF:  You have an objection to that?

24             MR. DOMINGUEZ:  Yes.

25             THE COURT:  What was --

1          MR. GRAEFF:  If I could approach and just --

2          THE COURT:  What was the testimony surrounding that,

3     Mr. Graeff?  Do you recall?

4          MR. GRAEFF:  Mr. Gary Phillips testified to that

5     exhibit, Your Honor, with respect to Brink's.

6          THE COURT:  I recall, on the screen, there was the

7     name "John."

8          Oh!  There it is.  And -- Americanized Welding.

9          What was the objection?

10         MR. DOMINGUEZ:  Your Honor, Mr. Phillips was asked

11    directly by Mr. Murphy as to did he know who John was that

12    appears on that document.  He clearly said no.

13         THE COURT:  Right.

14         MR. DOMINGUEZ:  So, the problem I have is relevance,

15    because there's no foundation for its admission.

16         THE COURT:  Right.

17         That was the basis for my objection.  It's not a

18    properly introduced document.

19         THE COURT:  Now, off the record ...

20         (Whereupon, a discussion was had off the record.)

21         THE COURT:  Okay.  I guess we're ready to bring in

22    the jury.

23         COURTROOM DEPUTY CLERK:  Okay.

24         (Whereupon, the jury was seated in the courtroom at

25    2:30 p.m.)

1          THE COURT:  Before I begin the final jury

2    instructions, there is the matter of the alternates who have,

3    as I have observed, have listened intently and which we

4    appreciate.

5          Now I can read the final instructions, which will

6    take a bit.  And you may stay for that if you wish, because I'm

7    going to then ask -- well, I'll ask all the jurors, is there

8    anyone here who is going to have any trouble going back and

9    deliberating?  Do you have time to do that and, if you don't

10   finish today, to come back tomorrow?

11         (No response.)

12         THE COURT:  Okay.  Then I'll thank our alternates --

13   who are our alternates?

14         Oh, over here.  I'm looking the wrong way.

15         You may sit and listen to the jury instructions, if

16   you wish, or I can excuse you now.

17         Thank you very much for your service.

18         (Whereupon, the alternate jurors exit the courtroom.)

19         THE COURT:  Now that you have -- can you see the

20   screens?

21         JURORS:  (Nodding affirmatively.)

22                    - - -

23              CHARGE OF THE COURT

24                    - - -

25         THE COURT:  Okay.

1    Now that you have heard the evidence and arguments of

2  the parties, it becomes my duty to give you instructions of the

3  Court, the instructions of the Court, as to the law applicable

4  to the case.

5    It is your duty as jurors to follow the law as stated

6  in the instructions of the Court and to apply these rules of

7  law to the facts as you find them from the evidence in the

8  case.

9    One or both of the parties may have referred to some

10  of the governing rules of law in their arguments.  If, however,

11  any difference appears to you between the law as stated by

12  counsel and that stated by the Court in these instructions,

13  you, of course, are to be governed by this Court's

14  instructions.

15    You are not to single out one instruction alone as

16  stating the law, but must consider the instructions as a whole.

17    Neither are you to be concerned with the wisdom of

18  any rule of law stated by the Court.  Regardless of any opinion

19  you may have as to what the law ought to be, it would be a

20  violation of your sworn duty to base a verdict upon any other

21  view of the law than that given by the instructions of the

22  Court, just as it would be a violation of your sworn duty, as

23  judges of the facts, to base a verdict upon anything but the

24  evidence in the case.

25    Justice through trial by jury must always depend upon

1  the willingness of each individual juror to seek the truth as

2  to the facts from the same evidence presented to all jurors and

3  to arrive at a verdict by applying the same rules of law as

4  given in the instructions of the Court.

5      Your function as jurors will be to determine the

6  issues of fact raised by the allegations of the Indictment and

7  the denial of those allegations by the not guilty plea of the

8  Defendant.  Perform your duty without bias or prejudice and

9  regardless of sympathy or public opinion.  The Defendant Sean

10  D. Murphy, hereinafter "the Defendant," the United States of

11  America, hereinafter "the Government," and the community you

12  represent are entitled to a careful and impartial consideration

13  of all the evidence, adherence to the law as explained to you

14  in these instructions, and a just verdict regardless of the

15  consequences.

16      Presumption of innocence and burden of proof and

17  reasonable doubt.

18      As you know, the Defendant has pled not guilty to the

19  crimes charged in the indictment.  A plea of not guilty is a

20  complete denial of the charges and puts into issue all of the

21  essential elements of each offense.

22      The indictment is not evidence of guilt.  It is just

23  the formal way the Government tells defendants what crimes they

24  are accused of committing.  It does not even raise any

25  suspicion of guilt and cannot be considered by you as evidence

1    of any kind.

2          To the contrary, the law presumes a defendant

3    innocent of the crime.  Thus, a defendant starts the trial with

4    a clean slate, with no evidence at all against him, and the law

5    presumes that the defendant is innocent.  This presumption of

6    innocence stays with the Defendant unless the Government

7    presents evidence here in court that overcomes the presumption,

8    and convinces you beyond a reasonable doubt that the Defendant

9    is guilty.

10          The presumption of innocence alone is sufficient to

11    acquit a defendant.  This means that a defendant has no

12    obligation to present any evidence at all or to prove to you in

13    any way that he is innocent.  A defendant has an absolute right

14    not to testify.  The fact that a defendant does not testify

15    cannot be considered by you in any way.  Do not even discuss it

16    in your deliberations.

17          Remember that the Government must prove the

18    Defendant's guilt beyond a reasonable doubt.  It is not up to

19    the Defendant to prove the innocence.  This burden is always on

20    the Government.  This burden is always on the Government from

21    the beginning of the trial to the end.  You must find the

22    Defendant not guilty unless the Government convinces you beyond

23    a reasonable doubt that he is guilty.

24          The Government must prove every element of the crime

25    charged beyond a reasonable doubt.  Proof beyond a reasonable

1  doubt does not mean proof beyond all possible doubt.  Possible

2  doubts or doubts based purely on speculation are not reasonable

3  doubts.  A reasonable doubt is a doubt based on reason and

4  common sense.  It may arise from the evidence, the lack of

5  evidence, or the nature of the evidence.

6       Proof beyond a reasonable doubt means proof which is

7  so convincing that you would not hesitate to act on it in

8  making the most important decisions in your own lives.  If,

9  after careful and impartial consideration of all of the

10  evidence, you are convinced that the Government has proved the

11  defendant guilty beyond a reasonable doubt, say so by returning

12  a guilty verdict.  If, after careful and impartial

13  consideration of all of the evidence, you are not convinced,

14  say so by returning a not guilty verdict.

