<pre>
              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF OHIO
                      EASTERN DIVISION


UNITED STATES OF AMERICA,      )      CASE NUMBER
                               )      2:11-CR-10(1)
              PLAINTIFF,       )
         VS.                   )      COLUMBUS, OHIO
                               )      JANUARY 25, 2012
                               )
SEAN D. MURPHY,                )
                               )
              DEFENDANT.       )
_____)
</pre>

**TRANSCRIPT OF SENTENCING HEARING**
BEFORE THE HONORABLE GEORGE C. SMITH
UNITED STATES DISTRICT JUDGE

APPEARANCES OF COUNSEL:

FOR THE UNITED STATES:      SALVADOR DOMINGUEZ, AUSA

                            HEATHER HILL, AUSA

FOR THE DEFENDANT:          DAVID GRAEFF, ESQUIRE

GEORGINA L. WELLS, OFFICIAL FEDERAL COURT REPORTER
                 (614)719-3225

# I N D E X

WITNESS                                          PAGE NO.


MICHAEL BUCKLEY


DIRECT EXAMINATION                                  19
CROSS-EXAMINATION                                   26



JASON COSTELLO


DIRECT EXAMINATION                                  55
CROSS-EXAMINATION                                   75
REDIRECT EXAMINATION                                85

1          Wednesday Morning Session,

2          January 25, 2012.

3                    - - -

4          COURTROOM DEPUTY CLERK:  The Court calls Criminal

5    Case Number 2:CR-11-10, Defendant Number 1, the United States

6    of America v. Sean Murphy.

7          THE COURT:  Good morning.

8          MR. DOMINGUEZ:  Good morning, Your Honor.

9          THE COURT:  Mr. Dominguez.  Mr. Graeff.

10         MR. GRAEFF:  Good morning, Your Honor.

11         THE COURT:  And Mr. Murphy.

12         MR. MURPHY:  Good morning, Your Honor.

13         THE COURT:  Mr. Graeff, have you and your client read

14   and discussed the Presentence Report prepared by the U.S.

15   Probation Office?

16         MR. GRAEFF:  We have, Your Honor.

17         THE COURT:  And Mr. Murphy, do you recall reviewing

18   the Presentence Report with your attorney?

19         MR. MURPHY:  Yes, I do, Your Honor.

20         THE COURT:  Do you understand everything that you and

21   your attorney have discussed regarding the Presentence Report?

22         MR. MURPHY:  Yes, Your Honor.

23         THE COURT:  Is there anything about the Presentence

24   Report that you do not understand?

25         MR. MURPHY:  No, Your Honor.

1          THE COURT:  And counsel, do you have any -- well,

2     Mr. Graeff, do you have any doubt as to your client's

3     understanding of the report?

4          MR. GRAEFF:  We discussed it thoroughly, and two days

5     ago, I spent two hours with him going over that and other

6     matters, Your Honor, and he understands it perfectly.

7          THE COURT:  Well, we have a lot of issues that we

8     need to address with respect to the sentencing.  And first, we

9     will discuss the factual objections to the Presentence Report,

10    and then turn to the guideline calculation objections.  And

11    followed by that, we will go over the Sentencing Memorandum.

12    And finally, we will hear from the victim, mitigation from

13    defense and from the defendant.

14         I will briefly summarize the defendant's factual

15    objections to the report, and then, Mr. Graeff, you may

16    supplement that in any manner that you wish, if it is

17    necessary.

18         The defendant objects to the inclusion of the words

19    that "he conducted research on the internet for this burglary"

20    in Paragraphs 11, 27 and 34.  Mr. Murphy asserts that all he

21    did was locate Brink's using the Yellow Pages.

22         Mr. Graeff, anything to add to that objection?

23         MR. GRAEFF:  The only thing that I would add, Your

24    Honor, is that the U.S. Attorney in their response utilized the

25    "Master Thief" book instead of what the Probation Officer

1    stated in her reasons for the factual dispute.

2         There is no indication of research during the trial

3    except for the U.S. Attorney stating that in opening and

4    closing.  The two main witnesses never used the word

5    "research", Your Honor.

6         THE COURT:  Any response, Mr. Dominguez?

7         MR. DOMINGUEZ:  Your Honor, it is clear from the

8    transcript excerpt that was included in the Sentencing

9    Memorandum prepared by the defense that Mr. Doucette did, in

10   fact, indicate that the internet was used by Mr. Murphy in

11   order to ascertain the whereabouts of the Brink's facility and

12   its suitability for the burglary that he perpetrated on it.  I

13   merely cited the "Master Thief" manifesto as consistent with

14   Murphy's belief that that is what should be used in order to

15   commit such a crime.  So, that's all that I have.

16        THE COURT:  Thank you.  As you know, I presided over

17   the trial and have reviewed the trial transcript, and there was

18   some testimony about research conducted on the internet.  Not

19   only does Mr. Murphy agree that he used the internet to locate

20   Brink's using the Yellow Pages, but Doucette testified that

21   Mr. Murphy showed him pictures on the internet while discussing

22   the plan to break into the Brink's Warehouse.

23        Mr. Murphy's clarification that all he did was locate

24   Brink's using the Yellow Pages is noted, but he did not testify

25   during the trial, and this is not evidence in this case.  The

phrase, "conducted research on the internet" is general and encompasses what Mr. Murphy did; however, to clarify facts for the record, Paragraphs 11, 27 and 34, in which is the phrase "conducted research on the internet" is amended to read "located the Brink's Warehouse and pictures of it on the internet."

Further in the "Master Thief, How to be a Professional Burglar" manual written by Mr. Murphy, he specifically writes:

The first place to begin your search is the internet. The amount of information available online is mind boggling. All the different telephone directories online provide a good starting point. You can search by company type or SEC. Both will limit your search to the exact type of business that you want to hit.

Additionally, he writes, quote: "You can get an initial look at the place from your own computer. Most of the online telephone directories like Superpages and Yellow Book have a map feature...that will allow you to choose a bird's-eye view, which is a picture taken from a satellite in space." The viewing of pictures from the Brink's facility is exactly what Doucette described that Murphy showed him.

Therefore, the factual statements in the Presentence Report with some clarification are accurate, and the defendant's objection is overruled.

1          Defendant also notes possible Presentence Report

2     confusion regarding his education records.  The Probation

3     Officer reports that she has yet to receive documentation of

4     defendant's attendance at the Wentworth Institute of Technology

5     and that she did receive confirmation that defendant was not a

6     participant in the Boston -- was not a participant in the

7     Boston University Prisoner Education Project.

8          Do you have any documentation of his education,

9     Mr. Graeff or Mr. Murphy?

10          MR. GRAEFF:  No, we don't, but I understand there is

11     a provision for what the Probation Officer has called a BOP

12     Presentence Report, and what we intend to do is provide the

13     documentation, and eventually, send that to the BOP, so it can

14     be, I guess, remedied.  So, the answer to your question, Your

15     Honor, is no.

16          And while I am standing up, the Sixth Circuit has

17     told us that we have to object to every issue that you

18     overrule.  Can I have a continuing objection to the ones that

19     you overrule so that I don't have to stand up and object every

20     time that you overrule our objections?

21          THE COURT:  Yes.

22          MR. DOMINGUEZ:  We don't object to proceeding in that

23     fashion, Your Honor.

24          THE COURT:  That will be fine.

25          MR. GRAEFF:  Thank you, sir.

1          THE COURT:  You'll have a continuing objection.

2          Any response, Mr. Dominguez?

3          MR. DOMINGUEZ:  Your Honor, we, likewise, have no

4    documentation to that.

5          THE COURT:  The Probation Officer has to include in

6    the Presentence Report the information that can be confirmed.

7    Without any documentation, I am not going to change the

8    Presentence Report, but I will consider your statements that

9    you have the education as truthful.

10          Defendant objects to the Probation Officer's failure

11    to include all the reasons he is requesting downward departures

12    or variances from his sentence.  The Probation Officer responds

13    that she included any relevant portions in Part F of the

14    Presentence Report.  The Court will address defendant's

15    additional arguments when discussing the Sentencing Memorandum.

16          Are there any additional objections to the factual

17    statements in the Presentence Report?

18          MR. GRAEFF:  No, sir.

19          MR. DOMINGUEZ:  No, Your Honor.  Thank you.

20          THE COURT:  The Court's finding is as follows:  The

21    Court has ruled on the objections to the factual statements and

22    finds based on the testimony presented at trial that all of the

23    factual statements contained in the Presentence Report are

24    correct, and, therefore, the Court adopts those statements as

25    its finding of fact.

1          The defendant was found guilty of Counts 1, 2, 3 and

2   4 of the Indictment charging him with conspiracy to transport

3   merchandise and money in interstate commerce in violation of

4   18 U.S.C., Section 371; traveling in interstate commerce with

5   the intent to further promote an unlawful activity in violation

6   of 18 U.S.C., Section 1952 and 2; and transporting merchandise

7   and money in interstate commerce, in violation of 18 U.S.C.

8   Section 2314 and 2.  Accordingly, the defendant is adjudged

9   guilty of these charges.

10          There are six unresolved objections to the

11  Presentence Report.  I understand with respect to one or more

12  of these objections the parties may wish to present testimony

13  or evidence.  I will summarizes the arguments, and you may then

14  supplement as necessary.

15          The defendant objects to not receiving a two-level

16  reduction for acceptance of responsibility pursuant to

17  Section 3E1.1 of the Sentencing Guidelines.  The defendant

18  asserts that he has always been willing to accept

19  responsibility as shown by his proffer in this case.  However,

20  he faced difficulties in negotiating a plea relating to the

21  actual loss amount, the sophisticated means enhancement, and

22  the final offense level.  Defendant cites U.S. v. Gee, Seventh

23  Circuit 2000, affirming a two-level downward departure for

24  acceptance of responsibility when defendant proceeded to trial.

25          Anything additional to that, Mr. Graeff?

1        MR. GRAEFF:  No, sir.

2        THE COURT:  The government and Probation Officer's

3   response was as follows:

4        There are rare situations where a defendant may

5   demonstrate acceptance of responsibility for his conduct and

6   still exercise his constitutional right to trial; however, the

7   defendant's conduct does not merit such a reduction.  Defendant

8   did not voluntarily withdraw from the criminal conduct; did not

9   voluntarily make restitution payment; did not voluntarily

10  surrender to authorities; nor did he assist authorities in the

11  recovery of the fruits and instrumentalities of the offense.

12  Although defendant admitted his involvement in this offense

13  during a proffer in May 2010, his arguments during trial were

14  inconsistent with the proffer.

15       The Court rules that the Court agrees with the

16  government and Probation Officer's positions.  The defendant

17  had the burden to demonstrate by a preponderance of evidence

18  that he has affirmatively accepted responsibility -- that he

19  has affirmatively accepted responsibility for his involvement

20  in the offense, and he has not done so.  The defendant

21  represented himself in this case, and it is clear from his

22  questions of the witnesses that he attempted to refute his

23  involvement in these offenses.  The defendant specifically

24  argued that he was not even in Ohio at the time of the offense.

25  All of his arguments at trial are inconsistent with the

proffer.  The defendant who presents claims of actual innocence

and attempts to implicate others who had "set him up" is not

entitled to a reduction for acceptance of responsibility.

Citing U.S. v. Farrelly, Sixth Circuit 2004.  Accordingly, the

defendant's objection -- that was F-A-R-R-E-L-L-Y -- objection

is overruled.

The defendant objects to the 24-level increase in

base offense level based on the intended loss of $92 million.

The defendant argues that there is no information that the

perpetrators intended to steal all of the money in the

building.  Additionally, co-defendants Morgan and Doucette's

objection to the intended loss were sustained, and they only

received an 18-level increase to the base offense level based

on a loss of more than $2,500,000 but less than $7,000,000, as

agreed by the parties in the plea agreement.  Defendant Murphy

argues if he does not receive this reduction, it is inherently

unfair and punishes him significantly more than his

co-defendants for the same behavior.

The defendant has also filed an additional Sentencing

Memorandum addressing this issue and citing the Sixth Circuit

case of U.S. v. McBride.  Defendant asserts that the Court

should consider the possibility of whether the plan or scheme

would succeed and the disparity between the actual loss and the

intended loss, which could overstate the seriousness of the

offense, justifying a departure.

1          Anything additional, Mr. Graeff?

2          MR. GRAEFF:  Yes.  In addition, I think that there

3    are three major points that should be emphasized in this issue

4    because we think it is very important.  The first issue is all

5    of the facts are in our favor with respect to this.  The

6    testimony showed by the government's own witnesses that they

7    got into the vault at about 6:30 in the morning, and they knew

8    that they had to leave around 8:30 because employees come in

9    there in the morning.  Mr. Daniels, the vault supervisor,

10   testified that when he got there, he saw a small opening in the

11   vault, and as I remember, he testified that the vault was

12   chuck-full of money.  What I am saying with respect to the

13   facts is that it was both a physical impossibility and a time

14   impossibility for the individuals to extract that degree of

15   money from them.

16          The other issue -- the second issue which is

17   important -- is the government's own actions with respect to

18   the enhancement with the other two co-defendants.  In

19   Mr. Morgan's case on August 17th, he was here -- or I was here

20   when the issue, again, was raised.  The Probation Officer

21   indicated that it was a $92 million loss.  The government stood

22   up and agreed with the objection of Laura Byrum and said that

23   we agree that it should be a six-level reduction.  So, the

24   government's --

25          THE COURT:  The Probation Officer said that?

1          MR. GRAEFF:  Pardon me?

2          THE COURT:  The Probation Officer?

3          MR. GRAEFF:  The Probation Officer in Mr. Morgan's

4    case enhanced the level from 18 to 24 in contradiction to what

5    the government was originally claiming.  During the course of

6    the sentencing hearing on August 17th, I was present when the

7    government stood up and said that we agree with the defense

8    attorney, Laura Byrum, we agree that the loss should not be

9    $92 million, it should be level 18, which is in the nature of

10   what we are claiming here.

11          The third issue is the McBride case, which could not

12   be more on point.  I happened to be the attorney that

13   represented or was the stand-by counsel with Mr. McBride when

14   you were the Judge.  My memory serves me that it was in the

15   spring of '02.  And in your case, at the sentencing hearing,

16   you were very concerned over the fact that the market value

17   that the Probation Officer had construed with respect to the

18   houses that were at issue was $1.1 million instead of about

19   $12,000 or $13,000.  In your response, you stated, I will go

20   along with what the Probation Officer and the government's U.S.

21   Attorney Dan Brown indicated.  The Sixth Circuit reversed

22   because of the facts that we are stating right here with

23   respect to this issue.  And that is every factor in the McBride

24   case and every factor in the facts of this case and with

25   respect to the government's actions are consistent with

1    beginning at an 18 level instead of a 24 level.  Thank you,

2    Your Honor.

3              THE COURT:  Thank you.  Do you have any comments?

4              MR. DOMINGUEZ:  Yes, I do, Your Honor.  Thank you

5    very much.

6              First of all, I would like to invite the Court's

7    attention to the sentencing hearing of Mr. Morgan -- and

8    Mr. Graeff was, in fact, present during that sentencing

9    hearing -- and when the issue of the intended loss came up, I

10   stood up and said -- and the transcript will bear this out --

11   is that the Probation Officer has correctly calculated the

12   intended loss in this matter; however, the government agrees to

13   be bound by the terms of the plea agreement that was issued to

14   Mr. Morgan.

15             As a factual matter in this case, Your Honor, Morgan,

16   Doucette and defendant Murphy were each tendered plea

17   agreements.  At the time we did not have a full final

18   accounting as to the amount of loss in the vault at the time of

19   the burglary and resulting interstate transportation of stolen

20   property.  We conveyed to each defendant, including Mr. Murphy,

21   that if they were willing to enter a guilty plea at that time,

22   at the time of the issuance of the plea agreement -- and that's

23   when Mr. Murphy was represented by Mr. Luther before he fired

24   Mr. Luther -- we told each and every one of those defendants

25   that we would agree to be bound by the loss figure being in the

area of $2.5 million.  Mr. Morgan accepted that plea agreement.

Mr. Doucette accepted that plea agreement.  And following their

acceptance of that plea agreement, we did, in fact, receive the

final accounting as to how much money was in that safe at the

time of the burglary.

Again, I emphasize, Mr. Murphy flatly rejected that

offer.

THE COURT:  Thank you.

MR. DOMINGUEZ:  The intended loss and loss amount was

in the area of $90 million, and we can put on testimony as to

that figure.  We are prepared to do that at this time.

MR. GRAEFF:  May I respond to that?

THE COURT:  Yes, sir.

MR. GRAEFF:  His argument is absolutely absurd.  He

is saying that they didn't have an actual accounting of the

loss when Doucette and Morgan negotiated their plea agreements.

That is the main reason why he is saying that the loss should

be $92 million for Mr. Murphy and in the neighborhood of an

18-level for the other two.

