## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**SEAN D. MURPHY,**

                                  **CASE NO. 2:14-CV-1706**

    **Petitioner,**                    **CRIM. NO. 2:11-CR-010(1)**

                                    **JUDGE GEORGE C. SMITH**

    **v.**                              **Magistrate Judge Elizabeth P. Deavers**

**UNITED STATES OF AMERICA,**

    **Respondent.**

### REPORT AND RECOMMENDATION

Petitioner, a federal prisoner, has filed the instant motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255 and *Motion for New Trial* pursuant to Rule 33 of the Federal Rules of Civil Procedure. (ECF Nos. 184, 185.) This matter is before the Court on the *Motion to Vacate 2255* and *Motion for New Trial, Supplemental Memorandum of Law in Support, Affidavit* and *Supplemental Affidavit in Support* (ECF Nos. 184, 185, 186, 189, 201), Respondent's *Response in Opposition* and *Supplemental Memorandum Supporting Response in Opposition* (ECF Nos. 206, 207), Petitioner's *Reply to Response to Motion to Vacate Under 28 U.S.C. 2255* (ECF No. 211), and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that the *Motion to Vacate under 28 U.S.C. 2255* (ECF No. 184) and *Motion for New Trial* (ECF No. 185) be **DENIED** and that this action be **DISMISSED.**

### Procedural History

The United States Court of Appeals for the Sixth Circuit summarized the facts and procedural history of the case as follows:

> Defendant–Appellant Sean D. Murphy ("Murphy") was convicted by a jury of one count of conspiracy to transport merchandise and money in interstate commerce, 18 U.S.C. § 371, one count of transporting merchandise and money in interstate commerce, 18

U.S.C. §§ 2314, 2, and two counts of traveling in interstate commerce with the intent to further promote an unlawful activity, 18 U.S.C. §§ 1952, 2. He was sentenced to four consecutive 60–month terms of imprisonment. Murphy appeals, asserting government misconduct, evidentiary error, and sentencing error. Because the government concedes that counts two and three of the indictment were insufficient, we DISMISS these counts, VACATE Murphy's sentence, and REMAND to the district court for resentencing. We AFFIRM with respect to Murphy's remaining claims.

On January 18, 2009, police investigated a burglary and fire at a Brink's secure warehouse in Columbus, Ohio. Police found that the door to a Brink's vault had been cut through with a torch. The interior of the vault was on fire and the area was filled with smoke. Four holes were cut into the roof of the warehouse and there were footprints leading down the walls to the floor of the warehouse. An exterior door of the warehouse was sealed with epoxy and surveillance equipment was either destroyed or missing. The vault contained approximately $92,000,000 on the night of the heist, and around $396,290 was missing.

In March 2009, the FBI interviewed David Nassor pursuant to a proffer agreement with federal and local prosecutors. Nassor told the FBI that he, Murphy, Joe Morgan, and Robert Doucette burglarized a Brink's warehouse in Ohio. Police arrested Morgan in early April, and FBI Special Agent Jason Costello visited Doucette and told him that he was a suspect in the Ohio Brink's burglary. Doucette retained a lawyer and began cooperating with the FBI. He described the circumstances of the heist to the FBI and led them to a storage facility in New Hampshire where the tools for the heist and the remaining money were stored.

According to Doucette, Murphy approached him in the fall of 2008 with a proposal to rob a Brink's warehouse in Columbus, Ohio. Murphy also engaged Morgan and Nassor in the plan, although Nassor only assisted in preparation for the heist because of an injury he suffered earlier in the year.

Murphy directed Nassor to pick up a cell-phone jammer, a device that disrupts cellular communications in a given area, from Memphis, Tennessee. This device was necessary because Brink's had an alarm system that would communicate with its security provider by cellular signal in the event that the phone lines were cut. Cell-phone jammers are not sold in the United States, and importing them is prohibited. Murphy obtained a jammer through

a British company called Global Gadget via FedEx. However, customs enforcement agents were intercepting jammers that passed through FedEx's Newark hub, necessitating shipment of the jammer to FedEx's Memphis hub in order to evade heightened security at Newark. Nassor traveled to Memphis and picked up the package at his hotel on December 3, 2008.

Murphy and Morgan also made a trip to Columbus in order to obtain DNA from individuals in the Columbus area "to keep the crime local." They brought cigarettes and drinks to a homeless shelter in the area. When the individuals consumed the cigarettes and beverages, Murphy and Morgan picked up the cigarette butts and empty drink containers and saved them for the night of the crime.

In early January 2009, Murphy rented a moving truck from Newmarket Storage in New Hampshire. Murphy, Morgan, and Doucette met at Murphy's Massachusetts warehouse and loaded the truck with various tools. Murphy and Morgan drove the truck to a storage facility in Pennsylvania, where they unloaded the tools in preparation for the heist.

On January 15, 2009, Murphy and Doucette rented a Dodge Journey in Revere, Massachusetts and picked up a 24–foot box truck in New Hampshire the following day. Murphy, Doucette, and Morgan drove to Ohio and stayed in a hotel overnight. On January 17, they drove to the Pennsylvania storage facility to pick up the equipment they had dropped off. Before loading the equipment, they obscured the license plate and numbers on the truck and backed the truck into the facility so that individuals in the storage facility office would not be able to see what they were loading into the truck.

After loading the truck, Murphy, Doucette, and Morgan drove to Columbus and arrived at the Brink's warehouse at approximately 8:00 or 9:00 p.m. They parked the truck at the loading docks of another business and covered it with a tarp. They changed out of their regular clothes and into burglary gear selected by Murphy: white clothes underneath a one-piece black jumpsuit with galoshes over their normal shoes. These clothes were selected so that the crew could easily change their outward appearances by removing the galoshes and jumpsuits.

Murphy, Doucette, and Morgan approached the Brink's warehouse from the rear and cut through an exterior fence with wire cutters. Murphy and Morgan climbed to the roof using scaffolding and

destroyed a security camera mounted on the side of the building. Doucette stayed behind at a nearby bridge to keep watch for the police. Murphy activated the cell-phone jammer, cut holes in the roof, and smashed the building's alarm system.

Murphy, Doucette, and Morgan entered the warehouse and moved trucks that were blocking the warehouse's garage door. Doucette sealed the exterior door with epoxy to keep out any unexpected Brink's workers and removed all of Brink's electronic equipment to insure that no recordings of the crime would be left.

Meanwhile, Murphy set up a thermal lance rod, a piece of equipment that burns at approximately 5,000 degrees and can melt through steel and concrete, and began cutting through the side of the vault. After several hours of cutting, Murphy gained access to the vault at approximately 6:30 a.m. Unfortunately for Murphy, the heat of the thermal rod ignited the contents of the vault, and large quantities of smoke quickly filled the room. Murphy, Doucette, and Morgan tried to put out the fire with fire extinguishers and water, but were unsuccessful. At this point, they took turns grabbing cash out of the vault.

Shortly before 9:00 a.m., Murphy, Doucette, and Morgan loaded the truck with their tools and prepared to leave. Murphy planted the cigarette butts and empty drink containers around the facility. The three drove to Pennsylvania where they unloaded the tools and coins into the storage facility. They placed the bills in garbage bags and traveled to Doucette's home in Massachusetts to count and divide the money. However, much of the money was burnt, wet, and smelled strongly of smoke. The next day, Murphy, Morgan, and Doucette washed the salvageable money in Doucette's washing machine and dryer to remove the smell of smoke. Any money that was burnt too badly to be saved was destroyed in Doucette's fireplace. They continued counting the money over the next few days.

Murphy began cooperating with the police near the end of 2009. He participated in four proffer sessions with the FBI, and provided details regarding his involvement in the Brink's heist during the third. Murphy's final proffer session was at the beginning of June 2010. The following month, the Essex County Jail, where Murphy was housed, conducted a contraband search and found a book entitled "Master Thief: How to Be a Professional Burglar" by Sean Murphy in the possession of an inmate. In his book, Murphy described methods for committing burglary that largely mirrored the Brink's heist. For example, Murphy advised his readers to use

a cell-phone jammer, to wear black jumpsuits over light clothes to avoid detection, to use storage facilities far from the target of the heist, and to use a thermal rod to cut through vault doors. Further, Murphy advised readers to "[b]e extremely careful when piercing the last layer of steel on the vault door. If your thermal [rod] catches something on fire in the vault, everything could burn up; and the smoke could prevent you from even entering the vault." Prison officials gave the book to the FBI.

A grand jury for the Southern District of Ohio indicted Murphy for conspiracy to transport merchandise and money in interstate commerce, 18 U.S.C. § 371, traveling in interstate commerce with the intent to further promote an unlawful activity, 18 U.S.C. §§ 1952, 2, and transporting merchandise and money in interstate commerce, 18 U.S.C. §§ 2314, 2. The case proceeded to trial and Murphy decided to represent himself with his court-appointed attorney serving as stand-by counsel. The court warned Murphy of the risks of self-representation and encouraged Murphy to reconsider, but he refused. Murphy's co-conspirators, Nassor and Doucette, testified against him pursuant to plea agreements with the government. After a five-day trial, the jury found Murphy guilty on all counts. After reviewing Murphy's offense conduct, personal history, and hearing testimony from FBI Agent Jason Costello regarding Murphy's cooperation with the government, the court sentenced Murphy to four consecutive terms of 60 months' imprisonment.