15       Evidence of the Defendant's Arrest.

16       You have heard testimony regarding the arrest of the

17  Defendant, Sean Murphy, and that he was in jail.  The fact that

18  the Defendant was arrested and is jail -- and is in jail must

19  not be considered as evidence of guilt.  An arrest, like an

20  Indictment, provides notice to an individual that he is charged

21  with a crime or crimes.  It should not be considered for any

22  other purpose.

23       Final Jury Instructions on What is Evidence.

24       Excuse me.

25       Number of Witnesses and Exhibits.

1    In resolving disputed issues of fact, you should not

2    permit your decision concerning any particular question to be

3    determined merely by the number of witnesses or exhibits that

4    one side or the other has introduced into evidence.  The test

5    is not which side brings the greater number of witnesses or

6    presents the greater quantity of evidence, but which witnesses

7    and which evidence you find sufficiently believable and

8    trustworthy.  You may find the testimony of a smaller number of

9    witnesses as to any fact is more credible than the testimony of

10   a larger number of witnesses to the contrary.

11   What is Evidence?

12   With some frequency, I have used the term "evidence."

13   Evidence in a case consists of only the sworn testimony of the

14   witnesses, the exhibits that have been received in evidence,

15   and any stipulations of fact entered into by the parties.

16   However, exhibits offered as evidence but not admitted by the

17   Court are not to be considered by you at all.

18   As I have told you, the Indictment is not evidence.

19   The opening statements of the parties that you heard before any

20   evidence was presented are not to be considered as part of the

21   evidence.  Any questions or statements to which I sustained an

22   objection are not to be considered as part of the evidence.

23   The closing arguments are not evidence.  Finally, anything you

24   may have seen or heard outside this courtroom is not evidence

25   and must not be considered by you as evidence.

1    You are to be -- you are to consider only the

2 evidence in the case.  You are permitted to draw, from the

3 facts that you find have been proved by the evidence, such

4 reasonable inferences as seem justified in light of your own

5 experience.  That is to say, from the facts that have been

6 proved, you may conclude that another fact exists based upon

7 reason and common sense.  You may not, however, base one

8 inference solely and entirely upon another inference.

9    You may draw more than one inference from the facts

10 or circumstances, but if the circumstances create inferences

11 that are equally consistent with either innocence or guilt,

12 such inferences must be resolved in favor of the Defendant's

13 innocence.

14    Testimony elicited on cross-examination of witnesses

15 is evidence, as is testimony elicited on direct examination of

16 witnesses.

17    Direct and Circumstantial Evidence.

18    There are two types of evidence that a jury may

19 properly consider in reaching its verdict:  direct and

20 circumstantial evidence.  Direct evidence is where a witness

21 testifies to what he or she saw, heard, or observed.  In other

22 words, when a witness testifies about what is known to the

23 witness as personal knowledge by virtue of his or her own

24 senses -- for example, what he or she sees or hears -- that is

25 called direct evidence.  If a witness testified that he saw it

1 raining outside, and you believe him, that would be direct

2 evidence that it was raining.

3      Proof of a chain of circumstances pointing to the

4 commission of the offense is an example of circumstantial

5 evidence.  Circumstantial evidence is evidence which tends to

6 prove a disputed fact by proof of other facts.  You infer on

7 the basis of reason and experience and common sense from an

8 established fact the existence or nonexistence of some other

9 fact.  If someone walked into the courtroom wearing a raincoat

10 covered with drops of water and carrying a wet umbrella, that

11 would be circumstantial evidence from which you could conclude

12 that it was raining.  Circumstantial evidence is of the same

13 value as direct evidence.

14      As a general rule, the law does not distinguish

15 between direct and circumstantial evidence.  The law does

16 require that before convicting a defendant, the jury must be

17 satisfied from all the evidence in the case that the Government

18 has proved the defendant's guilt beyond a reasonable doubt.

19      Witness Credibility.

20      An important part of your job here will be making

21 judgments about the testimony of the witnesses who testified in

22 the case.  You should decide whether you believe what each

23 person had to say, and how important the testimony was.  In

24 making that decision, I suggest you ask yourself several

25 questions:

1    Did the person impress you as honest?

2    Did he or she have any particular reason not to tell

3  the truth?

4    Did he or she have a personal interest in the outcome

5  of the case, including whether the witness had any relationship

6  to the Government or to the Defendant?

7    Did the witness seem to have a good memory?

8    Did the witness have the opportunity and ability to

9  observe accurately the things about which he or she testified?

10    Did he or she appear to understand the questions

11  clearly and answer them directly?

12    Did the witness' testimony differ from the testimony

13  of other witnesses?

14    Did the witness say something or do something at any

15  other time that is inconsistent with what the witness said

16  while testifying?  If you believe that the witness was

17  inconsistent, ask yourself if this makes the witness' testimony

18  any less believable.

19    There are few of the considerations that will help

20  you determine -- these are a few of the considerations that

21  will help you determine the accuracy of what each witness said.

22  As I stated before, however, you should consider the testimony

23  of all of the witnesses, and give the testimony of each witness

24  the weight you feel it deserves.

25    In making up your mind and reaching a verdict, do not

1  make any decisions simply based -- simply because there were

2  more witnesses on one side than the other.  Do not reach a

3  conclusion on a particular point just because there were more

4  witnesses testifying for one side on that point.  Your job is

5  to think about the testimony of each witness you heard and

6  decide how much you believe of what he or she had to say.

7           Testimony of an Accomplice.

8           You have heard the testimony of Robert Doucette and

9  Daniel (sic) Nassor.  You also heard that they were involved in

10 criminal activity that the Defendant is charged with

11 committing.  You should consider the testimony of Mr. Doucette

12 and Mr. Nassor with more caution than the testimony of other

13 witnesses.

14          Do not convict the Defendant based on the unsupported

15 testimony of such a witness, standing alone, unless you believe

16 his testimony beyond a reasonable doubt.

17          Testimony of a Drug User or an Addict.

18          You have heard the testimony of Robert Doucette and

19 David Nassor.  You have also heard that they were using drugs

20 during the time that they testified about, and that the

21 Government has made promises to them in connection with this

22 matter in exchange for their testimony.

23          It is permissible for the Government to make such a

24 promise.  But you should consider the testimony of Mr. Doucette

25 and Mr. Nassor with more caution than the testimony of other

1     witnesses.  An addict may have a constant need for drugs, and

2     for money to buy drugs, and may also have a greater fear of

3     imprisonment because his supply of drugs may be cut off.  Think

4     about these things and consider them, whether their testimony

5     may have been influenced by the Government's promise.

6         Do not convict the Defendant based on the unsupported

7     testimony of such a witness, standing alone, unless you believe

8     his testimony beyond a reasonable doubt.