The reason why it is absurd is because every

individual involved in this case, Your Honor, on the

government's side and on the law enforcement side knew how much

was in that vault shortly after they discovered the break-in on

January 18th.  Harry Trombitas in discovery stated it was

$100 million on January 18th.  Mr. Morgan at his initial

1   arraignment in Boston, the government knew it was $93 million.

2          Mr. Daniels who is the only one -- who I thought had

3   the best credibility in this entire trial -- the vault

4   supervisor said in the summertime, normally, there is

5   $50 million in there.  On January 17th and 18th, after the

6   Christmas season, he said that there is a lot of money floating

7   around, and so it is easily over the $50 million.

8          So, for Mr. Dominguez to stand up and say that they

9   did not have an actual accounting is ridiculous.  They knew it.

10  They knew exactly how much money is in there.  They have daily

11  reporting sheets that reflect it.  It is in the discovery.

12         So, again, the last thing with respect to the levels,

13  you don't need an actual accounting, the levels begin at

14  $50 million, that's 18 -- I'm sorry, that's 24.  Every person

15  said that there was at least $50 million here.  So, the main

16  argument is at best, it is tenuous.  He has got the

17  preponderance.  Mr. Dominguez and Ms. Hill have the

18  preponderance as far as showing that they did not know that

19  there was at least $50 million in that vault on January 18th.

20  They knew it.

21         MR. DOMINGUEZ:  I have a preponderance to prove that

22  I didn't know what was in the safe?  That's ridiculous.  If

23  Mr. Graeff is standing up and telling this Court that I could

24  not negotiate in good faith a plea agreement with these

25  defendants that would inure to their benefit, that they could

1    be held liable for the actual loss as opposed to the intended

2    loss, that in and of itself is ridiculous.

3              Mr. Buckley, who is their Regional Security Director

4    from Brink's is present in court, Your Honor.  He can explain

5    exactly what I am talking about.  I said that we did not have a

6    final accounting.  I told each and every one of those

7    defendants that it was going to be well in excess of

8    $2.5 million, but in negotiating a good faith plea agreement

9    which would be favorable to each defendant, they could plead to

10   the actual loss.

11             If Mr. Graeff is suggesting to this Court that I

12   could not do that, that in and of itself is ridiculous.  And

13   the fact of the matter is that Mr. Murphy himself had the

14   benefit of that same loss figure and rejected it after I told

15   his attorney that the actual intended loss would be well in

16   excess of $50 million.

17             So, for him to say that it was ridiculous for me to

18   offer his client the same deal as Mr. Murphy -- Mr. Morgan and

19   Mr. Doucette does make any sense.  He had the ability to

20   negotiate a plea agreement in the same manner as Mr. Doucette

21   and Mr. Morgan, and he rejected it.

22             THE COURT:  All right.

23             MR. DOMINGUEZ:  And we can put on the loss figure for

24   this Court at this time.

25             THE COURT:  Okay.  Now, we are bandying about these

1  terms of "actual loss" and "intended loss".  And my

2  understanding of what the law is, it is the intended loss.

3          MR. DOMINGUEZ:  That is correct, Your Honor.

4          THE COURT:  Now, if the United States Attorney wishes

5  to accept something less than that as a part of a plea bargain,

6  he certainly can do that.  So, the train pulled out of the

7  station on the defendant on that situation.

8          The Probation Officer -- the Court understands that

9  the offense level computation is based on the information

10  derived from the investigation of the offense conduct and is

11  correct insofar as the defendant had the ability to steal over

12  $92 million.  See Application Note 3(a) to 2B1.1, which

13  provides that the loss amount is the greater of actual loss or

14  intended loss, which I just stated.

15          The government asserts that the evidence presented at

16  the trial was that the defendant and his co-defendants reserved

17  a 24-foot truck to transport the burglary tools and the

18  monetary proceeds obtained during the burglary.  It appears

19  they intended to steal everything in the vault.  Had the fire

20  in the vault not have occurred, they would have removed as much

21  money as possible.

22          Further, when the government negotiated the plea

23  agreements with Morgan and Doucette, it had not yet received a

24  full accounting of the money in the vault from Brink's and

25  agreed to hold them responsible for the actual loss.  Defendant

1   Murphy was offered the same plea agreement, and although he was

2   advised that the intended loss would be much higher, he

3   rejected it.

4           Before ruling on this, Mr. Dominguez alluded to the

5   fact that he has a witness?

6           MR. DOMINGUEZ:  I do, indeed, Your Honor.

7           THE COURT:  And since this has become a major issue,

8   if you would like to do that?

9           MR. DOMINGUEZ:  Thank you, Your Honor.  We call

10  Michael Buckley.

11                          - - -

12                      MICHAEL BUCKLEY

13  AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

14                          - - -

15                    DIRECT EXAMINATION

16  BY MR. DOMINGUEZ:

17          THE COURT:  You may proceed.

18          MR. DOMINGUEZ:  Thank you, Your Honor.

19  Q.   Sir, would you state your name and spell your last name

20  for the benefit of the court reporter?

21  A.   Yes.  My name is Michael, last name Buckley,

22  B-U-C-K-L-E-Y.

23  Q.   Sir, where are you presently employed?

24  A.   I worked for Brink's Incorporated.

25  Q.   And what do you do for Brink's Incorporated?

1  A.   I am a Regional Security Manager for the northeast part of

2  the country.

3  Q.   Does that actually include the City of Columbus, Ohio?

4  A.   It does now.  It didn't back in '09, but it does now.  We

5  just changed the regions around.  But in '09, it did not, but I

6  was sent here on a special because of the burglary.

7  Q.   So, you became familiar with the burglary of the Brink's

8  facility in January of 2009?

9  A.   Yes.

10 Q.   Okay.  And, sir, sometime during the month -- or during

11 the year of 2011, did you receive a telephone call from Special

12 Agent Harry Trombitas advising you or requesting that you

13 provide an accounting as to the actual amount of money that was

14 in the vault in the Brink's facility on the evening of

15 January 17th and the early morning hours of January 18th of

16 2009?

17 A.   Yes, I did.

18 Q.   And did you endeavor to obtain that information from your

19 colleagues through the Brink's national system?

20 A.   I sure did, yes.

21 Q.   And for background purposes for the record and for the

22 Court's edification, sir, do you recall what the state of the

23 Brink's facility was in terms of the electronics, the

24 computers, the server following the Brink's burglary on

25 January 17th and January 18th of 2009?

1   A.   Yes.  The system completely shut down because of the loss

2   and the theft and the destruction of servers that enhanced our

3   computer capability and record keeping.

4   Q.   And with respect to the amount of money, the approximate

5   amount of money that was in the vault, did you have any

6   conversations with FBI or any other law enforcement prior to

7   2011 as to an approximate amount of money that may have been in

8   the vault at the time of the burglary?

9   A.   I personally did not prior to -- have conversations

10  concerning the overall amount in the vault.  It was in 2011

11  when I was asked to determine this as closely as possible, the

12  exact amount in the vault.

13  Q.   But law enforcement generally knew, even as early as

14  January 18th of 2009, there was a substantial amount of money

15  in the vault?

16  A.   Oh, they knew, yes.  There is no question they knew.

17  Q.   And so after you received the request from Special Agent

18  Trombitas that we needed a final accounting as to the actual

19  amount that was in the vault, did you go about processing and

20  speaking with colleagues and coming up with that figure?

21  A.   I did.

22  Q.   Now, with respect to the amount, sir, did you review an

23  outbound tabs report with respect to the amount of money that

24  was in the vault on the evening of January 17th of 2009?

25  A.   Yes, I did.

1    Q.    What is an outbound tabs report, sir?

2    A.    It is a computer printout of everything that's maintained

3    in the Brink's vault that's for -- I term it as cash in

4    transit, monies holding in the vault to be delivered to various

5    banks or customers.

6    Q.    And that would have been, with respect to the amount of

7    money, an outbound tabs report -- in fact, the outbound tabs

8    report --

9    A.    Yes.

10   Q.    -- would have been the amount of money that was in that

11   facility as of January 16th of 2009?

12   A.    The night of the 16th, yes.

13   Q.    And that would have been money that would have been

14   dispersed subsequent to Martin Luther King Day, which would

15   have been January 19th of 2009?

16   A.    Correct.  It actually could have gone out on the 18th as

17   well.  Some routes do work on --

18   Q.    On Sundays?

19   A.    On Sundays.  So, it could have been monies to be delivered

20   on the 18th, 19th or 20th.

21   Q.    Very well.  And what was that final figure, sir?

22   A.    It was $53,573,933.31.

23   Q.    Very well.  Now, is there also a system of records called

24   "S-sheets" that is utilized internally to account for money at

25   the Brink's facility?

1  A.  Yes.

2  Q.  And what does "S-sheets" mean?

3  A.  An S-sheet -- it is a sheet that would go out and

4  accompany deliveries.  And on the other side, it is also

5  considered or called a "D-sheet" as well.  When monies are

6  delivered -- if monies were picked up at the customer location

7  and brought back, that information is put on the same sheet and

8  brought back.

9  Q.  Very well.  Was there a final accounting of how much money

10  was delivered to the Brink's facility on or about January 16th,

11  January 17th reflected on the "S-sheets"?

12  A.  That's correct, yes.

13  Q.  And what that was figure, sir?

14  A.  $11,455,419.38.

15  Q.  Now, in addition to the outbound tabs reports, which you

16  have discussed with us, as well as the money reflected on the

17  S-sheets that you have discussed with us, does the Brink's

18  facility also hold and maintain inventory in terms of currency

19  for different entities within the Greater Columbus Metropolitan

20  Area, being held to replenish ATMs or to be delivered to other

21  business entities during the normal course of business for

22  those specific entities?

23  A.  That's exactly correct.  I'm sorry.

24  Q.  Go ahead.

25  A.  There is another section within the Columbus branch called

1  the Money Processing Unit Section, it is a separate room inside

2  the same building.  What they do is process and count money,

3  they hold inventories for a number of banks or customers of

4  Brink's.  We maintain those inventories for the bank.  They

5  have it in our facility in case there is funds at ATMs that

6  needs to be delivered.  So, we maintained inventory for banks

7  at the time in January of 2009.

8  Q.   Brink's would receive calls from those entities, as long

9  as everything checks out, of course, Brink's would replenish

10 the ATMs for different other entities for those?

11 A.   Yeah, sure, that's correct.

12 Q.   Would that inventory, likewise, be maintained in the

13 vault?

14 A.   Yes.

15 Q.   Do you have an accounting as to the actual inventory

16 reporting as to how much was in the vault serving that purpose?

17 A.   Yes.  The information that I received, that the inventory

18 being held by the Money Processing Unit maintained in that

19 vault was $27,298,836.68.

20 Q.   Okay.  We have already established on this record

21 previously that my math is not all that great, but with the

22 outbound tabs and the S-sheets and the daily inventory report,

23 did that accumulate a total in excess of $90 million?

24 A.   In excess of $92 million, yes.

25 Q.   Very well.  And did you actually provide that amount to

1   Agent Trombitas sometime during the year of 2011 in response to

2   his specific request?

3   A.   Yes.  It was in excess of $92 million, yes, sir.

4          MR. DOMINGUEZ:  May I have a moment, Your Honor?

5   Q.   (By Mr. Dominguez) Now, Mr. Buckley, in your capacity as

6   Security Manager for the region, and of course, encompassing

7   Ohio during this time frame as well, did you have occasion to

8   -- have you had occasion to go into that actual vault to

9   determine the dimensions of that vault?

10   A.   Yes.  Many times.  Back in January, February and March of

11   '09, I was there every day, and I was there as recently as

12   yesterday and today.

13   Q.   Okay.  What are the dimensions of that vault, sir?

14   A.   Approximately 24 feet long by 14-feet wide.

15   Q.   And do you have the height of the vault?

16   A.   Approximately 8 feet.

17   Q.   Very well.  And are you familiar with 24-foot semi-tractor

18   trailers or trucks?

19   A.   Box trucks?

20   Q.   Box trucks?

21   A.   Yes.

22   Q.   Based on your knowledge of the contents of the vault and

23   the size of the vault, would all of the currency that was in

24   that vault fit in that 24-foot box truck?

25   A.   No question the currency itself, yes, if removed from some

1    of the inventory containers they were in.  The currency itself

2    would, by all means, fit in a 24-foot box truck.

3              MR. GRAEFF:  I will object on speculation.  He has no

4    idea if it would fit in a box truck.

5              THE COURT:  The objection is overruled.

6              MR. DOMINGUEZ:  I have no further questions at this

7    time.

8                            - - -

9                        CROSS-EXAMINATION

10   BY MR. GRAEFF:

11   Q.   Mr. Buckley, my name is David Graeff.  We have seen each

12   other in the hallways a lot but never really talked to each

13   other.  How long have you been employed by Brink's?

14   A.   It will be nine years in March.

15   Q.   And you mentioned that your region is the Northeast

16   Region?

17   A.   Correct.

18   Q.   So, you are based out of Virginia?

19   A.   No, I am based out of Boston, actually.

20   Q.   All right.  Were you present when Mr. Morgan's initial

21   appearance in Boston occurred?

22   A.   No, I was not.

23   Q.   Do you know whether there was a representative of Brink's

24   present there?

25   A.   I don't believe there was, no.

1   Q.   All right.  When did you first gain knowledge that the

2   Brink's facility in Columbus was broken into in January of '09?

3   A.   On Sunday morning, January 18th.

4   Q.   Who did you talk to?

5   A.   I received a call from -- I believe it was my immediate

6   boss.

7   Q.   Who was that?

8   A.   Bruce Warner.

9   Q.   And he is the fellow that's the head of security down in

10  Dallas?

11  A.   He is Director of Security for the U.S., yes.

12  Q.   Did he ask you how much was in the vault?

13  A.   No, he didn't ask me.  No, I was in Boston.  I think he

14  was en route that day.  He was calling me from his residence,

15  and he was going to be traveling to Ohio later that day or the

16  next day.

17  Q.   And he mentioned that the burglary had occurred in

18  Columbus, Ohio?

19  A.   Columbus, Ohio, yes.

20  Q.   Who else did you talk to besides Mr. Warner dealing with

21  the break-in on January 18th in the morning?

22  A.   I don't believe that I spoke with anyone else that day.

23  Q.   What is your title, sir?

24  A.   Regional Security Manager.

25  Q.   You were the Regional Security Manager, and it is a Sunday

1  morning and Brink's has been broken into, and the only person

2  that you talked to that day was Bruce Warner?

3  A.   No, sir.  Let me correct -- I made it clear on my direct

4  examination that Columbus, Ohio was not part of my territory

5  during the burglary.  I was sent there on a special.  Columbus

6  was not my area of responsibility.  Another Regional Security

7  Manager had responsibility for the Great Lakes Region, which

8  included Columbus, Ohio.

9  Q.   When did you gain the responsibility for Columbus, Ohio?

10 A.   Approximately, a week or two after the burglary, I was

11 asked to go in and assist in the investigation.

12 Q.   Right.  So, within a short period of time after the

13 burglary, you were the head guy as far as security here in

14 Columbus?

15 A.   For Brink's, yeah.  I was asked to come in and assist in

16 the investigation, to liaison with the authorities the best I

17 could and to conduct an in-house investigation.

18 Q.   So, late January, you, obviously, probably had a lot of

19 phone calls with law enforcement officials dealing with the

20 burglary?

21 A.   Correct.

22 Q.   Did that include Harry Trombitas?

23 A.   Yes.

24 Q.   Did you discuss the amount of money that was taken in the

25 vault?

1  A.   I don't recall.  I don't think that I did.  At that time,

2  I didn't know.  Several other security folks had been there the

3  first two weeks.  I was sent in, I think, the second or third

4  week to conduct an in-house investigation.  And at that time, I

5  didn't know at that time how much was in the vault.

6  Q.   You sat through -- this was a six-day trial -- you sat

7  through -- I noticed that you were here just about every day,

8  and for a period of a short time, you were there the whole

9  time?

10  A.   Yes.

11  Q.   During the course of you appearing here, you, obviously,

12  saw when Mr. Daniels testified with respect to the burglary?

13  A.   No, I did not.  I missed -- that's the one portion of the

14  trial that I did miss.  I missed Mr. Daniels' testimony and

15  Mr. Blankenship's testimony.  I was over at the Brink's branch

16  that morning.  And when I got back, they had already testified.

17  I did not see his testimony.

18  Q.   Do you know Mr. Daniels?

19  A.   Yes.

20  Q.   Are you aware that in his testimony that he mentioned that

21  normally, on a normal day, there is $50 million in the vault?

22  A.   I didn't witness his testimony, but I heard that this

23  morning in this proceeding that he had testified to that.