On appeal, Murphy argues that the district court erred by denying his motion to dismiss counts two and three of the indictment, that the prosecutor's alleged misconduct should result in a mistrial, that the government did not disclose exculpatory evidence, that the district court erred by admitting Murphy's book into evidence, and that the district court erred in its finding of intended loss and sophisticated means at sentencing.

*United States v. Murphy*, 518 F. App'x  396, 397-400, unpublished, 2013 WL 1224092 (6th Cir.

2013).  On March 27, 2013, the Sixth Circuit dismissed counts two and three of the indictment,

vacated Petitioner's sentence, and remanded the case for re-sentencing.  The Court of Appeals

otherwise affirmed the judgment of this Court.  *Id*.  On June 26, 2013, the Court re-sentenced

Petitioner to an aggregate term of 156 months imprisonment.  (ECF No. 175.)  On November 19,

2014, the Sixth Circuit affirmed the sentence and judgment of this Court.  (ECF No. 193.)

Meanwhile, on September 26, 2014, Petitioner filed the instant motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255. He asserts that prosecution witness Robert Doucette committed repeated material perjury (claim one); that the government knowingly presented such perjured testimony (claim two); that he is actually innocent (claim three); that he was denied the effective assistance of counsel (claim four); that the government violated *Brady v. Maryland,* 373 U.S. 83 (1963) (claim five); and that he was denied a fair trial based on cumulative error (claim six). It is the position of the Respondent that Petitioner's claims lack merit.

In conjunction with his § 2255 petition, and on the same basis as claim one of his § 2255 petition, Petitioner has filed a motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure, which provides:

> (a) Defendant's Motion. Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. If the case was tried without a jury, the court may take additional testimony and enter a new judgment.

> (b) Time to File.

>> (1) Newly Discovered Evidence. Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.

>> (2) Other Grounds. Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty.

According to Petitioner, he has obtained newly discovered evidence which establishes that prosecution witness Robert Doucette lied and indicates that Petitioner is innocent, justifying a new trial. Petitioner has attached the *Declaration of Anthony Moschopoulos* (ECF No. 187), and *Declaration of Joseph M. Morgan* (ECF No. 188). He also has attached a copy of a "mapquest"

6

document indicating that the distance between 300-302 Brush Creek Road, Warrendale, Pennsylvania (presumably the site of storage bins used by defendants), and  the Comfort Inn on 924 Sheraton Drive, Mars, Pennsylvania (where the defendants purportedly stayed after burglarizing the Brinks facility), is 1.11 miles, *Exhibit A* (ECF No. 184-2, PageID# 2709-12); what purports to be a record from the Comfort Inn indicating the names of guests who stayed at the hotel on the night of January 18, 2009, *Exhibit B* (ECF No. 184-3, PageID# 2714-16); and a document indicating that, on January 23, 2009, a person by the name of George Bogart rented a storage unit from "webselfstorage."  *Exhibit C* (ECF No. 184-4, PageID# 2717-19.)

### Motion for a New Trial/Claim One

As discussed, Petitioner asserts that prosecution witness Robert Doucette committed repeated and material perjury when he testified against Petitioner, requiring reversal of Petitioner's convictions.  For example, Petitioner maintains that Doucette lied when he testified that the hotel where the defendants stayed was located one to two hours from the Pennsylvania storage facility they used for storage of criminal tools and burglary proceeds; that the defendants did not stay overnight at the Comfort Inn on Sunday, January 18, 2009, after burglarizing Brinks, but returned to Lynn, Massachusetts; denied renting a UHAUL storage bin in Lynn, Massachusetts; denied taking Oxycontin on the weekend of the crime; claimed to have no recollection of the use of a storage facility located in Eastern Ohio; and testified that, on January 18, 2009, the defendants returned to Lynn, Massachusetts with proceeds of the burglary. Petitioner additionally claims that the prosecution knowingly presented Doucette's perjured testimony to prove that Petitioner crossed state lines with the stolen goods thus establishing his guilt of the offenses charged.

Doucette testified that, on January 18, 2009, Doucette, Morgan, and Petitioner drove to a Pennsylvania storage facility after burglarizing Brinks.  Doucette drove the rental car, and Morgan and Murphy drove the box truck.  *Transcript* (ECF No. 159-2, PageID# 1540.)  They unloaded all of the criminal tools, the racks, and "change" (*i.e.*, five large racks of Susan B. Anthony coins and halves).  They took only the "actual currency" or paper money, back with them to Lynn, Massachusetts, which they placed in trash bags inside of the rental car.  *Transcript* (ECF No. 159-2, PageID# 1541-42.)  Once in Lynn, they took the currency out of the car and started to split it up.  (PageID# 1543.)  According to Doucette, Nassor got 5% of the proceeds, (PageID# 1543-44); 50% went to Petitioner, 30% to Joe Morgan, and 20% to Doucette. (PageID# 1544.)  They stored the stolen money inside of the rental car.  (PageID# 1544-45.)  It was wet, smelly, and much of it was burnt or destroyed.  They put some Febreze into the trash bags with the money in an attempt to eliminate the odor.  (PageID# 1545.)  The next day, they began washing the money in a washer and dryer, and continued to divide the proceeds. (PageID# 1546.)  Petitioner and Nassor washed down the rental truck and returned it to the storage facility.  (PageID# 1546-47.)  After Petitioner's arrest, Doucette and Morgan decided to return to Pennsylvania to retrieve the items they had left in the storage facility there.  (PageID# 1549.)  Doucette's friend rented a truck for them to use for this purpose.  (PageID# 1549.) Doucette and Morgan accessed the storage bin using a key that Petitioner had left hidden for them.  (PageID# 1550.)  They emptied out the storage bin and moved all of its contents into a storage facility located in New Hampshire.  (PageID# 1552-53.)  They continued to divide the proceeds of the burglary, with Morgan taking Petitioner's share of the proceeds.  (PageID# 1553.)  They left everything sitting in the New Hampshire storage facility for a couple of weeks, and then collected the electronic equipment and put it into a UHAUL facility that Morgan had

rented.  (PageID# 1555.)  They cut up and disassembled the electronic equipment and racks that held the stolen coins, disposing of the metal with a local metal collector.  Doucette threw the hard drives from the electronic equipment into the ocean.  (PageID# 1556.)  On April 8, 2009, police arrested Joe Morgan.  (PageID# 1556.)  Doucette thereafter moved the items remaining in the New Hampshire storage facility into another storage unit in Raymond, New Hampshire, located a few miles away.  (PageID# 1557.)  Doucette moved the equipment yet again when he returned to that storage facility "and it looked like someone had went in there and some of the stuff was moved around, and. . . I found a key on the ground."  (PageID# 1558.)  Police subsequently arrested Doucette.  Doucette cooperated, and testified pursuant to the terms of his plea agreement.  Doucette also testified regarding the contents of three letters he had purportedly received from Petitioner after his arrest regarding the crime at issue.  (PageID# 1579-1585.)

A brief review of David Nassor's testimony is also helpful to consideration of Petitioner's claims.  Nassor testified that in late December 2008 or early January 2009, Petitioner asked him to drive to Ohio to conduct a surveillance of the Ohio Brinks armored car facility. *Transcript* (ECF No. 159, PageID# 1107-08.)  Petitioner instructed Nassor to observe the time of day that people came into and left the facility.  (PageID# 1108-09.)  Petitioner wanted to know what time people left on Saturday night, and what time they arrived on Sunday morning. (PageID# 1110.)  At Petitioner's request, Nassor observed the facility for approximately 14 hours, observing that people left the facility at 8:30 p.m. on Saturday, and returned at 9:00 a.m. the following morning.  (PageID# 1113-14.)  Nassor returned to Lynn, Massachusetts, and reported his observations to the Petitioner.  (PageID# 1115-16.)  It was Nassor's understanding that he would receive payment for his assistance.  (PageID# 1120,1149.)  On or about January 21, 2009, Nassor drove Petitioner to Newmarket Storage in New Hampshire so that Petitioner

could return a Budget rental truck.  (PageID# 1117.)  After January 23, 2009, Nassor obtained $1000.00 to $1500.00 from Joe Morgan for his services.  (PageID# 1119-20.)  Nassor and Morgan stole oxygen tanks in the summer of 2007, which were placed in Petitioner's storage facility at Newmarket storage in New Hampshire.  (PageID# 1120-21.)  Nassor also identified a generator that had been stored at the Newmarket storage facility with rods that would function as a torch.  (PageID# 1122-24.)  "It burns like 5,000 degrees and just melts anything that it touches."  (PageID# 1124.)  Nassor also identified lubrication for an electromagnetic drill that would be used to cut through and gain entry to a safe, batteries for a cellular phone jammer, antennas to the cellular phone jammer, the Y2000 cellular telephone jammer.  (PageID# 1126-29.)  Nassor was incarcerated and testified pursuant to the terms of his plea agreement with Massachusetts.  (PageID# 1130.)  The FBI had agreed not to pursue charges against him. (PageID# 1164.)  Nassor was not present when the defendants returned to Lynn after the Brinks burglary.  (PageID# 1161.)  He did not know where they went when they returned from Ohio. (*Id.*)  He was not present when they were splitting up and separating the money.  (PageID# 1161-62.)  Nassor was not present when the criminal tools were removed from the Raymond, New Hampshire, storage bin.  (PageID# 1171.)  The last place he had seen the Y2000 cellular jammer was at Petitioner's house.  (PageID# 1171-72.)