9         Testimony of Law Enforcement Officers.

10        You have heard testimony from several law enforcement

11    officers.  The fact that a witness may be employed by the state

12    or federal Government as a law enforcement official does not

13    mean that his or her testimony is necessarily deserving of more

14    or less consideration or greater or lesser weight than that of

15    an ordinary witness.  It is your decision, after viewing all

16    the evidence, whether to accept the testimony of the law

17    enforcement witness and to give that testimony whatever weight

18    you find it deserves.

19        In your daily life, you are constantly determining

20    who is worthy of belief and who is not.  Employ the same tests

21    in determining the weight and credibility, if any, you will

22    assign to the testimony of each witness.

23        Prior Conviction of a Witness.

24        You have heard the testimony of a witness who has

25    pled guilty and/or was convicted of a crime.  The fact that a

1   witness has been convicted of a crime was brought to your

2   attention only as one way of helping you decide how believable

3   his testimony was.  Do not use it for any other purpose.  It is

4   not evidence of anything else.

5           Testimony Pursuant to a Plea Agreement.

6           Proper plea agreements are permissible under the law.

7   The United States Attorney may agree with a witness that, in

8   return for his truthful testimony, the United States Attorney

9   will recommend a more lenient sentence or allow the witness to

10  plead guilty to a lesser charge.  This is a form of plea

11  bargaining.  Plea bargaining is not improper.  It is an

12  essential component of the administration of justice.

13          For those plea agreements that include a provision

14  for a recommendation for a more lenient sentence, the key word

15  is "recommend" because that is all the United States Attorney

16  may do.  A Judge is not bound in sentencing by the plea

17  agreement.  It is permissible for the Government to make such a

18  promise.  But you should consider such testimony with more

19  caution than the testimony of other witnesses.  Consider

20  whether the witness' testimony may have been influenced by the

21  Government's promise.  Do not convict the Defendant based on

22  the unsupported testimony of such a witness, standing alone,

23  unless you believe his testimony beyond a reasonable doubt.

24  You may only consider the subject of plea bargaining as it

25  bears upon the credibility of a witness.  You may not consider

1   whether or not that witness has been or will be adequately

2   punished.

3            However, a witness who hopes to gain more favorable

4   treatment in his own case may have reason to make a false

5   statement because the witness wants to strike a good bargain

6   with the Government.  While a witness who has pled guilty may

7   be entirely truthful when testifying, you should consider the

8   testimony of that witness with more caution than the testimony

9   of other witnesses.  You should give the testimony of the

10  witness the weight, if any, you feel it deserves in light of

11  all the circumstances, including any promises made to the

12  witness, the plea agreement between the witnesses and the

13  government, or any hopes of leniency on the part of the

14  witness.  The decision whether to accept the testimony of the

15  witness is entirely a matter for you to decide.

16           Caution here is to consider only crimes charged.

17           You are here to decide whether the Government has

18  proved beyond a reasonable doubt that the Defendant is guilty

19  of the crimes charged in the indictment.  The Defendant is not

20  on trial for any act, conduct, or offense not alleged in the

21  Indictment.  You should -- you are also -- you also are not

22  concerned with the guilt of any other person or persons not on

23  trial as a defendant in this case.

24           Objections.

25           It is the duty of the parties on both sides of a case

to object when testimony or other evidence is offered that the other side believes is not properly admissible. You should not show prejudice against either the Government's attorneys or the Defendant because they made objections.

Upon allowing testimony or other evidence to be introduced over an objection, the Court does not, unless expressly stated, indicate any opinions opinion as to the weight or effect of such evidence.

When the Court has sustained an objection to a question addressed to a witness, the jury must disregard the question entirely, and may draw no inference from the wording of the question, or speculate as to what the witness would have said if she had -- he or she had been permitted to answer the question.

(Phone ringing.)

THE COURT: I was afraid that was the Supreme Court of Ohio calling. Excuse me.

Upon allowing the testimony or other evidence to be introduced over an objection, the Court does not, unless expressly stated, indicate any opinion as to the weight or effect of such evidence.

When the Court has sustained an objection to a question addressed to a witness, the jury must disregard the question entirely, and may draw no inference from the wording of the question, or speculate as to what the witness would have

1    said if he or she had been permitted to answer the question.

2            Furthermore, statements of asserting or -- assertions

3    made in connection with an objection by the Government's

4    attorney or the Defendant are not evidence and must not be

5    considered as such.

6            The Court's Comments.

7            No statement, ruling, or remark, question or comment

8    which I made or I may have made during the course of the trial

9    is intended to indicate my opinion as to how you should decide

10   the case or to influence you in any way in your determination

11   of the facts.

12           It is the duty of the Court to admonish the

13   Government and/or the Defendant who does something which is not

14   in compliance with the rules of evidence or procedure.  When

15   the Court makes such an admonishment, it does not thereby

16   express any opinion on the merits of the case, and you are to

17   draw no inference against the Government or the Defendant who

18   may have been admonished by the Court.

19           Multiple Crimes.

20           The Defendant has been charged with several crimes.

21   The number of charges is not evidence of guilt, and this should

22   not influence your decision in any way.  It is your duty to

23   separately consider the evidence that relates to each charge

24   and to return a separate verdict on each one.  For each charge,

25   you must decide whether the Government has presented proof

1 beyond a reasonable doubt that the Defendant is guilty of that

2 particular crime.

3 Your decision on one charge, whether it is guilty or

4 not guilty, should not influence your decision on any other --

5 on any other charge.

6 Defendant's Election Not to Testify.

7 A defendant has an absolute right not to testify.

8 The fact that a defendant does not testify cannot be considered

9 by you in any way.  Do not even discuss it in your

10 deliberations.

11 Remember that it is up to the Government to prove the

12 Defendant guilty beyond a reasonable doubt.  It is not up to

13 the Defendant to prove his innocence.

14 Self-representation.

15 The Defendant decided to represent himself in this

16 case and not use the services of an attorney.  It was and is

17 the Defendant's right to represent himself.  The Court

18 appointed standby counsel for the Defendant to serve as a

19 consultant to him during the proceeding.  The Defendant's

20 decision to represent himself has no bearing on whether he is

21 guilty or not guilty, and it must not -- and it must have no

22 effect on your consideration of the case.

23 Now, as to the actual crimes charged:  Conspiracy to

24 transport stolen goods, traveling in interstate commerce with

25 the intent to further promote an unlawful activity, interstate

1  transportation of stolen property.

2           The Nature of the Offenses Charged.

3           Count 1 of the indictment alleges that, on or about

4  December 8 (sic) through May 2009, the Defendant Sean D. Murphy

5  and others did knowingly, willfully, and unlawfully combine,

6  conspire, confederate, and agree with each other to transport

7  in interstate commerce merchandise and money of a value of

8  $5,000 or more knowing that said merchandise and money had been

9  stolen, in violation of 18 U.S.C. Section 2314 and Section 2.