24  Q.   Is there any reason to disagree with that?

25  A.   No.

1    MR. DOMINGUEZ:  Your Honor, I was here for his

2 testimony, we will stipulate that he testified to that.

3    MR. GRAEFF:  I am asking the question for a reason,

4 Your Honor, and I am not interested in his stipulation.  I am

5 asking it for a reason.

6 Q.   (By Mr. Graeff) Go ahead.

7 A.   No, I'm sorry.

8    THE COURT:  Would you repeat the question,

9 Mr. Graeff?

10 Q.   (By Mr. Graeff) Is there any reason why you would disagree

11 with Mr. Daniels' testimony that on a normal day, let's say the

12 summer of 2011, that $50 million is in the vault?

13 A.   That's a very accurate statement.

14 Q.   During the course of your tenure at Brink's, are you aware

15 that after the Christmas season, there is a great deal more

16 money in the Brink's facility throughout the country?

17 A.   Yes.  Preceding Christmas and directly after Christmas,

18 sure, there is.

19 Q.   So, at a very minimum, if it is Christmas season or after

20 Christmas season, on January 17th, there is going to be at

21 least -- and I will be conservative -- $60, $70 million in the

22 vault?

23 A.   Yes, I agree with what I was told Mr. Daniels testified

24 to, $50 million is extremely accurate.  And it coincides

25 exactly to what I testified to from these outbound tabs.

1  Q.   Now, your status as the Head Security Officer at Brink's

2  in this region, I assume, included the plea negotiations with

3  Messrs. Doucette and Morgan?

4  A.   Could you repeat that?  Is that a question?  I'm sorry.  I

5  wasn't a part of the plea --

6  Q.   Were you aware of the negotiations going on between the

7  U.S. Attorney's Office and Messrs. Doucette and Morgan?

8  A.   Just the fact that their negotiations were ongoing, not

9  the specifics.

10  Q.   Did Mr. Dominguez or Ms. Hill inform you that the plea

11  negotiations included the actual or the approximate amount in

12  Brink's on January 17th?

13  A.   No.  I had no contact with Mr. Dominguez or Ms. Heather --

14  or Ms. Hill.  I was strictly in contact with either Harry

15  Trombitas or Jason Costello.

16  Q.   Did you, in your capacity, as the head of Brink's

17  security, have the authority to approve or disapprove the plea

18  negotiations between those two individuals?

19  A.   No, I wouldn't have the authority to approve or

20  disapprove, no.  I think, as a courtesy, they would advise me

21  of that there were negotiations going on and what was being

22  discussed as far as times, but I don't have the authority to

23  agree or disagree.

24  Q.   So, when you are saying -- correct me if I am wrong -- the

25  two U.S. Attorneys were the ones that had the ultimate

1  authority to negotiate the plea agreements?

2  A.    As well as the FBI.

3  Q.    Now, Mr. Dominguez has asked you a lot of questions about

4  math and how much money was there, how much money was taken

5  out -- blah, blah, blah.  The bottom line is, minimally, there

6  was well over $50 million in the Brink's vault on January 17th

7  of 2009?

8  A.    Minimally, yes, but it was -- yes.

9  Q.    Now, you mentioned the dimensions of the vault on Essex.

10  And if I remember right, you said it was 24 feet in length?

11  A.    Yes.

12  Q.    And?

13  A.    By 14.

14  Q.    Pardon me?

15  A.    By 14.

16  Q.    By 14.  And your final accounting was $92,600,000 and

17  something?

18  A.    In excess of $92 million, yes.

19  Q.    Mr. Buckley, did you actually view the vault with the

20  amount of money inside of it, the amount of money dealing with

21  the $92 million or whatever?

22  A.    Just the photographs from -- the crime scene photographs

23  with the hole in the vault door and when it was opened even

24  further by the Fire Department, and I saw the vault full right

25  to the door, yes.

1   Q.   So, when you actually viewed the photographs, you saw what

2   I would consider a reasonably small opening?

3   A.   Yes.

4   Q.   With respect to the -- let's say there is $92 million in

5   the vault.  And using that small opening, you would agree with

6   me that it would take a great deal of time to extract that

7   $92 million from the vault?  That's a question.

8   A.   Yeah, it would take some time.  Depending on -- with three

9   people doing it, it would take some time, but -- I don't know

10  exactly how long -- I think that could be done in a couple of

11  hours time.

12  Q.   And assuming, again, at the August 17th, 2011 hearing, in

13  which Mr. Morgan got sentenced by Judge Smith, adding the

14  factor in of, as you stated -- or I'm sorry -- as was stated,

15  there was a great deal of smoke and fire and hardly anyone

16  could get into the vault.  That would probably increase the

17  difficulty of the individuals trying to extract that amount of

18  money; is that a fair statement?

19  A.   The smoke and fire?  It was certainly a deterrent in

20  getting the money out of the vault.

21          MR. GRAEFF:  Thank you, sir.  I have no further

22  questions.

23          THE COURT:  Anything further?

24          MR. DOMINGUEZ:  No, thank you, Your Honor.

25          THE COURT:  Thank you, Mr. Buckley.

1          MR. DOMINGUEZ:  No further evidence as to this issue,

2    Your Honor.

3          THE COURT:  Is there anything further, Mr. Graeff,

4    from your end on this issue?

5          MR. GRAEFF:  I think we have testimony now from the

6    head of the security in the Northeast Section that he agrees

7    that there was a minimum of at least $50 million and a lot

8    more.  And under the sentencing levels, again, the U.S.

9    Attorney and law enforcement and everyone knew at the time that

10   there was approximately that amount of money, and Mr. Dominguez

11   has made a big deal over the fact that they did not get the

12   actual accounting.  That simply does not hold water when we are

13   talking about sentencing hearings.

14         This Court has been here for close to 25 years, if my

15   memory serves me, and you know that in your ordinary drug case,

16   narcotic case, that no one can state the actual amount of drugs

17   at a particular level, whether it is heroin, cocaine or

18   whatever, you just have to show an approximation.  That's all

19   they needed to show when these plea negotiations were current

20   with the two other individuals.

21         THE COURT:  Thank you, Mr. Graeff.

22         The Court has considered the arguments of the parties

23   as well as the testimony now from Mr. Buckley, the Regional

24   Security Manager with Brink's regarding the final accounting of

25   the money at the Brink's facility during the time of the

1 offense, which was in excess of $92 million.

2      In accordance with Section 2B1.1, I must apply the

3 greater of the actual loss or the intended loss, whichever is

4 greater. There is no question based on the evidence presented

5 at trial that the defendant and his co-defendants intended to

6 steal as much money as they could from the Brink's Warehouse,

7 and they planned the burglary for after a holiday to ensure as

8 much money as possible would be on-site.

9      However, there is no specific testimony that the

10 defendant believed they could steal over $92 million or whether

11 that was even possible. The defendant asserts that there was a

12 serious time concern in that they did not gain access to the

13 vault until 6:30 a.m. and had very little time before the

14 morning shift when the Brink's employees arrived.

15      Morgan and Doucette received the benefit of the lower

16 amount based on the plea agreement and the fact that the exact

17 intended loss was not known at the time. However, the Court

18 acknowledges that law enforcement knew that there was a

19 substantial amount of money in the vault. Mr. Murphy was

20 offered this same amount of loss in a plea agreement, and he

21 rejected it. Therefore, the defendant Murphy is not entitled

22 to the same reduction as his co-defendants received.

23      However, the Court does find that there is some doubt

24 as to whether the defendants intended to steal over

25 $92 million. It is more appropriate that they expected that

1  there would be approximately $50 million at the warehouse,

2  which was the typical amount, according to James Daniels, the

3  Vault Supervisor with Brink's.

4      Therefore, the Court will reduce the intended loss by

5  half, to $46 million.  Therefore, according to Section 2B1.1,

6  the intended loss is more than $20 million but less than

7  $50 million, which would cause the 22 levels to be added to the

8  base offense as opposed to the 24 levels.  The defendant's

9  offense level would be reduced by these two levels to reflect

10 this reduction.

11      The defendant now stands at an offense level of 34,

12 combined with his Criminal History of VI, and the new advisory

13 guideline range is 262 to 327 months.  Defendant's objection,

14 therefore, is sustained in part.

15      Defendant objects to a two-level sophisticated means

16 enhancement.  The defendant concedes that the sophisticated

17 means enhancement applies to him, but since the Court sustained

18 his co-defendants' objections to this enhancement and since the

19 burglary is a jointly undertaken effort for all involved, that

20 is why it would be unfair to apply the enhancement only to

21 Mr. Murphy.

22      Mr. Graeff, do you have anything to add to that?

23      MR. GRAEFF:  No, sir.

24      THE COURT:  The government and Probation Officer's

25 response was that the two-level enhancement for sophisticated

means was appropriate because the defendant was responsible for

the sophistication in carrying out this crime, such as the

extensive planning to purchase and retrieve the cellular

telephone jammer from Global Gadget Corporation, the rental of

vehicles and storage facilities, and extensive planning and

bringing everyone together to commit these crimes.

Any comment -- excuse me -- Mr. Dominguez, any

comment on this?

MR. DOMINGUEZ: Nothing in addition to what we said

in our Sentencing Memorandum.

THE COURT: There is no question that these offenses

involved planning and preparation to the extensive travel and

even the method in which the vault was broken into. The

defendant's objection was based upon the fact that his

co-defendants did not receive this enhancement, and it would be

unfair to apply it in his case. And the Court does not agree.

When I sustained the objection of Morgan and Doucette, I found

that Murphy would be more suited to receive the enhancement.

The testimony at trial revealed that Murphy was the

mastermind behind the burglary. While this case involves a

conspiracy, there is no question that Murphy is responsible for

the sophisticated nature of the burglary -- not Morgan or

Doucette. Accordingly, the two-level enhancement was properly

applied to the defendant's objection, and defendant's objection

is overruled.

1          The defendant objects to the application of the

2    larceny guidelines of Section 2B1.1 to the sentencing

3    calculation.  Defendant argues that the burglary guideline of

4    2B2.1 is more appropriate based upon the actual conduct of this

5    case.

6          Mr. Graeff, any additional comment or argument?

7          MR. GRAEFF:  We have filed two separate documents and

8    also an oral motion with respect to this, so we rest on those,

9    Your Honor.

10         THE COURT:  The defendant filed a motion prior to

11   trial, as Mr. Graeff just alluded, in this matter on this same

12   issue, Document #101.  The Court held that in an Opinion and

13   Order dated October 3 of 2011, Document #104, that the

14   appropriate guideline to be applied to defendant's case and the

15   offense of transporting money in interstate commerce is 2B1.1

16   and not the burglary guidelines.  The Court has again

17   considered defendant's argument on this matter and does not

18   find any basis to reverse its prior ruling.  The Probation

19   Officer has correctly applied the guidelines of Section 2B1.1

20   to defendant's case.

21         Therefore, the defendant's objection to overruled.

22         The defendant objects to the two-level increase in

23   his offense level for obstruction of justice for leaving a

24   cigarette butt at the Brink's Warehouse with the intent to have

25   somebody else identified as a culprit.  The defendant again

1   objects because co-defendant Morgan, who also traveled to

2   Columbus, Ohio to collect DNA, did not receive this

3   enhancement.

4           Anything additional, Mr. Graeff?

5           MR. GRAEFF:  The only thing I would like to emphasize

6   with respect to this is that the Probation Officer indicated

7   the cigarette issue, but then she based almost all her

8   reasoning beyond conduct which is an integral part of the

9   conspiracy.  If you track the overt acts in Count 1 of the

10  conspiracy with what she states in her Probation Report, they

11  mirror exactly what are in there.

12          So, what she basically is saying is the obstruction

13  of justice enhancement, she is using that as a basis to the

14  very conduct which was included, again, in the first count of

15  the conspiracy in almost as an afterthought to bring in the

16  cigarette issue.  Thank you, sir.

17          THE COURT:  Thank you.  Any comment?

18          MR. DOMINGUEZ:  Well, Your Honor, in addition, we

19  believe that the cigarette alone would justify the obstruction

20  enhancement based on the fact that Mr. Murphy utilized that

21  cigarette in order to help the law enforcement ascertain that

22  it was someone local as opposed to someone from Boston, who

23  actually committed the offense.

24          But most importantly, Your Honor, you said it before,

25  you presided over this trial, you noted that Mr. Murphy also in

1   his communications with Global Gadget advised them to identify

2   the cellular telephone jammer as an amplifier to avoid

3   detection, advised them to place the value somewhere in the

4   area of $50 to avoid its detection as a cellular telephone

5   jammer, which, of course, he used to commit this crime.

6          There are several elements of what he did during the

7   course of this criminal activity that rises to a level to

8   support an obstruction of justice enhancement, and I believe

9   the Probation Officer's recommendation in this regard to this

10  is well taken.

11         MR. GRAEFF:  Your Honor, may I respond to this?

12         THE COURT:  Yes, certainly.

13         MR. GRAEFF:  On Page 11 and 12 of Mr. Doucette's

14  testimony in answer to a question as far as who accompanied him

15  with respect to the homeless shelter, Mr. Doucette said it was

16  Joe Morgan and Mr. Murphy.  And if I recollect Mr. Doucette's

17  Presentence Report, there is no indication that that

18  enhancement was applied to him.  So, if he is basing it

19  specifically on the fact, as he stated just a few seconds ago,

20  that we believe that that alone is enough for obstruction of

21  justice, what he is saying is he is contradicting what occurred

22  both in Mr. Morgan's Presentence Report and Mr. Doucette's

23  Presentence Report and what Mr. Doucette said in his testimony

24  when he was questioned as to who accompanied him to the

25  homeless shelter.  Thank you, sir.

1          THE COURT:  Thank you.  According to Section 3C1.1 --

2    according to the Probation Officer -- if the defendant

3    willfully obstructed or impeded the administration of justice

4    during the investigation, prosecution our sentencing, and the

5    obstructive conduct related to the defendant's offense or

6    relevant conduct, then increase the offense two levels.

7          The Court agrees that the defendant Murphy obstructed

8    justice when he visited the local homeless shelter in Columbus,

9    Ohio prior to the commission of the instant offense, to

10   distribute water and cigarettes, and then collected the used

11   cigarettes butts and left one behind at the Brink's Warehouse

12   to identify that person as the culprit.  He also obstructed

13   justice in the ordering of the cell phone jammer, instructing

14   the company to label it as an amplifier and reduce the costs to

15   confuse customs agents.  Defendant further used aliases in the

16   rental of vehicles and storage facilities to avoid detection.

17         Therefore, the obstruction of justice enhancement was

18   properly applied, and the objection is overruled.

19         And, of course, the fact that Mr. Morgan did not get

20   the enhancement does not change my finding.  He got the benefit

21   of a plea agreement.

22         Defendant objects to the $131,000 being included in

23   the restitution amount that was paid to the police and Brink's

24   employees to guard the Brink's Warehouse while repairs were

25   being made to the building.  The defendant argues that these

1  consequential damages are not to be included in the loss

2  amount.

3       Mr. Graeff, anything additional?

4       MR. GRAEFF:  No, sir.

5       THE COURT:  Anything, Mr. Dominguez, on that?

6       MR. DOMINGUEZ:  Nothing in addition to our response,

7  Your Honor.

8       THE COURT:  The Probation Officer's response:

9       The victim of the instant offense, Brink's, had to

10  hire police and security officers to guard the warehouse 24

11  hours a day as a result of defendant cutting a hole in the

12  building -- there were six holes, as I recall.  Surveillance

13  equipment was also destroyed.  The $131,000 loss was a direct

14  result from the break-in, and therefore, appropriately included

15  for restitution purposes.

16       The Court finds that while the restitution

17  calculation is correct, Brink's was forced to pay these special

18  duty officers to take extra security measures as a direct

19  result of the damages caused by defendant and his

20  co-conspirators.  But for the defendant's conduct, those

21  expenses would not have been necessary.

22       The defendant's objection is therefore overruled.

23       The defendant objects to being assessed a total of

24  seven criminal history points for three convictions that were

25  consolidated for sentencing purposes, were run concurrent with

1    each other and were resolved on the same date.

2           Defendant asserts that he should only receive three

3    criminal history points per Section 4A1.2(a)(2), therefore

4    reducing his criminal history points by four, resulting in a

5    total of 13 criminal history points.

6           Anything additional on that, Mr. Graeff?

7           MR. GRAEFF:  No.

8           THE COURT:  Mr. Dominguez?

9           MR. DOMINGUEZ:  Those offenses were separated by an

10   intervening arrest, Your Honor, and we believe the Probation

11   Officer has correctly calculated that.

12          THE COURT:  The Probation Officer's response to this:

13          In accordance with Section 4A1.2(a)(2), prior

14   sentences are always counted separately if the sentences were

15   imposed for offenses that were separated by an intervening

16   arrest.  There were separate arrest dates for each offense, and

17   the cases took place in two separate courts.