Petitioner disputes the truth of portions of Doucette's trial testimony.  Petitioner states that he advised the prosecutor and FBI in May 2010 that he, Morgan, and Doucette stayed at the same hotel, under the name of William Palavacini, on the night of Friday, January 16, 2009, and Sunday, January 18, 2009, and that the hotel was located only a short distance away from the Pennsylvania storage facility they used in connection with the offense.  *Supplemental Affidavit of Sean D. Murphy* (ECF No. 201, PageID# 2781-82.)  Petitioner has attached what purports to be a

record from the Comfort Inn located in Mars, Pennsylvania, indicating that a person by the name of William Palavacini stayed at the hotel on January 18, 2009, checking out the following day. *Exhibit B* (ECF No. 184-3, PageID# 2714-16.)  As discussed, Petitioner also has attached a copy of a "mapquest" document, indicating that the Comfort Inn located at 924 Sheraton Drive, in Mars, Pennsylvania, is 1.11 miles from 300-302 Brush Creek Road, Warrendale, Pennsylvania – the location of the Pennsylvania storage facility.  *Exhibit A* (ECF No. 184-2, PageID# 2710-12.)

Petitioner maintains that they used a storage facility located in Eastern Ohio, not the Pennsylvania storage facility, to store all proceeds of the crime immediately after the burglary. According to Petitioner, the Ohio storage facility was located one to two hours from the Comfort Inn in Pennsylvania where they spent that night.  He asserts that Doucette therefore lied when Doucette said that they transported the proceeds of the Brinks burglary to Pennsylvania and then returned directly to Lynn, Massachusett with the paper currency.  These facts are significant, Petitioner argues, because they establish that he did not transport any proceeds from Brinks across state lines, and that he therefore is innocent of the charges of conspiracy to transport merchandise and money in interstate commerce, and transporting merchandise and money in interstate commerce, in violation of 18 U.S.C. §§§ 371, 2314[1] and 2.  Petitioner maintains that

---

[1]  18 U.S.C. § 2314 provides:

> Transportation of stolen goods, securities, moneys, fraudulent State tax stamps, or articles used in counterfeiting
>
> Whoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud; or
>
> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person or persons to travel in, or to be transported in interstate or foreign commerce in the execution or concealment of a scheme or artifice to defraud that person or those persons of money or property having a value of $5,000 or more; or

the previously described "newly discovered evidence" establishes that Doucette and Morgan

transported the proceeds of the burglary across state lines only after Petitioner's arrest.

Petitioner disputes various aspects of Doucette's trial testimony in support of his claim

that Doucette committed repeated material perjury.  Specifically, he claims Doucette lied when

denying that the defendants returned to Brinks after the burglary.[2]  Petitioner claims that

---

Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce any falsely made, forged, altered, or counterfeited securities or tax stamps, knowing the same to have been falsely made, forged, altered, or counterfeited; or

Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce any traveler's check bearing a forged countersignature; or

Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce, any tool, implement, or thing used or fitted to be used in falsely making, forging, altering, or counterfeiting any security or tax stamps, or any part thereof; or

Whoever transports, transmits, or transfers in interstate or foreign commerce any veterans' memorial object, knowing the same to have been stolen, converted or taken by fraud—

Shall be fined under this title or imprisoned not more than ten years, or both. If the offense involves a pre-retail medical product (as defined in section 670) the punishment for the offense shall be the same as the punishment for an offense under section 670 unless the punishment under this section is greater. If the offense involves the transportation, transmission, or transfer in interstate or foreign commerce of veterans' memorial objects with a value, in the aggregate, of less than $1,000, the defendant shall be fined under this title or imprisoned not more than one year, or both.

This section shall not apply to any falsely made, forged, altered, counterfeited or spurious representation of an obligation or other security of the United States, or of an obligation, bond, certificate, security, treasury note, bill, promise to pay or bank note issued by any foreign government. This section also shall not apply to any falsely made, forged, altered, counterfeited, or spurious representation of any bank note or bill issued by a bank or corporation of any foreign country which is intended by the laws or usage of such country to circulate as money.
For purposes of this section the term "veterans' memorial object" means a grave marker, headstone, monument, or other object, intended to permanently honor a veteran or mark a veteran's grave, or any monument that signifies an event of national military historical significance.

[2]

Q.  [W]hen you were coming back from the Ohio Brink's burglary, and you went and you said you dropped off the tools in the Pennsylvania storage facility?

A.  Yes.

Q.  You are also claiming that you came straight back to Lynn, but you didn't spend the night there?

A.  We didn't spend the night. . . .

Doucette lied when he testified that Nassor stopped at Brinks to observe their hours of operation on the way home from picking up a cell phone jammer for Petitioner.  (*Transcript,* ECF No. 159-2, PageID# 1463.)[3]  He claims that Doucette lied when Doucette claimed to be present when Petitioner and Morgan took tools to be used in the burglary to Pennsylvania one month to five weeks before the January 17, 2009, burglary, as evidence indicated they did not rent the Pennsylvania storage bin until January 3, 2009.  (ECF No. 184-1, PageID# 2685.)[4]  He claims

---

Q.  Do you recall being in the hotel and washing the crime clothes while two members of your crew went back to the Brink's burglary to check things out.  Do you remember that? . . .

A.  Not at all.

*Transcript* (ECF No. 1640.)

[3] Nassor testified that he drove to Memphis, Tennessee to pick up a Federal Express package containing a cellular telephone jammer for Petitioner, and drove straight home, *Transcript* (ECF No. 159, PageID# 1100, 1106), but returned to conduct surveillance on the Brinks facility for Petitioner at a later date.  (ECF No. 159, PageID# 1107-08.)

[4]

Q.  [Y]ou were present when the tools were put in the truck to go out to Ohio?

A.  Yes.

Q.  Do you remember the date that that was?

A.  It was prior to us leaving, I don't know an exact date.

Q.  You have no idea?

A.  I can speculate.

Q.  Okay.

A.  But I don't want to get pinned down to a date.  So, I am going to say I don't know an official date.  But if you want an approximation, it was about a month.

***
Approximately.  Maybe five weeks.

***
It was approximately a month, give or take a week.  I wasn't paying attention and writing down dates, but I know it was prior to us leaving.

*Transcript* (ECF No. 159-2, PageID# 1603.)

that Doucette lied when Doucette denied recollection of use of a ladder during the burglary. (*Transcript,* ECF No. 160, PageID# 1760.)   He claims that Doucette lied in regard to his testimony attempting to account for a quantity of 452 miles driven on the rental car used by the defendants.[5]  He claims that Doucette lied when he testified that Morgan made the decision to retrieve the stolen money after Petitioner's arrest.  He claims that Doucette lied when he stated that Morgan and Doucette accessed the Pennsylvania storage bin on January 24, 2009, with a key Petitioner had left hidden for them there.  (*Transcript*, ECF No. 159-2, PageID# 1550.)   He claims that Doucette lied when he stated that he removed items from the Raymond, New Hampshire, storage bin (where the contents of the Pennsylvania storage bin had been moved) prior to Morgan's arrest.  (*Transcript,* ECF No. 159-2, PageID# 1593.)   Petitioner claims that Doucette lied because he initially described the rental car used by the defendants as a Voyageur, but at trial identified it as a Dodge Journey.[6]  Petitioner claims that Doucette lied when he

---

[5] Petitioner submitted on cross-examination, that the odometer from the Dodge Journey rented by the defendants indicated that it had been driven 2,245 miles, whereas the Budget rental truck had only been driven 1800 miles, making for a difference of 452 miles driven by the two vehicles.  *Transcript* (ECF No. 160, PageID# 1673.)  Petitioner argued that these documents showed that the defendants had driven back to Brinks after the burglary, and then returned to the Pennsylvania hotel.  (PageID# 1674.)  When Petitioner asked Doucette to account for the extra 452 miles, Doucette stated:

> I'm just saying I can't account for the extra miles, considering that you had the keys.  So you have to ask yourself.  I mean, maybe you came and took it.  Maybe you let someone borrow it.  I can't account for that.

*Transcript* (ECF No. 160, PageID# 1676.)