10          Count 2 of the Indictment alleges that, on or about

11 the month of January, 2009, the Defendant Sean D. Murphy did

12 knowingly, willfully, and unlawfully aid and abet and cause an

13 individual to travel in interstate commerce from the State of

14 Massachusetts to the Southern District of Ohio, with the intent

15 to further promote, manage, establish, carry on, and to

16 facilitate the promotional -- promotion, management,

17 establishment and carrying on of an unlawful activity, that

18 being the theft of merchandise and money for the purpose of

19 taking the stolen merchandise and money in interstate commerce

20 from the Southern District of Ohio to locations outside of the

21 State of Ohio, in violation of 18 U.S.C. Section 2314, and

22 thereafter the Defendant did cause and perform -- the

23 performance and attempted performance of acts to further

24 promote, manage, establish, and carry on and facilitate the

25 promotion, management, establishment and carrying on of said

1  unlawful activities.

2      Count 3 of the Indictment alleges that, on or about

3  January 16, 2009, the Defendant Sean D. Murphy did knowingly,

4  willfully, and unlawfully travel in interstate commerce from

5  the State of Massachusetts to the Southern District of Ohio,

6  with the intent to further promote, manage, establish, carry

7  on, and to facilitate the promotion, management, establishment,

8  and carrying on of an unlawful activity, that being the theft

9  of merchandise and money for the purpose of taking the stolen

10 merchandise and money in interstate commerce from the Southern

11 District of Ohio to locations outside of the State of Ohio, in

12 violation of 18 U.S.C. Section 2314, and thereafter the

13 Defendant did perform and attempt to perform acts to further

14 promote, manage, establish, and carry on, and facilitate the

15 promotion, management, establishment and carrying on of said

16 unlawful activity.

17     Count 4 of the Indictment alleges that, on on about

18 January 18, 2009, in the Southern District of Ohio, the

19 Defendant and others did unlawfully transport stolen

20 merchandise and money in interstate commerce, that is,

21 miscellaneous items of some value and more than $5,000 in U.S.

22 currency, from Columbus, Ohio to locations outside of the State

23 of Ohio, knowing that the merchandise and money had been

24 stolen.

25     The statutes defining the offenses charged, with the

1  same heading there that the other one had.

2       Title 18, Section 371, of the United States Code

3  provides, in relevant part:  If two or more persons conspire

4  either to commit any offense against the United States, or to

5  defraud the United States, or any agency thereof in any manner

6  or for any purpose, and one or more of such persons do any act

7  to effect the object of the conspiracy, shall be punished as

8  provided by law.

9       Title 18, Section 1952, of the United States Code

10 provides in relevant part:  (a) Whoever travels in interstate

11 or foreign commerce or uses the mail or any facility in

12 interstate or foreign commerce, with intent to otherwise

13 promote, manage, establish, carry on, or facilitate the

14 promotion, management, establishment, or carrying on, of any

15 unlawful activity, and thereafter performs or attempts to

16 perform an act described in paragraph 3 shall be punished as

17 provided by law.

18    Title 18, Section 2 provides:  Whoever commits an offense

19 against the United States or aids, abets, counsels, commands,

20 induces or procures its commission, is punishable as a

21 principal.

22       Whoever willfully causes an act to be done which if

23 directly performed by him or another would be an offense

24 against the United States, is punishable as a principal.

25       Section 18, Title 2314 of the United States Code,

1 provides in pertinent part: Whoever transports, transmits or

2 transfers in interstate or foreign commerce any goods, wares,

3 merchandise, securities or money, of the value of $5,000 or

4 more, knowingly -- knowing the same to have been stolen,

5 converted or taken by fraud shall be punished as provided by

6 law.

7        Count 1.

8        Now, these are the essential elements of the offense

9 in Count 1.  And this tells you exactly -- you follow this to

10 determine whether or not this crime has been committed.

11       Count 1 of the Indictment accuses the Defendant of

12 participating in a conspiracy to transport merchandise and

13 money.  It is a crime for two or more persons to conspire, or

14 agree, to commit a criminal act, even if they never actually

15 achieve the goal.

16       The conspiracy is a kind of criminal partnership.

17 For you to find the Defendant guilty of the conspiracy, the

18 government must prove each and every one of the elements beyond

19 a reasonable doubt:

20       First:  That two or more persons conspired, or

21 agreed, to transport stolen merchandise and money in interstate

22 commerce;

23       Second:  That the Defendant knowingly and voluntarily

24 joined the conspiracy; and

25       Third:  That one or more co-conspirators committed at

1    least one overt act in furtherance of the conspiracy; and

2          Fourth:  That the offense charged occurred in whole

3    or in part in the Southern District of Ohio on or about the

4    dates alleged in the Indictment.

5          You must be convinced that the Government has proved

6    all of these elements beyond a reasonable doubt in order to

7    find the Defendant guilty of the conspiracy charge.

8          Count 1.  Conspiracy to Transport Stolen Goods.

9          Conspiracy, dash, Agreement.

10          The evidence in the case need not show that the

11    members of the conspiracy entered into any express or formal

12    agreement, or that they directly, by words spoken or in

13    writing, stated between themselves what their object or purpose

14    was to be, or the details thereof, or the means by which the

15    object or purpose was to be accomplished.  What the evidence

16    must show beyond a reasonable doubt, in order to establish the

17    proof -- proof that a conspiracy existed, is that the members

18    of the conspiracy in some way or manner, or through some

19    contrivance, came to a mutual understanding to try to

20    accomplish a common and unlawful plan.  The evidence need not

21    establish that all of the persons charged to have been members

22    of the conspiracy were in fact members of the conspiracy.  What

23    the evidence must establish beyond a reasonable doubt is that

24    the alleged conspiracy was knowingly and intentionally formed

25    and that two or more persons were members of the conspiracy.

1        An agreement can be proved indirectly, by facts and

2   circumstances which lead to a conclusion that an agreement

3   existed.  But it is up to the Government to convince you that

4   such facts and circumstances existed in this particular case.

5        Conspiracy -- Membership.

6        If you are convinced that there was a criminal

7   agreement, then you must decide whether the Government has

8   proved that the Defendant knowingly and voluntarily joined the

9   agreement.  To convict the Defendant, the Government must prove

10  that he knew of the conspiracy's main purpose, and that he was

11  voluntarily -- and that he voluntarily joined it intending to

12  help advance or achieve its goals.