18          While the Court agrees that the criminal history

19   points calculated is technically correct, because the three

20   offenses noted in defendant's objection were all combined for

21   purposes of sentencing, the Court will only assess three

22   criminal points for those offenses.  Therefore, the defendant's

23   objection is sustained, and his total criminal history points

24   are now 13.  The defendant's Criminal History Category remains

25   at a VI.

1          The defendant has filed a Sentencing Memorandum, and

2    the Court will consider these arguments as grouped by the

3    defendant in his memo, and the parties may supplement when

4    necessary.

5          The defendant requests a 36-month jail credit to

6    account for the time he has served since his arrest on

7    January 23rd, 2009 on the instant charges.  The defendant

8    requests this adjustment to his sentence for the following

9    reasons:  Sentence disparity; inability to obtain concurrent

10   sentence; pre-indictment delay; and 18 U.S.C., Section 3585 --

11   what I'll call relevant conduct.

12         When Mr. Murphy was arrested, he was taken into

13   Massachusetts state custody and when he was indicted in this on

14   January 20 of 2011, he was taken in the custody of the U.S.

15   Marshals via a Writ.  Therefore, the last 36 months Murphy has

16   been incarcerated will not count toward the federal sentence

17   imposed today.  Murphy argues that there is a sentencing

18   disparity because co-defendant Morgan was able to post bond in

19   the state case and therefore received credit for his federal

20   sentence since the time of his arrest on January 20, 2011.

21         Murphy asserts that the government's actions in this

22   case eliminated any possibility of him obtaining a federal and

23   state sentence that would run fully concurrent, despite the

24   Assistant District Attorney in Massachusetts agreeing to run

25   his sentence concurrent to the federal sentence.  Additionally,

1    Murphy argues that the government's delay in filing of criminal

2    charges against him in the case deprived him of the opportunity

3    to obtain concurrent sentences.

4            Finally, Murphy argues that a 36-month jail credit

5    will account for these disparities, and it must be done in the

6    form of a sentence adjustment, as the BOP will not recognize

7    this as a jail credit since he actually, technically, in

8    state custody.

9            The government responds that Murphy's arrest was for

10   his involvement in a burglary in Massachusetts, and law

11   enforcement was not aware of his involvement in the Brink's

12   burglary at that time.  Further, the government was not

13   responsible for how the Massachusetts case was handled, nor did

14   it have any control over his ability to obtain bail in that

15   case.  Notably, Murphy asserts that on one hand the government

16   should have waited to indict him in the federal case until he

17   was sentenced on the Massachusetts case, and then on the other

18   hand, there was a delay in indicting him on this case.  The

19   government asserts that there was an extensive investigation

20   involved in this case, and there was no undue delay in pursuing

21   the Indictment in this case.

22           Mr. Graeff, anything further?

23           MR. GRAEFF:  No, sir.  You have said it very

24   succinctly.

25           THE COURT:  Any response?

1          MR. DOMINGUEZ:  No, thank you.

2          THE COURT:  The Court acknowledges defendant's

3    arguments and that he has been incarcerated since January 23,

4    2009.  Now, many of the defendant's arguments are based on what

5    he assumes the state court in Massachusetts would have done,

6    but that's not definite.  He assumes he could have gotten his

7    bail reduced and then he would be similarly situated to

8    co-defendant Morgan.  This Court is not privy to the

9    prosecution that is currently ongoing in Massachusetts and

10   whether defendant will receive a concurrent sentence to the

11   sentence I will impose today.  Nonetheless, I believe defendant

12   Murphy should receive credit for the time he has been

13   incarcerated awaiting indictment on these charges and through

14   this sentencing.  Therefore, I will downward depart to reflect

15   this sentence adjustment.

16          The defendant seeks a reduction of his sentence based

17   on his cooperation with law enforcement in this case.

18   Defendant created a training video for the FBI and provided

19   information during several proffer sessions.  Defendant claims

20   he requested his sentence be cut in half in return for

21   providing this information.  Defendant points out that the

22   Court has authority to consider a downward departure under

23   5K2.0, even in the absence of a government motion for downward

24   departure based on cooperation.

25          Defendant also suggests that he should be entitled to

a departure based on his cooperation in providing information to the FBI on a long list of crimes he has knowledge of and who was involved in those crimes -- a specific list, as a matter of fact, of the crimes and those involved over there in Massachusetts -- many of which were opened and unsolved, including:  He was the main witness in Commonwealth v. Brian Stevens; he provided information received from Juan Garcia Hernandez, a member of the Mexican Los Zetas Gang from Rio Bravo, including names and numbers for acquiring drugs from the cartel; he provided information from Vladislav Vladev, a member of a high-tech Bulgarian criminal network who used ATM skimming devices to capture customers' account numbers; and the defendant asserts that he advised the U.S. Marshals of at least five areas where our courthouse security could be improved and how to do so.

Finally -- there is nothing in there about funding, is there?

Finally, the defendant argues that even if the Court does not reduce his sentence under 5K, it should still consider a reduction under Section 3553(a) based on his cooperation, and he asserts that any opposition by the government to such a reduction would be without good cause.

The government opposes defendant's request for a three-level reduction for acceptance for responsibility and any further departure for cooperation because Murphy proceeded to

1   trial and forced the government to exhaust numerous economic

2   resources.  Further, the government represents that it offered

3   Murphy a plea agreement that would have amounted to more than a

4   50 percent reduction in sentence -- 10 years, that is -- that

5   was based, in part, on his cooperation; however, he rejected

6   that offer.  Because the defendant has proceeded to trial, the

7   government does not believe any departure for cooperation is

8   warranted.

9           Any further comments, Mr. Graeff?

10          Mr. Graeff?  Any further comments on this section?

11          MR. GRAEFF:  Real quickly, you have included

12   everything, Your Honor, except the Brink's Evaluation Report

13   that was also a part of the unsealed -- I'm sorry -- the sealed

14   record; specifically, Exhibit 5.  Thank you, sir.

15          Your Honor, may we approach?

16          THE COURT:  Yes.

17                       - - -

18          THEREUPON, the following proceedings were held at

19   sidebar out of the hearing of the open court:

20          MR. GRAEFF:  This is on Exhibit 5.  What occurred is

21   after the jury trial in this case, Mr. Murphy, on his own,

22   wrote a letter to the president of Brink's in Dallas, and you

23   are looking at the response right now.

24          THE COURT:  Oh, yeah.

25          MR. GRAEFF:  What occurred right after that is

1  Mr. Warner, who was identified by Mr. Buckley in his testimony,

2  sent a letter back to Mr. Murphy at the Delaware County Jail,

3  saying that he is very interested in discussing the ins and

4  outs of Brink's security.  We got no response from Mr. Warner,

5  so I wrote a letter to him, which is not in there, saying:  Hi,

6  guy.  What's up?  Let's come to Delaware County so Mr. Murphy

7  can tell you all about the infirmities of Brink's.

8          During the course of the post-trial proceedings,

9  Mr. Murphy analyzed Brink's, and that is Exhibit 5, which

10  Mr. Murphy, in my conversations with him, has made a concerted

11  effort to tell me that he believes that is an important part of

12  this whole sentence structure.  So, that's the reason that I

13  asked for the Court conference here.

14      THE COURT:  Well, this is dealt with in here, but the

15  in-kind payment is the issue.  Brink's would have to agree to

16  that.

17          MR. DOMINGUEZ:  And, Your Honor, Mr. Warner is here

18  today.  He is going to read a Victim Impact Statement to the

19  Court, and he will let the Court know what he thinks about

20  Mr. Murphy and his letter, his invitation, and he will express

21  a degree of consternation, if you will.

22          MR. GRAEFF:  The only reason that I asked for this is

23  just to make sure that you are aware of Exhibit 5, and that it

24  is a part of your sentence structure.  I am not trying to

25  create waves, but I want to make sure that everything is part

1  of the package.

2  THE COURT:  No, I understand.  You are saying,

3  obviously, that he thinks some credit is due for his efforts on

4  this.

5  MR. GRAEFF:  Okay.

6  THE COURT:  And I think, maybe, what we will do is

7  for us to have a meeting with this gentleman.

8  MR. DOMINGUEZ:  Mr. Warner?

9  THE COURT:  Before I get into this.  So, they

10  understand.

11  MR. DOMINGUEZ:  And, Your Honor, I didn't know where

12  you were going because you were talking about Mr. Murphy's

13  cooperation.  And we have Jason Costello to put on the stand,

14  so the Court can be aware from the government's perspective

15  whether or not any of that was valuable, and I think that it is

16  important to put that on the record.

17  THE COURT:  Sure.  Well, why don't we take a break?

18  Okay.  And bring in Mr. Warner.

19  MR. DOMINGUEZ:  Into the conference room?

20  THE COURT:  In the conference room.

21  MR. DOMINGUEZ:  That's fine.  I have no objection.

22  THE COURT:  We will be recess, okay?

23  – – –

24  THEREUPON, a recess was taken.

25  – – –

1     THEREUPON, the following proceedings were held in the

2  Robing Room out of the hearing and presence of the open

3  courtroom:

4          THE COURT:  Bring in Mr. Warner.

5          MR. DOMINGUEZ:  He is right here, Judge.

6          THE COURT:  Good morning.  Mr. Warner is with

7  Brink's, and he will testify regarding the defendant's attempt

8  to offer his security expertise to Brink's in exchange for

9  cooperation and consideration on the restitution issue, in

10 other words, in-kind payment was the suggestion that Mr. Murphy

11 made, right?

12         MR. MURPHY:  That was the initial letter that I wrote

13 him, Your Honor, yes.

14         THE COURT:  Why don't you tell us what you had in

15 mind?  Give us an example.

16         MR. MURPHY:  Well, I had actually had a whole agenda

17 prepared.  When I initially wrote to the president of Brink's,

18 I had a response from Mr. Warner, who said that he was very

19 interested in the information that I would have and that he

20 looked forward to seeing me, and he just wanted to know how to

21 set up the visit with me at the jail.

22         I had Mr. Graeff contact Mr. Warner, because, as you

23 may know at the jail, there is two types of visits that they

24 have.  If it is a regular visit, it is through glass and

25 through a phone, but Mr. Graeff can set up a visit in what they

1   call the interview room, which is something similar to this.

2   And I had a whole presentation and a bunch of documents,

3   exhibits and evidence that I would like to give to Mr. Warner

4   in regards to this, in regards to what I may offer him in

5   regards to my expertise, my products that I have from my

6   security company that I have developed that I believe would be

7   beneficial to Brink's and some exhibits that I think that

8   Brink's, his department would have very good use for that the

9   government is aware of, that I would like to present to him,

10  including the security evaluation report that I made

11  specifically for 1362 Essex Avenue based upon my observations.

12          And considering that I have numerous -- (there was a

13  conference between Mr. Murphy and his counsel) and I also have

14  information for Mr. Warner on other comparable Brink's across

15  the country, Your Honor.

16          THE COURT:  I am aware of the letters back and forth,

17  and you sent a letter to Mr. Murphy?

18          MR. WARNER:  Yes.

19          THE COURT:  Indicating that you were interested in

20  this --

21          MR. WARNER:  I was interested in hearing what he had

22  to say.

23          THE COURT:  -- in hearing what he had to say.

24          Based on the information -- that information and this

25  information, any in-kind restitution matter would be -- would

1  be, really, up to the victims.  They would have a say-so in

2  whether they would want to accept that, and I don't want to put

3  you -- but I guess I am putting you on the spot because we are

4  here for the eleventh hour, you know.

5          MR. WARNER:  I'll give you my opinion.

6          THE COURT:  Okay.

7          MR. WARNER:  I view Mr. Murphy as a career criminal,

8  not as a security expert.  And if we were even considering

9  accepting or giving any kind of credit to him, it should be

10  prison wages.  And whether that has any value to us or not, I

11  don't think so, but I would be remiss not to listen to anything

12  in my efforts to help protect Brink's.

13          THE COURT:  So, is your answer, then, as to the

14  in-kind restitution, that the efforts that he would put forth

15  in giving you advice on security advice and other information

16  that he has indicated here today -- and I am not trying to talk

17  you in or out of this, but I think it only fair to Mr. Murphy

18  -- he has made this offer, it is only fair to you that if it

19  would be something that you were interested in -- and I would

20  assume from what you are saying is that you would not be giving

21  him any credit; is that what you are saying?

22          MR. WARNER:  I don't see how that he should be able

23  to benefit from committing a crime against us.  I have a hard

24  time accepting that.  If he wanted to do it as an act of

25  accepting responsibility and remorse, that's what I would

1  listen to.  But if he was expecting credit, I was just going to

2  tell him, sorry, we are not going to give you credit for

3  anything when you have victimized us.  And that would have been

4  probably the end of it.  Again, I see him trying to exploit

5  Brink's and him trying to gain benefit from what he has already

6  done.

7           THE COURT:  Is Mr. Buckley here?

8           MR. WARNER:  No, Mr. Buckley reports to me.

9           THE COURT:  Oh, okay.  Well, this is not in place of

10 your victim statement.

11          MR. WARNER:  Thank you.

12          (Mr. Warner left the room.)

13          THE COURT:  Anything else?

14          MR. MURPHY:  No.

15          MR. DOMINGUEZ:  Your Honor, while we are in here, and

16 obviously, it is at your discretion, but there was some

17 indication by Mr. Murphy that he had assisted -- the Marshals

18 had specifically requested tips about courthouse security.

19          John Bailey is present in this conference.  I didn't

20 know, for efficiency purposes, whether you wanted to address

21 that here.

22          THE COURT:  Well, this is actually off the record.

23                    - - -

24          THEREUPON, a lunch recess was taken at 12:00 p.m. to

25 return at 1:15 p.m.

1                                    - - -

2

3                          Wednesday Afternoon Session,

4                          January 25, 2012.

5                                    - - -

6           THE COURT:  Before the break, we were discussing the

7    defendant's request in his sentencing memo for consideration

8    and departure based upon the defendant's document.  The Court

9    summarized the defendant's list of areas that he believes

10   justifies consideration, including providing his security

11   expertise to Brink's and a security analysis of the courthouse.

12          The Court understood that the government would like

13   to call Jason Costello to testify regarding the defendant's

14   alleged cooperation.  You may do so.

15          MR. DOMINGUEZ:  Thank you, Your Honor.  We would call

16   Jason Costello.

17                                   - - -

18                          JASON COSTELLO

19   AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

20                                   - - -

21                          DIRECT EXAMINATION

22   BY MR. DOMINGUEZ:

23          THE COURT:  You may proceed.

24          MR. DOMINGUEZ:  Thank you, Your Honor.

25   Q.   You have already testified for the record.  Would you

1    please state your name?

2    A.    Jason Costello, C-O-S-T-E-L-L-O.

3    Q.    Are you still employed with the FBI in Boston,

4    Massachusetts Metropolitan Area?

5    A.    Yes, I am.

6    Q.    And you still work for the Task Force there?

7    A.    I am assigned to an Organized Crime Task Force.

8    Q.    Very well.  First, I think the Court would benefit from

9    kind of like a timeline of events of this case.  And part and

10   parcel of that, of course, is the proffers that you engaged

11   Mr. Murphy in.

12        You are aware of the fact that Mr. Murphy was arrested on

13   January 23rd of 2009?

14   A.    Yes.

15   Q.    Did that arrest, Agent Costello have anything at all to do

16   with the Brink's burglary that occurred approximately five to

17   six days prior to that arrest?

18   A.    No, it did not.

19   Q.    What was that arrest for?

20   A.    It was a crime under investigation that occurred in

21   Massachusetts June 6th to 8, somewhere, I can't remember the

22   exact date, of 2008, the E.A. Dion Corporation was burglarized.

23   It is a manufacturer of jewelry.  So, it was burglarized of

24   both finished product and manufacturing stock.

25   Q.    And the Court actually presided over the trial in this

1  case, and I believe there was a search warrant executed at both

2  at Mr. Murphy's business and at Mr. Murphy's residence on

3  January 23rd of 2009?

4  A.  Yes, there was.

5  Q.  Was Mr. Murphy eventually indicted on the E.A. Dion

6  burglary case by the Commonwealth of Massachusetts?

7  A.  Yes, he was.

8  Q.  And did that happen on or about May 1 of 2009?

9  A.  Yes.

10  Q.  And he was arraigned sometime shortly thereafter?

11  A.  Yes, I believe a few days following the indictment.

12  Q.  And when he was arraigned on that case, and sometime

13  thereafter -- and/or sometime thereafter, did he engage the

14  services of David Linsky, an attorney there in the Boston,

15  Massachusetts area?

16  A.  Yes.

17  Q.  Very well.  Was there any indication, subsequent to his

18  arraignment in May of 2009 from Mr. Murphy or Mr. Linsky that

19  Mr. Murphy was interested in meeting with law enforcement

20  officials for the express purpose of a proffer and possible

21  disposition of his case?