[6]

> Q.  Do you remember what day that Dodge Journey was rented?
>
> A.  Yes.
>
> ***
> That was the 15th.
>
> Q.  And in your prior testimony, Mr. Doucette, you referred to it as another vehicle?
>
> ***
> I called it a Voyager because a Voyager and a Journey, they are both kind of similar words, and I did get confused on that.

testified that the defendants brought back all paper currency to Lynn, Massachusetts on January 18, 2009, and began splitting it up on January 18, 19, 20, 2009, and when Doucette stated that Nassor received a share of the proceeds.  Petitioner claims that Doucette lied when he testified that Morgan had rented the storage bin at UHAUL Storage in Lynn, Massachusetts.[7]  Petitioner claims that Doucette lied when he testified that they burned damaged unusable money obtained from the Brinks burglary.  Petitioner claims that Doucette lied when he testified that only $210,000 of unburned paper currency remained.  Petitioner claims that Doucette lied when he denied destroying the laptop computer he used to research the Brinks building.  Petitioner claims that Doucette lied when he testified that someone must have gotten into the Raymond, New Hampshire storage bin and stolen a trash bag full of money and the electromagnetic drill.[8]  (*Transcript*, ECF No. 159-2, PageID# 1625-27.)  Petitioner claims that Doucette lied when he stated that Morgan took Petitioner's share of the proceeds after Petitioner's arrest.  Petitioner refers to Doucette's trial testimony admitting that he initially lied to the grand jury and FBI

---

        ***
        After I had seen one, I realized that they are two different vehicles.

*Transcript* (ECF No. 159-2, PageID# 1614.)

[7] After Petitioner's arrest, Doucette testified that Morgan rented a bay at a UHaul facility for storage of the electronic equipment they had used in the burglary.  Transcript (ECF No. 159-2, PageID# 1555.)  Petitioner contends that it was Doucette who rented the storage bin under the nickname "Bogart".  (ECF No. 184-1, PageID# 2690.)  Petitioner has attached in support of this claim what appears to be a receipt from "webselfstorage" indicating that an individual by the name of George Bogart rented a storage unit in Lynn, Massachusetts, from January 23, 2009, until May 9, 2009.  *Exhibit C* (ECF No. 184-4, PageID# 2717-21.)

[8] Doucette stated:

        A lot of the money was burnt.  We sat at my house, counting it, and we burnt the money that was no good, because, as you can see in the pictures and the evidence that was shown to the jury, the money was damaged extensively. . . . And on top of it . . . we washed and dried it.  So money got damaged there.  And when I went to the storage facility, I noticed there was an issue with one of the bags missing.  So – and it was all damaged money, which was useless.  That's the reason why we had it in bags, because we only took what was good.

        And, in the end, we ended up with a bunch of burnt money that was useless.  That's why there was a bag.  So, if someone stole a bag of burnt money, good luck to them[.]

regarding his involvement in the Brinks burglary and James Hennessey's involvement as evidence of Doucette's untruthfulness.  (*Transcript,* ECF No. 160, PageID# 1677-1680.)[9] Petitioner claims that Doucette lied when he testified that they stored a 100 watt cell phone jammer in the Pennsylvania storage bin.[10]  He claims that Doucette lied when he testified that everything but paper currency went into the Pennsylvania storage bin.[11] Petitioner claims that

---

[9]

     Q.  When you were first approached by authorities regarding the Brink's burglary. . . . [w]hat did you tell them?

     A.  I told them that I wasn't involved.

     Q.  And was that a lie?

     A.  Yes, it was.

*Transcript* (ECF No. 160, PageID# 1677.)

     Q.  Did you tell Special Agent Costello, or any of the FBI or law enforcement that questioned you, that James Hennessey (phonetic) helped you move the stuff?

     A.  No, I didn't.

     ***
     I had Jim Hennessey help me, and I corrected myself yesterday and stated that. . . . because Jim was a life-long friend, and I had asked him for help. . . and I didn't tell him the truth.

*Transcri*pt (ECF No. 160, PageID# 1680.)

[10]

     Q.  Was the big hundred-watt cell phone jammer used in the Brink's heist?

     Its service was not needed.

     Q.  Was it even brought out to Ohio?

     A.  I don't recall.

     Q.  Do you know if it was in the Pennsylvania storage bin?

     A.  I would say yes.

*Transcript* (ECF No. 160, PageID# 1702.)

[11] Doucette acknowledged on cross-examination that they must have brought the money counter obtained from Brinks back with the money.  (*Transcript,* ECF No. 159-2, PageID# 1642-43.)

Doucette lied when he testified that he was awake for 100 hours straight on the weekend of the burglary.

According to the *Declaration of Anthony Moschopoulos*, submitted by Petitioner, Robert Doucette told Moschopoulos that he regretted lying at Petitioner's trial, and that the prosecutor had told Doucette "not to change his story." (ECF No. 187.) Petitioner refers to the *Declaration of Joseph M. Morgan* as setting forth an accurate account of the events that transpired, as follows:

> Prior to going to do the BRINKS burglary, Robert Doucette purchased a MILWAUKEE Electromagnetic Drill for @ $2,500 in Woburn, MA. This drill was attempted to be used on a 6 ft. safe inside BRINKS at 1362 Essex Avenue, Columbus, Ohio. I later placed this drill inside the "first" Raymond, NH, storage bin after retrieving the stolen money and tools from Ohio

> On January 3, 2009, me and Sean Murphy drove to Western Pennsylvania (PA) and rented a storage bin. We placed all the crime tools in this bin on that date.

> After me and Murphy unloaded the crime tools in the PA storage bin, we drove over the border into Eastern Ohio and rented another storage bin that all the stolen money from BRINKS was going to go inside. The reason being that BRINKS may have GPS units hidden inside their packets of money. We could, therefore, unload the money into the Ohio storage bin rather quickly, lock the bin, go to the PA storage bin and unload the crime tools which would take a lot longer, then drive home empty.

> On January 16, 2009, after arriving at BRINKS, I cut four holes in BRINKS roof using a MILWAUKEE plug-in sawzall. I later placed this sawzall inside the "first" Raymond, NH, storage bin after retrieving the crime tools and stolen money from Ohio.

> We entered BRINKS building above the cash vault inside the Vault Room. In order to get into the garage area all we had to do was unlatch the doors by hand because we were already in the Vault Room. No other procedure was necessary to open the doors leading out to the garage area.

Robert Doucette used a 12 ft. A-frame ladder inside BRINKS to release the rear garage door opener so that the garage door could be opened and closed by hand.  All three of us used this same ladder to lug the industrial fan onto and off of BRINKS roof.

After we left BRINKS, we brought the tools, stolen money and other stolen items to the Ohio storage facility and unloaded everything in the storage bin.  The crime tools were supposed to go in the PA storage bin.  However, because the gate was stuck open 24 hours, we decided to put everything in the Ohio storage bin.

We made the decision to stay at the same Hotel (Comfort Inn) in Western, PA that we had stayed in on January 16, 2009.  We checked in the Hotel again on January 18, 2009. . . .

We then used the rent-a-car to drive back to BRINKS to see if any BRINKS employees were able to enter the building because we had epoxy-glued the doors shut.

After observing BRINKS was a major crime scene, we drove back to the Comfort Inn Hotel in Western, PA and stayed the night.

On January 19, 2009, we checked out of the Comfort Inn Hotel and drove back to Lynn, MA, empty as planned.  Nothing taken from BRINKS came back to Lynn.

Me and Robert Doucette snorted crushed up 80 mg. Oxycontin pills together on January 16, 17, 18, 19, 2009, and also on January 23, 23, 2009, when we went back to Ohio to retrieve the items from the Ohio storage bin.

Once we returned home to Lynn, MA, on January 19, 2009, at @ 7:00 pm, we all went home to get some sleep.  Robert Doucette took the rent-a-car home with him.

On January 20, 2009, we brought the 24 ft. BUDGET moving truck to Robert Doucette's house for cleaning. . . .

On January 21, 2009, the BUDGET moving truck was driven out of Doucette's yard and David Nassor was responsible for returning the truck to the truck rental center in NH.

On January 23, 2009, Murphy was arrested, when state police and FBI raided Murphy's home and moving warehouse in Lynn, MA.

18

Robert Doucette wanted to go to Ohio to retrieve the stolen money due to Murphy's arrest.  So me and Robert Doucette drove to Ohio using a 24 ft. UHAUL moving truck his friend James Hennessey rented for him on January 23, 2009.

Once the items were retrieved from Ohio, we needed a place to put the heavy steel coin racks and video recording units stolen from BRINKS.  I suggested that we put them in the PA storage bin knowing the rent on the bin had been prepaid for several months in advance.

On January 24, 2009, me and Robert Doucette pulled into the Western, PA storage facililty. . . .

We had previously stashed the key to the Western PA storage bin inside an overhead door flashing next to Bin 124.  We could not find the key so we then disassembled the entire door flashing to try to locate the key.  The key was not there so we re-assembled the door flashing and drove back to Lynn, MA with all the tools, money and stolen items from BRINKS.

Me and Robert Doucette unloaded all the crime tools, stolen coin and crime clothes in a storage bin in Raymond, NH, that James Hennessey had rented for Doucette.