13       In determining whether a conspiracy existed, the jury

14  should consider the acts and declarations of all of the alleged

15  participants.  However, in determining whether the Defendant

16  was a member of the conspiracy, the jury should consider only

17  this particular Defendant's acts and statements.  A defendant

18  cannot be bound by the acts or declarations of other

19  participants in a conspiracy until it is established that a

20  conspiracy existed, and that the particular defendant in

21  question was one of its members.

22       Mere presence, association, knowledge, approval or

23  acquiescence is not sufficient to convict a defendant of

24  conspiracy.  Similarly, just because a defendant may have done

25  something that happened to help a conspiracy does not

1  necessarily make him a co-conspirator.  These are all things

2  that you may consider in deciding whether the Government has

3  proved that the Defendant joined a conspiracy.  But without

4  more they are not enough.

5      To be a member of the conspiracy, a defendant need

6  not know of all the other members, nor all the details of the

7  conspiracy, nor the means by which the objects of the

8  conspiracy were to be accomplished.  The Government need not

9  prove that a defendant knew everything about the conspiracy, or

10  everyone else involved, or that he was a member of it from the

11  very beginning.  Nor does it require proof that a defendant

12  played a major role in conspiring, or that his connection to it

13  was substantial.  A slight connection may be enough.  Each

14  member of the conspiracy may perform separate and distinct

15  acts.  It is necessary, however, that the Government prove

16  beyond a reasonable doubt that the Defendant under

17  consideration was aware of the common purpose of the conspiracy

18  and was a willing participant with the intent to advance the

19  purpose of the conspiracy.

20      A Defendant's knowledge can be proved indirectly by

21  facts and circumstances which lead to a conclusion that he knew

22  the conspiracy's main purpose.  It is up to the Government to

23  convince you that such facts and circumstances existed in this

24  particular case.

25      Whenever it appears beyond a reasonable doubt from

1   the evidence in the case that the charged conspiracy existed,

2   and that the defendant was one of the members, then any

3   statements thereafter knowingly made and any acts thereafter

4   knowingly done, by any person likewise found to be a member,

5   may be considered by the jury as evidence in the case as to

6   that particular defendant.  This is true even though the

7   statements and acts may have occurred in the absence of and

8   without the knowledge of the defendant, provided such

9   statements and acts were knowingly made and done during the

10  existence of such conspiracy, and in furtherance of some object

11  or purpose of the conspiracy.  Therefore, statements of any

12  conspiracy (sic) which are not in furtherance of the conspiracy

13  or are made before its existence or after its termination, may

14  be considered as evidence only against the person making them.

15          Overt Acts.

16          The third element that the Government must prove is

17  that a member of the conspiracy did one of the overt acts

18  described in the Indictment for the purpose of advancing or

19  helping in the conspiracy.

20          The Indictment lists overt acts.  The Government does

21  not have to prove that all these acts were committed, or that

22  any of these act were themselves illegal.

23          But the Government must prove that at least one of

24  these acts was committed by a member of the conspiracy and that

25  it was committed for the purpose of advancing or helping the

1   conspiracy.  This is essential.

2          The overt acts from Count 1 of the indictment are:

3   On or about December 1, 2008, a person known to the grand jury

4   drove from the greater Boston, Massachusetts metropolitan area

5   to Memphis, Tennessee.

6          2.  During the month of January, 2009, a person known

7   to the grand jury drove from the greater Boston, Massachusetts

8   metropolitan area to Columbus, Ohio.

9          On January 3rd, 2009, Sean D. Murphy, using the alias

10  Brian Heatherman, rented a storage facility from The Lock Up

11  Storage Centers, 922 Brush Creek Road, Warrendale,

12  Pennsylvania.

13         4.  On or about January 15, 2009, Sean D. Murphy

14  rented a Dodge Sedan from DTG Operations d/b/a Thrifty Car

15  Rental, 40 Lee Burbank Highway, Revere, Massachusetts.

16         On January 16, 2009, Sean D. Murphy, using the alias

17  Brian Heatherman, rented a truck from Newmarket Storage, 133

18  Exeter, Newmarket, New Hampshire.

19         On or about January 16, 2009, Sean D. Murphy, Joseph

20  M. Morgan and Robert Doucette, drove from the greater Boston,

21  Massachusetts metropolitan area to Warrendale, Pennsylvania.

22         On or about January 17, 2009, Sean D. Murphy, Joseph

23  M. Morgan and Robert Doucette drove from Warrendale

24  Pennsylvania Columbus, Ohio.

25         On or about January 17, 2009, Sean D. Murphy and

1   Joseph M. Morgan enter the Brink's Warehouse facility located

2   at 1362 Essex Avenue, in Columbus, Ohio.

3         On or about January 18, 2009, Sean D. Murphy, Joseph

4   M. Morgan and Robert Doucette drove from Columbus, Ohio to

5   Warrendale, Pennsylvania.

6         On or about January 18, 2009, Sean D. Murphy, Joseph

7   M. Morgan, and Robert Doucette drove from Warrendale,

8   Pennsylvania to the greater Boston, Massachusetts metropolitan

9   area.

10        Conspiracy to Transport Stolen Goods.  Unindicted,

11   Unnamed and (sic) Separately Tried Co-Conspirators.

12        Some of the people who may have been involved in

13   these events are not on trial.  This does not matter.  There is

14   no requirement that all members of a conspiracy be charged and

15   prosecuted, or tried together in one proceeding.

16        Nor is there any requirement that the names of the

17   other conspirators be known.  An indictment can charge a

18   defendant with a conspiracy involving people whose names are

19   not known, as long as the Government can prove that the

20   Defendant conspired with one or more of them.  Whether they are

21   named or not does not matter.

22        Causing an Individual to Travel in Interstate

23   Commerce With the Intent to Further Promote an Unlawful

24   Activity.

25        The Essential Elements of Offense Charged in Count 2.

1    Count 2 of the indictment accuses the Defendant of

2 causing an individual to travel in interstate commerce with the

3 intent to further promote an unlawful activity, in violation of

4 federal law.  For you to find the Defendant guilty of Count 2

5 of the indictment, you must be convinced that the Government

6 has provided (sic) each and every one of the following elements

7 beyond a reasonable doubt.

8    First:  That the Defendant caused another to travel

9 in interstate commerce.

10    Second:  That the Defendant caused another to engage

11 in such travel with the intention to promote, manage, establish

12 or carry on or facilitate the activity described in the

13 Indictment.

14    Third:  The activity described in this Indictment was

15 illegal; and

16    That interstate -- the interstate travel, the

17 Defendant knowingly and deliberately caused another to do an

18 act, or to attempt to do an act, in order to establish, or

19 carry on or facilitate the activity described in the

20 Indictment.

21    Fifth:  That the act occurred on or about the date

22 alleged in the Indictment in the Southern District of Ohio and

23 elsewhere.