22  A.  Not at the time that he was arraigned or indicted, no,

23  there was no indication at that point in time.

24  Q.  Did there come a time when there was that indication?

25  A.  Yes.

1  Q.    When was that?

2  A.    Approximately, September of 2009 is when I served

3  Mr. Murphy with a Grand Jury subpoena off of this particular

4  investigation for DNA and major case prints, we talked about

5  the potential for proffer, to see if he was interested.

6  Q.    And on or about the same time frame that you issued that

7  subpoena for DNA and fingerprints for Mr. Murphy, did you, in

8  fact, likewise, issue similar subpoenas for the same items from

9  Joseph Morgan and Robert Doucette?

10  A.    Yes, sir.

11  Q.    Very well.  Subsequent to the -- strike that.  When you

12  did, in fact, serve the subpoena upon Mr. Murphy and he

13  provided the DNA and provided the fingerprints, did you have

14  any discussions with him as to whether or not he wanted to talk

15  to you?

16  A.    Well, yeah.  When we served him with the subpoena, I made

17  reference that we were also investigating a case out of Ohio,

18  and that if he wanted to proffer, and you know, and try to tell

19  us what he knew about things, that we would be interested to

20  take that proffer.  He said he was interested in proffering,

21  and I advised him to reach out through Mr. Linsky to set that

22  up.

23  Q.    And did Mr. Linsky actually call you with respect to a

24  potential proffer?

25  A.    He may have.  I know he talked with ADA -- the ADA

1    presiding over the Bristol County case.  I may very well have

2    had direct conversations with Mr. Linsky.  I don't recall, but

3    I may have.

4    Q.   Was there a degree of difficulty with Mr. Linsky in

5    actually setting up a proffer?

6    A.   Yes, I think Mr. Murphy had expressed frustration over

7    just getting ahold of his attorney, and then his attorney was

8    very slow in actually setting something up.  So, there were

9    significant delays because of his attorney's just sluggish

10   response to Mr. Murphy, from what he reported, and also to his

11   own scheduling conflicts with his other job.

12   Q.   And during that same time frame when you were having

13   difficulty arranging a proffer, were you working the Ohio

14   Brink's burglary investigation along with Special Agent Harry

15   Trombitas?

16   A.   Yes, that investigation was ongoing.

17   Q.   And did it, in fact, involve the service of subpoenas and

18   the interviewing of witnesses in five separate states?

19   A.   Yes.

20   Q.   On or about February of 2010, did you have occasion to

21   link up with Mr. Murphy for an initial proffer?

22   A.   Yes, February 23rd was the initial sitdown with

23   Mr. Murphy.

24   Q.   And did you have a subsequent proffer with Mr. Murphy?

25   A.   Yes.  In total, we sat down four times.

1   Q.   I invite your attention, if I could, to May 27th of 2010,

2   did you, in fact, have a proffer with Mr. Murphy at that time?

3   A.   Yes, sir.

4   Q.   And there are some discussion in Mr. Murphy's sentencing

5   memorandum relative to your not providing him with a 302 of

6   that proffer, but wasn't that proffer videotaped in total?

7   A.   Yes.

8   Q.   And wasn't that, in fact, made available to defense

9   counsel as a part of discovery?

10  A.   Yes, sir.

11  Q.   Very well.  And during that proffer on May 27th of 2010 --

12  and that was May 27th?

13  A.   I believe that sounds correct, May 27th.

14  Q.   Did Mr. Murphy, in fact, provide information regarding a

15  person named Juan Garcia Hernandez?

16  A.   Yes.

17  Q.   And was that information that he provided regarding

18  Mr. Hernandez of any value to you?

19  A.   No.

20  Q.   And why is that?

21  A.   Well, he reported that he was -- while he was held in the

22  Middleton House of Corrections or the Middleton Jail pretrial,

23  that another inmate by the name of Juan Garcia Hernandez was

24  there on the charge of cocaine trafficking.  Mr. Murphy said

25  that he was a significant cocaine trafficker, which if he was

1  there on those charges, that I would believe.  He told me

2  that -- he gave me names and phone numbers of reported drug

3  associates of Mr. Hernandez and that he could order up cocaine

4  or cocaine could be ordered up from any of these people, that

5  was the information that he provided.

6  Q.   And did he advise you that he could assist you if he was

7  released on bail and acted as a cooperating informant?

8  A.   That had been a -- prior to that, he had made overtures

9  that if he was released out on bail, he could function on the

10 street as a cooperating witness for us and be able to make

11 proactive cases.  So, this information, I presumed, was in the

12 same vein, that he could contact these individuals to do that

13 same type of thing.

14 Q.   Were you, based upon your knowledge of Mr. Murphy and his

15 history, were you and/or the Assistant DA -- for the record,

16 Garrett Fregault -- were either of you of the mind to allow

17 Mr. Murphy on bail to conduct himself in that manner?

18 A.   No.  I mean, ultimately, the decision rested with the

19 Bristol County District Attorney's Office.  I personally was

20 opposed to that as were the other officers involved in the

21 investigation at that point.  We certainly made ADA Fregault

22 aware of that, but he echoed that and he said that he was not

23 amenable to doing anything of the sort.

24 Q.   And this videotaped proffer was on May 27th of 2010?

25 A.   Yes.

1  Q.   And is it a fact that at that time that Mr. Hernandez was

2  already under indictment?

3  A.   Right, he was pretrial.

4  Q.   And approximately two months thereafter or, perhaps, even

5  less than that, in July of 2010, isn't it a fact that Hernandez

6  actually entered a guilty plea to some charges that he was

7  facing on that indictment?

8  A.   Yes, I did learn that.  Yes.

9  Q.   So, Mr. Murphy's cooperation would not have been any

10 benefit to government given the fact that Mr. Hernandez had

11 actually pled guilty?

12 A.   Yes, that was my take on it.

13 Q.   Did Mr. Murphy provide you with information regarding a

14 Vladislav Vladev on an ATM skimming case?

15 A.   Yes, he did.

16 Q.   And what, if anything, did you do with that information

17 following the May 27th of 2010 proffer?

18 A.   Well, that information actually sounded very good.  He

19 gave very detailed information.  He reported, again, that he

20 was incarcerated or being held with Mr. Vladev at the Middleton

21 Jail.  They befriended one another and shared information, and

22 he gleaned certain details of Mr. Vladev's crimes.  In short,

23 it was an ATM skimming ring that operated in the region.  The

24 information was very detailed, and I thought could be of use.

25 That was a Secret Service investigation.  All I knew is what I

1   read in the newspaper about it, but I contacted the Secret

2   Service to notify them that I had information that could

3   potentially help their case.  At the same time, they had been

4   trying to reach me, they had intercepted a letter at the

5   Plymouth County Jail, that they believed had been penned by

6   Mr. Murphy either with or in conjunction with Mr. Vladev and

7   they wanted me to look at that letter, based upon my knowledge

8   Mr. Murphy, to see if I could authenticate it.

9   Q.   Did you, in fact, look at that letter?

10  A.   I did.

11  Q.   And were you able to, based on your knowledge of

12  Mr. Murphy, in letters that you had previously seen, were you

13  able to discern whether or not Mr. Murphy had, in fact,

14  authored that letter?

15  A.   Oh, absolutely, yes.

16  Q.   Did he use any code names in that letter?

17  A.   Yes, he did.

18  Q.   What was that mentionable code name that he used that you

19  were familiar with?

20  A.   Before the code names, the outer envelope was with a --

21  had a return address of "S. Murphy" from "407 Walnut Street" in

22  "Lynn", which is Mr. Murphy's home address.  So, presumably, it

23  was mailed by a third party from there.  It was addressed to a

24  "Mr. Earl Hart".  But the name is signed, it looks like "Nig"

25  possibly, you know, with an "R" after it, and it is scrawled

1  and then underneath it, it reads "Himey Goldstein".

2  Q.  And during the course of this trial, you are aware that of

3  the fact that witnesses verified that Mr. Murphy did, in fact,

4  use the alias "Nig"?

5  A.  Yes.

6  Q.  Once you identified Murphy as being the possible author of

7  this letter, did you have any discussions as to the viability

8  of Mr. Murphy's cooperation in that case with the Assistant

9  U.S. Attorney assigned to that case?

10  A.  Yes.

11  Q.  And what was the nature of your discussion?

12  A.  That case, also, was indicted and proceeding to trial.  On

13  the information itself, I was informed that the information did

14  check out.  However, the prosecutor in the case advised that

15  they did not need that information, they already had it, as

16  they had themselves a cooperating defendant in the case that

17  had already provided that same information.

18      In regards to the letter, the letter was actually -- the

19  subject of the letter was that cooperating defendant which was

20  held at the Plymouth County Jail.  But the letter, because of

21  the implied threats that it contained, they thought would just

22  impeach Mr. Murphy even if they had wanted to use him as a

23  witness.  So, therefore, while the information I thought and

24  they thought was very good information, but it was rendered

25  useless by his actions in this letter and the fact that they

1    simply did not need the information.

2    Q.    Did that letter, in fact, undermine the usefulness of the

3    cooperating witness?

4    A.    It could.  From what they believed, it was intercepted

5    prior to its going to its intended recipient, but certainly, it

6    appeared as though Mr. Murphy was trying to have that witness

7    either intimidated, possibly extorted, so, it would, obviously,

8    would be very difficult to use him as a trial witness against

9    Mr. Vladev, if they opted to do so.

10   Q.    And that letter was addressed to whom?

11   A.    Mr. Earl Hart, H-A-R-T.

12   Q.    Do you have know anything about Earl Hart?

13   A.    Yes, I do, by reputation only.  I have never taken part in

14   an investigation of him.

15   Q.    Did you have occasion to look at his criminal history?

16   A.    Yes.

17   Q.    And tell us about Mr. Hart's history.

18   A.    In the State of Massachusetts, I believe he has

19   approximately 130 arraignments, adult arraignments, most all of

20   them being violent offenses, assault and battery, firearms

21   offenses, assault and battery, dangerous weapons, drug

22   offenses, things of that nature.

23       Coincidentally, the day that I talked to Mr. Murphy on May

24   27th of 2010, that he was talking to me about Mr. Vladev,

25   Mr. Hart was being arraigned in Boston -- U.S. District Court

1  in Boston on the crime of tampering with and retaliation

2  against a witness.  He was already serving a life sentence for

3  firearms and violent -- and drug trafficking charges and the

4  violence that went along with that arrest.

5  Q.   So, the AUSA in charge of the Vladislav Vladev case

6  believed, based upon that letter, that Mr. Murphy, at the very

7  least, compromised any ability to be a useful witness based

8  upon this communication?

9  A.   Yes.

10 Q.   Are you familiar with a Brian -- is it Brian Skinner?

11 A.   Stevens.

12 Q.   Stevens, I'm sorry.  Brian Stevens.  There is some mention

13 in Mr. Murphy's paperwork that some consideration should be

14 given for his level of cooperation against a person by the name

15 of Brian Stevens.  Are you familiar with any case involving

16 Brian Stevens?

17 A.   Yes, I am.

18 Q.   Please let us know about that.

19 A.   Mr. Murphy was a victim of Mr. Stevens.  He had a couple

20 of checks, while he was on vacation, in August -- I believe it

21 was August of 2009.  Mr. Stevens reportedly stole some checks

22 from Mr. Murphy and cashed those checks.  So, Mr. Stevens --

23 Mr. Murphy made a complaint about that to the Lynn Police

24 Department, and I believe Mr. Stevens was charged for probably

25 those and I believe other larceny-type charges in the region

1  sometime thereafter.

2  Q.    So, Mr. Murphy was actually a victim --

3  A.    Yes.

4  Q.    -- in the case of the Commonwealth of Massachusetts v.

5  Brian Stevens?

6  A.    Yes.

7  Q.    So, what he is, basically, doing is requesting a level of

8  downward departure for cooperation in a case where he was a

9  victim?

10  A.    Right.  And from my understanding -- and we have, again, a

11  letter Mr. Murphy wrote to Brian Stevens.  Apparently,

12  Mr. Murphy was at court to provide a victim impact statement,

13  and he actually declined to do so, according to him.

14  Q.    Are you familiar, Agent Costello, with the Costco burglary

15  that occurred in Pennsylvania, I believe, in 2004?

16  A.    Yes, I am.

17  Q.    And was Mr. Murphy actually convicted of conducting a

18  burglary of that facility?

19  A.    Yes, he was.

20  Q.    And did he, in fact -- did that case involve the actual

21  cutting of holes into a roof and the cell phone jammer and

22  cutting lines of security to conduct that operation?

23  A.    Yes, it did.

24  Q.    Sometime subsequent to that Costco burglary, did

25  Mr. Murphy communicate with anyone associated with Costco to

1  attempt to advise them that he could, in fact, assist them with

2  security at their facility because of his expertise?

3  A.   Yes.  This all happened long before I even knew who

4  Mr. Murphy was and I was assigned to an investigation of him.

5  But as I understand it, in 2004, he and another party were

6  arrested after the burglary, was held for a time and

7  ultimately, the charges were either dismissed or withdrawn, I

8  am not sure which.  But when he was released from pretrial

9  detention, he did write a letter to Costco, that I was provided

10  a copy with, and in that letter he bragged that he was a master

11  thief -- and they may not be his exact word choice -- but

12  bragged about his exploits as a thief and that he was the only

13  such thief to successfully burglarize Costco's stores over and

14  over again, and he wanted to use his security consulting

15  firm -- or to offer his services to Costco as a corporation to

16  try to bolster their defenses to thieves of his caliber.

17  Q.   And he was actually requesting payment for that service;

18  is that correct?

19  A.   Yes, he wanted to enter into a consulting contract with

20  them.

21  Q.   Did Costco avail themselves of those services?

22  A.   No, they did not.  In fact, you know, we -- the FBI

23  attempted to look at that as an attempt at an extortion,

24  although the investigation did not go anywhere, but Costco

25  simply stopped communicating with Mr. Murphy, as I understand

1  it.

2         MR. DOMINGUEZ:  May I approach, Your Honor?

3         THE COURT:  You may.

4  Q.   (By Mr. Dominguez) Agent Costello, I just handed you what

5  has been marked for identification purposes and labeled

6  Government Exhibit 1, dated today's date.  First of all, is

7  that what appears on the government exhibit sticker?

8  A.   Yes.

9  Q.   Do you recognize that document, sir, or that set of

10 documents?

11 A.   I do.

12 Q.   And what is it?

13 A.   This is a letter to Costco.  There are actually a couple

14 of letters here, the top one being dated January 19th of 2007,

15 the next one being dated September 25th, 2006.  And then some

16 different -- they look to be talking notes, a contract

17 agreement.  These are actually photocopies of items that we

18 discovered on our searches of Mr. Murphy's -- I don't recall if

19 these came from his home or his business, but they were

20 recovered in that fashion.

21 Q.   So, as I understand it, by way of that letter, Mr. Murphy

22 was attempting to enrich himself through Costco following his

23 burglary of the Costco in Pennsylvania in 2004?

24 A.   That's the way I take it, yes.

25 Q.   And he actually pled guilty to that offense, and he

1   received a sentence of time-served, I believe; is that correct?

2   A.   Yeah, ultimately, charges were reinstated, I believe.

3   Again, these are all coming from conversations with the

4   detective on that case, but charges were reinstated based on

5   the letter that had been received by Costco, and I believe some

6   testimony that they had from a newly-cooperating witness.  And

7   from what I was told is that Mr. Murphy did plead guilty in

8   agreement for time-served.

9   Q.   Well, that conviction is a part of his PSR that the Court

10  has a record of.

11          MR. DOMINGUEZ:  May I approach, Your Honor?

12          THE COURT:  Yes.  May I see that exhibit?

13          MR. DOMINGUEZ:  Yes.  We will be offering it, Judge,

14  at the appropriate time.

15          May I proceed, Your Honor?

16          THE COURT:  You may.

17  Q.   (By Mr. Dominguez) There was some discussion during the

18  course of these proceedings, Agent Costello, regarding a

19  training video of sorts -- regarding a training video of sorts

20  that Mr. Murphy had made as part of his cooperation with law

21  enforcement authorities.  Was that videotape ever made?

22  A.   Yes.

23  Q.   Has it been used?

24  A.   No.

25  Q.   And why is that?

1   A.   Well, we thought it prudent to not make any derivative use

2   of that until Mr. Murphy was -- his case were adjudicated both

3   here and in Massachusetts, we did not want to complicate any

4   proceedings.  So, it has remained in our case file ever since.