Me and Robert Doucette brought the paper currency, digital money counter, steel coin racks, and video recording units back to Lynn, MA from the Raymond, NH storage bin.

Robert Doucette rented a storage bin at UHAUL Storage in Lynn, MA, on January 23, 2009, where we temporarily stored the items taken out of the Raymond, NH storage bin.  Robert Doucette rented the storage bin under the name George Bogart. . . .

On January 26, 2009, me and Robert Doucette began counting the stolen money and separating the partially burned money from the unburned money.  We did this for the next three days straight.

The total count of unburned paper currency stolen from BRINKS was @ $420,00[0].  The total count of stolen coin was @ $425,000.  The total amount of partially burned money was well over $225,000.

All the unburned money was kept at Robert Doucette's house.  All the partially burned money was bagged up and brought to the Lynn

storage bin at UHAUL Storage.   No money was destroyed or thrown away.

Robert Doucette took his laptop computer that he researched BRINKS with and drove over it in his driveway with my Chevrolet Tahoe truck.  The laptop was demolished.

Sometime in February 2009, me and Robert Doucette cut up the heavy steel coin racks in Doucette's yard with a cutting torch. Doucette knew a local salvage guy who came and took the steel from his yard.

In June 2007, I purchased all the equipment for the Thermolance set up that cut through BRINKS vault.

Only the cell phone jammer David Nassor picked up in Memphis, TN was taken to Ohio.  Murphy's 100 Watt cell phone jammer was at Doucette's house in a blue flight container on the weekend of January 17-18, 2009.

***

The FBI approached me to cooperate and I refused to speak with them.

Murphy requested that I testify on his behalf at trial and I told Murphy that if I was called as a witness I would invoke my Fifth Amendment rights.

*Declaration of Joseph M. Morgan* (ECF No. 188, PageID# 2730-33.)

"The Supreme Court has long recognized that due process is denied where '[the] state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured.'"  *Brooks v. Tennessee*, 626 F.3d 878, 894 (6th Cir. 2010) (citing *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)).  "To prevail on a claim that the government presented perjured testimony, [the petitioner] must show '(1) that the statements were actually false; (2) the statements made were material; and (3) [the] prosecution knew they were false.'"  *United States v. Pierce*, 62 F.3d 818, 834 (6th Cir. 1995) (citing *United States v.*

*Farley*, 2 F.3d 645, 655 (6th Cir. 1993)).  "A false statement is material under this standard, and '[a] new trial is required[,] if the false testimony could in any reasonable likelihood have affected the judgment of the jury.'" *Brooks*, 626 F.3d at 895 (citing *Giglio,* 405 U.S. at 154 (alterations and internal quotation marks omitted) (quoting *Napue v. Illinois*, 360 U.S. 264, 271 (1959). "This rule applies to both the solicitation of false testimony and the knowing acquiescence in false testimony." *United States v. Benton*, 64 F. App'x 914, 919, unpublished, 2003 WL 21085276 (6th Cir. 2003) (citing *Napue*, 360 U.S. at 269. "The burden is on the defendant[] to show that the testimony was actually perjured, and mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony." *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998) (quoting *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989)).  A witness commits perjury where he "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993) (citations omitted).  "The statement must be 'indisputably false,' instead of simply misleading." *United States v. Leman*, No. 10-10-GFVT, 2013 WL 1856123, at *3 (E.D. Ky. April 30, 2013) (citing *Byrd v. Collins,* 209 F.3d 486, 517–18 (6th Cir. 2000); *Akrawi v. Booker*, 572 F.3d 252, 265 (6th Cir. 2009)). Moreover, "[m]otions for a new trial based upon newly discovered evidence are disfavored and should be granted with caution." *United States v. Turns*, 198 F.3d 584, 586 (6th Cir. 2000) (citing *United States v. Seago*, 930 F.2d 482, 488 (6th Cir. 1991)).  "When a defendant makes a motion for a new trial based upon newly discovered evidence, he must show that (1) the evidence was discovered after the trial, (2) it could not have been discovered earlier with due diligence, (3) it is material and not merely cumulative or impeaching, and (4) it would likely

produce an acquittal if the case was retried." *Id.* (citing *Barlow*, 693 F.2d at 966).  Petitioner has failed to meet these standards here.

Where a witness asserts his Fifth Amendment privilege against self-incrimination and refuses to testify at trial, but later changes his mind and decides to testify on the defendant's behalf, the evidence does not constitute newly discovered evidence within the meaning of Rule 33.  *Turns,* at 586 (citing *United States v. Glover,* 21 F.3d 133 (6th Cir. 1994)).  "While [the witness]'s testimony may have been newly available, it was not in fact 'newly discovered evidence' within the meaning of Rule 33."  *Glover*, at 138.

> In so holding, this Court is in accord with other circuits that have addressed this issue. *See, e.g., United States v. Lockett*, 919 F.2d 585, 591 (9th Cir. 1990) ("[W]hen a defendant who has chosen not to testify comes forward to offer testimony exculpating a codefendant, the evidence is not 'newly discovered.' "); *United States v. DiBernardo,* 880 F.2d 1216, 1224–25 (11th Cir. 1989) (where defendants were "well aware" of witness' proposed testimony prior to trial, "the testimony cannot be deemed 'newly discovered evidence' within the meaning of Rule 33"); *United States v. Jacobs*, 475 F.2d 270, 286 n.33 (2d Cir.) ("a court must exercise great caution in considering evidence to be 'newly discovered' when it existed all along and was unavailable only because a codefendant, since convicted, had availed himself of his privilege not to testify"), cert. denied, 414 U.S. 821, 94 S.Ct. 116, 38 L.Ed.2d 53 (1973).

*Id*. at 138-139.

> For other cases reaching the same conclusion, *see Pierce*, 62 F.3d at 825 ("Evidence is not newly discovered when it is necessarily known by the defendant at the time of trial."); *United States v. Hawkins*, 969 F.2d 169, 175 (6th Cir. 1992) (holding that if a defendant knew about the evidence at the time of trial, he cannot satisfy the newly discovered evidence requirement of Rule 33); *Seago*, 930 F.2d at 489 (holding that evidence known by the defendant at the time of trial cannot constitute "newly discovered" evidence); *United States v. DiBernardo*, 880 F.2d 1216, 1224 (11th Cir. 1989) ("Here, both [defendants] were well aware of [the witness]'s proposed testimony prior to trial. Therefore, the

> testimony cannot be deemed 'newly discovered evidence' within the meaning of Rule 33.").

*Id.* at 138. *See also United States v. Lockett*, 919 F.2d 585, 591 (9th Cir. 1990) ("We agree. . . that "a court must exercise great caution in considering evidence to be 'newly discovered' when it existed all along and was unavailable only because a co-defendant, since convicted, had availed himself of his privilege not to testify.") (citing *United States v. Jacobs*, 475 F.2d 270, 286 n. 33 (2d Cir.), *cert. denied sub nom. Lavelle v. United States,* 414 U.S. 821 (1973)).  Thus, the *Declaration of Joseph M. Morgan* does not constitute newly discovered evidence justifying a new trial.

Similarly, this Court is not persuaded that the "mapquest" document, or Comfort Inn hotel records constitute newly discovered evidence that Petitioner could not have obtained earlier.  Petitioner, himself, knew the location of the hotel where he claims to have spent the night after commission of the offense, the name under which the defendants registered the room, the location of the Pennsylvania storage facility they used, and the location of any purported Ohio storage facility.  Petitioner therefore had access to the all of the pertinent information he needed to require documentation or records to support his claim that the defendants stored proceeds of the burglary in Ohio, and spent the night at a Comfort Inn in Pennsylvania under an assumed name.  Petitioner likewise had the information he needed to obtain documents to establish the proximity of the hotel to the Pennsylvania storage facility.  Petitioner's claim that he was "surprised" by Doucette's testimony, and prevented from earlier obtaining such documents on this basis or only because his attorney told the defense investigator to cease investigations shortly before the trial is disingenuous, at best.

Phillips' *Activity Log* indicates that Phillips spent hours interviewing Morgan and consulting with Petitioner and his attorney in this case.  (ECF No. 207, PageID# 2841.)  Nothing

prevented Petitioner from providing Phillips, or defense counsel, with the information that would have enabled Phillips to obtain the documents Petitioner now submits in support of his claim prior to trial. Further, it does not appear from the record that Petitioner ever notified the Court that he needed additional time to obtain evidence for the defense.

Further, despite Petitioner's arguments to the contrary, this Court is not persuaded that any of the evidence Petitioner refers to, or any of Petitioner's claimed instances of perjury by Doucette, lends credibility to his claim that he is innocent of the crimes charged or constitutes material evidence of an exculpatory nature that likely would have produced an acquittal. Records indicating that a person by the name of William Palavacini stayed at the Comfort Inn in Pennsylvania on the night of January 18, 2009, and documentation reflecting that the hotel was located near a storage facility used by the defendants, or that a person by the name of George Bogart rented a storage unit from "webselfstorage" on January 23, 2009, does nothing to call into question the substantial evidence indicating that Petitioner did conspire to and plan and burglarize Brinks, and transport the proceeds of the burglary across state lines. Doucette has not recanted his trial testimony,[12] and neither the *Declaration of Anthony Moschopoulos* indicating that Doucette stated that he regretted lying, or the *Declaration of Joseph M. Morgan*, constitute the type of material reliable evidence sufficient to justify a new trial, particularly in view of the substantial evidence of guilt. At most, such evidence constitutes impeachment evidence.