24    If you are convinced that the Government has proved

25 all of these elements, say so by returning a guilty verdict on

1    this charge.  If you have a reasonable doubt about any one of

2    these elements, then you must find the Defendant not guilty of

3    the charge.

4           Traveling in Interstate Commerce.

5           Count 3 of the Indictment accuses the defendant of

6    traveling from the State of Massachusetts to the Southern

7    District of Ohio with the intent to further promote an unlawful

8    activity, in violation of the Federal law.  For you to find the

9    Defendant guilty of Count 3, you must be convinced that the

10   Government has proved each and every element beyond a

11   reasonable doubt:

12          First:  That the Defendant traveled from one state to

13   another;

14          Second:  The Defendant traveled with the intention to

15   promote, manage, establish or carry on the activity described

16   in the Indictment;

17          The activities described in this indictment was

18   illegal;

19          And after the interstate travel, the Defendant

20   knowingly and deliberately, did an act, or attempted to do an

21   act, in order to establish, or carry on, the activity described

22   in the Indictment.

23          That such act occurred on or about the date alleged

24   in the Indictment, in the Southern District of Ohio and

25   elsewhere.

1    If you are convinced that the government has proved

2 all of these elements, say so by returning a guilty verdict on

3 this charge.  If you have a reasonable doubt about any one of

4 these elements, then you must find the Defendant not guilty of

5 this charge.

6    Travel in Interstate Commerce Defined.

7    The term "travels in interstate commerce" means

8 simply travel or transportation from one state to another.

9    It is not necessary for the Government to prove that

10 any travel from one state to another was contemplated or

11 planned at the time that the course of activity began.  It is

12 not necessary for the Government to prove that the promotion of

13 the activity alleged to be unlawful was the only reason for the

14 interstate travel or that the travel was essential to that

15 activity.

16    The Government must prove beyond a reasonable doubt,

17 however, that the Defendant traveled in interstate commerce and

18 that one of the reasons for this travel was to promote, manage,

19 carry on, or facilitate the activity described in the

20 indictment.

21    To Promote or Facilitate of Any Unlawful Activity is

22 Defined.

23    The phrase to "promote or facilitate the promotion of

24 any unlawful activity" means to do any act that would cause an

25 unlawful act described in the indictment to be accomplished or

1    to assist the unlawful activity in any way.

2          In Counts 2 and 3, the term "unlawfully" —- "unlawful

3    activity" means any activity involving the illegal

4    transportation of stolen merchandise and money in interstate

5    commerce in violation of the laws of the United States.

6          The illegal transportation of stolen merchandise and

7    money in interstate commerce is unlawful under the laws of the

8    United States.

9          The elements that the Government would have to prove

10   beyond a reasonable doubt to sustain a conviction for an

11   offense involving the illegal transportation of merchandise and

12   money in interstate commerce will be explained for you in your

13   next instruction.  You may utilize those elements to assist you

14   in determining whether or not the Government has sustained its

15   burden to prove the unlawful activity alleged in Counts 2 and

16   3.

17         Essential Elements of Offense Charged.

18         Count 4 of the Indictment charges the Defendant with

19   interstate transportation of stolen property.  In order to

20   establish the offense charged in Count 4, the Government must

21   prove the following elements beyond a reasonable doubt:

22         First:  That the merchandise and money identified in

23   the indictment had been stolen;

24         That the merchandise and money had a value of $5,000

25   or more;

1     And that at the time of the transportation, the

2 Defendant knew that the property had been stolen;

3     That the Defendant transported the merchandise and

4 money in interstate commerce from Columbus, Ohio, to locatoins

5 outside of the State of Ohio.

6     If you are convinced that the Government has proved

7 all of these elements, say so by returning a verdict of guilty

8 on this charge.  If you have a reasonable doubt about any one

9 of these elements, then you must find the Defendant not guilty

10 of these charges.

11     Aiding and Abetting.

12     Whoever commits an offense against the United States,

13 or aids, abets, counsels, commands, induces, or procures its

14 commission is punishable as a principal.

15     Whoever willfully causes an act to be done, which if

16 directly performed by him or another would be an offense

17 against the United States, is punishable as a principal.

18     The guilt of a defendant in a criminal case may be

19 established without proof that he personally committed the

20 offense charged or that he did everything -- or that he did

21 every act constituting the offense charged.  If a defendant

22 aids and abets another person by willfully joining together

23 with that person in the commission of a crime, then that law

24 holds the defendant responsible for the acts and conduct of

25 such other person just as though the defendant had committed

1   the acts or engaged in such conduct himself.

2         To "aid and abet" means to assist the perpetrator of

3   the crime while sharing in the requisite criminal intent.  In

4   other words, the defendant must perform some affirmative act

5   which contributes to the execution of a crime, and must also

6   possess the intent to aid another person in the commission of

7   the crime.

8         Of course, mere knowledge that a crime is being

9   committed is not sufficient to establish that a defendant aided

10   and abetted the crime.  Nor is mere acquiescence by the

11   defendant in the criminal conduct of others sufficient to

12   establish aiding and abetting.

13         In order to aid and abet another in the commission of

14   a crime, it is necessary that the defendant willfully associate

15   in some way with the criminal venture and willfully participate

16   in it as he would in something he wishes to bring about; that

17   is to say, that the defendant willfully seeks by some act or

18   omission of his to make the criminal venture succeed.

19         An act is willfully done if it is done voluntarily

20   and intentionally and with the specific intent to do something

21   the law forbids.

22         Before a defendant will be found guilty of aiding and

23   abetting another person in the commission of a crime, it is

24   necessary that the crime actually be committed.  Thus, you may

25   not find that the Defendant aided or abetted the offense

1  contained in the Indictment unless you find beyond a reasonable

2  doubt that another person or persons in fact committed the

3  offense with which the Defendant is charged, and that the

4  Defendant willfully participated in its commission.

5  "On or about" is defined.

6  The Indictment charges that each count happened "on

7  or about" a given date.  The Government does not have to prove

8  that the crime happened on one exact date.  But the Government

9  must prove that the crime happened reasonably close to the date

10  or dates alleged.

11  Verdict Limited to Charges Against the Defendant.

12  Remember that the Defendant is only on trial for the

13  particular crimes charged in the Indictment.  Your job is

14  limited to deciding whether the Government has proved the

15  crimes charged.

16  Also remember that whether anyone else should be

17  prosecuted and convicted for one or more of these crimes is not

18  a proper matter for you to consider.  The possible guilt of

19  others is no defense to a criminal charge.  Your job is to

20  decide if the Government has proved this Defendant guilty.  Do

21  not let the possible guilt of others influence your decisions

22  in any way.