5   Q.   And from the law enforcement perspective, has the use of

6   that video in some way been compromised by other actions of

7   Mr. Murphy?

8   A.   Yes, sir.

9   Q.   And why is that?

10  A.   The "How to be a Master Thief" document brought in at

11  trial essentially contains a mirror image of the information

12  that Mr. Murphy included in the video.  The problem is that

13  manuscript was in the custody of --

14          MR. DOMINGUEZ:  May I approach, Your Honor?

15  A.   -- was in the custody of a cell mate in the county jail

16  for some time before it was discovered by jail personnel.  So,

17  all of this information was, essentially, released to the

18  inmate population for their use.  So, any edge that law

19  enforcement would glean from the video version could simply be

20  taken away, in my opinion, by the written version that he

21  provided to the criminal element.

22  Q.   And that was the -- and so that the record is clear, would

23  you please state the title of that manifesto?

24  A.   "Master Thief, How to be a Professional Burglar" by Sean

25  Murphy.  And it is marked Government's Exhibit 15-1.

1    Q.   And to recollect for everyone's information, that

2    manifesto was actually found in a prison facility where Sean

3    Murphy had been housed after he had been transferred out of

4    that prison?

5    A.   Yes.  He was housed -- upon his January 23rd of 2009

6    arrest, he was housed at the Middleton Correctional Facility,

7    it is a Essex County Jail and House of Corrections, one

8    complex.  He was transferred, I believe, sometime about April

9    of 2010 to the Bristol County Jail.  At some point, and I don't

10   know the exact date, but this was -- this document was found in

11   the cell, his old cell in the custody of his old cell mate by

12   the Middleton staff.  So, he wrote it at Middleton and left it

13   at Middleton upon his departure.

14              MR. DOMINGUEZ:  May I have a moment, Your Honor?

15              THE COURT:  Well, I have a question.  Agent Costello,

16   you made a statement that this was available to the prison

17   population there.  And what was your statement to that effect?

18              THE WITNESS:  Well, Your Honor, it was in the custody

19   of Mr. Murphy's cell mate, so it is our presumption that if an

20   inmate has something like this, that the information would be

21   readily shared with other inmates as it would directly benefit

22   those inclined to be going out and doing property-based crimes

23   such as this.

24              THE COURT:  Well, do you have any -- did you ever

25   look into that with the other inmates?  Do you have anything

1    other than your own speculation on that?

2    THE WITNESS:  No, Your Honor, that's my speculation.

3    THE COURT:  Okay.

4    Q.   (By Mr. Dominguez) But it was found in the bunk of a cell

5    mate at the prison?

6    A.   Yes, it was concealed, and it was found during a

7    contraband inspection on the cell block.

8    Q.   And so that the Court is clear as to a timeline with

9    respect to Mr. Murphy's prosecution, he was awaiting trial in

10   the Commonwealth of Massachusetts, correct?

11   A.   Yes.

12   THE COURT:  Is that in the E.A. Dion case?

13   Q.   (By Mr. Dominguez) The E.A. Dion, in the summer of 2009?

14   A.   Correct.

15   Q.   There had, in fact, been some discussion amongst my

16   office, your office, the FBI and the District Attorney's Office

17   there in Massachusetts of the possibility of a resolution of

18   this case?

19   A.   Yes.

20   Q.   And while our investigation was ongoing, our office was

21   mindful of the fact that he had been indicted in Massachusetts

22   and there was no attempt to interfere in that prosecution going

23   forward?

24   A.   Correct.

25   Q.   In November -- on or about November of 2010, did Murphy,

1    in fact, fire his attorney and decide to proceed pro se in the

2    case of Massachusetts?

3    A.    Yes, I believe he filed the motion on October 7th of 2010

4    and his attorney filed a motion in November to withdraw.

5    Q.    And subsequent to that activity, the case was prolonged

6    even further?

7    A.    It would have been, yes.

8    Q.    Is that the point in time where a decision was made to go

9    forward here with our prosecution?

10   A.    Yes.

11   Q.    And was there a writ issued for David Nassor's testimony

12   before the Grand Jury at that same time in November of 2010?

13   A.    Yes, I believe that writ was issued within days of that

14   conversation.

15   Q.    And did Mr. Nassor, in fact, testify in the early part of

16   January of 2011 here in the Southern District of Ohio before

17   the Grand Jury?

18   A.    Yes, he did.

19   Q.    And two weeks thereafter, he was, in fact, indicted; is

20   that correct?

21   A.    Yes, sir.

22         MR. DOMINGUEZ:  May I have a moment, Your Honor?

23         THE COURT:  Yes.

24         MR. DOMINGUEZ:  Thank you, Your Honor.  No further

25   questions.

1    THE COURT:  Mr. Graeff?

2                    - - -

3                CROSS-EXAMINATION

4    BY MR. GRAEFF:

5    Q.   Agent Costello, my name is David Graeff, and I represent

6    Mr. Murphy.  Just for correction, I think that you stated that

7    the E.A. Dion burglary occurred on June 6th of 2008?

8    A.   It was either June 6th, 7th or 8th, somewhere in that

9    window.

10   Q.   But what, I believe, is correct is June 8th, for the

11   record?

12   A.   Okay.

13   Q.   You mentioned the skimming issue, and I believe at the end

14   that you indicated that you felt that the information was

15   useless?

16   A.   No.  I thought when I received it from Mr. Murphy that it

17   looked to be good information, the level of detail was pretty

18   good.  I didn't believe it was useless, but that's what I was

19   told by -- when I rendered that information to both the Secret

20   Service and the AUSA prosecuting that case, that the

21   information was rendered useless by the letter that Mr. Murphy

22   had written to Mr. Hart.

23   THE COURT:  Excuse me, the Costco letter?

24   THE WITNESS:  No, Your Honor.  This was the letter

25   that Mr. Murphy wrote, I believe, in 2009 -- or sorry, 2010.

1  It was actually postmarked April 30th of 2010.  So, it was
2  three-and-a-half to four weeks prior to Mr. Murphy giving me
3  the ATM skimming information he had written this letter,
4  addressed to Earl Hart in reference to the cooperating
5  defendant in this ATM skimming case.
6         It was, essentially, the cooperating defendant,
7  according to Mr. Murphy, had access to ATM passwords, codes,
8  etc. that were used in the skimming operation that would be
9  worth a lot of money to Mr. Vladev.  So, the letter, Mr. Murphy
10 explains that -- who the cooperator is, he explains that he
11 cooperated against Mr. Vladev.  He asked Mr. Hart if he had
12 access to them, that he and Mr. Vladev needed some information,
13 explained the information explained in the letter, that if the
14 information was provided, that he was to tell -- Mr. Hart was
15 to tell the cooperating defendant, and Mr. Vladev would pay him
16 some small sum of money.  But if he did not give the
17 information or gave misleading information that he, quote, tell
18 him that he will be smashed and labeled as a rat.
19        It further goes on to say that if Mr. Vladev got the
20 information, Mr. Vladev would pay Mr. Hart about $1,000 for
21 making this happen.
22        THE COURT:  Go ahead.
23 Q.   (By Mr. Graeff) How long have you been with the FBI, sir?
24 A.   Since July of 2004.
25 Q.   And before that you were with the Massachusetts State

1  Troopers; is that correct?

2  A.    No, I was an Army officer.

3  Q.    I'm sorry?

4  A.    I was an Army Officer.

5  Q.    And you were a military police officer?

6  A.    No.

7  Q.    What was your position in the Army?

8  A.    I was an artillery officer.

9  Q.    Okay.  During your tenure in the FBI, I am sure, you have

10 gone through many debriefings?

11 A.    Yes, sir.

12 Q.    And in those debriefings, you obtained information which

13 is, obviously, hearsay?

14 A.    Yes, sir.

15 Q.    And you obtained information from which the individual

16 giving you that information is not going to be used in trial?

17 A.    Sure.

18 Q.    You also had, I am sure, times when the individual who was

19 giving you that information is not going to testify in trial?

20 A.    Yes, sir.

21 Q.    And separate from that, the information that you get,

22 oftentimes, is good information because it corroborates what

23 other people are saying?

24 A.    Yes, sir.

25 Q.    In this instance, with respect to the Bulgarian, I can't

1   pronounce the names, but in addition to the one particular

2   individual that Mr. Murphy mentioned to you, he also gave you

3   two other individuals' names?

4   A.   Yeah, I don't recall them off the top of my head again,

5   and I have a hard time pronouncing them myself.

6   Q.   But you do recall that he gave you two other Bulgarian

7   names?

8   A.   Right, one was the cooperating defendant that he had

9   written the letter to, and the other was the other defendant

10  that, I believe, was charged --

11  Q.   That was good information, correct?

12  A.   Again, it sounded very good to me, and when I relayed it

13  to the prosecutor and the Secret Service, they said that he was

14  accurate in his information, yes.

15  Q.   That information included the fact that the skimming

16  through the Bulgarian conspiracy was occurring in Chicago

17  through Scottsdale, Arizona and Toronto, Canada.  So, in

18  essence, what we are saying is the skimming that Mr. Murphy

19  provided you at the debriefing was occurring throughout North

20  America?

21  A.   That's what he said.  Again, I didn't know anything about

22  the case.  I repeated everything that he gave me verbatim from

23  my notes to the Secret Service and passed it onto them.  So, I

24  did disseminate the information, yes.

25  Q.   And again -- in other words, the information that you got

1    that you presented to other law enforcement agencies was

2    because you deemed it credible?

3    A.   Well, again, I was only looking at the information.  I

4    didn't have any of the case background, but based on the level

5    of detail provided, that was my gut feeling, that it would be

6    credible information, and I presented that to them.

7    Q.   Now, you mentioned that because of what happened

8    subsequent to that, in your opinion, the information was

9    useless?

10   A.   Again, to reiterate, my opinion, I concur with them, what

11   they told me, one, they didn't need the information, and two,

12   even if they wanted to use Mr. Murphy as a witness, they

13   thought that they wouldn't be able to because of that letter

14   that he had written three weeks or four weeks prior.

15   Q.   But, again, the information that you received and

16   information that you get in other debriefings that is also

17   credible and informative, is given with the idea that an

18   individual like Mr. Murphy is not going to testify at trial?

19   A.   Well, again, it is useful if we can do something with the

20   information, but if he is giving us information that's already

21   known through the course of an investigation and is already

22   going to be testified to by another party, I don't see what

23   value it would have.  If they didn't plan to use his

24   information, again, you know, giving us information is one

25   thing, but that information needs to be useful in some

1  capacity.

2  That's the understanding, is that, you know, we need to be

3  able to use it forward an existing investigation, maybe bring

4  new charges or initiate a new investigation, but this was

5  information on something that had already been indicted, that

6  was moving towards trial, and it was redundant information, and

7  then the undermining letter that was sent or, you know, the

8  letter undermined his potential credibility as a witness,

9  that's what I was told.

10 Q.   But, again, to repeat myself, you have had situations in

11 the past when, again, you were not going to use the person as a

12 witness, but because of the information that Murphy gave you,

13 it was corroborated and it was good information?  You are

14 saying that it is not good information because of the fact that

15 at time you thought it was good, but then because of a letter,

16 you considered it not credible?

17 A.   It didn't change the credibility of the information, but

18 it changed the credibility of the one giving the information.

19 And, again, we can go round and round on this, yes, I thought

20 the information on its face was good, and the information from

21 what I was told by the investigators on the case, it was

22 accurate.  So, it is good information; however, they were not

23 going to use it to further their prosecution.  So, therefore,

24 they didn't need it, but the caveat was they couldn't use it

25 had they wanted to use it.  And, yes, I have debriefed people

1   on the understanding that the information was for intelligence

2   value only.  But that's not really the dynamic that we had

3   here, we were hoping for him to be able to help us to make

4   further cases or to assist other ongoing investigations but

5   just because the information was good, it didn't really assist

6   their prosecution.

7   Q.   Do you remember in the trial when Mr. Murphy

8   cross-examined you, and he asked you what a political junky

9   was?

10  A.   What a what?

11  Q.   A political junky was?

12  A.   A political junky?

13  Q.   I'm sorry.

14  A.   A junky?

15  Q.   A junky.  A junky was?

16  A.   Yes, I do recall.

17  Q.   You indicated that in response to his questions that in

18  many instances, junkies, whether they be drug junkies or

19  cocaine or whatever, are not -- often not credible individuals?

20  Do you remember you responded to that?

21  A.   Sure.

22  Q.   Do you remember Mr. Doucette and Mr. Nassor testified --

23  well, you probably weren't here -- but Mr. Nassor and

24  Mr. Doucette testified in this case?

25  A.   Yes, I am aware that they were witnesses, but I was not in

1    the courtroom as I, too, was a witness.

2    Q.    Let me ask you a couple of questions about the Costco

3    burglary.  I know that you weren't involved in it, but are you

4    aware that a Motion to Suppress was filed in that case and that

5    it was granted by the trial court?

6    A.    Yes.  Yeah, I read the police report, and that's where my

7    knowledge came from.  So, I am aware of that, yes, sir.

8    Q.    And, afterwards, after the case was reinstated was when

9    Mr. Murphy then just pled to time-served to get it over with?

10   A.    Yes, that's the way I understand it, yes.

11         I should note that as he was brought down from the

12   Middleton Jail by the detectives in the case -- this is from a

13   conversation with that detective -- was that he offered the

14   detectives to come in and train their detectives on how to

15   investigate this type of crime as well.  So, that was something

16   that was in the police report that I had read that was

17   documented when the charges were reinstated and he was

18   rearrested.  So, he remarked that it was weak case, and he

19   would just would probably plead out to time-served.

20   Q.    Now, Mr. Dominguez asked you about Mr. Murphy volunteering

21   to be out on bond and to gain further information on behalf of

22   the FBI?

23   A.    Yes, sir.

24   Q.    When did you first become an agent with the FBI?

25   A.    July of 2004.

1  Q.   Are you aware of an agent by the name of Scott Decker?

2  A.   Yes, I know him by reputation.

3  Q.   Did you know that Mr. Murphy and Mr. Decker had an

4  arrangement where Mr. Murphy was a paid informant in 1996

5  through 2000?

6  A.   Well, now that it is out, and he is divulging that, yes, I

7  did.

8  Q.   Mr. Dominguez brought it up, and you were the one who

9  mentioned that you were concerned over having Mr. Murphy out on

10  the streets.  And, evidently, Mr. Decker was not so concerned.

11  A.   You are talking apples and oranges here.  Mr. Decker,

12  whatever he did with Mr. Murphy was, I believe, in the late

13  '90s and Mr. Murphy -- yes, I read his file when I first took

14  on the case, he provided information.  This time around,

15  Mr. Murphy wanted to proffer -- he told me that he could best

16  serve us and help himself if he were to be out on the street

17  and try to make cases for us.  All parties involved, the

18  prosecutor and various agencies did not want him to be let out

19  on bond because they saw him as a flight risk.

20  Q.   I'm sorry.  I didn't hear the last part?

21  A.   The opinion was they saw him as a flight risk, knowing

22  that there could have been assets that we weren't aware of,

23  they did not want him released from jail for that reason.  So,

24  we looked at him as a risk if he was released.  It had nothing

25  to do with what he did or didn't do with Agent Decker back in

1    the '90s.

2    Q.   Right.  So, it wasn't the credibility that the Mr. Murphy

3    issue was with you, but it was the fact that you considered him

4    a flight risk?

5    A.   Yes.

6    Q.   So, you agree that the information that Mr. Murphy would

7    provide if he would be out on the street would be credible and

8    good information?

9    A.   I would have no way of knowing if it would be until he

10   provided it and we could corroborate it.  I mean, you know, him

11   making the offer is great and if he wanted to -- if we were

12   amenable to letting him out, that would be one thing.  But I

13   have no way to judge whether or not his information would be

14   credible, would hypothetically be credible unless he got out

15   and did something.  But, again, that was not an issue that

16   anyone would agree to as far as bail, so that was not an

17   option.  And that was out of my hands.

18           MR. GRAEFF:  Thank you.  I have no further questions,

19   Your Honor.

20           MR. DOMINGUEZ:  Just one, Your Honor.

21           May I approach?

22           THE COURT:  Yes.

23                   - - -

24                   REDIRECT EXAMINATION

25   BY MR. DOMINGUEZ:

1  Q.   I am handing you what has been marked for identification

2  purposes and is labeled as Government's Exhibit 2.  Is that

3  what appears on the exhibit sticker, Agent Costello?

4  A.   Yes.

5  Q.   In the body of that letter, who is "Vladi"?

6  A.   That is the aforementioned Vladislav Vladev.

7  Q.   And that is the person that Mr. Murphy had provided

8  information about?

9  A.   Yes.  This is the letter that I described about the ATM

10  skimming ring.  This is the letter that I was discussing, and

11  Mr. Vladev headed that ATM skimming crew.

12  Q.   And in that letter, Mr. Murphy is outing, if you will, the

13  cooperating witness?

14  A.   Yes.

15  Q.   And suggesting that the cooperating witness, someone would

16  cause harm to that person?

17  A.   "Be smashed and labeled as a rat" was the phrase that he

18  used.  So, I take that to be physically threatened or

19  assaulted.