Nothing in the record supports Petitioner's claim that Doucette lied when testifying against Petitioner. To the contrary, Doucette's testimony was corroborated by other evidence

---

[12] *See United States v. Coker*, 23 F. App'x 411, 412, unpublished, 2001 WL 1450692 (6th Cir. Nov. 2, 2001) ("[W]hen the motion for a new trial is based on the recantation of a material government witness, the motion should be granted only if: 1) the court is reasonably well satisfied that the trial testimony given by the material witness is false; 2) without the false testimony, the jury might have reached a different conclusion; and 3) the party seeking the new trial was taken by surprise when the false testimony was given, and was unable to meet it or did not know of its falsity until after the trial.") (citing *United States v. Willis*, 257 F.3d 636, 642–43 (6th Cir. 2001)).

submitted at trial.  In any event, virtually all of Petitioner's claimed instances of perjury by Doucette simply do not involve material facts in regard to Petitioner's guilt.  For example, the date on which Nassor conducted surveillance of the Brinks facility; whether or not the defendants returned to the scene of the crime after making their escape; the manner in which the proceeds were divided; how long Doucette was awake the weekend of the crime; whether Doucette was under the influence of drugs or could recall the use of a ladder during the crime; whether Doucette could recall the model of the vehicle they rented; the date on which the defendants delivered the criminal storage tools to Pennsylvania; the means by which Doucette and Morgan gained entry into the Pennsylvania facility after Petitioner's arrest – none of these issues affect the determination of Petitioner's guilt.  While these issues may have gone to the issue of Doucette's credibility, each involves issues for which Doucette was subject to cross-examination at trial.

In short, the record fails to support Petitioner's claim that Doucette committed material perjury, that the prosecution knowingly presented perjured testimony, or that newly discovered evidence establishes Petitioner's innocence or justifies a new trial or will warrant habeas corpus relief.

## Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255

### Standard of Review

To obtain relief under 28 U.S.C. § 2255, a defendant must establish the denial of a substantive right or defect in the trial that is inconsistent with the rudimentary demands of fair procedure.  *United States v. Timmreck*, 441 U.S. 780 (1979); *United States v. Ferguson*, 918 F.2d 627, 630 (6th Cir. 1990) (*per curiam*).  Relief under 28 U.S.C. § 2255 is available when a federal sentence was imposed in violation of the Constitution or laws of the United States or the trial

court was without jurisdiction or the sentence is in excess of the maximum sentence allowed by law, or is "otherwise subject to collateral attack." *United States v. Jalili*, 925 F.2d 889, 893 (6th Cir. 1991). Apart from constitutional error, the question is "whether the claimed error was a 'fundamental defect which inherently results in a complete miscarriage of justice,'" *Davis v. United States,* 417 U.S. 333, 346 (1974) (quoting *Hill v. United States*, 368 U.S. 424, 428–429 (1962); *see also Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2006). Nonconstitutional claims not raised at trial or on direct appeal are waived for collateral review except where the errors amount to something akin to a denial of due process.

It is well-established that a § 2255 motion "is not a substitute for a direct appeal." *Ray v. United States,* 721 F.3d 758, 761 (6th Cir. 2013) (quoting *Regalado v. United States*, 334 F.3d 520, 528 (6th Cir. 2003) (citing *United States v. Frady*, 456 U.S. 152, 167–68 (1982)). Accordingly, claims that could have been raised on direct appeal, but were not, will not be entertained via a motion under § 2255 unless the petitioner shows: (1) cause and actual prejudice to excuse his failure to raise the claims previously; or (2) that he is "actually innocent" of the crime. *Ray,* 721 F.3d at 761 (citing *Bousley v. United States*, 523 U.S. 614, 622 (1998) (internal citations omitted).

## Claim Five

In claim five, Petitioner asserts that the prosecution violated *Brady v*. Maryland, 373 U.S. 83 (1963) by failing to disclose material exculpatory information to the defense. Specifically, Petitioner asserts that the government failed to disclose the recorded statement of Robert Doucette; a video recording taken from the business next door to Brinks; and "the picture of the smaller hole in vault prior to the hole being enlarged by the fire department." (ECF No. 184-1,

PageID# 2705.). However, the Court of Appeals for the Sixth Circuit has already rejected this

claim:

> Murphy argues that the government violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to produce the following pieces of exculpatory evidence: (1) the recorded statement of Robert Doucette, (2) video taken from a neighboring business's security camera the night of the heist, (3) a picture of a smaller hole in the side of the Brink's vault, before the fire department enlarged the hole, and (4) information regarding DNA test results obtained from the cigarette butts and empty drink containers discovered at the scene of the heist.

> "[T]he suppression . . . of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." *Brady*, 373 U.S. at 87, 83 S.Ct. 1194. "*Brady* also applies to the nondisclosure of evidence affecting the credibility of a witness whose 'reliability . . . may . . . be determinative of guilt or innocence.' " *United States v. Blood*, 435 F.3d 612, 627 (6th Cir. 2006) (quoting *Giglio v. United States*, 405 U.S. 150, 153–54, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)). Reversal is required only "where there is a reasonable probability that, had the evidence been disclosed, the result of the trial would have been different." *United States v. Bencs*, 28 F.3d 555, 560 (6th Cir. 1994). Because Murphy did not object to these issues below, we review his claims for plain error. *Blood*, 435 F.3d at 627–28.

> Murphy argues that the government violated *Brady* by not turning over a video-taped statement of Doucette, the only witness who testified that Murphy was at the scene of the heist. Murphy does not explain why the video-taped statement of Doucette would have been exculpatory or changed the outcome of the trial. Murphy cross-examined Doucette extensively over two days on a wide range of topics, including his proffer with Agent Costello. Given the substantial evidence presented against Murphy, it is unlikely that production of Doucette's taped statement would have altered the outcome of the trial.

> Murphy also argues that a video from a business neighboring the Brink's facility was not provided to him. Again, Murphy does not explain how this video would have been exculpatory or why it would have changed the outcome of the trial. Doucette testified that Murphy and his co-conspirators covered the truck with a large tarp prior to pulling up to the Brink's warehouse, with only a small hole cut in the front of the cover for the driver to see the road. It is

therefore unlikely that a security video from a nearby business would have revealed information exonerating Murphy.

Murphy contends that the government should have disclosed pictures of a smaller hole in the Brink's vault, rather than pictures of the vault with a larger hole in the side created after the fire department enlarged the hole to put out the fire. Murphy argues that a picture of the smaller hole would have allowed him to establish that the intended loss was less than the $92,000,000 that was in the vault at the time of the robbery. However, Murphy made this argument at his sentencing and the court acknowledged it, reducing the intended loss by half from $92,000,000 to $46,000,000. Thus, no error was committed.

Lastly, Murphy argues that information regarding another individual's DNA found at the scene of the crime was disclosed to him on the day of the trial, thereby prejudicing his case as he was unable to fully investigate the individual identified by the DNA. "Brady generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose," and a "[d]elay only violates *Brady* when the delay itself causes prejudice." *Bencs*, 28 F.3d at 560–61 (citations and internal quotation marks omitted). The DNA discovered on one cigarette butt found at the crime scene matched the DNA of a homeless individual named Anthony L. Woods. This match was discovered a few weeks before Murphy's trial and was promptly disclosed to Murphy. Because the information regarding Woods was promptly disclosed to Murphy before his trial, no *Brady* violation occurred.

Murphy has not demonstrated that any of the information he seeks would have changed the outcome of his trial given the substantial evidence against him. For this reason, we deny Murphy's *Brady* claims.

*United States v. Murphy*, 518 F. App'x 402-03. This Court therefore will not again consider this claim here. *See Cooper v. United States*, No. 2:03-cv-479; 2:99-cr-061, 2007 WL 2110493, at *9 (S.D. Ohio July 16, 2007) (citing *Jones v. United States,* 178 F.3d 790, 796 (6th Cir. 1999) (citing *Oliver v. United States*, 90 F.3d 177, 180 (6th Cir. 1996) and *Davis v. United States*, 417 U.S. 333, 345 (1974); *DuPont v. United States*, 76 F.3d 108, 110 (6th Cir. 1996)).