23  Venue.

24  The Court has taken judicial notice that 1362 Essex

25  Avenue in Columbus, Ohio is in the Southern District of Ohio.

1    You may accept the Court's declaration of judicial notice as

2    evidence and regard as provided, as proved, the fact that it

3    has been judicially noticed, but you are not required to do so

4    since you are the sole judge of the facts.

5            There is no requirement that the entire offense

6    charged in a particular count took place in the Southern

7    District of Ohio.  But for you to return a guilty verdict on

8    each count, the Government must prove by a preponderance of the

9    evidence that the offense charged took place, at least in part,

10   in the Southern District of Ohio.

11           Unlike all the other elements I have described, this

12   is just a fact that the Government has to prove only by a

13   preponderance, or greater weight, of the evidence, not beyond a

14   reasonable doubt.  This means that the Government only has to

15   convince you that it is more likely than not that the

16   particular offense charged was begun, continued or completed in

17   the Southern District of Ohio.

18           Remember that all other elements that I have

19   described must be proved beyond a reasonable doubt.

20           Jury Deliberations and Foreperson.

21           That concludes the part of my instructions explaining

22   the rules you must apply in this case.  Now let me finish by

23   explaining some other things about your deliberations in the

24   jury room and your possible verdicts.

25           When you get to the jury room, you must first -- your

first order of business will be the election of a foreperson to

preside over your deliberations.  The foreperson acts as the

chairperson of the meeting.  He or she must see to it that the

charges and issues are taken up as given to you, that everyone

has a chance to speak to these matters, and your deliberation

proceeding -- must proceed in an orderly way.

Once you start deliberating, do not talk to anyone

else except each other about the case.  If you have any

questions or messages, please write them on a sheet of paper

and have the foreperson sign and date the paper following the

question, and give it to the jury official (sic) or marshal.

If you submit a written question, continue to

deliberate on those matters to which the question does not

apply, if at all possible.

Items Going to the Jury Room.

All of the exhibits that have been admitted into evidence

will go to the jury room with you, together with a copy of

these instructions and the verdict -- two copies, actually --

and the verdict forms.

If you're unable to readily locate any particular

exhibits, please have the foreperson notify the Marshal or

guard that is covering the courtroom sitting outside of the

court -- your deliberation room.  The numbers of those exhibits

will be given to you in order to facilitate your search for

them.

1          Please make sure that you have all the exhibits and

2     the verdict forms.

3          The jury is not to consider punishment.

4          You, the jury, are instructed that you may not

5     discuss or consider the subject of punishment as it relates to

6     this matter.  Your duty is confined to the determination of the

7     guilt or innocence of the Defendant.  In the event that you

8     find the Defendant guilty, the law places the duty to determine

9     the punishment upon the Court.

10          Jury Deliberations.

11          It is your duty as jurors to consider, confer, with

12     each other and to deliberate with a view toward reaching an

13     agreement, if you can do so without doing harm to your

14     individual judgment.  Talk with each other, listen carefully

15     and respectfully to each other's views and keep an open mind.

16          Each of you must decide the case for yourself, but

17     you do so only after an impartial consideration of the evidence

18     in this case with your fellow jurors.  In the course of your

19     deliberations, do not hesitate to reexamine your own views and

20     change your opinion, if you are convinced that it is erroneous.

21          However, do not surrender your honest conclusion as

22     to the weight or effect of the evidence solely because of the

23     opinion of your fellow jurors or for the mere purpose of

24     returning a verdict.  No one will be allowed to hear your

25     discussions in the jury room, and no record will be made of

1  what you say.  So you should all feel free to speak your minds.

2          Remember always that you are not partisans.  You are

3  judges, impartial judges of the facts.  Your sole interest is

4  to ascertain the truth from the evidence in the case.  Don't

5  take a firm position at the outset and then be too proud to

6  change your position.

7          Experiments, Research and Investigation.

8          Remember that you must make your decision based only

9  on the evidence that you saw or heard here in Court.  Do not

10 try to gather any information about your case, about the case,

11 on your own while you are deliberating.

12         For example, do not conduct any experiments inside or

13 outside the jury room.  Do not bring any books, like a

14 dictionary, or anything else with you like a computer during

15 your deliberations.  Do not compute -- conduct -- any

16 independent research, reading or investigation about the case,

17 and do not visit any of the places that were mentioned during

18 the trial.

19         Make your decision based only on the evidence you

20 have seen and heard here.

21         The verdict must be unanimous.

22         Your verdict must represent the considered judgment

23 of every juror.  To return a verdict, whether it is guilty or

24 not guilty, it is necessary that all jurors agree with the

25 verdict and -- in other words, it's 12, one way or the other --

1  with the verdict and indicate their agreement by signing the

2  verdict form.

3          In other words, the verdict must be unanimous.

4          To find the Defendant guilty, every one of you must

5  agree that the Government has overcome the presumption of

6  innocence with evidence that proves his guilt beyond a

7  reasonable doubt.

8          To find the Defendant not guilty, every one of you

9  must agree that the Government has failed to convince you

10  beyond a reasonable doubt.

11          The Verdict is the Exclusive Responsibility of the

12  Jury.

13          Nothing that the Court has said in these

14  instructions, and nothing in the verdict forms that has been

15  prepared for your verdict, or by any of the rulings of the

16  Court is intended to suggest or convey in any way that the

17  verdict of the Court thinks -- the verdict the Court thinks you

18  should return.  Verdicts are the exclusive duty and

19  responsibility of the jury.

20          I state to you categorically that although the Court

21  may have an opinion as to the guilt or innocence of the

22  Defendant, it is inappropriate for the Court to express the

23  same, as it is you, and you alone, who must determine the guilt

24  or innocence of the Defendant.  Nothing that I have said or

25  done during this trial was meant to influence your decision in

1    any way.  You decide for yourselves if the Government has

2    proved the Defendant's guilt beyond a reasonable doubt.

3         A form of the verdict will be furnished, one form of

4    verdict.

5         Each count of the indictment is set out on the

6    verdict form.  If you find the Defendant not guilty as to a

7    particular count, you will mark that space labeled "Not Guilty"

8    preceding that count.  Otherwise, if you find the Defendant

9    guilty as to a particular count, you will mark the space

10   labeled "Guilty.

11        Consider your verdict separately and as to each count

12   of the Indictment.

13        When you have reached a verdict and have filled out

14   and signed the verdict form, the foreperson of the jury shall

15   notify the Marshal as to that the jury has reached a verdict.

16        The parties have agreed or stipulated to various

17   facts and evidence surrounding the case.  When both sides of a

18   case stipulate or agree to the existence of a fact, you may

19   accept the stipulation as evidence and regard that fact as

20   proven.  You may -- you are not required to do so, however,

21   since you are the sole judges of the facts.