20       MR. DOMINGUEZ:  May I approach, Your Honor?

21       THE COURT:  You may.

22       MR. DOMINGUEZ:  Your Honor, I have no further

23  questions.

24       THE COURT:  I didn't hear you?

25       MR. DOMINGUEZ:  I have no further questions of the

1   witness.  Sorry, Your Honor.

2           Your Honor, at this time, we would move for admission

3   of Government's Exhibit 1 and 2, dated today's date

4   respectively.

5           THE COURT:  Any objection?

6           MR. GRAEFF:  I didn't see the last exhibit that he

7   introduced.

8           MR. DOMINGUEZ:  It is a letter to Earl Hart.

9           MR. GRAEFF:  I hadn't been shown it.

10          THE COURT:  Anymore questions of Agent Costello?

11  Mr. Graeff, anymore questions?

12          MR. GRAEFF:  No, sir.

13          MR. DOMINGUEZ:  Any objections to the exhibits,

14  Mr. Graeff?

15          MR. GRAEFF:  No.

16          MR. DOMINGUEZ:  No further questions, Your Honor.

17          THE COURT:  The exhibits will be admitted.

18          You may step down, Mr. Costello.

19          The government has called Special Agent Costello to

20  testify, and he has been cross-examined by the defense.  The

21  Court has heard from Mr. Costello regarding Mr. Murphy's

22  cooperation.  Agent Costello suggested to Mr. Murphy that if he

23  was interested in making a proffer, he should set that up with

24  his attorney.  He had a proffer session on May 27th of 2010,

25  and that was videotaped.  Information on Hernandez was then

provided by Murphy and was not helpful to law enforcement.
Information on Vadislav Vladev was turned over to the Secret
Service for their investigation, and it did check out, but they
already had the same information.  With respect to the
Commonwealth v. Brian Stevens, Mr. Murphy was actually a victim
in that case, and he did not assist the prosecution.  The
defendant was also videotaped to provide law enforcement a
training video, but it has not been used because of the pending
cases.  Also, Murphy's "How to be a Master Thief" was dispersed
to other prisoners, so there may no longer be a benefit to law
enforcement.  Actually, the evidence is that it was in the
possession of another prisoner, and perhaps, it went to other
prisoners.

Regarding this knowledge, therefore, it appears from
Agent Costello's testimony that defendant Murphy has attempted
to proffer an extensive amount of information, but it was
either already known to law enforcement or unable to be used.
Nonetheless, as argued by the defendant, this information
provided can be considered cooperative information.

The Court has carefully considered all of the areas
in which defendant Murphy has provided information and/or
attempted to cooperate.  Had defendant decided to take the plea
agreement, the government has acknowledged that Murphy would
have received some consideration based upon his cooperation.
However, Mr. Murphy proceeded to trial and forced both the

1   government and this Court to exhaust numerous resources in the

2   trial.  I do not find that any departure based upon 5K of the

3   guidelines is warranted, but however, I will consider the

4   defendant's cooperation as a part of the 3553(a) factors and

5   believe that some departure and consideration of those factors

6   combined is warranted.

7       Defendant Murphy asserts that the fact that he

8   received little or no money as a result of this offense and the

9   collateral consequences of this offense justify a departure.

10      The defendant was arrested shortly after the Brink's

11  burglary and the proceeds had yet to be fully counted or

12  divided up.  Defendant claims that he actually lost money for

13  renting the moving truck, storage bin and car used to commit

14  the crime.  He asserts that co-defendant Doucette kept the bulk

15  of the stolen money.

16      Defendant claims that as a result of his arrest, he

17  lost his business.  When authorities executed the search

18  warrant, they caused substantial damage to his moving

19  customers' property, and the damage was not covered by

20  insurance, and Murphy could not cover it.

21      The government responds that it is unaware of the

22  exact amount of money Murphy personally received as a result of

23  this offense, but the fact that he was arrested before all of

24  the money could be divided is not a circumstance that the Court

25  should consider for a downward departure.

1    Is there anything to add to this, Mr. Graeff?

2    Mr. Graeff, is there anything further on this issue?

3    MR. GRAEFF:  No, sir.

4    THE COURT:  Mr. Dominguez?

5    MR. DOMINGUEZ:  No, thank you.

6    THE COURT:  The Court rules that it does not find the

7 cases cited by defendant persuasive as the circumstances

8 surrounding this offense are distinguishable.  It is true that

9 a minor participant who has not received any money for his

10 participation in an offense may warrant a departure, but that

11 is not the case here.  Mr. Murphy was the mastermind of this

12 scheme, and the fact that he was arrested before he was able to

13 receive the full benefit of the proceeds of the burglary do not

14 justify a departure.  The fact that Murphy's business had to

15 close is a foreseeable consequence of him being caught on this

16 offense.  Nonetheless, the Court will consider this in

17 sentencing.

18    The defendant argues that his lack of guidance as a

19 youngster justifies a departure.  His mother married her third

20 husband when Murphy was 11, and he did not like children.

21 Murphy was forced to reside with his father, who was an

22 alcoholic and didn't care what his kids were doing.  Murphy was

23 lured by his older brother into a life of crime as a burglar.

24 Murphy now claims that he must change so he can raise his

25 children and become a responsible member of society.  The

1    defendant claims his acceptance of responsibility in this case

2    establishes his intent to change.

3          The defendant also argues that his family

4    responsibilities justify a departure.  The defendant has lost

5    both of his parents and his older brother.  The defendant also

6    has two children, from his ex-wife and from his current wife,

7    that both have health issues that require Murphy to assist in

8    their care.

9          The government respond that while the Court can

10    consider the relevant history and characteristics of the

11    defendant in accordance with Section 3553(a), Section 5H1.12 of

12    the Sentencing Guidelines specifically states that "lack of

13    guidance as a youth and similar circumstances indicating a

14    disadvantaged upbringing are not relevant grounds in

15    determining whether a departure is warranted."  The government

16    further notes that the cases cited by the defendant are

17    factually dissimilar to Murphy's case as the defendant in those

18    cases were youthful offenders, whereas Murphy has had decades

19    of involvement with the criminal justice system.

20          And is there anything additional, Mr. Graeff, that

21    you would have to add for the Court's consideration?

22          MR. GRAEFF:  Your Honor, there were some letters

23    that, I believe, the Court received from individuals?

24          THE COURT:  I'm getting to that.

25          MR. GRAEFF:  I'm sorry.

1        THE COURT:  Okay.  The Court is sympathetic to the

2   defendant's situation, currently with his family

3   responsibilities and his difficult upbringing and lack of

4   guidance.  The Court would be more inclined to consider this as

5   a grounds for departure if it were defendant's first or second

6   offense, but however, the defendant has a long history of

7   committing burglaries.  I previously held that defendant Murphy

8   did not accept responsibility for his actions in this case.  He

9   did not change any of his behaviors prior to being arrested.

10  Now, he claims that he wants to change, but the Court is not

11  persuaded.  Nevertheless, the Court will consider the history

12  and characteristics of the defendant when sentencing;

13  specifically, that he has lost most of his family and his

14  concern for the well-being of his children and the mothers of

15  his children.

16       The defendant is seeking a departure based upon the

17  improper, insufficient investigation of co-defendant Doucette's

18  use of James Hennessey to rent a moving truck and storage bin.

19  The defendant contends that had this been fully investigated,

20  the outcome of the trial may have been different, or he would

21  have had a witness to challenge Doucette's testimony.

22       Anything additional to add to that, Mr. Graeff?

23       MR. GRAEFF:  No, Your Honor.

24       THE COURT:  The Court is confident based on the

25  testimony given at trial that the government's response that

1    the investigation into James Hennessey was sufficient, and

2    there is no information that would have been helpful to the

3    defendant at trial.

4         The defendant argues that 3553(a) factors based on

5    the arguments set forth above, including that a sentence must

6    be sufficient but not greater than necessary, requires an

7    additional three to five-level reduction in sentence.

8         Defendant also cites his co-conspirators' sentence --

9    Morgan received 55 months and Doucette received 27 months and

10   David Nassor was not charged because of his cooperation.

11   Defendant submits that a sentence of 120 to 150 months would be

12   appropriate in this case.

13        The government responds that not only did Morgan and

14   Doucette receive the benefit of a plea bargain, but their

15   criminal history scores were much lower than Murphy's,

16   therefore, the three co-defendants are not similarly situated.

17        Anything to add to that, Mr. Graeff?

18        MR. GRAEFF:  No, Your Honor.

19        THE COURT:  There is no question that defendant

20   Murphy's sentence will be much higher than that of his

21   co-conspirators because they received the benefit of a plea

22   agreement, and their criminal history scores were lower.

23   Further, Morgan and Doucette pled guilty to two counts, whereas

24   Murphy was convicted of four counts.  Therefore, the fact that

25   defendant Murphy went to trial in this case and did not accept

1   the plea agreement offered by the government with a lower

2   amount of loss justifies the sentencing disparities among the

3   co-defendants.

4           In addition to all of the arguments addressed, the

5   Court has also received a number of exhibits attached to the

6   defendant's Sentencing Memorandum, which have been carefully

7   reviewed.  I may not have addressed each and every one during

8   the previous summary of your arguments; therefore, Mr. Graeff

9   or Mr. Murphy, I will give you time to raise any additional

10  arguments that you believe or might have that would justify a

11  departure or further consideration that have not already been

12  addressed.

13          And I also do cite later on in this opinion that

14  Mr. Murphy wants to be close to -- Ft. Devens, is it?

15          MR. GRAEFF:  Yes, sir.

16          THE COURT:  In Massachusetts to be close to his

17  family and to be able to litigate civil matters in

18  Massachusetts courts.

19          Let's see.  To summarize, I have carefully considered

20  the aforementioned arguments.

21          I have asked for any additional arguments,

22  Mr. Graeff?  And I do acknowledge the letters later on.

23          MR. GRAEFF:  Nothing further, Your Honor.

24          THE COURT:  All right.  Thank you.

25          To summarize, I have carefully considered all of the

aforementioned arguments raised in the objections and the

sentencing memoranda, as well as all of the 3553(a) factors.

The Probation Officer has recommended a total sentence of 300

months in this case.  And I was initially inclined to go along

with that sentence based upon defendant Murphy being the

mastermind behind the complex scheme to burglarize the Brink's

Warehouse as well as his lengthy criminal history.  However,

after hearing all of the defendant's arguments, I believe that

a departure is warranted.  The defendant should receive some

credit for the time served since his indictment in this case

through sentencing.  Further, the 3553(a) factors, including

the history and characteristics of the defendant and his

attempts to cooperate by providing information on unsolved

crimes to law enforcement justify a departure.  The Court will

reduce the recommended sentence of 300 months by 60 months to a

total of 240 months.

The defendant requests to serve his prison sentence

at Ft. Devens -- I mentioned that -- and while the Court is

sympathetic to the defendant's family situation, it must also

consider general protection of the public.  Defendant Murphy

has close ties to many people involved in illegal operations in

Boston and in the Boston area, and he has the ability to get

people involved in his illegal operations.  If the defendant is

placed in Massachusetts, he could continue to maintain these

connections.  Therefore, the Court denies the defendant's

1    request to make this recommendation but notes that the Bureau

2    of Prisons makes the ultimate decision where to place the

3    defendant.

4         The Court will also include a separation order in the

5    Judgment and Commitment Order that Murphy and his

6    co-defendants, Morgan and Doucette, should be placed in

7    different prison facilities.

8         The defendant has also requested that his $400

9    special assessment be paid with the money that he had in his

10   possession when he was arrested; but however, Murphy was

11   arrested and taken into custody on the state case in

12   Massachusetts, therefore, any money that was on him when he was

13   arrested would be in the possession of the Massachusetts

14   authorities.  The Court has no control over that money, and

15   therefore, cannot grant the defendant's request.

16        Finally, defendant requests that he be allowed to

17   make restitution through an in-kind payment pursuant 18 U.S.C.,

18   Section 3664(f)(4).  An in-kind payment may be in the form of a

19   return of property, replacement of property, or if the victim

20   agrees to a service was rendered to the victim or a person or

21   an organization other than the victim.  The defendant claims to

22   be a security expert and has contacted Brink's and proposed the

23   in-kind payment.  But, however, in order to order such an

24   in-kind payment, the victim must agree, and there has been no

25   such agreement.  The Court has heard from Mr. Warner from

1   Brink's, and he does not agree to such an in-kind restitution

2   payment.  Mr. Warner does not believe that Mr. Murphy should

3   benefit from his crime and victimization of Brink's.

4   Therefore, the defendant's request is denied.

5            Mr. Dominguez, do you have any additional comments on

6   this?

7            MR. DOMINGUEZ:  No, Your Honor.  We do have

8   Mr. Warner here representing Brink's.  I don't know if it is

9   the appropriate time?  I believe they would like to provide the

10  Court with a victim statement.

11           THE COURT:  Now is the time.

12           MR. DOMINGUEZ:  Oh, Your Honor, for the record,

13  before he speaks, I do have, for the record, which I would like

14  to make a part of the record Government's Exhibits 13-A1

15  through 13-A4.  You will recall during the course of the trial

16  that we had redacted letters which were 13-1 through 13-4.

17  These are the unredacted letters.  I believe they should be

18  made a part of the record.

19           MR. GRAEFF:  I object to that.

20           THE COURT:  Okay.  Let's hold off on that because

21  Mr. Graeff is going to have an opportunity to speak in

22  mitigation, and we need to hear from Mr. Warner.

23           Mr. Warner, you can do this from your seat.  I'm

24  sorry.

25           Go ahead, Mr. Warner.

1          MR. WARNER:  The crime on which Mr. Murphy is about

2     to be sentenced is not a victimless insurance crime or

3     something that can be looked upon as a big business victim and

4     that they can take it.  This crime impacted the lives of

5     countless people.  It is really an investigation of innocent

6     people that were suspect and their integrity was questioned.

7     Jobs were lost directly and indirectly from this incident.

8          Financially, this crime impacted every employee of

9     Brink's.  The losses from this incident come directly off the

10    bottom line profitability of Brink's.  Brink's is a

11    profit-sharing program and because of this incident, Brink's

12    personnel in Columbus did not receive any profit-sharing.  The

13    money taken was not the property of Brink's, this money was not

14    delivered to our customers as they would expect.  Our customers

15    had to be paid back by Brink's.  This impacts our customers and

16    their cash-flow processes.

17          This diminished the reputation of Brink's to their

18    customers.  The customers entrusted us to protect their

19    valuables and deliver them on time.  This customer impact has a

20    negative impact on customer relations, potential new customers,

21    the renewal of contracts and our reputation in the community.

22    As this loss comes directly off the bottom line of

23    profitability, it will take nearly $5 million in new revenue to

24    make up for the money stolen in the burglary.  This incident

25    took place at a time when customers are cutting back on service

1    and asking us to reduce our rates.  This does not include the

2    damage to the buildings and the cost of those repairs.

3            Shortly after Murphy was convicted, we received a

4    letter from Murphy.  In this letter, there was no apology, no

5    regrets, not a mention of responsibility for the crime.  He

6    simply wanted to continue to gain from his crime by taking

7    advantage of fulfilling his restitution responsibility by

8    claiming to be a security expert.  Murphy is not a security

9    expert, he is an egotistical criminal.  He will never be able

10    to repay Brink's and the people affected by this crime.  His

11    history shows that he is nothing more than a career criminal

12    who looks to exploit his victims in any way he can.

13            I answered Murphy's letter that I would like to talk

14    to him, but this conversation would not be with him as a

15    security expert.  He is a criminal, not a security expert.  And

16    if he was to be credited for anything, he could pay Brink's

17    back at the rate for which he is a convicted criminal and from

18    his prison wage rate.

19            If he were a security expert, he would know the

20    definition of security is to protect, not to exploit, not to

21    take advantage of, and certainly not to burglarize and steal.

22    I don't believe Mr. Murphy has any regrets about this crime

23    other than being caught.

24            He specifically targeted Brink's.  It is my belief

25    that this crime was motivated by another crime where Brink's

1   was victimized on January 17th of 1950 in Boston.  This is

2   where Murphy is from.  I don't believe the date of this crime

3   was a coincidence.  The Boston robbery has been heralded in the

4   media in Boston as the great Brink's job since it occurred.

5   The Boston Public Library has an exposition on it, it is even

6   documented on the FBI website.  Murphy wanted to pull off the

7   next great Brink's job and become famous in the Boston criminal

8   underworld.  Murphy had planned this burglary for months, if

9   not years.  I don't think it is coincidence that he chose to do

10  it in Ohio, when the risks of getting caught in those states

11  where he has committed crimes, the state of Ohio's penalties

12  for burglaries are the lowest.  What he didn't count on was the

13  great work by the FBI and the United States Attorney's Office.