### Ineffective Assistance of Counsel

Petitioner asserts that he was denied the effective assistance of counsel, because approximately two weeks prior to the start of trial, his attorney instructed defense investigator Gary Phillips to cease investigations on the case.  Petitioner states that he did not learn that Phillips had discontinued his investigations until October 16, 2011, on the eve of opening statements.  According to Petitioner, had counsel not instructed Phillips to cease investigation, Petitioner would have been able to obtain proof that Doucette lied.  (PageID# 2704.)  Petitioner also complains that counsel urged him to enter a guilty plea.  He states that he did not learn until after the start of trial that his attorney had failed to subpoena requested defense witnesses.  "Even though the Government stipulated to certain facts that Murphy was seeking from his defense witnesses, there were other 'key' areas that Murphy wanted to elicit testimony and he was thus prevented from doing so[.]"  (ECF No. 184-1, PageID# 2703.)  Petitioner asserts that his attorney improperly failed to obtain a copy of Robert Doucette's recorded statement.[13]

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel.  *See Strickland v. Washington*, 466 U.S. 668, 686 (1984).  To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate both that counsel's performance was deficient, or that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed" by the Sixth Amendment, and that this deficient performance prejudiced the petitioner.  *Id*. at 687. This showing requires that defense counsel's errors were so serious as to deprive the defendant of a fair and reliable trial. *Id.*

---

[13] Petitioner asserts in passing that his attorney "went behind [his] back and told the Judge, prosecutor and FBI that Murphy was communicating with government witness David Nassor, then devised a plan on how the government could gain possession of the correspondence."  (PageID# 2703.)  However, Petitioner provides no further specificity regarding this claim, and the record does not support a claim of the denial of the effective assistance of counsel on this basis.

"Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 599 U.S. 356, 371 (2010). Given the difficulties inherent in determining whether an attorney's performance was constitutionally deficient, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. . . ." *Strickland*, 466 U.S. at 689. Nevertheless, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. A petitioner, therefore, must show prejudice in order to prevail on a claim of ineffective assistance of counsel. *Id.* at 692.

In order to establish prejudice, a petitioner must demonstrate that a reasonable probability exists that, but for counsel's errors, the result of the proceedings would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Because a petitioner must satisfy both prongs of *Strickland* to demonstrate ineffective assistance of counsel, should a court determine that the petitioner has failed to satisfy one prong, it need not consider the other. *Id.* at 697.

On July 5, 2011, the Court appointed Attorney Graeff on Petitioner's behalf. (ECF No. 71.) Graeff represented Petitioner during pre-trial proceedings and *voir dire*, until October 17, when the Court granted Petitioner's *Motion to Proceed Pro Se*. (ECF Nos. 126, 127.)[14] Petitioner exercised his right of self representation until the conclusion of trial with Graeff acting as stand-by counsel. Graeff again represented Petitioner at sentencing. (ECF No. 207, PageID# 2835.)

Attorney Graeff has responded to Petitioner's allegations as follows:

---

[14] Petitioner stated that he wanted to represent himself with Attorney Graeff acting as stand-by counsel, because he had learned that his attorney had instructed Phillips to cease investigations on the case, and because his attorney had determined that he would not be calling certain defense witnesses. Petitioner also complained that counsel had advised him to enter a guilty plea. *Transcript* (ECF No. 159, PageID# 979-80.)

Regarding the allegation dealing with investigation by Gary Phillips, said investigation continued up to the eve of trial and actually during the trial itself.

Exhibit 1 reflects the investigation by Gary Phillips. On October 31, 2011, I sent the fee application to the Financial Technician. Under 13, it states "Investigation for Sean Murphy." Under Activity Log towards the end of the time sheet, it notes that throughout the month of October 2011, Gary Phillips spent a number of hours on investigation on behalf of Sean Murphy. At the end of the time sheet, it reflects Gary Phillips' actual attendance at the trial, i.e., October 24th and October 25th, 2011.

Affiant does recollect certain requests in which Affiant ordered the Investigator not to proceed, during the Pre-trial proceedings. An example is Mr. Murphy wanted Gary Phillips to post a notice in various colleges and universities throughout the Central Ohio area. Affiant instructed Gary Phillips not to post the exhibit reflected (Exhibit 2.)

The notation "No" is this counsel's handwriting and it was placed there during the course of the Pre-trial proceedings.

It is my recollection that Sean Murphy also ordered Gary Phillips to send a letter to a Co-Defendant at the Delaware County Jail who was to testify against him in the trial. The letter was sealed and the return address was a fictitious one. I instructed Gary Phillips not to send this letter. (The letter was delivered, but through proper means.)

Perhaps, this is what Mr. Murphy recollects when he alleges that I stopped the investigation two weeks before trial.

It should be noted that Mr. Murphy conducted an enormous amount of investigation on his own years before the beginning of the trial. Affiant conducted a significant amount of investigation, along with Gary Phillips.

The second allegation is that I never received a taped statement of Robert Doucette, said statement reflecting his cooperation in June 2009.

Along with a significant amount of discovery, I state that I received the disc reflecting Robert's said statement, reviewed it before trial, and said disc is reflected in Exhibit 3.[15]

I do recollect a situation during the course of trial when I acted as standby counsel.  Mr. Murphy was cross-examining a witness and he came up at the counsel table, as he often did during the course of trial, and asked me if I had the Doucette tape.  I said "no," because, at the time of the trial, I did not have the Doucette tape at counsel's table, since the enormous amount of discovery was located in my office.

It has been years, but I do recollect reviewing the Doucette June 2009 statement and remember that Mr. Doucette basically reflected what he testified to at the time of trial.

*Affidavit of David J. Graeff* (ECF No. 207, PageID# 2835-37.).  An *Activity Log* attached to the *Affidavit* indicates that Phillips spent a total of 55 hours on the case, from August 31, 2011, to October 24, and 25, 2011, when Phillips attended trial.  (ECF No. 207, PageID# 2841.)  Phillips spent 8 hours reviewing discovery in the case, from August 31, 2011 to September 7, 2011.  On September 8, 2011, Phillips spent .75 hours in "Att interview with Morgan."  On September 9, 2011, Phillips spent .25 hours on a "Ltr to Chief Barrett, FCSO."  On September 10, 2011, Phillips spent two hours interviewing Joe Morgan.  On September 13, 2011, Phillips spent 4.5 hours running a computer search, "Doucett Tvl to jail, meet with client and attorney."  On September 14, 2011, Phillips spent 4.50 hours interviewing Don Morgan, preparing summaries, and reviewing discovery.  On September 23, 2011, Phillips spent 6.50 hours attending court, meeting with the attorney, and reviewing "video cd."[16]  On October 7, 2011, Phillips spent 2 hours meeting with the attorney for case review.  On October 11, 2011, Phillips spent 2.5 hours on "T/c with atty. Computer searches."  Phillips also met with Petitioner on October 17, 2011

---

[15] What appears to be a photocopy of a DVD of Robert Doucette's June 4, 2009, statement is attached as Exhibit 3 to the *Affidavit.*  (ECF No. 207, PageID# 2844.)

[16] The Court is unable to determine from the record, but it would appear that the "video cd" refers to Doucette's recorded statement.

(the date that the Court granted Petitioner's request for self representation) and thereafter, and conducted additional investigation during that time.  On October 17, 2011, Phillips spent 3.25 hours attending court and meeting with petitioner and his attorney.  On October 18, 2011, Phillips spent 4.75 hours attending court, preparing and filing subpoenas, conducting "mapquest" searches, and computer research.  On October 19, 2011, Phillips spent 4 hours on "t/c with atty. Case assistance with clt & atty."  On October 20, 2011, Phillips spent 4 hours researching receipts and following up on Petitioner's requests.  On October 21, 2011, Phillips spent .50 hours on "t/c with atty."  *Activity Log* (ECF No. 207, PageID# 2841.)  Hand written documents attached to Graeff's *Affidavit* also appear to indicate that Petitioner had requested notices to be posted at various local colleges and universities asking for individuals to attend his trial and to start a "Twitter Blog" on his behalf.  (PageID# 2842.)

Petitioner asserts that, but for the improper actions of defense counsel in directing Phillips to cease investigations in the case, Phillips would have been able to locate a storage facility in Eastern Ohio as well as rental records indicating that the storage facility had been rented by a person under the name of Brian Hetherman, an alias used by Petitioner.[17]  Petitioner argues that such evidence would have established that Doucette lied about what the defendants did with the proceeds of the robbery, and that Petitioner was not guilty of the crimes charged because the stolen goods did not cross state lines until after his arrest.  *Petitioner's Reply to Government's Response to § 2255 Petition and Motion for New Trial* (ECF No. 211, PageID# 2853-54.)

Phillips testified that he interviewed co-defendant Joseph Morgan regarding details surrounding the Brink's burglary and the weekend of January 17-18, 2009.  *Transcript* (ECF No.

---

[17] Evidence indicated that Petitioner rented a Budget rental truck from New Market Storage in New Market, New Hampshire, with a pick-up date of January 16, 2009, under the name of Brian Hetherman.  *Transcript* (ECF No. 159-1, PageID# 1316-17.)