22        In this case, both parties have expressed stipulation

23   the following facts:

24        Defendant Sean Murphy is the author of the book

25   titled "Master Thief:  How To Be A Professional Burglar" that

1  was found during the course of this investigation.

2         2.  On January 16, 2009, Defendant Sean Murphy was

3  present at Newmarket Storage, in Newmarket, New Hampshire, on

4  or about 10:30 a.m.

5         Forensic Scientist Mark L. Bryant examined latent

6  lifts from the front of a battery and Motorola walkie talkie,

7  Government Exhibit 1D-9.  The subject latent lifts were

8  analyzed according to appropriate latent impression procedures

9  and compared to inked finger and palm prints of Sean D. Murphy.

10 The lifts from the battery and walkie talkie were identified as

11 an impression of the left thumb of Sean D. Murphy.  The crime

12 lab report reflecting these results is marked as Government

13 Exhibit 11-1.

14        Forensic Scientist Jamie F. Armstrong examined DNA

15 swabs collected from the welder's mask, Government Exhibit

16 1D-11, and the respirator, Government Exhibit 1D-19.  The swabs

17 were compared to an oral swab from Sean D. Murphy.  The

18 comparisons were completed according to appropriate DNA

19 analysis procedures.  The DNA types obtained from the mask

20 contained a mixture of at least two different contributors.

21 Sean D. Murphy cannot be excluded as one of those contributors.

22 Now, the DNA from the respirator matched the DNA from Sean D.

23 Murphy.  The crime lab report reflecting these results is

24 marked as Government Exhibit 12-1.

25        Then there is the guilty -- the verdict forms.  I

1   will mention one other thing about sending a question to the

2   Court through the -- through the -- through whoever is guarding

3   the jury room.

4            I will not read back the testimony of witnesses.  You

5   will have to rely upon your collective memories for that,

6   because, if you do read that back, then you have to read the

7   cross-examination and on and on and anything else that relates

8   to that.  So, you will have to rely on your memories.

9            Rely on, if you have a question, a legal question,

10  about what any of the elements of the case, for example, mean,

11  so forth, go to that and read that over again; but if you have

12  a question on that, you may send it; and we'll probably refer

13  you specifically to what you should read again that are already

14  in your jury instructions.

15           Are there any questions?

16           (No response.)

17           THE COURT:  Remember, first, to select a foreperson.

18           Counsel?

19           MR. DOMINGUEZ:  No objection, Your Honor.

20           MR. GRAEFF:  No objection, sir.

21           MR. DOMINGUEZ:  No objection from the government,

22  Your Honor.

23           THE COURT:  Okay.  Well, it's now 20 of 4:00.  So,

24  you will have some time to go into this.

25           Do you want to go until 5:30 today?  You may reach a

1  verdict by then.  I don't -- I don't know.  I don't have any

2  way of knowing.  I'm not urging that there is any time limit on

3  this.  If you cannot reach a verdict by 5:30 today, you will be

4  coming back at 9:30 tomorrow morning, or earlier, if you wish.

5  Do you have any thoughts on that?

6          JUROR:  I don't think we're going to reach a verdict

7  today.

8          THE COURT:  Okay.  There is a lot of material in the

9  case, and four counts.  So, if so, how late do you want to

10 stay?

11         JUROR:  Can we talk about it and provide you an

12 answer?

13         THE COURT:  Okay.  Fine.

14         COURTROOM DEPUTY CLERK:  Anything else, Your Honor?

15         Anything else?

16         THE COURT:  No.  That's it.

17         COURTROOM DEPUTY CLERK:  Ladies and gentlemen, please

18 rise.

19         (Whereupon, the jury existed the courtroom to begin

20 their deliberations at 3:43 p.m.)

21         MR. GRAEFF:  Just for the record, I renew -- Mr.

22 Murphy renews his motion, his Rule 29 motion for acquittal, on

23 all four counts.

24         We specifically, if the Court recollects, have

25 filed -- with respect to Counts 2 and 3, we have filed motions

1  to dismiss that on two separate occasions.  Mr. Murphy even

2  gave you a brief summary of why he believes they were -- they

3  are dismissible in his September 14th hearing.

4         We also filed yesterday, or Mr. Murphy filed

5  yesterday, electronically, a motion for acquittal specifically

6  focusing on Counts 2 and 3.

7         So, with that respect, we renew our motions for

8  acquittal.

9         THE COURT:  Based on the arguments of counsel and the

10  evidence presented, the Court -- it is not appropriate for a

11  motion -- to grant a motion for acquittal.  And the motion is

12  overruled.

13         MR. GRAEFF:  Thank you, sir.

14         (Whereupon, a recess was taken at 3:46 p.m.)

15                        -  -  -

16         THEREUPON, at 5:00 p.m. the following proceedings were

17  held in the jury room with all of the jurors present and the

18  Court and his staff:

19         THE COURT:  Lisa has to go over the exhibits.  But I

20  urge you to come as early as you possibly can tomorrow.  We

21  will have people here, but you don't have to have all of the

22  parties present.

23         THE JURY:  What time would you like to start?

24         THE COURT:  Can you make it by nine?

25         THE JURY:  8:30.

1          THE COURT:  But if we have some traveling from

2    farther away.  Well, what about if we shoot for 8:30, and then

3    if someone doesn't quite make it, don't start without them.

4          Remember not to discuss this case with each other

5    until you are all at this table discussing the case.  And

6    report any violations to court personnel.  Do not form an

7    opinion until you have really gotten into your deliberations.

8    Do not do any investigation or read any reports in the

9    newspaper.  Do not discuss the case with your family and

10   friends.  You will be able to do that when you have completed

11   this.  And that's it.  Thank you for your time.

12                          - - -

13         THEREUPON, the evening recess was taken at 5:00

14   O'CLOCK to be resumed on Wednesday, October 26, 2011 at 8:30

15   a.m.

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3   United States of America

4   Southern District of Ohio

5          We, Georgina L. Wells and Denise N. Errett, Official

6   Court Reporters of the United States District Court for the

7   Southern District of Ohio, do hereby certify that the foregoing

8   164 pages constitute a true and correct transcription of our

9   stenographic notes taken of the proceedings held in the City of

10  Columbus, Ohio, in the matter therein stated, on the 25th day

11  of October, 2011.

12         In testimony whereof, we hereunto set our hands on

13  the 23rd day of March, 2012.

14

15

16                            /s/ Georgina L. Wells

17                            _____

18                            Georgina L. Wells, RMR
                              Official Court Reporter
                              Southern District of Ohio

19

20                            /s/ Denise N. Errett, FCRR

21                            _____

22                            Denise N. Errett, FCRR
                              Official Court Reporter
                              Southern District of Ohio

23

24

25