14          Murphy's letter makes it clear, he wants to continue

15  to benefit from his criminal activity.  He wants the attention

16  for what he has done.  He wants to be known as a mastermind and

17  acclaimed as someone who beat Brink's and that Brink's is using

18  him as a consultant.  Nothing is further from the truth.  The

19  only thing we really want from Murphy is to see him sentenced

20  to a very long term of prison.

21          I would ask the Court to exceed the guidelines in

22  this case for several reasons.  The impact of this crime was

23  not as limited as it would appear.  It impacted a large number

24  of innocent people.  It was calculated and planned to provide a

25  large gain for the criminals involved with minimal potential

1   criminal penalty.  The defendant has no remorse for what he has

2   done.  He is a career criminal and probably already has his

3   next crime planned.

4          The Court has within its discretion deterrent

5   sentencing, and we are asking that that be imposed on Murphy.

6   Murphy is an example of someone who picked his victim as a

7   result of a previous crime that was well-publicized, and he

8   thought he was smarter than the criminals who attempted the

9   same crime before him.  I would ask the Court to exceed the

10  sentencing guidelines and make an example of Murphy and protect

11  society from his next crime.

12         Thank you for your time, Your Honor.

13         THE COURT:  Thank you, Mr. Warner.

14         Mr. Graeff, you may speak in mitigation.

15         MR. GRAEFF:  Your Honor, I am not going to be long

16  because it is 2:30, and it is getting close to go, but I just

17  want to talk a little bit about my relationship with this man.

18         Years ago, I was drafted in the Army, and I went

19  overseas -- this was in the mid-60s -- and my job was assigning

20  troops from America, both officers and enlisted men, and I

21  spent 15 months overseas doing this.  And one of the seminars

22  that I took was factors that a person had as far as leadership

23  abilities.  And I won't detail the leadership factors, but I

24  can tell you that in the seven-and-a-half months that I have

25  met Mr. Murphy, he has every single quality of this.

1          One of the characteristics is analytical ability, and

2   in all of my years, I have never met anyone who can look at

3   something, analyze it and come to a quick decision.  I have

4   never met anyone who can organize his thoughts better than this

5   man.

6          Now, I have heard Mr. Warner and how he explained to

7   you why they think he is nothing but a bum, a hoodlum and

8   useless, and I have also heard from Mr. Murphy.  What should

9   occur here is, eventually, when Mr. Murphy is released, both

10  sides need to give a little bit and recognize the absolute

11  positive qualities of this man and somehow separate all of his

12  past improper deeds and use him as someone who has got just an

13  incredible ability to analyze and figure out what the problem

14  is and how to solve it.

15         In chambers, we mentioned what he did as far as

16  Brink's and what he did as far as this court system, and all I

17  am saying is that I appreciate very much the fact that you gave

18  us the opportunity to show you in our own way his qualities,

19  and I appreciate the fact that you considered and are taking a

20  downward departure.  Other than that, I have nothing further to

21  say, Your Honor.

22         THE COURT:  Thank you, Mr. Graeff.

23         Mr. Murphy?

24         MR. MURPHY:  Thank you, Your Honor.

25         Your Honor, I would like to take the time to

1  apologize to the Court and to Brink's for any damage that my

2  actions may have caused.  I have realized in this business, as

3  long as I have been in it and as long as I have been doing it,

4  it is time for me to retire, Your Honor.  I am getting old.

5       I just can't do it no more.  I mean, with the amount

6  of time that I am getting from this crime and everything else,

7  good help is hard to find, and I'm just done.  So, you know,

8  whatever punishment the Court imposes on me, I will take it and

9  go serve my time and when I get out, hopefully, I can establish

10  a relationship with my family.  My kids will be grown up.  All

11  of my family is dead, I am the only Murphy left at this point

12  besides the kids, and I have just got to move on with my life.

13       And any consideration that you give me for downward

14  departures for those 3553(a) factors and the cooperation, I

15  appreciate that, Your Honor.  I worked hard, as you can see,

16  with the FBI in trying to mitigate this crime and trying to do

17  what I can, and whatever you grant me, I appreciate, and thank

18  you very much.

19       THE COURT:  Mr. Murphy.

20       The Court acknowledges that it is the law that we

21  must acknowledge the arguments made by the defendant and

22  defense counsel, as well as the arguments of the government and

23  the victims, who are a very important aspect of this.  And this

24  crime had, as near as I can see, a devastating effect on the

25  business, on the victim of this crime.

1    In addition to your arguments, I must also

2   acknowledge the letter from your ex-wife and the mother of your

3   child, Ms. Brown -- is it Rikkile?

4        MR. MURPHY:  Rikkile.

5        THE COURT:  Rikkile Brown.  The Court is sympathetic

6   to her situation and that of your autistic son.  We also

7   received a very positive letter from Richard Ford,

8   Vice-President of the Lynn City Council, discussing your

9   involvement in the community as well as a letter from Judge

10  Albert Conlon, who represented you when he was in private

11  practice.  The Court appreciates these letters of support.

12       Are there any issues -- if such is possible -- that

13  we have not considered, any 3553 factors that we have not

14  considered or addressed today?

15       MR. GRAEFF:  No, sir.

16       THE COURT:  Mr. Dominguez?

17       MR. DOMINGUEZ:  No issues or 3553(a) factors, Your

18  Honor.

19       THE COURT:  Pursuant to the Sentencing Reform Act of

20  1984 and 18 United States Code, Section 3553(a), it is the

21  judgment of the Court that the defendant, Sean D. Murphy, is

22  hereby committed to the custody of the United States Bureau of

23  Prisons to be imprisoned for a term of 60 months on Counts 1

24  through 4 to be served consecutively to each other for a total

25  of 240 months.

1          Upon release from imprisonment, the defendant shall

2     serve a term of supervision of three years on Counts 1 through

3     4, to be served concurrently.

4          Within 72 hours of release from the custody of the

5     Bureau of Prisons, the defendant shall report to the Probation

6     Office in the district to which he is released.

7          While on supervised release, the defendant shall not

8     commit any federal, state or local crimes.  He shall be

9     prohibited from possessing a firearm or other dangerous device.

10    The defendant shall also refrain from any unlawful possession

11    or use of a controlled substance, submit to a drug test within

12    15 days of release while on supervised release and at least two

13    periodic drug tests thereafter.  The defendant shall submit to

14    the collection of a sample of his DNA as directed by the

15    Probation Officer or designee of the Bureau of Prisons.

16         The defendant shall comply with the standard

17    conditions of supervised release as adopted by this Court.  The

18    defendant shall also comply with the following special

19    conditions:

20         The defendant shall participate in a program of

21    testing and treatment for alcohol and controlled substance

22    abuse as directed by the U.S. Probation Office until such time

23    as the defendant is released from the program by the Probation

24    Office.

25         The defendant shall provide all personal financial

1    information upon request by the Probation Office.

2         The Court finds that the defendant does not have the

3    ability to pay a fine.  However, pursuant to 18 United States

4    Code, 3663A, the defendant is ordered to pay restitution in

5    this case.  The amount of restitution is $1,270,456.80.  The

6    restitution shall be paid jointly and severally with Joseph

7    Morgan in this case.  Restitution is due immediately with any

8    unpaid balance to be paid as a condition of supervised release.

9    And also Mr. Doucette is jointly and severally responsible for

10   the restitution.

11        While incarcerated, if the defendant is working in a

12   non-UNICOR or Grade 5 UNICOR job, he shall be pay $25 per

13   quarter toward the restitution obligation.  If working in a

14   Grade 1 through 4 UNICOR job, the defendant shall pay 50

15   percent of his monthly pay toward the restitution obligation.

16   Any change in the schedule shall be made only by order of this

17   Court.

18        Within 60 days of the commencement of the term of

19   supervised release, the Probation Officer shall recommend a

20   payment schedule to the Court to justify any unpaid balance of

21   the restitution.  The Court will enter an order establishing a

22   schedule of payments.

23        Pursuant to 18 United States Code, Section

24   3612(f)(3)(A), the Court waives the requirement of interest on

25   any balance of the restitution not paid within 15 days after

judgment.  The defendant is ordered to pay a special assessment in the amount of $400, which shall be due immediately.

As justification for this sentence, the defendant, Sean D. Murphy, is before the Court after having been found guilty of conspiracy to transport merchandise and money in interstate commerce; two counts of traveling in interstate commerce with the intent to further promote an unlawful activity and transporting merchandise and money in interstate commerce.

The defendant was involved in a conspiracy to travel from Boston, Massachusetts to Columbus, Ohio to commit a burglary at the Brink's Warehouse.  The defendant and two other defendants successfully broke into the Brink's facility and stole $2,330,291.15, but had the capability of stealing more than $92 million.  The amount of money they were able to obtain was limited because the high intensity torch that they used to break into the vault ignited money and materials inside of the vault.  Defendant Murphy was the mastermind behind the conspiracy.

The sentence imposed is consistent with the U.S. Supreme Court decision in United States v. Booker.  The Booker holding effectively made the sentencing guidelines advisory rather than mandatory.  Booker requires judges to not only consider the guideline range, but also to consider the other factors listed in 18 United States Code, Section 3553(a) in

1    determining the appropriate sentence.

2            The Court has considered the nature and circumstances

3    of the offense as well as the history and characteristics of

4    the defendant.  The defendant is 47 years old.  He has lost

5    both parents and his older brother.  He has two, two-year old

6    children, one with an ex-wife and the other with a girlfriend.

7    He also has a 26 year old daughter who was raised by his

8    mother.

9            The defendant's criminal history is very lengthy

10   including convictions for:  13 counts of breaking and entering;

11   six counts of possession of burglarious tools; possession with

12   a knife over two-and-a-half inches long; three counts of

13   larceny under $250; possession of marijuana; malicious damage

14   to property; breaking and entering with intent; six counts of

15   larceny over $250; use of a motor vehicle without

16   authorization; wanton destruction of property; possession of a

17   controlled substance; two counts of larceny of a motor vehicle;

18   five counts of receiving stolen property; three counts of

19   knowingly receiving stolen property; two counts of breaking and

20   entering nighttime; two counts of larceny; violation compulsory

21   insurance law and attaching wrong motor vehicle plate;

22   possession of a dangerous weapon; larceny of a controlled

23   substance; two counts of attempted breaking and entering; two

24   counts of armed robbery; 11 counts of possession with intent to

25   distribute drugs; possession; distribution of drugs; two counts

1   of breaking and entering with intent to commit felony;

2   possession of stolen firearms; two counts of possession of a

3   Class E substance with intent to distribute/manufacture;

4   illegal possession of a Class D substance; two counts of

5   possession of a Class C substance with intent to

6   distribute/manufacture; possession of a Class B substance with

7   intent to distribute; conspiracy to commit larceny over $250;

8   soliciting another to commit larceny; attempt to commit a

9   crime; operating under the influence of drugs; and burglary.

10       It is apparent from the defendant's recidivist

11   behavior that the only way to stop him is a lengthy period of

12   incarceration.  The sentence is further justified because

13   Murphy was the mastermind of this conspiracy, intricately

14   involved in the planning and carrying out of the burglary,

15   which involved deceptive and illegal stages, such as purchasing

16   the cellular telephone jammer, obtaining DNA on a cigarette of

17   a man from a homeless shelter to leave at the Brink's facility.

18       While the Court has granted the defendant a departure

19   of 60 months from the recommended sentence, the sentence

20   imposed is still considerable and will provide just punishment

21   for the offense and deter those in the community who may

22   consider committing similar offenses.  Further, this sentence

23   will help protect the public from further crimes of the

24   defendant.  The sentence imposed will also avoid unwarranted

25   sentencing disparities as co-defendants Morgan and Doucette

1    each received the benefit of a plea agreement to two counts of

2    the Indictment and had substantially lower criminal history

3    scores than Murphy.

4         In conclusion, after considering the facts of this

5    particular case, the advisory sentencing guidelines, the

6    3553(a) statutory factors and the information in the

7    Presentence Report, the sentence imposed is reasonable and

8    sufficient, but not greater than necessary, to comply with the

9    purposes of sentencing outlined in Section 3553(a).  The

10   sentence imposed today will afford the defendant the

11   appropriate and necessary means of rehabilitation.

12        Now, do the parties have any objections to the

13   sentence just pronounced that have not been previously raised?

14        MR. GRAEFF:  No, Your Honor.

15        MR. DOMINGUEZ:  No, Your Honor.

16        THE COURT:  I will read you your appeal rights,

17   Mr. Murphy.  You can appeal your conviction if you believe that

18   your guilty -- that your conviction was somehow unlawful or if

19   there is some other fundamental defect in the proceedings

20   during your trial.

21        You also have a statutory right to appeal your

22   sentence under certain circumstances; particularly, if you

23   think the sentence is contrary to law.

24        If you are unable to pay the costs of an appeal, you

25   may apply to this Court for leave to appeal in forma pauperis,

1    that is without payment of fees and costs.

2         Do you understand your rights, Mr. Murphy?

3         MR. MURPHY:  Yes, Your Honor.

4         THE COURT:  You may request the Clerk of this Court

5    to prepare and file a notice of appeal for you on your behalf.

6    Do you wish to have the Clerk file a notice of appeal for you?

7         MR. MURPHY:  Yes, Your Honor.

8         THE COURT:  I understand, Mr. Graeff, that this will

9    conclude your work on this case; is that correct?

10        MR. GRAEFF:  And I have discussed that with

11   Mr. Murphy, and he is in full agreement, Your Honor.

12        THE COURT:  All right.  And then the Court of Appeals

13   will appoint your lawyer for you and begin that work.

14        Is there anything else to come before the Court?  We

15   do have the one issue of the exhibits.

16        MR. GRAEFF:  Your Honor, if I may?  You mentioned

17   Ft. Devens.  And in our Sentencing Memorandum on Page 25, we

18   mention that there is a possibility that Fairton, F-A-I-R-T-O-N

19   in New Jersey would be amenable to Mr. Murphy.  Could we

20   request -- and by the way, that's like 500 miles away from

21   Boston.  Could we ask that Fairton be the FCI that you

22   recommend?

23        THE COURT:  I will take that under consideration.

24        MR. GRAEFF:  Thank you, sir.

25        THE COURT:  You may be seated.

1          MR. MURPHY:  Thank you, Your Honor.

2          THE COURT:  The government has moved to admit

3  Exhibits 13-A1 through A4, the unredacted copies of the letters

4  that were initially admitted during the trial in the redacted

5  form.  If you recall, the Court has reviewed these letters in

6  detail in addressing the admissibility of them pretrial.  They

7  were admitted in the trial in the redacted form, right?

8          MR. DOMINGUEZ:  Yes.

9          THE COURT:  Okay.  But you object to the letters in

10 the unredacted form?

11         MR. GRAEFF:  We agreed -- the U.S. Attorneys and I

12 agreed to those letters being introduced at a pretrial hearing,

13 or at a conference, but I don't see the relevance of why they

14 should be introduced during the course of this sentencing

15 hearing.  So, yes, I do object to their introduction.

16         MR. DOMINGUEZ:  Your Honor, there was a great deal of

17 work done.  I mean, this doesn't involve a jury, I just want

18 the record to be complete.  He is going to have a different

19 lawyer on appeal, and I just want the Sixth Circuit to be aware

20 of the original letters.  There is no jury involved here, so it

21 is not a prejudice issue.

22         THE COURT:  The objection is overruled.  The letters

23 will be admitted for the purpose of the sentencing.  I will

24 make it clear that those were not presented to the jury in the

25 unredacted form.

1          MR. DOMINGUEZ:  And they are distinguished, Your

2    Honor.  That's why we have marked them 13-A1 through 13-A4.

3    The ones that were submitted were 13-1 through 13-4.

4          MR. GRAEFF:  Just to be clear, what you are saying,

5    those letters that you are holding in your hands right now,

6    they were not part of the exhibits that the jury --

7          MR. DOMINGUEZ:  That is correct.

8          MR. GRAEFF:  Thank you.

9          THE COURT:  Is there anything else to come before the

10   Court on this case?

11         MR. DOMINGUEZ:  No, Your Honor.  Thank you.

12         THE COURT:  This matter is adjourned.

13                              - - -

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2    United States of America

3    Southern District of Ohio

4           I, Georgina L. Wells, Official Court Reporter of the

5    United States District Court for the Southern District of Ohio,

6    do hereby certify that the foregoing 112 pages constitute a

7    true and correct transcription of my stenographic notes taken

8    of the said requested proceedings, held in the City of

9    Columbus, Ohio, in the matter therein stated on the 25th day of

10   January, 2012.

11          In testimony whereof, I hereunto set my hand on the

12   4th day of April, 2012.

13

14

15

16

17

18                        /s/Georgina L. Wells

19                        _____

                          Georgina L. Wells, RMR
20                        Official Court Reporter
                          Southern District of Ohio
21

22

23

24

25