160-2, PageID# 2043.)   Phillips attempted to corroborate the information he obtained from Morgan.  (*Id*.)  This included attempting to track down various receipts for items used in the crime.  (*Id*.)  Phillips also investigated the purchase of a Milwaukee electromagnetic drill, but he did not verify the purchase, at the instruction of defense counsel.  (PageID# 2045.)  When Petitioner took over control of his case, Petitioner requested Phillips to conduct some follow-up. Petitioner instructed Phillips to investigate the purchase of a thermal rod hose, handle and thermal rods.  (*Id*.)  Phillips located the business where the items had been purchased and obtained a copy of the receipt.  (PageID# 2046.)  The receipt referred to a company as the purchaser.  (PageID# 2048.)  Petitioner also instructed Phillips to investigate the purchase of a 28 foot RV cover.  Phillips did not locate the business where the cover had been purchased, as Mr. Graeff had asked him to withhold additional efforts in that regard.  (PageID# 2048.)  Phillips did not attempt to locate the UHaul truck that had transported money from the Brink's robbery, as he was advised to hold investigation until Petitioner took over the case.  (PageID# 2049-50.)  He did not locate a storage bin rented in the city of Lynn at a U-Haul storage facility sometime in the week following January 23rd for the same reason.  (PageID# 2050.)  Petitioner had asked Phillips to attempt to locate a storage bin in Eastern Ohio that would have been rented on January 17th within one hour of the Ohio-Pennsylvania border, but the request was so overbroad that Phillips did not have time to identify possibilities.  (PageID# 2051.)  Phillips determined that the distance between the Ohio-Pennsylvania border and Columbus varied between 120 miles to 100 to 200 miles.  (PageID# 2051.)  The mileage on the rental car would be consistent with the rental car going from the Ohio-Pennsylvania border, back to the Columbus area and then back.  (PageID# 2052.)

Again, nothing in the record supports Petitioner's claim that Phillips could have obtained evidence indicating that Doucette lied, or that Phillips could have obtained any information exculpatory to the defense but for the actions of defense counsel.  Phillips did not indicate that Petitioner ever requested him to obtain records from the Comfort Inn regarding the names of guests who stayed at the hotel on the night of January 18, 2009.  In fact, Phillips stated that Petitioner failed to provide him with adequate information to identify the location of any Eastern Ohio storage facility.  The record likewise does not indicate that Petitioner provided Phillips with necessary information to obtain records that would purportedly show that Petitioner rented an Ohio storage unit for storage of the proceeds of the Brinks burglary.  Again, Petitioner, himself, had knowledge of the facts that would have enabled Phillips to acquire such information from the outset of Phillips' investigation of the case.  Moreover, as discussed, even had Petitioner obtained such information, it would have provided him with no more than potential impeachment evidence.  It would not, as he argues, have established that he did not conspire to or transport proceeds of the burglary across state lines.  Petitioner has failed to establish the denial of the effective assistance of counsel under *Strickland* in relation to his attorney's interaction with the defense investigator.

Petitioner's claim that his attorney performed in a constitutionally ineffective manner by failing to subpoena defense witnesses likewise fails.  The record reflects that, on October 18, 2011, mid-trial, Petitioner advised the Court that he wanted to call Tina Ankrom, United States Probation Officer, as a defense witness to testify regarding statements made to her by one of the co-defendants.  (ECF No. 159-1, PageID# 1348.)  The Court denied the request, because such testimony would have been inadmissible.  (*Id*.)  Petitioner also indicated that he wanted to call Henry Wojewodzic, a police officer from the Lynn Police Department, to testify that he observed

Petitioner in Massachusetts on the date of January 16, 2009.  The prosecutor agreed to stipulate that Petitioner remained in Massachusetts on that date, at least until the time of the truck rental.  (PageID# 1349.)  Petitioner agreed to such stipulation in lieu of calling Wojewodzic as a defense witness.  (*Id*.)  Petitioner stated that he wanted to call his daughter, Shannon Murphy, for the same purpose.  The prosecutor again agreed to stipulate to the fact that Petitioner remained in Lynn, Massachusetts at the time that the rental truck was rented from Newmarket in New Hampshire, and Petitioner agreed to such stipulation in lieu of calling Murphy as a defense witness.  (PageID# 1349-50.)  Petitioner indicated that he wanted to call his daughter's boyfriend, Dylan Holmes, to testify that Petitioner was in the greater Boston area on the morning of January 16.  The prosecutor stated, "[t]he record reflects that this vehicle was rented at 10:30 in the morning at Newmarket, New Hampshire under the name of Brian Hetherman with his signature[.]"  (PageID# 1350-51.)  Petitioner agreed to stipulate that he and his company had rented the vehicle.  (PageID# 1351.)  Petitioner indicated that he wanted to call John Fleury of Lynn, Massachusetts, to testify as to conversations he had had with prosecution witness Nassor.  The Court ruled that any such testimony would constitute inadmissible hearsay.  (*Id*.)  The only other person Petitioner indicated that he wanted to call as a defense witness was the defense investigator, who testified as a defense witness at trial.  (PageID# 1351.)

Petitioner now asserts that unnamed defense witnesses also would have testified "to what they observed when the crew returned from Ohio and conversations amongst the co-conspirators during the span of the conspiracy.  This testimony would also have contributed to proving Doucette committed perjury in material areas[.]"  *Reply to Response to Motion to Vacate* (ECF No. 211, PageID# 2864.)  However, the record fails to support Petitioner's claim that any potential defense witness would have provided exculpatory evidence for the defense.

"[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim."  *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) (footnotes omitted).

Significantly, Petitioner chose to exercise his right of self representation.  He agreed to certain stipulations in lieu of calling defense witnesses.  He cannot, therefore, now complain, that he thereby was denied the effective assistance of counsel.  "[A] defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.'"  *Faretta v. California*, 422 U.S. 806, 834 n.46 (1975).  Further, any failure by stand-by counsel " 'is an incidental effect of [defendant's decision to proceed pro se], and not the basis of an ineffective assistance of counsel claim.'"  *Brooks v. United States*, No. 1:08-CR-141, 2012 WL 3075129, at *2 (N.D. Ohio July 28, 2012) (citing *Holmes v. United States*, 281 F. App'x. 475, 480 (6th Cir. 2008)).  As to the counsel's conduct before Petitioner proceeded *pro se*, Petitioner's decision to represent himself makes it "virtually impossible to apply the *Strickland* test; the outcome of the cases depended on both counsel and [Petitioner's] conducts." *Id*. (citing *Wilson v. Parker*, 515 F.3d 682, 699 (6th Cir. 2008)).

Similarly, the record does not support Petitioner's claim that his attorney failed to obtain the recorded statement of Robert Doucette.  Nonetheless, Petitioner claims that Doucette's recorded statement would have provided him with evidence to prove that Doucette lied.  Again, the record fails to support this claim.  Further, it would have been Petitioner's responsibility, acting as his own attorney, to obtain and review discovery material.  Since Petitioner chose to

represent himself at trial, his claim that his attorney performed in a constitutionally ineffective manner in this regard fails. *Faretta,* 422 U.S. at 834 n.46.

The Court notes that an attorney does not perform in a constitutionally ineffective manner by urging his client to plead guilty in light of overwhelming evidence of guilt, or when it is the opinion of the attorney that entry of a guilty plea would be in the best interest of his client. Indeed, this is a function of an attorney representing a criminal defendant, and the failure to do so would be an abrogation of one of the duties of defense counsel. *See, e.g., Smith v. United States*, 348 F.3d 545, 553 (6th Cir. 2003) (an "attorney may provide an opinion on the strength of the government's case, the likelihood of a successful defense, and the wisdom of a chosen course of action," however, "the ultimate decision of whether to go to trial must be made by the person who will bear the ultimate consequence of a conviction.") Petitioner elected his right to proceed to jury trial, and chose to exercise his right to self-representation in this case.

Petitioner has failed to establish the denial of the effective assistance of counsel.

### Actual Innocence

As discussed, the record does not support Petitioner's claim of actual innocence. In any event, to the extent that Petitioner raises an independent claim of actual innocence, it does not provide him the relief he seeks. "Freestanding claims of actual innocence are [ ] not cognizable on federal habeas review[.]" *Boes v. Warren*, No. 2013 WL 5499918 (E.D. Mich. Oct. 3, 2013) (citing *Herrera v. Collins*, 506 U.S. 390, 400 (1993); *McQuiggin v. Perkins*, -- U.S. --, --, 133 S.Ct. 1924, 1931 (2013); *Cress v. Palmer*, 484 F.3d 844, 854-55 (6th Cir. 2007)).

### Cumulative Error

Petitioner asserts that cumulative error warrants relief. The record, however, fails to support any of his claims of alleged error. This claim therefore likewise fails.

## Recommended Disposition

Therefore, the Magistrate Judge **RECOMMENDS** that the *Motion to Vacate 2255 under 28 U.S.C. 2255* (ECF No. 184) and *Motion for New Trial* (ECF No. 185) be **DENIED** and that this action be **DISMISSED.**

## Procedure on Objections

If any party objects to this *Report and Recommendation*, that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b) (1).

The parties are specifically advised that failure to object to the *Report and Recommendati*on will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

_s/ Elizabeth A. Preston Deavers_
Elizabeth A. Preston Deavers
United States Magistrate Judge

Date:  May 11, 2016